IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PERIMETRAL ORIENTAL DE BOGOTÁ,
S.A.S.,
                          *Petitioner*,

        v.                                        Civil Action No. _____

AGENCIA NACIONAL DE
INFRAESTRUCTURA
and
THE REPUBLIC OF COLOMBIA
                          *Respondents*.

## **Petition to Confirm Arbitral Award**

1.      Petitioner Perimetral Oriental de Bogotá, S.A.S. ("POB") brings this action to enforce an arbitral award (the "Award") issued on December 18, 2024, as clarified in the tribunal's decision on March 7, 2025 ("Clarification") in *Perimetral Oriental de Bogotá, S.A.S. and Shikun & Binui VT AG, v. Agencia Nacional de Infraestructura*, International Centre for Dispute Resolution ("ICDR") Case No. 01-20-0015-3123 against Respondents, the Agencia Nacional de Infraestructura ("ANI"), an arm of the Government of the Republic of Colombia, and the Republic of Colombia ("Colombia") (together with POB, the "Parties"), following arbitration proceedings seated in Bogotá, Colombia and conducted pursuant to the arbitration agreement in the concession contract concluded by the Parties on September 8, 2014 (the "Contract").

2.      A copy of the Award in the original Spanish, along with an English translation of the same, is attached as Exhibit 1 to the Declaration of Jason W. Myatt ("Myatt Declaration").[1]  A

---

[1]     Citations and references to Exhibit 1 are to the page numbers in the certified English translation.  References to "Exhibit" or "Ex." herein shall refer to the Exhibits attached to the Declaration of Jason W. Myatt filed contemporaneously with this Petition.

copy of the Clarification of the Award in the original Spanish, along with an English translation of the same, is attached as Exhibit 2.

3.      Pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "New York Convention") and its implementing legislation, the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 201–08, POB requests that this Court enforce the Award and enter judgment in POB's favor in the amount of the Award, including pre- and post-award interest until full payment of the Award.

## PARTIES

4.      Petitioner POB is a company constituted and registered under the laws of the Republic of Colombia ("Colombia").

5.      Respondent Agencia Nacional de Infraestructura is an arm of the Executive Branch of the Government of the Republic of Colombia, responsible for the development of the country's national infrastructure, with offices at Calle 24A # 59–42 Building T3 Tower 4 Floor 2, Bogotá, D.C., Colombia.  As set out below, ANI is one and the same as Colombia and is thus a foreign sovereign under the Foreign Sovereign Immunities Act ("FSIA") 28 U.S.C. § 1603(a).

6.      Respondent Republic of Colombia is a foreign sovereign within the meaning of the FSIA, 28 U.S.C. §§ 1330, 1332, 1391(f), 1602–11, which at all relevant times operated through ANI, an arm of the Executive Branch of the Colombian State, in its dealings with Petitioner POB.

## JURISDICTION AND VENUE

7.      This Court has subject-matter jurisdiction over this action pursuant to the FSIA, 28 U.S.C. § 1330(a), because this is a "nonjury civil action against a foreign state" on a claim "with respect to which the foreign state is not entitled to immunity from jurisdiction" under the FSIA, 28 U.S.C. § 1605(a)(1), (6).

8.      Pursuant to Section 1605(a)(1) of the FSIA and the "implied waiver exception," Colombia is not entitled to immunity from jurisdiction because this is a proceeding to confirm an arbitral award pursuant to the New York Convention, and Colombia implicitly waived its immunity from jurisdiction over such proceedings by agreeing to that Convention.  *See Tatneft v. Ukraine*, 771 F. App'x 9, 9-10 (D.C. Cir. 2019) (per curiam) (holding that a state waived its sovereign immunity from arbitration-enforcement actions in other signatory states by signing the New York Convention); *M.B.L. Intern. Contractors, Inc. v. Rep. of Trinidad and Tobago*, 725 F. Supp. 52, 55-56 (D.D.C. 1989) (same).

9.      In addition, pursuant to Section 1605(a)(6) of the FSIA, and the "arbitration exception," Colombia is not entitled to immunity from jurisdiction over this action because this is an action to confirm an arbitral award that is governed by the New York Convention, a treaty in force in the United States for the recognition and enforcement of arbitral awards.  *See von Pezold v. Republic of Zimbabwe,* No. 23-7109, 2024 WL 4763943, at *1-2 (D.C. Cir. Nov. 13, 2024) (holding that, under the arbitration exception, district courts have jurisdiction over foreign states in actions to confirm arbitral awards governed by treaties to which the United States is a party).

10.     As described below, ANI is one and the same as Colombia and is thus a foreign sovereign subject to this Court's jurisdiction and not entitled to immunity for the same reasons as Colombia.

11.     This Court also has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because, as a "proceeding falling under the [New York] Convention," it is "deemed" "to arise under the laws and treaties of the United States."  9 U.S.C. § 203.

12.     This Court has personal jurisdiction over Colombia pursuant to the FSIA. 28 U.S.C. § 1330(b).

13.    Venue is proper in this Court pursuant to 9 U.S.C. § 204 and 28 U.S.C. § 1391(f)(4).

## FACTUAL BACKGROUND

### A.    The Agreement to Arbitrate

14.    The Parties' agreement to arbitrate is set out at Section 15.3 of the Contract under the PPP Scheme No. 002, which the Parties executed on September 8, 2014.  Ex. 1, ¶ 7.

15.    Section 15.3 of the Contract provides that "[a]ny dispute arising between the Parties in connection with this Contract shall be resolved by an International Arbitral Tribunal."  Ex. 3, at 459-60.[2]  It further provides that (i) any such arbitration is to be administered by the U.S.-based International Centre for Dispute Resolution ("ICDR"), a division of the American Arbitration Association, (ii) in accordance with the ICDR's International Arbitration Rules, (iii) the applicable law to the Contract and the procedural rules of law applicable to the arbitration is Colombian law, (iv) the seat of arbitration is Bogotá, Colombia, and (v) the language of the arbitration is Spanish.  *Id.* at 460.

### B.    The Underlying Dispute

16.    The Colombian State is the owner of the national road network in Colombia, and "is primarily responsible for its construction, rehabilitation and maintenance."  Ex. 1, ¶ 73.  To fulfill Colombia's legal obligations with respect to infrastructure, which are established by Presidential Decree, the State "has the power to enter into concession agreements for private parties to carry out these tasks, under the terms and conditions provided for by the law and in the agreement."  *Id.* ¶ 73.  In 2011, ANI was created by Law Decree as the means by which the

---

[2]    References to exhibits originally in a language other than English refer to the English translation thereof.  All pincites refer to the PDF page numbering.

Executive Branch of the Colombian State would, on behalf of the State, enter into such public-private partnerships.  Ex. 4, at 54.[3]

17.    Exercising this Executive power of the Colombian State, in October and November 2013, ANI ordered the opening of a selection process for the design, construction, operation, financing and hand-back of the Eastern Perimetral Highway of Cundinamarca (the "Project"), which consisted of "the rehabilitation and improvement of an existing road corridor, plus the construction of an additional road, in the east of Bogotá D.C."  Ex. 1, ¶¶ 74-75.  The Project was to have a total length of approximately 153 kilometers, divided into five Functional Units ("UFs"). *Id.* ¶ 75.

18.    On October 29, 2013, ANI officially opened the tender for the Project (the "Tender").  *Id.* ¶ 76.  On July 23, 2014, ANI selected an offer submitted by a joint venture supported by Shikun & Binui VT AG ("S&B"), C.I. Grodco en C.A., Ingenieros Civiles, and Colombiana de Inversiones de Infraestructura S.A.S. (together "Plural Structure S&B") as the winner of the Tender.  *Id.* ¶¶ 78-80.  In accordance with the Tender specifications, the companies comprising the Plural Structure S&B, as shareholders, incorporated Petitioner POB on August 20, 2014.  *Id.* ¶ 81.

19.    ANI and POB signed the Contract on September 8, 2014.  *Id.* ¶ 82.  POB's remuneration under the Contract had three components: ANI contributions, toll collection, and commercial exploitation income, with approximately 58% of POB's revenue tied to work performed in areas designated UFs 4 and 5.  *Id.* ¶¶ 86-87.

20.    Under the Contract, the parties were exempted from liability for delay in the performance of their obligations when certain events ("Exculpatory Events of Liability" or

---

[3]    A Law Decree is a Decree issued by the President of Colombia pursuant to authorization from the Colombian Congress and has the effect of law.

"EERs")—occur.  Section 14.2(b) of the Contract defines these Exculpatory Events of Liability as "any event[,] circumstance or combination of events or circumstances beyond the reasonable control of the Party invoking it, which materially and adversely affects the performance of the obligations under the Contract, in respect of which it is invoked, after having taken all reasonably possible actions to avoid it."  Ex. 3, at 442; *see also* Ex. 1, ¶ 339.

21.    The effects of an Exculpatory Event of Liability were set out at Section 14.2(a) of the Contract, as follows:

> The Parties shall be relieved of all liability for any delay in the performance of the obligations under the Contract, when upon due verification it is concluded by agreement of the Parties or, failing such agreement, by the Amicable [Arbitrator], that the delay is the result of facts that may be defined as an [Exculpatory Event of Liability] under the terms of this Section 14.2.  Delay in the performance of any subcontractor shall not in itself be deemed [an Exculpatory Event of Liability], unless the existence of such Circumstance is itself the result of an [Exculpatory Event of Liability].

Ex. 3, at 442; *see also* Ex. 1, ¶ 340.

22.    During the construction phase of the Project, POB identified (i) 66 freshwater springs that were impacted by the route of UFs 4 and 5, and (ii) 5 archaeological sites found along the route of UF 2.  Ex. 1, ¶¶ 96-98, 114.

23.    As it relates to UFs 4 and 5, POB submitted three EER Notices to ANI regarding the springs identified in November 2017, February 2018, and April 2018.  *Id.* ¶ 99.  The parties ultimately executed an Exoneration of Liability Event Certificate ("EER Certificate") on August 1, 2018, whereby they "acknowledged that the existence of the springs in UFs 4 and 5 of the Project was an EER under the terms of the [Contract]."  *Id.* ¶ 100.  In the EER Certificate, ANI and POB agreed to undertake certain activities to "overcome" the EER.  *Id.* ¶¶ 101-02.  Ultimately, however, ANI failed to comply with its obligations, which prevented POB from performing further construction work in UFs 4 and 5.  *Id.* ¶ 302.  Consequently, POB was unable to obtain

remuneration associated with UFs 4 and 5 (which, as noted above, accounted for approximately 58% of the total remuneration foreseen under the Contract). *Id.* ¶ 303.

24.     The presence of these freshwater springs created additional legal challenges for POB because Colombian environmental laws prohibit any activity other than "the harvesting of secondary forest fruits" within 100 meters of springs, and any construction along UFs 4 and 5 was therefore illegal under Colombian law. *Id.* ¶¶ 110, 300. Indeed, POB was investigated and sanction proceedings were commenced against the company by the Colombian environmental authorities (CAR and Corporinoquía) in May 2018 and March 2019 for POB's allegedly having carried out prohibited construction activity. *Id.* ¶ 110.

**C.     The Arbitration and the Award**

25.     In light of the above, on October 16, 2020, POB commenced arbitral proceedings against ANI pursuant to the arbitration clause contained in Section 15.3 of the Contract, asserting that ANI was in breach of its obligations under the Contract and the EER Certificate. Ex. 1, ¶¶ 13, 305-06.

26.     On November 5, 2020, ANI requested a 90-day extension to submit its response to POB's Notice of Arbitration. The ICDR granted ANI a 60-day extension on November 9, 2020. *Id.* ¶ 15.

27.     On January 13, 2021, POB filed a Request for Interim Measures ("Request for Measures") prohibiting ANI from taking any action that would affect the proper conduct of the Arbitration or render the final award ineffective, including (i) declaring a default and/or imposing a fine on POB in connection with any proceedings relating to the subject matter of the Arbitration, including certain "Sanction Proceedings" that were underway, or (ii) initiating any new administrative proceedings against POB in connection with the dispute. *Id.* ¶ 16. On January 15,

2021, the ICDR appointed Salvador Fonseca González as an emergency arbitrator ("Emergency Arbitrator").  On January 27, 2021, ANI filed a Reply to the Request for Measures, wherein it argued against POB's request and objected to the Emergency Arbitrator's jurisdiction.  The Emergency Arbitrator conducted a hearing with the Parties on February 1, 2021 and, on February 9, 2021, issued a Provisional Award finding that he had jurisdiction, and granting the requested urgent protective measures.  In particular, the Emergency Arbitrator ordered that, "until a final award [is] issued settling the dispute under Arbitration," ANI must "refrain … from declaring POB in default and from imposing and/or enforcing fines on POB in the Sanctioning Proceedings or in any future sanctioning proceedings against POB related to the subject matter of the Arbitration." *Id*. ¶¶ 16-21.

28.     On February 28, 2022, ANI filed a counterclaim in which it asserted that POB breached its obligations with respect to UFs 4 and 5.  *Id.* ¶¶ 307-08.  In the alternative, ANI argued that it should be permitted to terminate the Contract because POB had not completed the works within the originally prescribed time period, and any changes to the layout of the works (which POB would have been required to undertake) would give rise to an Early Termination right.  *Id.* ¶¶ 677-80.  In its defense against this claim, POB asserted that ANI's request for early termination was not permissible because it would permit ANI to benefit from its own default by terminating POB's contract rights because of issues caused by ANI's own failure to cooperate with POB to overcome the environmental challenges. *Id.* ¶ 306.  Additionally, POB requested that, in the event the tribunal declared the Early Termination of the Contract, it should order ANI to pay full compensation damages to POB.  *Id*. ¶¶ 813-17.

29.     The arbitral tribunal was constituted on June 3, 2021.  *Id.* ¶ 23.  The tribunal conducted a hearing from December 12 through December 16, 2022 at the Arbitration and

Conciliation Center of the Bogotá Chamber of Commerce in Bogotá, Colombia. *Id.* ¶ 50. Written submissions followed, as well as two additional hearings, on May 18, 2023 and June 26, 2024, respectively. *Id.* ¶¶ 55-60, 68.

30.    The tribunal issued its Partial Award on Jurisdiction, Liability and Damages on December 18, 2024. *Id.* ¶ 900.

31.    The tribunal held that completion of UFs 4 and 5 was "legally impossible" under Colombian environmental regulations "due to the presence of the springs." *Id.* ¶¶ 348-49. It further held in favor of POB that, "[b]y signing the EER [Certificate], ANI acknowledged that the presence of the springs was the cause of the suspension of the works and activities . . . in UFs 4 and 5, releasing POB from its obligation to carry out such works and activities, and POB was not responsible for such suspension." *Id.* ¶ 352.

32.    The tribunal also found that "it was ANI's responsibility," not POB's, "to detect the presence of the springs in a timely manner, prior to opening the Tender of the Agreement," and that "timely detection of the springs would have allowed structuring of the Project in such a way that it would have been feasible, avoiding the need for its paralysis due to the EER." *Id.* ¶ 365. It held that "the risk and responsibility for the presence of the springs were not assigned by ANI to POB under the Agreement." *Id.* ¶ 399.

33.    The tribunal rejected ANI's argument that POB did not adequately fulfill its obligations with respect to UFs 4 and 5. *Id.* ¶ 460. It found that ANI "did not comply with [its] obligation to act in good faith." *Id.* ¶ 465.

34.    The tribunal declined to rule in POB's favor with respect to an additional claim concerning archaeological sites in UF 2, holding that it did not have jurisdiction to award POB relief on this claim. *Id.* ¶ 299.

35.    The tribunal rejected all of ANI's counterclaims.  *Id.* ¶¶ 576, 634, 666.

36.    The tribunal held that, in light of ANI's breaches of the Contract, the entire contract should be deemed terminated.  *Id.*  ¶¶ 756-57.  It found that POB was entitled to compensation for the damages incurred as a result of ANI's breaches.  *Id.* ¶ 803.  The tribunal's Award ordered ANI to pay POB COP 1,332,305,900,000.  *Id.* ¶ 900(17)-(18) (as corrected in the Clarification, Ex. 2, ¶ 20.6).

37.    On January 17, 2025, ANI submitted a request for clarification of the Award to (1) clarify how POB's damages were calculated; (2) correct the date on which the arbitration hearing concluded; (3) specify whether interim measures remained in place following the issuance of the Award; and (4) specify the evidence relied upon to determine certain amounts ANI was required to refund to POB.  Ex. 2, ¶ 2.  The tribunal rejected ANI's first three requests as improper, *id.* ¶¶ 12-14, 20.1, and clarified the parts of the tribunal's damages award that were erroneously transcribed in the Award, *id.* ¶ 20.2.  The tribunal further clarified that the Award should read: "Furthermore, this Partial Award is immediately enforceable, and the ANI has the obligation to pay the total sum of COP $1,332,305,900,000 awarded to POB, effective immediately."  *Id.* ¶ 20.6.

38.    Although the December 18, 2024 Award is titled a "Partial Award" in name, it is in fact a full and final Award on jurisdiction, liability and damages.  All that remains to be decided is ANI's additional liability for costs and interest, which will be determined in a separate award in late 2025 or early 2026.  *See generally* Ex. 5, at 6-8.

## LEGAL BASIS FOR RELIEF

39.    The New York Convention ("Convention") is a multilateral international treaty governing "the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought."  New York

Convention, art. I(1). The Convention provides that "[e]ach Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon." *Id.* art. III.

40.     The United States is a contracting party to the Convention and has agreed to apply the Convention to disputes arising out of a "commercial" relationship. New York Convention, 21 U.S.T. at 2560. Congress codified the New York Convention in the FAA, 9 U.S.C. §§ 201-08.

41.     In the United States, an award issued pursuant to arbitration conducted in the territory of a party to the Convention falls under the Convention, as implemented in the FAA, if the award "aris[es] out of a legal relationship, whether contractual or not, which is considered as commercial." 9 U.S.C. § 202. Thus, the FAA applies when "(1) there is a written agreement; (2) the writing provides for arbitration in the territory of a signatory of the convention; (3) the subject matter is commercial; and (4) the subject matter is not entirely domestic in scope." *Africard Co. Ltd. v. Republic of Niger*, 210 F. Supp. 3d 119, 123 (D.D.C. 2016) (quotations omitted).

42.     Enforcement of an arbitral award that is subject to the New York Convention is governed by Section 207 of the FAA, which entitles "any party to the arbitration" to apply "for an order confirming the award as against any other party to the arbitration" within three years after the award is issued. 9 U.S.C. § 207.

43.     Upon submission of an application for confirmation, the court "shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." 9 U.S.C. § 207. "Federal courts in the United States have minimal discretion to refuse to confirm an arbitration award under the FAA." *Tatneft v. Ukraine*, 301 F. Supp. 3d 175, 184 (D.D.C. 2018) (citing 9 U.S.C. § 207). "Confirmation

proceedings are generally summary in nature" because the New York Convention "provides only several narrow circumstances where a court may deny confirmation of an arbitral award." *Int'l Trading & Indus. Inv. Co. v. DynCorp Aerospace Tech.*, 763 F. Supp. 2d 12, 20 (D.D.C. 2011). "[T]he showing required to avoid summary confirmation . . . is high." *Id.*

## ANI IS A FOREIGN STATE UNDER 28 U.S.C. § 1603(A)

44.    ANI is part of the Executive Branch of the Colombian State, responsible for performing what the Colombian State recognizes to be core government functions concerning the design, construction, and maintenance of the national infrastructure.  It is therefore one and the same as Colombia, a "foreign state" as defined in 28 U.S.C. § 1603 and, under 28 U.S.C. §§ 1605(a)(1) and (2), is not immune from subject-matter jurisdiction of this Court, nor is it entitled to due process rights such that POB must prove minimum contacts to support the exercise of personal jurisdiction. *TMR Energy Ltd. v. State Property Fund of Ukraine,* 411 F. 3d 296, 302 (D.C. Cir. 2005) ("[T]he [State Property Fund of Ukraine]—like its principal, the State of Ukraine—is not a 'person' for purposes of the due process clause and cannot invoke the minimum contacts test to avoid the personal jurisdiction of the district court.").  ANI's origins, legal status, oversight, and powers all demonstrate that its core functions are governmental, and thus it is the State itself.

45.    To determine whether a foreign entity qualifies as a "foreign state" (rather than a state "agency or instrumentality") under 28 U.S.C. § 1603, courts consider "whether the core functions of the foreign entity are predominantly governmental or commercial." *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F. 3d 148, 151 (D.C. Cir. 1994).  In particular, courts ask whether the entity "is an integral part of a foreign state's political structure," or, instead, "an entity whose structure and function is predominantly commercial." *Id.* (quoting *Segni v. Com. Off. of Spain*,

650 F. Supp. 1040, 1041-42 (N.D. Ill. 1986)).  If an entity's core functions are governmental, "it is considered the foreign state itself"; if its core functions are commercial, it is an "agency or instrumentality" of the foreign state.  *Roeder v. Islamic Republic of Iran*, 333 F. 3d 228, 234-35 (D.C. Cir. 2003) (holding that the Iranian Ministry of Foreign Affairs was considered Iran itself, on the basis that "[t]he conduct of foreign affairs is an important and 'indispensable' governmental function").[4]

46.     Courts applying this test have concluded that ministries and other similar entities— regardless of their legal status under foreign law—are "political organs" or "political subdivisions" considered to be the foreign state itself under the FSIA and federal common law.  *E.g.*, *Servaas Inc. v. Republic of Iraq*, 653 F. App'x 22, 25 (2d Cir. 2011) (holding Iraq liable for the contracts of the Ministry of Industry, notwithstanding its formal separateness under Iraqi law).

47.     The D.C. Circuit recently applied this "core functions" test and determined that the Chief Mining Commissioner of the Zimbabwean Ministry of Mines fell within the FSIA's definition of "foreign state" under 28 U.S.C. § 1603(a).  *See Amaplat Mauritius Ltd. v. Zimbabwe Mining Development Corporation*, 663 F. Supp. 3d 11 (D.C. Cir. 2023).  The D.C. Circuit's analysis focused on the Commissioner's "broad administrative duties" and powers—which included, *inter alia*, registering and investigating mining claims, issuing mining regulations, resolving mining disputes, issuing injunctions, and approving and/or revoking mining licenses—

---

[4]     This test, originally set out by the D.C. Circuit in *Transaero*, has been expressly adopted and applied by other circuits.  *See, e.g.*, *Magness v. Russian Federation*, 247 F. 3d 609, 613 n. 7 (5th Cir. 2001) (holding that "[w]hether an entity is a 'separate legal person' depends upon the nature of its 'core functions'—governmental vs. commercial—and whether the entity is treated as a separate legal entity under the laws of the foreign state"); *Garb v. Republic of Poland*, 440 F.3d 579, 593-94 (2d Cir. 2006) (applying *Transaero* and "inquir[ing] 'whether the core functions' of the Ministry of the Treasury of Poland 'are predominantly governmental or commercial.'") (vacated on other grounds).

and the fact that the Commissioner was appointed and supervised by the Secretary of the Ministry of Mines. *Id.* at 28. The Court ultimately held the Commissioner was "acting as a governmental administrator, investigator, and adjudicator," and was therefore "properly understood as a political subdivision of the Republic [of Zimbabwe]." *Id.*

48.  The fact that an entity's duties also touch upon or concern commercial activity does not render its "core functions" commercial. The Supreme Court has specified that it is only when a foreign government acts "in the manner of a private player" within a market that its actions are considered "'commercial' within the meaning of the FSIA." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614-15 (1992). Based on the reasoning in *Weltover*, the Court in *Amaplat* expressly held that, despite the Chief Mining Commissioner's duties "unquestionably" touching upon commercial activity—namely mining—it still qualified as the state because "the office does so as a government regulator and adjudicator," including by approving applications to prospect land and approving and revoking mining licenses, "not as a market participant or commercial entity." *Amaplat*, 663 F. Supp. 3d at 28.

49.  As set out below, ANI's "core functions" are predominantly governmental, not commercial. As such, ANI falls within the FSIA's definition of "foreign state" under 28 U.S.C. § 1603(a).

**1.  ANI's Origins and Structure**

50.  ANI was established via a Law Decree in November 2011. Ex. 4, at 54. ANI is not separate from the Government; it is "attached to the Ministry of Transportation." *Id.*; *see also* Ex. 6, at 5. Upon its creation, ANI assumed executive responsibilities previously performed through the National Institute of Concessions (the "INCO"), a predecessor subdivision of the Executive Branch responsible for planning, structuring, contracting, executing and managing

transportation infrastructure projects across Colombia. Ex. 7, at 12. ANI retained the original purposes of the INCO, but was further empowered to enter into public-private partnerships on behalf of the Government, with the aim of developing various public works. Its responsibilities include "planning, coordinating, structuring, contracting, executing, managing and evaluating concession projects . . . for the design, construction, maintenance, operation, administration and/or exploitation of public transportation infrastructure" and it is the means by which the Colombian State performs uniquely governmental responsibilities such as expropriating property when such expropriations relate to the development of the national infrastructure. Ex. 4, at 54.

51.    In the domestic context, courts are clear that "the development of transportation infrastructure qualifies as a government[al] (not a proprietary) task." *New Albany Main St. Properties v. Watco Companies, LLC*, 75 F. 4th 615, 630 (6th Cir. 2023) (quotations omitted). And the D.C. Circuit has long held that "the design and planning of a transportation system are governmental activities because they involve quasi-legislative policy decisions which are discretionary in nature." *McKethean v. W.M.A.T.A.*, 588 A. 2d 708, 714 (D.C. 1991); *see also Doe v. Washington Metro. Area Transit Auth.*, 453 F. Supp. 3d 354, 366 (D.D.C. 2020) (same).

52.    Colombian law likewise confirms that the functions overseen and administered by ANI—"[t]he planning, execution, maintenance, improvement and rehabilitation of transportation infrastructure projects and works materialize the general interest provided for in the Constitution"—constitute "an element of the sovereignty and security of the State," and therefore "constitute a governmental function." Ex. 8, at 58. In fact, Law Decree No. 1079 of 2015 makes explicit that the Colombian State acts "through the ANI" to grant concessions and carry out other procedures. *See* Ex. 9, at 13. Indeed, ANI was created by a Law Decree that explicitly confirms

that ANI is part of the Colombian State's Executive Branch, and in particular, the Ministry of Transportation.  *See* Ex. 4, at 54.

### 2.    ANI Exercises Sovereign Powers

53.    ANI's core functions include powers that are generally reserved for sovereign States and/or entities.  Like the Chief Mining Commissioner in *Amaplat*, ANI has the power to "carry out administrative expropriation processes or initiate legal actions for expropriation when voluntary sale of the properties required for the execution of projects under its charge is not possible."  Ex. 4, at 55.  It is widely acknowledged that "[a] state's confiscation of property within its borders is not a 'commercial' act," and numerous courts have affirmed—both in the arbitral award enforcement context and otherwise—that "[e]xpropriation is a decidedly sovereign—rather than commercial—activity."  *Garb*, 440 F. 3d at 582, 586; *see also, e.g.*, *Alberti v. Empresa Nicaraguense de la Carne*, 705 F. 2d 250, 254 (7th Cir. 1983) (recognizing that the nationalization of property is a "quintessential [g]overnment act"); *Haven v. Rzeczpospolita Polska (Republic of Poland)*, 68 F. Supp. 2d 947, 954 (N.D. Ill. 1999) ("It is obvious that governmental expropriation of private property under governmental authority … is the classic type of [sovereign, rather than commercial,] activity[.]").

54.    The same is true under Colombian law.  The Colombian Constitutional Court "has long defined expropriation as an operation of public law by which <u>the State</u> forces a private party to transfer an asset from the private dominion to the public dominion, for the benefit of the community and by means of a prior compensation."  Ex. 10, at 136 (emphasis added) (quotations omitted).

55.    Under ANI's purview, guided by the State's interest, expropriations unfold as follows:  ANI first issues a Decree identifying the properties affected by a transportation

infrastructure project.  *See generally* Ex. 11.  Once identified, ANI determines the need to expropriate these properties due to the State's interest in them.  *Id.*  Subsequently, ANI issues an expropriation decision targeting the properties deemed necessary for the project.  *Id.*  Finally, ANI delegates the responsibility of notifying property owners and conducting other specific land management activities for each identified property to the concessionaire.  *Id.*  The expropriated properties then become the property of ANI, not the concessionaire.  *Id.*

56.    At all stages, ANI acts as the sovereign, deciding whether an expropriation is necessary, determining how it should be carried out, and then doing so.  As would be expected with regard to acts carried out by the executive branch of a sovereign nation, ANI's expropriations are not subject to administrative or other review within the Executive Branch, but are instead subject only to judicial review.  *See* Ex. 10, at 166, 179.  ANI has repeatedly deployed this "quintessentially sovereign act" of expropriation, *Garb v. Republic of Poland*, 207 F. Supp. 2d 16, 31 (E.D.N.Y. 2002) (vacated on other grounds), including in March 2024, when it expropriated land to execute the Highway Infrastructure Project *Autopista Al Mar 1* in Medellin.  *See generally* Ex. 12.

57.    ANI also acts as a "state entity" under Art. 2.1(a) of Law 80 of 1993.  This law grants ANI powers reserved to the government, including the authority to unilaterally interpret, amend, and terminate contracts, without acquiescence of the private contractor, "[w]hen the demands of public service so require or when the situation of public order so dictates."  Ex. 13, at 43; *see also* Ex. 14, at 108 (amending Law 80 of 1993, noting that entities like ANI "subject to the General Statute of Contracting of the Public Administration may declare noncompliance, quantifying the damages thereof, impose the fines and penalties agreed in the contract, and enforce the penalty clause").  Non-governmental entities cannot unilaterally declare contractual breaches

and self-enforce penalty clauses in this way, and must instead prove the existence of special circumstances and satisfy due process requirements when seeking to impose contractual fines. Ex. 15, at 95. Even in those cases, such rights must be explicitly agreed upon by the parties in advance and are interpreted restrictively. But because it is not a private actor, such restrictions do not apply to ANI.

58.    In fact, ANI's exercise of its sovereign powers gave rise to the underlying arbitration here. In November and December 2020, ANI exercised its statutory rights to impose fines and sanctions against POB for two actions ANI declared to be in breach of the Contract. *See generally* Ex. 16.

59.    In other cases, ANI has unilaterally cancelled a concession contract for the Pacific Railway Network due to neglect of "maintenance and conservation activities of the railway corridor, equipment maintenance, and operation and exploitation of the railway network" and imposed a fine of more than 100 billion pesos on concessionaire Ferrocarril del Pacífico SAS for damages arising from its non-compliance. *See* Ex. 17, at 6. Again, unlike a private actor, ANI was not required to demonstrate the existence of specific circumstances under which a non-State entity can unilaterally impose and enforce penalty clauses.

60.    Thus, like the Commissioner in *Amaplat*, ANI's core functions include acting "as a governmental administrator, investigator, and adjudicator." *Amaplat*, 663 F. Supp. 3d at 28. ANI's exercise of these governmental powers further confirms it is not an ordinary private entity but is instead an arm or "political subdivision" of the Colombian State. *Id.* ("Any government of reasonable complexity must act through men [and women] organized into offices and departments . . . and the Commissioner is just one such office.") (internal citation omitted). Indeed, ANI's authority to expropriate property, impose fines and sanctions, and unilaterally

declare breaches of contract are powers "so closely bound up with the structure of the state" that ANI must be considered "as the 'foreign state' itself." *Transaero*, 30 F.3d at 153.

3.    **Colombian Law Recognizes ANI as Part of the Colombian State**

61.    Colombian law expressly recognizes ANI as the Colombian State; specifically, it is part of the Executive Branch. The decentralized sector of "[t]he Executive Branch of Public Power at the national level is made up of [inter alia] national administrative entities with legal personality that the law creates, organizes or authorizes to form part of the Executive Branch of Public Power." Ex. 18, at 100-01. As discussed above, ANI is a national administrative entity created by law. *See supra* ¶¶ 50-52; *see also* Ex. 19 at 54 (establishing ANI as "a National State Agency of a Special Nature"). It is therefore part of the Executive Branch. And ANI has the obligation to ensure the performance of public services.

62.    As shown above, ANI is an arm of the Ministry of Transportation. *See supra* ¶¶ 50-52. The Colombian Constitutional Court has recognized that such arms or "affiliated entities" "are charged with exercising administrative functions and providing public services in accordance with the rules of Public Law." Ex. 19, at 37. Colombia's Council of State (*Consejo de Estado de Colombia*)—its highest court for administrative matters, *see* Ex. 20, at 2—has repeatedly held that entities like ANI, which belong to the "decentralized sector" of the Colombian State are "subject to [the] political control and the supreme direction of the central sector body to which they are attached or linked" and are often highly dependent on the National Government, Ex. 21, at 29 (emphases added).

63.    ANI is also subject to the contractual liability regime reserved for governmental entities. Section II of Law 80 of 1993 introduces specific principles for public procurement, which regulate the conduct of governmental entities and establish unique rules of liability distinct from

the rules that govern the liability of private parties (even private parties to public contracts). *See* Ex. 14, at 76-87 (requiring, for example, "reciprocity" in contracting processes, providing for penalty clauses for "commission of crimes against the public administration," and establishing rights of "unilateral termination" of contracts "when the demands of public service require it"). The Council of State confirmed that ANI is subject to these laws that uniquely apply to the Government when it ruled that a case involving damages caused by ANI's concessionaire was inadmissible against the concessionaire and was admissible instead only against ANI due to the particular legal regime governing ANI, i.e., its administration and ownership of the concession agreements and the road infrastructure. Ex. 22, at 42 ("[T]he liability will be declared solely that of the National Infrastructure Agency (ANI), since this entity is the director and owner of the public works in accordance with the provisions of Decree 4165 of 2011[.]").

### 4.    ANI Functions as Part of the Executive Branch

64.    Like other governmental entities in the "decentralized sector," ANI is subject to the "political control" and "supreme direction" of the Colombian State in a number of ways. Ex. 21, at 29. ANI's President is appointed directly by the President of Colombia. *See* Ex. 4, at 57-58. Its Board of Directors is comprised of nine members, four of whom must be officials in Colombia's national government: the Minister of Transportation, the Minister of Finance, the Minister of Environment and Sustainable Development, and the Director of the National Planning Department. *See* Ex. 4, at 60-61. And the five remaining members of ANI's Board are nominated by the President of the Republic and, in turn, elected by these four national government officials. *See id.*; Ex. 23, at 10, 12-14.

65.     In addition, ANI is subject to oversight mechanisms that are unique to the State. For example, the Ministry of Transportation publishes public accountability bulletins that highlight ANI's projects as part of the Transportation Sector's achievements.  *See*, *e.g.*, Ex. 24, at 11.

66.     Additionally, the Comptroller General's Office ("Contraloría General de la República" or "CGR")—generally responsible for fiscal oversight over "public entities," *see* Ex. 25, at 145—oversees and audits ANI's resources, financial statements, and overall administration to ensure the proper use of public funds and transparency in project execution.  It draws this authority over ANI from the fact that ANI is a public entity.  *See* Ex. 4, at 54.[5]  In 2014, the Comptroller General imposed formal sanctions on the former President of INCO, ANI's predecessor.  *See* Ex. 27, at 6.

67.     CGR has also issued numerous audit reports monitoring the use of ANI's funds and evaluating its programs for public infrastructure development.  In fact, CGR has initiated investigations into ANI officials for their failure to comply with legal obligations linked to the Contract between POB and ANI.  *See* Ex. 1, ¶¶ 362-64 (noting that the 2019 Financial Audit found that ANI's obligation to identify forest reserve areas and water recharge zones along a planned corridor was not complied with, and that the June 2020 Performance Audit Report accused ANI of not having taken the necessary measures to reflect the environmental reality of the area affected by the Project).

68.     As with other government bodies, the Inspector General's Office ("Procuraduría General de la Nación" or "PGN") has authority to oversee ANI's "official conduct," carry out investigations, and impose disciplinary sanctions.  *See* Ex. 28, at 5.  The PGN draws jurisdiction over ANI from its responsibility "to exercise the highest oversight of the official conduct of those

---

[5]     Notably, the Comptroller General lacks jurisdiction over private entities or activities.  *See* Ex. 26, at 62, 66-67.

who perform public duties." *See* Ex. 28, at 5 (emphasis added). The PGN has the authority to discipline and/or remove ANI's Directors from office if they violate disciplinary regulations governing the conduct of public servants. *See* Ex. 29, at 7; Ex. 4, at 58. Like the Comptroller General, the PGN's authority covers only public entities and officials. *See* Ex. 28, at 5-6.

69. The PGN has taken action against ANI in the past, including to: (i) remove its former President, Luis Fernando Andrade Moreno, from office, *see* Ex. 30, at 7, and (ii) initiate an ongoing investigation into its current Vice President, Iván Humberto Baquero Susa. *See* Ex. 31, at 7.

### 5. Further Evidence that ANI Performs Sovereign Functions

70. ANI's assets and funds are derived from multiple sources, including the National General Budget, credit resources obtained by the National Government, contributions from international cooperation sources, and property and real estate transferred by the Ministry of Transportation, sector entities, and other public institutions. *See* Ex. 4, at 56-57. Additionally, ANI generates funds through fees and payments for the use, management, or exploitation of transportation infrastructure when provided in the relevant concession agreements it executes, as well as charges, rights, fines, and income from contracts executed by the Agency. *Id.* at 57. These sources are public funds. Indeed, confirming the Award against Colombia is consistent with Colombian law, which already recognizes ANI's governmental status by permitting the State to assume ANI's litigation debts. For example, the Colombian State is enabled, via Decree No. 2295 of 2023, to assume as "public debt" ANI's obligations that arise from court rulings and settlements up to five hundred billion pesos. *See* Ex. 32, at 39.

**6.    ANI Is Not a Mere Agency or Instrumentality**

71.    The above indicia of State control confirm that ANI is a sovereign entity with "predominantly governmental," rather than commercial, functions.  In previous disputes, foreign entities like ANI have attempted to escape this reality by claiming they are agencies or instrumentalities and are thus presumptively separate from the foreign sovereign.  *See, e.g.*, *TMR Energy*, 411 F. 3d at 300.[6]  That argument, which relies on the fact that all governments must necessarily organize themselves into departments to carry out their state functions, is wrong.  Indeed, in the seminal *Transaero* case, the D.C. Circuit concluded that "[a]ny government of reasonable complexity must act through men organized into offices and departments," and "[i]f a separate name and some power to conduct its own affairs suffices to make a foreign department an 'agency' rather than a part of the state itself, the structure of section 1608 will list too far to one side." *Transaero*, 30 F. 3d at 153.

72.    The organization of the United States Government is also instructive.  In the United States, the executive carries out its governmental responsibilities through cabinet departments and divisions thereof, but the sovereign remains directly liable for torts committed by employees of those entities, even when they are organized with multiple levels of management between the President and the management of the department in question.  *See, e.g.*, *Salim v. United States*, 382 F. 2d 240, 241-43 (5th Cir. 1967) (claim against the United States for alleged negligence on the part of the United States Postal Service); *Gourgeot v. United States*, 372 Fed. Appx. 489-91 (5th Cir. 2010) (same, and noting that while the action was initially brought against the United

---

[6]    Although the court in *TMR Energy* found that the State Property Fund of Ukraine was one and the same as the foreign sovereign without applying the *Transaero* test (because the case was not exclusively concerned with service of process under the FSIA), subsequent courts, including in the 2023 *Amaplat* decision have held that the *Transaero* test is the better framework when the "heart of the parties' dispute is whether the [entity] falls within a component of § 1603's definition of 'foreign state.'" *Amaplat*, 663 F. Supp. at 27.

States Postal Service, the United States itself was "substituted as the defendant"); *Gibson v. United States*, 809 F. 3d 807 (5th Cir. 2016) (underlying torts committed by employees of the Federal Emergency Management Agency "FEMA"); *Harr v. United States*, 705 F. 2d 500-01 (D.D.C. 1983) (underlying torts committed by employees of the Federal Aviation Administration "FAA"); *Leuthauser v. United States*, 71 F.4th 1189-92 (9th Cir. 2023) (underlying torts committed by employees of the Transportation Security Administration "TSA"). And, when found liable for the torts committed by employees of subdivisions of the Executive Branch, the United States government pays damages from the national treasury. Similarly, when agencies and subdivisions of the United States government breach their contracts with private parties, the United States is responsible for payment of damages to the plaintiff. *See, e.g.*, *Hughes Commc'ns Galaxy, Inc. v. United States*, 271 F. 3d 1060 (Fed. Cir. 2001) (upholding an award of damages to a satellite company when NASA breached a contract to launch several satellites). Indeed, even where that contract was signed by an entity like the United States Forest Service, an agency attached to the Department of Agriculture, the United States "government cannot avoid liability—and must compensate the party with whom the government lawfully contracts." *Wetsel-Oviatt Lumber Co. v. United States*, 38 Fed. Cl. 563, 572 (1997). The outcome should be no different here.

## CAUSE OF ACTION AND REQUEST FOR RELIEF

73.     Petitioner repeats and re-alleges the allegations in paragraphs 1 through 72 as if set forth fully herein.

74.     The Award falls under the New York Convention because the Contract was in writing, called for arbitration in Colombia, concerned POB's construction of a highway, which is not a commercial act, and is in no way related to domestic activity within the United States.

24

75.     The Award is the result of an arbitration seated in Colombia—a party to the New York Convention—between POB and ANI.  The Parties' agreement to arbitrate is found in Section 15.3 of the Contract.  The Award was made within the past three years, on December 18, 2024, and clarified on March 7, 2025.

76.     Under the FAA, the Court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the Award specified in the New York Convention.  9 U.S.C. § 207.  None of the New York Convention grounds for denying recognition and enforcement apply in this case.

77.     For the foregoing reasons, POB is entitled to an order (a) confirming the Award pursuant to the New York Convention, and (b) entering judgment in POB's favor in the amount specified in the Award.

WHEREFORE, POB requests that the Court enter an order:

(a)     confirming the Award against ANI and Colombia; and

(b)     entering judgment against ANI and Colombia and in POB's favor, ordering Respondents to pay POB the United States Dollar equivalent of COP 1,332,305,900,000, converted to United States Dollars at the prevailing exchange rate as of the date of the Judgment.[7]

---

[7]     As of March 31, 2025 COP 1332,305,900,000 is equivalent to USD $317,108,477.61 based on the prevailing exchange rate of 4,201.4200 COP/USD published by the United States Treasury, Bureau of the Fiscal Service. Ex. 33 at 2.

Dated: April 11, 2025                              Respectfully submitted,

                                                   /s/ Miguel Estrada
Rahim Moloo, N.Y. Bar #4628616                     Miguel Estrada, D.C. Bar #456289
rmoloo@gibsondunn.com                              mestrada@gibsondunn.com
Jason Myatt, N.Y. Bar #4450599                     GIBSON, DUNN & CRUTCHER LLP
jmyatt@gibsondunn.com                              1050 Connecticut Avenue, N.W.
Zachary Kady, N.Y. Bar # 5374871                   Washington, DC  20036
zkady@gibsondunn.com                               Telephone:  202.955.8500
GIBSON, DUNN & CRUTCHER LLP                         Facsimile:  202.467.0539
200 Park Avenue
New York, NY 10166
Telephone:  212.351.4000
Facsimile:  212.351.4035

*Attorneys for Petitioner Perimetral Oriental de Bogotá, S.A.S.*