IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PERIMETRAL ORIENTAL DE BOGOTÁ, S.A.S.,<br><br>*Petitioner*,<br><br>v.<br><br>AGENCIA NACIONAL DE INFRAESTRUCTURA<br>and<br>THE REPUBLIC OF COLOMBIA<br><br>*Respondents*. | Civil Action No. _____ |

<u>**Declaration of Jason W. Myatt in Support of Petition to Confirm Arbitral Award**</u>

# EXHIBIT 1

# Certified English Translation of Exhibit 1

Washington, DC

## TRANSLATOR AFFIDAVIT

I, Mary Lewis, of 323 Peabody Street NW, Washington, DC 20011, am a qualified, professional translator for the Spanish and English languages. My qualifications include 15 years of experience as a translator of written documents from Spanish to English and a Master of Arts degree in Spanish Language from West Virginia University. I am certified by the American Translators Association under certification number 493386 for Spanish into English translation.

I herewith certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English of the attached Partial Final Award on Jurisdiction, Liability and Damages.

_Signature_

Signature

_Mary Lewis_

Name

_4/9/2025_

Date


District of Columbia
Signed and sworn to (or affirmed) before me

on _4/9/2025_ by _Mary Lewis_

Date        Name(s) of Individual(s) making Statement

_Signature of Notarial Officer_

_ups notary public_
Title of Office
My commission expires: _12/14/2025_

**INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION**

---

**Case Number 01-20-0015-3123**

---

**BETWEEN:**

**PERIMETRAL ORIENTAL DE BOGOTA, S.A.S.**

**AND SHIKUN & BINUI VT AG,**

**Claimants**

**-and-**

**AGENCIA NACIONAL DE INFRAESTRUCTURA [COLOMBIAN NATIONAL**

**INFRASTRUCTURE AGENCY]**

**Respondent**

---

**PARTIAL FINAL AWARD ON JURISDICTION, LIABILITY AND DAMAGES**

---

**Arbitral Tribunal:**

**Elina Mereminskaya (Arbitrator)**

**Cristián Conejero (Arbitrator)**

**Eduardo Palmer (President of the Arbitral Tribunal)**

**18 December 2024**

**Bogotá, Colombia**

1

**TABLE OF CONTENTS**

I.   **Preliminary considerations** ...................................................................................**10**

    A.   The parties and their Representatives ......................................................10

    B.   The Arbitration Agreement .......................................................................12

    C.   Applicable Substantive Law .....................................................................14

    D.   Applicable Procedure Rules......................................................................14

    E.   Seat of Arbitration....................................................................................14

    F.   Language of Arbitration............................................................................14

    G.   Arbitral Tribunal ......................................................................................14

II.  **The Arbitration Proceedings** ...............................................................................**15**

    A.   Steps prior to the Formation of the Tribunal ...........................................15

    B.   Establishment of the Arbitral Tribunal and Procedural Order No. 1 ........17

    C.   Written Submissions .................................................................................18

    D.   Evidentiary Hearing .................................................................................22

    E.   Post-hearing Procedures, Conclusion of the Proceedings and Time Limit for
       rendering the Final Award .......................................................................23

III. **The Facts**................................................................................................................**26**

    A.   The Tender of the Project and the execution of the Concession Agreement...........26

    B.   The Scope of the Agreement .....................................................................29

    C.   The Beginning of the Agreement's performance .......................................30

    D.   The identification of the Springs in UFs 4 and 5 and the Execution of the EER
       Minutes ....................................................................................................32

       1.   Identification of springs in UFs 4 and 5 .............................................32

       2.   Execution of the EER Minutes ...........................................................34

    E.   The facts subsequent to the execution of the EER Minutes regarding UFs 4 and 5.35

    F.   Archaeological findings of UF 2...............................................................37

G.  Funding of the Supervisor Subaccount ...................................................39

**IV.  Analysis of the Arbitral Tribunal......................................................40**

A.  Objections to the jurisdiction and competence of the Arbitral Tribunal .................41

1.  Objections to the Jurisdiction of the Arbitral Tribunal.......................................43

(a)  The internationality of the Arbitration pursuant to Article 62(c) of Law 1563 of 2012 .....................................................................43

(i)  ANI's position........................................................43

(ii)  Position of POB and S&B..........................................47

(iii)  Analysis of the Arbitral Tribunal...............................50

(b)  The internationality of the Arbitration in accordance with Article 62(a) of Law 1563 of 2012 .....................................................54

(i)  ANI's position........................................................54

(ii)  Position of POB and S&B..........................................56

(iii)  Analysis of the Arbitral Tribunal...............................57

(c)  The concurrence of subparagraph b) of Article 62 .......................................60

(i)  ANI's position........................................................60

(ii)  Position of POB and S&B..........................................60

(iii)  Analysis of the Arbitral Tribunal...............................60

2.  Objections to the Competence of the Arbitral Tribunal.....................................61

(a)  Competence of the Tribunal to hear claims relating to compensation for EER (Section 14.2 (h) of the Agreement) ...........................................61

(i)  ANI's position........................................................61

(ii)  Position of POB and S&B..........................................62

(iii)  Analysis of the Arbitral Tribunal...............................64

(b)  Competence of the Tribunal over claims of the EPC Contractor .................65

(i)  ANI's position........................................................65

3

(ii)    Position of POB and S&B...........................................................68

(iii)   Analysis of the Arbitral Tribunal.............................................69

B.    POB and S&B's Main Claim...............................................................76

1.    Claimants' Claims in connection with UF 2......................................76

(a)    Position of POB and S&B................................................76

(b)    ANI's Position ............................................................79

(c)    Analysis of the Arbitral Tribunal...................................82

2.    Claimants' Claims in connection with UFs 4 and 5 .........................83

(a)    Regarding the alleged non-compliance of ANI regarding the Springs.........86

(i)    Position of POB and S&B.........................................86

(ii)   ANI's position......................................................90

(iii)  The Agreement and the Applicable Law....................92

(iv)   Analysis of the Arbitral Tribunal.............................95

(b)    Regarding the alleged breaches by ANI for repudiating of the EER Minutes and alleged breaches by POB with respect to Activities 1 and 2................111

(i)    Position of POB and S&B.......................................111

(ii)   ANI's position....................................................115

(iii)  The Agreement and the Applicable Law..................118

(iv)   Analysis of the Arbitral Tribunal...........................119

3.    Claim for Reduction of Amounts Funded to the Supervisor Subaccount.........124

(a)    Position of POB and S&B..............................................124

(b)    ANI's Position .........................................................126

(c)    Analysis of the Arbitral Tribunal.................................127

C.    ANI's Counterclaim................................................................129

1.    Respondent's Claims in connection with UF 2.................................131

      (a)    ANI's position ................................................................ 132

      (b)    Position of POB and S&B ............................................... 133

      (c)    The Applicable Law and The Agreement ..................... 136

      (d)    Analysis of the Arbitral Tribunal ................................. 141

   2.    Claims of the Respondent in connection with UFs 4 and 5 ............................ 152

      (a)    ANI's position ................................................................ 152

      (b)    Position of POB and S&B ............................................... 154

      (c)    The Agreement and The Applicable Law ..................... 157

      (d)    Analysis of the Arbitral Tribunal ................................. 160

   3.    Claim for interest for Delay in the total funding of the Supervisor Subaccount ................................................................................................... 166

      (a)    ANI's position ................................................................ 166

      (b)    Position of POB and S&B ............................................... 170

      (c)    Analysis of the Arbitral Tribunal ................................. 173

D.    Effects on the Agreement of the Decision on the breaches alleged by the Parties . 174

   1.    Effects of the EER Minutes regarding UFs 4 and 5 according to the Claimants and POB's specific requests. ................................................... 174

      (a)    Position of POB and S&B ............................................... 174

      (b)    ANI's position ................................................................ 175

   2.    Effects of the EER Minutes according to ANI and ANI's specific requests; in particular, regarding the subsidiary claim for Early Termination .................... 176

      (a)    ANI's position ................................................................ 176

      (b)    Position of POB and S&B ............................................... 180

      (c)    The Agreement and the Applicable Law ..................... 186

      (d)    Analysis of the Arbitral Tribunal ................................. 187

E.   Claimants' Compensation ........................................................................197

1.   Is POB entitled to compensation or damages and in what amount?.................197

(a)   On the Claimants' right to receive damages for ANI's breaches and, in
addition, as a consequence of the Early Termination of the Agreement ....197

(i)   Position of POB and S&B........................................................197

(ii)   ANI's position.....................................................................201

(iii)  The Agreement and the Applicable Law..................................204

(iv)  Analysis of the Arbitral Tribunal............................................207

(b)   Amount of damages claimed by the Claimants ..........................................208

(i)   Position of POB and S&B........................................................208

(ii)   ANI's Position ....................................................................215

(iii)  Analysis of the Arbitral Tribunal............................................218

2.   Is S&B entitled to compensation or damages and in what amount?.................231

(a)   Position of POB and S&B........................................................231

(b)   ANI's position .....................................................................232

(c)   Analysis of the Arbitral Tribunal............................................232

**V.   Decision**......................................................................................**233**

## TABLE OF ABBREVIATIONS AND TERMS

| | |
|---|---|
| **EER Minutes** | Minutes of 1 August 2018 by which the Parties recognized the existence of the EER of UFs 4 and 5 |
| **ANI** | [Agencia Nacional de Infraestructura] Colombian National Infrastructure Agency |
| **ANLA** | [Autoridad Nacional de Licencias Ambientales] Colombian National Environmental Licensing Authority |
| **PPP** | [Asociación Público-Privada] Public-Private Partnership |
| **Arbitration** | The present case, ICDR arbitration number 01-20-0015-3123 |
| **Emergency Arbitrator** | Salvador Fonseca González |
| **Evidentiary Hearing or Final Hearing** | The hearing held between 12 December and 16 December 2022 |
| **Capex** | Term derived from "capital expenditure" |
| **CAR** | [Corporación Autónoma Regional de Cundinamarca] Regional Autonomous Corporation of Cundinamarca |
| **ICDR** | International Centre for Dispute Resolution |
| **Arbitration Clause** | Section 15.3 of the Concession Agreement 002 of 2014 |
| **CONPES** | [Consejo Nacional de Política Económica y Social] Colombian National Council for Economic and Social Policy |
| **Concession Agreement or Agreement** | Concession Agreement 002 of 2014 |
| **Corporinoquía** | [Corporación Autónoma Regional de la Orinoquía] Regional Autonomous Corporation of Orinoquia |
| **Respondent** | ANI |
| **Claimants** | POB and S&B |
| **EER** | [Evento Eximente de Responsabilidad] Exemption of Liability Event. |
| **EER-UF2** | EER derived from the existence of archaeological pieces between K5+650 and K5+800 (location known as *El Divino Niño*) and K8+890 (location known as *Hacienda los Alcaparros*) of UF2 |

7

| | |
|---|---|
| **The Concessionaire** | Perimetral Oriental de Bogotá S.A.S. |
| **S&B Plural Structure** | Together, S&B, and the company C.I. Grodco en C.A., Ingenieros Civiles, and the company Colombiana de Inversiones de Infraestructura S.A.S. |
| **ICANH** | [Instituto Colombiano de Antropología e Historia] Colombian Institute of Anthropology and History. |
| **IFC** | International Finance Corporation |
| **Interventions** | Construction, Rehabilitation and/or Improvement Works, necessary for the fulfillment of the Concessionaire's obligations |
| **Award or Partial Award** | This partial final award on jurisdiction, liability and damages |
| **Provisional Award** | The provisional award issued on 9 February 2021 by the Emergency Arbitrator to decide the Request for Emergency Measures |
| **Law 1536 of 2012** | The law "whereby the National and International Arbitration Statute is issued and other provisions are enacted" |
| **O&M** | Operation and Maintenance Works |
| **PAGA** | [Programas de Adaptación a la Guía Ambiental] Environmental Guide Adaptation Programs |
| **Parties** | Together, the Claimants and the Respondent |
| **POB** | The Concessionaire |
| **PQR** | [Preguntas, Quejas y Reclamos] Questions, complaints and claims from members of the community surrounding the Project. |
| **Project** | Activities, goods, services, obligations and rights necessary for the financing, construction, rehabilitation, improvement and operation of the Eastern Perimetral Highway corridor of Cundinamarca (*vía Perimentral del Oriente de Cundinamarca*). |

| | |
|---|---|
| **S&B** | Shikun & Binui VT AG |
| **UF** | [Unidades Funcionales] Functional Units |
| **UF 2** | Functional Unit 2 |
| **UFs 4 and 5** | Functional Units 4 and 5 |
| **VPIP** | [Valor Presente por Ingresos de Peaje] Present Value of Toll Revenues |

1. This arbitration award is issued in the arbitration Case Number 01-20-0015-3123 of the International Centre for Dispute Resolution ("**ICDR**") and it constitutes a final partial award on jurisdiction, liability and damages ("**Award**" or "**Partial Award**").

## I.    PRELIMINARY CONSIDERATIONS

### A.    THE PARTIES AND THEIR REPRESENTATIVES

2. The Claimants in this arbitration are:

   a) Perimetral Oriental de Bogotá S.A.S. ("**POB**" or the "**Concessionaire**" and, together with Shikun & Binui VT AG, the "**Claimants**").

   Calle 93 No 11A–28, Office 701

   Bogotá D.C., Colombia

   b) Shikun & Binui VT AG ("**S&B**")

   Bachstrasse 56, 8200 Schaffhausen

   Swiss Confederation

3. The Claimants are represented in the arbitration by:[1]

   Rafael Rincón Ordóñez

   Miguel Castro Muñoz

   Santiago Suárez Chaves

   Ana María Rincón

   Santiago Vernaza Civetta

   RINCÓN CASTRO ABOGADOS, S.A.S.

---

[1] Initially, the representatives of the Claimants were part of the firm Zuleta Abogados y Asociados S.A.S., and Dr. Eduardo Zuleta Jaramillo was part of the representatives of the Claimants. Afterwards, the firm Rincón y Castro Abogados was created, and Messrs. Rafael Rincón and Miguel Castro remained as representatives of the Claimants, while Eduardo Zuleta left his role as counsel for the Claimants. This Award sets forth the name of the law firm and the current email addresses of the Claimants' representatives.

Carrera 7 # 75-51, Edificio Terpel, Office 502

Bogotá, D.C., Colombia

rrincon@rinconcastro.com

mcastro@rinconcastro.com

ssuarez@rinconcastro.com

arincon@rinconcastro.com

svernaza@rinconcastro.com

4. The Respondent in this arbitration is:

The National Infrastructure Agency ("**ANI**" or the "**Respondent**").

5. The Respondent is represented in this arbitration by:

Yesenia Paba

Fernando Augusto Ramírez Laguado

Nerly Rocio Pinzon Florez

*AGENCIA NACIONAL DE INFRAESTRUCTURA* - ANI

Calle 24 A # 59 – 42, Building T3 Tower 4 Floor 2

Ciudadela Empresarial Sarmiento Angulo

Bogotá D.C., Colombia

ypaba@ani.gov.co

npinzon@ani.gov.co

framirez@ani.gov.co


Carlos Ortegón Pulido

María Torres Castro

María Fernanda Sánchez

ORTEGÓN & PULIDO

Calle 73 No. 9 - 42 Office 207 Nepal Building

Bogotá D.C., Colombia

fortegon@ortegonpulido.legal

mariatorres92@hotmail.com

msanchez@ortegonpulido.legal

6.  For purposes of reference, the Claimant and the Respondent will be referred to collectively as the "**Parties**".

## B.  THE ARBITRATION AGREEMENT

7.  The Concession Contract under the PPP Scheme No. 002 which the Parties concluded on 8 September 2014 (the "**Agreement**") establishes the following in its General Part, Section 15.3:

15.3 International Arbitration[2]

(a)  Any dispute arising between the Parties in connection with this Contract shall be decided by an International Arbitral Tribunal in accordance with Article 62(c) of Law 1563 of 2012 and the rules set forth below.

(b)  The final decisions of the *amiable compositeur* [amigable componedor] may also be submitted to it, in accordance with what is established for the purposes of a settlement in the [sic] Applicable Law.

(c)  The international arbitration shall be administered by the International Centre for Dispute Resolution (ICDR), in accordance with its International Arbitration Rules, as well as the following terms:

(i)      The seat of arbitration shall be Bogotá, Colombia.

---

[2]    In the event that the winning bid has direct or indirect foreign investment, the compromissory clause of the Agreement shall only be the one regulated in section 15.3. However, if the arbitrators or any authority with jurisdiction to do so, declare that, for this Agreement, the legal grounds for international arbitration do not exist, the national arbitration provided in Section 15.2 above shall be deemed as agreed upon.

(ii)     The language of the arbitration shall be Spanish.

(iii)    The law applicable to the Agreement shall be the Colombian law in force at the time of the execution of the Agreement as well as the procedural rules of the law, applicable to the dispute.

(iv)     The tribunal shall be appointed by the Parties based on a list drawn up by the ICDR, which shall take into account the observations of qualification and experience reported by the Parties. In the event that the Parties fail to reach an agreement, the ICDR shall be responsible for appointing all arbitrators, in accordance with its regulations.

(v)      Once the request for arbitration has been filed by one of the Parties, the summoning Party shall additionally notify the Ombudsmen Office [Procuraduría General de la Nación], which may intervene in the proceedings through its agents as it does in domestic arbitration, as well as the Colombian National Legal Defense Agency, which may intervene in the arbitration proceedings through a representative on behalf of ANI or as a mere intervening party, enjoying in this case the same powers, rights and procedural and evidentiary guarantees of the Parties.

(vi)     The arbitrators shall decide according to the law.

(vii)    The fees of the international arbitral tribunal shall be limited to the same amounts as those set forth in Section 1.52(f) of this General Part, unless the Parties agree to modify such amounts.

(viii)   The same provisions contained in Section 15.2(h) shall apply to the arbitrators of the International Arbitral Tribunal and the provisions contained in Sections 15.2(i) and 15.2(j) of this General Part shall apply to international arbitration.

(d)  The initiation of the arbitration proceedings shall not impair the exercise of exceptional powers available to ANI under the Agreement and the Applicable Law. Administrative acts resulting from the exercise of such powers may not be submitted to

arbitration because they fall under the jurisdiction of the contentious-administrative jurisdiction.

(e)   The Parties agree that in the event that the Arbitral Tribunal is convened, the effects of the arbitration clause shall be extended to those companies, corporations or individuals that have jointly submitted the Tender Bid, to the extent that such parties gave their consent by reference at the time of the submission of the Tender Bid.

(f)   The initiation of the arbitration proceedings does not entitle the parties to unilaterally suspend the performance of the obligations of the Agreement.

## C.   APPLICABLE SUBSTANTIVE LAW

8.   Pursuant to Section 15.3 of the Agreement, the Applicable Law is Colombian law.

## D.   APPLICABLE PROCEDURAL RULES

9.   Pursuant to Section 15.3 of the Agreement, the applicable procedural rules are those contained in the ICDR International Dispute Resolution Procedures, Rules as Amended and in Force as of 1 June 2014 (the "**Rules**").

## E.   SEAT OF ARBITRATION

10. Pursuant to Section 15.3 of the Agreement, the seat of arbitration is Bogotá, Colombia.

## F.   LANGUAGE OF ARBITRATION

11. Pursuant to Section 15.3 of the Agreement, the language of the arbitration is Spanish.

## G.   ARBITRAL TRIBUNAL

12.  The Arbitral Tribunal is composed of the following members:

Elina Mereminskaya – co-arbitrator

Independent Arbitrator, Santiago, Chile.

em@emereminskaya-arb.com

Cristián Conejero – co-arbitrator

Av. Nueva Costanera 3300, 4th floor Vitacura, Santiago, Chile.

cristian.conejero@cuatrecasas.com

Eduardo Palmer – President

2601 South Bayshore Drive, Penthouse 1

Miami, Florida 33133

ep@epalmerlaw.com

Paula C. Arias – Administrative Secretary

1311 Miller Drive, Miami, Fl. 33146

paulacarias@gmail.com

## II.  THE ARBITRATION PROCEEDINGS

### A.  STEPS PRIOR TO THE FORMATION OF THE TRIBUNAL

13. On 16 October 2020, the Claimants filed their Notice of Arbitration with the ICDR, based on the compromissory clause contained in Section 15.3 of the Agreement (the "**Compromissory Clause**").

14. The ICDR assigned the number 01-20-0015-3123 to the present arbitration (the "**Arbitration**").

15. On 5 November 2020, ANI requested a 90-day extension to submit its response to the Notice of Arbitration. After reviewing comments on the matter submitted by

both ANI and the Claimants, the ICDR decided to grant a 60-day extension by email dated 9 November 2020.

16. On 13 January 2021, the Claimants filed the Request for Interim Measures consisting in ordering ANI the following: (a) to refrain from taking any action that affects the proper course of the Arbitration or that would render the final award ineffective; (b) to take all necessary steps to ensure that the Sanctioning Proceedings do not obstruct this Arbitration, aggravate the dispute or render the final award ineffective; (c) to refrain from declaring any breaches and/or imposing fines on POB in connection with any proceedings relating to the subject matter of this Arbitration, including the Sanctioning Proceedings, until a final award is rendered; (d) to refrain from initiating new administrative proceedings related to the subject matter of this Arbitration, until a final award is rendered; and (e) if, at the time the Measures are adopted, any sanctioning decision related to the subject matter of the Arbitration is in force, including in the Sanctioning Proceedings, to suspend the execution of the respective administrative act (the "**Request for Measures**").

17. On 18 January 2021, the Respondent filed its Reply to the Request for Arbitration and its Counterclaim.

18. On 15 January 2021, Salvador Fonseca González was appointed by the ICDR as Emergency Arbitrator in the proceedings and issued Procedural Order No. 1. (the "**Emergency Arbitrator**"). On that same day the Emergency Arbitrator held a preliminary conference with the Parties and the ICDR. Likewise, on the same date, the Procedural Calendar for the Request for Measures was established.

19. On 27 January 2021, the Respondent filed a Reply to the Request for Measures, in which it argued, in summary: (i) that ANI has the duty to seek compliance with the purposes of the State; (ii) that the public administration is vested with exorbitant powers to protect the collective interest; (iii) that the sanctioning power of the authorities ensures the achievement of the State's purposes; (iv) that Article 17 of Law 1150 of 2007 entitles ANI to impose fines; (v) that Article 86 of

Law 1474 of 2011 establishes a legal mandate to compel contractors to comply with the agreed terms; (vi) the Agreement establishes that ANI may impose fines to POB to compel it to comply with its obligations; (vii) Section 15.3(d) of the Agreement does not impair ANI's powers; (viii) the requirements to grant the measures set forth in the Arbitration Law, the Code of Administrative and Contentious Proceedings and the Rules are not met; among others. Likewise, ANI objected to the jurisdiction and competence of the Emergency Arbitrator, in the same terms as it did previously in the Arbitration.

20. On 1 February 2021, the hearing with the Parties and the Emergency Arbitrator took place, in which the Parties presented their positions regarding the Request for Measures.

21. On 9 February 2021, the Emergency Arbitrator issued the Provisional Award whereby he ruled that he had jurisdiction and competence. Likewise, he granted the interim measures, ordering ANI to refrain from declaring POB in default and from imposing and/or enforcing fines on POB in the Sanctioning Proceedings or in any future sanctioning proceedings against POB related to the subject matter of the Arbitration (the "**Provisional Award**"), until a final award was issued settling the dispute under Arbitration.

B. **ESTABLISHMENT OF THE ARBITRAL TRIBUNAL AND PROCEDURAL ORDER NO. 1**

22. The ICDR determined, pursuant to Article 11 of the Rules, that the disputes in this arbitration would be decided by a tribunal comprised of three members, Elina Mereminskaya, Cristián Conejero and Eduardo Palmer.

23. On 3 June 2021, the ICDR stated that it had received no objections to these appointments and therefore confirmed the appointment of the members of the Arbitral Tribunal and determined that Eduardo Palmer would act as President of the Arbitral Tribunal.

24. On 17 June 2021, the Arbitral Tribunal issued Procedural Order No. 2, in which it summoned the Parties to a Preliminary Hearing in order to agree on certain matters relating to the conduction of the Arbitration.

25. On 25 June 2021, the Arbitral Tribunal held the Preliminary Hearing with the representatives of the Parties. Appearing for the Claimants were counsel Miguel Castro, Sebastián Briceño and Rafael Rincón. Counsel Maria Torres appeared on behalf of the Respondent.

26. Based on the discussions between the Parties and the Tribunal at said Preliminary Hearing, as well as on the communication sent by the Claimants dated 24 June 2021, and confirmed by the Respondent on the same date, the Arbitral Tribunal issued Procedural Order No. 3, dated 19 July 2021, whereby the rules of procedure of the Arbitration and the Procedural Timetable were established. Likewise, at the Preliminary Hearing, and as set forth in Procedural Order No. 3, the Parties accepted the appointment of Paula Arias as Secretary of the Tribunal, to perform the functions set forth in Procedural Order No. 2.

## C.  WRITTEN SUBMISSIONS

27. On 19 November 2021, the Claimants filed their Statement of Claim and the Respondent filed its Statement of Counterclaim.

28. On 28 February 2022, the Claimants filed their Response to the Statement of Counterclaim and the Respondent filed its Response to the Statement of Claim.

29. On 18 March 2022, both Parties filed their Request for Production of Documents in Redfern *Schedule* format. On 8 April 2022, the Parties submitted Objections to the Request for Production of Documents. On 22 April 2022, the Parties submitted their respective responses to the Objections to the Request for Production of Documents.

30. On 11 May 2022, the Arbitral Tribunal issued Procedural Order No. 4, in which it summoned the Parties to a conference to review procedural issues and to organize the following phases, as well as to ask questions about the *Redfern Schedules* of each of the Parties.

31. The aforementioned conference took place with the Arbitral Tribunal and the Parties on 18 May 2022. Counsel Rafael Rincón and the team of Zuleta Abogados Asociados appeared on behalf of the Claimants. Counsel Carlos F. Ortegón, María Torres and Rocío Pinzón appeared for the Respondent.

32. On 2 June 2022, the Arbitral Tribunal issued Procedural Order No. 5, defining the date of the Final Hearing and amending the date of the Procedural Timetable regarding the Arbitral Tribunal's decision on the Objections to the Request for Production of Documents.

33. Likewise, through Procedural Order No. 5, the Arbitral Tribunal decided on the Requests for Production of Documents (*Redfern Schedules*) submitted by each of the Parties and the individual Objections, as well as the reasons given.

34. On 19 July 2022, Procedural Order No. 6 was issued, granting the Claimants' request to order the Respondent to produce the documents required under Procedural Order No. 5, or to certify that such documents do not exist or that they are not in its possession or custody. Likewise, an extension was granted for the submission of the Reply and Rejoinder Memorials.

35. On 29 July 2022, Procedural Order No. 7 was issued, in which aspects related to the compliance with the production of documents required by Procedural Order No. 5 were decided and an extension was granted for the filing of the Reply and Rejoinder Memorials.

36. On 5 August 2022, Procedural Order No. 8 was issued, in which aspects related to the compliance with the production of documents required under Procedural Orders No. 5 and 6 were decided, and an extension was granted for the filing of the statement

of undisputed facts to be submitted jointly by the Parties.

37. On 16 August 2022, the Claimants filed their Reply and the Respondent filed its Reply on the Counterclaim.

38. On 15 September 2022, Procedural Order No. 9 was issued, deciding on the Claimants' communication dated 19 August 2022, in which they requested to exclude certain evidence submitted by the Respondent together with its Reply on the Counterclaim. Likewise, due to the time spent on the exchange of communications regarding the admissibility of such evidence, a new extension was granted for the submission of the Rejoinder Briefs and the Parties were invited to agree on the necessary and prudent extension period.

39. In the absence of agreement between the Parties on the date for filing the Rejoinder Briefs, on 30 September 2022, the Arbitral Tribunal issued Procedural Order No. 10, setting the date for filing the Rejoinder Briefs for 2 November 2022, maintaining the date set for the Final Hearing.

40. On 2 November 2022, the Claimants filed their Rejoinder on the Counterclaim and the Respondent filed its Rejoinder.

41. On 20 November 2022, Procedural Order No. 11 was issued, deciding the evidentiary challenge to the Claimants' Rejoinder filed by the Respondent on 9 November 2022, and opposed by the Claimants on 11 November 2022. By means of the same Procedural Order No. 11, the Arbitral Tribunal admitted the three expert reports, CER-006, CER-007 and CER-008, submitted by the Claimants in their Rejoinder. Likewise, the Respondent was granted a period up to 2 December 2022 to respond to the analysis contained in expert report CER-008.

42. On 21 November 2022, a remote hearing was held with the Parties and the Arbitral Tribunal, in which, among other things, the Parties were instructed to convene in order

to agree on the pending issues between them in view of the Final Hearing. By email of the same date, the Parties informed the Arbitral Tribunal of the following agreements reached: (i) the Final Hearing would take place in Bogotá, D.C.; (ii) the Parties would submit to the Arbitral Tribunal a brief with the stipulation of the undisputed facts; and (iii) they would send the agreed schedule for the development of the Final Hearing, which would take place between 12 and 16 December 2022.

43. On 23 November 2023, Procedural Order No. 12 was issued, whereby it ruled on the commencement of a *actio popularis* brought against the Respondent, as well as on the Notice of Disregard of the Provisional Award, filed by the Claimants on 17 November 2022, and answered on 18 November 2022. Procedural Order No. 12 confirmed the final, valid and binding nature of the Provisional Award. It also fixed the dates of the Final Hearing between 12 December and 16 December 2022, as previously agreed by the Parties and decided by the Arbitral Tribunal.

44. On 29 November 2022, the Parties submitted to the Arbitral Tribunal a memorial with two exhibits filed by mutual agreement of the Parties.

45. On 2 December 2022, the Respondent filed a memorial in response to ANI's Funding Report, in accordance with the term granted for such purpose in Procedural Order No. 11.

46. On 6 December 2022, the Arbitral Tribunal acknowledged receipt of the Brief submitted jointly by the Parties and considered the evidence submitted as attached.

47. By e-mail dated 7 December 2022, the Parties sent to the Arbitral Tribunal the Written Statement of Undisputed Facts.

48. By communication dated 8 December 2022, the Parties referred to the Arbitral Tribunal certain procedural aspects of the Final Hearing for its decision, such as the preparation of a hearing protocol, dates and deadlines for the delivery of the power

point presentations, the possibility of suspending the Final Hearing for possible COVID-19 infections, among others. These matters were decided on Procedural Order No. 13 dated 10 December 2022.

49. On 11 December 2022, the Parties sent to the Arbitral Tribunal the schedule of the Final Hearing.

## D.   **EVIDENTIARY HEARING**

50. The Final Hearing took place between 12 and 16 December 2022, between 10:00 a.m. and 6:00 p.m., local time, at the Arbitration and Conciliation Center of the Bogotá Chamber of Commerce, located at Calle 76 #11-52 in Bogotá, Colombia.

50. The following persons appeared at the Final Hearing: (a) the Arbitral Tribunal, composed of Elina Mereminskaya; Cristián Conejero and Eduardo Palmer, as President of the Arbitral Tribunal, as well as Paula Arias as Administrative Secretary; (b) Rafael Rincón, Miguel Castro, Santiago Vernaza, Ana María Rincon, Santiago Suarez, José David López, Adriana Triana, Tomer Ginesin and Mr. Néstor [last name not recorded], CEO of POB, on behalf of the Claimants; and (c) on behalf of the Respondent: Carlos Felipe Ortegon, Jesus Valbuena, Maria Torres and Rocio Pinzon.

51. The hearing began with opening statements from each of the Parties, lasting 90 minutes.

52. Then, the Parties presented their fact witnesses and expert witnesses according to the schedule of the Final Hearing previously sent by the Parties to the Arbitral Tribunal.

53. The Arbitral Tribunal heard: (a) the witness presented by the Claimants: Luis Ernesto Pérez; (b) the witnesses presented by the Respondents: Natalia Mayorga, Eduardo Román and Álvaro Durán; (c) the legal expert presented by the Claimants: Gonzalo Suárez; (d) the expert witnesses presented by the Claimants: Hernando Torres, Edinson Arias, Juliette Fortin, Tatiana Santa Rios, Gabriel Medina Moncayo, Juan

Carlos Valenzuela; and (e) the expert witness presented by the Respondent: Guillermo Sarmiento.

## E.   POST-HEARING PROCEDURES, CONCLUSION OF THE PROCEEDINGS AND TIME LIMIT FOR RENDERING THE FINAL AWARD

55. During the course of the Final Hearing, the Parties reached certain agreements to advance the proceedings after the Hearing, which were set forth by the Arbitral Tribunal in Procedural Order No. 14 dated 20 December 2022. The Tribunal informed the Parties during the Final Hearing and in Procedural Order No. 14 that the file would remain open under Article 27 of the Rules for the purpose of advancing the proceedings after the Final Hearing.

56. By Procedural Order No. 14, the Arbitral Tribunal granted the Respondent, in accordance with the opportunity offered by the Claimants, until 23 December 2022 to inform whether it would avail itself of the opportunity to contradict the CER-008 report and the time it would need to exercise that right. Likewise, the deadlines were set for the proceedings after the Final Hearing, consisting of (1) the questions that the Arbitral Tribunal would submit to the Parties; (2) the submission of the post-hearing briefs; and (3) a hearing for closing arguments.

57. On 18 January 2023, pursuant to the provisions of Procedural Order No. 14, the Arbitral Tribunal issued Procedural Order No. 15, whereby the Arbitral Tribunal formulated the request for additional information and the questions it deemed necessary to put to the Parties after the Final Hearing.

58. As of 23 January 2023, the Respondent did not report whether it was interested in using the opportunity to contradict the CER-008 report.

59. On 28 February 2023, the Parties submitted their post-hearing briefs.

60. On 18 May 2023, the Closing Arguments Hearing was held virtually.

61. On 19 June 2023, the Arbitral Tribunal issued Procedural Order No. 16, rejecting the Claimants' request to provide new evidence, and dismissing the Respondent's request that the Tribunal decline jurisdiction since the arbitral proceedings had expired. The Tribunal noted that under Article 27 of the ICDR Rules, the Final Hearing had been kept open and the Tribunal had jurisdiction to decide the case.

62. In the same Procedural Order No. 16, the Arbitral Tribunal reaffirmed that the Tribunal would render two awards, a final partial award on jurisdiction, liability and damages, and then a final partial award on interest and costs of the arbitration. In view of the foregoing, the Final Hearing was kept open for the purpose of resolving questions or requesting clarifications necessary to the Parties for the preparation of this Partial Award on jurisdiction, liability and damages, and to be able to request, a posteriori, the position of the Parties on the matter of interest and costs, and to be able to prepare the final partial award on interest and costs.

63. On 1 December 2023, the Arbitral Tribunal issued Procedural Order No. 17, by which it requested the Claimants to "submit a disaggregated calculation for each of the Functional Units 1, 2, 3, 4 and 5" using the same methodology applied in their previous expert reports, and, if necessary, to attach an expert report in order to present such amounts. The Respondent, in turn, could submit a response to such calculation, and could also attach an expert report analyzing and challenging the amounts presented by the Claimants. Procedural Order No. 17 also indicated that the Final Hearing would remain open, as provided in Procedural Order No. 16, for the same purposes.

64. Pursuant to Procedural Order No. 17, on 15 January 2024, the Claimants filed a submission accompanied by FTI's Fourth Expert Opinion (Exhibit CER- 009). On 1 March 2024, the Respondent filed its response to Exhibit CER-009 accompanied by an expert opinion challenging that exhibit.

65. On 18 March 2024, pursuant to Procedural Order No. 17, the Arbitral Tribunal issued Procedural Order No. 18, by which it granted Claimants leave to file their Reply to

the Respondent's Counter-memorial to the calculations and related expert opinion filed on 1 March 2024. The Respondent, in turn, could file a Rejoinder. The Tribunal also reserved the right to convene another session of the Final Evidentiary Hearing to clarify issues related to damages calculations and the evidence supporting them.

66. Pursuant to Procedural Order No. 18, on 12 April 2024, the Claimants filed a submission accompanied by FTI's Fifth Expert Opinion (Exhibit CER-010). On 7 May 2024, the Respondent filed its response to Exhibit CER-010 accompanied by an expert opinion challenging that exhibit.

67. On 4 June 2024, the Arbitral Tribunal issued Procedural Order No. 19, based on the reservation made to keep the Final Hearing open, whereby it set a remote hearing with the presence of the experts of both Parties. At the hearing each Party would have the opportunity to present its closing arguments and to clarify and/or challenge the observations and conclusions presented in the reports submitted pursuant to Procedural Orders Nos. 17 and 18.

68. On 26 June 2024, the hearing convened by Procedural Order No. 19 was held. At the conclusion of this hearing, the Tribunal again confirmed that the file would remain open to continue evaluating the evidence and arguments to render the partial award on liability and damages, and subsequently another on arbitration costs.

69. On 5 July 2024, within the time frame established at the hearing, the Claimants noted the specific location in the record of the evidence associated with the UF2 Archaeological Claim.

70. On 12 July 2024, the Respondent submitted its statement regarding the Claimants' brief dated 5 July 2024.

71. On 26 July 2024, the Parties sent to the Arbitral Tribunal the transcript of the hearing of 26 June 2024.

### III.    THE FACTS

72. This Section describes the essential facts of the Arbitration, as derived from the Memorials of each of the Parties, as well as from the Statement of Undisputed Facts submitted jointly by the Parties.

### A.    THE TENDER OF THE PROJECT AND THE EXECUTION OF THE CONCESSION AGREEMENT

73. The Colombian State is the owner of the national road network and is primarily responsible for its construction, rehabilitation and maintenance. In order to fulfil its legal obligations in relation to this infrastructure, it has the power to enter into concession agreements for private parties to carry out these tasks, under the terms and conditions provided for by the law and in the agreement. The entities must determine that the agreements can be performed before initiating the corresponding tenders.[3]

74. By Resolutions 1187 of 29 October 2013 and 1267 of 5 November 2013, ANI ordered the opening of the selection process for Public Tender No. VJ-VE-IP-LP-010-2013, whose purpose was to satisfy the need for public transportation service between the municipality of Sopó and the municipality of Cáqueza, connecting with the Bogotá - Villavicencio highway.[4]

75. In 2013, ANI published the public-private partnership ("**PPP**") public initiative project for the design, construction, operation, financing and hand-back of the Eastern Perimetral Highway of Cundinamarca (*vía Perimentral del Oriente de Cundinamarca*) (the "**Project**"). The Project consisted of the rehabilitation and improvement of an existing road corridor, plus the construction of an additional road, in the east of Bogotá D.C. In total, the Project would have a total length of approximately 153 kilometers, divided into five Functional Units ("**UFs**").[5]

---

[3]    Written Statement of Undisputed Facts, ¶¶ 11-12.
[4]    ANI Statement of Counterclaim, ¶ 1.
[5]    Written Statement of Undisputed Facts, ¶ 4; POB & S&B Statement of Claim, ¶ 3;

76. According to both Parties, ANI structured the Project, determined that the Project was feasible and, therefore, on 29 October 2013, opened the public tender for the Project (the "**Tender**").[6]

77. During the Tender, ANI published the following documents:[7]

(i)     On 18 April 2013, ANI published an invitation to preselect potential interested parties in the Project and establish a prequalified Bidders list.[8] On that occasion, ANI published the Prefeasibility studies prepared by its structurer, in which it stated which roads would be intervened in UFs 4 and 5 and which Interventions would be carried out on them.[9]

(ii)    In July 2013, ANI selected the Prequalified Bidders, who were the potential interested parties in the Project that met the enabling requirements of legal capacity, investment experience and financial capacity provided by ANI in the prequalification invitation.

(iii)   ANI prepared the Prefeasibility and Feasibility studies before the start of the Tender, together with its team of structuring agents, formed by the International Finance Corporation ("**IFC**") of the World Bank, the Euroestudios - Durán & Osorio - Deloitte Temporary Union and by FONADE (now Enterritorio), a public entity dedicated exclusively to the financing and structuring of development projects. These studies included, among others, detailed analyses on environmental, geotechnical, geological and hydrological matters.[10]

(iv)   On 16 September 2013, ANI published the studies and designs in the feasibility stage and the other documents of the Tender.[11]

---

6   Written Statement of Undisputed Facts, ¶¶ 13, 15; POB and S&B Statement of Claim, ¶ 120.
7   Written Statement of Undisputed Facts, ¶¶ 4, 16.
8   POB and S&B Statement of Claim, ¶ 107.
9   POB and S&B Statement of Claim, ¶ 108.
10  ANI Reply on the Counterclaim, ¶ 134.
11  POB and S&B Statement of Claim, ¶ 117.

(v)    ANI issued Public Interest Resolution (*Resolución de Utilidad Pública*) No. 309 of 7 February 2014, by which it declared that the Project is of public interest and general interest and defined the layout of the Project.

78. The plural structure formed by S&B, the company C.I. Grodco en C.A., Ingenieros Civiles, and the company Colombiana de Inversiones de Infraestructura S.A.S. "**Plural Structure S&B**") expressed interest in being preselected. ANI, through Resolution No. 823 of 29 July 2013 included it in the list of Prequalified Bidders .[12]

79. During the Tender, the Plural Structure S&B made more than 60 observations on its contents and visited the Project site to verify its general conditions.[13]

80. On 30 May 2014, the Plural Structure S&B submitted its Tender Bid (the "**Bid**").[14] By Resolution No. 922 dated 23 July 2014, ANI declared that the Plural Structure S&B was the winner of the Tender.[15]

81. In compliance with the Bidding documents, the companies comprising the Plural Structure S&B, as shareholders, incorporated POB on 20 August 2014.[16]

82. The Parties signed the concession agreement No. 004 of 2014, dated 8 September 2014 (the "**Agreement**" or the "**Concession Agreement**").[17]

---

[12]    POB and S&B Statement of Claim, ¶ 107.
[13]    Written Statement of Undisputed Facts, ¶ 17.
[14]    POB and S&B Statement of Claim, ¶ 124.
[15]    POB and S&B Statement of Claim, ¶ 125.
[16]    Written Statement of Undisputed Facts, ¶ 18; POB and S&B Statement of Claim, ¶¶ 5, 41, 126.
[17]    POB and S&B Statement of Claim, ¶¶ 41, 127; ANI Statement of Counterclaim, ¶ 4.

B.    **THE SCOPE OF THE AGREEMENT**

83. According to both Parties, the performance of the Agreement for the development of the Project is divided into three Stages:[18]

  (i)   Preoperative Stage: This stage is composed of the Preconstruction Phase and the Construction Phase. The Preconstruction Phase starts from the Commencement Date until the date on which the Construction Phase Commencement Minutes are executed, from which date the Construction Phase would commence. By express provision of the Agreement, the Construction Phase—and therefore the Pre-Operational Stage—would end with the signing of the last Functional Unit Completion Minutes.

  (ii)  Operation and Maintenance Stage ("**O&M**"): This stage would begin with the execution of the last Functional Unit Completion Minutes and would extend until the termination date established in Section 2.4 of the Agreement regarding the term thereof.

  (iii) Hand-Back Stage: This stage would begin once the Operation and Maintenance Stage concluded or if the Early Termination of the Agreement is declared. This stage concludes with the execution of the Hand-Back Minutes.

84. During the Construction Phase, which takes place in the Pre-Operational Stage, there are different types of interventions carried out by the Concessionaire. In accordance with Section 4.1 of Technical Appendix 1, interventions are all Construction, Rehabilitation and/or Improvement works necessary for the fulfillment of the Concessionaire's obligations ("**Interventions**").[19] The Interventions provided for each of the five UFs are described in Technical Appendix 1.[20]

85. In turn, according to both Parties, the O&M activities in the Pre-Operational Stage required of the Concessionaire are those required to maintain the road corridor in

---

[18]   Written Statement of Undisputed Facts, ¶ 5; POB and S&B Statement of Claim, ¶¶ 128-134.
[19]   Written Statement of Undisputed Facts, ¶¶ 6-7; POB and S&B Statement of Claim, ¶ 135.
[20]   Written Statement of Undisputed Facts, ¶¶ 6-7; POB and S&B Statement of Claim, ¶ 137.

adequate conditions during the Pre-Operational Stage of the corresponding UFs, in compliance with the provisions of the Agreement.[21]

86. The Concessionaire's remuneration, called Compensation [Retribución] in the Concession Agreement, has three components: ANI Contributions, Toll Collection and Commercial Exploitation Income ("**Retribution**").[22]

87. UFs 4 and 5 represent approximately 58% of the Retribution, being the most significant UFs of the Project and those that have the greatest impact on the Concessionaire's Retribution. Under the Agreement, POB would receive a minimum value for Toll Collection, called the Present Value of Toll Revenues - VPIP [Valor Presente por Ingresos de Peaje] (the "**VPIP**").[23]

88. The Agreement, pursuant to its Section 2.4, would have a duration of 25 years. However, in the event that the Concessionaire does not obtain the VPIP within that term, the duration of the Agreement could be extended up to a maximum of 29 years. If the Concessionaire does not obtain the VPIP within 29 years, ANI must pay the difference between the amount actually collected and the VPIP and the Agreement would terminate.[24]

## C.    THE BEGINNING OF THE AGREEMENT PERFORMANCE

89. According to the Parties, under the terms of the Agreement, the Concessionaire undertook to obtain the applicable permits and licenses in order to be able to perform the Interventions contemplated in the Concession Agreement. Without the required permissions (including applicable licenses), the Interventions cannot be performed.[25]

---

[21]   Written Statement of Undisputed Facts, ¶ 31.
[22]   Written Statement of Undisputed Facts, ¶ 8; POB and S&B Statement of Claim, ¶¶ 140-146.
[23]   Written Statement of Undisputed Facts, ¶ 9.
[24]   Written Statement of Undisputed Facts, ¶ 10.
[25]   Written Statement of Undisputed Facts, ¶ 20.

90. These environmental permits and licenses can be of two types in infrastructure projects in Colombia: Environmental licenses and Environmental Guidance Adaptation Programs ("**PAGA**").[26]

91. The need to have one or the other depends on the type of intervention to be carried out: If the Intervention is for Construction, an environmental license shall be required; if the Intervention is for Improvement or Rehabilitation, a PAGA shall be required.[27]

92. The Concessionaire obtained the following environmental permits:[28]

(i)   For UF1: by means of a concept dated 25 June 2015, the Supervisor issued its no-objection to the PAGA prepared by the Concessionaire;

(ii)  For UF2: by means of a concept dated 13 September 2016, the Supervisor issued its no-objection to the PAGA prepared by the Concessionaire;

(iii) For UF3: by means of a concept dated 13 September 2016, the Supervisor issued its no-objection to the PAGA prepared by the Concessionaire;

(iv)  For UF4: by means of a concept dated 26 October 2016, the Supervisor issued its no-objection to the PAGA prepared by the Concessionaire;

(v)   For UF5: by means of a concept dated 30 September 2016, the Supervisor issued its no-objection to the PAGA prepared by the Concessionaire; and

(vi)  For the Choachí Variant: The National Environmental Licensing Authority [Autoridad Nacional de Licencias Ambientales] ("**ANLA**") issued the environmental license through Resolution 248 of 10 March 2016.

---

[26]   Written Statement of Undisputed Facts, ¶ 21; POB and S&B Statement of Claim, ¶ 157.
[27]   Written Statement of Undisputed Facts, ¶ 22; POB and S&B Statement of Claim, ¶ 158.
[28]   Written Statement of Undisputed Facts, ¶ 22.

93. The Concessionaire submitted to the Supervisor the Layout and Geometric Design Studies and the Detailed Studies of UFs 4 and 5[29].

94. The Supervisor submitted its No-objection to the Layout and Geometric Design Studies of UFs 4 and 5 through the official letters CP-PER-360-2015 (RAD. ANI No. 2015-409081869-2) and CP-PER-356-2015 (RAD. ANI No. 2015-409-080604-2) dated 10 and 4 December 2015 respectively, as well as its No-Objection to the Detailed Studies of Functional Units 4 and 5, through the official letters CP-PER-370-2015 (RAD. ANI No. 2015-409-082668- 2) and CP-PER-369- 2015 (RAD. ANI No. 2015-409-082674-2) of 14 December 2015[30].

95. Derived from the foregoing, on 16 January 2016, the Parties signed the Construction Phase Commencement Minute. In accordance with the provisions of Amendment No. 4, the completion of the Construction Phase of UFs 4 and 5 began on 15 December 2015. From then on, the Concessionaire began to perform the activities provided for in the Agreement and in the Works Plan.[31]

## D.  THE IDENTIFICATION OF THE SPRINGS IN UFS 4 AND 5 AND THE EXECUTION OF THE EER MINUTES

### 1.  IDENTIFICATION OF SPRINGS IN UFs 4 AND 5

96. During the Construction Phase, the Concessionaire identified that there were 66 springs in the layout of UFs 4 and 5 of the Project.[32]

97. Indeed, according to the Claimants, on 16 August 2016, 1 September 2016, and 6 December 2016, POB received questions, objections, and claims ("**PQRs**") from

---

[29]  Written Statement of Undisputed Facts, ¶ 23;
[30]  Written Statement of Undisputed Facts, ¶ 24.
[31]  Written Statement of Undisputed Facts, ¶ 25; POB and S&B Statement of Claim, ¶¶ 166-167.
[32]  Written Statement of Undisputed Facts, ¶ 26.

members of the community surrounding the Project, where the community warned of the possible existence of springs in the vicinity of the route of UFs 4 and 5.[33]

98. According to the Claimants, between October 2016 and April 2018, POB carried out technical studies to verify the physical and chemical characteristics of the water sources identified in the PQRs.[34] These reports include the report prepared by the Pontificia Universidad Javeriana (the "**Javeriana Report**")[35] and the report prepared by Constructora SIAM S.A. (the "**SIAM Report**"),[36] which together concluded the existence of the 66 springs, which were informed to ANI and the Supervisor.[37]

99. The Claimants point out that on 14 November 2017, as concluded by the Javeriana Report, it submitted to ANI the first notice of the Exemption of Liability Event ("**EER**") (the "**First EER Notice**"); on 27 February 2018, and as concluded by the SIAM Report, the Concessionaire submitted the second EER notice (the "**Second EER Notice**"), to which ANI supposedly has not replied.[38] POB adds that on 28 April 2018, based on a supplement to the SIAM Report and other requirements,[39] it submitted to ANI the third EER notice (the "**Third EER Notice**"), supplemented by a communication dated 23 May 2018.[40] According to the Claimants, only on 19 July

---

[33]  POB and S&B Statement of Claim, ¶ 168.
[34]  POB and S&B Statement of Claim, ¶¶ 170-180.
[35]  POB and S&B Statement of Claim, ¶¶ 172-175, 177.
[36]  POB and S&B Statement of Claim, ¶¶ 176, 178-179.
[37]  POB and S&B Statement of Claim, ¶¶ 174, 177, 180.
[38]  POB and S&B Statement of Claim, ¶¶ 186-190.
[39]  The Claimants point out that, on 18 February 2018, the Corporación Autónoma Regional de la Orinoquía, an autonomous entity of the central State in charge of the administration of the environment and natural resources and with jurisdiction over part of the Project ("**Corporinoquía**") notified POB of two administrative acts urging POB to carry out hydrogeological studies to verify the conditions of two points of water interest in the vicinity of the Project. Statement of Claim, ¶ 189. In addition, the Respondent states that the Corporación Autónoma Regional de Cundinamarca, an autonomous entity of the central State in charge of the administration of the environment and natural resources, and with jurisdiction over part of the Project ("**CAR**" and jointly with Corporinoquía, the "**Environmental Authorities**") reportedly sent POB a communication, dated 22 May 2018, stating that no activities could be carried out in the vicinity of the springs. Statement of Claim, ¶ 192.
[40]  POB and S&B Statement of Claim, ¶¶ 190-192.

2019 did the Supervisor allegedly communicate to ANI that it agreed that the events reported in the Third EER Notice constituted an EER.[41]

## 2.  EXECUTION OF THE EER MINUTES

100.    According to both Parties, on 1 August 2018, the Parties executed the Exemption of Liability Event Minutes ("**EER Minutes**"), whereby the Parties acknowledged that the existence of the springs in UFs 4 and 5 of the Project was an EER under the terms of the Agreement.[42]

101.    According to the Parties, in the EER Minutes, among other obligations and commitments, the Parties undertook to carry out the following activities:[43]

(i)     Activity 1, which consisted of the "preparation and presentation of standard mitigation measures and works at the water points identified for Functional Units 4 and 5 by the Concessionaire" (the "**Mitigation Measures**"). The Mitigation Measures would be submitted by the Concessionaire to ANI and the Supervisor so that they could be subsequently "presented with the collaboration of the Concessionaire to the competent Authorities for their study (approval or rejection)". The Parties responsible for this activity were the "Concessionaire - ANI - Supervisor". The Parties indicated that "the estimated time" of this activity would be "three (3) months counted as of the execution of the present minutes".

a.  If the Environmental Authorities accepted the standard Mitigation Measures, Activity 2 included the following: "(...) the Parties and the Supervisor shall meet and determine the possibility and/or feasibility of entering into a contractual document in which the Parties in good faith shall review, among other things, the activities and conditions required to resume

---

[41]    POB and S&B Statement of Claim, ¶ 193.
[42]    Written Statement of Undisputed Facts, 27-28; POB and S&B Statement of Claim, ¶¶ 196.
[43]    Written Statement of Undisputed Facts, ¶ 29.

the performance of the contractually foreseen interventions, studying the impacts that may arise".

b.   On the contrary, if the Environmental Authorities rejected the Mitigation Measures or works, Activity 2 included the following: "(...) the parties and the Supervisor shall meet and determine the possibility and/or feasibility of entering into a contractual document in which the Parties in good faith shall review, among other things, the activities and conditions required to perform the interventions of Functional Units 4 and 5 facing the impossibility of performing the contractually foreseen interventions".

(ii)   The parties responsible for Activity 2 were the "Concessionaire and ANI (with the support of the Supervisor)" and the Parties "estimated" that the duration of this Activity 2 would be "[t]wo months, subject to extension up to two more times". The Parties stated that "[i]f an agreement is not reached within the term stipulated herein, they would proceed as indicated in the Agreement(sic)".

102.   Activities 1 and 2 were the obligations acquired by the Parties to overcome the EER under the terms established in the EER Minutes and the Concession Agreement.[44]

## E.   THE FACTS SUBSEQUENT TO THE EXECUTION OF THE EER MINUTES REGARDING UFS 4 AND 5

103.   The Claimants point out that, on 21 August 2018, and in compliance with Activity 1 set forth in the EER Minutes, a meeting was held between ANI, the Supervisor and POB with the Environmental Authorities, with the purpose of proposing measures, which the Environmental Authorities allegedly refused.[45]

104.   POB adds that, despite the refusal of the Environmental Authorities, and in compliance with the EER Minutes, POB submitted, on 13 September 2018, the

---

[44]   Written Statement of Undisputed Facts, ¶ 30.
[45]   POB and S&B Statement of Claim, ¶¶ 251-252.

Mitigation Measures for their study (approval or rejection), which were supposedly rejected by the Environmental Authorities.[46]

105.    The Claimants point out that, on 17 September 2018, right after submitting the Mitigation Measures to the Environmental Authorities —anticipating that they would not be approved— POB sent to ANI a communication in which it stated that it had complied with Activity 1 of the EER Minutes. Then, after the Mitigation Measures were not approved, on 21 November 2018, 4 December 2018, and 1 January 2019, POB sent communications to ANI terminating Activity 1 and promoting the advancement of Activity 2.[47]

106.    According to the Claimants, in mid-January 2019, the Parties began negotiating an Amendment to the Concession Agreement as required by Activity 2. The first version of the Amendment that was negotiated under Activity 2 was sent by POB to ANI on 21 January 2019. These negotiations lasted between January and October 2019, and concluded with the agreement of the terms of the Studies and Designs Amendment, the final version of which was sent by POB to ANI, at ANI's request, on 11 October 2019.[48]

107.    According to the Claimants, ANI did not express any opposition to the Studies and Designs Amendment, but did not return it executed, despite POB's requests, made between November 2019 and June 2020.[49]

108.    For its part, the Respondent points out that there was never an approval of the Amendment, and that Activity 1 was still ongoing.[50]

---

[46]    POB and S&B Statement of Claim, ¶¶ 253-254.
[47]    POB and S&B Statement of Claim, ¶¶ 256-264.
[48]    POB and S&B Statement of Claim, ¶¶ 265-268, 272-274, 279.
[49]    POB and S&B Statement of Claim, ¶ 281.
[50]    ANI Statement of Counterclaim, ¶¶ 97, 137-138, 147-148, 168.

109.    According to the Claimants, on 23 June 2020, ANI sent communications to the Ministry of the Environment and the Comptroller's Office through which ANI allegedly attempted to reopen Activity 1, repudiating the terms of the EER Minutes.[51]

110.    On the other hand, the Claimants point out that both CAR and Corporinoquía have initiated environmental sanctioning proceedings against POB for allegedly carrying out activities other than the harvesting of secondary forest fruits within 100 meters around a spring, which would be stated in CAR's order 0415 of 4 May 2018, and Corporinoquía's order 800.6.19.0091 of 12 March 2019, respectively.[52]

111.    The Respondent points out that, due to its function of institutional articulation of Colombian State entities, on 16 June 2021, an Interinstitutional Working Group was held jointly with the environmental and governmental authorities and the Comptroller's Office, in which it was decided that the Regional Environmental Authorities would carry out a working group with ANLA. [53] It adds that, subsequently, more working groups were held between July 2020 and October 2021.[54]

112.    Additionally, the Respondent points out that, despite the execution of the EER Minutes, POB's O&M obligations were not suspended, which is why it sent multiple requests, between 2017 and 2020, for it to carry out the Maintenance and/or Priority Interventions activities in the sections of Functional Units 4 and 5.[55]

## F.    ARCHAEOLOGICAL FINDINGS OF UF 2

113.    The Claimants point out that on 21 July 2015, the Colombian Institute of Anthropology and History ("**ICANH**") issued Authorization for the Archaeological Intervention

---

[51]    POB and S&B Statement of Claim, ¶¶ 293-302.
[52]    POB and S&B Statement of Claim, ¶ 317.
[53]    ANI Statement of Counterclaim, ¶ 124.
[54]    ANI Statement of Counterclaim, ¶ 126.
[55]    ANI Statement of Counterclaim, ¶¶ 78-84.

No. 5048, through which the Preventive Archaeology Program of the UF2 of the Eastern Perimetral Highway Corridor of Cundinamarca (*vía Perimentral del Oriente de Cundinamarca*) was authorized (the "**Archaeological Program**").

114.    According to both Parties, 5 archaeological sites were found along the route of UF2: (i) El Divino Niño; (ii) the property of Mrs. Ana de Forero; (iii) the Hacienda los Alcaparros; (iv) the Crossroad el Salitre-Guasca; and (v) the Hacienda Búfalo - Camino al Meta.[56]

115.    The Claimants point out that, on 30 March 2016, ICANH approved the Archaeological Prospecting Report and ordered POB to implement the relevant management measures with respect to the sites found. As a result, according to the Claimants, on 26 January 2017, POB's Team of Archaeologists submitted the Request for Authorization for Archaeological Intervention, approved by ICANH on 1 March 2017.[57]

116.    According to both Parties, the work carried out by the Archaeological Team in charge of the Archaeological Program identified the presence of two sites of archaeological impact along the layout of the Project's UF2. The first, located between K5+650 and K5+800 within the El Divino Niño site. The second, located at K8+890 within the Hacienda los Alcaparros site.[58]

117.    According to both Parties, on 18 February 2022, two Panels of *Amiable Compositeurs*[59] acknowledged the existence of two EERs reported by POB ("**EERs-UF2**"), derived from the existence of archaeological elements between K5+650 and K5+800 (El Divino Niño) and K8+890 (Hacienda los Alcaparros) of UF2.[60]

---

[56]    Written Statement of Undisputed Facts, ¶ 34; POB and S&B Statement of Claim, ¶ 419.
[57]    POB and S&B Statement of Claim, ¶¶ 420-426.
[58]    Written Statement of Undisputed Facts, ¶ 35; POB and S&B Statement of Claim, ¶¶ 428-429; ANI Statement of Counterclaim, ¶ 19.
[59]    Final Decision *Amiable Compositeurs*, Dispute 15854 and 15856, both dated 18 December 2018. POB and S&B Statement of Claim, ¶ 412.
[60]    Written Statement of Undisputed Facts, ¶ 36.

118.    According to both Parties, in the Divino Niño *Amiable Composition* and in the Hacienda los Alcaparros *Amiable Composition* it was recognized that the archaeological findings presented in the Project's UF2 were an unforeseeable event.[61]

119.    The Claimants point out that, on 11 June 2020, POB informed ANI that the issues related to the archaeological findings, the intensity and quantity of the findings, as well as their effects on the Agreement, exceed the Concessionaire's reasonable allocation of risks and resulted in an economic imbalance of the Agreement.[62]

120.    According to both Parties, after the acknowledgment of these two EERs-UF2, POB continued to carry out the rescue work with the help of a team of archaeologists. POB continued to find relevant archaeological remains that extended the Archaeological Program. On 31 August 2021, the Parties executed the Completion Minutes for UF2.[63]

## G.    FUNDING OF THE SUPERVISOR SUBACCOUNT

121.    According to both Parties, the value of the funding of the Supervision and Supervisor Subaccount is as follows:[64]

(i)    During the Preconstruction Phase, the funding value is equivalent to $2,923,117,956 Reference Month Pesos per year;

(ii)    During the Construction Phase, the value of the funding is equivalent to $10,160,367,351 Reference Month Pesos per year —that is, between 3 and 4 times more than the value of the Preconstruction Phase; and

---

[61]   Written Statement of Undisputed Facts, ¶ 37.
[62]   POB and S&B Statement of Claim, ¶¶ 413, 438.
[63]   Written Statement of Undisputed Facts, ¶ 38.
[64]   Written Statement of Undisputed Facts, ¶ 32.

(iii) During the O&M Phase, the value of the funding is equivalent to $3,446,637,624 Reference Month Pesos per year, i.e., approximately 3 times less than the value of the Construction Phase.

122.    According to both Parties, the value of the Supervisor Contract is equivalent to $229,582,850 Reference Month Pesos per month during the Preconstruction Phase, $525,960,917 Reference Month Pesos per month during the Construction Phase, and $308,109,147 Reference Month Pesos per month during the O&M Stage. As of August 2020, ANI modified the value of the Supervisor Contract during the Construction Phase to $455,190,117 Reference Month Pesos per month.[65]

## IV.    ANALYSIS OF THE ARBITRAL TRIBUNAL

123.    With respect to the analysis of each of the claims made by the Parties that are the subject of this Award, the Arbitral Tribunal declares that it has analyzed and taken into consideration all the arguments presented by the Parties, as well as all the evidence produced during the Arbitration.

124.    Consequently, throughout this Award, the Arbitral Tribunal refers only to the arguments and evidence that has been considered relevant and necessary for the decision of the dispute. The fact that a piece of evidence or an argument is not mentioned does not mean that the Tribunal has not studied and analyzed it for the purposes of this decision.

125.    The analysis of the Arbitral Tribunal consists of (**A**) the objections on jurisdiction and competence raised by ANI; (**B**) the claims of POB and S&B in the Statement of Claim; (**C**) the claims of ANI in the Statement of Counterclaim, (**D**) the effects on the Agreement and on the claims of the Parties of the decision on the contractual breaches; and (**E**) compensation to the Claimants.

---

[65]    Written Statement of Undisputed Facts, ¶ 33.

## A.    OBJECTIONS TO THE JURISDICTION AND COMPETENCE OF THE ARBITRAL TRIBUNAL

126.    ANI asserts that this Arbitral Tribunal lacks jurisdiction and competence to entertain the dispute, arguing that the Arbitration is not international in character and raising certain objections to the Arbitral Tribunal's competence based on the matters claimed by the Claimants.

127.    As to the jurisdictional defenses, it raises the following objections: (a) the absence of the internationality requirement of subparagraph (c) of Article 62 of Law 1563 of 2012 "Whereby the National and International Arbitration Statute is issued and other provisions are enacted" ("**Law 1563 of 2012**");[66] (b) the non-fulfillment of the requirement of subparagraph (a) of Article 62 of Law 1563 of 2012, invoked by the Claimants to demonstrate that the arbitration is international;[67] and (c) non-fulfillment of the requirement of subparagraph (b) of Article 62 of the same Law.[68]

128.    Regarding the competence of the Arbitral Tribunal, ANI concludes: a) the Tribunal does not have competence to entertain the claims related to compensation, pursuant to section 14.2 (h) "Compensations for Events Exempting from Liability" of the Agreement;[69] and b) the Tribunal does not have competence to rule on the EPC Claims.[70]

129.    ANI argues that, only in the event that the Arbitral Tribunal declares that this Arbitration is international, confirming that it has jurisdiction, would it be able to hear the dispute raised in its Statement of Counterclaim.[71]

130.    It should be noted that ANI had presented the same objections on jurisdiction and competence in response to the Request for Interim Protection Measures filed by the Claimants dated 13 January 2021. The Emergency Arbitrator, Salvador Fonseca

---

[66]    ANI Statement of Counterclaim, Section 5.1.2.
[67]    ANI Statement of Counterclaim, Section 5.1.1.1.
[68]    ANI Statement on Defense, ¶ 494-498. In the same sense, ANI Rejoinder, ¶ 286-287.
[69]    ANI Statement of Counterclaim, Section 5.1.3.1.
[70]    ANI Statement on Defense, ¶ 548-561. In the same sense, ANI Rejoinder, ¶ 303-305.
[71]    ANI Statement of Counterclaim, p. 162.

González, issued a Provisional Award dated 9 February 2021 ("**Provisional Award**"), also ruling on the objections raised by ANI.

131.  The Emergency Arbitrator determined that the Arbitration was international, because: i) the Plural Structure stated in Annex 15 of the Bid contained foreign investment and that the Agreement was entered into under this assumption; ii) the requirements of subparagraphs a) and c) of Article 62 of the Arbitration Law to consider the arbitration as international are met; and iii) the dispute affects the interests of international trade.[72]

132.  The Emergency Arbitrator also rejected ANI's objection regarding its jurisdiction because this was a conflict surrounding an EER. Instead, he ruled that the issues in dispute related to a series of various declarations and damage awards that the Claimants sought from ANI and that did not relate to compensation arising from an EER.[73]

133.  The Emergency Arbitrator rejected ANI's argument that these were matters assigned to the competence of the *Amiable Compositeur*, pointing out that none of the claims in the Notice of Arbitration fell within the specific cases provided in the Agreement for the intervention of the *Amiable Compositeur*.[74]

134.  The Parties complied with the Provisional Award, in particular, ANI waived its right to seek its annulment.

135.  Throughout this Arbitration, ANI has broadly maintained the same line of argument of its objections. The Claimants, in turn, continued with the presentation of their respective arguments. The Arbitral Tribunal will now conduct an analysis of its jurisdiction and competence under Article 19 of the ICDR Rules.

---

[72]  Provisional Award, pp. 17-18.
[73]  Provisional Award, pp. 18-19.
[74]  Provisional Award, pp. 19-20.

1.    OBJECTION TO THE JURISDICTION OF THE ARBITRAL TRIBUNAL

136. ANI argues that the Arbitration between the Parties should not be considered an international arbitration, and therefore this Arbitral Tribunal —constituted in accordance with the arbitration clause established for international arbitrations— would not be the competent forum to rule on the dispute.

137. The Arbitral Tribunal will analyze ANI's arguments and the Claimants' respective submissions, in order of relevance attributed by the Tribunal, to rule on ANI's objection.

(a) The internationality of the Arbitration pursuant to Article 62(c) of Law 1563 of 2012

    (i)    ANI's position

138. ANI claims that this Arbitration should not be deemed international, since the requirement set forth in subparagraph c) of Law 1563 of 2012 is not met.[75]

139. First, ANI argues that the Parties wanted to limit the resolution of their disputes through international arbitration only to the cases subsumed in subparagraph c) of Article 62 of Law 1563 of 2012, for which purpose they drafted the clause with reference to this subparagraph, excluding subparagraphs a) and b) of the same article.[76]

140. According to ANI, due to the primacy of the will of the Parties, the only criteria of internationality that allows them to resort to international arbitration is that of subparagraph c) of Article 62. The Arbitral Tribunal would not even have to examine whether or not subparagraphs a) and b) of the same article are applicable, since they are not referred to in the arbitration agreement.[77]

---

[75]   ANI Statement of Counterclaim p. 175; Hereinafter, Law 1563 of 2022 is cited according to Exhibit CL-133.
[76]   ANI Statement on Defense, ¶ 467.
[77]   ANI Statement on Defense, ¶ 473, ¶¶ 477-480.

141. Second, ANI points out that the onus is on the Claimants to prove that the dispute "affects the interests of international trade"[78]. There is, in its opinion, no "cause, nexus or relationship whatsoever between the Claimants' statements or allegations and the effect on the interests of international trade".[79]

142. Indeed, ANI points out that, since S&B is not a party to the arbitration agreement or the Agreement, the justifications presented by POB to prove the alleged affectation of international trade are immediately meaningless and irrelevant.[80]

143. Third, ANI argues that the criterion of Article 62(c) is different from that used in the French legislation from which it originated, and therefore it is not sufficient to:[81]

> [S]imply demonstrate the impact on the interests of international trade as occurs in France, but rather, that THE DISPUTE is the one that affects the interests of international trade for the admissibility of international arbitration, which is a stricter and more rigorous criterion than the French one" [original capitalization].

144. ANI argues that it is not enough that there are transfers of foreign currency for the dispute itself to affect international trade, and that in the present case:[82]

> [T]he subject matter of the dispute revolves around whether to declare ANI's alleged breaches of Sections 14.1 and 14.2 of the Concession Agreement and not on the transfer of foreign currency by way of equity or debt on the project.

145. ANI goes on to state:[83]

> If the Claimants' position were accepted, the Colombian legal mandate would be ignored and it would mean

---

[78] ANI Statement of Counterclaim, p. 163, 177. In the same vein, ANI Reply on the Counterclaim, ¶¶ 307-314; ANI Rejoinder, ¶ 287.
[79] ANI Statement of Counterclaim, p. 179. In the same sense, ANI Statement of Defense, ¶¶ 521-523.
[80] ANI Statement of Defense, ¶ 504.
[81] ANI Statement of Counterclaim, p. 178-180. In the same sense, ANI Statement of Defense, ¶¶ 514-532.
[82] ANI Statement of Counterclaim, p. 179-181. In the same sense, ANI Statement of Defense, ¶ 517-520, ¶¶524-526.
[83] ANI Statement of Counterclaim, p. 182. In the same sense, ANI Statement of Defense, ¶ 518.

44

> that all arbitration is international simply because the contract
> has some element of internationality, even if the dispute does not
> deal with such element and, even more so, when there is not even
> an element of summary evidence of how the alleged breach
> affects the interests of international trade.

146.  Fourth, ANI emphasizes that subparagraph c) of article 62:[84]

> Refers unequivocally to the "interests of trade", i.e. the activity,
> not the interests of traders, or to the effects arising from the
> dispute affecting the interests of international trade, which is
> different. Thus, the fact that a foreign trader has an "interest" in
> a dispute is not sufficient to qualify an arbitration as
> international.

147.  ANI points out that there would be a difference between "the DISPUTE affecting the
interests of international trade and not that the hypothetical EFFECTS of the dispute
may or may not affect S&B in this case" [original capital letters].[85]

148.  Fifth, ANI analyzes the scope of Section 15.3 of the Agreement and argues that what
is stated in footnote 1 of Section 15.3 does not contradict its position.[86] In its
understanding, this footnote refers to Section 15.3 of the Agreement, which, in turn,
contains the reference to Article 62 (c). ANI concludes that:[87]

> [If] the provisions of Article 62(c) of Law 1563, to which the
> parties refer, are not proven, then the national or domestic
> arbitration referred to in Section 15.2 of the Agreement is
> appropriate.

149.  ANI attaches particular relevance to the document submitted by the Claimants
containing question No. 70 and ANI's answer on the scope of Section 15.3,

---

[84]  ANI Statement of Counterclaim, p. 182. In the same vein, ANI Reply on the Counterclaim, ¶ 307; ANI
Rejoinder, ¶¶ 292-294.
[85]  ANI Statement of Defense, ¶¶ 474, 488, ¶ 505-512. In the same sense, ANI Reply on the Counterclaim, ¶
311.
[86]  "In the event that the winning bid has direct or indirect foreign investment, the compromissory clause of the
Agreement shall only be the one regulated in section 15.3. However, if the arbitrators or any authority with
jurisdiction to do so, declare that, for this Agreement, the legal grounds for international arbitration do not
exist, the national arbitration provided in Section 15.2 above shall be deemed as agreed upon."
[87]  ANI Statement on Defense, ¶ 469. In the same sense, ANI Rejoinder, ¶¶ 288-290.

corresponding to the Tender period.[88] In its opinion, S&B acknowledged that neither of the parties had more than one domicile, and that the domicile of the SPV (Special-Purpose Vehicle) would be in Colombia, making unclear the application of the requirement provided for in Article 62(c) of Law 1563.[89]

150.  Question No. 70 reproduces the footnote of Section 15.3 of the Agreement and quotes Article 62(c) of Law 1563 of 2012:

> Taking into account that in the performance of the Concession Agreement, none of the parties would have more than one domicile, given that the SPV will be constituted for the specific purpose of performing the Concession Agreement and that the domicile of the SPV will be in Colombia, the application of the requirements provided in subparagraph c) of Article 62 of Law 1563 of 2012 would not be clear for it to be understood that the performance of the Concession Agreement affects the interests of international trade. We understand that it has been ANI's intention to protect the rights of plural [sic] structures with foreign investment, by indicating that disputes arising from the Concession Agreement will be decided through an International Arbitral Tribunal; however, since the application of subparagraph c) of Article 62 of Law 1563 of 2012 is not clear, we request you to modify the Concession Agreement in the sense that it is not mandatory that in these cases the disputes are decided by an International Arbitral Tribunal.

151.  Subsequently, question No. 70 expresses the concern that, in the event that the International Arbitral Tribunal is declared incompetent, the competent judge for the Agreement would be the contentious-administrative jurisdiction, requesting that the Agreement be modified to allow the choice between a National Arbitral Tribunal or an International Arbitral Tribunal.[90]

---

[88]  ANI Statement of Defense, ¶ 471; Exhibit C-180.
[89]  ANI Statement of Defense, ¶ 490. In the same sense, ANI Rejoinder, ¶¶ 302, 313.
[90]  Exhibit C-180.

152.  ANI answered with the intention of clearing such concern and, after quoting the text of Article 62 of Law 1563, indicated:[91]

> As is well known, the above provision is inspired by the decision of the Court of Appeals of Paris, in its Judgment of 14 March 1989, which in deciding the case: Murgue Seigle v. Coflexip, stated: 'The international nature of an arbitration must be determined in accordance with the economic reality of the process during which it arises. In this respect, all that is required is that the economic transaction must involve a transfer of goods, services or funds across national boundaries, while the nationality of the parties, the law applicable to the contract or arbitration, and the seat of the arbitration are irrelevant.' (Translation and emphasis added). Based on the foregoing, ANI provided that at the time of formulating the respective bids, the bidders must expressly, clearly and unequivocally state in a special annex whether their proposal contains the elements of direct or indirect foreign investment, since with that the transfer of goods, services or funds across national borders is thereby deemed to be certain, "understanding" that any "dispute submitted to arbitration decision affects (a) the interests of international trade". Thus, there would be no reason to doubt about the jurisdiction of the arbitrators to settle the eventual dispute under the rules of Section Three of Law 1563 of 2012 and those special rules set forth in the arbitration clause. Notwithstanding the foregoing, ANI modified the General Part of the Agreement to provide greater clarity regarding the application of national arbitration in the event of the impossibility of applying international arbitration.

(ii)   Position of POB and S&B

153.  The Claimants request the rejection of ANI's objections. First, they assert that the dispute at issue in this Arbitration affects the interests of international trade. In particular, "when it refers to an economic operation involving the transfer of funds,

---

[91]  Exhibit C-180.

goods or services across the borders of two or more States".[92]

154. Thus, the dispute at issue in the Arbitration affects the interests of international trade given that:[93]

> [T]he Concession Agreement has involved (1) direct or indirect foreign investment by S&B and (2) the execution of credit agreements with transnational and international financial entities.

155. In addition to the foregoing, the Claimants indicate that the financial structure of the Project required POB to undertake certain financial operations, being able to receive funds from shareholders or financial institutions. This resulted in the contributions of S&B and the other shareholders in the amount of US$117,870,000 and the Credit Contract entered into with the Inter-American Development Bank for a total amount of US$156,000,000, both being cross-border transactions.[94]

156. The Claimants assert that the *project finance* structure of the Project meant that POB could access the Project's retribution to pay the debts it acquired with the lenders and its shareholders, both international, together with profit sharing.[95] In the absence of the Retribution, the Claimants would not be able to carry out these transactions, affecting their ability to pay these international amounts due. The consequence of this is that the dispute between the Parties affects the interests of international trade.[96]

157. The Claimants argue that Article 62(c) of Law 1563 of 2012 "was incorporated into the Colombian legal system as a transplant of the French Code of Civil Procedure".[97] Therefore, it would not be necessary for the dispute to affect solely and exclusively

---

[92] POB and S&B Statement of Claim, ¶ 541. In the same sense, POB and S&B Statement of Defense to the Counterclaim, ¶ 777.
[93] POB and S&B Statement of Claim, ¶ 547.
[94] POB and S&B Statement of Claim, ¶¶ 559-560.
[95] POB and S&B Statement of Claim, ¶¶ 563-565.
[96] POB and S&B Statement of Claim, ¶¶ 566-568.
[97] POB and S&B Statement of Claim, ¶ 543.

the interests of international trade, as claimed by the Respondent[98].

158.  Second, the Claimants argue that S&B is indeed a party to the arbitration clause. Thus, S&B "was part of the Plural Structure S&B and the Agreement provides that, accordingly, it consented by reference to be a party to the Arbitration Agreement".[99]

159.  Likewise, in response to ANI's arguments regarding the effects of the arbitration clause —which would not be the same as granting the status of a party to said clause— the Claimants respond that said effects:[100]

> [W]ould extend directly to a foreign company domiciled outside of Colombia, to the extent that ANI's breaches of the agreement directly cause harm to it.

160.  Finally, the Claimants argue that Section 15.3 of the Agreements refers to direct or indirect foreign investment and that, furthermore, during the tender (document C-180), ANI made references to French jurisprudence and stressed the need to declare its presence in the bid, which was declared by the Plural Structure.[101]

161.  The Claimants emphasize that:[102]

> [T]he common understanding of the Parties when entering into the Agreement was that the presence of foreign direct investment in the Bid would be sufficient for arbitrations under the Agreement to be international within the meaning of Article 62(c) of the Arbitration Statute.

---

[98]  POB and S&B Statement of Claim, ¶ 545.
[99]  POB and S&B Reply, ¶ 194.
[100] POB and S&B Reply, ¶ 195.
[101] POB and S&B Statement of Claim, ¶¶ 550-552.
[102] POB and S&B Reply, ¶ 191.

(iii)   Analysis of the Arbitral Tribunal

162. This Arbitral Tribunal has been constituted under Section 15.3 of the Agreement, subparagraph (c) of which designates ICDR as the administering entity and makes its Rules for International Arbitration applicable.

163. Section 15.3 of the Agreement is entitled "International Arbitration" and has a footnote that states:

> In the event that the winning bid has direct or indirect foreign investment, the arbitration clause of the Agreement shall only be the one regulated in Section 15.3. However, if the arbitrators or any competent authority declare that, for this Agreement, the legal grounds for international arbitration do not exist, the national arbitration provided in Section 15.2 above shall be deemed to have been agreed upon.

164. By virtue of the literal wording of this footnote, once it has been verified that the winning bid had included direct or indirect foreign investment, this fact alone leads to the conclusion that the arbitration is international in nature and must be conducted in accordance with the provisions of Section 15.3.

165. On 30 May 2014, the Plural Structure formed by S&B, C.I. Grodco S. en C.A. Ingenieros Civiles and Colombiana Inversiones de Infraestructura S.A.S., submitted their Bid in the Tender, in whose Annex 15 it was affirmatively indicated that the Bid contained "foreign investment, either directly or indirectly".[103]

166. On 23 July 2014, by Resolution No. 992, ANI awarded the Project to the Plural Structure, expressly indicating that one of its members was S&B, a company incorporated under the laws of the Swiss Confederation.[104]

---

[103]   Exhibit C-046.
[104]   Exhibit C-047.

167. Due to the presence of the foreign investment in the Bid and as indicated in the footnote to Section 15.3, it must be concluded that the only arbitration clause of the Agreement applicable to this Arbitration is the one contained in Section 15.3.

168. However, ANI argues that this fact alone is not sufficient to confirm the internationality of this Arbitration. Rather, the Arbitration must satisfy the criteria set forth in letter a) of Section 15.3, which in turn refers to letter c) of Article 62 of Law 1563 of 2012.

169. Section 15.3(a) states:

> Any dispute arising between the Parties in connection with this Agreement shall be decided by an International Arbitral Tribunal in accordance with Article 62(c) of Law 1563 of 2012 and the rules set forth below.

170. In turn, Article 62(c) of Law 1563 of 2012 establishes that arbitration is international when: "the dispute submitted to arbitration affects the interests of international trade."

171. In the opinion of the Arbitral Tribunal, letter a) of Section 15.3 of the Agreement establishes that recourse to international arbitration —in the case of the presence of foreign investment— is justified in accordance with the provisions of letter c) of Article 62. In other words, this clause enshrines that, when the arbitration under this Agreement is of an international nature, it will be so because the requirement set forth in subparagraph c) of Article 62 of Law 1563 of 2012 is met. Therefore, the reference to subparagraph c) of Article 62 does not require the Parties to prove that the dispute affects the interests of international trade. On the contrary, Section 15.3(a) provides that —in the case of the presence of foreign investment— the internationality of the arbitration is based on Article 62(c) of Law 1563 of 2012.

172. This way of regulating the internationality of the arbitration seems consistent if one considers the requirement of the Agreement to constitute an SPV to carry out the concession, that is, a company different from the one to which the agreement is assigned. Thus, the entity providing the foreign investment will not be the one that carries out the

concession; rather, it will be a company incorporated in Colombia. However, this should not nullify the contribution of foreign investment to the PPP for the purposes of the internationality of the arbitration.

173. The term "Concessionaire" is defined in section 1.32 of the Agreement as:

> The Sole Purpose Vehicle fully identified in the Special Part, formed by the successful bidder(s) in the framework of the Selection Process.

174. Along the same lines, section 1.109 defines the "Concessionaire's Bid":

> [T]he bid submitted by the successful bidder in the Selection Process and the one that granted it the right to incorporate the special purpose vehicle (SPV) that enters into this Agreement as Concessionaire.

175. In other words, the design of the Tender does not allow the bidders themselves to enter into the concession agreement; they must incorporate an SPV under Colombian law.

176. At the time of the Tender, ANI's understanding was precisely that the presence of direct or indirect foreign investment in the winning bid was sufficient to corroborate the international character of the arbitration. This is reflected in Article 62(c) of Law 1563, that is, in the reference to the interests of international trade.

177. This same understanding of ANI is reflected during the period of the negotiation of the Agreement, in particular, in the document that gathers the series of questions that the Tender participants formulate to better understand the terms of the agreement and to request some adjustments, and answers given to them by ANI. Exhibit C-180 includes an excerpt of the document dated 26 May 2014, which reproduces question No. 70 on the correct interpretation of Section 15.3 and the respective answer of ANI, quoted above.[105]

---

[105] Exhibit C-180.

178. Question No. 70 raised some doubts about the interpretation of Section 15.3, together with the concern that the Successful Bidder could be deprived of access to arbitration —national or international— in which case the permanent contentious-administrative jurisdiction would be competent.

179. In answering question No. 70, ANI tried to reassure the Plural Structure. From ANI's answer it is clear that, to its understanding:

   i)     Article 62(c) is derived from French law;

   ii)    It is clearly established that the only requirement to comply with this subparagraph is that there are cross-border movements of goods and services;

   iii)   It is emphasized that for this reason the bidders were asked to indicate the presence of direct or indirect foreign investment in an attached form;

   iv)    It is concluded that the presence of such foreign investment generates the certainty of the cross-border movement of goods, services or funds, from which it follows that such dispute affects the interests of international trade; and

   v)     The clarification on domestic arbitration, in turn, seeks to ensure that the Successful Bidder or the Concessionaire does not lose access to arbitration, whether it is international or domestic in nature.

180. For the foregoing reasons, by virtue of the literal wording of Section 15.3 of the Agreement, the Arbitral Tribunal concludes that the present arbitration is of an international nature. Therefore, ANI is not correct in its objection to the jurisdiction of the Arbitral Tribunal due to an alleged failure to comply with the provisions of Article 62(c) of Law 1536 of 2012.

**(b)** **The internationality of the Arbitration in accordance with Article 62(a) of Law 1563 of 2012**

    (i)   ANI's position

181. First, ANI states that the Parties "freely and voluntarily agreed to limit" the applicability of international arbitration only to the concurrence of subparagraph c) of Article 62 of Law 1563 of 2012, and it is not appropriate to apply the grounds of subparagraph a) of the same article.[106]

182. ANI denies that its position was "repealing" mandates of the legislator embodied in Article 62 of Law 1536 of 2012, regarding the definition of internationality. It clarifies that, rather, it is a voluntary agreement of the Parties to:[107]

> [R]efer their disputes to the alternative mechanism of international arbitration only in relation to the verification of one of the requirements established in the law so that it is understood that it is an international arbitration, that is, only subparagraph c) of article 62 of Law 1563 of 2012.

183. Second, it argues that, in its opinion:[108]

> [C]olombian law does not prohibit the parties from expressly, freely and voluntarily agreeing to limit the possibility of settling disputes through international arbitration to only one [sic] of the 3 qualifying conditions, because "the fundamental principle of arbitration, such as consensuality" must be applied.

184. ANI states that it is different to understand "that the criteria of internationality are objective or that they are mandatory. Objectivity is different from a compulsory nature of the criteria".[109] It argues that the legal problem underlying the question of jurisdiction is the

---

[106] ANI Statement of Counterclaim, p. 164-166, 168. In the same sense, ANI Statement of Defense, par. 453; ANI Rejoinder, ¶ 284.

[107] ANI Statement of Defense, ¶¶ 450-451, 460. In the same sense, ANI Reply on the Counterclaim, ¶ 283.

[108] ANI Statement of Claim, p. 169. In the same sense, ANI Statement of Defense, ¶¶ 447-449, ¶¶ 456-459; ANI Rejoinder, ¶ 281; ANI Rejoinder, ¶ 283.

[109] ANI Reply on the Counterclaim, ¶ 285. In the same vein, ANI Rejoinder, ¶ 283.

determination of whether Article 62 of Law 1563 of 2012 is a mandatory rule. In its opinion, the answer to this question should be no.[110]

185. Finally, ANI considers that the criteria of subparagraph a) of Article 62 is not met because the domiciles of the parties to the Arbitration (POB and ANI) are located in the Republic of Colombia. In turn, ANI argues that S&B is not a party to the Agreement or to the arbitration agreement, and therefore the place of its establishment has no bearing.[111]

186. Along these lines, ANI argues that:[112]

> [N]o company, business or natural person that has jointly submitted an offer to be awarded the current Agreement 002 of 2014 is a party to the arbitration clause.

187. Thus, ANI insists on the argument that the arbitration agreement only includes POB and ANI and that, it is the effects of the results of the present proceedings, which would extend to S&B in accordance with subparagraph e) of the arbitration agreement.[113] In its opinion:[114]

> The effects of both the arbitration clause and the dispute itself will only be known at the time of knowing the results of the present arbitration proceedings in relation to S&B.

188. The Respondent further argues that such effect must be certain and not hypothetical.[115]

189. ANI indicates that the Claimants contradict themselves by asserting that:[116]

> S&B is a party to the arbitration agreement and is domiciled in the Swiss Confederation, but at the same time they state that ANI does not have a "cause of action against S&B".

---

[110]  ANI Rejoinder, ¶¶ 288-290.
[111]  ANI Statement of Defense, ¶¶ 481, 487. In the same sense, ANI Rejoinder, ¶ 285.
[112]  ANI Statement of Defense, ¶ 474.
[113]  ANI Statement of Defense, ¶¶ 476, 486-488.
[114]  ANI Statement of Defense, ¶ 489.
[115]  ANI Rejoinder, ¶ 294. In the same sense, ANI Statement of Defense, ¶ 510.
[116]  ANI Statement of Counterclaim, p. 171. In the same sense, ANI Statement of Defense, ¶¶ 491-493.

190. However, ANI notes that POB's argument that ANI has no cause of action against S&B would only reinforce the position that S&B is not a party to the arbitration agreement.[117]

191. In the face of this alleged contradiction, ANI points to the fact that S&B is one of the Claimants and that, by its participation in the Arbitration and its statements in the pleadings, it asserted that S&B adhered to the arbitration agreement, and that it acquired rights and obligations under the Concession Agreement.[118]

(ii)    Position of POB and S&B

192. First, the Claimants argue that the criteria established by law to determine the internationality of an arbitration are objective and cannot be modified contractually, and that there is no contradiction between the Agreement and the criteria of internationality provided for by law.[119]

193. In its opinion, Section 15.3 of the Agreement, which mentions subparagraph c) of Article 62 of Law 1536 of 2012, does not have the effect intended by ANI. In particular, the expression "in accordance" would not have "the grammatical function of limiting the application of Article 62 to this ground, nor excluding the other grounds of Article 62".[120]

194. Thus, the footnote accompanying said article would allow one:[121]

> [T]o see that the intention of the Parties was to determine that the arbitration would be international in all cases where there was direct or indirect foreign investment in the Bid, as is in fact the case with the Agreement.

195. Second, the Claimants assert that the factual criteria under Article 62(a) is met, namely that the arbitration is international when the parties are domiciled in

---

[117]  ANI Statement of Defense, ¶¶ 491-493.
[118]  ANI Statement of Counterclaim, pp. 173-174.
[119]  POB and S&B Statement of Claim, 506-514. In the same sense, POB and S&B Statement of Defense on the Counterclaim, ¶¶761-768.
[120]  POB and S&B Statement of Claim, ¶ 520.
[121]  POB and S&B Statement of Claim, ¶ 522.

different States. This is because the arbitration clause covers ANI and POB as parties to the Agreement, and S&B, which submitted the bid.[122]

196.  Since "S&B was part of the S&B Plural Structure, which submitted the winning bid in the Tender", then it would be covered by the arbitration clause.[123]

197.  The Claimants also assert that their position is consistent and that the alleged contradiction pointed out by ANI (that, on the one hand, S&B is a party to the arbitration agreement, but that ANI has no cause of action against S&B) is not a contradiction[124] and indicate that:[125]

> [T]he procedural position that S&B has in this Arbitration by virtue of ANI's acts, which confirm the international character of this Arbitration, has nothing to do with the merits of ANI's claims.

198.  The Claimants insist that ANI does not have a cause of action against S&B, and that, having included it as respondent in its counterclaim confirms the international character of this Arbitration.[126]

(iii)  <u>Analysis of the Arbitral Tribunal</u>

199.  According to the previous analysis of the Arbitral Tribunal, Section 15.3 of the Agreement is intended to confirm that the presence of foreign investment in the bid, direct or indirect, makes the arbitration international, in accordance with the legal mandate of Article 62(c) of Law 1563 of 2012.

200.  At the same time, nothing in the literal wording of this provision indicates that international arbitration would not be proper in any other case provided for in Article 62 of Law 1563. Thus, international arbitration is not subject to the unique situation

---

[122]  POB and S&B Statement of Claim, ¶ 526.
[123]  POB and S&B Statement of Claim, ¶ 529.
[124]  POB and S&B Statement of Defense to the Counterclaim, ¶ 779.
[125]  POB and S&B Statement of Defense to the Counterclaim, ¶ 781.
[126]  POB and S&B Statement of Defense to the Counterclaim, ¶¶ 779-783.

of Article 62(c). In particular, the expressions "solely and exclusively", "shall only be proper", etc. are not used.

201. The Arbitral Tribunal does not share ANI's view that the parties could limit the grounds of internationality to only some of those grounds. Following its logic, could the parties eliminate all the grounds for internationality, rendering international arbitration in Colombia ineffective? But beyond this theoretical question, nothing in the literal wording of Section 15.3 of the Agreement indicates that the intention of the contracting parties was to exclude the other legal grounds of the internationality of the arbitration.

202. Thus, Article 62(a) of Law 1563 of 2012 establishes that arbitration is international when "the parties to an arbitration agreement have, at the time of the conclusion of such agreement, their domiciles in different States".

203. In addition to the above, letter e) of Section 15.3 of the Agreement states:

> The Parties agree that in the event that the Arbitral Tribunal is convened, the effects of the arbitration clause shall be extended to those companies, corporations or individuals that have jointly submitted the Bid, to the extent that such parties gave their consent by reference at the time of the submission of the Bid.

204. It follows from this clause that the "Parties" of the Agreement, that is, ANI and the Concessionaire, agree to accept the participation in the arbitration of the entities that participate in the Bid as long as they have expressed their corresponding consent.

205. At the time the Plural Structure, and S&B as part of it, submitted their Bid, they necessarily accepted the terms of the Tender. Indeed, when question No. 70 of the series of questions and answers dated 26 May 2014 about the scope of Section 15.3 of the Agreement was asked, the concern expressed by the Plural Structure is regarding the risk of not being able to access the arbitration jurisdiction, whether domestic or

international.[127] In no case does it object to the arbitration clause itself, with which the Arbitral Tribunal understands that it gives its consent by reference.

206.  Thus, S&B, a Swiss entity, consented to the arbitration agreement at the time of submitting the Bid, thus becoming a party to such agreement. Therefore, it must be concluded that the parties to the arbitration agreement have their places of business in different states, which fulfills the requirement of Article 62(a) of Law 1563.

207.  Finally, it is not reasonable to understand, as ANI intends, that, in accordance with clause 15.3 (e), the effects of the arbitration clause refer only to the results of the Arbitration, that is to say, to the arbitration award.

208.  Section 15.3 (e) of the Agreement refers to "the effects of the arbitration clause" without making any mention of the effects of the arbitration award. A commonly known effect of the arbitration clause is to create the negative jurisdiction of the ordinary courts and the positive jurisdiction of the arbitral tribunal. An arbitration award could not have direct effects on S&B without S&B first being a party to the arbitration agreement.

209.  In turn, any effect that S&B might suffer indirectly through POB's assets does not need to be regulated or "accepted" by the Parties, since it will occur automatically, as a consequence of the rendering of an award, without requiring the consent of the Parties.

210.  For the foregoing reasons, the Arbitral Tribunal concludes that S&B is a party to the arbitration agreement, which has the effect that the internationality requirement of Article 62(a) is met. Therefore, ANI is not correct in its objection to the Arbitral Tribunal's jurisdiction due to an alleged failure to comply with Article 62(a) of Law 1536 of 2012.

---

[127]  Exhibit C-180.

**(c)      The concurrence of subparagraph b) of article 62**

(i)     <u>ANI's position</u>

211. ANI indicates that the requirement established in subparagraph b) of Article 62 of Law 1563 of 2012 is not met either. It states that none of its criteria apply, given that the place of performance of the obligations is in the Republic of Colombia. It concludes that, in addition to the Parties not having agreed on the applicability of subparagraph b), its requirements are not met.[128]

(ii)    <u>Position of POB and S&B</u>

212. The Claimants point out that this internationality requirement is also met, given that the domicile of one of the parties (S&B) is located in a place other than the place most closely related to the Arbitration, i.e., Colombia.[129]

(iii)   <u>Analysis of the Arbitral Tribunal</u>

213. Article 62(b) of Law 1536 of 2012 covers a factual situation in which all parties to the arbitration agreement are located in one country, but certain elements of the dispute, the subject matter or the seat of the arbitration are located in a different country, namely:

> The place of performance of a substantial part of the obligations or the place with which the subject matter of the dispute is most closely connected is located outside the State in which the parties have their domiciles.

214. In the opinion of the Arbitral Tribunal, this ground of internationality is not met given that one of the parties that consented to arbitration under Section 15.3 is an entity established abroad (S&B). Indeed, the Plural Structure stated in Annex 15 of the Bid that it contained foreign investment, accepting the effects of the arbitration clause.

---

[128]  ANI Statement of Defense, ¶ 494-498. In the same sense, ANI Rejoinder, ¶ 286-287.
[129]  POB and S&B Statement of Claim, 534-538.

215. In the absence of S&B's consent, all parties to the arbitration agreement would have had their places of business in one country. However, this did not occur, since one of the parties to the arbitration agreement has its place of business in a different country. Therefore, the internationality of the present Arbitration does not follow the circumstances described in Article 62(b) of Law 1536 of 2012, and is rather derived from paragraphs (a) and (c) of the same legal provision. Therefore, ANI's opposition should be accepted, but only with respect to the assumption of Article 62(b).

216. Therefore, the Arbitral Tribunal concludes that ANI's objections on jurisdiction should be rejected, since this international Arbitral Tribunal was properly established under Section 15.3 of the Agreement.

2. **OBJECTIONS TO THE COMPETENCE OF THE ARBITRAL TRIBUNAL**

(a) **Competence of the Tribunal to hear claims relating to compensation for EER (Section 14.2 (h) of the Agreement)**

(i) ANI's position

217. In the event of having jurisdiction, in ANI's opinion, the Arbitral Tribunal must declare it lacks competence to entertain the claims related to compensation and indemnities in relation to an EER, since such competence is vested in the *Amiable Compositeur* pursuant to Section 14.2(h) of the Agreement.[130]

218. ANI is of the opinion that from the Claimants' position —that neither S&B nor ANI consented to submit to the *Amiable Compositeur*— it follows that they also did not do so in relation to the arbitration, since Section 15.3.e of the Agreement only refers to the "effects" of the compromissory clause.[131]

---

[130] ANI Statement of Counterclaim, pp. 185-188. In the same sense, see ANI Statement of Defense, ¶ 533, ANI Rejoinder, ¶¶ 310-312.
[131] ANI Statement of Defense, ¶¶ 537-540.

219. In response to the Claimants' position —that the referral to the *Amiable Compositeur* could not become an impediment to access the Arbitral Tribunal— ANI is of the opinion that the *Amiable Compositeur* mechanism is an alternative mechanism recognized in the Colombian legal system and that any dispute that the Parties submitted to such mechanism must be resolved through it.[132]

220. Finally, ANI concludes that the forum to resolve claims for compensation, idle costs or other effects derived from an EER is the *Amiable Compositeur*. In turn, S&B and the EPC Contractor, in the absence of an arbitration agreement, must direct any dispute they intend to initiate against ANI to the ordinary jurisdiction.[133]

   (ii)   Position of POB and S&B

221. The Claimants request that the Tribunal dismiss ANI's argument, since its claim does not refer to the idle costs due to an EER regulated in Section 14.2(h) of the Agreement, in particular, it does not refer to its recognition or its assessment.[134] On the contrary, the Claimants' claims refer to ANI's alleged breaches of UFs 4 and 5 obligations; including requests for declarations by the Tribunal on the compliance of the Construction Phase obligations upon execution of the Completion Minutes for UFs 1, 2 and 3; claims for damages; subsidiary claims for the reestablishment of the economic equilibrium of the Agreement; and payment of the Arbitration costs.[135]

222. Additionally, the Claimants reference Section 15.1 of the Concession Agreement[136] which would establish a specific and limited jurisdiction of the *Amiable Compositeur*, concluding

---

[132]   ANI Statement of Defense, ¶¶ 541-546.
[133]   ANI Post-Hearing Memorial, ¶ 24-25.
[134]   POB and S&B Statement of Claim, ¶ 573-574. In the same sense, POB and S&B Statement of Defense to the Counterclaim, ¶ 784-785; POB and S&B Reply, 198-203.
[135]   POB and S&B Statement of Claim, ¶ 575.
[136]   Section 15.1: "the Parties agree to resort to an *Amiable Compositeur* to settle all those disputes that have been expressly indicated in this Agreement to be referred to the *Amiable Compositeur*."

that it would not be competent due to the subject matter of the Arbitration.[137] They emphasize that:[138]

> [T]he Claimants' claims are not within the competence of the *Amiable Compositeur* Panel because they do not relate to idle costs due to the longer stay on site caused by an EER but rather to the full damages to which the Claimants are entitled under the Applicable Law. Moreover, as demonstrated, none of the Claimants' claims fall within the express and limited powers of the *Amiable Compositeur* under the Agreement. In any event, the eventual competence of the *Amiable Compositeur* Panel does not preclude the jurisdiction and competence of the Arbitral Tribunal over all disputes arising out of the Agreement, as provided for in the Arbitration Agreement and demonstrated by the Claimants in the Arbitration.

223. They further argue that the *Amiable Compositeur* does not have competence *ratione personae* over claims raised by S&B against ANI because neither of them expressed their consent.[139] The Claimants assert that "to accept ANI's position would deprive the Claimants of the forum available to them to pursue their disputes against ANI".[140]

224. In contrast to the above limitations, in the Claimants' view, the Concession Agreement grants the Arbitral Tribunal a broad power to rule on "any dispute arising between the Parties under this Agreement," which in turn would include S&B's claims under Section 15.3(e) of the Concession Agreement.[141]

225. The Claimants argue that, even if the *Amiable Compositeur* were competent, that does not preclude the jurisdiction of this Arbitral Tribunal, given that:[142]

---

[137]  POB and S&B Statement of Claim, ¶¶ 579-580. In the same sense, POB and S&B Reply, ¶ 198.
[138]  Post-Hearing Memorial, ¶ 437.
[139]  POB and S&B Statement of Claim, ¶ 581.
[140]  POB and S&B Statement of Defense to the Counterclaim, ¶ 785.iii.
[141]  POB and S&B Statement of Claim, ¶ 582.
[142]  POB and S&B Statement of Claim ¶ 586.

> [T]he consequences arising from eventual breaches of the agreement to submit certain disputes to the *Amiable Compositeur* are exclusively contractual, not procedural.

226.  In other words, they argue that, if certain matters within the competence of the *Amiable Compositeur* were brought before this Arbitral Tribunal, a breach of contract would eventually arise, but not the lack of competence of this Arbitral Tribunal.[143]

227.  Finally, the Claimants reference Article 13 of the General Code of Procedure, according to which clauses limiting access to judicial authorities are ineffective in the Colombian legal system.[144]

   (iii)   Analysis of the Arbitral Tribunal

228.  Pursuant to Section 15.1.a of the Agreement:

> The Parties agree to resort to an *Amiable Compositeur* to settle all those disputes that have been expressly indicated in this Agreement to be referred to the *Amiable Compositeur*.

229.  Section 14.2.h of the Agreement regulates compensation owed for Events Exempting from Liability. Its paragraph ii) provides for compensation to the Concessionaire with respect to:

> [I]dle costs due to the longer stay on site that may be caused by these events, through the recognition of a daily sum to be defined by the Parties by mutual agreement.

230.  According to paragraph v) of the same provision, "in case of disputes regarding the application of this event or its valuation, the difference between the Parties shall be submitted to the *Amiable Compositeur*".

---

[143]  POB and S&B Statement of Claim, ¶ 587.
[144]  POB and S&B Statement of Claim, ¶ 588.

231. For the Arbitral Tribunal, it is sufficient to review the Claimants' relief in the Statement of Claim to determine that there is no dispute as to the existence of an EER or the assessment of the idle costs due to the longer stay at the construction site.

232. Indeed, the Parties acknowledged the existence of several EERs, which affected UFs 2, 4 and 5, through the signature of the respective Exemption of Liability Event Minutes.[145] The dispute before this Arbitral Tribunal is partly related, as to the facts, to the EERs that occurred in UFs 2, 4 and 5. However, this dispute has very different dimensions with respect to those that the Parties had reserved for the competence of the *Amiable Compositeur*. Thus, the existence of an EER is not at issue before this Arbitral Tribunal and, likewise, the Claimants' claims do not refer to the assessment of idle costs, matters that should be submitted before the *Amiable Compositeur*.

233. Likewise, ANI's Counterclaim, although filed under the condition that this Tribunal would confirm its jurisdiction and/or competence, refers to a series of disputes that exceed the limits of the competence assigned to the *Amiable Compositeur* including a request for the early termination of the Agreement.[146]

234. For the aforementioned reasons, the Arbitral Tribunal concludes that ANI's objection regarding the alleged lack of competence to entertain the claims related to compensation and damages in connection with the EERs must be rejected.

**(b) Competence of the Tribunal over claims of the EPC Contractor**

(1) ANI's position

235. ANI asserts that the Arbitral Tribunal should not rule on damages and/or compensation from or in relation to third parties outside the arbitration agreement and the Agreement.[147]

---

[145] Exhibit C-002.
[146] ANI Statement of Counterclaim, p. 361-367.
[147] ANI Statement of Defense, ¶¶ 548-561. In the same sense, ANI Rejoinder, ¶¶ 303-305.

This refers specifically to the EPC Contractor with whom POB entered into an EPC Contract (the "**EPC Claims**"). Thus, Sections 5.1.a and 5.1.b set forth the obligations to execute, respectively, the Design Contract and the Construction Contract, within the time periods indicated therein.

236.  In practice, POB executed an Engineering, Procurement and Construction Contract, known as the EPC Contract, with the POB Construction Consortium (JV-POB).[148] The object of the EPC Contract, according to its Clause 3.01, consisted of the following:

> On the terms and subject to the conditions of this Contract, the EPC Contractor shall perform on a lump sum turnkey basis and in accordance with the Back to Back Principle, the Design and the EPC Works to satisfy the Concession Agreement Tests and achieve completion of each Functional Unit in accordance with Section 8.07 within the EPC Contract Time for Completion, all in compliance with the Compliance Standards.

237.  ANI objects to the competence of the Arbitral Tribunal to rule on any claim of the EPC Contractor, considering that the Claimants' claim is for idle costs due to longer stay on site derived from an EER.[149]

238.  ANI references Section 16.3 of the Agreement, which states that the Agreement does not create any association, partnership or agency relationship between the Parties, and that none of them may bind the other.[150] It states that:[151]

> [T]he EPC contractor is not a party to the Concession Agreement 002 of 2014 or to the arbitration agreement. The only parties to the agreement and the arbitration agreement are ANI and POB. Due to the foregoing, the tribunal must declare its lack of competence in relation to any claim related to the EPC contractor.

---

[148]  Exhibit C-086.
[149]  ANI Statement of Counterclaim, p.364.
[150]  ANI Statement of Defense, ¶ 558.
[151]  ANI Post-Hearing Memorial, ¶ 13.

239.  ANI also invokes Section 14.3 of the Agreement, which establishes the obligation to keep ANI free from any claim arising from its actions or those of its subcontractors or employees.[152]

240.  ANI argues that, when POB claims alleged damages of the EPC contractor, "there is no legal standing with POB's claims".[153] ANI argues that POB does not have standing in the cause of action to request damages in favor of the EPC Contractor, since only the latter would have such standing in accordance with the substantial relationship. It also states that it is not aware of a decision ordering ANI to pay damages in favor of the EPC Contractor.[154]

241.  ANI adds that the Arbitral Tribunal could not rule on the alleged damages suffered by the EPC Contractor without the latter's participation in the process to assert its rights.[155] It also indicates that:[156]

> [T]he EPC Contractor is not and has not been a party to the present arbitration proceedings and, therefore, any position of the EPC Contractor in relation to the present dispute is unknown. Therefore, the tribunal must dismiss any claim relating to POB's EPC.

242.  Finally, it indicates that there would be a double recovery risk:[157]

> What POB is seeking is not only to obtain an absolutely unjustified compensation, since ANI has not breached any agreement, but it is even seeking the recognition of a double recovery since the shareholding composition of the EPC contractor is similar to that of POB.

---

[152]  ANI Statement of Defense, ¶ 560. In the same sense, ANI Rejoinder, ¶ 307.
[153]  ANI Statement of Defense, ¶ 562.
[154]  ANI Statement of Defense, ¶ 565.
[155]  ANI Statement of Defense, ¶ 567.
[156]  ANI Post-Hearing Memorial, ¶ 16.
[157]  ANI Post-Hearing Memorial, ¶ 17.

(ii)    Position of POB and S&B

243.    The Claimants state that the Agreement establishes the Concessionaire's obligation to enter into a construction contract for the performance of the Interventions and that this was done, ANI being aware and having approved the EPC Contract.[158]

244.    The Claimants explain that Clause 4.04 "*Back-to-Back Principle*" of the EPC Contract enshrines the EPC Contractor's right to claim from the Concessionaire the recovery of damages suffered due to ANI's breach of the Agreement. In these cases, the Concessionaire must file the corresponding claim before ANI and transfer all proceeds from said claim to the EPC Contractor.[159] Based on the foregoing, the Claimants conclude that:[160]

> [T]his is the procedure to be followed in the event of claims by the EPC contractor for contractual breaches committed by ANI. The Concessionaire was under no obligation to pay the EPC Contractor's claims in advance so as to claim before ANI, but only once ANI had paid them, voluntarily or by order of the Arbitral Tribunal.

245.    Since there is no prior obligation to pay the EPC Contractor on the part of the Concessionaire, the Claimants seek to provide certainty that the amounts recognized by the Arbitral Tribunal will be transferred to the EPC Contractor:[161]

> Likewise, the Tribunal can have full certainty that the Concessionaire will comply with the EPC Contract and, consequently, that it will transfer to the EPC Contractor the amounts that are recognized by the Arbitral Tribunal and paid by ANI as a consequence of the claims derived from the EPC Contractor. For this purpose, the Tribunal may order the Concessionaire to credit ANI for the payment of such damages to the EPC Contractor once ANI has fully compensated the Concessionaire. The Tribunal may even establish a payment method that allows ANI to verify

---

[158]    Post-Hearing Memorial, ¶¶ 325-327.
[159]    Post-Hearing Memorial, ¶ 327.
[160]    Post-Hearing Memorial, ¶ 327.iii.
[161]    Post-Hearing Memorial, ¶ 327.v.

that the Concessionaire paid the corresponding compensation to
the EPC Contractor.

246. Finally, the Claimants conclude:[162]

> Therefore, the EPC Contractor's claims are made by the
> Concessionaire against ANI, in accordance with the claims
> structure set forth in the Concession Agreement, to obtain
> compensation for the damages that the EPC Contractor suffered as
> a consequence of ANI's breaches. These are claims that respond
> to the nature of the EPC Contract as a contract related to the
> Concession Agreement. In this sense, they are certain and future
> costs for the Concessionaire. Consequently, the jurisdiction of the
> Tribunal to settle this controversy is unquestionable, since these
> are claims within the objective and subjective scope of the
> Concession Agreement and which are expressly foreseen to be
> formulated by the Concessionaire against ANI.

(iii)  Analysis of the Arbitral Tribunal

247. The Arbitral Tribunal notes that the EPC Contractor is not listed as one of the
Claimants in this Arbitration. In other words, the EPC Contractor does not even
attempt to exercise an active role in this Arbitration, and therefore it does not seem
appropriate to raise an objection for lack of standing, since the EPC Contractor does
not intend to assume the role of the claimant or any other active role. Moreover, this
Arbitral Tribunal does not purport to "apply" the EPC Contract or any of its provisions
to this dispute.

248. However, in order for this Arbitral Tribunal to have competence to rule on the damages
claimed by POB, such damages must be rooted in POB's assets. Otherwise, in the
absence of proof that the Claimants are claiming damages of their own, this Arbitral
Tribunal would effectively lack competence, because it has not been constituted to rule
on the claims of a third party against POB under the EPC Contract.

---

[162]  Post-Hearing Memorial, ¶ 327.vi.

249. In the submission dated 15 January 2024, filed pursuant to Procedural Order No. 17, the Claimants state that "the damages claimed by the Claimants is certain, direct, and personal."[163]

250. However, the Arbitral Tribunal notes that the Claimants' costs include the concept of "EPC Claims", the values of which correspond to COP 5.8 billion for UF 2;[164] COP 67.3 billion for UF 4; and COP 49.0 billion for UF 5.[165]

251. In Procedural Order No. 18, the Tribunal requested that the Claimants clarify:[166]

> [W]hether the EPC costs and expenses were included in the damages valuation, and to specify the overall value of these EPC costs and expenses in each of the UFs ("Aggregate Value"). Additionally, within the Global Value of each UF, to specify whether these costs have been invoiced by the EPC to POB, and, separately, whether they have been paid by POB to the EPC.

252. In response to this request, the Claimants clarified:[167]

> [T]hat the EPC Claims are a future and certain injury of the Concessionaire and are so presented, in an individualized and differentiated manner, in the damages reports prepared by FTI in this Arbitration.

253. According to the Glossary of terms in the Statement of Claim, the EPC Claims include "EPC UF 2 Claim" and "EPC UF 4 and 5 Claim". The first one refers to the "'economic claim with respect to the archaeological findings in UF 2, submitted by the EPC Contractor to POB on 11 June 2020 and submitted by POB to ANI', in accordance with the definition assigned in Exhibit CER-001". The second one refers to the "'claim for damages

---

[163] POB and S&B Submission dated 15 January 2024, ¶ 15.
[164] Updated in the 12 April 2024 Claimants' Submission, Tables 2-1, 2-2, and 4-10, ¶ 4.
[165] POB and S&B Submission dated 15 January 2024, Tables 2-1 and 2-2, ¶ 8.
[166] Procedural Order No. 18.
[167] Claimants' Submission dated 12 April 2024, Tables 2-1, 2-2, and 4-10, ¶ 4.

related to the non-performance of UFs 4 and 5, submitted by the EPC Contractor to POB on 21 April 2021', in accordance with the definition assigned in Exhibit CER-001"[168].

254. The Claimants have at all times acknowledged that the EPC Claims are "the damages suffered by the EPC Contractor as a result of ANI's contractual breaches".[169] They also point out that the EPC Claims:[170]

> [H]ave not been invoiced by the EPC Contractor to POB nor paid by POB, to the extent that said EPC Claims will be payable once ANI pays the Concessionaire the corresponding amounts, pursuant to the principle of transparency.

255. In other words, the EPC Claims are confined to the EPC Contractor's assets and they have not been transferred to POB's assets. POB's assets have not been affected in any way by the EPC Claims. Since the amounts of such Claims were not even invoiced, no damages were caused, not even through a mere accounting provision in POB's balance sheet. Nor has POB submitted to this Arbitral Tribunal any acknowledgment of the debt in favor of the EPC Contractor or a settlement agreement with the latter.

256. For the reasons stated above, while the Claimants characterize the EPC Claims as "certain" damages, the certainty of such damages is not proven before this Arbitral Tribunal. The EPC Claims constitute damages suffered by a third party, damages outside POB's assets, which is why the Arbitral Tribunal lacks competence to rule on the EPC Claims.

257. On the other hand, the Tribunal is aware that the EPC Contract would authorize POB to claim damages suffered by the EPC Contractor. Indeed, Clause 4.02 of the EPC Contract requires (i) that ANI must have agreed in writing to take care of such claims or (ii) that it has decided to do so. Beyond the fact that in this case POB has not demonstrated that any of these requirements are met, the truth is that for ANI to be sued in the framework of

---

[168]    CER-001, ¶ 1.2.16; 2.6.1-2.6.19.
[169]    POB and S&B Statement of Claim, ¶ 470.
[170]    Claimants' Submission dated 12 April 2024, ¶ 6.

this Arbitration, pursuant to the arbitration clause contained in the Concession Agreement, for damages suffered by the EPC contractor, it is indispensable that ANI's consent to it be demonstrated.

258. In this regard, the Concession Agreement does not establish such consent on ANI's part. Nor does it state that ANI must be responsible for the EPC claims suffered by the EPC contractor that are brought by POB.

259. First, in relation to the Concession Agreement entered into between POB and ANI, Section 15 "Dispute Resolution" determined the composition of an arbitral tribunal, national or international, to decide disputes arising between the Parties and in connection with the Agreement. In turn, according to the Concession Agreement, "Party or Parties" is defined exclusively as Perimetral Oriental de Oriente S.A.S. and ANI: "They are, individually or jointly, the Concessionaire and ANI, as identified in the heading of this General Part."

260. Second, although the Concession Agreement establishes the Concessionaire's obligation to enter into a contract for the preparation of designs and the construction of the works under the agreement, ANI is not a party nor did it enter into such contract, nor does it have any legal relationship with the EPC Contractor. In this regard, the final sentence of Section 16.3 of the Agreement is particularly illustrative: "The Parties do not intend to create any right or grant any remedies to third parties beneficiaries of the Agreement". This means that the Concession Agreement not only does not explicitly recognize the rights derived from the EPC Contract in favor of the EPC contractor, but also that any implicit interpretation in that sense would be precluded by virtue of the principle enshrined in the aforementioned Section 16.3.

261. Third, Section 15.3 ("International Arbitration"), paragraph (e) states:

> The Parties agree that if the Arbitral Tribunal is convened, the effects of the arbitration clause shall be extended to those companies, corporations or individuals that have jointly submitted the Bid, to the extent that such parties gave their consent by reference at the time of the submission of the Bid.

262.  This scenario clearly allows for the intervention of non-signatories, but limits them only to members of the Concessionaire. In this sense, the Arbitral Tribunal ruled in Section IV.A.1 that S&B had given its consent by reference.

263.  Fourth, in Section 14.3 of the Agreement, the Parties expressly agreed that:

> The Concessionaire undertakes to keep ANI free from any claims from third parties arising from its actions or those of its subcontractors or employees.

264.  This principle is consistent with Section 5.2. "Contractors" paragraph (e) of the same Agreement:

> In all cases, the Concessionaire shall remain liable to ANI for the performance of all the obligations contained in this Agreement, including but not limited to those performed by the Contractors and their respective subcontractors, and shall keep ANI free from breaches and claims of the Contractors and subcontractors.

265.  In other words, in the Tribunal's opinion, due to the operation of the Concession Agreement, it is POB as Concessionaire who must respond to claims and lawsuits from the Contractors. A different question is whether, as a consequence of responding to such claims, POB suffers its own damages that, under the Concession Agreement, may be attributable to ANI.

266.  Consequently, this Arbitral Tribunal considers that ANI is not bound, under the Concession Agreement, to pay the claims made by the EPC contractor to POB.

267.  Thus, the Arbitral Tribunal lacks competence to rule on the award for damages allegedly caused by the archaeological findings of UF 2 which, according to the Claimants,

generated an economic imbalance of the Agreement and a damage equivalent to COP 5.8 billion.[171]

268. The EPC Claims for UFs 4 and 5 are in the same situation.[172] Since this is not a damage suffered by POB, but by the EPC Contractor, the Arbitral Tribunal lacks competence to rule on EPC Claims on UFs 4 and 5, and therefore it cannot consider these amounts within the Loss of Profit calculation scheme, and they must be excluded from the damages that may be awarded by the Arbitral Tribunal.[173]

269. The Claimants also highlight:[174]

> [T]hat the values associated with Capex in FTI's damage assessments are not part of the EPC Claims. On the contrary, these are costs that have already been incurred by the Concessionaire and they correspond to amounts (i) invoiced by the EPC Contractor to POB that (ii) were paid by POB to the EPC Contractor as consideration for the performance of the Project Interventions.

270. EPC Capex Values:[175]

> They are independent of and have no relation to the amounts that are the subject of the EPC Claims, which are the subject of the jurisdictional objections to which the Tribunal referred in OP 18.

271. Following the above logic, and dealing with a cost or damages supposedly incurred by POB itself,[176] the Arbitral Tribunal reaffirms its competence over POB's claims described as EPC Capex, so there is no obstacle for that item to be kept within the calculation of POB Loss of Profit corresponding to UFs 4 and 5.

---

[171] POB and S&B Statement of Claim, ¶ 445 (original amount 5.4).
[172] Exhibit CER-001, ¶ 2.6.2-2.6.11.
[173] See Section IV.E.1 of the Award.
[174] POB communication dated 12 April 2024, "Procedural Order No. 18 (OP18) - response to the request of the Arbitral Tribunal and response to ANI's letter dated 1 March 2024, ¶ 7.
[175] POB communication dated 12 April 2024, "Procedural Order No. 18 (OP18) - response to the request of the Arbitral Tribunal and response to ANI's letter dated 1 March 2024, ¶ 7.
[176] CER-001, ¶ 3.4.10: "In this report, I use the financial term "Capex" (originating from the English term capital expenditure) to refer to costs associated with carrying out investments."

272. For the aforementioned reasons, the Arbitral Tribunal accepts ANI's objection regarding the competence of the Arbitral Tribunal only with respect to the Claims of the EPC Contractor for UFs 2, 4 and 5, since it considers that it effectively lacks competence to rule on such Claims since they relate to damages suffered by a third party.

273. At the same time, the Arbitral Tribunal confirms that it does have competence over all POB's other claims, to the extent that it is concluded that they involve damages specific to that Party.

274. In particular, the Arbitral Tribunal confirms that it does have competence to rule on the appropriate compensation due to POB in the event that ANI's subsidiary claim for termination of the Agreement is successful.[177]

275. In this regard, the Claimants pointed out:[178]

> [I]n the hypothetical and unlikely event that the Tribunal were to consider that termination of the Agreement is appropriate based on the arguments of ANI, it should order full compensation for the damages suffered by the Claimants based on said termination.

From the perspective of the Arbitral Tribunal's competence, there is no impediment for the calculation of the compensation to incorporate references and amounts corresponding to UFs 2, 4 and 5, as long as they are Loss of Profit of POB itself and not the costs incurred by the EPC Contractor. Without prejudice to confirming here the Arbitral Tribunal's competence to award compensation in the event that ANI's subsidiary claim is successful, the specific merits of the compensation for the damages allegedly suffered by POB will be addressed in Section VI.E.1 of the Award.

---

[177] ANI Statement of Counterclaim, p. 367.
[178] POB and S&B Statement of Defense to the Counterclaim, ¶ 549.

## B.    POB AND S&B'S MAIN CLAIM

1.    **CLAIMANTS' CLAIMS IN CONNECTION WITH UF 2**

276.    The Claimants allege that ANI breached its legal and contractual obligations in the performance of UF 2 of the Project by failing to grant the request to reestablish the economic equilibrium of the Concession Agreement.[179] They claim that POB's archaeological obligations and risks are not unlimited[180] and that it did not assume the archaeological risk to the extent and in the way ANI claims.[181]

### (a)    Position of POB and S&B

277.    The Claimants argue that the UF 2 archaeological findings generated an economic imbalance of the Concession Agreement, which ANI has the duty to reestablish.[182]

278.    The archaeological findings had "an intensity of such magnitude that they unbalanced the economic equation of the Concession Agreement",[183] and given that the requirements contemplated by the Colombian legal system are met, ANI has the obligation to compensate POB[184] for such imbalance.[185]

279.    POB clarifies that the main claim on the reestablishment of the economic equilibrium of UF 2 discussed herein is focused only on the EPC Archaeology Claim.[186]

---

[179]    POB and S&B Statement of Claim, ¶ 410.
[180]    POB and S&B Reply, p. 82.
[181]    POB and S&B Reply, p. 83.
[182]    POB and S&B Statement of Claim, ¶¶ 434-435.
[183]    POB and S&B Statement of Claim, ¶ 440.
[184]    This request for compensation for UF2 is the original claim contained in the Statement of Claim. However, the Claimant subsequently and alternatively sought compensation for the total damages alleged, including compensation for UF2, in relation to the Respondent's claim for early termination. The Tribunal will discuss this subsequent and alternative claim in Section IV.E.1 of this Award.
[185]    POB and S&B Statement of Claim, ¶ 441.
[186]    POB communication dated 5 July 2024, "Hearing session of 26 June 2024 - Location in the file of the evidence associated with UF2 Archaeological Claim", ¶ 2(a).

280. POB states that the economic imbalance involved in this claim is strictly for the amounts that were caused as a consequence of the archaeological findings;[187] and that it is $5.8 billion Colombian pesos.[188] Furthermore, POB warns in any case that the amounts associated to the Capex in FTI's damages reports are not part of the EPC Claims, since they are costs already incurred by POB, amounts invoiced by the EPC Contractor to POB and paid by POB to the EPC Contractor.[189] In turn, the EPC Claims "are not part of the Global Value of each UF, they have not been invoiced by the EPC Contractor to POB nor paid by the latter".[190]

281. First, to support this claim, POB states that it found five archaeological sites in UF 2 of the Project, in which "the findings include: (i) the discovery of slabs or funerary structures, ceramic pieces and other archaeological remains between K5+650 and K5+800 and (ii) the discovery of human bone remains and hunting tools in K8+890".[191] Furthermore, that such archaeological findings resulted in the recognition of two EERs under the terms of the Concession Agreement, as enshrined in the statements of the *Amiable Compositeur*.[192]

282. Second, in support of its claim, POB states that:[193]

> [T]he archaeological findings between K5+650, K5+800 and K8+890 of UF2 are: (i) subsequent to the Concession Agreement, since they arose after the execution of the Agreement; (ii) not attributable to POB, since they are a typical feature of the area; (iii) unforeseeable, given their magnitude and complexity, their harmful consequences were not foreseen by the

---

[187] POB communication dated 5 July 2024, "Hearing session of 26 June 2024 - Located in the file of the evidence associated with UF2 Archaeological Claim", ¶ 2(a).

[188] POB communication dated 5 July 2024, "Hearing session of 26 June 2024 - Located in the file of the evidence associated with UF2 Archaeological Claim", ¶ 2(a). Exhibit CER-009.

[189] POB communication dated 12 April 2024, "Procedural Order No. 18 (OP18) - response to the request of the Arbitral Tribunal and response to ANI's letter dated 1 March 2024", ¶ 7.

[190] POB communication dated 12 April 2024, "Procedural Order No. 18 (OP18) - response to the request of the Arbitral Tribunal and response to ANI's letter dated 1 March 2024", ¶ 6.

[191] POB and S&B Statement of Claim, ¶ 411.

[192] POB and S&B Statement of Claim, ¶¶ 427-429.

[193] POB and S&B Statement of Claim, ¶ 442.

Parties; and (iv) they had serious consequences for POB, given that it had to significantly extend the term set for the recovery of the findings, which resulted in cost overruns assumed by the Concessionaire that were not taken into account when defining the contractual equation.

283. Third, in support of its claim, POB argues that the magnitude and complexity of the findings led to the fact that:[194]

> [T]he Interventions had to be extended until August 2021, to the extent that during more than four years it had to focus all of its resources to overcome the two EERs derived from the archaeological findings.

284. The above led to the fact that on:[195]

> [S]everal occasions during the operation it was required (i) to include additional personnel to the team of archaeologists, (ii) to acquire equipment, materials, supplies and specialized laboratories in the field, (iii) to adapt the sites and facilities where the recovery was to be carried out, (iv) to hire security systems, (v) to install sanitary units and hydration points, (vi) to assume transportation expenses, (vii) to assume costs derived from the interventions related to the scope of the Agreement, (viii) to execute insurance policies for machinery and (ix) others.

285. Fourth, POB concedes that it "assumed the risk arising from Social and Environmental Management, including matters related to archaeological findings".[196] However, according to the "applicable law, POB only assumed foreseeable and limited risks",[197] thus claiming that the intensity and quantity of the discoveries make them an unforeseeable and exorbitant risk, which broke the economic balance of the Concession Agreement.[198]

---

[194]  POB and S&B Statement of Claim, ¶ 442.
[195]  POB and S&B Statement of Claim, ¶ 442.
[196]  POB and S&B Statement of Claim, ¶ 413.
[197]  POB and S&B Reply, p. 82.
[198]  POB and S&B Reply, p. 83.

286.  Fifth, POB states that it requested ANI to reestablish the contractual equilibrium in the communication sent on 11 June 2020.[199] Furthermore, POB points out that there is no legal timing requirement that limits the power to request the reestablishment of the economic balance of a State contract, particularly it is not imperative to make reservations in amendments, in order to later request such reestablishment.[200] Likewise, POB argues that waivers to file claims must be expressly stated in contractual documents in order to be effective, in accordance with article 5 of Law 80 of 1993. Therefore, POB concludes that it did not waive its right to claim the reestablishment of the economic equilibrium of the Agreement.

**(b)  ANI's position**

287.  ANI asserts that the Arbitral Tribunal should not rule on damages and/or compensations from or in relation to third parties who are outside the arbitration agreement and the Agreement.[201]

288.  ANI also argues that POB is not entitled to the reestablishment of the economic equilibrium of the Agreement due to the archaeological findings in UF 2, since the impact of the EERs, declared by the *Amiable Compositeur*, releases all the Parties from liability and obligations, in accordance with Section 14.2(c) of the Concession Agreement.[202]

289.  In addition, ANI states that the archaeological findings were risks assigned in the Concession Agreement to POB.[203] Likewise, it argues that they are an unfavorable consequence derived from POB's negligent contractual management and breach of contractual obligations with respect to UF 2.[204] Additionally, ANI argues that the

---

[199]  POB and S&B Statement of Claim, ¶ 440. Exhibit C-128.
[200]  POB and S&B Reply, ¶¶ 183, 184.
[201]  ANI Statement of Defense, ¶¶ 548-561. In the same sense, ANI Rejoinder, ¶ 303-305.
[202]  ANI Statement of Defense, ¶¶ 757-768. ANI communication dated 12 July 2024, "Pronouncement Regarding the Claimant's Memorial dated 5 July 2024," ¶ 2.1.
[203]  ANI Statement of Response, ¶ 777.
[204]  ANI Statement of Response, ¶ 786.

eventual economic imbalance of the Agreement cannot generate damages or the recognition of profit, instead the project must be brought to a state of no loss.[205] In turn, ANI argues that POB did not promptly request the reestablishment of the economic equilibrium.[206]

290.  First, ANI objects to the competence of the Arbitral Tribunal on the economic reestablishment of the EPC Claims incurred in the context of the archaeological findings of UF 2. ANI argues that the Arbitral Tribunal should not rule on damages and/or compensations from or in relation to third parties who are outside the arbitration agreement and the Agreement.[207] Since the main claim for the reestablishment of the economic equilibrium of UF 2, discussed herein, is based on damages of third parties, unrelated to the arbitration agreement and the Agreement, the Arbitral Tribunal cannot make any declaration or decision regarding compensation for these amounts.

291.  Second, ANI concedes and agrees with POB that the archaeological findings in UF 2, constitute EERs, as determined by the *Amiable Compositeur*, and that, by virtue thereof, they are governed by Section 14.2 of the Concession Agreement, which is the special regime. It argues that there is a releasing effect not only for the Party suffering the EER, POB, but also exempting the other Party, ANI, from the recognition of losses, damages, expenses, charges or expenses incurred by the affected party during the special period.[208] Furthermore, ANI argues that, by virtue of Section 14.2 (h) of the Agreement, POB is only entitled to the recognition of idle costs due to the longer stay on site.[209]

292.  Third, ANI argues that there is no economic imbalance under Section 13.1 and 13.2 (ix) of the Concession Agreement, since the management of the archaeological findings

---

[205]  ANI Statement of Defense, ¶¶ 789, 793.
[206]  ANI Statement of Defense, ¶ 754.
[207]  ANI Statement of Defense, ¶¶ 548-561. In the same sense, ANI Rejoinder, ¶ 303-305.
[208]  ANI Statement of Defense, ¶¶ 760-761, 768.
[209]  ANI Statement of Defense, ¶¶ 762-764.

in UF 2 is a risk assumed by POB and the cost overruns are risks inherent to the performance of the Concession Agreement.[210]

293. ANI further states that the risk regime agreed in the Agreement cannot be modified. It affirms that POB assumed "the cost implied by the full and timely compliance with all the obligations and the assumption of the risks set forth in the Agreement and its Appendices and Annexes".[211] ANI further states that this assumption of risk is clear and is set forth in Section 2.6(v)(a) of the Agreement, in the "Representations and Warranties of the Parties".

294. Fourth, ANI argues that POB's breaches of its archaeological obligations and its negligence in overcoming the EERs[212] negate the right to the reestablishment of the contractual equilibrium of the Agreement. ANI asserts that the archaeological and social obligations have not been diligently fulfilled by POB.[213]

295. ANI argues that "there is evidence of the Concessionaire's improper management, since today, there is no evidence of the performance of all the required Interventions in the road corridor for which POB was hired".[214] For the above reasons, ANI argues that:[215]

> [I]n the interest of discussion, for the reestablishment of the economic equilibrium to be applicable, it is essential that the party requesting it has not contributed to its occurrence, which is not evident in the present case.

296. Fifth, ANI argues that in the event of a breach of the economic imbalance, the recognition of profits is not applicable, but rather the recognition of a loss is, and that the Concessionaire should be taken to a state of non-loss.[216] Therefore, ANI states that there was no

---

[210] ANI Statement of Defense, ¶¶ 755, 779, 782.
[211] ANI Statement of Defense, ¶ 778.
[212] ANI Statement of Defense, ¶¶ 33, 794.
[213] ANI Statement of Defense, ¶ 40.
[214] ANI Statement of Defense, ¶ 55
[215] ANI Statement of Defense, ¶ 793.
[216] ANI Statement of Defense, ¶¶ 789-794.

breach of the contractual equilibrium because its requirements are not met, since there was no damage or loss of profit to be recognized in favor of POB.[217]

297. ANI states that the Council of State has concluded that "only the extra expenses or costs incurred by the contractor due to the excess or cost overrun caused by the unforeseeable and irresistible circumstance shall be recognized".[218] POB is not entitled to the reestablishment of the equilibrium of the Agreement, since POB intends to be compensated for the profits it allegedly lost, and this remedy is not allowed under Colombian law.[219]

298. Sixth, ANI argues that, if there had been an imbalance in the contractual equation, POB did not allege this situation in a timely manner. ANI supports this position by pointing out that, by virtue of the principle of good faith, "the opportunity arises at the moment in which documents are executed that specify suspensions, additions, extensions of the contractual term, additional contracts, amendments, etc."[220] Therefore, the appropriate opportunity for this was at the time of requesting the EER declaration. Thus, ANI alleges that POB did not raise any objection related to the reestablishment of the contractual equilibrium in the request or in the declaration of the EERs. Additionally, ANI argues that it would also have been appropriate to raise the claim for the reestablishment of the contractual equilibrium at the time of the negotiation and/or signature of the Amendment number 8 and 9.[221]

**(c)    Analysis of the Arbitral Tribunal**

299. The Arbitral Tribunal understands that the essence of POB's claim for economic reestablishment of UF2 is the so-called EPC Claims in the amount of $5.8 billion Colombian pesos. ANI has objected to this claim arguing that the Arbitral Tribunal has

---

[217]    ANI Statement of Defense, ¶ 796.
[218]    ANI Statement of Defense, ¶ 791.
[219]    ANI Statement of Defense, ¶ 795
[220]    ANI Statement of Defense, ¶ 798.
[221]    ANI Rejoinder, ¶¶ 276-279.

82

no competence because the EPC Contractor is a third party outside this Arbitration. As discussed in this Award in the Section on Jurisdiction and Competence (Section IV.A.2), the Arbitral Tribunal agrees with ANI's objection. Therefore, the Arbitral Tribunal declares that it has no competence to decide POB's claim on the economic reestablishment of UF 2 since that claim is based on EPC Claims, which is constituted by damages suffered by a third party, external to this Arbitration, over which this Arbitral Tribunal has no competence.[222]

## 2. CLAIMANTS' CLAIMS IN CONNECTION WITH UFS 4 AND 5

300. The Claimants' most relevant claim, as regards the amount of compensation requested, is in relation to ANI's alleged breaches that "prevent the Project originally conceived by the Respondent from being performed".[223] The foregoing would be manifested insofar as ANI:[224]

> [D]id not identify the existence of more than sixty (60) water springs within one hundred (100) meters of the road corridor of UFs 4 and 5. This omission has material effects on the Project, since the Colombian legal system prohibits the execution of any activity other than the harvesting of secondary forest fruits within 100 meters of the springs. Therefore, the environmental protections in force in Colombian law do not allow POB to carry out the Interventions in the terms required by ANI in the road corridor of UFs 4 and 5.

301. The Claimants argue that, in light of this breach, the Concessionaire displayed diligent conduct in order to find solutions, exercising the available contractual remedies and requesting ANI to recognize an EER. They define an EER as an Exemption of Liability Event for POB's performance of the

---

[222] POB's subsequent and alternative claim for compensation for the total damages alleged, including compensation for UF2, in relation to the Respondent's claim for early termination, will be discussed in Section IV.E.1 of this Award.
[223] POB and S&B Statement of Claim, ¶ 6.
[224] POB and S&B Statement of Claim, ¶ 8.

affected obligations. They state that the existence of the EER does not exempt ANI from liability for its breaches.[225]

302.    They indicate that, in the EER Minutes, the Parties assumed certain obligations aimed at overcoming the EER. However, ANI failed to comply with its obligations, leading to the Concessionaire's inability to execute the Interventions provided for in UFs 4 and 5.[226]

303.    The Claimants point out that the foregoing means that the Concessionaire could not obtain the Retributions associated with UFs 4 and 5, which would amount to approximately 58% of the total Retribution foreseen under the Concession Agreement, as well as having incurred additional financial damages.[227]

304.    The Claimants emphasize that they had to resort to the Emergency Arbitrator to order ANI to refrain from continuing with the sanctioning procedures, from declaring defaults and imposing sanctions on POB, as a result of its inability to perform the Interventions in UFs 4 and 5.[228]

305.    The Claimants charge ANI with breaches of its obligations under the EER Minutes, agreed to overcome the EER.[229]

306.    The Claimants accuse the Respondent of wanting to benefit from its own fault, because it seeks the Early Termination of the Agreement as 730 days have elapsed since the completion of the original term foreseen for the termination of UFs 4 and 5, without having been able to overcome the EER, as changing the layout of the Project is prohibited, since this would amount to a change in the subject matter of the Agreement.[230]

---

[225]  POB and S&B Statement of Claim ¶ 10.
[226]  POB and S&B Statement of Claim, ¶ 11-16.
[227]  POB and S&B Statement of Claim, ¶ 17-18.
[228]  POB and S&B Statement of Claim, ¶ 21-23.
[229]  POB and S&B Statement of Claim, ¶ 14.
[230]  POB and S&B Statement of Claim, ¶ 27-29.

307.     The Respondent, in turn, argues that:[231]

    i) ANI had no obligation to identify the springs of UFs 4 and 5 at the project structuring stage; ii) neither the sections of the terms and conditions nor the clauses of Agreement 002 of 2014 related to the contracting entity's limitation of liability are ineffective; iii) the declaration of an EER in UFs 4 and 5 releases the parties to the Agreement, not only POB, from compliance.

308.     Consistently with this, ANI filed a Counterclaim, arguing that POB breached its obligations with respect to UFs 4 and 5, arguments reiterated in its Counter-Memorial.

309.     ANI claims that POB should have identified the springs in the Preconstruction Phase, since it was in charge of preparing the definitive designs. Likewise, it assumed the risk of requesting the necessary permits from the environmental authorities.[232]

310.     ANI indicates that the EER Minutes dated 1 August 2018, established that an extraordinary situation had arisen, which prevented them from fulfilling the obligations related to UFs 4 and 5 and that no reciprocal economic claims would be filed for that cause.[233]

311.     It affirms that POB had not adequately complied with Activity 1 of the EER Minutes, which would have forced ANI to initiate working groups with different entities, in order to achieve the performance of the Agreement. For its part:[234]

    [A]ctivity No. 2, i.e., the execution of an Amendment in which the original layout is modified, is not possible, since it would change the subject matter of the Agreement, a modification that is not allowed according to the jurisprudence of the Constitutional Court [Corte Constitucional] and the Council of State [Consejo de Estado].

---

[231]  ANI Statement of Defense, ¶ 19.
[232]  ANI Statement of Defense, ¶ 20.i. See also, ANI Statement of Counterclaim, pp. 212-215.
[233]  ANI Statement of Defense, ¶ 20.iii. See also, ANI Statement of Counterclaim, pp. 290-291.
[234]  ANI Statement of Defense, ¶ 20.iii. See also, ANI Statement of Counterclaim, pp. 291-296.

312.    ANI alleges that the Concessionaire did not perform the works of UFs 4 and 5, and therefore, in ANI's opinion, it cannot claim the corresponding Retribution.[235]

313.    ANI points out that, if the Arbitral Tribunal considers that the Concessionaire complied with Activity 1 of the EER Minutes, such activity has not been completed, since the environmental authorities have not yet rejected the possibility of continuing the Project with the original route. It indicates that the provisions of Section 14.1(e) of the Agreement should be applied, i.e., to declare its Early Termination, given that 730 days have elapsed since the completion of the term originally foreseen for the completion of UFs 4 and 5, without being able to overcome the EER and that the change in the Project's layout is prohibited, because it is equivalent to a change in the object of the Agreement.[236]

## (a) Regarding the alleged non-compliance of ANI regarding the springs

### (i)    Position of POB and S&B

314.    The Claimants allege that ANI had the obligation to identify the springs in UFs 4 and 5 during the structuring of the Agreement, inasmuch as ANI has the obligation to carry out the environmental studies that are necessary to guarantee the feasibility of the contracts that it structures.[237]

315.    Among other constitutional and legal norms, the Claimants highlight Article 24 of Law 80 of 1993 on the General Statute of Public Procurement in Colombia, which establishes the "principle of transparency" that renders ineffective as a matter of law the stipulations of the bidding documents and contracts that are contrary to the provisions of the foregoing section, or that provide for waivers of claims due to the occurrence of the facts set forth herein.[238] They emphasize that what is stated in section 1.9 of the

---

[235]    ANI Statement of Defense, ¶ 20.vii.
[236]    ANI Statement of Defense, ¶ 20.xi.
[237]    POB and S&B Statement of Claim, ¶ 67.
[238]    POB and S&B Statement of Claim, ¶ 80; Exhibit CL-062; Exhibit CL-066.

Tender Terms and Conditions, regarding the referential nature of the information,[239] would be ineffective by law and has no value or effect, as can be seen from article 24 of Law 80 of 1993.[240]

316.    The Claimants argue that ANI "structured the Project, determined that it was feasible and conducted the Tender".[241] They point out that ANI had a team of advisors of great national and international recognition for the structuring of the Project, such as FONADE, IFC, and the Temporary Union of Euroestudios - Durán & Osorio - Deloitte.[242]

317.    The Claimants add that "ANI and its Structuring Team did not include any springs or water sources in the list of water bodies that would be affected by UFs 4 and 5", and that they indicated there were some springs in the area, but in places of remote access and primary forest locations.[243]

318.    The Claimants allege that ANI's breaches:[244]

> [I]n relation to its legal and contractual duties to properly structure the Concession Agreement led to the impossibility of performing the Interventions in UFs 4 and 5. Such impossibility was acknowledged by the Parties in the EER Minutes.

319.    In particular, they point out that, if ANI had identified the springs promptly, it would have modified the layout of UFs 4 and 5.[245]

---

[239]  POB and S&B Statement of Claim, ¶ 362. 1.9.2: "The availability of studies and concepts in the Reference Data Room is only intended to facilitate access to the information stored in ANI's and/or INVIAS' archives. Therefore, the studies and concepts will be available for information purposes only, it being understood therefore that they are not information delivered by ANI for purposes of the presentation of the Tender Bids, nor do they generate any ANI's obligation or responsibility and, therefore, they are not part of the Terms and Conditions or of the Agreement."

[240]  POB and S&B Statement of Claim, ¶¶ 363-365, with references to the case of Concesión Transversal del Sisga S.A.S. v ANI, CL-065.

[241]  POB and S&B Statement of Claim, ¶¶ 106-108. Exhibit CL-070: Article 12 of Law 1682 of 2013

[242]  POB and S&B Statement of Claim, ¶ 115.i.

[243]  POB and S&B Statement of Claim, ¶ 118.iii.a, b and c; C-085(g).

[244]  POB and S&B Statement of Claim, ¶¶ 336.

[245]  POB and S&B Statement of Claim, ¶ 337.

320.    The Claimants argue that Legislative Decree 2811 of 1974, the Natural Resources Code in Colombia, establishes the classification of "protective forest areas," with a strict environmental conservation regime.[246] In turn, Article 3 of Decree 1449 of 1977 (compiled in Article 2.2.1.1.18.2 of Decree 1076 of 2015) establishes the definition of the protective forest areas that extend 100 meters around the periphery of the springs.[247]

321.    The joint application of both provisions leads the Claimants to conclude that:[248]

   (a) [A]reas within 100 meters around the springs must be covered by forests, natural or artificial, and (b) the only activity permitted within said forests is the use of their secondary fruits.

322.    Along these lines, Corporinoquía imposed the following obligation on POB:[249]

   If there are water springs in the project area, a minimum distance of 100 meters must be kept to protect them.

323.    The Claimants claim to have received the corresponding PAGA for UFs 1 to 5 and the Environmental License for the Choachí Variant, in accordance with ANLA's requirements, without the need to carry out specialized technical studies that could allow for the identification of the springs.[250]

324.    The Claimants state that on 16 January 2016, the Parties executed the Construction Phase Commencement Minutes.[251] In August 2016 "the Concessionaire began to

---

[246]  POB and S&B Statement of Claim, ¶ 111.
[247]  Exhibit CL-005.
[248]  POB and S&B Statement of Claim, ¶ 113.
[249]  POB and S&B Statement of Claim, ¶ 162; C-105, "Obligations", numeral 2, p. 29.
[250]  POB and S&B Statement of Claim, ¶ 158-161; ¶ 369.
[251]  POB and S&B Statement of Claim, ¶ 167, C-106.

receive PQRs from members of the community neighboring the Project warning of the possible existence of springs around the layout of UFs 4 and 5".[252]

325. Based on this information, the Concessionaire states that it contracted studies with the Pontificia Universidad Javeriana between October 2016 and October 2017.[253] Additionally, it hired the consulting firm SIAM S.A., which worked between September 2017 and April 2018[254].

326. The Claimants state that:[255]

> SIAM concluded that there were 55 water springs within 100 meters around each side of the Project axis in UFs 4 and 5. In June 2018, after a series of methodological adjustments requested by the Supervisor, SIAM reclassified some water sources and determined that 61 of them were springs. Those 61 springs, added to the 5 found by Javeriana in its report, totaled 66 springs within 100 meters around the layout of UFs 4 and 5.

327. The Claimants emphasize that the process took about 1.5 years of studies and resulted in the identification of 66 springs within 100 meters around each side of the road axis in UFs 4 and 5.[256] This time greatly exceeds the period provided for in the Tender Terms and Conditions for submitting bids, which was 7 months.[257]

328. They emphasize that ANI did not initiate any sanctioning proceedings against POB on the existence of the springs, which is indicative that ANI did not consider that the Concessionaire could be in breach of the Agreement.[258]

---

[252] POB and S&B Statement of Claim, ¶ 168; C-002.
[253] POB and S&B Statement of Claim, ¶¶ 172-174.
[254] POB and S&B Statement of Claim, ¶¶ 177-179; 370.
[255] POB and S&B Statement of Claim, ¶ 179.
[256] POB and S&B Statement of Claim, ¶ 180.
[257] POB and S&B Statement of Claim, ¶ 361.iii.
[258] POB and S&B Statement of Claim, ¶ 372.

329.    On 14 November 2017, with the first results from Universidad Javeriana, POB sent the First EER Notice, indicating that said event had arisen as of 31 October 2017, when POB became aware of said results.[259] POB reiterated these notices on 27 February 2018[260] and 28 April 2018.[261]

330.    On 1 August 2018, the EER Minutes were executed.[262]

331.    The Claimants argue that, in the EER Minutes, the Parties agreed that the term for the performance of all works and activities associated with UFs 4 and 5 was suspended, meaning that POB is exempt from liability for delays in the performance of such UFs.[263] In addition, some specific obligations were established "provided that they are not affected by the present EER declaration".[264]

(ii)    ANI's position

332.    ANI argues that it has fully complied with its duty to plan the Project, since it was not responsible for carrying out the final designs and detailed studies of the Preconstruction Phase based on which the construction of the works would be carried out.[265]

333.    It argues that, in compliance with the duty of planning, the structuring of the Project complied with the environmental requirements, according to the consultation made to the ANLA, carried out the Environmental Diagnosis of Alternatives for the Choachí variant requested by the ANLA and established the guidelines of the environmental impact study for the Calera-Cáqueza sector.[266] With respect to the Choachí variant, the Structural Engineer reportedly carried out the

---

[259]    POB and S&B Statement of Claim, ¶ 186.
[260]    POB and S&B Statement of Claim, ¶ 188.
[261]    POB and S&B Statement of Claim, ¶ 191, C-109.
[262]    Exhibit C-002.
[263]    POB and S&B Statement of Claim, ¶ 211.
[264]    POB and S&B Statement of Claim, ¶ 221.
[265]    ANI Statement of Defense, ¶ 20.i; ¶ 134, Exhibit 8.1.34.46; ¶ 144, Exhibit 8.1.34.43.
[266]    ANI Statement of Defense, ¶ 135-137.

environmental diagnosis of alternatives, choosing alternative 3 on a multi-criteria evaluation, which was approved by ANLA,[267] and the Concessionaire must carry out the Environmental Impact Study according to Technical Appendix 6.[268] ANI is emphatic in pointing out that neither the Entity nor its Structuring Company had the obligation to identify the springs of UFs 4 and 5, and that it was the Concessionaire who should have identified them to adjust its definitive designs so that the Project could continue.[269]

334.    ANI denies that subparagraph d) of paragraph 5 of Article 24 of Law 80 of 1993 applies, since section 1.9.2. of the Bidding Documents is not a liability exemption clause, but rather, it establishes that the availability of the studies and concepts made by ANI does not constitute the delivery of information for the submission of bids, therefore, no claims may be derived during the performance of the Agreement based on this information.[270]

335.    ANI states that, just as the Concessionaire detected the water sources during the performance of the Project, "it could also have noticed them during the Selection Process phase of the public Tender when it was aware of and verified the studies carried out by the structurer".[271] ANI accuses POB of lack of diligence in the identification of the water points and denies that it acted diligently, given that it was not until the Construction Phase of the Project, and in response to complaints from the community, that POB became aware of the water springs in the surroundings of UFs 4 and 5.[272]

336.    It also accuses POB of not having identified the presence of water springs at the time of obtaining the Environmental License, as well as during the preparation of

---

[267]  ANI Statement of Defense, ¶ 139, Exhibit 8.1.34.43.
[268]  ANI Statement of Defense, ¶ 140, Exhibit 8.1.3.6.
[269]  ANI Statement of Defense, ¶ 580
[270]  ANI Statement of Defense, ¶ 20.ii; ¶ 583-593; ¶ 704-707; Tender Terms and Conditions Draft No. VJ-VEIP-LP-010-2013, cl. 1.9.2
[271]  ANI Statement of Defense, ¶ 147.
[272]  ANI Statement of Defense, ¶ 179-186.

the documents that make up the PAGA, in which some of the springs were described as runoff.[273]

337.    Along with the above, ANI acknowledges in multiple passages of its submissions that the presence of the springs makes the performance of UFs 4 and 5 unfeasible, but disagrees, however, on the responsibility for the impact generated by this. For example, it states that:[274]

> [F]or reasons attributable to POB, currently the activities of improvement of UFs 4 and 5 of the Agreement cannot be performed due to the presence of water springs that were recognized by the EER in UFs 4 and 5, as stated in the Minutes of 1 August 2018.

338.    At the same time, ANI also states that the presence of springs does not make the Project unfeasible:[275]

> It is not true that due to the presence of springs in UFs 4 and 5 the project is unfeasible, it is reiterated that the mere existence of springs in the corridor, although it generates the need to analyze alternatives from the environmental point of view for their management, under no scenario determines the unfeasibility of the project.

(iii)    The Agreement and Applicable Law

339.    As indicated in Section 14.2 paragraph b) of the Agreement:

> An Exemption of Liability Event comprises any event, circumstance or combination of events or circumstances beyond the reasonable control of the Party invoking it, which substantially and adversely affects the performance of the obligations under the Agreement, with respect to which it is invoked; after having taken all reasonable steps to prevent it. The concept of an Exemption of Liability Event shall

---

[273]    ANI Statement of Defense, ¶¶ 167-171.
[274]    ANI Statement of Defense, ¶ 160; ¶ 219.
[275]    ANI Statement of Defense, ¶ 233; ¶ 273

include any event of Force Majeure, including Property Force Majeure, Environmental Force Majeure and Public Utilities Network Force Majeure.

340.    The effects of an EER, according to Section 14.2 paragraph a) of the Agreement, are as follows:

> The Parties shall be exempted from liability for any delay in the performance of the obligations under the Agreement, when upon due verification it is concluded by agreement of the Parties or, failing such agreement, by the *Amiable Compositeur*, that the delay is the result of facts that may be defined as an Exemption of Liability Event, under the terms of this Section 14.2. Delay in performance by any subcontractor shall not in itself be deemed as an Exemption of Liability Event unless the existence of such circumstance is itself the result of an Exemption of Liability Event.

341.    ANI also assures that the presence of the springs is due to a breach of POB's obligations, who had assumed the risk of environmental management. There are a series of contractual provisions that regulate the allocation of risks between the Parties.

342.    Section 2.6(a)v of the Agreement contains the Agreement acceptance statement, which states that the Concessionaire studied the terms of the documents that form part of the Agreement, made its observations and, likewise, "in the terms of Article 24 of Law 80 of 1993 and in general of the rules and principles applicable to public procurement", informed ANI of the sections that were not clear to it, which were clarified. It is further indicated that the Concessionaire:

> [A]ccepts the terms and conditions of the Agreement to the extent that it has studied them, it has carefully assessed the costs involved in the full and timely compliance in accordance with the terms of the Agreement of all the obligations and the assumption of the risks set forth in the Agreement, its Appendices and Annexes. In particular, it declares that it has made an assessment of the risks under its responsibility in accordance with the terms of this Agreements and

accepts said assumption of their favorable and unfavorable effects without limitation.

343.     In the same vein, Section 2.6(a)xi of the Agreement indicates that the Concessionaire declares that it is aware of "all matters and information related to the execution and performance of the Agreement", "the actual possibility of performing all the obligations under the Agreement with the available resources, as well as the places where the Agreement will be performed", "soil conditions, climatic, rainfall and topographic conditions", and "in general, all other aspects that may affect the performance of the Agreement, all of which were taken into account in the preparation of the Concessionaire's Bid".

344.     It is then stated:

> Likewise, the Concessionaire declares and warrants that it has carried out the complete examination of the work sites and that it has fully investigated the risks associated with the Project, and in general, all the factors determining the costs of performing the works, which were included in the economic components of its Bid, strictly taking into account the retribution structure stipulated in the Agreement, notwithstanding the coverage of the effects derived from some risks under the strict terms of the Agreement. The fact that the Concessionaire has not acquired all the information that may influence the determination of the costs will not exempt it from responsibility for the complete performance of the Project in accordance with the Agreement, nor will it entitle it to any additional payment from ANI, because the Concessionaire assumed the burden of diligence to carry out the necessary investigations and verifications to prepare its Bid.

345.     With respect to the risks assumed by ANI, Section 2.6(b)iv of the Agreement states that it:

> Has made available to the Concessionaire the information at its disposal in relation to the Project. Notwithstanding the foregoing, ANI states that it does not guarantee that such information is complete, adequate or sufficient, and it is the responsibility of the

Concessionaire to carry out due diligence on each of these
aspects.

346.     Finally, Legislative Decree 2811 of 1974, Colombia's Natural Resources Code,
establishes the classification of "protective forest areas", with a strict environmental
conservation regime.[276] Article 204 of the cited Code establishes the following:[277]

A protective forest area is the area that must be permanently
preserved with natural or artificial forests, to protect these same
resources or other renewable natural resources.

In the protective forest area, the protective effect must prevail
and only the harvesting of secondary forest fruits will be allowed.

347.     In turn, article 3 of Decree 1449 of 1977 (compiled in article 2.2.1.1.18.2 of
Decree 1076 of 2015) establishes the following:[278]

Protective Forest Areas comprise: a. The sources of water
springs in an extension of at least 100 meters all around,
measured from their periphery.

(iv)   <u>Analysis of the Arbitral Tribunal</u>

348.     First, from the joint reading of Article 2.2.1.1.18.2 of Decree 1076 of 2015 and
Article 204 of Decree 2811 of 1974, cited above, it follows that, the areas of at least
100 meters around the water springs constitute protective forest areas, where only the
collection of secondary fruits of the forest is allowed. An activity such as construction
or any other type of similar intervention is not allowed within 100 meters around
water sources.

---

[276]   POB and S&B Statement of Claim, ¶ 111.
[277]   Exhibit CL-004.
[278]   Exhibit CL-005.

349.    The above clearly shows a difficulty in performing the Agreement, given that the layout covered by the Agreement crosses protected forest areas. Thus, carrying out most of the Interventions in UFs 4 and 5 becomes legally impossible due to the presence of the springs.

350.    The question arises as to which of the Parties bears responsibility for the existence of the springs or for the failure to detect them in a timely manner.

351.    Notwithstanding the contractual clauses that assign a wide range of risks and responsibilities to the Concessionaire, the Parties executed the EER Minutes, i.e., the "EER Minutes Declaring an EER and the Consequent Suspension of the Performance of the Works and Activities for the Interventions of Functional Units 4 and 5, due to the aforementioned Declaration".[279] In said document, both Parties acknowledge that the Exemption of Liability Event was caused as a result of the presence of the springs:

> [They] acknowledge, agree and accept that the existence of springs of water sources (springs) in Functional Units 4 and 5, including the Choachí variant, constitutes an Exemption of Liability Event as of 31 October 2017.
>
> As a consequence of the occurrence and declaration of this Exemption of Liability Event, the Parties agree to SUSPEND as of 31 October 2017 the term for the performance of all works and activities associated with the Interventions corresponding to Functional Units 4 and 5 of the Project (including the Choachí variant).

352.    By signing the EER Minutes, ANI acknowledged that the presence of the springs was the cause of the suspension of the works and activities of the Interventions in UFs 4 and 5, releasing POB from its obligation to carry out such works and activities, and POB was not responsible for such suspension. The sole execution of the EER Minutes by the Parties constitutes an indication that, due to

---

[279]  Exhibit CL-002. Written Statement of Undisputed Facts, ¶ 27-30.

the presence of the springs, the performance of UFs 4 and 5 becomes legally unfeasible, due to the prohibition to perform construction and similar activities in the protective forest areas.

353.    Likewise, the expert opinion of Juan Carlos Valenzuela Miranda annexed by the Claimants, which was not challenged by any expert evidence of ANI, concludes that the presence of groundwater springs or water sources of subterranean origin that emerge from a rock or the ground produces the classification of the area as a protective forest area.[280] In this area, in addition to the obligation to preserve the forest cover, only the activity related to obtaining secondary fruits from the forest is permitted.[281]

354.    As indicated, it is confirmed that the presence of the springs leads to the legal impossibility of performing all the Interventions of UFs 4 and 5.

355.    Second, the Arbitral Tribunal inquires whether it was ANI's responsibility to detect the presence of the springs before opening the Tender for the Project.

356.    Article 11 of Law 1508 of 2012, which regulates the legal regime of Public-Private Partnerships, establishes the requirements for opening concessionaire selection processes. Subsection 1 of Article 11 establishes the obligation to have "updated technical, socioeconomic, environmental, property, financial and legal studies in accordance with the project".[282] Likewise, subsection 5 of Article 11 of the same Law requires, as a requirement for issuing the invitation, to have "[t]he appropriate classification, estimation and assignment of risks, possible contingencies" and "the respective risk matrix associated with the project".[283]

357.    In turn, Article 7 of Law 1682 of 2013 establishes that:[284]

---

[280]    Exhibit CER-003.
[281]    Exhibit CER-003, p. 11.
[282]    Exhibit CL-056.
[283]    Exhibit CL-056.
[284]    Exhibit CL-069, letter c).

> Public entities and persons responsible for the planning of transportation infrastructure projects shall identify and comprehensively analyze during the structuring stage, the existence in the direct and indirect area of influence of the project [including] exclusion or protected areas.

358.    For the purpose of obtaining this information, "they shall request such information from the authorities [...] in charge of these activities or services".[285]

359.    It cannot be assumed that the information obligations can be complied with in a merely formal manner, that is, by delivering studies that do not correspond to reality or by providing a classification and allocation of risks without having correctly detected the risks. Rather, what emerges from the aforementioned legislation is the need for the corresponding state entity to provide reliable information that allows the Tender to be carried out with certainty and transparency.

360.    The Arbitral Tribunal takes into consideration what is stated in the legal report of expert witness Gonzalo Suárez Beltrán, who demonstrates the existence, in the Colombian legal system, of the principle of planning and feasibility of the projects, which permeates the process of project structuring and the selection of contractors[286].

361.    The Arbitral Tribunal also takes into consideration the report of the expert Juan Carlos Valenzuela, who, acting within the scope of his expertise regarding the structuring of projects, states that:[287]

> It is the duty of the state entities, by virtue of the principle of planning, transparency and economy, to have prior studies that allow them to define in the bidding documents clear, precise and specific rules that, as they constitute the premises that will govern the Agreement, guarantee the performance of its object.

---

[285]  Exhibit CL-069.
[286]  Exhibit CER-007, ¶¶ 16-29.
[287]  Exhibit CER-003, p. 12.

ANI was the state entity responsible for structuring the Project and thus ensuring its feasibility; therefore, it was obliged to carry out prior studies in order to analyze its suitability and to guarantee that the Project could be performed under the terms set forth in the bidding process within the Prefeasibility and Feasibility Stage (studies that include the environmental component).

362.    The Arbitral Tribunal, likewise, highlights what is stated in the Report of the Comptroller's Office "Performance Audit Report to the Ministry of Transportation, the National Infrastructure Agency [and others] in the structuring, implementation and performance of the 4G road concession program [...]" issued in November 2019, which found that:[288]

In the structuring of the Perimetral del Oriente de Cundinamarca Concession all the environmental conditions of the areas that the concession project intended to intervene in were not taken into account and, consequently, it was not possible to establish the affectation and mitigation of the impacts that could be generated in the environmental resources, specifically in the sections of the functional units 4 and 5 of the project, since the "Terms of Reference Feasibility Annex 02 Group 03 OCC 0162012" were not taken into account [...].

363.    In particular, the obligation of the Structuring Team to identify forest reserve areas and water recharge zones along the planned corridor was allegedly breached. As regards the origin of this problem —that is, the structuring of the Project— the Report adds:

This situation affects ANI's performance with respect to its responsibility for the evaluation of these structuring proceedings due to the fact that there is no evidence that ANI expressed its opinion on the inconsistencies found in the structuring of the project, among them the identification of some contradictions within the same report of the structurer, for example, the need for Environmental Impact Studies and the non-identification of the real conditions

---

[288]  Exhibit C-039; Exhibit C-082.

of the project area. Furthermore, the effect this has on the configuration of possible Exemption of Liability Events.

364.    The Comptroller's Office reiterated these conclusions in the Performance Audit Report of June 2020, accusing ANI of not having taken the necessary measures to reflect the environmental reality of the area affected by the Project:[289]

> ANI recognizes and validates the observation submitted by the Comptroller's Office, confirming its findings, taking into account that since the structuring of the project it did not take all the necessary measures, nor did it carry out all the adequate and pertinent steps, that would reflect the environmental reality of the area affected by the project, [...], with the negative consequences that to date are present and are related to the suspension of the performance of the works of Functional Units 4 and 5.

365.    From the analysis of the aforementioned regulations and the facts, the Tribunal concludes that it was ANI's responsibility to detect the presence of the springs in a timely manner, prior to opening the Tender of the Agreement. In fact, timely detection of the springs would have allowed structuring of the Project in such a way that it would have been feasible, avoiding the need for its paralysis due to the EER.

366.    Third, the Arbitral Tribunal will analyze whether the information provided by ANI should have been considered final or binding. ANI is emphatic in pointing out that the information provided by ANI to carry out the Tender was referential and non-binding information. This allegedly follows from what is stated in section 1.9.2 of the Tender Terms and Conditions.

367.    Likewise, in Section 2.6 of the Agreement referenced above, it is stated that ANI provided all the information available to it, but this should not be considered "complete, adequate or sufficient".

368.    Although the information provided by ANI may not be complete, it cannot be, nor does ANI claim it to be, wrong or false. Thus, when such information indicates

---

[289]  Exhibit C-039.

that no springs are found, there is no reason for the Concessionaire to doubt it.

369.     This is the case of the document "Characterization of the area of influence of the project", provided by ANI in the tender, which indicates the following with respect to "Hydrogeology":[290]

> In the study area of the alternatives for the crossing of the municipality of Choachí, there are no wells, cisterns, springs or sources (*nacederos*), taking into account the consultation made to the Regional Autonomous Corporation of the Orinoco - CORPORINOQUIA.

370.     It should be noted that this specialty is the one that allows the presence of springs to be detected. This was clarified by the Claimants' expert, Mr. Juan Carlos Valenzuela. In response to the Arbitral Tribunal's question on the specialty of the studies to be carried out to detect the springs, namely, hydraulic, hydrological or hydrogeological, expert witness Valenzuela replied:[291]

> These are studies of hydrogeology, which is the subsurface resource of the soil and subsoil, and they establish groundwater. The other two deal with surface waters.

371.     In the same line, the Arbitral Tribunal considers that paragraph 1.9.2 of the Tender Terms and Conditions cannot have the effect that the Respondent intends to assign to it.[292]

372.     In the interpretation of the Agreement, the Arbitral Tribunal shall bear in mind "the purposes and principles" of Law 80 of 1993, as well as "the mandates of good faith",[293] the same mandate established in Article 1603 of the Civil Code[294] and in

---

[290]   Exhibit C-085(b).
[291]   Witness statement of Mr. Juan Carlos Valenzuela, 00:49:45.
[292]   R-11: "1.9.2. The availability of studies and concepts in the Reference Data Room is only intended to facilitate access to the information stored in ANI's and/or INVIAS' archives. Therefore, the studies and concepts will be available for information purposes only, it being understood therefore that they are not information delivered by ANI for purposes of the presentation of the Tender Bids, nor do they generate any ANI's obligation or responsibility, and, therefore, they are not part of the Tender Terms and Conditions or of the Agreements."
[293]   Exhibit CL-008.
[294]   Exhibit CL-009.

article 871 of the Commercial Code,[295] in light of the provisions set forth in article 13 of Law 80 of 1993.[296]

373.    According to the legal report of the expert Dr. Gonzalo Suárez Beltrán, annexed by the Claimants and not disputed by ANI:[297]

> One of the fundamental principles in matters of public procurement in Colombia is the general principle of good faith or bona fides, both subjective and objective, which must be observed in the pre-contractual and contractual stages, within the framework of all types and forms of contractor selection. This principle is enshrined in Article 83 of Colombia's Political Constitution, which is why it applies to all the actions of public authorities, as well as private parties, and it is applicable to all matters related to the execution and performance of state contracts, including concession contracts entered into under the PPP scheme of Law 1508 of 2012.

374.    It would go against good faith to assume that a concessionaire should ignore the information provided by the state entity, considering that it would not be reliable. The foregoing would alter the very essence of a bidding process, during which the bidders must make their best offers under equal conditions. This also applies to the case in which, in order to submit a bid, each bidder would have to carry out preliminary studies, often long and costly.

375.    The expert report submitted by the Claimants states along these lines:[298]

> Neither POB nor the other bidders were required to conduct hydrogeological studies (much less characterization of springs, hydrogeochemical or isotopic interpretation), protected areas studies or studies in many other areas; simply because the project planner had already studied them and had established that there were no springs in the area. Furthermore, if they had wanted to do so, they

---

[295]   Exhibit CL-010.
[296]   Exhibit CL-019.
[297]   Exhibit CER-007, ¶ 12, original citation omitted.
[298]   Exhibit CER-003.

would not have had enough time to prepare the proposal because it would have been impossible.

376.     The Claimants seek a declaration that Section 2.6 of the Agreement is null and void by virtue of Article 24 of Law 80 of 1993.

377.     Article 24 of Law 80 of 1993 contains a series of key mandates for the interpretation of the Terms and Conditions and their effects:[299]

> 5.  In the terms and conditions:
>
> [...] b) Objective, fair and clear, and complete rules shall be defined to allow the preparation of bids with the same character, ensure an objective choice and avoid the declaration of desertion of the tender;
>
> [...] d) Conditions and requirements that are impossible to comply with shall not be included, nor shall exemptions from liability derived from the data, reports and documents provided.
>
> e) Rules shall be defined to avoid misleading bidders and contractors and to prevent the formulation of offers with unlimited extension or that depend on the exclusive will of the entity.
>
> [...] Any provisions in the bidding documents and contracts that are contrary to the provisions of this section, or that provide for waivers of claims due to the occurrence of the events set forth herein, shall be ineffective by operation of law.

378.     As stated in article 1602 of the Civil Code:[300]

> Every legally concluded contract is law for the contracting parties, and cannot be invalidated except by their mutual consent or for legal reasons.

---

[299]   Exhibit CL-066.
[300]   Exhibit CL-097.

379.    In turn, Article 897 of the Commercial Code establishes the definition of "ineffectiveness by operation of law" as meaning "without the need for a judicial declaration".[301]

380.    In view of the foregoing, any stipulation in the Bidding Documents or the Agreement, which entails a waiver by the Concessionaire to invoke its rights derived from the information of the Tender, shall be deemed unwritten. Thus, the Respondent's exemption of liability contained in clause 2.6 of the Agreement constitutes an unlawful condition within the meaning of Article 24(d) of Law 80 of 1993.

381.    The above supports the Arbitral Tribunal's opinion that POB had not waived its ability to claim or exercise any other right in relation to ANI's eventual breach of its obligation to identify the presence of the springs and to report it in a timely manner, i.e., in the Tender process. Therefore, the information shared by ANI during the Tender should have been considered by the Claimants as accurate and binding information. Since it was pointed out that the Hydrology studies did not indicate the presence of the springs, there were no reasons for the Claimants to distrust such information.

382.    Fourth, the Arbitral Tribunal will analyze whether the presence of the springs is a risk that was expressly transferred to POB in the Agreement.

383.    Section 2.6.a.v of the Agreement, which contains the Acceptance of the Agreement statement, also states that the Concessionaire had:

> [M]ade an appraisal of the risks at its own expense under the terms of this Agreement and that it accepts such assumption of their favorable and unfavorable effects without limitation.

384.    In the Arbitral Tribunal's opinion, and strictly following the above-mentioned principle of contractual good faith, this provision could only have taken effect if ANI had provided correct and complete information regarding the presence of the springs within the scope of the concession. Having failed to do so, this Arbitral Tribunal

---

[301]    Exhibit CL-063.

cannot understand that the Concessionaire's intention was to accept risks that, according to the information provided to it, were unknown, unforeseen, and unexpected.

385.     In turn, Section 2.6.a.xi of the Agreement,[302] quoted above, can only be understood as an assertion of having carried out the investigation of the risks that were within the Concessionaire's control, not of those that should have been detected and informed by the Respondent.

386.     As to the specific risks assumed by POB, among the Concessionaire's Main Obligations during the Preconstruction Phase is to establish under its own responsibility whether it is necessary to obtain the Environmental Licenses required (Section 4.2.j) and to process and obtain "all permits, licenses, authorizations and concessions to develop the Project" (Section 4.2.k). The same applies to the Construction Phase (Section 4.5.f and g).

387.     It is not in dispute that POB obtained the respective permits.[303]

388.     However, even if POB had processed the Environmental License and the PAGA differently, accounting for the existence of the springs, this would not have changed the fact that UFs 4 and 5 were affected by the existence of the springs, with no construction activity allowed within 100 meters around them.

---

[302]  Likewise, the Concessionaire declares and warrants that it has carried out the complete examination of the work sites and that it has fully investigated the risks associated with the Project, and in general, all the factors determining the performance cost of the works, which were included in the economic components of its Bid, strictly taking into account the contribution structure stipulated in the Agreement, without prejudice to the coverage of the effects derived from some risks under the strict terms of the Agreement. The fact that the Concessionaire has not obtained all the information that may influence the determination of the costs will not exempt it from liability on the complete performance of the Project in accordance with the Agreement, nor will it entitle it to any additional recognition by ANI, since the Concessionaire assumed the burden of diligence to carry out the necessary investigations and verifications to prepare its Bid.
[303]  Exhibit C-015.

389.    This is also evident from the report of the expert witness Juan Carlos Valenzuela, which was not contested by ANI through other expert evidence, in the sense that:[304]

> In UF4, the interference of the protective forest area made up of 100 m around the sources and/or springs along the route of the road for 87.5% of them, that is, for 14 of the 16 springs identified and classified by the Concessionaire during the performance of the Concession Agreement No. 002 of 2014, was given from the time the project was structured by ANI.

> In the UF5 (including the Choachí Variant) the interference of the protective forest area formed by the 100 m around the sources and/or springs for 100% of them, that is, for all 56 springs identified and classified by the Concessionaire during the performance of the Concession Agreement No. 002 of 2014, was given from the moment the project was structured by ANI.

> Therefore, as a result of the above studies, 16 springs were identified in UF4 and 56 springs in UF5 (including the Choachí Variant), for a total of 72, of which 97.2% show interference with the corridor with which the project was structured and which was declared to be of public interest by ANI.

390.    In turn, the Concessionaire had to comply with Section 8.1 on "Social and Environmental Management" and Technical Appendices 6 and 8 of the Agreement (Section 8.1.a). The first obligation assigned to the Concessionaire in this context is that, again, to begin the Interventions in a UF, the Concessionaire must have the Environmental License or PAGA and the remaining environmental permits, licenses and concessions (Section 8.1.b).

391.    However, it is not clear that if POB had conducted Environmental Management differently, it could have overcome the ban on construction activities in forest reserve

---

[304]   Exhibit CER-003, p. 15.

areas. In other words, the problem generated by the presence of the springs in the layout of UFs 4 and 5 could not have been solved through greater or better Environmental Management by POB.

392.    A reference document on this matter, which guided the preparation of the Agreement, is CONPES 3760 for "Road Projects under the Public-Private Partnership Scheme: Fourth Generation of Road Concessions",[305] a document that guides the structuring of projects and allocation of risks, as stated by ANI's witness Mr. Álvaro Mauricio Duran.[306]

393.    While ANI considers that the presence of springs falls within the scope of Environmental Management, in CONPES the risks due to environmental obligations are grouped into three categories: (i) the management of regulatory permits, which should be the responsibility of the concessionaire; (ii) the costs of socio-environmental offsets, which should be shared under the same mechanism to cover cost overruns in land acquisition; and (iii) unforeseen works required by environmental authorities, subsequent to the issuance of the license and for reasons not attributable to the concessionaire, that are assigned to ANI.[307]

394.    Thus, according to the CONPES and the Agreement, the environmental risks of the Concessionaire do not include the risk of an eventual discovery of springs.

395.    The risks assumed by POB under Section 13.2 of the Agreement include, under item ix):

> Except for the coverage expressly provided for by ANI in this Agreement, the favorable or unfavorable effects derived from the Social and Environmental Management, since it is the Concessionaire's obligation to carry out the Social and

---

[305]    Exhibit CL-078(a), p. 43
[306]    Statement by Mr. Alvaro Mauricio Duran Leal, 01:27:38: "We structuralists are not free to tell the risks where they should be. That is what the CONPES document says, in the case of the fourth generation there were even two versions of the CONPES document, taking into account all the discussions with the market, a first version and then a correction to say how the risks should be assigned."
[307]    Exhibit CL-078(a), p. 51.

Environmental Management and to comply with the regulations
in force that govern the matter.

396.    In accordance with this clause, the unfavorable effects derived from the
Environmental Management must be assumed by POB to the extent that they arise
from the risks it had assumed. On the contrary, the Concessionaire should not assume
the unfavorable effects of the Environmental Management risks that are outside its
obligations.

397.    When ANI signed the EER Minutes, it acknowledged that the presence of the
springs is not an event derived from the risks assumed by POB. In fact, from the
account used by ANI itself, it is clear that ANI perceives the situation as outside
POB's responsibility.[308]

398.    Finally, the Arbitral Tribunal is not convinced by the position put forward by
ANI's witness, Mr. Álvaro Mauricio Durán. Mr. Durán has asserted that the problem
in this case is related to the design or the cost of construction of UFs 4 and 5, which
are the responsibility of POB.[309] The question about the costs associated with design
or construction could have been raised in the event that ANI had agreed to modify
the route of UFs 4 and 5 by moving it to the other side of the mountain, as suggested
by POB.[310] However, this problem did not arise in reality, leaving the discussion to
whether or not the Project could be carried out under its original conditions. This
means that the risk of an increase in the costs of the

---

[308]    Exhibit C-003: "In fact, from the initial report of water points reported by the community, a total of 23 were
listed to be analyzed. However, after an arduous review and verification process, the consultant hired by the
Concessionaire SIAM S.A.S. confirmed through a study submitted to ANI in April 2018 the existence of 60
springs, which included the six springs that had been previously identified by the Pontificia Universidad
Javeriana, for a total of 66 springs along Functional Units 4 and 5 of the Project. This generated by the Entity
the recognition of an - Exemption of Liability Event as of 1 August 2018, which suspended for the
Concessionaire the obligation to perform the Interventions established in the Concession Agreement and its
Appendices, in relation to the so-called Functional Units 4 and 5, until a series of activities were carried out".
[309]    Witness Statement of Mr. Alvaro Mauricio Duran Leal, 00:41:42-00:49:05; 01:14:49.
[310]    Exhibit C-049.

Project due to design and construction modifications —the risk assumed by the Concessionaire— was not verified.

399.    For the reasons stated above, the Tribunal concludes that the risk and the responsibility for the presence of the springs were not assigned by ANI to POB under the Agreement.

400.    Fifth, the Tribunal analyses whether the occurrence of the EER in UFs 4 and 5 makes the Project unfeasible.

401.    Although CONPES 3760 [311] for "Road Projects under the Public-Private Partnership Scheme: Fourth Generation of Road Concessions" is not part of the Agreement documents, it is useful for analyzing the concept of the EER, since its guidelines were set out in the Agreement and they provide greater detail about how an EER is conceived.

402.    In CONPES it is first pointed out that:[312]

> [E]vents of force majeure or fortuitous events are risks that may materialize in the development of projects, therefore contracts must provide formulas or mechanisms for their administration in the event that factors exogenous to the project occur.

403.    Immediately afterwards, it was established that:[313]

> [I]n order to maintain the performance rate of the contracts, it is necessary to consider contractual tools for the declaration of exemption of liability events for situations of force majeure or fortuitous events arising from environmental, social, real estate and public utilities network transfer events, among others, which will be assumed by ANI, after performing a verification process and certifying the due diligence of the private party on behalf of the supervisor or whoever acts in its place.

---

[311]  Exhibit CL-078(a), p. 43.
[312]  Exhibit CL-078(a), p. 43.
[313]  Exhibit CL-078(a), p. 43.

404.     From the above it follows that extraordinary events "will be assumed by ANI", that is, the concessionaire is not responsible for their occurrence and effects.

405.     In this context, it is of interest whether the possible unfeasibility of the Project, because of the presence of the springs, can be an EER that will be assumed by ANI.

406.     ANI's witness Mr. Álvaro Duran, who was directly involved in the drafting of the fourth generation contracts such as the Concession Agreement of the present case testified:[314]

> The concept of unfeasibility is not strictly speaking a risk. I have said, and I repeat, that there is a lot of confusion, that a risk is exclusively the variation of income or the variation of costs to obtain a certain result. That is the only thing that constitutes a risk.
>
> Unfeasibility sounds like an Exemption of Liability Event. This was a concept that was included in the Agreement, which is identical to that of force majeure but a little more extended, because the definition of force majeure in Colombian Law, which is an old definition of Law 153 of 1887, is a definition, in my opinion, imprecise, it is an antitechnical definition, as venerable as it may be given the many centuries that have passed without it being changed. And that is why, in my opinion, the Agreement must have a more technical definition, which is that of the Exemption of Liability Event.
>
> But the logic behind it is the same as force majeure, it is the traditional one of the law of obligations, according to which, if there is an impossibility for the debtor to perform the obligation, it cannot be liable for that. This has nothing to do with risks up to that point, it simply releases them from the performance of the obligation, because there have been no further costs. There are no further costs.
>
> What the Agreement has are concrete solutions to a situation like that. But I must reiterate, I do not recall any case where this concept of unfeasibility can be applied. Theoretically there may be, but I do not recall any case, because almost always in 99.9% of the situations there are solutions: it is only a question of money, that is, they are worth more or less. It is not that they cannot be done. Roads have always been made and will continue

---

[314]   Witness Statement of Mr. Alvaro Mauricio Duran Leal, 01:27:41.

to be made; and environmental problems are everywhere. The engineering solution is usually the answer, but it may cost more, that is where the risk, the concept of risk, applies.

407.    Paraphrasing the witness, the risk of unfeasibility does not exist, because engineering solutions can always be found or the costs of project performance can always be increased. However, in this specific case, it was not possible to develop the engineering solutions to address the problem of the presence of the springs without altering the object of the Agreement. This being so, the performance of UFs 4 and 5 remained unfeasible, but not only due to an EER.

408.    Rather, the performance of UFs 4 and 5 was unfeasible due to ANI's failure to comply with its contractual and/or legal obligation to structure and guarantee a feasible Project.

409.    For the reasons expressed in this Section, the Arbitral Tribunal concludes that (i) ANI had the contractual and legal obligation to structure and guarantee the feasibility of the Project, which included, in this case, the obligation to detect the existence of springs affecting the Project's area; and (ii) that ANI breached such obligation of structuring and planning the Project, by failing to timely detect the existence of the springs.

**(b)    Regarding the alleged breaches by ANI regarding the repudiation of the EER Minutes and alleged breaches by POB with respect to Activities 1 and 2**

(i)    Position of POB and S&B

410.    Section 14.2(d)(vi) of the Agreement requires the Parties to seek "solutions aimed at restoring the Affected Party's performance as soon as possible." In this line, in the EER Minutes, the Parties agreed to prepare and present to the Authorities,

standard mitigation measures and works at the water points identified for UFs 4 and 5 (the "**Mitigation Measures**").[315]

411.    As part of Activity 1, the Concessionaire was required to prepare and submit such Mitigation Measures within 45 days of signing the EER Minutes. The total duration of Activity 1 was 3 months. The parties responsible for this activity were "Concessionaire – ANI – Supervisor".[316]

412.    Under the EER Minutes, if the Environmental Authorities accepted the Mitigation Measures, the Parties had to consider:[317]

> [T]he possibility and/or feasibility of signing a contractual document in which the Parties in good faith will review, among other things, the activities and conditions required to resume the performance of the contractually planned Interventions, studying the impacts that may arise.

413.    In the event that the Environmental Authorities rejected the proposed measures, the Parties agreed to carry out Activity 2, namely:[318]

> [The] parties and the Supervisor shall meet and decide on the possibility and/or feasibility of executing a contractual document in which the Parties in good faith shall review, among other things, the activities and conditions required to perform interventions of Functional Units 4 and 5 considering the impossibility of performing the contractually foreseen interventions.

414.    The Parties responsible for this activity were the Concessionaire and ANI, with the support of the Supervisor, and said activity should have lasted 2 months, extendable for up to 2 more times, that is, up to a maximum of 6 months. In the event "that an agreement was not reached within the period stipulated herein, the procedure indicated in the Agreement will be followed".[319]

---

[315]  POB and S&B Statement of Claim, ¶ 227.i.
[316]  POB and S&B Statement of Claim, ¶ 227.i.
[317]  POB and S&B Statement of Claim, ¶ 227.ii.a.
[318]  POB and S&B Statement of Claim, ¶ 227.ii.b.
[319]  POB and S&B Statement of Claim, ¶ 227.iii, Exhibit C-002.

415.    The Claimants point out that, on 21 August 2018, a meeting was held between POB, ANI, the Supervisor and the Environmental Authorities, where the latter indicated that they would not authorize the development of any activity in the springs' riparian buffer zone.[320]

416.    Likewise, POB submitted the Mitigation Measures to the Environmental Authorities on 13 September 2018, under the terms of the EER Minutes.[321]

417.    Corporinoquía responded on 21 September 2018, reiterating that it would not allow activities within 100 meters of the 12 springs that were within its jurisdiction and for which Mitigation Measures were proposed.[322]

418.    On 13 November 2018, the CAR, which is responsible for 12 other springs for which Mitigation Measures were proposed, responded that these were not associated with "any of the 91 proceedings to be carried out before the Corporation", and therefore it could not issue a statement.[323]

419.    In the Claimants' view, Activity 1 had been completed on the dates on which Corporinoquía and CAR, respectively, stated that they did not approve the proposed Mitigation Measures.[324]

420.    The Claimants assert that on 21 November 2018, following CAR's negative response to the Mitigation Measures, POB requested that ANI begin Activity 2,[325] reiterating the request on several occasions.[326]

---

[320] POB and S&B Statement of Claim, ¶ 252.
[321] POB and S&B Statement of Claim, ¶ 253, Exhibit CL-110 and Exhibit CL-111.
[322] POB and S&B Statement of Claim, ¶ 254.i; Exhibit C-025 (document dated April 9, 2018); Exhibit C-024 (document dated 8 October 2018 and 31 October 2018).
[323] POB and S&B Statement of Claim, ¶ 254.ii; Exhibit C-112.
[324] POB and S&B Statement of Claim, ¶ 255.
[325] POB and S&B Statement of Claim, ¶ 259; Exhibit C-029.
[326] POB and S&B Statement of Claim, ¶ 261; Exhibit C-030; ¶ 263, Exhibit C-031

421.     The Claimants argue that negotiations began in mid-January 2019 and lasted until October of the same year, addressing possible solutions from a technical, legal and budgetary point of view.[327]

422.     The purpose of the Studies and Designs Amendment under discussion was the engineering studies and designs of a new route for UFs 4 and 5, including complementary studies and an EIA.[328]

423.     On 10 October 2019, ANI reportedly asked POB to send the agreed text,[329] which was done by POB on 11 October 2019.[330]

424.     However, in the view of the Claimants, ANI "repudiated" the terms of the EER Minutes and the Agreement since:[331]

>    (1) it failed to fully implement the actions provided for in Activity 2 of the EER Minutes and ANI stated that it would not comply with them; and (ii) it engaged in conduct that directly contravenes the EER Minutes and the Agreement.

425.     The Claimants point out that ANI had informed that the draft of the Amendment was going to be submitted to the "Internal Divisions of the Entity and ultimately, the Contracting Committee will recommend whether or not to sign the contract". It also indicated that the document "could be modified or objected to".[332]

426.     The Claimants allege that, in the Answer to the Notice of Arbitration and the Counterclaim Notice, in January 2021, the Respondent stated that it continued its studies to determine the feasibility of the Amendment, that the Amendment alone did not guarantee overcoming the EER or the performance of the Project, given

---

[327]   POB and S&B Statement of Claim, ¶ 265-267.
[328]   POB and S&B Statement of Claim, ¶ 268; Exhibit C-119.
[329]   POB and S&B Statement of Claim, ¶ 272; Exhibit C-050.
[330]   POB and S&B Statement of Claim, ¶ 274; Exhibit C-118.
[331]   POB and S&B Statement of Claim, ¶ 276.
[332]   POB and S&B Statement of Claim, ¶ 280; Exhibit C-050.

that it still "does not guarantee that, effectively, in the suggested route, there are no springs or water sources".[333]

427.    The Claimants refer to the information provided by the Comptroller's Office, according to which, within the framework of "*Compromiso Colombia*", only two informative meetings had been conducted on the subject, without any agreement between the parties involved.[334] They infer from the foregoing that ANI had failed to act in accordance with Activity 2 and thus repudiated the terms of the EER Minutes and the Agreement.[335] In turn, the Claimants criticize the lack of efforts on ANI's behalf to achieve a shift in the opinion of the different environmental authorities, pointing out that ANI has no contractual basis to try to create parallel instances to those agreed upon by the Parties to overcome the EER.[336]

(ii)   <u>ANI's position</u>

428.    ANI recognizes that there are negative decisions from the Environmental Authorities due to the special protection of water sources, but argues that there is no express decision rejecting the Mitigation Measures presented and, much less, that there is any reference to a legal prohibition for the completion of the Project in UFs 4 and 5. Thus, for ANI, "ALL the mitigation possibilities of the environmental impact and the eventual performance of the original route of the road have not yet been exhausted in good faith" [capitalization in original].[337]

429.    It affirms that, in view of the decisions of the environmental authorities "<u>suitable</u> mitigation measures" [underline in the original] have not been presented by POB, although they were again required by the interinstitutional working group dated

---

[333]  POB and S&B Statement of Claim, ¶¶ 282, 299.
[334]  POB and S&B Statement of Claim, ¶ 288.
[335]  POB and S&B Statement of Claim, ¶ 289.
[336]  POB and S&B Statement of Claim, ¶¶ 294-325.
[337]  ANI Statement of Defense, ¶ 88. Also ¶ 69, Exhibits 8.1.1.1 and 8.1.1.2

16 June 2021, held between the Procuraduría's Office, Environmental and Governmental Authorities.[338]

430.    ANI alleges that on 25 August 2021, a technical meeting was held with the Concessionaire and Corporinoquía Yopal headquarters during which an analysis of the technical studies requested by the Corporation regarding the 58 water sources within its jurisdiction was presented.[339] It points out that there is no evidence of a final decision by the CAR regarding the rejection of all the mitigation measures proposed by the Concessionaire, because they are not complete and precise.[340]

431.    ANI denies that Activity 1 was exhausted, because it is the Concessionaire who must:[341]

> [P]ropose sufficient and necessary mitigation measures for the springs located in Functional Units 4 and 5, which also meet the approval parameters of the environmental authorities, the Supervisor and ANI.

432.    It also points out that POB has refused to actively participate in presenting measures to obtain the permits from the Environmental Authorities. However, ANI has continued in inter-institutional working groups, with the Environmental Authorities to ensure that the Project can be carried out along the original route.[342]

433.    According to ANI, POB "abandoned" Activity 1 and focused on requesting the execution of the Amendment that modifies the scope of the project."[343]

434.    The Respondent argues that the modification of the scope of the Project through the execution of an Amendment is inadmissible, because:[344]

---

[338]  ANI Statement of Defense, ¶ 89, Exhibit 8.1.23.
[339]  ANI Statement of Defense, ¶ 91.
[340]  ANI Statement of Defense, ¶ 92.
[341]  Statement of Defense, ¶ 163; ¶ 347.
[342]  ANI Statement of Defense, ¶ 165. Also ¶¶ 95; 195-198; 340-349; 674-679.
[343]  ANI Statement of Defense, ¶ 219; ¶ 339; ¶ 675-676.
[344]  ANI Statement of Defense, ¶ 95; ¶ 340-349.

i) the modification of the design and scope of the project is not suitable to overcome the EER; ii) the execution of the Amendment must be the result of the parties' agreement and not the imposition of POB; iii) the execution of the Amendment intended by POB does not guarantee that the problem of the water sources will not arise again and proof of this is that in the draft proposed by POB there is a requirement to carry out special water studies, which imply the existence of a high uncertainty as to the feasibility of the change of route; iv) and the execution of an Amendment that modifies or seriously affects the scope of UF 4 and 5 would affect the scope initially agreed by the parties as to its origin – destination and the project specifications that justified its development, which would not be feasible from a legal standpoint since it would ignore the cause of the legal business and it would alter the purpose of the Agreement by distorting the project.

435.   ANI emphasizes that the POB's proposal to ANI, issued in October 2019:[345]

[Does] not guarantee in any way the feasibility of the Project, since, it is necessary to make a previous and deep analysis in the environmental, technical, financial, real estate matters, among others, but also, taking into account the existence of the risk of finding springs once again in the alternative proposals submitted by POB, as happened with the current layout of the project.

436.   ANI points out that the amendments of the State Contracts must follow strict rules of mandatory observance. It points out that the Amendment proposal formulated by the Concessionaire contains the analysis of three different corridors, which must still be evaluated in light of the technical, environmental, financial and other components to define the feasible corridor.[346]

---

[345]  ANI Statement of Defense, ¶ 208-210.
[346]  ANI Statement of Defense, ¶ 682.

437.    It states that, even though ANI began studying this proposal, this does not or did not imply:[347]

> [T]he obligation of this entity to execute the proposed Amendment, since, among other things, such alternatives do not establish a final solution [...] because there is no guarantee that in the suggested routes there are no springs or water sources that would lead to the current project status once again.

438.    ANI has reiterated these arguments in its Counterclaim.[348]

(iii)    <u>The Agreement and Applicable Law</u>

439.    In the EER Minutes, the Parties state that, "considering the special features" of such event, they agree to establish the "Special Period" in the terms of Section 14.2.d.i of the Agreement. It follows, in accordance with Section 14.2.d.v, that POB, as the "Affected Party" was exempted from the performance of the affected obligations during the Special Period.

440.    In the second paragraph of the EER Minutes, the Parties established that, with minimal exceptions:[349]

> As a consequence of the occurrence and declaration of this Exemption of Liability Event, the Parties agree to SUSPEND the term for the performance of all works and activities associated with the Interventions corresponding to Functional Units 4 and 5 of the Project (including the Choachí variant) from 31 October 2017.

441.    In line with the provisions of Section 14.2.d.vi of the Agreement, the Parties considered two Activities:

---

[347]   ANI Statement of Defense, ¶ 684.
[348]   Statement of Counterclaim, ¶¶ 91-148; pp. 291-296.
[349]   Exhibit C-002.

> [At] the request of either Party, the Parties shall meet to seek, in good faith, solutions aimed at resuming the performance of the obligations of the Affected Party as soon as possible.

442.    The Arbitral Tribunal pays special attention to the content of the obligations, deadlines and procedures that the Parties agreed upon in the EER Minutes to carry out such Activities. For Activity 1, a period of 3 months was considered as the estimated date for its completion. For Activity 2, a period of 2 months was considered, renewable up to 2 more times for a total of 6 months.

443.    In the introduction to these Activities, the Parties noted that the Special Period would end "once these Activities are completed." In turn, when defining the term for Activity 2, they established that: "If no agreement is reached within the period fixed herein, the procedure indicated in the Agreement will be followed."

(iv)    Analysis of the Arbitral Tribunal

444.    The Claimants set forth their claims regarding the Respondent's alleged breach of the EER Minutes, within the breaches and reasons preventing it from completing the Construction Phase of UFs 4 and 5.

445.    For its part, ANI alleges that Activity 1 is still under development, which it seeks to demonstrate with the existence of the working groups held with the participation of various public entities.

446.    Through the EER Minutes, the Parties regulated the effects of the findings of the springs, and the procedures and deadlines established for Activities 1 and 2, i.e., (i) the Concessionaire had to prepare and submit Mitigation Measures for the approval or rejection of the corresponding authorities; (ii) within a total term of 3 months for their submission and approval or rejection.

447.    From the description of the facts made by both Parties, and from the evidence submitted, it is established that the Parties made a genuine attempt to comply with Activity 1, in which the Mitigation Measures were devised and submitted to the competent Environmental Authorities. Such attempt did not lead to any favorable

result to overcome the EER, since the Mitigation Measures proposed by POB were rejected by the Environmental Authorities. Furthermore, all the responses received from CAR and Corporanquía were categorical in denying the possibility of granting the permits, while reiterating the obligation to respect the reserved areas.[350] Likewise, ANLA was unwilling to issue a permit to carry out the works in the reserved area.[351]

448.    Furthermore, the Arbitral Tribunal takes into consideration that in the EER Minutes, the Parties estimated that the period to conduct Activity 1 was approximately 3 months, counted from the date of execution of the EER Minutes. In other words, the Parties estimated the completion of such activity at the end of October 2018.

449.    Faced with this decision of the Parties, to consider that Activity 1 continues under development, (i) despite the rejection of the Mitigation Measures by the competent environmental authorities through the working groups of various public entities, and (ii) at least 3 years later, is not in accordance with the agreement reached by the Parties. In light of the EER Minutes, Activity 1 cannot have an uncertain or infinite duration.

450.    Thus, the Arbitral Tribunal concludes that Activity 1 was exhausted on 13 November 2018, with the rejection of both Corporations and with the 3 months considered for such activity having elapsed.

451.    Once Activity 1 was exhausted, it can be concluded that the Parties were moving towards Activity 2. As stated by the Claimants' witness Mr. Luis Ernesto Pérez, the Parties sat down to negotiate and that negotiation took 10 months.[352]

452.    According to the description provided by witness Pérez, Activity 2 consisted of evaluating the possibility of a radical change in the route, moving it to the other side

---

[350]  Exhibit CER-003, pp. 11-12.
[351]  Witness statement of Mr. Luis Ernesto Pérez, 00:26:35-00:27:47.
[352]  Witness statement of Mr. Luis Ernesto Pérez, 00:30:09.

of the mountain, where the composition of the mountain was much rockier, for which the firm Ingetec was hired and determined that this was feasible.[353]

453.    However, on 8 October 2019, Mr. Doron Sportas of S&B sent an email to ANI, stating: "We are still waiting to receive a final version from ANI in order to continue with the execution of this important amendment". [354] On 10 October 2019, ANI responded to this email stating that:

> [T]he Concessionaire must submit to the Entity the formal request containing the draft document that overcomes the EER of UF 4 and 5; said documents have been discussed in different working groups, the last one being on 18 September (see attachments). It should be noted that after such request, the opinion of the Intervías 4G Consortium and the internal divisions of the Entity will be required, and finally the Contracting Committee will recommend whether or not to execute the contract, so the draft may be modified or objected to during this procedure.

454.    The Arbitral Tribunal's conclusions are as follows: First, as developed above, in the month of January 2019, the Parties advanced towards the performance of Activity 2. Second, to initiate Activity 2, Activity 1 should have been exhausted. Third, the above-mentioned email lists several conditions for the execution of the proposed Amendment to become a reality, that is, the favorable opinion of the Supervisor, the evaluations of several internal divisions and the Contracting Committee's favorable recommendation, while making it clear that the latter could recommend against the execution of the Amendment.

455.    In turn, according to the EER Minutes, Activity 2 includes having to:

> [D]etermine the possibility and/or feasibility of executing a contractual document in which the Parties in good faith will review, among other things, the activities and conditions for the development of the interventions in Functional Units 4 and 5 in light

---

[353]    Witness statement of Mr. Luis Ernesto Pérez, 00:10:11; Exhibit C-049.
[354]    Exhibit C-050.

of the impossibility to perform the contractually foreseen interventions.

456.    As can be seen from the literal wording of the above provision, the first determination to be made by the Parties is the possibility and/or feasibility of executing an agreement. In this context, the possibility or feasibility of entering into the Amendment also includes that it may be considered impossible or unfeasible. In other words, there is no guarantee for POB that such an agreement or Amendment will be signed by the Parties. Likewise, there is no objective obligation on ANI to execute such an agreement or Amendment, but rather its obligation is to negotiate and analyze in good faith the possibility and/or feasibility of entering into such contractual document.

457.    If the possibility or feasibility of signing such amendment is confirmed, the Parties shall review -in good faith- the contractual terms, in order to perform UFs 4 and 5.

458.    In other words, when executing the EER Minutes, the Parties were not yet fully aware that the performance of UFs 4 and 5, in their original conception, would not be possible. In turn, ANI itself asserts that the performance of UFs 4 and 5, as of today, is not possible and even states that the changes in the layout do not guarantee that it would be possible to develop, given that the new layout may also be affected by the presence of other springs.

459.    Finally, Activity 2 also has a time limit, namely, up to 6 months, although the Parties extended it up to 10 months, reaching October 2019. Furthermore, if the Arbitral Tribunal were to assume that Activity 2 was initiated only upon submission of the draft Amendment dated 11 October 2019, it should have been concluded no later than 11 April 2020.

460.    In this regard, the Arbitral Tribunal considers that, based on the above, POB diligently complied with its obligations to overcome the EER regarding UFs 4 and 5, to the extent that (i) it submitted the required Mitigation Measures to the corresponding Environmental Authorities; and (ii) it conducted negotiations in good faith with ANI for purposes of determining the feasibility or possibility of

entering into an Agreement's modification and it proposed amendments to the Agreement in this regard. Therefore, the Arbitral Tribunal rejects ANI's allegations that POB did not adequately comply with its obligations to overcome the EER in relation to UFs 4 and 5.

461.    On the other hand, although the Claimants accuse ANI of a change of position that occurred after formally submitting the Amendment proposal,[355] the Arbitral Tribunal considers that neither the Agreement nor the EER Minutes establish an obligation for ANI to execute an Amendment, this being a possible, but not mandatory, outcome.

462.    Thus, from the literal wording of the EER Minutes' description, it is clear that ANI's obligation was to "determine and review", but not to "execute" the Amendment, which in the end never happened.

463.    However, this Tribunal considers that ANI did have an obligation to:

> [D]etermine the possibility and/or feasibility of executing a contractual document in which the Parties in good faith will review, among other things, the activities and conditions for the development of the interventions in Functional Units 4 and 5 in light of the impossibility to perform the contractually foreseen interventions.

464.    In this regard, this Arbitral Tribunal considers that ANI should have acted in good faith, both in determining the possibility or feasibility of entering into a contractual document and in reviewing the activities and conditions to perform the Interventions in UFs 4 and 5.

---

[355] Witness statement of Mr. Luis Ernesto Pérez, 00:30:09: "We filed it formally, accompanied by a letter and from that filing comes a silence of around six to eight months where ANI, practically - I don't know if it was due to a change of government or a change of something, I don't know what may have happened within ANI, but I know it was silent for eight months and after eight months, what the company, the Concessionaire, received as a response to a series of communications that were sent asking: What happened with the amendment? What happened with the amendment? was a request from the Ombudsman's Office asking it to attend a series of meetings they wanted to have regarding this issue. So, there was a change of position, but this change of position was not immediate, it was almost a year and a half later, a year and a half in which both we and the financiers of the Project, resorting to the principle of good faith, always believed that the amendment was going to be signed".

465.    The Arbitral Tribunal finds that ANI did not comply with this obligation to act in good faith. This breach will be explained in detail in Section IV.D.2 of this Award, which examines the Respondent's subsidiary claim for Early Termination of the Concession Agreement under clause 14.1(e) of the Agreement.

**3.    Claim for Reduction of AMOUNTS FUNDED TO THE SUPERVISOR SUBACCOUNT**

**(a)    Position of POB and S&B**

466.    POB claims the loss derived from increased funding to the Supervisor Subaccount. This claim is based on the Claimants' allegation that ANI breached the Agreement by failing to take the appropriate actions to reduce the amounts of the funds corresponding to the Supervisor Subaccount.[356]

467.    The Claimants argue, based on Exhibit CER-001, and on the Damages Expert Report prepared by FTI, that the Agreement foresees that the funding for this sub-account is almost 3 times higher during the Construction Phase than during the O&M Stage. This can be explained by the fact that the work of the Supervisor is greater when the activities related to the works of the Project are being performed.[357]

468.    POB points out that, due to the occurrence of the EER, no Supervisor work is being carried out in two of the most significant UFs of the Project (UFs 4 and 5) in terms of Capex and Opex. The Claimants allege that, despite this, ANI has refused to enter into a contractual agreement to reduce the funding for this sub-account, despite multiple requests from POB.[358]

469.    POB adds that ANI recognized that it is not economically reasonable for POB to be obliged to fund the Supervisor Subaccount

---

[356]   POB and S&B Statement of Claim, ¶ 469.
[357]   POB and S&B Statement of Claim, ¶ 469(i).
[358]   POB and S&B Statement of Claim, ¶ 469(i) and (ii).

according to the amounts foreseen for the Construction Phase given the state of the Project. This is because this contractual modification was part of the Studies and Designs Amendment that the Parties negotiated, but that ANI refused to sign.[359]

470. The Claimants argue that the refusal to reduce the funding of this account entails a breach of ANI's obligation to take reasonable measures to avoid the extension of the effects of the EER.[360]

471. POB points out that, from the documents produced by ANI in the Arbitration, it can be confirmed that POB has complied with its funding obligations of the Supervisor Subaccount.

472. Indeed, the Claimants assert that the work performed by the Supervisor since August 2018 is proportionally lower than what would have been conducted if the EER had not suspended the performance of the Interventions in UFs 4 and 5. According to the Claimants, this entails ANI's obligation to reduce both the amount of the Supervisor's remuneration and the amount of funding of the Supervisor Subaccount, as of that date[361].

473. Furthermore, POB points out that Amendments 1 to 5 to the Supervisor's Contract incorporated a substantial reduction in the retribution of the Supervisor, as a consequence of the construction circumstances of the Project, and, expressly, in relation to the fact that the Operation and Interventions stage was suspended in UFs 4 and 5.[362]

474. The Claimants add that even for the execution of these Amendments and the decision to reduce the value of the Supervisor's Contract, ANI expressed that

---

[359] POB and S&B Statement of Claim, ¶ 469(ii).
[360] POB and S&B Statement of Claim, ¶ 469(iii).
[361] POB and S&B Reply, ¶¶ 127-128.
[362] POB and S&B Reply, ¶¶ 129-130.

the execution of the Supervisor's Contract would leave a surplus in the Supervisor Subaccount. This would imply that ANI had obtained unjustified benefits, forcing POB to make payments that would not be used to pay for the Supervisor.[363]

**(b)**    **ANI's Position**

475.    The Respondent rejects the claims that ANI failed to comply with its obligations to reduce the funding amounts, since ANI was not obliged to reduce the amounts in the Supervisor Subaccount.[364]

476.    ANI explains that, in an Agreement such as the one at issue in this Arbitration, which is a Public-Private Partnership, the basis is the Concessionaire's financial capacity. It adds that, in relation to funding, this is determined from the structuring of the Project's financial model, so it cannot be adjusted subsequently.[365]

477.    The Respondent explains that pursuant to the Agreement, POB's obligation was established to constitute an autonomous trust fund to be administered by POB, by means of the execution of a commercial trust agreement. Thus, in accordance with Sections 3.13 and 3.14 of the Agreement, this obligation was established on POB, as well as the accounts that made up the trust fund, amongst which is the Supervisor Subaccount. Likewise, POB's obligation to fund the different accounts in accordance with the terms established in Section 4.5(e) of the Agreement was also established. Thus, the Respondent concludes that the Claimants failed to comply with their obligations to fund this sub-account, and claims default interest for their lack of payment.[366]

---

[363]    POB and S&B Reply, ¶¶ 131-133.
[364]    ANI Statement of Defense, ¶ 421.
[365]    ANI Statement of Defense, ¶¶ 422-424.
[366]    ANI Statement of Defense, ¶¶ 807-816. For more details on the Respondent's position, see the Section on the counterclaim for funding Section IV.C.3 of the Award.

478. The Respondent rejects POB's interpretations of the documents produced by ANI regarding the consequences of the reduction in the amounts of retribution of the Supervisor's Contract[367]. The Respondent points out that the retribution's reduction in the Contract would not entail ANI's obligation to reduce the funding amounts for the Supervisor Subaccount.[368]

479. Furthermore, the Respondent denies that it determined that the Supervisory Contract would leave a surplus in the Supervisor Subaccount. On the contrary, it points out that with the suitability study carried out to sign Amendments 3, 4 and 5 of the Supervisor's Contract, a favorable opinion was issued for the proposed addition made by the Supervisor, considering that said addition was within the amendment quota allowed by law and that it had sufficient resources to undertake said addition.[369]

480. Likewise, ANI denies that it obtained or sought to obtain an unjustified benefit, nor that these amounts were used for purposes other than the payment to the Supervisor.[370]

**(c)    Analysis of the Arbitral Tribunal**

481. As a preliminary matter, the Arbitral Tribunal notes that the specific claim for the funding of the Supervisor Subaccount is directly related to ANI's counterclaim for damages corresponding to interest on POB's default due to its failure to comply with its funding obligations 5, 6, 7 and 8 of the Supervisor Subaccount.[371] In this sense, this Section's discussion on the funding amounts of the Supervision Subaccount also applies to the analysis of the corresponding counterclaim, and is decided in Section IV.C.3 of this Award.

---

[367]    ANI Rejoinder, ¶ 85.
[368]    ANI Rejoinder, ¶¶ 91-93.
[369]    ANI Rejoinder, ¶ 94.
[370]    ANI Rejoinder, ¶¶ 95-96.
[371]    ANI Statement of Claim, p. 26-171; ANI Reply on the Counterclaim, ¶¶ 171-175.

482. POB claims that ANI breached the Agreement by failing to take the appropriate actions to reduce the amount of the funds corresponding to the Supervisor Subaccount, and in short, to avoid the extension of the effects of the EER[372]. POB claims the loss derived from higher funding of the Supervisor Subaccount for a total of COP $119,500,000,000.[373]

483. For its part, the Respondent opposes the claims that ANI failed to comply with its obligations to reduce the funding amounts, since ANI was not obliged to reduce the amounts in the Supervisor Subaccount.[374]

484. On this claim, on the one hand, the Arbitral Tribunal agrees with the Respondent that the Concession Agreement does not contain an obligation on ANI that specifically provides for the reduction of the funding amounts of each of the Subaccounts of the Trust Fund [Patrimonio Autónomo], in a given case.

485. However, the Tribunal also agrees with the Claimants that the Supervisor Subaccount must be funded by the Concessionaire in the terms set forth in Section 4.5 (e) of the Special Part of the Agreement, according to the initiation of each contractual phase: (i) Preconstruction; (ii) Construction and; (iii) Operation and Maintenance.

486. The division of the funding amounts in stages recognizes the economic reality of the Agreement that the Construction Phase requires a greater load of activities by the Concessionaire, which, in turn, requires greater Supervision tasks.

487. In this sense, and according to both Parties, the value of the funding of the Supervisor Subaccount is as follows:[375]

---

[372] POB and S&B Statement of Claim, ¶ 469.
[373] Claimants' Post-Hearing Memorial, ¶ 348(iii).
[374] ANI Statement of Defense, ¶ 421.
[375] Written Statement of Undisputed Facts, ¶ 32.

(i)     During the Preconstruction Phase, the funding value is equivalent to COP $2,923,117,956 Reference Month Pesos per year;

(ii)    During the Construction Phase, the funding value is equivalent to COP $10,160,367,351 Reference Month Pesos per year —that is, between 3 and 4 times more than the value of the Preconstruction Phase; and

(iii)   During the O&M Phase, the funding value is equivalent to COP $3,446,637,624 Reference Month Pesos per year, that is, approximately 3 times less than the value of the Construction Phase.

488.   On the other hand, the Supervisor Contract, entered into between ANI and the Supervisor, is directly related to, and was entered into pursuant to, the Concession Agreement. In fact, as regards its scope of application, it is stated that the Supervisor Contract and, in general, "the exercise of the control and monitoring activities must be in full compliance with the corresponding Concession Agreement".[376]

489.   It also adds that:[377]

    In the event of any difference or contradiction in the application of the provisions contained in the Concession Agreement, the Supervisor Contract and its annexes and this methodology, the provisions of the Concession Agreement and all the documents that add to, modify, complement or interpret said agreement shall prevail; if the differences or contradictions persist, the provisions contained in the Supervisor Contract and its annexes shall prevail.

490.   In this sense, the Supervisor Contract and its subject matter are inextricably linked to the Concession Agreement and the Project. On the one hand, inasmuch as the amount of the funds for each stage is directly related to the Supervisory works

---

[376]   Exhibit C-212: Supervisor Contract, Annex 4, p. 2, third paragraph.
[377]   Exhibit C-212: Supervisor Contract, Annex 4, p. 2, fourth paragraph.

129

performed. On the other hand, because any modification to the Concession Agreement would affect the Supervisor Contract, and in case of differences, the former prevailed.

491.   In line with the foregoing, and also according to both Parties, the value of the Contract entered into between ANI and the Supervisor is equivalent to COP $229,582,850 per month during the Preconstruction Phase, COP $525,960,917 per month during the Construction Phase, and COP $308,109,147 per month during the O&M Phase.[378]

492.   However, and according to both Parties, as of August 2020, ANI modified the value of the Supervisor Contract during the Construction Phase to COP $455,190,117 per month.[379]

493.   In fact, in the suitability and opportunity studies for the execution of the amendments to the Supervisor Contract, on which ANI based its decision to reduce the monthly amounts of the Construction Phase of the Supervisor Contract, it is expressly stated that this was due to "the current monitoring and verification requirements needed for the pending activities of the Preoperational Stage" and as a temporary situation, until "the performance of the activities and constructive interventions in Functional Units 4 and 5" are resumed.[380]

494.   In this sense, the Arbitral Tribunal considers that it is logical and in accordance with good faith that, if the Interventions were paralyzed and the Construction Phase did not begin in UFs 4 and 5, when the monthly amounts of the Supervisor's fees were reduced for this reason, the funding amounts for the Supervisor Subaccount were also reduced in the same term and proportion.

---

[378]   Written Statement of Undisputed Facts, ¶ 33.
[379]   Written Statement of Undisputed Facts, ¶ 33. See also, Exhibit CER-008, ¶¶ 47-49.
[380]   Exhibit C-263: ANI suitability study for executing the Amendment No. 1 of the Supervisor Contract, p. 22. See also Exhibit C-264: ANI suitability study for executing the Amendment No. 3 of the Supervisor Contract, p. 20; Exhibit C-265: ANI suitability study for executing the Amendment No. 4 of the Supervisor Contract, p. 18; Exhibit C-266: ANI suitability study for executing the Amendment No. 5 of the Supervisor Contract, p. 20.

495. This is further reinforced by the fact that the suspension of activities and Interventions in UFs 4 and 5 occurred due to events not attributable to POB but to ANI, as was decided in Section IV.B.2 of this Award.

496. Now, as to the amounts to be deducted, according to the expert evidence submitted by the Claimants, it is concluded that the funding of the Supervisor Subaccount should have been reduced by 63.59%, resulting in an annual funding to the Supervisor Subaccount of the Concession Agreement during the Construction Phase of COP $3,699,578,723.[381]

497. Thus, and as already stated, POB has indicated that, as a consequence of the failure to proportionally reduce the Supervisor Subaccount of the Agreement, among the damages that POB has suffered with respect to the costs incurred in UFs 4 and 5, there are the additional funds paid amounting to COP $119,500,000,000,[382] which must be reimbursed by ANI to POB.

## C.   ANI'S COUNTERCLAIM

### 1.   RESPONDENT'S CLAIMS IN CONNECTION WITH UF 2

498. ANI claims that POB breached the contractual obligations regarding archaeological matters with respect to UF 2, contained in Paragraph 5.2.2.7 of Technical Appendix 8 and Section 14.2(e) and (f) of the General Part of the Concession Agreement, and the *Amiable Compositeur* decision No. 15856 of 18 December 2018 "Toll Station/Alcaparros". ANI argues that POB has not mitigated or made suitable arrangements to overcome the EER and that it has not properly managed the archaeological findings in accordance with the environmental social management required for UF 2.[383]

---

[381] Exhibit CER-008, ¶ 94.
[382] Claimants' Post-Hearing Memorial, ¶ 348(iii).
[383] ANI Statement of Counterclaim, pp. 83, 362.

**(a)    ANI's position**

499.  ANI argues that POB breached its contractual obligations with respect to UF 2, since it has not acted reasonably and diligently, under the extraordinary circumstances in which it finds itself, to mitigate and reduce the effects of the EER affecting UF 2, preventing it from overcoming the EER in the shortest possible time.[384]

500.  First, ANI argues that after declaring the EER, POB has failed to comply with its obligations since it did not carry out the activities aimed at overcoming the Exemption of Liability Event.[385]

501.  In particular, POB allegedly has not incorporated the necessary and sufficient personnel in the archaeological intervention sites;[386] POB has not looked after the archaeological intervention sites, to the extent that the covers of the rescue sites have deteriorated;[387] and, in addition, the rescued elements have been found in poor condition in the laboratory.[388]

502.  Second, ANI argues that POB has not developed an adequate Preventive Archaeology Program in the Contractual Social Management Plan, because it has not obtained or diligently processed the archaeological intervention authorizations required to continue the works.[389] Specifically, POB has allegedly failed to renew the Archaeological Intervention Authorization No. 8559, thus failing to comply with its contractual obligations, [390] and therefore unjustifiably delaying the necessary measures to overcome the EER.[391]

503.  Third, ANI argues that, in accordance with these authorizations, POB must carry out the laboratory activities according to the Authorization for

---

[384] ANI Statement of Counterclaim, p. 11.
[385] ANI Statement of Counterclaim, p. 361.
[386] ANI Statement of Counterclaim, p. 286.
[387] ANI Statement of Counterclaim, p. 286.
[388] ANI Statement of Counterclaim, p. 286.
[389] ANI Statement of Counterclaim, p. 361.
[390] ANI Statement of Counterclaim, p. 82.
[391] ANI Statement of Counterclaim, p. 286-288.

Archaeological Intervention No. 6429, without which it is not possible to prepare the final report of the preventive archaeology program, nor to finish the works according to the Concession Agreement.[392] ANI states that the contractual obligation, not suspended by the EER, to prepare and submit the final report of the preventive archaeology program has not been complied with.[393]

504.   The Respondent emphasizes that the execution of the Completion Minutes of UF 2 does not imply, per se, compliance with the obligations related to the mitigation and overcoming of the EER, because the circumstances that gave rise to the declaration of the EER have not been remedied, and POB has not completed the removal or recovery of the archaeological material.[394]

**(b)   Position of POB and S&B**

505.   POB argues that it has diligently performed all the activities established in the Concession Agreement, in its Technical Appendices 6 and 8, and in the law.[395] POB argues that it has fully and timely complied with its archaeological obligations in the findings located in the UF 2 section.[396] Likewise, POB affirms that it has strictly complied with the legal guidelines and those indicated by the Colombian Institute of Anthropology and History (ICANH), the highest authority in archaeological matters, guaranteeing the protection of Colombia's cultural and archaeological heritage.[397]

506.   Furthermore, POB asserts that the non-completion of the removal or recovery of the archaeological material is due only to the magnitude of the findings, not only for their archaeological significance, but for the amount of findings.[398] Also, POB argues that the Completion Minutes of UF 2 recognize that POB took all the necessary

---

[392]   ANI Statement of Counterclaim, p. 288.
[393]   ANI Statement of Counterclaim, p. 288.
[394]   ANI Reply on the Counterclaim, ¶¶ 238, 243-244, 246.
[395]   POB and S&B Statement of Defense to the Counterclaim, ¶ 562.
[396]   POB and S&B Statement of Defense to the Counterclaim, ¶ 568.
[397]   POB and S&B Statement of Defense to the Counterclaim, ¶ 568.
[398]   POB and S&B Statement of Defense to the Counterclaim, ¶ 566.

measures to mitigate the effects of the EER, as the design of the affected section of the construction site was successfully completed to such an extent that the interventions in UF 2 were carried out without affecting the archaeological sites and the construction works were completed.[399]

507. First, POB argues that it directed all reasonably possible and advisable efforts and resources regarding the activities at the archaeological sites, El Divino Niño and Los Alcaparros. POB responded and met the requirements of the Supervisor regarding the number of personnel at the findings, since it had archaeologists and specialists, even in numbers greater than those required by ICANH, and specialized conservation and restoration personnel to carry out the works required in the laboratory.[400] POB also reported in a timely manner the restructuring of personnel to ensure compliance with the archaeological obligations as a result of the restrictive measures related to the spread of COVID-19.[401] Also, POB addressed the request concerning the damage to the sites' enclosures, which were caused by the impossibility to access them as a result of the restrictive measures imposed by COVID-19, by initiating the corresponding recovery work, once it was possible,[402] thus complying with all its obligations.

508. Second, POB argues that it complied with its obligations in relation to the administration of the findings, since it obtained all the necessary permits.[403] POB claims that it processed up to ten permits before the ICANH, obtaining the Authorizations for Archaeological Intervention No. 5048, No. 6429 and No. 8559.[404] Likewise, it states that the Authorization for Archaeological Intervention No. 8559

---

[399]  POB and S&B Statement of Defense to the Counterclaim, ¶ 683.
[400]  POB and S&B Statement of Defense to the Counterclaim, ¶ 625.
[401]  POB and S&B Statement of Defense to the Counterclaim, ¶ 637.
[402]  POB and S&B Statement of Defense to the Counterclaim, ¶ 638.
[403]  POB and S&B Statement of Defense to the Counterclaim, ¶ 576.
[404]  POB and S&B Statement of Defense to the Counterclaim, ¶¶ 587-607.

was renewed by an extension request on 8 November 2021,[405] thus demonstrating POB's consistent and diligent performance.

509. Third, POB argues that the activities in compliance with archaeological obligations are defined by ICANH guidelines and the law, which it fully complied with.[406] ICANH has not claimed a breach of POB's archaeological obligations, nor has it initiated any sanctioning proceedings against POB,[407] thus illustrating that POB complied with its contractual and legal obligations in relation to the findings at the archaeological sites of El Divino Niño and Los Alcaparros.[408]

510. POB emphasizes that pursuant to Section 14.2 of the Concession Agreement, its obligation was to do everything reasonably advisable and possible to overcome the EER.[409] However, POB clarifies that the non-completion of the recovery at Los Alcaparros site as of today does not prove a breach, as the obligation is not time-bound and it is contingent on extraordinary circumstances. Furthermore, POB argues that it has carried out all the necessary activities to overcome the EER.[410]

511. POB argues that the Completion Minutes of Functional Unit 2 evidence that ANI acknowledged POB's compliance with its obligations, and that the pending works regarding the archaeological excavations do not constitute any kind of breach.[411]

512. POB argues that ANI's assertions are based on facts prior to the declaration of the EER, for both archaeological sites, El Divino Niño and Los Alcaparros, and that therefore, the arguments presented by ANI are subject to res judicata.[412] POB

---

[405]  POB and S&B Statement of Defense to the Counterclaim, ¶ 609.
[406]  POB and S&B Statement of Defense to the Counterclaim, ¶¶ 640-641.
[407]  POB and S&B Statement of Defense to the Counterclaim, ¶ 678.
[408]  POB and S&B Statement of Defense to the Counterclaim, ¶ 673.
[409]  POB and S&B Statement of Defense to the Counterclaim, ¶ 578.
[410]  Statement of Defense to the Counterclaim par. 579.
[411]  Statement of Defense to the Counterclaim, par. 567.
[412]  Statement of Defense to the Counterclaim, par. 623, 643, 660, 664, 666-669.

further states that the *Amiable Compositeur* assessed POB's conduct and considered that it had fulfilled its Agreement obligations on Social Management, that it had carried out the recovery of the archaeological findings pursuant to to the instructions given by the ICANH, and that it had submitted the reports in a timely manner. ANI allegedly confirmed this in the Counterclaim Memorial at paragraph 43, stating that the *Amiable Compositeur* assessed POB's conduct and considered that it had complied with its contractual obligations in archaeological matters.

**(c)    The Applicable Law and the Agreement**

513.  The Arbitral Tribunal will first clarify the obligational framework to subsequently present its analysis leading to the resolution of the dispute regarding the archaeological obligation of UF 2.

514.  First, the Concession Agreement establishes in general terms the framework of the Parties' obligations. Particularly, in Section 4.2 it establishes the main obligations during the Preconstruction Phase,[413] while stating in the first paragraph of said clause that the Technical Appendices provide for other particular obligations.

515.  Additionally, Section 8.1(a) states that:

> The Social and Environmental Management of each of the Interventions is the responsibility of the Concessionaire, in compliance with the obligations and responsibilities established in Technical Appendix 6 and 8, and the Applicable Law.

516.  Technical Appendix 6 in Chapter I, paragraph (a) states that:

> In accordance with Section 8.1 of the General Part of the Agreement, the Concessionaire's obligations in relation to the environmental component of Social and Environmental

---

[413]  Reply on the Counterclaim, par. 124.

> Management are defined in this same Appendix; and that which
> is not provided for in it, is provided for in Technical Appendix
> 8.

517.  Furthermore, the obligations set forth in these Technical Appendices do not exempt
      the Concessionaire from complying with the Applicable Law. Additionally,
      Technical Appendix 6 in Chapter I, paragraph (d), subparagraph (iii), states that "the
      Concessionaire must comply with the guidelines of [...] ICANH— and the applicable
      law in relation to the National Cultural and Archaeological Heritage". Therefore, the
      obligations related to archaeological matters are precisely and specially defined in
      Technical Appendices 6 and 8.

518.  Second, Technical Appendix 8, in paragraph 5.2.2.7, specifically establishes the
      obligations relating to the Preventive Archaeology Program. In particular, paragraph
      5.2.2.7.4.1 requires that:

> [T]he Concessionaire must protect the Nation's Archaeological
> Heritage, that the Concessionaire has its responsibilities defined
> by Law, that the Concessionaire must request certifications and
> permits from the ICANH, that it must have an Archaeological
> Management Plan before starting the works, and that the
> Concessionaire must suspend the works and inform both the
> ICANH and ANI and the Supervisor in case of performing
> excavations where archaeological elements are found.

519.  Likewise, section 5.2.2.7.4.4 establishes the obligations of the:

> Concessionaire regarding archaeological findings; providing
> that (1) it must report such findings to the ICANH, (2) it must
> establish relevant security and control measures, (3) it must
> manage the receipt of the archaeological material with the
> authorized laboratory for the shelter and preservation of the
> recovered material, (4) it must follow the provisions of the
> ICANH to protect the archaeological material recovered, and (5)
> it must submit to the ICANH the corresponding report,
> cartography and database.

520.  In addition, paragraph 5.2.2.7.6 provides that:

> [T]he implementation of the activities described in the program,
> and in particular the effective performance of mitigation
> measures in compliance with the technical standards and
> specifications

137

> applicable to the corresponding infrastructure, is mandatory and
> failure to do so will result in the imposition of the fines contained
> in section 6.1(f) of the Special Part.

521. Therefore, POB's obligations in archaeological matters are generally defined in the Concession Agreement, in the Appendices and in the law, but they are bound by the guidelines and directives of the public entity, ICANH.

522. Third, in light of the declaration of the Exemption of Liability Events in UF 2 (EERs-UF 2),[414] the Concession Agreement in Section 14.2 (e) and (f) establishes the obligation of the party affected by the EER declaration to carry out all necessary steps to mitigate its effects and to overcome the EER. Specifically, paragraph (f) states that:

> [T]he Party Affected by an Exemption of Liability Event is
> obligated to take all reasonably advisable and possible steps,
> under the extraordinary circumstances, to mitigate and reduce
> the effects of the Exemption of Liability Event, as well as to
> overcome said event in the shortest possible time.

523. Fourth, article 7 of Law 1185 of 12 March 2008, states that:

> [In] road infrastructure construction projects, they shall conduct
> a preventive archaeology program and an archaeological
> management plan, which must be submitted to the ICANH and
> without which the works cannot be conducted.

524. Accordingly, article 55 of Decree 763 of 10 March 2009 establishes first, that "the [...] ICANH– is the only entity empowered by the legal provisions to apply the archaeological heritage administration regime"; and second, that:

> The Preventive Archaeology Program is the scientific research
> aimed at identifying and characterizing the archaeological assets
> and contexts existing in the area of those projects, works or

---

[414] *Amiable Compositeur* Decision No. 15854 of 18 December 2018 (ANI Exhibit 8.1.7.1) and *Amiable Compositeur* Decision No. 15856 of 18 December 2018 (Exhibit ANI 8.1.7.2).

activities that require environmental licenses, registrations or equivalent authorizations before the environmental authority or that, occupying areas larger than one hectare, require urbanization, subdivision or construction licenses.

The purpose of this program is to evaluate the expected levels of impact on the archaeological heritage due to the construction and operation of the aforementioned works, projects and activities, as well as to design and implement the necessary administration measures for the corresponding Archaeological Management Plan.

525. While Article 57 of the same Decree 763 of 2009, states that:

Interventions in construction projects of hydrocarbon transport networks, mining, dams, road infrastructure, as well as in other projects, works or activities that require environmental licenses, registrations or equivalent authorizations before the environmental authority, or that occupying areas larger than one hectare require a license for urbanization, subdivision or construction.

Prior to initiating the works or activities, the interested party must implement a Preventive Archeology Program that in an initial phase will enable it to present the corresponding Archeological Management Plan. As a condition to start the works, said Plan must be approved by the Colombian Institute of Anthropology and History. Notwithstanding the above, for each of the phases of the Preventive Archaeology Program that involve prospecting activities or archaeological excavations, the interested party must request the respective intervention authorization from the ICANH.

526. In turn, article 2.6.5.7 of Decree 1080 of 26 May 2015 states that:[415]

The Archaeological Management Plan must be conducted as approved by the ICANH and it may involve one of the following

---

[415] Decree 138 of 2019 modified Part VI of Decree 1080 of 2015. However, Article 2.6.5.7 of Decree 1080 of 2015 was not modified in its text. Furthermore, the transitional regime of the same in article 4, states that: "In general, the new procedure will apply to procedures that are in progress. However, the interested party may choose whether to update their process to the new guidelines, or to finish it under the regulations under which it was initiated." Therefore, as explained by the expert INERCO in his expert report in section 3.2 (CER-005), the permits processed for UF 2 were not affected by the change in regulations.

activities: a) verification and monitoring activities; b) excavation and recovery activities; c) specialized laboratory and analysis activities. The ICANH will specify in the terms of reference to be issued the content and periodicity of the progress reports, as well as the terms of the final report.

527. Fifth, article 1 paragraph 10 of Decree 833 of 26 April 2002 defines what an archaeological management plan is, which is complemented by the Legal Regime and Technical Guidelines for Preventive Archaeology Programs in Colombia of 15 July 2010. In this document, the ICANH presented the legal guidelines to implement Preventive Archaeology Programs in the context of the design, construction and operation of road infrastructure construction projects, and defined the stages for the development of Preventive Archaeology Programs in these projects.

528. Sixth, the first paragraph of Section 15 of the Concession Agreement establishes that the dispute resolution mechanisms agreed by the Parties shall be subject to the provisions of Law 1563 of 2012. Section 15.1(a) also establishes the agreement of the Parties that the decision of the *Amiable Compositeur* on any disputes expressly agreed in the Concession Agreement is final and binding for the Parties. Furthermore, in resolving a dispute, Section 15.1(f)(iv) of the Concession Agreement entitles the *Amiable Compositeur* to interpret the provisions of the Concession Agreement. Additionally, Section 15.1(k)(vii) of the Agreement establishes the binding force of the *Amiable Compositeur's* decisions, and states that the decision shall have binding force between the Parties and that it shall have settlement effects in accordance with the Applicable Law. Accordingly, Article 60 of Law 1563 regulates the effects of the decisions of *Amiable Compositeurs*, and provides that:

The *Amiable Compositeur* shall act as an agent of the parties and, in its decision, it may specify the scope or form of compliance with the obligations arising from a legal transaction, it may determine whether there has been a breach of contract and it may decide on conflicts of liability arising between the parties, among other determinations.

> The decision of the *Amiable Compositeur* shall produce the legal effects of a settlement agreement.
>
> Unless otherwise provided for, the decision of the *Amiable Compositeur* shall be based on equity, notwithstanding that the *Amiable Compositeur* may resort to legal rules, if it considers it convenient.

529.   In turn, article 2483 of the Colombian Civil Code regulates the effects of a settlement agreement, namely:

> The settlement agreement produces res judicata effects in the last instance; but a declaration of annulment or rescission may be sought, in accordance with the preceding articles.

**(d)   Analysis of the Arbitral Tribunal**

530.   In accordance with the obligations framework contained in the Concession Agreement, in Technical Appendices 6 and 8, in the EERs-UF 2, in the decrees and in the corresponding law, the Arbitral Tribunal considers that the counterclaimant, ANI, is not right in its counterclaim alleging a breach of the archaeological obligations related to UF 2.

531.   First, the counterclaim relating to UF 2 was largely presented only with general and conclusory allegations, without specificity. In addition, the claim was not supported by specific and detailed evidence, only by several reports from the Supervisor, statements from ICANH, and communications between the Parties and the Supervisor that were submitted as evidence. Therefore, the lack of precision and definition in the formulation and substantiation of the claim leads this Tribunal to conclude that [ANI] did not satisfy the burden of proof to identify POB's alleged specific breaches.

532.   For the resolution of the claim examined in this Section, it is necessary to point out that ANI brings up some facts that occurred prior to the EERs-UF 2, particularly at the

archaeological site called Los Alcaparros;[416] both in the preliminary issues section regarding the breaches in archaeological matters,[417] as well as in the facts section that serve as the basis for the Counterclaim.[418]

533. As regards these particular facts invoked by ANI, POB states that they were the basis of ANI's position prior to the EERs-UF 2.[419] Furthermore, POB asserts that they are the basis for ANI's claim and arguments before the *Amiable Compositeur*,[420] and that they constitute the same arguments raised in the Counterclaim.[421]

534. Consequently, POB argues that any dispute related to a claim based on the facts that occurred before the EERs-UF 2 has already been settled by the *Amiable Compositeur* [422] and, therefore, the counterclaim is subject to res judicata.[423] Thus, the scope of the decisions made in December 2018 by the *Amiable Compositeur*, pursuant to the Concession Agreement at Section 15(a), instructs this Tribunal. Thus, if the decision on the facts, claims and arguments presented during the Exemption of Liability Event proceedings derives from the same ones raised in the Counterclaim, this Tribunal can determine whether res judicata is applicable.

535. In its decision No. 15854 of December 2018, regarding El Divino Niño archaeological site, the *Amiable Compositeur* stated that:[424]

> There remain some brief considerations in relation to ANI's argument that the Concessionaire failed to

---

[416] ANI Statement of Counterclaim, pp. 66-75.
[417] ANI Statement of Counterclaim, pp. 10-19.
[418] ANI Statement of Counterclaim, pp. 60-83.
[419] POB and S&B Statement of Defense to the Counterclaim, ¶ 664.
[420] The EER claims regarding the archaeological findings of both El Divino Niño and Los Alcaparros in relation to UF2 were made jointly by the same *Amiable Compositeur* Panel, however, it issued two separate decisions.
[421] POB and S&B Statement of Defense to the Counterclaim, ¶ 665-666.
[422] POB and S&B Statement of Defense to the Counterclaim, ¶¶ 660, 663, 667-669.
[423] POB and S&B Statement of Defense to the Counterclaim, ¶¶ 664.
[424] Exhibit 8.1.7.1, p. 39.

comply with its obligations regarding archaeological management.

536. ANI submitted to the *Amiable Compositeur* evidence such as CP- PER-3314-2018,[425] identified in these proceedings as Exhibit ANI 8.1.11.2, CP- PER3468-2018,[426] identified in these proceedings as Exhibit ANI 8.1.11.3, and CP- PER-3659-2018, identified in these proceedings as Exhibit ANI 8.1.11.18,[427] among others.

537. Likewise, in Decision No. 15856 of December 2018, regarding Los Alcaparros archaeological site, the *Amiable Compositeur* stated:

> There remain some brief considerations in relation to ANI's argument that the Concessionaire failed to comply with its obligations regarding archaeological management.

538. ANI submitted to the *Amiable Compositeur* evidence such as CP-PER-3314-2018,[428] identified in these proceedings as Exhibit ANI 8.1.11.2, CP-PER3468-2018, identified in these proceedings as Exhibit ANI 8.1.11. 3, CP-PER-3659-2018,[429] identified in these proceedings as Exhibit ANI 8.1.11.18,[430] and ICANH's Minutes of the visit of 29 June 2018,[431] identified in these proceedings as Exhibit ANI 8.1.18; among other evidence.

539. Therefore, this Arbitral Tribunal understands that the disputes on archaeological management based on facts prior to the declaration of the EERs-UF 2 were analyzed and decided by the *Amiable Compositeur*. Hence, these are subject to res judicata, in accordance with Article 60 of Law 1553 of 2012, Article 2483 of the Colombian Civil Code

---

[425] ANI Statement of Counterclaim, p. 66. Also, Exhibit 8.1.7.1, p. 24.
[426] ANI Statement of Counterclaim, p. 69. Also, Exhibit 8.1.7.1, p. 24.
[427] ANI Statement of Counterclaim, p. 72. Also, Exhibit 8.1.7.1, p. 24.
[428] ANI Statement of Counterclaim, p. 66. Also, Exhibit 8.1.7.1, p. 24.
[429] ANI Statement of Counterclaim, p. 69. Also, Exhibit 8.1.7.1, p. 24.
[430] ANI Statement of Counterclaim, p. 72. Also, Exhibit 8.1.7.1, p. 24.
[431] ANI Statement of Counterclaim, p. 72. Also, Exhibit 8.1.7.2, p. 25.

and Section 15 of the Concession Agreement.

540. The above is supplemented by ANI's own statement where it acknowledges that the *Amiable Compositeur* "assessed the Concessionaire's conduct and considered it in accordance with the diligence requirements set forth in the Agreement".[432]

541. ANI has not objected to the decisions of the Amiable Compositeur as inappropriate or outside or in disregard of the power granted by the Parties to it in the Concession Agreement.[433] Therefore, such decisions are final and binding on the Parties pursuant to Section 15(a) of the Agreement. Moreover, in the present arbitration proceedings, ANI has not claimed that such decisions of the *Amiable Compositeur* overstepped its authority. Therefore, the claim for breach of the archaeological obligations based on facts prior to the EERs-UF 2, enjoy res judicata effects among the Parties.

542. However, although it is true that in its pleadings ANI bases its counterclaim on subsequent events, and even expressly clarifies that it only refers to issues subsequent to EERs-UF 2, it is evident in several instances of its submissions that ANI does refer to events prior to EERs-UF 2. Thus, considering the decisions of the *Amiable Compositeur* and its res judicata character, the Tribunal understands that said claims must be rejected.

543. Regarding the facts that occurred after the EERs-UF2, which are the basis of the counterclaim related to UF 2 filed by ANI,[434] there is no res judicata effect and this Arbitral Tribunal has the power to decide over that claim. Therefore, we will proceed to settle the dispute considering only these subsequent facts.

544. The allegation of lack of sufficient archaeological personnel in the recovery sites, and even in the laboratory, does not imply an improper Social and Archaeological

---

[432] ANI Statement of Counterclaim, p. 76.
[433] ANI Reply on the Counterclaim, ¶ 236.
[434] ANI Statement of Counterclaim, p. 83.

Management of the Project, nor is it a determining factor as to the failure to overcome the EER. ANI presented different requirements made to POB between 2019 and 2021,[435] such as, for example, ANI Exhibits 8.1.28.5, 8.1.28.6, 8.1.28.6, 8.1.28.7, 8.1.28.8, among others.

545.  These requirements made by the Supervisor requested or reminded of the need to have the necessary resources to overcome the EERs, and to explain the reasons for the decrease in the personnel in charge of the excavations. In addition, ANI claims that such requirements "were not answered or ruled on in order to determine full compliance with the obligations".[436] In response to this, POB claims to have answered and complied with ICANH's[437] recommendations, providing different communications through POB Exhibit C-233, demonstrating that POB acted in a diligent manner.

546.  In addition to the above, section 5.2.4 of INERCO's expert report (POB Exhibit CER-005), explains that:[438]

> There are no objective criteria to affirm that there was a shortage of professionals and assistants in the archaeological activities; ANI does not state in any of its communications what is the favorable and sufficient number of personnel for the attention of the EERs.

547.  POB Exhibit CER-005 also explains that the archaeological work was done "continuously and with personnel approved by ICANH, according to the needs of the project".[439]

548.  In the same vein, during the Final Hearing of Evidence, the expert archaeologist Tatiana Santa testified:[440]

> It is also important to mention here that the staff is being defined by the archaeologist. The archaeologist is the one who defines

---

[435]  ANI Statement of Counterclaim, p. 81.
[436]  ANI Statement of Counterclaim, p. 68.
[437]  POB and S&B Statement of Defense to the Counterclaim, ¶ 625.
[438]  Exhibit CER-005, pp. 44-45.
[439]  Exhibit CER-005, p. 45.
[440]  Transcript of Final Trial Hearing 2022.12.15 P2, p. 15.

how many people he needs to handle the finding, how many
people he can have in his excavation.

549. Thus, POB was able to demonstrate that it is the archaeologist responsible for the
findings who defines the resources to be used in the recovery works; without ANI
presenting any expert on the matter to challenge whether this corresponds to science
or not. Therefore, POB acted in a reasonable and advisable manner regarding its duty
on Social and Archaeological Management.

550. The allegation of failure to protect the enclosures to the archaeological sites, in the
same way, does not imply an improper Social and Archaeological Management of
the Project, and nor is it a determining factor for the failure to overcome the EER.
ANI factually substantiates the breach of the obligations with the presentation of
several requirements made by the Supervisor to POB from 2019 to 2021.

551. For example, ANI Exhibits 8.1.28.1, 8.1.28.7, 8.1.28.8 and 8.1.28.9, among others,
demonstrate requests to devote reasonable resources for the adequate protection of
the archaeological findings. However, in the same way, POB responded to such
requirements [441] and complied with ICANH's suggestions, as evidenced in the
documents provided in POB Exhibit C-233.

552. In addition, POB demonstrated that, due to COVID-19 and the restriction measures
imposed by the Government of Colombia, during a period of time it was unable to
adequately address the enclosures, however, it took reasonable and advisable
measures under the circumstances[442], thus evidencing that POB fully complied with
its obligations.

553. Similarly, POB Exhibit CER-005 explains and demonstrates that[443] :

[T]he coverings in the archaeological areas are made in order to
make recovery tasks easier to perform, avoiding delays due to

---

[441] Statement of Defense to the Counterclaim, par. 633-637.
[442] Statement of Defense to the Counterclaim, par. 638-640.
[443] Exhibit CER-005, p. 46.

> weather conditions, either rain or sun. [...] this does not mean
> that greenhouse-type enclosure constructions are required from
> a technical point of view."

554.  In the same sense, archaeologist Tatiana Santa testified during the Final Hearing of
      Evidence that: "enclosures are made in some archaeological sites to make the work
      easier, but it is not necessarily for the protection of the heritage".[444] Therefore, POB
      acted in a reasonable and advisable manner regarding its Social and Archaeological
      Management duties.

555.  ANI did not challenge the declarations of archaeologist Tatiana Santa, nor did it
      present any expert opinion in response to the INERCO report. The argument that
      witness Santa does not have the "expertise to issue this type of report (this is her first
      opinion) and, moreover, that she expressed her opinions based on highly biased
      information",[445] is not persuasive for this Arbitral Tribunal. This is because, as
      witness Santa explained during the Final Evidentiary Hearing, the opinions issued in
      Exhibit POB CER-005 were made based on the intervention authorizations granted
      by the ICANH, and on the Archaeological Management Plan approved by the
      ICANH.[446]

556.  Furthermore, ANI's witness, Ms. Natalia Mayorga, the Supervisor's representative,
      who testified about the inquiries to POB for its Social and Archaeological
      Management, did not testify about the qualifications of the archaeologist Ms. Santa.
      Therefore, POB did not breach its archaeological obligations.

557.  Regarding the authorizations and the Archaeological Management Plan, and the
      breach alleged by ANI that without such authorizations POB could not carry out the
      works to overcome the EER, the Tribunal does not find any breach,

---

[444]  Transcript of Final Trial Hearing 2022.12.15 P2, p. 15.
[445]  ANI Post-Hearing Memorial, par. 145.
[446]  Transcript of Final Trial Hearing 2022.12.15 P2, pp. 8-9.

neither to the Concession Agreement, nor to the law or to the obligations defined by the *Amiable Compositeur*.

558.  POB demonstrated that it processed all the authorizations, the Archaeological Management Plan, and that it conducted an adequate Preventive Archaeology Program in the Contractual Social Management Plan.[447] It was also demonstrated that the Authorization for Archaeological Intervention No. 8559, contrary to ANI's[448] allegations, was renewed and that the ICANH extended the term as evidenced in POB Exhibit C-227.

559.  In addition, it is clear from the record, and unchallenged, that ICANH never sanctioned POB[449] for failing to comply with the different Authorizations for Archaeological Intervention issued during the work's duration, or with the Archaeological Management Plan, or with the applicable law. Thus, POB not only complied with acquiring the required permits, but it also carried them out in compliance with ICANH guidelines and the mandate of Colombian law.

560.  On the other hand, regarding the obligation to prepare and submit the final report of the preventive archaeology program, the Arbitral Tribunal finds that there is a breach of contractual and legal duties. Although Authorization for Archaeological Intervention No. 6429 expired,[450] and the same purpose was assigned to a new authorization for archaeological intervention,[451] the final report of Authorization for Archaeological Intervention No. 6429 has not been submitted.[452]

561.  POB Exhibit CER-005 does not explain or demonstrate, as to this particular report, that it has been submitted to the public entity, and POB has not submitted reliable, clear and direct evidence that such final report has been presented.

---

[447]  POB and S&B Statement of Defense to the Counterclaim, ¶¶ 588-606.
[448]  ANI Statement of Counterclaim, p. 82.
[449]  POB and S&B Reply, ¶ 253.
[450]  POB and S&B Statement of Defense to the Counterclaim, ¶¶ 600-603.
[451]  Exhibit 8.1.33 (CE-1061-2020), p. 1. Also Exhibit C-224.
[452]  Exhibit 8.1.33 (CE-1061-2020), p. 2. Also Exhibit C-222.

562. However, the failure to carry out this administrative procedure is neither relevant nor determinant to the Social and Archaeological Management, nor to the reasonable and advisable activities required to overcome the EER. This relevance is confirmed, contrary to what ANI claims,[453] as demonstrated,[454] by the fact that the recovery of the UF 2 findings was carried out in accordance with the ICANH guidelines and the applicable law.[455]

563. Furthermore, "the interventions associated to the works and activities previously impacted by the aforementioned Exemption of Liability Events of Functional Unit 2, comply with the Technical Specifications identified for this event in Technical Appendix No. 1",[456] hence, the Parties signed the Completion Minutes in relation to UF 2. Therefore, POB has not breached any of its obligations in archaeological matters.

564. With regard to the lack of diligence in the Social and Archaeological Management, which purportedly delayed the overcoming of the Exemption of Liability Event,[457] and consequently caused a breach of the deadlines defined in the EERs-UF 2,[458] the Tribunal considers that POB's actions were within what was reasonably possible and advisable as mandated by the Concession Agreement in Section 14.2(f).

565. According to the evidence presented, the archaeological site Los Alcaparros located in UF 2, involves a great archaeological magnitude and complexity in its administration.[459] This magnitude and complexity is evidenced by the fact that the project carried out by POB has revealed approximately 41% of all the findings of all the fourth generation (4G) projects carried out in Colombia.[460]

---

[453] ANI Statement of Counterclaim, p. 289.
[454] Exhibit CER-005, pp. 7-8, 33, 35, 39.
[455] POB and S&B Statemen of Defense to the Counterclaim, ¶ 627.
[456] Exhibit C-240; Exhibit 8.1.28.2.
[457] ANI Statement of Counterclaim, p. 83. Also in ANI Reply on the Counterclaim, ¶¶ 237, 244.
[458] ANI Post-Hearing Memorial, ¶¶ 147-150.
[459] Exhibit CER-005, p. 39.
[460] Exhibit CER-005, p. 39.

566.    For example, at the Los Alcaparros site "at least 200 funerary concepts" have been found;[461] while at the El Divino Niño site "26 tombs have been found, which are a reference for the study of past Muisca societies";[462] among other findings of ceramic fragments, lithic artifacts and high density fauna remains (See Table 4-5),[463] conditions that, in accordance with the actions taken by POB, demonstrate compliance.

567.    Considering this, POB proved that it requested the extension of Authorizations for Archaeological Interventions No. 6429 and No. 8559[464] with the aim of completing the extensive archaeological work and thus overcoming the EER. The testimony of archaeologist Tatiana Santa clarified that "the magnitude of the findings at Los Alcaparros and its special characteristics may explain why this site has not yet been completed".[465]

568.    Regarding the El Divino Niño archaeological site, "the complexity and particularity of the archaeological evidence identified has to do with the density and type of tombs found".[466]

569.    Furthermore, ANI does not deny the magnitude and complexity of the archaeological findings in UF 2, nor did it present direct and concrete evidence challenging that such magnitude and complexity were not the determining factors for the delay. Therefore, ANI has not proven that POB failed to comply with its archaeological obligations, while POB succeeded in proving that it complied with such obligations.

570.    Finally, in relation to the argument that the Completion Minutes of Functional Unit 2 do not affect POB's lack of diligence in archaeological matters, the Tribunal considers that, on the contrary, it does have an impact.[467] The Completion Minutes of Functional Unit 2, both partial and total, demonstrate that POB acted

---

[461]  Exhibit CER-005, p. 41.
[462]  Exhibit CER-005, p. 42.
[463]  Exhibit CER-005, p. 41.
[464]  POB and S&B Statement of Defense to the Counterclaim, ¶¶ 596-609.
[465]  Transcript of Final Trial Hearing 2022.12.15 P2, p. 5.
[466]  Exhibit CER-005, p. 39, 42.
[467]  ANI Reply on the Counterclaim, ¶ 254.

within what is reasonably possible and advisable, since the Completion Minutes acknowledge compliance with "the minimum acceptance values for the Indicators and the Technical Specifications",[468] criteria agreed by the Parties in Section 4.17 of the Concession Agreement.

571. In the same Completion Minutes it was acknowledged that "the existence of the EER at the Los Alcaparros site and the lack of construction of the pedestrian bridge at the El Divino Niño site does not affect compliance with the Agreement".[469] Furthermore, the evidence submitted and the arguments presented in the Arbitration, as has been assessed in this Section, support the absence of breaches by POB with respect to each of its obligations. Therefore, the execution of the Completion Minutes is relevant, and no breach by POB is found to subsist.

572. In conclusion, the Tribunal finds no breach by POB regarding the archaeological obligation in UF 2. First, POB acted in a reasonably possible and advisable manner, within the circumstances, as it made available all personnel and technical resources necessary for the protection of the archaeological sites; it installed the enclosures and appropriately kept them in place to protect the findings; and it processed and acquired all the necessary permits and authorizations to conduct the Preventive Archaeology Program in the Contractual Social Management Plan.

573. Second, POB acted diligently in its Social and Archaeological Management, complying with ICANH guidelines, and thus fulfilling the contractual obligations and the mandate of law.

574. Third, POB performed the necessary activities to overcome the Exemption of Liability Event, although it is true, as alleged by ANI, that to date the EER at the Los Alcaparros site has not been overcome.

---

[468] Exhibit C-240, ¶ 16. Also, Exhibit 8.1.28.1, ¶ 47.
[469] Exhibit C-240, ¶ 16.

575.  Fourth, ANI did not meet its burden of proof, failing to demonstrate non-compliance by POB. In turn, POB proved that it complied with its obligations in archaeological matters.

576.  The Arbitral Tribunal therefore dismisses ANI's counterclaim regarding POB's obligations in archaeological matters in relation to UF 2.

## 2.  CLAIMS OF THE RESPONDENT IN CONNECTION WITH UFS 4 AND 5

577.  ANI claims that POB failed to comply with the obligation to operate and maintain the road corridor with respect to UFs 4 and 5, because it did not duly carry out the activities required to ensure the continuity of service, accessibility and safety of the road corridor for users.[470]

### (a)  ANI's position

578.     ANI alleges that POB failed to comply with the O&M results obligation for the road corridor in UFs 4 and 5. ANI also argues that POB breached the obligation to guarantee the minimum standards of quality, service and accessibility of the road corridor, in accordance with the provisions of the Concession Agreement.[471] Likewise, it alleges that POB completely halted the activities in UFs 4 and 5,[472] and that it disregarded various requirements of the Supervisor regarding improper or poor O&M practices.[473]

579.     ANI also argues that POB failed to comply with its obligations regarding Maintenance activities and Priority Interventions in the road corridor sections of UFs 4 and 5, as the Supervisor has pointed out by since 2017. The aforementioned breaches allegedly caused shoulder losses in several sectors and the transformation of some of these sectors into Critical Points.[474]

---

[470]  ANI Statement of Counterclaim, p. 19.
[471]  ANI Statement of Counterclaim, p. 296.
[472]  ANI Statement of Counterclaim, p. 304.
[473]  ANI Statement of Counterclaim, p. 313. In the same sense, ANI Reply on the Counterclaim, ¶ 137.
[474]  ANI Statement of Counterclaim, p. 314. In the same sense, ANI Reply on the Counterclaim, ¶ 137.

580.    First, ANI argues that the Project Operation obligation includes guaranteeing the continuity of the service, as provided in section 3.1.1. of Technical Appendix 2; guaranteeing the integrity of the Project corridor, as provided in section 3.1.6 of Technical Appendix 2; and guaranteeing road safety, as provided in section 3.3.7 of Technical Appendix 2.[475] Likewise, ANI argues that the Maintenance obligation includes having to correct the damages or deficiencies that may affect the road's accessibility, identified by the Supervisor or by the Concessionaire itself, as provided in section 6.1 of Technical Appendix 2.[476]

581.    Second, ANI argues that the Maintenance obligation is also of a legal nature, and that it entails that the Concessionaire must respect the quality standards and guarantee the continuity of service, as provided in Law 1508 of 2012.[477]

582.    Third, ANI argues that the O&M obligation is permanent in nature, from the execution of the Infrastructure Delivery Minutes until the Hand-Back Minutes,[478] and that it was not suspended by the execution of the EER Minutes dated 1 August 2018.[479]

583.    Fourth, ANI argues that the O&M obligations of the road were not suspended by the EER either, since the EER Minutes determined that the Priority Interventions referred to in Section 4.3 of Technical Appendix 1 were not suspended by the EER and therefore, the Concessionaire should have continued with the works to guarantee accessibility and road safety conditions.[480]

584.    ANI emphasizes that the O&M obligation "is not satisfied by the good intentions of the Concessionaire, but with the full and complete fulfillment of the

---

[475]   ANI Statement of Counterclaim, pp. 296-298.
[476]   ANI Statement of Counterclaim, pp. 298-300.
[477]   ANI Statement of Counterclaim, p. 301.
[478]   ANI Statement of Counterclaim, p. 297. In the same sense, ANI Reply on the Counterclaim, ¶ 126.
[479]   ANI Statement of Counterclaim, p. 308. In the same sense, ANI Reply on the Counterclaim, ¶¶ 134-136.
[480]   ANI Statement of Counterclaim, pp. 306-309.

Provision of the services."[481] This obligation involves "carrying out the works necessary to ensure the optimal provision of transportation, connectivity and traffic services",[482] which includes "a comprehensive service, that is not limited to the cross section (crown, lanes, berms, gutters, embankment shoulders, slopes) from the crown ditches and the cuts, among others".[483]

585.     ANI alleges that the road corridor's conditions have critically deteriorated as a result of POB's failure to carry out O&M and/or Priority activities, which are essential ongoing obligations, in force and enforceable on the Concessionaire because they were not suspended by the EER. For the above reasons, the safety and accessibility of the road have not been guaranteed, thus breaching POB's obligations undertaken during the Pre-Operational Stage.[484]

**(b)     Position of POB and S&B**

586.     POB argues that it has diligently performed all the activities established in the Concession Agreement and in its Technical Appendices 1 and 2, including the O&M obligations in the Pre-Operational Stage of UFs 4 and 5.[485] Furthermore, POB points out that it has diligently informed ANI of the emergence of Critical Points on the road in UFs 4 and 5, the attention of which would be outside the obligations acquired by POB in the Concession Agreement. Likewise, POB maintains that the activities required by the Supervisor and ANI are a consequence of ANI's contractual breaches.[486]

587.     First, POB argues that the O&M obligations in the Pre-Operational Stage are expressly and precisely stated in the Concession Agreement, as provided for in Law 1508 of 2012.[487] Likewise, it argues that the quality standard and service levels required by law are those defined in the Agreement, according to the characteristics

---

[481]   ANI Reply on the Counterclaim, ¶ 129.
[482]   ANI Reply on the Counterclaim, ¶ 127.
[483]   ANI Reply on the Counterclaim, ¶ 130.
[484]   ANI Reply on the Counterclaim, ¶ 138.
[485]   POB and S&B Statement of Defense to the Counterclaim, ¶ 257.
[486]   POB and S&B Statement of Defense to the Counterclaim, ¶ 262.
[487]   POB and S&B Statement of Defense to the Counterclaim, ¶¶ 269-271, 300.

of the Project, and that they do not have an effect beyond what the Parties agreed.[488]

588.    Second, POB argues that the only Service Levels applicable in relation to the Project's Operation and the Maintenance of UFs 4 and 5 in the Pre-Operational Stage are the operating indicators called O4 and O5, which refer to the response time for incidents, accidents and emergencies as provided in the Concession Agreement and Technical Appendix 2, Table 2.[489]

589.    Third, POB argues that the Maintenance obligation set forth in paragraph 6.1 of Technical Appendix 2 is not applicable during the Pre-Operational Stage.[490] Technical Appendix 4 expressly states that it is not applicable in Section 1 thereof.[491]

590.    Fourth, POB argues that the obligation for Priority Interventions consists of the performance of all activities required to meet the minimum Service Levels of the Pre-Operational Stage, which are not Interventions.[492] Furthermore, it argues that, since the minimum Service Levels in the Pre-Operational Stage of UFs 4 and 5 are defined in Table 1 of Technical Appendix 2, POB was only required to respond to incidents, accidents and emergencies.[493]

591.    Fifth, POB argues that addressing the Critical Points requires the performance of activities that qualify as Interventions. These Interventions are suspended by the EER[494] and they fall outside of the O&M's obligations framework established in Technical Appendix 2.

---

[488]    POB and S&B Statement of Defense to the Counterclaim, ¶¶ 271-275.
[489]    POB and S&B Statement of Defense to the Counterclaim, ¶¶ 276-277, 280-283.
[490]    POB and S&B Statement of Defense to the Counterclaim, ¶¶ 284, 364.
[491]    POB and S&B Statement of Defense to the Counterclaim, ¶ 302.
[492]    POB and S&B Statement of Defense to the Counterclaim, ¶¶ 284, 316, 318.
[493]    POB and S&B Statement of Defense to the Counterclaim, ¶ 282.
[494]    POB and S&B Statement of Defense to the Counterclaim, ¶ 314.

592.    POB claims that it has carried out all the activities required by it within the framework of the Concession Agreement and that it has not breached any obligation. This allegation is supported by the analysis carried out by FTI, who, after evaluating the communications between POB, ANI and the Supervisor, was able to conclude in its report CER-004 that all activities were performed, and that POB complied with the minimum Service Levels for the Pre-Operational Stage, specifically those related to indicators O4 and O5.[495] Furthermore, POB underscores such compliance with the fact that the Supervisor and ANI have never rejected the Service Levels of the Preoperational Stage of UFs 4 and 5.[496]

593.    POB states that the activities to address the Critical Points that have arisen as a consequence of the suspension of the construction of UFs 4 and 5 comprise slope reinforcement, earthworks and the creation of new drainage, among others. Relying on FTI's evaluation in its report CER-004, POB argues that the tasks to be performed in the existing Critical Points in the layout of UFs 4 and 5 are located in areas affected by the EER, and, since they constitute Interventions, they cannot be carried out.[497]

594.    POB states that the activities required by the Supervisor and ANI are related to Critical Points that emerged after 2018, and that these are Interventions suspended by the EER.[498] Furthermore, it argues that they are not POB's obligation, since these activities are a consequence of ANI's breaches.[499] POB concludes that it has complied with its obligations. The continuity of the service, safety and accessibility of the road allegedly is ANI's responsibility, according to the Agreement's provisions and by virtue of ANI's actions.

---

[495]  POB and S&B Statement of Defense to the Counterclaim, ¶¶ 305-307.
[496]  POB and S&B Statement of Defense to the Counterclaim, ¶ 308.
[497]  POB and S&B Statement of Defense to the Counterclaim, ¶¶ 319-325.
[498]  POB and S&B Statement of Defense to the Counterclaim, ¶¶ 333-334, 338-340.
[499]  POB and S&B Statement of Defense to the Counterclaim, ¶ 345.

**(c)    The Agreement and Applicable Law**

595.    The Arbitral Tribunal will first clarify the framework that regulates the obligations, in order to subsequently present its analysis that will lead to the resolution of the dispute regarding the O&M obligation of UFs 4 and 5.

596.    First, the Concession Agreement establishes in general terms the framework of the Parties' obligations. In particular, Section 4.2 sets out the main obligations during the Preconstruction Phase.[500] Paragraph (p) establishes that the Concessionaire assumes the results obligations provided for in the Agreement and its Appendices, upon receiving the infrastructure. In addition, paragraph (v) establishes that the Concessionaire must carry out the Project's O&M, in accordance with the requirements set forth in Technical Appendix 2 and that it must comply with the Minimum Service Level of the infrastructure foreseen for the Preconstruction Phase. Thus, the O&M obligations are precisely and specially defined in Technical Appendix 2.

597.    Second, regarding the risks assigned to the Concessionaire, Section 13.1(a)(i) of the Concession Agreement establishes that the infrastructure's O&M obligation - even in the Pre-operational Stage- is a result-based obligation, and that the favorable or unfavorable effects derived from the conditions of the infrastructure will not reduce this obligation.

598.    Third, paragraph 4.3 of Technical Appendix 1 defines what a Priority Intervention is, and establishes, in paragraph (c), that Priority Interventions will not be considered interventions as established in the General Part and the Technical Appendix. It also lists what these Priority Interventions consist of, namely:

---

[500]    Reply on the Counterclaim, par. 124.

### 4.3   Priority Interventions

(a)   In order to comply with the minimum service levels for the Pre-Operational Stage established in Technical Appendix 2, the Concessionaire must carry out all activities that, according to the state of the art, are necessary for such purpose. These activities will be called Priority Interventions, which may include, among others, the following:

    (i)   Patching and/or pothole repair.
    (ii)   Vertical signage
    (iii)   Horizontal signage
    (iv)   Removal of landslide debris
    (v)   Cleaning of margins and separators
    (vi)   Cleaning of drainage works

(b)   In order to meet the minimum service levels on the Project infrastructure that is not paved, Priority Interventions may include, among others, the following:

    (i)   Conformation of the existing roadway
    (ii)   Vertical signage
    (iii)   Removal of landslide debris
    (iv)   Cleaning of margins and separators.
    (v)   Cleaning of drainage works.

599.   Fourth, specifically, Technical Appendix 2 contains the Concessionaire's O&M obligations. Part 3 establishes the Operation obligation. In particular, section 3.1 regulates the general principles of Project Operation, namely: continuity in the service (paragraph 3.1.1); consistency (paragraph 3.1.2); and road safety (paragraph 3.1.5). Likewise, relevant for the counterclaim on the breach of the O&M obligation, section 3.3 regulates the specific Operation obligations.[501] Namely: Operation of the road during the Pre-operational Stage (paragraph 3.3.1); response to incidents, accidents and emergencies (numeral 3.3.3.1); and road safety (numeral 3.3.7).

600.   Fifth, section 3.3.1 of Technical Appendix 2 establishes that: "The Concessionaire has the obligation to comply with the minimum service levels for the pre-operational stage established in the following table":

---

[501]   Reply on the Counterclaim, par. 125,126, 136.

For the following subsectors, the measurement of the following Service Levels in Table 1 will not apply:

| UF | Origin) | Destination | Approximate length, origin destination | Service Level not measured |
|---|---|---|---|---|
| 4 | La Calera | Choachi | 31 Km | State of margins, central separator. Service Area and Project Corridor |
| | | | | Surface, longitudinal and transverse drainages |
| | | | | Vertical Signage |
| | | | | Potholes |
| 5 | Choachi | Cáqueza | 21.27 Km | State of margins, central separator. Service Area and Project Corridor |
| | | | | Surface, longitudinal and transverse drainages |
| | | | | Vertical Signage |
| | | | | Potholes |

601.    It is evident from the table that the measurement of the Minimum Service Levels in UFs 4 and 5 does not require the performance of Priority Interventions.

602.    Sixth, the EER Minutes expressly states:[502]

[A]s a consequence of the occurrence and declaration of this Exemption of Liability Event, the Parties agree to SUSPEND from 31 October 2017 the term for the performance of all works and activities associated with the Interventions corresponding to Functional Units 4 and 5 of the Project.

603.    It also expressly establishes:[503]

[R]emaining enforceable and in force only: [...] obligations related to the Priority Interventions as defined in Section 4.3 of Technical Appendix 1, as well as the operation and maintenance obligations corresponding to the pre-operational stage in accordance with Section 3.3.1 of Technical Appendix 2 of the

---

[502]    Exemption of Liability Event Minutes of 1 August 2018 (EER-UF 4&5), p. 29, par. Two.
[503]    Ibid.

> Concession Agreement, provided that they are not affected by the present EER declaration."

604.    Finally, it establishes that:[504]

> [N]otwithstanding the foregoing, the Concessionaire must comply with the contractual obligations that are applicable during the so-called "Special Period", provided that said obligations are not affected by the EER recognized herein.

**(d)    Analysis of the Arbitral Tribunal**

605.    In accordance with the obligations framework contained in the Concession Agreement, in the Technical Appendices 1 and 2 and in the EER Minutes, the Arbitral Tribunal considers that ANI is not justified in claiming POB's breach of the O&M obligation in UFs 4 and 5.

606.    It is essential to state that Law 1508 of 2012 and its regulatory decree, invoked by ANI in its Counterclaim[505] and accepted by POB in the respective Statement of Defense,[506] provide that:[507]

> The quality standard refers to the minimum characteristics inherent to the good or service that is the subject matter of the agreement, and the service level is the condition or requirement established for an administration indicator to define the scope and characteristics of the services to be provided.

607.    Thus, the service levels and the quality standard that must be met in order to be entitled to the Retribution are those specifically agreed by the Parties in the Agreement, since they "must respond to the characteristics of each project".[508] Therefore, the obligational framework that governs POB regarding O&M is the one

[504]    Exemption of Liability Event Minutes dated 1 August 2018 (EER), p. 30, ¶ 2
[505]    ANI Statement of Counterclaim, pp. 301-302.
[506]    POB and S&B Statement of Defense to the Counterclaim, ¶ 270.
[507]    ANI Statement of Counterclaim, p. 302. Also, POB and S&B Reply, ¶ 271.
[508]    Article 6 of Decree 1467 of 2012 cited in the ANI Statement of Counterclaim, p. 302.

provided in the Concession Agreement as detailed above, and not the one established in the law, generally.

608.    Considering the above, first, the obligatory framework does not require POB to carry out works or activities beyond those established in the Service Level indicators for UFs 4 and 5.

609.    Table 1 - Service Levels for the Pre-Operational Stage, contained in Technical Appendix 2, expressly excludes, for UFs 4 and 5, works or activities related to patching/shoveling, vertical signaling; surface, longitudinal and transversal drainage; and condition of margins; central separation; service area and project corridor,[509] leaving only Service Levels O4 and O5, as established in paragraph 3.3.3.1, regarding incidents, accident and emergencies response time.

610.    Likewise, paragraph 3.3.1 of Technical Appendix 2 states that:[510]

> The results obligations in terms of operation and service level that are required of the Concessionaire before the signing of the Functional Unit Completion Minutes will be those indicated in Table 1 - Service Levels for the Pre-Operational Stage.

611.    Therefore, the exclusion of said works and activities in accordance with Table 1 - Service Levels in UFs 4 and 5, delimits the obligations of the Concessionaire during the Pre-Operational Stage. It is strictly understood that, as the Concessionaire is not measured by the performance of these works or activities, the Concessionaire has no obligation in this regard.

612.    It is true that POB accepted permanent result obligations to guarantee the continuity of the road service, road safety and the accessibility of the Project corridor. However, these obligations are general in nature and they are subject to the specific obligations of the Pre-Operational Stage. Based on the legal principle

---

[509]   Technical Appendix 2, p. 16.
[510]   Technical Appendix 2, p. 17 par. 5.

that special matters prevail over general matters, the obligational framework is established, and the Tribunal concludes that POB has no obligation beyond the attention to incidents, accidents and emergencies according to the Service Levels in UFs 4 and 5.

613.    The obligations to guarantee the continuity, regularity, quality of the technical service, road safety and integrity of the concessioned road are binding, but they can be avoided, contrary to what ANI claims, because the Concession Agreement provides for exceptions in its text, as evidenced in paragraph 3.3.1. of Technical Appendix 2.

614.    Additionally, the Priority Interventions established in paragraph 4.3 of Technical Appendix 1, constitute the works or activities necessary to comply with the Minimum Services in the Pre-Operational Stage, which, as is understood, are defined in paragraph 3.3.1 of Technical Appendix 2, and particularly in Table 1 - Service Levels in the Pre-Operational Stage. Therefore, the argument raised by ANI, that POB has not complied with its Maintenance obligation in UFs 4 and 5, due the lack of performance of Priority Interventions as described in paragraph 4.3 of Technical Appendix 1, has no contractual support, since they are not works or activities that POB its obliged to perform.

615.    On the other hand, the EER Minutes expressly and clearly establish that the Priority Interventions, as defined in paragraph 4.3 of Technical Appendix 1, as well as the O&M obligations on the Pre-Operational Stage according to paragraph 3.3.1 of Technical Appendix 2, are not suspended by the EER, as long as they are not affected by the EER. Therefore, POB has no obligation to perform works, either as Priority Interventions or as O&M, if they are affected by the EER.

616.    In this regard, the Critical Points on the road, which affect accessibility, road safety, continuity and regularity of service, are related to the lack of performance of O&M works in UFs 4 and 5 since 2017. However, such failure is a consequence of the impossibility to perform works due to the presence of the

springs, i.e., due to the occurrence of the EER, and is not by itself a breach of any of POB's obligation.

617.     In addition, POB's FTI expert, in its opinion CER-004, states that:[511]

> The activities required to fix the so-called Critical Points are considered Interventions, that is, works or activities that require the use of tools in sectors that coincide with the protection round of the springs, which are consequently suspended.

618.     POB's FTI expert believes that attention to Critical Points requires:[512]

> Construction works of mechanically stabilized walls, recovery of the subgrade by rebuilding the embankment, construction of drainage channels and accounts, embankment stabilization activities and protection works.

619.     These works go beyond of POB's O&M obligations set out in Technical Appendix 2. Therefore, POB has not breached its obligations.

620.     Furthermore, POB complied with its O&M obligations and carried out the Priority Interventions, as provided for in the obligatory framework, as stated by the FTI expert.[513] POB has responded to incidents, accidents and emergencies in accordance with the Service Levels. In this regard, ANI has not argued any fault or defect in POB's performance, and therefore the Arbitral Tribunal does not recognize any default.

621.     Finally, ANI did not gather or present evidence to prove the non-compliance in the different areas where O&M works were required, nor evidence to contradict POB's expert opinion, referring to the fact that the required activities were of such nature that they were suspended by the EER.

---

[511]   Exhibit CER-004, ¶ 73.3.-7.37.
[512]   Exhibit CER-004, ¶ 7.3.10.
[513]   Exhibit CER-004, ¶ 7.3.11.

622.    The burden of proof required the claim to be formulated precisely. ANI did not accurately present the claim as to the incidents requiring POB's attention. Nor did it present with precision the claim as to the O&M works or activities to be expected from POB. Additionally, ANI did not precisely indicate on which sections of the UFs 4 and 5 track was POB required to carry out O&M works.

623.    On the contrary, in its claim ANI only generically references "the deterioration of the concessioned corridor",[514] stating that "the project's Supervisor has required POB to implement actions and measures that allows guaranteeing road safety"; and that there were "sectors that have deficiencies in their maintenance, as an example we present communications CP-PER-9630C-2021, CP-PER-9631C-2021, CP-PER-9440C-202 and CP-PER-9438C-2021".[515]

624.    Additionally, the claim was based solely on Supervisor's reports and communications sent to POB by ANI and the Supervisor as evidence. But this evidence does not demonstrate, nor does ANI explain to the Arbitral Tribunal in a detailed, itemized and concrete manner, the scope of POB's alleged non-compliance. Therefore, the lack of specificity and precision in the formulation of the claim results in the failure to satisfy ANI's burden of proof.

625.    The absence of detailed and segregated evidence of the works or activities necessary to comply with the Priority Interventions, and of attention to the Critical Points, leads the Arbitral Tribunal to conclude that POB complied with its obligations. The Supervisor's reports, which date from different times since 2018, are not sufficient evidence since they do not contradict POB's assertion that the Concessionaire had performed works that go beyond the obligatory contractual framework,[516] and they do not respond to the requirements to perform such works in light of the EER Minutes.

---

[514]  ANI Statement of Counterclaim, ¶ 76.
[515]  ANI Statement of Counterclaim, ¶ 77.
[516]  POB and S&B Statement of Defense to the Counterclaim, ¶¶ 310-314.

626.     In turn, as noted above, POB submitted an expert opinion, CER-004, in which POB explained that the works and activities required by ANI and the Supervisor could not be carried out due to the presence of the springs.[517] Furthermore, in the same exhibit CER-004, POB presented in detail the activities or works that could not be carried out as a consequence of the EER declaration.[518]

627.     This expert evidence was not contested by ANI with any evidentiary means. Therefore, ANI did not satisfy its burden of proof by not contesting whether the works or activities, which POB was supposed to carry out, were not suspended or could not be carried out because they affected the spring protection zones. Therefore, in the absence of evidence to the contrary, the Arbitral Tribunal understands that O&M's obligations, necessary to permanently guarantee continuity, road safety and accessibility in the Project, beyond attending to incidents, accidents and emergencies response activities, were suspended.

628.     The Arbitral Tribunal finds no breach of POB's O&M obligation in relation to UFs 4 and 5. First, the O&M obligation in the Pre-Operational Stage is defined by the Service Levels as set forth in Table 1 of Technical Appendix 2.

629.     Second, the O&M obligation only consists of attention to incidents, accidents and emergencies as stated in numeral 3.3.3.1 of Technical Appendix 2.

630.     Third, the permanent result O&M obligation is affected by the EER, which suspended all Intervention, Priority Intervention, activity or O&M work that impacts the areas protected by the presence of springs.

631.     Fourth, POB has performed the necessary and required works in compliance with O4 and O5 service level Indicators.

---

[517]   Exhibit CER-004, ¶ 7.3.3
[518]   Exhibit CER-004, ¶¶ 7.3.9-7.3.10.

632.     Fifth, the attention to Critical Points requires the performance of Interventions, i.e., works or activities that impact the areas protected by the presence of springs, which are suspended by the EER Minutes.

633.     Sixth, ANI failed to meet its burden of proof by not indicating in an exact and detailed manner POB's acts that amount to a failure to comply with the obligational framework. Furthermore, ANI did not adequately challenge POB's evidence that that the required works are suspended by the EER Minutes.

634.     Therefore, the Arbitral Tribunal dismisses ANI's counterclaim concerning POB's O&M obligation in UFs 4 and 5.

**3.   CLAIM FOR INTEREST FOR DELAY IN THE TOTAL FUNDING OF THE SUPERVISOR SUBACCOUNT**

**(a)   ANI's position**

635.   The Respondent claims, by way of compensation for damages, interest for POB's default in the payment of funding obligations 5, 6, 7 and 8 of the Supervisor Subaccount.[519]

636.   The Respondent points out that, with the execution of the Concession Agreement, POB assumed the obligation to establish a Trust Fund [Patrimonio Autónomo] in accordance with Section 1.114 of the General Part of the Concession Agreement throughout a mercantile trust agreement. In turn, Section 3.14 of the General Part of the Agreement establishes that the referred Trust Fund must be formed by the following accounts: (i) Project Account and (ii) ANI Account. The ANI Account contains, among others, the Supervisor Subaccount, which is funded by the Concessionaire, under the terms established in Section 4.5 (e) of the Special Part of the Concession Agreement, and accordingly to the beginning of each contractual stage: (i) Preconstruction; (ii) Construction and; (iii)

---

[519]   Statement of Counterclaim, p. 26; Reply on the Counterclaim, ¶¶ 171-175.

O&M. ANI adds that Section 4.5(e) of the Special Part of the Agreement establishes the funding terms of the Supervisor Subaccount in the different Phases and Stages of the Agreement.[520]

637. The Construction Phase shall be funded "[w]ithin five (5) Days following the beginning of each three hundred and sixty-five (365) Day period counted from the Commencement Date of the Construction Phase".[521]

638. On the other hand, ANI points out that, Section 3.6 of the General Part of the Agreement, which regulates the respective interest on remuneration and late payment, establishes that "[t]he late payment rate applicable to the payments due by the Parties under this Agreement shall be the equivalent to the DTF plus ten percentage points (10%), but in no case a rate higher than the maximum rate allowed by the Applicable Law".[522]

639. Thus, ANI indicates that, since the Construction Phase started on 15 December 2015, the funding corresponding to this stage had to be carried out annually on December 20, as maximum deadline.[523]

640. The Respondent claims that POB did not comply with the obligation to fully carry out the fifth, sixth and seventh installments on the Supervisor Subaccount, corresponding to the 2018, 2019 and 2020 periods, for which late payment interests were accrued since 20 December of each period, until 19 November 2021,[524] and then updated to 22 July 2022.[525]

641. The Respondent calculates the default interest on each of these accounts as follows:

---

[520] Statement of Counterclaim, pp. 55-56; ¶ 150; Statement of Counterclaim, pp. 330-335.
[521] Statement of Counterclaim, ¶ 152.
[522] ANI Statement of Counterclaim, p. 58; ANI Statement of Counterclaim, p. 337
[523] ANI Statement of Counterclaim, ¶153; ANI Statement of Counterclaim, pp. 335-336.
[524] ANI Statement of Counterclaim, ¶154.
[525] ANI Reply on the Counterclaim, ¶ 171.

642.   Funding 5, in the amount of COP $12,978,956,112 corresponding to the Construction
       Phase, was to be paid on 20 December 2018, however, POB made 2 partial payments:
       (i) on 13 April 2019 for COP $4,402,734.901 and (ii) on 7 December 2020 for COP
       $8,576,118,353. Therefore, ANI argues that POB is obliged to pay the amount of
       COP $3,180,932,398, which corresponds to the capital plus late payment interest,
       pursuant to the obligation to make Funding 5 installment.[526]

643.   Funding 6, in the amount of COP $13,478,596,227 corresponding to the Construction
       Phase, was to be paid on 20 December 2019, however, POB made 1 partial payment
       for COP $4,572,309,472. Considering POB's partial payment, the calculation of late
       payment interest as of 19 November 2021 amounts to COP $2,960,022,269, for a
       total capital plus late payment interest of COP $11,866,309,024[527].

644.   Funding 7, in the amount of COP $13,679,069,843 corresponding to the Construction
       Phase, was to be paid on 20 December 2020, however, POB did not made any
       payment for this item, which has accrued late payment interest for the amount of COP
       $1,507,505,276.[528]

645.   In total, and for this item, the Respondent considers that POB owes a total of COP
       $15,186,575,119.[529]

---

[526]   ANI Statement of Counterclaim, ¶ 155; Respondent's Post-Hearing Brief, ¶ 160.
[527]   ANI Statement of Counterclaim, ¶ 156; Respondent's Post-Hearing Brief, ¶ 161.
[528]   ANI Statement of Counterclaim, ¶ 157; Respondent's Post-Hearing Brief, ¶ 162.
[529]   ANI Statement of Counterclaim, ¶ 157; Respondent's Post-Hearing Brief, ¶ 162.

646. The Respondent argues that these amounts are owed by POB to ANI pursuant to Articles 1602,[530] 1605,[531] 1608,[532] 1615,[533] 1617[534] and 1625[535] of the Civil Code, as well as case law of the Supreme Court of Justice and the Council of State on the notice of default due to late payment.[536]

647. Thus, considering that POB had the obligation to fund these accounts, which is an obligation to deliver an amount of money in favor of ANI, the Respondent concludes that the breach of this obligation implies the duty to compensate default interest due to late payment[537].

648. The Respondent rejects POB's arguments in response to this claim.

649. First, ANI claims that it does have standing to claim in connection with the funding of the Supervisor Subaccount. The Respondent argues, based on the jurisprudence of the Council of State and the Constitutional Court, that a claimant has standing to sue if it has the potential to claim the

---

[530] Civil Code, Article 1602: "Every legally concluded contract is a law for the parties, and cannot be invalidated except by their mutual consent or for legal reasons."

[531] Civil Code, Article 1605: "The obligation to give contains the obligation to deliver the thing; and if it is a certain species or body, it also contains the obligation to preserve it until delivery, under penalty of paying damages to the creditor who has not defaulted in receiving."

[532] Civil Code, Article 1608: "The debtor is in default: 1.) When the obligation has not been fulfilled within the stipulated term; unless the law, in special cases, requires that the debtor be required to be placed in default. 2.) When the thing could not be given or performed but within a certain period of time and the debtor has let it pass without giving or performing it 3.) In other cases, when the debtor has been judicially subject to a counterclaim by the creditor".

[533] Civil Code, Article 1615: "Compensation for damages is due from the moment the debtor is in default, or, if the obligation is not to do, from the moment of the violation".

[534] Civil Code, Article 1617: "If the obligation is to pay a sum of money, compensation for damages due to delay is subject to the following rules: 1.) Contractual interest continues to be owed, if a higher than legal interest has been agreed upon, or legal interest begins to be owed, in the opposite case; remaining, however, in their force the special provisions that authorize the collection of current interest in certain cases. The legal interest is fixed at six percent per annum. 2.) The creditor has no need to justify damages when only charging interest; the fact of delay is sufficient. 3.) Late interest does not produce interest. 4.) The above rule applies to all types of income, royalties and periodic pensions."

[535] Civil Code, Article 1625: "Any obligation may be extinguished by an agreement in which the parties concerned, being capable of freely disposing of what is theirs, consent to render it null and void. Obligations are also extinguished in whole or in part: 1.) For the solution or effective payment."

[536] ANI Statement of Counterclaim, pp. 324-329.

[537] ANI Statement of Counterclaim, pp. 336-337.

entitlement to a right granted by law or if it has the ownership of the legal interest at stake in the proceedings.[538]

650.  For the specific case, the Respondent argues that, pursuant to Section 2.6(A)(8) of the Parties' representations and warranties, specifically the Concessionaire declares and warrants that it is aware that the sole beneficiary of the ANI Account is ANI itself. Accordingly, Section 3.14 of the General Part of the Agreement also states that the sole beneficiary of the ANI Account is ANI itself. The Respondent reiterates that POB had the obligation to make the funding in accordance with the terms set forth in Section 4.5(e) of the Special Part of the Agreement, and that in Section 3.6 of the General Part of the Agreement the Parties agreed on the default interest and the applicable rate.[539]

651.  Thus, ANI concludes that, as the sole beneficiary of the ANI Accounts —which includes the Supervisor Subaccount— it is entitled to proceed with the collection of the default interest agreed in the Agreement, as a consequence of POB's failure to fund.[540]

652.  Second, the Respondent reiterates that POB breached its contractual obligations regarding the funding of the Supervisor Subaccount,[541] for which POB owes default interest, the amount of which is updated as of 7 July 2022, the date of the filing of its Reply on the Counterclaim.[542]

**(b)  Position of POB and S&B**

653.  The Claimants deny ANI's claim on the amounts and default interest regarding the Supervisor Subaccount funding.

---

[538]  ANI Reply on the Counterclaim, ¶¶ 146-151.
[539]  ANI Reply on the Counterclaim, ¶¶ 152-155.
[540]  ANI Reply on the Counterclaim, ¶¶ 156-160.
[541]  ANI Reply on the Counterclaim, ¶¶ 162-170.
[542]  ANI Reply on the Counterclaim, ¶¶ 171-176.

654. First, POB states its compliance with the contractual obligations to fund the Supervisor Subaccount, therefore the first of the requirements of contractual liability claimed by ANI would not be met.[543]

655. Second, POB indicates that ANI did not suffer a compensable damage, hence, the requirements of civil liability would not be met either.

656. The Claimants argue that, with this claim, ANI seeks to assert for itself resources that belong to the Trust Fund. POB argues that, in accordance with the applicable law, in particular Article 1233 of the Code of Commerce, trust funds [Patrimonios Autónomos] are a legal institution by virtue of which, through a trust contract executed with a trust entity, a body of rights is created with assets independent of those of the parties involved in the trust contract.[544]

657. POB argues that its obligation was to establish such trust fund and in relation to the Supervisor Subaccount, which is part of the ANI Account of the Trust Fund, the Agreement provides that (i) the origin of the resources are the funds that correspond to the Concessionaire; and (ii) the purpose of such resources is "the attention of the payments to the Supervisor of the Agreement" but not ANI's assets. POB's specific obligation was to make contributions to the Supervisor Subaccount of the Trust Fund, under the terms of Sections 3.14.(i)(iv)(1) of the General Part and 4.5(e) of the Special Part.[545]

658. In this regard, and considering that POB's obligation to pay was on the Trust Fund and not on ANI's assets, the Claimants conclude that the Respondent does not have standing to claim these amounts[546].

---

[543] POB and S&B Statement of Defense to the Counterclaim, ¶¶ 412-414.
[544] POB and S&B Statement of Defense to the Counterclaim, ¶¶ 420-421.
[545] POB and S&B Statement of Defense to the Counterclaim, ¶¶ 423-425.
[546] POB and S&B Statement of Defense to the Counterclaim, ¶¶ 427-429.

659.  Third, POB alleges that ANI seeks to benefit from its own fault or willful misconduct, since the claim would be based on its own contractual breaches in relation to the structuring of the Project and the resolution of the EER. These breaches allegedly caused the value of the funding foreseen in the Agreement to be disproportionate and detrimental to POB. POB's works that ANI's non-compliance allow it to perform as of September 2018 lead to the Supervisor's work being so reduced that it has no justification to maintain the funding foreseen for such sub-account in the Construction Phase.[547]

660.  In the Rejoinder to the Counterclaim, the Claimants argue that, based on the documents produced by ANI in the Arbitration, there was no technical justification for not reducing the funding of the Supervisor Subaccount. On the contrary, and based on Exhibit CER-008: JS Held's Funding Expert Opinion, they argue that ANI should have made a reduction of 64 to 69% of the value of such funding. This would coincide with POB's argument that the value of the funding should be that of the O&M Stage (approximately 66% reduction compared to the value of such funding in the Construction Phase).[548]

661.  Fourth, the Claimants allege that the damages claimed by ANI are incorrectly assessed, due to two reasons.

662.  First, ANI uses the wrong rate to calculate the late payment interest. POB points out that ANI relies on Section 3.6(a) of the General Part of the Agreement to argue that the default interest applicable in this case should be calculated at a rate of DTF + 10 percentage points. According to POB, this rate is not applicable, since it refers to the payments due by the Parties, but not to the obligation to make the contributions to the Supervisor Subaccount, which should be governed by the rules of the mercantile trust.[549] POB adds that, to the extent that default interest constitutes a penalty for non-compliance, a broad or

---

[547] Statement of Defense to the Counterclaim, ¶¶ 430-432.
[548] POB and S&B Rejoinder on the Counterclaim, ¶¶ 111-113.
[549] POB and S&B statement of Defense to the Counterclaim, ¶¶ 436-440.

extensive interpretation of the rules that provide for default interest cannot be admitted. [550] In fact, according to the Agreement, the yields of the Supervisor Subaccount are intended for the Trust Fund Minor Works Subaccount.[551]

663. Second, because ANI calculates interest on interest, which would be contrary to the applicable law and the provisions of Article 886 of the Code of Commerce.[552]

**(c)    Analysis of the Arbitral Tribunal**

664. The Arbitral Tribunal notes that ANI's counterclaim is the counterpart of POB's claim regarding the losses derived from the non-reduction of the funding amounts of the Supervisor Subaccount.

665. In this regard, and as already analyzed and resolved in Section IV.B.3 of this Award, the Tribunal considers that it was logical and reasonable that the amounts of the funds of this sub-account were reduced, according to the needs of the Project, the impossibility to carry out Interventions in UFs 4 and 5; the reduction of the monthly amounts of the Supervisor's Contract in the Construction Phase, and additionally, that such facts are attributable to ANI and not to POB.

666. Consequently, the Arbitral Tribunal considers that this counterclaim should be rejected, declaring that POB does not have the contractual obligation to make larger contributions to the Supervisor Subaccount than those already made.

---

[550]   POB and S&B Statement of Defense to the Counterclaim, ¶ 441.
[551]   POB and S&B Statement of Defense to the Counterclaim, ¶ 442.
[552]   POB and S&B Statement of Defense to the Counterclaim, ¶¶ 444-447.

## D.   EFFECTS ON THE AGREEMENT OF THE DECISION ON THE BREACHES ALLEGED BY THE PARTIES

667.  In the previous sections the Arbitral Tribunal concluded that while ANI breached its contractual obligations, POB, on the other hand, complied with its own.

668.  However, as POB points out, ANI's failure to comply led to the impossibility of carrying out the Interventions in UFs 4 and 5. Considering the above, POB requests the Arbitral Tribunal to declare that the Concessionaire is not obliged to carry out the Interventions in UFs 4 and 5, while the rest of the Agreement remains in force. Furthermore, ANI requests that the Arbitral Tribunal declare the Early Termination of the Agreement in accordance with the provisions of Section 14.1(e) thereof.

669.  The decision on the Parties' breaches impacts the Parties' claim and counterclaim, since the Arbitral Tribunal considers that the Agreement cannot continue in a separated form. Therefore, it grants ANI's claim for Early Termination, but due to ANI's own breaches, as analyzed below.

## 1.   EFFECTS OF THE EER MINUTES REGARDING UFS 4 AND 5 ACCORDING TO THE CLAIMANTS AND POB'S SPECIFIC REQUESTS

### (a)   Position of POB and S&B

670.    The Claimants state that ANI's contractual and legal breaches regarding its duty to plan and structure the Project, as well as the repudiation of the EER Minutes activities of UFs 4 and 5 led to the impossibility of performing the Interventions in said UFs. They point out that such impossibility to perform the Interventions in UFs 4 and 5 entitle the Claimants to the damages requested in this Arbitration.[553]

671.    In this regard, the Claimants request that the Arbitral Tribunal in their Statement of Claim declare that (i) POB is not obliged to carry out the Interventions in UFs 4 and 5

---

[553]  POB Statement of Claim, ¶ 335.

relating to the Construction Phase (which would imply stating that POB is only obliged to carry out the other non-construction activities), and (ii) the Concessionaire's obligations during the Construction Phase of the Concession Agreement are exhausted and understood to be completed with the execution of the Completion Minutes of Functional Units 1, 2 and 3.[554]

672.     The Claimants support these claims, invoking the reasons why according to them ANI's claim for Early Termination of the Agreement is ill-founded, and therefore the Arbitral Tribunal will address both claims together.

673.     In any event, POB has clarified that, contrary to the Respondent's statement, POB does not seek to be "release" UFs 4 and 5, but rather, it seeks a declaration that the Concessionaire is not obliged to carry out the Interventions in such UFs, as a consequence of ANI's breaches, as requested in the Statement of Claim.

**(b)   ANI's position**

674.     ANI opposes the Claimants' request to "release" UFs 4 and 5, stating that POB is not obliged to perform them. It points out that such release "is unfeasible in the Colombian legal system and contravenes the principles of state procurement".[555] ANI highlights the importance of UFs 4 and 5 for the nature of the subject matter of the Agreement, given that they have a greater scope and influence in relation to the physical scope of the Project and the agreed Retribution scheme.[556]

675.     The entity points out that releasing UFs 4 and 5 from the Project would breach the principles of state procurement contained in the Political Constitution, Law 80 of 1993 and, specifically, it would be detrimental to the equality and objective selection of bidders.[557]

---

[554]   POB Statement of Claim, ¶¶ 575 (ii) and 575(iii).
[555]   ANI Statement of Defense, ¶ 85.
[556]   ANI Statement of Defense, ¶ 86.
[557]   ANI Statement of Defense, ¶ 96.

676.    The Respondent insists that the obligations of the Construction Phase are result obligations, and therefore the Concessionaire obligations cannot be fulfilled merely by completing UFs 1, 2 and 3, given that the Project would become a completely different one, thus violating the "principles of equality and objective selection, inherent to state contracting".[558]

2.    EFFECTS OF THE EER MINUTES ACCORDING TO ANI AND ANI'S SPECIFIC REQUESTS; IN PARTICULAR, REGARDING THE SUBSIDIARY CLAIM FOR EARLY TERMINATION

(a)    ANI's position

677.    As explained in detail above, ANI denies that Activity 1 regarding the EER Minutes is concluded.

678.    However, ANI notes that, in the alternative, and in the event that the Arbitral Tribunal considers that Activity 1 is effectively concluded, and in the event that POB's claims of non-compliance regarding its obligations to exceed the EER in UFs 4 and 5 are rejected, ANI requests that the Arbitral Tribunal declare the Early Termination of the Agreement pursuant to Section 14.1(e) thereof.[559]

679.    ANI states that the possibility of early termination of the Agreement is provided for in Section 14.1(e) of the Agreement.[560] ANI indicates that, given that 730 days have passed since the original deadline for the completion of the affected Functional Units, without overcoming the EER -not being, likewise, feasible to perform Activity 2, because changing the original layout would modify the purpose of the Agreement, which is prohibited by the jurisprudence of the Constitutional Court and the Council of State- it would be appropriate to proceed with the Early Termination of the Concession Agreement.[561]

---

[558]   ANI Statement of Defense, ¶ 99.
[559]   Statement of Counterclaim, pp. 27-31.
[560]   ANI Statement of Defense, ¶ 331.
[561]   ANI Statement of Defense, ¶ 20 (ix) - Exhibit 8.1.1.1,

680.     Thus, ANI's request for termination is presented as an alternative in the event that ANI's claims regarding POB's breaches in managing of the EER of Functional Units 4 and 5 are not resolved in its favor, and it would be based on the impossibility of making adjustments to the scope of the Agreement that alter its original subject matter, referencing Section 14.1(e) of Concession Agreement 002 of 2014.[562]

681.     According to ANI, Activity 1 of the EER Minutes, which involves the preparation and presentation of mitigation measures and works before the environmental authorities, has not concluded, as these authorities have not rejected the possibility of continuing the Project according to the original layout, so in its view there would still be the option of maintaining the Project in its original layout if acceptable Mitigation Measures are found, in collaboration with the environmental, governmental and control authorities, as has occurred in other similar projects.[563]

682.     ANI informs that on 16 June 2021, it was decided that the Regional Environmental Authorities would hold a working group with the National Environmental Licensing Authority (ANLA), in which ANLA presented legal and technical support to authorize similar interventions. As a result, the need to present environmental management measures to allow the feasibility of the interventions in the riparian buffer zones of the springs in UFs 4 and 5 was determined.

683.     In this context, ANI requested that POB prepare and submit such management measures to the competent entities to make the original layout feasible. However, according to ANI, POB has not definitively responded to this request, which has prevented it from obtaining the necessary environmental permits to perform the interventions in UFs 4 and 5 in accordance with the scope agreed in the Agreement. In summary, ANI argues that Activity 1 of the EER Minutes has not yet been completed due to the lack of submission of the environmental alternatives required by POB.[564]

---

[562] ANI Statement of Defense, ¶ 330-331.
[563] ANI Statement of Defense, ¶ 332-333.
[564] ANI Statement of Defense, ¶ 334-336.

684.    ANI presents communications from the competent Environmental Authorities, CAR and Corporinoquía, which have been received by the Entity. These communications allegedly contain relevant pronouncements on the environmental process related to the interventions in UFs 4 and 5, and do not indicate an explicit rejection of the mitigation measures presented by the Concessionaire.[565]

685.    On the part of Corporinoquía, observations were submitted, but there is no information on whether the Concessionaire addressed or resolved them. As for the CAR, there is no evidence of a final pronouncement confirming the rejection of the Mitigation Measures as stated by the Concessionaire.

686.    In spite of this, ANI denies POB's position that it has undertaken all the necessary steps to mitigate the environmental impacts on the original layout of the Project and that Activity 2 described in the EER Minutes for UFs 4 and 5 should proceed, which would entail modifying the layout of the road and the scope of the Agreement.[566]

687.    For ANI, POB's position is inadmissible, since even if it were considered that Activity 1 of the EER Minutes for UFs 4 and 5 was concluded, Activity 2, related to the execution of an amendment modifying the Agreement, has not been evaluated or deemed appropriate by the Entity. Moreover, ANI considers that executing the Amendment is not mandatory and is neither factually nor legally feasible, since it could distort the Agreement and would not guarantee that the situation leading to the declaration of the EER will not repeat itself.

688.    For ANI, its only obligation is to comply with the contractual subject matter within the framework regulated by law and the Agreement, therefore, given the impossibility of overcoming the EER in UFs 4 and 5 in the 730 days established in the Agreement, it is appropriate to apply the

---

[565] ANI Statement of Defense, ¶ 337. - Exhibit 8.1.34.15, Exhibit 8.1.34.16, Exhibit 8.1.34.17, Exhibit 8.1.34.18, Exhibit 8.1.34.19, Exhibit 8.1.34.20, Exhibit 8.1.34.21.
[566] ANI Statement of Defense, ¶ 338-339.

Early Termination of the Agreement as set forth in Section (e) of Article 14.1 of the Agreement.[567]

689.     ANI affirms that its actions have always been guided by good faith in the agreement and the interest in performing the Agreement with its original scope and purpose.[568]

690.     One sign of good faith is that the Parties began to explore alternatives for the performance of the Project, including the possibility of an alternative layout to the original one proposed by POB. ANI cites the negotiations that took place around 10 October 2019, aimed at developing studies and designs to find a new layout for UFs 4 and 5.

691.     Upon receipt of the proposed Amendment, ANI requested a concept to the Supervisor of the Project. The concept, issued in a communication dated 18 November 2019, concluded that POB's proposal did not comply with the legal and contractual requirements established for the Project.[569]

692.     Thus, the Claimants' assertion regarding ANI's alleged refusal to execute the Studies and Designs Amendment is not accurate, as it is necessary to clarify the following:[570]

i)    Activity 1 of the EER Minutes has not yet been concluded.

ii)   The execution of an amended document by ANI, as a public entity, involves various internal and external processes, which have not been completed to date.

iii)  Negotiations prior to the execution of an Amendment are not binding.

---

[567]  ANI Statement of Defense, ¶ 340-342
[568]  ANI Statement of Defense, ¶ 343.
[569]  ANI Statement of Defense, ¶ 344-346.
[570]  ANI Statement of Defense, ¶ 347.

iv)  The modification of a State Agreement must respect established legal and case law limits.

693.    Finally, it stresses that, although discussions were held on the proposed Amendment submitted by the Claimants, not all the legal, contractual and procedural requirements necessary to carry out a contractual modification of such magnitude have been complied with. Therefore, it is not accurate to state that the only outstanding issue with respect to the proposed Amendment was its signature.[571]

**(b)    Position of POB and S&B**

694.    The Claimants assert that Colombian law does not allow ANI to request Early Termination of the Agreement in this case, because: (i) the objective and time requirements established therein are not met; (ii) ANI cannot terminate the Agreement without compensating the Claimants for the damages caused, (iii) ANI has acted in bad faith, and (iv) Early Termination would illegally limit ANI's liability.[572]

695.    ANI announced its intention to seek Early Termination of the Agreement based on Section 14.1(e) of the Concession Agreement. This claim is raised as an alternative in the event that Activity 1 is not considered completed, or if it is assumed that Activity 2 is completed, and if it is established that ANI's efforts under "Compromiso Colombia" do not comply with Section 14.2(vi).[573]

696.    The Claimants argue that this claim must be rejected for two main reasons: first, because the conditions established by ANI for its own claim are not met, specifically for the failure to complete Activity 2 as set forth in the EER Minutes;[574] second, because Section 14.1(e) [575] of the Agreement has cumulative conditions that in this case

---

[571]    ANI Statement of Defense, ¶ 348-349.
[572]    POB and S&B Statement of Claim, ¶ 27-28.
[573]    POB and S&B Statement of Claim, ¶ 381.
[574]    POB and S&B Statement of Claim, ¶ 383.
[575]    POB and S&B Statement of Claim, ¶ 384; Exhibit C-001: Contract, General Part, Article 14.1(e).

are not met, i.e., the time elapsed since the expiration of the original deadline, the need for a good faith review between the Parties on the modification of the Interventions, and that subsequent to such good faith review, the Parties determine that it is not feasible to modify the Interventions.[576]

697.   As to the first cumulative condition set forth in the Agreement, the Claimants argue that ANI's position should be rejected because the negotiations in question were not covered by Section 14.1(e) of the Concession Agreement nor by Activity 2 of the EER Minutes, but by Section 14.2(d)(vi) of the Agreement and Activity 2. They also point out that these negotiations took place before the 730 days stipulated by Section 14.1(e) had expired.[577]

698.   In particular, the Claimants are emphatic in pointing out that:[578]

It should be noted that these negotiations were carried out well before the 730 days referred to in Section 14.1(e). Indeed, the negotiations carried out by the Parties took place between January and October 2019, well before the 730 days regulated in Section 14.1(e) -which, as seen, ended on 16 January 2021 or at least on 15 December 2020.

699.   For the Claimants, accepting the contrary would constitute an incorrect interpretation of the order of the factors agreed upon by the Parties in the Agreement, and would go against the Colombian legal system, by granting ANI an excessive power to request the Early Termination without fulfilling its contractual obligations and assuming that the Parties can negotiate a review of the Agreement before the 730-day term expires.[579]

---

[576] POB and S&B Statement of Claim, ¶ 383-386.
[577] POB and S&B Statement of Claim, ¶ 387-391.
[578] POB and S&B Statement of Claim, ¶ 388.
[579] POB and S&B Statement of Claim, ¶390 and Exhibit CL-101: Supreme Court of Justice, Civil Cassation Chamber, judgment of 30 August 2011.

700.     The second cumulative condition for Early Termination is not met either, as the Parties did not determine that it is unfeasible to review the scope of the Interventions, including the possibility of releasing UFs 4 and 5.

701.     The Claimants argue that ANI engages in an inaccurate characterization of reality by arguing that Activity 2 was completed without reaching an agreement to overcome the EER of UFs 4 and 5, which would entitle it to seek Early Termination under Section 14.1(e) of the Agreement.

702.     They point out that ANI's interpretation is incorrect because it ignores the objective scope of the negotiations and determinations regulated in Section 14.1(e) of the Agreement, which provides that Early Termination can only be requested when, after reviewing in good faith the scope of the Agreement, it is not possible to modify the scope of the Interventions.[580]

703.     They add that, during the Tender, S&B raised an observation stating that the Concessionaire could request Early Termination when it considered that it was not feasible to modify the scope of the Interventions. ANI responded that this was not correct and that the Parties should reach an agreement on the impossibility of modifying the scope of the works after a thorough and good faith review.

704.     However, the Claimants assert that these negotiations did not take place in the present case, as ANI repudiated the terms of the EER Minutes and did not allow the Parties to carry out the necessary steps to evaluate the possibility of modifying the scope of the Interventions in UFs 4 and 5. They also assert that the negotiations of Activity 2 of the EER Minutes were not aimed at determining whether it was

---

[580]   POB and S&B Statement of Claim, ¶ 392-395.

possible to modify the scope of the Interventions within the meaning of Section 14.1(e) of the Agreement, thus, that requirement was not complied with.[581]

705.    In support of the foregoing, the Claimants state that during negotiations between January and October 2019, the Parties actively discussed the mechanism to handle a situation in which, after completing the studies and designs stipulated in the Studies and Designs Amendment, it would not be possible to carry out the Interventions in UFs 4 and 5 due to circumstances such as an adverse decision by the Environmental Authorities, financial problems or the lack of agreement between the Parties to modify UFs 4 and 5 within a predetermined timeframe.[582]

706.    In that context:

a.    The Concessionaire proposed to establish a 2-month period for the Parties to negotiate in good faith the contractual modifications necessary to remove UFs 4 and 5 from the Project. ANI, for its part, suggested that reference be made to Section 14.1(e) as a regulation in this scenario.

b.    After consulting with its shareholders, the Concessionaire agreed to continue the negotiations of the Amendment with the text proposed by ANI, provided that it was clear that, if it were not possible to perform UFs 4 and 5 due to the conditions previously mentioned, both Parties would commit to make their best efforts in good faith to release UFs 4 and 5 from the Project, ensuring the economic equilibrium of the Agreement for both Parties.

c.    Although ANI did not respond directly to this communication from the Concessionaire, the terms of the Studies and Designs Amendment agreed by both parties include wording on this point, in its Tenth Clause.

d.    The Tenth Clause of the Studies and Designs Amendment would apply specifically after concluding the steps set forth in such Amendment, which are

---

[581]  POB and S&B Statement of Claim, ¶¶ 396-399.
[582]  POB and S&B Statement of Claim, ¶ 401.

related to the determination of a new possible layout for UFs 4 and 5. This layout would be submitted to ANLA for approval (condition i), and based on this layout, the Parties would analyze the financial aspects (condition ii) and then negotiate the necessary contractual modifications to resume the fulfillment of UFs 4 and 5 (condition iii).

e.   It is therefore clear that the Parties foresaw this situation. However, due to ANI's repudiation of the Agreement and the EER Minutes, these studies and designs cannot be carried out, which in turn prevents the configuration of the scenario foreseen in Section 14.1(e) and, therefore, the application of this Section in the context of the EER of UFs 4 and 5.

707.    Finally, the Claimants highlight that ANI itself admits that there is a scenario in which it could be feasible to execute the Studies and Designs Amendment: if in the framework of "Compromiso Colombia" it is determined that the presence of springs prevents the performance of the Interventions in UFs 4 and 5.[583]

708.    As regards the last cumulative condition, this is also not met in the opinion of the Claimants, since ANI allegedly did not act in good faith.[584]

709.    The reference to good faith in Section 14.1(e) of the Agreement establishes how negotiations between the Parties must be conducted as a prior step to having the right to request Early Termination of the Agreement. If negotiations are not conducted in good faith, the condition set forth in this Section is not met and therefore the legal consequence provided for herein cannot be applied.

710.    In this regard, the Claimants assert that ANI's actions depart from good faith as evidenced especially by the following:

(i)   ANI did not even analyze the feasibility of the Studies and Designs Draft Amendment that was the subject of negotiations between the Parties for

---

[583]   POB and S&B Statement of Claim, ¶ 402.
[584]   POB and S&B Statement of Claim, ¶¶ 404-408.

approximately 10 months. This, despite having informed POB that it would submit said draft Amendment for review by its internal divisions.

(ii) ANI made unilateral decisions departing from what the Parties agreed, without consulting or informing POB.

(iii) At the same time, ANI undertook a series of actions to threaten POB's contractual rights shortly after receiving the Notice of Arbitration.

(iv) After two years and allegedly without evaluating the feasibility of the Studies and Designs Amendment, it has suggested that the feasible solution to overcome the EER is to change the environmental regulations, something that was never discussed with POB, or to wait for the decisions of a forum in which POB does not participate ("Compromiso Colombia"). This change in ANI's position in relation to the negotiations with POB constitutes a violation of good faith that should govern contractual relations between private parties and state entities.

(v) Finally, it takes advantage of POB's efforts to negotiate, based on the premise of acting in good faith to overcome the EER of UFs 4 and 5, as arguments to support the request for Early Termination of the Agreement.

711.    In summary, the Claimants conclude that ANI has failed to meet the temporal and objective conditions for the Early Termination of the Agreement, while apparently seeking to avoid its contractual liability, by seeking to terminate the Agreement under Section 14.1(e) to limit the payments it must make under Section 18.3 of the Concession Agreement.

712.    Furthermore, the Claimants point out that by virtue of the additional results derived from the execution of the Studies and Designs Amendment, the Parties agreed to analyze the possibility of entering into a contractual amendment to the Concession Agreement to alter the layout of UFs 4 and 5, regulating the consequent contractual amendments, or to take the decision to exclude UFs 4 and 5 from the Project pursuant to Section 14.1(e) of the Agreement, which was simply not complied with.

713.     Indeed, the purpose of the Studies and Designs Amendment was not intended to assess the feasibility of modifying the Interventions, nor to exclude UFs 4 and 5. Instead, it sought to carry out additional actions that would allow the Parties to make informed decisions regarding UFs 4 and 5. Accordingly, it is not accurate to assert that the Parties sought to apply Section 14.1(e). Rather, the objective was to provide the Parties with objective information to make appropriate and well-informed decisions in accordance with Section 14.2(d)(vi) and the EER Minutes. This was intended to solve the effects arising from ANI's breaches of its planning obligations.[585]

714.     As noted above, Section 14.1(e) provides that before requesting early termination, the Parties must make a mutual and informed determination that it is not possible to modify the planned Interventions, including the release of UFs 4 and 5. This decision must be based on a negotiation process in which the Parties reach an agreement, which, according to the Claimants, did not occur.

**(c)    The Agreement and Applicable Law**

715.     The discussion between the Parties focuses on the provisions of Section 14.1.e of the Concession Agreement which regulates the termination of the Agreement in the case of an EER. This provision states:

> If the new amended Works Plan referred to in Section 14.l(d) above expires, or if seven hundred and thirty (730) Days elapse from the expiration of the term originally foreseen for the completion of the affected Functional Unit -whichever occurs first- without the completion of the corresponding Interventions, the payment of the Special Compensation corresponding to such Unit shall be suspended until the Completion Minutes of the Functional Unit has been executed. If the reason for non-completion is an Exemption of Liability Event or if it is attributable to ANI, the Parties in good faith shall review the scope of the Agreement to determine if it is feasible to modify the scope of the

---

[585]   POB and S&B Statement of Claim, ¶ 323.

Interventions, including the possibility of modifying or releasing the respective Functional Unit -prior recalculation of the Retribution that reflects the modifications made, recalculation that shall be made by mutual agreement of the Parties or by the *Amiable Compositeur*. If it is not feasible to modify the scope of the Interventions, either Party may request the Early Termination of the Agreement.

**(d)    Analysis of the Arbitral Tribunal**

716.    The Claimants' main arguments to oppose the Early Termination requested by ANI are the following:[586]

(i)   730 days did not elapse after the expiration of the deadline for the delivery of UFs 4 and 5 before the Parties carried out negotiations under Activity 2;

(ii)   The Parties did not determine that it is unfeasible to modify the Interventions or release UFs 4 and 5 of the Concession Agreement; and

(iii)   ANI has not acted in good faith.

717.     The Arbitral Tribunal will analyze each of them separately.

718.    First, the Claimants point out that the negotiations between the Parties were covered by Section 14.2(d)vi of the Agreement and by Activity 2 of the EER Minutes, and not by Section 14.1(e) of the Agreement. Accordingly, the negotiations would have taken place well before the 730 days established in Section 14.1(e) of the Agreement.[587]

719.    In this regard, ANI states that UFs 4 and 5 had a termination date of 15 December 2018, or, alternatively, 16 January 2019. The 730 days from those dates elapsed on 15 December 2020 or 16 January 2021. In turn, the Claimants

---

[586]    POB and S&B Statement of Claim, ¶ 385.
[587]    POB and S&B Statement of Claim, ¶ 388.

estimate that negotiations between the Parties took place between January and October 2019, well before these dates elapsed.[588]

720.    As noted above, the period of Activity 2 was set at 2 months, extendable twice, i.e., a total of 6 months. The Parties extended Activity 2 from at least January to October 2019. Even if the formal start date of Activity 2 were to be taken as 11 October 2019, the date of dispatch of the POB Addendum, the 6 months from that date would end on 11 April 2020. This date is prior to the date on which 730 days had passed since UFs 4 and 5 should have been completed.

721.    However, Section 14.1(e) of the Agreement does not establish a term-start relationship between the expiration of the 730-day period and the commencement of *bona fide* negotiations. The quoted Section also admits the interpretation that, in the event of failure to complete the Interventions within 730 days from the expiration of the originally scheduled deadline for the completion of the affected Functional Unit, due to an EER, the Parties -rather that remaining inactive while awaiting for such days to elapse- must in good faith review the scope of the Agreement to determine whether it is feasible to modify the scope of the Interventions.

722.    This interpretation of Section 14.1(e) of the Agreement is aligned with the principle of contractual good faith. Thus, it would have been contrary to good faith if one of the Parties refused to start negotiations in advance of the expiration of the 730-day period, invoking that it must elapse first, before negotiations started.

723.    The particular circumstances of the EER were perfectly known to both Parties. In particular, it is the Claimants' understanding that Activity 1 was terminated, i.e., that there were no authorizations from the competent authorities. As a result, the Agreement could not be performed under the agreed conditions, making it necessary to review its scope or the scope of the Interventions. Thus, initiating

---

[588]  POB and S&B Statement of Claim, ¶ 388.

such negotiations without waiting for the passage of 730 days from the original term of UFs 4 and 5 would have been consistent with its understanding and the contractual principle of good faith.

724.    Indeed, the Claimants assert that 10 months of negotiations had elapsed by October 2019, at which point they were in a position to submit a formal proposal for the Amendment, thereby shifting the opportunity to respond to ANI. Thus, in the Claimants' own understanding, the process of reviewing the scope of the Agreement was a lengthy process that, in this particular case, required technical studies by a third party. The duration and complexity of that process only confirm that it was not necessarily reasonable to wait for the 730 days to elapse before commencing negotiations between the Parties.

725.    In turn, in the Arbitral Tribunal's opinion, it does not seem fruitful to expect that, once the round of negotiations contemplated under Section 14.2(d)vi of the Agreement, established as Activity 2 of the EER Minutes, had concluded, the Parties would have then to initiate another round of negotiations under Section 14.1(e) of the Agreement, with the same object and purpose.

726.    Furthermore, according to the explicit wording of Section 14.1(e) of the Agreement, the passage of 730 days, without the affected UFs having been completed, directly affects the suspension of the payment of the Special Compensation, but not the initiation of negotiations. With respect to the initiation of the review of the scope of the Agreement, the literal wording of Section 14.1(e) is broader and does not condition the initiation of the review to the prior lapse of 730 days.

727.    For the foregoing reasons, the Arbitral Tribunal is not persuaded by the Claimants' first objection.

728.    Second, the Claimants argue that the Parties have not determined that it is impracticable to modify the Interventions or release UFs 4 and 5. In this regard, the Arbitral Tribunal considers that the Section under analysis does not require an express statement by the Parties to that effect. Thus, there is no requirement that the

Parties, at the end of the review and negotiations, issue a joint statement indicating that it was not possible to reach a modification agreement.

729.     In addition, Section 14.1(e) does not establish the duration of the negotiations. In other words, the Parties did not foresee a specific time period for such negotiations, which is in keeping with the very nature of negotiations of this nature.

730.     Likewise, Section 14.2(d)vi does not establish the duration of the negotiations. In the EER Minutes, the Parties assigned to the negotiation in the context of Activity 2 a maximum period of 6 months. Conservatively, this period could be calculated from the submission of the proposed Amendment by POB, dated 11 October 2019. ANI did not respond favorably to the proposed Amendment, during that period, which extended until 10 April 2020. The 6 months is a reasonable period and was agreed upon by the Parties. However, ANI's silence, which is indeed a bad faith behavior, as will be explained below, can also be understood as a rejection of the proposed Amendment, or the rejection of the offer to modify the Agreement.

731.     Indeed, the Claimants charge ANI with having repudiated Activity 2, i.e., they also understand that the execution of an Amendment negotiated in this context did not succeed. While the Claimants allude to the existence of ANI's informal commitments to sign such an agreement, such commitments will always remain informal commitments, especially in the case of a public entity, whose actions are subject to additional formalities.

732.     The fact that POB's offer was not accepted by ANI indicates the latter's lack of consent to modify the scope of the Interventions, the scope of the Agreement or to exclude UFs 4 and 5. Thus, the modification of the scope of the Interventions or the scope of the Agreement was not feasible.

733.    In conclusion, the Arbitral Tribunal also considered the magnitude of the modifications proposed. In fact, it was not a question of moving the corridor of UFs 4 and 5 a few meters. Rather, the proposed Amendment contemplated a significant redesign of the Project, including the proposal to relocate the corridor "to the other side of the mountain." It is precisely the magnitude of the modifications that suggests that, by falling to accepted the proposed Amendment within a reasonable period - or at some point in the past - ANI considered said modification unfeasible in light of the scope of the Interventions and the Agreement.

734.    For the foregoing reasons, the Arbitral Tribunal is not persuaded by the Claimants' second objection either.

735.    Third, the Claimants reproach the Respondent for not having acted in good faith throughout the negotiations, which was reflected in ANI's failure to analyze the feasibility of the draft Amendment that was the subject of negotiations between the Parties, taking actions to threaten POB's rights; seeking solutions within the framework of "Compromiso Colombia" of which POB does not participate; and using POB's previous negotiation efforts to support the request for Early Termination of the Agreement.

736.    The Arbitral Tribunal finds that ANI's lack of an express response to the proposed Amendment is, in fact, a very uncooperative behavior that does not meet the minimum standards of good faith required in the negotiations that the Parties should have had.

737.    Notwithstanding, ANI's bad faith actions, in the opinion of this Arbitral Tribunal, does not preclude the possibility of declaring the Early Termination of the Agreement under the terms of clause 14.1(e) of the Concession Agreement. Indeed, the exercise of the right to request the Early Termination of the Agreement does not constitute a breach of good faith by itself, insofar as it is a power established in the Concession Agreement, and to the extent that the requirements are met, it is possible to proceed with the declaration of Early Termination under this ground, which will be corroborated by the Arbitral Tribunal below.

738.    Thus, the Arbitral Tribunal is not persuaded by the Claimants' third objection either, because, although ANI did not act in good faith, this Tribunal also considers that the elements required to declared Early Termination according to clause 14.1(e) of the Agreement are met. ANI's lack of good faith is not an obstacle for such declaration, as we shall see.

739.    Fourth, the Claimants' objections having been dismissed, the Arbitral Tribunal will conduct a further analysis of the grounds in Section 14.1(e).

740.    In order to request Early Termination of the Agreement under Section 14.1(e) hereof, the following requirements must be met: 730 days must have elapsed since the deadline provided for the completion of UFs 4 and 5; ii) this must have occurred due to an EER or "a cause attributable to ANI"; iii) Having carried out a review of the scope of the Agreement in good faith, the Parties must determine whether it is possible to modify the scope of the Interventions (including the possibility of modifying or excluding the respective UF); iv) If it is not possible to modify the scope of the Interventions, either Party may request the Early Termination of the Agreement.

741.    The fulfillment of requirement (i) is evident and self-explanatory, since it is not being disputed by the Parties that UFs 4 and 5 are unfinished as of today, at the end of 2024, even though their completion dates were foreseen for the end of 2018 - beginning of 2019.

742.    With respect to requirement ii), it is important to highlight that the Early Termination of the Agreement is applicable both in the event that the impossibility was generated as a result of an EER or due to causes attributable to ANI. This Arbitral Tribunal ruled that ANI had failed to comply with its obligations at the time of structuring the Project and the Tender Public. At the same time, the Parties qualified the presence of the springs as an EER. In other words, the presence of the springs constituted both, a breach attributable to ANI and, an EER, according to the Parties' own qualification. In view of this double qualification of the phenomenon, the two criteria for the Early Termination of the Agreement are meet, namely, whether the non-completion would have been caused by the

presence of the springs as an EER, or as a breach by ANI.

743.    With respect to requirement iii), the Arbitral Tribunal notes that, although ANI breached its obligation to act in good faith in the negotiation, the factual assumptions to give rise to Early Termination are also met. In fact, the very grounds of Section 14.1 address situations of impossibility to continue with the performance of the Concession Agreement due to a cause attributable to ANI, as is the bad faith and lack of cooperation in responding to the Amendment submitted by the Claimants, or in participating in any other way in a negotiation based on such submission.

744.    In any event, the Tribunal considers that ANI was not under any obligation to consent or authorize the terms of the Amendment submitted by the Claimants. In the opinion of the Arbitral Tribunal, the breach did not occur because an agreement on this point had not been reached, but because any action that would really correspond to ANI's obligation to negotiate in good faith with the Claimants a solution for Activity 2 had not been demonstrated.

745.    The Arbitral Tribunal notes that the Claimants' proposal in their Amendment contained proposals for Interventions that could not have been accepted by ANI purely and simply for the purpose of modifying the layout, as we will detailed below.

746.    Indeed, Section 14.1(e) of the Agreement refers to "scope" with a lowercase letter. That is, it is not a defined term in the Agreement. However, Technical Appendix 1 of the Agreement is entitled "Project Scope." In turn, "Intervention" is a defined term in the Agreement in Section 1.87, as: "It will have the scope established in Technical Appendix 1."

747.    In other words, any modification to what is outline in Technical Appendix 1 would also mean a modification of the Interventions or the scope of the Agreement. Section 2.1 of Technical Appendix 1 provides a description of the route and its

location, as well as details of the technical characteristics for UFs 4 and 5.[589] Thus, by proposing its modification through the Amendment, the modification of the Interventions was proposed.

748.    In this context, it is relevant to bear in mind that the Amendment proposed by POB did not, through its mere acceptance, generate a new layout for UFs 4 and 5. On the contrary, the proposed Amendment established, mainly, that the Concessionaire would have a maximum term of 14 months to submit to ANI the following studies (first clause):[590]

> a. Engineering Studies and Designs on the alternative route proposed to connect the municipality of La Calera with the Bogotá-Villavicencio road and the connection of the latter with Functional Unit 3, Subsector 2. The above studies shall contain at least the provisions of Annex A of this Amendment (the "Engineering Studies and Designs"). As identified in Annex A, the preparation of the Engineering Studies and Designs will be divided into two stages, namely: (i) determination by the Concessionaire of the best possible corridor alternative ("Stage 1") and (ii) further studies on the selected corridor ("Stage 2").

> b. Complementary studies (traffic study, financial budgets and the proposal for new agreement conditions) in relation to the alternative layout for Functional Units 4 and 5, studies that will contain at least what is indicated in Annex B of this Amendment (the "Complementary Studies").

749.    As ANI has correctly argued throughout this process, the mere execution of the Amendment, by itself, do not render the Interventions feasible.

750.    Notwithstanding the foregoing, the obligation to negotiate in good faith in the context of Activity 2 required ANI to provide a timely response the Claimants Amendment proposal, or promptly propose other possible ways for progress or solution, and ANI failed to take any action in this regard and for more than 8

---

[589]   Exhibit C-008.
[590]   Exhibit C-119.

months remained silent, which constitutes a reprehensible conduct that, added to the breach of its obligation to detect the springs, is what made it unfeasible to carry out UFs 4 and 5.

751.     On the other hand, the Arbitral Tribunal, and for the reasons already stated for which the Early Termination will be accepted, considers that it is legally unfeasible to declare that POB is not obliged to carry out the Interventions in UFs 4 and 5, and at the same time order it to continue carrying out other operations (such as maintenance) *ad eternum*. The Tribunal considers that this would not be a solution that would allow the Parties to continue with the proper performance of the Agreement. Indeed, to the extent that the Interventions cannot be carried out without initiating a tender, the concession relating to UFs 4 and 5 has become unfeasible.

752.     This is further corroborated by the fact that both Parties confirm that the Arbitral Tribunal could not declare the partial termination of the Agreement, nor is this what either of them has requested.[591]

753.     For the foregoing reasons, the Arbitral Tribunal will grant ANI's request for Early Termination, rejecting the Claimants' claims that request the Arbitral Tribunal to declare that (i) POB is not obliged to perform the Interventions in UFs 4 and 5 related to the Construction Stage (which would imply stating that POB is only obliged to perform the other non-construction activities, such as, for example, the O&M activities), and that (ii) POB is not obliged to perform the construction activities in UFs 4 and 5 related to the Construction Stage (which would imply stating that POB is only obliged to perform the other non-construction activities, such as, for example, the O&M activities), (ii) the obligations of the Concessionaire during the Construction Phase of the Concession Agreement are exhausted and understood to be completed with the execution of the Completion Minutes of the Functional Unit of UFs 1, 2 and 3.[592]

Now, it is important to highlight that the Arbitral Tribunal will accept the claim for Early Termination of the Concession Agreement under Clause 14.1(e) of the Concession Agreement, but on the basis of a cause attributable to ANI.

---

[591]  Claimants' Post-Hearing Memorial, ¶ 446; Claimants' Post-Hearing Memorial, ¶¶ 382-387.
[592]  POB Statement of Claim, 575 (ii) and 575(iii).

The reason why the Parties could not advance in the negotiations to be developed during Activity 2 is due to ANI's own bad faith on this point.

754.    Therefore, although the subsidiary claim for Early Termination filed by ANI is accepted, and the termination of the Agreement is declared, the ground is fulfilled since it was ANI's conduct that implied that the 730 days elapsed without reaching agreements to overcome the EER.

755.    Thus, due to ANI's non-compliance, the Early Termination of the entire Agreement is declared, for the reason set forth in clause 14.1(e), declaring that the Agreement concluded as of the date of notification of this Award.

756.    On this point, an arbitration award, submitted by the Claimants addresses a similar situation in which (i) the claimant's (concessionaire's) claim that its obligation is or has become impossible to perform was upheld, but at the same time (ii) it was determined that the impossibility to perform arose form its own fault, and therefore its contractual liability derived from its breaches is left untouched. In this sense, the Tribunal's decision to accept the claim for early termination of the Agreement, but due to the fault of ANI itself, is consistent with this principle and falls within the language of Section 14.1(e) so that it also engenders its contractual liability, in this case towards POB as Concessionaire.[593]

---

[593]    Exhibit 8.1.16.25 (ARBITRAL TRIBUNAL OF CONCESIÓN VIAL DE LOS LLANOS S.A.S. v. ANI, pp. 291-292. In this ruling, the Arbitral Tribunal states as follows: "Consequently, although the contractor cannot be obliged to comply due to the impossibility of performance that arises in the specific case, this does not mean that it is released from its obligation without having to bear any economic burden, since, it is reiterated, such impossibility is not unrelated to the concessionaire, but, on the contrary, it is attributable to its behavior. In effect, having evidenced the breach of its obligations as a consequence of a deficient planning of the project and its financial structuring, it is clear that the liability of the concessionaire is compromised and it must compensate the damages caused to the contracting entity, to the extent that they are evidenced with the requirements established in the legal system to be considered as compensable damages, aspects on which the Tribunal already analyzed in depth when it analyzed the claims for compensation presented in this process by ANI and dismissed them unfavorably. In the foregoing terms, the Tribunal will declare the claim to be successful, but on the understanding that it is a case of impossibility of performance, which in any case compromises the Contractor's contractual liability because it arises from an event attributable to it".

### E.  CLAIMANTS' COMPENSATION

757.     In view of what has been resolved in the previous Sections, i.e. that the Early Termination of the Agreement is accepted, but due to ANI's breaches, the Arbitral Tribunal must decide two fundamental questions. First, whether the Claimants are entitled to receive compensation because of ANI's breaches, and second, if so, how much compensation they are entitled to.

**1.     IS POB ENTITLED TO COMPENSATION OR DAMAGES AND IN WHAT AMOUNT?**

**(a)    On the Claimants' right to receive damages for ANI's breaches and, in addition, as a consequence of the Early Termination of the Agreement**

(i)    Position of POB and S&B

759.     The Claimants assert that ANI's breaches have caused them damages that should be compensated.

760.     The Claimants refer to Article 90 of the Political Constitution, which establishes that the State shall be liable for unlawful damages attributable to it, caused by the action or omission of public authorities. They assert that this provision is the constitutional basis for the State's economic liability.[594]

761.     The Claimants also refer to Article 50 of Law 80 of 1993, which reiterates the constitutional provision just transcribed.

---

[594]   POB and S&B Statement of Claim, ¶ 447.

762.    As regards the obligation to compensate for damages, the Claimants argue that:[595]

> ANI has the obligation to fully compensate the damages caused to the Claimants for the breaches previously described, including consequential damages and lost profits. This is established in Article 90 of the Political Constitution, Article 50 of Law 80 of 1993 and paragraph 3 of Article 26 of Law 80 of 1993. Furthermore, this has been reiterated on multiple times by the Constitutional Court, the Council of State and national Arbitral Tribunals [citation omitted].

763.    Finally, they refer to the principles of comprehensive compensation and the mandates of the State to compensate for unlawful damages attributable to them, to maintain that "all proven damage must be compensated, regardless of the evidentiary disputes that may arise around its quantification".[596]

764.    The Claimants point to the recent decision of the State Defense Council, according to which the non-performance of a part of the relevant contract is due to the contracting entity's failure to comply with its obligations relating to the contract planification.[597]

765.    The Claimants also clarify that this is not a request for compensation or damages arising from an EER but rather relates to the breaches by ANI that prevented the performance of UFs 4 and 5.[598]

766.    The Claimants consider that the Arbitral Tribunal must reject any argument raised by ANI tending to limit its liability, since in their opinion the damages suffered by the Concessionaire are a direct consequence of ANI's breaches:[599]

---

[595]    POB and S&B Reply, ¶ 38.iv.
[596]    POB and S&B Statement of Claim, ¶ 455.
[597]    POB and S&B Statement of Claim, ¶454; Exhibit CL-072.
[598]    POB and S&B Statement of Claim, 486-488.
[599]    POB and S&B Statement of Claim, 489-493.

a. The first breach by ANI would be its failure to provide accurate and complete information during the public tender, which contravenes legal regulations prohibiting state entities from exempting themselves from liability for such matters.

b. The above would be without prejudice to the fact that ANI has attempted to base its argument on Section 14.2 of the Agreement, invoking the concept of idle costs due to longer stay on site, in an effort to limit the damages that the Claimants can claim.

767.    These breaches are not the responsibility of the Claimants and, therefore, ANI cannot exempt itself from its legal duty to reestablish the economic balance of the Agreement. This obligation to reestablish the balance is particularly relevant since ANI has breached its own contractual obligations, which has caused this balance to be broken.

768.    In view of the foregoing, it is considered that ANI cannot use Section 14.2(h) of the Agreement to exempt itself from its liability for its breaches. This Section:

a. Is not applicable to the Claimants' claim.

b. The interpretation that ANI seeks to prove is contrary to mandatory rules of public order that govern its legal duties as a Contracting Entity, and therefore would have no effect.

769.    Accordingly, the Claimants conclude that the damages experienced by POB are attributable to ANI because they are a direct consequence of the contractual breaches committed by the latter. Both case law and doctrine establish that, in order to attribute damages to public entities in cases of contractual breaches, it is necessary to prove (i) the existence of a contractual breach and (ii) the relationship between such breach and the damages sought.[600]

---

[600]   POB and S&B Statement of Claim, ¶ 497.

770.    In this case, both elements are met, since ANI breached its contractual obligations, and POB suffered a decrease in assets and loss of profits as a direct consequence of such breaches. Therefore, the damages are attributable to ANI and the Tribunal should order its compensation.

771.    In any case, the Claimants argue that the circumstances described regarding UFs 4 and 5 have generated an economic imbalance in the Agreement, so ANI has the obligation to make the compensations required to reestablish said economic equilibrium.[601]

772.    The Claimants support the foregoing in a series of arguments. First, Article 27 of Law 80 of 1993 -which is applicable to PPP contracts by virtue of Article 3 of Law 1508 of 2012-, establishes that equality must be maintained between the rights and obligations arising at the time of entering into a state contract.[602]

773.    Second, it places a limit on the autonomy of the will of the parties. Therefore, "contractors may always exercise this right as a legal mechanism to request the reestablishment of the balance of the contract".[603]

774.    Third, as required by the State Defense Council case law, the facts in this case meet these requirements:[604]

    a.    The springs were discovered after the execution of the Agreement.

    b.    The existence of the springs is not attributable to the Concessionaire.

    c.    The existence of the springs was unforeseeable for the Concessionaire.

    d.    The existence of the springs causes serious harm to the Claimants.

---

[601]    POB and S&B Statement of Claim, ¶ 348.
[602]    POB and S&B Statement of Claim, ¶ 349.
[603]    POB and S&B Statement of Claim, ¶ 351.
[604]    POB and S&B Statement of Claim, ¶ 353.

775.    The compensation requested by the Claimants would be appropriate, since the circumstances and breach of ANI have generated an economic imbalance of the Agreement, which imposes a legal and contractual obligation on the entity to compensate. Indeed:[605]

    a.    ANI failed to comply with its structuring obligations, which prevented the performance of the Interventions in UFs 4 and 5.

    b.    To address this situation, the Parties executed the EER Minutes, defining how to overcome the EER without exempting ANI from its liability.

    c.    ANI was able to solve the EER through Activities 1 and 2 agreed with POB but repudiated the EER Minutes and undertook alternative steps that did not solve the problem. Its non-compliance prevents the performance of the Interventions in UFs 4 and 5 of the Project.

(ii)    ANI's position

776.    Regarding the alleged damages claim by the Claimants due to ANI's alleged breach, the Respondent argues that the contractual liability requirements, which would entitle the Claimants to seek damages are not met. ANI argues that it has fully complied with all the necessary actions, acts and formalities in connection with the structuring of the Project, the activities of the EER Minutes and the regulatory duties for the fulfillment of the State's purposes.

777.    To attribute liability, two aspects must be analyzed: the factual scope and the legal attribution criteria, which includes different titles of attribution such as failure to provide the service, special damage, abnormal damage and exceptional risk. Liability attribution is an essential principle in the State's liability regimes and requires factual support and legal attribution.

---

[605]   POB and S&B Statement of Claim, ¶ 355.

778.     Finally, ANI argues that the Claimants have not demonstrated the existence of an unlawful damage, i.e., an injury that they should not have to bear. Consequently, ANI argues that the Claimants do not meet the necessary requirements to allege damages and that, in fact, is POB who has caused damages to ANI.[606]

779.     ANI concludes as follows: ANI has fully complied with its obligations related to the financing of ANI Contributions on the contractually agreed dates. The resources corresponding to Functional Units 4 and 5 allocated to ANI´s Contributions are available in the Subaccounts designated for this purpose. The payment of these resources to the Concessionaire has not been made because the necessary legal and contractual requirements have not been met. These requirements include obtaining the Completion Minutes or Partial Completion Minutes of the Functional Units, as well as the availability of the infrastructure and compliance with established service levels and quality standards. Consequently, the Claimants' claim is neither applicable not valid. The requirements for obtaining payments are not met. From a financial perspective, the economic design of the Agreement implies that the Concessionaire makes an investment in order to receive a payment in return. Hence, it would not be appropriate to make a payment or retribution for the Functional Units in which no investment has been made.[607]

780.     ANI highlights that in paragraph four of the EER Minutes, the Concessionaire stated and accepted that it would not claim idle costs due to longer stay in site, releasing ANI from any liability in this matter.[608]

781.     ANI also argues against the Claimants' assertion that there was an economic imbalance in the Agreement, as follows: ANI argues that the occurrence of EER in UFs 4 and 5 affects all the Parties to the Agreement and has a releasing effect on all of them.

---

[606]   ANI Statement of Defense, ¶¶ 393-397.
[607]   ANI Statement of Defense, ¶ 409.
[608]   ANI Statement of Defense, ¶ 678.

This means that a breach of the economic equilibrium cannot be alleged to the exclusive detriment of one of the Parties.[609]

782.    ANI also points out that the risk sharing scheme provided for in the Agreement establishes that POB agreed to assume the costs generated in case an EER materializes. Therefore, POB's lack of diligence in the management of the EER does not justify the claim of economic imbalance.[610]

783.    ANI emphasizes that economic imbalance cannot generate damages, nor does generates the recognition of profits. It argues that POB has misinterpreted the concept and seeks damages without valid grounds.[611]

784.    ANI further emphasizes that the request for the reestablishment of the economic equilibrium filed by POB is untimely and that it has not been proven that POB's negligence did not contribute to the imbalance.

785.    In summary, ANI rejects POB's allegations of an alleged economic imbalance of the Concession Agreement, arguing that the Exemption of Liability Event affects all Parties and that the risk sharing scheme provided for in the Agreement supports its position. It also stresses that the economic imbalance does not justify claims for damages or the recognition of profits and that the request for the reestablishment of the economic equilibrium is inadmissible.

786.    In conclusion, according to ANI, the breach of contractual balance alleged by POB has not occurred, since the elements that would support this claim have not been met. Therefore, no damage or loss of profit has been generated that justifies its recognition in favor of POB. Furthermore, ANI considers that the approach taken by POB

---

[609]  ANI Statement of Defense, ¶¶ 768 et seq.
[610]  ANI Statement of Defense, ¶¶ 788 et seq.
[611]  ANI Statement of Defense, ¶¶ 793 et seq.

is imprecise and inappropriate, so the Tribunal should reject any claim in this regard.[612]

787.     Ultimately, ANI argues that even if there were an imbalance in the contractual equilibrium, POB did not make any timely request to reestablish such balance. During the signing of the EER Minutes related to UFs 2, 4 and 5, POB did not present any objection or request to reestablish the contractual economic balance. This suggests its conformity with the measures adopted in those Minutes and its acknowledgement that those measures reestablish the contractual balance, in accordance with the jurisprudence of the Council of State. Therefore, any request in this sense by POB is considered extemporaneous and improper according to ANI.[613]

(iii)    The Agreement and Applicable Law

788.     The Arbitral Tribunal notes that the basis of the Claimants' claim is based, firstly, on the fact that the damages suffered by POB are a direct consequence of the breaches attributable to ANI, which is why ANI has the obligation to compensate the damages caused as a consequence of its unlawful conduct.

789.     Alternatively, the Claimants point out that, in any case, the situations relating to the impossibility of carrying out the Interventions in UFs 4 and 5 have generated an economic imbalance in the Agreement, which ANI must compensate.

790.     For these purposes, the Arbitral Tribunal must take into consideration the following legal and constitutional provisions.

791.     Article 90 of the Constitution of the Republic of Colombia, which establishes the following:[614]

---

[612]  ANI Statement of Defense, ¶ 796.
[613]  ANI Statement of Defense, ¶ 800.
[614]  Exhibit CL-111: Article 90, Political Constitution of Colombia.

> The State shall be liable for any unlawful damages attributable to them, caused by the action or omission of public authorities. In the event that the State is sentenced to pay financial compensation for such damages, which have been the result of the willful or grossly negligent conduct of one of its agents, the State must claim against the latter.

792.    Law 80 of 1993, which establishes the obligation to reestablish contractual equilibrium, if this balance is affected by causes not attributable to the affected party.[615] This is established in article 50 of the aforementioned law:[616]

> Entities shall be held accountable for any unlawful actions, abstentions, acts and omissions that are attributable to them and that cause harm to their contractors. In such cases, they must compensate for any loss in assets that may occur, any prolongation of the loss, and any profit, benefit or gain not received by the contractor.

793.    The Arbitral Tribunal also takes into account the following relevant case law which differentiates both the grounds and the effects of the compensation due, on the one hand, as a consequence of the breach of the economic equilibrium of the contract, and, on the other hand, as a consequence of a breach of contract.

794.    Thus, the State Defense Council has stated:[617]

> The Third Section of this Body has accepted the theories developed by foreign doctrine regarding the sources that generates the rupture of the economic-financial equilibrium of the state contract, pointing out that this may be altered by acts and facts of the administration or by external or foreign factors to the parties involved in the contractual relationship. The former are called "*fait du prince*" and "*potestas ius variandi*" (administrative law), while the assumptions that emerge from the second source are framed within the so-called "theory of

---

[615]  POB and S&B Statement of Claim, ¶¶ 348-355.
[616]  Exhibit CL-117: Article 50 of Law 80 of 1993.
[617]  Exhibit CL-107.

unforeseeability" and in parallel in the "theory of foreseeability". The foregoing allows to deduce, with absolute clarity, that contractual balance may be altered by the exercise of authority within the framework of legality or by situations unrelated to the parties, which make the performance more or less burdensome; however, such alteration does not arise from the unlawful behavior of the parties to the contract.

The breach of contract, on the other hand, has its origin in the unlawful conduct of one of the contracting parties, i.e., that a party assumes a course of action contrary to the obligations assumed when entering into the contract and, as the main effect, causes unlawful damage to the other party which, of course, is not obliged to bear it; in addition, the breach generates the obligation to fully compensate the damages caused to the performing party. [Emphasis added]

795.    In this regard, the Council of State has concluded that the breach of contract by one of the parties entitles the other party to full compensation for the damage, which does not necessarily occur in all cases due to a breach of contractual economic equilibrium:[618]

Now, although the Claimant requested in this trial the declaration of breach of the economic equilibrium of the contract due to the facts already described, the Chamber must emphasize - as it has pointed out in previous opportunities - that, although the breach of one of the contracting parties entails the affectation of the rights of the performed party, and therefore it may be thought that the breach of contract by the administration generates a breach of the economic equilibrium of the contract (especially when paragraph 1 of article 5 of Law 80 of 1993 indicates the breach as one of the causes of such imbalance), it is equally true that the contractual non-compliance must be handled with greater propriety under the perspective of contractual liability, since we are dealing with two "...institutions different in their configuration and in their effects": thus, contractual liability arises out of the unlawful damage caused by the party in breach of the contract, which generates the duty to fully compensate the damages

---

[618]    Exhibit CL-072.

caused, i.e., the affected party has the right to obtain full compensation, which is not the case in all events of breach of the economic equilibrium of the contract. [Emphasis added]

796.    Regarding the concept of damage, the Council of State has indicated that:[619]

For the damage to be compensable doctrine and case law have established that it must meet the characteristics of being certain, concrete or determined and personal.

797.    In this regard, the Council of State also resolved that:[620]

The compensable damage must therefore be certain, or present and/or future. A type of certain future damage is the loss of profits, since there is certainty as to its existence.

(iv) Analysis of the Arbitral Tribunal

798.    First, in relation to the Claimants' right to receive damages, this Tribunal considers that POB is entitled to request that the damages be compensated as a consequence of ANI's breaches.

799.    The Arbitral Tribunal has already determined that ANI breached its duty to structure the Agreement, a breach that was then aggravated by its reluctance to negotiate in good faith a solution to EER of UFs 4 and 5. In these circumstances, ANI's unlawful conduct has been corroborated, and its harmful consequences must be compensated to POB.

800.    Indeed, and as explained above, although the Arbitral Tribunal accepted the Respondent's claim for Early Termination pursuant to the provisions of Article 14.1(e) of the Concession Contract, it accepted such claim because its factual

---

[619]  Exhibit CL-116.
[620]  Exhibit CL-121.

criteria were met due to ANI's own fault, and therefore its contractual liability towards the Concessionaire remains unaffected.

801.    Second, Article 90 of the Constitution of the Republic of Colombia recognizes the principle of full reparation for damages, repeated in Article 50 of Law 80 of 1993. By virtue of these provisions, the State, through ANI in this case, is obliged to fully compensate the Concessionaire for any unlawful damages caused as a result of actions or omissions attributable to it.

802.    This principle of comprehensive reparation for damages has also been recognized by the jurisprudence of the Council of State, as noted above.

803.    In this regard, the Arbitral Tribunal accepts the Claimants' claim, in the sense of declaring that ANI's breaches have caused POB unlawful damages, which must be fully compensated by ANI.

**(b) Amount of damages claimed by the Claimants**

(1)    <u>Position of POB & S&B's</u>

804.    The Claimants make two damage quantifications for different scenarios:

(i)    By means of FTI's First Expert Opinion (Exhibit CER-001) they make a damages quantification based on POB's Statement of Claim in which it is assumed that, as a consequence of ANI's breaches, UFs 4 and 5 cannot be performed and UFs 1, 2 and 3 can be performed for the entire duration of the Agreement ("LoP Loss UF4 and UF5");

(ii)    By means of FTI's Second Expert Opinion (Exhibit CER-002) they make a quantification of damages based on ANI's subsidiary request for Early Termination of the Agreement in which POB assumed that, as a consequence of ANI's breaches, POB will not be able to continue performing any of the UFs or exercising all of the rights and obligations under the Concession Agreement ("Loss LoP Project");

(iii)  FTI's Third FTI Expert Opinion (Exhibit CER-006) (i) updates the calculations of both scenarios; (ii) addresses certain arguments raised in the Contradiction Expert Opinion submitted by ANI; (iii) and makes other updates according to new instructions.

i.  <u>Quantification of damages for non-performance of UFs 4 and 5 ("Loss LoP UF4 and UF5")</u>

805.  FTI has used the "Loss of profits" (LoP) methodology to quantify POB's damages with the following exercise: (i) assess POB's Current Position, with the contractual breaches; (ii) project the Counterfactual Position in which POB would be without the breach; and (iii) compare the current position and the counterfactual position, the difference between which is the damages subject to compensation.[621]

806.  This methodology calculates (i) the assets lost suffered; and (ii) the profit, benefit or gain foregone by POB.

807.  To present the Current Position:[622]

   a.  FTI evaluated all expenses and all income incurred by the Concessionaire as of the Evaluation Date, supported by the certifications of the trustee that manages the Project's Trust Fund and, when required, the direct supporting documents for the corresponding expenses and revenues.

   b.  The Current Position therefore reflects the situation of the Concessionaire, taking into account ANI's contractual breaches.

---

[621]  POB and S&B Statement of Claim, ¶ 459.
[622]  POB and S&B Statement of Claim, ¶ 463.

c. In addition, the Current Position includes a projection into the future of what will happen to the Project due to ANI's contractual breaches. Specifically, the Current Position is based on the assumption that, in the future:

    i. <u>The UFs 4 and 5 cannot be performed</u>. This means that this scenario does not include Capex expenses derived from the remaining Interventions in these UFs or Opex associated with them. Nor does it include the Retribution that the Concessionaire would have access to if ANI had fulfilled its contractual obligations.

    ii. <u>The Concessionaire may perform UFs 1, 2 and 3</u>. Therefore, the Current Position includes in its future projection the Opex expenses associated with these UFs (and the Capex expenses are incorporated in the costs already incurred by the Concessionaire).

808. To present the Counterfactual Position: FTI projected what would have happened if ANI had acted in accordance with the Agreement, which would have meant that UFs 4 and 5 could have been performed and the Functional Unit Termination Minutes of UFs 4 and 5 executed on 15 December 2018, and begun receiving the corresponding Retribution as of January 2019[623].

809. As a result of contrasting the Current Position and the Counterfactual Position, FTI concluded that Claimants (i) have incurred costs that they would not have incurred if ANI had fulfilled its contractual obligations and (ii) will forego profits that they would have received if ANI had fulfilled its contractual obligations.

810. Regarding the costs, the Counterfactual Position does not include certain values that are included in the Current Position, such as:[624] (i) values associated with the additional costs due to an extended Construction Phase of UFs 4 and 5,

---

[623] Exhibit CER-001, ¶ 6.1.1 y 6.2.1.
[624] POB and S&B Statement of Claim, ¶¶ 466, 468-470.

which include (a) higher funding in the Supervisor Subaccount[625] and (b) higher amounts for obligations related to Priority Interventions; (ii) amounts incurred in relation to the IDB Credit Agreement due to ANI's breaches; and (iii) amounts incurred for EPC claims, which would not have been incurred if ANI had fulfilled its contractual obligations.[626]

811.    Regarding the lost utility, the Counterfactual Position assumes that, if ANI had fulfilled the Agreement, UFs 4 and 5 could have been performed. Therefore, the Concessionaire would have incurred the Capex expenses associated with said UFs as well as the O&M Costs associated with these UFs and, consequently, it would have received the corresponding Retribution,[627] which includes the concepts of (i) ANI Contributions; (ii) Toll Collection; and (iii) income from Commercial Exploitation.[628]

812.    FTI's Third Expert Opinion updates the amount owed under this concept, considering the date of the Third Expert Opinion as the Evaluation date and concludes that the LoP UF 4 and UF 5 amounts to COP $1,665.0 billion.[629]

---

[625]    POB argues that ANI has breached the Agreement by not taking appropriate action to reduce the value of the funding corresponding to this sub-account. As explained by FTI, the Agreement provides that funding for this sub-account is almost 3 times greater during the Construction Phase than during the Operation and Maintenance Phase. This is explained by the fact that the work of the Supervisor is considerably greater when the activities related to the works of the Project are being performed. Due to the EER, these works, two of the most significant UFs for the Agreement in terms of Capex and Opex, are not being performed, and yet ANI has refused to execut a contractual agreement that reduces funding for this sub-account.

[626]    Among the damages claimed by POB are the damages suffered at the level of the EPC Contractor (Constructor POB Consortium) at the time of ANI's breaches. The Concession Agreement and the EPC Contract are linked contracts, since they have the common purpose of carrying out the Interventions. Thus, due to the way in which ANI itself structured the Concession Agreement, what happens in the Concession Contract - specifically in relation to the performance of the Interventions - will have consequences in the EPC Contract. For this reason, ANI has the obligation to compensate the EPC Contractor for any damages caused by its breaches of the Concession Agreement.

[627]    POB and S&B Statement of Claim, ¶ 467

[628]    Exhibit CER-001, ¶ 2.2.3.

[629]    Exhibit CER-006, ¶ 2.3.4 (2).

ii.  Quantification of Damages for Early Termination of Agreement ("**Project LoP Loss**")

813.  In preparing the Second FTI Expert Opinion that was submitted with the Statement of Defense on the Counterclaim, instructions were given to calculate the losses suffered by POB, maintaining the same Assessment Date and the same information cut-off date as the First Expert Opinion and assuming that, as a consequence of ANI's breaches and in accordance with the arguments raised by ANI in its Counterclaim, it will not be possible for POB to continue with all of its rights and obligations under the Agreement as of March 2022.[630]

814.  Thus, in the Second FTI Expert Opinion the "Project LoP Loss" is calculated, to distinguish it from the "LoP Loss UF 4 and UF 5" assessed in the First Expert Opinion according to the summarized instructions.

815.  Conceptually, the difference between both calculations is due to the instructions to assume regarding the future state of the Project under the Current Position. Specifically:[631]

a.  For the purposes of calculating the Project LoP Loss, it is assumed that POB will not receive any revenues or incur any costs related to the Project as of March 2022;

b.  For the calculation of the LoP Loss UF 4 and UF 5, it is assumed that POB will continue receiving profits from the performance of UF 1, UF 2 and UF 3 (but not UF 4 and UF 5) until the termination of the Agreement.

816.  Regarding the application of the cost calculation formula established for Early Termination of the Concession Agreement, FTI analyzes the conceptual difference between the Project LoP Loss and the Agreement Termination Payment. It notes that, although both the Project LoP Loss and the Agreement Termination Payment seek to

---

[630]  Statement of Defense to the Counterclaim, ¶¶ 548-559.
[631]  Exhibit CER-002, ¶ 2.2-3.2.

compensate POB in a situation where it will not continue with the performance of the Project, the type of compensation granted for each concept is different:[632]

a.  The LoP Project Loss considers the present value of the profits foregone by POB from the beginning of the Agreement until its termination (i.e., both in the past and in the future), taking into account that, but for the Alleged Acts, POB would have been able to continue with the performance of the entire Project until its termination; while

b.  The Agreement Termination Payment, specifically set forth in Clause 18.3(f) would only compensate POB for certain costs it has incurred (specifically, those that have been recognized by ANI and that are attributable to a series of specific activities set forth in the Agreement for such reason) from the Commencement Date until the execution of the Completion Minutes of the Agreement, net of the revenues it has received during the same period.

817.    In conclusion, if the purpose of the Arbitration Award is to return POB to the position it would have been, but for ANI's breaches, only the Project LoP Loss fully compensates POB for the losses it has suffered, since only this concept takes into account the value of the rights POB acquired by entering into the Agreement. On the other hand, the Agreement Termination Payment would limit the compensation made by ANI to POB to certain costs (net of revenues) incurred up to the Early Termination of the Agreement, without taking into account the profits not received by POB both in the past and in the future as a consequence of ANI's breaches.

818.    FTI's Third Expert Opinion updates the amount due for this concept, considering as the Evaluation date the date of its Third Expert Opinion and concludes that the LoP Project amounts to COP $2,227.8 billion.[633]

---

[632]  Exhibit CER-002, ¶ 3.4.
[633]  Exhibit CER-006, ¶ 2.3.4 (1).

iii. <u>Amounts and calculations broken down by UFs as requested by the Arbitral Tribunal in Procedural Order No. 17 and Procedural Order No. 18</u>

819.    As explained above, on 1 December 2023, the Arbitral Tribunal issued Procedural Order No. 17, by means of which it requested the Claimants to "submit a disaggregated calculation for each of the 1, 2, 3, 4 and 5 Functional Units" using the same methodology used in their previous expert reports.

820.    Pursuant to Procedural Order No. 17, Claimants filed the Fourth FTI Expert Opinion (Exhibit CER-009), as instructed in Procedural Order No. 17,[634] which presents (i) the breakdown by UF of POB losses;[635] and (ii) the disaggregation by UF of POB costs.[636]

821.    FTI's Fourth Expert Opinion presents the calculation of the profits that POB did not receive under the Loss of Profit methodology (used in its previous reports), disaggregated by each of the five UFs of the Project.[637] To this end, this report disaggregates by UF both the income components and the cost components of the Current Position and the Counterfactual Position developed in Opinions CER-001 and CER-002.[638]

822.    Thus, the Opinion presents the result of the disaggregation by UF of the POB losses for the different scenarios proposed,[639] that is, (i) for the UF 4 and UF 5 LoP scenario,[640] and (ii) for the Project LoP scenario.[641]

---

[634]    Exhibit CER-009, ¶ 1.2.
[635]    Exhibit CER-009, section 3.
[636]    Exhibit CER-009, section 4.
[637]    Exhibit CER-009, ¶ 2.2.
[638]    Exhibit CER-009, ¶ 3.3.
[639]    Exhibit CER-009, ¶ 3.4.
[640]    Exhibit CER-009, ¶3.4.1, Table 3.13.
[641]    Exhibit CER-009, ¶3.4.1, Table 3.14.

823.     The Opinion then does the same with the disaggregation of POB costs, distinguishing between those costs incurred by POB and those to be incurred[642].

824.     In turn, pursuant to Procedural Order No. 18, dated 12 April 2024, Claimants filed a communication accompanied by FTI's Fifth Expert Opinion (Exhibit CER-010), responding, where appropriate, to the opposing party's report regarding Exhibit CER-009, and updating some of its calculations.

(ii) <u>ANI's position</u>

i.   <u>On the quantification of damages for non-performance of UFs 4 and 5 ("Loss LoP UF4 and UF5");</u>

825.     The Respondent rejects the damages claimed for damages related to the LoP UF4 and UF5 Loss scenario, pointing out that, although POB says it is asking for full compensation of the damage, what it is really asking for is the Retribution of the Agreement.

826.     ANI argues that the requirements for POB to receive any Retribution under the terms of the Agreement have not been met. In fact, ANI argues that, in accordance with Section 3.1 of the Concession Agreement, the right to Retribution comes into existence when the Completion Minutes of each Functional Unit is executed, which have not been executed with respect to UFs 4 and 5, as acknowledged in the same FTI Expert Opinion.[643]

827.     In this regard, ANI points out that all the amounts corresponding to the Retribution of UFs 4 and 5 have been funded by ANI on the dates and in the terms set forth in the Concession Agreement and created for such purpose, but that these cannot be given to POB because the requirements to obtain the Retribution of

---

[642]   Exhibit CER-009, ¶ 4.1.
[643]   ANI Rejoinder, ¶ 249-251.

UFs 4 and 5 have not been met, mainly the lack of infrastructure, i.e. the completion of UFs 4 and 5.[644]

828.    ANI adds that in accordance with the provisions of Section 2.2. "Agreement value and budgetary contributions" of the Concession Agreement it is established that the concept of contract value cannot be used as a guarantee in favor of the Concessionaire, since the Retribution is contingent upon the fulfillment of various obligations by the Concessionaire, including among others, the verification of the availability of the infrastructure and compliance with the service levels and quality standards established in the Agreement.[645]

   ii.    On quantification of Damages for Early Termination of Agreement ("Project LoP Loss");

829.    The Respondent asserts that the claim for compensation corresponding to the LoP Loss of the Project was submitted untimely by the Claimants, since the procedural moment to present all the claims is in the Statement of Claim. ANI adds that, if this claim were admitted, the due process principle would be violated since ANI would not be able to adequately challenge this formulation.[646]

830.    On the other hand, the Respondent points out that, in the event that the Arbitral Tribunal decides to address the merits of this claim, it should be dismissed on the grounds that ANI would have complied with its contractual obligations and, for its part, POB would have failed to comply with its own to overcome the EER. As a result, POB has not completed the contracted works nor is it entitled to the Retribution. Thus, Early Termination would occur due to events attributable to the Concessionaire and would therefore not cause unlawful damage that must be compensated.[647]

---

[644]  ANI Statement of Defense, ¶ 404-420.
[645]  ANI Rejoinder, ¶ 252.
[646]  ANI Reply on the Counterclaim, ¶¶ 263-267.
[647]  ANI Reply on the Counterclaim, ¶¶ 268-272.

831.    Finally, ANI argues that the right to retribution in PPP contracts is conditioned to the availability of the infrastructure, the compliance with the service levels and the quality standards in the different functional units. Thus, ANI concludes that POB is not entitled to request compensation for damages for the Retribution foregone in the event that Early Termination of the Concession Agreement is declared, since to date it has not completed the works related to the UFs 4 and 5, which is the inherent requirement for Retribution.[648]

832.    On the other hand, ANI points out that, in the event that Early Termination of the Agreement is declared, it is not appropriate to grant a compensation for damages, but rather the liquidation of the Agreement, in accordance with the rules agreed in Section 18.3 of the Concession Agreement.[649]

833.    ANI points out that the liquidation of the Agreement corresponds to a balance of accounts of the services performed and that must be recognized, therefore, if the balance of the performance of the Agreement indicates that ANI must make an economic recognition to the Concessionaire by virtue of the performance of the Agreement, this acknowledgement would be based on the performed contractual obligations and as a compensation for damages. ANI adds that this balance must correspond to the technical and financial information of what has been performed by the Parties, which at this moment the Tribunal lacks, so it would not have objective elements of judgment to proceed to make a judicial liquidation that covers the entire performance of the Agreement.[650]

iii.    <u>On the amounts and calculations broken down by UFs as requested by the Arbitral Tribunal in Procedural Order No. 17 and in Procedural Order No. 18</u>

834.    Pursuant to Procedural Order No. 17, Respondent submitted a Contradiction Report on exhibit CER-009 submitted by the Claimants.

---

[648] ANI Reply on the Counterclaim, ¶¶ 273-274.
[649] ANI Reply on the Counterclaim, ¶ 233.
[650] ANI Reply on the Counterclaim, ¶¶ 233-234; Contradiction Report, pp. 33-35.

835.    In said Contradiction Report, the Respondent points out that Exhibit CER-009 (i) would not comply with Procedural Order No. 17, since it covers dates, items and evidence that exceed what was analyzed in Exhibits CER-001 and CER-002;[651] and (ii) the calculations of the profit received by POB in UFs 1, 2 and 3 would not have been purged as required by Procedural Order No. 17;[652] (iii) the non-existence of POB's entitlement to the Retribution for UFs 4 and 5;[653] (iv) the fact that the EER does not provide for acknowledgements;[654] (v) the early termination formula of the Agreement is incompatible with the Loss of Profit methodology;[655] (vi) that claims submitted by third parties to POB, such as the EPC Claims, were included;[656] (vii) that the Arbitral Tribunal does not have competence to rule on UFs 1, 2 and 3;[657] and (viii) finally, it highlights the difference between damages and the reestablishment of the economic equilibrium of the Agreement.[658]

836.    For all these reasons, ANI requests that the evidentiary value of exhibit CER-009[659] be dismissed.

837.    Pursuant to Procedural Order No. 18, the Respondent submitted its response to Exhibit CER-010 accompanied by a counter report of such exhibit.

838.    ANI does not propose an alternative calculation or amount to that submitted by the Claimants.

(iii) <u>Analysis of the Arbitral Tribunal</u>

839.    In line with the previous decision, on POB's right to full compensation, the Tribunal considers that it is necessary for this Tribunal to determine the amount of the damages

---

[651]    Memorial submitted in Response to Exhibit CER-009, section 2.1; Contradiction Report Exhibit CER-009, pp. 7-11.
[652]    Memorial submitted in Response to Exhibit CER-009, section 2.2; Contradiction Report Exhibit CER-009, p. 6.
[653]    Memorial submitted in Response to Exhibit CER-009, section 2.3; Contradiction Report exhibit CER-009, section 6.
[654]    Memorial submitted in Response to Exhibit CER-009, section 2.4.
[655]    Memorial submitted in Response to Exhibit CER-009, section 2.5; Contradiction Report Exhibit CER-009, section 8.
[656]    Memorial submitted in Response to Exhibit CER-009, section 2.6.
[657]    Memorial submitted in Response to Exhibit CER-009, section 2.7.
[658]    Memorial submitted in Response to Exhibit CER-009, section 2.8.
[659]    Memorial submitted in Response to Exhibit CER-009, ¶ 89.

suffered by POB and which are attributable to ANI. For this purpose, it is necessary to take into account the following considerations.

840.     First, it is necessary to highlight that, as decided in the preceding Sections, the Tribunal has accepted ANI's subsidiary claim for Early Termination of the Concession Agreement, in accordance with Section 14.1(e) of the Agreement, but as a consequence of breaches attributable to ANI and, therefore, leaving its contractual liability derived from such breaches unimpaired.

841.     Thus, and as it has already been stated, the Arbitral Tribunal considers that damages in favor of POB are due, by virtue of the principle of full reparation of the damage.

842.     However, the Tribunal rejects ANI's position that, in the event that Early Termination of the Concession Agreement is declared under Section 14.1(e) of the Agreement, the liquidation formulas set forth in Section 18.3. of the Agreement and/or Section 12.1(h) regarding compensation for Exemption of Liability Event should be applied.

843.     First, inasmuch as the principle of full reparation of damages takes precedence over any contractual provision to the contrary, although in this case the Arbitral Tribunal concludes that it is not even necessary to establish this order of precedence.

844.     In effect, Section 18.3 of the Agreement regulates situations of liquidation of the Agreement that look, in essence, to the comp items and amounts performed, and that cannot be interpreted as an exemption or exclusion of liability clause that substitutes any other indemnity. In no section of said Section or of the Concession Contract have the Parties attributed such an effect, ignoring or eliminating the possibility of the Claimants to claim damages other than the reimbursement of those costs incurred that are included in the settlement items of the Agreement. This is especially so in the case of costs and damages suffered as a consequence of ANI's breaches.

845.    Second, since neither Party has requested the liquidation of the Concession Agreement pursuant to Section 18.3 of the Agreement, this Arbitral Tribunal is therefore not competent to do so.

846.    Indeed, the Claimants are not seeking in this Arbitration the liquidation of the Agreement, but rather the compensation of the damages suffered as a consequence of the breaches of ANI that have caused unlawful harm to POB that the latter is not obliged to bear.

847.    The Claimants also do not seek compensation for Exemption of Liability Event pursuant to Section 12.1(h) of the Concession Agreement, but rather damages for ANI's breaches, including ANI's breaches of its obligations set forth in the EER Minutes.

848.    Third, and in line with the foregoing, because the Tribunal considers that Early Termination under Section 14.1(e) of the Agreement, but for breaches attributable to ANI, is not provided for in any of the Agreement liquidation scenarios set forth in Section 18.3 of the Agreement and cannot be applied by analogy.

849.    Indeed, the Arbitral Tribunal agrees with the Claimants that the formula set forth in Section 18.3(f) of the Agreement, which contemplates Early Termination in the Construction Phase, would not be applicable because it does not include all the costs incurred by the Concessionaire, but only those that have been recognized by ANI and that are attributable to a series of specific activities established in the Agreement for such purpose, from the Commencement Date until the execution of the Completion Minutes of the Agreement.[660] In addition, this formula implies the application of a capitalization rate to such costs, depending on whether it is Early Termination due to (i) request of the Concessionaire, (ii) due to causes not attributable to any of the Parties, and (iii) due to causes attributable to the Concessionaire.[661] The same applies

---

[660]   Exhibit CER-002, ¶ 3.4.7.
[661]   Exhibit CER-002, ¶ 3.4.8.

to the formula established in Section 18.3(g) of the Agreement, which contemplates Early Termination in the Operation and Maintenance Stage. None of them applies to the scenario studied in this Award of Early Termination due to causes attributable to ANI.

850.    Second, and as already explained, the Claimants quantify the damages claimed in two scenarios (i) UF 4 and UF 5 LoP Loss and (ii) Project LoP Loss.

851.    However, the Tribunal considers that neither of the two scenarios allows the quantification of the damages that the Arbitral Tribunal considers should be compensated to POB.

852.    It should be recalled that the UF 4 and UF 5 LoP Loss Scenario assumes a current position in which (i) the construction of UFs 4 and 5 would have been completed and the Completion Minutes of Functional Unit executed on 15 December 2018; (ii) POB would have been compensated in the cost overruns associated with the archaeological findings; and (iii) UFs 1, 2 and 3 could continue to be performed and POB will continue to receive profits for their performance (although with some adjustments with respect to the projected costs and revenues) and a counterfactual position in which it will not be possible to complete the required Interventions for UFs 4 and UF 5, meaning that theses UFs (and, as a consequence, the entire Project), will remain in Construction Phase until the termination of the Agreement.

853.    Thus, this scenario seeks to demonstrate the costs already incurred by the Concessionaire, as well as the costs that it will continue to incur, despite being unable to receive UFs 4 and 5 Retribution.

854.    The reason why the UF 4 and UF 5 LoP Loss scenario does not apply is obvious; the Arbitral Tribunal has accepted the ANI's subsidiary claim for Early Termination of the Agreement. As explained, the Tribunal does not consider it feasible to declare that the project remains in the Construction Phase *ad eternum.* In this regard, the Concessionaire will not (i) be entitled to receive the Retribution for UFs 4 and 5 (for the reasons explained below), (ii) nor will it have to continue incurring costs with respect to UFs 4 and 5.

855.     On the other hand, the Project LoP Loss scenario puts us in a situation where, as a consequence of non-compliance by the ANI and, in the event that Early Termination of the Agreement is declared, it will not be possible to continue with the entire Agreement. That is, POB will not continue receiving any Retribution, nor will it have to incur any costs with respect to any UF of the Agreement, since it has been terminated early.

856.     In this scenario, FTI has calculated a loss scenario that considers the present value of the profits not received by POB from the beginning of the Agreement until its termination, with respect to the entire Project, that is, with respect to all UFs.

857.     This subsidiary scenario has the obstacle that it includes the entire Project in the same calculation and under practically the same situations, even though, in the opinion of this Arbitral Tribunal, the situation of UFs 1, 2 and 3 is different from that of UFs 4 and 5.

858.     Indeed, UFs 1, 2 and 3 were performed and completed by POB, and all of them have UF Completion Minutes. [662] Thus, in accordance with Section 3.1 of the Concession Agreement, POB has the contractual right to receive Retribution for these UFs, in accordance with the contractual terms. The Arbitral Tribunal considers that the loss of profit or loss of earnings related to UFs 1, 2 and 3 meets the requirements of certainty and reliability required by the jurisprudence of the Council of State.

859.     However, the same does not occur with UFs 4 and 5, which have not been performed and completed. The Project's LoP Loss scenario (like the UFs 4 and 5 LoP Loss scenario) assumes, in a counterfactual position, that, if not for ANI's breaches, the Completion Minutes for UFs 4 and 5 would have been executed in December 2018. [663]

---

[662]  Annexes FTI-05 (Completion Minutess of UF1 and UF2); FTI-64 (Completion Minutes of UF3).
[663]  Exhibit CER-002, ¶ 1.2.4, 1.3.2.

860.    However, there is no further evidence to confirm that UFs 4 and 5 Completion Minutes were actually going to be signed on 15 December 2018. The Claimants point out, regarding the status of the Project, that the Interventions in UFs 4 and 5 have been suspended since October 2017 by virtue of the EER Minutes[664] and without an analysis of the percentage of progress that would allow this Tribunal to be convinced that UFs 4 and 5 had been completed on time.

861.    There is no further information in the case file concerning the progress status of UFs 4 and 5 as of October 2017, when the Interventions in these UFs were suspended. A reference to the percentage of progress of UFs 4 and 5 is found in the Contradiction Expert Report presented by the ANI, which states that the percentage of progress of the interventions in UFs 4 and UF 5 was of 5.07% and 1.69%.[665] Regarding this statement, the Tribunal notes that there is no evidence to justify it, since this statement does not contain any annex or reference,[666] even though it has not been disputed by POB.

862.    Consequently, the Arbitral Tribunal considers that it does not have sufficient evidence to be convinced that UFs 4 and 5 would have been effectively completed and the corresponding Functional Unit Completion Minutes executed by December 2018.

863.    In this regard, the Arbitral Tribunal considers that the lost profits in respect of UFs 4 and 5, that is, the loss of earnings in respect of said UFs, does not meet the requirement of certainty and reliability required for it to be compensable damage. However, the Arbitral Tribunal considers that the costs incurred by POB with respect to UFs 4 and 5 are compensable, to the extent that they have been evidenced and have not been dismissed for other reasons in this Award.

---

[664]    Claimants Post-Hearing Memorial, ¶ 409, C-002: EER Minutes, p. 29.
[665]    Contradiction Opinion, p. 28.
[666]    This statement has a footnote whose reference indicates only "ANI Information", with no other support to validate it.

864.    From the above, it is possible to conclude that since the Early Termination of the Concession Agreement has been granted, but due to ANI's breach, the Arbitral Tribunal considers that the full reparation of the damages covers (i) all the profits lost by POB, from the beginning of the Agreement until its termination (due to breaches attributable to ANI) with respect to UFs 1, 2 and 3, but not the profits foregone with respect to UFs 4 and 5, except for those (ii) costs incurred with respect to UFs 4 and 5, dully proved and that have not been dismissed for other reasons.

865.    Third, it is necessary to determine the specific amounts of each of these points.

866.    First, regarding point (i), the Arbitral Tribunal found that the evidence submitted in the process did not contain the necessary elements to determine the amount of profit lost in respect of UFs 1, 2 and 3 separately from the amount of profit lost in respect of UFs 4 and 5. This was because the Claimants did not originally present an amount calculated based exclusively on UFs 1, 2 and 3. Nor was it possible to obtain an amount derived from the calculation of the Project's LoP Loss, because FTI's Reports did not analyze these losses disaggregated by UF, which would allow separating the amounts of some of the UFs from the amounts of the others.

867.    For this reason, through Procedural Order No. 17, the Arbitral Tribunal requested the calculation of the amounts of profits not received by POB broken down by UF; in order to determine the amount corresponding to the profit not received only with respect to UFs 1, 2 and 3. As explained, this ruling contains said quantification for two different scenarios: LoP Loss for UFs 4 and 5 and Project LoP Loss. Considering that the ANI's subsidiary claim for Early Termination has been accepted, the amounts determined for the Project's LoP Loss scenario must be taken into account. Likewise,

and since POB's claims regarding the funding[667] have been accepted, the scenario that includes these amounts must be taken into account (LoP Loss scenario of the POB Funding Project).[668]

868.    According to Exhibit CER-010, which contains the most updated version of the analysis disaggregated by the different UFs, thus updating Exhibit CER-009, this amount is quantified as: COP $160,000,000,000 for UF 1; COP $332,200,000,000 for UF 2; and COP $316,900,000,000 for UF 3.[669]

869.    However, in the case of UF 2, the amount indicated must be subtracted from the amount corresponding to the EPC Claims (COP 5.8 billion), over which, as determined in Section IV.A.2 of this Award, the Arbitral Tribunal lacks jurisdiction. Thus, in the case of UF 2, the Project LoP Loss amounts to COP $326,400,000,000.

870.    Thus, the total LoP Loss of the Project corresponding to UFs 1, 2 and 3 amounts to COP $803,300,000,000.

871.    Second, with respect to point (ii), the Arbitral Tribunal considers that the costs incurred with respect to UFs 4 and 5 that have been demonstrated and that have not been dismissed in this Award for other reasons are included in the full reparation of damages.

872.    These costs are:[670]

    a.    EPC Capex, for COP $46,000,000,000 for UF 4 and COP $27,200,000,000 for UF 5.[671]

---

[667]    Section IV.B.3 of the Award.
[668]    Exhibit CER-009, ¶ 2.2.5.
[669]    Exhibit CER-010, ¶ 5.3.1, Table 5-2.
[670]    The costs indicated here originate from the Exhibit POB CER-010, ¶ 5.4.1, Table 5-3. However, the Arbitral Tribunal does not include in the following list of costs incurred by POB the concept "Funding Obligations", given that this concept was treated and awarded to POB separately, in Section IV.B.3 of this Award.
[671]    Exhibit CER-010, Table 5-3; Appendix 1.

b.    O&M costs, for COP $538,000,000 for UF 4 and COP $413,000,000 for UF 5.[672]

c.    Costs for the performance of Additional Priority Interventions, for an amount of COP $1,947,000,000 for UF 4 and 5.[673]

d.    Swap closing costs for an amount of COP $14,500,000,000 for UF 4 and COP $10,500,000,000 for UF 5.[674]

e.    General expense costs amounting to COP $13,400,000,000 for UF 4 and COP $12,000,000,000 for UF 5.[675]

f.    The costs derived from obtaining and maintaining financing for UFs 4 and 5 for an amount of COP $36,100,000,000 for UF 4 and COP $26,300,000,000 for UF 5.[676]

g.    Debt resource costs, incurred by POB for an amount of COP $11,300,000,000 for UF 4 and COP $7,900,000 for UF 5.[677]

h.    Heritage resource costs, incurred by POB in the amount of COP $123,000,000,000 for UF 4 and COP $90,400,000,000 for UF 5.[678]

873.    The costs incurred for the performance of the Interventions in UFs 4 and 5 do not include the Claims of the EPC Contractor, arising from the EPC Contract, regarding which the Arbitral Tribunal has already determined that it does not have jurisdiction .[679] Likewise, with respect to the amounts relating to the reduced funding that POB was obliged to make, the provisions of that Section[680] shall apply, which is why the "POB Funding" scenario has been used, as explained above.

---

[672]  Exhibit CER-010, Table 5-3; Appendix 1.
[673]  Exhibit CER-010, Table 5-3; Appendix 1.
[674]  Exhibit CER-010, Table 5-3; Appendix 1.
[675]  Exhibit CER-010, Table 5-3; Appendix 1.
[676]  Exhibit CER-010, Table 5-3; Appendix 1.
[677]  Exhibit CER-010, Table 5-3; Appendix 1.
[678]  Exhibit CER-010, Table 5-3, Appendix 1.
[679]  Section IV.A.2.
[680]  Section IV.B.3.

874.    Accordingly, the Arbitral Tribunal considers that the costs incurred in respect of UFs 4 and 5, and which must be compensated to POB amount to a total of COP $413,605,900,000.

875.    Fourth, it is necessary to refer to exhibit CER-009 that the Arbitral Tribunal has considered valid to quantify the damages (updated in exhibit CER-010) and the reasons why the objections to said report made by the Respondent have been dismissed.

876.    First, the Respondent raises a series of objections regarding the calculation of the amounts in exhibit CER-009 and that these would not comply with the terms of Procedural Order No. 17 because they exceed the cut-off date and would not correspond to the requested analysis period, since the two scenarios would include projections of future costs and expenses and not "actually incurred" figures as required by Procedural Order No. 17.[681]

877.    In summary, the Respondent notes that the Loss LoP UFs 4 and 5, and Loss LoP Project scenarios project a counterfactual scenario in which POB would continue to operate UFs 1, 2 and 3 until 2040, which would exceed the cutoff date of 31 July 2021. On the other hand, the Respondent points out that in order to comply with Procedural Order No. 17, FTI was required to take on actual revenues and subtract actual costs in order to clean up the amount of profit required, and that, by contrast, Exhibit CER-009 allegedly only quantified the costs incurred.[682]

878.    However, the Arbitral Tribunal finds that the exhibit CER-009 complies with the terms of Procedural Order No. 17, which states that, in order to present the disaggregated calculations of incurred costs and lost profits, POB should "use the "Loss of Profit" model already upheld and adopted in the CER 1 and CER 2 exhibits, for each of the Functional Units 1 to 5."

---

[681] Memorial Submitted in Response to Exhibit CER-009, section 2.1; Contradiction Report Exhibit CER-009, sections 1, 2, 3.
[682] Memorial Submitted in Response to Exhibit CER-009, section 2.2.

879.    In this sense, the cut-off date of Reports CER-1 and CER-2 refers to the cut-off date of the financial and operational information of the Project. However, this does not mean that the damages claimed by POB should be calculated only up to this date. Indeed, the Loss of Profit methodology used in Exhibits CER-1, CER-2, CER-6 and, pursuant to Procedural Order No. 17, also the exhibit CER-009 "considers the incremental profits (i.e., revenues net of costs) that Claimants have failed to receive as a result of the Alleged Acts from the beginning of the Agreement until its termination (i.e., both in the past and in the future)".[683] That is, this methodology necessarily includes projections of future costs and profits, and those after 31 July 2021, which is consistent with the request in Procedural Order No. 17.

880.    The Arbitral Tribunal does agree with the Contradiction Opinion that the scenarios under the Loss of Profit methodology and the costs incurred are not cumulative,[684] because the former includes the latter. But in this case, that does not occur and they do not accumulate, because, as indicated, (i) the profits not received under the Loss of Profit methodology, of UFs 1, 2 and 3 and (ii) the costs incurred of UFs 4 and 5 are granted.

881.    Second, the Respondent also considers that exhibit CER-009 should be dismissed, due to a series of substantive considerations, which should be dismissed at this point, since they have already been addressed in this Award and which, ultimately, lead to the decision on damages that has been awarded to the Claimants. For the sake of completeness, brief references will be made to each of them.

882.    The Respondent alleges that POB is not entitled to receive the Retribution for UFs 4 and 5, since these UFs have not been delivered and their respective termination Minutes have not been signed.[685] The Arbitral Tribunal agrees with

---

[683]  Exhibit CER-006, ¶ 2.2.2.
[684]  Contradiction Opinion to Exhibit CER-009, p. 12.
[685]  Memorial Submitted in Response to Exhibit CER-009, section 2.3; Contradiction Report exhibit CER-009, section 6

this position, as has already been decided previously, which is why POB has not been awarded the damages consisting of the aforementioned Retribution of UFs 4 and 5.

883.    The Respondent points out that the EER Minutes allegedly established that a circumstance beyond the control of the Parties would have compromised the normal performance of UFs 4 and 5, so there would not be a breach by ANI that would allow these claims to be adapted as compensatory.[686] However, this Arbitral Tribunal has already decided that there were breaches by ANI; both of the law, the Agreement and the EER Minutes, which does allow these claims to be adapted as compensation for POB.[687]

884.    The Respondent alleges that the calculations made by FTI are not those that correspond to the early termination formula recognized in the Agreement.[688] However, this Arbitral Tribunal has already explained why this formula is not applicable to the quantification of POB's[689] damages. It is also reiterated that, by means of this Award, the Concession Agreement is not being liquidated, but rather the damages suffered by the Claimants and which have been claimed in this Arbitration are being granted.

885.    The Respondent argues that the Arbitral Tribunal has no competence to rule on the EPC[690] Claims or on UFs 1, 2 and 3, in general, because they allegedly have the respective Completion Minutes and, in particular, with respect to the archaeological findings of UF2.[691] On the first point, the Arbitral Tribunal has already decided that it does not have the competence to rule on the EPC Claims, which is why it is not ruling on them. On the second point, the Arbitral Tribunal considers that it does have competence to rule on the damages caused with respect to UFs 1, 2 and 3, since the Respondent filed a subsidiary claim for Early Termination of the Agreement before which the Claimant claimed the damages that would derive

---

[686]   Memorial Submitted in Response to Exhibit CER-009, section 2.4.
[687]   Section IV.B.2 of the Award.
[688]   Memorial Submitted in Response to Exhibit CER-009, section 2.5; Contradiction Report Exhibit CER-009, section 8.
[689]   Section IV.D.2.
[690]   Memorial Submitted in Response to Exhibit CER-009, section 2.6.
[691]   Memorial Submitted in Response to Exhibit CER-009, section 2.7.

therefrom, including the profits foregone with respect to UFs 1, 2 and 3, which necessarily implies ruling on them.

886.    Third, as to the distinction made by the Respondent with respect to damages and the reestablishment of the economic equilibrium of the Agreement,[692] the Arbitral Tribunal has already ruled on this point, analyzing in detail the legal basis for the full compensation of damages owed to the Claimants.[693]

887.    Fourth, although the Arbitral Tribunal is aware that this recognition is not specifically requested by the Claimants, the Tribunal considers that this decision falls within its request "(viii) That [the Arbitral Tribunal] grant any other remedy or compensation to the Claimants that it deems legally or contractually relevant and that is proven in this Arbitration".[694]

888.    Fifth, by Procedural Order No. 18, the Parties were given an opportunity to comment on the memorials and reports of their counterparty. Likewise, POB was instructed to:

> [D]ifferentiate, separately for each UF, whether EPC's costs and expenses were included in the calculation of damages, and to specify the overall value of these EPC costs and expenses in each of the UFs ("Aggregate Value"). Additionally, within the Global Value of each UF, to specify whether these costs and expenses have been invoiced by the EPC to POB, and, separately, whether they have been paid by POB to the EPC.

889.    The Claimants complied with the requirement by submitting Exhibit CER-010.[695] The Respondent, for its part, presented its objections, essentially identical to those formulated in response to CER-009.[696] As previously stated, the Arbitral Tribunal took into account the updated amounts of the Project's LoP Loss to

---

[692]    Memorial Submitted in Response to Exhibit CER-009, section 2.8.
[693]    Section VI.D.1 of the Award.
[694]    POB and S&B Statement of Claim, ¶ 589.
[695]    Exhibit CER-010.
[696]    Memorial Submitted in Response to the Contradiction Financial Expert Opinion dated March 2024.

determine the loss of POB upon termination of the Agreement; in turn, the breakdown of the costs incurred for UFs 4 and 5 was taken into account.

890.    In conclusion, the Arbitral Tribunal grants POB compensation for the Project's LoP Loss corresponding to UFs 1, 2 and 3 amounting to COP $803,300,000,000, together with compensation for the costs incurred by POB for the performance of the Interventions in UFs 4 and 5 amounting to COP $413,605,900,000.

## 2.    IS S&B ENTITLED TO COMPENSATION OR DAMAGES AND IN WHAT AMOUNT?

### (a)    Position of POB and S&B

891.    The Claimants claim that S&B has incurred compensable damages of nine and a half billion pesos (COP $9,500,000,000). They point out that, due to ANI's breaches, S&B has been forced to maintain a series of stand-by letters of credit (the "**S&B Stand-By Letters of Credit**") for a longer period than it would have had to maintain them in force if ANI had complied with the Agreement. They explain that S&B is obliged to maintain the S&B Stand-By Letters of Credit in force under the Equity Contribution Agreement, Subordination and Share Retention Agreement ("**ECA**") that it signed with the IDB as a requirement for the latter to provide financing for the Project.

892.    Indeed, Claimants point out that, pursuant to the ECA, S&B is obliged to keep S&B's Stand-By Letters of Credit in effect until any of the following conditions occur: (i) the Construction Phase of the Project is completed; (ii) all of the resources to which S&B is obligated under the ECA are disbursed; or (iii) all of the debt owed to the Lenders participating in the ECA is paid.[697]

---

[697]   POB and S&B Statement of Claim, ¶¶ 477-478.

**(b)    ANI's position**

893.    ANI rejects S&B's claim for damages since the elements of liability according to the jurisprudence of the Supreme Court of Justice are: the event, the damage and the attribution to the person who caused it based on a causal relationship. However, in the present case, it is noted that the alleged damage does not exist, nor is there any evidence of the damaging event given that ANI did not carry out any positive or negative action that would have caused it.[698]

894.    However, any damage that the company may have suffered must be proven by the company and in case it is proven that the company suffered a damage it would be attributable to POB's negligence to overcome the EERs of UFs 2, 4 and 5; additionally, the damage would be caused thanks to the breach of its obligations regarding the activities necessary to build those Functional Units. Finally, the financial risk and the obligations to achieve the financing of the Project are of the Concessionaire and not of ANI, according to the Agreement. Therefore, the present Tribunal should dismiss the Concessionaire's claims in this regard.

895.    On the other hand, ANI points out that the Claimants fall into an alleged contradiction insofar as they have stated that ANI has no cause of action against S&B, so that, under the same criterion, S&B would not have a cause of action against ANI either.[699]

**(c)    Analysis of the Arbitral Tribunal**

896.    The Arbitral Tribunal rejects the Claimants' claim regarding the financial losses suffered by S&B.

897.    Indeed, the Tribunal does not find that S&B had an independent cause of action under the Agreement. While the Arbitral Tribunal took into consideration its participation in the issuance of the bid, for purposes of corroborating the

---

[698]    ANI Statement of Defense, ¶20(ix).
[699]    ANI Statement of Counterclaim, p. 171.

international character of the Arbitration (Section IV.A.1 of the Award), it did so because it was expressly so stated in Section 15.3 of the Agreement and the accompanying footnote.

898.     However, this determination does not automatically translate into S&B's substantive rights under the Agreement. On the contrary, the Agreement has been executed between ANI and POB, who holds the contractual rights as Concessionaire.

899.     Consequently, the Tribunal considers that there is no obligation on the part of ANI towards S&B, so that ANI's breaches of the Agreement do not generate civil liability on the part of ANI, nor an obligation to compensate S&B for damages.

## V. DESICION

900.  Based on the background information presented, the Tribunal has the necessary information to issue this Partial Award on Jurisdiction, Liability and Damages. In the legal analysis section of this Partial Award, the Tribunal addressed the issues in the order that was most efficient given the questions posed. In this operative part, the Tribunal summarizes its decision on those issues in the order in which the Parties presented them in their written submissions, and therefore decides as follows:

1.  **It dismisses ANI's objection** regarding the jurisdiction of the Arbitral Tribunal due to an alleged failure to comply with the provisions of section c) of article 62 of Law 1536 of 2012;

2.  **It dismisses ANI's objection** regarding the jurisdiction of the Arbitral Tribunal due to an alleged failure to comply with the provisions of section a) of article 62 of Law 1536 of 2012;

3.  **It accepts ANI's objection** to the jurisdiction of the Arbitral Tribunal because the circumstances described in section b) of article 62 of Law 1536 of 2012 are not met;

4.  **It dismisses ANI's objection** to the Arbitral Tribunal's lack of jurisdiction to hear claims relating to compensation and damages in relation to EERs related to UFs 2, 4 and 5;

5. **It accepts ANI's objection** on the lack of jurisdiction of the Arbitral Tribunal to hear the claims of the EPC Contractor (EPC Claims), as they relate to damages suffered by a third party, the EPC Contractor. Therefore, the Arbitral Tribunal decides that it lacks competence to rule on POB's claim with respect to the award of damages allegedly caused by the UF2 archaeological finds, since such damages are based on the EPC Claims.

6. **It rules in favor** of the Claimants with respect to their claims on UFs 4 and 5, and declares that ANI breached the contractual and legal obligation to structure and plan the Project by failing to promptly detect the existence of the springs;

7. **It rules in favor** of the Respondent and declares that ANI complied with the terms of the EER regarding UFs 4 and 5, since ANI's obligation was to "determine and review", but not to "sign" an agreement or Amendment that would allow it to overcome the EER by affecting the performance of UFs 4 and 5;

8. However, **it rules in favor** of the Claimants and declares that ANI did not comply with the obligation to act in good faith in relation to the overcoming of the EER of UFs 4 and 5. The Respondent breached the obligation of good faith both in determining the possibility or feasibility of entering into a contractual document and in reviewing the activities and conditions to perform Interventions in UFs 4 and 5;

9. **It considers** the subsidiary claim of ANI regarding Early Termination **to be well-founded** and declares the termination of the Agreement. Early Termination is accepted pursuant to the provisions of Section 14.1(e) of the Concession Agreement, but on the basis of a cause attributable to ANI for not having detected the springs in a timely manner. Likewise, ANI's bad faith implied that the 730 days elapsed without reaching agreements to overcome the EER of UFs 4 and 5, and the Project became unfeasible. The Early Termination of the Agreement is declared as of the date of notification of this Award;

10. **It rules in favor** of the Claimants in relation to the claim for full compensation, and awards COP $413,605,900,000, as costs incurred with respect to UFs 4 and 5. This compensation is in consideration of the recognition of the unlawful damage

caused by ANI's breaches and by virtue of the declaration of Early Termination of the Agreement. ANI shall pay POB the amount of COP $413,605,900,000;

11. **It rules in favor** of POB's claim as to the loss derived from higher funding to the Supervisor Subaccount. Consequently, the Tribunal awards COP $119,500,000,000,000, as a consequence of the non-proportional reduction of the Supervisor Subaccount of the Agreement and as costs incurred with respect to UFs 4 and 5. ANI shall pay POB the amount of COP $119,500,000,000;

12. **It rules in favor** of the Claimants in relation to the claim for full compensation, and awards COP $803,300,000,000, for loss of profit with respect to UFs 1, 2 and 3. This compensation is in consideration of the recognition of the unlawful damage caused by the breaches of ANI and by virtue of the declaration of Early Termination of the Agreement. ANI shall pay POB the amount of COP $803,300,000,000;

13. **It dismisses the** Claimant S&B's claim for compensation, since this Tribunal understands and declares that there are no contractual obligations that bind S&B with ANI, beyond having to consider S&B as a party covered by the arbitration agreement. Therefore, it does not award unlawful damages caused by ANI's breaches and neither by virtue of the declaration of Early Termination of the Agreement;

14. **It dismisses** ANI's counterclaim regarding POB's non-compliance with its contractual obligations in archaeological matters with respect to UF2;

15. **It dismisses** ANI's counterclaim of breach by POB of the O&M obligation in UFs 4 and 5;

16. **It dismisses** ANI's counterclaim for damages for late payment interest due to POB's failure to comply with its funding obligations 5, 6, 7 and 8 of the Supervisor Subaccount.

17. **In summary, ANI shall pay POB** COP $413,605,900,000, for the costs incurred with respect to UFs 4 and 5; COP $119,500,000,000, for the non-proportional reduction to the Supervisor Subaccount; and

COP $803,300,000,000 for loss of profit with respect to UFs 1-3, for a total of COP $1,336,405,900,000.

18. The file remains open and the Tribunal reserves jurisdiction over the matter of interest and costs, in accordance with Procedural Order No. 16. The Tribunal instructs the Parties to submit their written submissions on interest and costs, in accordance with Articles 31.4 and 34 of the Rules. In the pleadings, each Party shall clearly and concisely state the subject matter of its claim for interest and costs of the Arbitration, the legal grounds on which such claim is based, and shall provide the necessary evidence in support of the claim for costs of the Arbitration. The submission of the pleadings on interest and costs of the Arbitration shall be made simultaneously, and within 27 days from the date of issuance of this Partial Award, on 15 January 2025. In turn, the written responses to the claim for interest and costs of the Arbitration shall be filed simultaneously, and within 27 days of the filing of the initial pleadings, on 11 February 2025.

Any claim or request, other than claims for interest and costs, not directly expressed in this Partial Award, is deemed denied. This Award constitutes a liquidation of all claims presented in this Arbitration, except as set forth herein. In addition, this Partial Award is enforceable immediately and ANI is obligated to pay the total amount of COP $1,336,405,900,000 awarded to POB.

We hereby certify that, for the purposes of Article 1 of the 1958 New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, this Partial Award was issued in **Bogotá, Colombia.**

Date: 19 December 2024

| Cristian Conejero Roos | Digitally signed by Christian Conejero Roos Date: 2024.12.19 19:22:58 -03'00' | ELINA MEREMINSKAYA | Digitally signed by ELINA MEREMINSKAYA* Date: 2024.12.19 17:46:45 -03'00' |

Cristian Conejero, Arbitrator      Elina Mereminskaya, Arbitrator

[signature]
Eduardo Palmer, President of the Tribunal

I, Eduardo Palmer, affirm under my oath as Arbitrator that I am the person described herein and that I have executed the present instrument which is the Partial Award.

[signature]_____
Eduardo Palmer
President of the Tribunal

I, Elina Mereminskaya, affirm under my oath as Arbitrator that I am the person described herein and that I have executed this instrument which is the Partial Award.

ELINA              Digitally signed by ELINA
                   MEREMINSKAYA*
MEREMINSKAYA *  Date: 2024.12.19 17:47:09-03'00'
Elina Mereminskaya
Arbitrator

I, Cristian Conejero, affirm under my oath as Arbitrator that I am the person described herein and that I have executed this instrument which is the Partial Award.

[signature]_____
        Cristián Conejero

# Spanish Original
# of Exhibit 1

**CENTRO INTERNACIONAL DE RESOLUCIÓN DE DISPUTAS**

———————————————————————

**Caso Número 01-20-0015-3123**

———————————————————————

**ENTRE:**

**PERIMETRAL ORIENTAL DE BOGOTA, S.A.S.**

**Y SHIKUN & BINUI VT AG,**

**Demandantes**

**-y-**

**AGENCIA NACIONAL DE INFRAESTRUCTURA**

**Demandada**

**LAUDO PARCIAL FINAL SOBRE JURISDICCIÓN, RESPONSABILIDAD Y DAÑOS**

**Tribunal Arbitral:**

**Elina Mereminskaya (Árbitro)**

**Cristián Conejero (Árbitro)**

**Eduardo Palmer (Presidente del Tribunal Arbitral)**

**18 de diciembre de 2024**

**Bogotá, Colombia**

## ÍNDICE

I.    **Consideraciones preliminares** ................................................................**10**

A.    Las Partes y sus Representantes ..................................................................10

B.    El Acuerdo de Arbitraje .............................................................................12

C.    Ley Sustantiva Aplicable ...........................................................................14

D.    Reglas de Procedimiento Aplicable ...........................................................14

E.    La Sede del Arbitraje .................................................................................14

F.    Idioma del Arbitraje ..................................................................................14

G.    Tribunal Arbitral ........................................................................................14

II.    **El Procedimiento Arbitral** ........................................................................**15**

A.    Trámites previos a la Constitución del Tribunal ........................................15

B.    Constitución del Tribunal Arbitral y Primera Orden Procesal....................17

C.    Presentación de escritos .............................................................................18

D.    Audiencia de Prueba ..................................................................................22

E.    Trámites posteriores a la Audiencia, Cierre de la Instrucción y Plazo para dictar el Laudo Final
      .................................................................................................................23

III.    **Los Hechos** ..............................................................................................**26**

A.    La Licitación del Proyecto y la suscripción del Contrato de Concesión .....26

B.    Alcance del Contrato..................................................................................29

C.    El inicio de la ejecución del Contrato ........................................................30

D.    La identificación de los Manantiales en las UFs 4 y 5 y la Suscripción del Acta de EER ........32

      1.    La identificación de los manantiales en las UFs 4 y 5 ........................32

      2.    La suscripción del Acta de EER .........................................................34

E.    Los hechos posteriores a la suscripción del Acta de EER respecto de las UFs 4 y 5 ...............35

F.    Los hallazgos arqueológicos de la UF 2 .....................................................37

G.  Fondeo de la Subcuenta de Supervisión e Interventoría .........................................39

**IV.  Análisis del Tribunal Arbitral** .................................................................................**40**

A.  Excepciones de Jurisdicción y Competencia ...........................................................41

1.  Excepción de Jurisdicción.......................................................................................43

(a)  La internacionalidad del Arbitraje conforme a lo señalado en el literal c) del artículo 62 de la Ley 1563 de 2012 ...........................................................43

(i)  Posición de la ANI ...............................................................................43

(ii)  Posición de POB y S&B .......................................................................47

(iii)  Análisis del Tribunal Arbitral ..............................................................50

(b)  La internacionalidad del Arbitraje de acuerdo al literal a) del artículo 62 de la Ley 1563 de 2012 .................................................................................54

(i)  Posición de la ANI ...............................................................................54

(ii)  Posición de POB y S&B .......................................................................56

(iii)  Análisis del Tribunal Arbitral ..............................................................57

(c)  La concurrencia del literal b) del artículo 62 ...........................................60

(i)  Posición de la ANI ...............................................................................60

(ii)  Posición de POB y S&B .......................................................................60

(iii)  Análisis del Tribunal Arbitral ..............................................................60

2.  Excepciones de Competencia ..................................................................................61

(a)  Competencia del Tribunal para conocer sobre las pretensiones relacionadas con las compensaciones por EER (Sección 14.2 (h) del Contrato)................................................................................................................61

(i)  Posición de la ANI ...............................................................................61

(ii)  Posición de POB y S&B .......................................................................62

(iii)  Análisis del Tribunal Arbitral ..............................................................64

(b)  Competencia del Tribunal sobre reclamaciones del Contratista EPC.................65

(i)  Posición de la ANI ...............................................................................65

(ii)    Posición de POB y S&B ............................................................... 68

(iii)    Análisis del Tribunal Arbitral ................................................... 69

B.    Demanda Principal de POB Y S&B ............................................................. 76

1.    Reclamaciones de las Demandantes en relación con la UF 2 ....................... 76

(a)    Posición de POB y S&B ............................................................... 76

(b)    Posición de la ANI ...................................................................... 79

(c)    Análisis del Tribunal Arbitral ................................................... 82

2.    Reclamaciones de las Demandantes en relación con las UFs 4 y 5 ................ 83

(a)    Sobre los alegados incumplimientos de la ANI en torno a los manantiales ..................... 86

(i)    Posición de POB y S&B ............................................................... 86

(ii)    Posición de la ANI ...................................................................... 90

(iii)    Contrato y Ley Aplicable ........................................................ 92

(iv)    Análisis del Tribunal Arbitral ................................................ 95

(b)    Sobre los alegados incumplimientos de la ANI en cuanto a la repudiación del Acta de EER y supuestos incumplimientos de POB respecto de las Actividades 1 y 2 ........................ 111

(i)    Posición de POB y S&B ............................................................. 111

(ii)    Posición de la ANI .................................................................... 115

(iii)    Contrato y Ley Aplicable ...................................................... 118

(iv)    Análisis del Tribunal Arbitral .............................................. 119

3.    Reclamación de reducción de los montos de fondeos de Subcuenta de Supervención e Interventoría ........................................................................................... 124

(a)    Posición de POB y S&B ............................................................. 124

(b)    Posición de la ANI .................................................................... 126

(c)    Análisis del Tribunal Arbitral ................................................ 127

C.    Reconvención de la ANI ................................................................................ 131

1.    Reclamaciones de la Demandada en relación con la UF 2 ........................... 131

(a) Posición de la ANI ..................................................................................132

(b) Posición de POB y S&B ...........................................................................133

(c) Ley aplicable y el Contrato ......................................................................136

(d) Análisis del Tribunal Arbitral .................................................................141

2. Reclamaciones de la Demandada en relación con las UFs 4 y 5 .......................152

(a) Posición de la ANI ..................................................................................152

(b) Posición de POB y S&B ...........................................................................154

(c) Contrato y Ley Aplicable ........................................................................157

(d) Análisis del Tribunal Arbitral .................................................................160

3. Reclamación de intereses por mora en el pago total de los fondeos de la Subcuenta de Supervisión e Interventoría ......................................................................166

(a) Posición de la ANI ..................................................................................166

(b) Posición de POB y S&B ...........................................................................170

(c) Análisis del Tribunal Arbitral .................................................................173

D. Efectos que produce sobre el Contrato la decisión sobre los incumplimientos alegados por las Partes ...........................................................................................................174

1. Efectos del Acta de EER respecto de las UFs 4 y 5 según las Demandantes y peticiones concretas de POB ...............................................................................................174

(a) Posición de POB y S&B ...........................................................................174

(b) Posición de la ANI ..................................................................................175

2. Efectos del Acta de EER según la ANI y peticiones concretas de la ANI; en particular, sobre la petición subsidiaria de Terminación Anticipada .................................................176

(a) Posición de la ANI ..................................................................................176

(b) Posición de POB y S&B ...........................................................................180

(c) Contrato y Ley Aplicable ........................................................................186

(d) Análisis del Tribunal Arbitral .................................................................187

5

E.    Compensación de las Demandantes ........................................................................197

  1.    ¿Le asiste a POB un derecho a recibir una compensación o indemnización y en qué cuantía? ...........................................................................................................................197

    (a)    Sobre el derecho de las Demandantes de recibir una indemnización por los incumplimientos de la ANI y, además, como consecuencia de la Terminación Anticipada del Contrato ..197

      (i)    Posición de POB y S&B ............................................................197

      (ii)    Posición de la ANI ...................................................................201

      (iii)    Contrato y Ley Aplicable ..........................................................204

      (iv)    Análisis del Tribunal Arbitral ...................................................207

    (b)    Cuantía de los daños reclamados por las Demandantes....................................208

      (i)    Posición de POB ......................................................................208

      (ii)    Posición de la ANI ...................................................................215

      (iii)    Análisis del Tribunal Arbitral ...................................................218

  2.    ¿Le asiste a S&B un derecho a recibir una compensación o indemnización y en qué cuantía? ...........................................................................................................................231

    (a)    Posición de POB y S&B ............................................................231

    (b)    Posición de la ANI ...................................................................232

    (c)    Análisis del Tribunal Arbitral ...................................................232

V.    **Parte Resolutiva** ...................................................................................................**233**

## TABLA DE ABREVIATURAS Y TÉRMINOS

| | |
|---|---|
| **Acta de EER** | Acta de 1 de agosto de 2018 mediante la cual las Partes reconocieron la existencia del EER de las UFs 4 y 5 |
| **ANI** | Agencia Nacional de Infraestructura |
| **ANLA** | Autoridad Nacional de Licencias Ambientales |
| **APP** | Asociación Público-Privada |
| **Arbitraje** | El presente arbitraje CIRD número 01-20-0015-3123 |
| **Árbitro de Urgencia** | Salvador Fonseca González |
| **Audiencia de Prueba o Audiencia Final** | Audiencia efectuada entre los días 12 de diciembre y 16 de diciembre del 2022 |
| **Capex** | Término originado del inglés "capital expenditure" |
| **CAR** | Corporación Autónoma Regional de Cundinamarca |
| **CIRD** | Centro Internacional de Resolución de Disputas |
| **Cláusula de Arbitraje** | Sección 15.3 del Contrato de Concesión 002 de 2014 |
| **CONPES** | Consejo Nacional de Política Económica y Social |
| **Contrato de Concesión o Contrato** | Contrato de Concesión 002 de 2014 |
| **Corporinoquía** | Corporación Autónoma Regional de la Orinoquía |
| **Demandada** | ANI |
| **Demandantes** | POB y S&B |
| **EER** | Evento Eximente de Responsabilidad |
| **EER-UF2** | EER derivado de la existencia de elementos arqueológicos entre el K5+650 y el K5+800 (El Divino Niño) y el K8+890 (Hacienda los Alcaparros) de la UF2 |

7

| | |
|---|---|
| **El Concesionario** | Perimetral Oriental de Bogotá S.A.S. |
| **Estructura Plural S&B** | S&B, la sociedad C.I. Grodco en C.A., Ingenieros Civiles, y la sociedad Colombiana de Inversiones de Infraestructura S.A.S. |
| **ICANH** | Instituto Colombiano de Antropología e Historia |
| **IFC** | Corporación Financiera Internacional |
| **Intervenciones** | Obras de Construcción, Rehabilitación y/o Mejoramiento, necesarias para el cumplimiento de las obligaciones del Concesionario |
| **Laudo o Laudo Parcial** | El presente laudo parcial final sobre jurisdicción, responsabilidad y daños |
| **Laudo Provisional** | El laudo provisional proferido el 9 de febrero de 2021 por el Árbitro de Urgencia para resolver la Solicitud de Medidas de Urgencia |
| **Ley 1536 de 2012** | Ley "Por medio de la cual se expide el Estatuto de Arbitraje Nacional e Internacional y se dictan otras disposiciones" |
| **O&M** | Operación y Mantenimiento |
| **PAGA** | Programas de Adaptación a la Guía Ambiental |
| **Partes** | Demandantes y Demandada |
| **POB** | El Concesionario |
| **PQR** | Preguntas, quejas y reclamos de miembros de la comunidad aledaña al Proyecto |
| **Proyecto** | Actividades, bienes, servicios, obligaciones y derechos necesarios para la financiación, construcción, rehabilitación, mejoramiento y operación del corredor vía Perimetral del Oriente de Cundinamarca. |

8

| | |
|---|---|
| **S&B** | Shikun & Binui VT AG |
| **UF** | Unidades Funcionales |
| **UF 2** | Unidad Funcional 2 |
| **UFs 4 y 5** | Unidades Funcionales 4 y 5 |
| **VPIP** | Valor Presente por Ingresos de Peaje |

1. El presente laudo arbitral se dicta en el arbitraje Caso Número 01-20-0015-3123 del Centro Internacional de Resolución de Disputas ("**CIRD**") y constituye un laudo parcial final sobre jurisdicción, responsabilidad y daños ("**Laudo**" o "**Laudo Parcial**").

## I.    CONSIDERACIONES PRELIMINARES

### A.    LAS PARTES Y SUS REPRESENTANTES

2. Las Demandantes en este arbitraje son:

   a) Perimetral Oriental de Bogotá S.A.S. ("**POB**" o "**Concesionario**" y, en conjunto con Shikun & Binui VT AG, las "**Demandantes**").

   Calle 93 No 11A– 28, Oficina 701

   Bogotá D.C., Colombia

   b) Shikun & Binui VT AG ("**S&B**")

   Bachstrasse 56, 8200 Schaffhausen

   Confederación Suiza

3. Las Demandantes están representadas en el arbitraje por[1]:

   Rafael Rincón Ordóñez

   Miguel Castro Muñoz

   Santiago Suárez Chaves

   Ana María Rincón

   Santiago Vernaza Civetta

   RINCÓN CASTRO ABOGADOS, S.A.S.

---

[1] En un principio, los representantes de las Demandantes eran parte de la firma Zuleta Abogados y Asociados S.A.S., siendo parte de los representantes de las Demandantes el Dr. Eduardo Zuleta Jaramillo. Luego, se creó la firma Rincón y Castro abogados, y los Dres. Rafael Rincón y Miguel Castro se mantuvieron como representantes de las Demandantes, mientras que Eduardo Zuleta dejó su rol de abogado de las Demandantes. En este Laudo, se señala el nombre de la firma de abogados y las direcciones de correo actuales de los representantes de las Demandantes.

Carrera 7 # 75-51, Edificio Terpel, Oficina 502

Bogotá, D.C., Colombia

rrincon@rinconcastro.com

mcastro@rinconcastro.com

ssuarez@rinconcastro.com

arincon@rinconcastro.com

svernaza@rinconcastro.com

4. La Demandada en este arbitraje es:

   Agencia Nacional de Infraestructura ("**ANI**" o la "**Demandada**").

5. La Demandada está representada en este arbitraje por:

   Yesenia Paba

   Fernando Augusto Ramírez Laguado

   Nerly Rocio Pinzon Florez

   AGENCIA NACIONAL DE INFRAESTRUCTURA – ANI

   Calle 24 A # 59 – 42, Edificio T3 Torre 4 Piso 2

   Ciudadela Empresarial Sarmiento Angulo

   Bogotá D.C, Colombia

   ypaba@ani.gov.co

   npinzon@ani.gov.co

   framirez@ani.gov.co


   Carlos Ortegón Pulido

   María Torres Castro

   María Fernanda SánchezORTEGÓN & PULIDO

   Calle 73 No. 9 - 42 Oficina 207 Edificio Nepal

Bogotá D.C, Colombia

fortegon@ortegonpulido.legal

mariatorres92@hotmail.com

msanchez@ortegonpulido.legal

6. Para fines de referencia, la Demandante y la Demandada serán referidos conjuntamente como las "**Partes**".

## B.    EL ACUERDO DE ARBITRAJE

7. El Contrato de Concesión bajo el Esquema de APP No. 002 que las Partes celebraron el 8 de septiembre de 2014 (el "**Contrato**") establece en su Parte General, Sección 15.3, lo siguiente:

15.3 Arbitraje Internacional[2]

(a) Toda controversia que surja entre las Partes con ocasión del Presente Contrato será resuelta por un Tribunal de Arbitramento Internacional de conformidad con el literal c) del artículo 62 de la ley 1563 de 2012 y las reglas que a continuación se establecen.

(b) También podrán ser sometidas a su conocimiento las decisiones definitivas del amigable componedor, de conformidad con lo establecido para los efectos de la transacción en el [sic] la Ley Aplicable.

(c) El arbitraje internacional será administrado por el Centro Internacional para la Resolución de Disputas (International Centre for Dispute Resolution de la American Arbitration Association), — ICDR— de conformidad con su Reglamento de Arbitraje Internacional, así como por los siguientes términos:

(i)    La sede del arbitraje será Bogotá, Colombia.

---

[2]  En caso de que la oferta ganadora tenga inversión extranjera directa o indirecta, la cláusula arbitral del contrato será únicamente la que se regula en la sección 15.3. Sin embargo, si los árbitros o cualquier autoridad con competencia para ello, declaran que, para el presente Contrato, no concurren las causas legales para que proceda el arbitraje internacional, se entenderá pactado el arbitraje nacional previsto en la Sección 15.2 anterior.

(ii)    El idioma del arbitraje será el español.

(iii)   La ley aplicable al Contrato será la ley colombiana vigente al momento de la celebración del Contrato así como las normas de procedimiento de la ley, aplicables a la controversia.

(iv)    El tribunal será designado por las Partes con base en una lista elaborada por el ICDR quien tendrá en cuenta las observaciones de idoneidad y experiencia informadas por las Partes. En el evento en que las Partes no lleguen a un acuerdo el ICDR será el encargado de hacer la designación de todos los árbitros, de conformidad con su reglamento.

(v)     Una vez presentada la solicitud de arbitraje por una de las Partes, la Parte convocante procederá a notificar adicionalmente a la Procuraduría General de la nación quien podrá intervenir en el proceso por medio de sus agentes al igual que lo hace en el arbitraje local, así como a la Agencia Nacional de Defensa Jurídica del estado colombiano, quien podrá intervenir en el proceso arbitral por medio de apoderado en representación de la ANI o como mero interviniente gozando en ese caso de las mismas facultades, los mismos derechos y garantías procesales y probatorias de las Partes.

(vi)    Los árbitros decidirán en derecho.

(vii)   Los honorarios del Tribunal de Arbitraje internacional se limitarán a los mismos montos señalados en la Sección 1.52(f) de esta Parte General, salvo que las Partes acuerden modificar dichos montos.

(viii)  A los árbitros del Tribunal de Arbitramento Internacional se les aplicarán las mismas previsiones contenidas en la Sección 15.2(h) y al arbitramento internacional las previsiones contenidas en las Secciones 15.2(i) y 15.2(j) de esta Parte General.

(d) El inicio del procedimiento arbitral no inhibirá el ejercicio de facultades excepcionales al derecho común de que disponga la ANI conforme al Contrato y la Ley Aplicable. Los actos administrativos, fruto del ejercicio de tales facultades no podrán ser sometidos a

arbitramento por ser competencia de la jurisdicción contenciosa administrativa.

(e) Las Partes acuerdan que en el evento en que se convoque el Tribunal de Arbitramento, los efectos de la cláusula compromisoria serán extensivo a aquellas empresas, sociedades o personas naturales que hayan presentado conjuntamente la Oferta, en la medida que, dichos sujetos prestaron su consentimiento por referencia al momento de la presentación de la Oferta.

(f) El inicio del trámite arbitral no faculta a las partes para suspender unilateralmente la ejecución de las obligaciones del Contrato.

## C.    LEY SUSTANTIVA APLICABLE

8.   De conformidad con la Sección 15.3 del Contrato, la Ley Aplicable es la ley colombiana.

## D.    REGLAS DE PROCEDIMIENTO APLICABLE

9.   De conformidad con la Sección 15.3 del Contrato, las reglas de procedimiento aplicable son aquellas contenidas en los Procedimientos Internacionales de Resolución de Disputas del CIRD, Reglamentos Modificados y en Vigor desde el 1 de junio de 2014 (el "**Reglamento**").

## E.    LA SEDE DEL ARBITRAJE

10.  De conformidad con la Sección 15.3 del Contrato, la sede del arbitraje es Bogotá, Colombia.

## F.    IDIOMA DEL ARBITRAJE

11.  De conformidad con la Sección 15.3 del Contrato, el idioma del arbitraje es el español.

## G.    TRIBUNAL ARBITRAL

12.  El Tribunal Arbitral está compuesto por los siguientes miembros:

Elina Mereminskaya – co-árbitro

14

Árbitro Independiente, Santiago, Chile.

em@emereminskaya-arb.com

Cristián Conejero – co-árbitro

Av. Nueva Costanera 3300, piso 4 Vitacura, Santiago, Chile.

cristian.conejero@cuatrecasas.com

Eduardo Palmer – Presidente

2601 South Bayshore Drive, Penthouse 1

Miami, Florida 33133

ep@epalmerlaw.com

Paula C. Arias – Secretaria Administrativa

1311 Miller Drive, Miami, Fl. 33146

paulacarias@gmail.com

## II.    EL PROCEDIMIENTO ARBITRAL

### A.    TRÁMITES PREVIOS A LA CONSTITUCIÓN DEL TRIBUNAL

13. El 16 de octubre de 2020 las Demandantes presentaron su Notificación de Arbitraje ante el CIRD, con base en la cláusula de arbitraje contenida en la Sección 15.3 del Contrato (la "**Cláusula de Arbitraje**").

14. El CIRD asignó el número 01-20-0015-3123 al presente arbitraje (el "**Arbitraje**").

15. Con fecha 5 de noviembre de 2020 la ANI solicitó una prórroga de 90 días para presentar su contestación a la Notificación de Arbitraje. Tras revisar los comentarios al respecto

presentados tanto por la ANI como por las Demandantes, el CIRD determinó conceder una prórroga de 60 días mediante correo electrónico de fecha 9 de noviembre de 2020.

16. El 13 de enero de 2021 las Demandantes presentaron la Solicitud de Medidas Urgentes de Protección consistentes en que se ordenare a la ANI lo siguiente: (a) que se abstenga de tomar cualquier medida que afecte la adecuada conducción del Arbitraje o pueda dejar sin efectos el laudo final; (b) que tome todos los pasos necesarios para que los Procedimientos Sancionatorios no entorpezcan este Arbitraje, agraven la disputa o dejen sin efecto el laudo final; (c) que se abstenga de declarar un incumplimiento y/o imponer una multa a POB en relación con cualquier procedimiento relacionado con el objeto de este Arbitraje, incluyendo los Procedimientos Sancionatorios, hasta tanto no se emita un laudo final; (d) que se abstenga de iniciar nuevos procedimientos administrativos relacionados con el objeto de este Arbitraje, hasta tanto no se emita un laudo final; y (e) que, si al momento de adoptarse las Medidas, se encuentra en firme alguna decisión sancionatoria relacionada con el objeto del Arbitraje, incluyendo en los Procedimientos Sancionatorios, suspenda la ejecución del acto administrativo respectivo (la "**Solicitud de Medidas**").

17. Con fecha 18 de enero de 2021 la Demandada presentó su Contestación a la Solicitud de Arbitraje y Reconvención.

18. El mismo 15 de enero de 2021 Salvador Fonseca González fue nombrado por el CIRD como Árbitro de Urgencia en este procedimiento y emitió la Orden Procesal Núm. 1. (el "**Árbitro de Urgencia**"). Ese mismo día el Árbitro de Urgencia sostuvo una conferencia preliminar con las Partes y con el CIRD. Así mismo, y con esa misma fecha, se estableció el Calendario Procesal para la tramitación de la Solicitud de Medidas.

19. Con fecha 27 de enero de 2021 la Demandada presentó Contestación a la Solicitud de Medidas Cautelares, en que sostuvo, en síntesis: (i) que la ANI tiene el deber de buscar el cumplimiento de los fines estatales; (ii) que la administración pública está investida de poderes exorbitantes para proteger el interés colectivo; (iii) que la potestad sancionadora de las autoridades permite asegurar la realización de los fines del Estado; (iv) que el artículo 17 de la Ley 1150 de 2007 faculta a la ANI a imponer multas; (v) el artículo 86

de la Ley 1474 de 2011 erige como un mandato legal el conminar a los contratistas al cumplimiento de lo pactado; (vi) el Contrato establece que la ANI puede multar a POB para conminarlo al cumplimiento de sus obligaciones; (vii) la Sección 15.3(d) del Contrato no inhibe las facultades de la ANI; (viii) no se cumplen los requisitos de la Ley de Arbitraje; del Código de Procedimiento Administrativo y Contencioso ni del Reglamento para conceder las medidas; entre otros. Así mismo, la ANI objetó la jurisdicción y competencia del Árbitro de Urgencia, en los mismos términos en que lo hizo previamente en el Arbitraje.

20. Con fecha 1 de febrero de 2021 tuvo lugar la audiencia con las Partes y el Árbitro de Urgencia, en que las Partes expusieron sus posiciones respecto de la Solicitud de Medidas.

21. Con fecha 9 de febrero de 2021 el Árbitro de Urgencia dictó el Laudo Provisional por medio del cual resolvió que tenía jurisdicción y competencia. Así mismo, concedió las medidas de urgencia, ordenando a la ANI que, hasta que se emita un laudo final por el que se dirima definitivamente la controversia en el Arbitraje, se abstenga de declarar incumplimientos de POB e imponer y/o ejecutar multas a POB en los Procedimientos Sancionatorios o en cualquier procedimiento sancionatorio futuro contra POB relacionado con el objeto del Arbitraje (el "**Laudo Provisional**").

## B.    CONSTITUCIÓN DEL TRIBUNAL ARBITRAL Y PRIMERA ORDEN PROCESAL

22. El CIRD determinó, de conformidad con el Artículo 11 del Reglamento, que las disputas de este arbitraje serían resultas por un tribunal compuesto por tres miembros, Elina Mereminskaya, Cristián Conejero y Eduardo Palmer.

23. Con fecha 3 de junio de 2021 el CIRD manifestó que no había recibido objeciones a dichas designaciones, por lo que confirmó la designación de los miembros del Tribunal Arbitral y se determinó que Eduardo Palmer actuaría como Presidente del Tribunal Arbitral.

24. Con fecha 17 de junio de 2021 el Tribunal Arbitral emitió la Orden Procesal Núm. 2, en que citó a las Partes a una Audiencia Preliminar con el objeto de acordar ciertos asuntos relativos a la conducción del Arbitraje.

25. Con fecha 25 de junio de 2021 el Tribunal Arbitral celebró una Audiencia Preliminar con los representantes de las Partes. Por las Demandantes comparecieron los letrados Miguel Castro, Sebastián Briceño y Rafael Rincón. Por la Demandada compareció la letrada María Torres.

26. En base a lo discutido por las Partes y el Tribunal en dicha Audiencia Preliminar, así como en la comunicación enviada por las Demandantes con fecha 24 de junio de 2021 y confirmada por la Demandada en la misma fecha, el Tribunal Arbitral emitió la Orden Procesal Núm. 3, de fecha 19 de julio de 2021, por medio de la cual se fijaron las reglas de procedimiento del Arbitraje y el Calendario Procesal. Así mismo, en la Audiencia Preliminar, y según quedó consignado en la Orden Procesal Núm. 3, las Partes aceptaron la designación de Paula Arias como Secretaria del Tribunal, para cumplir las funciones establecidas en la Orden Procesal Núm. 2.

C.   **PRESENTACIÓN DE ESCRITOS**

27. Con fecha 19 de noviembre de 2021 las Demandantes presentaron su Memorial de Demanda y la Demandada presentó su Memorial de Reconvención.

28. Con fecha 28 de febrero de 2022 las Demandantes presentaron su Memorial de Contestación a la Reconvención y la Demandada presentó su Memorial de Contestación a la Demanda.

29. Con fecha 18 de marzo de 2022 ambas Partes presentaron su Solicitud de Exhibición de Documentos en formato *Redfern Schedule*. Con fecha 8 de abril de 2022 las Partes presentaron las Objeciones a la Solicitud de Exhibición de Documentos. Con fecha 22 de abril de 2022 las Partes presentaron sus respectivas respuestas a las Objeciones a la Solicitud de Exhibición de Documentos.

30. Con fecha 11 de mayo de 2022 el Tribunal Arbitral emitió la Orden Procesal Núm. 4, en la que citó a las Partes a una conferencia para revisar temas procedimentales y organizar las fases siguientes, así como realizar preguntas sobre los *Redfern Schedules* de cada una de las Partes.

31. La referida conferencia tuvo lugar con el Tribunal Arbitral y las Partes el día 18 de mayo de 2022. Por las Demandantes comparecieron el letrado Rafael Rincón y el equipo de Zuleta Abogados Asociados. Por la Demandada comparecieron los letrados Carlos F. Ortegón, María Torres y Rocío Pinzón.

32. Con fecha 2 de junio de 2022 el Tribunal Arbitral emitió la Orden Procesal Núm. 5, en la que se definió la fecha de la Audiencia Final, y se hicieron ciertas modificaciones a la fecha del Calendario Procesal, en lo relativo a la fecha de la decisión del Tribunal Arbitral sobre las Objeciones a la Solicitud de Exhibición de Documentos.

33. Así mismo, por medio de la Orden Procesal Núm. 5, el Tribunal Arbitral resolvió las Solicitudes de Exhibición de Documentos (*Redfern Schedules*) presentados por cada una de las Partes y la Objeciones individuales, así como las razones aducidas.

34. Con fecha 19 de julio de 2022 se emitió la Orden Procesal Núm. 6, por la cual se concedió la solicitud de las Demandantes de ordenar a la Demandada a producir los documentos requeridos según la Orden Procesal Núm. 5, o certificar que dichos documentos no existen o no están en su poder o custodia. Así mismo, se concedió una extensión para la presentación de los Memoriales de Réplica y Dúplica.

35. Con fecha 29 de julio de 2022 se emitió la Orden Procesal Núm. 7, en la que se decidieron aspectos relativos al cumplimiento de la exhibición de documentos requeridos según la Orden Procesal Núm. 5 y se concedió una extensión para la presentación de los Memoriales de Réplica y Dúplica.

36. Con fecha 5 de agosto de 2022, se emitió la Orden Procesal Núm. 8, en la que se decidieron aspectos relativos al cumplimiento de la producción de documentos requeridos según las Órdenes Procesales Núm. 5 y 6, y se concedió una extensión para

la presentación del escrito de hechos no controvertidos a ser presentado conjuntamente por las Partes.

37. Con fecha 16 de agosto de 2022 las Demandantes presentaron su Memorial de Réplica y la Demandada presentó su Memorial de Réplica a la Reconvención.

38. Con fecha 15 de septiembre de 2022 se emitió la Orden Procesal Núm. 9, por medio de la cual se resolvió la comunicación de las Demandantes de fecha 19 de agosto del 2022, en la que solicitó descartar ciertas pruebas presentadas por la Demandada junto con su Memorial de Réplica a la Reconvención. Así mismo, en virtud del tiempo vertido en el intercambio de las comunicaciones relativas a la admisibilidad de dicha prueba, se concedió una nueva extensión para la presentación de los Memoriales de Dúplica y se invitó a las Partes a ponerse de acuerdo acerca del tiempo necesario y prudente de extensión.

39. A falta de acuerdo entre las Partes sobre la fecha de presentación de los Memoriales de Dúplica, con fecha 30 de septiembre de 2022, el Tribunal Arbitral emitió la Orden Procesal Núm. 10, en la que fijó la fecha de presentación de los Memoriales de Dúplica para el día 2 de noviembre de 2022, manteniendo la fecha fijada para la Audiencia Final.

40. Con fecha 2 de noviembre de 2022 las Demandantes presentaron su Memorial de Dúplica a la Reconvención y la Demandada presentó su Memorial de Dúplica.

41. Con fecha 20 de noviembre de 2022 se emitió la Orden Procesal Núm. 11, por medio de la cual se resolvió la oposición de pruebas del Memorial de Dúplica de las Demandantes presentado por la Demandada el día 9 de noviembre del 2022, y contestado por las Demandantes con fecha 11 de noviembre de 2022. Por medio de la misma Orden Procesal Núm. 11, el Tribunal Arbitral admitió los tres dictámenes periciales, CER-006, CER-007 y CER-008, aportados por las Demandantes en su Memorial de Dúplica. Así mismo, se concedió a la Demandada un término hasta el 2 de diciembre de 2022 para responder al análisis contenido en el dictamen pericial CER-008.

42. Con fecha 21 de noviembre de 2022 se efectuó una audiencia virtual con las Partes y el Tribunal Arbitral, en la que, entre otras cosas, se instruyó a las Partes a reunirse con el

fin de acordar los temas pendientes entre ellas de cara a la Audiencia Final. Por medio de correo electrónico de la misma fecha, las Partes informaron al Tribunal Arbitral de los siguientes acuerdos alcanzados: (i) la Audiencia Final tendría lugar en Bogotá, D.C.; (ii) las Partes presentarían al Tribunal Arbitral un escrito con la estipulación de los hechos no controvertidos; y (iii) enviarían el cronograma acordado para el desarrollo de la Audiencia Final, la cual tendría lugar entre los días 12 y 16 de diciembre de 2022.

43. Con fecha 23 de noviembre de 2023 se emitió la Orden Procesal Núm. 12, por medio de la cual se resolvió sobre el inicio de una acción popular iniciada en contra de la Demandada; al igual que sobre la Comunicación sobre desconocimiento del Laudo Provisional, presentada por las Demandantes el día 17 de noviembre del 2022, y contestada con fecha 18 de noviembre de 2022. La Orden Procesal Núm. 12 confirmó el carácter firme, válido y vinculante del Laudo Provisional. Así mismo, fijó las fechas de la Audiencia Final entre los días 12 de diciembre y 16 de diciembre del 2022, según lo previamente acordado por las Partes y decidido por el Tribunal Arbitral.

44. Con fecha 29 de noviembre de 2022 las Partes presentaron al Tribunal Arbitral un Memorial dirigido al proceso con dos pruebas aportadas de común acuerdo entre las Partes.

45. Con fecha 2 de diciembre de 2022 la Demandada presentó el Memorial de Respuesta al Dictamen de Fondeos de la ANI, de conformidad con el término otorgado para ello en la Orden Procesal Núm. 11.

46. Con fecha 6 de diciembre de 2022 el Tribunal Arbitral acusó recibo del Memorial presentado conjuntamente por las Partes y tuvo por acompañadas las pruebas presentadas.

47. Por correo electrónico de fecha 7 de diciembre de 2022 las Partes enviaron al Tribunal Arbitral el Escrito de Hechos No Controvertidos.

48. Por comunicación de fecha 8 de diciembre de 2022 las Partes sometieron al Tribunal Arbitral ciertos aspectos procedimentales de la Audiencia Final para su decisión, tales como la elaboración de un protocolo de audiencia, fechas y plazos de entrega de las

presentaciones *power point*, posibilidad de suspender la Audiencia Final por eventuales contagios de COVID-19, entre otros. Dichos asuntos fueron resueltos por medio de la Orden Procesal Núm. 13 de fecha 10 de diciembre de 2022.

49. Con fecha 11 de diciembre de 2022 las Partes enviaron al Tribunal Arbitral el cronograma de la Audiencia Final.

D.    **AUDIENCIA DE PRUEBA**

50. La Audiencia Final tuvo lugar entre los días 12 y 16 de diciembre de 2022, entre las 10:00am y las 6:00pm, hora local, en el Centro de Arbitraje y Conciliación de la Cámara de Comercio de Bogotá, ubicado en la Calle 76 #11-52 en Bogotá, Colombia.

51. A la Audiencia Final comparecieron las siguientes personas: (a) El Tribunal Arbitral, compuesto por Elina Mereminskaya; Cristián Conejero y Eduardo Palmer, como Presidente del Tribunal Arbitral, así como Paula Arias como Secretaria Administrativa; (b) Rafael Rincón, Miguel Castro, Santiago Vernaza, Ana María Rincon, Santiago Suarez, José David López, Adriana Triana, Tomer Ginesin y el señor Néstor [apellido no quedó registrado], CEO de POB, en representación de las Demandantes; y (c) en representación de la Demandada: Carlos Felipe Ortegón, Jesús Valbuena, María Torres y Rocío Pinzón.

52. La Audiencia comenzó con los Alegatos Iniciales de cada una de las Partes, por un tiempo de 90 minutos.

53. Luego, las Partes presentaron sus testigos de hecho y testigos expertos según el cronograma de la Audiencia Final enviado previamente por las Partes al Tribunal Arbitral.

54. El Tribunal Arbitral presenció: (a) al testigo presentado por las Demandantes: Luis Ernesto Pérez; (b) a los testigos presentados por las Demandadas: Natalia Mayorga, Eduardo Román y Álvaro Durán; (c) el experto legal presentado por las Demandantes: Gonzalo Suárez; (d) los testigos expertos presentados por las Demandantes: Hernando Torres, Edinson Arias, Juliette Fortin, Tatiana Santa Ríos, Gabriel Medina Moncayo,

Juan Carlos Valenzuela; y (e) el testigo experto presentado por la Demandada: Guillermo Sarmiento.

E.    **TRÁMITES POSTERIORES A LA AUDIENCIA, CIERRE DE LA INSTRUCCIÓN Y PLAZO PARA DICTAR EL LAUDO FINAL**

55. Durante el curso de la Audiencia Final las Partes llegaron a ciertos acuerdos para impulsar el procedimiento con posterioridad a la Audiencia y que fueron plasmados por el Tribunal Arbitral en la Orden Procesal Núm. 14 de fecha 20 de diciembre de 2022. El Tribunal informó a las Partes durante la Audiencia Final y en la Orden Procesal Núm. 14, que el expediente quedaría abierto bajo el Artículo 27 del Reglamento para objeto de adelantar los procedimientos después de la Audiencia Final.

56. Por medio de la Orden Procesal Núm. 14 el Tribunal Arbitral otorgó a la Demandada, según la oportunidad ofrecida por las Demandantes, un término hasta el día 23 de diciembre de 2022 para informar si haría uso de la oportunidad de contradecir el reporte CER-008 y el tiempo que necesitaría para el ejercicio de ese derecho. Así mismo, se fijaron los plazos de los trámites posteriores a la Audiencia Final, consistentes en (1) las preguntas que el Tribunal Arbitral sometería a las Partes; (2) la presentación de los escritos post-audiencia; y (3) la realización de una audiencia de alegatos de conclusión.

57. Con fecha 18 de enero de 2023, de conformidad con lo dispuesto en la Orden Procesal Núm. 14, el Tribunal Arbitral emitió la Orden Procesal Núm. 15, por medio de la cual el Tribunal Arbitral formuló la solicitud de información adicional y las preguntas que consideró necesario hacer a las Partes luego de la Audiencia Final.

58. Hasta la fecha 23 de enero de 2023 la Demandada no informó su interés en hacer uso de la oportunidad de contradecir el reporte CER-008.

59. Con fecha 28 de febrero de 2023 las Partes presentaron sus escritos post-audiencia.

60. Con fecha 18 de mayo de 2023 tuvo lugar la Audiencia de Alegatos de Conclusión, de forma virtual.

61. Con fecha 19 de junio de 2023, el Tribunal Arbitral emitió la Orden Procesal Núm. 16, donde resolvió rechazar la solicitud de las Demandantes de aportar una nueva prueba, y desestimar al requerimiento de la Demandada de que el Tribunal prescinda de competencia toda vez que el proceso arbitral ha fenecido. El Tribunal indico que bajo el Artículo 27 del Reglamento CIRD, la Audiencia Final se había mantenido abierta y el Tribunal tenía competencia para decidir el caso.

62. En la misma Orden Procesal Núm. 16, el Tribunal Arbitral reafirmó que el Tribunal dictaría dos laudos, uno parcial final sobre jurisdicción responsabilidad y daños, y luego otro parcial final sobre intereses y costas del arbitraje. En razón de lo anterior, la Audiencia Final se mantuvo abierta con el propósito de poder dirimir preguntas o aclaraciones necesarias a las Partes, para la elaboración del presente Laudo Parcial sobre jurisdicción, responsabilidad y daños, y para poder requerir, a posteriori, la posición de las partes sobre la materia de intereses y costas, y poder elaborar el laudo parcial final sobre intereses y costas.

63. Con fecha 1 de diciembre de 2023 el Tribunal Arbitral emitió la Orden Procesal Núm. 17, por medio de la cual solicitó a las Demandantes "presentar un cálculo desagregado por cada una de las 1, 2, 3, 4 y 5 Unidades Funcionales" utilizando la misma metodología usada en sus informes periciales anteriores, pudiendo acompañar un reporte pericial con el objeto de presentar dichos montos. La Demandada, a su vez, podía presentar una respuesta a dicho cálculo, pudiendo igualmente acompañar un reporte pericial analizando y refutando los montos presentados por las Demandantes. La Orden Procesal Núm. 17 también indicó que la Audiencia Final se mantendría abierta, tal y como se dispuso en la Orden Procesal Núm. 16 para los mismos efectos.

64. En virtud de la Orden Procesal Núm. 17, con fecha 15 de enero de 2024, las Demandantes presentaron una comunicación acompañada del Cuarto Dictamen de FTI (prueba CER-009). Con fecha 1 de marzo de 2024 la Demandada presentó su respuesta a la prueba CER-009 acompañada de un informe de contradicción de dicha prueba.

65. Con fecha 18 de marzo de 2024, en conformidad con lo dispuesto en la Orden Procesal Núm. 17, el Tribunal Arbitral emitió la Orden Procesal Núm. 18, por medio de la cual

concedió traslado a las Demandantes para que presentaran su contestación al memorial de respuesta a los cálculos y el correspondiente dictamen presentado por la Demandada el día 1 de marzo del 2024. La Demandada, a su vez, podía presentar una respuesta. El Tribunal también se reservó el derecho a convocar otra sesión de la Audiencia Final de pruebas para clarificar los temas relacionados con los cálculos de daños y la prueba que los fundamenta.

66. En virtud de la Orden Procesal Núm. 18, con fecha 12 de abril de 2024, las Demandantes presentaron una comunicación acompañada del Quinto Dictamen de FTI (prueba CER-010). Con fecha 7 de mayo de 2024 la Demandada presentó su respuesta a la prueba CER-010 acompañada de un informe de contradicción de dicha prueba.

67. Con fecha 4 de junio de 2024 el Tribunal Arbitral emitió la Orden Procesal Núm. 19, en base de la reserva hecha de mantener la Audiencia Final abierta, por medio de la cual fijó una audiencia virtual con la presencia de los expertos de ambas Partes. En la audiencia cada Parte tendría la oportunidad para presentar sus argumentos de cierre y para aclarar y/o refutar las observaciones y conclusiones elucidadas con los reportes presentados en virtud de las Órdenes Procesales Núm. 17 y 18.

68. Con fecha 26 de junio de 2024 se llevó a cabo la audiencia convocada por la Orden Procesal Núm. 19. A la conclusión de esta audiencia, el Tribunal otra vez confirmó que el expediente permanecería abierto para seguir evaluando las pruebas y argumentos para dictar el laudo parcial sobre responsabilidad y daños, y posteriormente otro sobre costos del arbitraje.

69. Con fecha 5 de julio de 2024, dentro del plazo establecido en la audiencia, las Demandantes señalaron la ubicación específica en el expediente de las pruebas asociadas a la Reclamación Arqueológica de la UF2.

70. Con fecha 12 de julio de 2024 la Demandada presentó su pronunciamiento en consideración al escrito de la Demandante de fecha 5 de julio de 2024.

71. Con fecha 26 de julio de 2024 las Partes enviaron al Tribunal Arbitral la transcripción de la audiencia de 26 de junio de 2024.

### III.     LOS HECHOS

72. En esta Sección se describen los hechos esenciales del Arbitraje, derivados de los Memoriales de cada una de las Partes, así como del Escrito de Hechos No Controvertidos presentado conjuntamente por las Partes.

## A.     LA LICITACIÓN DEL PROYECTO Y LA SUSCRIPCIÓN DEL CONTRATO DE CONCESIÓN

73. El Estado colombiano es el propietario de la red vial nacional y el primer responsable de su construcción, rehabilitación y conservación. Para cumplir con sus deberes legales en relación con esa infraestructura, tiene la facultad de celebrar contratos de concesión para que sean los particulares quienes se encarguen de esas labores, en los términos y condiciones previstos en la ley y en el contrato. Las entidades deben determinar que los contratos pueden ejecutarse antes de iniciar las licitaciones correspondientes[3].

74. Mediante las Resoluciones 1187 de 29 de octubre de 2013 y 1267 de 5 de noviembre de 2013, la ANI ordenó la apertura del proceso de selección de Licitación Pública No. VJ-VE-IP-LP-010-2013, cuyo objeto consistió en satisfacer la necesidad del servicio público de transporte entre el origen y destino, iniciándose en torno al municipio de Sopó y finalizando a la altura del municipio de Cáqueza conectando con la vía Bogotá – Villavicencio[4].

75. En el año 2013 la ANI publicó el proyecto de asociación público-privada ("**APP**") de iniciativa pública para el diseño, construcción, operación, financiación y reversión de la Vía Perimetral del Oriente de Cundinamarca (el "**Proyecto**"). El Proyecto consistía en la rehabilitación y mejoramiento de un corredor vial existente, más la construcción de una vía adicional, en el oriente de Bogotá D.C. En total, el Proyecto tendría una longitud total aproximada de 153 kilómetros, divididos en cinco Unidades Funcionales ("**UFs**")[5].

---

[3] Escrito de Hechos No Controvertidos, ¶¶ 11-12.
[4] Demanda ANI, ¶ 1.
[5] Escrito de Hechos No Controvertidos, ¶ 4; Demanda POB y S&B, ¶ 3;

76. Según ambas Partes, la ANI estructuró el Proyecto, determinó que el Proyecto era viable y, por ende, con fecha 29 de octubre de 2013 abrió la licitación del Proyecto (la "**Licitación**")[6].

77. Durante la Licitación, la ANI publicó los siguientes documentos[7]:

(i) El 18 de abril de 2013 la ANI publicó una invitación para preseleccionar a los posibles interesados en el Proyecto y formar una lista de precalificados[8]. En esa oportunidad, la ANI publicó los estudios en etapa de Prefactibilidad elaborados por su estructurador, en los que manifestó cuáles serían las vías intervenidas en las UFs 4 y 5 y cuáles serían las Intervenciones que se ejecutarían en las mismas[9].

(ii) En julio de 2013 la ANI seleccionó a los Precalificados, que eran los posibles interesados en el Proyecto que cumplían con los requisitos habilitantes de capacidad jurídica, experiencia en inversión y capacidad financiera previstos por la ANI en la invitación de precalificación.

(iii) La ANI elaboró los estudios de Prefactibilidad y Factibilidad antes del inicio de la Licitación, conjuntamente con su equipo de estructuradores, conformado por la Corporación Financiera Internacional ("**IFC**") del Banco Mundial, la Unión Temporal Euroestudios – Durán & Osorio – Deloitte y por FONADE (hoy Enterritorio), una entidad pública dedicada exclusivamente a la financiación y estructuración de proyectos de desarrollo. Estos estudios incluyeron, entre otros, análisis detallados en materia ambiental, geotécnica, geológica e hidrológica[10].

(iv) El 16 de septiembre de 2013 la ANI publicó los estudios y diseños en etapa de Factibilidad y los demás documentos de la Licitación[11].

---

[6] Escrito de Hechos No Controvertidos, ¶¶ 13, 15; Demanda POB y S&B, ¶ 120.
[7] Escrito de Hechos No Controvertidos, ¶¶ 4, 16.
[8] Demanda POB y S&B, ¶ 107.
[9] Demanda POB y S&B, ¶ 108.
[10] Contestación ANI, ¶ 134.
[11] Demanda POB y S&B, ¶ 117.

(v)    La ANI expidió la Resolución de Utilidad Pública No. 309 del 7 de febrero de 2014, mediante la cual declaró que el Proyecto es de utilidad pública e interés general y definió el trazado del Proyecto.

78. La estructura plural conformada por S&B, la sociedad C.I. Grodco en C.A., Ingenieros Civiles, y la sociedad Colombiana de Inversiones de Infraestructura S.A.S. (la "**Estructura Plural S&B**") manifestó su interés en ser preseleccionada. La ANI, por medio de Resolución No. 823 del 29 de julio de 2013 la incluyó dentro de la lista de Precalificados[12].

79. Durante la Licitación la Estructura Plural S&B realizó más de 60 observaciones a su contenido y visitó la zona del Proyecto para verificar sus condiciones generales[13].

80. Con fecha 30 de mayo de 2014 la Estructura Plural S&B presentó su oferta (la "**Oferta**")[14]. Mediante la Resolución No. 922 de fecha 23 de julio de 2014, la ANI determinó que la Oferta de la Estructura Plural S&B era la ganadora de la Licitación[15].

81. En cumplimiento de los pliegos de condiciones de la Licitación, las sociedades integrantes de la Estructura Plural S&B, en calidad de accionistas, constituyeron a POB con fecha 20 de agosto de 2014[16].

82. Las Partes suscribieron el contrato de concesión en la modalidad de APP No. 004 de 2014, con fecha 8 de septiembre de 2014 (el "**Contrato**" o el "**Contrato de Concesión**")[17].

---

[12]  Demanda POB y S&B, ¶ 107.
[13]  Escrito de Hechos No Controvertidos, ¶ 17.
[14]  Demanda POB y S&B, ¶ 124.
[15]  Demanda POB y S&B, ¶ 125.
[16]  Escrito de Hechos No Controvertidos, ¶ 18; Demanda POB y S&B, ¶¶ 5, 41, 126.
[17]  Demanda POB y S&B, ¶¶ 41, 127; Demanda ANI, ¶ 4.

**B.    ALCANCE DEL CONTRATO**

83. Según ambas Partes, la ejecución del Contrato para el desarrollo del Proyecto se divide en tres Etapas[18]:

(i)    Etapa Preoperativa: Esta etapa está compuesta por la Fase de Preconstrucción y la Fase de Construcción. La Fase de Preconstrucción iniciaría desde la Fecha de Inicio hasta la fecha en que se suscribiera el Acta de Inicio de la Fase de Construcción, a partir de la cual empezaría a correr la Fase de Construcción. Por expresa disposición del Contrato, la Fase de Construcción—y por ende la Etapa Preoperativa—terminaría con la suscripción de la última Acta de Terminación de Unidad Funcional.

(ii)    Etapa de Operación y Mantenimiento ("**O&M**"): Esta etapa iniciaría con la suscrición de la última Acta de Terminación de Unidad Funcional y se extendería hasta la fecha de terminación que se establece en la Sección 2.4 del Contrato referente al plazo de éste.

(iii)    Etapa de Reversión: Esta etapa iniciará una vez concluya la Etapa de Operación y Mantenimiento o se haya declarado la Terminación Anticipada del Contrato y concluye con la suscripción del Acta de Reversión.

84. Durante la Fase de Construcción, que se desarrolla en la Etapa Preoperativa, hay diferentes tipos de intervenciones a cargo del Concesionario. De conformidad con la Sección 4.1 del Apéndice Técnico 1, las intervenciones son todas aquellas obras de Construcción, Rehabilitación y/o Mejoramiento, necesarias para el cumplimiento de las obligaciones del Concesionario ("**Intervenciones**")[19]. Las Intervenciones previstas para cada una de las cinco UFs se encuentran descritas en el Apéndice Técnico 1[20].

85. A su vez, según ambas Partes, las actividades de O&M en la Etapa Preoperativa exigibles al Concesionario son aquellas requeridas para mantener el corredor vial en condiciones

---

[18]   Escrito de Hechos No Controvertidos, ¶ 5; Demanda POB y S&B, ¶¶ 128-134.
[19]  Escrito de Hechos No Controvertidos, ¶¶ 6-7; Demanda POB y S&B, ¶ 135.
[20]  Escrito de Hechos No Controvertidos, ¶¶ 6-7; Demanda POB y S&B, ¶ 137.

adecuadas durante la Etapa Preoperativa de las UFs correspondientes, en cumplimiento de lo previsto en el Contrato[21].

86. La remuneración del Concesionario, denominada Retribución en el Contrato de Concesión, tiene tres componentes: los Aportes ANI, el Recaudo de Peaje y los Ingresos por Explotación Comercial ("**Retribución**")[22].

87. Las UFs 4 y 5 representan aproximadamente un 58% de la Retribución, siendo las UFs más significativas del Proyecto y las que más incidencia tienen en la Retribución al Concesionario. Según el Contrato, POB recibiría un valor mínimo por concepto de Recaudo de Peaje, denominado el Valor Presente por Ingresos de Peaje – VPIP (el "**VPIP**")[23].

88. De conformidad con la Sección 2.4 del Contrato, éste tendría una duración de 25 años. Sin embargo, en caso de que el Concesionario no obtuviese el VPIP en ese término, la duración del Contrato podría extenderse hasta un máximo de 29 años. Si el Concesionario no obtuviese el VPIP en el término de 29 años, la ANI debería pagarle la diferencia entre lo efectivamente recaudado y el VPIP y el Contrato se terminaría[24].

## C.   EL INICIO DE LA EJECUCIÓN DEL CONTRATO

89. Según las Partes, en los términos del Contrato, el Concesionario se obligó a obtener los permisos y licencias aplicables para poder ejecutar las Intervenciones previstas en el Contrato de Concesión. Sin los permisos requeridos (incluyendo las licencias aplicables), las Intervenciones no pueden ejecutarse[25].

---

[21] Escrito de Hechos No Controvertidos, ¶ 31.
[22] Escrito de Hechos No Controvertidos, ¶ 8; Demanda POB y S&B, ¶¶ 140-146.
[23] Escrito de Hechos No Controvertidos, ¶ 9.
[24] Escrito de Hechos No Controvertidos, ¶ 10.
[25]   Escrito de Hechos No Controvertidos, ¶ 20.

90. Esos permisos y licencias ambientales pueden ser de dos tipos en proyectos de infraestructura en Colombia: licencias ambientales y Programas de Adaptación a la Guía Ambiental ("**PAGA**")[26].

91. La necesidad de contar con uno u otro depende del tipo de Intervención que se va a realizar: si la Intervención es de Construcción se requerirá de una licencia ambiental; si la Intervención es de Mejoramiento o Rehabilitación se requerirá un PAGA[27].

92. El Concesionario obtuvo los siguientes permisos ambientales[28]:

(i)    Para la UF1: mediante concepto del 25 de junio de 2015, la Interventoría emitió su no objeción al PAGA elaborado por el Concesionario;

(ii)   Para la UF2: mediante concepto del 13 de septiembre de 2016, la Interventoría emitió su no objeción al PAGA elaborado por el Concesionario;

(iii)  Para la UF3: mediante concepto del 13 de septiembre de 2016, la Interventoría emitió su no objeción al PAGA elaborado por el Concesionario;

(iv)   Para la UF4: mediante concepto del 26 de octubre de 2016, la Interventoría emitió su no objeción al PAGA elaborado por el Concesionario;

(v)    Para la UF5: mediante concepto del 30 de septiembre de 2016, la Interventoría emitió su no objeción al PAGA elaborado por el Concesionario; y

(vi)   Para la Variante de Choachí: la Autoridad Nacional de Licencias Ambientales ("**ANLA**"), emitió la licencia ambiental mediante la Resolución 248 del 10 de marzo de 2016.

---

[26]  Escrito de Hechos No Controvertidos, ¶ 21; Demanda POB y S&B, ¶ 157.
[27]  Escrito de Hechos No Controvertidos, ¶ 22; Demanda POB y S&B, ¶ 158.
[28]  Escrito de Hechos No Controvertidos, ¶ 22.

93. El Concesionario presentó a la Interventoría los Estudios de Trazado y Diseño Geométrico y los Estudios de Detalle de las UFs 4 y 5[29].

94. La Interventoría presentó la no Objeción a los Estudios de Trazado y Diseño Geométrico de las UFs 4 y 5 a través de los oficios CP-PER-360-2015 (RAD. ANI No. 2015-409-081869-2) y CP-PER-356-2015 (RAD. ANI No. 2015-409-080604-2) del 10 y 4 de diciembre de 2015 respectivamente, así como la no Objeción a los Estudios de Detalle de las Unidades Funcionales 4 y 5, a través de los oficios CP-PER-370-2015 (RAD. ANI No. 2015-409-082668- 2) y CP-PER-369- 2015 (RAD. ANI No. 2015-409-082674-2) del 14 de diciembre de 2015[30].

95. Derivado de lo anterior, el 16 de enero de 2016, las Partes suscribieron el Acta de Inicio de la Fase de Construcción. De conformidad con lo previsto en el Otrosí No. 4, el término de la Fase de Construcción de las UFs 4 y 5 comenzó a contabilizarse el 15 de diciembre de 2015. A partir de entonces, el Concesionario comenzó a ejecutar las actividades previstas en el Contrato y en el Plan de Obras[31].

## D.   LA IDENTIFICACIÓN DE LOS MANANTIALES EN LAS UFS 4 Y 5 Y LA SUSCRIPCIÓN DEL ACTA DE EER

### 1.   LA IDENTIFICACIÓN DE LOS MANANTIALES EN LAS UFs 4 Y 5

96. Durante la Fase de Construcción, el Concesionario identificó que en el trazado de las UFs 4 y 5 del Proyecto existían 66 manantiales[32].

97. En efecto, según las Demandantes, con fechas 16 de agosto de 2016, 1 de septiembre de 2016 y 6 de diciembre de 2016, POB recibió preguntas, quejas y reclamos ("**PQRs**") de

---

[29] Escrito de Hechos No Controvertidos, ¶ 23;
[30] Escrito de Hechos No Controvertidos, ¶ 24.
[31] Escrito de Hechos No Controvertidos, ¶ 25; Demanda POB y S&B, ¶¶ 166-167.
[32] Escrito de Hechos No Controvertidos, ¶ 26.

miembros de la comunidad aledaña al Proyecto en las que se advertía la posible existencia de manantiales en las inmediaciones del trazado de las UFs 4 y 5[33].

98.  Según las Demandantes, entre octubre de 2016 y abril de 2018, POB elaboró estudios técnicos para verificar las características físicas y químicas de las fuentes de agua respecto de las cuales trataban los PQRs[34]. Entre estos informes se encuentran el informe realizado por la Pontificia Universidad Javeriana (el "**Informe Javeriana**")[35] y el informe realizado por la Constructora SIAM S.A. (el "**Informe SIAM**")[36], que, en conjunto, concluyeron la existencia de los 66 manantiales y que fueron dados a conocer a la ANI y a la Interventoría[37].

99.  Las Demandantes señalan que el 14 de noviembre de 2017, de conformidad con lo concluido por el Informe Javeriana, presentó a la ANI la primera notificación del Evento Eximente de Responsabilidad ("**EER**") (la "**Primera Notificación de EER**"); el 27 de febrero de 2018, y según lo concluido por el Informe SIAM, presentó la segunda notificación de EER (la "**Segunda Notificación de EER**"), a las cuales la ANI no habría contestado[38]. Agrega POB que con fecha 28 de abril de 2018, basado en una complementación del Informe SIAM y otros requerimientos[39], presentó a la ANI la tercera notificación de EER (la "**Tercera Notificación de EER**"), complementada por comunicación de fecha 23 de mayo de 2018[40]. Según las Demandantes, solo el 19 de

---

[33]  Demanda POB y S&B, ¶ 168.
[34]  Demanda POB y S&B, ¶¶ 170-180.
[35]  Demanda POB y S&B, ¶¶ 172-175, 177.
[36]  Demanda POB y S&B, ¶¶ 176, 178-179.
[37]  Demanda POB y S&B, ¶¶ 174, 177, 180.
[38]  Demanda POB y S&B, ¶¶ 186-190.
[39]  Las Demandantes señalan que, Con fecha 18 de febrero de 2018, la Corporación Autónoma Regional de la Orinoquía, un ente autónomo del Estado central que tiene a su cargo la administración del medio ambiente y los recursos naturales y con jurisdicción en parte del Proyecto ("**Corporinoquía**") notificó a POB dos actos administrativos por los cuales lo exhortaba a efectuar estudios hidrogeológicos para verificar las condiciones de dos puntos de interés hídrico en las inmediaciones del Proyecto. Memorial de Demanda, ¶ 189. Asimismo, la Demandada manifiesta que la Corporación Autónoma Regional de Cundinamarca, un ente autónomo del Estado central que tiene a su cargo la administración del medio ambiente y los recursos naturales, y con jurisdicción en parte del Proyecto ("**CAR**" y conjuntamente con Corporinoquía, las "**Autoridades Ambientales**") le habría enviado una comunicación, con fecha 22 de mayo de 2018, en que le manifiesta que no se podían desarrollar actividades en las inmediaciones de los manantiales. Memorial de Demanda, ¶ 192.
[40]  Demanda POB y S&B, ¶¶ 190-192.

julio de 2019 la Interventoría le habría comunicado a la ANI que estaba de acuerdo con que los eventos informados en la Tercera Notificación de EER constituían un EER[41].

## 2. LA SUSCRIPCIÓN DEL ACTA DE EER

100.    Según ambas Partes, con fecha 1 de agosto de 2018, las Partes suscribieron el Acta de Evento de Eximente de Responsabilidad ("**Acta de EER**"), por medio de la cual las Partes reconocieron que la existencia de los manantiales en la UFs 4 y 5 del Proyecto era un EER en los términos del Contrato[42].

101.    Según las Partes, en el Acta de EER, entre otras obligaciones y compromisos, las Partes se comprometieron a realizar las siguientes actividades[43]:

(i)    La Actividad 1, la cual consistía en la "elaboración y presentación de medidas y obras de mitigación tipo en los puntos hídricos identificados para las Unidades Funcionales 4 y 5 por parte del Concesionario", (las "**Medidas de Mitigación**"). Las Medidas de Mitigación serían presentadas por el Concesionario ante la ANI y la Interventoría para que posteriormente fueran "presentadas con la colaboración del Concesionario a las Autoridades competentes para su estudio (aprobación o rechazo)". Las Partes, responsables de esta actividad eran "Concesionario – ANI – Interventoría". Las Partes señalaron que "el tiempo estimado" de esta actividad sería de "tres (3) meses contados a partir de la suscripción de la presente acta".

a.    Si las Autoridades Ambientales aceptaban las Medidas de Mitigación tipo, la Actividad 2 consistía en que: "(…) las Partes y la Interventoría deberán reunirse y determinar sobre la posibilidad y/o viabilidad de suscribir un documento contractual en el que las Partes de buena fe revisarán, entre otras cosas, las actividades y condiciones requeridas para reanudar la ejecución de las

---

[41] Demanda POB y S&B, ¶ 193.
[42] Escrito de Hechos No Controvertidos, ¶¶ 27-28; Demanda POB y S&B, ¶ 196.
[43] Escrito de Hechos No Controvertidos, ¶ 29.

Intervenciones contractualmente previstas, estudiando los impactos a que haya lugar".

    b.  Por el contrario, si las Autoridades Ambientales rechazaban las Medidas u obras de Mitigación tipo, la Actividad 2 consistía en que: "(…) las partes y la Interventoría deberán reunirse y determinar sobre la posibilidad y/o viabilidad de suscribir un documento contractual en el que las Partes de buena fe revisarán, entre otras cosas, las actividades y condiciones requeridas para ejecutar intervenciones de las Unidades Funcionales 4 y 5 ante la imposibilidad de ejecutar las intervenciones contractualmente previstas".

  (ii)  Las partes responsables de la Actividad 2 eran "Concesionario y ANI (con el soporte de la Interventoría)" y las Partes "estimaron" que la duración de esta Actividad 2 sería de "[d]os meses, prorrogables hasta por dos veces más". Las Partes señalaron que "[e]n caso de no llegar a un acuerdo en el plazo acá estipulado, se procederá conforme lo indica el Contrato (sic)".

102.    Las Actividades 1 y 2 fueron las obligaciones adquiridas por las Partes para superar el EER en los términos establecidos en el Acta de EER, y el Contrato de Concesión[44].

## E.   LOS HECHOS POSTERIORES A LA SUSCRIPCIÓN DEL ACTA DE EER RESPECTO DE LAS UFS 4 Y 5

103.    Las Demandantes señalan que, con fecha 21 de agosto de 2018, y en cumplimiento de la Actividad 1 establecida en el Acta de EER, se llevó a cabo una reunión entre la ANI, la Interventoría y POB con las Autoridades Ambientales, con el objeto de proponer medidas, ante lo cual las Autoridades Ambientales se habrían negado[45].

104.    Agrega POB que, a pesar de la negativa de las Autoridades Ambientales, y en cumplimiento del Acta de EER, POB presentó, con fecha 13 de septiembre de 2018, las

---

[44] Escrito de Hechos No Controvertidos, ¶ 30.
[45] Demanda POB y S&B, ¶¶ 251-252.

Medidas de Mitigación para su estudio (aprobación o rechazo), las que habrían sido rechazadas por las Autoridades Ambientales[46].

105.    Las Demandantes señalan que, con fecha 17 de septiembre de 2018, justo después de presentarles a las Autoridades Ambientales las Medidas de Mitigación —anticipando que no serían aprobadas— POB le envió a la ANI una comunicación en la que le manifestó que había cumplido con la Actividad 1 del Acta de EER. Luego, después de que las Medidas de Mitigación no fueran aprobadas, con fecha 21 de noviembre de 2018, 4 de diciembre de 2018, y 1 de enero de 2019, POB envió a la ANI comunicaciones dando por concluida la Actividad 1 y promoviendo que se adelantara la Actividad 2[47].

106.    Según las Demandantes, a mediados del mes de enero de 2019, las Partes comenzaron a negociar un Otrosí del Contrato de Concesión conforme a lo requerido respecto de la Actividad 2. La primera versión del Otrosí que se negoció en virtud de la Actividad 2 fue enviada por POB a la ANI el 21 de enero de 2019. Estas negociaciones habrían durado entre enero y octubre del año 2019 y habrían concluido con el acuerdo de los términos del Otrosí de Estudios y Diseños, cuya versión final fue enviada por POB a la ANI, a solicitud de la ANI, con fecha 11 de octubre de 2019[48].

107.    Según las Demandantes, la ANI no habría manifestado oposición alguna al Otrosí de Estudios y Diseños, pero no lo habría devuelto firmado, pese a las solicitudes de POB de devolverlo firmado, formuladas entre noviembre de 2019 a junio de 2020[49].

108.    Por su parte, la Demandada señala que nunca hubo una aprobación al Otrosí, y que la Actividad 1 seguía en desarrollo[50].

---

[46] Demanda POB y S&B, ¶¶ 253-254.
[47] Demanda POB y S&B, ¶¶ 256-264.
[48] Demanda POB y S&B, ¶¶ 265-268, 272-274, 279.
[49] Demanda POB y S&B, ¶ 281.
[50] Demanda ANI, ¶¶ 97, 137-138, 147-148, 168.

109.    Según las Demandantes, con fecha 23 de junio de 2020, ANI envió comunicaciones al Ministerio de Medio Ambiente y a la Contraloría por medio de las cuales la ANI habría intentado reabrir la Actividad 1, repudiando los términos del Acta de EER[51].

110.    Por otro lado, las Demandantes señalan que tanto la CAR como Corporinoquía han iniciado procedimientos sancionatorios ambientales en contra de POB por presuntamente realizar actividades diferentes al aprovechamiento de los frutos secundarios del bosque dentro de los 100 metros alrededor de un manantial, lo que constaría en el auto 0415 del 4 de mayo de 2018 de la CAR, y en el auto 800.6.19.0091 del 12 de marzo de 2019 de Corporinoquía, respectivamente[52].

111.    La Demandada señala que, en virtud de su función de articulación institucional de entidades del Estado colombiano, logró la realización, con fecha 16 de junio de 2021, de una Mesa de Trabajo Interinstitucional desarrollada conjuntamente con las autoridades ambientales, gubernamentales y la Procuraduría General de la Nación, en la cual se dispuso que las Autoridades Ambientales Regionales adelantarán una mesa de trabajo con la ANLA[53]. Agrega que, con posterioridad, se realizaron más mesas de trabajo entre julio de 2020 y octubre de 2021[54].

112.    Por su parte, la Demandada señala que, a pesar de la suscripción del Acta de EER, las obligaciones de O&M de POB no se encontraban suspendidas, razón por la cual envió múltiples requerimientos, entre los años 2017 y 2020, para que efectuara las actividades de Mantenimiento y/o Intervenciones Prioritarias en los tramos de las Unidades Funcionales 4 y 5[55].

## F.    LOS HALLAZGOS ARQUEOLÓGICOS DE LA UF 2

113.    Las Demandantes señalan que el 21 de julio de 2015, el Instituto Colombiano de Antropología e Historia ("**ICANH**") expidió la Autorización de Intervención

---

[51]  Demanda POB y S&B, ¶¶ 293-302.
[52]  Demanda POB y S&B, ¶ 317.
[53]  Demanda ANI, ¶ 124.
[54]  Demanda ANI, ¶ 126.
[55]  Demanda ANI, ¶¶ 78-84.

Arqueológica No. 5048, mediante la cual se autorizó el Programa de Arqueología Preventiva de la UF2 del Corredor Perimetral Oriental de Bogotá (el "**Programa Arqueológico**").

114. Según ambas Partes, en el trazado de la UF2 se encontraron 5 yacimientos arqueológicos: (i) El Divino Niño; (ii) el predio de la señora Ana de Forero; (iii) la Hacienda los Alcaparros; (iv) el Cruce el Salitre-Guasca; y (v) la Hacienda Búfalo – Camino al Meta[56].

115. Las Demandantes señalan que, con fecha 30 de marzo de 2016, el ICANH aprobó el Informe de Prospección Arqueológica y le ordenó a POB que implementara las medidas de manejo pertinentes frente a los yacimientos encontrados. A raíz de ello, según las Demandantes, el 26 de enero de 2017, el Equipo de Arqueólogos de POB presentó la Solicitud de Autorización para Intervención Arqueológica, aprobada por el ICANH el 1 de marzo de 2017[57].

116. Según ambas Partes, la labor que realizó el Equipo de Arqueólogos en ejercicio del Programa Arqueológico permitió identificar la presencia de dos sitios de impacto arqueológico a lo largo del trazado de la UF2 del Proyecto. El primero, ubicado entre el K5+650 y el K5+800 dentro del yacimiento El Divino Niño. El segundo, ubicado en el K8+890 dentro del yacimiento la Hacienda los Alcaparros[58].

117. Según ambas Partes, con fecha 18 de febrero de 2022, dos Paneles de Amigables Componedores[59] reconocieron la existencia de dos EERs notificados por POB ("**EERs-UF2**", derivados de la existencia de elementos arqueológicos entre el K5+650 y el K5+800 (El Divino Niño) y el K8+890 (Hacienda los Alcaparros) de la UF2[60].

---

[56] Escrito de Hechos No Controvertidos, ¶ 34; Demanda POB y S&B, ¶ 419.
[57] Demanda POB y S&B, ¶¶ 420-426.
[58] Escrito de Hechos No Controvertidos, ¶ 35; Demanda POB y S&B, ¶¶ 428-429; Demanda ANI, ¶19.
[59] Decisión final Amigables Componedores, Controversia 15854 y 15856, ambas de fecha 18 de diciembre de 2018. Demanda POB y S&B, ¶ 412.
[60] Escrito de Hechos No Controvertidos, ¶ 36.

38

118.    Según ambas Partes, en la Amigable Composición Divino Niño y en la Amigable Composición Hacienda los Alcaparros se reconoció que los hallazgos arqueológicos presentados en la UF2 del Proyecto eran un evento imprevisible[61].

119.    Las Demandantes señalan que, con fecha 11 de junio de 2020, POB informó a la ANI que los asuntos relacionados con los hallazgos arqueológicos, la intensidad y la cantidad de los hallazgos, así como sus efectos en el Contrato, desbordan la asignación razonable de riesgos del Concesionario y dan lugar a un desequilibrio económico del Contrato[62].

120.    Según ambas Partes, con posterioridad al reconocimiento de estos dos EERs-UF2, POB continuó ejecutando la labor de rescate de la mano de equipo de arqueólogos. POB continuó encontrando restos arqueológicos relevantes que extendieron el Programa Arqueológico. El 31 de agosto de 2021, las Partes firmaron el Acta de Terminación de la UF2[63].

## G.    FONDEO DE LA SUBCUENTA DE SUPERVISIÓN E INTERVENTORÍA

121.    Según ambas Partes, el valor del fondeo de la Subcuenta de Supervisión e Interventoría es el siguiente[64]:

   (i)    Durante la Fase de Preconstrucción, el valor del fondeo equivale a $2.923.117.956 Pesos del Mes de Referencia al año;

   (ii)    Durante la Fase de Construcción, el valor del fondeo equivale a $10.160.367.351 Pesos del Mes de Referencia al año —esto es, entre 3 y 4 veces más que el valor de la Fase de Preconstrucción; y

---

[61]  Escrito de Hechos No Controvertidos, ¶ 37.
[62]  Demanda POB y S&B, ¶¶ 413, 438.
[63]  Escrito de Hechos No Controvertidos, ¶ 38.
[64]  Escrito de Hechos No Controvertidos, ¶ 32.

(iii)    Durante la Etapa de O&M, el valor del fondeo equivale a $3.446.637.624 Pesos del Mes de Referencia al año —esto es, aproximadamente 3 veces menos que el valor de la Fase de Construcción.

122.    Según ambas Partes, el valor del Contrato de Interventoría equivale a $229.582.850 Pesos del Mes de Referencia mensuales durante la Fase de Preconstrucción, $525.960.917 Pesos del Mes de Referencia mensuales durante la Fase de Construcción, y $308.109.147 Pesos del Mes de Referencia mensuales durante la Etapa de O&M. A partir de agosto de 2020, la ANI modificó el valor del Contrato de Interventoría durante la Fase de Construcción a $455.190.117 Pesos del Mes de Referencia mensuales[65].

## IV.    ANÁLISIS DEL TRIBUNAL ARBITRAL

123.    Respecto al análisis de cada una de las pretensiones interpuestas por las Partes objeto del presente Laudo, el Tribunal Arbitral declara que ha analizado y tomado en consideración todos los argumentos expuestos por las Partes, así como también toda la prueba producida durante el Arbitraje.

124.    En consecuencia, a lo largo de este Laudo Arbitral el Tribunal Arbitral hace referencia sólo a los argumentos y a la prueba que ha sido considerada como relevante y necesaria para la decisión de la controversia. El que se omita la mención a una prueba o a un argumento no significa que el Tribunal no lo haya estudiado y analizado para efectos de la presente decisión.

125.    El análisis del Tribunal Arbitral consiste en (**A**) las excepciones de jurisdicción y competencia propuestas por la ANI; (**B**) las reclamaciones de POB y S&B en la Demanda; (**C**) las reclamaciones de la ANI en la Reconvención, (**D**) los efectos que produce en el Contrato y respecto de las pretensiones de las Partes la decisión sobre los incumplimientos; y (**E**) compensación de las Demandantes.

---

[65]    Escrito de Hechos No Controvertidos, ¶ 33.

A.    **EXCEPCIONES DE JURISDICCIÓN Y COMPETENCIA**

126.  La ANI afirma que este Tribunal Arbitral carece de jurisdicción y competencia para conocer de la controversia, argumentando que el presente Arbitraje no tiene el carácter de internacional y planteando ciertas objeciones a la competencia del Tribunal Arbitral en virtud de las materias demandadas por las Demandantes.

127.  En cuanto a las excepciones de jurisdicción, plantea las siguientes objeciones: a) la inexistencia del requisito de internacionalidad del literal (c) del artículo 62 de la misma Ley[66]; b) la improcedencia del requisito del literal (a) del artículo 62 de la Ley 1563 de 2012 "Por medio de la cual se expide el Estatuto de Arbitraje Nacional e Internacional y se dictan otras disposiciones" ("**Ley 1563 de 2012**"), invocado por las Demandantes para demostrar que el arbitraje es internacional[67]; y c) la improcedencia del requisito del literal (b) del artículo 62 de la misma Ley[68].

128.  En cuanto a la competencia del Tribunal Arbitral, la ANI deduce: a) la excepción de falta de competencia del Tribunal para conocer sobre las pretensiones relacionadas con las compensaciones, de conformidad con el numeral 14.2 (h) "Compensaciones por Eventos Eximentes de Responsabilidad" del Contrato[69]; y b) la excepción de falta de competencia para pronunciarse sobre las Reclamaciones EPC[70].

129.  La ANI sostiene que, sólo en el caso en que el Tribunal Arbitral declarara que el presente Arbitraje es internacional, confirmando que tiene jurisdicción, podría conocer de la controversia planteada en su Reconvención[71].

130.  Cabe tener presente que la ANI había presentado las mismas excepciones de jurisdicción y competencia en respuesta a la Solicitud de Medidas Urgentes de Protección presentadas por las Demandantes con fecha 13 de enero de 2021. El Árbitro de Urgencia, Salvador

---

[66]  Demanda ANI, Sección 5.1.2.
[67]  Demanda ANI, Sección 5.1.1.1.
[68]  Contestación ANI, ¶ 494-498. En el mismo sentido, Dúplica ANI, ¶ 286-287.
[69]  Demanda ANI, Sección 5.1.3.1.
[70]  Contestación ANI, ¶ 548-561. En el mismo sentido, Dúplica ANI, ¶ 303-305.
[71]  Demanda ANI, p. 162.

Fonseca González, emitió un Laudo Provisional con fecha 9 de febrero de 2021 ("**Laudo Provisional**"), pronunciándose también sobre las objeciones formuladas por la ANI.

131. El Árbitro de Urgencia determinó que el Arbitraje era internacional, porque: i) la Estructura Plural manifestó en el Anexo 15 de la Oferta que ésta contenía inversión extranjera y que el Contrato se celebró bajo este supuesto; ii) se cumplen los requisitos de los incisos a) y c) del artículo 62 de la Ley de Arbitraje para considerar el arbitraje como internacional; y iii) la controversia afecta los intereses del comercio internacional[72].

132. El Árbitro de Urgencia, así mismo, rechazó la objeción de la ANI en cuanto a su competencia por tratarse de un conflicto en torno a un EER. En cambio, resolvió que los temas en disputa versaban sobre una serie de diversas declaraciones e indemnizaciones por daños que las Demandantes pretendían obtener de la ANI y que no estaban relacionadas con compensaciones derivadas de un EER[73].

133. El Árbitro de Urgencia desestimó el argumento de la ANI que se tratase de materias asignadas al conocimiento del Amigable Componedor, señalando que ninguna de las pretensiones de la Notificación de Arbitraje caía en los supuestos específicos previstos en el Contrato para la intervención del Amigable Componedor[74].

134. Las Partes acataron el Laudo Provisional, en particular, la ANI renunció a promover su anulación.

135. A lo largo del presente Arbitraje, la ANI, a grandes rasgos, ha mantenido la misma línea argumental de sus objeciones. A su vez, las Demandantes, continuaron con la presentación de sus respectivos descargos. A continuación, el Tribunal Arbitral llevará a cabo un análisis propio de su jurisdicción y competencia bajo Artículo 19 del Reglamento CIRD.

---

[72] Laudo Provisional, pp. 17-18.
[73] Laudo Provisional, pp. 18-19.
[74] Laudo Provisional, pp. 19-20.

1.    **E**XCEPCIÓN DE **J**URISDICCIÓN

136.   La ANI plantea que el Arbitraje suscitado entre las Partes no debe ser considerado un
       arbitraje internacional, por lo que el presente Tribunal Arbitral –constituido de
       conformidad a la cláusula arbitral establecida para arbitrajes internacionales– no sería el
       foro competente para pronunciarse sobre la controversia.

137.   El Tribunal Arbitral analizará los argumentos de la ANI y los respectivos descargos de
       las Demandantes, por orden de relevancia que el Tribunal le atribuye, para resolver
       acerca de la objeción de la ANI.

(a)    **La internacionalidad del Arbitraje conforme a lo señalado en el literal c) del artículo
       62 de la Ley 1563 de 2012**

       (i)    Posición de la ANI

138.   La ANI afirma que el presente Arbitraje no debe ser declarado como internacional, al no
       configurarse el supuesto establecido en el literal c) de la Ley 1563 de 2012[75].

139.   En primer lugar, la ANI argumenta que las Partes quisieron limitar la resolución de sus
       controversias mediante arbitraje internacional únicamente a los casos subsumibles en el
       literal c) del Artículo 62 de la Ley 1563 de 2012, para lo cual redactaron la cláusula con
       referencia a este literal, excluyendo los literales a) y b) del mismo artículo[76].

140.   Según la ANI, debido a la primacía de la voluntad de las Partes, el único supuesto de
       internacionalidad que les permite recurrir al arbitraje internacional es aquel del literal c)
       del artículo 62. El Tribunal Arbitral no tendría que siquiera estudiar la procedencia o no
       de los literales a) y b) del mismo artículo, por no estar referidos en el pacto arbitral[77].

---

[75] Demanda ANI, p. 175; Aquí en adelante, la Ley 1563 de 2022 se cita según Prueba CL-133.
[76] Contestación ANI, ¶ 467.
[77] Contestación ANI, ¶ 473, ¶¶ 477-480.

141. En segundo lugar, la ANI señala que recae en las Demandantes probar que la controversia "afecte los intereses del comercio internacional"[78], no existiendo a su juicio "causa, nexo o relación alguna con lo manifestado o pretendido por las Demandantes y la afectación a los intereses del comercio internacional"[79].

142. En efecto, la ANI señala que, al no ser S&B parte del pacto arbitral ni del Contrato, inmediatamente las justificaciones que presenta POB para probar la supuesta afectación del comercio internacional carecerían de sentido y serían irrelevantes[80].

143. En tercer lugar, la ANI plantea que el criterio del literal c) del artículo 62 es distinto a aquel empleado en la legislación francesa que le sirvió de origen, por lo que no basta que[81]:

> [S]e demuestre sencillamente la afectación a los intereses del comercio internacional como ocurre en Francia sino que, LA CONTROVERSIA sea la que afecte los intereses del comercio internacional para la procedencia del arbitraje internacional siendo así, el criterio más estricto y riguroso que el francés" [mayúsculas originales].

144. La ANI argumenta que no basta con que existan transferencias de divisas para que la controversia en sí afecte el comercio internacional, y que en el presente caso[82]:

> [E]l objeto de la controversia gira en torno a la declaratoria o no de los supuestos incumplimientos de la ANI de las Secciones 14.1 y 14.2 del Contrato de Concesión y no sobre transferencia de divisas a título de *equity* o deuda sobre el proyecto.

145. La ANI continúa afirmando[83]:

> De acogerse la posición de las Demandantes, se estaría desconociendo el mandato legal colombiano y se entendería que

---

[78] Demanda ANI, p. 163, 177. En el mismo sentido, Réplica ANI, ¶¶ 307-314; Dúplica ANI, ¶ 287.
[79] Demanda ANI, p. 179. En el mismo sentido, Contestación ANI, ¶¶ 521-523.
[80] Contestación ANI, ¶ 504.
[81] Demanda ANI, p. 178-180. En el mismo sentido, Contestación ANI, ¶¶ 514-532.
[82] Demanda ANI, p. 179-181. En el mismo sentido, Contestación ANI, ¶ 517-520, ¶¶ 524-526.
[83] Demanda ANI, p. 182. En el mismo sentido, Contestación ANI, ¶ 518.

todo arbitraje es internacional por el simple hecho de que el contrato tuviese algún elemento de internacionalidad, aun cuando la controversia no versare sobre dicho elemento y, más aún, cuando no existe ni siquiera un elemento de prueba sumaria de cómo el supuesto incumplimiento afecta los intereses del comercio internacional.

146.  En cuarto lugar, la ANI enfatiza que el numeral c) del artículo 62[84]:

Se refiere inequívocamente a los "intereses del comercio", es decir la actividad, no los intereses de los comerciantes, o a los efectos que se deriven de la controversia afecten los intereses del comercio internacional, que es distinto. Por ende, el hecho de que un comerciante extranjero tenga un "interés" en una disputa no es suficiente para calificar un arbitraje como internacional.

147.  Señala la ANI que habría una diferencia entre que "la CONTROVERSIA afecte los intereses del comercio internacional y no que los hipotéticos EFECTOS de la controversia puedan o no afectar en este caso a S&B" [mayúsculas originales][85].

148.  En quinto lugar, la ANI analiza los alcances de la Sección 15.3 del Contrato y argumenta que lo señalado en el pie de página 1 de la Sección 15.3 no controvierte su posición[86]. A su entender, este pie de página remite a la Sección 15.3 del Contrato, la cual, a su vez, contiene la referencia al literal c) del artículo 62. La ANI concluye que[87]:

[D]e no comprobarse lo establecido en el literal c) del artículo 62 de la ley 1563 al que las partes remiten, entonces lo que procede es el arbitraje nacional o doméstico del que trata la Sección 15.2 de Contrato.

149.  La ANI asigna una relevancia particular al documento aportado por las Demandantes que contiene la pregunta Nº 70 y respuesta de la ANI sobre los alcances de la Sección 15.3,

---

[84]  Demanda ANI, p. 182. En el mismo sentido, Réplica ANI, ¶ 307; Dúplica ANI, ¶¶ 292-294.
[85]  Contestación ANI, ¶¶ 474, 488, ¶ 505-512. En el mismo sentido, Réplica ANI, ¶ 311.
[86]  "En caso de que la oferta ganadora tenga inversión extranjera directa o indirecta, la cláusula arbitral del Contrato será únicamente la que se regula en la sección 15.3. Sin embargo, si los árbitros o cualquier autoridad con competencia para ello, declaran que, para el presente Contrato, no concurren las causas legales para que proceda el arbitraje internacional, se entenderá pactado el arbitraje nacional previsto en la Sección 15.2 anterior."
[87]  Contestación ANI, ¶ 469. En el mismo sentido, Dúplica ANI, ¶¶ 288-290.

correspondientes al período de Licitación[88]. A su parecer, S&B reconocía que ninguna de las partes tendría más de un domicilio, y que el domicilio del SPV (*Special-Purpose Vehicle*) estaría en Colombia, no resultando clara la aplicación del supuesto previsto en el literal c) del artículo 62 de la Ley 1563[89].

150. La pregunta Nº 70 reproduce la nota a pie de página de la Sección 15.3 del Contrato y cita el literal c) del artículo 62 de la Ley 1563 de 2012:

> Teniendo en cuenta que en ejecución del Contrato de Concesión, ninguna de las partes tendría más de un domicilio, dado que el SPV se constituirá con el propósito específico de ejecutar el Contrato de Concesión y que el domicilio del SPV estará en Colombia, no resultaría clara la aplicación de los supuestos previstos en el literal c) del artículo 62 de la Ley 1563 de 2012 para que se entienda que la ejecución del Contrato de Concesión afecta los intereses del comercio internacional. Entendemos que ha sido intención de la ANI proteger los derechos de las estructura [sic] plurales que cuentan con inversión extranjera, al indicar que las controversias derivadas del Contrato de Concesión se resolverán a través de un Tribunal de Arbitramento Internacional; sin embargo al no ser clara la aplicación del literal c) del artículo 62 de la ley 1563 de 2012, les solicitamos modificar el Contrato de Concesión en el sentido de que no sea obligatorio que en estos casos las controversias sean resueltas por un Tribunal de Arbitramento Internacional.

151. A continuación, la pregunta Nº 70 expresa la preocupación de que, en el caso de declararse incompetente el Tribunal de Arbitramento Internacional, el juez competente del Contrato sería la jurisdicción contencioso-administrativa, solicitando sea modificado el Contrato para permitir la elección entre el Tribunal de Arbitramento Nacional o un Tribunal de Arbitramento Internacional[90].

---

[88]  Contestación ANI, ¶ 471; Prueba C-180.
[89]  Contestación ANI, ¶ 490. En el mismo sentido, Réplica ANI, ¶¶ 302, 313.
[90]  Prueba C-180.

152. La ANI respondió con el ánimo de despejar dicha preocupación y, después de citar el texto del artículo 62 de la Ley 1563, indicó [91]:

> Como es de público conocimiento, la anterior preceptiva está inspirada en lo decidido por la Corte de Apelaciones de París, en Sentencia de Marzo 14 de 1989, alto tribunal que al decidir el asunto: Murgue Seigle v. Coflexip, señaló: 'La naturaleza internacional de un arbitraje debe ser determinada de acuerdo con la realidad económica del proceso durante el cual surge la misma. A este respecto, todo lo que es requerido es que la transacción económica debe acarrear una transferencia de bienes, servicios o fondos a través de fronteras nacionales, en tanto que la nacionalidad de las partes, la ley aplicable al contrato o al arbitraje, y la sede del arbitraje son irrelevantes.' (Traducción y resaltado propio). Con base en lo anterior, la ANI dispuso que al momento de formularse las ofertas respectivas los proponentes deben manifestar en anexo especial, expresa, clara e inequívocamente si su propuesta contiene los elementos propios de inversión extranjera directa o indirecta, ya que con ello se tiene por cierta la transferencia de bienes, servicios o fondos a través de fronteras nacionales, "entendiendo" con ello que toda "controversia sometida a decisión arbitral afecte (a) los intereses del comercio internacional". Así las cosas, no habría motivo de duda acerca de la competencia de los árbitros para dirimir la eventual controversia bajo las reglas de la Sección Tercera de la Ley 1563 de 2012 y aquellas reglas especiales señaladas en la cláusula compromisoria. No obstante lo anterior, la ANI modificó la Parte General del Contrato para dar mayor claridad frente a la aplicación del arbitraje nacional ante una eventual imposibilidad de aplicar el arbitraje internacional.

(ii)    Posición de POB y S&B

153. Las Demandantes solicitan el rechazo de las objeciones de la ANI. En primer lugar, afirman que la controversia objeto de este Arbitraje afecta los intereses del comercio internacional. En particular, "cuando se refiere a una operación económica que involucra

---

[91] Prueba C-180.

la transferencia de fondos, bienes o servicios a través de las fronteras de dos o más Estados"[92].

154.  Así, la controversia objeto del Arbitraje afecta los intereses del comercio internacional dado que[93]:

> [E]l Contrato de Concesión ha implicado (1) inversión extranjera directa o indirecta por parte de S&B y (2) la celebración de contratos de crédito con entidades financieras transnacionales e internacionales.

155.  Adicionalmente a lo anterior, las Demandantes indican que la estructura financiera del Proyecto requería que POB realizase determinadas operaciones financieras, pudiendo recibir los fondos de los accionistas o de instituciones financieras. Ello habría redundado en los aportes de S&B y los demás accionistas en la cuantía de US$117.870.000 y el Contrato de Crédito celebrado con el Banco Interamericano de Desarrollo por un valor total de US$156.000.000, siendo ambas transacciones transfronterizas[94].

156.  Las Demandantes afirman que la estructura de *project finance* del Proyecto suponía que POB pudiera acceder a la retribución del mismo para pagar las deudas que adquirió con los prestamistas y sus accionistas, ambos internacionales, junto con repartir utilidades[95]. De no contar con la Retribución, las Demandantes no podrían efectuar estas operaciones, afectándose su posibilidad de pagar estas acreencias de naturaleza internacional. Ello tiene como consecuencia que la controversia entre las Partes afecta los intereses del comercio internacional[96].

157.  Las Demandantes argumentan que la letra c) del artículo 62 de la Ley 1563 de 2012 "fue incorporada al ordenamiento jurídico colombiano como un trasplante del Código de Procedimiento Civil francés"[97]. Por lo tanto, no sería necesario que la controversia

---

[92]  Demanda POB y S&B, ¶ 541. En el mismo sentido, Contestación POB y S&B, ¶ 777.
[93]  Demanda POB y S&B, ¶ 547.
[94]  Demanda POB y S&B, ¶¶ 559-560.
[95]  Demanda POB y S&B, ¶¶ 563-565.
[96]  Demanda POB y S&B, ¶¶ 566-568.
[97]  Demanda POB y S&B, ¶ 543.

afectara única y exclusivamente los intereses del comercio internacional tal y como lo afirma la Demandada[98].

158.  En segundo lugar, las Demandantes argumentan que S&B sí es parte de la cláusula arbitral. Así, S&B "hizo parte de la Estructura Plural S&B y el Contrato establece que, en consecuencia, prestó su consentimiento por referencia para hacer parte del Acuerdo Arbitral"[99].

159.  Asimismo, frente a los argumentos de la ANI con respecto a los efectos de la cláusula arbitral – lo que no sería lo mismo que otorgar el estatus de una parte de dicha cláusula– responden las Demandantes que estos[100]:

> [S]e extenderían directamente a una sociedad extranjera y domiciliada por fuera de Colombia, al punto de que los incumplimientos contractuales de la ANI le causan perjuicios directamente.

160.  Finalmente, las Demandantes argumentan que la Sección 15.3 del Contrato se refiere a la inversión extranjera directa o indirecta y que, además, durante la licitación (documento C-180), la ANI hizo referencias a la jurisprudencia francesa y subrayó la necesidad de declarar su presencia en la oferta, lo que fue declarado por Estructura Plural[101].

161.  Las Demandantes enfatizan que[102]:

> [E]l entendimiento común de las Partes al suscribir el Contrato fue que la presencia de inversión extranjera directa en la Oferta sería suficiente para que los arbitrajes derivados del Contrato sean internacionales en los términos del ordinal (c) del artículo 62 del Estatuto Arbitral.

---

[98]   Demanda POB y S&B, ¶ 545.
[99]   Réplica POB y S&B, ¶ 194.
[100] Réplica POB y S&B, ¶ 195.
[101] Demanda POB y S&B, ¶¶ 550-552.
[102] Réplica POB y S&B, ¶ 191.

(iii)  <u>Análisis del Tribunal Arbitral</u>

162. Este Tribunal Arbitral se ha constituido al alero de la Sección 15.3 del Contrato, cuya letra c) designa como ente administrador al CIRD y hace aplicable su Reglamento de Arbitraje Internacional.

163. La Sección 15.3 del Contrato se titula "Arbitraje Internacional" y lleva una nota a pie de página que señala:

> En caso de que la oferta ganadora tenga inversión extranjera directa o indirecta, la cláusula arbitral del contrato será únicamente la que se regula en la Sección 15.3. Sin embargo, si los árbitros o cualquier autoridad con competencia para ello, declaran que, para el presente Contrato, no concurren las causas legales para que proceda el arbitraje internacional, se entenderá pactado el arbitraje nacional previsto en la Sección 15.2 anterior.

164. En virtud del tenor literal de esta nota a pie de página, una vez verificado que la oferta ganadora había incluido inversión extranjera directa o indirecta, este hecho por sí solo lleva a concluir que el arbitraje es de carácter internacional y debe conducirse de conformidad a lo establecido en la Sección 15.3.

165. El 30 de mayo de 2014 la Estructura Plural formada por S&B, C.I. Grodco S. en C.A. Ingenieros Civiles y Colombiana Inversiones de Infraestructura S.A.S., presentaron su Oferta en la Licitación, en cuyo Anexo 15, se señaló afirmativamente que la Oferta contenía "inversión extrajera ya sea de manera directa o indirecta"[103].

166. El 23 de julio de 2014, mediante Resolución No. 992, la ANI adjudicó el Proyecto a la Estructura Plural, indicándose expresamente que uno de sus miembros era S&B, sociedad constituida bajo las leyes de la Confederación Suiza[104].

---

[103] Prueba C-046.
[104] Prueba C-047.

167. Debido a la presencia de la inversión extranjera en la Oferta y conforme a lo indicado en la nota correspondiente a la Sección 15.3, es forzoso concluir que la única cláusula arbitral del Contrato aplicable a este Arbitraje es aquella contenida en la Sección 15.3.

168. Sin embargo, la ANI argumenta que este solo hecho no es suficiente para corroborar la internacionalidad del Arbitraje. Más bien, el Arbitraje debe satisfacer los criterios establecidos en la letra a) de la Sección 15.3, la que a su vez remite al literal c) del artículo 62 de la Ley 1563 de 2012.

169. La letra a) de la Sección 15.3 establece:

> Toda controversia que surja entre las Partes con ocasión del presente Contrato será resuelta por un Tribunal de Arbitramiento Internacional de conformidad con el literal c) del artículo 62 de la ley 1563 de 2012 y las reglas que a continuación se establecen.

170. A su vez, el literal c) del artículo 62 de la Ley 1563 de 2012 establece que el arbitraje es internacional cuando: "la controversia sometida a decisión arbitral afecte los intereses del comercio internacional."

171. A juicio del Tribunal Arbitral, la letra a) de la Sección 15.3 del Contrato establece que el recurso al arbitraje internacional –en el caso de la presencia de la inversión extranjera– se justifica de conformidad a lo establecido en el literal c) del artículo 62. En otras palabras, esta cláusula consagra que, cuando el arbitraje bajo este Contrato sea de carácter internacional, lo será porque se cumple el requisito recogido en el literal c) del artículo 62 de la Ley 1563 de 2012. Por lo tanto, la referencia al literal c) del artículo 62 no exige que las Partes prueben que la controversia afecta los intereses del comercio internacional. Por el contrario, la letra a) de la Sección 15.3 establece que –en el caso de la presencia de la inversión extranjera– la internacionalidad del arbitraje se fundamenta en el literal c) del artículo 62 de la Ley 1563 de 2012.

172. Esta manera de regular la internacionalidad del arbitraje parece coherente si se considera la exigencia del Contrato de constituir un SPV para llevar a cabo la concesión, esto es, una sociedad distinta a aquella que resulte adjudicada. Así, la entidad que aporta la inversión extranjera no será la que lleve a cabo la concesión; más bien lo será una

empresa constituida en Colombia. Sin embargo, lo anterior no debería anular el aporte de la inversión extranjera a la APP para los efectos de la internacionalidad del arbitraje.

173. El concepto de "Concesionario" se encuentra definido en la definición 1.32 del Contrato como:

> La sociedad de objeto único identificada plenamente en la Parte Especial, conformada por quien(es) resultó(aron) adjudicatario(s) en el marco del Proceso de Selección.

174. En la misma línea, la definición 1.109 define la "Oferta del Concesionario":

> [L]a oferta entregada por el oferente que resultó adjudicatario en el Proceso de Selección y le otorgó el derecho de constituir la sociedad -vehículo de propósito especial- que suscribe el presente Contrato como Concesionario.

175. En otras palabras, el diseño de la Licitación no permite que los oferentes mismos celebren el contrato de concesión, debiendo constituir un SPV bajo la ley colombiana.

176. Al momento de la Licitación el entendimiento de la ANI fue justamente que la presencia de la inversión extranjera directa o indirecta en la oferta ganadora bastaba para corroborar el carácter internacional del arbitraje. Ello se encuentra reflejado en el literal c) del artículo 62 de la Ley 1563, esto es, en la referencia a los intereses del comercio internacional.

177. Este mismo entendimiento de la ANI se manifiesta durante el período de la negociación del Contrato, en particular, en el documento que recoge la serie de preguntas que los participantes de la Licitación formulan para comprender de mejor manera los términos de la contratación y solicitar algunos ajustes, y respuestas que les otorga la ANI. La prueba documental C-180 incluye un extracto del documento de fecha 26 de mayo de 2014, el que reproduce la pregunta Nº 70 sobre la correcta interpretación de la Sección 15.3 y la respectiva respuesta de la ANI, arriba citadas[105].

---

[105] Prueba C-180.

178. La pregunta Nº 70 planteó algunas dudas sobre la interpretación de la Sección 15.3, junto con la preocupación de que el Adjudicatario pudiera verse privado del acceso al arbitraje –nacional o internacional– siendo en ese caso competente la jurisdicción permanente contencioso-administrativa.

179. Al responder esta pregunta Nº 70, la ANI trató de entregarle la tranquilidad a la Estructura Plural. De esta respuesta de la ANI se desprende que, a su entender:

   i)    El literal c) del artículo 62 sí se deriva del derecho francés;

   ii)   Se establece en forma tajante que lo único requerido para cumplir con dicho literal es que existan movimientos transfronterizos de bienes, servicios o fondos;

   iii)  Se enfatiza que por esta razón se solicitó a los oferentes indicar la presencia de la inversión extranjera directa o indirecta en un formulario anexo;

   iv)   Se concluye que la presencia de dicha inversión extranjera genera la certeza del movimiento transfronterizo de bienes, servicios o fondos, de lo que se desprende que dicha controversia afecta los intereses del comercio internacional; y

   v)    La aclaración sobre el arbitraje nacional, a su vez, busca asegurar que los Adjudicatarios o el Concesionario no pierdan acceso al arbitraje, sea que su naturaleza fuera internacional o nacional.

180. Por las razones señaladas, en virtud del tenor literal de la Sección 15.3 del Contrato, el Tribunal Arbitral concluye que el presente arbitraje es de índole internacional. Por lo anterior, no le asiste la razón a la ANI cuando formula su objeción a la jurisdicción del Tribunal Arbitral por una supuesta inobservancia de lo señalado en el literal c) del artículo 62 de la Ley 1536 de 2012.

**(b)    La internacionalidad del Arbitraje de acuerdo al literal a) del artículo 62 de la Ley 1563 de 2012**

    (i)    <u>Posición de la ANI</u>

181.  En primer lugar, la ANI afirma que las Partes "libre y voluntariamente consensuaron en limitar" la procedencia del arbitraje internacional únicamente a la concurrencia del literal c) del artículo 62 de la Ley 1563 de 2012, no siendo procedente aplicar la causal del literal a) del mismo artículo[106].

182.  La ANI niega que su postura estuviera "derogando" mandatos del legislador plasmados en el artículo 62 de la Ley 1536 de 2012, en cuanto a la definición de la internacionalidad. Aclara que, más bien, se trata de un acuerdo voluntario de las Partes de[107]:

> [R]emitir sus controversias al mecanismo alternativo del arbitraje internacional solo en relación a que se compruebe uno de los supuestos establecidos en la ley para que se entienda que es un arbitraje internacional, esto es, a solo el literal c) del artículo 62 de la Ley 1563 de 2012.

183.  En segundo lugar, sostiene que, a su parecer[108]:

> [L]a ley colombiana no prohíbe que las partes puedan de manera expresa, libre y voluntaria pactar limitar la posibilidad de dirimir las controversias por medio del arbitraje internacional a solo la procedencia a solo uno [sic] de los 3 supuestos de habilitación debiendo aplicarse "el principio fundamental del arbitraje como lo es la consensualidad".

184.  La ANI afirma que es diferente entender "que los criterios de internacionalidad son objetivos o que son imperativos. La objetividad es distinta de la obligatoriedad"[109]. Argumenta que el problema jurídico que subyace a la cuestión de jurisdicción es la

---

[106] Demanda ANI, p. 164-166, 168. En el mismo sentido, Contestación ANI, par. 453; Réplica ANI, ¶ 284.

[107] Contestación ANI, ¶¶ 450-451, 460. En el mismo sentido, Réplica ANI, ¶ 283.

[108] Demanda ANI, p. 169. En el mismo sentido, Contestación ANI, ¶¶ 447-449, ¶¶ 456-459; Réplica ANI, ¶ 281; Dúplica ANI, ¶ 283.

[109] Réplica ANI, ¶ 285. En el mismo sentido, Dúplica ANI, ¶ 283.

determinación sobre si el artículo 62 de la Ley 1563 de 2012 es una norma imperativa. A su juicio, esta pregunta se debe responder negativamente[110].

185. Finalmente, la ANI considera que el supuesto del literal a) del artículo 62 no se cumple porque los domicilios de las partes del Arbitraje (POB y la ANI) se encuentran en la República de Colombia. A su vez, la ANI argumenta que S&B no es parte ni del Contrato ni del pacto arbitral, por lo que el lugar de su establecimiento no tiene incidencia[111].

186. En esta línea, la ANI esgrime que[112]:

> [N]inguna sociedad, empresa o persona natural que haya presentado conjuntamente oferta para ser adjudicatario del hoy Contrato 002 de 2014 es parte de la cláusula arbitral.

187. Así, la ANI insiste en el argumento de que el pacto arbitral solo incluye a POB y a la ANI y que, son los efectos de las resultas del presente proceso, los que de conformidad con el literal e) del pacto arbitral serían extensivos a S&B[113]. En su concepto[114]:

> Los efectos tanto de la cláusula compromisoria como de la controversia misma solo se sabrán al momento de conocer las resultas del presente trámite arbitral en relación a S&B.

188. Asimismo, la Demandada argumenta que dicha afectación ha de ser cierta más no hipotética[115].

189. La ANI indica que las Demandantes se contradicen al afirmar que[116]:

> S&B es parte del pacto arbitral y se encuentra domiciliada en la confederación de Suiza, pero, al mismo tiempo manifiestan que la ANI no tiene una "causa de acción contra S&B".

---

[110] Réplica ANI, ¶¶ 288-290.
[111] Contestación ANI, ¶¶ 481, 487. En el mismo sentido, Dúplica ANI, ¶ 285.
[112] Contestación ANI, ¶ 474.
[113] Contestación ANI, ¶¶ 476, 486-488.
[114] Contestación ANI, ¶ 489.
[115] Dúplica ANI, ¶ 294. En el mismo sentido, Contestación ANI, ¶ 510
[116] Demanda ANI, p. 171. En el mismo sentido, Contestación ANI, ¶¶ 491-493.

190. Sin embargo, la ANI señala que el argumento de POB de que la ANI no tendría causa de acción contra S&B solo reforzaría la postura de que S&B no es parte del pacto arbitral[117].

191. Frente a esta presunta contradicción, la ANI apunta a que S&B es una de las Demandantes y que, con su participación en el Arbitraje y sus manifestaciones en los escritos habrían afirmado que S&B se habría adherido al pacto arbitral, y que habría adquirido derechos y obligaciones bajo el Contrato de Concesión[118].

 (ii)  Posición de POB y S&B

192. En primer lugar, las Demandantes sostienen que los criterios establecidos en la ley para determinar la internacionalidad de un arbitraje son objetivos y no pueden ser modificados contractualmente, no existiendo contradicción entre el Contrato y los criterios de internacionalidad previstos en la ley[119].

193. A su parecer, la Sección 15.3 del Contrato en la que se menciona el literal c) del artículo 62 de la Ley 1536 de 2012, no tiene el efecto pretendido por la ANI. En particular, la expresión "de conformidad" no tendría "la función gramatical de limitar la aplicación del artículo 62 a esta causal, ni excluir las demás del artículo 62"[120].

194. Así, la nota a pie de página que acompaña dicho artículo permitiría[121]:

> [V]er que la intención de las Partes era determinar que el arbitraje sería internacional en todos los casos en los que hubiera inversión extranjera directa o indirecta en la Oferta, como en efecto ocurre con el Contrato.

195. En segundo lugar, las Demandantes afirman que se cumple el supuesto de hecho previsto en la letra a) del artículo 62, a saber, que el arbitraje es internacional cuando las partes

---

[117] Contestación ANI, ¶¶ 491-493.
[118] Demanda ANI, pp. 173-174.
[119] Demanda POB y S&B, ¶¶ 506-514. En el mismo sentido, Contestación POB y S&B, ¶¶ 761-768.
[120] Demanda POB y S&B, ¶ 520.
[121] Demanda POB y S&B, ¶ 522.

tengan sus domicilios en Estados diferentes. Lo anterior se debe a que la cláusula arbitral cobija a la ANI y a POB como partes del Contrato, y a S&B que presentó la oferta[122].

196. Dado que "S&B hizo parte de la Estructura Plural S&B, que presentó la Oferta ganadora en el marco de la Licitación", entonces se encontraría cubierta por la cláusula arbitral[123].

197. Las Demandantes también afirman que su posición es consistente y que la pretendida contradicción señalada por la ANI (que, por un lado, S&B es parte del acuerdo arbitral, pero, que la ANI no tiene acusa de acción contra S&B) no es tal[124] e indican que[125]:

> [L]a posición procesal que tiene S&B en este Arbitraje en virtud de los actos de la ANI, que confirman el carácter internacional de este Arbitraje, no tiene nada que ver con el mérito de las pretensiones de la ANI.

198. Las Demandantes insisten que la ANI no tiene una causa de acción en contra de S&B, y que, al haberla incluido como parte pasiva de su reconvención, confirma el carácter internacional del presente Arbitraje[126].

(iii)  Análisis del Tribunal Arbitral

199. Conforme al análisis anterior del Tribunal Arbitral, la Sección 15.3 del Contrato tiene por objeto confirmar que la presencia de la inversión extranjera en la oferta, directa o indirecta, hace que el arbitraje se torna en internacional, de conformidad al mandato legal del literal c) del artículo 62 de la Ley 1563 de 2012.

200. Al mismo tiempo, nada del tenor literal de esta norma indica que el arbitraje internacional no procedería en ningún otro supuesto previsto en el artículo 62 de la Ley 1563. Así, no se sujeta la procedencia del arbitraje internacional a la situación única del literal c) del

---

[122] Demanda POB y S&B, ¶ 526.
[123] Demanda POB y S&B, ¶ 529.
[124] Contestación POB y S&B, ¶ 779.
[125] Contestación POB y S&B, ¶ 781.
[126] Contestación POB y S&B, ¶¶ 779-783.

artículo 62. En particular, no se usan expresiones "única y exclusivamente", "solo procederá", etc.

201. El Tribunal Arbitral no comparte la visión de la ANI de que las partes podrían limitar las causales de internacionalidad a solo algunas de ellas. Siguiendo su lógica, ¿podrían las partes eliminar todas las causales de internacionalidad, dejando sin efecto el arbitraje internacional en Colombia? Pero más allá de esta interrogante teórica, nada en el tenor literal de la Sección 15.3 del Contrato indica que la intención de los contratantes fuera la de excluir las otras causales legales de la internacionalidad del arbitraje.

202. Así, el literal a) del artículo 62 de la Ley 1563 de 2012 establece que el arbitraje es internacional cuando "las partes en un acuerdo de arbitraje tengan, al momento de la celebración de ese acuerdo, sus domicilios en Estados diferentes".

203. Adicionalmente a lo anterior, la letra e) de la Sección 15.3 del Contrato indica:

> Las Partes acuerdan que en el evento en que se convoque el Tribunal de Arbitramento, los efectos de la cláusula compromisoria serán extensivos a aquellas empresas, sociedades o personas naturales que hayan presentado conjuntamente la Oferta, en la medida que, dichos sujetos prestaron su consentimiento por referencia al momento de la presentación de la Oferta.

204. De esta cláusula se desprende que las "Partes" del Contrato, esto es, la ANI y el Concesionario, acuerdan aceptar la participación en el arbitraje de las entidades que participan en la Oferta siempre y cuando estas hayan manifestado su consentimiento correspondiente.

205. En el momento en que la Estructura Plural, y S&B como parte de esta, presentaron su Oferta, necesariamente aceptaron los términos de la Licitación. En efecto, cuando se realiza la pregunta Nº 70 de la serie de preguntas y respuestas de fecha 26 de mayo de 2014 acerca de los alcances de la Sección 15.3 del Contrato, la preocupación que manifiesta la Estructura Plural es frente al riesgo de no poder acceder a la justicia arbitral,

sea nacional o internacional[127]. En ningún caso objeta la cláusula arbitral propiamente tal, con lo cual, el Tribunal Arbitral entiende, que presta su consentimiento por referencia.

206. De esta manera, S&B, una entidad suiza, prestó su consentimiento al acuerdo de arbitraje al momento de presentar la Oferta, haciéndose parte de dicho acuerdo. Por lo anterior es forzoso concluir que las partes del acuerdo de arbitraje tienen sus establecimientos en estados diferentes, con lo cual se cumple el requisito de la del literal a) del artículo 62 de la Ley 1563.

207. Finalmente, no es factible entender, tal como lo pretende la ANI, que, de conformidad con el literal e) de la cláusula 15.3, los efectos de la cláusula arbitral se refieran únicamente a los resultados del Arbitraje, es decir, al laudo arbitral.

208. La letra e) de la Sección 15.3 del Contrato se refiere a "los efectos de la cláusula compromisoria" sin hacer mención alguna a los efectos del laudo arbitral. Un efecto comúnmente conocido de la cláusula arbitral consiste en crear la competencia negativa de los tribunales ordinarios y la competencia positiva del tribunal arbitral. Un laudo arbitral no podría generar efectos directos sobre S&B sin que ésta fuera previamente parte del acuerdo arbitral.

209. A su vez, cualquier efecto que S&B pudiera sufrir de manera indirecta por intermedio del patrimonio de POB no requiere ser regulado o "aceptado" por las Partes, dado que se producirá de manera automática, como consecuencia de la dictación de un laudo, sin requerir el consentimiento de las Partes.

210. Por las razones señaladas, el Tribunal Arbitral concluye que S&B forma parte del acuerdo de arbitraje, lo que tiene por efecto que se cumple el requisito de la internacionalidad del literal a) de artículo 62. Por lo anterior, no le asiste la razón a la ANI cuando formula su objeción a la jurisdicción del Tribunal Arbitral por una supuesta inobservancia de lo señalado en el literal a) del artículo 62 de la Ley 1536 de 2012

---

[127] Prueba C-180.

**(c)    La concurrencia del literal b) del artículo 62**

    (i)    Posición de la ANI

211.    La ANI indica que tampoco se cumple el supuesto establecido en el literal b) del artículo 62 de la Ley 1563 de 2012. Afirma que ninguno de sus supuestos se aplica, dado que el lugar del cumplimiento de las obligaciones es en la República de Colombia. Concluye que, además de no haber sido pactada por las Partes la procedencia del literal b), sus supuestos no se cumplen[128].

    (ii)    Posición de POB y S&B

212.    Las Demandantes señalan que también este requisito de internacionalidad se cumple, dado que el domicilio de una de las partes (S&B) se encuentra en un lugar diferente al lugar que tenga una relación más estrecha con el Arbitraje, esto es, Colombia[129].

    (iii)    Análisis del Tribunal Arbitral

213.    El literal b) del artículo 62 de la Ley 1536 de 2012 cubre una situación de hecho en la cual todas las partes del acuerdo de arbitraje se sitúan en un país, pero determinados elementos de la controversia, el objeto o la sede del arbitraje se sitúan en un país distinto, a saber:

> El lugar del cumplimiento de una parte sustancial de las obligaciones o el lugar con el cual el objeto del litigio tenga una relación más estrecha, está situado fuera del Estado en el cual las partes tienen sus domicilios.

214.    A juicio del Tribunal Arbitral esta causal de internacionalidad no se cumple dado que una de las partes que consintió al arbitraje bajo la Sección 15.3 es una entidad establecida en el extranjero (S&B). En efecto, la Estructura Plural manifestó en el Anexo 15 de la Oferta que ésta contenía inversión extranjera, aceptando los efectos de la cláusula arbitral.

---

[128] Contestación ANI, ¶ 494-498. En el mismo sentido, Dúplica ANI, ¶ 286-287.
[129] Demanda POB y S&B, ¶ 534-538.

215. De no haberse manifestado el consentimiento de S&B, todas las partes del acuerdo arbitral habrían tenido sus establecimientos en un solo país. Pero ello no ocurrió, dado que una de las partes del acuerdo arbitral tiene su establecimiento en un país distinto. Por lo anterior, la internacionalidad del presente Arbitraje no obedece a las circunstancias descritas en el literal b) del artículo 62 de la Ley 1536 de 2012, y se desprende más bien de los literales a) y c) del mismo precepto legal. Por lo anterior, corresponde aceptar la oposición de la ANI, pero solo en cuanto al supuesto del literal b) del artículo 62.

216. Finalmente, el Tribunal Arbitral concluye que corresponde rechazar las objeciones de la ANI a su jurisdicción, dado que este Tribunal Arbitral de carácter internacional se constituyó correctamente al amparo de la Sección 15.3 del Contrato.

**2. EXCEPCIONES DE COMPETENCIA**

**(a) Competencia del Tribunal para conocer sobre las pretensiones relacionadas con las compensaciones por EER (Sección 14.2 (h) del Contrato)**

(i) Posición de la ANI

217. En el caso de tener jurisdicción, a juicio de la ANI, el Tribunal Arbitral debe declarar su falta de competencia para conocer sobre las pretensiones relacionadas con las compensaciones e indemnizaciones en relación con EER, por recaer dicha competencia en el Panel de Amigables Componedores de acuerdo a lo pactado en la Sección 14.2(h) del Contrato[130].

218. La ANI opina que de la posición de las Demandantes –de que ni S&B ni la ANI habrían prestado su consentimiento para someterse ante al Amigable Componedor– se sigue que tampoco lo hicieron en relación con el arbitraje, dado que la Sección 15.3.e del Contrato únicamente hace referencia a los "efectos" de la cláusula compromisoria[131].

---

[130] Demanda ANI, pp. 185-188. En el mismo sentido, Contestación ANI, ¶ 533, Dúplica ANI, ¶¶ 310-312.
[131] Contestación ANI, ¶¶ 537-540.

219. Frente a la posición de las Demandantes –que la sumisión al Amigable Componedor no podría transformarse en un impedimento para acceder al Tribunal Arbitral– la ANI opina que el mecanismo del Amigable Componedor es un mecanismo alternativo reconocido en el ordenamiento jurídico colombiano y que toda controversia que las Partes sometieron a dicho mecanismo debe ser resuelta a través de éste[132].

220. Finalmente, la ANI concluye que el foro para resolver las reclamaciones por compensaciones, costos ociosos u otro efecto derivado de un EER es el panel de Amigables Componedores. A su vez, S&B y el Contratista EPC, ante la ausencia de pacto arbitral, deben dirigir toda controversia que pretendan iniciar en contra de la ANI, a la jurisdicción ordinaria[133].

(ii)    Posición de POB y S&B

221. Las Demandantes solicitan rechazar el argumento de la ANI, dado que su reclamación no se refiere a los costos ociosos por EER regulada en la Sección 14.2(h) del Contrato, en particular, no se refiere a su reconocimiento o a su tasación[134]. Muy por el contrario, las reclamaciones de las Demandantes aluden a los presuntos incumplimientos de la ANI en torno a las UFs 4 y 5; incluyen solicitud de declaraciones de parte del Tribunal sobre el cumplimiento de las obligaciones de la Fase de Construcción al suscribirse las Actas de Terminación de las UFs 1, 2 y 3; solicitud de daños y perjuicios, petición subsidiaria de restablecimiento del equilibrio económico del contrato; y el pago de los costos del Arbitraje[135].

222. A su vez, las Demandantes citan la Sección 15.1 del Contrato de Concesión[136] que establecería una competencia específica y limitada del Amigable Componedor,

---

[132] Contestación ANI, ¶¶ 541-546.
[133] Escrito Post Audiencia ANI, ¶ 24-25.
[134] Demanda POB y S&B, ¶ 573-574. En el mismo sentido, Contestación POB y S&B, ¶ 784-785; Replica POB y S&B, ¶ 198-203.
[135] Demanda POB y S&B, ¶ 575.
[136] Sección 15.1: "las Partes acuerdan acudir a un Amigable Componedor para definir todas aquellas controversias que expresamente se han señalado en el presente Contrato para conocimiento del Amigable Componedor".

concluyendo que no sería competente en razón de la materia del Arbitraje[137]. Enfatizan que[138]:

> [L]as reclamaciones de las Demandantes no son competencia del Panel de Amigable Componedor porque no se refieren a los costos ociosos por mayor permanencia en obra causados por un EER sino a la indemnización plena de los perjuicios a la que las Demandantes tienen derecho bajo la Ley Aplicable. Es más, como se demostró, ninguna de las pretensiones de las Demandantes cabe dentro de las expresas y limitadas facultades de Panel de Amigable Componedor bajo el Contrato. En todo caso, la eventual competencia del Panel de Amigable Componedor no excluye la jurisdicción y competencia del Tribunal Arbitral sobre todas las controversias que se deriven del Contrato, como lo establece el Acuerdo Arbitral y lo demostraron las Demandantes en el Arbitraje.

223. Plantean, además, que el Amigable Componedor no tiene competencia *ratione personae* sobre reclamos planteados por S&B en contra de la ANI por falta de consentimiento de ambas[139]. Las Demandantes afirman que "aceptar la posición de la ANI supondría desproveer a las Demandantes del foro con el que cuentan para tramitar sus controversias con la ANI"[140].

224. A diferencia de las limitaciones señaladas, a juicio de las Demandantes, el Contrato de Concesión le concede al Tribunal Arbitral una facultad amplia de pronunciarse sobre "toda controversia que surja entre las Partes con ocasión del presente Contrato", lo que, a su vez, incluiría las pretensiones de S&B en virtud de lo señalado en la Sección 15.3(e) del Contrato de Concesión[141].

225. Las Demandantes argumentan que, incluso si el Amigable Componedor tuviera competencia, eso no excluye la competencia del presente Tribunal Arbitral, dado que[142]:

---

[137] Demanda POB y S&B, ¶¶ 579-580. En el mismo sentido, Replica POB y S&B, ¶ 198.
[138] Escrito Post Audiencia, ¶ 437.
[139] Demanda POB y S&B, ¶ 581.
[140] Contestación POB y S&B, ¶ 785.iii.
[141] Demanda POB y S&B, ¶ 582.
[142] Demanda POB y S&B, ¶ 586.

> [L]as consecuencias derivadas de los eventuales incumplimientos
> del acuerdo de someter ciertas controversias al Amigable
> Componedor son exclusivamente contractuales, no procesales.

226. En otras palabras, argumentan que, si ciertas materias de la competencia del Amigable Componedor fueran llevadas ante este Tribunal Arbitral, se configuraría eventualmente un incumplimiento contractual, pero no la falta de competencia de este Tribunal Arbitral[143].

227. Finalmente, las Demandantes citan el artículo 13 del Código General del Proceso según el cual las cláusulas que limitan el acceso a operadores de justicia son ineficaces en el ordenamiento jurídico colombiano[144].

   (iii)  <u>Análisis del Tribunal Arbitral</u>

228. De conformidad a lo establecido en la Sección 15.1.a del Contrato:

> Las Partes acuerdan acudir a un Amigable Componedor para definir
> todas aquellas controversias que expresamente se han señalado en el
> presente Contrato para conocimiento del Amigable Componedor.

229. La Sección 14.2.h del Contrato regula las compensaciones por Eventos Eximentes de Responsabilidad. Su numeral ii) contempla una posible compensación al Concesionario con respecto a:

> [C]ostos ociosos de la mayor permanencia en la obra que se llegaren
> a causar por estos hechos, mediante el reconocimiento de una suma
> diaria que definirán las Partes de común acuerdo.

230. Acorde al numeral v) de la misma norma, "en caso de controversia sobre la aplicación de este reconocimiento o su tasación, la discrepancia será sometida al Amigable Componedor".

---

[143] Demanda POB y S&B, ¶ 587.
[144] Demanda POB y S&B, ¶ 588.

231. Para el Tribunal Arbitral resulta suficiente revisar el petitorio de la demanda de las Demandantes para determinar que no se discute la existencia de un EER o la tasación de los costos ociosos de mayor permanencia en la obra.

232. En efecto, las Partes reconocieron la concurrencia de varios EERs, los que afectaron las UFs 2, 4 y 5, a través de la firma de las respectivas Actas de Declaratoria de Evento Eximente de Responsabilidad[145]. La controversia presentada ante este Tribunal Arbitral en parte se encuentra relacionada, en cuanto a los hechos, con los EERs ocurridos en las UFs 2, 4 y 5. Sin embargo, dicha controversia posee dimensiones muy distintas con respecto a aquellas que las Partes habían reservado para la competencia del Amigable Componedor. Así, ante este Tribunal Arbitral no se discute la concurrencia de un EER y, así mismo, las pretensiones de las Demandantes no se refieren a la tasación de los costos ociosos, materias que deben ser sometidas al Amigable Componedor.

233. De la misma manera, la Reconvención de la ANI, aunque se haya presentado bajo la condición de que este Tribunal confirmara su jurisdicción y/o competencia, da cuenta de una serie de controversias que exceden los límites de la competencia asignada al Amigable Componedor, incluyendo dentro de ellas solicitud de la terminación anticipada del Contrato.[146]

234. Por las razones señaladas, el Tribunal Arbitral concluye que la objeción de la ANI sobre la supuesta falta de su competencia para conocer sobre las pretensiones relacionadas con las compensaciones e indemnizaciones en relación con EERs, debe ser rechazada.

**(b)   Competencia del Tribunal sobre reclamaciones del Contratista EPC**

(i)   Posición de la ANI

235. La ANI afirma que el Tribunal Arbitral no debe pronunciarse sobre las indemnizaciones y/o compensaciones de o en relación a terceros ajenos al pacto arbitral y al Contrato[147].

---

[145] Prueba C-002.
[146] Demanda ANI, p. 361-367.
[147] Contestación ANI, ¶¶ 548-561. En el mismo sentido, Dúplica ANI, ¶¶ 303-305.

Con ello alude específicamente al contratista EPC con el cual POB celebró un Contrato EPC (las "**Reclamaciones EPC**"). Así, las Secciones 5.1.a y 5.1.b, establecen las obligaciones de suscribir, respectivamente el Contrato de Diseño y el Contrato de Construcción, en los plazos que allí se indican.

236. En la práctica, POB celebró un contrato de Ingeniería, Suministro y Construcción, conocido como contrato EPC, con el Consorcio Constructor POB (JV-POB)[148]. El objeto del Contrato EPC, según su Cláusula 3.01, consistía en lo siguiente:

> On the terms and subject to the conditions of this Contract, the EPC Contractor shall perform on a lump sum turnkey basis and in accordance with the Back to Back Principle, the Design and the EPC Works to satisfy the Concession Agreement Tests and achieve completion of each Functional Unit in accordance with Section 8.07 within the EPC Contract Time for Completion, all in compliance with the Compliance Standards.

237. La ANI objeta la competencia del Tribunal Arbitral para que se pronuncie sobre alguna pretensión del Contratista EPC, considerando que la reclamación de las Demandantes es por los costos ociosos por mayor permanencia en obra derivados de un EER[149].

238. La ANI cita la Sección 16.3 del Contrato donde se indica que el Contrato no crea relación alguna de asociación, sociedad o agencia entre las Partes, no pudiendo ninguna de ellas comprometer a otra[150]. Indica que[151]:

> [E]l contratista EPC no es parte del Contrato de Concesión 002 de 2014 ni del pacto arbitral. Las únicas partes del contrato y el pacto son la ANI y POB. Por lo anterior, el tribunal deberá declarar su falta de competencia en relación a cualquier pretensión relacionada al contratista EPC.

---

[148] Prueba C-086.
[149] Demanda ANI, p.364.
[150] Contestación ANI, ¶ 558.
[151] Escrito Post Audiencia ANI, ¶ 13.

239. Asimismo, la ANI invoca la Sección 14.3 del Contrato que establece la obligación de mantener a la ANI indemne de cualquier reclamación proveniente de sus actuaciones o de sus subcontratistas o dependientes[152].

240. La ANI argumenta que, al reclamar POB los supuestos perjuicios del contratista EPC, "se configura la ausencia de legitimación en la causa por activa con las pretensiones de POB"[153]. Estima que POB no se encuentra legitimada en la causa por activa para solicitar el reconocimiento de los perjuicios en favor del Contratista EPC, siendo que solo este último tendría dicha aptitud de acuerdo con la relación sustancial. Asimismo, señala que no se tiene conocimiento de una sentencia que haya condenado a la ANI al pago de perjuicios en favor del Contratista EPC[154].

241. La ANI complementa lo anterior indicando que el Tribunal Arbitral no podría pronunciarse respecto de los supuestos perjuicios del Contratista EPC sin que este concurriera al proceso para hacer valer sus derechos[155]. También indica que[156]:

> [E]l contratista EPC no es ni ha sido parte en el presente trámite arbitral por lo que, se desconoce cualquier tipo de posición del EPC en relación a la presente controversia. Por lo anterior, el tribunal debe desestimar cualquier pretensión que tenga relación con el EPC de POB.

242. Finalmente, indica que existiría un riesgo de doble cobro[157]:

> Lo que pretende POB no es solo obtener una indemnización absolutamente improcedente, pues la ANI no ha incumplido contrato alguno, sino que, pretende incluso el reconocimiento de una doble indemnización ya que la composición accionaria del contratista EPC es similar a la de POB.

---

[152] Contestación ANI, ¶ 560. En el mismo sentido, Dúplica ANI, ¶ 307.
[153] Contestación ANI, ¶ 562.
[154] Contestación ANI, ¶ 565.
[155] Contestación ANI, ¶ 567.
[156] Escrito Post Audiencia ANI, ¶ 16.
[157] Escrito Post Audiencia ANI, ¶ 17.

(ii)    Posición de POB y S&B

243. Las Demandantes indican que el Contrato establece la obligación del Concesionario de celebrar un contrato de construcción para la ejecución de las Intervenciones y que así se procedió, habiendo la ANI conocido y aprobado el Contrato EPC[158].

244. Las Demandantes explican que la Cláusula 4.04 "*Back-to-Back Principle*" del Contrato EPC consagra el derecho del Contratista EPC a reclamarle al Concesionario el cobro de los perjuicios que sufra a causa de los incumplimientos contractuales de la ANI. En estos casos, el Concesionario debe presentar la reclamación correspondiente ante la ANI y trasladarle al Contratista EPC todos los réditos de dicha reclamación[159]. De acuerdo con lo anterior, las Demandantes concluyen que[160]:

> [E]ste es el procedimiento que debe seguirse frente a reclamaciones del Contratista EPC por incumplimientos de la ANI. El Concesionario no tenía la obligación de pagar de manera previa las reclamaciones del Contratista EPC para poder reclamar ante la ANI, sino una vez la ANI las pague, voluntariamente o por orden del Tribunal Arbitral.

245. Al no existir una obligación previa de pago al Contratista EPC por parte del Concesionario, las Demandantes buscan entregar certeza de que los valores que sean reconocidos por el Tribunal Arbitral le serán trasladados al Contratista EPC[161]:

> Asimismo, el Tribunal puede tener plena certeza de que el Concesionario cumplirá el Contrato EPC y, en consecuencia, trasladará al Contratista EPC los valores que sean reconocidos por el Tribunal Arbitral y pagados por la ANI como consecuencia de las reclamaciones derivadas del Contratista EPC. Para esto, el Tribunal puede ordenarle al Concesionario acreditar a la ANI el pago de esos perjuicios al Contratista EPC una vez la ANI haya indemnizado integralmente al Concesionario. Incluso, el Tribunal podría establecer un modo de pago que le permita a la ANI verificar que el

---

[158] Escrito Post Audiencia, ¶¶ 325-327.
[159] Escrito Post Audiencia, ¶ 327.
[160] Escrito Post Audiencia, ¶ 327.iii.
[161] Escrito Post Audiencia, ¶ 327.v.

Concesionario pagó la indemnización correspondiente al Contratista EPC.

246. Finalmente, las Demandantes concluyen[162]:

> Por ende, las reclamaciones del Contratista EPC las realiza el Concesionario en contra de la ANI, de acuerdo con la estructura de reclamos prevista en el Contrato de Concesión, para obtener la indemnización de los perjuicios que el Contratista EPC sufrió como consecuencia de los incumplimientos de la ANI. Son reclamaciones que responden a la naturaleza del Contrato EPC como contrato coligado del Contrato de Concesión. En este sentido, son costos ciertos y futuros para el Concesionario. En consecuencia, la jurisdicción del Tribunal para dirimir esta controversia es incuestionable, pues se trata de reclamaciones dentro del ámbito objetivo y subjetivo del Contrato de Concesión y que son expresamente previstas para que sean formuladas por el Concesionario en contra de la ANI.

(iii) <u>Análisis del Tribunal Arbitral</u>

247. El Tribunal Arbitral observa que el Contratista EPC no figura como uno de los Demandantes en este Arbitraje. En otras palabras, el Contratista EPC no intenta ni siquiera ejercer un rol activo en este Arbitraje, por lo cual no parece idóneo formular una objeción por falta de legitimación por activa, dado que el Contratista EPC no pretende asumir el rol del demandante o cualquier otro rol activo. Más aún, este Tribunal Arbitral no pretende "aplicar" el Contrato EPC o alguno de sus conceptos a esta controversia.

248. Sin embargo, para que este Tribunal Arbitral tenga competencia para pronunciarse sobre los daños y perjuicios reclamados por POB, dichos daños y perjuicios deben estar radicados en el patrimonio de POB. De no ser así, de no haberse demostrado que las Demandantes reclaman daños y perjuicios propios, este Tribunal Arbitral efectivamente carecería de competencia, dado que no se había constituido para pronunciarse sobre las pretensiones de una tercera parte hacía POB bajo el Contrato EPC.

---

[162] Escrito Post Audiencia, ¶ 327.vi.

249. En la presentación de fecha 15 de enero de 2024, ingresada en virtud de lo ordenado en la Orden Procesal Núm. 17, las Demandantes señalan que "la pérdida reclamada por las Demandantes es cierta, directa y personal"[163].

250. Sin embargo, el Tribunal Arbitral observa que dentro de los costos por incurrir de las Demandantes se incluye el concepto "Reclamaciones EPC", cuyos valores corresponden a 5,8 miles de millones de COP para la UF 2[164]; 67,3 miles de millones de COP para la UF 4; y 49,0 miles de millones de COP para la UF 5[165].

251. En la Orden Procesal Núm. 18, el Tribunal les solicitó a las Demandantes que se aclare[166]:

> [S]i se incluyeron dentro del cálculo de daños, costos y gastos del EPC, y especifique el valor global de estos costos y gastos del EPC en cada una de las UFs ("Valor Global"). Adicionalmente, dentro del Valor Global de cada UF, especifique si estos costos han sido facturados por EPC a POB, y, separadamente, si han sido pagados por POB a EPC.

252. En respuesta a este requerimiento, las Demandantes aclararon[167]:

> [Q]ue las Reclamaciones EPC son un perjuicio futuro y cierto del Concesionario y así están presentadas, de manera individualizada y discriminada, en los dictámenes de daños elaborados por FTI en este Arbitraje.

253. Según el Glosario de los términos de la demanda de las Demandantes, las Reclamaciones de EPC incluyen "Reclamación EPC UF 2" y "Reclamación EPC UF 4 y 5". La primera se refiere a la "'reclamación económica con respecto a los hallazgos arqueológicos en la UF 2, remitida por el Contratista EPC a POB con fecha 11 de junio de 2020 y presentada por POB a la ANI', de conformidad con la definición asignada en la Prueba CER-001". La segunda se refiere a la "'reclamación de perjuicios relacionados con la no ejecución de las

---

[163] Presentación POB y S&B de fecha 15 de enero de 2024, ¶ 15.
[164] Actualizado en la presentación de fecha 12 de abril de 2024 de las Demandantes, Tablas 2-1, 2-2 y 4-10, ¶ 4.
[165] Presentación POB y S&B de fecha 15 de enero de 2024, Tablas 2-1 y 2-2, ¶ 8.
[166] Orden Procesal Nº 18.
[167] Presentación de fecha 12 de abril de 2024 de las Demandantes, Tablas 2-1, 2-2 y 4-10, ¶ 4.

UFs 4 y 5, remitida por el Contratista EPC a POB con fecha 21 de abril de 2021', de conformidad con la definición asignada en la Prueba CER-001"[168].

254. Las Demandantes en todo momento han reconocido que las Reclamaciones EPC son "los daños sufridos al nivel del Contratista EPC con ocasión de los incumplimientos de la ANI"[169]. Asimismo, señalan que las Reclamaciones EPC[170]:

> [No] han sido facturadas por el Contratista EPC a POB ni pagadas por éste, en la medida en la que habrá lugar al pago de dichas Reclamaciones EPC una vez la ANI pague al Concesionario los valores correspondientes, en virtud del principio de transparencia.

255. En otras palabras, las Reclamaciones EPC se encuentran radicadas en el patrimonio del Contratista EPC y no han sido traspasadas al patrimonio de POB. El patrimonio de POB no ha sido afectado de ninguna manera por las Reclamaciones EPC. Dado que los montos de dichas Reclamaciones no fueron ni siquiera facturados, no se generó ningún perjuicio, aunque fuera simplemente a través de una previsión contable en el balance de POB. POB tampoco ha presentado a este Tribunal Arbitral ningún reconocimiento de la deuda a favor del Contratista EPC o un acuerdo de transacción con este último.

256. Por las razones señaladas, si bien las Demandantes califican las Reclamaciones EPC como un daño "cierto", la certeza del daño no se encuentra demostrada ante este Tribunal Arbitral. Las Reclamaciones EPC constituyen el daño sufrido por un tercero, un daño ajeno al patrimonio de POB, razón por la cual el Tribunal Arbitral carece de competencia para pronunciarse sobre las Reclamaciones EPC.

257. Por otro lado, el Tribunal tiene conocimiento de que el Contrato EPC autorizaría a POB a reclamar los daños sufridos por el Contratista EPC. En efecto, la Cláusula 4.02 del Contrato EPC requiere (i) que la ANI haya accedido por escrito a hacerse cargo de dichos reclamos o (ii) así lo haya decidido. Más allá de que en este caso no se ha evidenciado por POB el cumplimiento de ninguno de estos supuestos, lo cierto es que para que la ANI pueda ser

---

[168] CER-001, ¶ 1.2.16; 2.6.1-2.6.19.
[169] Demanda POB y S&B, ¶ 470.
[170] Presentación de fecha 12 de abril de 2024 de las Demandantes, ¶ 6.

demandada en el marco de este Arbitraje, conforme a la cláusula arbitral contenida en el Contrato de Concesión, por daños sufridos por el Contratista EPC, es indispensable que se demuestre que la ANI haya consentido en ello.

258. En este sentido, el Contrato de Concesión no establece dicho consentimiento por parte de la ANI. Tampoco señala que la ANI deba hacerse cargo de las reclamaciones EPC sufridas por el Contratista EPC que sean promovidas por POB.

259. En primer lugar, en relación con el Contrato de Concesión suscrito entre POB y la ANI, en la Sección 15 "Solución de Controversias" se determinó la composición de un tribunal de arbitramento, nacional o internacional, para resolver las controversias que surgiesen entre las Partes y con ocasión del Contrato. A su vez, de acuerdo con el Contrato de Concesión, se define como "Parte o Partes" exclusivamente a Perimetral Oriental de Oriente S.A.S. y a la ANI: "Son, individual o conjuntamente, el Concesionario y la ANI, tal y como se identifican en el encabezado de esta Parte General."

260. En segundo lugar, si bien el Contrato de Concesión establece la obligación del Concesionario de suscribir un contrato para la elaboración de diseños y la construcción de las obras objeto del contrato, la ANI no es parte ni celebró ese contrato, ni tiene relación jurídica alguna con el Contratista EPC. Al respecto, es particularmente ilustrativa la Sección 16.3, frase final del Contrato: "Las Partes no pretenden crear ningún derecho ni otorgar ninguna acción a ningún tercer beneficiario del Contrato". Lo anterior significa que el Contrato de Concesión no solo no reconoce explícitamente los derechos derivados del EPC a favor del Contratista EPC, sino que además cualquier interpretación implícita en ese sentido estaría proscrita en virtud del principio consagrado en la referida Sección 16.3.

261. En tercer lugar, la Sección 15.3 ("Arbitraje Internacional"), letra (e) señala:

> Las Partes acuerdan que en el evento en que se convoque al Tribunal de Arbitramento, los efectos de la cláusula compromisoria serán extensivos a aquellas empresas, sociedades o personas naturales que hayan presentado conjuntamente la Oferta, en la medida que, dichos sujetos prestaron su consentimiento por referencia al momento de presentación de la Oferta.

262. Esta hipótesis claramente permite intervención de no signatarios, pero los limita solo a los miembros del Concesionario. En este sentido el Tribunal Arbitral resolvió en la Sección IV.A.1 que S&B había prestado su consentimiento por referencia.

263. En cuarto lugar, en la Sección 14.3 del Contrato de Concesión, las Partes acordaron de forma expresa que:

> El Concesionario se obliga a mantener indemne a la ANI de cualquier reclamación proveniente de terceros y que se deriven de sus actuaciones o de las de sus subcontratistas o dependientes.

264. Este principio es consistente con la Sección 5.2. "Contratistas" letra (e) del mismo Contrato:

> En todos los casos, el Concesionario seguirá siendo responsable frente a la ANI por la ejecución de la totalidad de las obligaciones contenidas en el presente Contrato, incluyendo, pero sin limitarse a aquellas que ejecuten los Contratistas y sus respectivos subcontratistas, y deberá mantener indemne a la ANI por incumplimientos, y demandas de los Contratistas y subcontratistas.

265. Es decir, en opinión del Tribunal, por la operación del Contrato de Concesión, es POB como Concesionario quien debe responder frente a reclamaciones y demandas de los contratistas. Cuestión distinta es si, como consecuencia de responder frente a tales reclamaciones, POB sufre un daño propio que, bajo el Contrato de Concesión, pueda ser atribuible a la ANI.

266. En consecuencia, este Tribunal Arbitral considera que la ANI no está vinculada, bajo el Contrato de Concesión, a pagar los reclamos hechos por el Contratista EPC a POB.

267. De esta manera, el Tribunal Arbitral carece de competencia para pronunciarse sobre la adjudicación de los daños supuestamente producidos por los hallazgos arqueológicos de la

UF 2 que, según las Demandantes, generaron un desequilibrio económico del Contrato y un perjuicio equivalente a 5,8 miles de millones de COP[171].

268.   En la misma situación se encuentran las Reclamaciones EPC por las UFs 4 y 5[172]. Dado que no se trata de un perjuicio sufrido por POB, sino por el Contratista EPC, el Tribunal Arbitral carece de competencia para pronunciarse sobre Reclamaciones EPC UFs 4 y 5, por lo que no podrá considerar estos valores dentro del esquema de cálculo de Loss of Profit, debiendo ser excluidos de los daños que puede adjudicar el Tribunal Arbitral[173].

269.   Asimismo, las Demandantes resaltan[174]:

> [Q]ue los valores asociados al Capex en los dictámenes de daños de FTI no hacen parte de las Reclamaciones EPC. Por el contrario, se trata de costos en los que ya incurrió el Concesionario, y corresponden a valores (i) facturados por el Contratista EPC a POB que (ii) fueron pagados por POB al Contratista EPC como contraprestación por la ejecución de las Intervenciones del Proyecto.

270.   Valores del Capex EPC[175]:

> [S]on independientes y no tienen relación alguna con los valores objeto de las Reclamaciones EPC, que son sobre las que versan las objeciones jurisdiccionales a las que el Tribunal hizo referencia en la OP 18.

271.   Siguiendo la lógica anterior, y tratándose de un costo o perjuicio supuestamente incurrido por POB mismo[176], el Tribunal Arbitral reafirma su competencia sobre las pretensiones de POB descritas como Capex EPC, con lo cual no hay obstáculo para que ese concepto se mantenga dentro del cálculo de Loss of Profit de POB correspondiente a las UFs 4 y 5.

---

[171] Demanda POB y S&B, ¶ 445 (monto original 5,4).
[172] Prueba CER-001, ¶ 2.6.2-2.6.11.
[173] Ver Sección IV.E.1 del Laudo.
[174] POB comunicación de 12 de abril del 2024, "Orden Procesal No. 18 (la OP18) - respuesta a la solicitud del Tribunal Arbitral y respuesta al escrito de la ANI del 1 de marzo de 2024, ¶ 7.
[175] POB comunicación de 12 de abril del 2024, "Orden Procesal No. 18 (la OP18) - respuesta a la solicitud del Tribunal Arbitral y respuesta al escrito de la ANI del 1 de marzo de 2024, ¶ 7.
[176] CER-001, ¶ 3.4.10: "En este informe, uso el término financiero "Capex" (originado del inglés capital expenditure) para referirme a costos asociados a la realización de inversiones".

272. Por las razones señaladas, el Tribunal Arbitral acoge la excepción de la ANI a la competencia del Tribunal Arbitral únicamente con respecto a las Reclamaciones del Contratista EPC por las UFs 2, 4 y 5, por considerar que efectivamente carece de competencia para resolver acerca de dichas Reclamaciones al recaer sobre daños y perjuicios sufridos por un tercero.

273. Al mismo tiempo, el Tribunal Arbitral confirma que sí posee competencia sobre todas las demás pretensiones de POB, en la medida que se concluya que se trata de daños propios de esa Parte.

274. En particular, el Tribunal Arbitral confirma que sí posee competencia para pronunciarse sobre la compensación de POB procedente en el caso de prosperar la pretensión subsidiaria de la ANI de la terminación del Contrato[177].

275. Al respecto, las Demandantes señalaron[178]:

> [E]n el hipotético e improbable evento en que el Tribunal llegare a considerar que resulta procedente la terminación del Contrato con fundamento en los argumentos de la ANI, debe ordenar una indemnización plena de los perjuicios sufridos por las Demandantes con ocasión de dicha terminación.

Desde la perspectiva de la competencia del Tribunal Arbitral, no hay impedimentos para que el cálculo de la indemnización pueda incorporar referencias y montos correspondientes a las UFs 2, 4 y 5, siempre y cuando se trate de Loss of Profit de POB misma y no de los costos incurridos por el Contratista EPC. Sin perjuicio de confirmar aquí el Tribunal Arbitral su competencia para otorgar la indemnización en el caso de prosperar la pretensión subsidiaria de la ANI, la procedencia específica de la indemnización de los perjuicios supuestamente sufridos por POB será tratada en la Sección VI.E.1 del Laudo.

---

[177] Demanda ANI, p. 367.
[178] Contestación POB y S&B, ¶ 549.

B.    **DEMANDA PRINCIPAL DE POB Y S&B**

1.    RECLAMACIONES DE LAS DEMANDANTES EN RELACIÓN CON LA UF 2

276.    Las Demandantes afirman que la ANI incumplió sus obligaciones legales y contractuales en el marco de la ejecución de la UF 2 del Proyecto por no acceder a la solicitud de restablecer el equilibrio económico del Contrato de Concesión.[179] Alegan que las obligaciones y riesgos en materia arqueológica de POB no son ilimitados[180] y que no asumió el riesgo en materia arqueológica en la extensión y en la forma en la que la ANI lo afirma[181].

(a)    **Posición de POB y S&B**

277.    Las Demandantes argumentan que los hallazgos arqueológicos de la UF 2 generaron un desequilibrio económico del Contrato de Concesión, el cual la ANI tiene el deber de restablecer[182].

278.    Los hallazgos arqueológicos tuvieron "una intensidad de tal magnitud que desequilibraron la ecuación económica del Contrato de Concesión"[183], y dado que se configuran los requisitos contemplados por el ordenamiento jurídico colombiano, la ANI tiene la obligación de compensar a POB[184] por dicho desequilibrio[185].

279.    POB clarifica que la pretensión principal sobre el restablecimiento del equilibrio económico de la UF 2 acá discutida, se centra únicamente en la Reclamación de Arqueología del EPC[186].

---

[179] Demanda POB y S&B, ¶ 410.
[180] Réplica POB y S&B, p. 82.
[181] Réplica POB y S&B, p. 83.
[182] Demanda POB y S&B, ¶¶ 434-435.
[183] Demanda POB y S&B, ¶ 440.
[184] Esta petición de compensación por la UF2 es la pretensión original contenida en la Demanda. Sin embargo, la Demandante, subsecuentemente y alternativamente solicitó indemnización por el total de los daños aducidos, incluyendo compensación por la UF2, en relación a la pretensión de terminación anticipada aducida por la Demandada. El Tribunal discutirá esta pretensión subsecuente y alternativa en la Sección IV.E.1 de este Laudo.
[185] Demanda POB y S&B, ¶ 441.
[186] POB comunicación de 5 de julio del 2024, "Sesión de la audiencia del 26 de junio de 2024 – Ubicación en el expediente de las pruebas asociadas a la Reclamación Arqueológica de la UF2", ¶ 2(a).

280.  POB afirma que el desequilibrio económico objeto de esta reclamación es estrictamente por los valores que se causaron como consecuencia de los hallazgos arqueológicos[187]; y que es de $5,8 mil millones de pesos colombianos[188]. Además, advierte POB en todo caso que los valores asociados al Capex en los dictámenes de daños de FTI no hacen parte de las Reclamaciones EPC, pues son costos en los que ya incurrió POB, valores facturados por el Contratista EPC a POB y pagados por POB a Contratista EPC[189]. A su vez, las Reclamaciones EPC "no hacen parte del Valor Global de cada UF, no han sido facturadas por el Contratista EPC a POB ni pagadas por este"[190].

281.  En primer lugar, para sustentar esta pretensión, POB afirma que encontró cinco yacimientos arqueológicos en la UF 2 del Proyecto, en los cuales "los hallazgos comprenden: i) el descubrimiento de lajas o estructuras funerarias, pieza de cerámica y otros restos arqueológicos entre el K5+650 y el K5+800 y (ii) el descubrimiento de restos óseos humanos y utensilios de caza en el K8+890"[191]. Además, que dichos hallazgos arqueológicos dieron lugar a reconocer dos EERs en los términos del Contrato de Concesión, tal y como se materializaron en las declaraciones del Amigable Componedor[192].

282.  En segundo lugar, para sustentar la pretensión, POB afirma que[193]:

> [L]os hallazgos arqueológicos entre el K5+650, el K5+800 y el K8+890 de la UF2 son: (i) sobrevinientes al Contrato de Concesión, toda vez que surgieron después de la celebración del Contrato; (ii) no son atribuibles a POB, toda vez que son una característica propia de la zona; (iii) eran imprevisibles, toda vez que, por su magnitud y complejidad, sus consecuencias nocivas no fueron previstas por las

---

[187] POB comunicación de 5 de julio del 2024, "Sesión de la audiencia del 26 de junio de 2024 – Ubicación en el expediente de las pruebas asociadas a la Reclamación Arqueológica de la UF2", ¶ 2(a).

[188] POB comunicación de 5 de julio del 2024, "Sesión de la audiencia del 26 de junio de 2024 – Ubicación en el expediente de las pruebas asociadas a la Reclamación Arqueológica de la UF2", ¶ 2(a). Prueba CER-009.

[189] POB comunicación de 12 de abril del 2024, "Orden Procesal No. 18 (la OP18) - respuesta a la solicitud del Tribunal Arbitral y respuesta al escrito de la ANI del 1 de marzo de 2024", ¶ 7.

[190] POB comunicación de 12 de abril del 2024, "Orden Procesal No. 18 (la OP18) - respuesta a la solicitud del Tribunal Arbitral y respuesta al escrito de la ANI del 1 de marzo de 2024", ¶ 6.

[191] Demanda POB y S&B, ¶ 411.

[192] Demanda POB y S&B, ¶¶ 427-429.

[193] Demanda POB y S&B, ¶ 442.

Partes; y (iv) tuvieron graves consecuencias para POB, toda vez que se tuvo que ampliar significativamente el plazo fijado para el rescate de los hallazgos, lo que derivó en sobrecostos asumidos por el Concesionario que no se tuvieron en cuenta al momento de definir la ecuación contractual.

283. En tercer lugar, para sustentar la pretensión, POB argumenta que la magnitud y complejidad de los hallazgos llevaron a que[194]:

> [L]as Intervenciones debieron extenderse hasta agosto de 2021, en la medida que durante más de cuatro años tuvo que perfilar todos sus recursos a superar los dos EERs derivados de los hallazgos arqueológicos.

284. Lo anterior llevó a que en[195]:

> [R]eiteradas oportunidades durante la operación fuera requerido (i) incluir personal adicional al equipo de arqueólogos, (ii) adquirir equipos, materiales, consumibles y laboratorios especializados en la materia, (iii) adecuar los sitios e instalaciones donde se debía realizar el rescate, (iv) contratar sistemas de seguridad, (v) instalar unidades sanitarias y puntos de hidratación, (vi) asumir gastos de transporte, (vii) asumir costos derivados de las intervenciones relacionadas con el alcance del Contrato, (viii) suscribir pólizas de seguro de maquinaria y (ix) otros.

285. En cuarto lugar, POB concede que "asumió el riesgo derivado de la Gestión Social y Ambiental, incluyendo los asuntos relacionados con los hallazgos arqueológicos"[196]. Sin embargo, según la "ley aplicable POB únicamente asumió los riesgos previsibles y limitados"[197], alegando así que la intensidad y la cantidad de los hallazgos hacen de ellos un riesgo imprevisible y exorbitante, que rompió el equilibrio económico del Contrato de Concesión[198].

---

[194] Demanda POB y S&B, ¶ 442.
[195] Demanda POB y S&B, ¶ 442.
[196] Demanda POB y S&B, ¶ 413.
[197] Réplica POB y S&B, p. 82.
[198] Réplica POB y S&B, p. 83.

286.    En quinto lugar, POB afirma que solicitó a la ANI el restablecimiento del equilibrio contractual en el comunicado enviado el día 11 de junio del 2020[199]. Además, señala POB que no existe por ley requisito alguno de oportunidad, que limite el poder a solicitar el restablecimiento del equilibrio económico de un contrato estatal, particularmente no es imperante hacer salvedades en otrosíes, para posteriormente pretender dicho restablecimiento[200]. Así mismo, POB aduce que las renuncias a presentar reclamaciones deben plantearse expresamente en documentos contractuales para que tengan efectos, en conformidad con el artículo 5 de la Ley 80 de 1993. Por lo tanto, POB concluye que no renunció a su derecho de reclamar el restablecimiento del equilibrio económico del Contrato.

**(b)    Posición de la ANI**

287.    La ANI afirma que el Tribunal Arbitral no debe pronunciarse sobre las indemnizaciones y/o compensaciones de o con relación a terceros quienes son ajenos al pacto arbitral y al Contrato[201].

288.    También, la ANI argumenta que POB no tiene derecho al restablecimiento del equilibrio económico del Contrato por los hallazgos en materia arqueológica encontrados en la UF 2, toda vez que el impacto de los EERs, declarados por el Amigable Componedor, es de carácter liberatorio de responsabilidad y obligaciones respecto de todas las Partes, en consonancia con la Sección 14.2(c) del Contrato de Concesión[202].

289.    Además, la ANI afirma que los hallazgos arqueológicos fueron riesgos asignados en el Contrato de Concesión a POB[203]. Así mismo, argumenta que son una consecuencia desfavorable derivada de la gestión contractual negligente y el incumplimiento de las obligaciones contractuales por parte de POB, respecto de la UF 2[204]. Adicionalmente, la

---

[199] Demanda POB y S&B, ¶ 440. Prueba C-128.
[200] Réplica POB y S&B, ¶¶ 183, 184.
[201] Contestación ANI, ¶¶ 548-561. En el mismo sentido, Dúplica ANI, ¶ 303-305.
[202] Contestación de la Demanda, ¶¶ 757-768. ANI comunicación del 12 de julio del 2024, "Pronunciamiento Respecto del Memorial de la parte demandante del 5 de julio de 2024", ¶ 2.1.
[203] Contestación ANI, ¶ 777.
[204] Contestación ANI, ¶ 786.

ANI argumenta que el eventual desequilibrio económico del contrato no puede generar perjuicios ni el reconocimiento de utilidad, sino que debe llevarse a un estado de no perdida[205]. A su vez, la ANI sostiene que POB no solicitó oportunamente el restablecimiento del equilibrio económico[206].

290. En primer lugar, la ANI objeta la competencia del Tribunal Arbitral sobre el restablecimiento económico de las Reclamaciones EPC incurridas en el contexto de los hallazgos arqueológicos de la UF 2. La ANI argumenta que el Tribunal Arbitral no debe pronunciarse sobre las indemnizaciones y/o compensaciones de o con relación a terceros quienes son ajenos al pacto arbitral y al Contrato[207]. Toda vez que la pretensión principal de restablecimiento del equilibrio económico de la UF 2, acá discutida, se funda en daños de terceros, ajenos al pacto arbitral y al Contrato, no puede proceder pronunciamiento y decisión alguna del Tribunal Arbitral en cuanto la compensación por estos valores.

291. En segundo lugar, la ANI concede y concuerda con POB que los hallazgos arqueológicos en la UF 2, constituyen EERs, tal y como lo determinó el Amigable Componedor, y que, en virtud de ello, están regidos por la Sección 14.2 del Contrato de Concesión, que es el régimen especial. Argumenta que existe un efecto liberatorio no solo para la Parte que sufre el EER, POB, sino también eximiendo a la otra Parte, la ANI, del reconocimiento de pérdidas, daños, gastos, cargos o expensas incurridos por el afectado durante el periodo especial[208]. Además, la ANI argumenta que, en virtud del literal h) de la Sección 14.2 del Contrato de Concesión, POB solo tiene derecho al reconocimiento de los costos ociosos por la mayor permanencia en obra[209].

292. En tercer lugar, la ANI sustenta que no existe desequilibro económico en virtud de la Sección 13.1 y 13.2 (ix) del Contrato de Concesión, toda vez que el manejo de los

---

[205] Contestación ANI, ¶¶ 789, 793.
[206] Contestación ANI, ¶ 754.
[207] Contestación ANI, ¶¶ 548-561. En el mismo sentido, Dúplica ANI, ¶ 303-305.
[208] Contestación ANI, ¶¶ 760-761, 768.
[209] Contestación ANI, ¶¶ 762-764.

hallazgos arqueológicos en la UF 2 es un riesgo asumido por POB y los sobrecostos son riesgos propios de la ejecución del Contrato de Concesión[210].

293.  La ANI ahonda en que no puede modificarse el régimen de riesgos acordado en el Contrato. Afirma que POB asumió "el costo que implica el cumplimiento cabal, oportuno y conforme de la totalidad de las obligaciones y de la asunción de los riesgos previstos en el Contrato y sus Apéndices y Anexos"[211]. La ANI profundiza que esta asunción de riesgo es clara y consta en la Sección 2.6(v)(a) del Contrato de Concesión, en las "Declaraciones y Garantías de las Partes".

294.  En cuarto lugar, la ANI argumenta que los incumplimientos de POB de sus obligaciones en materia arqueológica y su negligencia en la superación de los EER[212], niegan el derecho al restablecimiento del equilibrio del Contrato. La ANI afirma que las obligaciones en materia arqueológica y social no han sido cumplidas de forma diligente por POB[213].

295.  Aduce la ANI que "existe evidencia de la indebida gestión del Concesionario pues hoy, no se cuenta con la ejecución de la totalidad de Intervenciones requeridas en el corredor vial para lo cual fue contratado POB"[214]. Por lo anterior, la ANI sustenta que[215]:

> [E]n gracia de discusión, para que proceda el restablecimiento del equilibrio económico resulta esencial que la parte que lo solicita no haya contribuido a que este se produzca, lo cual, no se evidencia en el presente caso.

296.  En quinto lugar, la ANI argumenta que en caso de un rompimiento al desequilibrio económico no se procede al reconocimiento de ganancias, sino al reconocimiento de un perjuicio, y que debe llevarse es al estado de no perdida[216]. Por lo que, la ANI afirma,

---

[210] Contestación ANI, ¶¶ 755, 779, 782.
[211] Contestación ANI, ¶ 778.
[212] Contestación ANI, ¶¶ 33, 794.
[213] Contestación ANI, ¶ 40.
[214] Contestación ANI, ¶ 55
[215] Contestación ANI, ¶ 793.
[216] Contestación ANI, ¶¶ 789-794.

que no se configuró el rompimiento del equilibrio contractual pues no se materializaron los elementos, toda vez que no se configuró ningún tipo de perjuicio o pérdida de utilidad que deba reconocerse en favor de POB[217].

297.  La ANI fundamenta que el Consejo de Estado ha concluido que "solo se reconocerán los gastos o costos extras en que haya incurrido el contratista en virtud del exceso o sobrecosto producido por la circunstancia imprevisible e irresistible"[218]. POB no tiene derecho al restablecimiento del equilibrio del contrato, pues POB pretende que se le reconozcan las ganancias, que supuestamente dejo de percibir, y esta posibilidad no se admite en el derecho colombiano[219].

298.  En sexto lugar, la ANI argumenta que, en caso de que se hubiese presentado un desequilibrio en la ecuación contractual, POB no alegó oportunamente esta situación. La ANI fundamenta esta posición señalando que, en virtud del principio de buena fe, "la oportunidad se materializa en el momento en que se suscriben documentos que concretan suspensiones, adiciones, prórrogas del plazo contractual, contratos adicionales, otrosíes, etc."[220], por lo que la oportunidad adecuada para ello era al momento de solicitar la declaración EER. Alega así la ANI que POB no elevó ni dejó salvedad alguna relacionada con el restablecimiento del equilibrio contractual en la solicitud ni en la declaratoria de los EERs. Adicionalmente, la ANI argumenta que también hubiese sido oportuno dejar sentada la reclamación de restablecimiento del equilibrio contractual al momento de la negociación y/o firma de los Otrosíes número 8 y 9[221].

**(c)  Análisis del Tribunal Arbitral**

299.  El Tribunal Arbitral entiende que la esencia de la pretensión de POB sobre restablecimiento económico de la UF2 es lo denominado Reclamaciones EPC por un valor de $5,8 mil millones de pesos colombianos. La ANI ha objetado a esta pretensión argumentado que el

---

[217] Contestación ANI, ¶ 796.
[218] Contestación ANI, ¶ 791.
[219] Contestación ANI, ¶ 795
[220] Contestación ANI, ¶ 798.
[221] Dúplica ANI, ¶¶ 276-279.

Tribunal Arbitral no tiene competencia porque el Contratista EPC es una tercera parte ajena a este Arbitraje. Tal y como fue discutido en este mismo Laudo en la Sección de Jurisdicción y Competencia (Sección IV.A.2), el Tribunal Arbitral está de acuerdo con la objeción de la ANI. En consideración, el Tribunal Arbitral declara que no tiene competencia para decidir la pretensión de POB sobre el restablecimiento económico de la UF 2 dado que, esa pretensión está basada en Reclamaciones EPC, la cual está constituida por daños sufridos por un tercero, ajeno a este Arbitraje, sobre el cual este Tribunal Arbitral no tiene competencia[222].

## 2. RECLAMACIONES DE LAS DEMANDANTES EN RELACIÓN CON LAS UFs 4 Y 5

300. La pretensión más relevante de las Demandantes, en cuanto a la cuantía de la indemnización solicitada, es en relación con los supuestos incumplimientos de la ANI que "impiden que el Proyecto originalmente concebido por la Demandada pueda ser ejecutado"[223]. Lo anterior, se manifestaría en que la ANI[224]:

> [N]o identificó la existencia de más de sesenta (60) manantiales de agua a menos de cien (100) metros del corredor vial de las UFs 4 y 5. Esta omisión tiene unos efectos materiales en el Proyecto, pues el ordenamiento jurídico colombiano prohíbe la ejecución de cualquier actividad distinta a la recolección de frutos secundarios del bosque dentro de los 100 metros alrededor de los manantiales. Por ende, las protecciones ambientales vigentes en el derecho colombiano no permiten que POB realice las Intervenciones en los términos requeridos por la ANI en el corredor vial de las UFs 4 y 5.

301. Las Demandantes argumentan que, frente a tal incumplimiento, el Concesionario desplegó una conducta diligente con el fin de encontrar soluciones, ejerciendo los remedios contractuales disponibles y solicitando a la ANI el reconocimiento de un EER. Definen un EER como una causal de exoneración de la responsabilidad por el

---

[222] La pretensión subsecuente y alternativa de POB de indemnización por el total de los daños aducidos, incluyendo compensación por la UF2, en relación a la pretensión de terminación anticipada formulada por la Demandada, será discutida en la Sección IV.E.1 de este mismo Laudo.

[223] Demanda POB y S&B, ¶ 6.

[224] Demanda POB y S&B, ¶ 8.

cumplimiento de las obligaciones afectadas por parte de POB. Afirman que la existencia del EER no exonera a la ANI de responsabilidad por sus incumplimientos[225].

302.    Indican que, en el Acta de EER, las Partes asumieron determinadas obligaciones destinadas a superar el EER. Sin embargo, la ANI incumplió sus obligaciones, llevando a que el Concesionario no pudiera ejecutar las Intervenciones previstas en las UFs 4 y 5[226].

303.    Las Demandantes señalan que lo anterior se traduce en que el Concesionario no habría podido obtener las Retribuciones asociadas a las UFs 4 y 5, las cuales ascenderían aproximadamente al 58% del total de la Retribución prevista bajo el Contrato de Concesión, así como haber incurrido en perjuicios financieros adicionales[227].

304.    Las Demandantes destacan que debieron recurrir al Árbitro de Urgencia para que le ordenara a la ANI a abstenerse de seguir con los procedimientos sancionatorios, de declarar incumplimientos e imponer sanciones a POB, producto de su inhabilidad para ejecutar las Intervenciones en las UFs 4 y 5[228].

305.    Las Demandantes le imputan a la ANI el incumplimiento de las obligaciones bajo el Acta de EER, pactadas para superar el EER[229].

306.    Las Demandantes le reprochan a la Demandada de querer beneficiarse de su propia culpa, dado que pretende la Terminación Anticipada del Contrato por haber transcurrido 730 días desde el cumplimiento del plazo originalmente previsto para la terminación de las UFs 4 y 5, sin que se haya podido superar el EER, y estando prohibido el cambio en el trazado del Proyecto, dado que equivaldría a un cambio del objeto del Contrato[230].

---

[225] Demanda POB y S&B, ¶ 10.
[226] Demanda POB y S&B, ¶ 11-16.
[227] Demanda POB y S&B, ¶ 17-18.
[228] Demanda POB y S&B, ¶ 21-23.
[229] Demanda POB y S&B, ¶ 14.
[230] Demanda POB y S&B, ¶ 27-29.

307.    A su vez, la Demandada, argumenta que[231]:

> i) la ANI no tenía la obligación de identificar los manantiales de las UFs 4 y 5 en la etapa de estructuración del proyecto; ii) no son ineficaces los apartes de los pliegos de condiciones ni las cláusulas del Contrato 002 de 2014 relacionadas con la limitación de responsabilidad del contratante; iii) la declaración de un EER en las UFs 4 y 5 releva del cumplimiento a las partes del Contrato, no solo a POB.

308.    Consistentemente con esto, la ANI presentó una Reconvención, argumentando que POB habría incumplido sus obligaciones con respecto a las UFs 4 y 5, argumentos reiterados en su escrito de Contestación a la Demanda.

309.    La ANI afirma que POB debió haber identificado los manantiales en la Fase de Preconstrucción, toda vez que tenía a su cargo la preparación de los diseños definitivos. Asimismo, habría asumido el riesgo para solicitar a las autoridades ambientales los permisos necesarios[232].

310.    La ANI indica que el Acta de EER de fecha 1 de agosto de 2018, estableció que se había presentado una situación extraordinaria, que impedía que cumplieran las obligaciones relacionadas con las UFs 4 y 5 y que no se presentarían reclamaciones económicas recíprocas por esa causa[233].

311.    Afirma que POB no había cumplido de forma idónea con la Actividad 1 del Acta de EER, lo que habría obligado a la ANI iniciar mesas de trabajo con diferentes entidades, para lograr la ejecución del Contrato. Por su parte[234]:

> [L]a Actividad No. 2 es decir, la suscripción de un Contrato en el que se modifique el trazado original no es posible, ya que cambiaría el objeto del Contrato, cambio que no está permitido de acuerdo con la jurisprudencia de la Corte Constitucional y el Consejo de Estado.

---

[231] Contestación ANI, ¶ 19.
[232] Contestación ANI, ¶ 20.i. Ver también, Reconvención, pp. 212-215.
[233] Contestación ANI, ¶ 20.iii. Ver también, Reconvención, pp. 290-291.
[234] Contestación ANI, ¶ 20.iii. Ver también, Reconvención, pp. 291-296.

312.    La ANI alega que el Concesionario no ejecutó las obras de las UFs 4 y 5, con lo cual, a juicio de la ANI, no puede pretender recibir una Retribución[235].

313.    Señala que, en el evento que el Tribunal Arbitral considere que el Concesionario cumplió con la Actividad 1 del Acta de EER, dicha actividad no ha terminado, dado que las autoridades ambientales no han rechazado aún la posibilidad de continuar el Proyecto con el trazado original. Indica que correspondería aplicar lo dispuesto en la Sección 14.1(e) del Contrato, a saber, declarar su Terminación Anticipada, dado que transcurrieron 730 días desde el cumplimiento del plazo originalmente previsto para la terminación de las UFs 4 y 5, sin que se haya podido superar el EER y estando prohibido el cambio en el trazado del Proyecto, por equivaler a un cambio del objeto del Contrato[236].

**(a)    Sobre los alegados incumplimientos de la ANI en torno a los manantiales**

(i)    Posición de POB y S&B

314.    Las Demandantes le atribuyen a la ANI la obligación de haber identificado los manantiales en las UFs 4 y 5 durante la estructuración del Contrato, en cuanto la ANI tiene la obligación de realizar los estudios ambientales que sean necesarios para garantizar la viabilidad de los contratos que se estructuran[237].

315.    Entre otras normas constitucionales y legales, las Demandantes destacan el artículo 24 de la Ley 80 de 1993 sobre el Estatuto General de la Contratación Pública en Colombia, que establece el "principio de la transparencia" que declara ineficaces de pleno derecho las estipulaciones de los pliegos y de los contratos que contravengan lo dispuesto en este numeral, o dispongan renuncias a reclamaciones por la ocurrencia de los hechos aquí enunciados[238]. Resaltan que lo señalado en el numeral 1.9 de los Pliegos

---

[235] Contestación ANI, ¶ 20.vii.
[236] Contestación ANI, ¶ 20.xi.
[237] Demanda POB y S&B, ¶ 67.
[238] Demanda POB y S&B, ¶ 80; Prueba CL-062; Prueba CL-066.

de Condiciones de la Licitación, en cuanto al carácter referencial de la información,[239] sería ineficaz de pleno derecho y no tiene valor ni efecto, conforme se desprende del artículo 24 de la Ley 80 de 1993[240].

316.    Las Demandantes argumentan que la ANI "estructuró el Proyecto, determinó que era viable y desarrolló la Licitación"[241]. Señalan que la ANI contaba con un equipo de asesores de gran reconocimiento nacional e internacional para la estructuración del Proyecto, tales como el FONADE, la IFC, y la Unión Temporal de Euroestudios – Durán & Osorio – Deloitte[242].

317.    Las Demandantes agregan que "la ANI y su Estructurador no incluyeron ningún manantial o nacimiento de agua en la lista de cuerpos de agua que se verían afectados en las UFs 4 y 5", junto con indicar que había unos manantiales en la zona, pero en lugares de acceso remoto y de bosque primario[243].

318.    Las Demandantes afirman que los incumplimientos de la ANI[244]:

> [E]n relación con sus deberes legales y contractuales de estructurar adecuadamente el Contrato de Concesión llevaron a la imposibilidad de ejecutar las Intervenciones en las UFs 4 y 5. Dicha imposibilidad fue reconocida por las Partes en el Acta de EER.

319.    En particular, señalan que, si la ANI hubiera identificado oportunamente los manantiales, hubiera modificado el trazado de las UFs 4 y 5[245].

---

[239] Demanda POB y S&B, ¶ 362. 1.9.2: "La disponibilidad de estudios y conceptos en el Cuarto de Información de Referencia, sólo pretende facilitar el acceso a la información que reposa en los archivos de la ANI y/o INVIAS. Por lo tanto, los estudios y conceptos estarán disponibles a título meramente informativo, entendiéndose por tanto que no es información entregada por la ANI para efectos de la presentación de las Ofertas, ni generan obligación o responsabilidad alguna a carga de la ANI, y, por lo tanto, no hacen parte del Pliego de Condiciones ni del Contrato".

[240] Demanda POB y S&B, ¶¶ 363-365, con referencias al caso de la Concesión Transversal del Sisga S.A.S. c ANI, CL-065.

[241] Demanda POB y S&B, ¶¶ 106-108. Prueba CL-070: artículo 12 de la Ley 1682 de 2013

[242] Demanda POB y S&B, ¶ 115.i.

[243] Demanda POB y S&B, ¶ 118.iii.a, b y c; C-085(g).

[244] Demanda POB y S&B, ¶¶ 336.

[245] Demandada POB y S&B, ¶ 337.

320.    Las Demandantes argumentan que el Decreto Ley 2811 de 1974, Código de Recursos Naturales en Colombia, consagra la categorización de "áreas forestales protectoras", con un régimen estricto de conservación ambiental[246]. A su vez, el artículo 3 del Decreto 1449 de 1977 (compilado en el artículo 2.2.1.1.18.2 del Decreto 1076 de 2015) establece la definición de las áreas forestales protectoras que se extienden a 100 metros a la redonda desde la periferia del manantial[247].

321.    La aplicación conjunta de ambas disposiciones lleva a las Demandantes a concluir que[248]:

(a) [L]as áreas dentro de los 100 metros alrededor de los manantiales deben estar cubiertas de bosques, naturales o artificiales, y (b) la única actividad permitida dentro de dichos bosques es el aprovechamiento de sus frutos secundarios.

322.    En esta línea, Corporinoquía le impuso a POB la siguiente obligación[249]:

De encontrarse en el área del proyecto la presencia de nacimientos, se deberá guardar una distancia de protección de los mismos como mínimo 100 mts.

323.    Las Demandantes aseguran haber recibido los PAGA correspondientes para las UF 1 a 5 y la Licencia Ambiental para la Variante de Choachí, de conformidad con los requerimientos de ANLA, sin necesidad de realizar los estudios técnicos especializados que pudieran permitir la identificados de los manantiales[250].

324.    Las Demandantes relatan que, con fecha 16 de enero de 2016, las Partes suscribieron el Acta de Inicio de la Fase de Construcción[251]. En agosto de 2016 "el Concesionario comenzó a recibir PQRs de miembros de la comunidad aledaña al

---

[246] Demanda POB y S&B, ¶ 111.
[247] Prueba CL-005.
[248] Demanda POB y S&B, ¶ 113.
[249] Demanda POB y S&B, ¶ 162; C-105, "Obligaciones", numeral 2, p. 29.
[250] Demanda POB y S&B, ¶ 158-161; ¶ 369.
[251] Demanda POB y S&B, ¶ 167, C-106.

Proyecto en las que se advertía de la posible existencia de manantiales en las inmediaciones del trazado de las UFs 4 y 5"[252].

325.    Sobre la base de esta información, el Concesionario señala que contrató estudios con la Pontificia Universidad Javeriana entre el mes de octubre de 2016 y octubre de 2017[253]. Adicionalmente, contrató a la consultora SIAM S.A., que trabajó entre septiembre de 2017 y abril de 2018[254].

326.    Las Demandantes indican que[255]:

SIAM concluyó que existían 55 nacimientos de agua dentro de los 100 metros alrededor de cada lado del eje del Proyecto en las UFs 4 y 5. En junio de 2018, luego de una serie de ajustes metodológicos solicitados por la Interventoría, SIAM reclasificó algunas fuentes de agua y determinó que 61 de ellas eran manantiales. Esos 61 manantiales, sumados a los 5 encontrados por la Javeriana en su informe, sumaron un total de 66 manantiales dentro de los 100 metros a la redonda del trazado de las UFs 4 y 5.

327.    Las Demandantes enfatizan que el proceso tomó alrededor de 1,5 años de estudios y desembocó en la identificación de 66 manantiales dentro de los 100 metros alrededor de cada lado del eje de la vía en las UFs 4 y 5[256]. Este tiempo excede ampliamente el plazo previsto en el Pliego de Condiciones para presentar las ofertas, que fue de 7 meses[257].

328.    Destacan que la ANI no inició ningún procedimiento sancionatorio en contra de POB con ocasión de la existencia de los manantiales, lo que es indicativo de que la ANI no consideró que habría un incumplimiento contractual por parte del Concesionario[258].

---

[252] Demanda POB y S&B, ¶ 168; C-002.
[253] Demanda POB y S&B, ¶¶ 172-174.
[254] Demanda POB y S&B, ¶¶ 177-179; ¶ 370.
[255] Demanda POB y S&B, ¶ 179.
[256] Demanda POB y S&B, ¶ 180.
[257] Demanda POB y S&B, ¶ 361.iii.
[258] Demanda POB y S&B, ¶ 372.

329.    Con fecha 14 de noviembre de 2017, con los primeros resultados de la Universidad Javeriana, POB envío la Primera Notificación de EER, indicando que dicho evento se había configurado a partir del 31 de octubre de 2017, cuando éste tuvo conocimiento de dichos resultados[259]. POB reitero dichas notificaciones con fecha el 27 de febrero de 2018[260] y 28 de abril de 2018[261].

330.    Con fecha 1 de agosto de 2018, se firmó el Acta de EER[262].

331.    Las Demandantes argumentan que, en el Acta de EER, las Partes acordaron que se suspendía el plazo para la ejecución de todas las obras y actividades asociadas a las UFs 4 y 5, lo que quiere decir que POB está exento de responsabilidad por las demoras en la ejecución de dichas UFs[263]. Además, se establecieron algunas obligaciones específicas "siempre que no se encuentren afectadas con la presente declaratoria de EER".[264]

(ii)    Posición de la ANI

332.    La ANI argumenta haber cumplido a cabalidad el deber de planeación del Proyecto, dado que no tenía a su cargo la obligación de realizar los diseños definitivos y los estudios de detalle de la Fase de Preconstrucción con base en los cuales se llevaría a cabo la construcción de las obras[265].

333.    Afirma que, en acatamiento del deber de planeación, la estructuración del Proyecto cumplió con los requerimientos ambientales, conforme a la consulta realizada a la ANLA, procediendo a realizar el Diagnóstico Ambiental de Alternativas para la variante Choachí solicitada por la ANLA y establecer los lineamientos del estudio de impacto ambiental para el sector Calera-Cáqueza[266]. Con respecto a la variante de Choachí, el Estructurador habría realizado el trámite de diagnóstico ambiental de alternativas,

---

[259] Demanda POB y S&B, ¶ 186.
[260] Demanda POB y S&B, ¶ 188.
[261] Demanda POB y S&B, ¶ 191, C-109.
[262] Prueba C-002.
[263] Demanda POB y S&B, ¶ 211.
[264] Demanda POB y S&B, ¶ 221.
[265] Contestación ANI, ¶ 20.i; ¶ 134, Prueba 8.1.34.46; ¶ 144, Prueba 8.1.34.43.
[266] Contestación ANI, ¶ 135-137.

eligiendo la alternativa 3 sobre una evaluación multicriterio, que fue aprobada por ANLA[267], debiendo el Concesionario realizar el Estudio de Impacto Ambiental conforme al Apéndice Técnico 6[268]. La ANI es enfática en señalar que ni la Entidad ni su Estructurador tenían la obligación de identificar los manantiales de las UFs 4 y 5, y que fue el Concesionario quien debió haberlos identificado para ajustar sus diseños definitivos de tal forma que se pudiera dar continuidad al Proyecto[269].

334.    La ANI niega que se aplique el literal d) del numeral 5 del artículo 24 de la Ley 80 de 1993, dado que el apartado 1.9.2. del Pliego de Condiciones no es una cláusula de exoneración de responsabilidad, más bien, establece que la disponibilidad de los estudios y conceptos hechos por la ANI no constituye la entrega de información para la presentación de ofertas, por lo tanto, no se podrán derivar reclamaciones durante la ejecución del Contrato con base en esta información[270].

335.    La ANI afirma que, tal como el Concesionario detectó los nacimientos hídricos durante la ejecución del Proyecto, "también habría podido advertirlas en la fase del proceso de selección de la licitación pública al conocer y verificar los estudios realizados por estructurador".[271] Le reprocha a POB falta de diligencia en la identificación de los puntos hídricos y niega que ésta había actuado diligentemente, dado que no fue hasta la Fase de Construcción del Proyecto, y ante las quejas de la comunidad, que se percató de los manantiales de agua en cercanía a las UFs 4 y 5[272].

336.    También, reprocha a POB no haber advertido la presencia de nacederos o manantiales al momento de obtener la Licencia Ambiental, al igual que durante la

---

[267] Contestación ANI, ¶ 139, Prueba 8.1.34.43.
[268] Contestación ANI, ¶ 140, Prueba 8.1.3.6.
[269] Contestación ANI, ¶ 580
[270] Contestación ANI, ¶ 20.ii; ¶ 583-593; ¶ 704-707; Pliego de Condiciones del Proyecto No. VJ-VEIP- LP-010-2013, cl. 1.9.2
[271] Contestación ANI, ¶ 147.
[272] Contestación ANI, ¶ 179-186.

91

elaboración de los documentos que componen a los PAGA, en los cuales algunos de los manantiales fueron descritos como escorrentías[273].

337.    Junto con todo lo anterior, la ANI reconoce en múltiples pasajes de sus escritos que la presencia de los manantiales hace inviable la ejecución de las UFs 4 y 5, discrepando, sin embargo, sobre la responsabilidad por el impacto que ello genere. Así, por ejemplo, señala que[274]:

> [P]or razones atribuibles a POB se tiene que actualmente las UFs 4 y 5 del Contrato están en estado de inejecutabilidad de las actividades de mejoramiento por la presencia de nacimientos de agua que fueron objeto del reconocimiento del EER en las UFs 4 y 5, según consta en el Acta de 1 de agosto de 2018.

338.    Al mismo tiempo, la ANI también afirma que la presencia de manantiales no hace que el Proyecto fuera inviable[275]:

> No es cierto que debido a que se evidenció la presencia de manantiales en las UFs 4 y 5 el proyecto sea inviable, se reitera que, la mera existencia de manantiales en el corredor si bien genera la necesidad de analizar alternativas desde el punto de vista ambiental para su manejo, bajo ningún escenario determina la inviabilidad del proyecto.

(iii)    <u>Contrato y Ley Aplicable</u>

339.    Conforme a lo señalado en la Sección 14.2 letra b) del Contrato:

> Se entenderá por Evento Eximente de Responsabilidad cualquier evento, circunstancia o combinación de eventos o circunstancias fuera del control razonable de la Parte que lo invoca, que afecte en forma sustancial y adversa el cumplimiento de las obligaciones derivadas del Contrato, respecto de las cuales se invoca; depués de haber efectuado todos los actos razonablemente posibles para evitarlo. Se entiende incluido dentro del concepto de Evento

---

[273] Contestación ANI, ¶¶ 167-171.
[274] Contestación ANI, ¶ 160; ¶ 219.
[275] Contestación ANI, ¶ 233; ¶ 273

Eximente de Responsabilidad, cualquier evento de Fuerza Mayor, incluyendo la Fuerza Mayor Predial, la Fuerza Mayor Ambiental y la Fuerza Mayor por Redes.

340.    Los efectos de un EER, según la Sección 14.2 letra a) del Contrato, son las siguientes:

Las Partes quedarán exentas de toda responsabilidad por cualquier demora en la ejecución de las obligaciones emanadas del Contrato, cuando con la debida comprobación se concluya por acuerdo de las Partes o, a falta de ello, por el Amigable Componedor, que la demora es el resultado de hechos que puedan ser definidos como Evento Eximente de Responsabilidad, en los términos de la presente Sección 14.2. La demora en el cumplimiento de cualquier subcontratista no se considerará por si sola Evento Eximente de Responsabilidad, a menos que la existencia de dicha circunstancia sea el resultado a su vez de un Evento Eximente de Responsabilidad.

341.    La ANI igualmente asegura que la presencia de los manantiales obedece a un incumplimiento de las obligaciones de POB, quien había asumido el riesgo de la gestión ambiental. Existe una serie de disposiciones contractuales que regulan la asignación de los riesgos entre las Partes.

342.    La Sección 2.6(a)v del Contrato contiene la declaración de la Aceptación del Contrato, en la que se afirma que el Concesionario estudió los términos de los documentos que forman parte del Contrato, hizo sus comentarios y, así mismo, "en los términos del artículo 24 de la Ley 80 de 1993 y en general de las normas y principios aplicables a la contratación pública", informó a la ANI los apartados que no le eran claros, los que fueron aclarados. Se indica, además, que, el Concesionario:

[A]cepta los términos y condiciones del Contrato en la medida en que los ha estudiado, ha valorado con cuidado el costo que implica el cumplimiento cabal, oportuno y conforme a los términos del Contrato de la totalidad de las obligaciones y de la asunción de los riesgos previstas en el Contrato, sus Apéndices y Anexos. Particularmente, declara que ha efectuado una valoración de los riesgos a su cargo conforme a los términos del presente Contrato y

93

acepta dicha asunción de sus efectos favorables y desfavorables sin limitación alguna.

343.    En la misma línea, la Sección 2.6(a)xi del Contrato indica que el Concesionario declara que conoce "todos los asuntos e informaciones relacionados con la celebración y ejecución del Contrato", "la posibilidad real de ejecutar todas las prestaciones del Contrato con cargo a los recursos disponibles, así como los lugares donde se ejecutará el Contrato", "condiciones del suelo, condiciones climáticas, de pluviosidad y topográficas", y "en general, todos los demás aspectos que puedan afectar el cumplimiento del Contrato, todo lo cual fue tomado en cuenta en la preparación de la Oferta del Concesionario".

344.    A continuación, se declara:

Asimismo, el Concesionario declara y garantiza que ha realizado el examen completo de los sitios de la obra y que ha investigado plenamente los riesgos asociados con el Proyecto, y en general, todos los factores determinantes de los costos de ejecución de los trabajos, los cuales se incluyeron en los componentes económicos de su Oferta, teniendo en cuenta estrictamente la estructura de aportes estipulada en el Contrato, sin perjuicio del cubrimiento de los efectos derivados de algunos riesgos en los estrictos términos del Contrato. El hecho que el Concesionario no haya obtenido toda la información que pueda influir en la determinación de los costos, no lo eximirá de responsabilidad por la ejecución completa del Proyecto de conformidad con el Contrato, ni le dará derecho a reconocimiento adicional alguno por parte de la ANI ya que el Concesionario asumió la carga de diligencia de efectuar las investigaciones y verificaciones necesarias para preparar su Oferta.

345.    Con respecto a los riesgos asumidos por la ANI, la Sección 2.6(b)iv del Contrato declara que ésta:

Ha puesto a disposición del Concesionario la información que tiene a su disposición en relación con el Proyecto. No obstante lo anterior, la ANI manifiesta que no garantiza que tal información sea completa, adecuada o suficiente, siendo responsabilidad del

Concesionario la realización de la debida diligencia sobre cada uno de estos aspectos.

346.     Finalmente, el Decreto Ley 2811 de 1974, Código de Recursos Naturales en Colombia, consagra la categorización "áreas forestales protectoras", con un régimen estricto de conservación ambiental[276]. El artículo 204 del Código citado establece lo siguiente[277]:

> Se entiende por área forestal protectora la zona que debe ser conservada permanentemente con bosques naturales o artificiales, para proteger estos mismos recursos u otros naturales renovables.
>
> En el área forestal protectora debe prevalecer el efecto protector y solo se permitirá la obtención de frutos secundarios del bosque.

347.     A su vez, el artículo 3 del Decreto 1449 de 1977 (compilado en el artículo 2.2.1.1.18.2 del Decreto 1076 de 2015) establece lo siguiente[278]:

> Se entiende por Áreas Forestales Protectoras:
> a. Los nacimientos de fuentes de agua en una extensión por lo menos de 100 metros a la redonda, medidos desde su periferia.

(iv)   Análisis del Tribunal Arbitral

348.     Primero, de la lectura conjunta del artículo 2.2.1.1.18.2 del Decreto 1076 de 2015 y del artículo 204 del Decreto 2811 de 1974, arriba citados, se desprende que, las áreas de por lo menos de 100 metros a la redonda de los nacimientos de fuentes de agua constituyen áreas forestales protectoras, donde solamente se permite la obtención de frutos secundarios del bosque. Una actividad como la construcción u otro tipo de intervención semejante no están permitidas alrededor de 100 metros a la redonda de los nacimientos de fuentes de agua.

---

[276] Demanda POB y S&B, ¶ 111.
[277] Prueba CL-004.
[278] Prueba CL-005.

349.     De lo anterior se desprende una evidente dificultad para la ejecución del Contrato, dado que el trazado objeto del Contrato atraviesa áreas forestales protectoras. Así, la realización de la mayor parte de las Intervenciones en las UFs 4 y 5 se torna legalmente imposible debido a la presencia de los manantiales.

350.     Surge la pregunta en cuál de las Partes recae la responsabilidad derivada de la existencia de los manantiales o de la omisión de detectarlos oportunamente.

351.     Sin perjuicio de las cláusulas contractuales que asignan una amplia gama de riesgos y responsabilidades al Concesionario, las Partes firmaron el Acta de EER, esto es, el "Acta de Declaratoria de EER y la Consecuente Suspensión de la Ejecución de las Obras y Actividades de Intervenciones de las Unidades Funcionales 4 y 5, con Ocasión de la Declaratoria Referida"[279]. En dicho documento, ambas Partes reconocen que el Evento Eximente de Responsabilidad fue ocasionado como resultado de la presencia de los manantiales:

> [R]econocen, acuerdan y aceptan que la existencia de nacimientos de fuentes de aguas (manantiales) en las Unidades Funcionales 4 y 5, incluyendo la variante de Choachí, constituye un Evento Eximente de Responsabilidad desde el 31 de octubre de 2017.

> Como consecuencia de la ocurrencia y declaratoria del presente Evento Eximente de Responsabilidad, las Partes acuerdan SUSPENDER desde el 31 de octubre de 2017 el plazo para la ejecución de todas las obras y actividades asociadas a las Intervenciones correspondientes a las Unidades Funcionales 4 y 5 del Proyecto (incluyendo la variante de Choachí).

352.     A través de la firma del Acta de EER, la ANI reconoció que la presencia de los manantiales era la causa de la suspensión de las obras y actividades propias de las Intervenciones en las UFs 4 y 5, liberando a POB de su obligación de ejecutar dichas obras y actividades, no siendo POB responsable de tal suspensión. La sola firma del Acta de EER por las Partes constituye un indicio de que, debido a la presencia de los

---

[279] Prueba CL-002. Escrito de hechos no controvertidos, ¶ 27-30.

manantiales, la ejecución de las UFs 4 y 5 se torna legalmente inviable, esto debido a la prohibición de ejecutar actividades de construcción y semejantes en las áreas forestales protectoras.

353.     Asimismo, el dictamen del perito Juan Carlos Valenzuela Miranda acompañado por las Demandantes[280], que no fue controvertido por ninguna prueba pericial de la ANI, concluye que la presencia de los manantiales o nacimientos de agua de origen subterráneo que emerge desde una roca o el suelo produce la clasificación del área como área forestal protectora. En ésta, además de existir la obligación de mantener la cobertura boscosa, solo está permitida la actividad relativa a la obtención de frutos secundarios del bosque[281].

354.     Conforme a lo señalado, se confirma que la presencia de los manantiales conduce a la imposibilidad legal de ejecutar todas las Intervenciones de las UFs 4 y 5.

355.     Segundo, el Tribunal Arbitral indaga si le correspondía a la ANI detectar la presencia de los manantiales previo a abrir la Licitación del Proyecto.

356.     El artículo 11 de la Ley 1508 de 2012, que regula el régimen jurídico de las Asociaciones Público-Privadas, establece los requisitos para abrir procesos de selección de concesionario. El inciso 1 del artículo 11 establece la obligación de contar para ello con estudios "vigentes de carácter técnico, socioeconómico, ambiental, predial, financiero y jurídico acordes con el proyecto"[282]. Asimismo, el inciso 5 del artículo 11 de la misma Ley requiere, como requisito para expedir la invitación, contar con "[l]a adecuada tipificación, estimación y asignación de los riesgos, posibles contingencias" y "la respectiva matriz de riesgos asociados al proyecto"[283].

357.     A su vez, el artículo 7 de la Ley 1682 de 2013, establece que[284]:

---

[280] Prueba CER-003.
[281] Prueba CER-003, p. 11.
[282] Prueba CL-056.
[283] Prueba CL-056.
[284] Prueba CL-069, letra c).

> Las entidades públicas y las personas responsables de la planeación
> de los proyectos de infraestructura de transporte deberán identificar
> y analizar integralmente durante la etapa de estructuración, la
> existencia en el área de influencia directa e indirecta del proyecto
> [incluyendo] exclusión o áreas protegidas.

358.    Para efectos de contar con esta información, "deberán solicitar a las autoridades
[…] que tengan a su cargo estas actividades o servicios dicha información"[285].

359.    No es de suponer que las obligaciones de información puedan ser cumplidas de
manera únicamente formal, esto es, entregando estudios que no corresponden con la
realidad o proporcionando una tipificación y asignación de los riesgos sin haber
detectado los riesgos correctamente. Más bien, lo que se desprende de la normativa citada
es la necesidad que la entidad estatal correspondiente entregue una información fidedigna
que permita llevar a cabo la licitación con certeza y transparencia.

360.    El Tribunal Arbitral tiene en consideración lo señalado en el informe legal del perito
Gonzalo Suárez Beltrán, quien demuestra la existencia, en el ordenamiento jurídico
colombiano, del principio de planeación y viabilidad de los proyectos, que permea el
proceso de la estructuración de los proyectos y de la selección de los contratistas[286].

361.    El Tribunal Arbitral también tiene en consideración lo señalado en el informe del
perito Juan Carlos Valenzuela, quien, actuando dentro de su ámbito de la *expertise*
relativa a la estructuración de los proyectos, afirma que[287]:

> Es deber de las entidades estatales, en virtud del principio de
> planeación, transparencia y economía, disponer de los estudios
> previos que les permitan definir en el pliego de condiciones reglas
> claras, precisas y específicas que, en tanto se constituyen en las
> premisas que gobernarán el contrato, garanticen la ejecución de su
> objeto.

---

[285] Prueba CL-069.
[286] Prueba CER-007, ¶¶ 16-29.
[287] Prueba CER-003, p. 12.

La ANI fue la entidad estatal responsable de estructurar el Proyecto y así, asegurar su viabilidad; por lo que, estaba obligada a realizar estudios previos con el fin de efectuar el análisis de su conveniencia y garantizar que el Proyecto pudiera ejecutarse en los términos previstos en el proceso de licitación dentro de la Etapa de Prefactibilidad y Factibilidad (estudios que comprenden el componente ambiental).

362.    El Tribunal Arbitral, así mismo, destaca lo señalado en el Informe de la Contraloría "Informe de Auditoría de Desempeño al Ministerio de Transporte, a la Agencia Nacional de Infraestructura [y otros] en la estructuración, implementación y ejecución del programa de concesiones viales 4G […]" emitido en noviembre de 2019, que dictamina que[288]:

En la estructuración de la Concesión Perimetral del Oriente de Cundinamarca no se tuvieron en cuenta todas las condiciones ambientales de las áreas que el proyecto de la concesión pretendía intervenir y, en consecuencia, no fue posible establecer la afectación y la mitigación de los impactos que se pudieran generar en los recursos ambientales, específicamente en los tramos de las unidades funcionales 4 y 5 del proyecto, toda vez que no se tuvo en cuenta los "Términos de Referencia Factibilidad Anexo 02 Grupo 03 OCC 016-2012" […].

363.    En particular, se habría incumplido la obligación del Estructurador de identificar áreas de reserva forestal y zonas de recarga hídrica, a lo largo del corredor previsto. En lo que se refiere al origen de este problema –esto es, la estructuración del Proyecto– el Informe agrega:

Esta situación afecta el desempeño de la ANI respecto a su responsabilidad para la evaluación de estas estructuraciones debido a que no se evidencia que se haya pronunciado sobre las inconsistencias encontradas en la estructuración del proyecto, entre ellas la identificación de algunas contradicciones dentro del mismo informe del estructurador, por ejemplo, la necesidad de Estudios de Impacto Ambiental y la no identificación de las condiciones reales

---

[288] Prueba C-039; Prueba C-082.

de la zona del proyecto. Además, el efecto que esto tiene en la configuración de los posibles eventos eximentes de responsabilidad.

364.    La Contraloría reiteró estas conclusiones en el Informe de Auditoría de Desempeño de junio de 2020, imputándole a la ANI el no haber tomado las medidas necesarias para poder reflejar la realidad ambiental de la zona afectada por el Proyecto[289]:

> [L]a ANI reconoce y da validez a la observación presentada por la CGR, confirmando lo observado, teniendo en cuenta que desde la estructuración del proyecto no tomó todas las medidas necesarias, ni adelantó todas las gestiones adecuadas y pertinentes, que reflejaran la realidad ambiental de la zona afectada por el proyecto, […], con las consecuencias negativas que a la fecha se presentan y están relacionadas con la suspensión de la ejecución de las obras de las Unidades Funcionales 4 y 5.

365.    Del análisis de la normativa citada y de los hechos, se concluye que le correspondía a la ANI detectar la presencia de los manantiales oportunamente, previo a abrir la Licitación del Contrato. En efecto, detectar oportunamente los manantiales habría permitido estructurar el Proyecto de manera que fuera viable, evitando que se tuviera que producir su paralización producto del EER.

366.    Tercero, el Tribunal Arbitral analiza si la información entregada por la ANI debió haberse considerada como final o vinculante. La ANI es enfática en señalar que la información proporcionada por ella para realizar la Licitación era información referencial y no vinculante. Lo desprende de lo señalado en el numeral 1.9.2 de los Pliegos de Condiciones.

367.    Así mismo, en la Sección 2.6 del Contrato arriba citada, se señala que la ANI entregó toda la información existente en su disposición, pero ésta no debería ser considerada "completa, adecuada o suficiente".

368.    Si bien la información entregada por la ANI puede no ser completa, ésta no puede ser, ni la ANI tampoco lo sostiene, equivocada o falsa. De esta manera, cuando en dicha

---

[289] Prueba C-039.

información se señala que no se encuentran manantiales, no hay razón alguna para que el Concesionario tuviera que dudar de aquello.

369.    Así ocurre con lo señalado en el documento "Caracterización del área de influencia del proyecto", proporcionado por la ANI en la licitación que indica con respecto a la "Hidrogeología" lo siguiente[290]:

> En la zona de estudio de las alternativas de paso por el centro poblado del municipio de Choachí, no se registran pozos, aljibes, manantiales o nacederos, teniendo en cuenta la consulta realizada a la Corporación Autónoma Regional de la Orinoquía - CORPORINOQUIA.

370.    Se tiene presente que esta especialidad es la que permite detectar la presencia de los manantiales. Así lo aclaró el perito de las Demandantes, el señor Juan Carlos Valenzuela. Frente a la pregunta del Tribunal Arbitral sobre la especialidad de los estudios que deben desarrollarse para detectar los manantiales, a saber, hidráulicos, hidrológicos o hidrogeológicos, el perito Valenzuela respondió[291]:

> Son los estudios de hidrogeología, que es el recurso subsuperficial del suelo y el subsuelo y establecen cuándo las aguas subterráneas. Los otros dos trabajan sobre aguas superficiales.

371.    En la misma línea, el Tribunal Arbitral considera que el numeral 1.9.2 de los Pliegos de Condiciones[292] no puede tener el efecto que la Demandada le pretende asignar.

372.    En la interpretación del Contrato, el Tribunal Arbitral deberá tener presente "los fines y principios" de la Ley 80 de 1993, al igual que "los mandatos de la buena fe"[293], el mismo mandato establecido en el artículo 1603 del Código Civil[294] y en el artículo 871

---

[290] Prueba C-085(b).
[291] Declaración testimonial del señor Juan Carlos Valenzuela, 00:49:45.
[292] R-11: "1.9.2. La disponibilidad de estudios y conceptos en el Cuarto de Información de Referencia, sólo pretende facilitar el acceso a la información que reposa en los archivos de la ANI y/o INVIAS. Por lo tanto, los estudios y conceptos estarán disponibles a título meramente informativo, entendiéndose por tanto que no es información entregada por la ANI para efectos de la presentación de las Ofertas, ni generan obligación o responsabilidad alguna a carga de la ANI, y, por lo tanto, no hacen parte del Pliego de Condiciones ni del Contrato."
[293] Prueba CL-008.
[294] Prueba CL-009.

del Código de Comercio[295], a la luz de lo señalado en el artículo 13 de la Ley 80 de 1993[296].

373.    Según señala el informe legal del perito doctor Gonzalo Suárez Beltrán, acompañado por las Demandantes y no controvertido por la ANI[297]:

> Uno de los principios fundamentales en materia de contratación estatal en Colombia es el principio general de buena fe o bona fides, tanto subjetiva como objetiva, que debe ser observado en la etapa precontractual como en la contractual, en el marco de todas la modalidades y formas de selección de contratistas. Este principio está consagrado en el artículo 83 de la Constitución Política de Colombia, razón por la cual tiene aplicación en todas las actuaciones de las autoridades públicas, así como de los particulares, e irradia todo lo relativo a la celebración y ejecución de los contratos estatales, inclusive aquellos de concesión celebrados bajo el esquema de APP de la Ley 1508 de 2012.

374.    Sería contrario a la buena fe asumir que un concesionario deba ignorar la información que le fuera entregada por la entidad estatal, considerando que no sería fidedigna. Lo anterior alteraría la esencia misma de un proceso de licitación, durante el cual los oferentes deben hacer sus mejores ofertas en la igualdad de las condiciones. Lo anterior se aplica también al supuesto en el cual, para poder presentar una oferta, cada oferente tendría que ejecutar estudios previos, muchas veces duraderos y costosos.

375.    El informe pericial presentado por las Demandantes señala en esta línea[298]:

> Tanto POB como los demás proponentes, no debían hacer estudios de hidrogeología (mucho menos de caracterización de manantiales, de interpretación Hidrogeoquímica o de isotopía), de área protegidas o de tantos otros temas; sencillamente porque el estructurador del proyecto ya las había estudiado y había establecido que no existían manantiales en el área. Además, si hubieran querido hacerlas, no

---

[295] Prueba CL-010.
[296] Prueba CL-019.
[297] Prueba CER-007, ¶ 12, citación en original omitida.
[298] Prueba CER-003.

hubieran alcanzado en el tiempo que tuvieron para preparar la propuesta porque hubiera sido imposible.

376.    Las Demandantes persiguen la declaración de que la Sección 2.6 del Contrato es nula de pleno derecho, en virtud de lo señalado en el artículo 24 de la Ley 80 de 1993.

377.    El artículo 24 de la Ley 80 de 1993 contiene una serie de mandamientos claves al momento de interpretar los Pliegos de las Condiciones y sus efectos[299]:

> 5. En los pliegos de condiciones:
>
> […] b) Se definirán reglas objetivas, justas y claras y completas que permitan la confección de ofrecimientos de la misma índole, aseguren una escogencia objetiva y eviten la declaratoria de desierta de la licitación;
>
> […] d) No se incluirán condiciones y exigencias de imposible cumplimiento, ni exenciones de la responsabilidad derivada de los datos, informes y documentos que se suministren.
>
> e) Se definirán reglas que no induzcan a error a los proponentes y contratistas y que impidan la formulación de ofrecimiento de extensión ilimitada o que dependan de la voluntad exclusiva de la entidad.
>
> […] Serán ineficaces de pleno derecho las estipulaciones de los pliegos y de los contratos que contravengan lo dispuesto en este numeral, o dispongan renuncias a reclamaciones por la ocurrencia de los hechos aquí enunciados.

378.    Conforme lo señala el artículo 1602 del Código Civil[300]:

> Todo contrato legalmente celebrado es una ley para los contratantes, y no puede ser invalidado sino por su consentimiento mutuo o por causas legales.

---

[299] Prueba CL-066.
[300] Prueba CL-097.

379.    A su vez, el artículo 897 del Código de Comercio establece la definición de "ineficacia de pleno de derecho" en el sentido "sin necesidad de declaración judicial"[301].

380.    En vista de lo señalado, cualquier estipulación del Pliego de las Condiciones o del Contrato, que conlleva una renuncia del Concesionario a la invocación de sus derechos derivados de la información de la Licitación, se tendrá por no escrita. Así, la exclusión de responsabilidad de la Demandada contenida en la cláusula 2.6 del Contrato constituye una condición ilegal según lo señalado en la letra d) del artículo 24 de la Ley 80 de 1993.

381.    Lo anterior, consolida la opinión del Tribunal Arbitral de que POB no había renunciado a reclamar o ejercer cualquier otro derecho en relación con el eventual incumplimiento de la ANI de su obligación de detectar la presencia de los manantiales y de informarla oportunamente, esto es, en el proceso de la Licitación. Por lo anterior, la información compartida por la ANI durante la Licitación debió haber sido considerada por las Demandantes como información certera y vinculante. Al haberse señalado que los estudios de Hidrología no indicaban la presencia de los manantiales, no existían las razones para que las Demandantes desconfiaran de dicha información.

382.    Cuarto, el Tribunal Arbitral analizará si la presencia de los manantiales es un riesgo que le fue expresamente trasladado a POB en el Contrato.

383.    La Sección 2.6.a.v del Contrato, que contiene la declaración de la Aceptación del Contrato, afirma también que el Concesionario había:

> [E]fectuado una valoración de los riesgos a su cargo conforme a los términos del presente Contrato y acepta dicha asunción de sus efectos favorables y desfavorables sin limitación alguna.

384.    En la opinión del Tribunal Arbitral, y siguiendo estrictamente el principio de la buena fe contractual arriba mencionado, esta disposición únicamente podría haber surtido efecto si la ANI hubiera entregado la información correcta y completa con respecto a la presencia de los manantiales en el ámbito de la concesión. Al no haberlo hecho, no puede

---

[301] Prueba CL-063.

entender este Tribunal Arbitral que la intención del Concesionario era aceptar los riesgos que, según la información que le fue proporcionada, eran desconocidos, imprevistos, e inesperados.

385.    A su vez, la Sección 2.6.a.xi del Contrato arriba citada[302], únicamente puede entenderse como una aseveración de haber efectuado la investigación de los riesgos que estuviesen dentro del ámbito de control del Concesionario, no de aquellos que debieron haber sido detectados e informados por la Demandada.

386.    En cuanto a los riesgos específicos asumidos por POB, dentro de las Principales Obligaciones del Concesionario durante la Fase de Preconstrucción, se encuentra la de establecer bajo su propia responsabilidad la necesidad de obtener las Licencias Ambientales necesarias (Sección 4.2.j) y la de tramitar y obtener "todos los permisos, licencias, autorizaciones y concesiones para adelantar el Proyecto" (Sección 4.2.k). Lo mismo se aplica a la Fase de Construcción (Sección 4.5.f y g).

387.    No está en discusión que POB obtuvo los respectivos permisos[303].

388.    Sin embargo, incluso si POB hubiera tramitado la Licencia Ambiental y el PAGA de forma distinta, dando cuenta de la existencia de los manantiales, ello no habría cambiado el hecho de que las UFs 4 y 5 se vieron afectadas por la existencia de los manantiales, no estando permitida la actividad constructiva alrededor de 100 metros a la redonda de éstos.

---

[302] Asimismo, el Concesionario declara y garantiza que ha realizado el examen completo de los sitios de la obra y que ha investigado plenamente los riesgos asociados con el Proyecto, y en general, todos los factores determinantes de los costos de ejecución de los trabajos, los cuales se incluyeron en los componentes económicos de su Oferta, teniendo en cuenta estrictamente la estructura de aportes estipulada en el Contrato, sin perjuicio del cubrimiento de los efectos derivados de algunos riesgos en los estrictos términos del Contrato. El hecho que el Concesionario no haya obtenido toda la información que pueda influir en la determinación de los costos, no lo eximirá de responsabilidad por la ejecución completa del Proyecto de conformidad con el Contrato, ni le dará derecho a reconocimiento adicional alguno por parte de la ANI ya que el Concesionario asumió la carga de diligencia de efectuar las investigaciones y verificaciones necesarias para preparar su Oferta.
[303] Prueba C-015.

389.    Ello también se desprende de lo señalado por el informe pericial del perito Juan
Carlos Valenzuela, no controvertido por la ANI por otra prueba pericial, en el sentido
que[304]:

> En la UF4 la interferencia del área forestal protectora conformada
> por los 100 m a la redonda de nacimientos y/o manantiales con el
> trazado de la vía para el 87,5% de ellos, es decir, para 14 de los 16
> manantiales identificados y caracterizados por el Concesionario
> durante la ejecución del Contrato de Concesión No. 002 de 2014,
> estaba dada desde el momento en el que fue estructurado el proyecto
> por parte de la ANI.
>
> En la UF5 (incluida la Variante Choachí) la interferencia del área
> forestal protectora conformada por los 100 m a la redonda de
> nacimientos y/o manantiales para el 100% de ellos, es decir, para
> todos los 56 manantiales identificados y caracterizados por el
> Concesionario durante la ejecución del Contrato de Concesión No.
> 002 de 2014, estaba dada desde el momento en el que fue
> estructurado el proyecto por parte de la ANI.
>
> Por lo que, producto de los anteriores estudios, fueron identificados,
> 16 manantiales en la UF4 y 56 manantiales en la UF5 (incluida la
> Variante Choachí), para un total de 72, de los cuales, el 97,2 %
> presentan interferencia con el corredor con el que se estructuró el
> proyecto y que fue declarado como de utilidad pública por parte de
> la ANI.

390.    A su vez, el Concesionario debía cumplir con la Sección 8.1 sobre la "Gestión
Social y Ambiental" y los Apéndices Técnicos 6 y 8 del Contrato (Sección 8.1.a). La
primera obligación que se le asigna al Concesionario en este contexto es, nuevamente,
para iniciar las Intervenciones en una UF, contar con la Licencia Ambiental o PAGA y
los demás permisos, licencias y concesiones de carácter ambiental (Sección 8.1.b).

391.    Sin embargo, no es evidente que, si POB hubiera desarrollado la Gestión Ambiental
de manera diferente, podría haber superado la prohibición de efectuar las actividades

---

[304] Prueba CER-003, p. 15.

constructivas en las áreas de reserva forestal. En otras palabras, el problema generado por la presencia de los manantiales en el trazado de las UFs 4 y 5, no pudo haber sido solucionado a través de una mayor o mejor Gestión Ambiental por parte de POB.

392.    Un documento referente en esta materia, que orientó la elaboración del Contrato, es CONPES 3760 para "Proyectos Viales bajo el Esquema de Asociaciones Público-Privadas: Cuarta Generación de Concesiones Viales"[305], documento que guía la estructuración de los proyectos y asignación de los riegos, según fue declarado por el testigo de la ANI señor Álvaro Mauricio Duran[306].

393.    Mientras que la ANI considera que la presencia de los manantiales cae dentro del ámbito de la Gestión Ambiental, en CONPES los riesgos por obligaciones ambientales se agrupan en tres categorías: i) la gestión de permisos normativos, que debe estar a cargo del concesionario; ii) los costos de las compensaciones socioambientales, que deben ser compartidos bajo el mismo mecanismo de cobertura de sobrecostos en adquisición predial); y iii) las obras no previstas requeridas por autoridades ambientales, posteriormente a la expedición de la licencia y por razones no imputables al concesionario que son de cargo de la ANI[307].

394.    Así, dentro de los riegos ambientales del Concesionario, según el CONPES y según el Contrato, no se contempla el riesgo de un eventual descubrimiento de los manantiales.

395.    Los riesgos que POB asumió en virtud de la Sección 13.2 del Contrato, incluyen, bajo el numeral ix):

> Salvo por las coberturas a cargo de la ANI expresamente previstas en el presente Contrato, los efectos favorables o desfavorables derivados de la Gestión Social y Ambiental, toda vez que es obligación de resultado del Concesionario efectuar la Gestión Social

---

[305] Prueba CL-078(a), p. 43
[306] Declaración del señor Álvaro Mauricio Duran Leal, 01:27:38: "Los estructurales no tenemos libertad para decir los riesgos dónde deben estar. Eso es el documento CONPES el que lo dice, para el caso de cuarta generación hubo incluso dos versiones de documento CONPES, atendiendo todas las discusiones que hubo con el mercado, una primera versión y después una corrección para decir cómo es que se debían asignar los riesgos".
[307] Prueba CL-078(a), p. 51.

y Ambiental y cumplir con las normas vigentes que regulan la materia.

396.    De conformidad a esta cláusula, los efectos desfavorables derivados de la Gestión Ambiental deben ser asumidos por POB en la medida que se produzcan a partir de los riesgos que había asumido. En el sentido contrario, el Concesionario no debería asumir los efectos desfavorables de los riesgos de la Gestión Ambiental que sean ajenos a sus obligaciones.

397.    Cuando la ANI firma el Acta de EER, reconoce que la presencia de los manantiales no es un evento derivado de los riesgos asumidos por POB. De hecho, del relato empleado por la misma ANI se desprende que ésta percibe la situación como ajena a la responsabilidad de POB[308].

398.    Finalmente, el Tribunal Arbitral no se encuentra convencido por la posición adelantada por el testigo de la ANI, señor Álvaro Mauricio Durán. El señor Durán ha aseverado que la problemática del caso dice relación con el diseño o con el costo de construcción de las UFs 4 y 5, de responsabilidad de POB[309]. La pregunta sobre los costos asociados al diseño o la construcción podría haberse planteado en el evento que la ANI hubiera aceptado modificar el trazado de las UFs 4 y 5 trasladándolo al otro lado de la montaña, tal como lo sugería POB[310]. Sin embargo, esta problemática no surgió en los hechos, quedando la discusión relacionada con la pregunta acerca de la viabilidad o no de realizar el Proyecto en sus condiciones originales. Esto es, el riesgo del aumento del

---

[308] Prueba C-003: "En efecto, del reporte inicial de puntos hídricos advertidos por la comunidad, se listaron un total de 23 que debían ser analizados. No obstante, tras un proceso arduo de revisión y verificación, el consultor contratado por el Concesionario SIAM S.A.S. confirmó mediante estudio presentado en abril de 2018 ante la ANI la existencia de 60 nacederos a los que se incluyeron los seis manantiales que habían sido previamente identificados por la Pontificia Universidad Javeriana, para un total de 66 manantiales a lo largo de las Unidades Funcionales 4 y 5 del Proyecto. Lo anterior, generó por parte de la Entidad el reconocimiento de un Evento Eximente de Responsabilidad a partir del 1 de agosto de 2018 que suspendió para el Concesionario la obligación de ejecutar las Intervenciones establecidas en el Contrato de Concesión y sus Apéndices, en relación con las denominadas Unidades Funcionales 4 y 5, hasta tanto se surtieran una serie de actividades".
[309] Declaración testimonial del señor Álvaro Mauricio Duran Leal, 00:41:42-00:49:05; 01:14:49.
[310] Prueba C-049.

costo del Proyecto por modificaciones de diseño y constructivas -el riesgo propio del Concesionario- no se verificó.

399.    Por las razones señaladas, se concluye que el riesgo y la responsabilidad por la presencia de los manantiales no fueron asignados por la ANI a POB en virtud del Contrato.

400.    Quinto, se analiza si la ocurrencia del EER en las UFs 4 y 5 transforma el Proyecto en inviable.

401.    Si bien CONPES 3760[311] para "Proyectos Viales bajo el Esquema de Asociaciones Público-Privadas: Cuarta Generación de Concesiones Viales" no forma parte de los documentos del Contrato, resulta de utilidad para analizar la noción del EER, dado que sus lineamientos fueron plasmados en el Contrato y entregan un mayor detalle acerca de cómo se concibe un EER.

402.    En CONPES se señala primero que[312]:

> [E]ventos de fuerza mayor o caso fortuito son riesgos que se pueden materializar en el desarrollo de los proyectos, por lo que los contratos deberán prever fórmulas o mecanismos para su manejo ante la ocurrencia de factores exógenos al proyecto.

403.    Inmediatamente después, se estable que[313]:

> [C]on el objetivo de mantener el ritmo de ejecución de los contratos, se hace necesario contemplar herramientas contractuales de declaratoria de eventos eximentes de responsabilidad por situaciones de fuerza mayor o caso fortuito derivados de eventos en temas ambientales, sociales, prediales y de traslado de redes, entre otros, los cuales serán asumidos por la ANI, después de realizar un proceso de verificación y certificada la debida diligencia del privado por parte de la interventoría o quien haga sus veces.

---

[311] Prueba CL-078(a), p. 43.
[312] Prueba CL-078(a), p. 43.
[313] Prueba CL-078(a), p. 43.

404.  De lo anterior se desprende que los eventos extraordinarios "serán asumidos por la ANI", esto es, el concesionario no es responsable de su ocurrencia y efectos.

405.  En este contexto interesa si la eventual inviabilidad del Proyecto, consecuencia de la presencia de los manantiales, puede ser un EER que será asumido por la ANI.

406.  El testigo de la ANI señor Álvaro Duran, quien estuvo directamente involucrado en la redacción de los contratos de cuarta generación como es el Contrato de Concesión del presente caso testificó[314]:

> El concepto de inviabilidad no es propiamente un riesgo. He dicho, y en eso repito, que hay muchísimas confusiones, que el riesgo es exclusivamente la variación de ingresos o la variación de costos para obtener un determinado resultado. Eso es lo único que es riesgo.
>
> La inviabilidad suena a un Evento Eximente, el Evento Eximente fue un concepto que se puso en el Contrato, que es idéntico al de fuerza mayor pero un poquito más ampliado, porque la definición de fuerza mayor de la Ley colombiana, que es una vieja definición de la Ley 153 de 1887, es una definición, en mi opinión, imprecisa, es una definición antitécnica e incluso con lo venerable que pueda ser por tantos siglos que ha pasado sin que la hayan cambiado. Y por eso, en mi opinión, es necesario que el Contrato tenga una definición más técnica, que fue la de Evento Eximente de Responsabilidad.
>
> Pero la lógica detrás de eso es la misma que la fuerza mayor, es la tradicional del derecho de las obligaciones, de acuerdo con la cual, si aparece una imposibilidad para el deudor de cumplir, no puede ser responsable de eso. Eso no tiene nada que ver con riesgos hasta ahí, simplemente lo libera del cumplimiento de la obligación, porque no ha habido más costos necesariamente. No hay más costos.
>
> Lo que el Contrato tiene son unas soluciones concretas a una situación como esas. Pero debo reiterar, yo no recuerdo ningún caso en donde ese concepto de inviabilidad se pueda aplicar. Teóricamente puede haberlo, pero no recuerdo ningún caso, porque casi siempre en el 99.9% de las situaciones hay soluciones: solo son

---

[314] Declaración testimonial del señor Álvaro Mauricio Duran Leal, 01:27:41.

cuestión de dinero, valen más o valen menos. No es que no se puedan hacer. Las carreteras se han hecho por siempre y se seguirán haciendo; y problemas ambientales encuentra uno por todas partes. La solución de ingeniería es normalmente la respuesta, pero puede costar más, ahí es donde aplica el riesgo, el concepto de riesgo.

407.    Parafraseando al testigo, el riesgo de la inviabilidad no existe, dado que siempre pueden encontrarse soluciones de ingeniería o incrementarse los costos de la ejecución del proyecto. No obstante, en este caso preciso, no era posible desarrollar soluciones de ingeniería para resolver el problema de la presencia de los manantiales, sin alterar el objeto del Contrato. Al ser ello así, la ejecución de las UFs 4 y 5 permaneció inviable, pero no únicamente debido a un EER.

408.    Más bien, la ejecución de las UFs 4 y 5 fue inviable debido al incumplimiento de la ANI de su obligación contractual y/o legal de estructurar y garantizar un Proyecto viable.

409.    Por las razones expresadas en esta Sección, el Tribunal Arbitral concluye que (i) la ANI tenía la obligación contractual y legal de estructurar y garantizar la viabilidad del Proyecto, lo que incluía, en este caso, la obligación de detectar la existencia de manantiales que afectan la zona del Proyecto; y (ii) que la ANI incumplió dicha obligación de estructuración y planeación del Proyecto, al no detectar oportunamente la existencia de los manantiales.

**(b)    Sobre los alegados incumplimientos de la ANI en cuanto a la repudiación del Acta de EER y supuestos incumplimientos de POB respecto de las Actividades 1 y 2**

(i)    Posición de POB y S&B

410.    La Sección 14.2(d)(vi) del Contrato obliga a las Partes a buscar "soluciones tendientes a reanudar el cumplimiento de la Parte Afectada, a la mayor brevedad posible". En esta línea, en el Acta de EER, las Partes acordaron elaborar y presentar a las

Autoridades, medidas y obras de mitigación tipo en los puntos hídricos identificados para las UFs 4 y 5 ("**Medidas de Mitigación**")[315].

411.    Como parte de la Actividad 1, el Concesionario estaba obligado a elaborar y presentar dichas Medidas de Mitigación en un plazo de 45 días siguientes a la suscripción del Acta de EER. La duración total de la Actividad 1 era de 3 meses. Las partes responsables de esta actividad eran "Concesionario – ANI – Interventoría"[316].

412.    Conforme al Acta de EER, si las Autoridades Ambientales aceptaban las Medidas de Mitigación, las Partes tenían que analizar[317]:

> [L]a posibilidad y/o viabilidad de suscribir un documento contractual en el que las Partes de buena fe revisarán, entre otras cosas, las actividades y condiciones requeridas para reanudar la ejecución de las Intervenciones contractualmente previstas, estudiando los impactos a que haya lugar.

413.    Para el evento que las Autoridades Ambientales rechazaran las medidas propuestas, las Partes acordaron realizar la Actividad 2, a saber[318]:

> [L]as partes y la Interventoría deberán reunirse y determinar sobre la posibilidad y/o viabilidad de suscribir un documento contractual en el que las Partes de buena fe revisarán, entre otras cosas, las actividades y condiciones requeridas para ejecutar intervenciones de las Unidades Funcionales 4 y 5 ante la imposibilidad de ejecutar las intervenciones contractualmente previstas.

414.    Las Partes responsables de esta actividad eran el Concesionario y la ANI, con el soporte de la Interventoría, debiendo durar dicha actividad 2 meses, prorrogables hasta por 2 veces más, esto es, hasta un máximo de 6 meses. En el caso "de no llegar a un acuerdo en el plazo acá estipulado, se procederá conforme lo indica el Contrato"[319].

---

[315] Demanda POB y S&B, ¶ 227.i.
[316] Demanda POB y S&B, ¶ 227.i.
[317] Demanda POB y S&B, ¶ 227.ii.a.
[318] Demanda POB y S&B, ¶ 227.ii.b.
[319] Demanda POB y S&B, ¶ 227.iii, Prueba C-002.

415.    Las Demandantes señalan que, con fecha 21 de agosto de 2018, se llevó a cabo la reunión entre POB, la ANI, la Interventoría y las Autoridades Ambientales, donde estas últimas señalaron que no autorizarían la realización de ninguna actividad en la ronda hídrica de los manantiales[320].

416.    De igual manera, POB presentó las Medidas de Mitigación ante las Autoridades Ambientales el 13 de septiembre de 2018, en los términos del Acta de EER[321].

417.    Corporinoquía respondió con fecha 21 de septiembre de 2018, reiterando que no permitiría actividades dentro de los 100 metros de los 12 manantiales que se encontraban dentro de su ámbito de competencia y sobre los cuales se propusieron Medidas de Mitigación[322].

418.    Con fecha 13 de noviembre de 2018 la CAR, competente con respecto a otros 12 manantiales sobre los cuales se propusieron Medidas de Mitigación, respondió que éstas no se encontraban asociadas a "ninguno de los 91 trámites que se adelantarán en la Corporación", no pudiendo emitir un pronunciamiento[323].

419.    A juicio de las Demandantes, la Actividad 1 había culminado en las fechas en las cuales Corporinoquía y la CAR, respectivamente, manifestaron que no aprobaban las Medidas de Mitigación propuestas[324].

420.    Las Demandantes afirman que el 21 de noviembre de 2018, después de la respuesta negativa de la CAR frente a las Medidas de Mitigación, POB solicitó a la ANI empezar con la Actividad 2[325], reiterando la solicitud en varias oportunidades[326].

---

[320] Demanda POB y S&B, ¶ 252.
[321] Demanda POB y S&B, ¶ 253, Prueba C-110 y Prueba C-111.
[322] Demanda POB y S&B, ¶ 254.i; Prueba C-025 (documento fechado con 09 de abril de 2018); Prueba C-024 (documento fechado de 08 de octubre de 2018 y 31 de octubre de 2018).
[323] Demanda POB y S&B, ¶ 254.ii; Prueba C-112.
[324] Demanda POB y S&B, ¶ 255.
[325] Demanda POB y S&B, ¶ 259; Prueba C-029.
[326] Demanda POB y S&B, ¶ 261; Prueba C-030; ¶ 263, Prueba C-031

421.    Las Demandantes argumentan que a partir de mediados de enero de 2019 se iniciaron las negociaciones que duraron hasta octubre del mismo año, abordando las posibles soluciones desde un punto de vista técnico, jurídico y presupuestario[327].

422.    El Otrosí de Estudios y Diseños en discusión, tenía por objeto los estudios y diseños de ingeniería de un nuevo trazado para las UFs 4 y 5, incluyendo los estudios complementarios y un EIA[328].

423.    Con fecha 10 de octubre de 2019 la ANI le habría pedido a POB que le enviara el texto acordado[329], lo que fue hecho por POB con fecha 11 de octubre de 2019[330].

424.    Sin embargo, a juicio de las Demandantes, la ANI "repudió" los términos del Acta de EER y el Contrato dado que[331]:

> (i) se abstuvo de ejecutar a cabalidad las gestiones previstas en la Actividad 2 del Acta de EER y manifestó que no las cumplirá; y (ii) realizó conductas que contravienen directamente el Acta de EER y el Contrato.

425.    Las Demandantes señalan que la ANI le había informado que el borrador del Otrosí iba a ser sometido a las "Gerencias internas de la Entidad y finalmente, el Comité de Contratación recomendará o no su suscripción". Asimismo, indicó que el documento "podría ser modificado u objetado"[332].

426.    Las Demandantes reprochan que, en la Contestación a la Notificación de Arbitraje y la Notificación de Reconvención, en enero de 2021, la Demandada manifestó que continuaba los estudios para concluir la viabilidad o no del Otrosí, que el Otrosí por sí solo no garantizaba superar el EER ni la ejecución del Proyecto, dado que aún "no

---

[327] Demanda POB y S&B, ¶ 265-267.
[328] Demanda POB y S&B, ¶ 268; Prueba C-119.
[329] Demanda POB y S&B, ¶ 272; Prueba C-050.
[330] Demanda POB y S&B, ¶ 274; Prueba C-118.
[331] Demanda POB y S&B, ¶ 276.
[332] Demanda POB y S&B, ¶ 280; Prueba C-050.

garantiza que, efectivamente, en el trazado sugerido, no existan manantiales o nacederos de agua"[333].

427.    Las Demandantes aluden a la información de la Contraloría, según la cual, en el marco de "Compromiso Colombia" sólo se habían realizado dos reuniones informativas sobre el tema, sin contemplar ningún acuerdo entre los actores involucrados[334]. Deducen de lo anterior, que la ANI habría dejado de actuar conforme a la Actividad 2 y de esta manera repudió los términos del Acta de EER y del Contrato[335]. A su vez, las Demandantes critican la falta de esfuerzos por parte de la ANI para obtener un cambio de la opinión de las autoridades ambientales de diversa naturaleza, señalando que la ANI no tiene sustento contractual alguno para intentar crear instancias paralelas a las pactadas por las Partes para superar el EER[336].

(ii)    Posición de la ANI

428.    La ANI reconoce que existen pronunciamientos negativos de las Autoridades Ambientales debido a la protección especial a los nacimientos de agua, pero argumenta que no se hace un pronunciamiento expreso de rechazo a las Medidas de Mitigación presentadas y, mucho menos, se hace referencia a una prohibición legal de ejecución del Proyecto en las UFs 4 y 5. Así, para la ANI, "aún no se agotan de buena fe TODAS las posibilidades de mitigación de impacto ambiental y la eventual ejecución del trazado original de la vía" [mayúsculas en original][337].

429.    Afirma que, frente a los pronunciamientos de las autoridades ambientales "medidas de mitigación idóneas" [subrayado en original] no han sido presentadas por POB, siendo que fueron nuevamente requeridas por la mesa de trabajo interinstitucional de fecha 16

---

[333] Demanda POB y S&B, ¶¶ 282, 299.
[334] Demanda POB y S&B, ¶ 288.
[335] Demanda POB y S&B, ¶ 289.
[336] Demanda POB y S&B, ¶¶ 294-325.
[337] Contestación ANI, ¶ 88. También ¶ 69, Pruebas 8.1.1.1 y 8.1.1.2

de junio de 2021, realizada entre la Procuraduría General de la Nación, Autoridades Ambientales y gubernamentales[338].

430.    La ANI indica que, con fecha 25 de agosto de 2021, se realizó una mesa técnica con el Concesionario y Corporinoquía sede Yopal en la que se expuso un análisis de los estudios técnicos solicitados por la Corporación de los 58 nacederos en jurisdicción de esta Corporación[339]. Señala que tampoco se evidencia un pronunciamiento final por parte de la CAR en cuanto a rechazo de todas las medidas de mitigación propuestas por el Concesionario, dado que no son completas y precisas[340].

431.    La ANI niega que la Actividad 1 se encuentre agotada, dado que es el Concesionario quien debe[341]:

> [P]lantear medidas suficientes y necesarias de mitigación para los nacimientos ubicados en las Unidades Funcionales 4 y 5, que además cumplan los parámetros de aprobación de las autoridades ambientales, la Interventoría y la ANI.

432.    Señala además que POB se ha negado a participar activamente en presentar medidas tendientes a obtener los permisos de las Autoridad Ambientales. Sin embargo, la ANI ha continuado en mesas de trabajo interinstitucionales y con las Autoridades Ambientales a efecto de lograr que el Proyecto se pueda desarrollar por el trazado original[342].

433.    A juicio de la ANI, POB "abandonó la Actividad 1 y se centró en solicitar la suscripción del Otrosí que modifique el alcance del proyecto"[343].

434.    La Demandada argumenta que la modificación del alcance del Proyecto a través de la suscripción de un Otrosí es improcedente, debido a que[344]:

---

[338] Contestación ANI, ¶ 89, Prueba 8.1.23.
[339] Contestación ANI, ¶ 91.
[340] Contestación ANI, ¶ 92.
[341] Contestación, ¶ 163; ¶ 347.
[342] Contestación ANI, ¶ 165. También ¶¶ 95; 195-198; 340-349; 674-679.
[343] Contestación ANI, ¶ 219; ¶ 339; ¶ 675-676.
[344] Contestación ANI, ¶ 95; ¶ 340-349.

i ) la modificación del diseño y alcance del proyecto no es la vía idónea para superar el EER; ii) la suscripción del Otrosí modificatorio debe ser el resultado del acuerdo de voluntades de las partes y no la imposición de POB; iii) la suscripción del Otrosí que pretende POB no garantiza que no se presente de nuevo la problemática de los nacimientos de agua y prueba de ello es que el borrador propuesto por POB contiene la necesidad de realizar estudios hídricos especiales, que implican la existencia de una alta incertidumbre de la viabilidad del cambio de trazado; iv) y la suscripción de un Otrosí que modifique o afecte gravemente el alcance de las UF 4 y 5 afectaría el alcance inicialmente pactado por las partes en cuanto a su origen – destino y las especificaciones del proyecto que justificaron su celebración, lo cual no sería viable desde el punto de vista legal toda vez que desconocería la causa del negocio jurídico y alteraría el objeto del Contrato al desnaturalizar el proyecto.

435.    La ANI enfatiza que la propuesta de Otrosí de POB a la ANI, emitida en octubre de 2019[345]:

> [N]o garantiza de ninguna manera la viabilidad de ejecución del Proyecto, pues, es necesario hacer un análisis previo y profundo en materia ambiental, técnico, financiero, predial, entre otros, pero además, teniendo en cuenta la existencia del riesgo de que se vuelvan a encontrar manantiales en las propuestas alternas presentadas por POB, púes como sucedió con el trazado actual del proyecto.

436.    La ANI señala que la modificación de los Contratos estatales debe seguir estrictas reglas que deben ser observadas de forma imperativa. Destaca que la propuesta de Otrosí formulada por el Concesionario contiene el análisis de tres corredores diferentes, debiendo aún ser evaluados en virtud de los componentes técnicos, ambientales, financieros entre otros, para definir el corredor viable[346].

---

[345] Contestación ANI, ¶ 208-210.
[346] Contestación ANI, ¶ 682.

437.    Afirma que, incluso si la ANI dio inicio al estudio de esta propuesta, ello no implica o implicaba[347]:

> [L]a obligación de esta entidad de suscribir la propuesta de Otrosí, pues, entre otras cosas, dichas alternativas no establecen una solución definitiva […] toda vez que no se garantiza que en los trazados sugeridos no existan manantiales o nacederos de agua que lleven nuevamente a la situación en la que se encuentra actualmente el Proyecto.

438.    La ANI ha reiterado estos argumentos en su Reconvención[348].

(iii)   Contrato y Ley Aplicable

439.    En el Acta de EER, las Partes señalan que, "considerando las particularidades" de dicho evento, acuerdan establecer el "Período Especial" en los términos de la Sección 14.2.d.i del Contrato. De lo anterior se desprende, conforme a lo señalado en la Sección 14.2.d.v, que POB, como "Parte Afectada" quedaba excusada del cumplimiento de las obligaciones afectadas durante el Período Especial.

440.    En el numeral segundo del Acta de EER, las Partes establecieron que, con mínimas excepciones[349]:

> Como consecuencia de la ocurrencia y declaratoria del presente Evento Eximente de Responsabilidad, las Partes acuerdan SUSPENDER desde el 31 de octubre de 2017 el plazo para la ejecución de todas las obras y actividades asociadas a las Intervenciones correspondientes a las Unidades Funcionales 4 y 5 del Proyecto (incluyendo la variante de Choachí).

441.    En línea con lo señalado en la Sección 14.2.d.vi del Contrato, las Partes contemplaron dos Actividades:

---

[347] Contestación ANI, ¶ 684.
[348] Reconvención, ¶¶ 91-148; pp. 291-296.
[349] Prueba C-002.

[A] solicitud de cualquiera de las Partes, éstas se reunirán para buscar, de buena fe, soluciones tendientes a reanudar el cumplimiento de la Parte Afectada, a la mayor brevedad posible.

442.    El Tribunal Arbitral presta especial atención al contenido de las obligaciones, los plazos y procedimientos que se habían dado las Partes en el Acta de EER para llevar a cabo dichas Actividades. Para la Actividad 1 se contempló como fecha estimada para completarla, un período de 3 meses. Para la Actividad 2, se contempló un período de 2 meses, prorrogables hasta por 2 veces más, es decir, por un total de 6 meses.

443.    En la introducción a estas Actividades, las Partes señalaron que el Período Especial iba a finalizar "una vez se adelanten" dichas Actividades. A su vez, al definir el plazo de la Actividad 2, se establece que: "En caso de no llegar a un acuerdo en el plazo acá estipulado, se procederá conforme lo indica el Contrato".

(iv)    <u>Análisis del Tribunal Arbitral</u>

444.    Las Demandantes formulan sus pretensiones relativas al supuesto incumplimiento del Acta de EER por parte de la Demandada, dentro de los incumplimientos y razones que le impiden finalizar la Fase de Construcción de las UFs 4 y 5.

445.    Por su parte, la ANI alega que la Actividad 1 aún se encuentra en desarrollo, lo cual busca demostrar con la existencia de las mesas de trabajo realizadas con la participación de las diversas entidades públicas.

446.    A través del Acta de EER, las Partes regularon los efectos de los hallazgos de los manantiales, y los procedimientos y plazos establecidos para las Actividades 1 y 2, esto es que (i) el Concesionario debía elaborar y presentar Medidas de Mitigación para la aprobación o rechazo de las autoridades correspondientes; (ii) en un plazo de duración total de 3 meses para su presentación y aprobación o rechazo.

447.    De la descripción de los hechos efectuada por ambas Partes, y de la prueba allegada, se encuentra acreditado que las Partes hicieron un genuino intento de acatar la Actividad 1, en que se idearon y presentaron, ante las Autoridades Ambientales competentes, las Medidas de Mitigación. Dicho intento no condujo a ningún resultado favorable para la

superación del EER, dado que las Medidas de Mitigación propuestas por POB fueron rechazadas por las Autoridades Ambientales. Más aún, todas las respuestas recibidas de CAR y Corporanquía fueron tajantes en negar la posibilidad de otorgar los permisos, reiterando la obligación de respetar las áreas reservadas[350]. Asimismo, la ANLA se mostró indispuesta a entregar un permiso para ejecutar los trabajos en el área reservada[351].

448.    A mayor abundamiento, el Tribunal Arbitral tiene en consideración que en el Acta de EER, las Partes estimaron que el plazo para realizar la Actividad 1 era de 3 meses aproximadamente, contados desde la fecha de la firma del Acta. En otras palabras, las Partes estimaron que dicha actividad tenía que terminar a fines de octubre del año 2018.

449.    Frente a esa decisión de las Partes, considerar que la Actividad 1 continúa en desarrollo, (i) a pesar de haber sido rechazadas las Medidas de Mitigación por las autoridades ambientales competentes a través de las mesas de trabajo de diversas entidades públicas, y (ii) a lo menos 3 años después, no es acorde a lo pactado por las Partes. En vista de lo señalado en el Acta de EER, la Actividad 1 no puede tener una duración incierta o infinita.

450.    Así, el Tribunal Arbitral concluye que la Actividad 1 quedó agotada con fecha 13 de noviembre de 2018, con el rechazo de ambas Corporaciones y habiendo transcurrido los 3 meses considerados para dicha actividad.

451.    Una vez agotada la Actividad 1, cabe concluir que las Partes estaban avanzando hacía la Actividad 2. Tal como señala el testigo de las Demandantes el señor Luis Ernesto Pérez, las Partes se sentaron a negociar y esa negociación llevó 10 meses[352].

452.    Según la descripción que proporciona el testigo Pérez, la Actividad 2 consistió en la evaluación de la posibilidad de un cambio radical del trazado, trasladándolo al otro

---

[350] Prueba CER-003, pp. 11-12.
[351] Declaración testimonial del señor Luis Ernesto Pérez, 00:26:35-00:27:47.
[352] Declaración testimonial del señor Luis Ernesto Pérez, 00:30:09.

lado de la montaña, donde la composición de la montaña era mucho más rocosa, para lo cual se contrató la firma Ingetec que determinó que ello era factible[353].

453.    Con todo, con fecha 8 de octubre de 2019, el señor Doron Sportas de S&B, envió un correo electrónico a la ANI, indicando: "aun quedamos atentos para recibir una versión final de parte de la ANI para poder seguir con las firmas de este otrosí importante"[354]. Con fecha 10 de octubre de 2019, la ANI respondió a este correo indicado que:

> [E]l Concesionario debe presentar a la Entidad, la solicitud formal del documento borrador que supere el EER de las UF 4 y 5; dichos documentos han sido discutidos en diferentes mesas de trabajo siendo la última el pasado 18 de septiembre (ver adjuntos). Es de anotar, que posterior a dicha solicitud, se requerirá el concepto del Consorcio Intervías 4G, de las Gerencias internas de la Entidad y finalmente, el Comité de Contratación recomendará o no su suscripción, por lo cual en dicho procedimiento, este borrador remitido podría ser modificado u objetado.

454.    Para el Tribunal Arbitral surgen las siguientes conclusiones: Primero, según lo desarrollado arriba, en el mes de enero de 2019, las Partes avanzaron hacia la ejecución de la Actividad 2. Segundo, para iniciar dicha Actividad 2, la Actividad 1 debió haberse agotado. Tercero, el correo citado lista diversas condiciones para que la firma del Otrosí propuesto pudiera hacerse realidad, esto es, la opinión favorable la Interventoría, las revisiones de varias Gerencias internas y la recomendación favorable del Comité de Contratación, dejando también en claro que éste podría no recomendar su suscripción.

455.    A su vez, conforme al Acta de EER, la Actividad 2 comprende tener que:

> [D]eterminar sobre la posibilidad y/o viabilidad de suscribir un documento contractual en el que las Partes de buena fe revisarán, entre otras cosas, las actividades y condiciones para ejecutar intervenciones de las Unidades Funcionales 4 y 5 ante la

---

[353] Declaración testimonial del señor Luis Ernesto Pérez, 00:10:11; Prueba C-049.
[354] Prueba C-050.

imposibilidad de ejecutar las intervenciones contractualmente previstas.

456.    Como se desprende del tenor literal de la estipulación citada, la primera determinación que deberán efectuar las Partes es sobre la posibilidad y/o viabilidad de suscribir un acuerdo. En este contexto, la posibilidad o viabilidad de suscribirlo, comprende también la alternativa de considerarlo imposible o inviable. En otras palabras, no hay una garantía para POB de que dicho convenio u Otrosí vaya a ser suscrito por las Partes. De la misma forma, no existe la obligación objetiva de la ANI de suscribir dicho convenio u Otrosí, sino que su obligación es negociar y analizar de buena fe la posibilidad y/o viabilidad de suscribir dicho documento contractual.

457.    De confirmarse la posibilidad o viabilidad de suscribir dicho acuerdo, en él las Partes deberán revisar -de buena fe- los términos contractuales, con el fin de ejecutar las UFs 4 y 5.

458.    En otras palabras, al momento de firmar el Acta de EER, las Partes aún no tenían la conciencia plena de que la ejecución de las UFs 4 y 5, en su formato original no iba a ser posible. A su vez, la misma ANI asevera que la ejecución de las UFs 4 y 5, al día de hoy, no es posible e incluso afirma que los cambios de trazado no garantizan que se hiciera posible, dado que el trazado nuevo puede verse afectado también por la presencia de otros manantiales.

459.    Finalmente, la Actividad 2 también tiene un límite temporal, a saber, de hasta 6 meses, aunque las Partes la extendieron de hasta 10 meses, llegando a octubre de 2019. Más aún, si el Tribunal Arbitral fuera a asumir que recién el envío del borrador del Otrosí con fecha 11 de octubre de 2019 diera inicio a la Actividad 2, esta debió haber concluido a más tardar el 11 de abril de 2020.

460.    En este sentido, el Tribunal Arbitral considera que, de todo lo dicho, POB cumplió con diligencia sus obligaciones de superación del EER respecto de las UFs 4 y 5, en la medida de que (i) presentó las Medidas de Mitigación requeridas a las Autoridades Ambientales correspondientes; y (ii) realizó negociaciones de buena fe con la ANI para efectos de determinar la viabilidad o posibilidad de llevar a cabo dicha suscripción de

modificación del Contrato y propuso modificaciones del Contrato en este sentido. Por lo tanto, el Tribunal Arbitral rechaza las alegaciones de la ANI, de que POB no habría cumplido de forma idónea sus obligaciones para superar el EER en relación con las UFs 4 y 5.

461.    Por otro lado, si bien las Demandantes le reprochan a la ANI un cambio de posición que ocurrió después de enviado formalmente la propuesta del Otrosí[355], el Tribunal Arbitral considera que ni el Contrato ni el Acta de EER establecen una obligación para la ANI de firmar un Otrosí, siendo este desenlace posible, pero no obligatorio.

462.    Así, del tenor literal de la descripción del Acta de EER, se desprende que la obligación de la ANI era "determinar y revisar", pero no así "suscribir" el Otrosí, lo que finalmente no ocurrió.

463.    Sin embargo, este Tribunal considera que la ANI sí tenía una obligación de:

> [D]eterminar sobre la posibilidad y/o viabilidad de suscribir un documento contractual en el que las Partes de buena fe revisarán, entre otras cosas, las actividades y condiciones para ejecutar intervenciones de las Unidades Funcionales 4 y 5 ante la imposibilidad de ejecutar las intervenciones contractualmente previstas.

464.    En este sentido, este Tribunal Arbitral considera que la ANI debía actuar de buena fe, tanto en determinar la posibilidad o viabilidad de suscribir un documento contractual como en revisar las actividades y condiciones para ejecutar Intervenciones en las UFs 4 y 5.

---

[355] Declaración testimonial del señor Luis Ernesto Pérez, 00:30:09: "Lo presentamos de manera formal, acompañado de una carta y de esa radicación viene un silencio de alrededor entre seis y ocho meses donde la ANI, prácticamente, no sé si se debió a un cambio de gobierno o a un cambio de algo, no sé qué habrá pasado dentro de la ANI, pero sé guardó un silencio de ocho meses y después de ocho meses, lo que recibió como respuesta la compañía, la Concesión, a una serie de comunicaciones que se enviaron preguntando ¿qué pasaba con el otrosí? ¿qué pasó el con otrosí?, fue un requerimiento de la Procuraduría solicitando acompañamiento a una serie de reuniones, que querían tener respecto de este tema. Entonces, sí hubo un cambio de posición, pero este cambio de posición no fue inmediato, fue casi año y medio después, año y medio donde tanto nosotros como los financiadores del Proyecto, acudiendo al principio de buena fe, siempre creímos que el otrosí se iba a firmar".

465.    El Tribunal Arbitral estima que la ANI no cumplió con dicha obligación de actuar de buena fe. Este incumplimiento se explicará en detalle en la Sección IV.D.2 de este Laudo Arbitral, en que se analiza la pretensión subsidiaria de la Demandada de Terminación Anticipada del Contrato de Concesión en virtud de la cláusula 14.1(e) del Contrato.

## 3.    RECLAMACIÓN DE REDUCCIÓN DE LOS MONTOS DE FONDEOS DE SUBCUENTA DE SUPERVENCIÓN E INTERVENTORÍA

### (a)    Posición de POB y S&B

466.    POB reclama la pérdida derivada de mayores fondeos a la Subcuenta de Supervisión e Interventoría. Este reclamo se basa en que las Demandantes señalan que la ANI habría incumplido el Contrato por no tomar las acciones procedentes para reducir el valor de los fondeos correspondientes a la Subcuenta de Supervisión e Interventoría [356].

467.    Las Demandantes argumentan, basadas en la Prueba CER-001, y en el Dictamen Pericial de Daños elaborado por FTI, que el Contrato prevé que el fondeo para esta subcuenta es casi 3 veces mayor durante la Fase de Construcción que durante la Etapa de O&M. Ello se explicaría por cuanto las labores de Supervisión e Interventoría son mayores cuando se están ejecutando las actividades relacionadas con las obras del Proyecto[357].

468.    POB señala que, debido a la ocurrencia del EER no se están ejecutando labores de Supervisión e Interventoría en dos de las UFs más significativas del Proyecto (UFs 4 y 5) en términos de Capex y Opex. Las Demandantes alegan que, a pesar de ello, la ANI se ha negado a suscribir un acuerdo contractual que reduzca el fondeo para esta subcuenta, a pesar de que POB se lo habría solicitado en múltiples ocasiones[358].

469.    POB agrega que la ANI habría reconocido que carece de razonabilidad económica que POB esté obligado a realizar fondeos a la Subcuenta de Supervisión e Interventoría

---

[356] Demanda POB y S&B, ¶ 469.
[357] Demanda POB y S&B, ¶ 469(i).
[358] Demanda POB y S&B, ¶ 469(i) y (ii).

conforme a los valores previstos para la Fase de Construcción dado el estado del Proyecto. Ello, por cuanto esta modificación contractual hacía parte del Otrosí de Estudios y Diseños que las Partes habrían negociado, pero que la ANI se habría negado a firmar[359].

470. Las Demandantes argumentan que esta negativa a reducir los fondeos de esta cuenta implicaría el incumplimiento de la obligación de la ANI de tomar las medidas razonables para evitar la extensión de los efectos del EER[360].

471. POB señala que, de los documentos exhibidos por la ANI en el Arbitraje se confirmaría que POB habría cumplido sus obligaciones de fondeo de la Subcuenta de Supervisión e Interventoría.

472. En efecto, las Demandantes afirman que las labores ejecutadas por la Interventoría desde agosto de 2018 son proporcionalmente inferiores a las que se habrían ejecutado si el EER no hubiera suspendido la ejecución de las Intervenciones en las UFs 4 y 5. Según las Demandantes, ello implicaría la obligación de la ANI de reducir tanto el monto de la remuneración de la Interventoría como el monto de fondeo de la Subcuenta de Supervisión e Interventoría, desde esa fecha[361].

473. Ahora bien, POB señala que, los Otrosíes 1 a 5 del Contrato de Interventoría incorporaron una reducción sustancial de la retribución de la Interventoría, como consecuencia de las circunstancias constructivas del Proyecto, y, expresamente, respecto del hecho de que la etapa de Operación e Intervenciones se encontraban suspendidas en las UFs 4 y 5. Sin embargo, dicha reducción no se vio reflejada en el fondeo de la Subcuenta de Supervisión e Interventoría[362].

474. Agregan las Demandantes que incluso para la suscripción de estos Otrosíes y la decisión de reducción del valor del Contrato de Interventoría, la ANI habría expresado que la

---

[359] Demanda POB y S&B, ¶ 469(ii).
[360] Demanda POB y S&B, ¶ 469(iii).
[361] Réplica POB y S&B, ¶¶ 127-128.
[362] Réplica POB y S&B, ¶¶ 129-130.

ejecución del Contrato de Interventoría dejaría un superávit en la Subcuenta de Supervisión e Interventoría. Ello implicaría que la ANI habría obtenido beneficios injustificados, forzando a POB a realizar pagos que no se destinarían al pago de Interventoría[363].

**(b) Posición de la ANI**

475. La Demandada rechaza las afirmaciones de que la ANI habría incumplido sus obligaciones de recudir los montos de los fondeos, toda vez que la ANI no tenía la obligación de reducir los montos de la Subcuenta de Supervisión e Interventoría[364].

476. La ANI explica que, en un Contrato como el objeto del presente Arbitraje, de naturaleza de contrato de Asociación Público-Privada, el fundamento lo constituye la capacidad financiera del Concesionario. Agrega que, en relación con los fondeos, éstos están determinados desde la estructuración del modelo financiero del Proyecto, por lo que no se puede ajustar posteriormente[365].

477. La Demandada explica que, de conformidad con el Contrato, se pactó la obligación de POB de constituir un patrimonio autónomo que estaría a cargo de POB, por medio de la celebración de un contrato de fiducia mercantil. Así, de conformidad con las Secciones 3.13 y 3.14 del Contrato, se estableció esta obligación de POB y las cuentas que conformaban en patrimonio autónomo, dentro de las cuales se encuentra la Subcuenta de Supervisión e Interventoría. Asimismo, se pactó la obligación de cargo de POB de realizar el fondeo a las distintas cuentas de conformidad con los plazos establecidos en la Sección 4.5(e) de dicho Contrato. Así, la Demandada concluye que las Demandantes incumplieron con sus obligaciones de fondeo de esta subcuenta, y reclaman los intereses moratorios por su falta de pago[366].

---

[363] Réplica POB y S&B, ¶¶ 131-133.
[364] Contestación ANI, ¶ 421.
[365] Contestación ANI, ¶¶ 422-424.
[366] Contestación ANI, ¶¶ 807-816. Para más detalle sobre la postura de la Demandada, ver Sección sobre reclamación reconvencional de fondeos Sección IV.C.3 del Laudo.

478. La Demandada rechaza las interpretaciones que POB hace de los documentos exhibidos por la ANI, relativa a las consecuencias de la reducción de los montos de remuneración del Contrato de Interventoría[367]. La Demandada señala que la reducción de la remuneración del Contrato de Interventoría no traería aparejada la obligación de la ANI de reducir el monto del fondeo de la Subcuenta de Supervisión e Interventoría[368].

479. Asimismo, la Demandada rechaza que habría determinado que el Contrato de Interventoría dejaría un superávit en la Subcuenta de Supervisión e Interventoría. Por el contrario, señala que con el estudio de conveniencia realizado para suscribir los Otrosíes 3, 4 y 5 del Contrato de Interventoría, lo que se emitió fue un concepto favorable para la adición propuesta hecha por la Interventoría, en la cual, se consideró que la misma estaba dentro del cupo de adicción permitido por ley y que contaba con los recursos suficientes para llevar a cabo dicha adición[369].

480. Asimismo, la ANI rechaza que habría obtenido o buscado obtener un beneficio injustificado, ni que esos montos se destinarían a otros objetos distintos del pago a Interventoría[370].

(c)    **Análisis del Tribunal Arbitral**

481. Como cuestión preliminar, el Tribunal Arbitral nota que la reclamación específica de los fondeos de la Subcuenta de Supervisión e Interventoría tiene directa relación con la reclamación reconvencional de la ANI relativa a la indemnización de perjuicios correspondientes a los intereses por la mora de POB por el no pago de las obligaciones de fondeo 5, 6, 7 y 8 de la Subcuenta de Interventoría y Supervisión[371]. En este sentido, lo dicho en esta Sección sobre los montos de los fondeos de la Subcuenta de Interventoría y Supervisión, vale también para el análisis de la reclamación reconvencional correspondiente, y es decidida en la Sección IV.C.3 de este Laudo.

---

[367] Dúplica ANI, ¶ 85.
[368] Dúplica ANI, ¶¶ 91-93.
[369] Dúplica ANI, ¶ 94.
[370] Dúplica ANI, ¶¶ 95-96.
[371] Demanda ANI, p. 26; Réplica ANI, ¶¶ 171-175.

482. POB reclama que la ANI habría incumplido el Contrato por no tomar las acciones procedentes para reducir el valor de los fondeos correspondientes a la Subcuenta de Supervisión e Interventoría, y en definitiva, para evitar la extensión de los efectos del EER[372]. POB reclama la pérdida derivada de mayores fondeos a la Subcuenta de Supervisión e Interventoría por un monto de COP $119.500.000.000[373].

483. Por su parte, la Demandada rechaza las afirmaciones de que la ANI habría incumplido sus obligaciones de reducir los montos de los fondeos, toda vez que la ANI no tenía la obligación de reducir los montos de la Subcuenta de Supervisión e Interventoría[374].

484. Sobre este reclamo, por un lado, el Tribunal Arbitral coincide con la Demandada de que el Contrato de Concesión no contiene una obligación de la ANI que específicamente prevea la obligación de reducir el monto de fondeos de cada una de las Subcuentas del Patrimonio Autónomo, en un caso determinado.

485. Sin embargo, el Tribunal también coincide con las Demandantes de que la Subcuenta de Supervisión e Interventoría debe ser fondeada por el Concesionario en los términos establecidos en la Sección 4.5 (e) de la Parte Especial del Contrato de Concesión, de acuerdo con el inicio de cada etapa contractual: (i) Preconstrucción; (ii) Construcción y; (iii) Operación y Mantenimiento.

486. La división de montos de fondeos en etapas reconoce la realidad económica del Contrato de que la Fase de Construcción requiere una mayor carga de actividades por parte del Concesionario, lo que, a su vez, requiere mayores labores de Supervisión e Interventoría.

487. En este sentido, y según ambas Partes, el valor del fondeo de la Subcuenta de Supervisión e Interventoría es el siguiente[375]:

---

[372] Demanda POB y S&B, ¶ 469.
[373] Escrito Post Audiencia de las Demandantes, ¶ 348(iii).
[374] Contestación ANI, ¶ 421.
[375] Escrito de Hechos No Controvertidos, ¶ 32.

(i)     Durante la Fase de Preconstrucción, el valor del fondeo equivale a COP $2.923.117.956 Pesos del Mes de Referencia al año;

(ii)    Durante la Fase de Construcción, el valor del fondeo equivale a COP $10.160.367.351 Pesos del Mes de Referencia al año —esto es, entre 3 y 4 veces más que el valor de la Fase de Preconstrucción; y

(iii)   Durante la Etapa de O&M, el valor del fondeo equivale a COP $3.446.637.624 Pesos del Mes de Referencia al año, esto es, aproximadamente 3 veces menos que el valor de la Fase de Construcción.

488.   Por su parte, el Contrato de Interventoría, celebrado entre la ANI y la Interventoría, tiene directa relación con, y se suscribió en función del, Contrato de Concesión. En efecto, en cuanto a su ámbito de aplicación, se señala que el Contrato de Interventoría y, en general "el ejercicio de las actividades de control y seguimiento deberán ceñirse en un todo al correspondiente Contrato de Concesión"[376].

489.   Se agrega así mismo que[377]:

> En el evento en que llegare a existir alguna diferencia o contradicción frente a la aplicación de las previsiones contenidas en el Contrato de Concesión, el contrato de Interventoría y sus anexos y la presente metodología, deberán aplicarse de manera prevalente las estipulaciones del Contrato de Concesión y de todos los documentos que lo adicionen, modifiquen, complementen o interpreten, si persisten las diferencias o contradicciones prevalecerán las estipulaciones contenidas en el Contrato de Interventoría y sus anexos.

490.   En este sentido, el Contrato de Interventoría y su objeto, están indisolublemente ligados al Contrato de Concesión y al Proyecto. Por un lado, por cuanto el monto de los fondeos de cada etapa tiene directa relación con las labores de Interventoría ejecutadas. Por otro

---

[376] Prueba C-212: Contrato de Interventoría, Anexo 4, p. 2, párrafo tercero.
[377] Prueba C-212: Contrato de Interventoría, Anexo 4, p. 2, párrafo cuarto.

lado, por cuanto cualquier modificación del Contrato de Concesión afectaba al Contrato de Interventoría, prevaleciendo, en caso de diferencias, el primero.

491.    En línea con lo anterior, y también según ambas Partes, el valor del Contrato de Interventoría, celebrado entre la ANI y la Interventoría, equivale a COP $229.582.850 mensuales durante la Fase de Preconstrucción, COP $525.960.917 mensuales durante la Fase de Construcción, y COP $308.109.147 mensuales durante la Fase de O&M[378].

492.    Sin embargo, y según ambas Partes, a partir de agosto de 2020, la ANI modificó el valor del Contrato de Interventoría durante la Fase de Construcción a COP $455.190.117 mensuales[379].

493.    En efecto, en los estudios de conveniencia y oportunidad para la suscripción de los otrosíes al Contrato de Interventoría, en que la ANI se fundó para disminuir los montos mensuales de la Fase de Construcción del Contrato de Interventoría, se establece expresamente que se debió a "las necesidades actuales del seguimiento y verificación que se requiere para las actividades pendientes de la Etapa Preoperativa" y como una situación de carácter temporal, hasta que se reanuden "la ejecución de las actividades e intervenciones constructivas en las Unidades Funcionales 4 y 5"[380].

494.    En este sentido, el Tribunal Arbitral estima que resulta de toda lógica, y de buena fe que, si las Intervenciones se vieron paralizadas y no se inició la Fase de Construcción en las UFs 4 y 5, al rebajarse los montos mensuales de Interventoría por ese concepto, se hayan rebajado en igual término y proporción los montos de los fondeos de la Subcuenta de Supervisión e Interventoría.

---

[378] Escrito de Hechos No Controvertidos, ¶ 33.
[379] Escrito de Hechos No Controvertidos, ¶ 33. Ver también, Prueba CER-008, ¶¶ 47-49.
[380] Prueba C-263: Estudio de conveniencia de la ANI para suscribir el Otrosí No. 1 del Contrato de Interventoría, p. 22. Ver también Prueba C-264: Estudio de conveniencia de la ANI para suscribir el Otrosí No. 3 del Contrato de Interventoría, p. 20; Prueba C-265: Estudio de conveniencia de la ANI para suscribir el Otrosí No. 4 del Contrato de Interventoría, p. 18; Prueba C-266: Estudio de conveniencia de la ANI para suscribir el Otrosí No. 5 del Contrato de Interventoría, p. 20.

495. Ello se ve reforzado, además, por el hecho de que la suspensión de las actividades e Intervenciones en las UFs 4 y 5 sucedieron por hechos no imputables a POB sino que a la ANI, como se ha decidido en la Sección IV.B.2 de este Laudo Arbitral.

496. Ahora bien, en cuanto a los montos a ser deducidos, según las pruebas periciales rendidas por las Demandantes, se concluye que el fondeo de la Subcuenta de Supervisión e Interventoría debió haberse reducido en un 63.59%, dando como resultado un fondeo anual a la Subcuenta de Interventoría y Supervisión del Contrato de Concesión en Fase de Construcción de COP $3.699.578.723[381].

497. Así, y como ya se ha dicho, POB ha señalado que, como consecuencia de la no reducción proporcional de la Subcuenta de Interventoría y Supervisión del Contrato, entre los daños que ha sufrido POB respecto de los costos incurridos en las UFs 4 y 5, se encuentran los fondeos pagados demás que ascienden a COP $119.500.000.000[382] y que deben ser restituidas por la ANI a POB.

## C.   RECONVENCIÓN DE LA ANI

### 1.   RECLAMACIONES DE LA DEMANDADA EN RELACIÓN CON LA UF 2

498. La ANI afirma que POB incumplió las obligaciones contractuales en materia arqueológica respecto de la UF 2, contenidas en el Numeral 5.2.2.7 del Apéndice Técnico 8 y en la Sección 14.2(e) y (f) de la Parte General del Contrato de Concesión, y la decisión del Amigable Componedor del 18 de diciembre de 2018 No. 15856 "Estación de Peaje/Alcaparros". La ANI argumenta que POB no ha mitigado ni ha realizado las gestiones idóneas para superar el EER, y no ha manejado de buena forma los hallazgos arqueológicos en conformidad con la gestión social ambiental requerida para la UF 2[383].

---

[381] Prueba CER-008, ¶ 94.
[382] Escrito Post Audiencia de las Demandantes, ¶ 348(iii).
[383] Demanda ANI, pp. 83, 362.

(a)    **Posición de la ANI**

499.    La ANI aduce que POB incumplió sus obligaciones contractuales con respecto de la UF 2, toda vez que no ha actuado razonable ni diligentemente, bajo las circunstancias extraordinarias en que se encuentra, para mitigar y reducir los efectos del EER que afecta la UF 2, impidiendo superar el EER en el menor tiempo posible[384].

500.    En primer lugar, la ANI argumenta que después de declarado el EER, POB ha incumplido sus obligaciones toda vez que no realizó las actividades tendientes a la superación de los Eventos Eximentes de Responsabilidad[385].

501.    Particularmente, supuestamente POB no ha incorporado el personal necesario y suficiente en los sitios de intervención arqueológica[386]; POB no ha atendido los sitios de intervención arqueológica, a tal punto que se han deteriorado las cubiertas de los sitios de rescate[387]; y, además, los elementos rescatados se han advertido en mala disposición en el laboratorio[388].

502.    En segundo lugar, la ANI argumenta que POB no ha desarrollado un adecuado Programa de Arqueología Preventiva del Plan de Gestión Social Contractual[389], toda vez que no ha obtenido ni tramitado de forma diligente las autorizaciones de intervención arqueológica requeridas para continuar las obras. En específico, POB supuestamente no ha renovado la Autorización de Intervención Arqueológica No. 8559, incumpliendo así sus obligaciones contractuales[390], y demorando así de forma injustificada las medidas necesarias para superar el EER[391].

503.    En tercer lugar, la ANI argumenta que, en concordancia con estas autorizaciones, POB debe realizar las actividades relacionadas con el laboratorio según la Autorización de

---

[384] Demanda ANI, p. 11.
[385] Demanda ANI, p. 361.
[386] Demanda ANI, p. 286.
[387] Demanda ANI, p. 286.
[388] Demanda ANI, p. 286.
[389] Demanda ANI, p. 361.
[390] Demanda ANI, p. 82.
[391] Demanda ANI, p. 286-288.

Intervención Arqueológica No. 6429, sin las cuales, no es posible elaborar el informe final del programa de arqueología preventiva, ni terminar las obras según el Contrato de Concesión[392]. La ANI afirma que la obligación contractual, no suspendida por el EER, de elaborar y presentar el informe final del programa de arqueología preventiva, no ha sido cumplida[393].

504.   La Demandada enfatiza que la suscripción del Acta de Terminación de la UF 2 no implica, per se, el cumplimiento de las obligaciones relacionadas con la mitigación y superación del EER, toda vez, que no se han superado las circunstancias que dieron lugar a la declaratoria del EER, y POB no ha culminado el levantamiento o recuperación del material arqueológico[394].

**(b)   Posición de POB y S&B**

505.   POB argumenta que ha ejecutado de manera diligente todas las actividades establecidas en el Contrato de Concesión, en sus Apéndices Técnicos 6 y 8, y en la ley[395]. POB sostiene que ha cumplido cabal y oportunamente con sus obligaciones en materia arqueológica en los hallazgos ubicados en el tramo de la UF 2[396]. Así mismo, POB afirma que ha dado estricto cumplimiento a los lineamientos legales y los señalados por el Instituto Colombiano de Antropología e Historia (ICANH), la máxima autoridad en materia arqueológica, garantizando la protección del patrimonio cultural y arqueológico de Colombia[397].

506.   Además, POB afirma que la no culminación del levantamiento o recuperación del material arqueológico se debe solo a la magnitud de los hallazgos, no solo por el significado arqueológico, sino por la cantidad de hallazgos[398]. También, POB arguye que el Acta de Terminación de la UF 2 reconoce que POB tomó todas las medidas

---

[392] Demanda ANI, p. 288.
[393] Demanda ANI, p. 288.
[394] Réplica ANI, ¶¶ 238, 243-244, 246.
[395] Contestación POB y S&B, ¶ 562.
[396] Contestación POB y S&B, ¶ 568.
[397] Contestación POB y S&B, ¶ 568.
[398] Contestación POB y S&B, ¶ 566.

conducentes para mitigar los efectos del EER, ya que el diseño del tramo de la obra afectada se logró hacer, con tal certeza que las Intervenciones en la UF 2 fueron ejecutadas sin afectar los yacimientos arqueológicos y se terminaron las obras de construcción[399].

507.  En primer lugar, POB argumenta que dirigió todos los esfuerzos y recursos razonablemente posibles y aconsejables en cuanto a las actividades en los sitios arqueológicos, El Divino Niño y Los Alcaparros. POB dio respuesta y atendió a los requerimientos de la Interventoría en cuanto al número de personal en los hallazgos, ya que contaba con arqueólogos y especialistas, incluso en números superiores a los exigidos por la ICANH, y con personal especializado en conservación y restauración para que adelanten la labor requerida en el laboratorio[400]. E incluso, POB informó de manera oportuna la restructuración del personal para garantizar el cumplimiento de las obligaciones en materia arqueológica a consecuencia de las medidas restrictivas relativas a la propagación del COVID-19[401]. También, POB atendió al requerimiento del deterioro de los cerramientos de los yacimientos, los cuales fueron causados por la imposibilidad de acudir a estos a consecuencia de las medidas restrictivas del COVID-19, iniciando las labores de recuperación correspondientes, una vez que fue posible[402], estando así en cumplimiento de todas sus obligaciones.

508.  En segundo lugar, POB argumenta que cumplió con sus obligaciones en relación con el manejo de los hallazgos, toda vez que obtuvo todos los permisos necesarios[403]. POB afirma que tramitó ante la ICANH hasta diez permisos, obteniendo así la Autorización de Intervención Arqueológica No. 5048, No. 6429 y la No. 8559[404]. Así mismo, afirma que la Autorización de Intervención Arqueológica No. 8559 fue renovada mediante

---

[399] Contestación POB y S&B, ¶ 683.
[400] Contestación POB y S&B, ¶ 625.
[401] Contestación POB y S&B, ¶ 637.
[402] Contestación POB y S&B, ¶ 638.
[403] Contestación POB y S&B, ¶ 576.
[404] Contestación POB y S&B, ¶¶ 587-607.

petición de ampliación el día 8 noviembre de 2021[405], demostrando así el cumplimento constante y diligente de POB.

509.   En tercer lugar, POB argumenta que las actividades en cumplimiento de las obligaciones en materia arqueológica están definidas por los lineamientos dispuestos por la ICANH y la ley, los cuales cumplió a cabalidad[406]. La ICANH no ha reclamado un incumplimiento de las obligaciones en materia arqueológica a cargo de POB, ni ha abierto procesos sancionatorios en su contra[407], lo cual ilustra que POB cumplió tantos sus obligaciones contractuales y legales en relación con los hallazgos en los sitios arqueológicos El Divino Niño y Los Alcaparros[408].

510.   POB enfatiza que conforme a la Sección 14.2 del Contrato de Concesión, la obligación era de hacer todo lo razonablemente aconsejable y posible, para superar el EER[409]. Sin embargo, POB aclara que la no culminación del rescate en Los Alcaparros a la fecha no prueba un incumplimiento, toda vez que la obligación no tiene un marco temporal y está supeditada a las circunstancias extraordinarias. Además, POB aduce que ha adelantado todas las actividades necesarias para superar el EER[410].

511.   POB aduce que el Acta de Terminación de la Unidad Funcional 2, evidencia el reconocimiento por parte de la ANI sobre el cumplimiento de las obligaciones por parte de POB, y que los trabajos pendientes de ejecutar en cuanto a las excavaciones arqueológicas no son incumplimiento alguno[411].

512.   POB argumenta que las afirmaciones de la ANI están fundadas en hechos anteriores a la declaratoria del EER, para ambos sitios arqueológicos, El Divino Niño y Los Alcaparros, y que por ende, los argumentos presentados por la ANI se encuentren afectados de cosa

---

[405] Contestación POB y S&B, ¶ 609.
[406] Contestación POB y S&B, ¶¶ 640-641.
[407] Contestación POB y S&B, ¶ 678.
[408] Contestación POB y S&B, ¶ 673.
[409] Contestación POB y S&B, ¶ 578.
[410] Contestación a la Reconvención, par. 579.
[411] Contestación a la Reconvención, par. 567.

juzgada[412]. POB ahonda que el Amigable Componedor valoró la conducta de POB y consideró que había cumplido sus obligaciones de Gestión Social del Contrato, adelantó el rescate de los hallazgos arqueológicos en cumplimiento de las instrucciones impartidas por el ICANH, y llevó a cabo la presentación de los informes de manera oportuna. La ANI lo habría corroborado en la Demanda de Reconvención en el párrafo 43, al declarar que el Panel de Amigable Componedor valoró la conducta de POB y consideró que había cumplido sus obligaciones contractuales en materia arqueológica.

**(c)    Ley aplicable y el Contrato**

513.    El Tribunal Arbitral precisara primero el marco obligacional para efectos de poder posteriormente presentar su análisis que conllevara a la resolución de la controversia en cuanto a la obligación en materia arqueológica de la UF 2.

514.    En primer lugar, el Contrato de Concesión establece de forma general el marco de las obligaciones de las Partes. Particularmente, en la Sección 4.2 establece las principales obligaciones durante la Fase de Preconstrucción[413], a su vez estableciendo en el inciso primero de dicha cláusula, que los Apéndices Técnicos prescriben otras obligaciones particulares.

515.    Adicionalmente, la Sección 8.1(a) establece que:

> La Gestión Social y Ambiental de cada una de las Intervenciones está a cargo del Concesionario, atendiendo a las obligaciones y responsabilidades establecidas en el Apéndice Técnico 6 y 8, y la Ley Aplicable.

516.    El Apéndice Técnico 6 en el Capítulo I, literal (a) establece que:

> De conformidad con la Sección 8.1 de la Parte General del Contrato, las obligaciones del Concesionario en lo relacionado con el componente ambiental de la Gestión Social y Ambiental están

---

[412] Contestación a la Reconvención, par. 623, 643, 660, 664, 666-669.
[413] Réplica a la Contestación en la Reconvención, par. 124.

136

definidas en este mismo Apéndice; y que lo no previsto en el, está previsto en el Apéndice Técnico 8.

517. Además, se establece que las obligaciones prescritas en estos Apéndices Técnicos no excusan de cumplir con la Ley Aplicable. Adicionalmente, el Apéndice Técnico 6 en el capítulo I, literal (d), inciso (iii), establece que "el Concesionario debe cumplir con los lineamientos del […] ICANH— y la ley aplicable en relación con el Patrimonio Cultural y Arqueológico de la Nación". Por lo que las obligaciones relativas a la materia arqueológica están definidas de forma precisa y especial en los Apéndices Técnico 6 y 8.

518. En segundo lugar, el Apéndice Técnico 8, en el numeral 5.2.2.7, establece de forma particular las obligaciones relativas al Programa de Arqueología Preventiva. Concretamente, el numeral 5.2.2.7.4.1 prescribe que:

[E]l Concesionario debe proteger el Patrimonio Arqueológico de la Nación, que el Concesionario tiene sus responsabilidades definidas por la Ley, que el Concesionario debe solicitar a la ICANH certificados y permisos, que debe contar con un Plan de Manejo Arqueológico antes de iniciar las obras, y que el Concesionario en caso de encontrar excavaciones donde se encuentren elementos arqueológicos, debe suspender las obras e informar tanto a la ICANH como a la ANI y la Interventoría.

519. Así mismo, el numeral 5.2.2.7.4.4 establece las obligaciones del:

Concesionario en cuanto a los hallazgos arqueológicos; disponiendo que (1) debe reportar dichos hallazgos a la ICANH, (2) debe establecer medidas de seguridad y control pertinentes, (3) gestionar la recepción del material arqueológico con el laboratorio autorizado para el albergue y preservación del material recuperado, (4) debe seguir las disposiciones del ICANH para efectos del cuidado del material arqueológico recuperado, y (5) hacer entrega ante el ICANH del informe correspondiente, cartografía y base de datos.

520. En adición, el numeral 5.2.2.7.6 dispone que:

[L]a realización de las actividades descritas en el programa, y en particular la efectiva ejecución de las medidas de mitigación cumpliendo con las normas técnicas y especificaciones aplicables a

137

la infraestructura correspondiente, es obligatoria y su incumplimiento dará lugar a la imposición de las multas contenidas en el numeral 6.1(f) de la Parte Especial.

521. Por lo tanto, las obligaciones de POB en materia arqueológica están definidas de forma general en el Contrato de Concesión, en los Apéndices y en la ley, pero están delimitadas por los lineamientos y directrices de la entidad pública, ICANH.

522. En tercer lugar, en virtud de la declaratoria de los Eventos Eximentes de Responsabilidad en la UF 2 (EERs-UF 2)[414], el Contrato de Concesión en la Sección 14.2 (e) y (f) establece la obligatoriedad de la parte afectada con la declaración EER de adelantar todas las gestiones que sean necesarias para mitigar los efectos y superar el EER. Singularmente, el literal (f) prescribe que:

> [L]a Parte Afectada por un Evento Eximente de Responsabilidad queda obligada a adelantar todo lo que sea razonablemente aconsejable y posible, bajo las circunstancias extraordinarias, para mitigar y reducir los efectos del Evento Eximente de Responsabilidad, así como para superarlo en el menor tiempo posible.

523. En cuarto lugar, la Ley 1185 de marzo 12 de 2008, en su artículo 7, prescribe que:

> [En] los proyectos de construcción de infraestructura vial deberán elaborar un programa de arqueología preventiva y un plan de manejo arqueológico, que debe presentarse a el ICANH y sin el cual no puede adelantarse la obra.

524. En concordancia, el Decreto 763 de marzo 10 de 2009 en su artículo 55 establece primero, que "el […] ICANH– es la única entidad facultada por las disposiciones legales para aplicar el régimen de manejo del patrimonio arqueológico"; y segundo que:

> El Programa de Arqueología Preventiva es la investigación científica dirigida a identificar y caracterizar los bienes y contextos arqueológicos existentes en el área de aquellos proyectos, obras o

---

[414] Decisión del Amigable Componedor No. 15854 de 18 de diciembre de 2018 (Prueba ANI 8.1.7.1) y Decisión del Amigable Componedor No. 15856 de 18 de diciembre de 2018 (Prueba ANI 8.1.7.2).

actividades que requieren licencia ambiental, registros o autorizaciones equivalentes ante la autoridad ambiental o que, ocupando áreas mayores a una hectárea, requieren licencia de urbanización, parcelación o construcción.

El propósito de este programa es evaluar los niveles de afectación esperados sobre el patrimonio arqueológico por la construcción y operación de las obras, proyectos y actividades anteriormente mencionados, así como formular y aplicar las medidas de manejo a que haya lugar para el Plan de Manejo Arqueológico correspondiente.

525.    Mientras que en el artículo 57 del mismo Decreto 763 de 2009, se establece que:

Intervenciones en proyectos de construcción de redes de transporte de hidrocarburos, minería, embalses, infraestructura vial, así como en los demás proyectos, obras o actividades que requieran licencia ambiental registros o autorizaciones equivalentes ante la autoridad ambiental, o que ocupando áreas mayores a una hectárea requieran licencia de urbanización, parcelación o construcción.

Previo al inicio de las obras o actividades, el interesado deberá poner en marcha un Programa de Arqueología Preventiva que le permita en una primera fase formular el Plan de Manejo Arqueológico correspondiente. Como condición para iniciar las obras, dicho Plan deberá ser aprobado por el Instituto Colombiano de Antropología e Historia. Sin prejuicio de lo anterior, para cada una de las fases del Programa de Arqueología Preventiva que impliquen actividades de prospección o excavaciones arqueológicas, el interesado deberá solicitar ante el ICANH la respectiva autorización de intervención.

526.    A su vez, el Decreto 1080 de mayo 26 del 2015 en su artículo 2.6.5.7 prescribe que[415]:

El Plan de Manejo Arqueológico deberá ser ejecutado conforme fue aprobado por el ICANH y podrá implicar una o las siguientes

---

[415] El decreto 138 de 2019 modificó la Parte VI del decreto 1080 de 2015. Sin embargo, el artículo 2.6.5.7 del decreto 1080 de 2015 no fue modificado en su texto. Además, el régimen transitorio del mismo en el artículo 4, dice que: "De manera general, los trámites que se encuentran en curso les será aplicable el nuevo procedimiento. Sin embargo, el interesado podrá elegir si actualiza su trámite a los nuevos lineamientos, o lo finaliza bajo la normativa bajo la cual lo inició." Por lo que, tal y como lo expuso el experto INERCO en su reporte pericial en el acápite 3.2 (CER-005), los permisos tramitados para la UF 2 no fueron afectados por el cambio de normativa.

actividades: a) actividades de verificación y monitoreo; b) actividades de excavación y rescate; c) actividades de laboratorio y análisis especializados. El ICANH precisará en los términos de referencia que expedirá el contenido y periodicidad de los informes de avance, así como los términos del informe final.

527. En quinto lugar, el Decreto 833 de abril 26 de 2002 define lo que es un plan de manejo arqueológico en su artículo 1 numeral 10, lo cual se entiende complementado por el Régimen legal y lineamientos técnicos de los Programas de Arqueología Preventiva en Colombia de 15 de julio de 2010. En éste, el ICANH presentó los lineamientos legales para implementar Programas de Arqueología Preventiva en el contexto de diseño, construcción y puesta en marcha de proyectos de construcción de infraestructura vial, y definió las etapas para el desarrollo de los Programas de Arqueología Preventiva en los mismos.

528. En sexto lugar, la Sección 15 del Contrato de Concesión, en el inciso primero, establece que a los mecanismos de solución de controversias pactados por las Partes se le aplicara lo previsto en la Ley 1563 de 2012. Así mismo, la Sección 15.1(a) establece el acuerdo de las Partes de que la decisión del Amigable Componedor sobre cualesquiera controversias expresamente pactadas en el Contrato de Concesión es de carácter definitivo y vinculante para las Partes. Además, la Sección 15.1(f)(iv) del Contrato de Concesión le otorga el poder al Amigable Componedor para que, al resolver la controversia, pueda interpretar el contenido del Contrato de Concesión. Adicionalmente, la Sección 15.1(k)(vii) del Contrato establece la fuerza vinculante de las decisiones del Amigable Componedor, y dice que la decisión tendrá fuerza vinculante para las Partes y tendrá efectos transaccionales de acuerdo con la Ley Aplicable. En concordancia, el artículo 60 de la Ley 1563 regula los efectos del Amigable Componedor, y dispone que:

> El amigable componedor obrará como mandatario de las partes y, en su decisión, podrá precisar el alcance o forma de cumplimiento de las obligaciones derivadas de un negocio jurídico, determinar la existencia o no de un incumplimiento contractual y decidir sobre conflictos de responsabilidad suscitados entre las partes, entre otras determinaciones.

> La decisión del amigable componedor producirá los efectos legales propios de la transacción.
>
> Salvo convención en contrario, la decisión del amigable componedor estará fundamentada en la equidad, sin perjuicio de que el amigable componedor haga uso de reglas de derecho, si así lo estima conveniente.

529. A su vez, el Código Civil Colombiano, en el artículo 2483, regula efectos de la transacción, a saber:

> La transacción produce el efecto de cosa juzgada en última instancia; pero podrá impetrarse la declaración de nulidad o la rescisión, en conformidad a los artículos precedentes.

**(d)    Análisis del Tribunal Arbitral**

530. En conformidad con el marco obligacional, contenido tanto en el Contrato de Concesión, en los Apéndices Técnicos 6 y 8, en el EERs-UF 2, en los decretos y la ley respectiva, el Tribunal Arbitral considera que, la demandante en reconvención, ANI, no tiene la razón en su pretensión reconvencional de incumplimiento de las obligaciones en materia arqueológica relativas a la UF 2.

531. Primeramente, la pretensión reconvencional relativa a la UF 2 solo fue presentada en gran parte con alegaciones generales y conclusivas, sin especificidad. Además, de que la pretensión no fue sustentada con prueba especifica y pormenorizada, solo se acompañaron como prueba varios reportes de la Interventoría, declaraciones del ICANH y, comunicaciones entre las Partes y la Interventoría. Por lo que, la falta de precisión y definición en la formulación y fundamentación de la pretensión lleva a este Tribunal concluir que POB no satisfizo la carga de la prueba de indicar los supuestos incumplimientos específicos de POB.

532. Es preciso especificar para la resolución de la pretensión examinada en esta Sección, que la ANI trae a colación algunos hechos que ocurrieron con anterioridad a las EERs-UF 2,

particularmente al sitio arqueológico llamado Los Alcaparros[416]; tanto en la sección de cuestiones preliminares respecto de los incumplimientos en materia arqueológica[417], como en la sección de los hechos que sirven de fundamento a la Reconvención.[418]

533. En cuanto a estos hechos en particular invocados por la ANI, POB afirma que fueron fundamento de la posición de la ANI previamente a los EERs-UF 2[419]. Además, POB afirma que éstos fundan la pretensión y los argumentos de la ANI en frente del Panel del Amigable Componedor[420], y que son los mismos formulados en la Reconvención.[421]

534. En consecuencia, POB argumenta que cualquier controversia relacionada con una pretensión fundada en los hechos ocurridos antes de los EERs-UF 2, ya ha sido dirimida por el Panel del Amigable Componedor[422] y, por ende, la pretensión reconvencional está afectada de cosa juzgada.[423] Por lo que, el ámbito de las decisiones tomadas en diciembre 2018 por el Panel del Amigable Componedor, en conformidad con el Contrato de Concesión en la Sección 15(a), instruye a este Tribunal. Así, si la resolución sobre los hechos, pretensiones y argumentos presentados durante la declaratoria del Evento Eximente de Responsabilidad deriva de los mismos elevados en la Reconvención, permite a este Tribunal determinar si hay una afectación de cosa juzgada.

535. El Panel del Amigable Componedor, en su decisión No. 15854 de diciembre del 2018, en cuanto al sitio arqueológico El Divino Niño dijo, a saber[424]:

> Resta por efectuar unas breves consideraciones en relación con el argumento expuesto por la ANI consistente en que el Concesionario

---

[416] Demanda ANI, pp. 66-75.
[417] Demanda ANI, pp. 10-19.
[418] Demanda ANI, pp. 60-83.
[419] Contestación POB y S&B, ¶ 664.
[420] Las reclamaciones de EER sobre los hallazgos arqueológicos tanto de EL Divino Niño como de Los Alcaparros en cuanto a la UF2, fueron adelantadas de forma conjunta por el mismo Panel del Amigable Componedor, sin embargo, dicto dos decisiones separadas.
[421] Contestación POB y S&B, ¶ 665-666.
[422] Contestación POB y S&B, ¶¶ 660, 663, 667-669.
[423] Contestación POB y S&B, ¶¶ 664.
[424] Prueba 8.1.7.1, p. 39.

incumplió sus obligaciones en lo que respecta al manejo arqueológico.

536. La ANI presentó a dicho Panel de Amigable Componedores pruebas tales como la CP-PER-3314-2018[425], identificada en este proceso como Prueba ANI 8.1.11.2, CP-PER3468-2018[426], identificada en este proceso arbitral como Prueba ANI 8.1.11.3, y CP-PER-3659-2018, identificada en este proceso arbitral como Prueba ANI 8.1.11.18[427], entre otras.

537. Así mismo, el Panel del Amigable Componedor en su decisión No. 15856 de diciembre del 2018, en cuanto al sitio arqueológico Los Alcaparros dijo, a saber:

> Resta por efectuar unas breves consideraciones en relación con el argumento expuesto por la ANI consistente en que el Concesionario incumplió sus obligaciones en lo que respecta al manejo arqueológico.

538. La ANI presentó a dicho Panel de Amigable Componedor pruebas tales como la CP-PER-3314-2018[428], identificada en este proceso como Prueba ANI 8.1.11.2, CP-PER3468-2018[429], identificada en este proceso arbitral como Prueba ANI 8.1.11.3, CP-PER-3659-2018, identificada en este proceso arbitral como Prueba ANI 8.1.11.18[430], y el Acta de la ICANH de la visita del 29 de junio de 2018[431], identificada en este proceso arbitral como Prueba ANI 8.1.18; entre otras pruebas.

539. Entiende, entonces, este Tribunal Arbitral que las controversias sobre el manejo arqueológico fundadas en hechos anteriores a la declaratoria de los EERs-UF 2 fueron evaluadas y decididas por el Panel del Amigable Componedor. Por lo tanto, estas están afectadas por la cosa juzgada, en consonancia con la Ley 1553 del 2012 en su artículo

---

[425] Demanda ANI, p. 66. También, Prueba 8.1.7.1, p. 24.
[426] Demanda ANI, p. 69. También, Prueba 8.1.7.1, p. 24.
[427] Demanda ANI, p. 72. También, Prueba 8.1.7.1, p. 24.
[428] Demanda ANI, p. 66. También, Prueba 8.1.7.1, p. 24.
[429] Demanda ANI, p. 69. También, Prueba 8.1.7.1, p. 24.
[430] Demanda ANI, p. 72. También, Prueba 8.1.7.1, p. 24.
[431] Demanda ANI, p. 72. También, Prueba 8.1.7.2, p. 25.

60, el Código Civil Colombiano artículo 2483 y el Contrato de Concesión en su Sección 15.

540.  A lo anterior, le acompaña la propia declaración de la ANI donde reconoce que el Panel del Amigable Componedor "valoró la conducta del Concesionario y la consideró acorde con los requisitos de diligencia que establece el contrato".[432]

541.  La ANI no ha objetado las decisiones del Panel del Amigable Componedor por ser inapropiadas o fuera o en desconocimiento del poder otorgado por las Partes en el Contrato de Concesión.[433] Por lo tanto, dichas decisiones son definitivas y vinculantes para las Partes en conformidad con la Sección 15(a) del Contrato de Concesión. Además, en el presente proceso arbitral, la ANI no ha indicado que dichas decisiones del Panel del Amigable Componedor excedieron su autoridad. Por lo tanto, la pretensión de incumplimiento de las obligaciones en materia arqueológica fundada en hechos previos a los EERs-UF 2, gozan del efecto cosa juzgada entre las Partes.

542.  Empero, si bien es cierto que en sus escritos la ANI funda su pretensión reconvencional en hechos posteriores, e incluso de forma expresa clarifica que solo hace alusión a temas posteriores al EERs-UF 2, se evidencia en varias instancias de sus escritos que, ANI sí hace alusión a hechos anteriores a EERs-UF 2. De manera que, tendiendo de presente las decisiones del Panel del Amigable Componedor y su carácter de cosa juzgada, se entiende que dichas afirmaciones deben ser desestimadas.

543.  En cuanto a los hechos que ocurrieron con posterioridad a los EERs-UF2, que son fundamento de la pretensión reconvencional relativa a la UF 2 presentados por ANI[434], no existe efecto de cosa juzgada y este Tribunal Arbitral tiene poder para dirimirla. Por lo que se procederá a dirimir la controversia solo con estos hechos posteriores.

544.  La alegación de falta de personal arqueológico suficiente en los sitios de rescate, e incluso en el laboratorio, no supone una indebida Gestión Social y Arqueológica del Proyecto, y

---

[432] Demanda ANI, p. 76.
[433] Réplica ANI, ¶ 236.
[434] Demanda ANI, p. 83.

mucho menos un hecho determinante a la no superación del EER. La ANI presentó diferentes requerimientos que se le hizo a POB entre los años 2019 y 2021[435], como, por ejemplo, las pruebas ANI 8.1.28.5, 8.1.28.6, 8.1.28.6, 8.1.28.7, 8.1.28.8, entre otras.

545. Estos requerimientos, de forma genérica, por parte de la Interventoría pedían o se recordaba de la necesidad de disponer de los recursos necesarios para superar los EERs, y que se explicara la razón de la disminución del personal encargado de las excavaciones. Además, la ANI aduce que dichos requerimientos "no recibieron respuesta ni pronunciamiento que permitiera determinar el cabal cumplimiento de las obligaciones"[436]. A lo cual, POB afirma haber respondido y atendido las recomendaciones del ICANH[437], aportando diferentes comunicaciones mediante la prueba POB C-233, evidenciando que POB actuó de forma diligente.

546. Aunando a lo anterior, la prueba pericial de INERCO (Prueba POB CER-005), en el acápite 5.2.4, explica que[438]:

> No hay criterios objetivos para afirmar que había insuficiencia de profesionales y auxiliares en las actividades arqueológicas; que la ANI no refiere en ninguno de sus comunicados cual es la cantidad favorable y suficiente de personal para la atención de los EER.

547. La Prueba POB CER-005 también explica que las labores arqueológicas se hicieron de "manera continua y con personal aprobado por la ICANH, de acuerdo con las necesidades del proyecto"[439].

548. En el mismo sentido, durante la Audiencia Final de Prueba, la perito arqueóloga Tatiana Santa testificó[440]:

> También es importante aquí mencionar que el personal lo está definiendo el arqueólogo. El arqueólogo es el que define qué

---

[435] Demanda ANI, p. 81.
[436] Demanda ANI, p. 68.
[437] Contestación POB y S&B, ¶ 625.
[438] Prueba CER-005, pp. 44-45.
[439] Prueba CER-005, p. 45.
[440] Transcripción Audiencia Final de Prueba 2022.12.15 P2, p. 15.

cantidad de personas necesita para atender su hallazgo, cuantas personas puede tener dentro de su excavación.

549. Así, POB logró demostrar, que es el arqueólogo responsable del hallazgo quien define los recursos a utilizar en las labores de rescate; sin que la ANI presentara experto alguno sobre la materia que refutara si dentro de la ciencia esto corresponde o no. Por ello, POB actuó de forma razonable y aconsejable en cuanto su deber de Gestión Social y Arqueológica.

550. La alegación de la falta de cuidado de los cerramientos a los yacimientos arqueológicos, de la misma manera, no supone una indebida Gestión Social y Arqueológica del Proyecto, y mucho menos un hecho determinante a la no superación del EER. La ANI fundamenta fácticamente el incumplimiento a las obligaciones con la presentación de varios requerimientos hechos por la Interventoría a POB desde 2019 hasta 2021.

551. Por ejemplo, las pruebas ANI 8.1.28.1, 8.1.28.7, 8.1.28.8 y 8.1.28.9, entre otras, demuestran la solicitud de dedicar los recursos razonables para la protección adecuada para los hallazgos arqueológicos. Sin embargo, de la misma manera, POB respondió a dichos requerimientos[441] y atendió a las sugerencias del ICANH, según se evidencia en los documentos aportados en la prueba POB C-233.

552. Además, POB demostró que, en virtud del COVID-19 y las medidas restrictivas impuestas por el Gobierno de Colombia, durante un periodo no pudo atender adecuadamente los cerramientos, sin embargo, tomó las medidas razonables y aconsejables acorde a las circunstancias[442], evidenciando así que POB cumplió a cabalidad con sus obligaciones.

553. De la misma manera, la prueba POB CER-005 explica y demuestra que[443]:

[L]os cubrimientos en las áreas arqueológicas se realizan con el fin de que las tareas de rescate sean más fáciles de realizar, evitando

[441] Contestación a la Reconvención, par. 633-637.
[442] Contestación a la Reconvención, par. 638-640.
[443] Prueba CER-005, p. 46.

146

> retrasos por condiciones climáticas, ya sean de lluvia o sol. […] no
> quiere decir que las construcciones de cerramientos tipo invernadero
> sean requeridas desde un punto de vista técnico".

554.  En el mismo sentido, testifico la arqueóloga Tatiana Santa durante la Audiencia Final de Pruebas, a saber: "los cerramientos se hacen en algunos sitios arqueológicos para que la labor sea más fácil, pero no necesariamente es para la protección del patrimonio".[444] Por ello, POB actuó de forma razonable y aconsejable en cuanto su deber de Gestión Social y Arqueológica.

555.  La ANI no controvirtió el testimonio de la arqueóloga Tatiana Santa, ni presentó pericia alguna en respuesta al reporte de INERCO. La argumentación de que la testigo Santa no cuenta con la "expertia para realizar este tipo de dictámenes (es su primer dictamen) y por demás sus juicios de valor los realizó con base en una información muy parcializada"[445], no resulta convincente para este Tribunal Arbitral. Toda vez que, según explicó la testigo Santa durante la Audiencia Final de Prueba, los juicios de valor emitidos en la Prueba POB CER-005, se hicieron basados en las autorizaciones de intervención otorgadas por el ICANH, y en el Plan de Manejo Arqueológico aprobado por el ICANH.[446]

556.  Además, la testigo de la ANI, la señora Natalia Mayorga, la representante de la Interventoría, que declaró sobre los requerimientos a POB por su Gestión Social y Arqueológica, no testificó sobre las cualificaciones de la arqueóloga Santa.  Por lo tanto, POB no incumplió sus obligaciones en materia arqueológica.

557.  En relación con las autorizaciones y el Plan de Manejo Arqueológico, y al alegado incumplimiento que aduce la ANI, de que sin dichas autorizaciones POB no podía proceder con las obras para superar el EER, el Tribunal no encuentra incumplimiento

---

[444] Transcripción Audiencia Final de Prueba 2022.12.15 P2, p. 15.
[445] Escrito Post-Audiencia ANI, par. 145.
[446] Transcripción Audiencia Final de Prueba 2022.12.15 P2, pp. 8-9.

alguno, ni al Contrato de Concesión, ni a la ley, ni a las obligaciones definidas por el Panel de Amigable Componedor.

558. Quedó demostrado que POB tramitó todas las autorizaciones, el Plan de Manejo Arqueológico[447] y desarrolló un adecuado Programa de Arqueología Preventiva del Plan de Gestión Social Contractual. También se demostró que la Autorización de Intervención de Arqueológica No. 8559, contrario a lo alegado por la ANI[448], fue renovada y el ICANH amplió el plazo como se evidencia en la prueba POB C-227.

559. Además, quedó sentado en el expediente, sin contradicción, que el ICANH nunca sancionó a POB[449] por incumplimiento en el marco de las distintas Autorizaciones de Intervención Arqueológica tramitadas durante la vida de la obra, ni del Plan de Manejo Arqueológico, o la ley aplicable. Por lo tanto, POB no solo cumplió con adquirir los permisos requeridos, también ejecutó estos en respeto a los lineamientos del ICANH y el mandato de la ley colombiana.

560. Por otro lado, en cuanto a la obligación de elaboración y presentación el informe final del programa de arqueología preventiva, el Tribunal Arbitral encuentra que hay una falta a los deberes contractuales y legales. Si bien, la Autorización de Intervención Arqueológica No. 6429 venció[450], y el mismo objeto fue asignado a una nueva autorización de intervención arqueológica[451]; el informe final de la Autorización de Intervención Arqueológica No. 6429 no se ha presentado.[452]

561. La prueba POB CER-005 no explica ni demuestra, en cuanto a este particular informe, que se ha presentado a la entidad pública y POB no ha presentado prueba fehaciente, clara y directa que demuestre que dicho informe final ha sido presentado.

---

[447] Contestación POB y S&B, ¶¶ 588-606.
[448] Demanda ANI, p. 82.
[449] Réplica POB y S&B, ¶ 253.
[450] Contestación POB y S&B, ¶¶ 600-603.
[451] Prueba 8.1.33 (CE-1061-2020), p. 1. También Prueba C-224.
[452] Prueba 8.1.33 (CE-1061-2020), p. 2. También Prueba C-222.

562. Sin embargo, el no llevar a cabo este trámite administrativo no es relevante ni determinante a la Gestión Social y Arqueológica, ni a las actividades razonables y aconsejables para la superación del EER. Dicha relevancia se constata, contrario a lo que aduce la ANI[453], como fue demostrado[454], por el hecho de que los rescates de los hallazgos de la UF 2, se cumplieron en conformidad con los lineamientos del ICANH y la ley aplicable.[455]

563. Además, "las intervenciones asociadas a las obras y actividades previamente afectadas por los mencionados Eventos Eximentes de Responsabilidad de la Unidad Funcional 2, cumplen con las Especificaciones Técnicas que se identifican para este evento en el Apéndice Técnico No. 1"[456], por lo que, las Partes firmaron el Acta de Terminación en relación a la UF 2. Por lo tanto, POB no ha incumplido ninguna de sus obligaciones en materia arqueológica.

564. En lo que se refiere a la falta de diligencia en la Gestión Social y Arqueológica, que habría retrasado la superación del Evento Eximente de Responsabilidad[457], y en consecuencia causando un incumplimiento de los plazos definidos en los EERs-UF 2[458], el Tribunal considera que las acciones de POB estuvieron dentro de lo razonablemente posible y aconsejable según lo manda el Contrato de Concesión en la Sección 14.2(f).

565. El sitio arqueológico Los Alcaparros ubicado en la UF 2, según la evidencia presentada[459], supone una gran magnitud y complejidad arqueológica en su manejo. Magnitud y complejidad evidenciada en el hecho de que el proyecto adelantado por POB ha revelado aproximadamente el 41% de todos los hallazgos de todos los proyectos de cuarta generación (4G) desarrollados en Colombia[460].

---

[453] Demanda ANI, p. 289.
[454] Prueba CER-005, pp. 7-8, 33, 35, 39.
[455] Contestación POB y S&B, ¶ 627.
[456] Prueba C-240; Prueba 8.1.28.2.
[457] Demanda ANI, p. 83. También en Replica ANI, ¶¶ 237, 244.
[458] Escrito Post-Audiencia ANI, ¶¶ 147-150.
[459] Prueba CER-005, p. 39.
[460] Prueba CER-005, p. 39.

566. Por ejemplo, en el sitio Los Alcaparros se han encontrado "al menos 200 contextos funerarios"[461]; mientras, en el sitio El Divino Niño se han encontrado "26 tumbas, referentes para el estudio de las sociedades muiscas del pasado"[462] ; entre otros hallazgos de fragmentos cerámicos, artefactos líticos y restos de fauna de gran densidad (*Ver* Tabla 4-5)[463], condiciones que, en concordancia con las acciones tomadas por POB, prueban el cumplimiento.

567. En consideración, POB probó que requirió la ampliación de las Autorizaciones de Intervención Arqueológica No. 6429 and No. 8559[464] con el propósito de terminar las extensas labores arqueológicas y así poder superar el EER. El testimonio de la arqueóloga Tatiana Santa aclaro que "la magnitud de los hallazgos de Los Alcaparros y sus características especiales pueden explicar por qué este lugar aún no se ha culminado"[465].

568. En cuanto al sitio arqueológico El Divino Niño, "la complejidad y particularidad de las evidencias arqueológicas identificas, tiene que ver con la densidad y el tipo de tumbas encontradas"[466].

569. Aún más, la ANI no niega la magnitud y complejidad en los hallazgos arqueológicos en la UF 2, y tampoco presentó prueba directa y concreta contradiciendo que dicha magnitud y complejidad no fueron los factores determinantes para el retraso. Por lo tanto, ANI no ha probado que POB incumplió sus obligaciones en materia arqueológica, mientras que POB logró probar que cumplió dichas obligaciones.

570. Finalmente, con relación al argumento que el Acta de Terminación de la Unidad Funcional 2 no incide en el actuar poco diligente en materia arqueológica de POB[467], el Tribunal considera todo lo contrario, que sí incide. Las Actas de Terminación de la Unidad Funcional 2, tanto la parcial como la total, demuestran que POB actuó dentro de

---

[461] Prueba CER-005, p. 41.
[462] Prueba CER-005, p. 42.
[463] Prueba CER-005, p. 41.
[464] Contestación POB y S&B, ¶¶ 596-609.
[465] Transcripción Audiencia Final de Prueba 2022.12.15 P2, p. 5.
[466] Prueba CER-005, p. 39, 42.
[467] Réplica ANI, ¶ 254.

lo razonablemente posible y aconsejable, ya que el Acta de Terminación es un reconocimiento del cumplimiento de "los valores mínimos de aceptación para los Indicadores y las Especificaciones Técnicas[468]", criterio acordado por las Partes en el Contrato de Concesión en la Sección 4.17.

571. En las mismas Actas de Terminación se reconoció que "la vigencia del EER en el sitio Los Alcaparros y la no construcción del puente peatonal en el sitio El Divino Niño no afecta el cumplimiento del contrato"[469]. Además, la prueba acompañada y los argumentos presentados en el Arbitraje, como se viene evaluando en esta Sección, fundamentan la inexistencia de incumplimientos por parte de POB en cuanto a cada una de sus obligaciones. Por lo que, la firma del Acta de Terminación incide, y no se encuentra que subsiste incumplimiento alguno por parte de POB.

572. En conclusión, el Tribunal no encuentra incumplimiento por parte de POB en cuanto a la obligación en materia arqueológica en la UF 2. Primero, POB actuó de forma razonablemente posible y aconsejable, dentro de las circunstancias, ya que puso a disposición todos los recursos de personal y técnicos necesarios para el cuidado de los sitios arqueológicos; instaló los cerramientos y mantuvo estos de forma apropiada para proteger los hallazgos; y tramitó y adquirió todos los permisos y autorizaciones necesarias para ejecutar el Programa de Arqueología Preventiva del Plan de Gestión Social Contractual.

573. Segundo, POB actuó de forma diligente en su Gestión Social y Arqueológica, cumpliendo con los lineamientos de la ICANH, y cumpliendo así las obligaciones contractuales y el mandato de la ley.

574. Tercero, POB ejecutó las actividades necesarias para superar los eventos eximentes de responsabilidad, si bien es cierto, como alega ANI a la fecha no se ha superado el EER en el sitio Los Alcaparros.

---

[468] Prueba C-240, ¶16. También, Prueba 8.1.28.1, ¶ 47.
[469] Prueba C-240, ¶16.

575. Cuarto, ANI no satisfizo su carga de la prueba, no logrando demostrar incumplimiento por parte de POB. A su vez, POB probó que cumplió sus obligaciones en materia arqueológica.

576. Por tanto, el Tribunal Arbitral desestima la pretensión contravencional de la ANI referente a las obligaciones de POB en materia arqueológica en relación a la UF 2.

## 2. RECLAMACIONES DE LA DEMANDADA EN RELACIÓN CON LAS UFs 4 Y 5

577. La ANI afirma que POB incumplió la obligación de operar y mantener el corredor vial respecto de las UFs 4 y 5, dado que no ejecutó de forma debida las actividades requeridas para velar por la continuidad del servicio, la transitabilidad y la seguridad del corredor vial para los usuarios[470].

## (a) Posición de la ANI

578. La ANI aduce que POB incumplió la obligación de resultado de O&M del corredor vial en las UFs 4 y 5. La ANI también argumenta que POB incumplió la obligación de garantizar los estándares mínimos de calidad, servicio y transitabilidad del corredor vial, en conformidad con lo establecido en el Contrato de Concesión[471]. Así mismo, alega que POB paralizó en su totalidad las actividades en las UFs 4 y 5[472], y no dio atención a los distintos requerimientos de la Interventoría en cuanto a O&M indebidos o malos[473].

579. También, la ANI aduce que POB incumplió sus obligaciones en cuanto a las actividades de Mantenimiento y las Intervenciones Prioritarias en los tramos del corredor vial de las UFs 4 y 5, como lo ha señalado la Interventoría desde el año 2017. El mencionado incumplimiento habría ocasionado la perdida de banca en varios sectores y la conversión de algunos de éstos en Puntos Críticos[474].

---

[470] Demanda ANI, p. 19.
[471] Demanda ANI, p. 296.
[472] Demanda ANI, p. 304.
[473] Demanda ANI, p. 313. En el mismo sentido, Réplica ANI, ¶ 137.
[474] Demanda ANI, p. 314. En el mismo sentido, Réplica ANI, ¶ 137.

580.    En primer lugar, la ANI argumenta que la obligación de Operación del Proyecto comprende la continuidad del servicio, según lo previsto en el numeral 3.1.1. del Apéndice Técnico 2; la integridad del corredor del Proyecto, según los previsto en el numeral 3.1.6 del Apéndice Técnico 2; y la seguridad vial, según lo previsto en el numeral 3.3.7 del Apéndice Técnico 2[475]. Así mismo, la ANI argumenta que la obligación de Mantenimiento incluye tener que corregir los deterioros o deficiencias que puedan afectar la transitabilidad de la vía, detectados por la Interventoría o por el Concesionario mismo, según lo previsto en el numeral 6.1 del Apéndice Técnico 2[476].

581.    En segundo lugar, la ANI argumenta que la obligación de Mantenimiento es también de carácter legal, y supone que el Concesionario debe respetar los estándares de calidad y la garantía de continuidad del servicio, según lo previsto en la Ley 1508 de 2012[477].

582.    En tercer lugar, la ANI argumenta que la obligación de O&M es de carácter permanente, desde la suscripción del Acta de Entrega de Infraestructura hasta el Acta de Reversión[478], y no fue suspendida por la emisión del Acta de EER de fecha 1 de agosto de 2018[479].

583.    En cuarto lugar, la ANI argumenta que las obligaciones de O&M de la vía tampoco fueron suspendidas por el EER, toda vez que, en el Acta de EER se determinó que las Intervenciones Prioritarias de que trata la Sección 4.3 del Apéndice Técnico 1, no fueron suspendidas por el EER y el Concesionario debía continuar con la ejecución para garantizar las condiciones de transitabilidad y seguridad vial[480].

584.    La ANI enfatiza que la obligación de O&M, "no se satisface con los buenos oficios del Concesionario, sino con el cumplimiento íntegro y pleno de la prestación"[481]. Esta

---

[475] Demanda ANI, pp. 296-298.
[476] Demanda ANI, pp. 298-300.
[477] Demanda ANI, p. 301.
[478] Demanda ANI, p. 297. En el mismo sentido, Réplica ANI, ¶ 126.
[479] Demanda ANI, p. 308. En el mismo sentido, Réplica ANI, ¶¶ 134-136.
[480] Demanda ANI, pp. 306-309.
[481] Réplica ANI, ¶ 129.

obligación supone "adelantar las labores que sean necesarias para garantizar la óptima prestación de los servicios de transporte, conectividad y transitabilidad"[482], lo que incluye "el servicio integral, sin limitarse a la Sección transversal (corona, carriles, bermas, cunetas, hombros terraplén, taludes) desde las zanjas de coronación y los descoles, entre otros"[483].

585.    La ANI alega que el corredor vial ha desmejorado críticamente sus condiciones, a consecuencia de la no ejecución de las actividades de O&M y/o Prioritarias por parte de POB, las cuales son obligaciones permanentes esenciales, vigentes y exigibles al Concesionario por no haber sido suspendidas con el EER. Por lo anterior, la seguridad y transitabilidad de la vía no se habrían garantizado, incumpliendo así las obligaciones contraídas durante la Etapa Preoperativa por POB[484].

**(b)    Posición de POB y S&B**

586.    POB argumenta que ha ejecutado de manera diligente todas las actividades establecidas en el Contrato de Concesión y en sus Apéndices Técnicos 1 y 2, incluyendo, las obligaciones de O&M en la Etapa Preoperativa de las UFs 4 y 5[485]. Además, POB señala que ha informado de forma diligente a la ANI de la ocurrencia de unos Puntos Críticos en la vía en las UFs 4 y 5, cuya atención estaría por fuera de las obligaciones adquiridas por POB en el Contrato de Concesión. Así mismo, POB sustenta que las actividades requeridas por la Interventoría y la ANI son consecuencia de los incumplimientos contractuales de la ANI[486].

587.    En primer lugar, POB argumenta que las obligaciones en materia de O&M en la Etapa Preoperativa están expresa y precisamente señaladas en el Contrato de Concesión, tal y como lo dispone la Ley 1508 de 2012[487]. Así mismo, argumenta que el estándar de calidad y los niveles de servicios exigidos por la ley son los definidos en el Contrato,

---

[482] Réplica ANI, ¶ 127.
[483] Réplica ANI, ¶ 130.
[484] Réplica ANI, ¶ 138.
[485] Contestación POB y S&B, ¶ 257.
[486] Contestación POB y S&B, ¶ 262.
[487] Contestación POB y S&B, ¶¶ 269-271, 300.

según las características del Proyecto, y no tienen alcance más allá de lo acordado por las Partes[488].

588.    En segundo lugar, POB argumenta que los únicos Niveles de Servicio aplicables en relación a la Operación del Proyecto y el Mantenimiento de las UFs 4 y 5 en la Etapa Preoperativa son los indicadores de operación denominados O4 y O5, que se refieren al tiempo de atención de incidentes, accidentes y emergencias según lo dispuesto en el Contrato de Concesión y el Apéndice Técnico 2, Tabla 2[489].

589.    En tercer lugar, POB argumenta que la obligación de Mantenimiento establecida en el numeral 6.1 del Apéndice Técnico 2 no es aplicable durante la Etapa Preoperativa[490]. El Apéndice Técnico 4 expresamente establece que no es aplicable en la Sección 1 del mismo[491].

590.    En cuarto lugar, POB argumenta que la obligación en cuanto a las Intervenciones Prioritarias consiste en la ejecución de todas las actividades requeridas para cumplir los Niveles de Servicio mínimo de la Etapa Preoperativa, que no son Intervenciones[492]. Además, argumenta que, como los Niveles de Servicio mínimo en la Etapa Preoperativa de las UFs 4 y 5 están definidos en el Apéndice Técnico 2, en la Tabla 1, POB solo tenía como obligación la atención de incidentes, accidentes y emergencias[493].

591.    En quinto lugar, POB argumenta que la atención de los Puntos Críticos requiere la ejecución de actividades que tienen naturaleza de Intervenciones. Dichas Intervenciones están suspendidas por el EER[494] y están por fuera del marco de la obligación de O&M establecido en el Apéndice Técnico 2.

---

[488] Contestación POB y S&B, ¶¶ 271-275.
[489] Contestación POB y S&B, ¶¶ 276-277, 280-283.
[490] Contestación POB y S&B, ¶¶ 284, 364.
[491] Contestación POB y S&B, ¶ 302.
[492] Contestación POB y S&B, ¶¶ 284, 316, 318.
[493] Contestación POB y S&B, ¶ 282.
[494] Contestación POB y S&B, ¶ 314.

592.     POB afirma que ha ejecutado todas las actividades que le corresponden dentro del marco del Contrato de Concesión y no ha incumplido obligación alguna. Sustenta esta afirmación con el análisis hecho por FTI, quien, luego de evaluar las comunicaciones entre POB, ANI y la Interventoría, pudo concluir en su informe CER-004 que la totalidad de las actividades fueron ejecutadas, que POB cumplió con los Niveles de Servicio mínimo para la Etapa Preoperativa, específicamente los relacionados con los indicadores O4 y O5[495]. Además, POB enfatiza dicho cumplimiento con el hecho de que la Interventoría y ANI jamás han reprobado los Niveles de Servicio de la Etapa Preoperativa de las UFs 4 y 5[496].

593.     POB afirma que las actividades para atender los Puntos Críticos que han surgido a consecuencia de la suspensión de la construcción de la UFs 4 y 5, consisten en reforzamiento de taludes, movimientos de tierra y la creación de nuevos drenajes, entre otros. POB, apoyándose en la evaluación de FTI en su informe CER-004, aduce que dichas tareas a ejecutar en los Puntos Críticos existentes en el trazado de las UFs 4 y 5 se encuentran en áreas afectadas por EER, y, al tener naturaleza de Intervenciones, no pueden ejecutarse[497].

594.     POB afirma que las actividades requeridas por la Interventoría y la ANI son referentes a los Puntos Críticos ocurridos después del 2018, y que estas son Intervenciones suspendidas por el EER[498]. Además, sostiene que no son obligación de POB, toda vez que dichas actividades son consecuencia del incumplimiento de la ANI[499]. POB concluye que ha cumplido con sus obligaciones. La continuidad del servicio, la seguridad y transitabilidad de la vía serían de responsabilidad de la ANI, según los términos pactados en el Contrato y en virtud de las actuaciones de la ANI.

---

[495] Contestación POB y S&B, ¶¶ 305-307.
[496] Contestación POB y S&B, ¶ 308.
[497] Contestación POB y S&B, ¶¶ 319-325.
[498] Contestación POB y S&B, ¶¶ 333-334, 338-340.
[499] Contestación POB y S&B, ¶ 345.

**(c)    Contrato y Ley Aplicable**

595.    El Tribunal Arbitral precisará primero el marco que regula las obligaciones, para efectos de poder posteriormente presentar su análisis que conllevará a la resolución de la controversia en cuanto a la obligación de O&M de las UFs 4 y 5.

596.    En primer lugar, el Contrato de Concesión establece de forma general el marco de las obligaciones de las Partes. Particularmente, la Sección 4.2 establece las principales obligaciones durante la Fase de Preconstrucción[500]. El literal (p) establece que el Concesionario, al recibir la infraestructura, asume las obligaciones de resultado que se prevén en el Contrato de Concesión y sus Apéndices. Además, el literal (v) establece que el Concesionario debe efectuar la O&M del Proyecto, conforme a los requisitos previstos en el Apéndice Técnico 2 y cumplir con el nivel de Servicio Mínimo de la infraestructura prevista para esta Fase de Preconstrucción. Así, las obligaciones de O&M están definidas de forma precisa y especial en el Apéndice Técnico 2.

597.    En segundo lugar, la Sección 13.1(a)(i) del Contrato de Concesión, en cuanto a los riesgos asignados al Concesionario, establece que la obligación de O&M de la infraestructura -aun en la Etapa Preoperativa- es de resultado, y que los efectos favorables o desfavorables derivados de las condiciones de la infraestructura, no reducirán esta obligación.

598.    En tercer lugar, el Apéndice Técnico 1, en su numeral 4.3, define lo que es una Intervención Prioritaria, y establece, en el literal (c), que las Intervenciones Prioritarias no serán consideradas intervenciones tal y como se establecen en la Parte General y el Apéndice Técnico. Así mismo, enumera en qué consisten dichas Intervenciones Prioritarias, a saber:

---

[500] Réplica a la Contestación en la Reconvención, par. 124.

4.3    Intervenciones Prioritarias

(a)    Para el cumplimiento de los niveles de servicio mínimos para la Etapa Preoperativa establecidos en el Apéndice Técnico 2, el Concesionario deberá adelantar todas las actividades que de acuerdo con el estado de la técnica sean necesarias para tal efecto. Dichas actividades se denominarán Intervenciones Prioritarias, las cuales podrán incluir, entre otras, las siguientes:

(i)    Parcheo y/o bacheo.
(ii)   Señalización vertical
(iii)  Señalización horizontal
(iv)   Remoción de derrumbes
(v)    Limpieza de márgenes y separadores
(vi)   Limpieza de obras de drenaje

(b)    Para el cumplimiento de los niveles de servicio mínimos en la infraestructura del Proyecto que no estén pavimentadas, las Intervenciones Prioritarias podrán incluir, entre otras, las siguientes:

(i)    Conformación de la calzada existe
(ii)   Señalización vertical
(iii)  Remoción de derrumbes
(iv)   Limpieza de márgenes y separadores.
(v)    Limpieza de obras de drenaje.

599.    En cuarto lugar, de forma concreta, el Apéndice Técnico 2 contiene las obligaciones del Concesionario en materia de O&M. La parte 3 establece la obligación de Operación. Especialmente, regula en el numeral 3.1 los principios generales de la Operación del Proyecto, a saber: la continuidad del servicio (numeral 3.1.1); la regularidad (numeral 3.1.2); y la seguridad vial (numeral 3.1.5). Así mismo, de forma relevante a la pretensión reconvencional sobre el incumplimiento de la obligación de O&M[501], el numeral 3.3 regula las obligaciones particulares de Operación. A saber: la Operación de la vía durante la Etapa Preoperativa (numeral 3.3.1); la atención de incidentes, accidentes y emergencias (numeral 3.3.3.1); y la seguridad vial (numeral 3.3.7).

600.    En quinto lugar, el Apéndice Técnico 2, en el numeral 3.3.1, establece: "será obligación del Concesionario cumplir con los niveles de servicio mínimo para la etapa preoperativa que se establecen en la siguiente tabla":

---

[501] Réplica a la Contestación en Reconvención, par. 125,126, 136.

Para los siguientes subsectores no aplicará la medición de los siguientes Niveles de Servicio de la Tabla 1:

| UF | Origen) | Destino | Longitud aproximada origen destino | Nivel de Servicio que no se mide |
|---|---|---|---|---|
| 4 | La Calera | Choachí | 31 Km | Estado de márgenes, separador central. Área de servicio y Corredor del Proyecto |
| | | | | Drenajes Superficiales, longitudinal y trasversal |
| | | | | Señalización Vertical |
| | | | | Baches |
| 5 | Choachí | Cáqueza | 21,27 Km | Estado de márgenes, separador central. Área de servicio y Corredor del Proyecto |
| | | | | Drenajes Superficiales, longitudinal y trasversal |
| | | | | Señalización Vertical |
| | | | | Baches |

601.    De la tabla se evidencia que la medición en cuanto a los Niveles de Servicio Mínimo en las UFs 4 y 5 no requiere la ejecución de Intervenciones Prioritarias.

602.    En sexto lugar, el Acta de EER establece de forma expresa[502]:

> [C]omo consecuencia de la ocurrencia y declaratoria del presente Evento Eximente de Responsabilidad, las Partes acuerdan SUSPENDER desde el 31 de octubre de 2017 el plazo para la ejecución de todas las obras y actividades asociadas a las Intervenciones correspondientes a las Unidades Funcionales 4 y 5 del Proyecto.

603.    También, establece de forma expresa[503]:

> [P]ermaneciendo exigibles y vigentes únicamente: […] obligaciones relacionadas con las Intervenciones Prioritarias según se define en la Sección 4.3 del Apéndice Técnico 1, así como las obligaciones de operación y mantenimiento correspondiente a la etapa preoperativa de acuerdo con la Sección 3.3.1 del Apéndice Técnico 2 del Contrato

---

[502] Acta Evento Eximente de Responsabilidad del 1ro de agosto de 2018 (EER-UF 4&5), pág. 29, par. Segundo.
[503] Ibidem.

de Concesión, siempre que no se encuentren afectadas con la presente declaratoria de EER".

604.    Finalmente, establece que[504]:

[N]o obstante lo anterior, el Concesionario deberá cumplir con las obligaciones contractuales que sean aplicables durante el denominado 'Periodo Especial', siempre y cuando dichas obligaciones no se encuentren afectadas con el EER aquí reconocido.

**(d)    Análisis del Tribunal Arbitral**

605.    En conformidad con el marco obligacional contenido en el Contrato de Concesión, en los Apéndices Técnicos 1 y 2 y en el Acta de EER, el Tribunal Arbitral considera que, a la ANI no le concurre la razón en cuanto a la pretensión de incumplimiento por parte de POB de la obligación de O&M en las UFs 4 y 5.

606.    Es indispensable dejar sentado que la Ley 1508 de 2012 y su decreto reglamentario, invocados por ANI en su Reconvención[505] y aceptados por POB en la respectiva Contestación[506], disponen que[507]:

El estándar de calidad se refiere a las características mínimas inherentes al bien o servicio objeto del contrato, y que el nivel de servicio es la condición o exigencia que se establece para un indicador de gestión para definir el alcance y las características de los servicios que serán provistos.

607.    Así, los niveles de servicio y el estándar de calidad que deben cumplirse para tener derecho a la Retribución son aquellos acordados por las Partes de forma específica en el contrato, ya que "deben responder a las características de cada proyecto"[508]. Por lo tanto, el marco obligacional que rige a POB en cuanto a la O&M es el previsto en el Contrato

---

[504] Acta Evento Eximente de Responsabilidad del 1ro de agosto de 2018 (EER), p. 30, ¶ 2
[505] Demanda ANI, pp. 301-302.
[506] Contestación POB y S&B, ¶ 270.
[507] Demanda ANI, p. 302. También, Contestación POB y S&B, ¶ 271.
[508] Artículo 6 del Decreto 1467 de 2012 citado en la Demanda ANI, p. 302.

de Concesión como se detalló anteriormente, y no aquel establecido en la ley, de forma genérica.

608.    Atendiendo a lo anterior, primero, el marco obligacional no le impone a POB ejecutar obras o actividades más allá de las establecidas en los indicadores de Nivel de Servicio para las UFs 4 y 5.

609.    La tabla 1 - Niveles de Servicio para la Etapa Preoperativa, contenida en el Apéndice Técnico 2, excluye de forma expresa, en cuanto a las UFs 4 y 5, obras o actividades de parcheo/bacheo, señalización vertical; drenajes superficiales, longitudinal y trasversal; y estado de márgenes; separados central; área de servicio y corredor del proyecto[509], dejando entonces como exigibles solo los Niveles de Servicio O4 y O5, según lo prescrito en el numeral 3.3.3.1, atinente al tiempo de atención de incidentes, accidentes y emergencias.

610.    Así mismo, el Apéndice Técnico 2, en el numeral 3.3.1, aclara que[510]:

   Las obligaciones de resultado en materia de operación y nivel de servicio que le son exigibles al Concesionario antes de la suscripción del Acta de Terminación de Unidad Funcional, serán las indicadas en la Tabla 1 - Niveles de Servicio para Etapa Preoperativa.

611.    Por lo anterior, la exclusión de dichas obras y actividades en conformidad con la Tabla 1 - Niveles de Servicio en las UFs 4 y 5, delimita las obligaciones del Concesionario durante la Etapa Preoperativa. Es de estricto entendimiento que, al no ser medido por la ejecución de estas obras o actividades, el Concesionario no ostenta obligación en cuanto a estas.

612.    Es cierto que POB aceptó las obligaciones, de resultado y de carácter permanente, de garantizar la continuidad del servicio vial, la seguridad vial y la transitabilidad del corredor del Proyecto. Empero, estas obligaciones son de carácter general y están condicionadas a las obligaciones particulares de la Etapa Preoperativa. En virtud del

---

[509] Apéndice Técnico 2, pág. 16.
[510] Apéndice Técnico 2, pág. 17 par. 5.

principio en derecho de que lo especial prima sobre lo general, se construye el marco obligacional, y se concluye que POB no ostenta obligación más allá de la atención a incidentes, accidentes y emergencias según los Niveles de Servicio en las UFs 4 y 5.

613.    Las obligaciones de garantizar la continuidad, regularidad, calidad del servicio técnico, seguridad vial e integridad de la vía concesionado son vinculantes, pero son eludibles, contrario a lo que sostiene la ANI, toda vez que el Contrato de Concesión dispone en su texto excepciones, tal y como se evidencia en el Apéndice Técnico 2, en el numeral 3.3.1.

614.    Adicionalmente, las Intervenciones Prioritarias establecidas en el Apéndice Técnico 1, numeral 4.3, constituyen las obras o actividades necesarias para el cumplimiento de los Servicios Mínimos en la Etapa Preoperativa, que, como se entiende, son definidos en el Apéndice Técnico 2 en el numeral 3.3.1, y particularmente en la Tabla 1 – Niveles de Servicio en la Etapa Preoperativa. Por lo tanto, el argumento de que POB no ha cumplido la obligación de Mantenimiento en las UFs 4 y 5, por no haber ejecutado Intervenciones Prioritarias según lo descrito en el Apéndice Técnico 1, numeral 4.3, no tiene sustento en el marco obligacional del Contrato, ya que no son obras o actividades que debía ejecutar POB.

615.    Por otro lado, el Acta de EER de forma expresa y clara decreta que las Intervenciones Prioritarias, según se define en el Apéndice Técnico 1, numeral 4.3, así como las obligaciones de O&M correspondientes a la Etapa Preoperativa de acuerdo con el Apéndice Técnico 2, numeral 3.3.1, no se entienden suspendidas por el EER, siempre que no se encuentren afectadas con la declaratoria del EER. Por ello, POB no tiene obligación de ejecutar obras, sea como Intervenciones Prioritarias o como O&M, si estas están afectadas por el EER.

616.    Al respecto, la ocurrencia de Puntos Críticos en la vía, los cuales afectan la transitabilidad, la seguridad vial, la continuidad y regularidad del servicio, está relacionada con la falta de ejecución de obras de O&M en las UFs 4 y 5 desde el 2017. Empero, dicha falta es consecuencia de la imposibilidad de ejecutar obras por cuenta de

la presencia de los manantiales, es decir, por el acaecimiento del EER, y no es en sí un incumplimiento de obligación alguna por parte de POB.

617.     Además, el perito FTI de POB, en su informe CER-004, sustenta que[511]:

Las actividades necesarias para dar solución a los denominados Puntos Críticos son consideradas como Intervenciones, es decir obras o actividades que requieren la utilización de herramientas en sectores que coinciden con la ronda de protección de los manantiales, que como consecuencia están suspendidas.

618.     El perito FTI de POB opina que la atención a los Puntos Críticos requiere[512]:

Obras de construcción de muros mecánicamente estabilizados, la recuperación de la subrasante mediante la reconstrucción del terraplén, la construcción de drenajes canales y cuentas actividades de estabilización de taludes y obras de protección.

619.     Estas obras van más allá de las actividades en cumplimiento de las obligaciones de O&M establecidas en el Apéndice Técnico 2. Por tanto, POB no ha incumplido sus obligaciones.

620.     Es más, POB cumplió con las obligaciones de O&M, y ejecutó las Intervenciones Prioritarias, tal y como están previstas en el marco obligacional, según lo asevera el perito FTI[513]. POB ha atendido los incidentes, accidentes y emergencias en conformidad con los Niveles de Servicio. A lo cual la ANI no ha argumentado falta o defecto en su prestación, por lo que el Tribunal Arbitral no reconoce incumplimiento alguno.

621.     Finalmente, la ANI no reunió ni presentó pruebas que demuestren el incumplimiento en las diferentes áreas donde se requería realizar obras de O&M, ni prueba que contradijera la prueba pericial de POB, referente a que las actividades requeridas eran de naturaleza tal que se encontraban suspendidas por el EER.

_____

[511] Prueba CER-004, ¶ 7.3.3.-7.3.7.
[512] Prueba CER-004, ¶ 7.3.10.
[513] Prueba CER-004, ¶ 7.3.11.

622.    La carga de la prueba requería que la pretensión se formulara con precisión. La ANI no presentó con precisión la pretensión en cuanto a los incidentes que requerían atención por parte de POB. Tampoco presentó con precisión la pretensión en cuanto a las obras o actividades de O&M esperable de parte de POB. Mucho menos indicó con precisión en qué tramos de la vía de las UFs 4 y 5 POB debía realizar obras de O&M.

623.    Por el contrario, la ANI en su pretensión solo menciona de forma genérica "el deterioro del corredor concesionado"[514], sobre que "la Interventoría del proyecto le ha requerido a POB la implementación de acciones y medidas conducentes a garantizar la seguridad vial"; y que habría "sectores que cuentan con deficiencias en su mantenimiento, así como ejemplo presentamos las comunicaciones CP-PER-9630C-2021, CP-PER-9631C- 2021, CP-PER-9440C-202 y CP-PER-9438C-2021"[515].

624.    Además, la pretensión solo se fundamentó en acompañar como prueba varios reportes de la Interventoría y comunicaciones enviadas a POB por parte de la ANI y de la Interventoría. Pero ni esa prueba demuestra, ni la ANI explica al Tribunal Arbitral de forma detallada, itemizada y concreta, el ámbito del supuesto incumplimiento de POB. Por tanto, la falta de especificidad y de precisión en la formulación de la pretensión se traducen en el no poder satisfacer la carga de la prueba que recae en la ANI.

625.    La ausencia de prueba detallada y segregada de las obras o actividades necesarias para cumplir las Intervenciones Prioritarias, y de atención a los Puntos Críticos, lleva al Tribunal Arbitral a concluir que POB cumplió con sus obligaciones. Los reportes de la Interventoría, que datan de distintos momentos desde el 2018, no son prueba suficiente toda vez que estos no contravienen la afirmación de POB de que incluso había ejecutado obras que van más allá del marco obligacional[516], y no responden a los requerimientos de ejecutar dichas obras a la luz del Acta de EER.

---

[514] Demanda ANI, ¶ 76.
[515] Demanda ANI, ¶ 77.
[516] Contestación POB y S&N, ¶¶ 310-314.

626.     A su vez, tal y como se ha denotado anteriormente, POB presentó una prueba pericial, CER-004, en donde explicó que las obras y actividades requeridas por la ANI y la Interventoría no podían llevarse a cabo por la presencia de los manantiales[517]. Además, en la misma prueba CER-004, POB de forma concreta y detallada presentó actividades u obras que no podían realizarse como consecuencia de la declaración del EER[518].

627.     Esta prueba pericial no fue controvertida por ningún medio probatorio por parte de la ANI. Entonces, la ANI no satisfizo su carga de la prueba al no contravenir si las obras o actividades, que POB supuestamente debía ejecutar, no estaban suspendidas o no podían llevarse a cabo por afectar las zonas de protección de manantiales. Por lo tanto, en ausencia de prueba en contrario, el Tribunal Arbitral entiende que las obligaciones de O&M, en cuanto a lo que fuera necesario para garantizar de forma permanente la continuidad, la seguridad vial y la transitabilidad, y más allá de la atención a incidentes, accidentes y emergencias, se encontraban suspendidas.

628.     El Tribunal Arbitral no encuentra incumplimiento por parte de POB en cuanto a la obligación de O&M en relación con las UFs 4 y 5. Primero, la obligación de O&M en la Etapa Preoperativa está definida por los Niveles de Servicio según consta en la Tabla 1 del Apéndice Técnico 2.

629.     Segundo, la obligación de O&M solo consiste en atención a incidentes, accidentes y emergencias según consta en el numeral 3.3.3.1 del Apéndice Técnico 2.

630.     Tercero, la obligación de resultado y permanente de O&M se encuentra afectada por el EER, que suspendió toda Intervención, Intervención Prioritaria, actividad u obra de O&M que impacten las zonas protegidas por la presencia de manantiales.

631.     Cuarto, POB ha ejecutado las obras necesarias y requeridas en cumplimiento de los indicadores de niveles de servicio O4 y O5.

---

[517] Prueba CER-004, ¶ 7.3.3
[518] Prueba CER-004, ¶¶ 7.3.9-7.3.10.

632.     Quinto, la atención a Puntos Críticos requiere ejecución de Intervenciones, es decir, obras o actividades que impactan las zonas protegidas por la presencia de manantiales, las cuales están suspendidas en virtud del Acta de EER.

633.     Sexto, la ANI no satisfizo su carga de la prueba en cuanto a indicar de manera exacta y detallada los actos de incumplimiento por POB del marco obligacional, y en cuanto a la contravención de la prueba de POB de que las obras requeridas se encuentran suspendidas por el Acta de EER.

634.     Por tanto, el Tribunal Arbitral desestima la pretensión reconvencional de la ANI referente a la obligación de O&M de POB en las UFs 4 y 5.

**3.  RECLAMACIÓN DE INTERESES POR MORA EN EL PAGO TOTAL DE LOS FONDEOS DE LA SUBCUENTA DE SUPERVISIÓN E INTERVENTORÍA**

**(a)  Posición de la ANI**

635.   La Demandada reclama, a título de indemnización de perjuicios los intereses por la mora de POB por el no pago de las obligaciones de fondeo 5, 6, 7 y 8 de la Subcuenta de Interventoría y Supervisión[519].

636.   La Demandada señala que, con la suscripción del Contrato de Concesión, POB asumió la obligación de constituir un Patrimonio Autónomo de conformidad con la Sección 1.114 de la Parte General del Contrato de Concesión por medio de un contrato de fiducia mercantil. Por su parte, la Sección 3.14 de la Parte General del Contrato, establece que el referido Patrimonio Autónomo debe estar conformado por las siguientes cuentas: (i) Cuenta Proyecto y (ii) Cuenta ANI. En la Cuenta ANI, por su parte, debe existir, entre otras, la Subcuenta de Supervisión e Interventoría que debe ser fondeada por el Concesionario, en los términos establecidos en la Sección 4.5 (e) de la Parte Especial del Contrato de Concesión, de acuerdo con el inicio de cada etapa contractual: (i) Preconstrucción; (ii) Construcción y; (iii) O&M. Agrega la ANI que la Sección 4.5(e) de

---

[519] Demanda de Reconvención, p. 26; Réplica a Reconvención, ¶¶ 171-175.

la Parte Especial del Contrato establece los plazos de fondeo de la Subcuenta de Interventoría y Supervisión en las distintas Fases y Etapas del Contrato[520].

637. Así, respecto de la Fase de Construcción, debe fondearse "[d]entro de los cinco (5) Días siguientes al inicio de cada periodo de trescientos sesenta y cinco (365) Días contados desde la Fecha de Inicio de la Fase de Construcción"[521].

638. Por otro lado, la ANI señala que, de conformidad con la Sección 3.6 de la Parte General del Contrato, que regula los respectivos intereses remuneratorios y de mora, establece que "[l]a tasa de mora aplicable a los pagos debidos por las Partes bajo el presente Contrato será la equivalente a DTF más diez puntos porcentuales (10%), pero en ningún caso una tasa mayor que la máxima permitida por la Ley Aplicable"[522].

639. Así, la ANI señala que, en la medida en que la Fase de Construcción inició el día 15 de diciembre de 2015, los fondeos correspondientes a esta etapa se debían realizar cada vigencia con plazo máximo hasta el 20 de diciembre[523].

640. La Demandada reclama que POB no cumplió la obligación de realizar integralmente los fondeos 5, 6 y el 7, en su totalidad, de la Subcuenta de Interventoría y Supervisión, que corresponden a las vigencias 2018, 2019 y 2020, por lo que se causaron intereses de mora desde la fecha límite contractualmente establecida para su cumplimiento, 20 de diciembre de cada vigencia, hasta el 19 de noviembre de 2021[524], y luego actualizado al 22 de julio de 2022[525].

641. La Demandada calcula el interés moratorio de cada una de esas cuentas de la siguiente manera:

---

[520] Demanda de Reconvención, pp. 55-56; ¶ 150; Demanda de Reconvención, pp. 330-335.
[521] Demanda de Reconvención, ¶ 152.
[522] Demanda ANI, p. 58; Demanda ANI, p. 337
[523] Demanda ANI, ¶ 153; Demanda ANI, pp. 335-336.
[524] Demanda ANI, ¶ 154.
[525] Réplica ANI, ¶ 171.

Case 1:25-cv-01099-JDB    Document 1-2    Filed 04/11/25    Page 409 of 478

642. El fondeo 5 por la suma de COP $12.978.956.112 correspondiente a la Fase de Construcción debía ser pagado el 20 de diciembre de 2018, sin embargo, POB realizó 2 abonos parciales: (i) el 13 de abril de 2019 por el valor de COP $4.402.734.901 y (ii) el 7 de diciembre de 2020 por la suma de COP $8.576.118.353. En ese sentido, la ANI argumenta que POB debe, en virtud de la obligación de realizar el fondeo 5, la suma de COP $3.180.932.398 que corresponden a capital más intereses de mora[526].

643. El fondeo 6 por la suma de COP $13.478.596.227 correspondiente a la Fase de Construcción debía ser pagado el 20 de diciembre de 2019, sin embargo, POB realizó 1 abono parcial por el valor de COP $4.572.309.472. Teniendo en cuenta el abono realizado por POB, el cálculo de intereses moratorios al 19 de noviembre de 2021 corresponde a la suma de COP $2.960.022.269, para un total de capital más intereses de COP $11.866.309.024[527].

644. El fondeo 7 por la suma de COP $13.679.069.843 correspondiente a la Fase de Construcción debía ser pagado el 20 de diciembre de 2020, sin embargo, POB no ha realizado ningún pago por este concepto, por lo que se han causado unos intereses moratorios de COP $1.507.505.276[528].

645. En total, y por este concepto, la Demandada considera que POB adeuda un total de COP $15.186.575.119[529].

---

[526] Demanda ANI, ¶ 155; Escrito Post Audiencia de la Demandada, ¶ 160.
[527] Demanda ANI, ¶ 156; Escrito Post Audiencia de la Demandada, ¶ 161.
[528] Demanda ANI, ¶ 157; Escrito Post Audiencia de la Demandada, ¶ 162.
[529] Demanda ANI, ¶ 157; Escrito Post Audiencia de la Demandada, ¶ 162.

646. La Demandada argumenta que estos montos son debidos por POB a la ANI de conformidad con lo dispuesto en los artículos 1602[530], 1605[531], 1608[532], 1615[533], 1617[534] y 1625[535] del Código Civil, así como en jurisprudencia de la Corte Suprema de Justicia y del Consejo de Estado sobre la constitución de la mora[536].

647. Así, considerando que POB tenía la obligación de fondear estas cuentas, que se trata de una obligación de entregar una suma de dinero en favor de la ANI, la Demandada concluye que el incumplimiento de esta obligación implica el deber de indemnizar los intereses moratorios[537].

648. La Demandada rechaza los argumentos de POB en respuesta a esta reclamación.

649. En primer lugar, la ANI afirma que sí tiene legitimación activa en relación con los fondeos de la Subcuenta de Supervisión e Interventoría. La Demandada argumenta, en base a jurisprudencia del Consejo de Estado y de la Corte Constitucional, que está legitimado en la causa por activa quien tiene la vocación para reclamar la titularidad de

---

[530] Código Civil, artículo 1602: "Todo contrato legalmente celebrado es una ley para los contratantes, y no puede ser invalidado sino por su consentimiento mutuo o por causas legales".

[531] Código Civil, artículo 1605: "La obligación de dar contiene la de entregar la cosa; y si ésta es una especie o cuerpo cierto, contiene, además, la de conservarla hasta la entrega, so pena de pagar los perjuicios al acreedor que no se ha constituido en mora de recibir".

[532] Código Civil, artículo 1608: "El deudor está en mora: 1o.) Cuando no ha cumplido la obligación dentro del término estipulado; salvo que la ley, en casos especiales, exija que se requiera al deudor para constituirlo en mora. 2o.) Cuando la cosa no ha podido ser dada o ejecutada sino dentro de cierto tiempo y el deudor lo ha dejado pasar sin darla o ejecutarla 3o.) En los demás casos, cuando el deudor ha sido judicialmente reconvenido por el acreedor".

[533] Código Civil, artículo 1615: "Se debe la indemnización de perjuicios desde que el deudor se ha constituido en mora, o, si la obligación es de no hacer, desde el momento de la contravención".

[534] Código Civil, artículo 1617: "Si la obligación es de pagar una cantidad de dinero, la indemnización de perjuicios por la mora está sujeta a las reglas siguientes: 1a.) Se siguen debiendo los intereses convencionales, si se ha pactado un interés superior al legal, o empiezan a deberse los intereses legales, en el caso contrario; quedando, sin embargo, en su fuerza las disposiciones especiales que autoricen el cobro de los intereses corrientes en ciertos casos. El interés legal se fija en seis por ciento anual. 2a.) El acreedor no tiene necesidad de justificar perjuicios cuando solo cobra intereses; basta el hecho del retardo. 3a.) Los intereses atrasados no producen interés. 4a.) La regla anterior se aplica a toda especie de rentas, cánones y pensiones periódicas".

[535] Código Civil, artículo 1625: "Toda obligación puede extinguirse por una convención en que las partes interesadas, siendo capaces de disponer libremente de lo suyo, consientan en darla por nula. Las obligaciones se extinguen además en todo o en parte: 1o.) Por la solución o pago efectivo".

[536] Demanda ANI, pp. 324-329.

[537] Demanda ANI, pp. 336-337.

un derecho otorgado por la ley o quien tiene la titularidad para reclamar el interés jurídico que se debate en el proceso[538].

650. Para el caso concreto, la Demandada argumenta que, de conformidad con la Sección 2.6(A)(8) de las declaraciones y garantías de las Partes, específicamente el Concesionario declara y garantiza que es consciente de que el único beneficiario de la Cuenta ANI es la misma ANI. En concordancia, también la Sección 3.14 de la Parte General del Contrato establece que el beneficiario único de la Cuenta ANI es la misma ANI. Reitera la Demandada que POB tenía la obligación de efectuar los fondeos de conformidad con los términos establecidos en la Sección 4.5(e) de la Parte Especial del Contrato, y que en la Sección 3.6 de la Parte General del Contrato las Partes acordaron los intereses moratorios y la tasa aplicable[539].

651. Así, la ANI concluye que, en cuanto único beneficiario de las Cuentas ANI—que incluye la Subcuenta de Supervisión e Interventoría—se encuentra legitimada para proceder con el cobro de los intereses moratorios pactados en el Contrato, como consecuencia de los incumplimientos de fondeo de POB[540].

652. En segundo lugar, la Demandada reitera que POB incumplió sus obligaciones contractuales en materia de fondeo de la Subcuenta de Supervisión e Interventoría[541], por lo que POB adeuda los intereses moratorios, cuyo monto actualiza a la fecha de 7 de julio de 2022, fecha de la presentación de su Réplica[542].

**(b)    Posición de POB y S&B**

653. Las Demandantes rechazan las reclamaciones de las sumas e intereses moratorios de los fondeos de la Subcuenta de Supervisión e Interventoría.

---

[538] Réplica ANI, ¶¶ 146-151.
[539] Réplica ANI, ¶¶ 152-155.
[540] Réplica ANI, ¶¶ 156-160.
[541] Réplica ANI, ¶¶ 162-170.
[542] Réplica ANI, ¶¶ 171-176.

654. En primer lugar, por cuanto POB señala que habría cumplido con sus obligaciones contractuales de fondeo de la Subcuenta de Supervisión e Interventoría, por lo que no se cumpliría el primero de los requisitos de la responsabilidad contractual que reclama la ANI[543].

655. En segundo lugar, por cuanto la ANI no habría sufrido un daño indemnizable, por lo que este requisito de la responsabilidad civil tampoco se cumpliría.

656. Las Demandantes argumentan que, con esta reclamación, la ANI busca reclamar para sí unos recursos que le corresponderían al Patrimonio Autónomo. Argumenta POB que, de conformidad con la ley aplicable, en particular el artículo 1233 del Código de Comercio, los patrimonios autónomos son una institución jurídica en virtud de la cual, por medio de un contrato de fiducia celebrado con una entidad fiduciaria, se crea un centro de derechos con un patrimonio independiente del de las partes involucradas en el contrato de fiducia[544].

657. POB argumenta que su obligación consistía en constituir dicho patrimonio y en relación con la Subcuenta de Supervisión e Interventoría, que hace parte de la Cuenta ANI del Patrimonio Autónomo, el Contrato dispone que (i) el origen de los recursos son los fondeos que le corresponden al Concesionario; y (ii) la destinación de dichos recursos es "la atención de los pagos al Interventor y a la Supervisión del Contrato" mas no el patrimonio de la ANI. La obligación específica de POB era realizar aportes a la Subcuenta de Supervisión e Interventoría del Patrimonio Autónomo, en los términos de las Secciones 3.14.(i)(iv)(1) de la Parte General y 4.5(e) de la Parte Especial[545].

658. En este sentido, y considerando que la obligación de pago del POB era al Patrimonio Autónomo y no al patrimonio de la ANI, las Demandantes concluyen que la Demandada no tiene legitimación activa para el reclamo de estos valores[546].

---

[543] Contestación POB y S&B, ¶¶ 412-414.
[544] Contestación POB y S&B, ¶¶ 420-421.
[545] Contestación POB y S&B, ¶¶ 423-425.
[546] Contestación POB y S&B, ¶¶ 427-429.

659.  En tercer lugar, POB alega que la ANI pretende beneficiarse de su propia culpa o dolo, por cuanto el reclamo estaría basado en sus propios incumplimientos contractuales en relación con la estructuración del Proyecto y la superación del EER. Estos incumplimientos habrían tenido como consecuencia que el valor de los fondeos previsto en el Contrato resulte desproporcionado y perjudicial para POB. Las labores de POB que los incumplimientos de la ANI permiten ejecutar a partir de septiembre de 2018 conducen a que las labores de la Interventoría sean tan reducidas que de ninguna forma se justifica mantener un fondeo como el previsto para dicha subcuenta en la Fase de Construcción[547].

660.  En la Dúplica a la Reconvención, las Demandantes argumentan que, a partir de los documentos exhibidos por la misma ANI en el Arbitraje, no había justificación técnica para no reducir el monto del fondeo de la Subcuenta de Supervisión e Interventoría. Por el contrario, y basadas en la Prueba CER-008: Dictamen Pericial de Fondeos de JS Held, argumentan que la ANI debió realizar una reducción de entre 64 y 69% del valor de dicho fondeo. Ello coincidiría con el argumento de POB de que el valor del fondeo debe ser el de la Etapa de O&M (aproximadamente 66% de reducción frente al valor de dicho fondeo en la Fase de Construcción)[548].

661.  En cuarto lugar, las Demandantes alegan que los daños pretendidos por la ANI están incorrectamente liquidados, por dos razones.

662.  Primero, por cuanto la ANI estaría usando la tasa indebida para calcular los intereses moratorios. POB señala que la ANI se basa en la Sección 3.6(a) de la Parte General del Contrato para sostener que los intereses moratorios aplicables en este caso deben calcularse con una tasa de DTF + 10 puntos porcentuales. Según POB, esta tasa no sería aplicable, por cuanto se refiere a los pagos debidos por las Partes, mas no a la obligación de efectuar los aportes a la Subcuenta de Supervisión e Interventoría, los que deben regirse por las normas de la fiducia mercantil[549]. Agrega POB que, en la medida en la que los intereses moratorios constituyen una sanción frente a un incumplimiento, no

[547] Contestación a la Reconvención, ¶¶ 430-432.
[548] Dúplica POB y S&B, ¶¶ 111-113.
[549] Contestación POB y S&B, ¶¶ 436-440.

172

puede admitirse una interpretación amplia o extensiva de las normas que prevean intereses moratorios[550]. POB destaca que la ANI no tiene un derecho a recibir rendimientos sobre los valores que se destinan a la Subcuenta de Supervisión e Interventoría. En efecto, de conformidad con el Contrato, los rendimientos de dicha subcuenta tienen como destinación la Subcuenta de Obras Menores del Patrimonio Autónomo[551].

663. Segundo, por cuanto la ANI calcula intereses sobre intereses, lo que sería contrario a la ley aplicable y lo dispuesto en el artículo 886 del Código de Comercio[552].

**(c)    Análisis del Tribunal Arbitral**

664. El Tribunal Arbitral nota que esta reclamación reconvencional de la ANI es la contracara la reclamación de POB relativa a las pérdidas derivadas por la no reducción de los montos de fondeos de la Subcuenta de Supervisión e Interventoría.

665. En este sentido, y como ya se analizó y resolvió en la Sección IV.B.3 de este Laudo, el Tribunal considera que era lógico y razonable que los montos de los fondeos de esta subcuenta se redujeran, de acuerdo a las necesidades del Proyecto, la imposibilidad de efectuar Intervenciones en las UFs 4 y 5; la reducción de los montos mensuales del Contrato de Interventoría en la Fase de Construcción, y sumado a todo ello, que dichos hechos son imputables a la ANI y no a POB.

666. En consecuencia, el Tribunal Arbitral estima que corresponde rechazar esta reclamación reconvencional de la Demandada, declarando que POB no tiene la obligación contractual de realizar los mayores fondeos a la Subcuenta de Interventoría y Supervisión que los ya realizados.

---

[550] Contestación POB y S&B, ¶ 441.
[551] Contestación POB y S&B, ¶ 442.
[552] Contestación POB y S&B, ¶¶ 444-447.

### D.    EFECTOS QUE PRODUCE SOBRE EL CONTRATO LA DECISIÓN SOBRE LOS INCUMPLIMIENTOS ALEGADOS POR LAS PARTES

667.    En las secciones anteriores se ha concluido que mientras la ANI incumplió sus obligaciones contractuales, POB, en cambio, cumplió con las suyas.

668.    Sin embargo, tal como señala POB, los incumplimientos de la ANI llevaron a la imposibilidad de ejecutar las Intervenciones en las UFs 4 y 5 y solicita que se declare que no está obligada a ejecutarlas, mientras subsiste el resto del Contrato. Por otro lado, la ANI solicita al Tribunal Arbitral que declare la Terminación Anticipada del Contrato de conformidad con lo dispuesto en la Sección 14.1(e) del mismo.

669.    La decisión sobre los incumplimientos de las Partes genera impactos respecto de las pretensiones de las Partes, por cuanto el Tribunal Arbitral estima que el Contrato no puede continuar de forma escindida, por lo que da lugar a la pretensión de Terminación Anticipada de la ANI, pero por incumplimientos de la misma ANI, según se analiza a continuación.

### 1.    EFECTOS DEL ACTA DE EER RESPECTO DE LAS UFS 4 Y 5 SEGÚN LAS DEMANDANTES Y PETICIONES CONCRETAS DE POB

### (a)    Posición de POB y S&B

670.    Las Demandantes señalan que los incumplimientos contractuales y legales de la ANI relativas a su deber de planeación y estructuración del Proyecto, así como el repudio de las actividades del Acta de EER de las UF 4 y 5 llevaron a la imposibilidad de ejecutar las Intervenciones en dichas UF. Señalan que dicha imposibilidad de ejecutar las Intervenciones en las UFs 4 y 5 le dan derecho a las Demandantes a la indemnización de perjuicios solicitada en el presente Arbitraje[553].

671.    En este sentido, las Demandantes solicitan en su demanda que el Tribunal Arbitral declare que (i) POB no está obligado a ejecutar las Intervenciones en las UFs 4 y 5

---

[553] Demanda POB, ¶ 335.

relativas a la Fase de Construcción (lo que implicaría señalar que POB solo está obligada a ejecutar las otras actividades que no sean de construcción, como por ejemplo las actividades de O&M) y (ii) las obligaciones del Concesionario durante la Fase de Construcción del Contrato de Concesión se agotan y entienden culminadas con la suscripción de las Actas de Terminación de Unidad Funcional de las Unidades Funcionales 1, 2 y 3[554].

672.    Las Demandantes argumentan estas pretensiones, invocando los motivos por los cuales no procede la Terminación Anticipada del Contrato en los términos solicitados por la ANI, por lo que el Tribunal Arbitral se referirá a ambas pretensiones en conjunto.

673.    En cualquier caso, POB ha aclarado que, contrariamente a la caracterización hecha por la Demandada, POB no busca "desafectar" las UFs 4 y 5, sino que, busca que se declare que no se encuentra obligada a ejecutar las Intervenciones en dichas UFs, como consecuencia de los incumplimientos de la ANI, según se solicitó en la Demanda.

**(b)    Posición de la ANI**

674.    La ANI se opone al pedido de las Demandantes a "desafectar" las UFs 4 y 5, declarando que POB no está obligada a ejecutarlas. Señala que esa desafectación "es inviable en el ordenamiento jurídico colombiano y contraviene los principios de la contratación estatal"[555]. Resalta la importancia de las UFs 4 y 5 para la naturaleza del objeto del Contrato, dado que tienen una mayor envergadura e influencia en relación con el alcance físico del Proyecto y el esquema de Retribución pactado[556].

675.    La entidad señala que desafectar las UFs 4 y 5 del Proyecto supondría vulnerar principios de la contratación estatal contenidos en la Constitución Política, Ley 80 de 1993 y, específicamente iría en detrimento de la igualdad y selección objetiva de los oferentes[557].

---

[554] Demanda POB, ¶¶ 575 (ii) y 575(iii).
[555] Contestación ANI, ¶ 85.
[556] Contestación ANI, ¶ 86.
[557] Contestación ANI, ¶ 96.

676.    La Demandada insiste que las obligaciones de la Fase de Construcción son de resultado, con lo cual las obligaciones del Concesionario no pueden agotarse con la sola terminación de las UFs 1, 2 y 3, dado que el Proyecto se devendría en otro completamente distinto, quebrantando así los "principios de igualdad y selección objetiva, inherentes a la contratación estatal"[558].

## 2.    EFECTOS DEL ACTA DE EER SEGÚN LA ANI Y PETICIONES CONCRETAS DE LA ANI; EN PARTICULAR, SOBRE LA PETICIÓN SUBSIDIARIA DE TERMINACIÓN ANTICIPADA

### (a)    Posición de la ANI

677.    Como ya se ha explicado en detalle, la ANI niega que la Actividad 1 relativa al Acta de EER se encuentre agotada.

678.    Sin embargo, la ANI señala de que, en subsidio, y en caso de que el Tribunal Arbitral considere que la Actividad 1 se encuentra efectivamente agotada, y para el caso que se rechacen las pretensiones de incumplimientos de POB relativas a sus obligaciones de superación del EER en las UFs 4 y 5, solicita al Tribunal Arbitral que declare la Terminación Anticipada del Contrato de conformidad con lo dispuesto en la Sección 14.1(e) del mismo[559].

679.    La ANI señala que la posibilidad de terminar anticipadamente el Contrato se encuentra prevista en la Sección 14.1(e) del Contrato[560]. Indica que, dado que han transcurrido 730 días desde el plazo original de terminación de las Unidades Funcionales afectadas, sin que se haya superado el EER -no siendo, así mismo, viable ejecutar la Actividad 2, debido a que cambiar el trazado original modificaría el propósito del Contrato, lo cual es prohibido por la jurisprudencia de la Corte Constitucional y el Consejo de Estado- correspondería dar lugar a la Terminación Anticipada del Contrato de Concesión por esta causa[561].

---

[558] Contestación ANI, ¶ 99.
[559] Reconvención, pp. 27-31.
[560] Contestación ANI, ¶ 331.
[561] Contestación ANI, ¶ 20 (ix) - Prueba 8.1.1.1.

680.    De este modo, la solicitud de terminación de la ANI se plantea como alternativa en caso de que no se resuelvan a su favor sus pretensiones relativas a incumplimientos de POB en la gestión del EER de las Unidades Funcionales 4 y 5, y se basaría en la imposibilidad de realizar ajustes en el alcance del Contrato que alteren su objeto original, citando al efecto la Sección 14.1(e) del Contrato de Concesión 002 de 2014[562].

681.    Según la ANI, la Actividad 1 del Acta EER, que involucra la elaboración y presentación de medidas y obras de mitigación ante las autoridades ambientales, no ha concluido, ya que dichas autoridades no han rechazado la posibilidad de continuar el Proyecto según el trazado original, por lo que en su criterio aún existiría la opción de mantener el Proyecto en su trazado original si se encuentran Medidas de Mitigación aceptables, en colaboración con las autoridades ambientales, gubernamentales y de control, tal como ha ocurrido en otros proyectos similares[563].

682.    La ANI informa que el 16 de junio de 2021, se decidió que las Autoridades Ambientales Regionales sostendrían una mesa de trabajo con la Autoridad Nacional de Licencias Ambientales (ANLA), en la cual la ANLA presentó el sustento jurídico y técnico para autorizar intervenciones similares. Como resultado, se determinó la necesidad de presentar medidas de manejo ambiental para permitir la viabilidad de las intervenciones en las rondas hídricas de los manantiales en las UFs 4 y 5.

683.    En este contexto, la ANI le solicitó a POB que elaborara y presentara dichas medidas de manejo a las Corporaciones competentes para viabilizar el trazado original. Sin embargo, según la ANI, POB no ha respondido de manera definitiva a esta solicitud, lo que ha impedido obtener los permisos ambientales necesarios para ejecutar las intervenciones en las UFs 4 y 5 de acuerdo con el alcance acordado en el Contrato. En resumen, la ANI sostiene que la Actividad 1 del Acta EER aún no se ha completado debido a la falta de presentación de las alternativas ambientales requeridas por POB[564].

---

[562] Contestación ANI, ¶ 330-331.
[563] Contestación ANI, ¶ 332-333.
[564] Contestación ANI, ¶ 334-336.

684.    La ANI presenta comunicaciones de las Autoridades Ambientales competentes, CAR y Corporinoquía, que han sido recibidas por la Entidad. Estas comunicaciones contendrían pronunciamientos relevantes sobre el proceso ambiental relacionado con las intervenciones en las UFs 4 y 5, y no indicarían un rechazo explícito de las medidas de mitigación presentadas por el Concesionario[565].

685.    Por parte de Corporinoquía, se presentaron observaciones, pero no se tiene conocimiento sobre si el Concesionario las atendió o solventó. En cuanto a la CAR, no se evidencia un pronunciamiento final que confirme el rechazo de las Medidas de Mitigación como afirmado por el Concesionario.

686.    A pesar de esto, la ANI niega la postura de POB en cuanto habría realizado todas las gestiones necesarias para mitigar los impactos ambientales en el trazado original del Proyecto y que se debería proceder con la Actividad 2 descrita en el Acta de EER para las UFs 4 y 5, lo que implicaría modificar el trazado de la vía y el alcance del Contrato[566].

687.    Para la ANI, la posición de POB es inadmisible, ya que aún si se considerara que la Actividad 1 del Acta de EER para las UFs 4 y 5 se agotó, la Actividad 2, relativa a la suscripción de un Otrosí modificatorio del Contrato, no ha sido evaluada ni considerada por la Entidad como procedente. Es más, considera que la suscripción del Otrosí no es obligatoria para ellos y no es viable ni desde el punto de vista fáctico ni jurídico, ya que podría desnaturalizar el Contrato y no garantizaría que la situación que llevó a la declaratoria del EER no se repita.

688.    Para la ANI, su única obligación es cumplir con el objeto contractual dentro del marco regulado por la ley y el Contrato, por ende, ante la imposibilidad de superar el EER en las UFs 4 y 5 en los 730 días establecidos en el Contrato, procede aplicar la

---

[565] Contestación ANI, ¶ 337. - Prueba 8.1.34.15, Prueba 8.1.34.16, Prueba 8.1.34.17, Prueba 8.1.34.18, Prueba 8.1.34.19, Prueba 8.1.34.20, Prueba 8.1.34.21.
[566] Contestación ANI, ¶ 338-339.

Terminación Anticipada del Contrato según lo establecido en la Sección (e) del artículo 14.1 del Contrato[567].

689.    La ANI afirma que sus actuaciones siempre han sido guiadas por la buena fe contractual y el interés de ejecutar el Contrato con su alcance y finalidad original[568].

690.    Una muestra de la buena fe es que las Partes comenzaron a explorar alternativas para la ejecución del Proyecto, incluyendo la posibilidad de un trazado alternativo al original propuesto por POB. Cita para ello las negociaciones ocurridas en el marco de comunicaciones alrededor del 10 de octubre de 2019, con el objetivo de elaborar estudios y diseños para encontrar un nuevo trazado para las UFs 4 y 5.

691.    La ANI, al recibir la propuesta de Otrosí, solicitó un concepto a la Interventoría del Proyecto. El concepto, emitido en una comunicación del 18 de noviembre de 2019, concluyó que la propuesta de POB no se ajustaba a los requisitos legales y contractuales establecidos para el Proyecto[569].

692.    De este modo, la afirmación de las Demandantes sobre la supuesta negativa de la ANI a tramitar la firma del Otrosí de estudios y diseños no es precisa, ya que es necesario aclarar lo siguiente[570]:

i) La Actividad 1 del Acta de EER aún no ha concluido.

ii) La suscripción de un documento modificatorio por parte de la ANI, como entidad pública, implica diversos procesos internos y externos, los cuales no han sido completados hasta la fecha.

iii) Las conversaciones previas a la firma de un Otrosí no tienen carácter vinculante.

---

[567] Contestación ANI, ¶ 340-342
[568] Contestación ANI, ¶ 343.
[569] Contestación ANI, ¶ 344-346.
[570] Contestación ANI, ¶ 347.

iv) La modificación de un Contrato Estatal debe respetar límites legales y jurisprudenciales establecidos.

693.    Finalmente, subraya que, aunque se llevaron a cabo discusiones sobre la propuesta de Otrosí presentada por las Demandantes, no se han cumplido todos los requisitos legales, contractuales y procedimientos necesarios para llevar a cabo una modificación contractual de esa envergadura. Por lo tanto, no es exacto afirmar que la única cuestión pendiente respecto a la propuesta de Otrosí era su firma[571].

**(b)    Posición de POB y S&B**

694.    Las Demandantes afirman que el Derecho Colombiano no permite que la ANI solicite la Terminación Anticipada del Contrato en este caso, por cuanto: (i) no se cumplen los requisitos objetivos y temporales establecidos en el mismo; (ii) la ANI no puede finalizar el Contrato sin compensar los perjuicios causados, (iii) la ANI ha actuado de mala fe, y (iv) la Terminación Anticipada tendría por efecto limitar ilegalmente su responsabilidad.[572]

695.    La ANI anunció su intención de buscar la Terminación Anticipada del Contrato basándose en la Sección 14.1(e) del Contrato de Concesión. Esta pretensión se plantea como alternativa en caso de que no se considere completada la Actividad 1, o si se asume que la Actividad 2 está culminada, y si se establece que las gestiones de la ANI en el marco de "Compromiso Colombia" no se ajustan a la Sección 14.2(vi).[573]

696.    Las Demandantes argumentan que esta pretensión debe ser rechazada por dos razones principales: primero, porque no se cumplen las condiciones establecidas por la ANI para su propia pretensión, específicamente por no haberse completado la Actividad 2 según lo establecido en el Acta de EER[574]; segundo, porque la Sección 14.1(e)[575] del Contrato tiene condiciones acumulativas que en este caso no se cumplen, esto es, el

---

[571] Contestación ANI, ¶ 348-349.
[572] Demanda POB y S&B, ¶ 27-28.
[573] Demanda POB y S&B, ¶ 381.
[574] Demanda POB y S&B, ¶ 383.
[575] Demanda POB y S&B, ¶ 384; Prueba C-001: Contrato, Parte General, artículo 14.1(e).

tiempo transcurrido desde el vencimiento del plazo original, la necesidad de una revisión de buena fe entre las Partes sobre la modificación de las Intervenciones, y que posterior a dicha revisión de buena fe, las Partes determinen que no es viable modificar las Intervenciones[576].

697.    En cuanto a la primera condición acumulativa establecida en el Contrato, las Demandantes sostienen que la posición de la ANI debe ser rechazada por cuanto las negociaciones en cuestión no estaban amparadas por la Sección 14.1(e) del Contrato de Concesión ni por la Actividad 2 del Acta de EER, sino por la Sección 14.2(d)(vi) del Contrato y la Actividad 2. Asimismo, resaltan que estas negociaciones tuvieron lugar antes de que se cumplieran los 730 días estipulados por la Sección 14.1(e)[577].

698.    En particular, las Demandantes son enfáticas al señalar que[578]:

> Se debe destacar que estas negociaciones se adelantaron mucho antes de que se cumplieran los 730 días referidos en la Sección 14.1(e). En efecto, las negociaciones adelantadas por las Partes tuvieron lugar entre enero y octubre de 2019, mucho antes de que transcurrieran los 730 días regulados en la Sección 14.1(e) —que, como se vio, finalizaron el 16 de enero de 2021 o cuando menos el 15 de diciembre de 2020.

699.    Para las Demandantes, aceptar lo contrario constituiría una interpretación incorrecta del orden de los factores pactados por las Partes en el Contrato, e iría en contra del Ordenamiento Jurídico Colombiano, al otorgar a la ANI un poder excesivo para solicitar la Terminación Anticipada sin cumplir con sus obligaciones contractuales y asumir que las Partes pueden negociar una revisión del Contrato antes de que se cumpla el plazo de 730 días[579].

---

[576] Demanda POB y S&B, ¶ 383-386.
[577] Demanda POB y S&B, ¶ 387-391.
[578] Demanda POB y S&B, ¶ 388.
[579] Demanda POB y S&B, ¶ 390 y Prueba CL-101: Corte Suprema de Justicia, Sala de Casación Civil, sentencia del 30 de agosto de 2011.

700.    Tampoco se cumple la segunda condición acumulativa del Contrato para que proceda la Terminación Anticipada, pues las Partes no determinaron que sea inviable revisar el alcance de las Intervenciones, incluyendo la posibilidad de desafectar las UFs 4 y 5.

701.    Las Demandantes argumentan que la ANI incurre en una caracterización imprecisa de la realidad al sostener que la Actividad 2 se completó sin llegar a un acuerdo que permita superar el EER de las UFs 4 y 5, lo cual la habilitaría para solicitar la Terminación Anticipada bajo la Sección 14.1(e) del Contrato.

702.    Señalan que la interpretación de la ANI es incorrecta por cuanto desconoce el alcance objetivo de las negociaciones y determinaciones reguladas en la Sección 14.1(e) del Contrato, en cuanto dispone que la Terminación Anticipada solo puede ser solicitada cuando, después de revisar de buena fe el alcance del Contrato, no sea posible modificar el alcance de las Intervenciones.[580]

703.    Agregan que, durante la Licitación, S&B planteó una observación en la que se sostenía que el Concesionario podría solicitar la Terminación Anticipada cuando considerara que no era viable modificar el alcance de las Intervenciones. La ANI respondió que esto no era correcto y que las Partes debían llegar a un acuerdo sobre la imposibilidad de modificar el alcance de las obras luego de una revisión acabada y de buena fe.

704.    Pues bien, las Demandantes afirman que estas negociaciones no se llevaron a cabo en el caso presente, ya que la ANI repudió los términos del Acta de EER y no permitió que las Partes llevaran a cabo las medidas necesarias para evaluar la posibilidad de modificar el alcance de las Intervenciones en las UFs 4 y 5. También afirman que las negociaciones de la Actividad 2 del Acta de EER no estaban dirigidas a determinar si era

---

[580] Demanda POB y S&B, ¶ 392-395.

posible modificar el alcance de las Intervenciones en el sentido de la Sección 14.1(e) del Contrato, por ende, no se cumplió con dicha norma.[581]

705.    Para fundamentar lo anterior, relatan que durante las negociaciones entre enero y octubre de 2019, las Partes discutieron activamente el mecanismo para manejar una situación en la que, después de completar los estudios y diseños estipulados en el Otrosí de Estudios y Diseños, no fuera posible llevar a cabo las Intervenciones en las UFs 4 y 5 debido a circunstancias como un pronunciamiento adverso de las Autoridades Ambientales, problemas financieros o la falta de acuerdo entre las Partes para modificar las UFs 4 y 5 en un plazo predeterminado.[582]

706.    En ese contexto:

a.  El Concesionario propuso establecer un período de 2 meses para que las Partes negociaran de buena fe las modificaciones contractuales necesarias para desafectar las UFs 4 y 5 del Proyecto. La ANI, por su parte, sugirió que se hiciera referencia a la Sección 14.1(e) como regulación en este escenario.

b.  Luego de consultar con sus accionistas, el Concesionario aceptó continuar las negociaciones del Otrosí con el texto propuesto por la ANI, siempre y cuando quedara claro que, si no fuera posible ejecutar las UFs 4 y 5 debido a las condiciones mencionadas previamente, ambas Partes se comprometerían a realizar sus mejores esfuerzos de buena fe para desafectar las UFs 4 y 5 del Proyecto, asegurando el equilibrio económico del Contrato para ambas Partes.

c.  A pesar de que la ANI no respondió directamente a esta comunicación del Concesionario, los términos del Otrosí de Estudios y Diseños acordados por ambas partes incluyen una redacción sobre este punto, en su Cláusula Décima.

d.  La Cláusula Décima del Otrosí de Estudios y Diseños se aplicaría específicamente después de finalizar las gestiones establecidas en dicho Otrosí, que están

---

[581] Demanda POB y S&B, ¶¶ 396-399.
[582] Demanda POB y S&B, ¶ 401.

relacionadas con la determinación de un nuevo posible trazado para las UFs 4 y 5. Este trazado sería sometido a la aprobación de la ANLA (condición i), y sobre la base de este trazado, las Partes analizarían los aspectos financieros (condición ii) y luego negociarían las modificaciones contractuales necesarias para retomar el cumplimiento de las UFs 4 y 5 (condición iii).

e. En consecuencia, queda claro que las Partes previeron esta situación. Sin embargo, debido al repudio del Contrato y del Acta de EER por parte de la ANI, estos estudios y diseños no pueden llevarse a cabo, lo que a su vez impide la configuración del escenario previsto en la Sección 14.1(e) y, por ende, la aplicación de esta Sección en el contexto del EER de las UFs 4 y 5.

707. Finalmente, las Demandantes resaltan que la ANI misma admite que existe un escenario en el que podría ser viable firmar el Otrosí de Estudios y Diseños: si en el marco de "Compromiso Colombia" se determina que la presencia de manantiales impide la ejecución de las Intervenciones en las UFs 4 y 5[583].

708. En cuanto a la última condición acumulativa, esta tampoco se cumple en la opinión de las Demandantes, ya que la ANI no habría actuado con buena fe.[584]

709. La referencia a la buena fe en la Sección 14.1(e) del Contrato establece cómo deben ser las negociaciones entre las Partes como un paso previo para tener el derecho de solicitar la Terminación Anticipada del Contrato. Si las negociaciones no se realizan de buena fe, no se cumple con la condición establecida en esta Sección y, por lo tanto, no se puede aplicar la consecuencia legal prevista en ella.

710. Al respecto, las Demandantes afirman que el actuar alejado de la buena fe de la ANI queda en evidencia especialmente por lo siguiente:

(i) Se abstuvo siquiera de analizar la viabilidad del proyecto de Otrosí de Estudios y Diseños que fue objeto de negociación entre las Partes durante aproximadamente

---

[583] Demanda POB y S&B, ¶ 402.
[584] Demanda POB y S&B, ¶¶ 404-408.

10 meses. Esto, a pesar de haber comunicado a POB que llevaría dicho proyecto de Otrosí a la revisión de sus instancias directivas internas.

(ii) Tomó decisiones unilaterales que iban en contra de lo pactado entre las Partes, sin consultar ni informar a POB.

(iii) Al mismo tiempo, emprendió una serie de acciones para amenazar los derechos contractuales de POB poco después de recibir la Notificación de Arbitraje.

(iv) Tras dos años y supuestamente sin evaluar la viabilidad del Otrosí de Estudios y Diseños, ha sugerido que la solución viable para superar el EER es cambiar la normativa ambiental, algo que nunca fue discutido con POB, o esperar los pronunciamientos de un foro en el que POB no participa ("Compromiso Colombia"). Este cambio de postura de la ANI en relación con las negociaciones con POB constituye una violación de la buena fe que debe regir las relaciones contractuales entre particulares y entidades estatales.

(v) Por último, se aprovecha de los esfuerzos de POB para negociar, basados en la premisa de actuar de buena fe para superar el EER de las UFs 4 y 5, como argumentos para fundar la solicitud de Terminación Anticipada del Contrato.

711.    En resumen, las Demandantes concluyen que la ANI no ha cumplido con las condiciones temporales y objetivas para plantear la Terminación Anticipada del Contrato, a la vez que aparentemente pretende evitar su responsabilidad contractual por incumplimientos, buscando finalizar el Contrato bajo la Sección 14.1(e) para limitar los pagos que debe realizar según la Sección 18.3 del Contrato de Concesión.

712.    Además, las Demandantes puntualizan que en virtud de los resultados adicionales derivados de la ejecución del Otrosí de Estudios y Diseños, las Partes acordaron que llevarían a cabo un análisis de la posibilidad de suscribir una modificación contractual al Contrato de Concesión para alterar el trazado de las UFs 4 y 5, regulando las consiguientes modificaciones contractuales, o bien, tomar la decisión de excluir las UFs 4 y 5 del Proyecto en virtud de lo establecido en la Sección 14.1(e) del Contrato, lo cual simplemente no se cumplió.

713.    Al efecto, el propósito del Otrosí de Estudios y Diseños no consistía en evaluar la viabilidad de modificar las Intervenciones, ni mucho menos excluir las UFs 4 y 5. En cambio, se buscaba llevar a cabo acciones adicionales que permitieran a las Partes tomar decisiones informadas respecto a las UFs 4 y 5. En consecuencia, no es exacto afirmar que las Partes buscaban aplicar la Sección 14.1(e). Más bien, el objetivo era proporcionar a las Partes información objetiva para tomar decisiones adecuadas y bien informadas de acuerdo con la Sección 14.2(d)(vi) y el Acta de EER. Esto tenía como propósito resolver los efectos derivados de los incumplimientos de la ANI en sus obligaciones de planificación[585].

714.    Como se señaló anteriormente, la Sección 14.1(e) establece que antes de solicitar la terminación anticipada, las Partes deben determinar de manera mutua e informada que no es posible modificar las Intervenciones planeadas, incluyendo la desafectación de las UFs 4 y 5. Esta decisión debe basarse en un proceso de negociación en el que las Partes lleguen a un acuerdo, lo cual, según las Demandantes, no ocurrió.

**(c)    Contrato y Ley Aplicable**

715.    La discusión entre las Partes se enfoca en lo establecido en la Sección 14.1.e del Contrato de Concesión que regula el término de este en el caso de un EER. Dicho precepto señala:

> Si se vence el nuevo Plan de Obras modificado al que se refiere la Sección 14.l(d) anterior, o si transcurren setecientos treinta (730) Días contados desde el vencimiento del plazo originalmente previsto para la terminación de la Unidad Funcional afectada -lo que primero ocurra- sin que se logren culminar las Intervenciones correspondientes, se suspenderá el pago de la Compensación Especial correspondiente a dicha Unidad, hasta tanto se haya suscrito el Acta de Terminación de Unidad Funcional. Si la razón de no terminación es un Evento Eximente de Responsabilidad o imputable a la ANI, las Partes de buena fe revisarán el alcance del Contrato para determinar si resulta viable modificar el alcance de las

---

[585] Demanda POB y S&B, ¶ 323.

Intervenciones, incluyendo la posibilidad de modificar o desafectar la Unidad Funcional respectiva -previo recálculo de la Retribución que refleje las modificaciones realizadas, recálculo que se hará por el mutuo acuerdo de las Partes o por el Amigable Componedor. Si no es viable modificar el alcance de las Intervenciones, cualquiera de las Partes podrá solicitar la Terminación Anticipada del Contrato.

(d)    **Análisis del Tribunal Arbitral**

716.    Los principales argumentos de las Demandantes para oponerse a la Terminación Anticipada solicitada por la ANI son los siguientes[586]:

(i) No transcurrieron 730 días después del vencimiento del plazo para la entrega de las UFs 4 y 5 antes de que las Partes adelantaran negociaciones conforme a la Actividad 2;

(ii) Las Partes no determinaron que sea inviable modificar las Intervenciones o desafectar las UFs 4 y 5 del Contrato de Concesión; y

(iii) La ANI no ha actuado de buena fe.

717.    El Tribunal Arbitral analizará cada una de ellas de forma separada.

718.    Primero, las Demandantes señalan que las negociaciones entre las Partes estuvieron amparadas por la Sección 14.2(d)vi del Contrato y por la Actividad 2 del Acta de EER, y no por la Sección 14.1(e) del Contrato. En línea con ello, las negociaciones se habrían desarrollado mucho antes de cumplirse 730 días establecidos en la Sección 14.1(e) del Contrato[587].

719.    Al respecto, la ANI afirma que las UFs 4 y 5 tenían como fecha de término el 15 de diciembre de 2018, o, en subsidio, el 16 de enero de 2019. Los 730 días a partir de esas fechas, transcurrirían el 15 de diciembre de 2020 o el 16 de enero de 2021. A su vez, las

---

[586] Demanda POB y S&B, ¶ 385.
[587] Demanda POB y S&B, ¶ 388.

Demandantes estiman que las negociaciones entre las Partes tuvieron lugar entre enero y octubre 2019, mucho antes de transcurrir estas fechas[588].

720.    Según lo señalado arriba, el período de la Actividad 2 tenía una duración de 2 meses prorrogables por 2 veces, esto es, un total de 6 meses. Las Partes extendieron la Actividad 2, a lo menos, desde enero hasta octubre de 2019. Incluso si se tomara como fecha de inicio formal de la Actividad 2 el día 11 de octubre de 2019, día del envío del Otrosí por POB, los 6 meses a partir de esa fecha terminaban el 11 de abril de 2020. Esta fecha es anterior a la fecha en la que se cumplían 730 días desde que las UFs 4 y 5 debieron haber sido terminadas.

721.    Sin embargo, la Sección 14.1(e) del Contrato no establece una relación de tipo término-inicio entre el término del plazo de 730 días y el inicio de las negociaciones de buna fe. La Sección citada también admite la interpretación de que, en el caso de no terminar las Intervenciones en el plazo de 730 días contados desde el vencimiento del plazo originalmente previsto para la terminación de la Unidad Funcional afectada, debido a un EER, las Partes -sin permanecer en la inactividad a la espera de que transcurran dichos días- deben de buena fe revisar el alcance del Contrato para determinar si resulta viable modificar el alcance de las Intervenciones.

722.    Esta interpretación de la Sección 14.1(e) del Contrato es más acorde al principio de la buena fe contractual. Así, habría sido contrario a la buena fe si una de las Partes se rehusara a iniciar las negociaciones con anticipación a la expiración del plazo de 730 días, invocando que debe transcurrir primero, antes de poder abrirse la negociación.

723.    Las circunstancias particulares del EER estaban perfectamente conocidas por ambas Partes. En particular, es el entendimiento de las Demandantes que la Actividad 1 se encontraba terminada, esto es, que no se contaba con las autorizaciones de las autoridades competentes, con lo cual no se iba a poder ejecutar el Contrato en las condiciones pactadas, siendo necesario revisar su alcance o el alcance de las

---

[588] Demanda POB y S&B, ¶ 388.

Intervenciones. De esta manera, iniciar dichas negociaciones sin esperar el transcurso de 730 días desde el término original de las UFs 4 y 5 habría sido consistente con su entendimiento y el principio contractual de la buena fe.

724.    En efecto, las Demandantes afirman que habían transcurrido 10 meses de negociaciones hasta que, en octubre del año 2019, ellas estuvieron en condiciones de enviar una propuesta formal del Otrosí, momento que le trasladó la oportunidad para pronunciarse a la ANI. Así, en el propio entendimiento de las Demandantes, el proceso de la revisión del alcance del Contrato era un proceso largo que, en este caso en particular, requirió de estudios técnicos de un tercero. La duración y complejidad de ese proceso únicamente confirman que no era necesariamente razonable esperar el transcurso de los 730 días para dar inicio a las negociaciones entre las Partes.

725.    A su vez, en opinión del Tribunal Arbitral, no parece fructífero esperar que, una vez culminada la ronda de las negociaciones contempladas en cumplimiento de la Sección 14.2(d)vi del Contrato, establecidas como Actividad 2 del Acta de EER, las Partes tuvieran que iniciar otra ronda de las negociaciones bajo la Sección 14.1(e) del Contrato, con el mismo objeto y propósito.

726.    A mayor abundamiento, conforme al tenor literal explícito de la Sección 14.1(e) del Contrato, el transcurso de 730 días, sin que se hayan terminado las UFs afectadas, incide directamente en la suspensión del pago de la Compensación Especial, no así, en el inicio de las negociaciones. Con respecto al inicio de la revisión del alcance del Contrato, el tenor literal de la Sección 14.1(e) es más amplio y no condiciona el inicio de la revisión al transcurso previo de los 730 días.

727.    Por las razones señaladas, el Tribunal Arbitral no se encuentra persuadido por la primera oposición de las Demandantes.

728.    Segundo, las Demandantes argumentan que las Partes no habrían determinado que sea inviable modificar las Intervenciones o desafectar las UFs 4 y 5. Al respecto, el Tribunal Arbitral considera que la Sección en análisis no exige un pronunciamiento expreso de las Partes en tal sentido. Así, no se requiere que las Partes, al terminar la

revisión y las negociaciones, emitan una declaración conjunta en la que señalen que no fue posible lograr un acuerdo modificatorio.

729.    Adicionalmente, la Sección 14.1(e) no establece la duración que deben tener las negociaciones. Es decir, las Partes no previeron un plazo específico para desarrollar dichas negociaciones, lo que está acorde a la naturaleza misma de las negociaciones de esta índole.

730.    A su vez, la Sección 14.2(d)vi tampoco establece la duración de las negociaciones. En el Acta de EER, las Partes asignaron a la negociación en el contexto de la Actividad 2 un período máximo de 6 meses. Siendo conservador, es factible empezar el cómputo de ese período a partir del envío de la propuesta del Otrosí por POB, con fecha 11 de octubre de 2019. La ANI no se manifestó favorablemente con respecto a la propuesta del Otrosí, durante ese período, que se extendió hasta el 10 de abril de 2020. El período de 6 meses es un período razonable y acordado por las Partes. Pero el silencio de la ANI que, efectivamente se trata de un comportamiento de mala fe, como se explicará más adelante, también cumple con ser entendido como un rechazo de la propuesta del Otrosí, o el rechazo de la oferta de la modificación del Contrato.

731.    En efecto, las Demandantes le imputan a la ANI el haber repudiado la Actividad 2, esto es, también entienden que la celebración de un Otrosí que negociaron en este contexto no prosperó. Si bien las Demandantes aluden a la existencia de los compromisos informales de la ANI de firmar dicho acuerdo, dichos compromisos siempre permanecerán compromisos informales, especialmente en el caso de una entidad pública, cuyo actuar está sujeto a formalidades adicionales.

732.    El hecho que la oferta formulada por POB no fue aceptada por la ANI, es una indicación de la falta de consentimiento de esta última para poder modificar el alcance de las Intervenciones, el alcance del Contrato o para desafectar las UFs 4 y 5. En otras palabras, no fue viable lograr un acuerdo en esta materia. Así, la modificación del alcance de las Intervenciones o del alcance del Contrato no fue viable.

733.    Para concluir lo anterior, el Tribunal Arbitral también tiene presente la magnitud de las modificaciones que estaban siendo consideradas. En efecto, no se trataba de la posibilidad de trasladar el corredor de las UFs 4 y 5 unos metros. Más bien, la propuesta del Otrosí contemplaba un rediseño significativo del Proyecto y contemplaba la propuesta de trasladar el corredor "al otro lado de la montaña". Justamente la magnitud de las modificaciones es lo que sugiere que, al no haber aceptado la propuesta del Otrosí en un plazo razonable -o en algún momento del pasado- la ANI estimó dicha modificación inviable a la luz del alcance de las Intervenciones y del Contrato.

734.    Por las razones señaladas, el Tribunal Arbitral tampoco se encuentra persuadido por la segunda oposición de las Demandantes.

735.    Tercero, las Demandantes le reprochan a la Demandada el no haber actuado de buena fe a lo largo de las negociaciones, lo que se manifestó en no analizar la viabilidad del proyecto de Otrosí que fue objeto de negociación entre las Partes, tomar acciones para amenazar los derechos de POB; buscar soluciones en el marco de "Compromiso Colombia" del cual POB no participa; y usar los esfuerzos previos de POB para negociar, para fundar la solicitud de Terminación Anticipada del Contrato.

736.    El Tribunal Arbitral encuentra que la falta de una respuesta expresa frente a la propuesta del Otrosí se trata, efectivamente de un comportamiento muy poco colaborativo, que no cumple los mínimos estándares de buena fe en las negociaciones que debieron haber tenido las Partes.

737.    Sin perjuicio de que la ANI actuó de mala fe, en opinión de este Tribunal Arbitral, ello no implica que no pueda darse lugar a la Terminación Anticipada en los términos de la cláusula 14.1(e) del Contrato de Concesión. En efecto, el ejercicio del derecho a solicitar la Terminación Anticipada del Contrato no constituye en sí una infracción a la buena fe, en la medida que se trata de una facultad establecida en el Contrato de Concesión, y en la medida que se encuentren cumplidos los requisitos es posible proceder a la declaración de Terminación Anticipada conforme a esta causal, lo que será corroborado por el Tribunal Arbitral a continuación.

738. Así, el Tribunal Arbitral tampoco se encuentra persuadido por la tercera oposición de las Demandantes, por cuanto, si bien la ANI no actuó de buena fe, este Tribunal igualmente estima que se cumplen los elementos para dar lugar a la Terminación Anticipada según la cláusula 14.1(e) del Contrato de Concesión, la falta de buena fe de la ANI no es óbice para dicha declaración, según veremos.

739. Cuarto, habiéndose descartado las objeciones de las Demandantes, el Tribunal Arbitral realizará un análisis adicional de las causales de la Sección 14.1(e).

740. Para poder solicitar la Terminación Anticipada del Contrato bajo la Sección 14.1(e) de éste, se deben cumplir los siguientes requisitos: i) Debe haber transcurrido el plazo de 730 días desde el vencimiento del plazo previsto para el término de las UFs 4 y 5; ii) ello debe haberse producido en razón de un EER o por "una causa imputable a la ANI"; iii) Habiéndose efectuado de buena fe la revisión del alcance del Contrato, las Partes deben determinar si es posible modificar el alcance de las Intervenciones (incluyendo la posibilidad de modificar o desafectar la UF respectiva); iv) Si no es viable modificar el alcance de las Intervenciones, cualquiera de las Partes puede solicitar la Terminación Anticipada del Contrato.

741. El cumplimiento del requisito i) resulta evidente y autoexplicativo, dado que no está siendo discutido por las Partes que las UFs 4 y 5 se encuentran sin terminar hasta el día de hoy, a fines del año 2024, siendo que sus fechas de término estaban previstas para los fines de 2018 – inicios de 2019.

742. Con respecto al requisito ii), es importante destacar que la Terminación Anticipada del Contrato procede tanto en el caso que la imposibilidad se haya generado producto de un EER o por causas imputables a la ANI. Este Tribunal Arbitral resolvió que la ANI había incumplido sus obligaciones al momento de la estructuración del Proyecto y de la Licitación de este. Al mismo tiempo, las Partes calificaron la presencia de los manantiales como un EER. En otras palabras, la presencia de los manantiales, por un lado, constituye un incumplimiento de la ANI y, al mismo tiempo, es un EER, según la calificación de las propias Partes. En vista de esta doble calificación del fenómeno, cumple con ambos supuestos para la Terminación Anticipada del Contrato, a saber, si la no terminación

hubiera sido causada por la presencia de los manantiales en tanto un EER, o en tanto un incumplimiento de la ANI.

743.    Con respecto al requisito iii), el Tribunal Arbitral nota que, si bien la ANI incumplió su obligación de actuar de buena fe en la negociación, igualmente se cumplen los presupuestos fácticos para dar lugar a la Terminación Anticipada. De hecho, la propia causal de la Sección 14.1 se coloca en la situación de imposibilidad de continuar con la ejecución del Contrato de Concesión se deba a una causa imputable a la propia ANI, como sería precisamente la mala fe y ausencia de cooperación en evacuar una respuesta al Otrosí presentado por las Demandantes, o participar de cualquier otro modo en una negociación a partir de dicha presentación.

744.    En todo caso, el Tribunal considera que la ANI no tenía una obligación de consentir en o autorizar los términos del Otrosí presentado por las Demandantes. El incumplimiento no se produce, a juicio del Tribunal Arbitral, por no haber llegado a un acuerdo sobre este punto, sino por no haber demostrado ninguna actuación que realmente correspondería a la obligación de la ANI de negociar de buena fe con las Demandantes una solución en el contexto de la Actividad 2.

745.    El Tribunal Arbitral aprecia que la propuesta de las Demandantes en su Otrosí contenía propuestas de Intervenciones que no podrían haber sido aceptadas por la ANI pura y simplemente con el fin de modificar el trazado, como veremos a continuación.

746.    En efecto, la Sección 14.1(e) del Contrato se refiere a "alcance" con minúscula. Es decir, no es un término definido en el Contrato. Sin embargo, el Apéndice Técnico 1 del Contrato tiene como título "Alcance del Proyecto". A su vez, "Intervención" es un término definido en el Contrato en la Sección 1.87, señalando: "Tendrá el alcance establecido en el Apéndice Técnico 1".

747.    En otras palabras, cualquier modificación a lo señalado en el Apéndice Técnico 1 significaría también una modificación de las Intervenciones o del alcance del Contrato. El numeral 2.1 del Apéndice Técnico 1 contempla la descripción del recorrido y su

localización, al igual que el detalle de las características técnicas para las UFs 4 y 5[589]. Con ello, al proponer su modificación a través del Otrosí, se proponía la modificación de las Intervenciones.

748. En este contexto es relevante tener presente que el Otrosí propuesto por POB no permitía, a través de su simple aceptación, generar un nuevo trazado para las UFs 4 y 5. Muy por el contrario, la propuesta del Otrosí establecía[590], en lo principal, que el Concesionario iba a contar con un plazo máximo de 14 meses para presentarle a la ANI los siguientes estudios (cláusula primera):

a. Estudios y Diseños de Ingeniería sobre el trazado alternativo que se propone para conectar el municipio de la Calera con la vía Bogotá-Villavicencio y la conexión de éste con la Unidad Funcional 3, Subsector 2. Los anteriores estudios contendrán como mínimo lo dispuesto en el Anexo A de este Otrosí (los "Estudios y Diseños de Ingeniería"). Tal y como se identifica en el Anexo A, la elaboración de los Estudios y Diseños de Ingeniería estará divida en dos etapas, a saber: (i) determinación por parte del Concesionario de la mejor alternativa posible de corredor (la "Etapa 1") y (ii) profundización de estudios sobre el corredor escogido (la "Etapa 2").

b. Estudios complementarios (estudio de tráfico, presupuestos financieros y la propuesta de las nuevas condiciones contractuales) en relación con el trazado alternativo para las Unidades Funcionales 4 y 5, estudios que contendrán como mínimo lo señalado en el Anexo B de este Otrosí (los "Estudios Complementarios").

749. Tal como correctamente lo ha sostenido la ANI a lo largo de este proceso, la sola firma del Otrosí, por sí sola, no hacía viable las Intervenciones.

750. Sin perjuicio de lo anterior, la obligación de negociar de buena fe en el contexto de la Actividad 2 exigía a la ANI haber dado una respuesta tempestiva a las Demandantes sobre su propuesta contenida en el Otrosí, o bien proponer también tempestivamente otras posibles vías de avance o solución, y la ANI no hizo nada al respecto y durante más

---

[589] Prueba C-008.
[590] Prueba C-119.

de 8 meses guardó silencio, lo cual constituye una conducta reprochable que, sumada al incumplimiento de su obligación de detección de los manantiales, es lo que termina inviabilizando el Proyecto relativo a las UFs 4 y 5.

751.     Por otro lado, el Tribunal Arbitral, y por las razones ya señaladas por las que se acogerá la Terminación Anticipada, considera que es inviable jurídicamente declarar que POB no está obligado a ejecutar las Intervenciones en las UFs 4 y 5, y al mismo tiempo ordenar que se mantenga ejecutando otras operaciones (como las de mantenimiento) *ad eternum*. El Tribunal estima que ello no sería una solución que permitiría a las Partes seguir con la adecuada ejecución del Contrato. En efecto, en la medida que las Intervenciones no son susceptibles de realizarse sin iniciar una licitación, la concesión relativa a las UFs 4 y 5 se ha tornado inviable.

752.     Ello, además, se ve corroborado por el hecho de que ambas Partes confirman que el Tribunal Arbitral no podría declarar la terminación parcial del Contrato, ni es lo que ninguna de ellas ha pedido[591].

753.     Por las razones señaladas, el Tribunal Arbitral acogerá la solicitud de la Terminación Anticipada formulada por la ANI, rechazando a su vez las pretensiones de las Demandantes, consistentes en que el Tribunal Arbitral declare que (i) POB no está obligado a ejecutar las Intervenciones en las UFs 4 y 5 relativas a la Etapa de Construcción (lo que implicaría señalar que POB solo está obligada a ejecutar las otras actividades que no sean de construcción, como por ejemplo las actividades de O&M) y (ii) las obligaciones del Concesionario durante la Fase de Construcción del Contrato de Concesión se agotan y entienden culminadas con la suscripción de las Actas de Terminación de Unidad Funcional de las UFs 1, 2 y 3[592].

754.     Ahora bien, es importante destacar que el Tribunal Arbitral acogerá la pretensión de Terminación Anticipada del Contrato de Concesión en virtud de lo dispuesto en la cláusula 14.1(e) del Contrato de Concesión, pero sobre la base de una causa imputable a

---

[591] Escrito post- Audiencia de las Demandantes, ¶ 446; Escrito post-Audiencia de la Demanda, ¶¶ 382-387.
[592] Demanda POB, ¶¶ 575 (ii) y 575(iii).

la ANI. Y es que la razón por la que las Partes no pudieron avanzar en las negociaciones a desarrollarse durante la Actividad 2, se deben a la propia mala fe de la ANI en este punto.

755.    Así las cosas, si bien se acoge la pretensión subsidiaria de Terminación Anticipada interpuesta por la ANI, y se declara la terminación del Contrato, la causal se cumple por cuanto fue la conducta de la ANI la que implicó que transcurrieran los 730 días sin llegar a acuerdos para la superación del EER.

756.    Así, por causa de los incumplimientos de la ANI, es que se declara la Terminación Anticipada de la totalidad del Contrato, por la causal de la cláusula 14.1(e), declarando el Contrato terminado a partir de la fecha de la notificación del presente Laudo.

757.    Sobre este punto, una sentencia arbitral, aportada por las Demandantes se enfrenta a una situación parecida en que (i) se acoge la pretensión en dicho caso de la demandante (concesionario) de que su obligación es o se ha tornado de imposible cumplimiento, pero al mismo tiempo (ii) se señala que se hizo de imposible cumplimiento por su propia culpa, por lo que se deja a salvo su responsabilidad contractual derivada de sus incumplimientos. En este sentido, la decisión del Tribunal de acoger la pretensión de terminación anticipada del Contrato, pero por culpa de la misma ANI, es coherente con este principio y se enmarca dentro del lenguaje de la Sección 14.1(e) de modo que también engendra su responsabilidad contractual, en este caso frente a POB como Concesionario[593].

---

[593] Prueba 8.1.16.25 (TRIBUNAL DE ARBITRAJE DE CONCESIÓN VIAL DE LOS LLANOS S.A.S. v. ANI, pp. 291-292. En dicha Sentencia, el Tribunal Arbitral señala lo siguiente: "En consecuencia, si bien el contratista no puede ser obligado al cumplimiento debido a la imposibilidad de ejecución que se presenta en el caso concreto, esto no significa que quede liberado de su vínculo sin tener que soportar carga patrimonial alguna, pues, se reitera, dicha imposibilidad no le es ajena al concesionario, sino que, por el contrario, es atribuible a su comportamiento. En efecto, acreditado el incumplimiento de sus obligaciones como consecuencia de una deficiente planeación del proyecto y de su estructuración financiera, es claro que la responsabilidad de la concesionaria se ve comprometida y deberá indemnizar los perjuicios que cause a la entidad contratante, en la medida en que se acrediten con los requisitos establecidos en el ordenamiento jurídico para que se puedan considerar como daños resarcibles, aspectos sobre los que ya profundizó el Tribunal cuando analizó las pretensiones indemnizatorias presentadas en este proceso por la ANI y las despachó desfavorablemente. En los anteriores términos, el Tribunal declarará próspera la pretensión, pero en el entendido de que se trata de un supuesto de imposibilidad de cumplimiento, que en todo caso compromete la responsabilidad contractual del contratista por provenir de un hecho que le es imputable".

E.    **COMPENSACIÓN DE LAS DEMANDANTES**

758.    En razón de lo resuelto en las Secciones anteriores, esto es que se acoge la Terminación Anticipada del Contrato, pero por incumplimientos de la ANI, el Tribunal Arbitral debe decidir dos cuestiones fundamentales. En primer lugar, si es que les asiste a las Demandantes el derecho de recibir indemnización de perjuicios como consecuencia de los incumplimientos de la ANI, y, en segundo lugar, en la afirmativa de la cuestión anterior, en qué cuantía le corresponden dichos perjuicios.

1.    ¿LE ASISTE A **POB** UN DERECHO A RECIBIR UNA COMPENSACIÓN O INDEMNIZACIÓN Y EN QUÉ CUANTÍA?

(a)    **Sobre el derecho de las Demandantes de recibir una indemnización por los incumplimientos de la ANI y, además, como consecuencia de la Terminación Anticipada del Contrato**

(i)    Posición de POB y S&B

759.    Las Demandantes afirman que los incumplimientos de la ANI les han causado daños y perjuicios que deben ser indemnizados.

760.    Las Demandantes se refieren al artículo 90 de la Constitución Política que establece que el Estado será responsable por los daños antijurídicos que le sean imputables, causados por la acción o la omisión de las autoridades públicas. Afirman que en esta norma se radica el fundamento constitucional de la responsabilidad patrimonial del Estado[594].

761.    Asimismo, las Demandantes se refieren al artículo 50 de la Ley 80 de 1993, que reitera la disposición constitucional recién transcrita.

---

[594] Demanda POB y S&B, ¶ 447.

762.    En cuanto a la obligación de indemnizar los daños, las Demandantes argumentan que[595]:

> [L]a ANI tiene la obligación de indemnizar plenamente los perjuicios causados a las Demandantes por los incumplimientos descritos previamente, incluyendo el daño emergente y el lucro cesante. Así lo establecen el artículo 90 de la Constitución Política, el artículo 50 de la Ley 80 de 1993 y el numeral 3 del artículo 26 de la Ley 80 de 1993. Además, esto ha sido reiterado en múltiples oportunidades por la Corte Constitucional, el Consejo de Estado y tribunales arbitrales nacionales [citación del original omitida].

763.    Finalmente, aluden a los principios de reparación integral y de los mandatos del Estado de indemnizar los daños antijurídicos que le sean imputables, para sostener que "todo daño probado debe ser indemnizado, con independencia de las controversias probatorias que puedan surgir en torno a su cuantificación"[596].

764.    Las Demandantes destacan la decisión reciente del Consejo de Defensa del Estado, acorde al cual la inejecución de una parte del contrato correspondiente se debe a incumplimientos de la entidad contratante en sus obligaciones relativas a la planeación del contrato[597].

765.    Asimismo, las Demandantes aclaran que no se trata de una petición de indemnización o compensaciones derivadas de un EER, sino más bien dice relación con los incumplimientos de la ANI que impidieron la ejecución de las UFs 4 y 5[598].

766.    Las Demandantes consideran que el Tribunal Arbitral debe desestimar cualquier argumento de la ANI tendiente a limitar su responsabilidad, por cuanto en su entender los perjuicios sufridos por la Concesionaria son consecuencia directa de los incumplimientos de la ANI[599]:

---

[595] Réplica POB y S&B, ¶ 38.iv.
[596] Demanda POB y S&B, ¶ 455.
[597] Demanda POB y S&B, 454; Prueba CL-072.
[598] Demanda POB y S&B, ¶¶ 486-488.
[599] Demanda POB y S&B, ¶¶ 489-493.

a. El primer incumplimiento de la ANI sería el no proporcionar información precisa y completa durante la Licitación, lo cual va en contra de las regulaciones legales que prohíben a las entidades estatales eximirse de responsabilidad por tales asuntos.

b. Lo anterior sería sin perjuicio de que la ANI ha intentado basar su argumento en la Sección 14.2 del Contrato, invocando el concepto de costos ociosos por mayor permanencia en obra, para limitar los perjuicios que las Demandantes pueden reclamar.

767.    Estos incumplimientos no son responsabilidad de las Demandantes y, por lo tanto, la ANI no puede eximirse de su deber legal de restablecer el equilibrio económico del Contrato. Esta obligación de restablecimiento es especialmente relevante ya que la ANI ha incumplido sus propias obligaciones contractuales, lo que ha generado la ruptura de este equilibrio.

768.    En vista de lo expuesto, se considera que la ANI no puede utilizar la Sección 14.2(h) del Contrato para eximirse de su responsabilidad por sus incumplimientos. Esta Sección:

a. No es aplicable a la reclamación de las Demandantes.

b. La interpretación que la ANI busca darle es contraria a normas imperativas de orden público que rigen sus deberes legales como Entidad contratante, por lo que carecería de efectos.

769.    En consecuencia, las Demandantes concluyen que los daños experimentados por POB resultan imputables a la ANI debido a que son una consecuencia directa de los incumplimientos contractuales cometidos por esta última. Tanto la jurisprudencia como la doctrina establecen que, para atribuir daños a entidades públicas en casos de incumplimientos contractuales, es necesario demostrar (i) la existencia de un incumplimiento contractual y (ii) la relación causal entre dicho incumplimiento y los daños buscados[600].

---

[600] Demanda POB y S&B, ¶ 497.

770.    En este caso, ambos elementos están establecidos, ya que la ANI incumplió sus obligaciones contractuales, y POB sufrió una disminución patrimonial y pérdida de ganancias como consecuencia directa de dichos incumplimientos. Por lo tanto, los daños son atribuibles a la ANI y el Tribunal debería ordenar su indemnización.

771.    En todo caso, las Demandantes argumentan que las circunstancias descritas respecto de las UFs 4 y 5 han generado un desequilibrio económico del Contrato, por lo que la ANI tiene la obligación de realizar las compensaciones requeridas para restablecer dicho equilibrio económico[601].

772.    Las Demandantes sustentan lo anterior en una serie de argumentos. Primero, el artículo 27 de la Ley 80 de 1993 —que es aplicable a contratos de APP en virtud del artículo 3 de la Ley 1508 de 2012—, consagra que se debe mantener la igualdad entre los derechos y las obligaciones surgidos al momento de celebrar un contrato estatal[602].

773.    Segundo, se trata de una figura de orden imperativo que pone un límite a la autonomía de la voluntad de las partes. Por ende, "los contratistas siempre pueden ejercer este derecho como un mecanismo legal para solicitar el restablecimiento del equilibrio del contrato"[603].

774.    Tercero, tal y como lo requiere la jurisprudencia del Consejo de Defensa del Estado, en el caso en cuestión, los hechos cumplen con estos requisitos[604]:

    a.  Los manantiales fueron descubiertos después de la firma del Contrato.

    b.  La existencia de los manantiales no es imputable al Concesionario.

    c.  La existencia de los manantiales era imprevisible para el Concesionario.

    d.  La existencia de los manantiales causa un grave perjuicio a las Demandantes.

---

[601] Demanda POB y S&B, ¶ 348.
[602] Demanda POB y S&B, ¶349.
[603] Demanda POB y S&B, ¶351.
[604] Demanda POB y S&B, ¶ 353.

775.    Las compensaciones solicitadas por las Demandantes serían procedentes, ya que las circunstancias e incumplimiento de la ANI han generado un desequilibrio económico del Contrato, por lo que dicha entidad tiene la obligación legal y contractual de compensar. En efecto[605]:

    a.  La ANI incumplió sus obligaciones de estructuración, lo que impidió la ejecución de las Intervenciones en las UFs 4 y 5.

    b.  Para abordar esta situación, las Partes firmaron el Acta de EER, definiendo cómo superar el EER sin exonerar a la ANI de su responsabilidad.

    c.  La ANI pudo solucionar el EER a través de las Actividades 1 y 2 acordadas con POB, pero repudió el Acta de EER y emprendió gestiones alternativas que no resolvieron el problema. Su incumplimiento impide la ejecución de las Intervenciones en las UFs 4 y 5 del Proyecto.

(ii)    <u>Posición de la ANI</u>

776.    En relación con los supuestos perjuicios alegados por las Demandantes debido al presunto incumplimiento de la ANI, la Demandada señala que no se cumplen los requisitos de responsabilidad contractual que les permitirían reclamar indemnización por daños. La ANI argumenta que ha cumplido de manera cabal con todas las acciones, actos y trámites necesarios en relación con la estructuración del Proyecto, las actividades del Acta de EER y los deberes normativos para el cumplimiento de los fines del Estado.

777.    Para establecer la imputación de responsabilidad, se deben analizar dos aspectos: el ámbito fáctico y la imputación jurídica, que incluye distintos títulos de imputación como falla en la prestación del servicio, daño especial, daño anormal y riesgo excepcional. La imputabilidad es un principio esencial en los regímenes de responsabilidad patrimonial del Estado, y se requiere sustento fáctico y atribución jurídica.

---

[605] Demanda POB y S&B, ¶ 355.

778.    Finalmente, la ANI argumenta que las Demandantes no han demostrado la existencia de un daño antijurídico, es decir, una lesión que no debieran soportar. En consecuencia, la ANI argumenta que las Demandantes no cumplen con los requisitos necesarios para alegar perjuicios y que, en realidad, ha sido POB quien ha causado perjuicios a la ANI[606].

779.    La ANI concluye lo siguiente: La ANI ha cumplido plenamente con sus obligaciones relacionadas con el financiamiento de los Aportes ANI en las fechas acordadas contractualmente. Los recursos correspondientes a las Unidades Funcionales 4 y 5 destinados a los Aportes ANI se encuentran disponibles en las Subcuentas designadas para este propósito. No se ha realizado el pago de estos recursos al Concesionario debido a que no se han cumplido los requisitos legales y contractuales necesarios. Estos requisitos incluyen la obtención del Acta de Terminación o Acta de Terminación Parcial de las Unidades Funcionales, así como la disponibilidad de la infraestructura y el cumplimiento de niveles de servicio y estándares de calidad establecidos. En virtud de lo anterior, la reclamación realizada por las Demandantes no procede ni es aplicable. No se cumplen los requisitos para la obtención de los pagos. Desde una perspectiva financiera, el diseño económico del Contrato implica que el Concesionario realice una inversión para recibir un pago a cambio. En este sentido, no sería procedente efectuar un pago o retribución por las Unidades Funcionales en las que no se ha realizado una inversión[607].

780.    La ANI destaca que en el numeral cuarto del Acta del EER, el Concesionario manifestó y aceptó que no reclamaría costos ociosos por mayor permanencia en obra, liberando a la ANI de cualquier reconocimiento por esta causa[608].

781.    La ANI, así mismo, argumenta en contra de la afirmación de las Demandantes de que se habría producido un desequilibrio económico del Contrato, lo siguiente: La ANI sostiene que el acaecimiento de EER en las UFs 4 y 5, afecta a todas las Partes del

---

[606] Contestación ANI, ¶¶ 393-397.
[607] Contestación ANI, ¶ 409.
[608] Contestación ANI, ¶ 678.

Contrato y tiene efectos liberatorios para todas ellas. Esto significa que no se puede alegar un rompimiento del equilibrio económico en perjuicio exclusivo de una de las Partes[609].

782.    La ANI también señala que el esquema de distribución de riesgos previsto en el Contrato establece que POB aceptó asumir los costos generados en caso de materializarse un EER. Por lo tanto, la falta de diligencia de POB en la gestión del EER no justifica la reclamación de desequilibrio económico[610].

783.    La ANI enfatiza que el desequilibrio económico no puede generar perjuicios ni dar lugar al reconocimiento de utilidades. Argumenta que POB ha malinterpretado el concepto y busca una indemnización de perjuicios sin fundamentos válidos[611].

784.    La ANI también destaca que la solicitud de restablecimiento del equilibrio económico presentada por POB es extemporánea y que no se ha demostrado que la negligencia de POB no haya contribuido al desequilibrio.

785.    En resumen, la ANI rechaza las alegaciones de POB sobre un supuesto desequilibrio económico en el Contrato de Concesión, argumentando que los Eventos Eximentes de Responsabilidad afectan a todas las Partes y que el esquema de distribución de riesgos previsto en el Contrato respalda su posición. También destaca que el desequilibrio económico no justifica reclamaciones de perjuicios ni el reconocimiento de utilidades y que la solicitud de restablecimiento del equilibrio económico es improcedente.

786.    En conclusión, según la ANI, no se ha producido el rompimiento del equilibrio contractual alegado por POB, ya que no se han cumplido los elementos que respaldarían esta afirmación. Por lo tanto, no se ha generado ningún perjuicio ni pérdida de utilidad que justifique su reconocimiento a favor de POB. Además, la vía utilizada por POB para

---

[609] Contestación ANI, ¶¶ 768 y siguientes.
[610] Contestación ANI, ¶¶ 788 y siguientes.
[611] Contestación ANI, ¶¶ 793 y siguientes.

plantear estas pretensiones es considerada imprecisa e inadecuada por la ANI, por lo que el Tribunal debería desestimar cualquier reclamación en este sentido[612].

787.    En último término, la ANI argumenta que incluso en el supuesto de que existiera un desequilibrio en el equilibrio contractual, POB no planteó oportunamente ninguna solicitud para restablecer dicho equilibrio. Durante la suscripción de las actas de EER relacionadas con las UFs 2, 4 y 5, POB no presentó ninguna objeción o solicitud para restablecer el equilibrio económico contractual. Esto sugiere su conformidad con las medidas adoptadas en esas actas y su reconocimiento de que esas medidas restauraron el equilibrio contractual, de acuerdo con la jurisprudencia del Consejo de Estado. Por lo tanto, cualquier solicitud en este sentido por parte de POB se considera extemporánea e improcedente según la ANI[613].

(iii)   <u>Contrato y Ley Aplicable</u>

788.    El Tribunal Arbitral observa que el fundamento de la pretensión de las Demandantes se basa, en primer lugar, en que los perjuicios sufridos por POB son una consecuencia directa de los incumplimientos imputables a la ANI, razón por la cual, la ANI tiene la obligación de reparar los daños causados como consecuencia de su actuar antijurídico.

789.    En subsidio, las Demandantes señalan que, en cualquier caso, las situaciones relativas a la imposibilidad de ejecutar las Intervenciones en las UFs 4 y 5 han generado un desequilibrio económico del Contrato, que la ANI debe compensar.

790.    Para estos efectos, el Tribunal Arbitral debe tener en consideración las siguientes disposiciones legales y constitucionales.

791.    El artículo 90 de la Constitución de la República de Colombia, que establece lo siguiente[614]:

---

[612] Contestación ANI, ¶ 796.
[613] Contestación ANI, ¶ 800.
[614] Prueba CL-111: Artículo 90, Constitución Política de Colombia.

204

> El Estado responderá patrimonialmente por los daños antijurídicos
> que le sean imputables, causados por la acción o la omisión de las
> autoridades públicas. En el evento de ser condenado el Estado a la
> reparación patrimonial de uno de tales daños, que haya sido
> consecuencia de la conducta dolosa o gravemente culposa de un
> agente suyo, aquel deberá repetir contra éste.

792.    La Ley 80 de 1993, la cual establece la obligación de restablecer el equilibrio contractual, en caso de que este equilibrio se vea afectado por causas no atribuibles a la parte afectada[615]. Así se establece en el artículo 50 de dicha ley[616]:

> Las entidades responderán por las actuaciones, abstenciones, hechos
> y omisiones antijurídicas que les sean imputables y que causen
> perjuicios a sus contratistas. En tales casos, deberán indemnizar la
> disminución patrimonial que se ocasione, la prolongación de la
> misma y la ganancia, beneficio o provecho dejados de percibir por
> el contratista.

793.    Asimismo, el Tribunal Arbitral tiene en cuenta la siguiente jurisprudencia relevante en que se diferencian tanto los fundamentos como los efectos de la indemnización que se debe, por un lado, como consecuencia de la ruptura del equilibrio económico del contrato, y, por otro lado, como consecuencia de un incumplimiento contractual del mismo.

794.    Así, el Consejo de Defensa del Estado ha señalado:[617]

> La Sección Tercera de esta Corporación ha acogido las teorías
> desarrolladas por la doctrina foránea en torno a las fuentes que dan
> lugar a la ruptura del equilibrio económico – financiero del contrato
> estatal, señalando que éste puede verse alterado por actos y hechos
> de la administración o por factores externos o extraños a las partes
> involucradas en la relación contractual. A los primeros se les
> denomina "hecho del príncipe", y "potestas ius variandi" (álea
> administrativa), mientras que a los supuestos que emergen de la
> segunda fuente se les enmarca dentro de la denominada "teoría de la

---

[615] Demanda POB y S&B, ¶¶ 348-355.
[616] Prueba CL-117: Artículo 50 de la Ley 80 de 1993.
[617] Prueba CL-107.

imprevisión" y paralelamente en la "teoría de la previsibilidad". Lo anterior permite deducir, con absoluta claridad, que puede verse alterado por el ejercicio del poder dentro del marco de la legalidad o por situaciones ajenas a las partes, que hacen más o menos gravosa la prestación; pero, en ningún caso tiene lugar por los comportamientos antijurídicos de las partes del contrato.

El <u>incumplimiento contractual, en cambio, tiene origen en el comportamiento antijurídico</u> de uno de los contratantes, esto es, que asume un proceder contrario a las obligaciones que contrajo al celebrar el contrato y, como efecto principal, causa un daño antijurídico a la parte contraria que, desde luego, no está en la obligación de soportar; además, el <u>incumplimiento genera la obligación de indemnizar integralmente los perjuicios causados a la parte cumplida.</u> [Énfasis añadido]

795.    En esa línea, el Consejo de Estado ha concluido que el incumplimiento contractual de una de las partes da derecho a la otra parte a una reparación integral del daño, lo que no ocurre necesariamente en todas las hipótesis de ruptura del equilibrio económico contractual[618]:

> Ahora bien, aunque la parte demandante solicitó en este juicio la declaratoria de ruptura del equilibrio económico del contrato por los hechos ya descritos, la Sala debe recalcar –como lo ha señalado en anteriores oportunidades - que, si bien el incumplimiento de uno de los contratantes entraña la afectación de los derechos de la parte cumplida, por lo que puede pensarse que el incumplimiento contractual de la administración da lugar al rompimiento del equilibrio económico del contrato (máxime cuando el numeral 1º del artículo 5º de la Ley 80 de 1993 señala el incumplimiento como una de las causas de tal ruptura), es igualmente cierto que el incumplimiento contractual debe manejarse con mayor propiedad bajo la óptica de la responsabilidad contractual, por cuanto se trata de dos "...instituciones distintas en su configuración y en sus efectos" : así, <u>la responsabilidad contractual se origina en el daño antijurídico que es ocasionado por la parte incumplida del contrato, lo que hace surgir a su cargo el deber de indemnizar los perjuicios</u>

---

[618] Prueba CL-072.

ocasionados en forma plena, es decir, que para el afectado surge el
derecho a obtener una indemnización integral, lo que no sucede en
todos los eventos de rompimiento del equilibrio económico del
contrato. [Énfasis añadido]

796.    Con respecto al concepto de daño, el Consejo del Estado ha indicado que[619]:

Para que el daño sea resarcible o indemnizable la doctrina y la
jurisprudencia han establecido que debe reunir las características de
cierto, concreto o determinado y personal.

797.    En esta línea, el Consejo del Estado también resolvió que[620]:

El perjuicio indemnizable debe por tanto ser cierto, o presente y/o
futuro. Una especie de perjuicio cierto futuro es el lucro cesante, toda
vez que hay certeza respecto de su existencia.

(iv)    Análisis del Tribunal Arbitral

798.    En primer lugar, en relación con el derecho de las Demandantes de recibir la
indemnización de perjuicios, este Tribunal estima que POB se encuentra legitimada a
solicitar que los perjuicios se le indemnicen como consecuencia de los incumplimientos
de la ANI.

799.    El Tribunal Arbitral ya determinó que la ANI incumplió su deber de estructuración
del Contrato, incumplimiento que luego se vio agravado por su renuencia de negociar de
buena fe una solución a EER de las UFs 4 y 5. En estas circunstancias, se ha corroborado
el comportamiento antijurídico de la ANI, cuyas consecuencias dañinas deben ser
indemnizadas a POB.

800.    En efecto, y según se explicó con anterioridad, si bien el Tribunal Arbitral acogió
la pretensión de Terminación Anticipada de la Demandada en virtud de lo dispuesto en
el artículo 14.1(e) del Contrato de Concesión, acogió dicha pretensión por cuanto se

---

[619] Prueba CL-116.
[620] Prueba CL-121.

cumplieron sus presupuestos fácticos por la propia culpa de la ANI, por lo que queda a salvo su responsabilidad contractual frente al Concesionario.

801.    En segundo lugar, por cuanto el artículo 90 de la Constitución de la República de Colombia reconoce el principio de reparación integral del daño, repetido en el artículo 50 de la Ley 80 de 1993. En virtud de dichas disposiciones, el Estado, por medio de la ANI en este caso, está obligado a reparar integralmente al Concesionario de los daños antijurídicos que le hayan sido causado como consecuencia de las acciones u omisiones que le sean imputables.

802.    Este principio de reparación integral del daño ha sido también reconocido por la jurisprudencia del Consejo de Estado, como se ha señalado anteriormente.

803.    En este sentido, el Tribunal Arbitral acoge la pretensión de las Demandantes, en el sentido de declarar que los incumplimientos de la ANI le han causado a POB daños antijurídicos, que deben ser resarcidos plenamente por la ANI.

**(b)    Cuantía de los daños reclamados por las Demandantes**

(i)    Posición de POB

804.    Las Demandantes efectúan dos cuantificaciones de daños para distintos escenarios:

(i)    Por medio del Primer Dictamen de FTI (Prueba CER-001) efectúan una cuantificación de daños basado en la Demanda Principal de POB en que se asume que, como consecuencia de los incumplimientos de la ANI, las UFs 4 y 5 no podrán ejecutarse y las UFs 1, 2 y 3 sí podrán ejecutarse por toda la duración del Contrato ("Pérdida LoP UF4 y UF5");

(ii)    Por medio del Segundo Dictamen de FTI (prueba CER-002) efectúan una cuantificación de daños basada en la petición subsidiaria de Terminación Anticipada del Contrato por parte de la ANI en que se asume que, como consecuencia de los incumplimientos de la ANI, POB no podrá continuar ejecutando ninguna de las UF ni ejerciendo la totalidad de los derechos y obligaciones bajo el Contrato de Concesión ("Pérdida LoP Proyecto");

208

(iii)    El Tercer Informe de FTI (Prueba Cer-006) (i) actualiza los cálculos de ambos escenarios; (ii) responde algunos argumentos del Dictamen de Contradicción presentado por la ANI; (iii) y efectúa otras actualizaciones según nuevas instrucciones.

i.    <u>Cuantificación de daños por la no ejecución de las UFs 4 y 5 ("Pérdida LoP UF4 y UF5")</u>

805.    FTI ha utilizado la metodología "Loss of profits" (LoP), para cuantificar los daños de POB con el siguiente ejercicio: (i) evaluar la Posición Actual de POB, con los incumplimientos contractuales; (ii) proyectar la Posición Contrafactual en que se encontraría POB sin el incumplimiento; y (iii) comparar la posición actual y la posición contrafactual, cuya diferencia son los perjuicios objeto de indemnización[621].

806.    Con ello, se calcula (i) la disminución patrimonial sufrida; y (ii) la ganancia, beneficio o provecho dejados de percibir por POB.

807.    Para presentar la Posición Actual[622]:

a.    FTI evaluó todos los gastos y todos los ingresos incurridos por el Concesionario a la Fecha de Evaluación, soportados en las certificaciones de la fiduciaria que administra el Patrimonio Autónomo del Proyecto y, cuando fue requerido, los soportes directos de los egresos e ingresos correspondientes.

b.    La Posición Actual refleja, por tanto, la situación en la que se encuentra el Concesionario, teniendo en consideración los incumplimientos contractuales de la ANI.

---

[621] Demanda POB y S&B, ¶ 459.
[622] Demanda POB y S&B, ¶ 463.

c. Además, la Posición Actual incorpora una proyección hacia el futuro de lo que ocurrirá con el Proyecto debido a los incumplimientos contractuales de la ANI. Puntualmente, la Posición Actual parte de la base de que, hacia futuro:

  i. <u>Las UFs 4 y 5 no podrán ejecutarse</u>. Esto significa que este escenario no incluye los gastos de Capex derivados de las Intervenciones restantes en estas UFs ni de Opex asociado a las mismas. Tampoco incorpora la Retribución a la que accedería el Concesionario si la ANI hubiera cumplido sus obligaciones contractuales.

  ii. <u>El Concesionario podrá ejecutar las UFs 1, 2 y 3</u>. Por tanto, la Posición Actual incluye en su proyección hacia futuro los gastos de Opex asociados a estas UFs (y los de Capex están incorporados en los costos ya incurridos por el Concesionario).

808. Para presentar la Posición Contrafactual: FTI proyectó lo que habría ocurrido si la ANI hubiera actuado conforme al Contrato lo que habría implicado que las UFs 4 y 5 podrían haberse ejecutado y suscrito el Acta de Terminación de Unidad Funcional de las UFs 4 y 5 el 15 de diciembre de 2018, y comenzado a recibir la Retribución correspondiente a partir de enero de 2019[623].

809. Como resultado de contrastar la Posición Actual y la Posición Contrafactual, FTI concluyó que las Demandantes (i) han incurrido en costos en los que no habrían incurrido si la ANI hubiera cumplido sus obligaciones contractuales y (ii) dejarán de percibir una utilidad que habrían percibido si la ANI hubiera cumplido sus obligaciones contractuales.

810. En cuanto a los costos, la Posición Contrafactual no incluye ciertos valores que sí están incluidos en la Posición Actual, entre ellos[624]: (i) valores asociados a los sobrecostos por una mayor duración de la Fase de Construcción de las UFs 4 y 5, que

---

[623] Prueba CER-001, ¶ 6.1.1 y 6.2.1.
[624] Demanda POB y S&B, ¶¶ 466, 468-470.

incluyen (a) mayores fondeos en la Subcuenta de Supervisión e Interventoría[625] y (b) mayores valores por obligaciones relacionadas con Interventorías Prioritarias; (ii) valores incurridos en relación con el Contrato de Crédito BID debido a los incumplimientos de la ANI; y (iii) los valores incurridos por las reclamaciones EPC, que no se habrían incurrido si ANI hubiera cumplido sus obligaciones contractuales[626].

811.    En cuanto a la utilidad dejada de recibir, la Posición Contrafactual parte del supuesto de que, si la ANI hubiera cumplido el Contrato, las UFs 4 y 5 se hubieran podido ejecutar. Por tanto, el Concesionario habría incurrido en los gastos de Capex asociados a dichas UFs e incurriría en Costos de O&M asociados a dichas UFs y, por consiguiente, habría accedido a la Retribución correspondiente[627], que incluye los conceptos de (i) Aportes ANI; (ii) Recaudo de Peaje; e (iii) ingresos por Explotación Comercial[628].

812.    El Tercer Informe de FTI actualiza el monto debido por este concepto, considerando como fecha de Evaluación la fecha de su Tercer Informe y concluye que la Pérdida LoP UF 4 y UF 5 asciende a COP $1.665,0 mil millones[629].

---

[625] POB argumenta que la ANI ha incumplido el Contrato por no tomar acciones procedentes para reducir el valor de los fondeos correspondientes a esta subcuenta. Como lo explica FTI, el Contrato prevé que el fondeo para esta subcuenta es casi 3 veces mayor durante la Fase de Construcción que durante la Etapa de Operación y Mantenimiento. Esto se explica en que las labores de supervisión e Interventoría son mucho mayores cuando se están ejecutando las actividades relacionadas con las obras del Proyecto. Debido al EER, no se están ejecutando esas obras dos de las UFs más significativas para el Contrato en términos de Capex y Opex, y, sin embargo, la ANI se ha negado a suscribir un acuerdo contractual que reduzca el fondeo para esta subcuenta.

[626] Dentro de los daños reclamados por POB, se encuentran los daños sufridos al nivel del Contratista EPC (Consorcio Constructor POB) con ocasión de los incumplimientos de la ANI. El Contrato de Concesión y el Contrato EPC son contratos coligados, pues tienen como finalidad común la ejecución de las Intervenciones. Así, por la forma en la que la propia ANI estructuró el Contrato de Concesión, lo que ocurra en el Contrato de Concesión —específicamente en relación con la ejecución de las Intervenciones— tendrá consecuencias en el Contrato EPC. Por lo mismo, la ANI tiene la obligación de indemnizar los perjuicios que sus incumplimientos del Contrato de Concesión le ocasionan al Contratista EPC.

[627] Demanda POB y S&B, ¶ 467.

[628] Prueba CER-001, ¶ 2.2.3.

[629] Prueba CER-006, ¶ 2.3.4 (2).

ii.    Cuantificación de daños por la Terminación Anticipada del Contrato ("**Pérdida LoP Proyecto**")

813.    En la elaboración del Segundo Informe de FTI que fue presentado con la Contestación a la Reconvención, se dieron instrucciones de calcular las pérdidas sufridas por POB, manteniendo la misma Fecha de Evaluación y la misma fecha de corte de información del Primer Informe y asumiendo que, como consecuencia de los incumplimientos de la ANI y de conformidad con los argumentos planteados por la ANI en su Demanda de Reconvención, no será posible para POB continuar con la totalidad de sus derechos y obligaciones bajo el Contrato a partir de marzo de 2022[630].

814.    Así, en el Segundo Dictamen FTI se calcula la "Pérdida LoP Proyecto", para distinguirla de la "Pérdida LoP UF 4 y UF 5" evaluada en el Primer Informe según las instrucciones resumidas.

815.    Conceptualmente, la diferencia entre ambos cálculos se debe a las instrucciones de asumir con respecto al estado del Proyecto a futuro bajo la Posición Actual. Específicamente[631]:

a.    Para el cálculo de la Pérdida LoP Proyecto, se asume que POB no recibirá ingresos ni incurrirá en costos relacionados al Proyecto a partir de marzo de 2022;

b.    Para el cálculo de la Pérdida LoP UF 4 y UF 5, se asume que POB continuará recibiendo utilidades por la ejecución de las UF 1, UF 2 y UF 3 (pero no de la UF 4 y la UF 5) hasta la terminación del Contrato.

816.    Respecto de la aplicación de la fórmula de cálculo de costos establecida para Terminación Anticipada del Contrato de Concesión, FTI analiza la diferencia conceptual entre la Pérdida LoP del Proyecto y el Pago por Terminación del Contrato. Señala que, si bien tanto la Pérdida LoP Proyecto como el Pago por Terminación del Contrato buscan

---

[630] Contestación a la Reconvención, ¶¶ 548-559.
[631] Prueba CER-002, ¶ 2.2-3.2.

compensar a POB en una situación donde este no va a continuar con la ejecución del Proyecto, el tipo de compensación otorgada por cada concepto es distinta[632]:

    a. La Pérdida LoP Proyecto considera el valor presente de las utilidades dejadas de recibir por POB desde el inicio del Contrato hasta la terminación del mismo (es decir, tanto en el pasado como en el futuro), teniendo en cuenta que, de no ser por los Actos Alegados, POB habría podido continuar con la ejecución de la totalidad del Proyecto hasta su terminación; mientras que

    b. El Pago por Terminación del Contrato, establecido específicamente en la cláusula 18.3(f) solo compensaría a POB por ciertos costos en los que ha incurrido (específicamente, aquellos que hayan sido reconocidos por la ANI y que sean atribuibles a una serie de actividades específicas establecidas en el Contrato para tal motivo) desde la Fecha de Inicio hasta la suscripción del Acta de Liquidación del Contrato, neto de los ingresos que ha recibido durante el mismo periodo.

817.    En conclusión, si el objetivo del Laudo Arbitral es retornar a POB a la posición en que estaría de no ser por los incumplimientos de la ANI, solo la Pérdida LoP Proyecto indemniza plenamente a POB por las pérdidas que ha sufrido, pues solo este concepto tiene en cuenta el valor de los derechos que adquirió POB al haber suscrito el Contrato. En cambio, el Pago por Terminación del Contrato limitaría la indemnización efectuada por la ANI a POB a ciertos costos (netos de ingresos) incurridos hasta la Terminación Anticipada del Contrato, sin contemplar las utilidades dejadas de recibir por POB tanto en el pasado como en el futuro como consecuencia de los incumplimientos de la ANI.

818.    El Tercer Informe de FTI actualiza el monto debido por este concepto, considerando como fecha de Evaluación la fecha de su Tercer Informe y concluye que la Pérdida LoP Proyecto asciende a COP $2.227,8 mil millones[633].

---

[632] Prueba CER-002, ¶ 3.4.
[633] Prueba CER-006, ¶ 2.3.4 (1).

iii.   Montos y cálculos desagregados por UFs según lo solicitado por el Tribunal Arbitral en la Orden Procesal Núm. 17 y la Orden Procesal Núm. 18

819.   Según se explicó anteriormente, con fecha 1 de diciembre de 2023 el Tribunal Arbitral emitió la Orden Procesal Núm. 17, por medio de la cual solicitó a las Demandantes "presentar un cálculo desagregado por cada una de las 1, 2, 3, 4 y 5 Unidades Funcionales" utilizando la misma metodología usada en sus informes periciales anteriores.

820.   En cumplimiento de la Orden Procesal Núm. 17, las Demandantes presentaron el Cuarto Informe FTI (prueba CER-009), según las instrucciones contenidas en la Orden Procesal Núm. 17[634], en que se presenta (i) la desagregación por UF de las pérdidas de POB[635]; y (ii) la desagregación por UF de los costos de POB[636].

821.   El Cuarto Dictamen de FTI presenta el cálculo de las utilidades dejadas de recibir por POB, bajo la metodología Loss of Profit (usada en sus informes anteriores), desagregada por cada una de las cinco UFs del Proyecto[637]. Para ello, este informe desagrega por UF tantos los componentes de ingreso como los componentes de costos de la Posición Actual y de la Posición Contrafactual desarrollada en los Informes CER-001 y CER-002[638].

822.   Así, el informe presenta el resultado de la desagregación por UF de las pérdidas de POB para los distintos escenarios planteados[639], esto es, (i) para el escenario de Pérdida LoP UF 4 y UF 5[640], y (ii) para el escenario Pérdida LoP Proyecto[641].

---

[634] Prueba CER-009, ¶ 1.2.
[635] Prueba CER-009, sección 3.
[636] Prueba CER-009, sección 4.
[637] Prueba CER-009, ¶ 2.2.
[638] Prueba CER-009, ¶ 3.3.
[639] Prueba CER-009, ¶ 3.4.
[640] Prueba CER-009, ¶ 3.4.1, Tabla 3.13.
[641] Prueba CER-009, ¶ 3.4.1, Tabla 3.14.

823.    Luego, el Informe hace lo propio con la desagregación de los costos de POB, distinguiendo entre aquellos costos incurridos por POB y aquellos por incurrir[642].

824.    A su vez, en virtud de la Orden Procesal Núm. 18, con fecha 12 de abril de 2024, las Demandantes presentaron una comunicación acompañada del Quinto Dictamen de FTI (prueba CER-010), respondiendo, donde estimaba pertinente, al informe de la contraria relativo a la prueba CER-009, y actualizando algunos de sus cálculos.

(ii)    <u>Posición de la ANI</u>

i.    <u>Sobre la cuantificación de daños por la no ejecución de las UFs 4 y 5 ("Pérdida LoP UF4 y UF5");</u>

825.    La Demandada rechaza los daños reclamados por conceptos de indemnización de perjuicios relativos al escenario de Pérdida LoP UF4 y UF5, señalando que, aunque POB diga que está pidiendo reparación integral del daño, lo que en verdad está pidiendo es la Retribución del Contrato.

826.    Argumenta la ANI que no se han cumplido los requisitos para que POB reciba Retribución alguna en los términos del Contrato de Concesión. En efecto, la ANI argumenta que, de conformidad con la Sección 3.1 del Contrato de Concesión, el derecho de Retribución al Concesionario nace a la vida jurídica cuando se suscribe el Acta de Terminación de cada Unidad Funcional, las que no han sido suscritas respecto de las UFs 4 y 5, según reconoce el mismo Informe de FTI[643].

827.    En este sentido, señala la ANI que todos los valores correspondientes a la Retribución de las UFs 4 y 5 han sido fondeados por la ANI en las fechas y en los términos previstos en el Contrato de Concesión y creadas para el efecto, pero que estas no pueden darse a POB por cuanto no se cumplen los presupuestos para obtener la

---

[642] Prueba CER-009, ¶ 4.1.
[643] Dúplica ANI, ¶ 249-251.

Retribución de las UFs 4 y 5, principalmente la falta de infraestructura, es decir de la finalización de las UFs 4 y 5[644].

828.    Agrega que de conformidad con lo dispuesto en la Sección 2.2. "Valor del contrato y aportes presupuestales" del Contrato de Concesión se estableció que no se puede utilizar el concepto de valor del contrato como una garantía a favor del Concesionario, ya que la Retribución supone el cumplimiento de varias obligaciones por parte del Concesionario, entre otras, la verificación de la disponibilidad de la infraestructura y el cumplimiento de los niveles de servicio y estándares de calidad establecidos en el Contrato[645].

ii.    Sobre la cuantificación de daños por la Terminación Anticipada del Contrato ("Pérdida LoP Proyecto");

829.    La Demandada señala que la pretensión de indemnización correspondiente a la Pérdida LoP del Proyecto habría sido presentada de manera extemporánea por las Demandantes, por cuanto el momento procesal para presentar la totalidad de las pretensiones es la Demanda. Agrega que, de admitirse esta reclamación se estaría violando el debido proceso toda vez que la ANI no podría controvertir en forma adecuada dicha formulación[646].

830.    Por otro lado, la Demandada señala que, en el caso que el Tribunal Arbitral decida resolver el fondo de esta pretensión, esta debe ser rechazada bajo el argumento de que la ANI habría cumplido con sus obligaciones contractuales y, por su parte, POB habría incumplido con su obligación de superar el EER, por lo que no ha terminado con las obras contratadas ni tiene derecho a la Retribución. Así, la Terminación Anticipada se daría por eventos atribuibles al Concesionario, por lo que no causaría un daño antijurídico que se deba indemnizar[647].

---

[644] Contestación ANI, ¶ 404-420.
[645] Dúplica ANI, ¶ 252.
[646] Réplica ANI, ¶¶ 263-267.
[647] Réplica ANI, ¶¶ 268-272.

831.    Por último, argumenta que el derecho a retribución de un contratista en los contratos de APP está condicionado a la disponibilidad de la infraestructura, al cumplimiento de los niveles de servicio, y a los estándares de calidad en las distintas unidades funcionales. Así, concluye que POB no tiene derecho a solicitar indemnización de perjuicios por las Retribuciones dejadas de percibir en caso de que sea decretada la Terminación Anticipada del Contrato de Concesión, toda vez que a la fecha no ha culminado las obras referentes a las UFs 4 y 5, presupuesto inmanente de la Retribución[648].

832.    En otro orden de ideas, la ANI señala que, en caso de que se decrete la Terminación Anticipada del Contrato, no corresponde otorgar una indemnización de perjuicios, sino que el escenario consecuente es la liquidación del Contrato, de conformidad con las reglas pactadas en la Sección 18.3 del Contrato de Concesión[649].

833.    Señala que la liquidación del Contrato corresponde a un balance de cuentas de las prestaciones ejecutadas y que deben ser reconocidas, por lo que, si el balance de la ejecución del contrato indica que la ANI debe realizar un reconocimiento económico al Concesionario en virtud de la ejecución del contrato, será con fundamento en las obligaciones contractuales ejecutadas y no en virtud de una indemnización de perjuicios. Agrega que este balance debe corresponder a la información técnica y financiera de lo ejecutado por las Partes, de la cual en este momento carece el Tribunal, por lo que no tendría elementos de juicio objetivos para proceder a realizar una liquidación judicial que abarque la totalidad de la ejecución del contrato[650].

iii.    Sobre los montos y cálculos desagregados por UFs según lo solicitado por el Tribunal Arbitral en la Orden Procesal Núm. 17 y en la Orden Procesal Núm. 18

834.    En virtud de la Orden Procesal Núm. 17, la Demandada presentó un Dictamen de Contradicción de la prueba CER-009 presentada por las Demandantes.

---

[648] Réplica ANI, ¶¶ 273-274.
[649] Réplica ANI, ¶ 233.
[650] Réplica ANI, ¶¶ 233-234; Dictamen de Contradicción, pp. 33-35.

835.    En dicho Dictamen de Contradicción, la Demandada señala que la prueba CER-009 (i) no cumpliría la Orden Procesal Núm. 17, por cuanto abarcaría fechas, partidas y pruebas que exceden lo analizado en las pruebas CER-001 y CER-002[651]; y (ii) los cálculos de la utilidad percibida por POB en las UFs 1, 2 y 3 no se habría depurado según lo exigido en la Orden Procesal Núm. 17[652]; (iii) inexistencia del derecho a la Retribución de POB por las UFs 4 y 5[653]; (iv) el hecho de que el EER no prevé reconocimientos[654]; (v) la fórmula de terminación anticipada del Contrato es incompatible con la metodología de Loss of Profit[655]; (vi) que se habrían incluido reclamaciones presentadas por terceros a POB, como son las Reclamaciones EPC[656]; (vii) que el Tribunal Arbitral no tendría competencia para pronunciarse sobre las UFs 1, 2 y 3[657]; y (viii) por último, destaca la diferencia entre la indemnización de perjuicios y el restablecimiento del equilibrio económico del Contrato[658].

836.    En virtud de todas estas razones, la ANI solicita que se desestime el valor probatorio de la prueba CER-009[659].

837.    En virtud de la Orden Procesal Núm. 18, la Demandada presentó su respuesta a la prueba CER-010 acompañada de un informe de contradicción de dicha prueba.

838.    La ANI no propone un cálculo o monto alternativo al presentado por las Demandantes.

(iii)    <u>Análisis del Tribunal Arbitral</u>

839.    En línea con la decisión anterior, sobre el derecho de reparación integral de POB, el Tribunal considera que es necesario que este Tribunal determine la cuantía de los daños

---

[651] Memorial de Respuesta a la prueba CER-009, sección 2.1; Dictamen de Contradicción prueba CER-009, pp. 7-11.
[652] Memorial de Respuesta a la prueba CER-009, sección 2.2; Dictamen de Contradicción prueba CER-009, p. 6.
[653] Memorial de Respuesta a la prueba CER-009, sección 2.3; Dictamen de Contradicción prueba CER-009, sección 6.
[654] Memorial de Respuesta a la prueba CER-009, sección 2.4.
[655] Memorial de Respuesta a la prueba CER-009, sección 2.5; Dictamen de Contradicción prueba CER-009, sección 8.
[656] Memorial de Respuesta a la prueba CER-009, sección 2.6.
[657] Memorial de Respuesta a la prueba CER-009, sección 2.7.
[658] Memorial de Respuesta a la prueba CER-009, sección 2.8.
[659] Memorial de Respuesta a la prueba CER-009, ¶ 89.

sufridos por POB y que son imputables a la ANI. Para ello, es necesario tener en cuenta las siguientes consideraciones.

840.    En primer lugar, es necesario destacar que, según lo decidido en las Secciones precedentes, el Tribunal ha acogido la pretensión subsidiaria de la ANI de Terminación Anticipada del Contrato de Concesión, de conformidad con la causal establecida en la Sección 14.1(e) del Contrato, pero como consecuencia de incumplimientos imputables a la ANI y, por lo tanto, dejando a salvo su responsabilidad contractual derivada de dichos incumplimientos.

841.    Así, y como ya se ha declarado, el Tribunal Arbitral estima que procede la indemnización de perjuicios en favor de POB, en virtud del principio de reparación integral del daño.

842.    Sin embargo, el Tribunal rechaza la postura de la ANI de que, en caso de que se declare la Terminación Anticipada del Contrato de Concesión en virtud de la Sección 14.1(e) del Contrato, se deban aplicar las fórmulas de liquidación establecidas en la Sección 18.3. del Contrato y/o la Sección 12.1(h) relativa a compensaciones por Eventos Eximentes de Responsabilidad.

843.    Primero, por cuanto el principio de reparación integral del daño tiene preminencia sobre cualquier disposición contractual en contrario, aunque en este caso el Tribunal Arbitral concluye que ni siquiera es necesario establecer este orden de prevalencia.

844.    En efecto, la Sección 18.3 del Contrato regula hipótesis de liquidación del Contrato que miran, en esencia, a la compensación de trabajos, partidas y cantidades ejecutadas, y que no puede interpretarse como una cláusula exonerativa o excluyente de responsabilidad que sustituye cualquier otra indemnización. En ningún apartado de dicha Sección o del Contrato de Concesión las Partes le han atribuido semejante efecto, desconociendo o eliminando la posibilidad de las Demandantes de reclamar otros daños distintos al reembolso de aquellos costos incurridos que se comprenden en las partidas de liquidación del Contrato. Ello, sobre todo, cuando se trate de costos y perjuicios sufridos como consecuencia de los incumplimientos de la ANI.

845.    Segundo, por cuanto ninguna de las Partes ha solicitado la liquidación del Contrato de Concesión en virtud de la Sección 18.3 del Contrato, razón por la cual este Tribunal Arbitral no tiene competencia para ello.

846.    En efecto, las Demandantes no pretenden en este Arbitraje la liquidación del Contrato, sino que la reparación e indemnización de los perjuicios sufridos como consecuencia de los incumplimientos de la ANI que han causado un daño antijurídico a POB que éste no está obligado a soportar.

847.    Las Demandantes tampoco solicitan las compensaciones por Eventos Eximentes de Responsabilidad, de conformidad con la Sección 12.1(h) del Contrato de Concesión, sino que la indemnización de perjuicios por los incumplimientos de la ANI, entre los que se incluyen los incumplimientos de la ANI a sus obligaciones establecidas en la misma Acta del EER.

848.    Tercero, y en línea con lo anterior, porque el Tribunal considera que la Terminación Anticipada en virtud de la Sección 14.1(e) del Contrato, pero por incumplimientos imputables a la ANI, no se prevé en ninguna de las hipótesis de liquidación del Contrato establecida en la Sección 18.3 del Contrato y no cabe aplicarlas por analogía.

849.    En efecto, el Tribunal Arbitral concuerda con las Demandantes de que no sería aplicable la fórmula establecida en la Sección 18.3(f) del Contrato, que contempla la Terminación Anticipada en la Fase de Construcción, por cuanto, no incluye todos los costos incurridos por el Concesionario, sino que únicamente aquellos que hayan sido reconocidos por la ANI y que sean atribuibles a una serie de actividades específicas establecidas en el Contrato para tal motivo, desde la Fecha de Inicio hasta la suscripción del Acta de Liquidación del Contrato[660]. Además, esta fórmula implica la aplicación de una tasa de capitalización a dichos costos, según si se trata de Terminación Anticipada por (i) solicitud del Concesionario, (ii) por causas no imputables a ninguna de las Partes, y (iii) por causas imputables al Concesionario[661]. Lo mismo ocurre respecto de la fórmula

---

[660] Prueba CER-002, ¶ 3.4.7.
[661] Prueba CER-002, ¶ 3.4.8.

establecida en la Sección 18.3(g) del Contrato, que contempla la Terminación Anticipada en la Etapa de Operación y Mantenimiento. Ninguna de ellas aplica a la hipótesis que se está en este Laudo, de Terminación Anticipada por causales imputables a la ANI.

850.    En segundo lugar, y como ya se ha explicado, las Demandantes cuantifican los perjuicios reclamados en dos escenarios (i) Pérdida LoP UF 4 y UF 5 y (ii) Pérdida LoP Proyecto.

851.    Sin embargo, el Tribunal considera que ninguno de los dos escenarios permite cuantificar los daños que el Tribunal Arbitral estima que deben indemnizarse a POB.

852.    Cabe recordar que el Escenario Pérdida LoP UF 4 y UF 5 supone una posición actual en que (i) se habría finalizado la construcción de las UFs 4 y 5 y suscrito el Acta de Terminación de Unidad Funcional el 15 de diciembre de 2018; (ii) POB habría sido compensado en los sobrecostos asociados a los hallazgos arqueológicos; y (iii) las UFs 1, 2 y 3 podrían seguir ejecutándose y POB continuará recibiendo utilidades por su ejecución (aunque con algunos ajustes respecto de los costos e ingresos proyectados) y una posición contrafactual en que no será posible finalizar las Intervenciones requeridas para las UF 4 y UF 5, por lo cual dichas UFs (y, como consecuencia, la totalidad del Proyecto), permanecerán en Fase de Construcción hasta la terminación del Contrato.

853.    Así, este escenario busca demostrar los costos ya incurridos por el Concesionario, así como los costos en que seguirá incurriendo, a pesar de que no podría acceder a la Retribución de las UFs 4 y 5.

854.    La razón por la que no corresponde aplicar el escenario de Pérdida LoP UF 4 y UF 5 es evidente; el Tribunal Arbitral ha acogido la pretensión subsidiaria de la ANI de Terminación Anticipada del Contrato. Como se explicó, el Tribunal no considera viable declarar que el proyecto se mantenga en Fase de Construcción *ad eternum*. En este sentido, el Concesionario no (i) tendrá derecho a recibir la Retribución por las UF 4 y 5 (por las razones que más adelante se explican), (ii) ni tampoco deberá seguir incurriendo en costos respecto de las UFs 4 y 5.

855.    Por otro lado, el escenario de Pérdida LoP Proyecto, se pone en una situación en que, como consecuencia de los incumplimientos de la ANI y, en caso de que se declare la Terminación Anticipada del Contrato, no será posible continuar con la totalidad del Contrato. Es decir, POB no seguirá recibiendo Retribución alguna, ni tendrá que incurrir en costos algunos respecto de ninguna UF del Contrato, por cuanto este se ha terminado anticipadamente.

856.    En este escenario, FTI ha calculado un escenario de pérdida que considera el valor presente de las utilidades dejadas de recibir por POB desde el inicio del Contrato hasta la terminación del mismo, respecto de todo el Proyecto, es decir respecto de todas las UFs.

857.    Este escenario subsidiario tiene el obstáculo de que incluye en el mismo cálculo y bajo prácticamente las mismas hipótesis la totalidad del Proyecto, a pesar de que, en opinión de este Tribunal Arbitral, la situación de las UFs 1, 2 y 3 es distinta de las UFs 4 y 5.

858.    En efecto, las UFs  1, 2 y 3 fueron ejecutadas y finalizadas por POB, y todas ellas cuentan con Actas de Terminación de UF[662]. Así, de conformidad con la Sección 3.1 del Contrato de Concesión, POB tiene el derecho contractual de recibir la Retribución de dichas UFs, de conformidad con los términos contractuales. El Tribunal Arbitral estima que la pérdida de utilidad o  lucro cesante relacionado con las UFs 1, 2 y 3, reúne los requisitos de certeza y certidumbre que requiere la jurisprudencia del Consejo de Estado.

859.    Sin embargo, no ocurre lo mismo con las UFs 4 y 5, las cuales no se han ejecutado y finalizado. El escenario de Pérdida LoP del Proyecto (al igual que el escenario de Pérdida LoP UFs 4 y 5) asume, en una posición contrafactual, que, de no ser por los incumplimientos de la ANI, las Actas de Terminación de las UFs 4 y 5 se habrían suscrito en diciembre de 2018[663].

---

[662] Anexos FTI-05 (Actas de Terminación de UF1 y UF2); FTI-64 (Acta de Terminación de la UF3).
[663] Prueba CER-002, ¶ 1.2.4, 1.3.2

860.    Sin embargo, no hay mayores evidencias que confirmen que las Actas de Terminación de Unidad Funcional de las UFs 4 y 5 se hubieran efectivamente suscrito el 15 de diciembre de 2018. Las Demandantes señalan, respecto del estado del Proyecto, que las Intervenciones en las UFs 4 y 5 se encuentran suspendidas desde octubre de 2017 en virtud del Acta de EER[664] y sin un análisis del porcentaje o grado de avance que permita a este Tribunal convencerse que de las UFs 4 y 5 se hubieran finalizado a tiempo.

861.    No hay mayor información en el expediente del estado de avance de las UFs 4 y 5 a octubre de 2017, cuando se suspendieron las Intervenciones en dichas UFs. Una referencia al porcentaje de avance de las UFs 4 y 5 se encuentra en el Dictamen de Contradicción presentado por la ANI, en que se afirma que el porcentaje de avance de las intervenciones en las UF 4 y UF 5, objeto de la controversia, corresponden al 5,07% y 1,69%[665]. Sobre esta afirmación, el Tribunal nota que no hay evidencia que la justifique, pues esta afirmación no lleva a un anexo o referencia alguna[666], aun cuando no ha sido controvertida por POB.

862.    En consecuente, el Tribunal Arbitral considera que no cuenta con los elementos de prueba suficientes para poder convencerse de que las UFs 4 y 5 hubieran sido efectivamente finalizadas y las correspondientes Actas de Terminación de Unidad Funcional suscritas para diciembre de 2018.

863.    En este sentido, el Tribunal Arbitral considera que la utilidad dejada de percibir respecto de las UFs 4 y 5, es decir, el lucro cesante respecto de dichas UFs, no cumple con el requisito de certidumbre y certeza que se exige para que se trate de un daño indemnizable. Sin embargo, el Tribunal Arbitral considera que son indemnizables los costos incurridos por POB respecto de las UFs 4 y 5, en la medida de que hayan sido acreditados, y no hayan sido desestimados por otras razones en el presente Laudo.

---

[664] Escrito Post-Audiencia Demandantes, ¶ 409, C-002: Acta de EER, p. 29.
[665] Dictamen de Contradicción, pág. 28.
[666] Dicha afirmación tiene una nota al pie cuya referencia indica únicamente "Información ANI", sin otro soporte que la valide.

864.    De lo dicho anteriormente, es posible concluir que dado que se ha concedido la Terminación Anticipada del Contrato de Concesión, pero por incumplimiento de la ANI, el Tribunal Arbitral estima que la reparación integral del daño abarca (i) todas las utilidades dejadas de percibir por POB, desde el inicio del Contrato hasta la terminación del mismo (por incumplimientos imputables a la ANI) respecto de las UFs 1, 2 y 3, mas no las utilidades dejadas de percibir, respecto de las UFs 4 y 5, sino que solo aquellos (ii) costos incurridos respecto de las UFs 4 y 5, acreditados y que no hayan sido desestimados por otras razones.

865.    En tercer lugar, corresponde determinar los montos específicos de cada uno de estos puntos.

866.    Primero, respecto del punto (i) el Tribunal Arbitral estimó que de la prueba rendida en el proceso no se contenían los elementos necesarios para determinar el monto de la utilidad dejada de percibir respecto de las UFs 1, 2 y 3 en forma separada al monto de utilidad dejado de percibir respecto de las UFs 4 y 5. Esto, por cuanto las Demandantes no presentaron originalmente un monto calculado en base a las UFs 1, 2 y 3 exclusivamente. Tampoco era posible obtener un monto derivado del cálculo Pérdida LoP del Proyecto, por cuanto los Dictámenes de FTI no hicieron un análisis de estas pérdidas desagregadas por UF, que permitiera separar los montos de unas respecto de los montos de otras.

867.    Es por esta razón que, por medio de la Orden Procesal Núm. 17, el Tribunal Arbitral pidió el cálculo de los montos de utilidades dejadas de recibir por POB desagregados por UF; para poder determinar el monto correspondiente a la utilidad dejada de percibir únicamente respecto de las UFs 1, 2 y 3. Según se explicó, este dictamen contiene dicha cuantificación para dos escenarios distintos: Pérdida LoP UFs 4 y 5 y Pérdida LoP del Proyecto. Considerando que se ha acogido la pretensión subsidiaria de Terminación Anticipada de la ANI, se debe tener en cuenta los montos determinados para el escenario de Pérdida LoP del Proyecto. Asimismo, y como se han acogido las pretensiones de POB

respecto de los fondeos[667] se debe tener en cuenta el escenario que incluye estos montos (escenario Pérdida LoP del Proyecto Fondeos POB)[668].

868.    Según la prueba CER-010, que contiene la versión más actualizada del análisis segregado por distintas UFs, actualizando así la prueba CER-009, se cuantifica este monto en: COP \$160.000.000.000 para la UF 1; COP \$332.200.000.000 para la UF 2; y COP \$316.900.000.000 para la UF 3[669].

869.    Sin embargo, en el caso de la UF 2, del monto señalado se debe sustraer el monto correspondiente a las Reclamaciones EPC (5,8 miles de millones de COP), sobre las cuales, según lo determinado en la Sección IV.A.2 de este Laudo, el Tribunal Arbitral carece de competencia. De esta manera, en el caso de la UF 2, la Pérdida LoP del Proyecto asciende a COP \$326.400.000.000.

870.    Así, el total de Pérdida LoP del Proyecto correspondiente a las UFs 1, 2 y 3 asciende a COP \$803.300.000.000.

871.    Segundo, respecto del punto (ii), el Tribunal Arbitral considera que caben dentro de la reparación integral del daño, los costos incurridos respecto de las UFs 4 y 5 que hayan sido acreditados y que no hayan sido desestimados en el presente Laudo por otras razones.

872.    Estos costos son[670]:

    a.    Capex EPC, por COP \$46.000.000.000 para la UF 4 y COP \$27.200.000.000 para la UF 5[671].

---

[667] Sección IV.B.3 del Laudo.
[668] Prueba CER-009, ¶ 2.2.5.
[669] Prueba CER-010, ¶ 5.3.1, Tabla 5-2.
[670] Los costos aquí señalados tienen su origen en la prueba de POB CER-010, ¶ 5.4.1, Tabla 5-3. Sin embargo, el Tribunal Arbitral no incluye en el listado siguiente de los costos incurridos por POB el concepto "Obligaciones de Fondeo", dado que este concepto fue tratado y adjudicado a POB en forma separada, en la Sección IV.B.3 del presente Laudo.
[671] Prueba CER-010, Tabla 5-3; Apéndice 1.

b.  Costos O&M, por COP $538.000.000 para la UF 4 y COP $413.000.000 para la UF 5[672].

c.  Costos por ejecución de Intervenciones Prioritarias Adicionales, por un monto de COP $1.947.000.000 para las UF 4 y 5[673].

d.  Costos por cierre del Swap por un monto de COP $14.500.000.000 para la UF 4 y COP $10.500.000.000 para la UF 5[674].

e.  Costos por conceptos de gastos generales por un monto de COP $13.400.000.000 para la UF 4 y COP $12.000.000.000 para la UF 5[675].

f.  Los costos derivados de la obtención y mantenimiento del financiamiento para las UFs 4 y 5 por un monto de COP $36.100.000.000 para la UF 4 y COP $26.300.000.000 para la UF 5[676].

g.  Costos de recursos de deuda, incurridos por POB por un monto de COP $11.300.000.000 para la UF 4 y COP $7.900.000 para la UF 5[677].

h.  Costos de recursos de patrimonio, incurridos por POB por un monto de COP $123.000.000.000 para la UF 4 y COP $90.400.000.000 para la UF 5[678].

873.  No se incluye dentro de los costos incurridos para la ejecución de las Intervenciones en las UFs 4 y 5 las Reclamaciones del Contratista EPC, derivadas del Contrato EPC, respecto de las cuales, el Tribunal Arbitral ya ha determinado que no tiene competencia para conocer[679]. Asimismo, respecto de los montos relativos a los menores fondeos que POB estaba obligada a hacer, se estará a lo dicho en esa Sección[680], razones por las cuales se ha utilizado el escenario "Fondeos POB", como se explica más arriba.

---

[672] Prueba CER-010, Tabla 5-3; Apéndice 1.
[673] Prueba CER-010, Tabla 5-3; Apéndice 1.
[674] Prueba CER-010, Tabla 5-3; Apéndice 1.
[675] Prueba CER-010, Tabla 5-3; Apéndice 1.
[676] Prueba CER-010, Tabla 5-3; Apéndice 1.
[677] Prueba CER-010, Tabla 5-3; Apéndice 1.
[678] Prueba CER-010, Tabla 5-3, Apéndice 1.
[679] Sección IV.A.2.
[680] Sección IV.B.3.

874.     En consecuencia, el Tribunal Arbitral considera que los costos incurridos respecto de las UFs 4 y 5 y que deben indemnizarse a POB alcanzan a un total de COP $413.605.900.000.

875.     En cuarto lugar, es necesario referirse a la prueba CER-009 que el Tribunal Arbitral la ha considerado como válida para cuantificar los daños (actualizados en la prueba CER-010) y las razones por las cuales se han desestimado objeciones de dicho informe hechas por la Demandada.

876.     Primero, la Demandada hace una serie de objeciones relativas al cálculo de los montos de la prueba CER-009 y que estos no cumplirían los términos de la Orden Procesal Núm. 17 por cuanto sobrepasan la fecha de corte y que no corresponderían al periodo de análisis solicitado, por cuanto los dos escenarios incluirían proyecciones de costos y gastos futuros y no cifras "realmente incurridas" como exigiría la Orden Procesal Núm. 17[681].

877.     En resumidas cuentas, la Demandada señala que los escenarios de Pérdida LoP UFs 4 y 5 y Pérdida LoP Proyecto proyectan un escenario contrafactual en que POB seguiría operando las UFs 1, 2 y 3 hasta el año 2040, lo que excedería la fecha de corte de 31 de julio de 2021. Por otro lado, la Demandada señala que para cumplir con la Orden Procesal Núm. 17, FTI debía tomar los ingresos reales y restarle los costos reales, para así depurar el monto de la utilidad requerida, y que, por el contrario, la prueba CER-009 solo se limitaría a cuantificar los costos supuestamente incurridos[682].

878.     Sin embargo, el Tribunal Arbitral estima que la prueba CER-009 cumple con los términos de la Orden Procesal Núm. 17 que señala que, para presentar los cálculos desagregados de costos incurridos y utilidades dejadas de percibir, POB debía "emplear el modelo de 'Loss of Profit' ya sustentado y adoptado en la prueba CER 1 y CER 2, por cada una de las Unidades Funcionales 1 a 5".

---

[681] Memorial de Respuesta a la prueba CER-009, sección 2.1; Dictamen de Contradicción prueba CER-009, secciones 1, 2, 3.

[682] Memorial de Respuesta a la prueba CER-009, sección 2.2.

879.    En este sentido, la fecha de corte de los Informes CER-1 y CER-2 se refiere a la fecha de corte de la información financiera y operativa del Proyecto. Pero ello no implica que los daños y perjuicios reclamados por POB se deban calcular solo hasta esta fecha. En efecto, la metodología de Loss of Profit usado en los Informes CER-1, CER-2, CER-6 y, en virtud de la Orden Procesal Núm. 17, también la prueba CER-009 "considera las utilidades incrementales (es decir, ingresos netos de costos) que las Demandantes han dejado de percibir como consecuencia de los Actos Alegados desde el inicio del Contrato hasta la terminación del mismo (es decir, tanto en el pasado como en el futuro)"[683]. Es decir, esta metodología necesariamente incluye las proyecciones de costos y utilidades futuras, y posteriores al 31 de julio de 2021, lo que es consistente con la solicitud de la Orden Procesal Núm. 17.

880.    El Tribunal Arbitral sí coincide con el Dictamen de Contradicción de que los escenarios bajo la metodología Loss of Profit, y los costos incurridos no son acumulables[684], porque el primero contiene al segundo. Pero en este caso ello se cumple y no se acumulan, porque, según se señaló, se otorga (i) las utilidades dejadas de percibir bajo la metodología Loss of Profit, de las UFs 1, 2 y 3 y (ii) los costos incurridos de las UFs 4 y 5.

881.    Segundo, la Demandada también considera que debe desestimarse la prueba CER-009, por una serie de consideraciones de fondo, las que deben descartarse en este punto, por cuanto ya han sido abordadas en este Laudo y que, en definitiva, llevan a la decisión de daños que se ha otorgado a las Demandantes. En aras de la completitud, se hará una breve referencia a cada una de ellas.

882.    La Demandada alega que POB no tiene derecho a percibir la Retribución de las UFs 4 y 5, por cuanto estas UFs no se habrían entregado y no se habrían suscrito sus respectivas actas de terminación[685]. El Tribunal Arbitral concuerda con esta postura,

---

[683] Prueba CER-006, ¶ 2.2.2.
[684] Dictamen de Contradicción prueba CER-009, p. 12.
[685] Memorial de Respuesta a la prueba CER-009, sección 2.3; Dictamen de Contradicción prueba CER-009, sección 6.

según ya se ha decidido anteriormente, razón por la cual no se ha otorgado a POB los daños consistentes en dichas Retribuciones de las UFs 4 y 5.

883.    La Demandada señala que en el Acta del EER se habría establecido que una circunstancia ajena a las Partes habría comprometido la normal ejecución de las UFs 4 y 5, por lo que no habría un incumplimiento de la ANI que permita adecuar estas pretensiones como indemnizatorias[686]. Sin embargo, este Tribunal Arbitral ya ha decidido que sí hubo incumplimientos de la ANI; tanto de la ley, del Contrato como del Acta de EER, lo que sí permite adecuar estas pretensiones como indemnizatorias para POB[687].

884.    La Demandada alega que los cálculos hechos por FTI no son aquellos que corresponden a la fórmula de terminación anticipada reconocida en el Contrato[688]. Sin embargo, este Tribunal Arbitral ya ha explicado porqué dicha fórmula no es aplicable para la cuantificación de los daños de POB[689]. Asimismo, se reitera que, por medio de este Laudo no se está liquidando el Contrato de Concesión, sino que se está otorgando los perjuicios sufridos por las Demandantes y que han sido reclamados en este Arbitraje.

885.    La Demandada alega que el Tribunal Arbitral no tiene competencia para pronunciarse sobre las Reclamaciones EPC[690] ni sobre las UFs 1, 2 y 3, en general, por cuanto estás ya contarían con el acta de terminación respectiva y, en particular, respecto de los hallazgos arqueológicos de la UF2[691]. Sobre el primer punto, el Tribunal Arbitral ya ha decidido que no tiene competencia para pronunciarse sobre las Reclamaciones EPC, razón por la cual no se pronuncia sobre ellas. Sobre el segundo punto, el Tribunal Arbitral estima que sí tiene competencia para pronunciarse sobre los daños causados respecto de las UFs 1, 2 y 3, por cuanto la Demandada planteó una pretensión subsidiaria de Terminación Anticipada del Contrato ante la cual la Demandante reclamó los daños y

---

[686] Memorial de Respuesta a la prueba CER-009, sección 2.4.
[687] Sección IV.B.2 del Laudo.
[688] Memorial de Respuesta a la prueba CER-009, sección 2.5; Dictamen de Contradicción prueba CER-009, sección 8.
[689] Sección IV.D.2.
[690] Memorial de Respuesta a la prueba CER-009, sección 2.6.
[691] Memorial de Respuesta a la prueba CER-009, sección 2.7.

perjuicios que se derivarían de ello, incluyendo las utilidades dejadas de percibir respecto de las UFs 1, 2 y 3, lo que implica necesariamente pronunciarse sobre ellas.

886. Tercero, en cuanto a la distinción que hace la Demandada respecto de la indemnización de perjuicios y el restablecimiento del equilibrio económico del Contrato[692], el Tribunal Arbitral ya se ha pronunciado sobre este punto, analizando en detalle el sustento jurídico de la reparación integral de daños que se le debe a las Demandantes[693].

887. Cuarto, si bien el Tribunal Arbitral tiene consciencia de que lo otorgado no es lo pedido específicamente por las Demandantes, el Tribunal considera que esta decisión cabe dentro de su pretensión "(viii) Que [el Tribunal Arbitral] conceda cualquier otro remedio o compensación a las Demandantes que legal o contractualmente estime pertinente y resulte probado en el presente Arbitraje"[694].

888. En quinto lugar, a través de la Orden Procesal Núm. 18, se otorgó a las Partes una oportunidad de pronunciarse sobre los escritos e informes de la contraria. Así mismo, se instruyó a POB, que:

> [D]iferencie, de forma independiente para cada UF, si se incluyeron dentro del cálculo de daños, costos y gastos del EPC, y especifique el valor global de estos costos y gastos de EPC en cada una de las UFs ("Valor Global"). Adicionalmente, dentro del Valor Global de cada UF, especifique si estos costos y gastos han sido facturados por EPC a POB, y, separadamente, si han sido pagados por POB a EPC.

889. Las Demandantes cumplieron con el requerimiento presentando la prueba CER-010[695]. La Demandada, por su parte, presentó sus objeciones, en esencia, idénticas a aquellas formuladas en respuesta al CER-009[696]. Según lo señalado con anterioridad, el Tribunal Arbitral tuvo presente los montos actualizados de Pérdida LoP del Proyecto

---

[692] Memorial de Respuesta a la prueba CER-009, sección 2.8.
[693] Sección VI.D.1 del Laudo.
[694] Demanda POB y S&B, ¶ 589.
[695] Prueba CER-010.
[696] Respuesta al Dictamen de Experto Financiero de Contradicción de marzo de 2024.

para determinar la pérdida de POB al ponerse término al Contrato; a su vez, se tuvo presente el desglose de los costos incurridos para las UFs 4 y 5.

890.    Para concluir, el Tribunal Arbitral otorga a POB la indemnización por Pérdida LoP del Proyecto correspondiente a las UFs 1, 2 y 3 ascendente a COP $803.300.000.000, junto con la indemnización de los costos incurridos por POB para la ejecución de las Intervenciones en las UFs 4 y 5 ascendente a COP $413.605.900.000.

2.    ¿LE ASISTE A **S&B** UN DERECHO A RECIBIR UNA COMPENSACIÓN O INDEMNIZACIÓN Y EN QUÉ CUANTÍA?

(a)    **Posición de POB y S&B**

891.    Las Demandantes reclaman que S&B ha incurrido en un daño indemnizable de nueve mil quinientos millones (COP $9.500.000.000). Señalan que, debido a los incumplimientos de la ANI, S&B se ha visto obligada a mantener vigente una serie de cartas de crédito stand by (las "**Cartas de Crédito Stand-By de S&B**") durante un tiempo mayor al que habría tenido que mantenerlas vigentes si la ANI hubiera cumplido el Contrato. Explican que S&B tiene la obligación de mantener vigentes las Carta de Crédito Stand-By S&B en virtud del Equity Contribution Agreement, Subordination and Share Retention Agreement ("**ECA**") que suscribió con el BID como requisito para que éste otorgara la financiación del Proyecto.

892.    En efecto, las Demandantes señalan que, de conformidad con el ECA, S&B tiene la obligación de mantener vigentes las Cartas de Crédito Stand-By de S&B hasta que ocurra alguna de las siguientes condiciones: (i) se culmine la Fase de Construcción del Proyecto; (ii) se desembolsen la totalidad de los recursos a los que S&B se obligó en virtud del ECA o (iii) se pague la totalidad de la deuda con los Prestamistas parte del ECA[697].

---

[697] Demanda POB y S&B, ¶¶ 477-478.

**(b)    Posición de la ANI**

893.    La ANI rechaza la reclamación de daños de S&B dado que, los elementos de la responsabilidad de acuerdo con la jurisprudencia de la Corte Suprema de Justicia son: el hecho, el daño y la imputación a quien lo ocasionó con base en una relación de causalidad. No obstante, en el presente caso, señala que el daño alegado no existe, así como tampoco se evidencia prueba del hecho dañoso dado que la ANI no ejecutó ninguna actuación positiva o negativa que lo produjera[698].

894.    No obstante, cualquier perjuicio que hubiese podido sufrir la sociedad debe ser demostrado por esta y en caso de que se pruebe que la sociedad sufrió un perjuicio sería atribuible al actuar negligente de POB para superar los EER de las UFs 2, 4 y 5; adicionalmente, el perjuicio estaría causado gracias al incumplimiento de sus obligaciones en cuanto a las actividades necesarias para construir esas Unidades Funcionales. Por último, el riesgo financiero y las obligaciones de lograr la financiación del Proyecto son del Concesionario y no de la ANI, según el Contrato. Por lo anterior, el presente Tribunal debería desestimar las pretensiones formuladas por el Concesionario al respecto.

895.    Por otro lado, la ANI señala que las Demandantes se contradirían por cuanto han señalado que la ANI no tiene causa de acción en contra de S&B, por lo que, bajo ese mismo criterio, S&B tampoco tendría causa de acción en contra de la ANI[699].

**(c)    Análisis del Tribunal Arbitral**

896.    El Tribunal Arbitral rechaza la pretensión de las Demandantes relativas a las pérdidas patrimoniales sufridas por S&B.

897.    En efecto, el Tribunal no observa que S&B tuviera una causa de pedir independiente bajo el presente Contrato. Si bien el Tribunal Arbitral tuvo en consideración su participación en la emisión de la oferta, a efectos de corroborar el carácter internacional

---

[698] Contestación ANI, ¶ 20(ix).
[699] Demanda ANI, p. 171.

del Arbitraje (Sección IV.A.1 del Laudo), lo hizo porque así lo indica expresamente la Sección 15.3 del Contrato y la nota a pie de página que le acompaña.

898.    Sin embargo, esta determinación no se traduce automáticamente en derechos sustantivos de S&B bajo el Contrato. Por el contrario, el Contrato se ha perfeccionado entre la ANI y POB, quien ostenta los derechos contractuales en la calidad de Concesionario.

899.    En consecuencia, el Tribunal considera que no hay una obligación de la ANI para con S&B, por lo que los incumplimientos de la ANI del Contrato no generan responsabilidad civil de la ANI, ni obligación de indemnizar perjuicios a S&B.

## V.    PARTE RESOLUTIVA

900.  Con base en los antecedentes presentados, el Tribunal cuenta con la información necesaria para expedir el presente Laudo Parcial de Jurisdicción, Responsabilidad y Daños. En la sección de análisis legal de este Laudo Parcial, el Tribunal abordó los temas en el orden que resultaba más eficiente según las preguntas planteadas. En esta parte resolutiva, el Tribunal resume su decisión sobre esos temas en el orden en que las Partes los presentaron en sus escritos, y por lo tanto decide lo siguiente:

1.  **Desestima la excepción de ANI** sobre la jurisdicción del Tribunal Arbitral por una supuesta inobservancia de lo señalado en el literal c) del artículo 62 de la Ley 1536 de 2012;

2.  **Desestima la excepción de ANI** sobre la jurisdicción del Tribunal Arbitral por una supuesta inobservancia de lo señalado en el literal a) del artículo 62 de la Ley 1536 de 2012;

3.  **Acoge la excepción de ANI** sobre la jurisdicción del Tribunal Arbitral por el incumplimiento de las circunstancias descritas en el literal b) del artículo 62 de la Ley 1536 de 2012;

4.  **Desestima la excepción de ANI** sobre la objeción de falta de competencia del Tribunal Arbitral para conocer las pretensiones relacionadas con las compensaciones e indemnizaciones en relación con EERs relacionados con la UFs 2, 4 y 5;

233

5. **Estima fundada la excepción de ANI** sobre la falta de competencia del Tribunal Arbitral para conocer las reclamaciones del Contratista EPC (Reclamaciones EPC), al recaer sobre daños y perjuicios sufridos por un tercero, el Contratista EPC. Por lo anterior, el Tribunal Arbitral encuentra que carece de competencia para pronunciarse sobre la pretensión de POB con respecto a la adjudicación de los daños supuestamente producidos por los hallazgos arqueológicos de la UF2, toda vez que dichos daños están basados en las Reclamaciones EPC.

6. **Falla a favor** de las Demandantes en relación con sus reclamos sobre las UFs 4 y 5, y declara que la ANI incumplió la obligación contractual y legal de estructuración y planeación del Proyecto, al no detectar oportunamente la existencia de los manantiales;

7. **Falla a favor** de la Demandada y declara que la ANI cumplió con los términos del Acta del EER relativa a las UFs 4 y 5, toda vez que la obligación de la ANI era "determinar y revisar", pero no así de "suscribir" un convenio u Otrosí que permitiera superar el EER afectando la ejecución de la UFs 4 y 5;

8. Sin embargo**, falla a favor** de las Demandantes y declara que la ANI no cumplió con la obligación de actuar de buena fe en relación con la superación del EER de las UFs 4 y 5. La ANI incumplió la obligación de buena fe tanto en determinar la posibilidad o viabilidad de suscribir un documento contractual como en revisar las actividades y condiciones para ejecutar Intervenciones en las UFs 4 y 5;

9. **Estima fundada** la pretensión subsidiaria de la ANI sobre Terminación Anticipada y declara la terminación del Contrato. La Terminación Anticipada es acogida en virtud de lo dispuesto en la Sección 14.1(e) del Contrato de Concesión, pero sobre la base de una causa imputable a la ANI al no haber detectado oportunamente los manantiales. Asimismo, la mala fe de la ANI implicó que transcurrieran los 730 días sin llegar a acuerdos para la superación del EER de las UFs 4 y 5, y que el Proyecto resultara inviable. Se declara la Terminación Anticipada del Contrato a partir de la fecha de la notificación de este Laudo;

10. **Falla a favor** de las Demandantes en relación con la reclamación de indemnización integral, y otorga COP $413.605.900.000, con carácter de costos incurridos respecto de las UFs 4 y 5. Esta indemnización es en consideración al reconocimiento al daño antijurídico causado por los incumplimientos de la ANI y en virtud de la declaratoria

de Terminación Anticipada del Contrato. La ANI deberá pagar a la POB, la suma de COP $413.605.900.000;

11. **Falla a favor** de la reclamación de POB en cuanto la pérdida derivada de mayores fondeos a la Subcuenta de Supervisión e Interventoría. En consecuencia, el Tribunal otorga COP $119.500.000.000, como consecuencia de la no reducción proporcional de la Subcuenta de Interventoría y Supervisión del Contrato y con carácter de costos incurridos respecto de las UFs 4 y 5. La ANI deberá pagar a la POB, la suma de COP $119.500.000.000;

12. **Falla a favor** de las Demandantes en relación con la reclamación de indemnización integral, y otorga COP $803.300.000.000, por pérdida de utilidad respecto de las UFs 1, 2 y 3. Esta indemnización es en consideración al reconocimiento al daño antijurídico causado por los incumplimientos de la ANI y en virtud de la declaratoria de Terminación Anticipada del Contrato. La ANI deberá pagar a la POB, la suma de COP $803.300.000.000;

13. **Desestima la pretensión de indemnización** de la Demandante S&B, toda vez que este Tribunal entiende y declara que no existen obligaciones contractuales que unen a S&B con la ANI, más allá de tener que considerar a S&B como una parte alcanzada por el acuerdo de arbitraje. Por tanto, no otorga daños antijurídicos causados por los incumplimientos de la ANI y tampoco en virtud de la declaratoria de Terminación Anticipada del Contrato;

14. **Desestima** la pretensión reconvencional de la ANI sobre el incumplimiento de POB a las obligaciones contractuales en materia arqueológica respecto de la UF2;

15. **Desestima** la pretensión reconvencional de la ANI de incumplimiento por parte de POB de la obligación de O&M en las UFs 4 y 5;

16. **Desestima** la pretensión reconvencional de la ANI de indemnización de perjuicios por los intereses de mora a causa de el no pago de POB de las obligaciones de fondeo 5, 6, 7 y 8 de la Subcuenta de Interventoría y Supervisión.

17. **En resumen, la ANI deberá pagar a POB**, COP $413.605.900.000, por los costos incurridos respecto a las UFs 4 y 5; COP $119.500.000.000, por la no reducción proporcional a la Subcuenta de Supervisión e Interventoría; y COP $803.300.000.000

por pérdida de utilidad respecto de las UFs 1-3, por un total de COP $1.336.405.900.000.

18. El expediente se mantiene abierto y el Tribunal se reserva la jurisdicción sobre la materia de intereses y costas, en conformidad con lo decidido en la Orden Procesal Núm. 16. El Tribunal instruye a las Partes a presentar sus escritos de intereses y costas, de conformidad a lo señalado en los artículos 31.4 y 34 del Reglamento. En los escritos, cada Parte deberá expresar de forma clara y concisa sobre el objeto de su pretensión en cuanto a intereses y costas del Arbitraje, las razones legas que fundamentan dicha pretensión, y deberá aportar la prueba necesaria que apoyen la pretensión de costas del Arbitraje. La presentación de los escritos sobre intereses y costas del Arbitraje se hará de forma simultánea, y dentro de los 27 días contados a partir de la emisión de este Laudo Parcial, el día 15 de enero de 2025. A su vez, los escritos de respuesta a la pretensión sobre intereses costas del Arbitraje deberán ser presentados de forma simultánea y dentro de los 27 días contados a partir de la presentación de los escritos iniciales, el día 11 de febrero de 2025.

Cualquier reclamo o petición, excepto los reclamos sobre intereses y costas, que no se haya expresado directamente en este Laudo Parcial, se considera denegado. Este Laudo constituye una liquidación de todas las reclamaciones presentadas en este Arbitraje, salvo lo acá enunciado. Además, este Laudo Parcial es ejecutable inmediatamente y la ANI tiene la obligación de pagar la suma total de COP $1.336.405.900.000 otorgada a POB, con efecto inmediato.

Por la presente, certificamos que, a los efectos del Artículo I de la Convención de Nueva York de 1958 sobre el Reconocimiento y Ejecución de Laudos Arbitrales Extranjeros, este Laudo Parcial se dictó en **Bogotá, Colombia**.

Fecha: 19 de diciembre de 2024

Cristian Conejero Roos
Digitally signed by Cristian Conejero Roos
Date: 2024.12.19 19:22:58 -03'00'

ELINA MEREMINSKAYA *
Digitally signed by ELINA MEREMINSKAYA *
Date: 2024.12.19 17:46:45 -03'00'

Cristián Conejero, Árbitro

Elina Mereminskaya, Árbitro

Eduardo Palmer, Presidente del Tribunal

236

Yo, Eduardo Palmer, afirmo bajo mi juramento como Árbitro que soy la persona aquí descrita y quien ha ejecutado el presente instrumento que es el Laudo Parcial.

Eduardo Palmer
Presidente del Tribunal

Yo, Elina Mereminskaya, afirmo bajo mi juramento como Árbitro que soy la persona aquí descrita y quien ha ejecutado el presente instrumento que es el Laudo Parcial.

ELINA
MEREMINSKAYA *
Digitally signed by ELINA
MEREMINSKAYA *
Date: 2024.12.19 17:47:09 -03'00'

Elina Mereminskaya
Árbitro

Yo, Cristián Conejero, afirmo bajo mi juramento como Árbitro que soy la persona aquí descrita y quien ha ejecutado el presente instrumento que es el Laudo Parcial.

Cristián Conejero