IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PERIMETRAL ORIENTAL DE BOGOTÁ, S.A.S.,

　　　　　　　*Petitioner*,

v.

AGENCIA NACIONAL DE INFRAESTRUCTURA
and
THE REPUBLIC OF COLOMBIA

　　　　　　　*Respondents*.

**Civil Action No.** _____

**Declaration of Jason W. Myatt in Support of Petition to Confirm Arbitral Award**

# EXHIBIT 8

# LEY 1682 DE 2013

(noviembre 22)

D.O. 48.982, noviembre 22 de 2013

**por la cual se adoptan medidas y disposiciones para los proyectos de infraestructura de transporte y se conceden facultades extraordinarias.**

ANTECEDENTE LEGISLATIVO
PROYECTO DE LEY PUBLICADO GACETA 137/13
PRIMER DEBATE SENADO GACETA 330/13 – CAMARA 876/13
SEGUNDO DEBATE SENADO GACETA 419/13 – CAMARA 910/13 – 911/13
APROBACION PLENARIA SENADO GACETA 701/13
TEXTO APROBADO PLENARIA SENADO GACETA 572/13 – CAMARA 573/13
INFORME DE CONCILIACION SENADO GACETA 936/13 – CAMARA 935/13

**Nota 1: Modificada por la Ley 1882 de 2018 y por la Ley 1742 de 2014.**

**Nota 2: Reglamentada parcialmente por el Decreto 602 de 2017, por el Decreto 119 de 2015. por el Decreto 1955 de 2014, por el Decreto 791 de 2014, por el Decreto 738 de 2014, por el Decreto 737 de 2014 y por el Decreto 736 de 2014.**

**Nota 3: Ver Ley 1955 de 2019, artículo 119. Ver Decreto 884 de 2017. Ver Decreto 1008 de 2015. Ver Decreto 1026 de 2014.**

**Nota 4: Corregida por el Decreto 476 de 2014 y por el Decreto 3049 de 2013.**

El Congreso de Colombia

DECRETA:

TÍTULO I

DISPOSICIONES GENERALES, PRINCIPIOS Y POLÍTICAS DE LA INFRAESTRUCTURA DEL TRANSPORTE

Artículo 1°. Las disposiciones de la presente ley se aplicarán a la infraestructura del transporte.

Artículo 2°. La infraestructura del transporte es un sistema de movilidad integrado por un conjunto de bienes tangibles, intangibles y aquellos que se encuentran relacionados con este, el cual está bajo la vigilancia y control del Estado, y se organiza de manera estable para permitir el traslado de las personas, los bienes y los servicios, el acceso y la integración de las diferentes zonas del país y que propende por el crecimiento, competitividad y mejora de la calidad de la vida de los ciudadanos.

**Nota, artículo 2°: Ver Circular Externa 32 de 2018, SPT. Ver Resolución 602 de 2018, CGN. D.O. 50.811, pag. 23.**

Artículo 3°. Características de la infraestructura del transporte. La infraestructura de transporte como sistema se caracteriza por ser inteligente, eficiente, multimodal, segura, de acceso a todas las personas y carga, ambientalmente sostenible, adaptada al cambio climático y vulnerabilidad, con acciones de mitigación y está destinada a facilitar y hacer posible el transporte en todos sus modos.

Artículo 4°. Integración de la infraestructura de transporte. La infraestructura de transporte está integrada, entre otros por:

1. La red vial de transporte terrestre automotor con sus zonas de exclusión o fajas de retiro obligatorio, instalaciones operativas como estaciones de pesaje, centros de control de operaciones, estaciones de peaje, áreas de servicio y atención, facilidades y su señalización, entre otras.

2. Los puentes construidos sobre los accesos viales en Zonas de Frontera.

3. Los viaductos, túneles, puentes y accesos de las vías terrestres y a terminales portuarios y aeroportuarios.

4. Los ríos, mares, canales de aguas navegables y los demás bienes de uso público asociados a estos, así como los elementos de señalización como faros, boyas y otros elementos para la facilitación y seguridad del transporte marítimo y fluvial y sistemas de apoyo y control de tráfico, sin perjuicio de su connotación como elementos de la soberanía y seguridad del Estado.

5. Los puertos marítimos y fluviales y sus vías y canales de acceso. La infraestructura portuaria, marítima y fluvial comprende las radas, fondeaderos, canales de acceso, zonas de maniobra, zonas de protección ambiental y/o explotación comercial, los muelles, espigones diques direccionales, diques de contracción y otras obras que permitan el mantenimiento de un canal de navegación, estructuras de protección de orillas y las tierras en las que se encuentran construidas dichas obras.

6. Las líneas férreas y la infraestructura para el control del tránsito, las estaciones férreas, la señalización y sus zonas de exclusión o fajas de retiro obligatorio.

7. La infraestructura logística especializada que contempla los nodos de abastecimiento mayorista, centros de transporte terrestre, áreas logísticas de distribución, centros de carga aérea, zonas de actividades logísticas portuarias, puertos secos y zonas logísticas multimodales.

8. La infraestructura aeronáutica y aeroportuaria destinada a facilitar y hacer posible la navegación aérea.

9. Los Sistemas de Transporte por Cable: teleférico, cable aéreo, cable remolcador y funicular, construidos en el espacio público y/o con destinación al transporte de carga o pasajeros.

10. La infraestructura urbana que soporta sistemas de transporte público, sistemas integrados de transporte masivo, sistemas estratégicos de transporte público y sistemas integrados de transporte público; el espacio público que lo conforman andenes, separadores, zonas verdes, áreas de control ambiental, áreas de parqueo ocasional, así como ciclorrutas, paraderos, terminales, estaciones y plataformas tecnológicas.

11. Redes de sistemas inteligentes de transporte.

Parágrafo 1°. La integración a la que se refiere el presente artículo no modifica las competencias, usos, propiedad o destinación adicionales que el legislador haya previsto respecto de los bienes antes descritos.

Parágrafo 2°. Las zonas de exclusión o fajas de retiro obligatorio deberán ser previamente adquiridas por el responsable del proyecto de infraestructura de transporte, cuando se requiera su utilización.

**Nota, artículo 4º: Ver Ley 2294 de 2023, artículo 182, parágrafo. Ver Resolución 4413 de 2014, M. de Transporte. Ver Resolución 602 de 2018, CGN. D.O. 50.811, pag. 23.**

Artículo 5°. Las acciones de planificación, ejecución, mantenimiento, mejoramiento y rehabilitación de los proyectos y obras de infraestructura del transporte materializan el interés general previsto en la Constitución Política al fomentar el desarrollo y crecimiento económico del país; su competitividad internacional; la integración del Territorio Nacional, y el disfrute de los derechos de las personas y constituye un elemento de la soberanía y seguridad del Estado. En razón de ello, el desarrollo de las acciones antes indicadas constituye una función pública que se ejerce a través de las entidades y organismos competentes del orden nacional, departamental, municipal o distrital, directamente o con la participación de los particulares.

Artículo 6°. La infraestructura del transporte en Colombia deberá tener en cuenta las normas de accesibilidad a los modos de transporte de la población en general y en especial de las personas con discapacidad, así como el desarrollo urbano integral y sostenible.

Lo anterior, sin perjuicio de las exigencias técnicas pertinentes para cada caso.

Artículo 7°. Las entidades públicas y las personas responsables de la planeación de los proyectos de infraestructura de transporte deberán identificar y analizar integralmente durante la etapa de estructuración, la

existencia en el área de influencia directa e indirecta del proyecto, los siguientes aspectos, entre otros:

a) Las redes y activos de servicios públicos, los activos e infraestructura de la industria del petróleo y la infraestructura de tecnologías de la información y las comunicaciones;

b) El patrimonio urbano, arquitectónico, cultural y arqueológico;

c) Los recursos, bienes o áreas objeto de autorización, permiso o licencia ambiental o en proceso de declaratoria de reserva, exclusión o áreas protegidas;

d) Los inmuebles sobre los cuales recaigan medidas de protección al patrimonio de la población desplazada y/o restitución de tierras, conforme a lo previsto en las Leyes 387 de 1997 y 1448 de 2011 y demás disposiciones que las modifiquen, adicionen o complementen;

e) Las comunidades étnicas establecidas;

f) Títulos mineros en procesos de adjudicación, otorgados, existentes y en explotación;

g) Diagnóstico predial o análisis de predios objeto de adquisición.

Para tales efectos deberán solicitar a las autoridades, entidades o empresas que tengan a su cargo estas actividades o servicios dicha información, que deberá ser suministrada en un plazo máximo de treinta (30) días calendario después de radicada su solicitud.

Consultados los sistemas de información vigentes al momento de la estructuración, tales como el Sistema Integral de Información de Carreteras (SINC), y el Sistema de la Infraestructura Colombiana de Datos Especiales, entre otros, y sin limitarse a ellos, y reunida la información de que tratan los literales anteriores, el responsable de la estructuración de proyectos de infraestructura de transporte deberá analizar integralmente la misma, con el objetivo de establecer el mejor costo-beneficio para el proyecto en función de los aspectos, programas, planes y proyectos que lo impacten. El estructurador mantendrá un diálogo permanente con los actores e interesados para garantizar el interés general.

La Comisión Intersectorial de Infraestructura decidirá, en caso de existir superposición y/o conflicto entre proyectos de los distintos sectores o con los aspectos señalados anteriormente, cómo debe procederse.

Artículo 8°. Para efectos de la presente ley, se definen los siguientes principios, bajo los cuales se planeará y desarrollará la infraestructura del transporte:

**Accesibilidad**. En el desarrollo de los proyectos de infraestructura y los servicios de transporte deberán considerarse tarifas, cobertura y disposiciones que permitan el acceso de todas las personas e igualmente el acceso de la carga.

**Adaptación y mitigación al cambio climático**. Los proyectos de infraestructura de transporte deben considerar la implementación de medidas técnicas para reducir la vulnerabilidad de los sistemas de transporte por razón de los efectos reales o esperados del cambio climático. Asimismo, deben implementar los cambios y reemplazos tecnológicos que reducen el insumo de recursos y las emisiones de gases contaminantes y material particulado por unidad de producción.

**Calidad del servicio**. La infraestructura de transporte debe considerar las necesidades de los clientes, usuarios o ciudadanos, así como las características mínimas requeridas para cumplir con los niveles de servicio y los estándares nacionales o internacionales aplicables.

**Capacidad**. Se buscará el mejoramiento de la capacidad de la infraestructura, de conformidad con las condiciones técnicas de oferta y demanda de cada modo de transporte.

**Competitividad**. La planeación y desarrollo de los proyectos de infraestructura de transporte del país deberán estar orientados a mejorar la producción, el sostenimiento y la expansión de la industria nacional y el comercio exterior y su participación en los mercados internacionales, así como a propender por la generación de empleo. Se impulsará la consolidación de corredores que soporten carga de comercio exterior y que conecten los principales centros de producción y consumo con los puertos marítimos, aeropuertos y puntos fronterizos con la red vial terrestre, fluvial o aérea.

**Conectividad**. Los proyectos de infraestructura de transporte deberán propender por la conectividad con las diferentes redes de transporte existentes a cargo de la nación, los departamentos y los municipios, razón por la cual el tipo de infraestructura a construir variará dependiendo de la probabilidad de afectaciones por causas naturales, los beneficios esperados y los costos de construcción.

**Eficiencia**. En los proyectos de infraestructura de transporte se buscará la optimización del sistema de movilidad integrado, la adecuada organización de los diversos modos de transporte y la creación de las cadenas logísticas integradas.

**Seguridad**. La infraestructura de transporte que se construya en el país deberá atender a criterios y estándares de calidad, oportunidad, seguridad y la visión de cero muertes en accidentes, para cualquier modo de transporte.

Esta seguridad involucra las acciones de prevención o minimización de accidentes de tránsito y las encaminadas a proveer la información de las

medidas que deben adoptarse para minimizar las consecuencias de un accidente al momento de su ocurrencia.

**Sostenibilidad ambiental**. Los proyectos de infraestructura deberán cumplir con cada una de las exigencias establecidas en la legislación ambiental y contar con la licencia ambiental expedida por la Anla o la autoridad competente.

**Inciso adicionado por la Ley 1742 de 2014, artículo 1º.** Los proyectos de infraestructura deberán diseñarse y desarrollarse con los más altos criterios de sostenibilidad ambiental, acorde con los estudios previos de impacto ambiental debidamente socializados y cumpliendo con todas las exigencias establecidas en la legislación para la protección de los recursos naturales y en las licencias expedidas por la autoridad ambiental competente, quien deberá hacer un estricto control y seguimiento en todas las actividades de los proyectos.

Artículo 9°. Intermodalidad, multimodalidad, articulación e integración. Los proyectos de infraestructura se planificarán con la finalidad de asegurar la intermodalidad de la infraestructura de transporte, la multimodalidad de los servicios que se prestan y la articulación e integración entre los diversos modos de transporte, en aras de lograr la conectividad de las diferentes regiones del país y de estas con el exterior.

El Gobierno Nacional reglamentará la materia dentro de los ciento veinte días calendario siguientes.

**Nota, artículo 9º: Ver Decreto 736 de 2014.**

Artículo 10. Proyectos de infraestructura de transporte con intervención urbana y rural de la red secundaria o terciaria. En los proyectos de infraestructura de transporte de utilidad pública e interés social a cargo de la Nación que requieran intervenciones urbanas o rurales en vías de la red secundaria o terciaria para su desarrollo, se suscribirá un convenio de colaboración y coordinación con la Autoridad Territorial correspondiente en el que se establezcan las responsabilidades que cada una de las partes asume en la ejecución de las actividades relacionadas con el proyecto.

En caso de no llegar a un acuerdo en un término de noventa (90) días, la entidad responsable del proyecto a cargo de la Nación continuará con el proyecto de infraestructura de transporte, entregando a la entidad territorial un documento que dé cuenta de la revisión de la viabilidad del proyecto de la nación, se ajuste al plan de Desarrollo Territorial y las acciones de mitigación de impactos sobre el territorio a intervenir.

Artículo 11. Con el fin de mejorar la movilidad urbana, reducir la pobreza y propiciar la inclusión social, el Gobierno Nacional impulsará el diseño, construcción y operación de cables urbanos.

TÍTULO II

DEFINICIONES

Artículo 12. **Reglamentado por el Decreto 602 de 2017.** En lo que se refiere a la infraestructura de transporte terrestre, aeronáutica, aeroportuaria y acuática, se tendrán en cuenta las siguientes definiciones:

**Actividades y obras de protección**. Labores mecánicas de protección y mitigación, permanentes o provisionales, sobre los activos, redes e infraestructura de servicios públicos y actividades complementarias, tecnologías de la información y las comunicaciones y de la industria del petróleo.

**Construcción**. Son aquellas obras nuevas que incluyen el levantamiento o armado de algún tipo de infraestructura de transporte.

**Costos asociados al traslado o reubicación de redes y activos.** Corresponde al valor del desmantelamiento e instalación de una nueva red o activo. Dicho valor incluirá la adquisición de nuevos activos, servidumbres, licenciamientos, gestión contractual y en general los costos que impliquen la instalación de la nueva red, así como las obras necesarias para garantizar la continuidad y calidad en la prestación de los servicios públicos durante el traslado o reubicación de las redes y activos. La determinación del valor del activo estará sujeta al principio de no traslado de renta entre sectores.

**Estudios de Ingeniería**. Sin perjuicio de lo previsto en la Ley 1508 de 2012 y sus decretos reglamentarios, las siguientes definiciones deben tenerse en cuenta en la preparación de los diversos estudios de ingeniería que se adelanten para la ejecución de los proyectos de infraestructura:

Fase 1. Prefactibilidad. Es la fase en la cual se debe realizar el prediseño aproximado del proyecto, presentando alternativas y realizar la evaluación económica preliminar recurriendo a costos obtenidos en proyectos con condiciones similares, utilizando modelos de simulación debidamente aprobados por las entidades solicitantes. En esta fase se debe consultar la herramienta o base de datos que determine el Ministerio de Ambiente y Desarrollo Sostenible para tal fin, dentro de la Ventanilla Integral de Trámites Ambientales en Línea (Vital). El objetivo de la fase 1 es surtir el proceso para establecer la alternativa de trazado que a este nivel satisface en mayor medida los requisitos técnicos y financieros.

Fase 2. Factibilidad. Es la fase en la cual se debe diseñar el proyecto y efectuar la evaluación económica final, mediante la simulación con el modelo aprobado por las entidades contratantes. Tiene por finalidad establecer si el proyecto es factible para su ejecución, considerando todos los aspectos relacionados con el mismo.

En esta fase se identifican las redes, infraestructuras y activos existentes, las comunidades étnicas y el patrimonio urbano, arquitectónico, cultural y arqueológico que puedan impactar el proyecto, así como títulos mineros en procesos de adjudicación, otorgados, existentes y en explotación.

Desarrollados los estudios de factibilidad del proyecto, podrá la entidad pública o el responsable del diseño si ya fue adjudicado el proyecto, continuar con la elaboración de los diseños definitivos.

Finalizada esta fase de factibilidad, la entidad pública o el contratista, si ya fue adjudicado el proyecto de infraestructura de transporte, adelantará el estudio de impacto ambiental, el cual será sometido a aprobación de la autoridad ambiental quien otorgará la licencia respectiva.

Fase 3. Estudios y diseños definitivos. Es la fase en la cual se deben elaborar los diseños detallados tanto geométricos como de todas las estructuras y obras que se requieran, de tal forma que un constructor pueda materializar el proyecto. El objetivo de esta fase es materializar en campo el proyecto definitivo y diseñar todos sus componentes de tal manera que se pueda dar inicio a su construcción.

**Industria del petróleo**. Actividad de utilidad pública en las áreas de exploración, explotación, refinación, transporte y distribución de hidrocarburos y sus derivados según el Decreto ley número 1056 de 1953 y las normas que lo modifiquen, sustituyan o complementen.

**Infraestructuras Logísticas Especializadas (ILE)**. Son áreas delimitadas donde se realizan, por parte de uno o varios operadores, actividades relativas a la logística, el transporte, manipulación y distribución de mercancías, funciones básicas técnicas y actividades de valor agregado para el comercio de mercancías nacional e internacional.

Contemplan los nodos de abastecimiento mayorista, centros de transporte terrestre, áreas logísticas de distribución, centros de carga aérea, zonas de actividades logísticas portuarias, puertos secos y zonas logísticas multimodales.

**Mantenimiento de emergencia**. Se refiere a las intervenciones en la infraestructura derivada de eventos que tengan como origen emergencias climáticas, telúricas, terrorismo, entre otros, que a la luz de la legislación vigente puedan considerarse eventos de fuerza mayor o caso fortuito. Estas actividades están sujetas a reglamentación, dentro de los ciento veinte (120) días calendario siguientes.

**Mantenimiento periódico**. Comprende la realización de actividades de conservación a intervalos variables, destinados primordialmente a recuperar los deterioros ocasionados por el uso o por fenómenos naturales o agentes externos.

**Mantenimiento rutinario**. Se refiere a la conservación continua (a intervalos menores de un año) con el fin de mantener las condiciones

óptimas para el tránsito y uso adecuado de la infraestructura de transporte.

**Mejoramiento**. Cambios en una infraestructura de transporte con el propósito de mejorar sus especificaciones técnicas iniciales. Estas actividades están sujetas a reglamentación dentro de los ciento veinte (120) días calendario siguientes.

**Modo de transporte**. Espacio aéreo, terrestre o acuático soportado por una infraestructura especializada, en el cual transita el respectivo medio de transporte.

**Modo aéreo**. Comprende la infraestructura aeronáutica y aeroportuaria para los medios de transporte aéreo.

**Modo terrestre**. Comprende la infraestructura carretera, férrea y por cable para los medios de transporte terrestre.

**Modo acuático**. Comprende la infraestructura marítima, fluvial y lacustre para los medios de transporte acuático.

**Nodo de transporte**. Infraestructura en la cual se desarrollan actividades que permiten el intercambio de uno o más medios o modos de transporte.

**Redes y activos**. Corresponde al conjunto de elementos físicos destinados a la prestación del respectivo servicio público, tecnología de la información y las comunicaciones o de la industria del petróleo, de conformidad con la normativa vigente incluida la expedida por la correspondiente Comisión de Regulación o el Ministerio de Minas y Energía.

**Rehabilitación**. Reconstrucción de una infraestructura de transporte para devolverla al estado inicial para la cual fue construida.

**Reubicación o traslado de redes y activos**. Comprende la desinstalación, movilización de la infraestructura de redes y activos existentes, para ser ubicados en un sitio diferente, de tal manera que el respectivo servicio se continúe prestando con la misma red o activo o algunos de sus componentes y/o comprende el desmantelamiento, inutilización o abandono de la infraestructura de redes y activos y la construcción de una nueva red o activo o algunos de sus componentes en un sitio diferente, de tal manera que el respectivo servicio se continúe prestando en las mismas condiciones.

**Saneamiento automático**. Es un efecto legal que opera por ministerio de la ley exclusivamente a favor del Estado, cuando este adelanta procesos de adquisición de bienes inmuebles, por los motivos de utilidad pública consagrados en la ley para proyectos de infraestructura de transporte. En virtud de tal efecto legal, el Estado adquiere el pleno

dominio de la propiedad del inmueble quedando resueltas a su favor todas las disputas o litigios relativos a la propiedad.

Lo anterior, sin perjuicio de los conflictos que puedan existir entre terceros sobre el inmueble, los cuales se resolverán a través de las diferentes formas de resolución de conflictos, sin que puedan ser oponibles al Estado.

**Servicios conexos al transporte**. Son todos los servicios y/o actividades que se desarrollan o prestan en la infraestructura de transporte y complementan el transporte, de acuerdo con las competencias de las autoridades previstas para cada modo.

Dichos servicios permiten una operación modal o multimodal, atendiendo también las actividades propias del transporte en condiciones de regularidad y de eventualidades.

Entre estos servicios se encuentran los peritajes y evaluación de vehículos, las terminales de pasajeros y carga, las escuelas de enseñanza y los centros de desintegración y reciclaje de vehículos, entre otros.

**Términos de Referencia Integrales**. Son los lineamientos generales estándares que el Ministerio de Ambiente y Desarrollo Sostenible, en coordinación con la Autoridad Nacional de Licencias Ambientales, fija para la elaboración y ejecución de todos los estudios ambientales para proyectos de infraestructura de transporte, sin perjuicio de los lineamientos específicos que para cada proyecto exija la autoridad ambiental competente.

El solicitante deberá presentar los estudios exclusivamente de conformidad con estos términos de referencia integrales, los cuales serán de obligatorio cumplimiento.

**Vecinos o aledaños**. Para efectos del artículo que regula la Autorización Temporal, se considerará que los predios rurales son vecinos o aledaños a la obra, si se encuentran a no más de 50 km de distancia de la misma.

Parágrafo. En todo caso, las definiciones contenidas en reglamentos técnicos internacionales que deban ser observados por las autoridades colombianas prevalecerán frente a las que están reguladas en el presente artículo.

TÍTULO III

DISPOSICIONES ESPECIALES EN MATERIA DE CONTRATACIÓN DE INFRAESTRUCTURA DE TRANSPORTE

Artículo 13. Los contratos que en adelante desarrollen proyectos de infraestructura de transporte, incluirán una cláusula en la cual se establezca la fórmula matemática que determine las eventuales

prestaciones recíprocas en caso de terminarse anticipadamente por un acuerdo entre las partes o por decisión unilateral.

Parágrafo 1°. La entidad pública contratante garantizará el equilibrio económico del contrato en cualquiera de las etapas de su ejecución y podrá proponer, si así lo considera, de acuerdo con la ley vigente, el pago anticipado de la recuperación de la inversión en la etapa de operación, de conformidad con la fórmula descrita en el contrato.

Parágrafo 2°. Para los contratos celebrados con anterioridad a la sanción de la presente ley, que estén en etapa de operación, la entidad pública contratante podrá proponer fórmulas que aceleren la recuperación de la inversión, garantizando al contratista el pago de las prestaciones a que tiene derecho, posibilitando de común acuerdo la terminación anticipada del contrato, la cual deberá ser fundamentada en los motivos previstos en el Estatuto General de Contratación Estatal, siempre y cuando se requiera para ejecutar una obra de interés público o por motivos de utilidad e interés general.

Las indemnizaciones o pagos a que haya lugar podrán ser determinadas de común acuerdo entre las partes o haciendo uso de la amigable composición, o de un tribunal arbitral, o de cualquier otro mecanismo alternativo de solución de conflictos.

Parágrafo 3°. Por ministerio de la ley, la terminación anticipada implicará la subrogación de la entidad pública responsable en los derechos y obligaciones del titular de la licencia, los permisos o las autorizaciones ambientales, títulos mineros y en general otra clase de permisos o autorizaciones obtenidos para la ejecución del proyecto de infraestructura de transporte.

Lo anterior, sin perjuicio de las obligaciones pendientes al momento de la terminación, sobre las cuales las partes podrán acordar quién asume la respectiva responsabilidad, o deferir dicha decisión a un tercero, haciendo uso de cualquier mecanismo alternativo de solución de conflictos.

Artículo 14. Solución de controversias. Para la solución de las controversias surgidas por causa o con ocasión de la celebración, desarrollo, ejecución, interpretación, terminación y liquidación de contratos estatales, las partes podrán incluir cláusulas compromisorias, debiendo siempre observar lo previsto en la Ley 1563 de 2012 y demás normas que la adicionen, modifiquen, sustituyan o reglamenten, en especial, las normas que regulen el uso de mecanismos alternativos de solución de controversias para las entidades públicas.

Así mismo, de manera especial aplicarán las siguientes reglas:

a) **Literal modificado por la Ley 1742 de 2014, artículo 2°.** Las decisiones proferidas en ejercicio de los mecanismos alternativos de solución de controversias relativas al contrato, deberán proferirse en

derecha, salvo en el evento de la amigable composición en el que la decisión podrá adaptarse en equidad, de conformidad con el artículo 60 de la Ley 1563 de 2012.

Texto inicial del literal a): "Las decisiones proferidas en ejercicio de los mecanismos alternativos de solución de controversias, relativas al contrato, deberán proferirse en derecho;".

b) Las partes podrán acordar los asuntos jurídicos, técnicos o financieros que someterán a decisión, total o parcialmente;

c) Tanto los árbitros como los amigables componedores no tendrán competencia para pronunciarse sobre la legalidad de los actos administrativos expedidos en ejercicio de facultades excepcionales; **(Nota: Ver sentencia C-45 de 2017, con respecto a este literal.)**.

d) En caso de pactarse el uso del amigable componedor, las entidades objeto de la presente ley deberán incluir en la cláusula respectiva las reglas que garanticen los derechos de igualdad, publicidad, contradicción y defensa;

e) El ejercicio de dichos mecanismos no suspenderá de manera automática el ejercicio de las facultades ajenas al derecho común de que gocen las entidades contratantes, salvo que medie medida cautelar decretada en los términos del Capítulo XI del Título V de la Parte Segunda de la Ley 1437 de 2011 o demás normas que le adicionen, modifiquen o sustituyan;

f) Queda prohibido a las entidades públicas objeto de la presente ley, nombrar los integrantes del panel arbitral o de amigable componedor en la cláusula compromisoria relativa o inequívocamente referida al contrato, o a documentos que hagan parte del mismo en los pliegos de condiciones. Se seguirán las reglas de nombramiento de la Ley 1563 de 2012;

g) Las entidades contratantes deberán definir desde los pliegos de condiciones el perfil de los árbitros y amigables componedores, de tal manera que sus condiciones personales y profesionales, sean idóneas respecto del objeto del contrato y las actividades a desarrollar por las partes;

h) Ningún árbitro, amigable componedor o secretario podrá desempeñarse simultáneamente como tal, en más de tres (3) tribunales o amigable componedor en que intervenga como parte una entidad pública objeto de la presente ley, o en los conflictos relativos a estas;

i) Las entidades objeto de la presente ley deberán en las cláusulas compromisorias limitar los honorarios de los árbitros o de los amigables componedores. En caso de que la cláusula respectiva no disponga de fórmula de reajuste, el límite no podrá ser modificado ni actualizado por los árbitros o los amigables componedores;

j) Las entidades públicas incluirán los costos y gastos que demanden el uso de tales mecanismos en sus presupuestos.

Parágrafo. En los contratos celebrados con anterioridad a la expedición de esta ley por autonomía de la voluntad de las partes se podrá dar aplicación a las reglas que prevé el presente artículo.

Artículo 15. Permisos para el desarrollo de proyectos de infraestructura de transporte. Sin perjuicio de lo previsto en la Ley 1508 de 2012, cualquier interesado podrá solicitar a la autoridad competente, permiso para el desarrollo por su cuenta y riesgo de proyectos de infraestructura de transporte de su interés.

La entidad competente analizará la conveniencia técnica, legal y financiera del proyecto y podrá otorgar el permiso si considera que está acorde con los planes, programas y proyectos del sector y si el mismo cuenta con los conceptos técnicos y las autorizaciones legales pertinentes.

El proyecto deberá desarrollarse bajo los estándares y normas técnicas del modo correspondiente y deberá garantizar su conectividad con la infraestructura existente. Todos los bienes y servicios que se deriven del desarrollo del proyecto serán de propiedad, uso, explotación y administración de la Nación o entidad territorial según corresponda.

En ningún caso, la autorización o permiso otorgado constituirá un contrato con el particular, ni la entidad estará obligada a reconocer o pagar el valor de la inversión o cualquier otro gasto o costo asociado al proyecto de infraestructura de transporte.

Tampoco podrá entenderse que el particular obtiene derecho exclusivo o preferente sobre la propiedad, uso, usufructo, explotación o libre disposición y enajenación del bien o servicio del proyecto de infraestructura de transporte. Estos derechos los tendrá en igualdad de condiciones con los demás ciudadanos.

El Gobierno Nacional establecerá las condiciones que deben cumplir tanto las entidades nacionales, como las territoriales para el otorgamiento de estos permisos, en un plazo no mayor de ciento veinte (120) días calendario. Adicionalmente, reglamentará lo concerniente a la conectividad entre el proyecto de infraestructura de transporte de interés privado y la Red Vial a fin de evitar que aquellos proyectos generen perjuicios al interés general.

**Nota, artículo 15: Ver Resolución 2922 de 2014, M. de Transporte. Ver Decreto 942 de 2014.**

Artículo 16. Para el desarrollo de proyectos de infraestructura de transporte, las entidades deberán abrir los procesos de selección si cuentan con estudios de ingeniería en Etapa de Factibilidad como mínimo, sin perjuicio de los estudios jurídicos, ambientales y financieros con que debe contar la entidad.

Parágrafo. La anterior disposición no se aplicará:

a) Cuando excepcionalmente la entidad pública requiera contratar la elaboración de estudios y diseños, construcción, rehabilitación, mejoramiento y/o mantenimiento que se contemplen de manera integral, o

b) Para la revisión y verificación previas de proyectos de asociación pública-privada de iniciativa privada previstas en la Ley 1508 de 2012 o la norma que la modifique, sustituya o reemplace podrá iniciarse el trámite con estudios y diseños en etapa de prefactibilidad.

Artículo 17. Frentes de trabajo 7x24. Los contratistas de proyectos de infraestructura de transporte podrán solicitar al ente contratante autorización para incrementar los frentes de trabajo y/o realizar trabajos en 3 turnos diarios (24 horas), siete días a la semana para cumplir con sus cronogramas de obra en caso de presentar atrasos o para incrementar los rendimientos y adelantar la ejecución del proyecto. En este último caso, deberán presentar su propuesta respetando las apropiaciones presupuestales de la vigencia que amparen el respectivo contrato. También podrán solicitar ajustes contractuales que impliquen el adelantamiento de obra. La entidad tendrá treinta (30) días calendario para aceptar o rechazar motivadamente la solicitud.

Para las nuevas estructuraciones de proyectos de infraestructura de transporte, que se inicien a partir de la entrada en vigencia de la presente ley, las entidades estatales y privadas deberán planear el desarrollo de las obras, con jornadas de trabajo de 3 turnos diarios (24 horas), siete días a la semana.

Asimismo, las entidades estatales podrán hacer efectivas las multas y/o cláusula penal exigiéndole al contratista instalar frentes de trabajo en 3 turnos diarios (24 horas), siete días a la semana hasta por el valor de la sanción, como mecanismo conminatorio y forma de pago. Esta facultad se entiende atribuida respecto de las cláusulas de multas y cláusula penal pecuniaria pactadas en los contratos celebrados con anterioridad a la expedición de esta ley y en los que por autonomía de la voluntad de las partes se hubiese previsto la competencia de las entidades estatales para imponerlas y hacerlas efectivas.

Artículo 18. Responsabilidad. Las personas jurídicas que ejecuten proyectos de infraestructura bajo la modalidad de Asociación Público Privado su régimen de responsabilidad será el que se establezca en las leyes civiles y comerciales de acuerdo con el tipo de empresa que conforme.

TÍTULO IV

GESTIÓN Y ADQUISICIÓN PREDIALES, GESTIÓN AMBIENTAL, ACTIVOS Y REDES DE SERVICIOS PÚBLICOS, DE TIC Y DE LA INDUSTRIA DEL PETRÓLEO, ENTRE OTROS Y PERMISOS MINEROS Y SERVIDUMBRES

CAPÍTULO I

**Gestión y Adquisición Predial**

Artículo 19. Definir como un motivo de utilidad pública e interés social la ejecución y/o desarrollo de proyectos de infraestructura del transporte a los que se refiere esta ley, así como el desarrollo de las actividades relacionadas con su construcción, mantenimiento, rehabilitación o mejora, quedando autorizada la expropiación administrativa o judicial de los bienes e inmuebles urbanos y rurales que se requieran para tal fin, de conformidad con el artículo 58 de la Constitución Política.

Artículo 20. **Modificado por la Ley 1742 de 2014, artículo 3º.** La adquisición predial es responsabilidad del Estado y para ello la entidad pública responsable del proyecto podrá adelantar la expropiación administrativa con fundamento en el motivo definido en el artículo anterior, siguiendo para el efecto los procedimientos previstos en las Leyes 9a de 1989 y 388 de 1997, o la expropiación judicial con fundamento en el mismo motivo, de conformidad con lo previsto en las Leyes 9ª de 1989, 388 de 1997 y 1564 de 2012.

En todos los casos de expropiación, incluyendo los procesos de adquisición predial en curso, deben aplicarse las reglas especiales previstas en la presente ley.

Parágrafo 1º. La adquisición de predios de propiedad privada o pública necesarios para establecer puertos, se adelantará conforme a lo señalado en las reglas especiales de la Ley 1ª de 1991 o aquellas que la complementen, modifiquen o sustituyan de manera expresa.

Parágrafo 2º. Debe garantizarse el debido proceso en la adquisición de predios necesarios para el desarrollo o ejecución de los proyectos de infraestructura de transporte, en consecuencia, las entidades públicas o los particulares que actúen como sus representantes, deberán ceñirse a los procedimientos establecidos en la ley, respetando en todos los casos el derecho de contradicción.

Texto inicial del artículo 20: "La adquisición predial es responsabilidad del Estado y para ello la entidad pública responsable del proyecto podrá adelantar la expropiación administrativa con

fundamento en el motivo definido en el artículo anterior, siguiendo para el efecto los procedimientos previstos en las Leyes 9ª de 1989 y 388 de 1997, o la expropiación judicial con fundamento en el mismo motivo, de conformidad con lo previsto en las Leyes 9ª de 1989, 388 de 1997 y 1564 de 2012.

En todos los casos de expropiación, incluyendo los procesos de adquisición predial en curso, deben aplicarse las reglas especiales previstas en la presente ley.

La entidad responsable del proyecto de infraestructura deberá inscribir las afectaciones en el respectivo folio de matrícula inmobiliaria de los predios requeridos para la expansión de la infraestructura de transporte para el mediano y largo plazo y en cuanto sea viable presupuestalmente podrá adquirirlos. Para este caso, las afectaciones podrán tener una duración máxima de doce (12) años.

Parágrafo 1°. La adquisición de predios de propiedad privada o pública necesarios para establecer puertos, se adelantará conforme a lo señalado en las reglas especiales de la Ley 1o de 1991 o aquellas que la complementen, modifiquen o sustituyan de manera expresa.

Parágrafo 2°. Debe garantizarse el debido proceso en la adquisición de predios necesarios para el desarrollo o ejecución de los proyectos de infraestructura de transporte, en consecuencia, las entidades públicas o los particulares que actúen como sus representantes, deberán ceñirse a los procedimientos establecidos en la ley, respetando en todos los casos el derecho de contradicción.".

Artículo 21. **Reglamentado por el Decreto 737 de 2014**. Saneamientos por motivos de utilidad pública. La adquisición de inmuebles por los motivos de utilidad pública e interés social consagrados en las leyes gozará en favor de la entidad pública del saneamiento automático de cualquier vicio relativo a su titulación y tradición, incluso los que surjan con posterioridad al proceso de adquisición, sin perjuicio de las acciones indemnizatorias que por cualquier causa puedan dirigirse contra los titulares inscritos en el respectivo folio de matrícula inmobiliaria, *diferentes a la entidad pública adquirente*. **(Nota: La expresión tachada en sepia fue declarada inexequible por la Corte Constitucional en la Sentencia C-410 de 2015.).**

El saneamiento automático de que trata el presente artículo será aplicable a los inmuebles adquiridos para proyectos de infraestructura de transporte, incluso antes de la vigencia de la Ley 9ª de 1989, de acuerdo con la reglamentación que expida el Gobierno Nacional en un plazo no mayor de ciento veinte (120) días calendario.

Parágrafo 1°. El saneamiento automático será invocado por la entidad adquirente en el título de tradición del dominio y será objeto de registro en el folio de matrícula correspondiente.

Parágrafo 2°. La entidad pública que decida emplear el mecanismo de saneamiento automático deberá verificar si el inmueble a adquirir se encuentra inscrito en el Registro de Tierras Despojadas y Abandonadas Forzosamente creado por la Ley 1448 de 2011, a cargo de la Unidad Administrativa Especial de Gestión de Restitución de Tierras Despojadas, si existe en curso proceso judicial de restitución, así como si existen medidas de protección inscritas por la vía individual o colectiva a favor del propietario que no hayan sido levantadas, en virtud de lo previsto al efecto por la Ley 387 de 1997 y el Decreto número 2007 de 2001. En estos casos se entenderá que los propietarios carecen de la capacidad para enajenarlos voluntariamente.

En los casos en que solo se encuentren solicitudes de restitución o inscripción en el Registro de Tierras Despojadas o Abandonadas procederá adelantar la expropiación y se pondrá a disposición del juez de conocimiento de estos procesos el valor de los predios en depósito judicial, para que una vez se inicie el proceso de restitución este ponga el correspondiente depósito a órdenes del juez de restitución.

La inclusión del predio en los proyectos viales aprobados por el Gobierno Nacional se entenderá en los términos del artículo 72 de la Ley 1448 de 2011 como una imposibilidad jurídica para la restitución que impondrá al Fondo de la Unidad Administrativa Especial de Gestión de Restitución de Tierras Despojadas compensar a las víctimas con un predio de similares condiciones, en el orden y lineamientos establecidos en el artículo 98 de la Ley 1448 de 2011 y sus decretos reglamentarios. Sin embargo, en estos casos, el pago de la compensación se realizará con cargo a los recursos que se consignen en el depósito judicial efectuado por la entidad propietaria con cargo al proyecto, en virtud del proceso de expropiación.

En caso de que esté en trámite el proceso de restitución, se iniciará el proceso de expropiación, pero se esperarán las resultas del proceso de restitución para determinar a quién se consigna el valor del predio. En caso de que proceda la restitución, el valor consignado se transferirá al Fondo de la Unidad Administrativa Especial de Gestión de Restitución de Tierras Despojadas para que compense las víctimas cuyo bien es jurídicamente imposible de restituir, en los términos previstos en el artículo 98 de la Ley 1448 de 2011 y sus normas reglamentarias.

El saneamiento automático no desvirtuará las medidas de protección inscritas en el Registro Único de Tierras Despojadas con fines publicitarios a favor de los poseedores, sin embargo, la prueba se considerará constituida para los respectivos efectos en eventuales procesos de restitución que se adelanten en el futuro sobre el bien.

Si el objeto de la expropiación fuere la adquisición parcial de un inmueble determinado, sujeto a los casos previstos en el presente parágrafo, en el Folio de Matrícula Inmobiliaria de la parte restante que no sea objeto de adquisición, deberán mantenerse las medidas de protección inscritas. Además, teniendo en cuenta que no quedan afectos a los proyectos, procederá la restitución, siempre que se den los elementos y requisitos exigidos en la Ley 1448 de 2011.

Cumplido el procedimiento especial para la adquisición de predios vinculados a la restitución de tierras o con medidas de protección, procederá el saneamiento por motivos de utilidad pública.

No obstante lo anterior, la entrega anticipada de los predios la podrá solicitar la entidad responsable del proyecto de infraestructura ante el juez de conocimiento del proceso de expropiación. En cualquier caso, el juez de expropiación o el juez comisionado, durante la diligencia de entrega, deberá informar que se ha hecho la consignación del valor del predio a órdenes del juzgado de restitución.

Parágrafo 3°. En todo caso ningún saneamiento automático implicará el levantamiento de servidumbres de utilidad pública frente a redes y activos, ni el desconocimiento de los derechos inmobiliarios que hayan sido previamente adquiridos para el establecimiento de la infraestructura de servicios públicos domiciliarios y actividades complementarias, Tecnologías de la Información y las comunicaciones y la industria del Petróleo.

Artículo 22. **Modificado por la Ley 1882 de 2018, artículo 8°.** Limitaciones, afectaciones, gravámenes al dominio, medidas cautelares, impuestos, servicios públicos y contribución de valorización. En el proceso de adquisición de predios requeridos para proyectos de infraestructura de transporte, en caso de existir acuerdo de negociación entre la entidad Estatal y el titular inscrito en el folio de matrícula o al respectivo poseedor regular inscrito y previo al registro de la escritura pública correspondiente, la entidad estatal, con cargo al valor del proyecto, podrá descontar la suma total o proporcional que se adeuda por concepto de gravámenes, limitaciones, afectaciones, medidas cautelares, impuestos, servicios públicos y contribución de valorización y pagar directamente dicho valor al acreedor o mediante depósito judicial a órdenes del despacho respectivo, en caso de cursar procesos ejecutivos u ordinarios en los que se haya ordenado el respectivo gravamen, considerando para el efecto el área objeto de adquisición, o verificar que lo realizará directamente el titular. De no ser posible, se continuará con el proceso de expropiación administrativa o judicial, según corresponda.

La entidad estatal adquirente expedirá un oficio con destino al Registrador de Instrumentos Públicos respectivo o a la autoridad competente, en el cual se solicite levantar la limitación, la afectación, gravamen o medida cautelar, evidenciando el pago y paz y salvo correspondiente, cuando a ello haya lugar. El Registrador deberá dar trámite a la solicitud en un término perentorio de 15 días hábiles.

Una vez realizada la respectiva anotación en el registro, el Registrador deberá dar aviso mediante oficio al notario correspondiente para que obre en la escritura pública respectiva del inmueble.

Las medidas cautelares al dominio cuya inscripción se encuentre caducada de acuerdo con lo dispuesto en la Ley 1579 de 2012, se podrán cancelar con la solicitud que realice la entidad estatal al Registrador de Instrumentos Públicos.

Cuando se trate de servidumbres de utilidad pública y las redes y activos allí asentados puedan mantenerse, se conservará el registro del gravamen en el folio del inmueble.

Parágrafo. La entidad estatal con cargo al valor del negocio, podrá descontar la suma total o proporcional que debe pagarse por concepto de gastos de notariado y registro y pagar directamente dicho valor.

Texto inicial del artículo 22. "Limitaciones, afectaciones, gravámenes al dominio y medidas cautelares. En el proceso de adquisición de predios requeridos para proyectos de infraestructura de transporte, en caso de existir acuerdo de negociación entre la entidad Estatal y el titular inscrito en el folio de matrícula y previo al registro de la escritura pública correspondiente, la entidad estatal, con cargo al valor del negocio, podrá descontar la suma total o proporcional que se adeuda por concepto de gravámenes, limitaciones, afectaciones y medidas cautelares y pagar directamente dicho valor al acreedor o mediante depósito judicial a órdenes del despacho respectivo, en caso de cursar procesos ejecutivos u ordinarios en los que se haya ordenado el respectivo gravamen, considerando para el efecto el área objeto de adquisición, o verificar que lo realizará directamente el titular. De no ser posible, se continuará con el proceso de expropiación administrativa o judicial, según corresponda.

La entidad estatal adquirente expedirá un oficio con destino al Registrador de Instrumentos Públicos respectivo o a la autoridad competente, en el cual se solicite levantar la limitación, la afectación, gravamen o medida cautelar, evidenciando el pago y paz y salvo correspondiente, cuando a ello haya lugar. El Registrador deberá dar trámite a la solicitud en un término perentorio de 15 días hábiles.

Una vez realizada la respectiva anotación en el registro, el Registrador deberá dar aviso mediante oficio al notario correspondiente para que obre en la escritura pública respectiva del inmueble.

Las medidas cautelares al dominio cuya inscripción se encuentre caducada de acuerdo con lo dispuesto en la Ley 1579 de 2012, se podrán cancelar con la solicitud que realice la entidad estatal al Registrador de Instrumentos Públicos.

Cuando se trate de servidumbres de utilidad pública y las redes y activos allí asentados puedan mantenerse, se conservará el registro del gravamen en el folio del inmueble.".

Artículo 23. Avaluadores y metodología de avalúo. El avalúo comercial para la adquisición o expropiación de los inmuebles requeridos para proyectos de infraestructura de transporte será realizado por el Instituto Geográfico Agustín Codazzi (IGAC) o la autoridad catastral correspondiente o las personas naturales o jurídicas de carácter privado registradas y autorizadas por las Lonjas de Propiedad Raíz.

El avalúo comercial, de ser procedente, incluirá el valor de las indemnizaciones o compensaciones que fuera del caso realizar por afectar el patrimonio de los particulares.

Para la adquisición o expropiación de inmuebles requeridos en proyectos de infraestructura de transporte, el Instituto Geográfico Agustín Codazzi (IGAC) tendrá como función adoptar las normas, métodos, parámetros, criterios y procedimientos que deben aplicarse en la elaboración de los avalúos comerciales y su actualización. Cuando las circunstancias lo indiquen, el Instituto Geográfico Agustín Codazzi (IGAC) introducirá las modificaciones que resulten necesarias.

Las normas, métodos, parámetros, criterios y procedimientos establecidos y/o modificados por el Instituto Geográfico Agustín Codazzi (IGAC) son de obligatorio y estricto cumplimiento para los avaluadores, propietarios y responsables de la gestión predial en proyectos de infraestructura de transporte.

Parágrafo. El retardo injustificado en los avalúos realizados es causal de mala conducta sancionable disciplinariamente, sin perjuicio de las demás responsabilidades en que pueda incurrir el avaluador.

Parágrafo 2°. **Adicionado Ley 1882 de 2018, artículo 18.** En las normas, métodos, parámetros, criterios y procedimientos que adopte el Instituto Geográfico Agustín Codazzi (IGAC), en cumplimiento de lo

dispuesto en el presente artículo, no procederá indemnización, compensación o reconocimiento alguno por obras nuevas o mejoras, derechos, prerrogativas, autorizaciones que hayan sido levantadas, hechas o concedidas en las fajas o zonas reservadas en los términos del artículo 4° de la Ley 1228 de 2008.

**Nota, artículo 23: Ver Resolución 2684 de 2015, M. de Transporte. Ver Resolución 898 de 2014, IGAAC, D.O. 49.249, pag. 39. Ver Resolución 741 de 2014, IGAC, D.O. 49.229, pag. 61.**

Artículo 24. Revisión e impugnación de avalúos comerciales. Para la adquisición o expropiación de bienes requeridos en los proyectos de infraestructura de transporte, la entidad solicitante, o quien haga sus veces, del avalúo comercial, podrá pedir la revisión e impugnación dentro de los (5) días siguientes a la fecha de su entrega. La impugnación puede proponerse directamente o en subsidio de la revisión.

Se entiende por revisión la solicitud por la cual la entidad solicitante o quien haga sus veces, fundada en consideraciones técnicas, requiere a quien realizó el avalúo comercial, para que reconsidere la valoración y/o precio presentados, a fin de corregirlos, reformarlos o confirmarlos.

Corresponde a quien realizó el avalúo comercial pronunciarse sobre la revisión solicitada dentro de los diez (10) días siguientes a su presentación. Una vez decidida la revisión y si hay lugar a tramitar la impugnación, quien haya decidido la revisión enviará el expediente al Instituto Geográfico Agustín Codazzi (IGAC) dentro de los tres (3) días siguientes a la de la fecha del acto por el cual se resolvió la revisión.

La impugnación es el procedimiento que se adelanta por la entidad solicitante, o quien haga sus veces, ante el Instituto Geográfico Agustín Codazzi (IGAC), para que este examine el avalúo comercial, a fin de corregirlo, reformarlo o confirmarlo.

Al Instituto Geográfico Agustín Codazzi (IGAC) le compete resolver las impugnaciones en todos los casos, para lo cual señalará funcionalmente dentro de su estructura las instancias a que haya lugar. La decisión tendrá carácter vinculante. El plazo para resolver las impugnaciones será de diez (10) días y se contarán desde el día siguiente a la fecha de presentación de la impugnación.

Parágrafo 1°. En cuanto no sea incompatible con lo previsto en esta ley, se aplicarán para la revisión e impugnación lo previsto en el Código de Procedimiento Administrativo y de lo Contencioso Administrativo o demás normas que lo modifiquen, deroguen o sustituyan.

Parágrafo 2°. **Modificado por la Ley 1882 de 2018, artículo 9°.** El avalúo comercial tendrá una vigencia de un (1) año, contado, desde la fecha de su comunicación a la entidad solicitante o desde la fecha en que fue decidida y notificada la revisión y/o, impugnación de este. Una vez

notificada la oferta, el avalúo quedará en firme para efectos de la enajenación voluntaria.

Texto inicial del parágrafo 2°. "El avalúo comercial tendrá una vigencia de un (1) año, contado desde la fecha de su comunicación o desde aquella en que fue decidida y notificada la revisión y/o impugnación.".

Parágrafo 3°. La entidad solicitante, o quien haga sus veces, asumirá los costos que demande la atención de las impugnaciones a que se refiere el presente artículo, de conformidad con las tarifas fijadas por el Instituto Geográfico Agustín Codazzi (IGAC).

Parágrafo 4°. El retardo injustificado en la resolución de la revisión o impugnación de los avalúos, es causal de mala conducta sancionable disciplinariamente, sin perjuicio de las demás responsabilidades en que pueda incurrir el evaluador o el servidor público del Instituto Geográfico Agustín Codazzi (IGAC), según el caso.

Artículo 25. **Modificado por la Ley 1882 de 2018, artículo 10.** Notificación de la oferta. La oferta deberá ser notificada únicamente al titular de los derechos reales que figure registrado en el folio de matrícula del inmueble objeto de expropiación o al respectivo poseedor regular inscrito o a los herederos determinados e indeterminados, entendidos como aquellas personas que tengan la expectativa cierta y probada de entrar a representar al propietario fallecido en todas sus relaciones jurídicas por causa de su deceso de conformidad con las leyes vigentes.

La oferta será remitida por el representante legal de la entidad pública competente para realizar la adquisición del inmueble o su delegado; para su notificación se cursará oficio al propietario, poseedor inscrito o a los herederos determinados e indeterminados, el cual contendrá como mínimo:

1. Indicación de la necesidad de adquirir el inmueble por motivo de utilidad pública.

2. Alcance de conformidad con los estudios de viabilidad técnica.

3. Identificación precisa del inmueble.

4. Valor como precio de adquisición acorde con lo previsto en el artículo 37 de la presente ley.

5. Información completa sobre los posibles procesos que se pueden presentar como son: enajenación voluntaria, expropiación administrativa o judicial.

Se deberán explicar los plazos, y la metodología para cuantificar el valor que se cancelará a cada propietario o poseedor según el caso.

Una vez notificada la oferta se entenderá iniciada la etapa de negociación directa, en la cual el propietario o poseedor inscrito tendrá un término de

quince (15) días hábiles para manifestar su voluntad en relación con la misma, bien sea aceptándola, o rechazándola.

Si la oferta es aceptada, deberá suscribirse escritura pública de compraventa o la promesa de compraventa dentro de los diez (10) días hábiles siguientes e inscribirse la escritura en la oficina de registro de instrumentos públicos del lugar correspondiente.

Se entenderá que el propietario o poseedor del predio renuncian a la negociación cuando:

a) Guarden silencio sobre la oferta de negociación directa;

b) Dentro del plazo para aceptar o rechazar la oferta no se logre acuerdo;

c) No suscriban la escritura o la promesa de compraventa respectiva en los plazos fijados en la presente ley por causas imputables a ellos mismos.

Será obligatorio iniciar el proceso de expropiación si transcurridos treinta (30) días hábiles después de la notificación de la oferta de compra, no se ha llegado a un acuerdo formal para la enajenación voluntaria, contenido en un contrato de promesa de compraventa y/o escritura pública.

Notificada la oferta de compra de los inmuebles sobre los que recaiga la declaratoria de utilidad pública o de interés social, e inscrita dicha oferta en el respectivo Certificado de Libertad Tradición, los mismos no podrán ser objeto de ninguna limitación al dominio. El registrador se abstendrá de efectuar la inscripción de actos, limitaciones, gravámenes, medidas cautelares o afectaciones al dominio sobre aquellos.

Parágrafo. La entidad adquiriente procederá a expedir directamente la resolución de expropiación sin necesidad de expedir oferta de compra en los siguientes eventos:

1. Cuando se verifique que el titular inscrito del derecho real de dominio falleció y no es posible determinar sus herederos.

2. En el evento en el que alguno de los titulares del derecho real inscrito en el folio de matrícula inmobiliaria del inmueble objeto de adquisición o el respectivo poseedor regular inscrito se encuentren reportados en alguna de las listas de control de prevención de lavado de activos o financiación del terrorismo.

Una vez expedida la resolución de expropiación, la entidad adquiriente solicitará la inscripción de la misma en el respectivo Certificado de libertad y tradición y libertad del inmueble. El registrador se abstendrá de efectuar la inscripción de actos, limitaciones, gravámenes, medidas cautelares o afectaciones al dominio sobre aquellos.

Surtida la etapa de agotamiento de vía gubernativa, la Entidad adquirente deberá acudir al procedimiento de expropiación judicial contemplado en el artículo 399 del Código General del Proceso o la norma que lo modifique o sustituya, para lo cual aplicará el saneamiento automático y el valor que arroje la expropiación se dejará a cargo del juzgado de conocimiento.

Parágrafo 2°. Se dispone un plazo de noventa (90) días siguientes a la suscripción de contratos de compraventa de los bienes objeto de la oferta de compra, para realizar el pago correspondiente, vencido el plazo y no habiéndose realizado el mismo, los titulares de derechos reales podrán acudir al proceso ejecutivo y se causarán intereses de mora.

Texto anterior del artículo 25. **Modificado por la Ley 1742 de 2014, artículo 4º.** ''Notificación de la oferta. Notificación de la oferta. **La oferta deberá ser notificada únicamente al titular de derechos reales que figure registrado en el folio de matrícula del inmueble objeto de expropiación o al respectivo poseedor regular inscrito** de conformidad con las leyes vigentes. **(Nota: La expresión señalada en negrilla fue declarada exequible por los cargos analizados por la Corte Constitucional en la Sentencia C-750 de 2015.).**

La oferta será remitida por el representante legal de la entidad pública competente para realizar la adquisición del inmueble o su delegado; **para su notificación se cursará oficio al propietario o poseedor inscrito,** el cual contendrá como mínimo: **(Nota: La expresión señalada en negrilla fue declarada exequible por los cargos analizados por la Corte Constitucional en la Sentencia C-750 de 2015.).**

1. Indicación de la necesidad de adquirir el inmueble por motivo de utilidad pública.

2. Alcance de conformidad con los estudios de viabilidad técnica.

3. Identificación precisa del inmueble.

4. Valor como precio de adquisición acorde con lo previsto en el artículo 37 de la presente ley.

5. Información completa sobre los posibles procesos que se pueden presentar como son: enajenación voluntaria, expropiación administrativa o judicial.

Se deberán explicar los plazos, y la metodología para cuantificar el valor que se cancelará a cada propietario o poseedor según el caso.

**La oferta deberá ser notificada únicamente al titular de derechos reales que figure registrado en el folio de matrícula del inmueble objeto de adquisición o al respectivo poseedor regular inscrito,** de conformidad con lo dispuesto en el Código de Procedimiento Administrativo y de lo Contencioso Administrativo. **(Nota: La expresión señalada en negrilla fue declarada exequible por los cargos analizados por la Corte Constitucional en la Sentencia C-750 de 2015.).**

**Una vez notificada la oferta se entenderá iniciada la etapa de negociación directa, en la cual el propietario o poseedor inscrito tendrán un término de quince (15) días hábiles para manifestar su voluntad en relación con la misma, bien sea aceptándola, o rechazándola. (Nota: Inciso declarado exequible por los cargos analizados por la Corte Constitucional en la Sentencia C-750 de 2015.).**

Si la oferta es aceptada, deberá suscribirse escritura pública de compraventa o la promesa de compraventa dentro de los diez (10) días hábiles siguientes e inscribirse la escritura en la oficina de registro de instrumentos públicos del lugar correspondiente.

Se entenderá que el propietario o poseedor del predio renuncian a la negociación cuando:

a) Guarden silencio sobre la oferta de negociación directa.

b) Dentro del plazo para aceptar o rechazar la oferta no se logre acuerdo.

c) No suscriban la escritura o la promesa de compraventa respectiva en los plazos fijados en la presente ley por causas imputables a ellos mismos.

Será obligatorio iniciar el proceso de expropiación si transcurridos treinta (30) días hábiles después de la comunicación de la oferta de compra, no se ha llegado a un acuerdo formal para la enajenación voluntaria, contenido en un contrato de promesa de compraventa y/o escritura pública.

Notificada la oferta de compra de los inmuebles sobre los que recaiga la declaratoria de utilidad pública o de interés social, e inscrita dicha oferta en el respectivo Certificado de Libertad y Tradición, los mismos no podrán ser objeto de ninguna limitación al dominio. El Registrador se abstendrá de efectuar la inscripción de actos, limitaciones, gravámenes, medidas cautelares o afectaciones al dominio sobre aquellos.".

Texto inicial del artículo 25: "Notificación de la oferta. La oferta deberá ser notificada únicamente al titular de derechos reales que figure registrado en el folio de matrícula del inmueble objeto de expropiación y/o al respectivo poseedor regular inscrito de conformidad con las leyes vigentes.

Parágrafo. Notificada la oferta de compra de los inmuebles sobre los que recaiga la declaratoria de utilidad pública e interés social, los mismos no podrán ser objeto de ninguna limitación al dominio. El registrador se abstendrá de efectuar la inscripción de actos, limitaciones, gravámenes, medidas cautelares o afectaciones al dominio sobre aquellos.".

Artículo 26. Actualización de cabida y linderos. En caso que en el proceso de adquisición o expropiación de inmuebles necesarios para la realización de proyectos de infraestructura de transporte, se requiera la actualización de cabida y/o linderos, la entidad pública, o quien haga sus veces, procederá a solicitar dicho trámite ante el Instituto Geográfico Agustín Codazzi (IGAC) o la autoridad catastral correspondiente.

El Instituto Geográfico Agustín Codazzi (IGAC) o la autoridad catastral correspondiente comparará la información contenida en los títulos registrados con la que tiene incorporada en sus bases de datos, disponiendo y practicando una inspección técnica para determinar su coincidencia. Si la información de los títulos registrados coincide en un todo con la de sus bases de datos, procederá a expedir la certificación de cabida y/o linderos.

Si la información de catastro no coincide con la de los títulos registrados, el Instituto Geográfico Agustín Codazzi (IGAC) o la autoridad catastral correspondiente convocará a los titulares de derechos de dominio y demás interesados, directamente o a través de un medio de comunicación idóneo, para buscar un acuerdo a partir de una propuesta que sobre cabida y/o linderos el Instituto Geográfico Agustín Codazzi (IGAC) o quien haga sus veces realice. Si se llega a un acuerdo, se expedirá la certificación de cabida y/o lindero; en caso contrario, se agotarán las instancias judiciales a que haya lugar por parte de los titulares de derecho de dominio.

El término para tramitar y expedir la certificación de cabida y/o linderos es de dos (2) meses improrrogables contados a partir de la recepción de la solicitud, cuando la información de los títulos registrados coincida plenamente con la de catastro. Si no coincide y es necesaria convocar a los titulares de dominio y demás interesados, el término para agotar el trámite será de cuatro (4) meses, que se contabilizarán desde la recepción de la solicitud.

Una vez se expida la certificación de cabida y/o linderos, el Instituto Geográfico Agustín Codazzi (IGAC) o la autoridad catastral correspondiente dará traslado a la entidad u organismo encargado del registro de instrumentos públicos de la respectiva jurisdicción, dentro de los 5 días siguientes, con el fin de que proceda a hacer las anotaciones del caso. La anotación en el registro deberá realizarse dentro de los 10 días calendario a partir del recibo de la certificación.

El Instituto Geográfico Agustín Codazzi (IGAC) establecerá el procedimiento para desarrollar el trámite de cabida y/o linderos aquí señalado, en un término no mayor a tres (3) meses, contados a partir de la vigencia de la presente ley.

Parágrafo 1°. La Entidad solicitante, o quien haga sus veces, asumirá los costos que demande la atención del trámite a que se refiere el presente artículo, de conformidad con las tarifas fijadas por el Instituto Geográfico Agustín Codazzi (IGAC) o autoridad catastral correspondiente.

Parágrafo 2°. El retardo injustificado en el presente trámite de actualización de cabida y linderos o su inscripción en el registro es causal de sanción disciplinaria, que se puede imponer de oficio o por queja del interesado, sin perjuicio de la responsabilidad que pueda corresponder al funcionario.

**Nota, artículo 26:** Ver **Instrucción Administrativa 20 de 2018**. **Ver Instrucción Administrativa 16 de 2016**, S.N.R. Ver Resolución 193 de 2014,  IGAC. D.O. 49.071, pag. 118.

Artículo 27. **Modifico por la Ley 1882 de 2018, artículo 11**. Permiso de intervención voluntaria. Mediante documento escrito suscrito por la entidad y el titular inscrito en el folio de matrícula el poseedor regular o los herederos determinados del bien, podrá pactarse un permiso de intervención voluntario del inmueble objeto de adquisición o expropiación. El permiso será irrevocable una vez se pacte.

Con base en el acuerdo de intervención suscrito, la entidad deberá iniciar el proyecto de infraestructura de transporte.

Lo anterior, sin perjuicio de los derechos de terceros sobre el inmueble los cuales no surtirán afectación o detrimento alguno con el permiso de intervención voluntaria, así como el deber del responsable del proyecto de infraestructura de transporte de continuar con el proceso de enajenación voluntaria, expropiación administrativa o judicial, según corresponda.

Parágrafo. En el proceso administrativo, en caso de no haberse pactado el permiso de intervención voluntario del inmueble objeto de adquisición o expropiación, dentro de los quince (15) días siguientes a la ejecutoria del acto administrativo que la dispuso, la entidad interesada solicitará a la respectiva autoridad de policía, la práctica de la diligencia de desalojo, que deberá realizarse con el concurso de esta última y con el acompañamiento de la Defensoría del Pueblo y/o el personero municipal quien deberá garantizar la protección de los Derechos Humanos, dentro de un término perentorio de cinco (5) días, de la diligencia, se levantará un acta y en ella no procederá oposición alguna.

Texto inicial del artículo 27. "Permiso de intervención voluntario. Mediante documento escrito suscrito por la entidad y el titular inscrito en el folio de matrícula, podrá pactarse un permiso de intervención voluntario del inmueble objeto de adquisición o expropiación. El permiso será irrevocable una vez se pacte. **(Nota: Inciso 1º declarado exequible por los cargos analizados por la Corte Constitucional en la Sentencia C-669 de 2015.).**

Con base en el acuerdo de intervención suscrito, la entidad deberá iniciar el proyecto de infraestructura de transporte. **(Nota: Inciso 2º declarado exequible por los cargos analizados por la Corte Constitucional en la Sentencia C-669 de 2015.).**

Lo anterior, sin perjuicio de los derechos de terceros sobre el inmueble los cuales no surtirán afectación o detrimento alguno con el permiso de intervención voluntaria, así como el deber del responsable del proyecto de infraestructura de transporte de continuar con el proceso de enajenación voluntaria, expropiación administrativa o judicial, según corresponda. **(Nota: Inciso 3º declarado exequible por los cargos analizados por la Corte Constitucional en la Sentencia C-669 de 2015.).**

Parágrafo. En el proceso administrativo, en caso de no haberse pactado el permiso de intervención voluntario del inmueble objeto de adquisición o expropiación, dentro de los quince (15) días siguientes a la ejecutoria del acto administrativo que la dispuso, la entidad interesada solicitará a la respectiva autoridad de policía, la práctica de la diligencia de desalojo, que deberá realizarse con el concurso de esta última y con el acompañamiento de la Defensoría del Pueblo y/o el personero municipal quien deberá garantizar la protección de los derechos humanos, dentro de un término perentorio de cinco (5) días, de la diligencia, se levantará un acta y en ella no procederá oposición alguna.". **(Nota: Parágrafo declarado exequible por los cargos analizados por la Corte Constitucional en la Sentencia C-669 de 2015 en el entendido que las expresiones subrayadas se refieren respectivamente, al proceso de expropiación administrativa y a la ejecutoria del acto administrativo que la determina).**

**Nota, artículo 27: Ver Resolución 2684 de 2015, M. de Transporte.**

Artículo 28. **Modificado por la Ley 1742 de 2014, artículo 5º.** Entrega anticipada por orden judicial. Los jueces deberán ordenar la entrega de los bienes inmuebles declarados de utilidad pública para proyectos de infraestructura de transporte, en un término perentorio e improrrogable de diez (10) días hábiles, contados a partir de la solicitud de la entidad demandante, en los términos del artículo 399 de la Ley 1564 de 2012 Código General del Proceso o la norma que lo modifique o sustituya.

Si los bienes hubieren sido objeto de embargo, gravamen hipotecario o demandas registradas, para efectos de ordenar la entrega anticipada, no serán oponibles estas limitaciones. En todo caso, se respetarán los derechos de terceros dentro del proceso judicial.

Los numerales 4 y 11 de artículo 399 de la Ley 1564 de 2012 Código General del Proceso, en relación con la entrega anticipada del bien a solicitud de la entidad demandante, entrarán a regir a partir de la promulgación de esta ley y aplicarán para los procesos en curso, de conformidad con las precisiones que se disponen en la presente ley.

Texto inicial del artículo 28: "Entrega anticipada por orden judicial. Los jueces deberán ordenar la entrega de los bienes inmuebles declarados de utilidad pública para proyectos de infraestructura de transporte, en un término perentorio e improrrogable de treinta (30) días calendario, contados a partir de la solicitud de la entidad demandante, en los términos del artículo 399 de la Ley 1564 de 2012 Código General del Proceso o la norma que lo modifique o sustituya.

Si los bienes hubieren sido objeto de embargo, gravamen hipotecario o demandas registradas, para efectos de ordenar la entrega anticipada, no serán oponibles estas limitaciones. En todo caso, se respetarán los derechos de terceros dentro del proceso judicial.

Los numerales 4 y 11 de artículo 399 de la Ley 1564 de 2012 Código General del Proceso, en relación con la entrega anticipada del bien a solicitud de la entidad demandante, entrarán a regir a partir de la promulgación de esta ley y aplicarán para los procesos en curso, de conformidad con las precisiones que se disponen en la presente ley.".

Artículo 29. Entrega anticipada de bienes en proceso de extinción de dominio, baldíos y bajo administración de CISA. Los bienes inmuebles necesarios para el desarrollo de proyectos de infraestructura de transporte, que se encuentren bajo la administración de CISA o quien haga sus veces, en proceso de extinción de dominio, en proceso de clarificación o inmuebles baldíos, podrán ser expropiados o adjudicados, según sea procedente, por y a la entidad estatal responsable del proyecto y esta podrá solicitar a la entidad competente la entrega anticipada, una vez se haya efectuado el depósito del valor del inmueble, cuando a ello haya lugar.

La solicitud de entrega anticipada solo podrá realizarse cuando el proyecto de infraestructura de transporte se encuentre en etapa de construcción. La entidad competente tendrá un plazo máximo de 30 días calendario para hacer entrega material del inmueble requerido.

En el caso que el dominio sobre el bien inmueble no se extinga como resultado del proceso o en el proceso de clarificación se establezca un titular privado, el valor del depósito se le entregará al propietario del inmueble.

Artículo 30. Pagado el valor del inmueble objeto de expropiación de conformidad con el avalúo, no procederá la prejudicialidad para los procesos de expropiación, servidumbre o adquisición de predios para obras de infraestructura de transporte.

Artículo 31. Ejecutoriedad del acto expropiatorio. El acto administrativo por medio del cual la entidad declara la expropiación administrativa del inmueble u ordena el inicio de los trámites para la expropiación judicial, será de aplicación inmediata y gozará de fuerza ejecutoría y ejecutiva.

Contra el acto administrativo que decida la expropiación solo procede el recurso de reposición el cual se concederá en el efecto devolutivo.

Artículo 32. **Título corregido por el Decreto 3049 de 2013, artículo 1º**. Cesión voluntaria a título gratuito de franjas de terreno. Texto inicial: "Sesión voluntaria a título gratuito de franjas de terreno.". Los titulares de derechos reales sobre los predios requeridos para la ejecución de proyectos de infraestructura podrán ceder de manera voluntaria y a título gratuito en favor del ente adquirente los inmuebles de su propiedad sin que previamente tenga que mediar oferta formal de compra. La cesión a que se refiere este artículo no generará gastos de notariado y registro.

Artículo 33. Adquisición de áreas remanentes no desarrollables. En los procesos de adquisición predial para proyectos de infraestructura de transporte, las Entidades Estatales podrán adquirir de los titulares de derechos reales sobre los predios requeridos para la ejecución de proyectos de infraestructura, áreas superiores a las necesarias para dicha ejecución, en aquellos casos en que se establezca que tales áreas no son desarrollables para ningún tipo de actividad por no cumplir con los parámetros legales, esquemas o planes básicos de ordenamiento territorial o por tratarse de zonas críticas o de riesgo ambiental o social.

**Nota, artículo 33: Artículo declarado exequible por los cargos analizados por la Corte Constitucional en la Sentencia C-750 de 2015.**

Artículo 34. Avalúos comerciales. Cuando el avalúo comercial de los inmuebles requeridos para la ejecución de proyectos de infraestructura de transporte supere en un 50% el valor del avalúo catastral, el avalúo comercial podrá ser utilizado como criterio para actualizar el avalúo catastral de los inmuebles que fueren desenglobados como consecuencia del proceso de enajenación voluntaria o expropiación judicial o administrativa.

Para este efecto, el ente estatal una vez perfeccionado el proceso de adquisición predial a favor del Estado, procederá a remitir al organismo catastral o quien haga sus veces y a la autoridad tributaria, el informe del valor pagado por metro cuadrado, hectárea o fanegada del inmueble adquirido.

La entidad territorial podrá decidir si el avalúo catastral debe ser actualizado, y el incremento correspondiente.

Artículo 35. Predios adquiridos para compensación ambiental. Los predios que las Entidades Estatales deban adquirir en cumplimiento de obligaciones ambientales establecidas en la Licencia Ambiental para compensación, deberán ser cedidos a título gratuito, para ser incorporados como bien de uso público en el respectivo plan, esquema o plan básico de ordenamiento territorial de la jurisdicción donde se encuentre, a la entidad que determine la autoridad ambiental competente, de conformidad con la medida de compensación propuesta por el solicitante.

La propiedad y administración de dichos bienes deberá ser recibida por las autoridades municipales o las autoridades ambientales respectivas, de acuerdo con sus competencias y la destinación de los mismos.

Artículo 36. **Título corregido por el Decreto 3049 de 2013, artículo 2º.** Cesión de inmuebles entre entidades públicas. Texto inicial: "Sesión de inmuebles entre entidades públicas.". Los predios de propiedad de entidades públicas que se requieran para el desarrollo de proyectos de infraestructura deberán ser cedidos a la entidad responsable del proyecto, a título oneroso o como aporte de la respectiva entidad propietaria al proyecto de infraestructura de transporte.

Para efectos de determinar el valor del inmueble, la entidad cesionaria deberá contratar un avalúo con el Instituto Geográfico Agustín Codazzi (IGAC), la entidad que cumpla sus funciones o con peritos privados inscritos en las lonjas de propiedad raíz o asociaciones legalmente constituidas.

El avalúo que dichas entidades o personas establezcan tendrá carácter obligatorio para las partes.

La cesión implicará la afectación del bien como bien de uso público.

En todo caso, la entrega anticipada del inmueble deberá realizarse una vez lo solicite la entidad responsable del proyecto de infraestructura de transporte.

Artículo 37. **Modificado por la Ley 1742 de 2014, artículo 6º.** El precio de adquisición en la etapa de enajenación voluntaria será igual al valor comercial determinado por el Instituto Geográfico Agustín Codazzi (IGAC), los catastros descentralizados o por peritos privados inscritos en lonjas o asociaciones, de conformidad con las normas, métodos, parámetros, criterios y procedimientos que sean fijados por el Instituto Geográfico Agustín Codazzi (IGAC).

El valor comercial se determinará teniendo en cuenta la reglamentación urbanística municipal o distrital vigente al momento de la oferta de

compra en relación con el inmueble a adquirir y su destinación económica y, de ser procedente, la indemnización que comprenderá el daño emergente y el lucro cesante.

El daño emergente incluirá el valor del inmueble. El lucro cesante se calculará según los rendimientos reales del inmueble al momento de la adquisición y hasta por un término de seis (6) meses. **(Nota: Ver Sentencia C-750 de 2015, con relación a este inciso 3º.).**

En la cuantificación del daño emergente solo se tendrá en cuenta el daño cierto y consolidado. **(Nota: Ver Sentencia C-750 de 2015, con relación a este inciso 4º.).**

En caso de no llegarse a acuerdo en la etapa de enajenación voluntaria, el pago del predio será cancelado de forma previa teniendo en cuenta el avalúo catastral y la indemnización calculada al momento de la oferta de compra, en la etapa de expropiación judicial o administrativa. **(Nota: Inciso 5º declarado exequible condicionalmente por los cargos analizados por la Corte Constitucional en la Sentencia C-750 de 2015. Providencia confirmada en la Sentencia C-286 de 2016. Ver la Sentencia C-286 de 2016, con relación a la expresión subrayada.).).**

El valor catastral que se tenga en cuenta para el pago será proporcional al área requerida a expropiar para el proyecto que corresponda. **(Nota: Ver Sentencia C-286 de 2016, con relación a la expresión subrayada.).**

Con el fin de evitar la especulación de valores en los proyectos de infraestructura a través de la figura del autoavalúo catastral, la entidad responsable del proyecto o quien haga sus veces, informará al IGAC o a los catastros descentralizados el área de influencia para que proceda a suspender los trámites de autoavalúo catastral en curso o se abstenga de recibir nuevas solicitudes.

Para el cumplimiento de este artículo se deberá tener en cuenta lo preceptuado por la Ley 1673 de 2013.

Texto inicial del artículo 37: "El precio de adquisición será igual al valor comercial, determinado por el Instituto Geográfico Agustín Codazzi (IGAC), la entidad que cumpla sus funciones, o por peritos privados inscritos en las lonjas o asociaciones correspondientes, según lo determinado por el Decreto ley número 2150 de 1995 y de conformidad con las normas, métodos, parámetros, criterios y procedimientos que sean fijados por el Instituto Geográfico Agustín Codazzi (IGAC).

El valor comercial se determinará teniendo en cuenta la reglamentación urbanística municipal o distrital vigente al momento de la oferta de compra en relación con el inmueble a adquirir, su destinación económica, el daño emergente y el lucro cesante.

El daño emergente incluirá el valor del inmueble y el lucro cesante se calculará según los rendimientos reales del inmueble al momento de la adquisición y hasta por un término de seis (6) meses.".

**Nota, artículo 37: Ver Resolución 898 de 2014, IGAAC, D.O. 49.249, pag. 39. Ver Resolución 741 de 2014, IGAC, D.O. 49.229, pag. 61.**

Artículo 38. Durante la etapa de construcción de los proyectos de infraestructura de transporte y con el fin de facilitar su ejecución la Nación a través de los jefes de las entidades de dicho orden y las entidades territoriales, a través de los Gobernadores y Alcaldes, según la infraestructura a su cargo, tienen facultades para imponer servidumbres, mediante acto administrativo.

El Ministerio de Transporte impondrá tales servidumbres en los proyectos de infraestructura de transporte a cargo de los departamentos, cuando se afecten predios que se encuentren ubicados en más de uno de ellos. Asimismo, el Gobernador del departamento impondrá servidumbres en los proyectos de infraestructura de transporte a cargo de los municipios cuando se afecten predios que se encuentren ubicados en más de un municipio.

En los proyectos a cargo de la Nación, esta podrá imponer servidumbres en todo el Territorio Nacional.

Para efectos de lo previsto en este artículo, se deberá agotar una etapa de negociación directa en un plazo máximo de treinta (30) días calendario. En caso de no lograrse acuerdo se procederá a la imposición de servidumbre por vía administrativa. El Gobierno Nacional expedirá la reglamentación correspondiente con el fin de definir los términos en que se deberán surtir estas etapas.

Parágrafo 1°. El Ministro de Transporte podrá delegar esta facultad.

Parágrafo 2°. Lo dispuesto en este artículo será aplicable a la gestión predial necesaria para la ejecución de proyectos de infraestructura de servicios públicos, sin perjuicio de lo establecido en la Ley 56 de 1981.

**Nota 1, artículo 38: Artículo reglamentado por el Decreto 738 de 2014.**

**Nota 2, artículo 38: Ver Acuerdo 29 de 2017, ANT.**

CAPÍTULO II

**Gestión Ambiental**

Artículo 39. Los proyectos de infraestructura de transporte deberán incluir la variable ambiental, en sus diferentes fases de estudios de ingeniería, prefactibilidad, factibilidad y estudios definitivos, para aplicarla en su ejecución.

Para el efecto, en desarrollo y plena observancia de los principios y disposiciones constitucionales que protegen el medio ambiente, las fuentes hídricas y los recursos naturales, el Ministerio de Ambiente y Desarrollo Sostenible en coordinación con la Autoridad Nacional de Licencias Ambientales expedirá los términos de referencia integrales, manuales y guías para proyectos de infraestructura de transporte, en un término máximo de sesenta (60) días calendario, a partir de la promulgación de la presente ley.

Durante la realización de los Estudios de Prefactibilidad, la entidad o el responsable del diseño, debe consultar la herramienta o base de datos que determine el Ministerio de Ambiente y Desarrollo Sostenible, para poder, finalizados estos, obtener la viabilidad de una de las alternativas del proyecto por parte de la autoridad ambiental competente.

Culminados los Estudios de Factibilidad, la entidad o el contratista si ya fue adjudicado el proyecto de infraestructura de transporte, cuando a ello haya lugar, está obligado a adelantar con carácter de insumo y fundamento indispensable para gestionar y obtener la Licencia Ambiental, el Estudio de Impacto Ambiental.

En todo caso, el proceso de licenciamiento ambiental podrá iniciarse una vez se cuente con los Estudios de Factibilidad y el Estudio de Impacto Ambiental. A partir de tales estudios la autoridad ambiental deberá realizar la evaluación y adoptar la decisión respectiva. Lo anterior sin perjuicio de la información adicional que de manera excepcional podrá solicitar la autoridad ambiental para tomar la decisión correspondiente.

A partir del tercer año siguiente a la promulgación de la ley, como requisito previo a la apertura de los procesos de selección para la construcción de proyectos de infraestructura de transporte, la entidad pública estará obligada a contar con la viabilidad de una alternativa del proyecto aprobada por parte de la autoridad ambiental competente con base en estudios de prefactibilidad, haber culminado los Estudios de Factibilidad y haber concluido el proceso de consulta previa con la respectiva comunidad hasta su protocolización, si procede la misma.

**Inciso Corregido por el Decreto 3049 de 2013, artículo 3°**. Para el efecto, la autoridad ambiental deberá cumplir con los términos legales en materia de licenciamiento ambiental y los establecidos en esta ley, de modo que esta será responsable de los daños y perjuicios que se causen a los particulares, como consecuencia del incumplimiento de los términos establecidos en la ley. El retardo injustificado por parte de la autoridad ambiental podrá acarrear las investigaciones y sanciones disciplinarias establecidas en la Ley 734 de 2002.

Texto inicial del inciso final: "Para el efecto, la autoridad ambiental deberá cumplir con los términos legales en materia de licenciamiento ambiental y los establecidos en esta ley, de modo que esta será responsable de los daños y perjuicios que se causen a los particulares, como consecuencia del incumplimiento de los términos establecidos en la ley el retardo injustificado por parte de la autoridad ambiental podrá acarrear las investigaciones y sanciones disciplinarias establecidas en la Ley 734 de 2002.".

Artículo 40. La gestión para la obtención de la Licencia Ambiental, con fundamento en los estudios a los que se refiere el artículo anterior, podrá adelantarse por la entidad pública, el concesionario y/o contratista. La responsabilidad de gestión y obtención de la Licencia Ambiental deberá pactarse en el respectivo contrato.

Es deber del Ministerio del Interior liderar y acompañar de manera permanente el proceso de consulta previa con las comunidades étnicas cuando sea requerido para la obtención de la licencia ambiental del proyecto de infraestructura de transporte y la entidad contratante será responsable de los compromisos que se adquieran con las comunidades.

Artículo 41. Cambios menores en licencias ambientales. Las modificaciones menores o ajustes normales dentro del giro ordinario de la actividad licenciada y que no impliquen nuevos impactos ambientales, podrán ejecutarse, previo aviso a la autoridad ambiental, sin que esta deba pronunciarse y sin la necesidad de adelantar el trámite para el procedimiento de modificación de la Licencia Ambiental y/o autorización, teniendo en cuenta para ello el listado previsto en la reglamentación correspondiente.

El Gobierno Nacional, que para estos efectos se entiende conformado por los Ministerios de Transporte y Ambiente, previo concepto de la Autoridad Nacional de Licencias Ambientales, reglamentará en un término máximo de noventa (90) días calendario a partir de la promulgación de esta ley el listado de cambios menores o ajustes normales en proyectos de infraestructura de transporte, para el debido cumplimiento de la presente disposición. **(Nota: Inciso corregido por el Decreto 3049 de 2013, artículo 4°, en el sentido de quitarle el subrayado a la palabra "Autoridad".).**

**Nota, artículo 41: Ver Ley 2099 de 2021, artículo 38.**

Artículo 42. Nuevas fuentes de materiales. Cuando durante la ejecución de un proyecto de infraestructura de transporte se identifiquen y se requieran nuevas fuentes de materiales, previa solicitud del responsable contractual, se adelantará ante la Autoridad Ambiental una solicitud de modificación de Licencia Ambiental exclusiva para la inclusión de nuevas fuentes de materiales en la Licencia Ambiental. Este trámite no podrá ser superior a treinta (30) días contados a partir del radicado de la solicitud, siempre que la información se encuentre completa.

Para este efecto, el Ministerio de Ambiente y Desarrollo Sostenible expedirá los correspondientes Términos de Referencia dentro de los sesenta (60) días calendario, siguientes a la expedición de la ley.

**Nota 1, artículo 42: Artículo desarrollado por la Resolución 1514 de 2016, M. de Ambiente y Desarrollo Sostenible.**

**Nota 2, artículo 42: Ver Ley 2099 de 2021, artículo 38.**

Artículo 43. Obras de emergencia. Declarada por el Gobierno Nacional la existencia de una emergencia que afecte gravemente un proyecto de infraestructura de transporte, la entidad competente procederá a solicitar a la autoridad ambiental competente el pronunciamiento sobre la necesidad o no de obtener licencia, permisos o autorizaciones ambientales. La autoridad sin perjuicio de las medidas de manejo ambiental que ordene adoptar, deberá responder, mediante oficio, de manera inmediata.

**Nota, artículo 43: Ver Ley 2099 de 2021, artículo 38.**

Artículo 44. Los siguientes Proyectos de Infraestructura de Transporte no requerirán Licencia Ambiental:

a) Proyectos de mantenimiento;

b) Proyectos de rehabilitación;

c) Proyectos de mejoramiento.

Para el debido cumplimiento de la presente disposición, el Gobierno Nacional, que para estos efectos se entiende conformado por los Ministerios de Transporte y Ambiente, en coordinación con la Autoridad Nacional de Licencias Ambientales, reglamentará en un término máximo de noventa (90) días calendario, a partir de la fecha de expedición de esta ley, el listado de actividades de mejoramiento en proyectos de infraestructura de transporte. **(Nota: Inciso corregido por el Decreto 3049 de 2013, artículo 5°, en el sentido de quitarle el subrayado a la palabra "en coordinación".).**

Parágrafo. En el evento que una o más actividades de mejoramiento requiera permisos o autorizaciones ambientales, la entidad pública responsable del proyecto de infraestructura de transporte o quien haga sus veces, deberá tramitarlos y obtenerlos, cuando a ello haya lugar.

**Nota, artículo 44: Ver Ley 2099 de 2021, artículo 38. Ver Decreto 770 de 2014. Ver Decreto 769 de 2014.**

Artículo 45. Para la elaboración de los estudios ambientales requeridos para gestionar, obtener y modificar la Licencia Ambiental de proyectos de infraestructura de transporte, se entenderá que el permiso de recolección de especímenes silvestres de la diversidad biológica, como todos los demás permisos, está incluido dentro de la licencia ambiental.

**Nota, artículo 45: Ver Ley 2099 de 2021, artículo 38.**

CAPÍTULO III

**Activos y Redes de Servicios Públicos, de TIC y de la Industria del Petróleo, entre otros**

Artículo 46. Ámbito de aplicación. El presente capítulo es aplicable a la protección, traslado o reubicación de redes y activos de servicios públicos, de tecnologías de la información y las comunicaciones y de la industria del petróleo, instaladas en predios requeridos para el desarrollo de proyectos de infraestructura de transporte y en las fajas de retiro obligatorio, inclusive con anterioridad a la vigencia de la Ley 1228 de 2008.

Así mismo, es aplicable para el otorgamiento de permisos de instalación de nuevas redes de manera coordinada con los trazados y proyecciones de los proyectos de infraestructura de transporte, las cuales en ningún caso podrán ser oponibles para las expansiones futuras.

Igualmente es aplicable para las redes que se encuentren instaladas previamente sobre nuevos trazados de proyectos de infraestructura de transporte.

Artículo 47. Formulación y ejecución de proyectos de infraestructura de transporte que involucran la protección, el traslado o reubicación de redes y activos. Las entidades públicas o personas de derecho privado responsables de formular y ejecutar proyectos de infraestructura de transporte deberán analizar, en cada caso lo siguiente:

1. La pertinencia de proteger, trasladar o reubicar las redes y activos de servicios públicos, de la industria del Petróleo o de tecnologías de la información y de las comunicaciones como consecuencia del desarrollo de estos proyectos o de conservar o modificar la ubicación del proyecto de infraestructura. En todo caso deberá primar la opción que implique menores costos e impactos generales.

2. Las condiciones técnicas, legales y financieras bajo las cuales se efectuará dicha protección, traslado o reubicación.

3. La existencia de convenios o acuerdos para la protección, traslado o reubicación de redes y activos con prestadores de servicios públicos u operadores de redes, activos y servicios de tecnologías de la información y de las comunicaciones o de la Industria del Petróleo.

Realizado el anterior análisis, las entidades públicas o personas de derecho privado responsables de formular y ejecutar proyectos de infraestructura de transporte podrán:

a) Aplicar el convenio o acuerdo vigente para realizar la protección, el traslado o reubicación de redes y activos;

b) Celebrar los convenios o acuerdos necesarios para establecer o definir las condiciones para realizar la protección, el traslado o reubicación de redes y activos;

c) De no lograr ningún acuerdo, se deberá adelantar el procedimiento para la protección, reubicación o traslado de redes y activos de que trata el artículo siguiente, a partir de su numeral 4.

Artículo 48. Procedimiento para la protección, reubicación o traslado de activos y redes. Cuando una entidad pública responsable de un proyecto de infraestructura de transporte identifique la necesidad de trasladar, reubicar o proteger, entre otros, redes o activos de servicios públicos, de la industria del petróleo, o de tecnologías de la información y las comunicaciones, deberá:

1. Enviar comunicación escrita al prestador u operador pertinente, indicándole la ubicación georreferenciada del proyecto de infraestructura de transporte y demás información disponible que se requiera para identificar la(s) red(es) y activo(s) específicos a proteger, reubicar o trasladar.

2. Informarle al prestador u operador del servicio sobre la existencia de convenios, contratos o cualquier acuerdo de voluntades en virtud de los cuales la entidad pública responsable del proyecto de infraestructura de transporte y el prestador y/u operador hayan definido sus derechos y obligaciones relacionadas con la protección, el traslado o reubicación de redes y activos.

3. El prestador y/u operadores atenderá la comunicación indicada en el numeral primero del presente artículo dentro de los treinta (30) días calendario a su recibo, informando por escrito:

I. Tipología y caracterización de la red o activo según el servicio al que corresponda.

II. Inventario de elementos que conforman la red o activo objeto de protección, traslado o reubicación y dimensionamiento, según aplique.

III. Los permisos, autorizaciones o licencias concedidas al prestador y/u operador para la instalación de la red o activo.

IV. El momento en el cual fueron instaladas las redes o activos objeto de protección, traslado o reubicación.

V. El análisis y cuantificación de los costos asociados estimados a la protección, traslado o reubicación de la red o activo.

VI. Los acuerdos de confidencialidad que haya lugar a suscribir entre el solicitante, el prestador u operador del servicio, de conformidad con la

información entregada en cada caso.

4. Con dicha información, la entidad pública responsable del proyecto de infraestructura de transporte o quien haga sus veces podrá suscribir acuerdos con el prestador u operador en los que se defina diseño, costo, construcción y demás condiciones para realizar la protección, el traslado o reubicación de redes y activos a cargo del operador. Para el efecto, el prestador u operador será el responsable de suministrar el diseño de la red o activo a trasladar, proteger o reubicar en un término perentorio de dos (2) meses, cuando estos sean necesarios.

De no llegarse a un acuerdo, sobre los costos y tiempo de ejecución, en un término de cuarenta y cinco (45) días calendario contados a partir de la entrega de los diseños, la entidad pública responsable del proyecto de infraestructura de transporte o quien haga sus veces, podrá realizar la protección, el traslado o reubicación de las redes y/o activos bajo su propia cuenta, de conformidad con la normatividad técnica vigente, y deberá garantizar que el activo a proteger, trasladar o reubicar cumpla con las mismas condiciones técnicas que el activo o red original, de conformidad con la información suministrada por el operador o prestador. De no ser posible, con las condiciones técnicas equivalentes que prevea la normatividad técnica sectorial vigente, el reglamento técnico del prestador y/o las reglamentaciones internacionales aplicables según corresponda para cada sector, que garanticen la prestación del servicio.

Una vez realizado el traslado o reubicación, el prestador u operador deberá disponer de las redes o activos desmantelados y la entidad pública responsable del proyecto de infraestructura de transporte o quien haga sus veces hará entrega de la red o activo trasladados o reubicados a su respectivo propietario, para lo cual se suscribirán los documentos a que haya lugar. El prestador u operador estará en la obligación de recibir la red o activo trasladado o reubicado.

Parágrafo 1°. El inicio de la ejecución de las obras de protección, traslado o reubicación de las redes y activos quedará sujeto al otorgamiento de los permisos, autorizaciones y/o licencias pertinentes así como la constitución de las servidumbres a que haya lugar, a fin de no afectar la continuidad del servicio público respectivo, los cuales deberán ser tramitados ante las autoridades competentes.

Parágrafo 2°. Cuando una persona natural o jurídica en desarrollo de un proyecto de asociación público-privada requiera esta información en etapa de estudios de ingeniería de factibilidad, deberá elevar solicitud a la entidad pública responsable del proyecto de infraestructura de transporte, fundamentando la necesidad.

Revisada la solicitud, la entidad pública solicitará la información de manera directa al prestador y operador del servicio, en un plazo máximo de 15 días calendario. La información suministrada será recibida como confidencial y bajo reserva.

Parágrafo 3°. El presente procedimiento será aplicable para los proyectos de infraestructura en ejecución y los que se desarrollen con posterioridad a la entrada en vigencia de la presente ley.

Parágrafo 4°. Una vez finalizado el traslado, la protección o reubicación de la red o activo el prestador y/u operador deberá reportar a la Comisión de Regulación correspondiente y a la Superintendencia o al Ministerio de Minas y Energía para el caso de activos de petróleo, la descripción del proyecto con el listado de activos involucrados para que sean tenidos en cuenta los efectos tarifarios presentes o futuros cuando a ello haya lugar. En estos casos, la inversión a reconocer al prestador u operador por las nuevas redes o activos trasladados, protegidos o reubicados no podrá ser superior a la inversión reconocida, que no haya sido pagada o amortizada vía tarifa, por las redes o activos originales.

Artículo 49. Criterios para la determinación del valor de los costos asociados a la protección, traslado o reubicación de redes o activos. Para efectos de la determinación del valor de los costos asociados a la protección, traslado o reubicación de redes o activos, se aplicarán los valores de mercado de acuerdo con la región en donde se encuentren ubicados o la regulación sectorial vigente.

En todo caso no se podrá solicitar u obtener remuneración alguna por costos que han sido recuperados o que se encuentren previstos dentro de la regulación sectorial vigente.

Artículo 50. Asignación de los costos de protección, traslado o reubicación de activos y redes. Los costos asociados a la protección, traslado o reubicación de redes y activos con ocasión del desarrollo de proyectos de infraestructura de transporte, serán asumidos por el proyecto de infraestructura de transporte, salvo que:

a) Exista un permiso otorgado o autorización para la instalación de la red o activo, que haya sido condicionado a la expansión de la infraestructura de transporte, caso en el cual, el prestador y/u operador deberá asumir los costos asociados a la protección, traslado o reubicación;

b) Exista un acuerdo vigente suscrito por las partes, caso en el cual las partes respetarán dicho acuerdo;

c) Las redes o activos que hayan sido instaladas en las fajas o zonas reservadas a que se refiere la Ley 1228 de 2008 con posterioridad a su promulgación, caso en el cual, el prestador y/u operador deberá asumir los costos asociados a la protección, traslado o reubicación.

Artículo 51. Contratos de aporte reembolsable para el traslado o reubicación de redes. El Instituto Nacional de Vías (Invías), la agencia nacional de Infraestructura, la Unidad Administrativa Especial de

Aeronáutica Civil (Aerocivil), Cormagdalena, la Dirección General Marítima (Dimar) y demás autoridades del orden nacional o territorial que tengan a su cargo la ejecución de proyectos de infraestructura de transporte, podrán celebrar contratos de aporte reembolsable con los prestadores y operadores de servicios públicos, de redes, activos y servicios de Tecnologías de la Información y las Comunicaciones (TIC) o de la industria del petróleo, entre otros, responsables del traslado o la reubicación de redes para la planeación, estudios, permisos, y demás actividades requeridas para el desarrollo de obras de infraestructura de transporte, mediante los cuales la entidad pública aportará, en calidad de crédito reembolsable, los recursos requeridos para las obras de traslado o reubicación reconocidos tarifariamente.

La tasa de interés aplicable al citado crédito no podrá ser inferior a la que ha establecido la autoridad competente para determinar la tarifa regulada como remuneración a las inversiones del prestador y operador de servicios públicos, de redes y servicios de Tecnologías de la Información y las Comunicaciones (TIC), o de la Industria del Petróleo y el término para la cancelación total del crédito no podrá ser superior al previsto para la recuperación de dichas inversiones por el traslado o la reubicación de las redes por vía de tarifas.


Artículo 52. Suspensión en interés del servido. Cuando por efecto del traslado de las redes y activos de servicios públicos, servicios de Tecnologías de la Información y las Comunicaciones (TIC) o de la Industria del Petróleo, entre otros, a las cuales hace referencia el presente capítulo, sea necesario suspender la prestación del servicio público o afecte las condiciones de continuidad y/o calidad del servicio, la responsabilidad derivada de la suspensión no será imputable al prestador de servicios públicos o al operador de redes, activos y servicios de tecnologías de la información y de las comunicaciones o de la Industria del Petróleo, entre otros, ni afectará los indicadores de calidad definidos en la regulación sectorial vigente, ni se considerará falla en la prestación del servicio.

Lo anterior sin perjuicio de la aplicación de la normatividad de protección al usuario relativa a interrupciones programadas de los servicios que resulten afectados.


Artículo 53. En los nuevos proyectos que inicien su estructuración a partir de la promulgación de la presente ley para la construcción, ampliación, rehabilitación y apertura de nuevos tramos de infraestructura de transporte, deberá preverse la incorporación de infraestructura para el despliegue de redes públicas de tecnologías de la información y las comunicaciones o de elementos que soporten el despliegue de dichas redes, previa solicitud del Ministerio de Tecnologías de la Información y las Comunicaciones o quien haga sus veces.

Para estos efectos, los proveedores de Redes y Servicios podrán solicitar a las entidades estructuradoras de proyectos de infraestructura de transporte información sobre los proyectos en etapa de estructuración o consultar en los sistemas de información disponibles del sector transporte dicha información, con el objeto de manifestar su interés al Ministerio de Tecnologías de la Información y las Comunicaciones, de acuerdo con las necesidades de tecnologías de la información y de las comunicaciones.

La financiación del costo de construcción de la infraestructura para el despliegue de las redes públicas de TIC y su mantenimiento estarán a cargo en primera instancia de los proveedores de estos bienes y servicios de telecomunicaciones, o cuando sea declarado estratégico para la Nación y no exista interés privado lo podrá financiar el Fondo de Tecnologías de la Información y las Comunicaciones "Fontic", para lo cual se realizarán los convenios y apropiaciones presupuestales correspondientes.

Parágrafo. La infraestructura de redes de tecnologías de la información y de las comunicaciones instaladas y por instalarse en los proyectos de infraestructura de transporte podrá ser utilizada por el Ministerio de Transporte y la Policía de Carreteras. Para el efecto, se suscribirá el respectivo convenio con el dueño de la infraestructura.

Artículo 54. Integración de redes y activos. Cuando por motivo de la implementación de proyectos de infraestructura de transporte se requiera trasladar o reubicar redes y activos de servicios públicos y actividades complementarias o de tecnologías de la información y de las comunicaciones o de la industria del petróleo entre otros, se deben integrar a los corredores de redes y activos existentes y más cercanos, cumpliendo con la normatividad vigente para lograr la optimización de la ocupación física del terreno y del espacio aéreo, en la medida de lo técnicamente posible.

Artículo 55. Modifíquese el parágrafo 2° del artículo 1° de la Ley 1228 de 2008 y adiciónese un parágrafo 4° a dicha disposición.

El parágrafo 2° del artículo 1° de la Ley 1228 de 2008, el cual quedará así:

Parágrafo 2°. "El ancho de la franja o retiro que en el artículo 2° de la Ley 1228 de 2008 se determina para cada una de las anteriores categorías de vías, constituye zonas de reserva o de exclusión para carreteras, y por lo tanto se prohíbe realizar cualquier tipo de construcción o mejora en las mencionadas zonas, salvo aquellas que se encuentren concebidas integralmente en el proyecto de infraestructura de transporte como despliegue de redes de servidos públicos, tecnologías de la información y de las comunicaciones o de la industria del petróleo, o que no exista expansión de infraestructura de transporte prevista en el correspondiente plan de desarrollo.

La entidad estructuradora del proyecto de infraestructura de transporte o responsable del corredor vial, previa solicitud del competente, revisará la conveniencia técnica, tecnológica, legal y financiera de la instalación de estas redes y aprobará las condiciones de su instalación.

La instalación de redes públicas en el ancho de la franja o retiro, en ningún caso podrá impedir u obstaculizar la ampliación o expansión de la infraestructura de transporte.

Para los efectos de lo previsto en este artículo, se entienden como construcciones o mejoras todas las actividades de construcción de nuevas edificaciones o de edificaciones existentes, que requieran licencia de construcción y sus modalidades en los términos previstos en las normas vigentes sobre la materia.

Sin perjuicio de lo previsto en la normatividad vigente para el otorgamiento de licencias ambientales, licencias de intervención y ocupación del espacio público y demás permisos y autorizaciones por parte de las autoridades correspondientes, la entidad pública que tenga a cargo la vía dentro de la zona de exclusión de que trata el artículo 2° de la Ley 1228 de 2008 para otorgar permisos para la construcción de accesos, instalación de tuberías, redes de servicios públicos, canalizaciones, ductos, obras destinadas a seguridad vial, traslado de postes, transporte de hidrocarburos o cruces de redes eléctricas de alta, media o baja tensión, deberá establecer los requisitos que debe cumplir el interesado en el trámite correspondiente"

Adiciónese un parágrafo 4° al artículo 1° de la Ley 1228 de 2008, el cual quedará así:

Parágrafo 4° "La Policía Nacional de Carreteras será competente para hacer respetar el derecho de vía sobre la Red Vial Nacional. Para el efecto podrá crear zonas de aislamiento y efectuar operativos, sobre las fajas de retiro para ejercer sus diferentes funciones"

CAPÍTULO IV

**Permisos Mineros**

Artículo 56. De conformidad con la reglamentación en materia de uso, tarifas y capacidad que para el efecto expidan las autoridades competentes, las obras de infraestructura de transporte realizadas por los titulares mineros que hayan sido incluidas en los programas de trabajos y obras o instrumentos similares presentados a la autoridad minera, deberán cumplir la función social de acceso, de carga y/o pasajeros, a los terceros que requieran utilizarla. Estas obras revertirán gratuitamente a favor del Estado en todos los casos de terminación del contrato de concesión minera, conforme con las disposiciones del Código de Minas.

Artículo 57. Fuentes de material para proyectos de infraestructura de transporte. La autoridad competente deberá informar a la autoridad minera o quien haga sus veces, los trazados y ubicación de los proyectos de infraestructura de transporte, una vez aprobados, así como las fuentes de materiales que se identifiquen por el responsable del proyecto, necesarias para la ejecución del proyecto de infraestructura de transporte, con el fin de que las áreas ubicadas en dicho trazado y las fuentes de materiales identificadas sean incluidas en el Catastro Minero Colombiano y de este modo sean declaradas como zonas de minería restringida y en las mismas, no se puedan otorgar nuevos títulos de materiales de construcción, durante la vigencia del proyecto distintos a las autorizaciones temporales requeridas para la ejecución del mismo.

Artículo 58. Autorización temporal. El Ministerio de Transporte de común acuerdo con el Ministerio de Minas y Energía, establecerán la reglamentación de las Autorizaciones Temporales para la utilización de materiales de construcción que se necesiten exclusivamente para proyectos de infraestructura de transporte, en un término no superior a ciento veinte (120) días.

Las entidades públicas, entidades territoriales, empresas y los contratistas que se propongan adelantar la construcción, reparación, mantenimiento o mejora de una vía pública nacional, departamental o municipal, o la realización de un proyecto de infraestructura de transporte declarado de interés público por parte del Gobierno Nacional, podrán con sujeción a las normas ambientales, solicitar a la autoridad minera autorización temporal e intransferible, para tomar de los predios rurales, vecinos o aledaños a la obra, los materiales de construcción que necesiten exclusivamente para su ejecución, quienes deberán obtener los respectivos permisos ambientales.

**Inciso 3° corregido por el Decreto 3049 de 2013, artículo 6°.** Cuando las solicitudes de autorización temporal se superpongan con un título minero de materiales de construcción, sus titulares estarán obligados a suministrar los mismos a precios de mercado normalizado para la zona. En caso de que el titular minero no suministre los materiales, la autoridad minera otorgará la autorización temporal para que el contratista de la obra de infraestructura extraiga los materiales de construcción requeridos.

Texto inicial del inciso 3º: "Cuando las solicitudes de autorización temporal se superpongan con un título minero o materiales de construcción, sus titulares estarán obligados a suministrar los mismos a precios de mercado normalizado para la zona. En caso de que el titular minero no suministre los materiales, la autoridad minera otorgará la autorización temporal para que el contratista de la obra de infraestructura extraiga los materiales de construcción requeridos.".

La autorización temporal tendrá como plazo la duración de la obra sin exceder un máximo de siete (7) años.

La autoridad encargada de la obra de infraestructura informará a la Autoridad Minera sobre terminación de la misma o del eventual cambio del contratista a fin de dar por terminada la autorización temporal o

cederla al nuevo contratista de la obra indicado previamente por la autoridad.

Las actividades de extracción de materiales de construcción, realizadas por el responsable de la Autorización Temporal serán objeto de seguimiento y control por parte de la Autoridad Minera, y estos deben declarar y pagar las respectivas regalías. Los materiales extraídos no podrán ser comercializados.

**Inciso adicionado por la Ley 1742 de 2014, artículo 7º.** Sin perjuicio de las competencias de las entidades territoriales el Gobierno nacional, establecerá la reglamentación de las Autorizaciones Temporales para la utilización de materiales de construcción que se necesiten exclusivamente para proyectos de infraestructura de transporte.

**Inciso adicionado por la Ley 1742 de 2014, artículo 7º.** La solicitud de autorización temporal para la utilización de materiales de construcción se tramitará de acuerdo con las condiciones y requisitos contenidos en el título tercero, capítulo XIII del Código de Minas o por las normas que las modifiquen, sustituyan o adicionen.

**Inciso adicionado por la Ley 1742 de 2014, artículo 7º.** Los materiales extraídos podrán ser compartidos para los proyectos de infraestructura de transporte que lo requieran pero no podrán ser comercializados.

Parágrafo. **Adicionado por la Ley 1742 de 2014, artículo 7º.** Lo dispuesto en el presente artículo también operará para otorgar autorizaciones temporales a proyectos de infraestructura distintos a los de transporte cuando los mismos proyectos hayan sido declarados de interés nacional por parte del Gobierno Nacional, sin perjuicio de las competencias constitucionales legales.

Artículo 59. **Modificado por la Ley 1742 de 2014, artículo 8º.** Sobre la infraestructura de transporte la autoridad minera restringirá las actividades de exploración y explotación en dichos tramos y no podrá otorgar nuevos derechos mineros que afecten el desarrollo de proyectos de infraestructura de transporte.

Lo anterior, sin perjuicio de las restricciones y exclusiones a la actividad minera previstas en los artículos 35 y 36 del Código de Minas y en la presente ley.

En el evento de que un proyecto de infraestructura de transporte interfiera total o parcialmente con el ejercicio de los derechos otorgados previamente a un titular minero, con la propuesta o solicitud de contrato de concesión y/o solicitudes de legalización de minería, dicho título, propuesta o solicitud no serán oponibles para el desarrollo del proyecto. El proyecto de infraestructura de transporte podrá ser suspendido por un término de treinta (30) días calendario, por parte de la autoridad encargada de adelantar el proyecto de infraestructura de transporte, con el fin de que se llegue a un acuerdo en el valor a reconocer para compensar el monto a que haya lugar al titular minero, por los eventuales derechos económicos de los cuales sea beneficiario y se prueben afectados, teniendo en cuenta la etapa en la que se encuentre el proyecto minero y la información que del título minero posea la autoridad minera.

En caso de que no se logre acuerdo entre el titular del proyecto de infraestructura de transporte y el titular minero, dentro del término establecido en el párrafo anterior, se reanudará la ejecución del proyecto de infraestructura de transporte.

En consecuencia, la autoridad encargada de adelantar el proyecto de infraestructura de transporte y la autoridad minera designarán peritos con el fin de determinar el valor a compensar al titular minero.

Cuando el propietario del predio en el que se desarrolle un proyecto de infraestructura de transporte sea diferente al titular minero y se demuestren perjuicios económicos como consecuencia del desarrollo del proyecto, las partes podrán llegar a un acuerdo dentro de un término de treinta (30) días sobre el valor de la compensación económica a que haya lugar, la cual será asumida por el titular de la obra de infraestructura. En el evento en el que no se llegue a un acuerdo, el valor de la compensación será determinado por un perito designado de conformidad con el procedimiento establecido en el inciso anterior.

No obstante, las partes podrán acudir a un método alternativo de solución de conflictos que determinará el valor a compensar a favor del titular minero. Las compensaciones a que haya lugar serán asumidas por el proyecto de infraestructura de transporte, para lo cual se realizarán las apropiaciones presupuestales correspondientes.

El Gobierno nacional establecerá la forma en la que se desarrollarán dichos procedimientos.

Parágrafo. En el evento que el titular minero haya contraído obligaciones ante las autoridades ambientales, la autoridad encargada del proyecto de infraestructura de transporte y el titular minero deberán someter a aprobación de la correspondiente autoridad ambiental un acuerdo en el que las partes se obliguen a cumplir con las obligaciones de corto, mediano y largo plazo que continúen vigentes derivadas de las autorizaciones ambientales que ostentan el proyecto minero.

Texto inicial del artículo 59: "Sobre la infraestructura de transporte que conforma la Red Vial Nacional, la autoridad minera restringirá las actividades de exploración y explotación en dichos tramos y no podrá otorgar nuevos derechos mineros que afecten el desarrollo de proyectos de infraestructura de transporte. El Ministerio de Transporte delimitará los corredores existentes y/o necesarios.

Lo anterior, sin perjuicio de las restricciones a la actividad minera previstas en el artículo 35 del Código de Minas y en la presente ley.

En el evento de que un proyecto de infraestructura de transporte declarado de interés público, interfiera total o parcialmente con el ejercicio de los derechos otorgados previamente a un titular minero, este título no será oponible para el desarrollo del proyecto. El proyecto de infraestructura de transporte podrá ser suspendido por un término de treinta (30) días calendario, por parte de la autoridad encargada de adelantar el proyecto de infraestructura de transporte, con el fin de que se llegue a un acuerdo en el monto a reconocer para compensar el monto a que haya lugar al titular minero, por los eventuales derechos económicos de los cuales sea beneficiario y se prueben afectados, teniendo en cuenta la etapa en la que se encuentre el proyecto minero y la información que del título minero posea la autoridad minera.

En caso de que no se logre acuerdo entre el titular del proyecto de infraestructura de transporte y el titular minero, dentro del término establecido en el párrafo anterior, se reanudará la ejecución del proyecto de infraestructura de transporte.

En consecuencia, la autoridad encargada de adelantar el proyecto de infraestructura de transporte y la autoridad minera designarán peritos con el fin de determinar el valor a compensar al titular minero.

Cuando el propietario del predio en el que se desarrolle un proyecto de infraestructura de transporte sea diferente al titular minero y se demuestren perjuicios económicos como consecuencia del desarrollo del proyecto, las partes podrán llegar a un acuerdo dentro de un término de treinta (30) días sobre el valor de la compensación económica a que haya lugar, la cual será asumida por el titular de la obra de infraestructura. En el evento en el que no se llegue a un acuerdo, el valor de la compensación será determinado por un perito designado de conformidad con el procedimiento establecido en el inciso anterior.

No obstante, las partes podrán acudir a un método alternativo de solución de conflictos que determinará el valor a compensar a favor del titular minero. Las compensaciones a que haya lugar serán asumidas por el proyecto de infraestructura de transporte, para lo cual se realizarán las apropiaciones presupuestales correspondientes.

El Gobierno Nacional establecerá la forma en la que se desarrollarán dichos procedimientos.

Parágrafo. En el evento que el titular minero haya contraído obligaciones ante las autoridades ambientales, la autoridad encargada del proyecto de infraestructura de transporte y el titular minero deberán someter a aprobación de la correspondiente autoridad ambiental un acuerdo en el que las partes se obliguen a cumplir con las

obligaciones de corto, mediano y largo plazo que continúen vigentes derivadas de las autorizaciones ambientales que ostentan el proyecto minero.".

Artículo 60. Derecho de preferencia de acceso a puertos marítimos y fluviales para los hidrocarburos de regalías y de propiedad de la Agencia Nacional de Hidrocarburos (ANH) Se establece un derecho de preferencia de acceso a todos los puertos marítimos y fluviales de uso público y privado existentes que cuenten con las facilidades y autorizaciones o permisos legales requeridos para la importación y exportación de hidrocarburos de regalías y de propiedad de la Agenda Nacional de Hidrocarburos (AMI). Este derecho de preferencia consiste en garantizar de manera prioritaria el acceso y uso del 20% de la capacidad portuaria instalada y otorgar un derecho de atención prioritaria para prestar servicios portuarios cuando la carga a transportar sean hidrocarburos de regalías y de propiedad de la Agencia Nacional de Hidrocarburos (ANH), previa solicitud por parte del Estado, con una antelación no menor a treinta (30) días calendario.

De la misma manera, en los nuevos contratos de concesión portuaria se entiende pactado el derecho de preferencia de acceso para los hidrocarburos de regalías y de propiedad de la Agencia Nacional de Hidrocarburos (ANH), en los mismos términos del inciso anterior.

Este derecho se consagra a favor de la entidad estatal encargada de la administración de los recursos hidrocarburíferos de la Nación, o a quien esta designe.

Las condiciones técnicas y de seguridad necesarias que permitan hacer uso de la infraestructura de transporte instalada para la importación y exportación de hidrocarburos de regalías y de propiedad de la Agencia Nacional de Hidrocarburos (ANH) y las condiciones para el uso preferente de la capacidad portuaria para los hidrocarburos de regalías y de propiedad de la Agencia Nacional de Hidrocarburos (ANH) a que se refiere este artículo, se determinarán por la autoridad competente.

Las tarifas se establecerán libremente de conformidad con la oferta y demanda del mercado.

Artículo 61. **Reglamentado parcialmente por el Decreto 119 de 2015.** Puertos para el manejo de hidrocarburos. A partir de la vigencia de la presente ley, los puertos existentes de servicio privado para el manejo de hidrocarburos podrán prestar servicios a los agentes del sector de hidrocarburos, tengan o no vinculación jurídica o económica con la sociedad dueña de la infraestructura concesionaria.

Parágrafo. Para el debido cumplimiento de la obligación contenida en el presente artículo, el Gobierno Nacional establecerá las condiciones, obligaciones y responsabilidades para la realización de la respectiva modificación de los contratos de concesión portuaria de servicio privado existentes, cuando los titulares así lo soliciten. La reglamentación se

realizará en un plazo de ciento veinte días (120) calendario siguientes a la expedición de la ley.

TÍTULO V

DISPOSICIONES FINALES

Artículo 62. El Gobierno Nacional establecerá la organización administrativa requerida para implementar una ventanilla única o un centro de servicios especializado para adelantar todos los trámites, autorizaciones y permisos relacionados con la estructuración, planeación, contratación y ejecución de proyectos de infraestructura de transporte.

Para el funcionamiento de la ventanilla única o centro de servicios especializados, el Gobierno Nacional desarrollará un sistema único de información que permita la gestión y el seguimiento integrado de todas las actuaciones administrativas que se adelanten.

Parágrafo. Las entidades y organismos deberán adecuar sus procedimientos y sistemas existentes para garantizar la integración en la ventanilla única que mediante esta ley se ordena.

Artículo 63. **Reglamentado por el Decreto 602 de 2017.** En caso de emergencia, desastre o calamidad pública, alteración del orden público o por razones de seguridad vial, la infraestructura de propiedad privada destinada al transporte, tal como: vías carreteras o férreas, aeródromos y puertos marítimos o fluviales, así como los elementos, equipos y maquinaria privados asociados a esta, podrán ser utilizados por las autoridades públicas y por quienes presten un servicio de transporte público.

Asimismo, en caso de alteraciones al orden público, calamidad pública, desastre, emergencia o por razones de seguridad vial, la infraestructura de transporte incluyendo equipos y maquinaria deberá ser puesta a disposición de la respectiva autoridad de Policía y la Unidad Nacional de Gestión del Riesgo de Desastre o quien haga sus veces, con el fin de conjurar la situación y restablecer el orden y la seguridad nacional.

Los reconocimientos económicos que deban efectuarse en favor de los privados por la utilización de la infraestructura, equipos o maquinaria, será determinada a precios del mercado de común acuerdo, o por un tercero designado por las partes, con posterioridad a la superación del estado de emergencia, desastre o calamidad pública o alteración del orden público, etc.

Bajo las mismas circunstancias, los contratistas de infraestructura de transporte estarán obligados a permitir que la ejecución de las obras

destinadas a conjurar la circunstancia se realicen directamente por la contratante, o por terceros contratados para tal fin.

Todo lo dispuesto en el presente artículo deberá ser dirigido y coordinado por el Ministerio de Transporte.

Artículo 64. En caso de contradicción entre la presente norma y otra de igual jerarquía, prevalecerán las disposiciones que se adoptan mediante la presente ley, por ser una norma especial para la infraestructura de transporte.

Artículo 65. El Gobierno Nacional adoptará las medidas necesarias para garantizar que en el Secop se lleve a cabo el registro de iniciativas de asociación público-privadas, sus procesos de selección y los contratos desarrollados bajo esquemas de asociaciones público- privadas que tengan por objeto el desarrollo de proyectos de infraestructura del transporte.

Para el efecto, el Registro Único de Asociación Público Privada (RUAPP), previsto en el artículo 25 de la Ley 1508 de 2012 se integrará al Sistema Electrónico para la Contratación Pública (Secop), o el sistema que haga sus veces.

Artículo 66. Se otorgan facultades extraordinarias al Presidente de la República, por el término de seis (6) meses para:

1. Crear la Unidad de Planeación del Sector de infraestructura de Transporte como una Unidad Administrativa Especial, con independencia administrativa, técnica y patrimonial, con personería jurídica adscrita al Ministerio de Transporte, la cual tendrá un régimen privado en materia de contratación.

El presupuesto de la Unidad de Planeación de la Infraestructura de Transporte (UPET), hará parte del presupuesto general de la Nación y será presentado al Ministerio de Transporte para su incorporación en el mismo y su distribución anual se hará mediante resolución expedida por el Ministerio de Transporte y refrendada por el Director General de Presupuesto Nacional del Ministerio de Hacienda y Crédito Público, conforme a las disposiciones contenidas en la ley orgánica del presupuesto y en las demás normas que la reglamenten, modifiquen o sustituyan.

La Unidad de Planeación del Sector Transporte tendrá por objetivo: i) Establecer los requerimientos de infraestructura de Transporte para garantizar la competitividad, conectividad, movilidad y desarrollo en el territorio nacional.; ii) Elaborar y actualizar el Plan de Infraestructura en concordancia con las políticas y directrices definidas en los planes de desarrollo nacional y las propias del Ministerio; iii) Realizar diagnósticos

que permitan la formulación de planes y programas del sector de infraestructura; iv) Recomendar al Ministro de Transporte, políticas y estrategias para el desarrollo del sector de infraestructura de transporte; v) planear en forma integral, indicativa, permanente y coordinada con las entidades y organismos del sector transporte, todo lo relativo a los proyectos de infraestructura del transporte a cargo de la Nación, así como coordinar con las entidades territoriales los proyectos de infraestructura del transporte a cargo de estas entidades; vi) Igualmente, tendrá a su cargo la consolidación y divulgación de la información de los proyectos de infraestructura del transporte del sector y el registro de los operadores del sector.

2. Crear la Comisión de Regulación de Infraestructura y Transporte como una Unidad Administrativa Especial, con independencia administrativa, técnica y patrimonial, con personería jurídica adscrita al Ministerio de Transporte, la cual tendrá como misión reglamentar y regular e integrar la normatividad del sector, así como regular y promover la competencia del sector, evitar los monopolios y la posición dominante en los proyectos de infraestructura de transporte y definir la disponibilidad, los niveles de servicio, estándares de calidad, garantía de continuidad del servicio de transporte y los proyectos de infraestructura del sector, fijar las tarifas de las actividades reguladas y los topes máximos de actividades no reguladas del sector transporte, servir de instancia de resolución de conflictos entre los distintos actores del sector transporte. Quedarán exceptuadas de la competencia de la Comisión, la regulación del modo aéreo y, de conformidad con la Ley 1115 de 2006, la relativa a la fijación y el recaudo de tarifas por concepto de los servicios prestados por la Dirección General Marítima "Dimar".

**Nota, artículo 66: Ver Decreto 947 de 2014. Ver Decreto 946 de 2014.**

Artículo 67. Para disminuir los costos de construcción, mantenimiento y rehabilitación que se generan en los casos identificados como de alta vulnerabilidad y de emergencia, el Ministerio de Transporte podrá determinar a través de la Unidad de Planeación de Tierras Rurales, Adecuación de Tierras y usos Agropecuarios (UPRA), teniendo en cuenta lo dispuesto en la Ley 1551 de 2012, y/o del Ministerio de Ambiente y Desarrollo Sostenible, los cambios en el uso del suelo que sean requeridos en los instrumentos de ordenamiento territorial para asegurar la estabilidad del suelo y el equilibrio ecológico necesario para evitar impactos financieros negativos en el costo de la infraestructura de transporte.

Para estos casos, el Gobierno Nacional desarrollará los mecanismos de compensación financiera por las restricciones al uso que se impongan y permitan su efectivo reconocimiento al titular afectado.

Artículo 68. Los municipios y distritos podrán proveer de infraestructura adicional o complementaria de todo tipo o alumbrado público a aquellos corredores viales nacionales o departamentales que se encuentren dentro

de su perímetro urbano y rural aunque no estén a su cargo, para garantizar la seguridad y mejorar el nivel de servicio a la población en el uso de la infraestructura de transporte, previa autorización de la entidad titular del respectivo corredor vial.

Artículo 69. Corredores logísticos estratégicos. El Ministerio de Transporte podrá establecer corredores logísticos de importancia estratégica para el país. Cuando se encuentren definidos dichos corredores, el Ministerio convocará a los municipios comprendidos en el corredor para expedir en caso de ser necesario, de manera conjunta y coordinada la reglamentación relativa al flujo de carga.

**Nota, artículo 69: Ver Resolución 789 de 2018, M. Transporte. Ver Decreto 1478 de 2014.**

Artículo 70. **Reglamentado por el Decreto 1955 de 2014.** Obligaciones de la Nación como socia en entidades públicas o mixtas que financien infraestructura. Con el fin de promover la participación de socios estratégicos en entidades financieras públicas o mixtas que promuevan el desarrollo y la financiación de infraestructura, tales como la Financiera de Desarrollo Nacional, la Nación podrá adquirir obligaciones condicionales en el marco de acuerdos de accionistas de dichas entidades, que impliquen la adquisición parcial o total de la participación accionaria de los socios estratégicos. En el evento que se active la condición, el respectivo pago se deberá presupuestar en la siguiente Ley de Presupuesto General de la Nación.

**Nota, artículo 70: Artículo declarado exequible por los cargos analizados por la Corte Constitucional en la Sentencia C-147 de 2015.**

Artículo 71. El Gobierno Nacional reglamentará dentro de los ciento veinte (120) días siguientes a la expedición de la presente ley, la forma en que podrán establecerse en proyectos de Asociación Público Privada, unidades funcionales de tramos de túneles, en virtud de las cuales se predicará únicamente disponibilidad parcial y estándar de calidad para efectos de la retribución.

**Nota, artículo 71: Ver Decreto 1026 de 2014.**

Artículo 72. **Reglamentado por el Decreto 791 de 2014. Corregido por el Decreto 476 de 2014, artículo 1º.** Capacidad residual de contratación para contratos de obra pública. La capacidad residual de contratación cuando se realicen contratos de obra pública se obtendrá de sustraer de la capacidad de contratación, el saldo del valor de los contratos en ejecución.

La capacidad de contratación se deberá calcular mediante la evaluación de los siguientes factores: Experiencia (E), Capacidad Financiera (CF), Capacidad Técnica (CT), y Capacidad de Organización (CO).

Para los efectos de la evaluación de los factores mencionados en el inciso anterior, por ningún motivo, ni bajo ninguna circunstancia se podrán tener en cuenta la rentabilidad y las utilidades.

El Gobierno Nacional reglamentará la materia, dentro de los sesenta (60) días siguientes a la promulgación de la presente ley, acudiendo al concepto técnico de la Sociedad Colombiana de ingenieros, en virtud de la Ley 46 de 1904, para propender por una reglamentación equitativa en la implementación de mínimos y máximos que garanticen los derechos de los pequeños contratistas.

**FE DE ERRATAS**

En el **Diario Oficial** 48.982 del viernes 22 de noviembre de 2013, se publicó la Ley 1682 de 22 de noviembre de 2013, *por la cual se adoptan medidas y disposiciones para los proyectos de infraestructura de transporte y se conceden facultades extraordinarias;* sin embargo, el artículo 72 del texto publicado presenta errores de transcripción con respecto a su original.
A continuación se transcribe el texto completo y corregido del artículo 72:

Texto anterior del artículo 72. **Corregido según Fe de erratas publicada en el Diario Oficial 48.987, pag. 3º.** "Capacidad residual de contratación para contratos de obra pública. La capacidad residual de contratación cuando se realicen contratos de obra pública se obtendrá de sustraer de la capacidad de contratación, el saldo del valor de los contratos en ejecución.

La capacidad de contratación se deberá calcular mediante la evaluación de los siguientes factores: Experiencia (E), Capacidad Financiera (CF), Capacidad Técnica (CT), y Capacidad de Organización (CO).

Para los efectos de la evaluación de los factores mencionados en el inciso anterior, por ningún motivo, ni bajo ninguna circunstancia se podrán tener en cuenta la rentabilidad y las utilidades.

El Gobierno Nacional reglamentará la materia, dentro de los sesenta (60) días siguientes a la promulgación de la presente ley, acudiendo al concepto técnico de la Sociedad Colombiana de Ingenieros, en virtud de la Ley 49 de 1904, para propender por una reglamentación equitativa en la implementación de mínimos y máximos que garanticen los derechos de los pequeños contratistas.".

(La Ley 4a de 1913 en su artículo 45 reza: "Los yerros caligráficos o tipográficos en las citas o referencias de unas leyes a otras no perjudicarán, y deberán ser modificados por los respectivos funcionarios, cuando no quede duda en cuanto a la voluntad del legislador". Esta ley autoriza a la Imprenta Nacional de Colombia a publicar los yerros tipográficos que aparezcan en las normas).

Texto inicial del artículo 72: "Capacidad residual de contratación pública. La capacidad residual de contratación cuando obra pública se obtendrá de sustraer de la capacidad del valor de los contratos en ejecución.

La capacidad de contratación se deberá calcular mediante la evaluación de los siguientes factores: Experiencia (E), Capacidad Financiera (CF), Capacidad Técnica (CT), y Capacidad de Organización (CO).

Para los efectos de la evaluación de los factores mencionados en el inciso anterior, por ningún motivo, ni bajo ninguna circunstancia se podrán tener en cuenta la rentabilidad y las utilidades.

El Gobierno Nacional reglamentará la materia, dentro de los sesenta (60) días siguientes a la promulgación de la presente ley, acudiendo al concepto técnico de la Sociedad Colombiana de Ingenieros, en virtud de la Ley 49 de 1904, para propender por una reglamentación equitativa en la implementación de mínimos y máximos que garanticen los derechos de los pequeños contratistas.".

Artículo 73. La presente ley rige a partir de su sanción y publicación en el **Diario Oficial** y deroga el inciso 2° del artículo 37 de la Ley 9ª de 1989; artículo 32 de la Ley 105 de 1993; el artículo 83 de la Ley 1450 de 2011; parágrafos 1° y 2° del artículo 87 de la Ley 1474 de 2011; y las demás disposiciones que le sean contrarias.

El Presidente del honorable Senado de la República,

Juan Fernando Cristo Bustos.

El Secretario General del honorable Senado de la República,

Gregorio Eljach Pacheco.

El Presidente de la honorable Cámara de Representantes,

Hernán Penagos Giraldo.

El Secretario General de la honorable Cámara de Representantes,

Jorge Humberto Mantilla Serrano.

REPÚBLICA DE COLOMBIA – GOBIERNO NACIONAL

Publíquese y cúmplase.

Dada en Bogotá, D. C., a 22 de noviembre de 2013.

JUAN MANUEL SANTOS CALDERÓN

El Ministerio de Hacienda y Crédito Público,

Mauricio Cárdenas Santamaría.

El Ministerio de Justicia y del Derecho,

Alfonso Gómez Méndez.

El Ministerio de Minas y Energía,

Amílcar Acosta Medina.

La Ministra de Ambiente y Desarrollo Sostenible,

Luz Helena Sarmiento Villamizar.

La Ministra de Transporte,

Cecilia Álvarez Correa Glen.

# English Translation of Exhibit 8

# LAW 1682 OF 2013

(November 22)

DO 48.982, November 22, 2013

by which measures and provisions are adopted for transport infrastructure projects and extraordinary powers are granted.

---

LEGISLATIVE BACKGROUND

BILL PUBLISHED IN GAZETTE 137/13

FIRST DEBATE SENATE GAZETTE 330/13 – CHAMBER 876/13

SECOND DEBATE SENATE GAZETTE 419/13 – CAMERA 910/13 – 911/13

PLENARY APPROVAL OF THE SENATE GAZETTE 701/13

TEXT APPROVED PLENARY SENATE GAZETTE 572/13 – CHAMBER 573/13

CONCILIATION REPORT SENATE GAZETTE 936/13 – CHAMBER 935/13

---

**Note 1:** Modified by Law 1882 of 2018 and by Law 1742 of 2014.

**Note 2: Partially regulated by** Decree 602 of 2017, by Decree 119 of 2015, by Decree 1955 of 2014, by Decree 791 of 2014, by Decree 738 of 2014, by Decree 737 of 2014 and by Decree 736 of 2014.

**Note 3:** See Law 1955 of 2019, Article 119, See Decree 884 of 2017, See Decree 1008 of 2015, See Decree 1026 of 2014.

**Note 4: Corrected by** Decree 476 of 2014 and by Decree 3049 of 2013.

The Congress of Colombia

DECREES:

TITLE I

GENERAL PROVISIONS, PRINCIPLES AND POLICIES OF THE TRANSPORT INFRASTRUCTURE

Article 1. The provisions of this law shall apply to transport infrastructure.

Article 2. Transport infrastructure is a mobility system made up of a set of tangible and intangible assets and those related to it, which is under the surveillance and control of the State, and is organized in a stable manner to allow the transfer of people, goods and services, access and integration of the different areas of the country and which promotes growth, competitiveness and improvement of the quality of life of citizens.

Machine Translated by Google
12/19/24, 10:2    Case 1:25-cv-01099-JDB    Document 1-9    Filed 04/10/25    Page 57 of 108
Congress of Colombia Law 1682 of 2013

Note, article 2: See External Circular 32 of 2018, SPT. See Resolution 602 of 2018, CGN. DO 50,811, page. 23.

Article 3. Characteristics of transport infrastructure. Transport infrastructure as a system is characterized by being intelligent, efficient, multimodal, safe, accessible to all people and cargo, environmentally sustainable, adapted to climate change and vulnerability, with mitigation actions, and is intended to facilitate and enable transport in all its modes.

Article 4. Integration of transport infrastructure. The transport infrastructure is made up of, among others:

1. The road network for land motor transport with its exclusion zones or mandatory withdrawal zones, operational facilities such as weigh stations, operations control centers, toll stations, service and attention areas, facilities and their signage, among others.

others.

2. Bridges built on road accesses in Border Zones.

3. Viaducts, tunnels, bridges and accesses to land routes and port and airport terminals.

4. Rivers, seas, navigable water channels and other public assets associated with these, as well as signaling elements such as lighthouses, buoys and other elements for the facilitation and safety of maritime and river transport and traffic support and control systems, without prejudice to their connotation as elements of the sovereignty and security of the State.

5. Sea and river ports and their access routes and channels. Port, sea and river infrastructure includes roadsteads, anchorages, access channels, manoeuvring areas, environmental protection and/or commercial exploitation zones, docks, breakwaters, directional dikes, contraction dikes and other works that allow the maintenance of a navigation channel, shore protection structures and the land on which such works are built.

6. Railway lines and infrastructure for traffic control, railway stations, signage and their exclusion zones or mandatory withdrawal zones.

7. Specialized logistics infrastructure that includes wholesale supply nodes, land transportation centers, logistics distribution areas, air cargo centers, port logistics activity zones, dry ports and multimodal logistics zones.

8. Aeronautical and airport infrastructure designed to facilitate and make air navigation possible.

9. Cable Transport Systems: cable cars, aerial cables, tow cables and funiculars, built in public spaces and/or intended for the transport of cargo or passengers.

10. The urban infrastructure that supports public transport systems, integrated mass transport systems, strategic public transport systems and integrated public transport systems; the public space that consists of platforms, separators, green areas, environmental control areas, occasional parking areas, as well as cycle routes, bus stops, terminals, stations and technological platforms.

11. Intelligent transportation systems networks.

Paragraph 1. The integration referred to in this article does not modify the additional powers, uses, ownership or destination that the legislator has provided for the assets described above.

Paragraph 2. Exclusion zones or mandatory withdrawal zones must be previously acquired by the person responsible for the transport infrastructure project, when their use is required.

**Note, article 4: See Law 2294 of 2023, Article 182, paragraph. See Resolution 4413 of 2014, M. of Transportation. See Resolution 602 of 2018, CGN. DO 50,811, page. 23.**

Article 5. The actions of planning, execution, maintenance, improvement and rehabilitation of transport infrastructure projects and works materialize the general interest provided for in the Political Constitution by promoting the development and economic growth of the country; its international competitiveness; the integration of the National Territory, and the enjoyment of the rights of the people and constitute an element of the sovereignty and security of the State. For this reason, the development of the aforementioned actions constitutes a public function that is exercised through the competent entities and organizations at the national, departmental, municipal or district level, directly or with the participation of individuals.

Article 6. Transport infrastructure in Colombia must take into account the standards of accessibility to modes of transport for the general population and especially for people with disabilities, as well as comprehensive and sustainable urban development.

The above, without prejudice to the technical requirements relevant to each case.

Article 7. Public entities and persons responsible for planning transport infrastructure projects must comprehensively identify and analyze during the structuring stage, the

Existence in the area of direct and indirect influence of the project, the following aspects, among others:

a) Utility networks and assets, petroleum industry assets and infrastructure, and information and communications technology infrastructure;

b) Urban, architectural, cultural and archaeological heritage;

c) Resources, assets or areas subject to authorization, permit or environmental license or in the process of being declared a reserve, exclusion or protected area;

d) Properties subject to measures to protect the assets of the displaced population and/ or restitution of land, in accordance with the provisions of Laws 387 of 1997 and 1448 of 2011 and other provisions that modify, add to or complement them;

e) Established ethnic communities;

f) Mining titles in the process of being awarded, granted, existing and in operation;

g) Property diagnosis or analysis of properties subject to acquisition.

For such purposes, they must request said information from the authorities, entities or companies in charge of these activities or services, which must be provided within a maximum period of thirty (30) calendar days after submitting their request.

After consulting the information systems in force at the time of structuring, such as the Integrated Highway Information System (SINC) and the Colombian Special Data Infrastructure System, among others, and without being limited to them, and having gathered the information referred to in the previous paragraphs, the person responsible for structuring transport infrastructure projects must comprehensively analyze it, with the objective of establishing the best cost-benefit for the project based on the aspects, programs, plans and projects that impact it. The structuring party will maintain an ongoing dialogue with the actors and interested parties to guarantee the general interest.

The Intersectoral Infrastructure Commission will decide, in the event of overlap and/or conflict between projects from different sectors or with the aspects indicated above, how to proceed.

Article 8. For the purposes of this law, the following principles are defined under which transport infrastructure will be planned and developed:

**Accessibility.** When developing infrastructure projects and transport services, tariffs, coverage and provisions that allow access for all persons and also for cargo must be considered.

**Climate change adaptation and mitigation.** Transport infrastructure projects should consider the implementation of technical measures to reduce the vulnerability of transport systems due to the actual or expected effects of climate change. They should also implement technological changes and replacements that reduce resource input and emissions of polluting gases and particulate matter per unit of production.

**Quality of service.** Transport infrastructure must take into account the needs of customers, users or citizens, as well as the minimum characteristics required to meet service levels and applicable national or international standards.

**Capacity.** Improvements in infrastructure capacity will be sought in accordance with the technical conditions of supply and demand for each mode of transport.

**Competitiveness.** The planning and development of the country's transport infrastructure projects must be aimed at improving the production, maintenance and expansion of the national industry and foreign trade and its participation in international markets, as well as promoting job creation. The consolidation of corridors that support foreign trade cargo and that connect the main production and consumption centers with seaports, airports and border points with the land, river or air road network will be promoted.

**Connectivity.** Transport infrastructure projects must promote connectivity with the different existing transport networks run by the nation, departments and municipalities. For this reason, the type of infrastructure to be built will vary depending on the probability of impacts due to natural causes, the expected benefits and the construction costs.

**Efficiency.** Transport infrastructure projects will seek to optimise the integrated mobility system, ensure the proper organisation of the various modes of transport and create integrated logistics chains.

**Safety.** The transport infrastructure built in the country must meet criteria and standards of quality, timeliness, safety and the vision of zero deaths in accidents, for any mode of transport.

This security involves actions to prevent or minimize traffic accidents and those aimed at providing information on the

Machine Translated by Google
12/19/24, 10:2    Case 1:25-cv-01099-JDB    Document 1-9    Filed 04/11/25    Page 61 of 108
Congress of Colombia Law 1682 of 2013

measures that must be adopted to minimize the consequences of an accident at the time of its occurrence.

**Environmental sustainability.** Infrastructure projects must comply with each of the requirements established in environmental legislation and have an environmental license issued by Anla or the competent authority.

**Section added by Law 1742 of 2014, Article 1.** Infrastructure projects must be designed and developed with the highest criteria of environmental sustainability, in accordance with prior environmental impact studies that have been duly shared and in compliance with all requirements established in the legislation for the protection of natural resources and in the licenses issued by the competent environmental authority, who must carry out strict control and monitoring of all project activities.

Article 9. Intermodality, multimodality, articulation and integration.
Infrastructure projects will be planned with the aim of ensuring the intermodality of transport infrastructure, the multimodality of the services provided and the articulation and integration between the various modes of transport, in order to achieve connectivity between the different regions of the country and between these and the outside world.

The National Government will regulate the matter within the following one hundred and twenty calendar days.

**Note, article 9: See Decree 736 of 2014.**

Article 10. Transport infrastructure projects involving urban and rural intervention on the secondary or tertiary network. In the case of public utility and social interest transport infrastructure projects carried out by the Nation that require urban or rural interventions on roads in the secondary or tertiary network for their development, a collaboration and coordination agreement shall be signed with the corresponding Territorial Authority, establishing the responsibilities that each of the parties assumes in the execution of the activities related to the project.

In the event that an agreement is not reached within a period of ninety (90) days, the entity responsible for the project in charge of the Nation will continue with the transportation infrastructure project, delivering to the territorial entity a document that accounts for the review of the viability of the nation's project, conforms to the Territorial Development Plan and the actions to mitigate impacts on the territory to be intervened.

Article 11. In order to improve urban mobility, reduce poverty and foster social inclusion, the National Government will promote the design, construction and operation of urban cables.

Machine Translated by Google
12/19/24, 10:2    Case 1:25-cv-01099-JDB    Document 1-9    Filed 04/11/25    Page 62 of 108
Congress of Colombia / Law 1682 of 2013

TITLE II

DEFINITIONS

Article 12. **Regulated by Decree 602 of 2017.** As regards land, air, airport and water transport infrastructure, the following definitions shall be taken into account:

**Protection activities and works.** Permanent or temporary mechanical protection and mitigation works on assets, networks and infrastructure of public services and complementary activities, information and communications technologies and the oil industry.

**Construction.** These are new works that include the construction or assembly of some type of transport infrastructure.

**Costs associated with the transfer or relocation of networks and assets.** This corresponds to the value of the dismantling and installation of a new network or asset. This value will include the acquisition of new assets, easements, licensing, contractual management and, in general, the costs involved in the installation of the new network, as well as the works necessary to guarantee the continuity and quality of the provision of public services during the transfer or relocation of the networks and assets.

The determination of the value of the asset will be subject to the principle of not transferring income between sectors.

**Engineering Studies.** Without prejudice to the provisions of Law 1508 of 2012 and its regulatory decrees, the following definitions must be taken into account in the preparation of the various engineering studies that are carried out for the execution of infrastructure projects:

Phase 1. Pre-feasibility. This is the phase in which the approximate pre-design of the project must be carried out, presenting alternatives and performing the preliminary economic evaluation using costs obtained in projects with similar conditions, using simulation models duly approved by the requesting entities. In this phase, the tool or database determined by the Ministry of Environment and Sustainable Development for this purpose must be consulted, within the Comprehensive Online Environmental Procedures Window (Vital). The objective of phase 1 is to complete the process to establish the alternative route that best satisfies the technical and financial requirements at this level.

Phase 2. Feasibility. This is the phase in which the project must be designed and the final economic evaluation must be carried out, through simulation with the model approved by the contracting entities. Its purpose is to establish whether the project is feasible for execution, considering all aspects related to it.

In this phase, existing networks, infrastructure and assets, ethnic communities and urban, architectural, cultural and archaeological heritage that may impact the project are identified, as well as mining titles in the process of being awarded, granted, existing and in operation.

Once the project feasibility studies have been developed, the public entity or the person responsible for the design, if the project has already been awarded, may continue with the preparation of the final designs.

Once this feasibility phase is completed, the public entity or the contractor, if the transport infrastructure project has already been awarded, will carry out the environmental impact study, which will be submitted for approval by the environmental authority who will grant the respective license.

Phase 3. Final studies and designs. This is the phase in which detailed designs must be drawn up, both geometrically and for all the structures and works required, so that a builder can materialize the project. The objective of this phase is to materialize the final project in the field and design all its components in such a way that its construction can begin.

**Oil industry.** Public utility activity in the areas of exploration, exploitation, refining, transportation and distribution of hydrocarbons and their derivatives according to Decree Law number 1056 of 1953 and the rules that modify, replace or complement it.

**Specialised Logistics Infrastructures (SLI).** These are delimited areas where one or more operators carry out activities related to logistics, transport, handling and distribution of goods, basic technical functions and value-added activities for national and international trade in goods.

They include wholesale supply nodes, land transport centres, logistics distribution areas, air cargo centres, port logistics activity zones, dry ports and multimodal logistics zones.

**Emergency maintenance.** Refers to interventions in infrastructure resulting from events that have as their origin climatic emergencies, telluric emergencies, terrorism, among others, which in light of current legislation may be considered force majeure events or fortuitous events.

These activities are subject to regulation within one hundred and twenty (120) calendar days.

**Periodic maintenance.** This includes carrying out conservation activities at variable intervals, primarily aimed at restoring damage caused by use or by natural phenomena or external agents.

**Routine maintenance.** Refers to continuous maintenance (at intervals of less than one year) in order to maintain the conditions

optimal for transit and proper use of transportation infrastructure.

**Improvement.** Changes to a transportation infrastructure with the purpose of improving its initial technical specifications. These activities are subject to regulation within one hundred and twenty (120) calendar days.

**Mode of transport.** Air, land or water space supported by a specialized infrastructure, in which the respective means of transport transits.

**Air mode.** It includes the aeronautical and airport infrastructure for air transport.

**Land mode.** It includes road, rail and cable infrastructure for land transportation.

**Aquatic mode.** It includes maritime, river and lake infrastructure for aquatic means of transport.

**Transport node.** Infrastructure in which activities that allow the exchange of one or more means or modes of transport take place.

**Networks and assets.** This refers to the set of physical elements intended for the provision of the respective public service, information and communications technology or the oil industry, in accordance with current regulations, including those issued by the corresponding Regulatory Commission or the Ministry of Mines and Energy.

**Rehabilitation.** Reconstruction of a transport infrastructure to return it to the initial state for which it was built.

**Relocation or transfer of networks and assets.** This includes the de-installation or mobilization of existing network infrastructure and assets to be located at a different site, so that the respective service continues to be provided with the same network or asset or some of its components and/or includes the dismantling, disabling or abandonment of the network infrastructure and assets and the construction of a new network or asset or some of its components at a different site, so that the respective service continues to be provided under the same conditions.

**Automatic sanitation.** It is a legal effect that operates by operation of law exclusively in favor of the State, when it carries out acquisition processes of real estate, for the reasons of public utility established in the law for transport infrastructure projects. By virtue of such legal effect, the State acquires full ownership of the property.

Machine Translated by Google
12/19/24, 10:2...    Case 1:25-cv-01099-JDB    Document 1-9    Filed 04/10/25    Page 65 of 108
Congress of Colombia law 1682 2013

ownership of the property, with all disputes or litigation relating to the property being resolved in his/her favor.

The above, without prejudice to any conflicts that may exist between third parties regarding the property, which will be resolved through the different forms of conflict resolution, without being enforceable against the State.

**Services related to transport.** These are all services and/or activities that are developed or provided in the transport infrastructure and complement transport, in accordance with the powers of the authorities provided for each mode.

These services allow for modal or multimodal operations, also covering transport activities under conditions of regularity and contingencies.

These services include vehicle appraisals and evaluations, passenger and cargo terminals, teaching schools and vehicle disintegration and recycling centres, among others.

**Comprehensive Terms of Reference.** These are the standard general guidelines that the Ministry of Environment and Sustainable Development, in coordination with the National Environmental Licensing Authority, establishes for the preparation and execution of all environmental studies for transport infrastructure projects, without prejudice to the specific guidelines required for each project by the competent environmental authority.

The applicant must submit the studies exclusively in accordance with these comprehensive terms of reference, which shall be mandatory.

**Neighbors or surrounding areas.** For the purposes of the article regulating the Temporary Authorization, rural properties will be considered to be neighbors or surrounding areas of the work, if they are located no more than 50 km away from it.

Paragraph. In any case, the definitions contained in international technical regulations that must be observed by the Colombian authorities shall prevail over those regulated in this article.

TITLE III

SPECIAL PROVISIONS ON CONTRACTING OF
TRANSPORT INFRASTRUCTURE

Article 13. Contracts that from now on develop transport infrastructure projects will include a clause in which the mathematical formula that determines the eventual

Machine Translated by Google
12/19/24, 10:2   Case 1:25-cv-01099-JDB   Document 1-9   Filed 04/12/25   Page 66 of 108
Laws of Colombia law 1682 de 2013

reciprocal benefits in the event of early termination by agreement between the parties or by unilateral decision.

Paragraph 1. The contracting public entity shall guarantee the economic balance of the contract at any stage of its execution and may propose, if it so deems appropriate, in accordance with current law, the advance payment of the recovery of the investment at the operation stage, in accordance with the formula described in the contract.

Paragraph 2. For contracts entered into prior to the enactment of this law, which are in the operational stage, the contracting public entity may propose formulas that accelerate the recovery of the investment, guaranteeing the contractor payment of the benefits to which he is entitled, enabling by mutual agreement the early termination of the contract, which must be based on the reasons provided for in the General Statute of State Contracting, provided that it is required to execute a work of public interest or for reasons of general utility and interest.

Any compensation or payments to be made may be determined by mutual agreement between the parties or by making use of amicable settlement, or an arbitration tribunal, or any other alternative dispute resolution mechanism.

Paragraph 3. By operation of law, early termination will entail the subrogation of the responsible public entity in the rights and obligations of the holder of the license, permits or environmental authorizations, mining titles and in general other types of permits or authorizations obtained for the execution of the transportation infrastructure project.

The above, without prejudice to the obligations pending at the time of termination, on which the parties may agree who assumes the respective responsibility, or defer said decision to a third party, making use of any alternative dispute resolution mechanism.

Article 14. Dispute resolution. For the resolution of disputes arising from or in connection with the celebration, development, execution, interpretation, termination and liquidation of state contracts, the parties may include arbitration clauses, always observing the provisions of Law 1563 of 2012. and other regulations that add to, modify, replace or regulate it, especially regulations that govern the use of alternative dispute resolution mechanisms for public entities.

Likewise, the following rules will apply in a special manner:

a) **Literal modified by Law 1742 of 2014, Article 2.** Decisions issued in the exercise of alternative mechanisms for resolving disputes relating to the contract must be issued in

Machine Translated by Google
12/19/24, 10:2 Case 1:25-cv-01099-JDB    Document 1-9    Filed 04/11/25    Page 67 of 108
Congress of Colombia - Law 1682 of 2013

right, except in the event of amicable composition in which the decision may be adapted in equity, in accordance with article 60 of Law 1563 of 2012.

Initial text of literal a): "The decisions issued in the exercise of alternative dispute resolution mechanisms, relating to the contract, must be issued in law;".

b) The parties may agree on the legal, technical or financial matters that they will submit for decision, in whole or in part;

c) Neither the arbitrators nor the friendly mediators shall have jurisdiction to rule on the legality of administrative acts issued in the exercise of exceptional powers; **(Note: See judgment C-45 of 2017, with respect to this literal.).**

d) In the event that the use of amicable composition is agreed upon, the entities subject to this law must include in the respective clause the rules that guarantee the rights of equality, publicity, contradiction and defense;

e) The exercise of such mechanisms will not automatically suspend the exercise of powers outside of common law enjoyed by the contracting entities, unless a precautionary measure is decreed in the terms of Chapter XI of Title V of Part Two of Law 1437 of 2011. or other regulations that add to, modify or replace it;

f) Public entities subject to this law are prohibited from appointing the members of the arbitration panel or friendly settlement panel in the arbitration clause that is relatively or unequivocally referred to the contract, or to documents that are part of it in the specifications.

The appointment rules of Law 1563 of 2012 will be followed;

g) The contracting entities must define the profile of the arbitrators and friendly mediators in the specifications, in such a way that their personal and professional conditions are suitable for the purpose of the contract and the activities to be carried out by the parties;

h) No arbitrator, friendly mediator or secretary may simultaneously act as such in more than three (3) courts or friendly mediators in which a public entity subject to this law intervenes as a party, or in conflicts related to these;

(i) The entities covered by this law must limit the fees of the arbitrators or the friendly mediators in the arbitration clauses. In the event that the respective clause does not provide for a readjustment formula, the limit may not be modified or updated by the arbitrators or the friendly mediators;

j) Public entities shall include the costs and expenses required for the use of such mechanisms in their budgets.

Paragraph. In contracts entered into prior to the enactment of this law, by the parties' free will, the rules provided for in this article may be applied.

Article 15. Permits for the development of transport infrastructure projects. Without prejudice to the provisions of Law 1508 of 2012, Any interested party may request permission from the competent authority to develop, at their own expense and risk, transport infrastructure projects of interest to them.

The competent entity will analyze the technical, legal and financial convenience of the project and may grant the permit if it considers that it is in accordance with the plans, programs and projects of the sector and if it has the relevant technical concepts and legal authorizations.

The project must be developed in accordance with the corresponding technical standards and regulations and must guarantee its connectivity with the existing infrastructure. All goods and services derived from the development of the project will be owned, used, exploited and administered by the Nation or territorial entity as appropriate.

In no case will the authorization or permit granted constitute a contract with the individual, nor will the entity be obliged to recognize or pay the value of the investment or any other expense or cost associated with the transportation infrastructure project.

Nor can it be understood that the individual obtains exclusive or preferential rights over the ownership, use, usufruct, exploitation or free disposal and alienation of the goods or services of the transport infrastructure project. These rights shall be held on equal terms with other citizens.

The National Government will establish the conditions that must be met by both national and territorial entities for the granting of these permits, within a period of no more than one hundred and twenty (120) calendar days. Additionally, it will regulate matters concerning connectivity between the private interest transport infrastructure project and the Road Network in order to prevent those projects from causing harm to the general interest.

**Note, article 15: See Resolution 2922 of 2014, Ministry of Transport. See Decree 942 of 2014.**

Article 16. For the development of transportation infrastructure projects, entities must open selection processes if they have engineering studies at the Feasibility Stage as a minimum, without prejudice to the legal, environmental and financial studies that the entity must have.

Paragraph. The above provision shall not apply:

a) When exceptionally the public entity requires to contract the preparation of studies and designs, construction, rehabilitation, improvement and/or maintenance that are contemplated in an integral manner,
¨

b) For the prior review and verification of public-private partnership projects of private initiative provided for in Law 1508 of 2012 or the regulation that modifies, substitutes or replaces it, the process may be initiated with studies and designs in the pre-feasibility stage.

Article 17. 7x24 work fronts. Contractors of transportation infrastructure projects may request authorization from the contracting entity to increase the work fronts and/or carry out work in 3 daily shifts (24 hours), seven days a week to comply with their work schedules in the event of delays or to increase yields and speed up the execution of the project. In the latter case, they must submit their proposal respecting the budget appropriations of the term that support the respective contract. They may also request contractual adjustments that imply the advancement of work. The entity will have thirty (30) calendar days to accept or reject the request with reasons.

For new transport infrastructure project structurings, which begin after this law comes into force, state and private entities must plan the development of the works, with work days of 3 daily shifts (24 hours), seven days a week.

Likewise, state entities may enforce fines and/or penalty clauses by requiring the contractor to install work fronts in 3 daily shifts (24 hours), seven days a week up to the value of the fine, as a mechanism of coercion and form of payment. This power is understood to be attributed with respect to the clauses of fines and monetary penalty clauses agreed in contracts entered into prior to the enactment of this law and in which, by the parties' free will, the competence of state entities to impose and enforce them has been foreseen.

Article 18. Liability. Legal entities that execute infrastructure projects under the Public-Private Partnership modality will be subject to the liability regime established in civil and commercial laws in accordance with the type of company they form.

TITLE IV

Machine Translated by Google
12/19/24, 10:2... Case 1:25-cv-01099-JDB    Document 1-9    Filed 04/11/25    Page 70 of 108
Congress of Colombia Law 1682 of 2013

PROPERTY MANAGEMENT AND ACQUISITION, ENVIRONMENTAL MANAGEMENT, ASSETS AND
PUBLIC SERVICES, ICT AND INDUSTRY NETWORKS
OIL, AMONG OTHERS AND MINING PERMITS AND EASEMENTS

## CHAPTER I

### Property Management and Acquisition

Article 19. Define as a motive of public utility and social interest the execution and/or development of transport infrastructure projects referred to in this law, as well as the development of activities related to their construction, maintenance, rehabilitation or improvement, authorizing the administrative or judicial expropriation of urban and rural property and real estate required for such purpose, in accordance with article 58. of the Political Constitution.

———

Article 20. **Amended by Law 1742 of 2014, Article 3.** The acquisition of land is the responsibility of the State and for this purpose the public entity responsible for the project may carry out the administrative expropriation based on the reason defined in the previous article, following for this purpose the procedures provided for in Laws 9a of 1989 and 388 of 1997, or judicial expropriation based on the same reason, in accordance with the provisions of Laws 9 of 1989, 388 of 1997 and 1564 of 2012. _____

_____  _____  _____

In all cases of expropriation, including ongoing land acquisition processes, the special rules provided for in this law must be applied.

Paragraph 1. The acquisition of private or public property necessary to establish ports will be carried out in accordance with the special rules of Law 1 of 1991. or those that expressly complement, modify or replace it. _____

Paragraph 2. Due process must be guaranteed in the acquisition of land necessary for the development or execution of transportation infrastructure projects. Consequently, public entities or individuals acting as their representatives must adhere to the procedures established by law, respecting in all cases the right to contradiction.

Initial text of article 20: "The acquisition of land is the responsibility of the State and for this purpose the public entity responsible for the project may carry out the administrative expropriation with

based on the reason defined in the previous article, following for this purpose the procedures provided for in Laws 9 of 1989 and 388 of 1997, or judicial expropriation based on the same reason, in accordance with the provisions of Laws 9 of 1989, 388 of 1997 and 1564 of 2012.

In all cases of expropriation, including ongoing land acquisition processes, the special rules provided for in this law must be applied.

The entity responsible for the infrastructure project must register the impacts in the respective real estate registration folio of the properties required for the expansion of the transport infrastructure for the medium and long term and, as soon as it is budgetarily feasible, may acquire them. In this case, the impacts may have a maximum duration of twelve (12) years.

Paragraph 1. The acquisition of private or public property necessary to establish ports will be carried out in accordance with the special rules of Law 1 of 1991 or those that expressly complement, modify or replace it.

Paragraph 2. Due process must be guaranteed in the acquisition of land necessary for the development or execution of transportation infrastructure projects; consequently, public entities or individuals acting as their representatives must adhere to the procedures established by law, respecting in all cases the right to contradiction.

Article 21. **Regulated by Decree 737 of 2014.**

Saneamientos for reasons of public utility. The acquisition of real estate for reasons of public utility and social interest enshrined in the

laws will automatically benefit the public entity from any defect related to its title and tradition, including those that arise after the

acquisition process, without prejudice to the compensation actions that for any reason may be directed against the owners registered in

the respective real estate registry folio, *other than the acquiring public entity.* **(Note: The expression crossed out in sepia was**

**declared unconstitutional by the Constitutional Court in Judgment C-410 of 2015.)**

The automatic sanitation referred to in this article will be applicable to properties acquired for transport infrastructure projects, even before the validity of Law 9 of 1989, in accordance with the regulations issued by the National Government within a period of no more than one hundred and twenty (120) calendar days.

Paragraph 1. Automatic sanitation will be invoked by the acquiring entity in the title of tradition of the domain and will be subject to registration in the corresponding registration folio.

Paragraph 2. The public entity that decides to use the automatic sanitation mechanism must verify whether the property to be acquired is registered in the Registry of Forcibly Abandoned and Dispossessed Lands created by Law 1448 of 2011, by the Special Administrative Unit for the Management of Restitution of Stolen Lands, if there is a judicial process of restitution in progress, as well as if there are protection measures registered individually or collectively in favor of the owner that have not been lifted, pursuant to the provisions for this purpose by Law 387 of 1997. and Decree number 2007 of 2001. In these cases, it will be understood that the owners lack the capacity to voluntarily transfer them.

In cases where only applications for restitution or registration in the Registry of Stolen or Abandoned Lands are found, the expropriation will proceed and the value of the properties in judicial deposit will be made available to the judge in charge of these processes, so that once the restitution process begins, he/she will place the corresponding deposit at the orders of the restitution judge.

The inclusion of the property in the road projects approved by the National Government will be understood in accordance with the terms of article 72 of Law 1448 of 2011 as a legal impossibility for restitution that will force the Fund for the Management of Restitution of Stolen Lands to compensate the victims with a property of similar conditions, in the order and guidelines established in article 98 of Law 1448 of 2011 and its regulatory decrees. However, in these cases, the payment of compensation will be made from the resources recorded in the judicial deposit made by the owner entity with charge to the project, by virtue of the expropriation process.

In the event that the restitution process is in progress, the expropriation process will be initiated, but the results of the restitution process will be awaited to determine to whom the value of the property is assigned. In the event that restitution is appropriate, the assigned value will be transferred to the Fund of the Special Administrative Unit for the Management of Restitution of Stolen Lands to compensate victims whose property is legally impossible to restore, in accordance with the terms provided for in Article 98 of Law 1448 of 2011. and its regulatory standards.

Automatic sanitation will not distort the protection measures registered in the Single Registry of Lands Despoiled for advertising purposes in favor of the possessors; however, the evidence will be considered established for the respective purposes in possible restitution processes that may be carried out in the future on the property.

If the object of the expropriation is the partial acquisition of a specific property, subject to the cases provided for in this paragraph, the registered protection measures must be maintained in the Real Estate Registration Folio of the remaining part that is not the object of acquisition.
Furthermore, taking into account that the projects are not affected, restitution will proceed, provided that the elements and requirements established in Law 1448 of 2011 are met.

Once the special procedure for the acquisition of properties linked to land restitution or protection measures has been completed, the sanitation for reasons of public utility will proceed.

Notwithstanding the above, the early delivery of the land may be requested by the entity responsible for the infrastructure project before the judge in charge of the expropriation process. In any case, the expropriation judge or the commissioned judge, during the delivery procedure, must report that the value of the land has been deposited in accordance with the orders of the restitution court.

Paragraph 3. In any case, no automatic sanitation will imply the lifting of public utility easements with respect to networks and assets, nor the disregard of property rights that have been previously acquired for the establishment of the infrastructure for public utility services and complementary activities, Information and Communications Technologies and the Oil industry.

Article 22. **Amended by** Law 1882 of 2018, **Article 8°.**

Limitations, encumbrances, liens on the domain, precautionary measures, taxes, public services and value-added tax. In the process of acquiring land required for transport infrastructure projects, in the event of a negotiation agreement between the State entity and the owner registered in the registration folio or the respective regular registered owner and prior to the registration of the corresponding public deed, the State entity, with a charge to the value of the project, may discount the total or proportional sum owed for liens, limitations, encumbrances, precautionary measures, taxes, public services and value-added tax and pay said value directly to the creditor or through judicial deposit at the orders of the respective office, in the event of carrying out executive or ordinary proceedings in which the respective lien has been ordered, considering for this purpose the area subject to acquisition, or verifying that it will be carried out directly by the owner. If this is not possible, the administrative or judicial expropriation process will continue, as appropriate.

The acquiring state entity shall issue a letter to the respective Registrar of Public Instruments or the competent authority, requesting that the limitation, encumbrance, lien or precautionary measure be lifted, evidencing the payment and corresponding clearance, where applicable. The Registrar must process the request within a peremptory period of 15 business days.

Once the respective annotation has been made in the registry, the Registrar must notify the corresponding notary by means of an official letter so that he can act in the respective public deed of the property.

Precautionary measures to the domain whose registration has expired in accordance with the provisions of Law 1579 of 2012, They may be cancelled with the request made by the state entity to the Registrar of Public Instruments.

In the case of easements for public use and the networks and assets located there can be maintained, the record of the lien will be kept in the property folio.

Paragraph. The state entity charged with the value of the business may deduct the total or proportional sum to be paid for notary and registry fees and pay said value directly.

Initial text of article 22. "Limitations, encumbrances, liens on ownership and precautionary measures.
In the process of acquiring land required for transportation infrastructure projects, in the event of a negotiation
agreement between the State entity and the owner registered in the registration folio and prior to the registration of
the corresponding public deed, the State entity, from the value of the business, may discount the total or proportional
amount owed for liens, limitations, encumbrances and precautionary measures and pay said value directly to the
creditor or through judicial deposit at the orders of the respective office, in the event of carrying out executive or
ordinary proceedings in which the respective lien has been ordered, considering for this purpose the area subject to
acquisition, or verifying that it will be carried out directly by the owner. If this is not possible, the administrative or
judicial expropriation process will continue, as appropriate.

The acquiring state entity will issue a letter to the respective Registrar of Public Instruments or the competent authority,
requesting the lifting of the limitation, encumbrance, lien or precautionary measure, evidencing the payment and
corresponding clearance, when applicable. The Registrar must process the request within a peremptory period of 15
business days.

Once the respective annotation has been made in the registry, the Registrar must notify the corresponding notary by
means of an official letter so that he can act in the respective public deed of the property.

Precautionary measures to the domain whose registration has expired in accordance with the provisions of Law 1579
of 2012, They may be cancelled with the request made by the state entity to the Registrar of Public Instruments.

When it comes to public utility easements and the networks and assets located there can be maintained, the record
of the lien will be kept in the property folio."

Article 23. Appraisers and appraisal methodology. The commercial appraisal for the
acquisition or expropriation of the properties required for transport infrastructure projects
will be carried out by the Agustín Codazzi Geographic Institute (IGAC) or the
corresponding cadastral authority or by private individuals or legal entities registered and
authorized by the Real Estate Exchanges.

The commercial appraisal, if applicable, will include the value of any indemnities or
compensation that may be required due to the impact on the assets of individuals.

For the acquisition or expropriation of properties required for transport infrastructure
projects, the Agustín Codazzi Geographic Institute (IGAC) will adopt the standards,
methods, parameters, criteria and procedures that must be applied in the preparation of
commercial appraisals and their updating. When circumstances so require, the Agustín
Codazzi Geographic Institute (IGAC) will introduce the necessary modifications.

The standards, methods, parameters, criteria and procedures established and/or modified
by the Agustín Codazzi Geographic Institute (IGAC) are mandatory and must be strictly
complied with by appraisers, owners and those responsible for property management in
transportation infrastructure projects.

Paragraph. Unjustified delay in appraisals is grounds for misconduct subject to disciplinary
sanctions, without prejudice to any other responsibilities that the appraiser may incur.

Paragraph 2°. **Added Law 1882 of 2018, Article 18. In the** standards, methods,
parameters, criteria and procedures adopted by the Agustín Codazzi Geographic Institute
(IGAC), in compliance with the following:

provided in this article, no compensation, compensation or recognition shall apply for new works or improvements, rights, prerogatives, authorizations that have been raised, made or granted in the strips or zones reserved in the terms of article 4 of Law 1228 of 2008.

___ _____

**Note, article 23: See Resolution 2684 of 2015. Ministry of Transport. See Resolution 898 of 2014, IGAAC, DO 49,249, p. 39. See Resolution 741 of 2014, IGAC, DO 49,229, p. 61.**

Article 24. Review and challenge of commercial appraisals. For the acquisition or expropriation of assets required in transport infrastructure projects, the entity requesting, or whoever takes its place, the commercial appraisal, may request the review and challenge within (5) days following the date of its delivery. The challenge may be proposed directly or in aid of the review.

A review is understood as a request by which the requesting entity or its representative, based on technical considerations, requires the person who carried out the commercial appraisal to reconsider the valuation and/or price presented, in order to correct, reform or confirm them.

It is the responsibility of the person who carried out the commercial appraisal to decide on the requested revision within ten (10) days following its presentation. Once the revision has been decided and if there is grounds for processing the challenge, the person who decided on the revision will send the file to the Instituto Geográfico Agustín Codazzi (IGAC) within three (3) days following the date of the act by which the revision was resolved.

The challenge is the procedure carried out by the requesting entity, or whoever takes its place, before the Agustín Codazzi Geographic Institute (IGAC), so that it can examine the commercial appraisal, in order to correct, reform or confirm it.

The Agustín Codazzi Geographic Institute (IGAC) is responsible for resolving challenges in all cases, for which it will functionally indicate within its structure the appropriate instances. The decision will be binding. The deadline for resolving challenges will be ten (10) days and will be counted from the day following the date of submission of the challenge.

Paragraph 1. Insofar as it is not incompatible with the provisions of this law, the provisions of the Code of Administrative Procedure and of Administrative Litigation or other regulations that modify, repeal or replace it shall apply for review and challenge.

Paragraph 2°. **Modified by Law 1882 of 2018, Article 9. The** commercial appraisal will be valid for one (1) year, counted from the date of its communication to the requesting entity or from the date on which the review and/or challenge of this was decided and notified. Once

Once the offer has been notified, the appraisal will become final for the purposes of voluntary sale.

Initial text of paragraph 2. "The commercial appraisal will be valid for one (1) year, counted from the date of its communication or from the date on which the review and/or challenge was decided and notified."

Paragraph 3. The requesting entity, or whoever takes its place, shall assume the costs required to address the challenges referred to in this article, in accordance with the rates set by the Agustín Codazzi Geographic Institute (IGAC).

Paragraph 4. Unjustified delay in resolving the review or challenge of appraisals is grounds for misconduct subject to disciplinary sanctions, without prejudice to other responsibilities that may be incurred by the appraiser or public servant of the Agustín Codazzi Geographic Institute (IGAC), as the case may be.

Article 25. **Amended by Law 1882 of 2018, Article 10.**
Notification of the offer. The offer must be notified only to the owner of the real rights that appears registered in the registration folio of the property subject to expropriation or to the respective registered regular owner or to the determined and undetermined heirs, understood as those persons who have the certain and proven expectation of entering to represent the deceased owner in all his legal relations due to his death in accordance with the laws in force.

The offer will be sent by the legal representative of the public entity competent to carry out the acquisition of the property or its delegate; for notification purposes, an official letter will be sent to the owner, registered possessor or to the determined and undetermined heirs, which will contain at least:

1. Indication of the need to acquire the property for reasons of public utility.

2. Scope in accordance with technical feasibility studies.

3. Precise identification of the property.

4. Value as purchase price in accordance with the provisions of Article 37 of this law.

5. Complete information on the possible processes that may be presented, such as: voluntary alienation, administrative or judicial expropriation.

The deadlines and methodology for quantifying the value that will be paid to each owner or possessor, as the case may be, must be explained.

Once the offer has been notified, the direct negotiation stage will be understood to have begun, in which the owner or registered possessor will have a term of

Machine Translated by Google
12/19/24, 10:2    Case 1:25-cv-01099-JDB    Document 1-9    Filed 04/10/25    Page 77 of 108
Congress of Colombia Law 1682 de 2013

fifteen (15) business days to express their will in relation to it, either accepting or rejecting it.

If the offer is accepted, a public deed of sale or promise of sale must be signed within the following ten (10) business days and the deed must be registered in the public instruments registry office of the corresponding place.

It will be understood that the owner or possessor of the property waives the negotiation when:

a) Keep silent about the offer of direct negotiation;

b) No agreement is reached within the period for accepting or rejecting the offer;

c) They do not sign the deed or the respective promise of sale within the time limits established in this law for reasons attributable to themselves.

It will be mandatory to initiate the expropriation process if, after thirty (30) business days have passed after notification of the purchase offer, a formal agreement has not been reached for the voluntary alienation, contained in a contract of promise of sale and/or public deed.

Once the offer to purchase the properties that are subject to the declaration of public utility or social interest has been notified and said offer has been registered in the respective Certificate of Freedom of Tradition, they may not be subject to any limitation on ownership. The registrar shall refrain from registering any acts, limitations, liens, precautionary measures or encumbrances on the ownership of those properties.

Paragraph. The acquiring entity will proceed to issue the expropriation resolution directly without the need to issue a purchase offer in the following events:

1. When it is verified that the registered holder of the real right of ownership has died and it is not possible to determine his heirs.

2. In the event that any of the holders of the real property rights registered in the real estate registration folio of the property being acquired or the respective registered regular owner are reported on any of the control lists for the prevention of money laundering or terrorist financing.

Once the expropriation resolution has been issued, the acquiring entity will request its registration in the respective Certificate of freedom and tradition and freedom of the property. The registrar will refrain from registering acts, limitations, liens, precautionary measures or encumbrances on the ownership of those.

Once the stage of exhaustion of administrative proceedings has been completed, the acquiring entity must resort to the judicial expropriation procedure contemplated in article 399 of the General Code of Procedure or the regulation that modifies or replaces it, for which it will apply the automatic sanitation and the value that the expropriation yields will be left to the court of knowledge.

Paragraph 2. A period of ninety (90) days is provided following the signing of the purchase and sale contracts of the goods subject to the purchase offer, to make the corresponding payment. Once the period has expired and the payment has not been made, the owners of real rights may resort to the executive process and default interest will be charged.

Previous text of article 25. **Modified by Law 1742 of 2014, Article 4.** "Notification of the offer. Notification of the offer. **The offer must be notified only to the owner of real rights registered in the registration folio of the property subject to expropriation or to the respective regular owner registered** in accordance with current laws.

**(Note: The expression indicated in bold was declared constitutional based on the charges analyzed by the Constitutional Court in Judgment C-750 of 2015.)**

The offer will be submitted by the legal representative of the public entity competent to carry out the acquisition of the property or its delegate; **for notification purposes, a letter will be sent to the owner or registered possessor,** which will contain at least: **(Note: The expression indicated in bold was declared constitutional by the charges analyzed by the Constitutional Court in Judgment C-750 of 2015.)**

1. Indication of the need to acquire the property for reasons of public utility.

2. Scope in accordance with technical feasibility studies.

3. Precise identification of the property.

4. Value as purchase price in accordance with the provisions of Article 37 of this law.

5. Complete information on the possible processes that may be presented, such as: voluntary alienation, administrative or judicial expropriation.

The deadlines and methodology for quantifying the value that will be paid to each owner or possessor, as the case may be, must be explained.

**The offer must be notified only to the owner of the real rights registered in the registration folio of the property to be acquired or to the respective registered regular possessor,** in accordance with the provisions of the Code of Administrative Procedure and Administrative Litigation. **(Note: The expression indicated in bold was declared enforceable by the Constitutional Court in Judgment C- 750 of 2015.)**

**Once the offer has been notified, the direct negotiation stage will be understood to have begun, in which the owner or registered possessor will have a period of fifteen (15) business days to express his will in relation to it, either by accepting or rejecting it. (Note: Section declared constitutional based on the charges analyzed by the Constitutional Court in Judgment C-750 of 2015.)**

If the offer is accepted, a public deed of sale or promise of sale must be signed within the following ten (10) business days and the deed must be registered in the public instruments registry office of the corresponding place.

It will be understood that the owner or possessor of the property waives the negotiation when:

a) Keep silent about the offer of direct negotiation.

b) No agreement is reached within the period for accepting or rejecting the offer.

c) They do not sign the deed or the respective promise of sale within the time limits established in this law for reasons attributable to themselves.

It will be mandatory to initiate the expropriation process if, after thirty (30) business days have passed after the communication of the purchase offer, a formal agreement has not been reached for the voluntary alienation, contained in a contract of promise of sale and/or public deed.

Once the offer to purchase the properties that are subject to the declaration of public utility or social interest has been notified and said offer has been registered in the respective Certificate of Freedom and Tradition, they may not be subject to any limitation on ownership. The Registrar shall refrain from registering any acts, limitations, liens, precautionary measures or encumbrances on the ownership of those properties."

Initial text of article 25: "Notification of the offer. The offer must be notified only to the holder of real rights registered in the registration folio of the property subject to expropriation and/or the respective regular owner registered in accordance with current laws.

Paragraph. Once the offer to purchase the properties on which the declaration of public utility and social interest falls has been notified, they may not be subject to any limitation on ownership. The registrar shall refrain from registering acts, limitations, liens, precautionary measures or encumbrances on the ownership of those properties."

Article 26. Updating of capacity and boundaries. In the event that, in the process of acquisition or expropriation of properties necessary for the implementation of transport infrastructure projects, the updating of capacity and/or boundaries is required, the public entity, or whoever takes its place, will proceed to request said procedure before the Agustín Codazzi Geographic Institute (IGAC) or the corresponding cadastral authority.

The Agustín Codazzi Geographic Institute (IGAC) or the corresponding cadastral authority will compare the information contained in the registered titles with that incorporated in its databases, arranging and carrying out a technical inspection to determine their coincidence. If the information in the registered titles coincides in all respects with that in its databases, it will proceed to issue the certification of capacity and/or boundaries.

If the information in the land registry does not match the registered titles, the Agustín Codazzi Geographic Institute (IGAC) or the corresponding cadastral authority will call the owners of domain rights and other interested parties, directly or through an appropriate means of communication, to seek an agreement based on a proposal on area and/or boundaries made by the Agustín Codazzi Geographic Institute (IGAC) or whoever takes its place. If an agreement is reached, the certification of area and/or boundary will be issued; otherwise, the legal proceedings available to the owners of domain rights will be exhausted.

Machine Translated by Google
12/19/24, 10:2    Case 1:25-cv-01099-JDB    Document 19    Filed 04/11/25    Page 80 of 108
Congress of Colombia law 1682 of 2013

The term to process and issue the certification of capacity and/or boundaries is two (2) non-extendable months counted from the receipt of the application, when the information of the registered titles fully coincides with that of the cadastre. If it does not coincide and it is necessary to summon the owners of the domain and other interested parties, the term to exhaust the process will be four (4) months, which will be counted from the receipt of the application.

Once the certification of capacity and/or boundaries is issued, the Agustín Codazzi Geographic Institute (IGAC) or the corresponding cadastral authority will forward it to the entity or organization in charge of the registry of public instruments of the respective jurisdiction, within the following 5 days, in order to proceed to make the relevant annotations. The annotation in the registry must be made within 10 calendar days from receipt of the certification.

The Agustín Codazzi Geographic Institute (IGAC) will establish the procedure to develop the capacity and/or boundaries process indicated here, within a period of no more than three (3) months, counted from the validity of this law.

Paragraph 1. The requesting Entity, or whoever takes its place, will assume the costs required for the attention to the procedure referred to in this article, in accordance with the rates set by the Agustín Codazzi Geographic Institute (IGAC) or the corresponding cadastral authority.

Paragraph 2. Unjustified delay in the present process of updating the capacity and boundaries or their registration in the registry is grounds for disciplinary sanction, which may be imposed ex officio or upon complaint by the interested party, without prejudice to any liability that may correspond to the official.

**Note, article 26:** See **Administrative Instruction 20 of 2018. See** Administrative **Instruction 16 of 2016, SNR See Resolution 193 of** 2014, IGAC. DO 49.071, p. 118.

Article 27. **Modified by Law 1882 of 2018, Article 11.** Voluntary intervention permit. A voluntary intervention permit for the property subject to acquisition or expropriation may be agreed upon through a written document signed by the entity and the owner registered in the registration folio, the regular possessor or the determined heirs of the property.

The permit will be irrevocable once agreed.

Based on the signed intervention agreement, the entity must initiate the transport infrastructure project.

The above, without prejudice to the rights of third parties over the property, which will not be affected or harmed in any way by the voluntary intervention permit, as well as the duty of the person responsible for the transport infrastructure project to continue with the process of voluntary alienation, administrative or judicial expropriation, as appropriate.

Paragraph. In the administrative process, in the event that the voluntary intervention permit of the property subject to acquisition or expropriation has not been agreed upon, within fifteen (15) days following the execution of the administrative act that ordered it, the interested entity will request the respective police authority to carry out the eviction procedure, which must be carried out with the assistance of the latter and with the accompaniment of the Ombudsman and/or the municipal representative who must guarantee the protection of Human Rights, within a peremptory term of five (5) days, of the procedure, a record will be drawn up and no opposition will be allowed in it.

Initial text of article 27. "Voluntary intervention permit. By means of a written document signed

The entity and the owner registered in the registration folio may agree on a voluntary permit for intervention in the property subject to acquisition or expropriation. The permit will be irrevocable once it is agreed. **(Note: Paragraph 1 declared enforceable due to the charges analyzed by the Constitutional Court in Judgment C-669) of 2015.).**

Based on the signed intervention agreement, the entity must initiate the transport infrastructure project. **(Note: Paragraph 2 declared constitutional based on the charges analyzed by the Constitutional Court in Sentence C-669 of 2015.).**

The above, without prejudice to the rights of third parties over the property, which will not be affected or harmed in any way by the voluntary intervention permit, as well as the duty of the person responsible for the transport infrastructure project to continue with the process of voluntary alienation, administrative or judicial expropriation, as appropriate. **(Note: Paragraph 3 declared constitutional for the charges analyzed by the Constitutional Court in Judgment C-669 of 2015.).**

Paragraph. In the administrative process, in the event that the voluntary intervention permit of the property subject to acquisition or expropriation has not been agreed upon, within fifteen (15) days following the execution of the administrative act that ordered it, the interested entity will request the respective police authority to carry out the eviction procedure, which must be carried out with the assistance of the latter and with the accompaniment of the Ombudsman and/or the municipal representative who must guarantee the protection of human rights, within a peremptory term of five (5) days, of the procedure, a record will be drawn up and no opposition will proceed in it. **(Note: Paragraph declared constitutional for the charges analyzed by the Constitutional Court in Sentence C-669 of 2015, with the understanding that the underlined expressions refer respectively to the administrative expropriation process and the execution of the administrative act that determines it).**

**Note, article 27: See Resolution 2684 of 2015. M. of Transport.**

Article 28. **Amended by Law 1742 of 2014, Article 5.** Early delivery by court order. Judges must order the delivery of real estate declared of public utility for transport infrastructure projects, within a peremptory and non-extendable term of ten (10) business days, counted from the request of the plaintiff entity, in accordance with the terms of article 399 of Law 1564 of 2012. General Code of Procedure or the regulation that modifies or replaces it.

If the assets have been subject to seizure, mortgage liens or registered claims for the purpose of ordering early delivery, these limitations shall not be enforceable. In any case, the rights of third parties within the judicial process shall be respected.

Numbers 4 and 11 of article 399 of Law 1564 of 2012 General Code of Procedure, in relation to the early delivery of the asset at the request of the plaintiff entity, will come into force from the promulgation of this law and will apply to ongoing proceedings, in accordance with the details provided in this law.

Initial text of article 28: "Early delivery by court order. Judges must order the delivery of real estate declared of public utility for transportation infrastructure projects, within a peremptory and non-extendable term of thirty (30) calendar days, counted from the request of the plaintiff entity, in the terms of article 399 of Law 1564 of 2012. General Code of Procedure or the regulation that modifies or replaces it.

If the assets have been subject to seizure, mortgage liens or registered claims for the purpose of ordering early delivery, these limitations shall not be enforceable. In any case, the rights of third parties within the judicial process shall be respected.

Numbers 4 and 11 of article 399 of Law 1564 of 2012 General Code of Procedure, in relation to the early delivery of the property at the request of the plaintiff entity, will come into force from the promulgation of this law and will apply to ongoing proceedings, in accordance with the details provided in this law."

Article 29. Early delivery of assets in the process of domain extinction, vacant land and under CISA administration. The real estate necessary for the development of transport infrastructure projects, which are under the administration of CISA or whoever takes its place, in the process of domain extinction, in the process of clarification or vacant land, may be expropriated or awarded, as appropriate, by the state entity responsible for the project and this may request the competent entity to deliver it in advance, once the deposit of the value of the property has been made, when applicable.

The request for early delivery may only be made when the transport infrastructure project is in the construction phase. The competent entity will have a maximum period of 30 calendar days to make physical delivery of the required property.

In the event that ownership of the property is not extinguished as a result of the process or a private owner is established in the clarification process, the value of the deposit will be delivered to the owner of the property.

Article 30. Once the value of the property subject to expropriation has been paid in accordance with the appraisal, prejudiciality will not apply to the processes of expropriation, easement or acquisition of land for transportation infrastructure works.

Article 31. Enforceability of the expropriation act. The administrative act by which the entity declares the administrative expropriation of the property or orders the initiation of the procedures for judicial expropriation shall be of immediate application and shall have executory and executive force.

Against the administrative act that decides on expropriation, only the appeal for reconsideration is admissible, which will be granted with a devolutive effect.

Article 32. **Title corrected by Decree 3049 of 2013, Article 1.** Voluntary free transfer of strips of land. Initial text: "Voluntary free transfer of strips of land." Holders of property rights over the land required for the execution of infrastructure projects may voluntarily and free of charge transfer the properties they own to the acquiring entity without the need for a formal purchase offer beforehand. The transfer referred to in this article will not generate notary or registry fees.

Article 33. Acquisition of remaining non-developable areas. In the land acquisition processes for transport infrastructure projects, State Entities may acquire from the owners of real rights over the land required for the execution of infrastructure projects, areas greater than those necessary for said execution, in those cases in which it is established that such areas are not developable for any type of activity due to not complying with the legal parameters, schemes or basic land use plans or because they are critical areas or areas of environmental or social risk.

**Note, article 33: Article declared constitutional by the Constitutional Court in Judgment C-750 of 2015.**

Article 34. Commercial appraisals. When the commercial appraisal of the properties required for the execution of transport infrastructure projects exceeds the value of the cadastral appraisal by 50%, the commercial appraisal may be used as a criterion to update the cadastral appraisal of the properties that are disaggregated as a result of the voluntary alienation process or judicial or administrative expropriation.

For this purpose, the state entity, once the property acquisition process in favor of the State has been completed, will proceed to send to the cadastral agency or whoever acts as the tax authority, the report of the value paid per square meter, hectare or bushel of the acquired property.

The territorial entity may decide whether the cadastral appraisal should be updated, and the corresponding increase.

Machine Translated by Google

12/19/24, 10:2... Case 1:25-cv-01099-JDB    Document 1-9 Colombia Filed 04/10/25    Page 84 of 108
Congress of Colombia law 1682 de 2013

Article 35. Properties acquired for environmental compensation. The properties that State Entities must acquire in compliance with environmental obligations established in the Environmental License for compensation, must be transferred free of charge, to be incorporated as public use property in the respective plan, scheme or basic plan for territorial planning of the jurisdiction where it is located, to the entity determined by the competent environmental authority, in accordance with the compensation measure proposed by the applicant.

The ownership and management of such assets must be received by the municipal authorities or the respective environmental authorities, in accordance with their powers and their purpose.

Article 36. **Title corrected by Decree 3049 of 2013, Article 2.** Transfer of real estate between public entities. Initial text: "Transfer of real estate between public entities.". The properties owned by public entities that are required for the development of infrastructure projects must be transferred to the entity responsible for the project, for a fee or as a contribution from the respective owner entity to the transport infrastructure project.

In order to determine the value of the property, the transferee entity must contract an appraisal with the Agustín Codazzi Geographic Institute (IGAC), the entity that fulfills its functions or with private experts registered in the real estate exchanges or legally constituted associations.

The appraisal established by said entities or persons shall be binding on the parties.

The transfer will imply the allocation of the property as a public use property.

In any case, early delivery of the property must be carried out once requested by the entity responsible for the transport infrastructure project.

Article 37. **Amended by Law 1742 of 2014, Article 6.** The purchase price at the voluntary alienation stage shall be equal to the commercial value determined by the Agustín Codazzi Geographic Institute (IGAC), the decentralized cadastres or by private experts registered in exchanges or associations, in accordance with the standards, methods, parameters, criteria and procedures established by the Agustín Codazzi Geographic Institute (IGAC).

The commercial value will be determined taking into account the municipal or district urban planning regulations in force at the time of the offer of

purchase in relation to the property to be acquired and its economic purpose and, if applicable, the compensation that will include consequential damages and loss of profits.

The consequential damage will include the value of the property. The loss of profits will be calculated according to the real income of the property at the time of acquisition and for a period of up to six (6) months. **(Note: See Judgment C-750 of 2015, in relation to this section 3.).**

In the quantification of the emerging damage, only the certain and consolidated damage will be taken into account. **(Note: See Judgment C-750 of 2015, in relation to this section 4.).**

In the event that no agreement is reached at the voluntary alienation stage, the payment for the property will be cancelled in advance, taking into account the cadastral appraisal and the compensation calculated at the time of the purchase offer, at the judicial or administrative expropriation stage. **(Note: Paragraph 5 declared conditionally enforceable due to the charges analyzed by the Constitutional Court in Judgment C-750 of 2015. Order confirmed in Judgment C-286 of 2016. See Judgment C-286 of 2016, in relation to the underlined expression.).**

The cadastral value taken into account for payment will be proportional to the area required to be expropriated for the corresponding project. **(Note: See Judgment C-286 of 2016, in relation to the underlined expression.).**

In order to avoid speculation in the value of infrastructure projects through the figure of the cadastral self-assessment, the entity responsible for the project or whoever takes its place, will inform the IGAC or the decentralized cadastres of the area of influence so that they can proceed to suspend the ongoing cadastral self-assessment procedures or refrain from receiving new applications.

In order to comply with this article, the provisions of Law 1673 of 2013 must be taken into account.

Initial text of article 37: "The purchase price will be equal to the commercial value, determined by the Agustín Codazzi Geographic Institute (IGAC), the entity that fulfills its functions, or by private experts registered in the corresponding exchanges or associations, as determined by Decree Law number 2150 of 1995 and in accordance with the standards, methods, parameters, criteria and procedures established by the Agustín Codazzi Geographic Institute (IGAC).

The commercial value will be determined taking into account the municipal or district urban planning regulations in force at the time of the purchase offer in relation to the property to be acquired, its economic purpose, the consequential damage and the loss of profits.

The consequential damage will include the value of the property and the loss of profits will be calculated according to the real income of the property at the time of acquisition and for a period of up to six (6) months."

**Note, article 37: See Resolution 898 of 2014, IGAAC, DO 49.249, page 39. See Resolution 741 of 2014, IGAC, DO 49.229, page 61.**

Article 38. During the construction stage of transport infrastructure projects and in order to facilitate their execution, the Nation, through the heads of the entities of said order and the territorial entities, through the Governors and Mayors, according to the infrastructure under their charge, have the power to impose easements, by means of an administrative act.

The Ministry of Transport will impose such easements in transport infrastructure projects carried out by the departments, when properties located in more than one of them are affected.

Likewise, the Governor of the department will impose easements on transport infrastructure projects carried out by municipalities when properties located in more than one municipality are affected.

In projects managed by the Nation, it may impose easements throughout the National Territory.

For the purposes of the provisions of this article, a direct negotiation stage must be completed within a maximum period of thirty (30) calendar days. If no agreement is reached, the easement will be imposed by administrative means. The National Government will issue the corresponding regulations in order to define the terms under which these stages must be completed.

Paragraph 1. The Minister of Transport may delegate this power.

Paragraph 2. The provisions of this article shall apply to the land management necessary for the execution of public service infrastructure projects, without prejudice to the provisions of Law 56 of 1981.

**Note 1, article 38: Article regulated by Decree 738 of 2014.**

**Note 2, Article 38: See Agreement 29 of 2017, ANT.**

CHAPTER II

**Environmental Management**

Article 39. Transportation infrastructure projects must include the environmental variable in their different phases of engineering studies, pre-feasibility, feasibility and definitive studies, to apply it in their execution.

For this purpose, in development and full observance of the constitutional principles and provisions that protect the environment, water sources and natural resources, the Ministry of Environment and Sustainable Development in coordination with the National Environmental Licensing Authority will issue comprehensive terms of reference, manuals and guides for transportation infrastructure projects, within a maximum period of sixty (60) calendar days, from the promulgation of this law.

During the execution of the Pre-feasibility Studies, the entity or person responsible for the design must consult the tool or database determined by the Ministry of Environment and Sustainable Development, in order to, once these have been completed, obtain the viability of one of the project alternatives from the competent environmental authority.

Once the Feasibility Studies have been completed, the entity or the contractor, if the transport infrastructure project has already been awarded, when applicable, is obliged to carry out the Environmental Impact Study as an essential input and basis for managing and obtaining the Environmental License.

In any case, the environmental licensing process may begin once the Feasibility Studies and the Environmental Impact Study are available. Based on these studies, the environmental authority must carry out the evaluation and adopt the respective decision. This is without prejudice to the additional information that the environmental authority may exceptionally request in order to make the corresponding decision.

Starting from the third year following the promulgation of the law, as a prerequisite to the opening of the selection processes for the construction of transport infrastructure projects, the public entity will be required to have the viability of a project alternative approved by the competent environmental authority based on pre-feasibility studies, to have completed the Feasibility Studies and to have concluded the prior consultation process with the respective community until its formalization, if applicable.

**Section Corrected by Decree 3049 of 2013, Article 3. To this end**, the environmental authority must comply with the legal terms regarding environmental licensing and those established in this law, so that it will be responsible for any damages caused to individuals as a result of failure to comply with the terms established in the law. Unjustified delay on the part of the environmental authority may lead to investigations and disciplinary sanctions established in Law 734 of 2002.

Machine Translated by Google
12/19/24, 10:2  Case 1:25-cv-01099-JDB   Document 1-9   Filed 04/11/25   Page 88 of 108
Congress of Colombia Law 1682 of 2013

Initial text of the final paragraph: "For this purpose, the environmental authority must comply with the legal terms regarding environmental licensing and those established in this law, so that it will be responsible for any damages caused to individuals as a result of failure to comply with the terms established in the law. Unjustified delay on the part of the environmental authority may lead to investigations and disciplinary sanctions established in Law 734 of 2002."

Article 40. The management for obtaining the Environmental License, based on the studies referred to in the previous article, may be carried out by the public entity, the concessionaire and/or contractor. The responsibility for management and obtaining the Environmental License must be agreed upon in the respective contract.

It is the duty of the Ministry of the Interior to lead and permanently accompany the process of prior consultation with ethnic communities when required to obtain the environmental license for the transport infrastructure project and the contracting entity will be responsible for the commitments acquired with the communities.

Article 41. Minor changes in environmental licenses. Minor modifications or normal adjustments within the ordinary course of the licensed activity and which do not imply new environmental impacts may be carried out, after notifying the environmental authority, without the latter having to make a decision and without the need to advance the procedure for the modification of the Environmental License and/or authorization, taking into account the list provided in the corresponding regulations.

The National Government, which for these purposes is understood to be made up of the Ministries of Transport and Environment, after the opinion of the National Authority for Environmental Licensing, will regulate within a maximum period of ninety (90) calendar days from the promulgation of this law the list of minor changes or normal adjustments in transport infrastructure projects, for the due compliance of this provision. **(Note: Paragraph corrected by** Decree 3049 of 2013, **Article 4, in the sense of removing the underline from the word "Authority".).**

**Note, article 41: See** Law 2099 of 2021, **Article** 38.

Article 42. New sources of materials. When during the execution of a transportation infrastructure project new sources of materials are identified and required, upon request of the contractual party, a request for modification of the Environmental License shall be submitted to the Environmental Authority exclusively for the inclusion of new sources of materials in the Environmental License. This procedure may not exceed thirty (30) days from the filing of the request, provided that the information is complete.

For this purpose, the Ministry of Environment and Sustainable Development will issue the corresponding Terms of Reference within sixty (60) calendar days following the issuance of the law.

**Note 1, Article 42: Article developed by Resolution 1514 of 2016, M. of Environment and Sustainable Development.**

**Note 2, article 42: See Law 2099 of 2021, Article 38.**

Article 43. Emergency works. Once the National Government has declared the existence of an emergency that seriously affects a transport infrastructure project, the competent entity shall proceed to request the competent environmental authority to rule on the need or not to obtain environmental licenses, permits or authorizations. The authority, without prejudice to the environmental management measures it orders to be adopted, must respond, by means of an official letter, immediately.

**Note, article 43: See Law 2099 of 2021, Article 38.**

Article 44. The following Transportation Infrastructure Projects will not require an Environmental License:

a) Maintenance projects;

b) Rehabilitation projects;

c) Improvement projects.

For the due compliance of this provision, the National Government, which for these purposes is understood to be made up of the Ministries of Transportation and Environment, in coordination with the National Authority for Environmental Licensing, will regulate within a maximum period of ninety (90) calendar days, from the date of issuance of this law, the list of improvement activities in transportation infrastructure projects. **(Note: Paragraph corrected by Decree 3049 of 2013, Article 5, in the sense of removing the underline from the word "in coordination".).**

Paragraph. In the event that one or more improvement activities require environmental permits or authorizations, the public entity responsible for the transport infrastructure project or whoever takes its place, must process and obtain them, when applicable.

**Note, article 44: See Law 2099 of 2021, Article 38. See Decree 770 of 2014. See Decree 769 of 2014.**

Article 45. For the preparation of environmental studies required to manage, obtain and modify the Environmental License for transportation infrastructure projects, it shall be understood that the permit to collect wild specimens of biological diversity, like all other permits, is included within the environmental license.

**Note, article 45: See Law 2099 of 2021, Article 38.**

CHAPTER III

**Assets and Networks of Public Services, ICT and the Industry
Oil, among others**

Article 46. Scope of application. This chapter is applicable to the protection, transfer or relocation of networks and assets of public services, information and communications technologies and the oil industry, installed on properties required for the development of transport infrastructure projects and in mandatory withdrawal zones, including prior to the validity of Law 1228 of 2008.

Likewise, it is applicable to the granting of permits for the installation of new networks in a coordinated manner with the layouts and projections of transport infrastructure projects, which in no case may be enforced for future expansions.

It is also applicable to networks that are previously installed on new routes for transport infrastructure projects.

Article 47. Formulation and execution of transport infrastructure projects involving the protection, transfer or relocation of networks and assets. Public entities or private entities responsible for formulating and executing transport infrastructure projects must analyze, in each case, the following:

1. The appropriateness of protecting, moving or relocating utility networks and assets, those of the oil industry or information and communications technologies as a result of the development of these projects or of maintaining or modifying the location of the infrastructure project. In any case, the option that involves the lowest costs and overall impacts should prevail.

2. The technical, legal and financial conditions under which such protection, transfer or relocation will be carried out.

3. The existence of agreements or arrangements for the protection, transfer or relocation of networks and assets with public service providers or operators of networks, assets and services of information and communications technologies or the Petroleum Industry.

Having carried out the above analysis, public entities or private entities responsible for formulating and executing transport infrastructure projects may:

a) Apply the current agreement or arrangement to carry out the protection, transfer or relocation of networks and assets;

b) Enter into the necessary agreements or arrangements to establish or define the conditions for carrying out the protection, transfer or relocation of networks and assets;

c) If no agreement is reached, the procedure for the protection, relocation or transfer of networks and assets referred to in the following article, starting with section 4, must be carried out.

Article 48. Procedure for the protection, relocation or transfer of assets and networks. When a public entity responsible for a transport infrastructure project identifies the need to transfer, relocate or protect, among others, networks or assets of public services, the oil industry, or information and communications technologies, it must:

1. Send written communication to the relevant provider or operator, indicating the georeferenced location of the transport infrastructure project and other available information required to identify the specific network(s) and asset(s) to be protected, relocated or transferred.

2. Inform the service provider or operator of the existence of agreements, contracts or any voluntary agreement by virtue of which the public entity responsible for the transport infrastructure project and the provider and/or operator have defined their rights and obligations related to the protection, transfer or relocation of networks and assets.

3. The provider and/or operators will respond to the communication indicated in the first numeral of this article within thirty (30) calendar days of receipt, informing in writing:

I. Typology and characterization of the network or asset according to the service to which it corresponds.

II. Inventory of elements that make up the network or asset subject to protection, transfer or relocation and sizing, as applicable.

III. The permits, authorizations or licenses granted to the provider and/or operator for the installation of the network or asset.

IV. The time at which the networks or assets subject to protection, transfer or relocation were installed.

V. The analysis and quantification of the estimated costs associated with the protection, transfer or relocation of the network or asset.

VI. Confidentiality agreements that must be signed between the applicant, the service provider or operator, in accordance with the

information provided in each case.

4. With this information, the public entity responsible for the transport infrastructure project or whoever takes its place may sign agreements with the provider or operator in which the design, cost, construction and other conditions are defined to carry out the protection, transfer or relocation of networks and assets under the responsibility of the operator. For this purpose, the provider or operator will be responsible for providing the design of the network or asset to be transferred, protected or relocated within a peremptory period of two (2) months, when these are necessary.

If no agreement is reached on the costs and execution time within a period of forty-five (45) calendar days from the delivery of the designs, the public entity responsible for the transport infrastructure project or whoever takes its place, may carry out the protection, transfer or relocation of the networks and/or assets at its own expense, in accordance with the current technical regulations, and must guarantee that the asset to be protected, transferred or relocated complies with the same technical conditions as the original asset or network, in accordance with the information provided by the operator or provider.

If not possible, with the equivalent technical conditions provided for by the current sectoral technical regulations, the technical regulations of the provider and/or the applicable international regulations as appropriate for each sector, which guarantee the provision of the service.

Once the transfer or relocation has been carried out, the provider or operator must dispose of the dismantled networks or assets and the public entity responsible for the transport infrastructure project or whoever takes its place will deliver the transferred or relocated network or asset to its respective owner, for which the relevant documents will be signed. The provider or operator will be obliged to receive the transferred or relocated network or asset.

Paragraph 1. The start of the execution of the works for the protection, transfer or relocation of the networks and assets will be subject to the granting of the relevant permits, authorizations and/or licenses as well as the establishment of the appropriate easements, in order not to affect the continuity of the respective public service, which must be processed before the competent authorities.

Paragraph 2. When a natural or legal person developing a public-private partnership project requires this information at the feasibility engineering studies stage, they must submit a request to the public entity responsible for the transportation infrastructure project, justifying the need.

Once the request has been reviewed, the public entity will request the information directly from the service provider and operator, within a maximum period of 15 calendar days. The information provided will be received as confidential and reserved.

Paragraph 3. This procedure shall apply to infrastructure projects in progress and those developed after this law comes into force.

Paragraph 4. Once the transfer, protection or relocation of the network or asset is completed, the provider and/or operator must report to the corresponding Regulatory Commission and to the Superintendency or to the Ministry of Mines and Energy in the case of petroleum assets, the description of the project with the list of assets involved so that the present or future tariff effects are taken into account when applicable.

In these cases, the investment to be recognized by the provider or operator for the new networks or assets transferred, protected or relocated may not be greater than the recognized investment, which has not been paid or amortized via tariff, for the original networks or assets.

Article 49. Criteria for determining the value of costs associated with the protection, transfer or relocation of networks or assets. For the purposes of determining the value of costs associated with the protection, transfer or relocation of networks or assets, market values shall be applied according to the region in which they are located or current sector regulations.

In any case, no compensation may be requested or obtained for costs that have been recovered or that are provided for within the current sectoral regulations.

Article 50. Allocation of costs for protection, transfer or relocation of assets and networks. The costs associated with the protection, transfer or relocation of networks and assets in connection with the development of transport infrastructure projects shall be borne by the transport infrastructure project, unless:

a) There is a permit granted or authorization for the installation of the network or asset, which has been conditioned to the expansion of the transport infrastructure, in which case, the provider and/or operator must assume the costs associated with the protection, transfer or relocation;

b) There is a valid agreement signed by the parties, in which case the parties will respect said agreement;

c) Networks or assets that have been installed in the reserved areas or zones referred to in Law 1228 of 2008 after its promulgation, in which case the provider and/or operator must assume the costs associated with protection, transfer or relocation.

Article 51. Reimbursable contribution contracts for the transfer or relocation of networks. The National Institute of Roads (Invías), the national Infrastructure agency, the Special Administrative Unit of

Civil Aeronautics (Aerocivil), Cormagdalena, the General Maritime Directorate (Dimar) and other national or territorial authorities in charge of the execution of transportation infrastructure projects may enter into reimbursable contribution contracts with providers and operators of public services, networks, assets and services of Information and Communications Technologies (ICT) or the oil industry, among others, responsible for the transfer or relocation of networks for planning, studies, permits, and other activities required for the development of transportation infrastructure works, through which the public entity will contribute, as a reimbursable credit, the resources required for the transfer or relocation works recognized in the tariffs.

The interest rate applicable to the aforementioned credit may not be lower than that established by the competent authority to determine the regulated rate as remuneration for the investments of the provider and operator of public services, networks and services of Information and Communication Technologies (ICT), or the Petroleum Industry, and the term for the total cancellation of the credit may not be greater than that provided for the recovery of said investments due to the transfer or relocation of the networks through tariffs.

Article 52. Suspension in the interest of the served. When, as a result of the transfer of public service networks and assets, Information and Communications Technology (ICT) services or the Petroleum Industry, among others, to which this chapter refers, it is necessary to suspend the provision of the public service or this affects the conditions of continuity and/or quality of the service, the liability arising from the suspension shall not be attributable to the public service provider or the operator of networks, assets and services of Information and Communications Technology or the Petroleum Industry, among others, nor shall it affect the quality indicators defined in the current sectoral regulation, nor shall it be considered a failure in the provision of the service.

The above without prejudice to the application of user protection regulations relating to scheduled interruptions of the services that are affected.

Article 53. In new projects that begin their structuring after the promulgation of this law for the construction, expansion, rehabilitation and opening of new sections of transportation infrastructure, the incorporation of infrastructure for the deployment of public information and communications technology networks or elements that support the deployment of said networks must be foreseen, upon request of the Ministry of Information and Communications Technology or whoever takes its place.

For these purposes, Network and Service providers may request information on projects in the structuring stage from the entities structuring transport infrastructure projects or consult the information systems available in the transport sector for said information, in order to express their interest to the Ministry of Information and Communications Technologies, in accordance with the needs of information and communications technologies.

The financing of the cost of building the infrastructure for the deployment of public ICT networks and their maintenance will be the responsibility, in the first instance, of the providers of these telecommunications goods and services, or when it is declared strategic for the Nation and there is no private interest, it may be financed by the Information and Communications Technology Fund "Fontic", for which the corresponding agreements and budgetary appropriations will be made.

Paragraph. The information and communications technology network infrastructure installed and to be installed in transport infrastructure projects may be used by the Ministry of Transport and the Highway Police. For this purpose, the respective agreement will be signed with the owner of the infrastructure.

Article 54. Integration of networks and assets. When, due to the implementation of transport infrastructure projects, it is necessary to move or relocate networks and assets of public services and complementary activities or information and communications technologies or the oil industry, among others, they must be integrated into the existing and closest network and asset corridors, complying with current regulations to achieve optimization of the physical occupation of land and airspace, to the extent technically possible.

Article 55. Modify paragraph 2 of article 1 of Law 1228 of 2008 and a paragraph 4 shall be added to said provision.

Paragraph 2 of Article 1 of Law 1228 of 2008, which will look like this:

Paragraph 2°. "The width of the strip or setback determined in Article 2° of Law 1228 of 2008 for each of the aforementioned categories of roads constitutes reserve or exclusion zones for highways, and therefore any type of construction or improvement in the aforementioned zones is prohibited, except for those that are integrally conceived in the transportation infrastructure project such as the deployment of public service networks, information and communications technologies or the oil industry, or where there is no expansion of transportation infrastructure planned in the corresponding development plan.

The entity structuring the transport infrastructure project or responsible for the road corridor, upon request of the competent authority, will review the technical, technological, legal and financial convenience of installing these networks and will approve the conditions for their installation.

The installation of public networks within the width of the strip or setback may in no case prevent or hinder the expansion or extension of the transport infrastructure.

For the purposes of the provisions of this article, construction or improvements are understood to be all construction activities of new buildings or existing buildings, which require a construction license and its modalities in the terms provided for in the current regulations on the matter.

Without prejudice to the provisions of the current regulations for the granting of environmental licenses, licenses for intervention and occupation of public space and other permits and authorizations by the corresponding authorities, the public entity in charge of the road within the exclusion zone referred to in Article 2 of Law 1228 of 2008 to grant permits for the construction of accesses, installation of pipelines, public service networks, conduits, ducts, works intended for road safety, transfer of poles, transportation of hydrocarbons or crossings of high, medium or low voltage electrical networks, must establish the requirements that the interested party must meet in the corresponding procedure.

Add a paragraph 4 to article 1 of Law 1228 of 2008, which will look like this: _____

Paragraph 4° "The National Highway Police will be competent to enforce the right of way on the National Road Network. For this purpose, it may create isolation zones and carry out operations on the withdrawal strips to exercise its different functions"

CHAPTER IV

**Mining Permits**

Article 56. In accordance with the regulations on use, rates and capacity issued for this purpose by the competent authorities, the transport infrastructure works carried out by mining owners that have been included in the work and construction programs or similar instruments presented to the mining authority must fulfill the social function of access, for cargo and/or passengers, for third parties who require their use. These works will revert free of charge to the State in all cases of termination of the mining concession contract, in accordance with the provisions of the Mining Code.

Article 57. Sources of material for transport infrastructure projects. The competent authority shall inform the mining authority or its representative of the routes and location of transport infrastructure projects, once approved, as well as the sources of materials identified by the person responsible for the project, necessary for the execution of the transport infrastructure project, so that the areas located on said route and the identified sources of materials are included in the Colombian Mining Cadastre and thus are declared as restricted mining zones and in them, no new titles for construction materials may be granted during the term of the project other than the temporary authorizations required for its execution.

Article 58. Temporary Authorization. The Ministry of Transportation, in agreement with the Ministry of Mines and Energy, will establish the regulations for Temporary Authorizations for the use of construction materials that are needed exclusively for transportation infrastructure projects, for a period not exceeding one hundred and twenty (120) days.

Public entities, territorial entities, companies and contractors that intend to carry out the construction, repair, maintenance or improvement of a national, departmental or municipal public road, or the implementation of a transport infrastructure project declared to be of public interest by the National Government, may, subject to environmental regulations, request temporary and non-transferable authorization from the mining authority to take from rural, neighboring or adjacent properties to the work, the construction materials they need exclusively for its execution, who must obtain the respective environmental permits.

**Section 3 corrected by Decree 3049 of 2013. Article 6°.**
When applications for temporary authorisation overlap with a mining title for construction materials, the holders of the title will be obliged to supply the same at market prices standardised for the area. In the event that the mining title holder does not supply the materials, the mining authority will grant the temporary authorisation for the contractor of the infrastructure works to extract the required construction materials.

Initial text of paragraph 3: "When applications for temporary authorization overlap with a mining title or construction materials, their holders shall be obliged to supply the same at market prices standardized for the area. In the event that the mining title holder does not supply the materials, the mining authority shall grant the temporary authorization for the contractor of the infrastructure work to extract the required construction materials."

The temporary authorization will have a term for the duration of the work without exceeding a maximum of seven (7) years.

The authority in charge of the infrastructure work will inform the Mining Authority on the termination of the same or the eventual change of the contractor in order to terminate the temporary authorization or

transfer it to the new contractor of the work previously indicated by the authority.

The activities of extraction of construction materials carried out by the person responsible for the Temporary Authorization will be subject to monitoring and control by the Mining Authority, and they must declare and pay the respective royalties. The extracted materials may not be marketed.

**Section added by** Law 1742 of 2014, **Article 7.** Without prejudice to the powers of territorial entities, the national Government shall establish the regulations for Temporary Authorizations for the use of construction materials that are needed exclusively for transportation infrastructure projects.

**Section added by** Law 1742 of 2014, **Article 7.** The application for temporary authorization for the use of construction materials shall be processed in accordance with the conditions and requirements contained in Title Three, Chapter XIII of the Mining Code or by the regulations that modify, replace or add to them.

**Section added by** Law 1742 of 2014, **Article 7.** The extracted materials may be shared for transport infrastructure projects that require it but may not be marketed.

Paragraph. **Added by** Law 1742 of 2014, **Article 7.** The provisions of this article shall also apply to the granting of temporary authorizations for infrastructure projects other than transportation projects when the same projects have been declared to be of national interest by the National Government, without prejudice to the legal constitutional powers.

Article 59. **Amended by** Law 1742 of 2014, **Article 8.** Regarding transportation infrastructure, the mining authority will restrict exploration and exploitation activities in said sections and may not grant new mining rights that affect the development of transportation infrastructure projects.

The foregoing, without prejudice to the restrictions and exclusions on mining activity provided for in articles 35 and 36 of the Mining Code and in this law.

In the event that a transportation infrastructure project interferes totally or partially with the exercise of the rights previously granted to a mining title holder, with the proposal or request for a concession contract and/or requests for mining legalization, said title, proposal or request shall not be enforceable for the development of the project. The transportation infrastructure project may be suspended for a period of thirty (30) calendar days by the authority in charge of carrying out the transportation infrastructure project, in order to reach an agreement on the value to be recognized to compensate the amount to which the mining title holder is entitled, for the eventual economic rights of which he is a beneficiary and are proven to be affected, taking into account the stage in which the mining project is found and the information on the mining title held by the mining authority.

In the event that no agreement is reached between the holder of the transport infrastructure project and the mining holder, within the term established in the previous paragraph, the execution of the transport infrastructure project will be resumed.

Accordingly, the authority in charge of carrying out the transport infrastructure project and the mining authority will appoint experts in order to determine the amount to be compensated to the mining owner.

When the owner of the property on which a transport infrastructure project is being developed is different from the mining owner and economic damages are proven as a consequence of the development of the project, the parties may reach an agreement within a period of thirty (30) days on the value of the economic compensation to which there is a place, which will be assumed by the owner of the infrastructure project. In the event that an agreement is not reached, the value of the compensation will be determined by an expert appointed in accordance with the procedure established in the previous section.

However, the parties may resort to an alternative method of conflict resolution that will determine the amount to be compensated in favor of the mining owner. Any compensation that may arise will be assumed by the transport infrastructure project, for which the corresponding budgetary appropriations will be made.

The national Government will establish the manner in which these procedures will be developed.

Machine Translated by Google

12/19/24, 10:3... Case 1:25-cv-01099-JDB Document 1-0 Congress of Colombia Law 1682 of 2013 Filed 04/11/25 Page 100 of 108

Paragraph. In the event that the mining owner has contracted obligations with the environmental authorities, the authority in charge of the transport infrastructure project and the mining owner must submit to the corresponding environmental authority for approval an agreement in which the parties agree to comply with the short, medium and long-term obligations that remain in force arising from the environmental authorizations held by the mining project.

Initial text of article 59: "Regarding the transport infrastructure that makes up the National Road Network, the mining authority will restrict exploration and exploitation activities in said sections and may not grant new mining rights that affect the development of transport infrastructure projects. The Ministry of Transport will delimit the existing and/or necessary corridors.

The foregoing, without prejudice to the restrictions on mining activity provided for in article 35 of the Mining Code and in this law.

In the event that a transport infrastructure project declared to be of public interest interferes totally or partially with the exercise of rights previously granted to a mining title holder, this title shall not be enforceable for the development of the project. The transport infrastructure project may be suspended for a period of thirty (30) calendar days by the authority in charge of carrying out the transport infrastructure project, in order to reach an agreement on the amount to be recognized to compensate the mining title holder for any economic rights of which he is the beneficiary and are proven to be affected, taking into account the stage in which the mining project is found and the information on the mining title held by the mining authority.

In the event that no agreement is reached between the holder of the transport infrastructure project and the mining holder, within the term established in the previous paragraph, the execution of the transport infrastructure project will be resumed.

Accordingly, the authority in charge of carrying out the transport infrastructure project and the mining authority will appoint experts in order to determine the amount to be compensated to the mining owner.

When the owner of the property on which a transport infrastructure project is being developed is different from the mining owner and economic damages are proven as a consequence of the development of the project, the parties may reach an agreement within a period of thirty (30) days on the value of the economic compensation to which there is a place, which will be assumed by the owner of the infrastructure project. In the event that an agreement is not reached, the value of the compensation will be determined by an expert appointed in accordance with the procedure established in the previous section.

However, the parties may resort to an alternative method of conflict resolution that will determine the amount to be compensated in favor of the mining owner. Any compensation that may arise will be assumed by the transport infrastructure project, for which the corresponding budgetary appropriations will be made.

The National Government will establish the manner in which these procedures will be developed.

Paragraph. In the event that the mining owner has contracted obligations with the environmental authorities, the authority in charge of the transport infrastructure project and the mining owner must submit for approval by the corresponding environmental authority an agreement in which the parties agree to comply with the obligations of the corresponding environmental authorities.

short, medium and long-term obligations that remain in force arising from the environmental authorizations held by the mining project."

Article 60. Right of preferential access to sea and river ports for hydrocarbons from royalties and property of the National Hydrocarbons Agency (ANH) A right of preferential access is established to all existing sea and river ports for public and private use that have the facilities and authorizations or legal permits required for the import and export of hydrocarbons from royalties and property of the National Hydrocarbons Agency (AMI). This right of preference consists of guaranteeing, as a priority, the access and use of 20% of the installed port capacity and granting a right of priority attention to provide port services when the cargo to be transported is hydrocarbons from royalties and property of the National Hydrocarbons Agency (ANH), upon request by the State, with no less than thirty (30) calendar days' notice.

Likewise, in the new port concession contracts, the right of preferential access for hydrocarbons from royalties and property of the National Hydrocarbons Agency (ANH) is understood to be agreed upon, in the same terms as in the previous section.

This right is granted to the state entity in charge of the administration of the Nation's hydrocarbon resources, or to whomever it designates.

The technical and safety conditions necessary to allow the use of the transport infrastructure installed for the import and export of hydrocarbons from royalties and property of the National Hydrocarbons Agency (ANH) and the conditions for the preferential use of port capacity for hydrocarbons from royalties and property of the National Hydrocarbons Agency (ANH) referred to in this article, will be determined by the competent authority.

Rates will be freely set in accordance with market supply and demand.

Article 61. **Partially regulated by Decree 119 of 2015.** Ports for handling hydrocarbons. From the date of entry into force of this law, existing private service ports for handling hydrocarbons may provide services to agents in the hydrocarbon sector, whether or not they have a legal or economic link with the company that owns the concession infrastructure.

Paragraph. For the due fulfillment of the obligation contained in this article, the National Government will establish the conditions, obligations and responsibilities for carrying out the respective modification of the existing private service port concession contracts, when the holders so request. The regulations shall be

Machine Translated by Google

will be carried out within a period of one hundred and twenty (120) calendar days following the issuance of the law.

TITLE V

FINAL PROVISIONS

Article 62. The National Government will establish the administrative organization required to implement a single window or a specialized service center to carry out all procedures, authorizations and permits related to the structuring, planning, contracting and execution of transportation infrastructure projects.

For the operation of the one-stop shop or specialized service center, the National Government will develop a single information system that allows for the integrated management and monitoring of all administrative actions that are carried out.

Paragraph. Entities and organizations must adapt their existing procedures and systems to ensure integration into the single window mandated by this law.

Article 63. **Regulated by Decree 602 of 2017.** In the event of an emergency, disaster or public calamity, disturbance of public order or for reasons of road safety, privately owned infrastructure intended for transport, such as: highways or railways, airfields and sea or river ports, as well as the private elements, equipment and machinery associated with it, may be used by public authorities and by those who provide a public transport service.

Likewise, in the event of disturbances to public order, public calamity, disaster, emergency or for reasons of road safety, the transport infrastructure, including equipment and machinery, must be made available to the respective Police authority and the National Disaster Risk Management Unit or whoever takes its place, in order to avert the situation and restore order and national security.

The economic recognitions that must be made in favor of private parties for the use of infrastructure, equipment or machinery will be determined at market prices by mutual agreement, or by a third party designated by the parties, after the state of emergency, disaster or public calamity or disturbance of public order, etc. has been overcome.

Under the same circumstances, transport infrastructure contractors will be obliged to allow the execution of the works

intended to remedy the circumstance are carried out directly by the contractor or by third parties contracted for this purpose.

All provisions of this article shall be directed and coordinated by the Ministry of Transport.

Article 64. In the event of a contradiction between this regulation and another regulation of equal rank, the provisions adopted by this law shall prevail, as it is a special regulation for transport infrastructure.

Article 65. The National Government shall adopt the necessary measures to ensure that the Secop carries out the registration of public-private partnership initiatives, their selection processes and the contracts developed under public-private partnership schemes that have the purpose of developing transportation infrastructure projects.

For this purpose, the Single Registry of Public-Private Associations (RUAPP), provided for in article 25 of Law 1508 of 2012 will be integrated into the System Electronic System for Public Procurement (Secop), or the system that makes their times.

Article 66. Extraordinary powers are granted to the President of the Republic, for a period of six (6) months to:

1. Create the Transport Infrastructure Sector Planning Unit as a Special Administrative Unit, with administrative, technical and patrimonial independence, with legal status attached to the Ministry of Transport, which will have a private regime in terms of contracting.

The budget of the Transport Infrastructure Planning Unit (UPET) will be part of the general budget of the Nation and will be submitted to the Ministry of Transport for its incorporation in the same and its annual distribution will be made by means of a resolution issued by the Ministry of Transport and endorsed by the General Director of the National Budget of the Ministry of Finance and Public Credit, in accordance with the provisions contained in the organic law of the budget and in the other norms that regulate, modify or replace it.

The Transport Sector Planning Unit will have the following objectives: i) Establish the Transport infrastructure requirements to ensure competitiveness, connectivity, mobility and development in the national territory; ii) Prepare and update the Infrastructure Plan in accordance with the policies and guidelines defined in the national development plans and those of the Ministry itself; iii) Conduct diagnostics

Machine Translated by Google
12/19/24, 10:... Case 1:25-cv-01099-JDB    Document 1-9    Filed 04/11/25    Page 104 of 108
Congress of Colombia Law 1682 of 2013

that allow the formulation of plans and programs for the infrastructure sector; iv) Recommend to the Minister of Transport, policies and strategies for the development of the transport infrastructure sector; v) Plan in an integral, indicative, permanent and coordinated manner with the entities and organizations of the transport sector, everything related to the transport infrastructure projects under the responsibility of the Nation, as well as coordinate with the territorial entities the transport infrastructure projects under the responsibility of these entities; vi) Likewise, it will be in charge of the consolidation and dissemination of information on the transport infrastructure projects of the sector and the registration of the operators of the sector.

2. Create the Infrastructure and Transport Regulation Commission as a Special Administrative Unit, with administrative, technical and patrimonial independence, with legal status attached to the Ministry of Transport, which will have the mission of regulating and regulating and integrating the regulations of the sector, as well as regulating and promoting competition in the sector, avoiding monopolies and dominant positions in transport infrastructure projects and defining availability, service levels, quality standards, guarantee of continuity of the transport service and infrastructure projects in the sector, setting the rates for regulated activities and the maximum limits for non-regulated activities in the transport sector, serving as an instance for resolving conflicts between the different actors in the transport sector. The regulation of the air mode and, in accordance with Law 1115 of 2006, will be exempt from the Commission's jurisdiction. the one relating to the establishment and collection of fees for the services provided by the General Maritime Directorate "Dimar".

**Note, article 66:** See Decree 947 of 2014. See Decree 946 of 2014.

Article 67. In order to reduce the construction, maintenance and rehabilitation costs generated in cases identified as highly vulnerable and emergency, the Ministry of Transportation may determine, through the Rural Land Planning, Land Adaptation and Agricultural Use Unit (UPRA), taking into account the provisions of Law 1551 of 2012, and/or the Ministry of Environment and Sustainable Development, the changes in land use that are required in land use planning instruments to ensure soil stability and the ecological balance necessary to avoid negative financial impacts on the cost of transportation infrastructure.

In these cases, the National Government will develop mechanisms for financial compensation for the restrictions on use that are imposed and allow for effective recognition of the affected owner.

Article 68. Municipalities and districts may provide additional or complementary infrastructure of all types or public lighting to those national or departmental road corridors that are located within

of its urban and rural perimeter even if they are not under its charge, to guarantee security and improve the level of service to the population in the use of the transport infrastructure, with prior authorization from the entity that owns the respective road corridor.

Article 69. Strategic logistics corridors. The Ministry of Transport may establish logistics corridors of strategic importance for the country. Once these corridors have been defined, the Ministry will convene the municipalities included in the corridor to issue, if necessary, in a joint and coordinated manner, regulations regarding the flow of cargo.

**Note, article 69: See Resolution 789 of 2018, M. Transport. See Decree 1478 of 2014.** _____

Article 70. **Regulated by Decree 1955 of 2014.** _____
Obligations of the Nation as a partner in public or mixed entities that finance infrastructure. In order to promote the participation of strategic partners in public or mixed financial entities that promote the development and financing of infrastructure, such as the National Development Finance Company, the Nation may acquire conditional obligations within the framework of shareholder agreements of said entities, which imply the partial or total acquisition of the strategic partners' shareholding. In the event that the condition is activated, the respective payment must be budgeted in the following General Budget Law of the Nation.

**Note, Article 70: Article declared constitutional by the Constitutional Court in Judgment C-147 of 2015.** _____

Article 71. The National Government will regulate within one hundred and twenty (120) days following the issuance of this law, the manner in which functional units of tunnel sections may be established in Public-Private Partnership projects, by virtue of which only partial availability and quality standards will be predicted for the purposes of remuneration.

**Note, article 71: See Decree 1026 of 2014.** _____

Article 72. **Regulated by Decree 791 of 2014. Corrected by Decree 476 of 2014, article 1.**
Residual contracting capacity for public works contracts. The residual contracting capacity when public works contracts are executed will be obtained by subtracting from the contracting capacity the balance of the value of the contracts in execution.

Contracting capacity must be calculated by evaluating the following factors: Experience (E), Financial Capacity (CF), Technical Capacity (CT), and Organizational Capacity (CO).

For the purposes of evaluating the factors mentioned in the previous section, under no circumstances and for no reason may profitability and profits be taken into account.

The National Government will regulate the matter, within sixty (60) days following the promulgation of this law, resorting to the technical opinion of the Colombian Society of Engineers, pursuant to Law 46 of 1904, to promote equitable regulations in the implementation of minimums and maximums that guarantee the rights of small contractors.

---

**ERRATA**

In the **Official Gazette** 48,982 of Friday, November 22, 2013, Law 1682 of November 22 , 2013 was published, **by which measures and provisions are adopted for transport infrastructure projects and extraordinary powers are granted;** however, Article 72 of the published text contains transcription errors with respect to its original.

The complete and corrected text of Article 72 is transcribed below:

---

Previous text of article 72. **Correcte**d according to Errata published in the Official Journal **48,987, p. 3.** "Residual contracting capacity for public works contracts. The residual contracting capacity when public works contracts are executed will be obtained by subtracting from the contracting capacity the balance of the value of the contracts in execution.

Contracting capacity must be calculated by evaluating the following factors: Experience (E), Financial Capacity (CF), Technical Capacity (CT), and Organizational Capacity (CO).

For the purposes of evaluating the factors mentioned in the previous section, under no circumstances and for no reason may profitability and profits be taken into account.

The National Government will regulate the matter, within sixty (60) days following the promulgation of this law, resorting to the technical opinion of the Colombian Society of Engineers, pursuant to Law 49 of 1904, to promote equitable regulation in the implementation of minimums and maximums that guarantee the rights of small contractors.

( Law 4a of 1913 Article 45 states: "Calligraphic or typographical errors in the citations or references of one law to another shall not be prejudicial, and must be modified by the respective officials, when there is no doubt as to the will of the legislator." This law authorizes the National Printing Office of Colombia to publish typographical errors that appear in the norms.

Initial text of article 72: "Residual capacity for public procurement. The residual capacity for public works procurement shall be obtained by subtracting the value of contracts in execution from the capacity.

Contracting capacity must be calculated by evaluating the following factors: Experience (E), Financial Capacity (CF), Technical Capacity (CT), and Organizational Capacity (CO).

Machine Translated by Google
12/19/24, 10:31 Case 1:25-cv-01099-JDB   Document 1-9   Filed 04/11/25   Page 107 of 108
Congress of Colombia Law 1682 of 2013

For the purposes of evaluating the factors mentioned in the previous section, under no circumstances and for no reason may profitability and profits be taken into account.

The National Government will regulate the matter, within sixty (60) days following the promulgation of this law, resorting to the technical concept of the Colombian Society of Engineers, in accordance with Law 49 of 1904, to promote equitable regulation in the implementation of minimums and maximums that guarantee the rights of small contractors.

Article 73. This law shall enter into force upon its sanction and publication in the **Official Gazette** and repeals section 2 of article 37 of Law 9 of 1989; Article 32 of Law 105 of 1993; Article 83 of Law 1450 of 2011; paragraphs 1 and 2 of article 87 of Law 1474 of 2011; and other provisions that are contrary to it.

The President of the Honorable Senate of the Republic,

Juan Fernando Cristo Bustos.

The Secretary General of the Honorable Senate of the Republic,

Gregorio Eljach Pacheco.

The Speaker of the Honorable House of Representatives,

Hernan Penagos Giraldo.

The Secretary General of the Honorable House of Representatives,

Jorge Humberto Mantilla Serrano.

REPUBLIC OF COLOMBIA – NATIONAL GOVERNMENT

Let it be published and complied with.

Given in Bogotá, DC, on November 22, 2013.

Juan Manuel Santos Calderon

The Ministry of Finance and Public Credit,

Mauricio Cardenas Santamaria.

The Ministry of Justice and Law,

Alfonso Gomez Mendez.

The Ministry of Mines and Energy,

Amilcar Acosta Medina.

The Minister of Environment and Sustainable Development,

Machine Translated by Google
12/19/24, 10:... Case 1:25-cv-01099-JDB    Document 1-9    Filed 04/11/25    Page 108 of 108
Congress of Colombia Law 1682 of 2013

Light Helena Sarmiento Villamizar.

The Minister of Transport,

Cecilia Alvarez Correa Glen.