IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PERIMETRAL ORIENTAL DE BOGOTÁ, S.A.S., | |
| *Petitioner*, | |
| v. | Civil Action No. _____ |
| AGENCIA NACIONAL DE INFRAESTRUCTURA and THE REPUBLIC OF COLOMBIA | |
| *Respondents*. | |

**<u>Declaration of Jason W. Myatt in Support of Petition to Confirm Arbitral Award</u>**

# EXHIBIT 10

**TEMAS-SUBTEMAS**

**Sentencia C-474/23**

**PROCESO DE EXPROPIACION**-Restricción para proponer excepciones no vulnera derechos al debido proceso y al acceso a la administración de justicia

*(...) si bien es cierto que el numeral 5° del artículo 399 de la Ley 1564 de 2012 restringe la posibilidad de que el demandado dentro del proceso judicial de expropiación proponga excepciones, ello no conlleva una vulneración de los derechos al debido proceso y al acceso a la administración de justicia, toda vez que (i) el afectado tiene a su disposición distintas herramientas jurídicas idóneas para hacer valer sus intereses y ejercer la contradicción y la defensa desde la etapa prejudicial, a lo largo de todo el trámite y hasta su culminación; (ii) el juez instructor del proceso está revestido de amplios poderes que le permiten adoptar las medidas o eventuales correctivos que sean necesarios en orden a hacer efectivos los derechos de las partes e intervinientes; y, en todo caso, (iii) de acuerdo con la configuración legal del proceso judicial de expropiación, dicha instancia procesal civil no es el escenario para discutir en lo sustancial la pretensión de la entidad demandante, en tanto allí lo que se hace es ejecutar el acto administrativo que ordena la expropiación, acto que puede controvertirse ante la jurisdicción de lo contencioso administrativo; la esencia del proceso judicial de expropiación es determinar cuál es el monto y los conceptos que ha de comprender la justa indemnización a favor del demandado, en los términos del numeral 6° del artículo 399 del Código General del Proceso.*

**LIBERTAD DE CONFIGURACION LEGISLATIVA EN MATERIA PROCESAL**-Contenido y alcance

*La amplia potestad de configuración en cabeza del Legislador se patenta, según se ha señalado en la jurisprudencia constitucional, en la facultad de "(...) (i) fijar nuevos procedimientos, (ii) determinar la naturaleza de actuaciones judiciales, (iii) eliminar etapas procesales, (iv) establecer las formalidades que se deben cumplir, (v) disponer el régimen de competencias que le asiste a cada autoridad, (vi) consagrar el sistema de publicidad de las actuaciones, (vii) establecer la forma de vinculación al proceso, (viii) fijar los*

*medios de convicción de la actividad judicial, (ix) definir los recursos para controvertir lo decidido y, en general, (x) instituir los deberes, obligaciones y cargas procesales de las partes". Inclusive, este tribunal ha reconocido que, en este ámbito, el Legislador cuenta con la potestad de privilegiar determinados modelos de procedimiento, y hasta de prescindir de etapas o recursos en algunos de ellos.*

**LIBERTAD DE CONFIGURACION LEGISLATIVA EN MATERIA PROCESAL**-Límites

*(...) en el ejercicio de dicha potestad debe observar los límites trazados por la propia Constitución, que se contraen a (i) la imposibilidad de modificar las reglas procesales prescritas directamente en el texto constitucional; (ii) el debido respeto por los principios y fines esenciales del Estado; (iii) la satisfacción de los principios de razonabilidad y proporcionalidad; y, (iv) la realización de las garantías asociadas al debido proceso y al acceso a la justicia.*

**EXPROPIACION**-Concepto

**EXPROPIACION**-Elementos característicos

**EXPROPIACION**-Puede ser de carácter judicial o administrativa

**EXPROPIACION COMO LIMITANTE DEL DERECHO A LA PROPIEDAD**-Contenido y alcance

**EXPROPIACION**-Libertad de configuración legislativa

*(...) el Legislador tiene una amplia libertad de configuración normativa en cuanto a expropiación se refiere. Esto, de suyo, abarca lo relativo a los aspectos procesales de esta figura. En efecto, puesto que la actuación de las autoridades en este ámbito está sujeta a la estricta observancia del debido proceso, dentro de la esfera de regulación del Legislador se halla comprendida también la tarea de determinar las reglas procedimentales a que deben ceñirse tanto la administración como los jueces en materia expropiatoria.*

**PROCESO DE EXPROPIACION JUDICIAL O ADMINISTRATIVA**-Etapas

**EXCEPCIONES**-Manifestación del derecho de contradicción

*La proposición de excepciones se constituye, entonces, en una manifestación de resistencia procesal en cabeza del extremo pasivo que materializa el derecho fundamental al debido proceso, en su dimensión de derecho a la contradicción, en los escenarios en que sus derechos e intereses son sometidos a debate. Mediante la postulación de estas resistencias procesales, el demandado puede intentar derruir los elementos básicos de la pretensión aportando la correspondiente fundamentación fáctica y jurídica de su ataque, o bien, puede denunciar la ausencia de los elementos estructurales del proceso judicial.*

**EXCEPCIONES PREVIAS**-Finalidad

*(...) "]as excepciones previas son medidas de saneamiento en la etapa inicial de algunos procesos, por causa de vicios o defectos de los mismos, a cargo de la parte demandada, y tienen como finalidad mejorar aquellos o terminarlos cuando ello no es posible, y evitar así nulidades o sentencias inhibitorias (...). Se contraponen a las excepciones de fondo o de mérito, que se refieren al derecho sustancial, se dirigen contra las pretensiones de la demanda y por regla general se deciden en la sentencia"*

**INTERPRETACION  SISTEMATICA**-Aplicación/**INTERPRETACION TELEOLOGICA**-Aplicación

## REPÚBLICA DE COLOMBIA

## CORTE CONSTITUCIONAL
### -Sala Plena-

## SENTENCIA C-474 DE 2023

**Referencia:** Expediente D-15223

Demanda de inconstitucionalidad contra del numeral 5° del artículo 399 (parcial) de la Ley 1564 de 2012, "[p]or medio de la cual se expide el Código General del Proceso y se dictan otras disposiciones"

**Demandantes:**

John Fernando Restrepo Tamayo

Juan David Vanegas Arango

**Magistrado Ponente:**

**ALEJANDRO LINARES CANTILLO**

Bogotá, D.C., nueve (9) de noviembre dos mil veintitrés (2023).

La Sala Plena de la Corte Constitucional, en ejercicio de sus atribuciones constitucionales y en cumplimiento de los requisitos y trámites establecidos en el Decreto Ley 2067 de 1991, profiere la siguiente

**SENTENCIA**

## I.    ANTECEDENTES

1.   El 14 de marzo de 2023, los ciudadanos John Fernando Restrepo Tamayo y Juan David Vanegas Arango, en ejercicio de la acción pública prevista en

los artículos 40.6, 241 y 242 de la Constitución Política, formularon demanda de inconstitucionalidad contra el enunciado "*No podrá proponer excepciones de ninguna clase*", contenido en el numeral 5° del artículo 399 de la Ley 1564 de 2012, "[p]or medio de la cual se expide el Código General del Proceso y se dictan otras disposiciones", por considerar que vulnera los derechos al debido proceso (artículo 29 C.P.) y a la tutela judicial efectiva (artículo 229 C.P.).

2. Mediante auto del 27 de abril de 2023, el entonces magistrado sustanciador resolvió (i) admitir la demanda; (ii) fijar en lista el proceso por el término de 10 días, en orden a permitir la intervención ciudadana; (iii) correr traslado del expediente a la Procuradora General de la Nación para que rindiera el concepto a su cargo; (iv) comunicar la iniciación del proceso al Presidente de la República y al Presidente del Congreso; (v) comunicar la iniciación del proceso a la Dirección de Acceso a la Justicia del Ministerio de Justicia y del Derecho, al Ministerio de Transporte, al Ministerio de Vivienda, Ciudad y Territorio, al Departamento Nacional de Planeación –DNP–, a la Dirección Técnica de Predios del Instituto de Desarrollo Urbano –IDU–, a la Agencia Nacional de Tierras, a la Superintendencia de Notariado y Registro y a la Agencia Nacional de Infraestructura y, a su vez, (vi) invitar a participar en relación con el asunto objeto de controversia a varias universidades y organizaciones[1].

3. Cumplidos los trámites previstos en el artículo 242 de la Constitución y en el Decreto Ley 2067 de 1991, procede la Corte a decidir sobre la demanda de la referencia.

## A. Texto normativo demandado

---

[1] Las instituciones invitadas a participar en este proceso fueron las siguientes: facultades de Derecho de las Universidades Nacional de Colombia, de Antioquia, de los Andes, Javeriana, del Rosario, Pedagógica y Tecnológica de Colombia, Externado, Libre, EAFIT, Santo Tomás, del Norte y de la Sabana, Centro de Estudios de Derecho, Justicia y Sociedad –Dejusticia–, Academia Colombiana de Jurisprudencia, Comisión Colombiana de Juristas, Instituto Colombiano de Derecho Procesal, Centro Colombiano de Derecho Procesal Constitucional, Asociación Colombiana de Derecho Procesal Constitucional, Grupo de Acciones Públicas de la Universidad del Rosario, Instituto de Estudios Urbanos - IEU de la Universidad Nacional de Colombia, Federación Colombiana de Municipios y Federación Nacional de Departamentos.

4. A continuación se transcribe la disposición demandada, de acuerdo con su publicación en el Diario Oficial No. 48.489 de 12 de julio de 2012, subrayándose el enunciado objeto de acusación:

«**LEY 1564 DE 2012**

(julio 12)

"Por medio de la cual se expide el Código General del Proceso y se dictan otras disposiciones"

[…]

**ARTÍCULO 399. EXPROPIACIÓN**. El proceso de expropiación se sujetará a las siguientes reglas:

[…]

5. De la demanda se correrá traslado al demandado por el término de tres (3) días. **No podrá proponer excepciones de ninguna clase**. En todo caso el juez adoptará los correctivos necesarios para subsanar los defectos formales de la demanda.

Transcurridos dos (2) días sin que el auto admisorio de la demanda se hubiere podido notificar a los demandados, el juez los emplazará en los términos establecidos en este código; copia del emplazamiento se fijará en la puerta de acceso al inmueble objeto de la expropiación o del bien en que se encuentren los muebles.

En la imposición de las penas accesorias se observará estrictamente lo dispuesto en el artículo 59. […]».

## B. Pretensión y argumentos de la demanda

5.     Los demandantes solicitaron que se declare inexequible el enunciado normativo acusado, por cuanto estiman que contraría los artículos 29 y 229 de la Constitución.

6.     El concepto de la violación se contrae a la presunta vulneración de los derechos fundamentales al debido proceso y a la tutela judicial efectiva derivada del hecho de que, en virtud de la disposición impugnada, la parte demandada dentro del proceso judicial de expropiación no puede formular excepciones dentro del término de traslado de la demanda.

7.     En opinión de los promotores de la acción, "*[e]l derecho fundamental al debido proceso encarna la quintaesencia del derecho constitucional moderno concebido como la sumatoria de garantías en favor del sujeto y límites exigidos sobre la actuación estatal, por medio de los cuales se asegura que todo evento disciplinario, judicial o administrativo en el que puede generarse una consecuencia desfavorable para el acusado, se haga en el marco de la más rígida sujeción a las formas legales, con un tercero imparcial que provea de objetividad la posible restricción a derechos que se afecten como consecuencia de la decisión restrictiva a que haya lugar. El debido proceso es el vértice del constitucionalismo en el contexto liberal y garantista porque permite siempre y en todo caso que aquel sobre quien se dirige la mayor carga que puede poner en riesgo algún derecho disponga de medios de defensa, controversia o impugnación a la decisión que se tome en su contra. El debido proceso representa la máxima expresión del derecho estatal limitado sobre el que existe, aún en el máximo escenario inquisitivo, la*

*posibilidad de controvertir actuaciones que puedan resultar lesivas a su interés propio*"[2].

8.    Asimismo, afirmaron que el derecho de acceso a la administración de justicia permite que "*los sujetos planteen, ante el Juzgador Competente; pretensiones o exigencias; y a su vez, y de forma correlativa, se les brinde la posibilidad de; oponerse a los hechos y pretensiones planteados en su contra; presentar medios de defensa y/o excepciones con la finalidad de aportar y controvertir elementos materiales probatorios, en el curso de los procesos judiciales y/o administrativos, donde encuentren involucrados sus derechos e intereses sociales, económicos y/o personales*"[3].

9.    A partir de dichas consideraciones, los demandantes señalaron que el numeral 5° del artículo 399 del Código General del Proceso, al restringir la posibilidad de que los demandados en procesos de expropiación judicial presenten excepciones, impide el ejercicio adecuado de las garantías de defensa y contradicción de las personas afectadas en su propiedad privada como consecuencia de la decisión de expropiar de la administración.

10.    Agregaron que, si bien la misma norma le reconoce al juez la facultad de adoptar las medidas necesarias para subsanar los defectos formales de la demanda, tal oficiosidad no subsana la lesión que se ocasiona sobre el derecho de que es titular el demandado a defender sus propios intereses.

11.    Adicionalmente, manifestaron que la restricción en cuestión desconoce que en el proceso a que se alude no sólo están de por medio el interés general y la compensación económica de un derecho real, sino también el significado moral y afectivo del bien y los eventuales perjuicios inmateriales derivados de la expropiación.

---

[2] *Cfr.* Expediente D-15223, demanda de inconstitucionalidad, archivo *"D0015223. Demanda ciudadana.pdf"*, p. 4.

[3] *Ibidem*.

## C. Intervenciones

12.    Durante el trámite se recibieron oportunamente trece escritos de concepto o intervención[4], los cuales serán agrupados a continuación de acuerdo con el sentido de solicitud formulada.

13.    *Solicitudes de inhibición*[5]. Quienes cuestionaron la aptitud sustantiva de la demanda expresaron que no se aprecia en ella una contradicción entre la norma acusada y la Constitución, porque los actores parten de argumentos subjetivos, indeterminados, indirectos y abstractos que no acreditan debidamente los requisitos mínimos de carga argumentativa, y porque las razones de inconstitucionalidad recaen sobre una interpretación incorrecta y no sobre una proposición jurídica real y existente.

14.    *Solicitudes de exequibilidad*[6]. Quienes defendieron la validez constitucional de la disposición censurada sostuvieron que el derecho a la propiedad previsto en el artículo 58 de la Constitución puede ser limitado por motivos de utilidad pública o interés social (v.gr. es importante para cumplir con los fines del Estado y del ordenamiento del territorio), y enfatizaron que la expropiación puede ser administrativa o judicial, caso éste último en el cual el

---

[4]Además de los mencionados trece escritos, en el expediente se observa que el Director del Instituto de Estudios Urbanos de la Universidad Nacional allegó un oficio en el que manifestó que no contaba con profesionales disponibles para presentar el concepto requerido por la Corporación; el Ministerio de Transporte remitió dos veces el mismo concepto; y, después de vencido el término de fijación en lista, se recibieron de manera extemporánea escritos provenientes de la Agencia Nacional de Tierras, de la Superintendencia de Notariado y Registro, de la Academia Colombiana de Jurisprudencia, y de la Facultad de Derecho de la Universidad Santo Tomás.

[5] Solicitaron que se profiera decisión inhibitoria el Departamento Nacional de Planeación y la Agencia Nacional de Infraestructura. En subsidio, solicitaron que se declare la exequibilidad de la norma acusada.

[6] Presentaron solicitudes de exequibilidad el Ministerio de Transporte, el Ministerio de Vivienda, Ciudad y Territorio, el Ministerio de Justicia y del Derecho, la Asociación Colombiana de Ciudades Capitales –Asocapitales–, la Federación Colombiana de Municipios, el Fondo Nacional de Departamentos, el Departamento de Derecho Procesal de la Universidad Externado y el Observatorio de Intervención Ciudadana de la Universidad Libre.

proceso posee ciertas características especiales que lo distinguen frente a otros procesos declarativos.

15.    Expusieron que tratándose del proceso judicial de expropiación el juez puede pronunciarse de oficio sobre la falta de jurisdicción, compromiso o cláusula compromisoria, inexistencia o indebida representación del demandante o del demandado, e ineptitud de la demanda por falta de requisitos formales, lo cual garantiza el debido proceso. Indicaron, a su vez, que es posible acudir a la jurisdicción de lo contencioso administrativo para discutir tanto los motivos de utilidad pública o de interés social que justifican la actuación administrativa, como el acto administrativo que ordena la expropiación; que en el marco del proceso de expropiación los demandados pueden solicitar la suspensión del trámite por prejudicialidad mientras se pronuncia el juez administrativo, y que también pueden discutir el monto de la indemnización y controvertir las pruebas aportadas por las entidades públicas e interponer recursos, de modo tal que cuentan con diversos escenarios de defensa, pues las excepciones no son el único medio disponible para controvertir la demanda y el enunciado cuestionado no representa una barrera en ese sentido.

16.    Anotaron también que la Corte Suprema de Justicia, en sentencia de control de constitucionalidad del 27 de junio de 1978, concluyó que la imposibilidad de proponer excepciones previas en el proceso de expropiación judicial no afecta las garantías de los demandados. Por último, destacaron que el Legislador tiene un amplio margen de configuración en materia procesal, que habilitar las excepciones en estos procesos contraría a la utilidad pública al retardar la tradición del predio al Estado, y que la misma restricción para proponer excepciones en este tipo de procesos existe en otros países como México, Argentina, España y Francia.

17.    *Solicitud de inexequibilidad*[7]. Como razones para sustentar la inconstitucionalidad del precepto parcialmente censurado, se subrayó la

---

[7]  Allegó solicitud de inexequibilidad el ciudadano Harold Sua Montaña.

importancia procesal de las excepciones para cuestionar las pretensiones de la demanda. Asimismo, se esgrimió que la conducta de las autoridades no debe depender de la iniciativa de la parte actora de los procesos y que en los casos de expropiación el Estado es quien presenta la demanda y quien ejerce también la función judicial, lo cual debe ser valorado a efectos de establecer la inconstitucionalidad. El ciudadano que intervino en este sentido se refirió, además, a la sentencia de Gustavo Petro *vs.* Colombia para recalcar el principio de imparcialidad objetiva, y señaló que también es inexequible la expresión "[e]n todo caso, el juez adoptará los correctivos necesarios para subsanar los defectos formales de la demanda", porque en su criterio ese apartado integra la unidad normativa.

18.     *Solicitud de exequibilidad condicionada*[8]. Respecto de la necesidad de un condicionamiento en este caso, se argumentó que la limitación para proponer excepciones objeto de cuestionamiento no constituye una vulneración del derecho al debido proceso, no obstante lo cual el traslado de la demanda resulta un mecanismo alegórico en vista de que no pueden presentarse excepciones. Por lo tanto, se sugirió condicionar la exequibilidad "*bajo el entendido de que los afectados pueden presentar excepciones previas durante el traslado de la demanda para justificar su defensa"*, tras expresar que *"la modulación interpretativa debería encaminarse dando lugar a los sujetos procesales que participen en el proceso para ser oídos sin ir en detrimento del proceso de expropiación con base a la función social de la propiedad desde la Constitución de 1991"*.

### D.   Concepto de la Procuradora General de la Nación

19.     La Procuradora General de la Nación solicitó declarar la exequibilidad de la disposición parcialmente demandada. Señaló que el Legislador cuenta con un amplio margen de configuración normativa para definir los procedimientos dentro de los límites que le fijan los principios de

---

[8]  Solicitó un pronunciamiento de exequibilidad condicionada el Consultorio Jurídico de la Universidad de los Andes.

razonabilidad y proporcionalidad, por lo que las normas procesales deben ser conducentes para alcanzar un fin constitucional, sin resultar evidentemente desproporcionadas.

20.    Frente al apartado acusado, indicó que, si bien es cierto que el impedir la formulación de excepciones restringe *prima facie* la garantía de defensa, dicha limitación es proporcional, porque, en primer lugar, persigue el fin constitucional de administrar justicia con celeridad, y es idónea para conseguir la finalidad propuesta, porque la eliminación de la etapa de excepciones previas disminuye los tiempos procesales y evita dilaciones del trámite. Además, no es una medida evidentemente desproporcionada, porque los demandados *(i)* pueden ejercer su derecho a la defensa a través de la contestación de la demanda, la solicitud y práctica probatoria, las discusiones sobre el monto del avalúo presentado o de la indemnización y los recursos correspondientes, y *(ii)* están facultados para presentar memoriales al juez que justifiquen una posible excepción previa, con el fin de que este adopte los correctivos a que haya lugar.

21.    Resaltó que en la sentencia C-543 de 2011 la Corte reconoció que el Legislador puede restringir de forma legítima las garantías procesales para asegurar la celeridad en la administración de justicia, y que en estos asuntos la mora judicial puede generar una afectación para el interés general y la utilidad pública, así como el desconocimiento de la función social de la propiedad.

## II.    CONSIDERACIONES

### A.    Competencia

22.    De conformidad con lo dispuesto en el artículo 241.4 de la Constitución, la Corte es competente para conocer y decidir definitivamente sobre la demanda de inconstitucionalidad de la referencia, dado que la norma demandada se inserta en una ley de la República.

### B.    Cuestión preliminar: la aptitud sustantiva de la demanda

23.    La Sala Plena es competente para realizar un análisis del cumplimiento de los requisitos de procedibilidad de la demanda de inconstitucionalidad. Al respecto, en la sentencia C-623 de 2008 la Corte precisó que:

> "[a]*un cuando en principio, es en el auto admisorio donde se define si la demanda cumple o no con los requisitos mínimos de procedibilidad, ese primer análisis responde a una valoración apenas sumaria de la acción, llevada a cabo únicamente por cuenta del Magistrado Ponente, razón por la cual, la misma no compromete ni define la competencia del Pleno de la Corte, que es en quien reside la función constitucional de decidir de fondo sobre las demandas de inconstitucionalidad que presenten los ciudadanos contra las leyes y los decretos con fuerza de ley*"[9].

24.    Esta corporación ha señalado que toda demanda de inconstitucionalidad debe ser analizada a la luz del principio *pro actione*, habida cuenta de la naturaleza pública de esta acción. No obstante, la misma jurisprudencia ha reconocido que la demanda de inconstitucionalidad debe reunir ciertas condiciones mínimas que permitan guiar la labor del juez constitucional y orientar el debate de los intervinientes en el proceso de constitucionalidad.

25.    El artículo 2° del Decreto Ley 2067 de 1991 dispone que la demanda debe contener: *(i)* el señalamiento de las normas acusadas como inconstitucionales, trascribiéndolas literalmente por cualquier medio o aportando un ejemplar de la publicación oficial; *(ii)* el señalamiento de las normas constitucionales infringidas; *(iii)* las razones que sustentan la acusación, comúnmente denominadas concepto de violación; *(iv)* el señalamiento del trámite legislativo impuesto por la Constitución para la expedición del acto demandado, cuando fuere el caso; y, *(v)* la razón por la cual la Corte es competente.

---

[9]  Corte Constitucional, sentencias C-894 de 2009, C-055 y C-281 de 2013.

26.    De conformidad con la jurisprudencia constitucional, el *concepto de la violación* se formula debidamente cuando *(i)* se identifican las normas constitucionales vulneradas, *(ii)* se expone el contenido normativo de las disposiciones acusadas –lo cual implica señalar aquellos elementos materiales que se estiman violados–, y *(iii)* se expresan las razones por las cuales los textos demandados violan la Constitución.

27.    Como lo señaló esta Corte en la sentencia C-1052 de 2001, toda demanda de inconstitucionalidad debe, como mínimo, fundarse en razones *claras, ciertas, específicas, pertinentes y suficientes*. A partir de dicha sentencia, la Corte Constitucional ha reiterado, de manera uniforme, que las razones de inconstitucionalidad deben ser:

> "*(i) claras, es decir, seguir un curso de exposición comprensible y presentar un razonamiento inteligible sobre la presunta inconformidad entre la ley y la Constitución; (ii) ciertas, lo que significa que no deben basarse en interpretaciones puramente subjetivas, caprichosas o irrazonables de los textos demandados, sino exponer un contenido normativo que razonablemente pueda atribuírseles; (iii) específicas, lo que excluye argumentos genéricos o excesivamente vagos; (iv) pertinentes, de manera que planteen un problema de constitucionalidad y no de conveniencia o corrección de las decisiones legislativas, observadas desde parámetros diversos a los mandatos del Texto Superior; y (v) suficientes; esto es, capaces de generar una duda inicial sobre la constitucionalidad del enunciado o disposición demandada*"[10].

28.    Con fundamento en las anteriores consideraciones, y tomando en cuenta los cuestionamientos planteados en cuanto a la plena acreditación de las condiciones de aptitud sustantiva de la demanda, es preciso determinar si la censura promovida por los ciudadanos John Fernando Restrepo Tamayo Juan David Vanegas Arango se ajusta a los mínimos argumentativos previamente

---

[10]  Corte Constitucional, entre otras, sentencia C-330 de 2013.

señalados, de los cuales depende la posibilidad jurídica de desarrollar el juicio abstracto de constitucionalidad.

29.    En criterio de la Sala, y contrario a lo señalado por un sector de los intervinientes que apuntan a una supuesta ausencia de *certeza* [11] y *especificidad*[12], la acusación sí reúne los requisitos para emprender un análisis de mérito.

30.    En efecto, el cargo se aprecia cierto, en la medida en que del enunciado legal demandado sí se desprende la consecuencia que infieren los actores. Ciertamente, al prescribir que luego de corrido el traslado de la demanda de expropiación al demandado este "*No podrá proponer excepciones de ninguna clase*", el numeral 5 del artículo 399 del Código General del Proceso establece de manera puntual y veraz una restricción al extremo pasivo en lo que atañe a la posibilidad de formular argumentos encaminados a resistir la pretensión procesal, lo que evidencia que la premisa normativa que identifican los accionantes como uno de los extremos de contrastación y el contenido que de allí extraen no se basa en interpretaciones subjetivas, caprichosas o irrazonables del texto acusado.

31.    Asimismo, los argumentos expuestos en la demanda ponen de presente un reparo específico, comoquiera que se plantea de manera concreta y directa en qué consiste la presunta oposición al ordenamiento constitucional. Así, la infracción alegada se asocia al hecho de que la disposición jurídica impugnada introduce una limitante a la realización de un acto procesal propio de uno de los contendientes enfrentados en el proceso declarativo especial de expropiación como lo es la proposición de excepciones, lo cual –según el dicho de los ciudadanos accionantes– resulta incompatible con las garantías del debido proceso y acceso a la administración de justicia que le asisten al demandado, al no permitírsele promover su defensa en ese preciso espacio procesal. De esta manera, en vez de invocar ideas vagas, indeterminadas,

---

[11]  Dado que se sostiene que las razones de inconstitucionalidad recaen sobre una interpretación incorrecta y no sobre una proposición jurídica real y existente.

[12]  En tanto se afirma que los actores no plantean una contradicción entre la norma acusada y la Constitución, porque parten de argumentos subjetivos, indeterminados, indirectos y abstractos.

abstractas y globales, la demanda propone una contrastación normativa objetiva y puntual.

32.    En razón de lo anterior, dado que la demanda no adolece de las falencias en materia de admisibilidad aducidas por aquellos intervinientes que solicitaron que se declare la inhibición, es procedente que esta Corte se pronuncie de fondo frente al cargo de inconstitucionalidad formulado.

### C.    Problema jurídico y metodología de la decisión

33.  Le corresponde a la Sala Plena determinar si el enunciado "*No podrá proponer excepciones de ninguna clase*", contenido en el numeral 5° del artículo 399 de la Ley 1564 de 2012, "[p]or medio de la cual se expide el Código General del Proceso y se dictan otras disposiciones", vulnera los derechos fundamentales al debido proceso y a la tutela judicial efectiva, amparados por los artículos 29 y 228 de la Constitución, al restringir la posibilidad de que la parte demandada dentro del proceso judicial de expropiación formule excepciones dentro del término de traslado de la demanda.

34.  Para dilucidar lo anterior, la Corte se pronunciará en torno a los siguientes ejes temáticos: (i) la libertad de configuración del Legislador en materia de regulación procesal, (ii) el proceso de expropiación, y (iii) la proposición de excepciones como expresión del derecho a la contradicción. A partir de dichos elementos de juicio, se procederá al análisis de la cuestión planteada en la demanda en torno a la disposición censurada.

### D.    La libertad de configuración del Legislador en materia de regulación procesal –reiteración de jurisprudencia[13]

---

[13]  Para este acápite la Sala retoma parcialmente las consideraciones vertidas en la sentencia C-440 de 2022.

35.    De acuerdo con los numerales 1 y 2 del artículo 150 de la Constitución, dentro de las funciones del Congreso de la República se hallan comprendidas las facultades de hacer, reformar y derogar las leyes, así como de expedir códigos en todos los ramos. A partir de dicha cláusula superior, esta corporación ha reiterado que el Legislador goza de una amplia libertad de configuración a la hora de establecer las reglas adjetivas que definen y regulan los procedimientos legales, tanto judiciales como administrativos, para el ejercicio de los derechos de las personas[14].

36.    Este margen de configuración legislativa en materia procesal "le permite al legislador fijar las reglas a partir de las cuales se asegura la plena efectividad del derecho fundamental al debido proceso (artículo 29 C.P.), y del acceso efectivo a la administración de justicia (artículo 229 C.P.). Además, son reglas que consolidan la seguridad jurídica, la racionalidad, el equilibrio y finalidad de los procesos, y permiten desarrollar el principio de legalidad propio del Estado Social de Derecho"[15].

37.    La amplia potestad de configuración en cabeza del Legislador se patenta, según se ha señalado en la jurisprudencia constitucional, en la facultad de "(…) (i) fijar nuevos procedimientos, (ii) determinar la naturaleza de actuaciones judiciales, (iii) eliminar etapas procesales, (iv) establecer las formalidades que se deben cumplir, (v) disponer el régimen de competencias que le asiste a cada autoridad, (vi) consagrar el sistema de publicidad de las actuaciones, (vii) establecer la forma de vinculación al proceso, (viii) fijar los medios de convicción de la actividad judicial, (ix) definir los recursos para controvertir lo decidido y, en general, (x) instituir los deberes, obligaciones y cargas procesales de las partes"[16]. Inclusive, este tribunal ha reconocido que, en este ámbito, el Legislador cuenta con la potestad de privilegiar determinados modelos de procedimiento, y hasta de prescindir de etapas o recursos en algunos de ellos[17].

---

[14]  Corte Constitucional, sentencias C-296 de 2002, C-1235 de 2005, C-203 de 2011, C-437 de 2013, C-329 de 2015, C-086 de 2016, C-025 de 2018, C-031 de 2019 y C-210 de 2021.

[15]  Corte Constitucional, sentencia SU-418 de 2019.

[16]  Corte Constitucional, sentencia C-341 de 2021, en reiteración de la C-031 de 2019.

[17]  *Cfr*. Corte Constitucional, sentencias C-179 de 2016, C-282 de 2017, C-025 de 2018 y C-031 de 2019.

38.    Tratándose puntualmente de la institución jurídica de la expropiación, la Constitución señala de manera expresa en su artículo 58 que corresponde al Legislador definir los motivos de utilidad pública o interés social ante los cuales ha de ceder el interés particular y que dan lugar a la adquisición de un bien por el Estado con el respectivo reconocimiento de una compensación al afectado. Según la norma superior, esta competencia legal se predica tanto de la expropiación judicial como de aquella que se da por vía administrativa.

39.    A la luz de lo anterior, la jurisprudencia constitucional ha señalado que el Legislador tiene una amplia libertad de configuración normativa en cuanto a expropiación se refiere[18]. Esto, de suyo, abarca lo relativo a los aspectos procesales de esta figura. En efecto, puesto que la actuación de las autoridades en este ámbito está sujeta a la estricta observancia del debido proceso, dentro de la esfera de regulación del Legislador se halla comprendida también la tarea de determinar las reglas procedimentales a que deben ceñirse tanto la administración como los jueces en materia expropiatoria. Bajo esta perspectiva, la jurisprudencia ha enfatizado el importante rol que desempeña en este contexto específico la rama legislativa comoquiera que a través de ella se preserva el principio de legalidad del procedimiento y se previene la arbitrariedad estatal a la hora de adelantar una expropiación. En palabras de esta corporación, "[e]sta garantía del principio de legalidad limita el margen de acción del gobierno, y con ello ampara, desde el punto de vista subjetivo, el derecho fundamental al debido proceso de los administrados"[19].

40.    Ahora bien, aunque al Congreso de la República le haya sido deferida por la Carta Política la mencionada potestad de configuración normativa, tal atribución se encuentra sujeta a los precisos límites que traza la misma Constitución. En este sentido, la Corte ha identificado cuatro categorías dentro de las cuales la actuación del Legislador puede desplegarse en concordancia con los postulados fijados en la norma superior.

41.    El primer límite a la amplia potestad de configuración legislativa en materia de normas procesales tiene que ver con la debida observancia del principio de supremacía constitucional contemplado en el artículo 4 superior,

---

[18]  Corte Constitucional, sentencia C-750 de 2015.

[19]  Corte Constitucional, sentencia C-035 de 2016

y se traduce en que el Legislador no está autorizado para alterar materias procesales que se hallen directamente reguladas en la Constitución.

42.    El segundo límite tiene como fundamento los artículos 2 y 228 constitucionales y consiste en que el Legislador debe respetar los principios y fines esenciales del Estado, lo que implica que los procedimientos no son fines en sí mismos sino que han de operar como instrumentos para garantizar los derechos y libertades de las personas y para materializar el derecho sustancial, dotando de eficacia a principios como la independencia y autonomía judicial, el acceso efectivo a la administración de justicia y la publicidad de las actuaciones[20].

43.    El tercer límite se circunscribe a que, al determinar las formas de cada juicio, el Legislador debe atender a un criterio de razón suficiente, de tal suerte que mediante ellas se persiga el cumplimiento de un fin constitucionalmente válido, a través de un mecanismo que se muestre adecuado y necesario para el cumplimiento de dicho objetivo y que, al mismo tiempo, no afecte de forma desproporcionada un derecho, fin o valor constitucional[21].

44.    Y, por último, como cuarto límite se tiene que, conforme a los artículos 29, 209 y 228 de la Carta, al dictar las normas procesales el Congreso debe asegurar que los principios inherentes al debido proceso y al acceso a la justicia, esto es, legalidad, defensa, contradicción, publicidad y primacía del derecho sustancial, así como los de celeridad, igualdad de trato y dignidad humana, se proyecten en los trámites judiciales y administrativos.

45.    De lo expuesto se concluye que el ordenamiento superior le otorga al Legislador una amplia potestad de configuración en lo que atañe a establecer las normas que rigen los procedimientos por conducto de los cuales se hacen efectivos los derechos, conforme a la cual puede, inclusive, suprimir etapas o

---

[20]  Corte Constitucional, sentencia C-124 de 2011.

[21]  Corte Constitucional, sentencia C-428 de 2011.

recursos[22]. No obstante, en el ejercicio de dicha potestad debe observar los límites trazados por la propia Constitución, que se contraen a (i) la imposibilidad de modificar las reglas procesales prescritas directamente en el texto constitucional; (ii) el debido respeto por los principios y fines esenciales del Estado; (iii) la satisfacción de los principios de razonabilidad y proporcionalidad; y, (iv) la realización de las garantías asociadas al debido proceso y al acceso a la justicia.

46.   En lo que atañe a la expropiación, el amplio margen de configuración normativa a que se ha hecho alusión y sus límites constitucionales se proyectan tanto en la definición de los motivos de utilidad pública o interés social que hacen procedente la expropiación, ya sea esta judicial o administrativa, como también en el diseño de los procesos y el establecimiento de las precisas reglas procedimentales que están llamadas a acatar las autoridades al momento de llevar a cabo esta clase de operaciones.

47.   Al respecto, la jurisprudencia constitucional ha puesto de relieve que "la potestad de configuración del legislador lo faculta para crear procedimientos especiales de expropiación, en cada una de las áreas donde tal regulación específica permita optimizar la protección de los bienes jurídicos involucrados en cada caso[23]. En esa medida, por ejemplo, el legislador puede establecer la expropiación en materia de reforma urbana, para garantizar el acceso de las personas a una vivienda digna; en materia agraria, para permitir el acceso progresivo de las personas a la propiedad de la tierra y mejorar su

---

[22] Corte Constitucional, sentencias C-394 de 2023, C-440 de 2022, C-091 de 2022, C-284 de 2021, C-210 de 2021, C-605 de 2019, C-031 de 2019, C-025 de 2018, C-282 de 2017, C-179 de 2016, C-319 de 2013, C-180 de 2006, C-1233 de 2005, C-040 de 1997, C-541 de 1996, C-427 de 1996, C-005 de 1994, C-150 de 1993, C-093 de 1993, entre otras.

[23] En el mismo sentido la Corte declaró la constitucionalidad de un procedimiento subsidiario para dar a conocer a los particulares la oferta de compra de la administración, cuando ésta tuviera interés en adquirir la propiedad de bienes inmuebles de particulares. Con este mecanismo se permitía a la administración realizar el interés público o social perseguido. Al respecto, sostuvo: "*El empleo de medios subsidiarios para lograr la presencia de los interesados en las actuaciones administrativas o para poner en conocimiento los actos de la administración, constituye un procedimiento normal y ordinario, en atención a la necesidad de dar celeridad a dichas actuaciones y satisfacer oportunamente los intereses públicos o sociales, aparte de que la regularidad en la utilización de dichos medios se garantiza a través del control jurisdiccional.*" Sentencia C-428/94.

productividad; para atender desastres; y para proteger los bienes culturales o el ecosistema, entre otros"[24].

### E.    El proceso de expropiación

48.    El inciso 1º del artículo 58 de la Constitución consagra que "[c]uando de la aplicación de una ley expedida por motivos de utilidad pública o interés social, resultare en conflicto los derechos de los particulares con la necesidad por ella reconocida, el interés privado deberá ceder al interés público o social." En concordancia, el inciso 4º *ejusdem* establece que "[p]or motivos de utilidad pública o interés social definidos por el legislador, podrá haber expropiación mediante sentencia judicial e indemnización previa. Esta se fijará consultando los intereses de la comunidad y del afectado. En los casos que determine el legislador, dicha expropiación podrá adelantarse por vía administrativa, sujeta a posterior acción contenciosa-administrativa, incluso respecto del precio."

49.    A su vez, el artículo 21 de la Convención Americana sobre Derechos Humanos, que fue ratificada por Colombia mediante la Ley 74 de 1968, establece en su numeral 1: "[t]oda persona tiene derecho al uso y goce de sus bienes. La ley puede subordinar tal uso y goce al interés social". Y, seguidamente, el numeral 2 de la misma norma convencional prescribe: "[n]inguna persona puede ser privada de sus bienes, excepto mediante el pago de indemnización justa, por razones de utilidad pública o de interés social y en los casos y según las formas establecidas por la ley".

50.    En desarrollo del ordenamiento constitucional, de vieja data esta Corte definió la expropiación como "una operación de derecho público por la cual el Estado obliga a un particular a cumplir la tradición del dominio privado al dominio público de un bien, en beneficio de la comunidad y mediante una indemnización previa"[25]. Más recientemente, este tribunal ha precisado que

---

[24]  Corte Constitucional, sentencia C-227 de 2011.

[25]  Corte Constitucional, sentencia C-153 de 1994.

"la expropiación es un mecanismo judicial o administrativo por cuya virtud las entidades de derecho público, previa declaratoria de utilidad pública, pueden adquirir bienes privados que por lo tanto ingresan al patrimonio público para que aquellos sean usados exclusivamente en beneficio de la comunidad. Es por esto que, antes de iniciar cualquier proceso de expropiación, sea por vía judicial o por vía administrativa, debe verificarse cuál es la utilidad pública o el interés social que lo motivan y por qué se presentaría el conflicto entre el interés privado y el interés público que obliga la decisión que impere este último sobre aquel. […] Cuando dichos motivos se acrediten en la práctica, el interés privado ha de ceder ante el público"[26].

51.    Y es que, como lo ha subrayado reiteradamente este tribunal, la propiedad privada, amparada por el artículo 58 de la Carta, es un derecho que no posee una naturaleza absoluta[27]. Se trata, en cambio, de "un derecho subjetivo al que le son inherentes unas funciones sociales y ecológicas, dirigidas a asegurar el cumplimiento de varios deberes constitucionales, entre los cuales, se destacan la protección del medio ambiente, la salvaguarda de los derechos ajenos y la promoción de la justicia, la equidad y el interés general como manifestaciones fundamentales del Estado Social de Derecho y en lo referente a sus límites, ha establecido que se encuentran en la utilidad pública o el interés social, de los cuales deriva la expropiación"[28].

52.    En el ejercicio hermenéutico encaminado a establecer un adecuado equilibrio entre el interés privado y el interés público prevalente en el marco de la expropiación, considerada "la limitación más gravosa que puede imponerse sobre el derecho de propiedad legítimamente adquirido"[29], esta Corte ha fijado "unas condiciones *sine qua non* para que proceda la limitación a la propiedad privada, tales como (i) que se presente por motivos de utilidad pública o de interés social previamente definidos por el legislador; (ii) que la

---

[26]  Corte Constitucional, sentencia C-085 de 2022.

[27]  Corte Constitucional, sentencias C-750 de 2015, C-669 de 2015, C-306 de 2013, C-258 de 2013, C-227 de 2011, C-133 de 2009, C-870 de 2003, C-491 de 2002.

[28]  Corte Constitucional, sentencia C-207 de 2019, reiterando la sentencia C-133 de 2009.

[29]  Corte Constitucional, sentencias C-227 de 2011, C-476 de 2007.

expropiación se realice mediante decisión judicial o administrativa, esta última sujeta a posterior acción contencioso administrativa incluso respecto del precio; (iii) que la expropiación se adelante con respeto del principio de legalidad, esto es, de conformidad con el procedimiento establecido en la ley; (iv) que la expropiación comprenda una etapa previa de enajenación voluntaria o negociación directa, a partir de una oferta por parte de la entidad administrativa; y (v) que se pague una indemnización previamente al traspaso del derecho de propiedad a la Administración, la cual debe ser justa"[30].

53.    En ese contexto, se han identificado por esta corporación tres elementos característicos de la expropiación, a saber: sujetos, objeto y causa[31]. En ese sentido, se ha indicado que "[s]on *sujetos* de esta operación de derecho público: *(i)* la entidad –judicial o administrativa– con potestad expropiatoria (sujeto activo), *(ii)* el titular del derecho fundamental expropiado (sujeto pasivo) y *(iii)* la persona que se verá beneficiado por la expropiación (beneficiario)[32]. De otro lado, el *objeto* material del acto de expropiación es el derecho de dominio del sujeto pasivo sobre algún bien del cual era su legítimo titular y el cual, como resultado de la expropiación, ingresa al patrimonio público[33]. Por último, la *causa* es la finalidad de utilidad pública e interés social que motiva y justifica la expropiación, la cual debe estar prevista en la ley"[34].

54.    Asimismo, la jurisprudencia constitucional ha relevado que la operación de la expropiación está estructurada en diferentes momentos dentro de los cuales tiene lugar la intervención de las tres ramas del poder público[35]. De esta manera se busca precaver cualquier acción estatal arbitraria que vaya

---

[30]  Corte Constitucional, sentencia C-669 de 2015, reiterando la sentencia C-133 de 2009. En el mismo sentido, sentencias C-750 de 2015 y C-133 de 2009.

[31]  Corte Constitucional, sentencia C-020 de 2023, reiterando las sentencias C-227 de 2011 y C-764 de 2013.

[32]  *Ibidem*.

[33]  Corte Constitucional, sentencia C-085 de 2022.

[34]  Corte Constitucional, sentencia C-020 de 2023.

[35]  Corte Constitucional, sentencia C-669 de 2015, reiterando las sentencias C-306 de 2013, C-153 de 1994 y C-216 de 1993.

en detrimento de los derechos del titular del bien implicado, lo cual se acompasa con el mandato de protección de todas las personas en sus bienes, en tanto fin esencial del Estado al tenor del artículo 2 constitucional.

55.     Bajo dicha comprensión, conforme al principio de legalidad, al Legislador le corresponde la tarea de definir los motivos de utilidad pública o de interés social, a partir de donde se trazan los límites en cuanto a los supuestos taxativos en los que válidamente puede tener lugar una expropiación, toda vez que "los procedimientos judiciales o administrativos, dirigidos a obtener una expropiación, no pueden, en ningún caso, fundarse en motivos ajenos a aquellos que la ley definió como de interés social o utilidad pública"[36]. A su turno, la Administración, en cabeza de la entidad estatal competente y por medio de acto administrativo, ostenta la potestad para ordenar la expropiación del bien, dentro de y conforme al marco establecido por la ley. Por su parte, las autoridades jurisdiccionales intervienen en el escenario del proceso judicial, mecanismo a través del cual se materializa la decisión expropiatoria, velando por que se respeten en todo momento el ordenamiento jurídico, el debido proceso y los demás derechos de los afectados, y disponiendo el correspondiente resarcimiento económico en el evento en que se encuentren reunidas las condiciones para que proceda la transferencia del bien al Estado[37].

56.     Ahora bien, según lo prescribe el artículo 58 constitucional, la expropiación por motivos de utilidad pública o interés social puede ser administrativa o judicial. La primera tiene lugar cuando la expropiación la adelanta un órgano de la Administración, se realiza mediante la expedición de un acto administrativo y tiene carácter excepcional, sin perjuicio del control posterior de que es susceptible el referido acto ante el juez de lo contencioso administrativo[38]. La segunda, que es la regla general, ocurre cuando, después de surtirse el procedimiento en sede administrativa, se tramita ante las

---

[36]  Corte Constitucional, sentencia C-085 de 2022.

[37]  Corte Constitucional, sentencia C-1074 de 2002|

[38]  De acuerdo con lo establecido en los artículos 63 y siguientes de la Ley 388 de 1997 y en otros regímenes especiales.

autoridades judiciales un proceso declarativo especial al cabo del cual se ordena el pago de un monto justo al afectado y se decreta a través de sentencia el traspaso del bien a la entidad pública[39]. En ambos casos, ha dicho la Corte, "debe salvaguardarse el balance constitucional entre la utilidad pública o el interés social que motivan la expropiación, y el interés privado amparado a través de la indemnización. Para ello, debe cumplirse a cabalidad el procedimiento orientado a garantizar este balance"[40].

57.    De igual manera, la jurisprudencia constitucional sostiene que "la legislación colombiana ha previsto la posibilidad de la negociación directa del bien que se pretende adquirir y sólo cuando ésta fracasa autoriza el procedimiento de expropiación"[41]. La institución jurídica de la expropiación, entonces, se desenvuelve en tres etapas diferenciadas, a saber: (i) la oferta de compra, (ii) la negociación y (iii) el proceso expropiatorio propiamente dicho[42], las cuales se proyectan en una fase administrativa, en la que se expide el acto expropiatorio y la entidad expropiante persigue inicialmente un acuerdo con el afectado o, en su defecto, ordena expropiar. La expropiación judicial presupone el agotamiento de la fase administrativa, y en ella la autoridad jurisdiccional, con observancia plena de las garantías sustanciales y procesales, decreta la expropiación.

58.    La fase administrativa comienza cuando la entidad pública interesada en llevar a cabo la expropiación de un determinado bien expide acto administrativo que contiene la identificación precisa del mismo y la oferta de compra. En esta fase, la primera etapa consiste en que la Administración fija un precio base y le presenta la oferta al particular propietario del bien con el objetivo de persuadirlo de llegar a un consenso para la transferencia de la propiedad.

---

[39]  De conformidad con lo previsto en las Leyes 9ª de 1989, 1682 de 2013, 1742 de 2014 y el artículo 399 de la Ley 1564 de 2012.

[40]  Corte Constitucional, sentencia C-750 de 2015, reiterando la sentencia C-306 de 2013.

[41]  Corte Constitucional, sentencia C-306 de 2013.

[42]  Corte Constitucional, sentencias C-476 de 2007 y C-1074 de 2002.

59.    Sigue luego la etapa de negociación, que se denomina "enajenación voluntaria" en el proceso de expropiación judicial y "negociación directa" en la expropiación por vía administrativa[43], y como resultado de la concertación entre las partes es posible modificar el precio base señalado en la oferta. Esta etapa tendrá uno de dos desenlaces posibles: si prospera, se perfeccionará con la celebración de un contrato de compraventa enderezado a la tradición del bien al Estado y el pago del precio convenido, pero si no se consigue un acuerdo formal, proseguirá la etapa expropiatoria propiamente dicha.

60.    En esta última hipótesis, vencido el plazo establecido para concretar una negociación, la entidad dictará un nuevo acto administrativo motivado en el que ordenará la expropiación, con inclusión expresa de los siguientes elementos: (i) la identificación precisa del bien objeto de expropiación, (ii) el valor del precio indemnizatorio y la forma de pago, (iii) la destinación que se dará al bien expropiado, conforme a los motivos de utilidad pública o de interés social que se hayan invocado y las condiciones de urgencia que se hayan declarado, (iv) la orden de inscripción del acto administrativo, una vez ejecutoriado, en la correspondiente Oficina de Registro de Instrumentos Públicos, para los efectos de que se inscriba la transferencia del derecho de dominio de su titular a la entidad que haya dispuesto la expropiación, y (v) la orden de notificación a los titulares de derecho del dominio u otros derechos reales sobre el bien expropiado, con indicación de los recursos que legalmente procedan en vía gubernativa[44]. Si se trata de expropiación administrativa, una vez ejecutoriado este acto le corresponde al sujeto pasivo efectuar la entrega material del bien, al paso que la entidad adquirente deberá poner a disposición inmediata de aquel el valor del precio indemnizatorio.

61.    Es importante resaltar que contra el acto administrativo que decide la expropiación procede el medio de control de nulidad y restablecimiento del derecho ante la jurisdicción de lo contencioso administrativo, escenario en el

---

[43]  Corte Constitucional, sentencia C-476 de 2007, reiterando la sentencia C-1074 de 2002.

[44]  Artículo 68 de la Ley 388 de 1997.

cual se podrán controvertir tanto los fundamentos que sustentan la enajenación forzada como el precio indemnizatorio reconocido[45].

62.    La expropiación judicial se sujeta a las reglas del proceso declarativo especial regulado detalladamente en el artículo 399 del Código General del Proceso, y tiene lugar cuando ha fracasado el intento de negociación, por lo que la entidad procede a radicar demanda ante el juez civil luego de que ha quedado en firme el acto que ordena la expropiación[46]. La demanda deberá interponerse dentro de los tres meses siguientes a la fecha en la cual dicho acto ha adquirido firmeza[47] y se deberá dirigir contra los titulares de derechos reales principales sobre el bien a expropiar y, si estos se encuentran en litigio, también contra todas las partes del respectivo proceso, así como contra los tenedores cuyos contratos consten por escritura pública inscrita y contra los acreedores hipotecarios y prendarios que aparezcan en el certificado de registro[48].

63.    De acuerdo con el precepto normativo objeto de examen, de la mencionada demanda se correrá traslado al demandado por el término de tres días, sin que pueda proponer excepciones de ninguna clase. Lo anterior no obsta para que, en ejercicio de los poderes de que está investido, el juez adopte los correctivos que estime necesarios para subsanar los defectos formales de la demanda[49]. Con todo, el propietario demandado cuenta con la posibilidad de objetar el valor de la indemnización propuesto en la oferta de la entidad demandante, caso en el cual, so pena de rechazo, le corresponde la carga de aportar un dictamen pericial elaborado por el Instituto Geográfico Agustín Codazzi (IGAC) o por una lonja de propiedad raíz, del que se correrá traslado a la parte demandante[50].

---

[45]  Artículo 71 de la Ley 388 de 1997.

[46]  Corte Constitucional, sentencia C-1074 de 2002.

[47]  Numeral 2 del artículo 399 de la Ley 1564 de 2012.

[48]  Numeral 1 *ejusdem*.

[49]  Numeral 5 *ejusdem*.

[50]  Numeral 6 *ejusdem*.

64.    El juez debe convocar a audiencia una vez vencido el traslado de la demanda al demandado o del avalúo al demandante, según el caso. En dicha diligencia, luego de interrogar a los peritos autores de los avalúos, proferirá sentencia. Si decreta la expropiación, ordenará cancelar los gravámenes, embargos e inscripciones que recaigan sobre el bien y fijará el monto de la indemnización a favor del afectado[51]. Ejecutoriada la sentencia, la entidad deberá depositar a órdenes del juzgado el valor dispuesto por el juez[52], quien ordenará enseguida que se proceda a la entrega definitiva del bien a la demandante [53] y, tras el respectivo registro [54], el demandado recibirá la indemnización a que tiene derecho[55].

65.    Cabe anotar que, aunque la etapa previa de enajenación voluntaria no haya resultado exitosa, nada obsta para que en esta fase jurisdiccional se intente nuevamente llegar a un acuerdo entre entidad pública y propietario antes de que se dicte sentencia, caso en el cual el proceso terminará de manera anticipada[56].

66.    Es importante señalar, asimismo, que la entidad está facultada para promover el referido proceso civil aun cuando el acto administrativo por el que ordenó la expropiación sea controvertido mediante el respectivo medio de control ante la jurisdicción de lo contencioso administrativo. En tal evento, el juez que instruye el proceso civil deberá abstenerse de dictar sentencia antes

---

[51] Numeral 7 *ejusdem*.

[52] Numeral 8 *ejusdem*.

[53] Numeral 9 *ejusdem*.

[54] Numeral 10 *ejusdem*.

[55] Numeral 12 *ejusdem*.

[56] Corte Constitucional, sentencia C-1074 de 2002.

de que venza el término para que el juez administrativo se pronuncie[57], y es posible en todo caso plantear la prejudicialidad ante el juez civil[58].

67.    De modo pues que el proceso civil a que se alude se inserta dentro de la institución jurídica de la expropiación como una fase jurisdiccional en la cual, precedida de una etapa administrativa, lo que acontece, en suma, es que mediante decreto judicial se materializa como tal la decisión expropiatoria adoptada por la entidad pública competente y se otorga la respectiva indemnización al afectado. Resulta determinante enfatizar este objeto específico al que se contrae el proceso de expropiación, por cuanto da cuenta del propósito que tomó en consideración el Legislador a la hora de configurar el diseño procedimental de la operación expropiatoria. Sobre el particular, los tratadistas convergen en que la esencia de proceso judicial de expropiación no es otra más que hacer efectiva la orden de expropiar, imponiéndola al propietario, y asegurar a este último el pago de una justa indemnización[59].

---

[57]  Artículo 23 de la Ley 9 de 1989.

[58]  Numeral 1 del artículo 161 de la Ley 1564 de 2012.

[59]  Al respecto, los tratadistas de derecho procesal colombiano han señalado que, no obstante su naturaleza de proceso declarativo especial, el proceso de expropiación tiende a asemejarse más a un proceso ejecutivo que a uno declarativo. En ese sentido, Jaime Azula Camacho resalta que "el proceso de expropiación tradicionalmente ha sido incluido en nuestro ordenamiento procesal entre los declarativos, no obstante que su verdadera condición, como lo reconocen las legislaciones extranjeras, es la de un ejecutivo, porque se parte de un derecho cierto (el acto administrativo que la decreta) y porque persigue su satisfacción, esto es, el cumplimiento de esa decisión, que se realiza mediante el traspaso de la propiedad y la entrega del bien a la entidad de derecho público beneficiada." (AZULA CAMACHO, Jaime. *Manual de Derecho Procesal*, Tomo 3. Editorial Temis, Bogotá, p. 358). En similar sentido, Hernán Fabio López Blanco afirma que "[u]bicar la expropiación como un proceso declarativo, es desconocer la esencia del proceso de cognición, por medio del cual se procura, mediante una amplia actividad probatoria, establecer la existencia de un derecho cuya existencia se discute o es incierta, para que el juez lo declare; es decir, todo lo contrario de lo que sucede con la expropiación, que parte de la base de un derecho cierto y, lo más sobresaliente, indiscutible, tanto así que este proceso no admite excepciones de ninguna índole. Su esencia es ejecutar, hacer cumplir la orden de expropiación, por lo cual insisto en sostener éste es un proceso de ejecución y no de declaración." (LÓPEZ BLANCO, Hernán Fabio. *Código General del Proceso-Parte Especial*, Tomo 2. Editorial Dupré, Bogotá, 2017, p. 354). Ramiro Bejarano Guzmán, por su parte, sostiene que "el proceso de expropiación tiene por objeto forzar al particular a cumplir el acto administrativo por medio del cual se decretó la expropiación de un bien, mueble o inmueble, por motivos de utilidad pública o de interés social definidos por el legislador." (BEJARANO GUZMÁN, Ramiro. *Procesos declarativos, arbitrales y ejecutivos*. Editorial Temis, 8ª edición, Bogotá, 2018, p. 356).

68.    La finalidad puntual de este proceso se revela en el hecho de que, conforme al precepto bajo estudio, al afectado se le permite controvertir asuntos fundamentalmente relacionados con la indemnización. En efecto, las situaciones que regula la norma se dedican especialmente a ello, al disponer que (i) *cuando el demandado esté en desacuerdo con el avalúo o considere que hay lugar a indemnización por conceptos no incluidos en él o por un mayor valor*, deberá aportar un dictamen pericial elaborado por el Instituto Geográfico Agustín Codazzi (IGAC) o por una lonja de propiedad raíz, del cual se le correrá traslado al demandante por tres (3) días. Si no se presenta el avalúo, se rechazará de plano la objeción formulada. A su vez, (ii) cuando en el acto de la diligencia de entrega se oponga un tercero que alegue posesión material o derecho de retención sobre la cosa expropiada, la entrega se efectuará, pero el opositor podrá promover incidente para que se le reconozca su derecho y *se ordene un avalúo para establecer la indemnización que le corresponde*. Incluso, (iii) desde la presentación de la demanda, a solicitud de la entidad demandante, se puede decretar la entrega anticipada del bien, siempre que aquella consigne a órdenes del juzgado *el valor establecido en el avalúo aportado*.

69.    Recapitulando, la institución de la expropiación implica una limitación constitucionalmente admisible del derecho a la propiedad privada de quien ostenta la titularidad del dominio respecto de un bien determinado, que se justifica por el interés prevalente que se le reconoce al interés general frente al particular en el Estado Social de Derecho, por motivos de utilidad pública o de interés social definidos por el legislador. Pero, dado que tal limitación conlleva una afectación respecto de los derechos del propietario, la propia Carta previno que la actuación de las autoridades devenga en arbitrariedad sometiéndolas a estrictos linderos legales. En ese marco, el proceso declarativo especial de expropiación constituye una fase jurisdiccional en la cual, si no se ha logrado un acuerdo de negocio entre la Administración y el propietario, el acto administrativo que contiene la orden de expropiar, una vez en firme, se hace efectivo por virtud de decreto del juez civil, con la observancia plena de las garantías del debido proceso y asegurando en todo caso un justo resarcimiento al afectado.

### F.    La posibilidad de proponer excepciones como expresión del derecho a la contradicción

70.    El derecho de contradicción emana directamente de la cláusula de garantía del debido proceso prevista en el artículo 29 de la Constitución, en concordancia con el derecho que le asiste a toda persona, al tenor del artículo 8 de la Convención Americana sobre Derechos Humanos, a ser oída por la autoridad competente en aquellos procedimientos donde se determinen sus derechos y obligaciones.

71.    En armonía con estos preceptos, la doctrina procesal explica que "[e]l derecho de contradicción podemos entenderlo como aquel derecho abstracto que tiene el demandado a ser oído y gozar de la oportunidad de defenderse con la finalidad de obtener una sentencia que resuelva el conflicto de intereses. Como bien señala Devis Echandía[60], el principio del contradictorio resulta "la aplicación procesal del principio constitucional de que nadie puede ser juzgado sin ser oído en el juicio, ni condenado sin ser vencido, ya que por el solo hecho de ser demandado se sujeta al resultado de la sentencia que en el proceso llegue a dictarse"[61].

72.    De acuerdo con lo decantado en la jurisprudencia constitucional, el derecho de contradicción "se plantea desde la perspectiva de confrontación de los elementos sustantivos y procesales que afectan los derechos e intereses en el proceso. Por lo tanto, se ha precisado que esta garantía implica, entre otros: (i) el derecho de contradecir o debatir las pretensiones, que incluye la formulación de excepciones formales y sustanciales[62]; (ii) la posibilidad de oponer pruebas a las que se presentaron en su contra; (iii) participar efectivamente en la producción de la prueba solicitada por la contraparte, (iv)

---

[60]  DEVIS ECHANDÍA, Hernando. *Nociones Generales de Derecho Procesal*. Aguilar S.A., Madrid, 1966, p. 210.

[61]  CASSASA CASANOVA, Sergio. *Las excepciones en el proceso civil. Gaceta civil y procesal civil*, Lima, 2014, p. 17.

[62]  Sentencias C-939 de 2003 M.P. Clara Inés Vargas Hernández y C-641 de 2002 M.P. Rodrigo Escobar Gil.

exponer los argumentos en torno a los medios de prueba[63]; y (v) presentar recursos en contra de las decisiones desfavorables"[64].

73.    La proposición de excepciones se constituye, entonces, en una manifestación de *resistencia procesal*[65] en cabeza del extremo pasivo que materializa el derecho fundamental al debido proceso, en su dimensión de derecho a la contradicción, en los escenarios en que sus derechos e intereses son sometidos a debate. Mediante la postulación de estas resistencias procesales, el demandado puede intentar derruir los elementos básicos de la pretensión aportando la correspondiente fundamentación fáctica y jurídica de su ataque[66], o bien, puede denunciar la ausencia de los elementos estructurales del proceso judicial[67].

74.    A propósito de la institución de las excepciones, la función que desempeñan y las garantías inherentes a su formulación, la doctrina especializada es prolífica: "Couture[68] concebía a la excepción como 'el poder jurídico que se halla investido el demandado, que le habilita para oponerse a la acción promovida contra él'. Devis Echandía afirmaba que 'la excepción es una especial manera de ejercitar el derecho de contradicción o defensa en general que le corresponde a todo demandado, y que consiste en oponerse a la demanda para atacar las razones de la pretensión del demandante, mediante razones propias de hecho, que persigan destruirla o modificarla o aplazar sus

---

[63]  Sentencias C-029 de 2021 M.P. Gloria Stella Ortiz Delgado.

[64]  Corte Constitucional, sentencia C-284 de 2021.

[65]  La noción de *resistencia procesal* se vincula con la oposición a la pretensión procesal, la cual "está constituida por cualquier enfrentamiento a la reclamación procesal del actor. Quiere decir lo anterior que el enfrentamiento abarca todo tipo de resistencia por parte del sujeto pasivo de la pretensión procesal. Se define como: la declaración de voluntad por la que el sujeto pasivo de la pretensión procesal reclama al órgano jurisdiccional frente al sujeto activo de la misma la no actuación de la pretensión procesal invocada por este." (QUIROGA CUBILLOS, Héctor Enrique. *La pretensión procesal y su resistencia*. Ediciones Academia Colombiana de Jurisprudencia, Bogotá, 2005, p. 149).

[66]  *Ibid*. p. 177.

[67]  *Ibid*. p. 183

[68]  COUTURE, Eduardo. *Fundamentos del Derecho Procesal Civil*. 4ª edición, editorial IB de F, Montevideo, 2010, p. 73.

efectos'[69]. El italiano Rocco comenta que 'excepción es facultad procesal, comprendida en el Derecho de contradicción en el juicio, que corresponde al demandado, de pedir que los órganos jurisdiccionales declaren cierta existencia de un hecho jurídico que produce efecto jurídico relevante, frente a la acción ejercitada por el actor'[70]"[71].

75.    Igualmente, esta corporación ha resaltado que las excepciones "son manifestación del derecho de contradicción que tiene quien es llevado a estrados. Las [excepciones] previas son aquellas dirigidas a perfeccionar el proceso, mientras que las de mérito van encaminadas a negar el derecho que se reclama. Al respecto, la Corte Suprema de Justicia ha dicho que: 'si la excepción tiende a mejorar la forma o a demorar el trámite, perfeccionándolo, es dilatoria (…); y si la excepción tiende a desconocer el derecho reclamado, a enervar la acción o a obtener que se declare extinguida, es perentoria y ataca el fondo de lo planteado por el demandante'[72]"[73].

76.    Con la misma orientación, la Corte ha precisado que "[l]as excepciones previas son medidas de saneamiento en la etapa inicial de algunos procesos, por causa de vicios o defectos de los mismos, a cargo de la parte demandada, y tienen como finalidad mejorar aquellos o terminarlos cuando ello no es posible, y evitar así nulidades o sentencias inhibitorias (…). Se contraponen a las excepciones de fondo o de mérito, que se refieren al derecho sustancial, se dirigen contra las pretensiones de la demanda y por regla general se deciden en la sentencia"[74].

---

[69]  DEVIS ECHANDÍA, Hernando. *Teoría general del Proceso*. Tomo I, Ed. Universidad, Buenos Aires, 1984, p. 264.

[70]  ROCCO, Ugo. *Tratado de Derecho Procesal Civil*. Tomo I, traducido por Santiago Sentis Melendo y Marino Ayerra Redín, Ed. Temis y Depalma, Bogotá y Buenos Aires, 1976, p. 324.

[71]  CASSASA CASANOVA, Sergio. *Op. cit.*, p. 70.

[72]  Corte Suprema de Justicia, Sala de Casación Laboral, Auto de 10 de febrero de 1983, reiterado en sentencia del 20 de septiembre de 1985.

[73]  Corte Constitucional, sentencia C-551 de 2016.

[74]  Corte Constitucional, sentencia C-1237 de 2005.

77.    Ahora bien, no obstante la importancia que revisten estas oposiciones procesales para la parte demandada en un determinado litigio, en previas oportunidades este tribunal constitucional se ha visto abocado a examinar diferentes regulaciones procedimentales y ha encontrado que la eliminación de la etapa dedicada a la formulación de excepciones en el marco de diferentes procesos obedece a una decisión del Legislador, en ejercicio de su amplio margen de configuración normativa, encaminada a imprimirle mayor celeridad al trámite, y ha resaltado que introducir restricciones a dicha etapa no impide que el extremo pasivo pueda plantear ante el juez instructor los hechos constitutivos de posibles excepciones previas así como aportar las pruebas que considere pertinentes con el fin de que el funcionario los examine; vía por la cual, según ha subrayado la jurisprudencia, también se garantiza el derecho de contradicción, en la medida en que no se erradica por completo la posibilidad de alegación de tales argumentos de defensa por parte del demandado[75].

78.    A propósito del asunto que ocupa la atención de la Sala Plena, resulta pertinente traer a colación que, en pronunciamiento anterior, esta Corte analizó la efectividad del derecho de contradicción cuando, en el contexto de un proceso judicial promovido por una entidad pública en pro del interés general frente al interés particular, se le limita al demandado la posibilidad de proponer excepciones, pues se planteó que dicha restricción suponía una vulneración de los derechos constitucionales al debido proceso y al acceso a la administración de justicia[76].

79.    Pues bien: en aquella ocasión, esta corporación resaltó el especial carácter que revisten los procesos que imponen gravámenes a la propiedad privada a fin de permitir la ejecución de obras o proyectos relacionados con la protección del interés general, reiteró las reglas jurisprudenciales desarrolladas a partir de la interpretación del artículo 58 superior en materia de procesos de expropiación en torno al alcance del derecho a la propiedad y sus tensiones

---

[75]  Corte Constitucional, sentencias C-032 de 2006 y C-1193 de 2005, en similar sentido sentencia C-740 de 2003.

[76]  En esa ocasión se abordó el proceso de constitución de servidumbre pública de conducción de energía eléctrica.

con la protección del interés general, y recalcó que ante la declaratoria de utilidad pública "los propietarios o poseedores de los inmuebles afectados sólo podrán exigir a la administración que reconozca el valor de los intereses susceptibles de indemnización"[77]. En ese sentido, concluyó que, desde la perspectiva del afectado con la medida, la vulneración de los derechos fundamentales invocados sólo se podría predicar si el trámite judicial lo privara del acceso a la mencionada indemnización, lo cual no ocurría al impedírsele interponer excepciones. Esta restricción –recalcó la Corte– se enmarca dentro de la libertad de configuración del Legislador para definir procesos judiciales y obedece a la necesidad de viabilizar una decisión expedita en procura del interés general[78].

---

[77]  Corte Constitucional, sentencia C-831 de 2007.

[78]  Sobre el particular, dijo la Corte: "19. El límite temporal del término de traslado al demandado dentro del proceso imposición de servidumbre pública (Art. 27-3) no presenta dificultad constitucional alguna. En efecto, no existe una norma superior que imponga un plazo mínimo para que el demandado se oponga a las pretensiones de la entidad actora, razón por la cual la materia está contenida dentro del amplio margen de configuración normativa que tiene el legislador para definir los procesos judiciales. Adicionalmente, la fijación de un término breve de traslado al demandado responde a un fin constitucionalmente valioso, en tanto el proceso de constitución de servidumbre pública de conducción de energía tiene entre sus principales finalidades, como se ha insistido en esta sentencia, la protección del interés general, representado en la pronta ejecución de las obras necesarias para la adecuada prestación del servicio público.

20. Similares argumentos son predicables para el caso de la prohibición de excepciones dentro del proceso de constitución de servidumbre pública (Art. 27-5). Si se parte de afirmar que el interés del demandado se circunscribe a la obtención de una indemnización justa y las normas acusadas otorgan una instancia para discutir ese aspecto en específico, la prohibición de excepciones no configura una decisión legislativa irrazonable, en tanto responde a la limitación que la Carta Política impone al derecho a la propiedad privada, afectada con gravámenes derivados de la protección del interés general de los usuarios del servicio público de energía eléctrica. En ese sentido, el derecho de contradicción del propietario o poseedor del bien sirviente se circunscribe a la discusión acerca del monto de la compensación económica, excluyéndose otros asuntos. Por lo tanto, la prohibición en comento no sólo es compatible con la Constitución, sino que es un desarrollo de los mandatos superiores que imponen la función social de la propiedad y la adecuada prestación de los servicios públicos para todos los asociados.

Del mismo modo, debe tenerse en cuenta que la legislación en comento establece mecanismos concretos para que el juez del conocimiento pueda y deba ejercer, a través de las reglas fijadas por el Código Procedimiento Civil, norma supletoria para el proceso de constitución de servidumbres públicas de energía eléctrica, los controles procesales correspondientes. Estas medidas estarían dirigidas a acreditar las condiciones para proferir sentencia de fondo, entre ellas, la titularidad de la jurisdicción, la capacidad de las partes en el proceso y, en general, las demás causales constitutivas de excepciones previas dentro del procedimiento civil ordinario." Corte Constitucional, sentencia C-831 de 2007.

**G.    Análisis de constitucionalidad del numeral 5° del artículo 399 de la Ley 1564 de 2012**

80.    Con la panorámica que ofrecen las anteriores consideraciones, corresponde ahora a la Sala concentrarse en determinar si el enunciado "*No podrá proponer excepciones de ninguna clase*", contenido en el numeral 5° del artículo 399 de la Ley 1564 de 2012, desconoce los artículos 29 y 229 de la Constitución y, por tanto, lesiona los derechos al debido proceso y a la tutela judicial efectiva, al restringir la posibilidad de que la parte demandada dentro del proceso judicial de expropiación formule excepciones dentro del término de traslado de la demanda.

81.    Como primera medida, la Corte considera necesario reiterar en esta oportunidad que, de conformidad con la cláusula recogida en los numerales 1 y 2 del artículo 150 de la Carta Política, tratándose de la expedición de reglas de carácter procesal al Legislador le asiste una amplia libertad de configuración normativa.

82.    En ejercicio de esa competencia de expedir, reformar y derogar leyes y códigos, y a condición de que no traspase los límites que le traza el ordenamiento superior, esta corporación ha reconocido que el órgano legislativo está facultado, inclusive, para prescindir de etapas o recursos al momento de diseñar los procedimientos, como se aprecia que ocurre, para el caso bajo estudio, con la supresión de la etapa de proposición de excepciones por parte del extremo pasivo dentro del traslado de la demanda de expropiación.

83.    Ahora bien, a efectos de examinar si el Legislador desconoció los límites fijados por la Carta Política al establecer que el demandado dentro del proceso de expropiación no puede formular excepciones, tal como lo prescribe el artículo acusado, es menester que la Sala Plena tome en consideración los diferentes criterios de interpretación judicial de que dispone con el fin de desplegar un ejercicio hermenéutico razonable, ponderado y en consonancia con la función de salvaguarda de la supremacía e integridad de la Constitución que se le ha encomendado. Esto, sin perder de vista que las leyes objeto de

escrutinio por parte de esta corporación son la expresión del principio democrático, y que una incorrecta interpretación de las proposiciones legales sometidas a juicio –como la derivada de una lectura fragmentaria o aislada de los fines perseguidos por el Legislador– conlleva el riesgo de desnaturalizar el sentido y alcance de la norma demandada.

84.    En el asunto bajo estudio, la Corte encuentra que el precepto censurado debe ser analizado a la luz de los criterios teleológico y sistemático de interpretación: en efecto, para consultar si existe una justificación subyacente a la prohibición de proponer excepciones a que alude el numeral 5° del artículo 399 de la Ley 1564 de 2012, es preciso tomar en consideración el objeto y finalidad del proceso judicial de expropiación (criterio teleológico), en armonía con el conjunto de disposiciones del Código General del Proceso en que se inserta el citado artículo y con las demás reglas del ordenamiento jurídico que regulan la institución de la expropiación y cada una de sus diferentes etapas (criterio sistemático).

85.    Con esta aproximación a la norma cuestionada como punto de partida, es pertinente reiterar lo sentado por la jurisprudencia constitucional en cuanto a la finalidad social que persigue la institución jurídica de la expropiación. En ese marco, y de conformidad con lo consagrado en el artículo 58 superior, el proceso expropiatorio tiene un claro fundamento constitucional en el principio de prevalencia del interés público sobre el interés privado. Bajo esa lógica, resulta oportuno enfatizar que el objeto de este proceso se contrae puntualmente a (i) materializar la decisión estatal de expropiar adoptada por la Administración y (ii) asegurar una indemnización justa a quien resulta afectado con la transferencia del bien al Estado.

86.    Esta singular característica convierte al proceso de expropiación en un proceso especial cuyas particularidades lo distinguen de los demás procesos declarativos en materia civil, pues, no obstante la denominación que le asignó el Legislador de "proceso declarativo especial", es evidente que en él existe certidumbre sobre el derecho sustancial de que es titular la parte demandante y, por lo tanto, la controversia no gravita en torno al reconocimiento de esa prerrogativa, a diferencia de lo que ocurre con la generalidad de los litigios de naturaleza declarativa en los que dicho aspecto es el núcleo de la disputa. Tal perspectiva permite comprender, teniendo en cuenta la función que cumplen

las excepciones en la contienda procesal, por qué en este proceso especial no tiene caso formularlas, en la medida en que no tienen la potencialidad de repeler la pretensión procesal como sí sucede en los procesos declarativos ordinarios.

87.    Precisamente, en vista de que no hay controversia en relación con el derecho reclamado por la entidad expropiante, entonces, de manera correlativa, es estrecho el margen para que el demandado despliegue las actuaciones ordinarias de resistencia procesal que son habituales en el contexto de otros procesos. Y es que no se trata solamente del hecho de que en el centro del proceso se halla un derecho cierto, sin más, sino que la pretensión de la parte actora se afinca en la realización de objetivos ligados al interés general que la propia Constitución blinda, por lo que la pronta y eficaz resolución del asunto adquiere mayor connotación de cara a la consecución del bien común y al efectivo cumplimiento de los fines esenciales del Estado consistentes en servir a la comunidad y promover la prosperidad general, como lo pregona el artículo 2 constitucional.

88.    Ahora bien, lo anterior no significa que en nombre del interés general se convaliden abusos y atropellos por parte de la Administración, pues algo semejante sería inaceptable en un Estado Social de Derecho. Por el contrario, con el ánimo de proteger al sujeto pasivo de la expropiación, el propio ordenamiento jurídico prevé reglas para que la operación se desarrolle dentro de un marco de garantías y salvaguardas a lo largo de una secuencia de etapas, y con la oportuna intervención de las tres ramas del poder público, en orden a prevenir cualquier actuación arbitraria. De hecho, es del resorte exclusivo del Legislador definir los motivos de utilidad pública o de interés social, y mientras quien ordena la expropiación vía acto administrativo es la entidad de la Administración, a la autoridad judicial le corresponde controlar que se respete el debido proceso y demás derechos de las partes e intervinientes, siendo el proceso civil el mecanismo a través del cual se concreta la expropiación mediante sentencia judicial e indemnización previa.

89.    Como se destacó en las consideraciones de esta providencia, la institución de la expropiación está estructurada a partir de diferentes etapas que comprenden la expedición del acto administrativo que identifica el bien a expropiar y declara los motivos de utilidad pública o de interés social, la oferta

de compra por parte de la entidad pública al propietario, la negociación entre ambas partes con el objetivo de llegar a una concertación que viabilice la adquisición estatal del bien, y el proceso expropiatorio propiamente dicho en los eventos en que no se consiga lograr un acuerdo de voluntades. Dentro de todas estas etapas que se concatenan, las cuales están revestidas de una serie de garantías sustantivas y procesales en cuya virtud pueden ser ampliamente escuchados los propietarios afectados, el proceso civil de que trata el artículo 399 de la Ley 1564 de 2012 es apenas la fase final en que se ejecuta por decreto judicial el acto administrativo que ha adquirido firmeza.

90.    Así, desde una mirada comprehensiva de las diferentes normas que regulan en conjunto la figura de la expropiación, es posible evidenciar que el ordenamiento jurídico contempla diversos mecanismos en las etapas previas a la fase jurisdiccional, recogida en el proceso declarativo especial de expropiación que se rige por el Código General del Proceso, que permiten al afectado rebatir de manera eficaz y oportuna las determinaciones de la Administración en torno a la expropiación, así se le restrinja la posibilidad de proponer excepciones ulteriormente.

91.    En efecto, desde que se emite el primer acto administrativo enderezado a expropiar el bien, el propietario es vinculado al trámite y se propicia su participación activa a lo largo del mismo, aunado a que cuenta con la posibilidad de controvertir las decisiones adoptadas por la entidad pública mediante de la interposición de recursos y medios de control ante los jueces administrativos a fin de redargüir tanto los fundamentos que sustentan la enajenación forzada como el monto indemnizatorio. Inclusive, existe la posibilidad de suspender el proceso jurisdiccional expropiatorio a cargo del juez civil, por prejudicialidad, cuando se cuestione, ante la jurisdicción de lo contencioso administrativo, el acto administrativo que ordena la expropiación.

92.    En adición a lo anterior, la Sala estima relevante subrayar que dentro del régimen adjetivo en el que se inserta la norma acusada, el Legislador previó otras medidas que refuerzan el derecho de contradicción de que es

titular el demandado, aun cuando se le haya impedido la opción de ejercer resistencia procesal a través de la formulación de excepciones.

93.    En ese sentido, el mismo numeral objeto de censura establece que "[e]n todo caso el juez adoptará los correctivos necesarios para subsanar los defectos formales de la demanda"[79], lo cual habilita al funcionario judicial para que, de conformidad con los amplios poderes de que está investido, asuma un rol activo en la adopción de las medidas o eventuales correctivos que resulten necesarios para que los derechos de las partes e intervinientes, y especialmente los del afectado, sean efectivos y no sufran mengua alguna. En este punto, valga señalar que, como ya lo ha reconocido la jurisprudencia constitucional, la prescindencia de la etapa de proposición de excepciones no excluye la posibilidad de que el demandado plantee los argumentos defensivos que considere pertinentes (entre ellos, los hechos y pruebas que den cuenta de la posible configuración de una excepción previa) con el propósito de que el juez instructor los examine y, de ser el caso, se pronuncie de oficio al respecto.

94.    Asimismo, el numeral 6° del artículo 399 del Código General del Proceso le brinda al demandado otro escenario para desplegar su derecho a la contradicción cuando esté en desacuerdo con el avalúo o considere que hay lugar a indemnización por conceptos no incluidos en él o por un mayor valor. Este es un espacio propicio para que el afectado con la expropiación ponga de presente inclusive eventuales daños inmateriales que, en su criterio, debieran ser estimados dentro del proceso, con miras a que el juez determine si el resarcimiento económico por parte de la entidad pública debe contemplar también la indemnización por el posible perjuicio inmaterial que se le genere[80].

---

[79]  Numeral 5° del artículo 399 de la Ley 1564 de 2012.

[80]  Si bien el artículo 58 de la Carta señala que la indemnización previa se fijará consultando los intereses de la comunidad y del afectado, es pertinente tener en cuenta que dentro de cualquier proceso que se surta ante la Administración de Justicia, la valoración de daños irrogados a las personas y a las cosas, atenderá los principios de reparación integral y equidad y observará los criterios técnicos actuariales (artículo 16, Ley 446 de 1998).

95.    Al respecto, es pertinente tomar en cuenta que, de acuerdo con la doctrina sobre obligaciones civiles, es preciso "distinguir entre el interés del acreedor, de ordinario patrimonial, pero que bien puede ser espiritual, afectivo, recreacional, etc., […] y la prestación, que así excepcionalmente no sea patrimonial, de todas maneras ha de ser apreciable en dinero, pues de otra forma no podría hacerse efectiva la responsabilidad, en últimas siempre pecuniaria. Los ejemplos de la obligación de reparar la ofensa a un bien de la personalidad, en forma específica o mediante un sucedáneo, son dicientes: el interés del acreedor no es, ciertamente, pecuniario, pero la prestación, aun cuando no muestre esa calidad, sí es apreciable en dinero, de modo que ante la renuncia del deudor a ejecutarla, podrá el acreedor pretender que un tercero lo realice, a expensas del deudor, o sin más, demandarlo por el equivalente pecuniario"[81]. Así pues, sea cual fuere la naturaleza del daño que le ocasiona la expropiación del bien, el propietario cuenta con la posibilidad de alegarlo en este estadio procesal con miras a que la indemnización que ha de recibir sea justa.

96.    De esta forma, entonces, se le proporciona al extremo pasivo la oportunidad de discutir en torno al monto y los conceptos que ha de comprender la justa indemnización a que tiene derecho y, por esa vía, se le garantiza la posibilidad de ejercer resistencia procesal en aquello que sí es susceptible de debate en el marco de este particular proceso declarativo en el que, se insiste, la certeza del derecho en cabeza la demandante hace que la pretensión expropiatoria esté a salvo de cualquier ataque.

97.    A similares conclusiones arribó en el pasado la Corte Suprema de Justicia, en sede de control de constitucionalidad, cuando en sentencia del 27 de junio de 1978 analizó si los artículos 453, 454 y 457 del entonces Código de Procedimiento Civil vulneraban la igualdad y el debido proceso, al prescribir que en el proceso de expropiación judicial por motivos de utilidad pública no eran admisibles excepciones de ninguna clase. Luego de constatar

---

[81]  *Cfr.* OSPINA FERNÁNDEZ, Guillermo. *Régimen General de las Obligaciones*. Editorial Temis, Bogotá, 2018 (p.91).

que la misma regulación examinada imponía al juez instructor el deber de pronunciarse de oficio sobre las circunstancias constitutivas de excepciones previas y de abstenerse de resolver la expropiación en caso de encontrar configurada alguna de ellas, el alto tribunal sostuvo que "la actuación oficiosa y obligatoria que la ley impone al juez suple cabalmente la defensa del interés privado a la vez que permite hacer efectivo el interés social o la razón de utilidad pública que justifica la expropiación y que debe prevalecer, en los términos del artículo 30 de la Constitución". Agregó, además, que "las excepciones no son el único medio de defensa de que disponen los particulares para la protección de sus derechos y que, en el presente caso, esa garantía está constituida precisamente por el juicio de expropiación, dentro del cual hay amplia y equitativa controversia entre la administración y la persona afectada por la expropiación. En dicho proceso se determina, y ese es uno de sus objetivos, el monto de la indemnización que debe pagarse y en ese aspecto no hay restricción alguna del derecho de defensa, ni el Estado tiene una situación de parte privilegiada, pues la ley lo coloca en igualdad de situación que al expropiado. Y el pago de tal indemnización no es otra cosa que la garantía del derecho afectado, porque es la compensación legal del perjuicio sufrido". Consideró, por lo tanto, que las normas cuestionadas no eran inconstitucionales.

98.     Por lo demás, esta Corte estima que en el asunto bajo estudio resulta oportuno reiterar lo consignado en la sentencia C-831 de 2007 en cuanto a que en esta clase de procesos "[s]i se parte de afirmar que el interés del demandado se circunscribe a la obtención de una indemnización justa y las normas acusadas otorgan una instancia para discutir ese aspecto en específico, la prohibición de excepciones no configura una decisión legislativa irrazonable, en tanto responde a la limitación que la Carta Política impone al derecho a la propiedad privada, afectada con gravámenes derivados de la protección del interés general"[82]. En ese orden de ideas, tal como se dijo entonces y se ratifica ahora, la restricción a la formulación de excepciones por parte del demandado se sitúa dentro de la libertad de configuración normativa de que goza el Legislador en materia procesal y, en desarrollo de los

---

[82] Corte Constitucional, sentencia C-831 de 2007.

principios de celeridad y eficacia, atiende a la necesidad de viabilizar una decisión expedita en pro del bien común.

99.    Pues bien: en criterio de esta Sala, las razones expuestas en precedencia bastan para concluir que, si bien es cierto que el numeral 5° del artículo 399 de la Ley 1564 de 2012 restringe la posibilidad de que el demandado dentro del proceso judicial de expropiación proponga excepciones, ello no conlleva una vulneración de los derechos al debido proceso y al acceso a la administración de justicia, toda vez que (i) el afectado tiene a su disposición distintas herramientas jurídicas idóneas para hacer valer sus intereses y ejercer la contradicción y la defensa desde la etapa prejudicial, a lo largo de todo el trámite y hasta su culminación; (ii) el juez instructor del proceso está revestido de amplios poderes que le permiten adoptar las medidas o eventuales correctivos que sean necesarios en orden a hacer efectivos los derechos de las partes e intervinientes; y, en todo caso, (iii) de acuerdo con la configuración legal del proceso judicial de expropiación, dicha instancia procesal civil no es el escenario para discutir en lo sustancial la pretensión de la entidad demandante, en tanto allí lo que se hace es ejecutar el acto administrativo que ordena la expropiación, acto que puede controvertirse ante la jurisdicción de lo contencioso administrativo; la esencia del proceso judicial de expropiación es determinar cuál es el monto y los conceptos que ha de comprender la justa indemnización a favor del demandado, en los términos del numeral 6° del artículo 399 del Código General del Proceso.

100.   En vista de lo anterior, la Sala concluye que con dicha limitación para proponer excepciones en el marco del proceso de expropiación el Legislador (i) no ha modificado ninguna regla procesal prescrita en la Constitución, (ii) se respetan los principios y fines esenciales del Estado orientados al bienestar general; (iii) se aprecia como una medida razonable y proporcional, teniendo en cuenta que (iv) garantiza un debido proceso atendiendo a la finalidad específica del proceso de expropiación y su alcance.

101.   Como consecuencia de lo anterior, la Corte declarará la exequibilidad del enunciado "*No podrá proponer excepciones de ninguna clase*", contenido

en el numeral 5° del artículo 399 de la Ley 1564 de 2012, "[p]or medio de la cual se expide el Código General del Proceso y se dictan otras disposiciones".

## H.    Síntesis de la decisión

102.  La Sala Plena de la Corte Constitucional estudió una demanda de inconstitucionalidad contra el enunciado "*No podrá proponer excepciones de ninguna clase*", contenido en el numeral 5 del artículo 399 de la Ley 1564 de 2012, "[p]or medio de la cual se expide el Código General del Proceso y se dictan otras disposiciones", en virtud del cual la parte demandada dentro del proceso judicial de expropiación no puede formular excepciones dentro del término de traslado de la demanda.

103.  Los promotores de la acción alegaron que la citada disposición vulneraba los derechos al debido proceso y a la tutela judicial efectiva, consagrados respectivamente en los artículos 29 y 229 de la Constitución, pues, en su opinión, las personas afectadas en su propiedad privada como consecuencia de la decisión de expropiar de la administración se ven impedidas para ejercer adecuadamente las garantías de defensa y contradicción frente a las actuaciones de las entidades públicas. Afirmaron que, si bien la misma norma le reconoce al juez la facultad de adoptar las medidas necesarias para subsanar los defectos formales de la demanda, tal oficiosidad no subsana la lesión que se ocasiona sobre el derecho de que es titular el demandado a defender sus propios intereses. Adicionalmente, manifestaron que la restricción en cuestión desconoce que en el proceso a que se alude no sólo están de por medio el interés general y la compensación económica de un derecho real, sino también el significado moral del bien y los eventuales perjuicios inmateriales derivados de la expropiación.

104.  Como medida preliminar, y en atención a la solicitud de inhibición planteada por algunos intervinientes que consideraron que la acusación no cumplía la carga argumentativa mínima, la Sala verificó los requisitos de aptitud sustantiva de la demanda y los encontró satisfechos.

105.  Al emprender el examen de mérito, la Sala Plena reiteró, en primer lugar, que el Legislador goza de una amplia libertad de configuración normativa en materia de regulación procesal, y que en el ejercicio de esa

competencia de diseñar los distintos procedimientos y definir las formas propias de cada juicio el Congreso de la República puede, inclusive, suprimir etapas o recursos, siempre y cuando al realizar dicha tarea observe los límites que le impone la Constitución.

106.  Asimismo, subrayó que el texto legal acusado debía ser interpretado teleológicamente, teniendo en cuenta el objeto y finalidad del proceso judicial de expropiación, y sistemáticamente, en armonía con el conjunto de disposiciones que integran el artículo 399 del Código General del Proceso y con las demás reglas del ordenamiento jurídico que regulan la institución de la expropiación y sus diferentes etapas, puesto que una lectura fragmentaria o aislada de los fines perseguidos por el Legislador conlleva el riesgo de desnaturalizar el sentido y alcance de la norma demandada.

107.  A partir de esa aproximación hermenéutica, la Sala resaltó que el proceso judicial de expropiación tiene fundamento constitucional en el principio de prevalencia del interés público o social sobre el interés privado, al tenor del artículo 58 superior, y se caracteriza por ser un proceso judicial especial con ciertas particularidades que lo distinguen de los demás procesos declarativos en materia civil, pues su objeto consiste en materializar la decisión estatal de expropiar adoptada por la administración y asegurar una indemnización justa a quien resulta afectado con la transferencia del bien al Estado. Todo ello en un marco de garantías y salvaguardas a lo largo de una secuencia de etapas, y con la oportuna intervención de las tres ramas del poder público, en orden a prevenir cualquier actuación arbitraria. De hecho, los motivos de utilidad pública o de interés social son definidos por el Legislador, la entidad estatal que es parte de la administración ordena la expropiación vía acto administrativo y el proceso civil es el mecanismo a través del cual hay expropiación mediante sentencia judicial e indemnización previa.

108.  Tras verificar la manera como está estructurado el proceso de expropiación, dentro del cual el proceso judicial civil de que trata el artículo 399 del Código General del Proceso es apenas la fase de ejecución del acto administrativo, la Sala evidenció que el ordenamiento jurídico contempla diversos mecanismos en las etapas previas a la jurisdiccional a que se alude, que permiten al afectado rebatir de manera eficaz y oportuna las determinaciones de la administración en torno a la expropiación. Incluso,

existe la posibilidad de suspender el proceso jurisdiccional expropiatorio, por prejudicialidad, cuando se cuestione el acto administrativo que ordena la expropiación ante la jurisdicción de lo contencioso administrativo.

109.  En vista de lo anterior, la Corte concluyó que, si bien la disposición acusada introduce una limitación en relación con la actuación del extremo pasivo dentro del proceso judicial de expropiación, al restringir la posibilidad de que proponga excepciones, ello no conlleva una vulneración de los derechos al debido proceso y al acceso a la administración de justicia, toda vez que (i) el afectado tiene a su disposición distintas herramientas jurídicas idóneas para hacer valer sus intereses y ejercer la contradicción y la defensa desde la etapa prejudicial, a lo largo de todo el trámite y hasta su culminación; (ii) el juez instructor del proceso está revestido de amplios poderes que le permiten adoptar las medidas o eventuales correctivos que sean necesarios en orden a hacer efectivos los derechos de las partes e intervinientes; y, en todo caso, (iii) de acuerdo con la configuración del proceso de expropiación, dicha instancia judicial no es el escenario para discutir en lo sustancial la pretensión de la entidad demandante, en tanto allí lo que se hace es ejecutar el acto administrativo que ordena la expropiación y cuya esencia es determinar cuál es el monto y los conceptos que ha de comprender la justa indemnización a favor del demandado, en los términos del numeral 6 del artículo 399 del Código General del Proceso.

110.  Como consecuencia de lo anterior, la Sala Plena determinó que el enunciado normativo censurado debe ser declarado exequible.

## III.  DECISIÓN

La Corte Constitucional de la República de Colombia, administrando justicia en nombre del pueblo y por mandato de la Constitución,

### RESUELVE:

Declarar **EXEQUIBLE** el enunciado "*No podrá proponer excepciones de ninguna clase*", contenido en el numeral 5° del artículo 399 de la Ley 1564 de 2012, "Por medio de la cual se expide el Código General del Proceso y se dictan otras disposiciones".

Notifíquese, comuníquese y cúmplase.


DIANA FAJARDO RIVERA
Presidenta



NATALIA ÁNGEL CABO
Magistrada



JUAN CARLOS CORTÉS GONZÁLEZ
Magistrado



JORGE ENRIQUE IBÁÑEZ NAJAR
Magistrado
Con salvamento de voto



ALEJANDRO LINARES CANTILLO
Magistrado



ANTONIO JOSÉ LIZARAZO OCAMPO
Magistrado



PAOLA ANDREA MENESES MOSQUERA
Magistrada

CRISTINA PARDO SCHLESINGER
Magistrada
Con impedimento aceptado

JOSE FERNANDO REYES CUARTAS
Magistrado

ANDREA LILIANA ROMERO LOPEZ
Secretaria General

**SALVAMENTO DE VOTO DEL MAGISTRADO**

**JORGE ENRIQUE IBÁÑEZ NAJAR**

**A LA SENTENCIA C-474/23**

**(Expediente D-15.223)**

**1.** En la **Sentencia C-474 de 2023**, mayoritariamente, la Corte Constitucional decidió declarar la exequibilidad del enunciado "*[n]o podrá proponer excepciones de ninguna clase*", contenido en el numeral 5° del artículo 399 (parcial) del Código General del Proceso. Para sustentar su decisión, la mayoría consideró que el Legislador cuenta con una amplia libertad de configuración normativa en materia de regulación procesal que le permite diseñar los distintos procedimientos y las formas propias de cada juicio.

Incluso, puede suprimir etapas o recursos, siempre y cuando observe los límites impuestos por la Constitución.

**2.** Luego, advirtió que la disposición acusada debía interpretarse teleológicamente en atención al objeto y finalidad del proceso judicial de expropiación. Desde esa perspectiva, indicó que el proceso judicial de expropiación tiene sustento en la prevalencia del interés público o social sobre el privado y cuenta con ciertas particularidades que lo diferencian de los demás procesos declarativos en materia civil. Aquel pretende materializar la decisión de la administración de expropiar determinado predio y garantizar la correspondiente indemnización justa al afectado, con el agotamiento de una serie de etapas procesales destinadas a prevenir cualquier actuación arbitraria. Para la mayoría, eso significa que *"en él existe certidumbre sobre el derecho sustancial de que es titular la parte demandante y, por lo tanto, la controversia no gravita en torno al reconocimiento de esa prerrogativa, a diferencia de lo que ocurre con la generalidad de los litigios de naturaleza declarativa en los que dicho aspecto es el núcleo de la disputa"*. En consecuencia, la parte demandada no puede oponerse a la pretensión procesal y, por tanto, la formulación de excepciones carece de sentido.

**3.** En esa misma línea, la Corte aseguró que la etapa judicial del proceso es *"a penas la fase de ejecución del acto administrativo"* y las personas afectadas cuentan con otro tipo de herramientas para hacer valer sus intereses hasta el final de la actuación. En concreto, pueden: *(i)* cuestionar el acto administrativo de expropiación ante la autoridad que lo profirió; *(ii)* debatir el monto de la indemnización con un avalúo presentado por el Instituto Geográfico Agustín Codazzi; o, *(iii)* incluso, someter la decisión de la administración al control de los jueces de lo contencioso administrativo, caso en el cual pueden solicitar la suspensión del proceso por prejudicialidad. Además, resaltó que los jueces que conocen de ese tipo de procesos están facultados para adoptar las medidas correctivas que consideren oportunas para para hacer efectivos los derechos de las partes. Finalmente, afirmó que ese proceso judicial *"no es el escenario para discutir en lo sustancial la pretensión de la entidad demandante, en tanto allí lo que se hace es ejecutar el acto administrativo que ordena la expropiación y cuya esencia es determinar cuál es el monto y los conceptos que ha de comprender la justa indemnización a favor del demandado, en los términos del numeral 6 del artículo 399 del Código General del Proceso"*. De manera que, la norma no desconoce los derechos fundamentales al debido proceso y de acceso a la administración de justicia.

**4.** Con el acostumbrado respeto por las decisiones de la Honorable Corte Constitucional, a la cual honrosamente pertenezco, me aparto de la Sentencia mayoritaria por las razones que expondré a continuación. Primero, la certeza del derecho sustancial de la administración de expropiar por motivos de utilidad pública o de interés social, de ninguna manera implica que la pretensión principal de la demanda sea indiscutible, como lo asegura la providencia judicial cuestionada. De hecho, el artículo 58 de la Constitución es claro en advertir que la expropiación judicial solo puede darse como consecuencia de un proceso que termine con una sentencia y el Legislador estableció que ese debate debía adelantarse a través de un proceso declarativo especial, más no de un ejecutivo. Por esa razón, contrario a lo establecido en la providencia, el proceso declarativo especial de expropiación es el escenario procesal dispuesto por el ordenamiento jurídico para discutir la pretensión de la demanda, motivo por el cual los demandados deben contar con herramientas procesales idóneas para ejercer sus garantías de audiencia, defensa y contradicción.

**5.** Segundo, el propósito del proceso declarativo especial de expropiación no corresponde a la simple ejecución del acto administrativo de expropiación. Por el contrario, este trámite judicial tiene por objeto garantizar que el derecho de propiedad de los ciudadanos solo resulte afectado con ocasión de una decisión judicial que haya verificado que la administración ejerció su facultad de expropiación en debida forma y con el pleno de las garantías constitucionales. En todo caso, si en gracia de discusión se admitiera que ese trámite judicial es equiparable a un proceso ejecutivo, lo cierto es que, incluso, en ese escenario las partes deben contar con mecanismos procesales idóneos para debatir las pretensiones de la demanda, tales como la formulación de excepciones.

**6.** Tercero, contrario a la postura de la mayoría, considero que ni el agotamiento de la vía gubernativa, ni los controles oficiosos del juez que conoce del trámite, ni la posibilidad de objetar la indemnización, ni el medio de control de nulidad y restablecimiento del derecho, pueden ser considerados como herramientas procesales idóneas para el ejercicio del derecho de defensa de los afectados. Y, cuarto, la sentencia no aplicó la metodología establecida por la jurisprudencia para el control de constitucionalidad de estas normas. En vez de aplicar el test de proporcionalidad en su intensidad intermedia, como lo ha dispuesto de forma reiterada esta Corporación, realizó una serie de

consideraciones aisladas sobre otros mecanismos procesales, sin detenerse a valorar la idoneidad y la proporcionalidad de esas medidas. A continuación, procedo a explicar de forma puntual los argumentos esbozados.

**El proceso declarativo especial es el escenario judicial idóneo para discutir la pretensión sustancial de expropiación**

**7.** Ciertamente, el artículo 58 Superior dispone que *"[p]or motivos de utilidad pública o de interés social definidos por el legislador, podrá haber expropiación mediante sentencia judicial e indemnización previa. Esta se fijará consultando los intereses de la comunidad y del afectado. En los casos que determine el legislador, dicha expropiación podrá adelantarse por vía administrativa, sujeta a posterior acción contenciosa - administrativa, incluso respecto del precio"*. Ello significa que existe certeza de que la administración está facultada para adelantar los trámites administrativos o judiciales que correspondan para expropiar determinado bien, por motivos de utilidad pública o de interés social, motivo por el cual esa potestad es indiscutible. Sin embargo, de ninguna manera implica que la pretensión expropiatoria concreta de la administración sobre un bien resulte cierta e indiscutible *per se*. Todo lo contrario, de hecho, la Constitución es clara en advertir que la expropiación solo aplica cuando existe tensión entre el derecho a la propiedad y el interés público y social; y, está sometida a un proceso judicial. Es más, estableció dos mecanismos de control judicial, cuya aplicación depende de la actuación que pretenda desplegar la administración para materializar su fin expropiatorio. Para que ese control judicial sea efectivo, es necesario que los jueces competentes aborden los debates sobre la pretensión expropiatoria de la administración y que las partes cuenten con las garantías suficientes para discutir si existe un conflicto entre el derecho de propiedad del demandado y los intereses públicos o sociales y si, en caso de existir, la expropiación es el medio adecuado para resolverse la situación. Por tanto, no comparto la apreciación de la mayoría frente al alcance del proceso declarativo especial de expropiación.

**8.** Para desarrollar en detalle este asunto, me referiré *(i)* al ámbito de protección del derecho fundamental a la propiedad privada; *(ii)* a la tensión que puede suscitarse entre esa garantía constitucional y el interés público o social; y, *(iii)* a los mecanismos establecidos por el ordenamiento jurídico para resolver esa tensión, entre ellos, la declaratoria de utilidad pública para la

adquisición de un bien por parte del Estado. A partir de esos elementos, *(iv)* concluiré que, al someter el trámite de expropiación a una sentencia judicial, la Constitución previó un verdadero control judicial para este tipo de actuaciones y no un simple *"aval"* de la actuación desplegada por la administración.

### (i) Derecho fundamental a la propiedad privada

**9.** La propiedad privada es un derecho fundamental *"que faculta a su titular a usar, gozar, explotar y disponer de sus bienes y que lo protege de interferencias injustificadas por parte del Estado y terceros".*[83] Aquel está amparado por varias normas del bloque de constitucionalidad, entre ellas, los artículos 58 de la Constitución,[84] 17 de la Declaración Universal de Derechos Humanos[85] y 21 de la Convención Americana de Derechos Humanos.[86] A partir de esas disposiciones, la jurisprudencia ha establecido que esa garantía constituye un mecanismo para alcanzar la realización personal y familiar. Asimismo, ha advertido que es un medio para obtener la satisfacción de intereses comunitarios. Por lo tanto, constituye un pilar fundamental del Estado Social de Derecho.[87]

---

[83] Corte Constitucional, Sentencia C-020 de 2023. Esta providencia, a su vez, reiteró las Sentencias C-750 de 2015, C-269 de 2021 y C-284 de 2021.

[84] Constitución Política de Colombia. Artículo 58. *"Se garantizan la propiedad privada y los demás derechos adquiridos con arreglo a las leyes civiles, los cuales no pueden ser desconocidos ni vulnerados por leyes posteriores. Cuando de la aplicación de una ley expedida por motivos de utilidad pública o interés social, resultaren en conflicto los derechos de los particulares con la necesidad por ella reconocida, el interés privado deberá ceder al interés público o social. // La propiedad es una función social que implica obligaciones. Como tal, le es inherente una función ecológica. // El Estado protegerá y promoverá las formas asociativas y solidarias de propiedad. // Por motivos de utilidad pública o de interés social definidos por el legislador, podrá haber expropiación mediante sentencia judicial e indemnización previa. Esta se fijará consultando los intereses de la comunidad y del afectado. En los casos que determine el legislador, dicha expropiación podrá adelantarse por vía administrativa, sujeta a posterior acción contenciosa - administrativa, incluso respecto del precio".*

[85] Declaración Universal de los Derechos Humanos. *"1. Toda persona tiene derecho a la propiedad, individual y colectivamente. // 2. Nadie será privado arbitrariamente de su propiedad".*

[86] Convención Americana de Derechos Humanos. Artículo 21. *"1. Toda persona tiene derecho al uso y goce de sus bienes.  La ley puede subordinar tal uso y goce al interés social. // 2. Ninguna persona puede ser privada de sus bienes, excepto mediante el pago de indemnización justa, por razones de utilidad pública o de interés social y en los casos y según las formas establecidas por la ley. // 3. Tanto la usura como cualquier otra forma de explotación del hombre por el hombre, deben ser prohibidas por la ley".*

[87] *Cfr.,* Corte Constitucional, Sentencias C-192 de 2016, C-284 de 2021 y C-020 de 2023.

**10.** En cuanto a su ámbito de protección, esta Corporación ha señalado que la propiedad comprende los atributos de uso, goce y disposición de los bienes, es decir, de todas las cosas que son apropiables, tales como los objetos materiales o inmateriales susceptibles de valor.[88] Sobre estas prerrogativas, ha precisado que el uso (*ius utendi*) refiere a la facultad que tiene el propietario de disfrutar la cosa. Por su parte, el goce (*ius fruendi*) tiene que ver con la posibilidad de recoger el producto de la explotación del bien. Y, finalmente, la disposición (*ius abutendi*) garantiza que el dueño del objeto apropiado pueda enajenarlo cuando así lo disponga.[89]

**11.** Respecto de sus características esenciales, ha identificado que esta garantía *iusfundamental (a)* es un derecho real[90] de carácter pleno, porque le otorga a su titular una serie de atribuciones amplias que puede ejercer dentro de los límites previstos por el ordenamiento jurídico.[91] Además, *(b)* corresponde a un derecho exclusivo, es decir, a una garantía que permite al propietario oponerse a la intromisión indebida de terceros o del Estado en su ejercicio.[92] También, *(c)* tiene una duración perpetua ligada a la existencia del bien que incorpora el dominio, la cual no se extingue ante la falta de uso.[93] De igual forma, *(d)* se ejerce autónomamente, porque su existencia no depende de otro derecho principal. Y, finalmente, *(e)* es, *prima facie*, irrevocable en la medida en que su disposición generalmente depende del titular, más no de causas ajenas.[94]

**12.** Con todo, la jurisprudencia ha sido enfática en señalar que el derecho a la propiedad privada no es absoluto, sino relativo. En esa medida, debe ceder ante el interés público o social, tal y como se expone a continuación.

---

[88] *Cfr.,* Corte Constitucional, Sentencias C-364 de 2012, C-410 de 2015 y C-020 de 2023.

[89] *Cfr.,* Corte Constitucional, Sentencias C-189 de 2006, C-133 de 2009 y T-585 de 2019.

[90] *Cfr.,* Corte Constitucional, Sentencia C-020 de 2023.

[91] *Cfr.,* Corte Constitucional, Sentencias C-189 de 2006, C-133 de 2009, T-575 de 2011, T-837 de 2012, C-278 de 2014, C-410 de 2015, C-750 de 2015 y C-035 de 2016.

[92] *Cfr.,* Corte Constitucional, Sentencia C-020 de 2023.

[93] *Ibidem.*

[94] *Ibidem.*

### (ii) La tensión entre la propiedad privada y el interés público o social. El carácter relativo del derecho a la propiedad privada

**13.** Inicialmente, el ordenamiento constitucional colombiano privilegiaba una concepción individualista de la propiedad privada, en virtud de la cual, ese derecho solo podía limitarse en escenarios de guerra o de calamidad públicas. [95] En línea con esa concepción, el artículo 669 del Código Civil establecía que la propiedad correspondía a un derecho real sobre una cosa corporal, del cual se podía gozar y disponer arbitrariamente. Con todo, a partir de la Constitución de 1886, ese concepto absolutista del derecho a la propiedad privada empezó a aminorarse. A partir de ese momento, el Constituyente estableció que *"el Estado se reservaba la potestad de limitar los atributos del derecho de propiedad privada, en beneficio de un interés que juzgaba superior"*. [96]

**14.** Posteriormente, con la reforma constitucional de 1936, [97] la idea de la propiedad como un derecho subjetivo que podría ejercerse de forma arbitraria

[95] Constitución Política 1810. *"2. Nadie será molestado en su persona o en su propiedad sino por la ley. […]4. La tierra es el patrimonio del hombre que debe fecundar con el sudor de su frente, y así una generación no podrá limitar o privar de su libre uso a las generaciones venideras con las vinculaciones, mayorazgos y demás trabas contrarias a la naturaleza, y sagrado derecho de propiedad y a las leyes de la sucesión"*.

Constitución Política de la República de Colombia de 1886. (antes de la reforma constitucional de 1936). Artículo 31. *"Los derechos adquiridos con justo título con arreglo a las leyes civiles por personas naturales o jurídicas, no pueden ser desconocidos ni vulnerados por leyes posteriores. // Cuando de la aplicación de una ley expedida por motivos de utilidad pública, resultaren en conflicto los derechos de particulares con la necesidad reconocida por la misma ley; el interés privado deberá ceder al interés público. Pero las expropiaciones que sea preciso hacer requieren plena indemnización con arreglo al Artículo siguiente"*. Artículo 32. *"En tiempo de paz nadie podrá ser privado de su propiedad en todo ni en parte, sino por pena, o apremio, o indemnización, o contribución general, con arreglo a las leyes. Por graves motivos de utilidad pública, definidos por el Legislador, podrá haber lugar a enajenación forzosa, mediante mandamiento judicial, y se indemnizará el valor de la propiedad, antes de verificar la expropiación"*.

[96] Corte Constitucional, Sentencia C-595 de 1999.

[97] Acto Legislativo 1° de 1936 (agosto 05) Reformatorio de la Constitución. Artículo 10. *"Se garantizan la propiedad privada y los demás derechos adquiridos con justo título, con arreglo a las leyes civiles, por personas naturales o jurídicas, los cuales no pueden ser desconocidos ni vulnerados por leyes posteriores. Cuando de la aplicación de una ley expedida por motivos de utilidad pública o interés social, resultaren en conflicto los derechos de particulares con la necesidad reconocida por la misma ley, el interés privado deberá ceder al interés público o social. // La propiedad es una función social que implica obligaciones. // Por motivos de utilidad pública o de interés social definidos por el legislador, podrá haber expropiación, mediante sentencia judicial e indemnización previa. // Con todo, el legislador, por razones de equidad, podrá determinar los casos en que no haya lugar a indemnización, mediante el voto favorable de la Mayoría absoluta de los miembros de una y otra Cámara"*.

fue sustituida por la noción de función social. En efecto, esa reforma constitucional *(a)* incluyó de manera explícita el concepto de propiedad privada; *(b)* reiteró la prevalencia de la utilidad pública y el interés social, sobre el beneficio particular; y, *(c)* estableció que la propiedad es una función social que supone obligaciones. De igual forma, instauró la posibilidad de expropiar, mediante sentencia judicial e indemnización previa.

**15.** Sobre este cambio en la concepción de la propiedad privada, en Sentencia del 10 de marzo de 1938, la Sala Plena de la Corte Suprema de Justicia indicó que, durante la primera mitad del Siglo XIX, la Constitución de 1886 adoptó una concepción de la propiedad privada ligada a la libertad y a su concepción económica.[98] Bajo esa perspectiva, los principios referidos eran básicos para el desarrollo de la personalidad y exigían una propiedad privada que, en la medida de lo posible, se ejerciera de forma libre, sin trabas, ni vínculos.[99] Sin embargo, el *"constituyente de 1936 relativizó el derecho fundamental de la propiedad, acentuando la sumisión de ésta a los intereses de la colectividad y con ello la limitación del libre arbitrio del propietario"*,[100] la cual solo puede ocurrir en el marco de un procedimiento regulado y en una cuantía que se pueda medir.[101]

**16.** Para la Corte Suprema de Justicia, el Constituyente adoptó un concepto de propiedad:

> *"que se apoya únicamente sobre la utilidad social [, es decir, que] no debe existir sino en la medida de esta utilidad social. El Legislador puede, por lo tanto, introducir a la propiedad individual todas las restricciones que sean conformes con las necesidades sociales a las cuales debe sujetarse. Si en un momento dado la propiedad individual deja de corresponder a una necesidad social, el Legislador debe intervenir para organizar otra forma de apropiación de las riquezas. En un país en donde la propiedad individual esté reconocida por la legislación positiva, el propietario tiene, por el hecho de ser propietario, una cierta función social que realizar; la extensión de su derecho de propiedad debe ser determinada por la ley y por la jurisprudencia que*

---

[98] *Cfr.,* Corte Suprema de Justicia. Sala Plena. Sentencia del 10 de marzo de 1938.

[99] *Ibidem.*

[100] *Ibidem.*

[101] *Ibidem.*

*aplica ésta, según la función social que le corresponde desempeñar: no puede pretender otro derecho que el de poder cumplir libre, plena y enteramente su función social de propietario. Puede decirse que de hecho la concepción de la propiedad derecho subjetivo desaparece para dar lugar a la concepción de la propiedad función social".*[102]

**17.** A pesar de los avances descritos, la jurisprudencia ha señalado que la Constitución de 1991 es la que finalmente consolida la relativización de esta garantía *iusfundamental.* En efecto, esta Corporación ha advertido que la Carta fue determinante para relativizar la propiedad privada, en la medida en que acentuó la función social de la propiedad, incorporó el concepto de la función ecológica y estableció el mandato constitucional de proteger y promover las formas asociativas y solidarias de la propiedad.[103] Lo expuesto, en concordancia con la consolidación de un Estado social de derecho fundado, entre otros asuntos, en la solidaridad de las personas que la integran y en la prevalencia del interés general sobre el particular.[104] A partir de ese momento, *"se superó la vieja e individualista concepción clásica de derecho subjetivo al servicio exclusivo y excluyente de su titular, en cuyo favor se consagraban facultades irrestrictas de uso, abuso y disposición, que ahora aparece remplazada por la concepción solidarista de la propiedad que encuentra un campo abonado para su desarrollo en el Estado Social de Derecho, y hace posible el cumplimiento de variadas acciones e intervenciones estatales encaminadas al mejoramiento económico de los sectores marginados de la comunidad y a dar solución a los conflictos sociales que afectan a la sociedad civil".*[105]

**18.** Ciertamente, el artículo 58 Superior prevé que, si en aplicación de una ley expedida por motivos de utilidad pública o interés social, se suscita un conflicto con la propiedad privada, esta última debe ceder ante el provecho público o social. De igual forma, establece que esa garantía constitucional

---

[102] *Ibidem.* Sobre este asunto, también se pronunció la Sala Plena de la Corte Suprema de Justicia, en Sentencia del 17 de agosto de 1989. En esa oportunidad, la Corporación reiteró que, a la luz de la Constitución, Colombia había adoptado una *"concepción solidarista de la propiedad"*, la cual exigía que el ejercicio de este derecho estuviese dirigido a garantizar el bien común. Lo expuesto, en la medida en que la reforma constitucional de 1936 permitió la expropiación no solo por razones de utilidad pública, históricamente referidas a las obras públicas, sino por motivos de interés social.

[103] *Cfr.,* Corte Constitucional, Sentencia C-595 de 1999.

[104] *Ibidem.*

[105] *Ibidem.*

tiene una función social y otra ecológica, las cuales generan obligaciones para sus titulares. De manera que, el Constituyente adoptó un concepto amplio de propiedad privada, en virtud del cual no se trata de un derecho subjetivo al servicio exclusivo de su titular, sino que también constituye un instrumento para proveer beneficios comunitarios.[106] De manera que, el derecho a la propiedad privada dejó de ser absoluto para convertirse en una garantía relativa.[107]

**19.** Ahora bien, la nueva concepción del derecho a la propiedad privada no implica en lo absoluto una desprotección del interés privado. Por el contrario, se trata de garantizar el ejercicio de esa prerrogativa, sin que sobre pase los límites establecidos por la misma Constitución. En los términos de la jurisprudencia, "*la propiedad, en tanto que derecho individual, tiene el carácter de fundamental, bajo las particulares condiciones que [la Carta] ha señalado. Justamente los atributos de goce y disposición constituyen el núcleo esencial de ese derecho, que en modo alguno se afecta por las limitaciones originadas en la ley y el derecho ajeno pues, contrario sensu, ellas corroboran las posibilidades de restringirlo, derivadas de su misma naturaleza, pues todo derecho tiene que armonizarse con las demás que con él coexisten, o del derecho objetivo que tiene en la Constitución su instancia suprema*".[108]

**20.** A partir de lo expuesto, es posible concluir que el derecho a la propiedad privada contiene una tensión intrínseca entre el interés de los particulares en ejercer el goce y la disposición de su derecho real sobre determinado bien; y, la utilidad pública o el interés social que pueda existir en torno a la apropiación de ese bien en particular. Para resolver esa situación, la Constitución dispone un principio general de interpretación, en virtud del cual, los conflictos que se susciten entre la propiedad privada y la utilidad pública o el interés social, deben resolverse en favor de estos últimos. Sin embargo, ello no implica que, ante esas situaciones, el Estado pueda interferir de manera arbitraria en el derecho a la propiedad privada de los particulares, sino que debe resolver la tensión advertir, a través de los mecanismos dispuestos en la Constitución y la Ley. En los términos de la Sentencia C-750 de 2015:

---

[106]  Corte Constitucional, Sentencia C-306 de 2013.

[107]  Corte Constitucional, Sentencias C-258 de 2013, C-410 de 2015 y C-669 de 2015, entre muchas otras.

[108]  Corte Constitucional, Sentencia C-595 de 1999.

*"el derecho de propiedad concede a su titular el poder de usar, gozar, explotar y disponer del bien, siempre y cuando se respeten las inherentes funciones sociales y ecológicas que se derivan del principio de solidaridad. Los límites al derecho de dominio se encuentran encaminados al cumplimiento de deberes constitucionales estrechamente vinculados con la noción de Estado Social de Derecho, por ejemplo, la protección al medio ambiente, la salvaguarda de los derechos ajenos, la promoción de la justicia y la equidad y el interés general prevalente. Tales fines autorizan al Estado a restringir el derecho de propiedad y adquirir inmuebles para materializar los objetivos superiores. Esa labor debe realizarse en el marco de un procedimiento que respete los requisitos establecidos en la Constitución para privar del derecho de propiedad a una persona".*

**21.** Ciertamente, el Constituyente estableció de manera explícita que el Estado puede restringir el derecho a la propiedad privada, a través de los procesos de extinción del derecho de dominio,[109] expropiación en caso de guerra[110] o expropiación por motivos de utilidad pública o interés social,[111] los cuales deberán ser regulados por el Congreso de la República. Además, facultó *"al legislador y excepcionalmente a las autoridades administrativas para establecer restricciones a dicho derecho cuando medien razones de interés general que razonablemente las justifiquen".*[112] Con fundamento en esa potestad, el ordenamiento jurídico consagró restricciones a la propiedad

---

[109] Constitución Política de Colombia. Artículo 34. *"Se prohíben las penas de destierro, prisión perpetua y confiscación. // No obstante, por sentencia judicial, se declarará extinguido el dominio sobre los bienes adquiridos mediante enriquecimiento ilícito, en perjuicio del Tesoro público o con grave deterioro de la moral social".*

[110] Constitución Política de Colombia. Artículo 59. *"En caso de guerra y sólo para atender a sus requerimientos, la necesidad de una expropiación podrá ser decretada por el Gobierno Nacional sin previa indemnización. // En el expresado caso, la propiedad inmueble sólo podrá ser temporalmente ocupada, para atender a las necesidades de la guerra, o para destinar a ella sus productos. // El Estado será siempre responsable por las expropiaciones que el Gobierno haga por sí o por medio de sus agentes".*

[111] Constitución Política de Colombia. Artículo 58. *"[…] Por motivos de utilidad pública o de interés social definidos por el legislador, podrá haber expropiación mediante sentencia judicial e indemnización previa. Esta se fijará consultando los intereses de la comunidad y del afectado. En los casos que determine el legislador, dicha expropiación podrá adelantarse por vía administrativa, sujeta a posterior acción contenciosa - administrativa, incluso respecto del precio".*

[112] *Cfr.,* Corte Constitucional, Sentencias T-245 de 1997 y C-750 de 2015.

privada, a través de la enajenación forzosa,[113] el comiso,[114] el decomiso,[115] entre otros. De manera que, solo podrá restringirse el derecho a la propiedad

[113] Ley 388 de 1997. Artículo 55. *"Corresponderá al alcalde municipal o distrital, mediante resolución motivada, ordenar la enajenación forzosa de los inmuebles que no cumplan su función social en los términos aquí previstos. En dicha resolución se especificará el uso o destino que deba darse al inmueble en lo sucesivo, de conformidad con lo establecido en el plan de ordenamiento y normas urbanísticas que lo desarrollen. // La resolución que ordene la enajenación forzosa se notificará de conformidad con lo establecido en el Código Contencioso Administrativo. // Contra la resolución que declare la enajenación forzosa sólo procederá, por la vía gubernativa, el recurso de reposición, que deberá interponerse dentro de los quince (15) días siguientes a la fecha de la notificación. Transcurrido el término de dos meses, contados a partir de la fecha de la interposición del recurso de reposición contra esta resolución sin que se hubiere resuelto dicho recurso, éste se entenderá negado y la autoridad competente no podrá resolverlo, sin perjuicio de las sanciones disciplinarias y judiciales a que hubiere lugar. // Una vez en firme el acto administrativo que ordena la enajenación forzosa se inscribirá en el folio de matrícula inmobiliaria de los terrenos e inmuebles correspondientes. Los inmuebles así afectados quedarán fuera del comercio a partir de la fecha de inscripción y mientras subsista, ninguna autoridad podrá otorgar licencias urbanísticas. // La situación de enajenación forzosa se consignará en los certificados de libertad y tradición de los inmuebles objeto de dicho proceso".*

[114] Ley 599 de 2000. Artículo 100. *"Los instrumentos y efectos con los que se haya cometido la conducta punible o que provengan de su ejecución, y que no tengan libre comercio, pasarán a poder de la Fiscalía General de la Nación o a la entidad que ésta designe, a menos que la ley disponga su destrucción. // Igual medida se aplicará en los delitos dolosos, cuando los bienes, que tengan libre comercio y pertenezcan al responsable penalmente, sean utilizados para la realización de la conducta punible, o provengan de su ejecución. // En las conductas culposas, los vehículos automotores, naves o aeronaves, cualquier unidad montada sobre ruedas y los demás objetos que tengan libre comercio, se someterán a los experticios técnicos y se entregarán provisionalmente al propietario, legítimo tenedor salvo que se haya solicitado y decretado su embargo y secuestro. En tal caso, no procederá la entrega, hasta tanto no se tome decisión definitiva respecto de ellos. // La entrega será definitiva cuando se garantice el pago de los perjuicios, se hayan embargado bienes del sindicado en cuantía suficiente para atender al pago de aquellos, o hayan transcurrido diez y ocho (18) meses desde la realización de la conducta, sin que se haya producido la afectación del bien".*

[115] Ley 1801 de 2016. Artículo 179. *"Es la privación de manera definitiva de la tenencia o la propiedad de bienes muebles no sujetos a registro, utilizados por una persona en comportamientos contrarios a las normas de convivencia, mediante acto motivado. // PARÁGRAFO 1o. Los bienes muebles utilizados en la comisión de los comportamientos contrarios a la convivencia contenidos en el presente Código, serán decomisados. // PARÁGRAFO 2o. Cuando se trate de bebidas, comestibles y víveres en general que se encuentren en mal estado, o adulterados, o medicamentos vencidos o no autorizados por las autoridades de salud, o elementos peligrosos, el inspector de Policía ordenará su destrucción, sin perjuicio de lo que disponga la ley penal. // PARÁGRAFO TRANSITORIO. El Gobierno nacional, dentro del año siguiente a la expedición de la presente ley, definirá la entidad de orden nacional o territorial responsable del traslado, almacenamiento, preservación, depósito, cuidado, administración y destino definitivo de los bienes decomisados por las autoridades y la asignación de los recursos para tal fin, en razón al tipo de bien decomisado, a la especialidad de la entidad, y la destinación. Los bienes decomisados podrán ser donados o rematados de conformidad con la reglamentación. En el marco de esta facultad, el Gobierno nacional podrá considerar la tercerización, contratación y concesión de dichos servicios. Mientras se expida y toman las medidas para la implementación de esa ley, las entidades que a la fecha vienen adelantando esa labor, la continuarán realizando y se mantendrá la destinación actual de dichos bienes".*

privada para dar prevalencia al interés general, a través del agotamiento de alguno de los trámites judiciales o administrativos previstos por el ordenamiento jurídico para esos efectos.

### (iii) *La expropiación por motivos de utilidad pública o de interés social, como un mecanismo para resolver la tensión entre el derecho a la propiedad privada y el interés general*

**22.** El inciso 4° del artículo 58 de la Constitución dispone que *"[p]or motivos de utilidad pública o de interés social definidos por el legislador, podrá haber expropiación mediante sentencia judicial e indemnización previa. Esta se fijará consultando los intereses de la comunidad y del afectado. En los casos que determine el legislador, dicha expropiación podrá adelantarse por vía administrativa, sujeta a posterior acción contenciosa - administrativa, incluso respecto del precio"*.

**23.** En reiteradas oportunidades, la jurisprudencia ha definido la expropiación por motivos de utilidad pública o de interés social como *"una operación de derecho público por la cual el Estado obliga a un particular a cumplir la tradición del dominio privado al dominio público de un bien, en beneficio de la comunidad y mediante una indemnización previa"*.[116] En ella intervienen, *"en distintos momentos, (i) el legislador, al decantar los motivos de utilidad pública o interés social; (ii) la administración, al desarrollar el proceso expropiatorio; y (iii) los jueces, quienes controlan "el cumplimiento de los requisitos legales y constitucionales, garantizan el respeto a los derechos de los afectados, fijan la indemnización y pueden decidir si decretan o se abstienen de decretar la expropiación"*.[117]

---

[116] Corte Constitucional, Sentencia C-1074 de 2002. Este concepto fue reiterado en las Sentencias C-476 de 2007, T-360 de 2011, T-638 de 2011, C-227 de 2011, T-580 de 2011, T-582 de 2012, C-306 de 2013, SU-244 de 2021 y C-085 de 2022. Esta última afirmó que *"la expropiación es un mecanismo judicial o administrativo por cuya virtud las entidades de derecho público, previa declaratoria de utilidad pública, pueden adquirir bienes privados que por lo tanto ingresan al patrimonio público para que aquellos sean usados exclusivamente en beneficio de la comunidad. Es, por esto que, antes de iniciar cualquier proceso de expropiación, sea por vía judicial o por vía administrativa, debe verificarse cuál es la utilidad pública o el interés social que lo motivan y por qué se presentaría el conflicto entre el interés privado y el interés público que obliga la decisión que impere este último sobre aquél. El artículo 10 de la Ley 9 de 1989, modificado por el artículo 58 de la Ley 388 de 1997, por el artículo 30 de la Ley 2044 de 2020 y, más recientemente, por el artículo 31 de la Ley 2079 de 2021, establece cuáles son esos motivos de utilidad pública o interés social"*.

[117] Corte Constitucional, Sentencia C-085 de 2022.

**24.** Adicionalmente, la expropiación consta de tres elementos, a saber: *(a)* los *sujetos* involucrados en la operación. Es decir, la entidad con potestad expropiatoria (sujeto activo), el titular del derecho de propiedad (sujeto pasivo), y el o los beneficiados con la expropiación (beneficiarios); *(b)* el *objeto material* que corresponde al derecho de dominio del sujeto pasivo sobre un bien, respecto del cual era su propietario legítimo, el cual ingresará será declarada la expropiación del derecho de dominio, e ingresará al patrimonio público; y, *(c)* la *causa* que refiere a la finalidad prevista en la Ley que motiva y justifica la expropiación.[118] Sobre este último componente, la Sentencia C-085 de 2022 afirmó que:

> *"[d]ebe quedar claro que los procedimientos judiciales o administrativos, dirigidos a obtener una expropiación, no pueden, en ningún caso, fundarse en motivos ajenos a aquellos que la ley definió como de interés social o utilidad pública".* Por su parte, la Sentencia T-284 de 1994 indicó que "[l]*a declaración de la utilidad pública o del interés social hace referencia a la causa o fin que justifica la operación de desapoderamiento o sacrificio de la propiedad privada de contenido patrimonial afectada, es decir, a la determinación y proclamación formales de uno de los términos del conflicto: el interés general o público, que han de ser obviamente previos al ejercicio de la potestad expropiatoria. La distinción entre utilidad pública e interés social traduce la amplitud con que se configura la causa expropiatoria: ésta puede consistir tanto en un fin cuya cuestión esté legalmente atribuida a las Administraciones públicas (utilidad pública), como en un fin ciertamente social tutelado como tal, pero que puede estar y normalmente está entregado en su realización a la actividad privada (interés social). Encuentra cabal explicación ahora, pues, la clara distinción legal entre expropiante y beneficiario de la expropiación, pues en el caso de causa de interés social lo normal es que ambos sujetos de la expropiación no coincidan y el beneficiario pueda ser, como ya nos consta, una persona privada".*

**25.** A partir de estos elementos, la jurisprudencia ha señalado de manera enfática que, al momento de privar a una persona de la titularidad del derecho de propiedad, en contra de su voluntad, las autoridades deben: *(a)* verificar que se configure alguno de los motivos de utilidad pública o de interés social

---

[118]  *Cfr.,* Corte Constitucional, Sentencia C- 020 de 2023.

definidos por el Legislador; *(b)* agotar la etapa previa de enajenación voluntaria o de negociación directa, con fundamento en una oferta del sujeto activo de la operación de derecho público; *(c)* adelantar el procedimiento dispuesto en la ley, con el debido respeto del derecho al debido proceso, para proferir un acto administrativo u obtener una decisión judicial que ordene la expropiación del bien; y, *(d)* pagar la indemnización justa correspondiente, en los términos del artículo 21.2 de la Convención Americana sobre Derechos Humanos, antes del traspaso del derecho de propiedad al patrimonio público.[119]

**26.** En cuanto al procedimiento que se debe agotar, las Sentencias C- 476 de 2007, C-750 de 2015, C-085 de 2022 y C-020 de 2023, entre otras, han identificado que, por regla general, la expropiación por motivos de utilidad pública o interés social debe adelantarse por vía judicial. Excepcionalmente, procede la expropiación administrativa, en los casos especiales que determine el Legislador.[120] En el primer supuesto, la expropiación la ordena una autoridad judicial, en ejercicio de sus funciones jurisdiccionales, a través de una sentencia.[121] Aquella está regulada en las Leyes 9 de 1989, 388 de 1997, 1682 de 2013, 1742 de 2014 y en el artículo 399 del Código General del Proceso. Por el contrario, en el segundo escenario, la autoridad administrativa dispone la expropiación del bien, a través de un acto administrativo. Actualmente, este trámite está regulado en la Ley 388 de 1997 y en otros regímenes especiales, como el previsto en la Ley 2044 de 2020.[122]

**27.** Con todo, la jurisprudencia ha sido enfática en advertir que en ambas vías las autoridades deben *(a)* observar el principio de legalidad, *(b)* atender a la garantía del debido proceso y *(c)* otorgar de una indemnización previa y justa. Además, ha señalado que en los dos tipos de proceso previstos en la Constitución comparten una etapa previa denominada enajenación voluntaria en la que la autoridad expropiante intenta llegar a un acuerdo formal con el titular del derecho, la cual debe agotarse adecuadamente, para efectivizar el

---

[119] *Cfr.,* Corte Constitucional, Sentencias C- 750 de 2015 y C-133 de 2009, entre otras.

[120] Constitución Política de Colombia. Artículo 58. Inciso 4.

[121] Corte Constitucional, Sentencias C-531 de 1996, C-1074 de 2002, C-227 de 2011, C-306 de 2013 y C-750 de 2015.

[122] *"Por el cual se dictan normas para el saneamiento de predios ocupados por asentamientos humanos ilegales y se dictan otras disposiciones".*

derecho al debido proceso de los sujetos involucrados en la operación de derecho público.

**28.** Al respecto, la Sentencia C-669 de 2015 advirtió que:

> *"[l]a garantía del debido proceso implica, por tanto, que en la expropiación judicial como en la administrativa deben garantizarse el cumplimiento de una serie de etapas previas de negociación o enajenación voluntaria, mediante la cual la entidad administrativa intente adquirir el predio, de manera que se haga innecesaria la iniciación del proceso expropiatorio propiamente dicho. Esta etapa comienza con una oferta de la administración al particular con el fin de adquirir el bien por el precio base fijado por la entidad. Luego se continúa con la etapa de negociación directa con el particular. En caso de que el proceso de negociación directa prospere, se pasa a la etapa de transferencia del bien y al pago del precio acordado. En caso contrario, esto es, si el proceso de negociación fracasa, empieza la etapa expropiatoria propiamente dicha, la cual [puede ser judicial o administrativa y] debe culminar con el traspaso del título traslaticio de dominio al Estado y el pago de la indemnización al particular expropiado".*

**29.** En suma, la propiedad privada es un derecho fundamental de carácter real que comprende los atributos de uso, goce y disposición de los bienes materiales o inmateriales que sean susceptibles de apropiación. Su ejercicio es pleno, exclusivo, perpetuo, autónomo y, *prima facie,* irrevocable. Con todo, no es una garantía absoluta, sino relativa. En caso de entrar en tensión con la aplicación de una norma proferida por utilidad pública o interés social, esta debe ceder para garantizar el interés general. De manera que, la propiedad privada admite restricciones, con fundamento en la prevalencia del interés público sobre el interés privado.

**30.** Una de ellas permite declarar de utilidad pública o de interés social un bien privado y ulteriormente proceder a su adquisición mediante la expropiación conforme lo permite la Constitución mediante un proceso judicial o un proceso administrativo, según corresponda. En efecto, la Constitución consagra la posibilidad de expropiar la propiedad privada, a través de una operación de derecho público en la que intervienen: *(a)* el Legislador al decantar los motivos de utilidad pública o de interés de social,

*(b)* la administración al adelantar el proceso expropiatorio y *(c)* los jueces al controlar el cumplimiento de los requisitos legales y constitucionales y garantizar el respeto de los derechos de los involucrados. Aquella está compuesta por los sujetos involucrados en el trámite, el objeto material de la expropiación y la causa prevista en la ley que motiva y justifica la expropiación. Las autoridades que la adelanten deben observar el principio de legalidad, atender la garantía del debido proceso y otorgar una indemnización previa y justa. En atención a la garantía del debido proceso, deben agotar la etapa previa de negociación voluntaria que involucra una oferta por parte de la administración y la negociación directa del predio. En caso de que esta prospere, las partes procederán a la transferencia del bien y el pago de lo acordado. De lo contrario, tramitarán la expropiación propiamente dicha, la cual, por regla, debe ser judicial y, excepcionalmente, administrativa.

> **(iv)    *La expropiación judicial por motivos de utilidad pública o de interés social, exige que se agote un debate procesal frente al derecho de la administración de materializar su pretensión expropiatoria***

**31.** Tal y como se advirtió con anterioridad, la Constitución exige que la intención que tiene la administración de expropiar se someta a un control jurisdiccional, en el que las autoridades judiciales competentes deben corroborar que las entidades demandantes cumplan con los requisitos constitucionales y legales para llevar a cabo la expropiación. El artículo 58 Superior señaló dos tipos de control judicial. Respecto del primero de ellos, solo señaló que el despojo del derecho de propiedad solo puede darse a través de sentencia Judicial; mientras que, estableció que el control jurisdiccional de la expropiación administrativa solo puede darse a través de los jueces de lo contencioso administrativo. Con ocasión de esas disposiciones, el Legislador determinó que serían los jueces civiles los encargados de verificar en cada caso concreto si hay o no lugar a ordenar el despojo del derecho de propiedad de una persona, a través del proceso declarativo especial de expropiación. De manera que, el medio de control de nulidad y restablecimiento del derecho es el mecanismo judicial que debe activarse para controlar la expropiación por vía administrativa; y, el proceso declarativo especial de expropiación es el que debe aplicarse como regla general, cuando la administración pretende expropiar un bien en concreto.

**32.** Esta distinción es relevante al momento de analizar la norma acusada. En el primer escenario, basta la expedición del acto administrativo que decreta la expropiación para materializarla. De manera que, el control judicial ocurre con posterioridad a la afectación del derecho de propiedad y exige el restablecimiento del derecho en caso tal de que a ello haya lugar. Por el contrario, en el segundo caso, la administración tiene que esperar a la decisión judicial para despojar al demandado de su derecho de propiedad, pues es el juez quien finalmente determina si se cumplen o no los requisitos legales y constitucionales para expropiar. Además, para esos efectos, no solo debe corroborar que las actuaciones previas de la demandante estén ajustadas a derecho y que la indemnización ofrecida sea justa, sino que tengan sustento en los motivos de utilidad pública o social que determina la ley. Ello implica que el proceso declarativo especial de expropiación si es el escenario judicial idóneo para discutir la pretensión que tiene la administración de despojar a una persona de su derecho de propiedad. En esa medida, los demandados deben contar con herramientas procesales suficientes para oponerse a la pretensión de expropiación como tal, a través de la formulación de excepciones o de cualquier otro mecanismo que haga sus veces.

**33.** En efecto, uno de los aspectos que deben verificar las autoridades judiciales es el relativo a indemnización justa que debe darse como retribución al desconocimiento del derecho de propiedad, como señala la decisión mayoritaria. Sin embargo, no es el único asunto que está sujeto a supervisión por parte del juez. Las autoridades judiciales también deben revisar, entre otras cosas, la legitimación de la entidad demandante para materializar la expropiación, el agotamiento de los trámites administrativos dispuestos para exteriorizar la pretensión de expropiar, la configuración de uno de los motivos de utilidad pública o de interés social y si ello genera una verdadera tensión con el derecho de propiedad del demandado. Si bien es cierto que el Legislador es quien define cuales son los motivos de utilidad pública o de interés social que habilitan a la administración para expropiar un predio, también lo es que lo hace a través de una norma impersonal y abstracta. Por tanto, es necesario que la autoridad judicial competente determine si, en virtud de esas normas, la administración tiene o no derecho de materializar su propósito de despojar a una persona de su derecho de propiedad, a partir de los argumentos que presenten las partes frente a la pretensión expropiatoria. El escenario establecido por el Congreso de la República para esos efectos es el proceso declarativo especial de expropiación.

**34.** En conclusión, el hecho de que exista certeza respecto de la potestad que tiene la administración para adelantar procesos de expropiación en los escenarios previstos por el Legislador no implica que su pretensión concreta resulte indiscutible. Por el contrario, es la misma Constitución la que establece que la intención de expropiación de la administración está sometida a un debate judicial en el que los jueces competentes deben determinar si hay lugar o no a expropiar. Aquel exige que los demandados puedan ejercer sus derechos de audiencia, defensa y contradicción, para que el jue cuente con los elementos necesarios para adoptar una decisión ajustada a derecho. Antes de ello, la resolución a través de la cual la administración exterioriza su interés de expropiar es una mera expectativa.

## El proceso declarativo especial de expropiación no es equiparable a un ejecutivo especial

**35.** En línea con lo expuesto, considero que el proceso declarativo especial de expropiación no puede reducirse a la simple ejecución de un acto administrativo. Ese trámite judicial tiene un alcance diferente, en la medida en que exige que el juez valore todos los elementos disponibles para determinar si la entidad demandante tiene derecho o no a materializar su pretensión expropiatoria.

**36.** Ciertamente, la expropiación judicial o administrativa por motivos de utilidad pública o interés social da lugar a una limitación gravosa de la propiedad privada, en la medida en que impide que el dueño ejerza las prerrogativas que componen esa garantía *iusfundamental.* [123] Bajo esa perspectiva, la jurisprudencia ha resaltado la importancia de que el Legislador establezca procedimientos que otorguen garantías procesales y sustanciales mínimas a los demandantes que resulten idóneas para evitar que la expropiación se convierta en una privación arbitraria y desproporcionada del derecho de dominio.[124] En ejercicio de esa función, el legislador estableció el

---

[123] *Cfr.,* Corte Constitucional, Sentencias C-669 de 2015, C-080 de 2022 y C-020 de 2023.

[124] *Cfr.,* Corte Constitucional, Sentencias C-306 de 2013, C-669 de 2015, C-036 de 2016 y SU-244 de 2021.

siguiente trámite procesal para llevar a cabo la expropiación judicial de un bien privado.

**37.** *Presupuestos del proceso judicial declarativo especial de expropiación.* El trámite referido exige que, en virtud del principio de legalidad, la ley haya determinado de forma clara y suficiente: *(a)* los motivos de utilidad pública o de interés social que justificarían la expropiación; y, *(b)* las autoridades administrativas que están habilitadas para adelantar el procedimiento. [125] Asimismo, requiere que, antes de iniciar la etapa de negociación, la entidad administrativa facultada para el efecto profiera una decisión administrativa en la que declare la utilidad pública o el interés social de adquirir determinados predios para destinarlos a los fines establecidos por el Legislador, en los términos previstos por el artículo 10 de la Ley 9 de 1989, modificada por el artículo 58 de la Ley 388 de 1997.[126]

---

[125] *Cfr.,* Corte Constitucional, sentencias C-370 de 1994, C-133 de 2009, C-764 de 2013, C-750 de 2015 y C-035 de 2016.

[126] Ley 9 de 1989. Artículo 10, modificado por el Artículo 58 de la Ley 388 de 1997. Motivos de utilidad pública. *"El artículo 10 de la Ley 9ª de 1989, quedará así: // "Para efectos de decretar su expropiación y además de los motivos determinados en otras leyes vigentes se declara de utilidad pública o interés social la adquisición de inmuebles para destinarlos a los siguientes fines: // a) Ejecución de proyectos de construcción de infraestructura social en los sectores de la salud, educación, recreación, centrales de abasto y seguridad ciudadana; // b) Desarrollo de proyectos de vivienda de interés social, incluyendo los de legalización de títulos en urbanizaciones de hecho o ilegales diferentes a las contempladas en el artículo 53 de la Ley 9ª de 1989, la rehabilitación de inquilinatos y la reubicación de asentamientos humanos ubicados en sectores de alto riesgo; // c) Ejecución de programas y proyectos de renovación urbana y provisión de espacios públicos urbanos; // d) Ejecución de proyectos de producción, ampliación, abastecimiento y distribución de servicios públicos domiciliarios; // e) Ejecución de programas y proyectos de infraestructura vial y de sistemas de transporte masivo; // f) Ejecución de proyectos de ornato, turismo y deportes; // g) Funcionamiento de las sedes administrativas de las entidades públicas, con excepción de las empresas industriales y comerciales del Estado y las de las sociedades de economía mixta, siempre y cuando su localización y la consideración de utilidad pública estén claramente determinados en los planes de ordenamiento o en los instrumentos que los desarrollen; // h) Preservación del patrimonio cultural y natural de interés nacional, regional y local, incluidos el paisajístico, ambiental, histórico y arquitectónico; // i) Constitución de zonas de reserva para la expansión futura de las ciudades; // j) Constitución de zonas de reserva para la protección del medio ambiente y los recursos hídricos; // k) Ejecución de proyectos de urbanización y de construcción prioritarios en los términos previstos en los planes de ordenamiento, de acuerdo con lo dispuesto en la presente ley; // l) Ejecución de proyectos de urbanización, redesarrollo y renovación urbana a través de la modalidad de unidades de actuación, mediante los instrumentos de reajuste de tierras, integración inmobiliaria, cooperación o los demás sistemas previstos en esta ley; // m) El traslado de poblaciones por riesgos físicos inminentes".*

*Cfr.,* Consejo de Estado. Sala de Consulta y Servicio Civil, Concepto del 16 de julio de 2009; Consejo de Estado, Sección Primera, Sentencia del 9 de mayo de 2014, Radicado. 25000232600020000007601 24679.

**38.** Inicialmente, el artículo 58 de la Constitución establecía: *"[l]as razones de equidad, así como los motivos de utilidad pública o de interés social, invocados por el legislador, no serán controvertibles judicialmente"*. Con fundamento en esa disposición, la jurisprudencia del Consejo de Estado consideraba que ese acto administrativo era de trámite y, por mandato constitucional, no admitía control judicial por medio de la acción de nulidad y restablecimiento del derecho.[127] Sin embargo, el Acto Legislativo 01 de 1999 eliminó la prohibición constitucional de controvertir esas decisiones de la administración por vía judicial. Para justificar esa decisión, el Constituyente derivado argumentó que la expropiación debe ejercerse dentro del margen previsto en la Constitución, la cual prevé que Colombia es un Estado de derecho que se rige por el principio de legalidad, cuyo pilar fundamental es que las actuaciones del Estado no pueden estar exentas de control. De manera que, la prohibición que establecía la Carta resultaba contrario a las previsiones del Título Primero de la Constitución. En su criterio, ese mandato constitucional permitía que se profirieran actuaciones dictatoriales y, por esa razón, lo eliminó.[128]

**39.** Con fundamento en lo expuesto, mediante Sentencia de Unificación del 11 de diciembre de 2015, el Consejo de Estado cambió su postura, en virtud de la cual la declaratoria de un bien privado como de utilidad pública o interés social es un mero acto de trámite. En efecto, la Corporación precisó que *"se trata de un acto que produce efectos jurídicos inmediatos y directos respecto del administrado, por cuanto ordena adelantar e iniciar el trámite expropiatorio respecto de unos bienes determinados. Lo anterior cobra mayor fuerza en el entendido de que el mismo constituye la etapa inicial del procedimiento expropiatorio sin el cual no resulta posible habilitar a la autoridad para adelantarlo; no puede olvidarse que entre al acto expropiatorio y el que declara las condiciones de utilidad pública e interés social existe una relación de causa a efecto, pues sin la existencia de los primeros no pueden expedirse los segundos".*[129] En consecuencia, el acto administrativo referido puede generar perjuicios a los titulares del derecho de dominio, motivo por el cual es susceptible de control judicial, a través de la acción de nulidad y restablecimiento del derecho.

---

[127] *Cfr.,* Consejo de Estado, Sección Primera, Sentencias del 5 de agosto de 1994, Radicado 2679 y del 26 de mayo de 1995, Radicado. 1692; Auto del 30 de agosto de 2007, Radicado 2005-00136.

[128] *Cfr.,* Gaceta del Congreso 245 del 30 de octubre de 1998.

[129] Consejo de Estado. Sala de lo Contencioso Administrativo. Sección Primera, Sentencia del 11 de diciembre de 2015. Radicado: 25000 23 24 000 2006 01002 01.

**40.** De igual forma, enfatizó en que la decisión fue proferida en el marco de la expropiación de tipo administrativo y estableció las siguientes reglas para unificar su jurisprudencia en la materia:

*"- Todo procedimiento expropiatorio debe respetar el principio de legalidad como expresión democrática del Estado Social de Derecho.*

*- No puede haber actos exentos de control judicial; se proscribe la inexistencia de controles judiciales respecto de las actuaciones resultantes del ejercicio del poder público en materia expropiatoria.*

*- Los actos que declaran los motivos de utilidad pública o de interés social crean una situación jurídica particular y concreta; producen efectos jurídicos inmediatos y directos respecto del administrado.*

*- La revisión judicial de los motivos de utilidad pública o de interés social se puede hacer vía judicial a través del ejercicio de acción de nulidad y restablecimiento del derecho.*

*- La acción especial contencioso – administrativa también procede contra el acto administrativo que decide la expropiación con el fin de "obtener su nulidad y el restablecimiento del derecho lesionado, o para controvertir el precio indemnizatorio reconocido", al tenor de lo dispuesto en el artículo 71 de la Ley 388 de 1997*

*Se hace énfasis que la decisión guarda relación con la expropiación administrativa figura diferente a la expropiación judicial".*[130]

**41.** *Etapa previa de negociación.* En virtud de los establecido en las Leyes 9 de 1989 y 388 de 1997, antes de iniciar el proceso judicial declarativo especial de expropiación, las autoridades administrativas habilitadas para el efecto deben agotar una fase administrativa que consta de dos etapas,[131] las cuales se describen a continuación.

---

[130] *Ibidem.*

[131] *Cfr.,* Corte Constitucional, sentencias C-1074 de 2002, C-476 de 2007, C-227 de 2011, C-669 de 2015, C-750 de 2015 y C-378 de 2021.

**42.** *Oferta de compra*. El trámite inicia con un acto administrativo, denominado oficio, en el que la entidad facultada para el efecto realiza una oferta de compra al propietario del bien requerido. Aquel debe identificar de manera precisa el bien y el precio que será tenido como base para efectos de la negociación, el cual se establece a partir del valor comercial fijado por el Instituto Agustín Codazzi, quien haga sus veces, o por peritos privados.[132] Esa decisión debe ser notificada al afectado a través de los mecanismos dispuestos por el Código de Procedimiento Administrativo y de lo Contencioso Administrativo.[133] Asimismo, corresponde inscribirlo en el folio de matrícula inmobiliaria del predio, tal y como lo dispone el artículo 13 de la Ley 9 de 1989, *"para evitar que el dominio del bien sea traspasado a otras personas y, por esta vía retrasar el proceso expropiatorio"*.[134] Lo expuesto, en la medida en que este trámite *(a)* saca el bien del comercio; e *(b)* impide que se otorguen licencias relacionadas con las atribuciones de uso, goce y disposición del predio.[135] Sobre el control judicial de este acto administrativo, la Sentencia C-1074 de 2002 afirmó que *"[c]ontra ese oficio no proceden los recursos propios de la vía gubernativa, ni acciones ante la jurisdicción contencioso administrativa"*, tal y como lo dispone el artículo 61 de la Ley 388 de 1997.

**43.** *Enajenación voluntaria*. Una vez concluye la fase de oferta, los interesados cuentan con un término de 30 días hábiles para negociar directamente y llegar a un acuerdo formal de enajenación voluntaria.[136] En esta etapa las partes pueden modificar el precio señalado en la oferta. En caso de que las partes lleguen a un acuerdo, este deberá consignarse en un contrato

---

[132]  Ley 388 de 1997. Artículo 61. *"El precio de adquisición será igual al valor comercial determinado por el Instituto Geográfico Agustín Codazzi, la entidad que cumpla sus funciones, o por peritos privados inscritos en las lonjas o asociaciones correspondientes, según lo determinado por el Decreto-ley 2150 de 1995, de conformidad con las normas y procedimientos establecidos en el decreto reglamentario especial que sobre avalúos expida el gobierno. El valor comercial se determinará teniendo en cuenta la reglamentación urbanística municipal o distrital vigente al momento de la oferta de compra en relación con el inmueble a adquirir, y en particular con su destinación económica. […]"*.

[133]  Ley 388 de 1997. Artículo 61. *"La comunicación del acto por medio del cual se hace la oferta de compra se hará con sujeción a las reglas del Código Contencioso Administrativo y no dará lugar a recursos en vía gubernativa"*.

[134]  Corte Constitucional, Sentencia C-1074 de 2002.

[135]  *Cfr.,* Corte Constitucional, Sentencia C-1074 de 2002.

[136]  Ley 388 de 1997. Artículo 68.

*Cfr.,* Corte Constitucional, Sentencia C-020 de 2023.

de compraventa o de promesa de compraventa. En esa etapa se debe pagar el precio acordado. Sin embargo, si queda un saldo por pagar, la entidad deberá otorgar una garantía bancaria incondicional.[137]

**44.** Ahora bien, si el término referido acaece sin llegar a un acuerdo o las partes celebran un contrato de promesa de compraventa que no se perfecciona dentro de los dos meses siguientes a su celebración, la entidad correspondiente debe proferir una *"resolución de expropiación"*, para iniciar la etapa de expropiación propiamente dicha.

**45.** Contra esa decisión procede el recurso de reposición dentro de los 10 días siguientes a su notificación y las acciones.[138] En caso de transcurrir un mes sin que la autoridad resuelva el recurso, se entenderá negado y la decisión quedará en firme.[139] En estos supuestos también procede la acción de nulidad y restablecimiento del derecho, la cual deberá presentarse dentro de los 4 meses siguientes a la notificación de la decisión, ante el Tribunal Administrativo competente, quien deberá decidir el asunto en única instancia dentro de los 8 meses siguientes a la presentación de la demanda.[140] Si la Jurisdicción de lo Contencioso Administrativo define el asunto, en favor del demandante, antes que el juez civil, este último deberá abstenerse de dictar sentencia antes del término previsto en la norma y procederá la restitución del predio con la correspondiente indemnización de perjuicios. Por el contrario, si el juez civil ordena la expropiación antes de la definición del caso por el juez administrativo, y este último concede las pretensiones del propietario,

---

[137] *Cfr.,* Corte Constitucional, Sentencia C-1074 de 2002.

[138] Ley 9 de 1989. Artículo 21. *"[…] Contra la resolución que ordene la expropiación procederá únicamente el recurso de reposición, el cual deberá interponerse dentro de los diez (10) días hábiles siguientes al de su notificación".*

[139] Ley 9 de 1989. Artículo 22. *"Transcurrido un mes sin que la entidad expropiante hubiere expedido la resolución por la cual se resuelve el recurso de reposición, éste se entenderá negado, y quedará en firme el acto recurrido. Incurrirá en causal de mala conducta el funcionario que no resuelva el recurso oportunamente. Pasado dicho término no se podrá resolver el recurso interpuesto. […]".*

[140] Ley 9 de 1989. Artículo 22. *"[…] Contra la resolución que ordene una expropiación en desarrollo de la presente Ley procederán las acciones contencioso-administrativas de nulidad y de restablecimiento del derecho ante el Tribunal Administrativo competente, en única instancia. En estas acciones no procederá la suspensión provisional del acto demandado. El Tribunal Administrativo deberá dictar sentencia definitiva dentro del término máximo de ocho (8) meses, contados desde la fecha de la presentación de la demanda. El proceso contencioso-administrativo terminará si transcurrido el término anterior no se hubiere dictado sentencia. […]"* Subrayado declarado INEXEQUIBLE. Sentencia C 127 de 1998.

entonces quedará en firma la decisión de los jueces civiles y se pagará la indemnización correspondiente. [141]

**46.** *Expropiación propiamente dicha.* Esta fase corresponde al adelantamiento del proceso judicial regulado en el artículo 399 del Código General del Proceso, el cual está previsto en el Capítulo I del Título III de la norma que regula los procesos declarativos especiales. Aquel consta de las etapas que se describen a continuación.

**47.** *Presentación de la demanda.* La autoridad correspondiente deberá interponer una demanda de expropiación, dentro de los 3 meses siguientes a la fecha en la cual quede en firme la resolución previamente referida. Aquella estará dirigida en contra de: *(a)* los titulares de los derechos reales principales del bien; *(b)* las partes involucradas en litigios pendientes sobre la titularidad de esos derechos, en caso de existir; *(c)* los tenedores cuyos contratos consten por escritura pública inscrita y *(d)* los acreedores hipotecarios y prendarios inscritos en el certificado de registro.[142] Con ella, la entidad deberá allegar copia de la resolución que decreta la expropiación vigente, un avalúo del bien, un certificado acerca de la propiedad y de los derechos reales constituidos por un periodo de 10 años, en caso de ser posible.[143]

**48.** En caso de no presentarla dentro del término previsto, la resolución y las inscripciones realizadas en el folio de matrícula correspondiente perderán su

---

[141] Ley 9 de 1989. Artículo 23. *"El proceso civil de expropiación terminará si hubiere sentencia del Tribunal Administrativo favorable al demandante en fecha previa a aquella en la cual quedare en firme la sentencia del Juez Civil, quien se abstendrá de dictar sentencia con anterioridad al vencimiento del término establecido en el inciso anterior. En este evento, se procederá a la restitución del bien demandado y a la indemnización de perjuicios en los términos del artículo 459 del Código de Procedimiento Civil. // Será definitiva la transferencia del derecho de propiedad a favor de la entidad expropiante aun si la sentencia del Tribunal Administrativo fuere posterior a aquella en la cual quedare en firme la sentencia del juez civil. En este evento el tribunal tendrá en cuenta la indemnización decretada por el juez civil para el efecto de la reparación del daño sufrido por el propietario".*

[142] Código General del Proceso. Artículo 399. Numeral 1. *"1. La demanda se dirigirá contra los titulares de derechos reales principales sobre los bienes y, si estos se encuentran en litigio, también contra todas las partes del respectivo proceso. // Igualmente se dirigirá contra los tenedores cuyos contratos consten por escritura pública inscrita y contra los acreedores hipotecarios y prendarios que aparezcan en el certificado de registro".*

[143] Código General del Proceso. Artículo 399. *"3. A la demanda se acompañará copia de la resolución vigente que decreta la expropiación, un avalúo de los bienes objeto de ella, y si se trata de bienes sujetos a registro, un certificado acerca de la propiedad y los derechos reales constituidos sobre ellos, por un período de diez (10) años, si fuere posible".*

fuerza ejecutoria de manera automática. Como consecuencia de ello, previa solicitud, el registrador deberá cancelar las inscripciones correspondientes si constata el hecho.[144]

**49.** *Entrega anticipada del bien.* Una vez iniciado el proceso, podrá decretarse la entrega anticipada del bien, si la entidad lo requiere. Para el efecto, deberá consignar a órdenes del despacho judicial el valor establecido en el avalúo aportado. En la práctica de esa diligencia, el juez ordenará entregarle al propietario el dinero consignado, si demuestra que el predio estaba destinado de manera exclusiva a su vivienda. Lo expuesto, siempre y cuando la demandante no se oponga y el predio no tenga gravámenes hipotecarios, embargos, ni demandas registradas.[145]

**50.** *Traslado de la demanda.* Se correrá traslado de la demanda al propietario del predio por un término de 3 días. Si transcurren 2 día sin poder notificar a los demandados, el juez los emplazará y fijará copia de la actuación en la puerta de acceso del inmueble a expropiar o del lugar en el que se encuentran los muebles.[146]

**51.** En caso de estar en desacuerdo con el avalúo del predio, el propietario deberá allegar un dictamen pericial elaborado por el Instituto Geográfico

---

[144] Código General del Proceso. Artículo 399. Numeral 2. *"La demanda de expropiación deberá ser presentada dentro de los tres (3) meses siguientes a la fecha en la cual quedare en firme la resolución que ordenare la expropiación, so pena de que dicha resolución y las inscripciones que se hubieren efectuado en las oficinas de registro de instrumentos públicos pierdan fuerza ejecutoria, sin necesidad de pronunciamiento judicial o administrativo alguno. El registrador deberá cancelar las inscripciones correspondientes, a solicitud de cualquier persona, previa constatación del hecho".*

[145] Código General del Proceso. Artículo 399. Numeral 4. *"Desde la presentación de la demanda, a solicitud de la entidad demandante, se decretará La entrega anticipada del bien, siempre que aquella consigne a órdenes del juzgado el valor establecido en el avalúo aportado. Si en la diligencia el demandado demuestra que el bien objeto de la expropiación está destinado exclusivamente a su vivienda, y no se presenta oposición, el juez ordenará entregarle previamente el dinero consignado, siempre que no exista gravamen hipotecario, embargos, ni demandas registradas".*

[146] Código General del Proceso. Artículo 399. Numeral 5. *"De la demanda se correrá traslado al demandado por el término de tres (3) días. No podrá proponer excepciones de ninguna clase. En todo caso el juez adoptará los correctivos necesarios para subsanar los defectos formales de la demanda. // Transcurridos dos (2) días sin que el auto admisorio de la demanda se hubiere podido notificar a los demandados, el juez los emplazará en los términos establecidos en este código; copia del emplazamiento se fijará en la puerta de acceso al inmueble objeto de la expropiación o del bien en que se encuentren los muebles".*

Agustín Codazzi (IGAC) [147] o por una lonja de propiedad raíz. Este se trasladará a la demandante por un término de 3 días. De no hacerlo, la objeción será rechazada de plano. [148] Con todo, el demandado no podrá proponer excepciones de ninguna clase. De oficio, el juez adoptará las medidas necesarias para subsanar los defectos formales de la demanda. [149]

**52.** *Audiencia.* Vencidos los términos de traslado referidos previamente, el juez convocará a audiencia. En ella, interrogará a los peritos involucrados en los dictámenes y dictará sentencia, en la resolverá sobre la expropiación, ordenará cancelar los gravámenes, embargos e inscripciones y determinará el valor de la indemnización[150] que corresponda.[151]

**53.** *Ejecutoria de la decisión.* Dentro de los 20 días siguientes a la ejecutoria de la decisión, la entidad demandante deberá consignar el saldo de la indemnización que corresponda. De no hacerlo, el juez librará mandamiento

---

[147] Código General del Proceso. Artículo 399. Numeral 6. *"[...] A petición de la parte interesada y sin necesidad de orden judicial, el Instituto Geográfico Agustín Codazzi (IGAC) rendirá las experticias que se le soliciten, para lo cual el solicitante deberá acreditar la oferta formal de compra que haya realizado la entidad. El Gobierno Nacional reglamentará las tarifas a que haya lugar".*

[148] Código General del Proceso. Artículo 399. Numeral 6. *"Cuando el demandado esté en desacuerdo con el avalúo o considere que hay lugar a indemnización por conceptos no incluidos en él o por un mayor valor, deberá aportar un dictamen pericial elaborado por el Instituto Geográfico Agustín Codazzi (IGAC) o por una lonja de propiedad raíz, del cual se le correrá traslado al demandante por tres (3) días. Si no se presenta el avalúo, se rechazará de plano la objeción formulada [...]".*

[149] Código General del Proceso. Artículo 399. Numeral 5. *"De la demanda se correrá traslado al demandado por el término de tres (3) días. No podrá proponer excepciones de ninguna clase. En todo caso el juez adoptará los correctivos necesarios para subsanar los defectos formales de la demanda. // Transcurridos dos (2) días sin que el auto admisorio de la demanda se hubiere podido notificar a los demandados, el juez los emplazará en los términos establecidos en este código; copia del emplazamiento se fijará en la puerta de acceso al inmueble objeto de la expropiación o del bien en que se encuentren los muebles".*

[150] Código General del Proceso. Artículo 399. *"PARÁGRAFO. <Aparte tachado INEXEQUIBLE> Para efectos de calcular el valor de la indemnización por lucro cesante, cuando se trate de inmuebles que se encuentren destinados a actividades productivas y se presente una afectación que ocasione una limitación temporal o definitiva a la generación de ingresos proveniente del desarrollo de las mismas, deberá considerarse independientemente del avalúo del inmueble, la compensación por las rentas que se dejaren de percibir hasta por un periodo máximo de seis (6) meses. Aparte tachado declarado inexequible en la Sentencia C-750 de 2015".*

[151] Código General del Proceso. Artículo 399. Numeral 7. *"Vencido el traslado de la demanda al demandado o del avalúo al demandante, según el caso, el juez convocará a audiencia en la que interrogará a los peritos que hayan elaborado los avalúos y dictará la sentencia. En la sentencia se resolverá sobre la expropiación, y si la decreta ordenará cancelar los gravámenes, embargos e inscripciones que recaigan sobre el bien, y determinará el valor de la indemnización que corresponda".*

ejecutivo. Una vez entregado el dinero, el despacho judicial dispondrá la entrega definitiva del bien, ordenará el registro de la sentencia y del acta de la diligencia para que funjan de título para el demandante.[152]

**54.** Si hubo entrega anticipada del predio y el juez niega la expropiación, entonces ordenará adoptar las medidas para devolverle la posesión del predio al demandado. Por el contrario, si en la diligencia de entrega un tercero alega la posesión material del bien, este deberá promover un incidente para que se le reconozca su derecho, dentro de los 10 días siguientes a la terminación de la diligencia.[153] Una vez evaluada la indemnización, se realizará el pago con la suma consignada a órdenes del despacho.[154]

**55.** Con posterioridad al registro de la decisión y del acta, el juez entregará el valor de la indemnización, salvo en los casos en los que los predios tengan gravámenes. En esos casos, los dineros seguirán a disposición del despacho para que los acreedores puedan ejercer sus derechos en proceso separado.[155]

---

[152] Código General del Proceso. Artículo 399. Numerales 8, 9 y 10. *"8. El demandante deberá consignar el saldo de la indemnización dentro de los veinte (20) días siguientes a la ejecutoria de la sentencia. Si no realiza la consignación oportunamente, el juez librará mandamiento ejecutivo contra el demandante. // 9. Ejecutoriada la sentencia y realizada la consignación a órdenes del juzgado, el juez ordenará la entrega definitiva del bien. // 10. Realizada la entrega se ordenará el registro del acta de la diligencia y de la sentencia, para que sirvan de título de dominio al demandante".*

[153] Código General del Proceso. Artículo 399. Numeral 13. *"Cuando se hubiere efectuado entrega anticipada del bien y el superior revoque la sentencia que decretó la expropiación, ordenará que el inferior, si fuere posible, ponga de nuevo al demandado en posesión o tenencia de los bienes, y condenará al demandante a pagarle los perjuicios causados, incluido el valor de las obras necesarias para restituir las cosas al estado que tenían en el momento de la entrega. // Los perjuicios se liquidarán en la forma indicada en el artículo 283 y se pagarán con la suma consignada. Concluido el trámite de la liquidación se entregará al demandante el saldo que quedare en su favor".*

[154] Código General del Proceso. Artículo 399. Numeral 11. *"Cuando en el acto de la diligencia de entrega se oponga un tercero que alegue posesión material o derecho de retención sobre la cosa expropiada, la entrega se efectuará, pero se advertirá al opositor que dentro de los diez (10) días siguientes a la terminación de la diligencia podrá promover incidente para que se le reconozca su derecho. Si el incidente se resuelve a favor del opositor, en el auto que lo decida se ordenará un avalúo para establecer la indemnización que le corresponde, la que se le pagará de la suma consignada por el demandante. El auto que resuelve el incidente será apelable en el efecto diferido".*

[155] Código General del Proceso. Artículo 399. Numeral 12. *"Registradas la sentencia y el acta, se entregará a los interesados su respectiva indemnización, pero si los bienes estaban gravados con prenda\* o hipoteca el precio quedará a órdenes del juzgado para que sobre él puedan los acreedores ejercer sus respectivos derechos en proceso separado. En este caso las obligaciones garantizadas se considerarán exigibles, aunque no sean de plazo vencido. // Si los bienes fueren materia de embargo, secuestro o inscripción, el precio se remitirá a la autoridad que decretó tales medidas; y si estuvieren sujetos a condición resolutoria, el precio se*

**56.** *Recursos.* El numeral 13 del artículo 399 del Código General del Proceso, establece que *"la sentencia que deniegue la expropiación es apelable en el efecto suspensivo; la que la decrete, en el devolutivo"*.

**57.** El recuento previo permite concluir que fue el mismo Legislador quien le otorgó un alcance diferente a este proceso judicial en atención al desequilibrio implícito de las cargas que existe en los trámites de expropiación. En esa medida, no es posible modificar su naturaleza a la de un proceso ejecutivo especial en atención a la necesidad de obtener decisiones prontas en materia expropiatoria. Por el contrario, a la hora de determinar el alcance del proceso declarativo especial de expropiación, resulta indispensable valorar las demás condiciones que rodean el proceso, entre ellas, la necesidad de evitar el ejercicio arbitrario del poder por parte del Estado. Se trata, entonces, de un proceso judicial que tiene por objeto declarar si hay lugar o no a expropiar un predio, más no ejecutar una decisión de la administración que, entre otras cosas, no tiene la posibilidad de ordenar la expropiación, como lo asegura la decisión mayoritaria.

**58.** En efecto, cuando la etapa de negociación previa se declara fallida, las entidades públicas que tienen facultades expropiatorias expiden una resolución en la que identifican el predio que requieren y su avalúo, con el fin de tasar la indemnización que corresponda con ocasión de la expropiación. Sin embargo, ese acto administrativo no tiene la virtualidad de disponer la expropiación. Esa actuación corresponde a una mera intención que se materializa en el proceso de expropiación. Ciertamente, es en esa actuación en la que el juez debe resolver si procede o no la declaratoria de expropiación con todos los elementos de juicio necesarios. De manera que, la línea argumentativa de la decisión de la mayoría en este caso dejó de lado las diferencias que existen entre la expropiación de carácter administrativo, la cual procede ante circunstancias excepcionalísimas, y el proceso judicial declarativo especial de expropiación que es la regla general en estos casos.

**59.** Ahora bien, si en gracia de discusión se admitiera que el proceso judicial declarativo especial de expropiación es equiparable a los procesos ejecutivos, es del caso señalar que en últimos la ley prevé la posibilidad de que los

*entregará al interesado a título de secuestro, que subsistirá hasta el día en que la condición resulte fallida, siempre que garantice su devolución en caso de que aquella se cumpla".*

demandados se opongan a las pretensiones de la demanda. En concreto, los artículos 422 y 423 del Código General del Proceso establecen de forma precisa las excepciones que pueden proponerse en los procesos ejecutivos y la forma en la que deben ser tramitadas. Lo mismo ocurre con otros procesos judiciales que deben resolverse de forma ágil. En efecto, el artículo 421 del mismo código prevé que los demandados en esos procesos podrán oponerse a todas las pretensiones de la demanda en la contestación. La norma solo limita el derecho a la defensa respecto de algunas excepciones previstas de forma taxativa en la misma norma.

**60.** De manera que, incluso, bajo la equiparación inadecuada del proceso declarativo especial de expropiación con otros procesos como el ejecutivo, es evidente que la prohibición contenida en la norma demandada es desproporcionada, porque impide el ejercicio de las garantías de audiencia, defensa, contradicción y en general el debido proceso de los demandados.

**Las herramientas dispuestas en el ordenamiento jurídico para discutir algunos asuntos relacionados con la expropiación no protegen en debida forma las garantías de audiencia, defensa, contradicción y en general el debido proceso de los demandados**

**61.** La decisión de la mayoría señaló que la norma no desconoce las garantías de defensa y contradicción, porque los demandados *(i)* pueden oponerse a la pretensión expropiatoria en fase administrativa; *(ii)* tienen la posibilidad de discutir el monto de la indemnización; y, *(iii)* cuentan con el medio de control de nulidad y restablecimiento del derecho para discutir el acto administrativo que dispone la expropiación. Además, consideró que las facultades oficiosas del juez en el proceso también garantizan el derecho al debido proceso de los involucrados.

**62.** Sin embargo, no comparto la aproximación de la mayoría. Respecto de las actuaciones en sede administrativa, es importante precisar que no tienen la entidad suficiente para garantizar el derecho a la defensa de quienes son demandados en un proceso declarativo especial de expropiación. Aquellas constituyen un mecanismo para que la administración reconsidere sus decisiones y tenga oportunidad de corregirlas en caso tal que resulten

contrarias a derecho, más no suplen el derecho de las personas de acceder a la administración de justicia para presentar sus pretensiones u oponerse a las que planteen en su contra ante un tercero imparcial e independiente que este facultado para pronunciarse de forma definitiva sobre el derecho en cuestión[156].

**63.** En cuanto a la posibilidad de oponerse al monto de la indemnización, considero que, a pesar de su relevancia en este tipo de procesos, no es el único asunto discutible. Tal y como lo expliqué con anterioridad, la pretensión de expropiación en si misma es debatible. Por tanto, las discusiones sobre la indemnización justa no suplen de manera satisfactoria el derecho de defensa, de contradicción y de audiencia de los demandados.

**64.** Por otra parte, la posibilidad de acudir al proceso de nulidad y restablecimiento del derecho advierto que la viabilidad de un trámite judicial adicional no es suficiente para demostrar que los demandados en este tipo de procesos cuenten con un mecanismo de defensa idóneo dentro del trámite judicial que genera la controversia. Además, la posibilidad de acudir a este medio jurisdiccional de control no está prevista de forma clara en la legislación. Tan es así que solo a partir de la Sentencia de Unificación del 11 de diciembre de 2015, proferida por el Consejo de Estado, se les permitió a los demandados acudir a ese trámite judicial para cuestionar las pretensiones de las entidades públicas. De manera que, la procedencia de este mecanismo adicional no está previsto de forma clara en la ley, motivo por cual no se puede considerar como un mecanismo supletorio de las garantías de audiencia, defensa y contradicción que deben garantizarse en el proceso declarativo especial de expropiación.

**65.** Finalmente, las facultades oficiosas del juez no hacen parte del derecho de defensa y contradicción de las partes. Su ejercicio depende de la voluntad de la autoridad judicial que conoce del proceso y, en esa medida, no pueden considerarse como parte del derecho de acción de los demandados. En suma, los mecanismos que la decisión mayoritaria identifica como garantes de los derechos de los afectados por trámites de expropiación judicial no son idóneos para garantizar los derechos fundamentales al debido proceso y de acceso a la administración de justicia de las personas afectadas por este tipo de trámites.

---

[156] *Cfr.,* Corte Constitucional, Sentencia C-319 de 2002.

**El control de constitucionalidad de la norma, a través del juicio intermedio de constitucionalidad, necesariamente conllevaba a la declaratoria de inexequibilidad de la norma**

**66.** Por último, considero que la decisión mayoritaria debió aplicar un juicio de proporcionalidad en su intensidad intermedia para evaluar la constitucionalidad de la norma cuestionada. Para justificar esta postura, explicaré *(i)* el amplio margen de configuración normativa del Legislador en materia de expropiación; *(ii)* los límites a de la función mencionada; con énfasis en *(iii)* la eficacia de las garantías que conforman el debido proceso y el acceso a la administración de justicia como restricción a la configuración normativa del asunto; y, *(iv)* precisaré el rol de las excepciones previas y de mérito en la salvaguardia de los derechos a la defensa y contradicción. A partir de ello, *(v)* concluiré que la norma acusada debió declararse inexequible, en aplicación del juicio intermedio de proporcionalidad referido.

### *(i) El Legislador cuenta con un amplio margen de configuración normativa en lo relativo a la expropiación*

**67.** En virtud del artículo 58 de la Constitución, el Legislador participa, directamente, en la operación de derecho público que implica la expropiación, a través de la definición: *(a)* de los motivos de utilidad pública o de interés social que habilitarían a las entidades públicas a adquirir un bien privado a través de la expropiación; *(b)* de los eventos en los cuales procederá la expropiación por vía administrativa;[157] y *(c)* de la forma en la que debe garantizarse el derecho a la indemnización.

**68.** Al respecto, la Sentencia C-216 de 1996 aclaró que *"cuando [la norma] se refiere al legislador y no específicamente al Congreso, permite que los motivos de utilidad pública o de interés social sean definidos excepcionalmente por el Ejecutivo, investido, desde luego, de las precisas facultades extraordinarias contempladas en su artículo 150, numeral 10° (76, numeral 12, de la Carta Política anterior, a cuyo amparo se expidieron las*

---

[157] *Cfr.,* Corte Constitucional, Sentencia C-153 de 1994.

*normas atacadas), vale decir, en su calidad de legislador extraordinario".*[158]
Por su parte, la Sentencia C-750 de 2015 precisó que *"[e]l legislador tiene una amplia libertad de configuración en materia expropiatoria. No obstante, esa competencia no puede vaciar el marco de acción que tiene el juez y la administración para fijar una indemnización que atienda las circunstancias de cada caso, así como los intereses en tensión. La ley no puede estandarizar a todos los eventos unos topes o cómputo de indemnización, porque en ocasiones puede que las reglas estáticas sean una barrera e impedimento para que las autoridades cancelen una indemnización justa".*[159]

**69.** Esas no son las únicas facultades que tiene el Legislador en la materia. También le corresponde definir los procedimientos judiciales y administrativos que deben agotar las autoridades públicas para declarar la expropiación de un bien privado. Aunque el mandato constitucional aludido no se refiere explícitamente al deber señalado, lo cierto es que reconoce que esa potestad solo puede ejercerse con posterioridad al agotamiento de un trámite administrativo o judicial que respete las garantías propias del debido proceso. [160] De manera que, una interpretación sistemática de la norma aludida con lo previsto en la cláusula general de competencia consagrada en los numerales 1 y 2 del artículo 150 de la Constitución, permite concluir que le corresponde al Congreso de la República determinar los procedimientos administrativos y judiciales que deben agotarse en materia expropiatoria.

**70.** Sobre este asunto, la Sentencia C-035 de 2016 aseguró que el legislativo puede establecer límites del derecho a la propiedad, al facultar a la administración para adelantar procesos de expropiación. Sin embargo, la Constitución consagra varias garantías en favor de los sujetos pasivos de la acción. Entre ellas que el legislador: *(a)* defina de manera previa los motivos de utilidad pública y de interés social que habilitarían al Gobierno para iniciar este tipo de procesos, *(b)* establezca la competencia de las entidades públicas para adelantar esos trámites; y *(c)* regule todo lo relativo al proceso de expropiación. Respecto de esta garantía, la providencia mencionada destacó que *"la participación de la rama legislativa dentro de la expropiación es de*

---

[158]  Corte Constitucional, Sentencia C-216 de 1996.

[159]  Corte Constitucional, Sentencia C-750 de 2015.

[160]  *Cfr.,* Corte Constitucional, Sentencias C- 1074 de 2002, C-474 de 2005, C-476 de 2007, C-227 de 2011, C-306 de 2013, C-410 de 2015, C-669 de 2015, C-750 de 2015, C-035 de 2016, C-080 de 2022 y C-020 de 2023, entre otras.

*especial importancia en nuestro sistema constitucional, ya que garantiza el principio de legalidad del procedimiento. Con ello impide el ejercicio arbitrario de la facultad de expropiación por parte del gobierno en sus diferentes niveles. Esta garantía del principio de legalidad limita el margen de acción del gobierno, y con ello ampara, desde el punto de vista subjetivo, el derecho fundamental al debido proceso de los administrados"*.[161]

**71.** En efecto, la jurisprudencia ha indicado de manera reiterada que la definición de los procedimientos judiciales y administrativos le corresponde al Congreso de la República y tiene una especial relevancia en el ordenamiento jurídico, en la medida en que, a través de ellos, se garantiza el derecho de acceso a la administración de justicia. Lo expuesto, porque su regulación *"contribuye a la protección y efectividad de los derechos, fortalece la seguridad jurídica, materializa el debido proceso, impacta en la racionalidad y la pacificación social, viabiliza un orden justo, y hace efectivo el mandato dirigido a las autoridades de protección de la vida, honra, bienes, creencias, y demás derechos y libertades de los asociados"*.[162]

**72.** Sobre el ejercicio de la competencia referida, la Corte ha advertido que aquella involucra *"la configuración de todos los elementos de cada una de las actuaciones que se adelantan en la jurisdicción"*.[163] En concreto, ha precisado que le corresponde al Congreso de la República determinar: *(a)* el procedimiento a seguir, *(b)* la naturaleza de las actuaciones judiciales, *(c)* las etapas procesales y sus términos, *(d)* las instancias que procedan, *(e)* las formalidades que se deben cumplir, *(f)* el régimen de competencias, *(g)* el sistema de publicidad de las actuaciones, *(h)* la forma de vinculación al proceso, *(i)* los medios de prueba, *(j)* los recursos para controvertir las decisiones y, en general, *(k)* los deberes, obligaciones y cargas procesales de las partes. Esto último lo faculta, incluso, para prescindir de etapas o recursos.[164]

**73.** Asimismo, esta Corporación ha señalado que *"el margen de configuración legislativa en materia de diseño de los procedimientos*

---

[161]  Corte Constitucional, Sentencia C-035 de 2016.

[162]  Corte Constitucional, Sentencia C-284 de 2021.

[163]  Corte Constitucional, Sentencia C-543 de 2011.

[164]  *Cfr.,* Corte Constitucional, Sentencias C-1104 de 2001, C-543 de 2011, C-315 de 2012, C-319 de 2013, C-282 de 2017, C-025 de 2018, C-031 de 2019, C-290 de 2019 y C-284 de 2021.

*judiciales es amplio "en tanto la Carta Política no prevé un modelo particular sobre la materia, de modo que corresponde al Congreso, legitimado en el principio democrático representativo, regular esa materia a partir de los criterios que considere más convenientes". En otras palabras, "todo cuanto concierne a los procedimientos judiciales, a menos que lo haya establecido directamente la Constitución, corresponde al legislador (…)"".*[165]

**74.** En suma, la jurisprudencia ha indicado que el legislador cuenta con un amplio margen de configuración normativa en lo relativo a la expropiación. En ejercicio de esa función, le corresponde establecer los motivos de utilidad pública o de interés social que habilitarían a las entidades públicas a adquirir un bien privado a través de la expropiación; los eventos en los cuales procederá la expropiación por vía administrativa;[166] la forma en la que debe garantizarse el derecho a la indemnización; y, los procedimientos judiciales y administrativos que deban adelantarse para expropiar un bien privado. Al diseñar esos trámites judiciales o administrativos, en principio, debe definir *(a)* el procedimiento a seguir, *(b)* la naturaleza de las actuaciones judiciales, *(c)* las etapas procesales y sus términos, *(d)* las instancias que procedan, *(e)* las formalidades que se deben cumplir, *(f)* el régimen de competencias, *(g)* el sistema de publicidad de las actuaciones, *(h)* la forma de vinculación al proceso, *(i)* los medios de prueba, *(j)* los recursos para controvertir las decisiones y, en general, *(k)* los deberes, obligaciones y cargas procesales de las partes. Esto último lo faculta, incluso, para prescindir de etapas o recursos.[167]

### *(ii) Los límites a la amplia libertad de configuración normativa que tiene el Legislador para diseñar los procedimientos para la expropiación*

**75.** A pesar de la amplia libertad que tiene el Legislador para diseñar los procedimientos judiciales y administrativos en general y, específicamente, en

---

[165] Sentencia C-543 de 2011. Esa misma postura fue reiterada en las Sentencias C-290 de 2019 y C-284 de 2021, entre otras.

[166] *Cfr.,* Corte Constitucional, Sentencia C-153 de 1994.

[167] *Cfr.,* Corte Constitucional, Sentencias C-1104 de 2001, C-543 de 2011, C-315 de 2012, C-319 de 2013, C-282 de 2017, C-025 de 2018, C-031 de 2019, C-290 de 2019 y C-284 de 2021.

los que respectan a la expropiación, la jurisprudencia ha señalado de forma enfática que esa función no es ilimitada. La Corte ha determinado que en "*toda atribución de competencia en el Estado Democrático, existen límites sustantivos que contienen y dan forma al poder congresional de fijar esos procedimientos*",[168] los cuales *"corresponden a la compatibilidad de las normas procesales con la Constitución"*.[169] Al respecto, ha agrupado estos límites en cuatro categorías que son aplicables a todos los procedimientos judiciales en general y se describen a continuación.

**76.** *Las previsiones constitucionales:* Este grupo de restricciones corresponden a las cláusulas constitucionales que definen de forma directa y explícita procedimientos o reglas procesales. Tal es el caso de la previsión constitucional de los procesos judiciales de tutela (artículo 86 Superior), extinción del derecho de dominio (artículo 34 Superior), y de las disposiciones que permiten impugnar los fallos de primera instancia en sede de tutela (artículo 86 Superior), o de las sentencias penales condenatorias (artículo 29 Superior).[170]

**77.** En materia expropiatoria, el artículo 58 de la Constitución prevé de manera explícita que el Legislador debe diseñar un trámite judicial de expropiación y otro, excepcional, de índole administrativa. Además, prevé que aquel debe ligarse a la configuración de los motivos de utilidad pública o de interés social; así como, consagrar mecanismos idóneos para que las personas puedan acceder a una indemnización previa. De manera que, estos mandatos constituyen un límite cierto y preciso al ejercicio de la función de regulación atribuida al Congreso en la materia.

**78.** *El cumplimiento de los fines esenciales del Estado y, particularmente, de la administración de justicia.* A partir de la idea de que los procedimientos judiciales son un instrumento idóneo para materializar el derecho sustancial, más no un fin en sí mismo, la jurisprudencia ha advertido que uno de los límites a la función regulatoria de los procedimientos tiene que ver con garantizar que las formas procesales otorguen eficacia a los principios que

---

[168]  Sentencia C-124 de 2011. Ver al respecto, las Sentencias C-652 de 1997, C-1335 de 2000, C-047 de 2001, C-570 de 2003, C-1264 de 2005, C-370 de 2006, C-471 de 2006, C-543 de 2011, C-315 de 2012, C-319 de 2013, C-282 de 2017, C-025 de 2018, C-031 de 2019, C-290 de 2019 y C-284 de 2021, entre otras.

[169]  Corte Constitucional, Sentencia C-284 de 2021.

[170]  *Cfr.,* Corte Constitucional, Sentencias C-124 de 2011, C-543 de 2011, C-284 de 2021.

rigen la administración de justicia, previstos en el artículo 228 de la Constitución. [171] En consecuencia, la Corte ha señalado que serán inadmisibles las "*formas de procedimiento judicial que nieguen la función pública del poder judicial, en especial la imparcialidad y autonomía del juez, impidan la vigencia del principio de publicidad, privilegien otros parámetros normativos distintos al derecho sustancial, impongan procedimientos que impiden el logro de una justicia oportuna, o hagan nugatorio el funcionamiento desconcentrado y autónomo de la función jurisdiccional (Art. 228 C.P.)*".[172]

**79.** *La observancia de los principios de razonabilidad y proporcionalidad.* Sobre estas restricciones, la jurisprudencia ha señalado que están relacionadas con la aplicación de los preceptos mencionados a todas las actuaciones públicas o de los particulares. En ese sentido, ha precisado que aquellos *"se derivan de la previsión del Estado Social de Derecho, la protección de los derechos y libertades de las personas como mandatos principales de las autoridades públicas, el respeto de la dignidad humana como fundamento del Estado, el carácter inalienable de los derechos de la persona, la responsabilidad de los servidores públicos por omisión o extralimitación en el ejercicio de sus funciones, y el requisito de proporcionalidad de las medidas adoptadas durante los estados de excepción"*.[173] En esa medida, implican que los procedimientos deben dirigirse a cumplir propósitos constitucionalmente admisibles y ser idóneos para alcanzar ese fin. Además, *"no deben interferir con el núcleo esencial de derechos, principios o valores superiores"*.[174]

**80.** *La eficacia de las garantías que conforman el debido proceso y el acceso a la administración de justicia.* Según la jurisprudencia, este límite está relacionado con la vigencia de los derechos fundamentales relacionados con los trámites judiciales. Al respecto, la Sentencia C-124 de 2011 afirmó que, en la medida en que:

---

[171] *Ibidem.*

[172] Corte Constitucional, Sentencia C-124 de 2011. Esa decisión, a su vez, tuvo en cuenta las Sentencias C-652 de 1997, C-1264 de 2005, C-471 de 2005y fue reiterada en la Sentencia C-543 de 2011.

[173] Corte Constitucional, Sentencia C-284 de 2021. Ver al respecto, Sentencia C- 555 de 2001.

[174] *Ibidem.*

*"el procedimiento judicial encuentra su justificación constitucional en la obtención de decisiones justas que resuelvan los conflictos de la sociedad, el mismo debe garantizar que las garantías que la Carta confiere a las partes no sean menoscabadas. Específicamente, el proceso judicial debe permitir el logro efectivo de los distintos componentes del derecho al debido proceso, como son los principios de legalidad, contradicción y defensa, de favorabilidad en los casos que resulte aplicable, de presunción de inocencia para los trámites propios del derecho sancionador, etc. Estas garantías se suman a otras, vinculadas a distintos derechos fundamentales, como son la igualdad de trato ante autoridades judiciales, la vigencia de la intimidad y la honra, la autonomía personal y la dignidad humana, entre muchas otras".*[175]

**81.** En conclusión, al diseñar los trámites judiciales y administrativos de expropiación, el legislador *(a)* debe observar los mandatos previstos en el artículo 58 de la Carta. Asimismo, *(b)* le corresponde garantizar la eficacia de los principios de la administración de justicia. En esa medida, debe evitar procedimientos judiciales que afecten la publicidad, privilegien la forma sobre el derecho sustantivo, dilaten injustificadamente la resolución de las controversias, desconozcan los principios de imparcialidad y autonomía judicial, o impidan el funcionamiento desconcentrado de la función jurisdiccional. De igual forma, el Congreso de la República *(c)* tiene que aplicar los principios de razonabilidad y proporcionalidad en el diseño de los trámites; y, *(d)* establecer mecanismos para materializar las garantías que conforman el debido proceso y el acceso a la administración de justicia.

### (iii)    *La eficacia de las garantías que conforman el debido proceso y el acceso a la administración de justicia, como límite a la potestad del Legislador para diseñar los trámites judiciales y administrativos en materia de expropiación*

**82.** La jurisprudencia ha indicado que el derecho fundamental de acceso a la administración de justicia, consagrado en el artículo 229 de la Constitución, corresponde a la garantía que tienen las personas de poner en marcha el aparato judicial para resolver sus controversias. Al respecto, la Sentencia C-543 de 2011 indicó que la Constitución de 1991 adoptó un concepto

---

[175] *Cfr.,* Corte Constitucional, Sentencias C-543 de 2011, C-319 de 2013, C-424 de 2015, y C-282 de 2017, entre otras.

material del acceso a la administración de justicia, en virtud del cual, no solo debe garantizarse la posibilidad de acudir a las autoridades judiciales para que se reciban y tramiten sus demandas, escritos y alegatos, sino el derecho de obtener una respuesta pronta y oportuna por parte de la administración de justicia.[176]

**83.** Por su parte, la Sentencia C-410 de 2015 explicó que esa garantía fundamental *"deriva en la posibilidad de acudir a las autoridades judiciales para buscar la preservación del orden jurídico y la protección o restablecimiento de sus derechos, con base en los procedimientos establecidos, y atendiendo a las garantías fundamentales del ordenamiento. Su protección implica la salvaguarda real y efectiva del acceso a las autoridades, para evitar escenarios de indefensión de los particulares o la imposibilidad de resolver las controversias que surjan entre ellos".* Asimismo, precisó que su alcance debe entenderse en un sentido material. Es decir, como un derecho que involucra la posibilidad real de obtener justicia, a través de las decisiones que adopten las autoridades competentes, para resolver la controversia sometida a su consideración de manera oportuna y con el respeto correspondiente al debido proceso.[177]

**84.** En esa misma línea, la Sentencia C-284 de 2021 aseguró que el acceso a la administración de justicia tiene un carácter instrumental, en la medida en que su ejercicio permite materializar y proteger otros derechos fundamentales. Asimismo, expuso que ese derecho fundamental le impone al legislador el deber de definir procedimientos que viabilicen *"el funcionamiento adecuado de las vías institucionales para la resolución de los conflictos que surgen de la vida en sociedad, con el propósito de que los ciudadanos puedan gozar de la efectividad de sus derechos fundamentales y se garantice la convivencia pacífica entre los asociados".[178]* Por tanto, consideró que, además de exigir la previsión y acceso a un mecanismo judicial, ese precepto constitucional *"involucra la efectividad de los procedimientos para la protección de los derechos e intereses de los asociados".[179]*

---

[176] *Cfr.,* Corte Constitucional, Sentencia C-543 de 2011.

[177] *Cfr.,* Corte Constitucional, Sentencia C-410 de 2015.

[178] Corte Constitucional, Sentencia C-031 de 2019, retomada en la Sentencia C-284 de 2021.

[179] Corte Constitucional, Sentencia C-284 de 2021.

**85.** En atención a lo expuesto, la jurisprudencia ha precisado que ese derecho fundamental comprende, entre otras, el deber de garantizar: *(a)* el acceso a un recurso judicial efectivo, es decir, a procedimientos idóneos y efectivos para la determinación legal de derechos y obligaciones, así como para la solución de las controversias;[180] *(b)* la celeridad procesal, en el sentido de obtener decisiones prontas y sin dilaciones injustificadas;[181] *(c)* el derecho a que la controversia sea resuelta por un juez o tribunal imparcial competente para resolver el conflicto;[182] *(d)* la posibilidad de utilizar los instrumentos procesales para plantear pretensiones ante la jurisdicción;[183] *(e)* el respeto pleno del debido proceso;[184] *(vi)* la previsión de medidas que faciliten el acceso de las personas de escasos recursos económicos al sistema judicial;[185] *(f)* la oferta de justicia en todo el territorio nacional;[186] y, *(g)* el derecho a obtener una providencia judicial que resuelva las pretensiones de conformidad con las normas vigentes y pueda cumplirse de manera efectiva.[187]

**86.** A mi juicio, lo expuesto no impide que el legislador establezca límites al ejercicio del derecho de acceso a la administración de justicia. Tal y como lo advirtió la Sentencia C-652 de 1997, esa garantía *iusfundamental* no puede entenderse como una posibilidad abierta e ilimitada de los ciudadanos de acceder al aparato de justicia sin condición alguna.[188] Por el contrario, en los términos de la Sentencia C-1195 de 2001, su ejercicio puede restringirse a través de la previsión de requisitos de procedibilidad, límites temporales, oportunidades procesales, entre otros medios, siempre y cuando estén dirigidos a garantizar el derecho sustancial y resulten razonables.[189]

---

[180] *Cfr.,* Corte Constitucional, Sentencias C-159 de 2016, C-003 de 2017, C-193 de 2020 y C-284 de 2021, entre otras.

[181] *Cfr.,* Corte Constitucional, Sentencia C-543 de 2011, C-159 de 2016, entre otras.

[182] *Cfr.,* Corte Constitucional, Sentencias C-410 de 2015 y C-284 de 2021.

[183] *Cfr.,* Corte Constitucional, Sentencia C-1195 de 2001, C-410 de 2015 y C-284 de 2021.

[184] *Ibidem.*

[185] *Ibidem.*

[186] *Ibidem.*

[187] *Ibidem.*

[188] *Cfr.,* Corte Constitucional, Sentencia C-652 de 1997.

[189] *Cfr.,* Corte Constitucional, Sentencia C-1195 de 2001.

**87.** En cuanto al debido proceso, la jurisprudencia ha identificado que esa garantía corresponde a una cláusula compleja prevista en los artículos 29 de la Constitución[190] y 8.1 de la Convención Americana de Derechos Humanos.[191] Aquella contempla una serie de garantías que deben observarse en todos los procesos judiciales y administrativos, entre ellas, los derechos de las personas a ser oídas, a obtener justicia en un plazo razonable, a contar con un juez imparcial y competente que resuelva la controversia, a defenderse de las acusaciones que se presenten en su contra y a contradecir las pretensiones de su contraparte.

**88.** Sobre estas últimas, las Sentencias C-029 y C-284 de 2021 destacaron que aquellas garantizan que *"el acceso a la justicia no sea formal o nominal, sino que las personas cuenten con posibilidades reales de exigir y obtener la protección de sus derechos e intereses en los mecanismos administrativos y judiciales"*.[192] Según la jurisprudencia, aquellas viabilizan la participación de los ciudadanos involucrados como parte activa o pasiva de los distintos procesos judiciales. En esa medida, es una manifestación del principio de dignidad humana y un presupuesto para que se materialice el valor superior de la justicia. Por ese motivo, en *"la definición de los mecanismos judiciales resulta imperativo asegurar los derechos de contradicción y defensa como elementos medulares del debido proceso"*.[193]

---

[190] Constitución Política de Colombia. Artículo 29. *"El debido proceso se aplicará a toda clase de actuaciones judiciales y administrativas. // Nadie podrá ser juzgado sino conforme a leyes preexistentes al acto que se le imputa, ante juez o tribunal competente y con observancia de la plenitud de las formas propias de cada juicio. // En materia penal, la ley permisiva o favorable, aun cuando sea posterior, se aplicará de preferencia a la restrictiva o desfavorable. // Toda persona se presume inocente mientras no se la haya declarado judicialmente culpable. Quien sea sindicado tiene derecho a la defensa y a la asistencia de un abogado escogido por él, o de oficio, durante la investigación y el juzgamiento; a un debido proceso público sin dilaciones injustificadas; a presentar pruebas y a controvertir las que se alleguen en su contra; a impugnar la sentencia condenatoria, y a no ser juzgado dos veces por el mismo hecho. // Es nula, de pleno derecho, la prueba obtenida con violación del debido proceso".*

[191] Convención Americana de Derechos Humanos. Artículo 8.1. *"Toda persona tiene derecho a ser oída, con las debidas garantías y dentro de un plazo razonable, por un juez o tribunal competente, independiente e imparcial, establecido con anterioridad por la ley, en la sustanciación de cualquier acusación penal formulada contra ella, o para la determinación de sus derechos y obligaciones de orden civil, laboral, fiscal o de cualquier otro carácter".*

[192] Corte Constitucional, Sentencia C-284 de 2021.

[193] *Ibidem.*

**89.** Asimismo, aseguraron que existe una relación intrínseca entre ambas garantías. Sin embargo, las providencias mencionadas destacaron que esos preceptos tienen componentes diferenciables. Ciertamente, las providencias referidas advirtieron que, de un lado, el derecho de defensa involucra la posibilidad de utilizar los medios legítimos e idóneos que establece el ordenamiento para ser oído en un proceso y obtener una decisión favorable a sus intereses. Aquel comprende *"(i) la efectiva vinculación al trámite; (ii) la asistencia de un abogado cuando sea necesario; (iii) el derecho a ser oído en el proceso; (iv) la posibilidad de aportar medios probatorios; (v) el derecho a impugnar la sentencia condenatoria; (vi) el diseño de trámites y la fijación de plazos razonables; y, (vii) el otorgamiento del tiempo y los medios adecuados para la preparación de la defensa".* [194] Y, del otro, el derecho de contradicción tiene que ver con la confrontación de los elementos sustantivos y procesales que afectan los derechos e intereses del proceso respectivo, a pesar de que en términos amplios está dirigido a proteger los intereses de una de las partes en el procedimiento. Bajo esta perspectiva, la jurisprudencia de la Corte precisó que ese precepto contempla *"(i) el derecho de contradecir o debatir las pretensiones, que incluye la formulación de excepciones formales y sustanciales* https://www.corteconstitucional.gov.co/relatoria/2021/C-284-21. htm - _ftn98*; [195] (ii) la posibilidad de oponer pruebas a las que se presentaron en su contra; (iii) participar efectivamente en la producción de la prueba solicitada por la contraparte, (iv) exponer los argumentos en torno a los medios de prueba; y (v) presentar recursos en contra de las decisiones desfavorables".*[196]

**90.** Ahora bien, en los términos expuestos, los derechos de acceso a la administración de justicia y al debido proceso tienen una relación intrínseca, al punto que comprenden garantías que se entrelazan entre sí.[197] Al respecto, la Sentencia C-410 de 2015 aseguró que el debido proceso protege los derechos subjetivos de los ciudadanos en los procedimientos que adelantan ante las autoridades; mientras que, el acceso a la administración de justicia constituye un pilar fundamental de la sociedad democrática, en la medida en

---

[194] Corte Constitucional, Sentencia C-284 de 2021. Ver al respecto, las Sentencias C-341 de 2014 y C- 029 de 2021.

[195] *Cfr.,* Corte Constitucional, Sentencias C-939 de 2003 y C-641 de 2002.

[196] Corte Constitucional, Sentencia C-284 de 2021. Ver al respecto, Sentencia C-029 de 2021.

[197] *Cfr.,* Corte Constitucional, Sentencia C-410 de 2015.

que es el instrumento que le permite a las personas defenderse de las intromisiones indebidas de terceros o del Estado.[198] En consecuencia, *"el sistema judicial se articula como una serie de herramientas para la defensa de los derechos del ciudadano y sus intereses a través de las formas procesales"*.[199]

**91.** En esa misma providencia, la Corte resaltó que *"[a] la luz de ese orden de valores que irradian a los procedimientos en el Estado de Derecho, surge estándares para las formas procesales, en particular los recursos judiciales. En concordancia con ello, los sistemas regionales de protección de derechos humanos han establecido dos criterios específicos con los que deben cumplir los recursos para que haya una garantía verdadera del acceso a la justicia"*.[200] El primero de ellos consiste en que el proceso judicial debe ser un instrumento útil para materializar el acceso a la justicia y la eficacia del debido proceso. Al respecto, destacó que, en los casos en que la Corte Interamericana de Derechos Humanos ha determinado la responsabilidad internacional del Estado colombiano por violaciones a los derechos humanos, ha analizado si los trámites judiciales dispuestos por el ordenamiento jurídico cumplen de manera conjunta con las garantías previstas en los artículos 8 y 25 de la Convención Americana de Derechos humanos. Y, el segundo tiene que ver con la importancia de verificar la eficacia de esos recursos en el caso a caso. Lo expuesto, porque, si bien los procesos judiciales pueden cumplir con las garantías exigidas de manera global, es probable que en determinado caso no resulten idóneos para materializar los derechos de la persona afectada. Para justificar su punto, la sentencia aludió a las sentencias proferidas por esa Corporación en los casos Masacre de Pueblo Bello, Masacre de la Rochela, Masacre de Mapiripán, Escué Zapata, Valle Jaramillo, Manuel Cepeda Vargas y Vélez Restrepo contra Colombia.

**92.** Con fundamento en la correlación señalada, las Sentencias C-410 de 2015, C-029 y C-284 de 2021 advirtieron que, para evaluar si una medida procesal afecta la eficacia de los derechos de acceso a la administración de justicia y de debido proceso, puntualmente, en sus garantías de contradicción y defensa, es necesario atender a las siguientes reglas jurisprudenciales:

---

[198] *Ibidem*.

[199] Corte Constitucional, Sentencia C-410 de 2015.

[200] *Ibidem*.

- El Legislador cuenta con amplio margen de configuración normativa para diseñar los diferentes procesos judiciales y administrativos. Ello significa que las normas proferidas en ejercicio de esa función gozan de presunción de constitucionalidad. Por tanto, su escrutinio debe realizarse a través de un juicio de proporcionalidad que evalúe el impacto de la disposición acusada en las garantías constitucionales advertidas. En principio, la intensidad del "test" debe ser débil, en atención a la presunción referida. Sin embargo, tal y como lo advirtió la Sentencia C-213 de 2017, *"el rigor del escrutinio puede incrementarse en atención a las múltiples dimensiones de los derechos fundamentales que involucra el ejercicio de esa competencia"*.[201]

- Los procesos judiciales deben garantizar que las controversias sean resueltas de fondo, de manera definitiva y dentro de un término razonable, sin dilaciones injustificadas,[202] por el juez legalmente competente para el efecto, quien debe ser funcionalmente independiente, imparcial y estar sometido al imperio de la ley.

- Al diseñar los trámites judiciales, el Congreso de la República debe establecer mecanismos procesales que materialicen el derecho a la defensa. Entre otros asuntos, debe prever que las partes del proceso cuenten con *"la facultad de pedir y allegar pruebas y controvertir las que se alleguen en su contra, formular peticiones y alegaciones e impugnar las decisiones que se adopten. El ejercicio de este derecho tiene como presupuesto indispensable la publicidad del proceso, mediante las citaciones para obtener comparecencia, los traslados de actos procesales de las partes o de los auxiliares de la justicia, y las notificaciones, comunicaciones y publicaciones de las decisiones adoptadas"*.[203]

- Los derechos de acceso a la administración de justicia, contradicción y defensa deben ser garantizados en todos los mecanismos judiciales. Con todo, en los términos señalados por la Sentencia C-820 de 2011,

---

[201]  Corte Constitucional, Sentencia C-284 de 2021.

[202]  *Cfr.,* Corte Constitucional, Sentencia C-543 de 2011, C-410 de 2015, entre otras.

[203]  Corte Constitucional, Sentencia C- 410 de 2015.

ello no implica que exista una sola forma de materializar estas prerrogativas. Por el contrario, estos mandatos pueden materializarse de diferentes maneras, en atención al diseño procesal establecido.

- El diseño de los trámites judiciales debe responder a la naturaleza de los asuntos y a los objetivos que aquellos pretendan satisfacer. Como consecuencia de ello, la Sentencia C-282 de 2017 indicó que, por regla general, la posible afectación de una norma a las garantías previstas en los artículos 29 y 229 de la Carta no puede establecerse a partir de una comparación con otros procedimientos de igual jerarquía que establezca el ordenamiento jurídico.

- El legislador puede establecer cargas procesales para el ejercicio del derecho de contradicción. Ello no implica *prima facie* una afectación de las garantías del debido proceso. En todo caso, *"**su definición debe guardar una conexidad razonable con el fin del proceso y no puede eliminar, por completo, la posibilidad de que el demandado se defienda efectivamente en el trámite mediante excepciones que tengan un impacto directo en los presupuestos del proceso"***.[204] Con fundamento en esta regla jurisprudencial, la Sentencia C-886 de 2004 declaró la inexequibilidad de una norma que le exigía a las personas demandadas en procesos de restitución de inmueble arrendado demostrar que habían pagado algunos rubros, entre ellos, los servicios públicos dentro de los 30 días siguientes a la exigibilidad del pago, para ser oídos en el proceso. Para la Corte, ese requisito tenía la potencialidad de eliminar la posibilidad de que los arrendatarios ejercieran su derecho a la defensa.

- Las normas que disponen mecanismos procesales que eliminan la posibilidad de ejercer la defensa o que inciden de manera grave en su ejercicio son contrarias al artículo 29 de la Constitución. Además, como lo señaló la Sentencia C-383 de 2000, desconocen los principios de igualdad, justicia y protección de los bienes y derechos de todos los asociados.

---

[204] Corte Constitucional, Sentencia C- 284 de 2021.

- En algunas ocasiones, el derecho a la defensa puede entrar en tensión con la garantía de celeridad en la administración de justicia. Esto ocurre cuando el Legislador limita las oportunidades o reduce los términos procesales para presentar pruebas o controvertir argumentos, con el fin de garantizar decisiones judiciales prontas. Según las Sentencias C-543 de 2011 y C-648 de 2001, para solucionar esta pugna, la Corte debía determinar si la restricción del derecho a la defensa es proporcionada. Para el efecto, debe adelantar un juicio de proporcionalidad, en el que no solo verifique si la norma logre una finalidad legítima. También, debe evaluar *"si la limitación era necesaria y útil para alcanzar tal finalidad. Además, para que dicha restricción sea constitucional, se requiere que sea ponderada o proporcional en sentido estricto. Este paso del juicio de proporcionalidad se endereza a evaluar si, desde una perspectiva constitucional, la restricción de los derechos afectados es equivalente a los beneficios que la disposición genera. Si el daño que se produce sobre el patrimonio jurídico de los ciudadanos es superior al beneficio constitucional que la norma está en capacidad de lograr, entonces es desproporcionada y, en consecuencia, debe ser declarada inconstitucional"*.[205]

**93.** A partir de lo expuesto, considero que los derechos de acceso a la administración de justicia y de debido proceso constituyen un límite importante al amplio margen de configuración del Legislador en el diseño de los procedimientos en general y, en especial, de aquellos que deben establecerse en materia expropiatoria. Estos preceptos constitucionales tienen una relación intrínseca que exige una valoración conjunta de ambos mandatos, en tanto las garantías que los componen se entrelazan. Su observancia exige que los procesos que establezca el Congreso de la República permitan a los ciudadanos un acceso real y efectivo a la administración de justicia, para que su causa sea resuelta con las formas propias de cada juicio, las cuales deben ofrecer a las partes las garantías mínimas para que planteen sus pretensiones y ejerzan su defensa. Con todo, las normas proferidas por el legislativo en estos asuntos gozan de presunción de constitucionalidad. En esa medida, el escrutinio de constitucionalidad debe realizarse a través de un juicio de proporcionalidad, cuya intensidad dependerá de la naturaleza de los múltiples derechos involucrados en el

---

[205] Corte Constitucional, Sentencia C-543 de 2011. Ver al respecto, las Sentencias C-699 de 2000, C-803 de 2000 y C-648 de 2001.

trámite regulado. Con fundamento en lo expuesto, precisaré la relación de la figura procesal de las excepciones previas y de mérito y con las garantías de defensa y contradicción.


### (iv)   *Las excepciones previas y de mérito y su relación con el derecho de defensa y contradicción*

**94.** Ahora bien, las excepciones son instrumentos procesales que otorga el ordenamiento jurídico a las personas demandadas en los diferentes procesos judiciales para que puedan ejercer su derecho de contradicción y defensa. A través de ellas, la parte pasiva del proceso puede *(a)* atacar las pretensiones de la demanda; *(b)* enderezar el litigio para evitar posibles nulidades; o *(c)* solicitar la terminación de los procesos que no cuentan con las formalidades exigidas para ser adelantado.[206]

**95.** La jurisprudencia ha identificado tres tipos de excepciones, a saber.[207] Las previas son aquellas que están relacionadas con el procedimiento, tienen por propósito sanear el proceso y se resuelven en las primeras etapas del proceso.[208] En materia civil, este tipo de excepciones están consagradas de forma taxativa en el artículo 100 del Código General del Proceso.[209] Por su parte, las mixtas pretenden cuestionar asuntos sustanciales del trámite, pero la

---

[206] *Cfr.,* Consejo de Estado. Sección Tercera. Subsección B. Sentencia del 30 de agosto de 2018. Radicado: 41001-23-33-000-2015-00926-01 (58225).

[207] *Cfr.,* Corte Constitucional, Sentencia C-1335 de 2000.

[208] *Ibidem.*

[209] Código General del Proceso. Artículo 100. *"Excepciones previas. Salvo disposición en contrario, el demandado podrá proponer las siguientes excepciones previas dentro del término de traslado de la demanda: // 1. Falta de jurisdicción o de competencia. // 2. Compromiso o cláusula compromisoria. // 3. Inexistencia del demandante o del demandado. // 4. Incapacidad o indebida representación del demandante o del demandado. // 5. Ineptitud de la demanda por falta de los requisitos formales o por indebida acumulación de pretensiones. // 6. No haberse presentado prueba de la calidad de heredero, cónyuge o compañero permanente, curador de bienes, administrador de comunidad, albacea y en general de la calidad en que actúe el demandante o se cite al demandado, cuando a ello hubiere lugar. // 7. Habérsele dado a la demanda el trámite de un proceso diferente al que corresponde. // 8. Pleito pendiente entre las mismas partes y sobre el mismo asunto. // 9. No comprender la demanda a todos los litisconsortes necesarios. // 10. No haberse ordenado la citación de otras personas que la ley dispone citar. // 11. Haberse notificado el auto admisorio de la demanda a persona distinta de la que fue demandada".*

autoridad judicial se pronuncia sobre ellas en la audiencia inicial, para garantizar la economía procesal. Con todo, este mecanismo procesal no está contemplado para todos los procedimientos. [210] En el ámbito civil, inicialmente, estaban contempladas en el artículo 97 del Código de Procedimiento Civil. [211] Sin embargo, el Legislador no las reprodujo en el Código General del Proceso. Finalmente, las de mérito o fondo están dirigidas a desvirtuar las pretensiones propuestas por el demandante, es decir, constituyen un verdadero ataque al fondo de la demanda. En los términos de la jurisprudencia, aquellas:

> *"constituyen un verdadero contraderecho del demandado, preexistente al proceso y que excluye los efectos jurídicos perseguidos por la demanda; quien propone una excepción al ser demandado, en realidad lo que hace es alegar hechos nuevos, distintos a los expuestos en el libelo introductorio e impeditivos o extintivos del derecho pretendido por el actor. [... Además,] están constituidas por hechos que i) desvirtúan las pretensiones, al ser demostrativos de la inexistencia del derecho alegado por el demandante, bien sea porque el mismo nunca surgió a su favor o porque habiendo existido, se extinguió; o ii) sin demostrativos de que la reclamación del derecho resulta inoportuna, por estar sujeta a un plazo o condición que no se haya cumplido".* [212]

**96.** Lo expuesto, permite concluir que las excepciones tienen una relación estrecha con el derecho de contradicción y de defensa de las personas que son demandadas en los diferentes procesos judiciales. Sin embargo, ello no significa que todos los procesos judiciales deban contemplar este instrumento procesal de forma abierta e ilimitada. Tal y como lo advertí previamente, las garantías de contradicción y defensa no son absolutas, sino que pueden ser restringidas. Como consecuencia de ello, el Legislador puede limitar la

---

[210] *Cfr.,* Consejo de Estado. Sección Tercera. Subsección B. Sentencia del 30 de agosto de 2018. Radicado: 41001-23-33-000-2015-00926-01 (58225). Ver al respecto: Corte Suprema de Justicia, Sala de Casación Civil. Sentencia del 19 de junio de 2015. Radicado. 2010-00006; Consejo de Estado, Sección Tercera, Subsección A. Auto del 20 de noviembre de 2017. Radicado. 58834.

[211] Código de Procedimiento Civil. Artículo 97. *"[...] También podrán proponerse como previas las excepciones de cosa juzgada, transacción, caducidad de la acción, prescripción extintiva y falta de legitimación en la causa. Cuando el juez encuentre probada cualquiera de estas excepciones, lo declarará mediante sentencia anticipada".*

[212] Consejo de Estado. Sección Tercera. Subsección B. Sentencia del 20 de febrero de 2014. Radicado: 25000-23-26-000-2001-01678-01 (27507).

presentación de excepciones en los diferentes procesos judiciales, siempre que no afecte el núcleo esencial de las garantías mencionadas y atienda a los principios de razonabilidad y proporcionalidad. [213] Esta tensión ha sido analizada en sede de control abstracto de constitucionalidad en varias ocasiones, tal y como se expone a continuación.

**97.** De manera previa a la Constitución de 1991, en Sentencia del 27 de junio de 1978, la Corte Suprema de Justicia analizó la constitucionalidad de los artículos 453, 454 y 457 del Código de Procedimiento Civil, los cuales regulaban el proceso de expropiación judicial por motivos de utilidad pública, a la luz de la reforma constitucional de 1936 en materia del derecho a la propiedad. Una de las censuras planteadas por el demandante consistía en señalar que el artículo 453 referido[214] era contrario a los derechos de igualdad y de debido proceso, porque, al impedir la presentación de excepciones en los procesos judiciales de expropiación, sometía a los demandados a un procedimiento que elimina el derecho de defensa. A su juicio, esa situación, a su vez, colocaba a la persona en una situación de desventaja respecto de las demás personas.

**98.** En esa oportunidad, la Sala Plena de esa Corporación advirtió que la disposición acusada obligaba al juez a emitir un pronunciamiento de oficio sobre las circunstancias que darían lugar a presentar excepciones previas. Además, precisó que, en caso de encontrar configurado alguno de los eventos señalados, la autoridad judicial debía abstenerse de decretar la expropiación. De manera que, a su juicio, la norma otorgaba mecanismos suficientes para garantizar el ejercicio del derecho al debido proceso, la igualdad y el derecho de propiedad del sujeto pasivo de la expropiación. En sus propios términos, *"la actuación oficiosa y obligatoria que la ley impone al juez suple cabalmente la defensa del interés privado a la vez que permite hacer efec-tivo el interés social o la razón de utilidad pú-blica que justifica la expropiación y que debe prevalecer, en los términos del artículo 30 de la Constitución".[215]*

---

[213]  *Cfr.,* Corte Constitucional, Sentencia C-764 de 2014.

[214]  Código de Procedimiento Civil. Artículo 453. *"Excepciones. En este proceso no son admisibles excepciones de ninguna clase, pero en la sentencia el juez se pronunciará de oficio sobre las circunstancias contempladas en los numerales 1, 3, 4, 5 y 7 del artículo 97, y si encontrare establecida alguna, así lo expresará y se abstendrá de resolver la expropiación".*

**99.** En esa misma línea, aseguró que el fin último del proceso era evitar el desconocimiento del derecho de propiedad del demandado, el cual queda igualmente materializado con la tutela eficaz del juez, dispuesta por la norma. Además, como fundamento para considerar que la norma acusada no era contraria a la Constitución, afirmó que:

> *"las excepciones no son el único medio de defensa de que disponen los particulares para la protección de sus derechos y que, en el presente caso, esa garan-tía está constituida precisamente por el juicio de expropiación, dentro del cual hay amplia y equitativa controversia entre la administración y la persona afectada por la expropiación. En dicho proceso se determina, y ese es uno de sus objetivos, el monto de la indemnización que debe pagarse y en ese aspecto no hay restricción algu-na del derecho de defensa, ni el Estado tiene una situación de parte privilegiada, pues la ley lo coloca en igualdad de situación que al expropia-do. Y el pago de tal indemnización no es otra cosa que la garantía del derecho afectado, porque es la compensación legal del perjuicio sufrido".*[216]

**100.** Posteriormente, en Sentencia C-1335 de 2000, la Corte Constitucional estudió la constitucionalidad de una disposición que establecía un término para que los demandados en procesos ejecutivos con título hipotecario o prendario propusieran excepciones previas y de mérito. En esa ocasión, la Sala Plena advirtió que, en atención a la naturaleza del proceso, la determinación de un lapso para presentar excepciones previas y de mérito no vulnera el debido proceso, sino que lo desarrolla. Lo anterior, porque establece un término razonable para que se ejerzan las garantías de defensa y contradicción por parte de los demandados.

**101.** En ese mismo sentido, las Sentencias C-641 de 2002 y C-393 de 2003 advirtieron que, en virtud del artículo 29 Superior, los procesos judiciales deben proteger varias garantías mínimas. Entre ellas, *"el derecho de contradecir o debatir las pretensiones o excepciones propuestas".*[217] Al respecto señalaron que el mandato constitucional referido exige, de un lado,

---

[215]  Corte Suprema de Justicia. Sala Plena. Sentencia del 27 de junio de 1978.

[216]  *Ibidem.*

[217]  Corte Constitucional, Sentencia C-641 de 2002.

garantizar la intervención plena y eficaz de los sujetos procesales. Y, del otro, protegerlo de las posibles conductas abusivas en que puedan incurrir las autoridades involucradas en el asunto y las encargadas de definir la situación jurídica sometida a su consideración.[218]

**102.** Por su parte, la Sentencia C-886 de 2004 se pronunció sobre una norma que exigía que los sujetos demandados en procesos judiciales de restitución de bien inmueble arrendado haber cancelado algunas de las expensas previstas en el contrato, entre ellas, los servicios públicos, dentro de los 30 días siguientes a la exigibilidad del pago, para poder ejercer su derecho de defensa. Al analizar el impacto de la norma, la Corte advirtió que la disposición podía generar como efecto la anulación del derecho a la defensa de los accionados. En consecuencia, el Legislador había previsto una carga procesal desproporcionada que contradecía la Constitución. Por tanto, declaró la inexequibilidad del contenido normativo acusado.

**103.** En Sentencia C-1193 de 2005, la Sala Plena analizó la constitucionalidad de una disposición que, en los procesos ejecutivos, solo permitía proponer excepciones previas, a través del recurso de reposición presentado en contra de la providencia judicial que libraba mandamiento de pago. Para la demandante, la disposición desconocía el derecho de defensa, porque impedía eliminar los errores judiciales que podría cometer la autoridad judicial de primera instancia, a través del trámite de apelación. Sin embargo, la Corte advirtió que el Legislador está facultado para definir los recursos que proceden en contra de una determinación, la forma de ejercerlos y la oportunidad procesal en la que deben presentarse. De manera que, la norma corresponde a una decisión de política legislativa que pretende descongestionar la justicia. Además, señaló que la disposición no afectaba el derecho a la defensa, porque el efecto de la norma no era dejar de tramitar la oposición del demandante, sino *"que ellas no serán tramitadas como un incidente de previo y especial pronunciamiento, en el que, además, la providencia que lo resolvía era susceptible de impugnación con el recurso de apelación. De esta suerte, si los hechos constitutivos de excepciones previas de todas maneras pueden ser alegados, resulta evidente que no le asiste la razón a la actora sobre la supuesta violación del derecho de defensa como sucedería si se le impidiera por completo su alegación"*.[219] Esta perspectiva

---

[218]  *Cfr.,* Corte Constitucional, Sentencias C-641 de 2002 y C-393 de 2003.

[219]  Corte Constitucional, Sentencia C-1193 de 2005.

fue reiterada en la Sentencia C-032 de 2006, la cual, además, precisó que ese tipo de decisiones por parte del legislativo están amparadas por el mandato de celeridad en la administración de justicia.

**104.** Por último, en Sentencia C-726 de 2011, la Corte tuvo oportunidad de analizar si la regulación del proceso monitorio, establecida en los artículos 419 y siguientes del Código General del Proceso, afectaba los derechos de igualdad y debido proceso, en la medida en que le permitía al juez adoptar una decisión de fondo, sin escuchar a la parte demandada. En atención a las censuras propuestas, la Sala Plena estudió la norma a través de un juicio de proporcionalidad y razonabilidad leve, en atención al amplio margen de configuración normativa del Legislador en la materia. A partir de ello, consideró que la norma no desconocía las garantías del demandado, porque dispuso otros mecanismos para garantizar el derecho de defensa de las personas denominado oposición. En efecto, se advirtió:

> *"de una parte, que la regulación acusada persigue una finalidad constitucionalmente legítima, como es la de facilitar el acceso a la justicia, particularmente en relación con controversias de mínima cuantía, y de otra, que pese a que en este caso se haya invertido la secuencia que usualmente tienen los procesos judiciales, existen en la normatividad acusada suficientes garantías del derecho de defensa del demandado, entre ellas la imposibilidad de notificarle a través de curador ad –lítem, o la regla según la cual, en caso de oposición fundada por parte del demandado, el proceso se transforma en un trámite declarativo (proceso verbal sumario), dentro del cual aquél podría ejercer plenamente su derecho de defensa. Por ello concluyó que la aplicación de estas normas no rompe la igualdad entre las partes procesales, ni tampoco lesiona el debido proceso, como en este caso se alegó, razón por la cual estas normas resultan exequibles".*[220]

**105.** Con fundamento en lo expuesto hasta este punto, es posible concluir que las excepciones son mecanismos procesales que viabilizan el ejercicio de los derechos de defensa y contradicción, las cuales no son garantías absolutas. En esa medida, el legislador cuenta con un amplio margen de configuración normativa para establecer si esos instrumentos proceden o no y la forma en la que estas pueden interponerse, en atención a la naturaleza del proceso y al

---

[220] Corte Constitucional, Sentencia C-726 de 2011.

principio de celeridad, siempre que no afecte el núcleo esencial de las garantías mencionadas y atienda a los principios de razonabilidad y proporcionalidad.

### *(v) La disposición acusada debió declararse inexequible en aplicación del juicio de proporcionalidad en sentido estricto*

**106.** Los demandantes consideraron que la expresión *"[n]o podrá proponer excepciones de ninguna clase"*, prevista en el numeral 5° del artículo 399 del Código General del Proceso, desconoce los derechos fundamentales de acceso a la justicia (artículo 229 Superior) y de debido proceso (artículo 29 Superior). Lo expuesto, en la medida en que impide que los afectados por el proceso judicial declarativo especial de expropiación ejerzan sus garantías de contradicción y defensa, al punto que les imposibilita acceder a la justicia, desde un punto de vista material. Además, señalaron que el deber del juez de subsanar los errores formales de la demanda es insuficiente para materializar las garantías mencionadas, en la medida en que la autoridad judicial no puede suplir las actuaciones de las partes y traslada el derecho de las partes a una autoridad imparcial sin permitir a los demandados defenderse bajo su propia comprensión del asunto.

**107.** Por su parte, algunos intervinientes indicaron que la norma no podía leerse de manera aislada. En su criterio, los afectados cuentan con mecanismos idóneos de defensa, en la medida en que pueden acudir a la Jurisdicción de lo Contencioso Administrativo para discutir el contenido de los actos administrativos proferidos en la etapa previa al proceso de expropiación propiamente dicho. Asimismo, advirtieron que el contenido normativo demandado, inicialmente, estaba contemplado en el artículo 453 del Código de Procedimiento Civil y fue declarado exequible por la Sala Plena de la Corte Suprema de Justicia. Lo expuesto, entre otras cosas, al considerar que el deber oficioso del juez era suficiente para garantizar los derechos de las partes, en la medida en que, en últimas, evitaba las limitaciones arbitrarias del derecho a la propiedad que era lo importante. Y, finalmente, señalaron que la norma fue expedida en ejercicio de las amplias facultades del Legislador para el efecto y es constitucional en la medida en que pretende garantizar la celeridad del proceso en aras de materializar el interés general.

**108.** Para abordar el examen del asunto, la Corte debió *(i)* precisar el alcance de la decisión adoptada por la Corte Suprema de Justicia en la Sentencia del 27 de junio de 1978; *(iii)* establecer la metodología aplicable al caso concreto; y, *(iii)* estudiar el cargo propuesto, en los siguientes términos

### (a) *Alcance de la decisión adoptada por la Sala Plena de la Corte Suprema de Justicia en Sentencia del 27 de junio de 1978*

**109.** El proceso judicial de expropiación estaba regulado el Código de Procedimiento Civil. Sobre la posibilidad de presentar excepciones, el artículo 453 de esa norma establecía que *"[e]n este proceso no son admisibles excepciones de ninguna clase, pero en la sentencia el juez se pronunciará de oficio sobre las circunstancias contempladas en los numerales 1., 3., 4., 5. y 7. del artículo 97, y si encontrare establecida alguna, así lo expresará y se abstendrá de resolver la expropiación"*. A su vez, el artículo 97 de ese Código establecía las excepciones previas y mixtas que podían presentar los demandados en los procesos de naturaleza civil.[221]

**110.** Esa norma fue demandada, antes de la entrada en vigencia de la Constitución de 1991, por un cargo similar al que ocupa a esta Corporación actualmente. Para el accionante, la prohibición de presentar excepciones en el trámite judicial de expropiación desconocía el derecho de defensa de los propietarios. Lo expuesto, porque aquella *"equival*[ía *a eliminar medios de defensa que garantizan la situación jurídica subjetiva del propietario* [, al

---

[221] Código de Procedimiento Civil. Artículo 97. *"El demandado, en el proceso ordinario\* y en los demás en que expresamente se autorice, dentro del término de traslado de la demanda podrá proponer las siguientes excepciones previas: // 1. Falta de jurisdicción. // 2. Falta de competencia. // 3. Compromiso o cláusula compromisoria. // 4. Inexistencia del demandante o del demandado. // 5. Incapacidad o indebida representación del demandante o del demandado. // 6. No haberse presentado prueba de la calidad de heredero, cónyuge, curador de bienes, administrador de comunidad, albacea y en general de la calidad en que actúe el demandante o se cite al demandado. // 7. Ineptitud de la demanda por falta de los requisitos formales o por indebida acumulación de pretensiones. // 8. Habérsele dado a la demanda el trámite de un proceso diferente al que corresponde. // 9. No comprender la demanda a todos los litisconsortes necesarios. // 10. Pleito pendiente entre las mismas partes y sobre el mismo asunto. // 11. No haberse ordenado la citación de otras personas que la ley dispone citar. // 12. Haberse notificado la admisión de la demanda a persona distinta de la que fue demandada. // <Inciso modificado por el artículo 6 de la Ley 1395 de 2010. El nuevo texto es el siguiente:> También podrán proponerse como previas las excepciones de cosa juzgada, transacción, caducidad de la acción, prescripción extintiva y falta de legitimación en la causa. Cuando el juez encuentre probada cualquiera de estas excepciones, lo declarará mediante sentencia anticipada".*

punto de] *convertir la expropiación en un verdadero despojo"*.[222] A su juicio, esa situación también vulneraba el derecho a la igualdad, en la medida en que ponía a los afectados por este tipo de trámites en una situación de desventaja frente a los demás.

**111.** La Sala Plena de la Corte Suprema de Justicia resolvió la controversia en Sentencia del 27 de junio de 1978. En esa oportunidad, consideró que la norma no vulneraba la Constitución, porque el juez estaba obligado de oficio a pronunciarse sobre algunas excepciones previas. Además, la demanda debía acompañarse de la resolución que decretaba la expropiación y del certificado proferido por la Oficina de Registro sobre la propiedad y los derechos reales constituidos, de manera que *"no se ve cuáles excepciones pudiera proponer el demandado, sin las cuales quedaran anuladas o se menoscabaran sus posibilidades de defensa"*.[223]

**112.** Por otra parte, la Corporación precisó que la disposición acusada debía interpretarse a la luz de los artículos 4, 5 y 6 del mismo Código, en virtud de los cuales los jueces debían aplicar las normas procesales de manera tal que garantizaran los derechos reconocidos por la ley sustancial y los principios constitucionales, entre ellos, el derecho a la defensa, el debido proceso y la igualdad de las partes. En consecuencia, los jueces estaban obligados a observar esas disposiciones a la hora de pronunciarse de oficio sobre las excepciones consagradas en el artículo 97 de la misma normativa. Por tanto, *"la actuación oficiosa y obligatoria que la ley impone al juez suple cabalmente la defensa del interés privado a la vez que permite hacer efectivo el interés social o la razón de utilidad pública que justifica la expropiación y que debe prevalecer, en los términos del artículo 30 de la Constitución"*.[224]

**113.** Para la Corte, en su momento, lo relevante era evitar una afectación del derecho de propiedad. De manera que, el hecho de que la tutela estuviese en cabeza del juez y no de la parte resultaba irrelevante. Además, en su criterio, las excepciones no son el único mecanismo de defensa procesal, sino que esa garantía está protegida por el juicio en sí mismo, *"dentro del cual hay amplia y equitativa controversia entre la administración y la persona afectada por la expropiación. En dicho proceso se determina, y ese es uno de sus objetivos, el*

---

[222]  Corte Suprema de Justicia. Sala Plena. Sentencia del 27 de junio de 1978.

[223]  *Ibidem.*

[224]  *Ibidem.*

*monto de la indemnización que debe pagarse y en ese aspecto no hay restricción alguna del derecho de defensa, ni el Estado tiene una situación de parte privilegiada, pues la ley lo coloca en igualdad de situación que al expropiado. Y el pago de tal indemnización no es otra cosa que la garantía del derecho afectado, porque es la compensación legal del perjuicio sufrido".*[225]

**114.** Adicionalmente, retomó las consideraciones expuestas en la Sentencia del 10 de marzo de 1938, proferida por esa autoridad, para señalar que en ese proceso los jueces desempeñan una genuina función administrativa, en la medida en que tiene por propósito materializar la expropiación que tiene su máximo nivel de concreción. De manera que, a su juicio, el proceso no pretende debatir el acto mismo de la expropiación, sino hacer cumplir la decisión administrativa y cuantificar el monto de la indemnización correspondiente. En consecuencia, declaró la exequibilidad del artículo mencionado y de las demás disposiciones relacionadas con el proceso judicial ordinario de expropiación.[226]

**115.** En virtud de lo expuesto, resulta oportuno aclarar que el problema jurídico objeto de estudio fue analizado por la Corte Suprema de Justicia, a la luz de la Constitución de 1886. Sin embargo, tal y como lo ha advertido esta Corporación en oportunidades previas, este pronunciamiento no genera efectos de cosa juzgada respecto del debate que se plantea en la actualidad. Lo expuesto, en la medida en que la confrontación previa tuvo lugar en relación con la Constitución de 1886; mientras que en la actualidad debe hacerse respecto de la Carta de 1991, la cual ofrece una diferencia significativa en la materia objeto de debate.[227]

**116.** Ciertamente, los artículos 26 de la Constitución de 1886 y 29 de la Carta de 1991 adoptan una fórmula similar para definir el derecho al debido proceso, en la medida en que aseguran que *"[n]adie podrá ser juzgado sino conforme a leyes preexistentes al acto que se impute, ante Tribunal competente, y observando la plenitud de las formas propias de cada juicio".* Con todo, la Constitución de 1991, en su artículo 93, incorporó la noción del bloque de constitucionalidad, en virtud del cual, los tratados internacionales

---

[225] *Ibidem.*

[226] *Ibidem.*

[227] *Cfr.,* Corte Constitucional, Sentencia C-595 de 1999,

de derechos humanos prevalecen en el ordenamiento interno y las disposiciones de la Carta deben interpretarse a la luz de esos instrumentos. De manera que, a diferencia del control de constitucionalidad efectuado por la Corte Suprema de Justicia en su momento, esta Corporación debe adoptar una concepción del derecho al debido proceso que incorpora las previsiones de los tratados de derechos humanos sobre el asunto disponen, tal y como lo ha hecho a lo largo de su jurisprudencia. En especial, la Convención Americana de Derechos Humanos, la cual dispone de manera explícita que *"[t]oda persona tiene derecho a ser oída, con las debidas garantías y dentro de un plazo razonable, [...] para la determinación de sus derechos y obligaciones de orden civil"*.[228]

**117.** Además, la identidad entre los contenidos normativos demandados es meramente formal. Si bien es cierto que el artículo 453 del Código de Procedimiento Civil y el numeral 5° del artículo 399 del Código General del Proceso prohíben que los demandados en procesos judiciales de expropiación presenten excepciones, lo cierto es que cada norma responde a un contexto normativo distinto. En efecto, la disposición analizada por la Corte Suprema de Justicia estaba inmersa en un proceso ordinario, en el que el juez tenía el deber explícito de pronunciarse sobre algunas excepciones y, en caso de encontrarlas configuradas, abstenerse de decretar la expropiación. Por su parte, el numeral 5° del artículo 399 del Código General del Proceso establece que el juez adoptará los correctivos para subsanar los defectos formales de la demanda. Lo expuesto, permite concluir que la norma objeto de control actualmente tiene unas implicaciones diferentes en la medida en que la autoridad judicial no tiene un deber explícito de verificar si se configuran las excepciones previas, advertirlo y, en caso de encontrarlas configuradas, abstenerse de decretar la expropiación. Solo le corresponde adoptar determinados mecanismos para subsanar los defectos formales de la demanda para continuar con el trámite. En consecuencia, la disposición objeto de control no tiene previsiones explícitas para compensar la prohibición de presentar excepciones en el proceso judicial declarativo especial de expropiación. Por tanto, la decisión proferida por la Corte Suprema de Justicia en su momento no genera efectos de cosa juzgada, ni constituye un precedente para este debate.

---

[228] Convención Americana de Derechos Humanos, Artículo 8.

### (b) Metodología de análisis y estudio que debió emplearse para conocer de la censura: test intermedio de proporcionalidad

**118.** En los términos expuestos a lo largo de esta providencia, el Legislador cuenta con una amplia libertad de configuración en el diseño de los procedimientos judiciales en general y, respecto de aquellos establecidos para adelantar la expropiación. Incluso, está facultado para eliminar etapas, recursos y actuaciones de los trámites que determine. Como consecuencia de lo anterior, la jurisprudencia ha señalado que las disposiciones proferidas en ejercicio de esa función gozan de presunción de constitucionalidad, en esa medida el control de constitucionalidad debe adelantarse a través de un juicio de proporcionalidad. En principio, la intensidad del juicio debe ser débil, para otorgar deferencia con el Congreso de la República. Con todo, el rigor puede incrementarse en atención a los principios que se encuentren en tensión.

**119.** En este caso, considero que la disposición acusada afecta de manera considerable los derechos de acceso a la administración de justicia y al debido proceso. Esas garantías *iusfundamentales,* a su vez, tienen un carácter instrumental en la medida en que son el mecanismo para proteger los demás derechos de las personas involucradas y lograr un orden justo que alcance la pacificación social. Por esa razón, la jurisprudencia ha considerado que, en estos casos, el control de constitucionalidad debe obedecer a un criterio más intenso.[229]

**120.** La censura propuesta planteaba una tensión entre, los derechos fundamentales de acceso a la administración de justicia y de debido proceso, puntualmente, en sus garantías de defensa y contradicción; y, la celeridad y eficacia del procedimiento para materializar el interés general. En concreto, le exigía a la Sala determinar si la prohibición de presentar excepciones en el proceso judicial declarativo especial de expropiación impone una restricción excesiva sobre el derecho de los afectados a contradecir las pretensiones de la entidad expropiante o si es un mecanismo razonable y proporcional para garantizar la celeridad en el trámite. En virtud de la relación intrínseca entre los mandatos constitucionales previstos en los artículos 29 y 229 de la Constitución, la censura debió analizarse de forma conjunta, a través de la aplicación de un "test" intermedio de proporcionalidad, a partir del cual la

---

[229] *Cfr.,* Corte Constitucional, Sentencias C-284 de 2021, C-031 de 2019; C-345 de 2019; C-337 de 2016 y C-807 de 2009.

Corte debió concluir que la disposición acusada vulneraba las garantías invocadas de la siguiente manera.[230]

- ***El fin de la medida es legítimo y constitucionalmente relevante***

**121.** La norma objeto de control elimina la posibilidad de proponer excepciones previas y de mérito en el proceso judicial declarativo especial de expropiación. Esta restricción tiene por propósito otorgar celeridad al trámite de expropiación, garantizar la efectividad en la administración de justicia y viabilizar que la ejecución de los proyectos que representen utilidad pública o interés social. Estos fines se advierten del trámite legislativo que surtió la norma y del contexto mismo de la disposición.

**122.** En efecto, en la exposición de motivos del proyecto de ley que, finalmente, dio lugar al Código General del Proceso, el legislador advirtió que los procesos diseñados en ese cuerpo normativo tenían por propósito garantizar que los trámites judiciales tuviesen una duración razonable, sin afectar los derechos de las personas en ellos involucradas. Al respecto, advirtió que:

> *"no se trata de acelerar por la rapidez misma, sino de lograr una cercanía real entre la coacción de la demanda y la sentencia que permita evitar el lógico desgano u la razonable pérdida de la confianza de los ciudadanos en su órgano judicial y evitar que, como consecuencia de ello, se erosione la democracia. Como la justicia tardía no es verdadera justicia, el nuevo Código fija un término máximo de duración del proceso y proscribe las sentencias inhibitorias y evita las nulidades innecesarias, permitiendo que en cada etapa del proceso existe un saneamiento de los vicios no alegados, lo que genera la imposibilidad de alegar esos hechos como causal de nulidad en etapa posterior del proceso. Se consagran medidas de saneamiento, para que el justiciable tenga la seguridad que el proceso donde se involucra terminará con sentencia que resuelva el asunto y no con una gran frustración: la sentencia inhibitoria o la declaratoria de nulidad de lo actuado. Esta contradice la aptitud y disponibilidad abarcadora que debe tener la*

---

[230] *Ibidem.*

*jurisdicción para resolver, de una vez por todas, el asunto sometido a ella".[231]*

**123.** En esa misma línea, la ponencia para primer debate retomó las consideraciones de la jurisprudencia de esta Corporación, puntualmente de la Sentencia C-426 de 2022, para señalar que el legislador debe diseñar procesos que se desarrollen dentro de un término razonable, sin afectar los derechos de los involucrados. Sin embargo, las disposiciones que existían no habían logrado esos propósitos, en especial, el de celeridad, motivo por el cual era necesario realizar una reforma estructural. En esa oportunidad, el Congreso de la República afirmó que:

*"el sistema judicial colombiano atraviesa por una situación compleja en tanto los procedimientos instituidos no lucen idóneos para asegurar que los procesos judiciales se desarrollen en un término razonable y sin dilaciones injustificadas. La experiencia revela que la duración de los procesos en Colombia supera con creces el tiempo que pudiera considerarse razonable, y los estudios comparativos publicados señalan al sistema judicial colombiano como uno de los más demorados de todo el planeta. El estudio Doing Bussines, con corte al 2010, sobre los tiempos de respuesta de los sistemas de justicia, ubica a Colombia en el puesto 152. Los datos arrojados en el 2011 no son más alentadores, pues el país se ubica en el lugar 150 entre 183 países analizados, lo que indica que el sistema judicial colombiano es uno de los 24 países peor calificados según este indicador internacional. El factor tiempo indica que la controversia contractual tipo que se evalúa en todos los países tiene una tardanza de 1.346 días en su resolución, lo que equivale a casi el doble del promedio latinoamericano que es 707 días. Colombia en el indicador general ocupa el puesto 39 lo que demuestra que la variable justicia impacta negativamente la posición global de la Nación".[232]*

**124.** A partir de lo expuesto, es posible concluir que los objetivos del Código son indicadores de los propósitos del contenido normativo acusado. Ciertamente, la norma hace parte de los mecanismos establecidos para garantizar un proceso judicial más ágil que reduzca la congestión judicial y

---

[231] Congreso de la República, Gaceta 119 del 29 de marzo de 2011, p. 95.

[232] Congreso de la República, Gaceta 250 del 11 de mayo de 2011, p. 2.

asegure una respuesta efectiva de la administración de justicia dentro de un término razonable.

**125.** La perspectiva expuesta se ratifica al analizar el objeto del proceso. En efecto, una lectura sistemática del artículo 58 de la Constitución permite señalar que el proceso de expropiación pretende garantizar que el Estado adquiera los bienes que requiere para materializar proyectos de utilidad pública o de interés social que favorezcan a toda la sociedad. Contar con la disponibilidad de esos recursos de manera célere es indispensable para materializar las políticas públicas que haya diseñado el ejecutivo en favor de la comunidad. Es tanto así que el mismo Constituyente estableció un mandato de interpretación en virtud del cual la propiedad privada debe ceder ante la utilidad pública y el interés social. De manera que, la norma persigue el fin constitucional importante de garantizar la celeridad de los procesos judiciales que le permitan al Estado adquirir los bienes que requiere para ejecutar las políticas públicas que ha diseñado para garantizar el interés general.

**126.** En mi criterio, la norma persigue fines constitucionalmente relevantes en la medida en que pretende garantizar, de un lado, la celeridad de la administración de justicia y, del otro, la posibilidad de materializar los proyectos de utilidad pública o de interés social que materialicen la perspectiva solidarista de la propiedad y la prevalencia del interés general sobre el particular, entendida como una de las finalidades del Estado Social y Democrático de Derecho. Frente a la celeridad, resulta oportuno destacar que aquella debe entenderse desde dos perspectivas. La primera es como un mandato relevante desde el punto de vista constitucional en sí mismo. Ciertamente, este fin constitucional pretende garantizar que las autoridades protejan a las personas, sus bienes y derechos dentro de un tiempo oportuno, materializar las finalidades de la administración de justicia y contribuir a la descongestión judicial para reducir los tiempos de mora del aparato judicial en Colombia. La segunda exige comprender la celeridad, a su vez, como una figura instrumental para viabilizar el acceso a la administración de justicia desde una perspectiva material y el respeto por el debido proceso, tal y como se ha advertido a lo largo de esta decisión.

### (a) *La disposición no es efectivamente conducente para garantizar la celeridad del trámite y materializar el interés general*

**127.** Sin embargo, la disposición acusada impide que los demandados en los procesos declarativos de expropiación presenten excepciones previas y mérito. Esta medida la Corte debió advertir que la medida no es efectivamente conducente para garantizar que los ciudadanos accedan a una justicia material dentro de un término razonable, ni para reducir la descongestión judicial, ni para materializar el fin solidarista de la propiedad privada en Colombia de manera eficiente. Lo expuesto, en la medida en que obliga al demandado a iniciar procesos paralelos ante la Jurisdicción de lo Contencioso Administrativo, para discutir las decisiones frente a la expropiación del predio.

**128.** En atención a la descripción del proceso judicial declarativo especial de expropiación realizado en esta decisión y a las intervenciones recibidas en el proceso, se advierte que, antes de la presentación de la demanda, la entidad expropiante debe proferir, como mínimo, dos actos administrativos que están sujetos a control por parte de los jueces de lo contencioso administrativo, a saber: la declaratoria de utilidad pública o interés social; y la resolución que dispone la expropiación. Dentro de los 3 meses siguientes a la firmeza del último acto, la autoridad debe presentar la demanda de expropiación ante los jueces civiles. Ello implica que el ordenamiento jurídico dispone de tres procesos judiciales que pueden adelantarse de forma simultánea para materializar la pretensión expropiatoria del Estado. Esa situación, aunada a la prohibición dispuesta en la norma acusada, incentiva a las partes a iniciar varios procesos de nulidad y restablecimiento del derecho para discutir la actuación de la administración en el proceso expropiatorio.

**129.** La multiplicidad de procesos no solo congestiona a la administración de justicia, sino que afecta las garantías de los sujetos activo y pasivo de la expropiación e impide materializar en debida forma el mandato previsto en el artículo 58 Superior. El hecho de que los propietarios puedan acudir a otros procesos paralelos a discutir sus pretensiones afecta la celeridad en el trámite, porque se puede generar una situación de prejudicialidad que impida concluir el proceso declarativo especial expropiatorio hasta que no otra autoridad judicial no determine que la actuación administrativa fue legítima.

**130.** De igual manera, reduce la seguridad jurídica de las partes en los procesos judiciales, en la medida en que están sometidos a que las autoridades judiciales profieran órdenes contradictorias, ante la imposibilidad que tienen los demandados de participar en el proceso a través de las excepciones. Si bien es cierto esos medios judiciales no son los únicos instrumentos para

participar del proceso, lo cierto es que en el diseño procesal establecido por el artículo 399 del Código General del Proceso solo se evidencian dos posibilidades de oposición. La primera dirigida de forma exclusiva a la indemnización y la segunda a garantizar los derechos de los poseedores de los predios, punto que se desarrollará más adelante. Esta situación impide discutir el fondo del asunto o, incluso, debatir asuntos tan trascendentales como la debida identificación de las personas demandadas. De manera que, esta situación puede conllevar a que los jueces fallen con elementos de conocimiento diferentes y emitan decisiones opuestas que afecten la seguridad de las partes frente a las decisiones que adoptan las autoridades competentes para el efecto.

**131.** Finalmente, la medida tampoco es idónea para garantizar una efectiva materialización del mandato previsto en el artículo 58 Superior. Ciertamente, la expropiación solo se permite por motivos de utilidad pública o interés social. Al impedir que los demandados cuestionen las actuaciones de la entidad expropiante en el proceso judicial referido la norma permitiría que se adelanten expropiaciones sin contar con estas finalidades, en la medida en que los jueces limitarían sus actuaciones a hacer una verificación formal de los requisitos exigidos en la demanda. Esto podría conllevar a que se materialice una expropiación contraria al mandato constitucional, la cual quede en firme y se deba retrotraer con posterioridad, en virtud de un proceso judicial de naturaleza contencioso-administrativa. En conclusión, la medida no es efectivamente conducente para materializar la celeridad procesal, el acceso a la administración de justicia, ni el fin solidarista de la propiedad.

- *La prohibición es evidentemente desproporcionada*

**132.** Como lo explique previamente, la norma cuestionada limita las posibilidades de las personas demandadas en procesos de expropiación para ejercer su derecho a la defensa. Esta restricción, aunque pretende una mayor celeridad en el proceso, que corresponde a fines legítimos no es efectivamente conducente para el efecto. Aunada a la falta de conducencia, la medida afecta de manera desproporcionada las garantías de defensa y contradicción, las cuales hacen parte del derecho del debido proceso y del acceso a la administración de justicia. Lo anterior, por cuanto, de un lado, la disposición impide que el demandado plantee excepciones para la protección de sus intereses y derechos y, del otro, no establece medidas para que los demandantes se opongan o cuestionen la actuación de la administración

durante la fase previa al proceso judicial declarativo especial expropiatorio. De manera que, la norma impide que los demandados sean escuchados en el trámite judicial respecto de la decisión de expropiar y que contradigan o debatan las pretensiones a través de la formulación de excepciones formales y sustanciales.

**133.** Si bien es cierto que las excepciones no son el único mecanismo judicial que permite ejercer el derecho de defensa o de contradicción y que el legislador puede limitar su ejercicio, también lo es que, en esos casos, debe prever otros mecanismos que para que los involucrados se opongan a las pretensiones de su contraparte. En este caso, el proceso declarativo especial de expropiación solo permite que los demandados cuestionen el valor de la indemnización que la entidad expropiante propone. Sin embargo, el rubro a otorgar como consecuencia de la expropiación no es el único asunto relevante en el proceso. Por el contrario, en virtud del artículo 58 de la Constitución Política, el proceso judicial debe garantizar que las personas afectadas por estas decisiones puedan discutir de manera idónea y efectiva las decisiones de la administración en torno a la declaratoria de utilidad pública o interés social sobre el bien. Al respecto, la Sentencia C-035 de 2016 destacó que:

> *"Uno de los elementos primordiales del derecho al debido proceso lo constituye el deber del Legislador de definir los motivos de utilidad pública e interés social que justifican la limitación del derecho de propiedad. La definición de tales motivos determina el alcance de las facultades del gobierno para adelantar procesos de expropiación, y garantiza que el ejercicio de dicha facultad efectivamente contribuya a la realización de la función social de la propiedad. **De tal modo, los jueces pueden evaluar si la declaratoria de un proyecto como de utilidad pública o de interés social efectivamente corresponde a la realización de la función social en el caso concreto, y en esa medida, pueden establecer si una expropiación está justificada constitucional y legalmente.***
>
> *Desde el punto de vista de los derechos subjetivos, la definición de los motivos de interés social y utilidad pública con fundamento en los cuales el gobierno adelanta procesos de expropiación le permiten a los administrados, proteger su derecho a la propiedad, y garantizar el ejercicio efectivo de al menos dos derechos fundamentales: el acceso a la administración de justicia, el derecho al debido proceso, y en particular, el derecho a la defensa. La definición previa de los motivos*

*de interés social y utilidad pública garantizan que las personas tengan un fundamento jurídico con base en el cual pueden demandar la nulidad de las actuaciones administrativas, cuando consideren que la actuación de la administración no corresponde a los motivos definidos por el Legislador. Es decir, les permiten defenderse frente a eventuales desviaciones de poder, o falsas motivaciones en las actuaciones de la administración, entre otras".*[233] (Énfasis añadido)

**134.** Para que esa valoración de los jueces tenga el impacto referido resulta indispensable que los involucrados cuenten con mecanismos idóneos para plantearle a las autoridades judiciales las razones por las cuales se oponen a la pretensión expropiatoria de la administración pública. Este objetivo no se alcanza con la mera contradicción del valor de indemnizatorio de la pretensión de expropiación, ni con la posibilidad de los poseedores de oponerse a la diligencia de entrega. Lo expuesto, porque esos mecanismos no garantizan que los demandados puedan cuestionar la motivación de la administración en los actos administrativos que dan lugar a la demanda de expropiación. En esa medida, la disposición acusada genera una barrera para el ejercicio del derecho de defensa que hace a la norma evidentemente desproporcionada.

**135.** Además, la posibilidad de contradecir la pretensión de la administración en los procesos de nulidad y restablecimiento del derecho es ineficaz, en la medida en que no garantiza de forma oportuna el derecho de contradicción de los propietarios. Ciertamente, los demandados pueden acudir al proceso de nulidad y restablecimiento del derecho para debatir los actos administrativos que declaran la utilidad pública o interés social de un bien privado. Sin embargo, la decisión que adopten los jueces administrativos sobre el asunto puede resultar ineficaz para garantizar el derecho de propiedad de los afectados, en la medida en que la decisión favorable al interesado puede ser posterior a la sentencia que ordena la expropiación en la Jurisdicción Ordinaria en su especialidad civil. Además, la eventual declaratoria de prejudicialidad en el proceso declarativo especial de expropiación no solo depende de la voluntad del juez que adelanta el proceso, sino que implicaría una dilación injustificada del trámite que afectaría el acceso oportuno a la administración de justicia y el debido proceso. En consecuencia, el contenido normativo acusado, a pesar de perseguir un fin legítimo y constitucionalmente relevante, no es efectivamente idóneo para alcanzar su propósito y resulta

---

[233] Corte Constitucional, Sentencia C-035 de 2016.

evidentemente desproporcionado, por lo tanto, la Sala debió declarar la inexequibilidad de la disposición acusada.

**136.** Con este salvamento, dejo sentada mi posición sobre la importancia de garantizar que las partes de todos los procesos tengan la posibilidad de ejercer sus garantías de audiencia, defensa y contradicción de forma tal que puedan disfrutar de un acceso efectivo y oportuno a la administración de justicia.

**JORGE ENRIQUE IBÁÑEZ NAJAR**

**Magistrado**

# English Translation of Exhibit 10

Machine Translated by Google

# TOPICS-SUBTHEMS

### Judgment C-474/23

EXPROPRIATION **PROCESS** - Restriction on proposing exceptions does not violate the rights to due process and access to the administration of justice

*(...) although it is true that section 5 of article 399 of Law 1564 of 2012 restricts the possibility for the defendant within the judicial expropriation process to propose exceptions, this does not entail a violation of the rights to due process and access to the administration of justice, since (i) the affected party has at its disposal different legal tools suitable to assert its interests and exercise the contradiction and defense from the prejudicial stage, throughout the entire procedure and until its completion; (ii) the investigating judge of the process is vested with broad powers that allow him to adopt the measures or eventual corrective measures that are necessary in order to make effective the rights of the parties and interveners; and, in any case, (iii) in accordance with the legal configuration of the judicial expropriation process, said civil procedural instance is not the stage to discuss in substance the claim of the plaintiff entity, since what is done there is to execute the administrative act that orders the expropriation, an act that can be disputed before the jurisdiction of the administrative litigation; the essence of the judicial expropriation process is to determine the amount and the concepts that must be included in the fair compensation in favor of the defendant, in the terms of numeral 6 of article 399 of the General Code of Procedure.*

## FREEDOM OF LEGISLATIVE CONFIGURATION IN MATTERS
PROCEDURAL-Content and scope

*The broad power of configuration in the head of the Legislator is patented, as has been pointed out in the constitutional jurisprudence, in the faculty of "(...) (i) establish new procedures, (ii) determine the nature of judicial actions, (iii) eliminate procedural stages, (iv) establish the formalities that must be fulfilled, (v) arrange the regime of competences that assists each authority, (vi) consecrate the system of publicity of the actions, (vii) establish the form of connection to the process, (viii) establish the*

*means of conviction of judicial activity, (ix) define the resources to challenge the decision and, in general, (x) establish the duties, obligations and procedural burdens of the parties." This court has even recognized that, in this area, the legislature has the power to privilege certain procedural models, and even to dispense with stages or resources in some of them.*

## FREEDOM OF LEGISLATIVE CONFIGURATION IN MATTERS
PROCEDURAL-Limits

*(...) in exercising this power, it must observe the limits set by the Constitution itself, which are limited to: (i) the impossibility of modifying the procedural rules prescribed directly in the constitutional text; (ii) due respect for the essential principles and purposes of the State; (iii) compliance with the principles of reasonableness and proportionality; and (iv) the implementation of the guarantees associated with due process and access to justice.*

## EXPROPRIATION-Concept

## EXPROPRIATION- Characteristic elements

## EXPROPRIATION - It can be judicial or administrative in nature

## EXPROPRIATION AS A LIMITATION OF THE RIGHT TO
PROPERTY-Content and scope

## EXPROPRIATION-Freedom of legislative configuration

*(...) the legislature has broad discretion in the formulation of regulations regarding expropriation. This, in itself, encompasses the procedural aspects of this concept. Indeed, since the authorities' actions in this area are subject to strict observance of due process, the legislature's regulatory sphere also includes determining the procedural rules to which both the administration and the judges must adhere in expropriation matters.*

## PROCESS        OF        EXPROPRIATION        JUDICIAL        EITHER
ADMINISTRATIVE-Stages

EXCEPTIONS-Demonstration of the right to contradict

*The proposal of exceptions thus constitutes a manifestation of procedural resistance on the part of the passive party, which embodies the fundamental right to due process, in its dimension as the right to contradiction, in scenarios where its rights and interests are subject to debate. By raising these procedural resistances, the defendant may attempt to demolish the basic elements of the claim by providing the corresponding factual and legal grounds for his attack, or he may denounce the absence of structural elements of the judicial process.*

PRELIMINARY **EXCEPTIONS** -Purpose

*(...) "]Preliminary exceptions are measures of sanitation in the initial stage of some processes, due to vices or defects of the same, at the expense of the defendant, and their purpose is to improve them or terminate them when this is not possible, and thus avoid nullities or inhibitory sentences (...).*
*They are opposed to exceptions of substance or merit, which refer to substantive law, are directed against the claims of the lawsuit and are generally decided in the judgment.*

SYSTEMATIC **INTERPRETATION** -Application/INTERPRETATION TELEOLOGY-Application

---

**REPUBLIC OF COLOMBIA**



**CONSTITUTIONAL COURT**

**-Full Court-**

**JUDGMENT C-474 OF 2023**

**Reference:** File D-15223

Claim of unconstitutionality against numeral 5 of article 399 (partial) of the

Law 1564 of 2012, "[w]ith which the General Code of Procedure is issued and other provisions are dictated"

**Plaintiffs:**

John Fernando Restrepo Tamayo

Juan David Vanegas Arango

**Reporting Judge:**

**Alejandro Linares Cantillo**

Bogotá, DC, November nine (9) two thousand twenty-three (2023).

The Plenary Chamber of the Constitutional Court, in exercise of its constitutional powers and in compliance with the requirements and procedures established in Decree Law 2067 of 1991, issues the following

**JUDGMENT**

**I. BACKGROUND**

1. On March 14, 2023, citizens John Fernando Restrepo Tamayo and Juan David Vanegas Arango, in exercise of the public action provided for in

Articles 40.6, 241 and 242 of the Political Constitution, filed a claim of unconstitutionality against the statement *"No exceptions of any kind may be proposed",* contained in numeral 5 of article 399 of Law 1564 of 2012, "[t]hrough which the General Code of Procedure is issued and other provisions are dictated", considering that it violates the rights to due process (article 29 CP) and to effective judicial protection (article 229 CP).

2. By order of April 27, 2023, the then investigating magistrate resolved to (i) admit the claim; (ii) list the case for a period of 10 days, in order to allow citizen intervention; (iii) forward the file to the Attorney General of the Nation so that she could render her opinion; (iv) communicate the initiation of the process to the President of the Republic and the President of Congress; (v) communicate the initiation of the process to the Directorate of Access to Justice of the Ministry of Justice and Law, the Ministry of Transportation, the Ministry of Housing, City and Territory, the National Planning Department (DNP), the Technical Directorate of Lands of the Urban Development Institute (IDU), the National Land Agency, the Superintendency of Notaries and Registry and the National Infrastructure Agency and, in turn, (vi) invite several universities and organizations to participate in relation to the matter under dispute1 .

3. Once the procedures provided for in Article 242 of the Constitution and in Decree Law 2067 of 1991 have been completed, the Court shall proceed to decide on the aforementioned claim.

## A. Regulatory text challenged

---

[1]  The institutions invited to participate in this process were the following: Law Schools of the National University of Colombia, the University of Antioquia, the University of the Andes, the Javeriana University, the University of Rosario, the Pedagogical and Technological University of Colombia, the Externado University, the Libre University, the EAFIT University, the Santo Tomás University, the Northern University, and the Sabana University, the Center for Studies of Law, Justice, and Society (Dejusticia), the Colombian Academy of Jurisprudence, the Colombian Commission of Jurists, the Colombian Institute of Procedural Law, the Colombian Center for Constitutional Procedural Law, the Colombian Association of Constitutional Procedural Law, the Public Actions Group of the University of Rosario, the Institute of Urban Studies (IEU) of the National University of Colombia, the Colombian Federation of Municipalities, and the National Federation of Departments.

4. The challenged provision is transcribed below, according to its publication in the Official Gazette No. 48,489 of July 12, 2012, underlining the statement that is the object of the accusation:

**«LAW 1564 OF 2012**

(July 12)

"By means of which the General Code of Procedure is issued and other provisions are dictated"

[…]

**ARTICLE 399. EXPROPRIATION.** The expropriation process shall be subject to the following rules:

[…]

5. The defendant shall be notified of the claim within three (3) days. **No exceptions of any kind may be proposed.** In any case, the judge shall adopt the necessary corrective measures to remedy the formal defects of the claim.

After two (2) days have elapsed without the order admitting the claim being served on the defendants, the judge will summon them in the terms established in this code; a copy of the summons will be posted on the access door to the property subject to expropriation or the property in which the furniture is located.

In the imposition of accessory penalties, the provisions of Article 59 shall be strictly observed. […]».

**B. Claim and arguments of the lawsuit**

5. The plaintiffs requested that the challenged normative statement be declared unconstitutional, as they believe that it contravenes Articles 29 and 229 of the Constitution.

6. The concept of violation is limited to the alleged violation of the fundamental rights to due process and effective judicial protection arising from the fact that, by virtue of the contested provision, the defendant in the judicial expropriation process cannot raise exceptions within the term of transfer of the claim.

7. In the opinion of the promoters of the action, *"[t]he fundamental right to due process embodies the quintessence of modern constitutional law conceived as the sum of guarantees in favor of the subject and limits required on state action, by means of which it is ensured that any disciplinary, judicial or administrative event that may generate an unfavorable consequence for the accused, is done within the framework of the strictest adherence to legal forms, with an impartial third party that provides objectivity to the possible restriction on rights that are affected as a consequence of the restrictive decision that may take place. Due process is the pinnacle of constitutionalism in the liberal and guarantor context because it always and in all cases allows the one on whom the greatest burden is placed that may put a right at risk to have means of defense, controversy or challenge the decision taken against him.*

*Due process represents the maximum expression of the limited state right over which there exists, even in the maximum inquisitorial scenario, the*

*possibility of challenging actions that may be harmful to their own interests"2 .*

8. They also stated that the right of access to the administration of justice allows *"subjects to raise, before the Competent Judge; claims or demands; and in turn, and correlatively, they are given the possibility of; opposing the facts and claims raised against them; presenting means of defense and/or exceptions with the purpose of providing and disputing material evidence, in the course of judicial and/or administrative proceedings, where their social, economic and/or personal rights and interests are involved"3 .*

9. Based on these considerations, the plaintiffs pointed out that section 5 of article 399 of the General Code of Procedure, by restricting the possibility for defendants in judicial expropriation proceedings to file exceptions, prevents the proper exercise of the guarantees of defense and contradiction of the persons affected in their private property as a result of the administration's decision to expropriate.

10. They added that, although the same rule recognizes the judge's power to adopt the necessary measures to correct the formal defects of the claim, such officiousness does not remedy the injury caused to the defendant's right to defend his own interests.

11. Additionally, they stated that the restriction in question ignores the fact that the process referred to not only involves the general interest and the economic compensation of a real right, but also the moral and emotional significance of the asset and any potential immaterial damages arising from the expropriation.

---

2  *Cfr.* File D-15223, unconstitutionality claim, file *"D0015223. Citizen claim.pdf",* p. 4.

3  *Ibid.*

**C. Interventions**

12. During the process, thirteen written statements or interventions were received in a timely manner, which will be grouped below according to the meaning of the request made.[4]

13. *Requests for inhibition*[5]          Those who questioned the substantive suitability of the claim stated that it does not reveal a contradiction between the challenged rule and the Constitution, because the plaintiffs base their arguments on subjective, indeterminate, indirect, and abstract arguments that do not adequately demonstrate the minimum requirements for argumentative force, and because the grounds for unconstitutionality rest on an incorrect interpretation and not on a real, existing legal proposition.

14. *Requests for constitutional validity* . Those who defended the constitutional validity of the[6] censured provision maintained that the right to property provided for in Article 58 of the Constitution may be limited for reasons of public utility or social interest (e.g., it is important to fulfill the purposes of the State and territorial planning), and emphasized that expropriation may be administrative or judicial, the latter case in which the

---

[4]In addition to the aforementioned thirteen documents, the file shows that the Director of the Institute of Urban Studies at the National University submitted a letter stating that he did not have professionals available to present the opinion requested by the Corporation; the Ministry of Transportation submitted the same opinion twice; and, after the deadline for posting the document on the list had expired, documents were received late from the National Land Agency, the Superintendency of Notaries and Registry, the Colombian Academy of Jurisprudence, and the Law School of the University of Santo Tomás.

[5]  They requested that the National Planning Department and the Agency issue a decision to inhibit National Infrastructure Authority. Alternatively, they requested that the contested regulation be declared constitutional.

[6]  The Ministry of Transportation, the Ministry of Housing, City and Territory, the Ministry of Justice and Law, the Colombian Association of Capital Cities (Asocapitales), the Colombian Federation of Municipalities, the National Fund of Departments, the Department of Procedural Law of the Externado University, and the Citizen Intervention Observatory of the Free University submitted requests for constitutionality.

process has certain special characteristics that distinguish it from other declarative processes.

15. They explained that, in the case of a judicial expropriation proceeding, the judge may rule ex officio on the lack of jurisdiction, a commitment or arbitration clause, the non-existence or improper representation of the plaintiff or defendant, and the inadequacy of the claim due to a lack of formal requirements, which guarantees due process. They also indicated that it is possible to resort to the administrative litigation jurisdiction to discuss both the reasons of public utility or social interest that justify the administrative action, as well as the administrative act ordering the expropriation; that within the framework of the expropriation process, the defendants may request a suspension of the procedure due to prejudiciality while the administrative judge makes a ruling, and that they may also discuss the amount of compensation and challenge the evidence provided by the public entities and file appeals. Thus, they have various defense options, since exceptions are not the only means available to challenge the claim, and the contested statement does not represent a barrier in that regard.

16. They also noted that the Supreme Court of Justice, in a constitutional review ruling of June 27, 1978, concluded that the impossibility of proposing prior exceptions in judicial expropriation proceedings does not affect the defendants' guarantees. Finally, they emphasized that the legislature has a wide discretion in procedural matters, that allowing exceptions in these proceedings is contrary to the public interest by delaying the transfer of the property to the State, and that the same restriction on proposing exceptions in this type of proceedings exists in other countries such as Mexico, Argentina, Spain, and France.

17. *Request for unconstitutionality* . As reasons[7] to support the unconstitutionality of the partially censured provision, the following were highlighted:

---

[7] Citizen Harold Sua Montaña filed a request for unconstitutionality.

The procedural importance of exceptions to challenge the claims of the complaint. It was also argued that the conduct of the authorities should not depend on the initiative of the plaintiff in the proceedings and that in cases of expropriation, the State is the one who files the claim and also exercises the judicial function, which must be assessed for the purposes of establishing unconstitutionality. The citizen who intervened in this regard also referred to the ruling in Gustavo Petro *v.* Colombia to emphasize the principle of objective impartiality and pointed out that the expression "[i]n any case, the judge shall adopt the necessary corrective measures to remedy the formal defects of the claim" is also unconstitutional because, in his opinion, this section constitutes the normative unity.

18. *Request for conditional constitutionality8*   Regarding the need for a condition in this case, it was argued that the limitation on proposing exceptions under question does not constitute a violation of the right to due process; however, the transfer of the claim is an allegorical mechanism given that exceptions cannot be filed. Therefore, it was suggested that the constitutionality be conditioned *"on the understanding that those affected may present prior exceptions during the transfer of the claim to justify their defense,"* after stating that *"interpretive modulation should be directed toward giving procedural subjects who participate in the process a hearing, without detriment to the expropriation process based on the social function of property since the 1991 Constitution."*

## D. Concept of the Attorney General of the Nation

19. The Attorney General of the Nation requested that the partially challenged provision be declared constitutional. She noted that the legislature has a broad regulatory framework to define procedures within the limits established by the principles of

---

[8]   The Legal Office of the University of the Andes requested a conditional ruling on constitutionality.

reasonableness and proportionality, so procedural rules must be conducive to achieving a constitutional end, without being evidently disproportionate.

20. Regarding the accused section, he indicated that, although it is true that preventing the formulation of exceptions *prima facie* restricts the guarantee of defense, said limitation is proportional, because, in the first place, it pursues the constitutional purpose of administering justice expeditiously, and is suitable for achieving the proposed objective, because the elimination of the preliminary exceptions stage reduces procedural times and avoids delays in the process. Furthermore, it is not an evidently disproportionate measure, because the defendants *(i)* may exercise their right to defense through the response to the complaint, the request and presentation of evidence, discussions on the amount of the appraisal presented or the compensation and the corresponding resources, and *(ii)* are authorized to submit memorials to the judge that justify a possible prior exception, so that he may adopt the corrective measures that may be appropriate.

21. He emphasized that in judgment C-543 of 2011, the Court recognized that the legislature may legitimately restrict procedural guarantees to ensure speed in the administration of justice, and that in these matters, judicial delay may generate an impact on the general interest and public utility, as well as a lack of recognition of the social function of property.

## II. CONSIDERATIONS

### A. Competition

22. In accordance with the provisions of Article 241.4 of the Constitution, the Court is competent to hear and make a final decision on the claim of unconstitutionality of the reference, given that the challenged rule is inserted in a law of the Republic.

Machine Translated by Google

## B. Preliminary question: the substantive suitability of the claim

23. The Plenary Chamber is competent to analyze compliance with the admissibility requirements of the claim of unconstitutionality. In this regard, in Judgment C-623 of 2008, the Court stated that:

> "[e]ven *though in principle, it is in the admission order where it is defined whether or not the claim complies with the minimum requirements of admissibility, this first analysis responds to a barely summary assessment of the action, carried out solely on behalf of the Reporting Judge, reason for which, it does not compromise or define the competence of the Plenary of the Court, which is in charge of the constitutional function of deciding on the merits of claims of unconstitutionality that citizens present against laws and decrees with the force of law*

24. This Court has indicated that any claim of unconstitutionality must be analyzed in light of the *pro actione principle,* given the public nature of this action. However, the same jurisprudence has recognized that a claim of unconstitutionality must meet certain minimum conditions that guide the work of the constitutional judge and inform the debate of those involved in the constitutionality process.

25. Article 2 of Legislative Decree 2067 of 1991 provides that the complaint must contain: *(i)* a description of the provisions accused of being unconstitutional, transcribing them verbatim by any means or providing a copy of the official publication; *(ii)* a description of the constitutional provisions violated; *(iii)* the reasons supporting the accusation, commonly referred to as the concept of violation; *(iv)* a description of the legislative procedure imposed by the Constitution for the issuance of the challenged act, where applicable; and *(v)* the reasoning behind the Court's jurisdiction.

---

9   Constitutional Court, rulings C-894 of 2009, C-055 and C-281 of 2013.

Machine Translated by Google

26. In accordance with constitutional jurisprudence, the *concept of violation* is properly formulated when *(i)* the violated constitutional norms are identified, *(ii)* the normative content of the accused provisions is set forth – which implies pointing out those material elements that are considered violated – and *(iii)* the reasons why the challenged texts violate the Constitution are expressed.

27. As this Court pointed out in Judgment C-1052 of 2001, any claim of unconstitutionality must, at a minimum, be based on *clear, certain, specific, pertinent, and sufficient grounds.* Since that judgment, the Constitutional Court has consistently reiterated that the grounds for unconstitutionality must be:

> *"(i) clear, that is, they must follow a comprehensible course of exposition and present intelligible reasoning regarding the alleged inconsistency between the law and the Constitution; (ii) certain, meaning that they must not be based on purely subjective, capricious, or unreasonable interpretations of the challenged texts, but rather must present a normative content that can reasonably be attributed to them; (iii) specific, which excludes generic or excessively vague arguments; (iv) pertinent, such that they raise an issue of constitutionality and not of the appropriateness or correctness of legislative decisions, observed from parameters other than the mandates of the Superior Text; and (v) sufficient; that is, capable of generating an initial doubt about the constitutionality of the challenged statement or provision"10.*

28. Based on the above considerations, and taking into account the questions raised regarding the full accreditation of the conditions of substantive fitness of the claim, it is necessary to determine whether the censure promoted by citizens John Fernando Restrepo Tamayo Juan David Vanegas Arango complies with the minimum arguments previously

---

10  Constitutional Court, among others, ruling C-330 of 2013.

indicated, on which the legal possibility of developing the abstract judgment of constitutionality depends.

29. In the opinion of the Court, and contrary to what was stated by a section of the interveners who point to an alleged lack of *specific certainty12,* the accusation does meet the [11] and requirements to undertake an analysis of merit.

30. Indeed, the charge is deemed true, to the extent that the legal statement challenged does indeed lead to the consequences inferred by the actors.

Certainly, by prescribing that after the transfer of the expropriation claim to the defendant, he *"may not propose exceptions of any kind",* numeral 5 of article 399 of the General Code of Procedure establishes in a precise and truthful manner a restriction on the passive extreme with regard to the possibility of formulating arguments aimed at resisting the procedural claim, which shows that the normative premise that the plaintiffs identify as one of the extremes of contrast and the content that they extract from it are not based on subjective, capricious or unreasonable interpretations of the accused text.

31. Furthermore, the arguments set forth in the complaint reveal a specific objection, since it specifically and directly raises the question of what constitutes the alleged opposition to the constitutional order. Thus, the alleged violation is associated with the fact that the challenged legal provision introduces a limitation on the performance of a procedural act proper to one of the parties involved in the special declaratory expropriation process, such as the proposal of exceptions, which—according to the plaintiffs—is incompatible with the guarantees of due process and access to the administration of justice that the defendant enjoys, as he is not allowed to present his defense in that specific procedural space. In this way, instead of invoking vague, indeterminate ideas,

---

[11]   Since it is argued that the reasons for unconstitutionality are based on an incorrect interpretation and not on a real and existing legal proposition.

[12]   While it is stated that the actors do not raise a contradiction between the accused rule and the Constitution, because they are based on subjective, indeterminate, indirect and abstract arguments.

abstract and global, the claim proposes an objective and timely normative contrast.

32. Based on the foregoing, given that the claim does not suffer from the admissibility deficiencies alleged by those interveners who requested a declaration of disqualification, it is appropriate for this Court to rule on the merits of the charge of unconstitutionality raised.

## C. Legal problem and methodology of the decision

33. It is up to the Plenary Chamber to determine whether the statement *"No exceptions of any kind may be proposed,"* contained in numeral 5 of article 399 of Law 1564 of 2012, "[t]hrough which the General Code of Procedure is issued and other provisions are dictated," violates the fundamental rights to due process and effective judicial protection, protected by articles 29 and 228 of the Constitution, by restricting the possibility for the defendant within the judicial expropriation process to formulate exceptions within the term for transferring the claim.

34. To clarify the above, the Court will rule on the following thematic axes: (i) the legislature's freedom to configure procedural regulation, (ii) the expropriation process, and (iii) the proposal of exceptions as an expression of the right to contradict. Based on these elements of judgment, we will proceed to analyze the issue raised in the complaint regarding the censured provision.

## D. The freedom of configuration of the Legislator in matters of procedural regulation – reiteration of jurisprudence13

---

[13]  For this section, the Court partially resumes the considerations set forth in judgment C-440 of 2022.

35. Pursuant to paragraphs 1 and 2 of Article 150 of the Constitution, the functions of the Congress of the Republic include the power to make, amend, and repeal laws, as well as to issue codes in all areas. Based on this clause, this body has reiterated that the legislature enjoys broad discretion when establishing the procedural rules that define and regulate legal procedures, both judicial and administrative, for the exercise of human rights.14

36. This legislative framework in procedural matters "allows the legislator to establish the rules that ensure the full effectiveness of the fundamental right to due process (Article 29 of the Criminal Code) and effective access to the administration of justice (Article 229 of the Criminal Code). Furthermore, these rules consolidate legal certainty, rationality, balance, and the finality of processes, and allow for the development of the principle of legality inherent to the Social State of Law."15

37. The broad power of configuration in the head of the Legislator is patented, as has been pointed out in the constitutional jurisprudence, in the power to "(...) (i) establish new procedures, (ii) determine the nature of judicial actions, (iii) eliminate procedural stages, (iv) establish the formalities that must be fulfilled, (v) arrange the regime of competences that assists each authority, (vi) consecrate the system of publicity of the actions, (vii) establish the form of connection to the process, (viii) establish the means of conviction of the judicial activity, (ix) define the resources to challenge the decision and, in general, (x) institute the duties, obligations and procedural burdens of the parties"16. Even this court has recognized that, in this area, the Legislator has the power to privilege certain procedural models, and even to dispense with stages or resources in some of them17.

---

14  Constitutional Court, judgments C-296 of 2002, C-1235 of 2005, C-203 of 2011, C-437 of 2013, C-329 of 2015, C-086 of 2016, C-025 of 2018, C-031 of 2019 and C-210 of 2021.

15  Constitutional Court, ruling SU-418 of 2019.

16  Constitutional Court, ruling C-341 of 2021, reiterating ruling C-031 of 2019.

17  *See* Constitutional Court, judgments C-179 of 2016, C-282 of 2017, C-025 of 2018 and C-031 of 2019.

38. Regarding the legal institution of expropriation, the Constitution expressly states in Article 58 that it is the legislature's responsibility to define the reasons of public utility or social interest to which private interests must give way and which give rise to the acquisition of an asset by the State with the corresponding recognition of compensation to the affected party. According to the higher standard, this legal jurisdiction applies to both judicial expropriation and that carried out through administrative means.

39. In light of the above, constitutional jurisprudence has indicated that the legislature has broad discretion in shaping regulations regarding expropriation. 18 This, in itself, encompasses the procedural aspects of this concept. Indeed, since the actions of the authorities in this area are subject to strict observance of due process, the legislature's regulatory sphere also includes the task of determining the procedural rules to which both the administration and judges must adhere in expropriation matters. From this perspective, jurisprudence has emphasized the important role played by the legislative branch in this specific context, since it preserves the principle of procedural legality and prevents state arbitrariness when carrying out an expropriation. In the words of this corporation, "[t]his guarantee of the principle of legality limits the government's scope of action, and thereby protects, from a subjective point of view, the fundamental right to due process of the administered"19.

40. Now, although the Congress of the Republic has been granted the aforementioned power to formulate regulations by the Political Constitution, this power is subject to the precise limits established by the Constitution itself. In this regard, the Court has identified four categories within which the legislature's actions may be deployed in accordance with the principles established in the higher law.

41. The first limit to the broad power of legislative configuration in matters of procedural norms has to do with the due observance of the principle of constitutional supremacy contemplated in the superior article 4,

---

18  Constitutional Court, ruling C-750 of 2015.

19  Constitutional Court, ruling C-035 of 2016

and this means that the legislator is not authorized to alter procedural matters that are directly regulated in the Constitution.

42. The second limit is based on articles 2 and 228 of the Constitution and consists of the fact that the legislator must respect the essential principles and purposes of the State, which implies that procedures are not ends in themselves but must operate as instruments to guarantee the rights and freedoms of individuals and to materialize substantive law, providing effectiveness to principles such as judicial independence and autonomy, effective access to the administration of justice and publicity of proceedings[20].

43. The third limit is that, when determining the forms of each trial, the legislator must take into account a criterion of sufficient reason, in such a way that through them the fulfillment of a constitutionally valid end is pursued, through a mechanism that is shown to be adequate and necessary for the fulfillment of said objective and that, at the same time, does not disproportionately affect a constitutional right, end or value[21].

44. And finally, as a fourth limit, it is held that, in accordance with articles 29, 209 and 228 of the Charter, when issuing procedural rules, Congress must ensure that the principles inherent to due process and access to justice, that is, legality, defense, contradiction, publicity and primacy of substantive law, as well as those of speed, equal treatment and human dignity, are projected in judicial and administrative procedures.

45. From the above it is concluded that the higher order grants the Legislator a broad power of configuration in what concerns to establish the norms that govern the procedures through which the rights are made effective, according to which it can even eliminate stages or

---

[20]  Constitutional Court, ruling C-124 of 2011.

[21]  Constitutional Court, ruling C-428 of 2011.

22. However, in exercising this power, it must observe the limits set by the Constitution itself, which are limited to: (i) the impossibility of modifying the procedural rules prescribed directly in the constitutional text; (ii) due respect for the essential principles and purposes of the State; (iii) compliance with the principles of reasonableness and proportionality; and (iv) the implementation of the guarantees associated with due process and access to justice.

46. With regard to expropriation, the broad scope of regulatory configuration referred to above and its constitutional limits are reflected both in the definition of the reasons of public utility or social interest that make expropriation appropriate, whether judicial or administrative, as well as in the design of the processes and the establishment of the precise procedural rules that the authorities are required to comply with when carrying out this type of operation.

47. In this regard, constitutional jurisprudence has highlighted that "the legislator's power to configure empowers it to create special expropriation procedures in each of the areas where such specific regulation allows for the optimization of the protection of the legal assets involved in each case23. To that extent, for example, the legislator may establish expropriation in matters of urban reform, to guarantee people's access to decent housing; in agrarian matters, to allow progressive access of people to land ownership and improve their

---

22 Constitutional Court, judgments C-394 of 2023, C-440 of 2022, C-091 of 2022, C-284 of 2021, C-210 of 2021, C-605 of 2019, C-031 of 2019, C-025 of 2018, C-282 of 2017, C-179 of 2016, C-319 of 2013, C-180 of 2006, C-1233 of 2005, C-040 of 1997, C-541 of 1996, C-427 of 1996, C-005 of 1994, C-150 of 1993, C-093 of 1993, among others.

23 Similarly, the Court declared the constitutionality of a subsidiary procedure for informing private parties of the government's purchase offer when the government is interested in acquiring the property of privately owned real estate. This mechanism allowed the government to pursue the public or social interest it pursued. In this regard, it held: *"The use of subsidiary means to secure the presence of interested parties in administrative proceedings or to inform them of administrative actions constitutes a normal and ordinary procedure, given the need to expedite such proceedings and promptly satisfy public or social interests. Furthermore, the regularity of the use of such means is guaranteed through judicial oversight."*

Judgment C-428/94.

productivity; to respond to disasters; and to protect cultural assets or the ecosystem, among others."24

AND.    **The expropriation process**

48. Article 58, paragraph 1, of the Constitution establishes that "[w]hen the application of a law issued for reasons of public utility or social interest results in a conflict between the rights of individuals and the need recognized by the law, the private interest must yield to the public or social interest." Accordingly, paragraph 4, *ejusdem,* establishes that "[f]or reasons of public utility or social interest defined by the legislator, expropriation may be carried out by means of a court ruling and prior compensation. This shall be determined after consulting the interests of the community and the affected party. In cases determined by the legislator, such expropriation may be carried out through administrative means, subject to subsequent contentious-administrative action, including with respect to the price."

49. In turn, Article 21 of the American Convention on Human Rights, which Colombia ratified through Law 74 of 1968, establishes in its paragraph 1: "[e]very person has the right to the use and enjoyment of his or her property. The law may subordinate such use and enjoyment to the public interest." And, subsequently, paragraph 2 of the same conventional provision prescribes: "[n]o person may be deprived of his or her property, except through payment of fair compensation, for reasons of public utility or social interest and in the cases and according to the forms established by law."

50. In developing the constitutional order, this Court has long defined expropriation as "an operation of public law by which the State forces a private party to tran an asset from the private dominion to the public dominion, for the benefit of the community and by means of a prior compensation"25. More recently, this court has specified that

---

24  Constitutional Court, ruling C-227 of 2011.

25  Constitutional Court, ruling C-153 of 1994.

"Expropriation is a judicial or administrative mechanism by virtue of which public law entities, upon declaration of public utility, may acquire private property, which then becomes part of the public patrimony for use exclusively for the benefit of the community. Therefore, before initiating any expropriation process, whether through judicial or administrative means, it must be determined what the public utility or social interest motivating it is and why a conflict would arise between the private and public interests, requiring a decision that the latter prevails over the former. [...] When such reasons are proven in practice, the private interest must give way to the public interest."26

51. And as this court has repeatedly emphasized, private property, protected by Article 58 of the Charter, is a right that does not have an absolute subjective nature, to which social and                    27 . It is, however, "a right ecological functions are inherent, aimed at ensuring compliance with several constitutional duties, among which stand out the protection of the environment, the safeguarding of the rights of others and the promotion of justice, equity and the general interest as fundamental manifestations of the Social State of Law and with regard to its limits, it has established that they are found in public utility or social interest, from which expropriation derives"28.

52. In the hermeneutical exercise aimed at establishing an adequate balance between the private interest and the prevailing public interest in the context of expropriation, considered "the most burdensome limitation that can be imposed on the legitimately acquired property right" 29, this Court has established "certain *sine qua non* conditions for the limitation to private property to proceed, such as (i) that it is presented for reasons of public utility or social interest previously defined by the legislator; (ii) that the

---

26  Constitutional Court, ruling C-085 of 2022.

27  Constitutional Court, judgments C-750 of 2015, C-669 of 2015, C-306 of 2013, C-258 of 2013, C-227 of 2011, C-133 of 2009, C-870 of 2003, C-491 of 2002.

28  Constitutional Court, ruling C-207 of 2019, reiterating ruling C-133 of 2009.

29  Constitutional Court, judgments C-227 of 2011, C-476 of 2007.

(iii) that the expropriation be carried out by judicial or administrative decision, the latter being subject to subsequent administrative litigation, including with respect to the price; (iv) that the expropriation be carried out with respect for the principle of legality, that is, in accordance with the procedure established by law; (iv) that the expropriation include a prior stage of voluntary alienation or direct negotiation, based on an offer by the administrative entity; and (v) that compensation be paid prior to the transfer of the property right to the Administration, which must be fair.

53. In this context, this corporation has identified three characteristic elements of expropriation, namely: subjects, object and cause31. In this sense, it has been indicated that "[t]he *subjects* of this public law operation are: *(i)* the entity –judicial or administrative– with expropriation power (active subject), *(ii)* the holder of the expropriated fundamental right (passive subject) and *(iii)* the person who will benefit from the expropriation (beneficiary)32. On the other hand, the material *object* of the act of expropriation is the right of ownership of the passive subject over some asset of which he was the legitimate owner and which, as a result of the expropriation, enters the public patrimony33. Finally, the *cause* is the purpose of public utility and social interest that motivates and justifies the expropriation, which must be provided for by law"34.

54. Likewise, constitutional jurisprudence has highlighted that the expropriation operation is structured in different moments within which the intervention of the three branches of public power takes place35.
In this way, we seek to prevent any arbitrary state action that may

---

[30]  Constitutional Court, ruling C-669 of 2015, reiterating ruling C-133 of 2009. In the same sense, judgments C-750 of 2015 and C-133 of 2009.

[31]  Constitutional Court, ruling C-020 of 2023, reiterating rulings C-227 of 2011 and C-764 of 2013.

[32]  *Ibid.*

[33]  Constitutional Court, ruling C-085 of 2022.

[34]  Constitutional Court, ruling C-020 of 2023.

[35]  Constitutional Court, judgment C-669 of 2015, reiterating judgments C-306 of 2013, C-153 of 1994 and C-216 of 1993.

to the detriment of the rights of the owner of the property involved, which is in line with the mandate to protect all persons and their property, as an essential objective of the State under Article 2 of the Constitution.

55. Under this understanding, in accordance with the principle of legality, the legislator is responsible for defining the reasons of public utility or social interest, from which the limits are drawn as to the exhaustive assumptions in which an expropriation may validly take place, since "judicial or administrative procedures, aimed at obtaining an expropriation, cannot, in any case, be based on reasons other than those that the law defined as being of social interest or public utility" 36. In turn, the Administration, headed by the competent state entity and by means of an administrative act, has the power to order the expropriation of the property, within and in accordance with the framework established by law. For their part, the jurisdictional authorities intervene in the judicial process, the mechanism through which the expropriation decision is materialized, ensuring that the legal system, due process and other rights of those affected are respected at all times, and arranging the corresponding economic compensation in the event that the conditions are met for the transfer of the asset to the State to proceed37.

56. Now, according to Article 58 of the Constitution, expropriation for reasons of public utility or social interest may be administrative or judicial. The first occurs when the expropriation is carried out by an administrative body, is carried out by means of the issuance of an administrative act and is of an exceptional nature, without prejudice to the subsequent control to which the aforementioned act is susceptible before the judge of administrative litigation. The second, which is the general rule, occurs when, after the procedure has been carried out in the administrative headquarters, it is processed before the

---

36  Constitutional Court, ruling C-085 of 2022.

37  Constitutional Court, ruling C-1074 of 2002|

38  In accordance with the provisions of Articles 63 and following of Law 388 of 1997 and other special regimes.

judicial authorities a special declaratory process, after which the payment of a fair amount to the affected party is ordered and the transfer of the property to the public entity is decreed through a judgment. 39 In both cases, the Court has stated, "the constitutional balance between the public utility or social interest that motivates the expropriation and the private interest protected through compensation must be safeguarded. To achieve this, the procedure aimed at guaranteeing this balance must be fully complied with." 40

57. Likewise, constitutional jurisprudence holds that "Colombian law has provided for the possibility of direct negotiation of the property to be acquired and only when this fails does it authorize the expropriation procedure."41 The legal institution of expropriation, then, unfolds in three distinct stages, namely: (i) the purchase offer, (ii) the negotiation, and (iii) the expropriation process itself,42 which are projected into an administrative phase, in which the expropriation act is issued and the expropriating entity initially seeks an agreement with the affected party or, failing that, orders an expropriation. Judicial expropriation presupposes the exhaustion of the administrative phase, and in it the judicial authority, in full observance of the substantive and procedural guarantees, decrees the expropriation.

58. The administrative phase begins when the public entity interested in expropriating a specific asset issues an administrative act containing the precise identification of the asset and the purchase offer. In this phase, the first stage consists of the Administration setting a base price and presenting the offer to the private owner of the asset with the aim of persuading them to reach a consensus for the transfer of ownership.

---

39  In accordance with the provisions of Laws 9 of 1989, 1682 of 2013, 1742 of 2014 and Article 399 of Law 1564 of 2012.

40  Constitutional Court, ruling C-750 of 2015, reiterating ruling C-306 of 2013.

41  Constitutional Court, ruling C-306 of 2013.

42  Constitutional Court, rulings C-476 of 2007 and C-1074 of 2002.

59. The negotiation stage then follows, which is called "voluntary alienation" in the judicial expropriation process and "direct negotiation" in administrative expropriation,43 and as a result of the agreement between the parties, it is possible to modify the base price indicated in the offer. This stage will have one of two possible outcomes: if successful, it will be perfected with the execution of a sales contract aimed at transferring the asset to the State and payment of the agreed price. However, if a formal agreement is not reached, the expropriation stage itself will continue.

60. In this last hypothesis, once the deadline established to finalize a negotiation has expired, the entity will issue a new reasoned administrative act ordering the expropriation, with the express inclusion of the following elements: (i) the precise identification of the property subject to expropriation, (ii) the value of the compensation price and the method of payment, (iii) the purpose that will be given to the expropriated property, in accordance with the reasons of public utility or social interest that have been invoked and the conditions of urgency that have been declared, (iv) the order of registration of the administrative act, once final, in the corresponding Office of the Registry of Public Instruments, for the purposes of registering the transfer of the right of ownership from its holder to the entity that ordered the expropriation, and (v) the order of notification to the holders of the right of ownership or other rights.

real estate on the expropriated property, indicating the legally available resources through administrative channels44. If it is an administrative expropriation, once this act has become final, it is up to the taxpayer to make the physical delivery of the property, while the acquiring entity must immediately make the value of the compensation price available to the former.

61. It is important to highlight that against the administrative act that decides the expropriation, the means of control of nullity and restoration of the right can be used before the jurisdiction of the administrative litigation, a scenario in which

---

43  Constitutional Court, ruling C-476 of 2007, reiterating ruling C-1074 of 2002.

44  Article 68 of Law 388 of 1997.

which may be disputed both the grounds supporting the forced alienation and the recognized compensation price45.

62. Judicial expropriation is subject to the rules of the special declaratory process regulated in detail in article 399 of the General Code of Procedure, and takes place when the attempt at negotiation has failed, so the entity proceeds to file a claim before the civil judge after the act ordering the expropriation has become final46. The claim must be filed within three months following the date on which said act has become final and must be directed against the holders of principal real rights over the property to be expropriated and, if these are in litigation, also against all parties to the respective process, as well as against the holders whose contracts are recorded in a registered public deed and against the mortgage and pledge creditors who appear in the registration certificate48.

63. In accordance with the regulatory provision under review, the defendant shall be served with the aforementioned claim within a period of three days, and may not raise any objections. This does not prevent the judge, in exercising his powers, from adopting the corrective measures he deems necessary to remedy the formal defects of the claim. 49 However, the defendant property owner has the option of objecting to the value of the compensation proposed in the plaintiff's offer. In this case, under penalty of rejection, he shall be responsible for providing an expert opinion prepared by the Agustín Codazzi Geographic Institute (IGAC) or by a real estate exchange, which shall be forwarded to the plaintiff.

---

45  Article 71 of Law 388 of 1997.

46  Constitutional Court, ruling C-1074 of 2002.

47  Section 2 of Article 399 of Law 1564 of 2012.

48  Number 1 *ejusdem.*

49  Number 5 *ejusdem.*

50  Number 6 *ejusdem.*

64. The judge must convene a hearing once the deadline for service of the complaint on the defendant or the appraisal on the plaintiff, as the case may be, has expired. At this hearing, after questioning the appraisers who prepared the appraisals, the judge will issue a judgment. If he decrees expropriation, he will order the cancellation of liens, embargoes, and registrations on the property and set the amount of compensation for the affected party. 51 Once the judgment becomes final, the entity must deposit with the court the value set by the judge, 52 who will then order the final delivery of the property to the plaintiff, and after the respective registration, the defendant will receive the compensation to which he is entitled. 55

53                                                   54 ,

65. It should be noted that, although the previous stage of voluntary alienation has not been successful, nothing prevents the attempt in this jurisdictional phase to reach an agreement between the public entity and the owner before the sentence is issued, in which case the process will end early56.

66. It is also important to note that the entity is empowered to initiate the aforementioned civil process even when the administrative act by which it ordered the expropriation is challenged through the respective means of control before the administrative litigation jurisdiction. In such an event, the judge in charge of the civil process must refrain from issuing a judgment before

---

51  Number 7 *ejusdem.*

52  Number 8 *ejusdem.*

53  Number 9 *ejusdem.*

54  Number 10 *ejusdem.*

55  Number 12 *ejusdem.*

56  Constitutional Court, ruling C-1074 of 2002.

that the term for the administrative judge to rule expires57, and it is possible in any case to raise the preliminary ruling before the civil judge58.

67. Thus, the civil process referred to is inserted within the legal institution of expropriation as a jurisdictional phase in which, preceded by an administrative stage, what happens, in short, is that by means of a judicial decree the expropriation decision adopted by the competent public entity is materialized and the respective compensation is granted to the affected party. It is crucial to emphasize this specific objective of the expropriation process, since it reflects the purpose taken into consideration by the legislature when configuring the procedural design of the expropriation operation. On this matter, scholars agree that the essence of the judicial expropriation process is none other than to enforce the expropriation order, imposing it on the owner, and ensuring the latter receives fair compensation.

---

57  Article 23 of Law 9 of 1989.

58  Section 1 of Article 161 of Law 1564 of 2012.

59  In this regard, scholars of Colombian procedural law have pointed out that, despite its nature as a special declaratory process, the expropriation process tends to resemble an executive process more than a declaratory process. In this regard, Jaime Azula Camacho emphasizes that "the expropriation process has traditionally been included in our procedural system among declaratory processes, even though its true status, as recognized by foreign legislation, is that of an executive process, because it is based on a certain right (the administrative act that decrees it) and because it pursues its satisfaction, that is, compliance with that decision, which is carried out through the transfer of ownership and the delivery of the asset to the beneficiary public law entity." (AZULA CAMACHO, Jaime. *Manual de Derecho Procesal,* Volume 3.

(Editorial Temis, Bogotá, p. 358). In a similar vein, Hernán Fabio López Blanco states that "[t]o place expropriation as a declaratory process is to ignore the essence of the cognition process, by means of which an extensive evidentiary activity is sought to establish the existence of a right whose existence is disputed or uncertain, so that the judge declares it; that is, the complete opposite of what happens with expropriation, which is based on a certain and, most importantly, indisputable right, so much so that this process does not admit exceptions of any kind. Its essence is to execute, to enforce the expropriation order, which is why I insist on maintaining that this is a process of execution and not of declaration." (LÓPEZ BLANCO, Hernán Fabio. *General Code of Procedure - Special Part,* Volume 2. Editorial Dupré, Bogotá, 2017, p.

354). Ramiro Bejarano Guzmán, for his part, maintains that "the purpose of the expropriation process is to force the individual to comply with the administrative act by which the expropriation of a property, movable or immovable, was decreed for reasons of public utility or social interest defined by the legislator."
(BEJARANO GUZMÁN, Ramiro. *Declaratory, arbitration and executive processes.* Editorial Temis, 8th edition, Bogotá, 2018, p. 356).

68. The specific purpose of this process is revealed in the fact that, pursuant to the provision under study, the affected party is allowed to dispute matters fundamentally related to compensation. Indeed, the situations regulated by the rule are specifically dedicated to this, by providing that (i) *when the defendant disagrees with the appraisal or considers that compensation is warranted for concepts not included therein or for a higher value,* he must submit an expert opinion prepared by the Agustín Codazzi Geographic Institute (IGAC) or by a real estate exchange, which will be notified to the plaintiff within three (3) days. If the appraisal is not presented, the objection raised will be rejected outright. In turn, (ii) when a third party objects to the delivery process alleging material possession or a right of retention over the expropriated property, the delivery will be made, but the opponent may file an incident to have his right recognized and *an appraisal ordered to establish the compensation to which he is entitled.* Furthermore, (iii) from the time the claim is filed, at the request of the plaintiff entity, the early delivery of the property may be decreed, provided that the latter deposits *the value established in the appraisal provided to the court.*

69. In summary, the institution of expropriation entails a constitutionally admissible limitation on the right to private property of the holder of ownership of a specific asset. This limitation is justified by the prevailing interest accorded to the general interest over the private interest in the Social State of Law, for reasons of public utility or social interest defined by the legislator. However, given that such a limitation entails an impact on the rights of the owner, the Constitution itself prevents the actions of the authorities from becoming arbitrary, subjecting them to strict legal boundaries. Within this framework, the special declaratory process of expropriation constitutes a jurisdictional phase in which, if a business agreement has not been reached between the Administration and the owner, the administrative act containing the expropriation order, once final, becomes effective by decree of the civil judge, with full observance of due process guarantees and ensuring, in all cases, fair compensation for the affected party.

**F. The possibility of proposing exceptions as an expression of the right to contradiction**

70. The right to contradict arises directly from the due process clause provided for in Article 29 of the Constitution, in accordance with the right of every person, under Article 8 of the American Convention on Human Rights, to be heard by the competent authority in those proceedings where their rights and obligations are determined.

71. In harmony with these precepts, procedural doctrine explains that "[t]he right to contradiction can be understood as the abstract right that the defendant has to be heard and to have the opportunity to defend himself in order to obtain a judgment that resolves the conflict of interests.

As Devis Echandía60 rightly points out, the principle of contradiction is "the procedural application of the constitutional principle that no one can be judged without being heard in court, nor condemned without being defeated, since by the mere fact of being sued, one is subject to the result of the sentence that may be issued in the process"61.

72. According to constitutional jurisprudence, the right to contradiction "is raised from the perspective of confronting the substantive and procedural elements that affect the rights and interests in the process. Therefore, it has been specified that this guarantee implies, among others: (i) the right to contradict or debate the claims, which includes the formulation of formal and substantive exceptions62; (ii) the possibility of opposing evidence to that presented against him/her; (iii) effectively participating in the production of the evidence requested by the other party; (iv)

---

60   DEVIS ECHANDÍA, Hernando. *General Notions of Procedural Law.* Aguilar SA, Madrid, 1966, p. 210.

61   CASSASA CASANOVA, Sergio. *Exceptions in civil proceedings. Civil and Civil Procedure Gazette,* Lima, 2014, p. 17.

62   Judgments C-939 of 2003 MP Clara Inés Vargas Hernández and C-641 of 2002 MP Rodrigo Escobar Gil.

present arguments regarding the evidence63; and (v) file appeals against unfavorable decisions"64.

73. The proposition of exceptions is then constituted in one at the head of the passive The manifestation of *procedural resistance*[65] extreme that

materializes the fundamental right to due process, in its dimension as the right to contradiction, in the scenarios where one's rights and interests are subject to debate. By claiming these procedural resistances, the defendant may attempt to demolish the basic elements of the claim by providing the corresponding factual and legal basis for his attack66, or he may denounce the absence of structural elements of the judicial process67.

74. Regarding the institution of exceptions, the function they perform and the guarantees inherent in their formulation, specialized doctrine is prolific: "Couture68 conceived the exception as 'the legal power that the defendant is invested with, which enables him to oppose the action brought against him'. Devis Echandía stated that 'the exception is a special way of exercising the right of contradiction or defense in general that corresponds to every defendant, and which consists of opposing the claim to attack the reasons for the plaintiff's claim, by means of one's own factual reasons, which seek to destroy or modify it or postpone its

---

[63] Sentences C-029 of 2021 MP Gloria Stella Ortiz Delgado.

[64] Constitutional Court, ruling C-284 of 2021.

[65] The notion of *procedural resistance* is linked to opposition to the procedural claim, which "constitutes any opposition to the plaintiff's procedural claim. This means that opposition encompasses all types of resistance on the part of the passive subject of the procedural claim. It is defined as: the declaration of will by which the passive subject of the procedural claim demands that the jurisdictional body, before the active subject of the same, not act on the procedural claim invoked by the latter." (QUIROGA CUBILLOS, Héctor Enrique. La pretensión *procedural y su resistencia (Procedural Claim and its Resistance).* Ediciones Academia Colombiana de Jurisprudencia, Bogotá, 2005, p. 149).

[66] *Ibid.* p. 177.

[67] *Ibid.* p. 183

[68] COUTURE, Eduardo. *Fundamentals of Civil Procedural Law.* 4th edition, IB de F publishing house, Montevideo, 2010, p. 73.

effects' 69. The Italian Rocco comments that 'exception is a procedural power, included in the Law of contradiction in the trial, which corresponds to the defendant, to request that the jurisdictional bodies declare a certain existence of a legal fact that produces a relevant legal effect, in relation to the action exercised by the plaintiff'70"71.

75. Likewise, this Court has emphasized that exceptions "are a manifestation of the right to contradiction held by anyone brought before the court. Preliminary [exceptions] are those aimed at perfecting the proceedings, while meritorious exceptions are aimed at denying the right being claimed. In this regard, the Supreme Court of Justice has stated that: 'If the exception tends to improve the form or delay the process by perfecting it, it is dilatory (...); and if the exception tends to ignore the claimed right, to enervate the action, or to obtain that it be declared extinguished, it is peremptory and attacks the substance of the plaintiff's argument.'72"73

76. Along the same lines, the Court has specified that "[p]riorary exceptions are measures of remediation in the initial stage of some proceedings, due to flaws or defects in the same, at the expense of the defendant, and their purpose is to improve them or terminate them when this is not possible, and thus avoid nullities or inhibitory judgments (…). They are contrasted with exceptions of substance or merit, which refer to substantive law, are directed against the claims of the complaint and, as a general rule, are decided in the judgment"74.

---

[69]  DEVIS ECHANDÍA, Hernando. *General Theory of the Process*. Volume I, Ed. University, Buenos Aires, 1984, p. 264.

[70]  ROCCO, Ugo. *Treatise on Civil Procedural Law*. Volume I, translated by Santiago Sentis Melendo y Marino Ayerra Redín, Ed. Temis and Depalma, Bogotá and Buenos Aires, 1976, p. 324.

[71]  CASSASA CASANOVA, Sergio. *Op. cit.,* p. 70.

[72]  Supreme Court of Justice, Labor Cassation Chamber, Order of February 10, 1983, reiterated in judgment of September 20, 1985.

[73]  Constitutional Court, ruling C-551 of 2016.

[74]  Constitutional Court, ruling C-1237 of 2005.

77. However, notwithstanding the importance of these procedural objections to the defendant in a given dispute, this Constitutional Court has previously been forced to examine various procedural regulations and has found that the elimination of the stage devoted to raising objections in the context of various proceedings is due to a decision by the legislature, exercising its broad scope of regulatory configuration, aimed at speeding up the process. It has also emphasized that introducing restrictions to this stage does not prevent the passive party from raising before the investigating judge the facts constituting possible preliminary objections, as well as from providing the evidence it deems relevant for the official to examine. This means, as emphasized by case law, also guarantees the right to contradict, to the extent that the defendant's ability to raise such defense arguments is not completely eradicated.

78. Regarding the matter before the Plenary Chamber, it is pertinent to mention that, in a previous ruling, this Court analyzed the effectiveness of the right to contradiction when, in the context of a judicial process initiated by a public entity in favor of the general interest as opposed to the private interest, the defendant is limited in the possibility of proposing exceptions, since it was stated that such restriction entailed a violation of the constitutional rights to due process and access to the administration of justice.

79. Well then: on that occasion, this corporation highlighted the special nature of the processes that impose encumbrances on private property in order to allow the execution of works or projects related to the protection of the general interest, reiterated the jurisprudential rules developed from the interpretation of the superior article 58 regarding expropriation processes regarding the scope of the right to property and its tensions.

---

[75] Constitutional Court, rulings C-032 of 2006 and C-1193 of 2005, and similar ruling C-740 of 2003.

[76] On that occasion, the process of establishing a public right-of-way for the transmission of electrical energy was addressed.

Machine Translated by Google

with the protection of the general interest, and stressed that in the event of a declaration of public utility, "the owners or possessors of the affected properties may only require the administration to recognize the value of the interests subject to compensation."[77] In this regard, it concluded that, from the perspective of the person affected by the measure, the violation of the fundamental rights invoked could only be invoked if the judicial process deprived him of access to the aforementioned compensation, which did not occur because he was prevented from filing exceptions. This restriction, the Court emphasized, falls within the legislature's freedom to define judicial processes and is due to the need to facilitate a speedy decision in the pursuit of the general interest.

---

[77]  Constitutional Court, ruling C-831 of 2007.

[78]  On this matter, the Court stated: "19. The time limit for transferring the property to the defendant within the process for imposing a public easement (Art. 27-3) does not present any constitutional difficulty. Indeed, there is no higher law that imposes a minimum period for the defendant to oppose the plaintiff's claims, which is why the matter is contained within the broad scope of regulatory configuration that the legislator has to define judicial processes. Additionally, setting a short period for transferring the property to the defendant responds to a constitutionally valuable purpose, since the process for establishing a public easement for the conduction of energy has among its main purposes, as has been emphasized in this judgment, the protection of the general interest, represented in the prompt execution of the works necessary for the adequate provision of the public service.

20. Similar arguments apply to the case of the prohibition of exceptions within the process of establishing a public easement (Art. 27-5). If one assumes that the defendant's interest is limited to obtaining fair compensation, and the challenged provisions provide a forum for discussing that specific aspect, the prohibition of exceptions does not constitute an unreasonable legislative decision, as it responds to the limitation that the Political Constitution imposes on the right to private property, affected by encumbrances derived from the protection of the general interest of users of the public electric power service. In this sense, the right of the owner or possessor of the servient property to object is limited to the discussion of the amount of economic compensation, excluding other matters. Therefore, the prohibition in question is not only compatible with the Constitution, but is a development of the higher mandates that impose the social function of property and the adequate provision of public services for all members.

Likewise, it should be noted that the legislation in question establishes specific mechanisms so that the trial judge can and must exercise, through the rules established by the Code of Civil Procedure, a supplementary rule for the process of establishing public electricity easements, the corresponding procedural controls. These measures would be aimed at accrediting the conditions for issuing a judgment on the merits, including the ownership of jurisdiction, the capacity of the parties to the proceedings, and, in general, other grounds constituting preliminary exceptions within ordinary civil procedure." Constitutional Court, judgment C-831 of 2007.

**G. Analysis of the constitutionality of section 5 of article 399 of Law 1564 of 2012**

80. With the overview provided by the foregoing considerations, it is now up to the Court to focus on determining whether the statement *"No exceptions of any kind may be proposed",* contained in paragraph 5 of article 399 of Law 1564 of 2012, disregards articles 29 and 229 of the Constitution and, therefore, violates the rights to due process and effective judicial protection, by restricting the possibility for the defendant within the judicial expropriation process to raise exceptions within the term for transferring the claim.

81. As a first step, the Court considers it necessary to reiterate on this occasion that, in accordance with the clause contained in paragraphs 1 and 2 of article 150 of the Political Constitution, when it comes to the issuance of rules of a procedural nature, the legislator has a wide freedom of normative configuration.

82. In exercising this power to issue, amend and repeal laws and codes, and provided that it does not exceed the limits set by higher law, this corporation has recognized that the legislative body is empowered, even, to dispense with stages or resources when designing the procedures, as can be seen to occur, for the case under study, with the elimination of the stage of proposing exceptions by the passive end within the transfer of the expropriation claim.

83. Now, in order to examine whether the legislature ignored the limits set by the Political Constitution when it established that the defendant in the expropriation process cannot raise exceptions, as prescribed by the contested article, it is necessary for the Plenary Chamber to take into consideration the different criteria of judicial interpretation at its disposal in order to carry out a reasonable and balanced hermeneutical exercise in accordance with the function of safeguarding the supremacy and integrity of the Constitution that has been entrusted to it. This, without losing sight of the fact that the laws subject to

scrutiny by this corporation are the expression of the democratic principle, and that an incorrect interpretation of the legal propositions submitted for judgment – such as that derived from a fragmentary or isolated reading of the purposes pursued by the Legislator – carries the risk of distorting the meaning and scope of the challenged rule.

84. In the matter under study, the Court finds that the censured provision must be analyzed in light of the teleological and systematic criteria of interpretation: in effect, in order to consult whether there is an underlying justification for the prohibition of proposing exceptions referred to in numeral 5 of article 399 of Law 1564 of 2012, it is necessary to take into consideration the object and purpose of the judicial expropriation process (teleological criterion), in harmony with the set of provisions of the General Code of Procedure in which the aforementioned article is inserted and with the other rules of the legal system that regulate the institution of expropriation and each of its different stages (systematic criterion).

85. With this approach to the contested rule as a starting point, it is pertinent to reiterate the constitutional jurisprudence regarding the social purpose pursued by the legal institution of expropriation. Within this framework, and in accordance with the provisions of Article 58 above, the expropriation process has a clear constitutional basis in the principle that the public interest prevails over private interests. Under this logic, it is appropriate to emphasize that the purpose of this process is specifically limited to (i) materializing the State's decision to expropriate adopted by the Administration and (ii) ensuring fair compensation for those affected by the transfer of the asset to the State.

86. This unique characteristic makes the expropriation process a special process whose particularities distinguish it from other declaratory processes in civil matters, since, despite the name assigned to it by the Legislature of "special declaratory process", it is evident that in it there is certainty regarding the substantial right held by the plaintiff and, therefore, the controversy does not revolve around the recognition of that prerogative, unlike what occurs with the majority of litigation of a declaratory nature in which said aspect is the core of the dispute. Such a perspective allows us to understand, taking into account the function that

the exceptions in the procedural dispute, why in this special process there is no point in formulating them, to the extent that they do not have the potential to repel the procedural claim as occurs in ordinary declaratory processes.

87. Precisely, given that there is no dispute regarding the right claimed by the expropriating entity, there is correspondingly little scope for the defendant to deploy the ordinary procedural resistance measures common in other proceedings. It is not only the fact that a certain right lies at the heart of the proceedings, but also that the plaintiff's claim is based on the achievement of objectives linked to the general interest, which the Constitution itself protects. Therefore, a prompt and effective resolution of the matter takes on greater significance for achieving the common good and effectively fulfilling the essential purposes of the State, which are to serve the community and promote general prosperity, as proclaimed in Article 2 of the Constitution.

88. However, the foregoing does not mean that, in the name of the public interest, abuses and violations by the Administration are condoned, as such a thing would be unacceptable in a Social State governed by the rule of law. On the contrary, with the aim of protecting the taxpayer from expropriation, the legal system itself provides rules ensuring that the operation is carried out within a framework of guarantees and safeguards throughout a sequence of stages, and with the appropriate intervention of the three branches of government, in order to prevent any arbitrary action. In fact, it is the exclusive responsibility of the legislature to define the reasons of public utility or social interest, and while the entity that orders the expropriation via an administrative act is the administrative entity, the judicial authority is responsible for ensuring that due process and other rights of the parties and interveners are respected, with civil proceedings being the mechanism through which expropriation is finalized through a court ruling and prior compensation.

89. As highlighted in the considerations of this ruling, the institution of expropriation is structured from different stages that include the issuance of the administrative act that identifies the property to be expropriated and declares the reasons of public utility or social interest, the offer

The purchase by the public entity from the owner, the negotiation between both parties with the aim of reaching an agreement that makes the state acquisition of the property viable, and the expropriation process itself in the event that a voluntary agreement cannot be reached. Within all these interconnected stages, which are provided with a series of substantive and procedural guarantees by virtue of which the affected owners may be fully heard, the civil process referred to in Article 399 of Law 1564 of 2012 is merely the final phase in which the final administrative act is executed by judicial decree.

90. Thus, from a comprehensive view of the different rules that jointly regulate the figure of expropriation, it is possible to show that the legal system contemplates various mechanisms in the stages prior to the jurisdictional phase, included in the special declaratory process of expropriation governed by the General Code of Procedure, which allow the affected party to effectively and timely refute the determinations of the Administration regarding the expropriation, even if the possibility of proposing exceptions later is restricted.

91. Indeed, from the moment the first administrative act aimed at expropriating the property is issued, the owner is bound to the process and their active participation is encouraged throughout. They also have the opportunity to challenge the decisions adopted by the public entity by filing appeals and other means of review before administrative judges in order to challenge both the grounds supporting the forced sale and the amount of compensation. There is even the possibility of suspending the expropriation process by the civil judge, on the grounds of prejudiciality, when the administrative act ordering the expropriation is challenged before the administrative litigation jurisdiction.

92. In addition to the above, the Court deems it relevant to emphasize that within the adjective regime in which the challenged rule is inserted, the Legislator provided other measures that reinforce the right of contradiction that is

the defendant is entitled to it, even if he has been prevented from exercising procedural resistance through the formulation of exceptions.

93. In this regard, the same section under censure establishes that "[i]n all cases, the judge shall adopt the necessary corrective measures to remedy the formal defects of the complaint,"79 which enables the judicial officer, in accordance with the broad powers vested in him, to assume an active role in adopting the measures or eventual corrective measures that are necessary so that the rights of the parties and intervenors, and especially those of the affected party, are effective and do not suffer any impairment. On this point, it is worth noting that, as constitutional jurisprudence has already recognized, the dispensing with of the stage of proposing exceptions does not exclude the possibility for the defendant to raise the defensive arguments that he considers pertinent (among them, the facts and evidence that account for the possible configuration of a preliminary exception) so that the investigating judge may examine them and, if necessary, issue a ruling on the matter ex officio.

94. Likewise, numeral 6 of article 399 of the General Code of Procedure provides the defendant with another scenario to exercise his right to contradiction when he disagrees with the appraisal or considers that there is grounds for compensation for concepts not included in it or for a higher value.

This is a favorable space for the person affected by the expropriation to present even possible non-material damages that, in their opinion, should be estimated within the process, with a view to the judge determining whether the economic compensation by the public entity should also include compensation for the possible non-material damage caused to them80.

---

79  Section 5 of Article 399 of Law 1564 of 2012.

80  Although Article 58 of the Charter states that prior compensation shall be set by consulting the interests of the community and the affected party, it is pertinent to take into account that within any process that takes place before the Administration of Justice, the assessment of damages caused to people and things will take into account the principles of comprehensive reparation and equity and will observe the actuarial technical criteria (article 16, Law 446 of 1998).

Machine Translated by Google

95. In this regard, it is pertinent to take into account that, according to the doctrine on civil obligations, it is necessary to "distinguish between the creditor's interest, which is ordinarily patrimonial, but which may well be spiritual, emotional, recreational, etc., […] and the performance, which although exceptionally is not patrimonial, must nevertheless be appraised in monetary terms, since otherwise the liability, which is ultimately always pecuniary, could not be enforced. The examples of the obligation to repair the offense to an asset of the personality, in a specific manner or through a substitute, are telling: the creditor's interest is certainly not pecuniary, but the performance, even when it does not show that quality, is appraised in monetary terms, such that given the debtor's reluctance to perform it, the creditor may require a third party to do so, at the debtor's expense, or simply sue the debtor for the monetary equivalent"81. Thus, regardless of the nature of the damage caused by the expropriation of the property, the owner has the opportunity to allege it at this stage of the proceedings in order to ensure that the compensation he or she receives is fair.

96. In this way, then, the passive end is given the opportunity to discuss the amount and concepts that must comprise the fair compensation to which it is entitled and, in this way, it is guaranteed the possibility of exercising procedural resistance in that which is susceptible to debate within the framework of this particular declaratory process in which, it is insisted, the certainty of the right held by the plaintiff makes the expropriation claim safe from any attack.

97. The Supreme Court of Justice reached similar conclusions in the past, in its constitutionality review process, when in its ruling of June 27, 1978, it analyzed whether articles 453, 454 and 457 of the then Code of Civil Procedure violated equality and due process, by
prescribe that in the process of judicial expropriation for reasons of utility public were not admissible exceptions of any kind. After verifying

---

81  *See* OSPINA FERNÁNDEZ, Guillermo. *General Regime of Obligations.* Editorial Temis, Bogotá, 2018 (p. 91).

that the same regulation examined imposed on the investigating judge the duty to

to rule ex officio on the circumstances constituting exceptions

prior and to refrain from resolving the expropriation in case of finding

configured, the High Court held that "the ex officio and mandatory action that the law imposes on the judge fully compensates for the defense of private interest while allowing the social interest or reason of public utility that justifies the expropriation to be made effective and that must prevail, in the terms of Article 30 of the Constitution." He added that "exceptions are not the only means of defense available to individuals to protect their rights, and in the present case, that guarantee is constituted precisely by the expropriation trial, within which there is a broad and equitable dispute between the administration and the person affected by the expropriation. In this process, the amount of compensation to be paid is determined—and this is one of its objectives—and in this regard, there is no restriction on the right to defense, nor does the State have a privileged position, since the law places it on an equal footing with the expropriated party. And the payment of such compensation is nothing other than the guarantee of the affected right, because it is legal compensation for the harm suffered."

He therefore considered that the challenged rules were not unconstitutional.

98. Furthermore, this Court considers that in the matter under study it is appropriate to reiterate what was stated in judgment C-831 of 2007 regarding the fact that in this type of proceedings "[i]f one starts from affirming that the defendant's interest is limited to obtaining fair compensation and the challenged norms provide an opportunity to discuss that specific aspect, the prohibition of exceptions does not constitute an unreasonable legislative decision, insofar as it responds to the limitation that the Political Constitution imposes on the right to private property, affected by encumbrances derived from the protection of the general interest" 82. In that order of ideas, as was stated then and is ratified now, the restriction on the formulation of exceptions by the defendant is situated within the freedom of normative configuration that the Legislator enjoys in procedural matters and, in development of the

---

82  Constitutional Court, ruling C-831 of 2007.

principles of speed and efficiency, addresses the need to facilitate a speedy decision for the common good.

99. Well then: in the opinion of this Court, the reasons set forth above are sufficient to conclude that, while it is true that section 5 of article 399 of Law 1564 of 2012 restricts the possibility for the defendant within the judicial expropriation process to propose exceptions, this does not entail a violation of the rights to due process and access to the administration of justice, since (i) the affected party has at its disposal different legal tools suitable to assert its interests and exercise the contradiction and defense from the prejudicial stage, throughout the entire procedure and until its completion; (ii) the investigating judge of the process is vested with broad powers that allow him to adopt the measures or eventual corrective measures that are necessary in order to make effective the rights of the parties and interveners; and, in any case, (iii) in accordance with the legal configuration of the judicial expropriation process, said civil procedural instance is not the stage to discuss in substance the claim of the plaintiff entity, since what is done there is to execute the administrative act that orders the expropriation, an act that can be disputed before the jurisdiction of the administrative litigation; the essence of the judicial expropriation process is to determine the amount and the concepts that must be included in the fair compensation in favor of the defendant, in the terms of numeral 6 of article 399 of the General Code of Procedure.

100. In view of the foregoing, the Court concludes that with this limitation on proposing exceptions within the framework of the expropriation process, the legislator (i) has not modified any procedural rule prescribed in the Constitution; (ii) the essential principles and purposes of the State oriented towards the general welfare are respected; (iii) it is seen as a reasonable and proportional measure, taking into account that (iv) it guarantees due process in accordance with the specific purpose of the expropriation process and its scope.

101. As a consequence of the above, the Court will declare the constitutionality of the statement *"No exceptions of any kind may be proposed",* contained

in numeral 5 of article 399 of Law 1564 of 2012, "[t]hrough which the General Code of Procedure is issued and other provisions are dictated."

### H. Summary of the decision

102. The Plenary Chamber of the Constitutional Court examined a claim by unconstitutionality against the statement *"No exceptions of any kind may be proposed",* contained in numeral 5 of article 399 of Law 1564 of 2012, "[t]hrough which the General Code of Procedure is issued and other provisions are dictated", by virtue of which the defendant in the judicial expropriation process cannot formulate exceptions within the term of transfer of the claim.

103. The filers of the action alleged that the aforementioned provision violated the rights to due process and effective judicial protection, enshrined respectively in Articles 29 and 229 of the Constitution, since, in their opinion, persons whose private property is affected as a result of the government's decision to expropriate are prevented from adequately exercising the guarantees of defense and contradiction against the actions of public entities. They asserted that, although the same provision recognizes the judge's power to adopt the necessary measures to correct formal defects in the complaint, such officiousness does not remedy the infringement caused to the defendant's right to defend his own interests. Additionally, they stated that the restriction in question ignores the fact that the aforementioned process not only considers the general interest and the economic compensation of a property right, but also the moral significance of the property and any potential non-pecuniary damages arising from the expropriation.

104. As a preliminary measure, and in response to the request for disqualification made by some of the interveners who considered that the accusation did not meet the minimum argumentative burden, the Court verified the requirements of substantive suitability of the claim and found them satisfied.

105. In undertaking the examination of merit, the Plenary Chamber reiterated, firstly, that the Legislature enjoys a broad freedom of normative configuration in matters of procedural regulation, and that in the exercise of that

Machine Translated by Google

The Congress of the Republic has the power to design the different procedures and define the specific forms of each trial, and may even eliminate stages or resources, as long as, in carrying out this task, it observes the limits imposed by the Constitution.

106. He also stressed that the challenged legal text should be interpreted teleologically, taking into account the object and purpose of the judicial expropriation process, and systematically, in harmony with the set of provisions that make up article 399 of the General Code of Procedure and with the other rules of the legal system that regulate the institution of expropriation and its different stages, since a fragmentary or isolated reading of the purposes pursued by the legislature carries the risk of distorting the meaning and scope of the challenged rule.

107. Based on this hermeneutical approach, the Court emphasized that the judicial process of expropriation is constitutionally based on the principle that the public or social interest prevails over private interests, pursuant to Article 58 above. It is characterized by being a special judicial process with certain particularities that distinguish it from other declaratory processes in civil matters, since its purpose is to materialize the State's decision to expropriate, adopted by the administration, and to ensure fair compensation for those affected by the transfer of the asset to the State. All of this occurs within a framework of guarantees and safeguards throughout a sequence of stages, and with the timely intervention of the three branches of public power, in order to prevent any arbitrary action. In fact, the reasons of public utility or social interest are defined by the legislature; the State entity that is part of the administration orders the expropriation via an administrative act; and the civil process is the mechanism through which expropriation occurs by means of a court judgment and prior compensation.

108. After verifying the structure of the expropriation process, within which the civil judicial process referred to in Article 399 of the General Code of Procedure is merely the execution phase of the administrative act, the Court found that the legal system contemplates various mechanisms in the stages prior to the jurisdictional stage referred to, which allow the affected party to effectively and timely challenge the administration's determinations regarding the expropriation. Furthermore,

There is the possibility of suspending the expropriation jurisdictional process, due to prejudiciality, when the administrative act ordering the expropriation is questioned before the administrative litigation jurisdiction.

109. In view of the foregoing, the Court concluded that, although the challenged provision introduces a limitation on the actions of the passive party within the judicial expropriation process, by restricting the possibility of proposing exceptions, this does not entail a violation of the rights to due process and access to the administration of justice, since (i) the affected party has at its disposal various legal tools suitable for asserting its interests and exercising contradiction and defense from the pre-trial stage, throughout the entire process and until its completion; (ii) the investigating judge of the process is vested with broad powers that allow him to adopt the measures or eventual corrective measures that are necessary in order to make effective the rights of the parties and interveners; and, in any case, (iii) according to the configuration of the expropriation process, said judicial instance is not the stage to discuss in substance the claim of the plaintiff entity, since what is done there is to execute the administrative act that orders the expropriation and whose essence is to determine the amount and the concepts that must be included in the fair compensation in favor of the defendant, in the terms of numeral 6 of article 399 of the General Code of Procedure.

110. As a result of the above, the Plenary Chamber determined that the censured normative statement must be declared constitutional.

## III. DECISION

The Constitutional Court of the Republic of Colombia, administering justice in the name of the people and by mandate of the Constitution,

### RESOLVES:

Declare **CONSTITUTIONAL** the statement *"No exceptions of any kind may be proposed",* contained in numeral 5 of article 399 of Law 1564 of 2012, "By means of which the General Code of Procedure is issued and other provisions are dictated."

Notify, communicate, and comply.

Diana Fajardo Rivera
Chairwoman

NATALIA ANGEL CABO
Magistrate

Juan Carlos Cortes Gonzalez
Magistrate

Jorge Enrique Ibanez Najar
Magistrate
With dissenting vote

Alejandro Linares Cantillo
Magistrate

Antonio Jose Lizarazo Ocampo
Magistrate

PAOLA ANDREA MENESES MOSQUERA
Magistrate

Cristina Pardo Schlesinger

Magistrate

With accepted impediment

JOSE FERNANDO REYES CUARTAS

Magistrate

Andrea Liliana Romero Lopez

Secretary General

**DISSENTING VOTE OF THE JUDGE**

**Jorge Enrique Ibanez Najar**

**TO JUDGMENT C-474/23**

**(File D-15.223)**

**1.** In **Judgment C-474 of 2023,** the Constitutional Court, by its majority, decided to declare the constitutionality of the statement *"[n]o exceptions of any kind may be proposed,"* contained in section 5 of article 399 (partial) of the General Code of Procedure. In support of its decision, the majority considered that the legislature has broad freedom of normative configuration in matters of procedural regulation, which allows it to design the different procedures and the specific forms of each trial.

It can even eliminate stages or resources, as long as it observes the limits imposed by the Constitution.

**2.** The Court then noted that the challenged provision should be interpreted teleologically, taking into account the object and purpose of the judicial expropriation process. From this perspective, it indicated that the judicial expropriation process is based on the prevalence of the public or social interest over the private interest and has certain particularities that differentiate it from other declaratory proceedings in civil matters. The former seeks to materialize the administration's decision to expropriate a specific property and guarantee the corresponding fair compensation to the affected party, exhausting a series of procedural stages designed to prevent any arbitrary For the majority, this means that *"there is certainty regarding the substantive right held by the plaintiff, and therefore, the dispute does not revolve around the recognition of that prerogative, unlike what happens in most declaratory litigation, where this aspect is the core of the dispute."* Consequently, the defendant cannot oppose the procedural claim, and therefore, raising exceptions is meaningless.

**3.** Along the same lines, the Court affirmed that the judicial stage of the process is *"merely the execution phase of the administrative act,"* and that affected individuals have other tools to assert their interests until the end of the proceedings. Specifically, they can: *(i)* challenge the administrative act of expropriation before the authority that issued it; *(ii)* debate the amount of compensation with an appraisal presented by the Agustín Codazzi Geographic Institute; or *(iii)* even submit the administration's decision to the review of the administrative litigation judges, in which case they can request the suspension of the process due to prejudiciality. Furthermore, it emphasized that the judges who hear these types of proceedings are empowered to adopt any corrective measures they deem appropriate to enforce the rights of the parties. Finally, he stated that this judicial process *"is not the forum for discussing the substance of the plaintiff's claim, since what is done there is the execution of the administrative act ordering the expropriation, the essence of which is to determine the amount and the concepts that must be included in the fair compensation in favor of the defendant, in accordance with the terms of section 6 of article 399 of the General Code of Procedure."* Therefore, the rule does not ignore the fundamental rights to due process and access to the administration of justice.

**4.** With due respect for the decisions of the Honorable Constitutional Court, to which I honorably belong, I depart from the majority judgment for the reasons I will explain below. First, the certainty of the administration's substantive right to expropriate for reasons of public utility or social interest in no way implies that the principal claim of the lawsuit is undisputed, as the contested judicial order asserts. In fact, Article 58 of the Constitution clearly states that judicial expropriation can only occur as a result of a process that ends with a judgment, and the legislature established that this debate must be carried out through a special declaratory process, not an executive process. For this reason, contrary to what is established in the ruling, the special declaratory process of expropriation is the procedural setting provided by the legal system to discuss the claim of the lawsuit, which is why the defendants must have adequate procedural tools to exercise their guarantees of a hearing, defense, and contradiction.

**5.** Second, the purpose of the special declaratory expropriation process is not simply the execution of the administrative act of expropriation. On the contrary, this judicial procedure aims to ensure that citizens' property rights are only affected by a judicial decision verifying that the administration exercised its power of expropriation properly and in compliance with all constitutional guarantees.

In any case, if, for the sake of argument, it were to be accepted that this judicial process is comparable to an executive proceeding, the truth is that, even in this scenario, the parties must have adequate procedural mechanisms to debate the claims of the lawsuit, such as the formulation of exceptions.

**6.** Third, contrary to the majority's position, I consider that neither the exhaustion of administrative remedies, nor the ex officio controls of the judge hearing the case, nor the possibility of objecting to compensation, nor the means of controlling nullity and restoration of rights, can be considered suitable procedural tools for exercising the right of defense of those affected. And, fourth, the judgment did not apply the methodology established by jurisprudence for the constitutional review of these rules. Instead of applying the proportionality test in its intermediate intensity, as this Court has repeatedly established, it carried out a series of

isolated considerations about other procedural mechanisms, without pausing to assess the suitability and proportionality of these measures. Below, I will explain the arguments outlined in detail.

### The special declaratory process is the ideal judicial setting to discuss the substantial claim of expropriation

**7.** Indeed, Article 58 of the Constitution provides that *"[f]or reasons of public utility or social interest defined by the legislator, expropriation may be carried out by means of a court ruling and prior compensation. This will be determined after consulting the interests of the community and the affected party. In cases determined by the legislator, such expropriation may be carried out administratively, subject to subsequent contentious-administrative action, including with respect to the price."* This means that there is certainty that the administration is empowered to carry out the corresponding administrative or judicial procedures to expropriate a certain asset, for reasons of public utility or social interest, which is why this power is indisputable. However, this in no way implies that the administration's specific expropriation claim over an asset is certain and indisputable *per se.* Quite the contrary; in fact, the Constitution clearly states that expropriation only applies when there is a conflict between the right to property and the public and social interest; and it is subject to a judicial process. Furthermore, it established two judicial oversight mechanisms, the application of which depends on the actions the administration intends to take to achieve it. For this judicial review to be effective, it is necessary for the competent judges to address the debates regarding the administration's expropriation claim, and for the parties to have sufficient guarantees to discuss whether there is a conflict between the defendant's property rights and public or social interests, and whether, if so, expropriation is the appropriate means to resolve the situation. Therefore, I do not share the majority's assessment of the scope of the special declaratory expropriation process.

**8.** To develop this matter in detail, I will refer to *(i)* the scope of protection of the fundamental right to private property; *(ii)* the tension that may arise between this constitutional guarantee and the public or social interest; and *(iii)* the mechanisms established by the legal system to resolve this tension, including the declaration of public utility for the

Acquisition of an asset by the State. Based on these elements, *(iv)* I will conclude that, by subjecting the expropriation process to a court ruling, the Constitution provided for genuine judicial oversight of this type of action and not a simple *"endorsement"* of the actions carried out by the administration.

### (i) Fundamental right to private property

**9.** Private property is a fundamental right *"that empowers its owner to use, enjoy, exploit and dispose of his property and that protects him from unjustified interference by the State and third parties."83* That is
protected by several rules of the block of constitutionality, among them,
Articles 58 of the Constitution, 17 of the Universal Declaration of Human Rights
Human Rights85 and 21 of the American Convention on Human Rights.86
Based on these provisions, jurisprudence has established that this guarantee
It constitutes a mechanism to achieve personal and family fulfillment.
He also warned that it is a means to obtain satisfaction from
community interests. It is therefore a fundamental pillar of the
Social State of Law.87

---

[83]  Constitutional Court, Judgment C-020 of 2023. This ruling, in turn, reiterated Judgments C-750 of 2015, C-269 of 2021 and C-284 of 2021.

[84]  Colombian Political Constitution. Article 58. *"Private property and other rights acquired under civil law are guaranteed and may not be ignored or violated by subsequent laws. When the application of a law issued for reasons of public utility or social interest results in a conflict between the rights of individuals and the need recognized by it, private interest must yield to the public or social interest. // Property is a social function that implies obligations. As such, it has an inherent ecological function. // The State shall protect and promote associative and joint forms of property. // For reasons of public utility or social interest defined by the legislator, expropriation may be carried out by court judgment and prior compensation. This shall be determined after consulting the interests of the community and the affected party. In cases determined by the legislator, such expropriation may be carried out administratively, subject to subsequent contentious-administrative action, including with respect to the price."*

[85]  Universal Declaration of Human Rights. *"1. Everyone has the right to own property, individually and collectively. // 2. No one shall be arbitrarily deprived of his property."*

[86]  American Convention on Human Rights. Article 21. *"1. Everyone has the right to the use and enjoyment of his property. The law may subordinate such use and enjoyment to the public interest. // 2. No person may be deprived of his property except through payment of just compensation for reasons of public utility or social interest, and in the cases and according to the forms established by law. // 3. Usury, as well as any other form of exploitation of man by man, shall be prohibited by law."*

[87]  *Cfr.,* Constitutional Court, Judgments C-192 of 2016, C-284 of 2021 and C-020 of 2023.

**10.** Regarding its scope of protection, this Court has indicated that ownership encompasses the attributes of use, enjoyment, and disposition of assets, that is, of all things that are appropriable, such as tangible or intangible objects susceptible to value. 88 Regarding these prerogatives, it has specified that use *(ius utendi)* refers to the owner's right to enjoy the thing. Enjoyment *(ius fruendi)* refers to the possibility of collecting the proceeds from the exploitation of the asset. Finally, disposition *(ius abutendi)* guarantees that the owner of the appropriated object may alienate it whenever he or she so desires. 89

**11.** Regarding its essential characteristics, it has been identified that this *fundamental guarantee (a)* is a real right90 of a full nature, because it grants its holder a series of broad powers that can be exercised within the limits provided by the legal system.                               91    Furthermore, *(b)* corresponds to an exclusive right, that is, to a guarantee that allows the owner to oppose undue interference by third parties or the State in its exercise.92 Also, *(c)* it has a perpetual duration linked to the existence of the asset that incorporates the domain, which does not expire due to lack of use.93 Similarly, *(d)* is exercised autonomously, because its existence does not depend on another principal right. And finally, *(e)* is, *prima facie,* irrevocable to the extent that its disposition generally depends on the holder, but not on external causes.94

**12.** However, case law has been emphatic in pointing out that the right to private property is not absolute, but relative. To that extent, it must give way to the public or social interest, as explained below.

---

88   *Cfr.,* Constitutional Court, Judgments C-364 of 2012, C-410 of 2015 and C-020 of 2023.

89   *Cfr.,* Constitutional Court, Judgments C-189 of 2006, C-133 of 2009 and T-585 of 2019.

90   *Cfr.,* Constitutional Court, Judgment C-020 of 2023.

91   *Cfr.,* Constitutional Court, Judgments C-189 of 2006, C-133 of 2009, T-575 of 2011, T-837 of 2012, C-278 of 2014, C-410 of 2015, C-750 of 2015 and C-035 of 2016.

92   *Cfr.,* Constitutional Court, Judgment C-020 of 2023.

93   *Ibid.*

94   *Ibid.*

### (ii) The tension between private property and the public or social interest. The relative nature of the right to private property

**13.** Initially, the Colombian constitutional order privileged an individualistic conception of private property, according to which this right could only be limited in situations of war or public calamity.

[95] In line with this conception, Article 669 of the Civil Code established that property corresponded to a real right over a tangible thing, which could be enjoyed and disposed of arbitrarily. However, beginning with the 1886 Constitution, this absolutist concept of the right to private property began to diminish. From that moment on, the Constituent Assembly established that *"the State reserved the power to limit the attributes of the right to private property, in favor of an interest that*

*judged superior."* [96]

**14.** Later, with the constitutional reform of 1936, the idea of property as a subjective right that could be exercised arbitrarily [97]

---

[95]  Political Constitution 1810. *"2. No one shall be molested in his person or property except by law. […]4. The land is the heritage of man, which he must fertilize with the sweat of his brow, and thus one generation cannot limit or deprive future generations of its free use with entailments, entailments, and other obstacles contrary to nature, the sacred right of property, and the laws of succession."*

Political Constitution of the Republic of Colombia of 1886 (before the constitutional reform of 1936).
Article 31. *"Rights acquired with just title under civil law by natural or legal persons may not be disregarded or violated by subsequent laws. // When the application of a law issued for reasons of public utility results in a conflict between the rights of individuals and the necessity recognized by the law itself, the private interest must yield to the public interest. However, any expropriations that must be made require full compensation in accordance with the following Article."*
Article 32. *"In times of peace, no one may be deprived of his or her property, in whole or in part, except by penalty, coercion, compensation, or general contribution, in accordance with the law. For serious reasons of public utility, defined by the legislature, compulsory alienation may be granted by court order, and the value of the property shall be compensated before expropriation is carried out."*

[96]  Constitutional Court, Judgment C-595 of 1999.

[97]  Legislative Act 1 of 1936 (August 5) Reforming the Constitution. Article 10. *"Private property and other rights acquired by just title, in accordance with civil laws, by natural or legal persons are guaranteed, and may not be ignored or violated by subsequent laws.*
*When the application of a law issued for reasons of public utility or social interest results in a conflict between the rights of individuals and the need recognized by the same law, private interest must yield to the public or social interest. // Property is a social function that implies obligations. // For reasons of public utility or social interest defined by the legislator, expropriation may occur by means of a court judgment and prior compensation. // However, the legislator, for reasons of equity, may determine the cases in which compensation is not appropriate, by a favorable vote of the absolute majority of the members of both Chambers.*

was replaced by the notion of social function. Indeed, this constitutional reform *(a)* explicitly included the concept of private property; *(b)* reiterated the prevalence of public utility and social interest over private profit; and *(c)* established that property is a social function that entails obligations. Similarly, it introduced the possibility of expropriation through a court ruling and prior compensation.

**15.** Regarding this change in the conception of private property, in a Judgment of March 10, 1938, the Full Chamber of the Supreme Court of Justice indicated that, during the first half of the 19th Century, the Constitution of 1886 adopted a conception of private property linked to freedom and its economic conception.98 From that perspective, the principles referred to were basic for the development of personality and required private property that, to the extent possible, was exercised freely, without obstacles or ties.99 However, the *"constituent of 1936 relativized the fundamental right of property, accentuating its submission to the interests of the community and* which can only be

*thereby limiting the free will of the owner,"*          100

occur within the framework of a regulated procedure and in an amount that can be measured.101

**16.** For the Supreme Court of Justice, the Constituent Assembly adopted a concept of property:

*"which is based solely on social utility [, that is, which] should only exist to the extent of this social utility. The legislator can, therefore, introduce into individual property all the restrictions that are in conformity with the social needs to which it must be subject. If at a given moment individual property ceases to correspond to a social need, the legislator must intervene to organize another form of appropriation of wealth. In a country where individual property is recognized by positive legislation, the owner has, by the fact of being an owner, a certain social function to perform; the extent of his right of property must be determined by the law and by the jurisprudence that*

---

98  *See* Supreme Court of Justice. Full Court. Judgment of March 10, 1938.

99  *Ibid.*

100  *Ibid.*

101  *Ibid.*

*applies this, according to the social function that it is supposed to perform: it cannot claim any other right than that of being able to freely, fully and completely fulfill its social function as owner. It can be said that in fact the conception of property as a subjective right disappears to give way to the conception of property as a social function."102*

**17.** Despite the advances described, jurisprudence has indicated that the 1991 Constitution is the one that ultimately consolidates the relativization of this *fundamental guarantee.* Indeed, this Court has noted that the Constitution was instrumental in relativizing private property, insofar as it emphasized the social function of property, incorporated the concept of its ecological function, and established the constitutional mandate to protect and promote associative and joint forms of property.103 The foregoing is in line with the consolidation of a social State based on the rule of law, founded, among other things, on the solidarity of its constituents and on the prevalence of the general interest over the particular.                                                                    104    From that moment on, *"the old and individualistic classical conception of subjective rights at the exclusive and exclusive service of their holder, in whose favor unrestricted powers of use, abuse and disposal were consecrated, was overcome, which now appears replaced by the solidarity conception of property that finds a fertile field for its development in the Social State of Law, and makes possible the fulfillment of various state actions and interventions aimed at the economic improvement of the marginalized sectors of the community and to solve the social conflicts that affect civil society."105*

**18.** Indeed, Article 58 of the Constitution provides that if, in the application of a law issued for reasons of public utility or social interest, a conflict arises with private property, the latter must yield to public or social benefit. It also establishes that this constitutional guarantee

---

102    *Ibid.* The Full Court of the Supreme Court of Justice also ruled on this matter in a judgment of August 17, 1989. On that occasion, the Court reiterated that, in light of the Constitution, Colombia had adopted a *"solidarist conception of property,"* which required that the exercise of this right be directed toward guaranteeing the common good. This was true insofar as the 1936 constitutional reform allowed expropriation not only for reasons of public utility, historically referring to public works, but also for reasons of social interest.

103    *Cfr.,* Constitutional Court, Judgment C-595 of 1999.

104    *Ibid.*

105    *Ibid.*

It has a social and an ecological function, both of which generate obligations for its owners. Thus, the Constituent Assembly adopted a broad concept of private property, under which it is not a subjective right exclusively for the benefit of its owner, but also constitutes an instrument for providing community benefits. [106]  Thus, the right to private property ceased to be absolute and became a relative guarantee.[107]

**19.** However, the new conception of the right to private property does not in any way imply a lack of protection for private interests. On the contrary, it is about guaranteeing the exercise of this prerogative, without exceeding the limits established by the Constitution itself. According to jurisprudence, *"property, as an individual right, is fundamental under the specific conditions established by the Constitution. The attributes of enjoyment and disposition constitute the essential core of this right, which is in no way affected by limitations originating in the law and the rights of others, since, contrariwise, they corroborate the possibilities of restricting it, derived from its very nature, since every right must be harmonized with the other rights that coexist with it, or with the objective right whose supreme authority is the Constitution."*

[108]

**20.** Based on the foregoing, it is possible to conclude that the right to private property contains an intrinsic tension between the interest of individuals in exercising the enjoyment and disposition of their real right over a certain asset; and the public utility or social interest that may exist surrounding the appropriation of that particular asset. To resolve this situation, the Constitution establishes a general principle of interpretation, according to which conflicts that arise between private property and public utility or social interest must be resolved in favor of the latter. However, this does not imply that, in these situations, the State may arbitrarily interfere with the right to private property of individuals; rather, it must resolve the tension through the mechanisms provided in the Constitution and the Law. In the terms of Judgment C-750 of 2015:

---

[106]  Constitutional Court, Judgment C-306 of 2013.

[107]  Constitutional Court, Judgments C-258 of 2013, C-410 of 2015 and C-669 of 2015, among many others.

[108]  Constitutional Court, Judgment C-595 of 1999.

*"The right of ownership grants its holder the power to use, enjoy, exploit, and dispose of the asset, provided that the inherent social and ecological functions derived from the principle of solidarity are respected. The limits to the right of ownership are aimed at fulfilling constitutional duties closely linked to the notion of a social state governed by the rule of law, for example, environmental protection, safeguarding the rights of others, promoting justice and equity, and the prevailing general interest.*

*Such purposes authorize the State to restrict property rights and acquire real estate to achieve higher objectives. This work must be carried out within a procedure that respects the requirements established in the Constitution for depriving a person of property rights.*

**21.** Certainly, the Constituent Assembly explicitly established that the State may restrict the right to private property, through the processes of extinction of the right of ownership,109 expropriation in case of war110 or expropriation for reasons of public utility or social interest,111

which must be regulated by the Congress of the Republic. In addition, it empowered *"the legislator and, exceptionally, the administrative authorities to establish restrictions on said right when there are reasons of general interest that reasonably justify them."112* Based on this power, the legal system established restrictions on property

---

109   Colombian Political Constitution. Article 34. *"The penalties of banishment, life imprisonment, and confiscation are prohibited. // However, by judicial ruling, ownership of property acquired through illicit enrichment, to the detriment of the public treasury, or with serious deterioration of social morality shall be declared extinguished."*

110   Colombian Political Constitution. Article 59. *"In the event of war, and only to meet its requirements, the need for expropriation may be decreed by the National Government without prior compensation. // In the aforementioned case, real property may only be temporarily occupied to meet the needs of the war, or to allocate its proceeds to it. // The State shall always be responsible for expropriations carried out by the Government itself or through its agents."*

111   Colombian Political Constitution. Article 58. *"[…] For reasons of public utility or social interest defined by the legislator, expropriation may be carried out by means of a court ruling and prior compensation.*
*This will be determined in consultation with the interests of the community and the affected party. In cases determined by the legislator, such expropriation may be carried out administratively, subject to subsequent administrative litigation, including with respect to the price.*

112   *Cfr.,* Constitutional Court, Judgments T-245 of 1997 and C-750 of 2015.

private, through forced alienation,113 confiscation,114 forfeiture,115 among others. Thus, only the right to property may be restricted

---

[113] Law 388 of 1997. Article 55. *"It shall be the responsibility of the municipal or district mayor, by means of a reasoned resolution, to order the compulsory disposal of properties that do not fulfill their social function in the terms provided herein. Said resolution shall specify the use or destination that should be given to the property in the future, in accordance with the provisions of the urban development plan and regulations that develop it. // The resolution ordering the compulsory disposal shall be notified in accordance with the provisions of the Administrative Litigation Code. // Against the resolution declaring the compulsory disposal, only the appeal for reconsideration shall be admissible, through administrative means, which must be filed within fifteen (15) days following the date of notification. After a period of two months has elapsed, counting from the date of the filing of the appeal for reconsideration against this resolution without said appeal having been resolved, it shall be understood to be denied and the competent authority may not resolve it, without prejudice to any disciplinary and judicial sanctions that may apply. // Once the administrative act ordering the forced alienation becomes final, it will be registered in the real estate registration folio of the corresponding land and properties. The properties thus affected will be removed from commerce from the date of registration, and while it remains in effect, no authority may grant planning licenses. // The forced alienation situation will be recorded in the certificates of freedom and tradition of the properties subject to said process."*

[114] Law 599 of 2000. Article 100. *"The instruments and effects with which the punishable conduct has been committed or that come from its execution, and that are not freely traded, will pass into the power of the Attorney General's Office or the entity it designates, unless the law provides for their destruction. // The same measure will apply in intentional crimes, when the assets, which are freely traded and belong to the criminally responsible party, are used to carry out the punishable conduct, or come from its execution. // In negligent conduct, motor vehicles, ships or aircraft, any unit mounted on wheels and other objects that are freely traded, will be submitted to technical expertise and will be provisionally delivered to the owner, legitimate holder, unless their seizure and seizure has been requested and decreed. In such case, delivery will not proceed until a final decision is made regarding them. // Delivery will be final when payment for damages is guaranteed, seized the defendant's assets in an amount sufficient to cover their payment, or eighteen (18) months have passed since the conduct was carried out, without the asset having been affected."*

[115] Law 1801 of 2016. Article 179. *"It is the permanent deprivation of possession or ownership of movable property not subject to registration, used by a person in behaviors contrary to the rules of coexistence, through a motivated act. // PARAGRAPH 1. Movable property used in the commission of behaviors contrary to coexistence contained in this Code, will be confiscated. // PARAGRAPH 2. In the case of beverages, food and provisions in general that are in poor condition, or adulterated, or expired medications or those not authorized by the health authorities, or dangerous elements, the Police inspector will order their destruction, without prejudice to the provisions of the criminal law. // TRANSITIONAL PARAGRAPH. The national Government, within one year following the issuance of this law, will define the national or territorial entity responsible for the transfer, storage, preservation, deposit, care, administration and final destination of the assets confiscated by the authorities and the assignment of the resources for this purpose, based on the type of asset seized, the entity's specialty, and its intended purpose. Seized assets may be donated or auctioned in accordance with regulations. Within the framework of this power, the national government may consider outsourcing, contracting, and granting concessions for such services. Pending the issuance and implementation measures for this law, the entities currently carrying out this work will continue to do so, and the current purpose of said assets will be maintained.*

private to give precedence to the general interest, through the exhaustion of any of the judicial or administrative procedures provided by the legal system for these purposes.

### (iii) Expropriation for reasons of public utility or social interest, as a mechanism to resolve the tension between the right to private property and the general interest

**22.** Article 58, paragraph 4, of the Constitution provides that *"[f]or reasons of public utility or social interest defined by the legislator, expropriation may be carried out by means of a court ruling and prior compensation. This shall be determined by consulting the interests of the community and the affected party. In cases determined by the legislator, such expropriation may be carried out administratively, subject to subsequent administrative litigation, including with respect to the price."*

**23.** On repeated occasions, jurisprudence has defined expropriation for reasons of public utility or social interest as *"a public law operation by which the State forces a private individual to comply with the tradition of transferring private ownership to public ownership of an asset, for the benefit of the community and through prior compensation."116* It involves, *"at different times, (i) the legislator, when determining the reasons of public utility or social interest; (ii) the administration, when developing the expropriation process; and (iii) the judges, who control "compliance with the legal and constitutional requirements, guarantee respect for the rights of those affected, set the compensation and may decide whether to decree or abstain from decreeing the expropriation."117*

---

116 Constitutional Court, Judgment C-1074 of 2002. This concept was reiterated in Judgments C-476 of 2007, T-360 of 2011, T-638 of 2011, C-227 of 2011, T-580 of 2011, T-582 of 2012, C-306 of 2013, SU-244 of 2021 and C-085 of 2022. The latter stated that *"expropriation is a judicial or administrative mechanism by virtue of which public law entities, upon prior declaration of public utility, may acquire private property that therefore enters the public patrimony so that it is used exclusively for the benefit of the community. This is why, before initiating any expropriation process, whether through judicial or administrative means, it must be verified what is the public utility or the social interest that motivates it and why it is would present the conflict between private and public interests, which requires the decision that the latter prevails over the former. Article 10 of Law 9 of 1989, amended by Article 58 of Law 388 of 1997, by Article 30 of Law 2044 of 2020, and, more recently, by Article 31 of Law 2079 of 2021, establishes what these reasons of public utility or social interest are.*

117 Constitutional Court, Judgment C-085 of 2022.

**24.** Additionally, expropriation consists of three elements, namely: *(a)* the *parties* involved in the operation. That is, the entity with expropriation power (active party), the owner of the property right (passive party), and the beneficiary(ies) of the expropriation (beneficiaries); *(b)* the *material object* corresponding to the passive subject's right of ownership over an asset, of which they were the legitimate owner, which will enter the public patrimony if the expropriation of the right of ownership is declared; and *(c)* the *cause ,* which refers to the purpose provided for in the Law that motivates and justifies the expropriation.118 Regarding this last component, Judgment C-085 of 2022 stated that:

> *"[I]t must be clear that judicial or administrative procedures aimed at obtaining expropriation cannot, under any circumstances, be based on reasons other than those defined by law as being of social interest or public utility."* For its part, Judgment T-284 of 1994 indicated that "[t]he *declaration of public utility or social interest refers to the cause or purpose that justifies the operation of dispossession or sacrifice of the affected private property of patrimonial content, that is, to the formal determination and proclamation of one of the terms of the conflict: the general or public interest, which must obviously be prior to the exercise of the expropriation power. The distinction between public utility and social interest reflects the breadth with which the expropriation cause is configured: it may consist both in an end whose issue is legally attributed to the public administrations (public utility), as well as in a social purpose certainly protected as such, but which may be and normally is handed over in its realization to private activity (social interest). The clear legal distinction between expropriator and beneficiary of the expropriation is now fully explained, therefore, since in the case of a cause of social interest, it is normal for both subjects of the expropriation to not coincide and the beneficiary may being, as we already know, a private person."*

**25.** Based on these elements, jurisprudence has emphatically stated that, when depriving a person of the ownership of the right to property, against his will, the authorities must: *(a)* verify that one of the reasons of public utility or social interest is configured

---

118 *Cfr.,* Constitutional Court, Judgment C-020 of 2023.

defined by the Legislature; *(b)* exhaust the previous stage of voluntary alienation or direct negotiation, based on an offer from the active subject of the public law operation; *(c)* advance the procedure provided by law, with due respect for the right to due process, to

issue an administrative act or obtain a judicial decision ordering the expropriation of the property; and, *(d)* pay the corresponding fair compensation, in accordance with Article 21.2 of the American Convention on Human Rights, before the transfer of the property right to the public patrimony.119

**26.** Regarding the procedure to be followed, Judgments C-476 of 2007, C-750 of 2015, C-085 of 2022, and C-020 of 2023, among others, have identified that, as a general rule, expropriation for reasons of public utility or social interest must be carried out through judicial channels. Exceptionally, administrative expropriation is permitted in the special cases determined by the legislature.

120    In the first case, the expropriation is ordered by a judicial authority, exercising its jurisdictional functions, through a judgment.121 The former is regulated by Laws 9 of 1989, 388 of 1997, 1682 of 2013, 1742 of 2014 and Article 399 of the General Code of Procedure. On the contrary, in the second scenario, the administrative authority orders the expropriation of the property through an administrative act.

Currently, this procedure is regulated by Law 388 of 1997 and other special regimes, such as that provided for in Law 2044 of 2020.122

**27.** However, jurisprudence has been emphatic in warning that in both cases the authorities must *(a)* observe the principle of legality, *(b)* attend to the guarantee of due process and *(c)* provide prior and fair compensation.
Furthermore, he pointed out that the two types of process provided for in the Constitution share a prior stage called voluntary alienation in which the expropriating authority attempts to reach a formal agreement with the holder of the right, which must be exhausted adequately to make the transfer effective.

---

119    *Cfr.,* Constitutional Court, Judgments C-750 of 2015 and C-133 of 2009, among others.

120    Political Constitution of Colombia. Article 58. Section 4.

121    Constitutional Court, Judgments C-531 of 1996, C-1074 of 2002, C-227 of 2011, C-306 of 2013 and C-750 of 2015.

122    *"Whereby regulations are established for the sanitation of properties occupied by illegal human settlements and other provisions are issued."*

right to due process of the subjects involved in the operation of public law.

**28.** In this regard, Judgment C-669 of 2015 noted that:

*"[T]he guarantee of due process therefore implies that, in both judicial and administrative expropriation, compliance with a series of prior stages of negotiation or voluntary alienation must be guaranteed. This stage, through which the administrative entity attempts to acquire the property, renders the initiation of the expropriation process itself unnecessary. This stage begins with an offer from the administration to the individual to acquire the property for the base price set by the entity. This is then followed by the stage of direct negotiation with the individual. If the direct negotiation process is successful, the stage of transfer of the property and payment of the agreed price begins. Otherwise, that is, if the negotiation process fails, the expropriation stage itself begins, which [may be judicial or administrative and] must culminate with the transfer of the title deed to the State and the payment of compensation to the expropriated individual."*

**29.** In short, private property is a fundamental right of a real nature that encompasses the attributes of use, enjoyment, and disposition of tangible or intangible assets that are susceptible to appropriation. Its exercise is full, exclusive, perpetual, autonomous, and, *prima facie,* irrevocable. However, it is not an absolute guarantee, but rather a relative one. If it comes into conflict with the application of a rule issued for public utility or social interest, the latter must yield to guarantee the general interest. Therefore, private property admits restrictions, based on the prevalence of the public interest over the private interest.

**30.** One of them allows a private asset to be declared of public utility or social interest and subsequently to proceed with its acquisition by expropriation as permitted by the Constitution through a judicial or administrative process, as appropriate. Indeed, the Constitution enshrines the possibility of expropriating private property through a public law operation involving: *(a)* the legislature, by determining the reasons for public utility or social interest,

*(b)* the administration by carrying out the expropriation process; and *(c)* the judges by overseeing compliance with legal and constitutional requirements and ensuring respect for the rights of those involved. The former is composed of the parties involved in the process, the material purpose of the expropriation, and the cause provided for in the law that motivates and justifies the expropriation. The authorities carrying it out must observe the principle of legality, comply with the guarantee of due process, and provide prior and fair compensation. In compliance with the guarantee of due process, they must exhaust the prior stage of voluntary negotiation, which involves an offer by the administration and direct negotiation of the property. If this is successful, the parties will proceed with the transfer of the property and payment of the agreed amount. Otherwise, they will process the expropriation itself, which, as a rule, must be judicial and, exceptionally, administrative.

### *(iv) Judicial expropriation for reasons of public utility or social interest requires that a procedural debate be exhausted against the administration's right to materialize its expropriation claim.*

**31.** As previously noted, the Constitution requires that the administration's intention to expropriate be subject to judicial review, in which the competent judicial authorities must verify that the plaintiff entities comply with the constitutional and legal requirements to carry out the expropriation. Superior Article 58 established two types of judicial review. Regarding the first, it only indicated that the dispossession of property rights can only occur through a court ruling; meanwhile, it established that judicial review of administrative expropriation can only occur through administrative litigation judges. Under these provisions, the legislature determined that civil judges would be responsible for verifying, in each specific case, whether or not there is grounds for ordering the dispossession of a person's property rights through the special declaratory expropriation process. Therefore, the means of controlling nullity and restoring rights is the judicial mechanism that must be activated to control expropriation through administrative means; and the special declaratory process of expropriation is the one that must be applied as a general rule when the administration seeks to expropriate a specific asset.

**32.** This distinction is relevant when analyzing the challenged provision. In the first scenario, the issuance of the administrative act decreeing the expropriation is sufficient to materialize it. Therefore, judicial review occurs after the infringement of the property right and requires the restoration of the right, if necessary. In contrast, in the second case, the administration must wait for the judicial decision to deprive the defendant of their property rights, since it is the judge who ultimately determines whether or not the legal and constitutional requirements for expropriation are met. Furthermore, for these purposes, the judge must not only corroborate that the plaintiff's prior actions are in accordance with the law and that the compensation offered is fair, but also that they are based on the reasons of public or social utility established by law. This implies that the special declaratory expropriation process is the ideal judicial forum to discuss the administration's claim to deprive a person of their property rights. To that extent, defendants must have sufficient procedural tools to oppose the expropriation claim as such, through the formulation of exceptions or any other mechanism that takes its place.

**33.** Indeed, one of the aspects that judicial authorities must verify is the fair compensation that should be given as compensation for the violation of property rights, as indicated by the majority decision. However, this is not the only issue subject to judicial oversight. Judicial authorities must also review, among other things, the plaintiff's standing to carry out the expropriation, the exhaustion of the administrative procedures established to externalize the expropriation claim, the configuration of one of the public utility or social interest reasons, and whether this creates a real conflict with the defendant's property rights. While it is true that the legislature is the one that defines the public utility or social interest reasons that authorize the administration to expropriate a property, it is also true that it does so through an impersonal and abstract rule. Therefore, it is necessary for the competent judicial authority to determine whether, under these rules, the administration has the right to carry out its purpose of depriving a person of their property rights, based on the arguments presented by the parties against the expropriation claim. The framework established by the Congress of the Republic for these purposes is the special declaratory process of expropriation.

**34.** In conclusion, the fact that there is certainty regarding the administration's authority to pursue expropriation proceedings in the scenarios provided by the legislature does not imply that its specific claim is undisputed. On the contrary, the Constitution itself establishes that the administration's intention to expropriate is subject to judicial debate in which the competent judges must determine whether or not expropriation is warranted. The Constitution requires that defendants be able to exercise their rights to a hearing, defense, and contradiction, so that the judge has the necessary elements to make a decision in accordance with the law. Before then, the resolution through which the administration expresses its interest in expropriating is a mere expectation.

### The special declaratory process of expropriation is not comparable to a special executive

**35.** In line with the above, I believe that the special declaratory expropriation process cannot be reduced to the simple execution of an administrative act. This judicial procedure has a different scope, insofar as it requires the judge to assess all available elements to determine whether or not the plaintiff entity is entitled to pursue its expropriation claim.

**36.** Certainly, judicial or administrative expropriation for reasons of public utility or social interest gives rise to a burdensome limitation of private property, to the extent that it prevents the owner from exercising the prerogatives that comprise this *fundamental legal guarantee.* [123]  From this perspective, jurisprudence has highlighted the importance of the legislator establishing procedures that grant minimum procedural and substantive guarantees to the plaintiffs that are suitable to prevent the expropriation from becoming an arbitrary and disproportionate deprivation of the right of ownership.124 In exercising this function, the legislator established the

---

[123]  *Cfr.,* Constitutional Court, Judgments C-669 of 2015, C-080 of 2022 and C-020 of 2023.

[124]  *Cfr.,* Constitutional Court, Judgments C-306 of 2013, C-669 of 2015, C-036 of 2016 and SU-244 of 2021.

next procedural step to carry out the judicial expropriation of a private asset.

**37.** _Budgets of the special declaratory judicial process of expropriation._

The aforementioned procedure requires that, pursuant to the principle of legality, the law must clearly and sufficiently determine: _(a)_ the reasons of public utility or social interest that would justify the expropriation; and _(b)_ the administrative authorities authorized to carry out the procedure. [125] Likewise, it requires that, before starting the negotiation stage, the administrative entity empowered for this purpose issues an administrative decision in which it declares the public utility or social interest of acquiring certain properties to use them for the purposes established by the Legislature, in the terms provided by article 10 of Law 9 of 1989, modified by article 58 of Law 388 of 1997.[126]

---

[125]  _Cfr.,_ Constitutional Court, judgments C-370 of 1994, C-133 of 2009, C-764 of 2013, C-750 of 2015 and C-035 of 2016.

[126]  Law 9 of 1989. Article 10, amended by Article 58 of Law 388 of 1997. Reasons of public utility. _"Article 10 of Law 9 of 1989 shall be as follows: // "For the purposes of decreeing its expropriation and in addition to the reasons determined in other current laws, the acquisition of real estate is declared to be of public utility or social interest for the following purposes: // a) Execution of social infrastructure construction projects in the health, education, recreation, supply centers and citizen security sectors; // b) Development of social interest housing projects, including the legalization of titles in de facto or illegal urbanizations other than those contemplated in Article 53 of Law 9 of 1989, the rehabilitation of tenements and the relocation of human settlements located in high-risk sectors; // c) Execution of urban renewal programs and projects and the provision of urban public spaces; // d) Execution of projects for the production, expansion, supply, and distribution of public utilities; // e) Execution of road infrastructure and mass transit system programs and projects; // f) Execution of beautification, tourism, and sports projects; // g) Operation of the administrative headquarters of public entities, with the exception of state-owned industrial and commercial enterprises and mixed-economy companies, provided that their location and consideration of public utility are clearly determined in the development plans or the instruments that develop them; // h) Preservation of cultural and natural heritage of national, regional, and local interest, including landscape, environmental, historical, and architectural heritage; // i) Establishment of reserve zones for the future expansion of cities; // j) Establishment of reserve zones for the protection of the environment and water resources; // k) Execution of priority urbanization and construction projects under the terms provided for in the development plans, in accordance with the provisions of this law; // l) Execution of urban development, redevelopment, and urban renewal projects through the action unit modality, using land readjustment instruments, real estate integration, cooperation, or other systems provided for in this law; // m) The relocation of populations due to imminent physical risks."_

_See_ Council of State. Consultation and Civil Service Chamber, Decision of July 16, 2009; Council of State, First Section, Judgment of May 9, 2014, File No. 25000232600020000007601 24679.

**38.** Initially, Article 58 of the Constitution established: *"[r]easons of equity, as well as reasons of public utility or social interest, invoked by the legislator, shall not be subject to judicial challenge."* Based on this provision, the jurisprudence of the Council of State considered that this administrative act was procedural and, by constitutional mandate, did not admit judicial control through the action of nullity and restoration of the right.127 However, Legislative Act 01 of 1999 eliminated the constitutional prohibition on challenging these administrative decisions through judicial means. To justify this decision, the resulting Constituent Assembly argued that expropriation must be exercised within the scope provided for in the Constitution, which stipulates that Colombia is a state governed by the principle of legality, the fundamental pillar of which is that State actions cannot be exempt from control. Thus, the prohibition established by the Charter was contrary to the provisions of Title One of the Constitution. In his view, this constitutional mandate allowed dictatorial actions to be taken, and for that reason, he eliminated it.128

**39.** Based on the foregoing, in its Unification Judgment of December 11, 2015, the Council of State changed its position, stating that the declaration of a private asset as being of public utility or social interest is a mere procedural act. Indeed, the Court clarified that *"it is an act that produces immediate and direct legal effects for the individual concerned, as it orders the advancement and initiation of the expropriation process for specific assets. This is even more compelling given that it constitutes the initial stage of the expropriation procedure, without which the authority cannot be authorized to carry it out; it cannot be forgotten that there is a cause-and-effect relationship between the expropriation act and the act declaring the conditions of public utility and social interest, since without the existence of the former, the latter cannot be issued."*

[129] Consequently, the aforementioned administrative act may cause harm to the holders of the right of ownership, which is why it is subject to judicial review through an action for annulment and restoration of the right.

---

[127] *Cfr.,* Council of State, First Section, Judgments of August 5, 1994, Case No. 2679 and of August 26, May 1995, Case No. 1692; Order of August 30, 2007, Case No. 2005-00136.

[128] *Cfr.,* Congressional Gazette 245 of October 30, 1998.

[129] Council of State. Administrative Litigation Chamber. First Section, Judgment of 11 December 2015. Filed: 25000 23 24 000 2006 01002 01.

**40.** Similarly, it emphasized that the decision was issued within the framework of administrative expropriation and established the following rules to unify its jurisprudence on the matter:

*"- Every expropriation procedure must respect the principle of legality as a democratic expression of the Social State of Law.*

*- No acts can be exempt from judicial review; the absence of judicial review is prohibited for actions resulting from the exercise of public power in matters of expropriation.*

*- Acts that declare reasons of public utility or social interest create a specific and specific legal situation; they produce immediate and direct legal effects for the person concerned.*

*- Judicial review of reasons of public utility or social interest can be carried out through the exercise of an action for annulment and restoration of the right.*

*- The special contentious-administrative action also proceeds against the administrative act that decides the expropriation in order to "obtain its nullity and the restoration of the injured right, or to challenge the recognized compensation price", according to the provisions of article 71 of Law 388 of 1997*

*It is emphasized that the decision is related to administrative expropriation, a figure different from judicial expropriation."*[130]

**41.** *Preliminary negotiation stage.* Pursuant to the provisions of Laws 9 of 1989 and 388 of 1997, before initiating the special declaratory judicial process of expropriation, the administrative authorities authorized to do so must complete a two-stage administrative phase,[131] described below.

---

[130]    *Ibid.*

[131]    *Cf.,* Constitutional Court, sentences C-1074 of 2002, C-476 of 2007, C-227 of 2011, C-669 of 2015, C-750 of 2015 and C-378 of 2021.

**42.** *Purchase offer*. The process begins with an administrative act, called an official letter, in which the entity authorized to do so makes a purchase offer to the owner of the requested property. The official letter must precisely identify the property and the price that will be used as the basis for negotiation. The price is established based on the market value set by the Agustín Codazzi Institute, acting on its behalf, or by private appraisers.132

This decision must be notified to the affected party through the mechanisms provided by the Code of Administrative Procedure and Administrative Litigation.133 Likewise, it must be registered in the property registration folio of the property, as provided in article 13 of Law 9 of 1989, *"to prevent the ownership of the property from being transferred to other persons and, in this way, delay the expropriation process."*

134 The foregoing, to the extent that this procedure *(a)* removes the property from commerce; and *(b)* prevents the granting of licenses related to the powers of use, enjoyment and disposal of the property.135 Regarding the judicial control of this administrative act, Judgment C-1074 of 2002 stated that *"[a]gainst this document, the remedies provided for in the administrative procedure, nor actions before the contentious-administrative jurisdiction, are not admissible,"* as provided in Article 61 of Law 388 of 1997.

**43.** *Voluntary transfer.* Once the bidding phase concludes, interested parties have 30 business days to negotiate directly and reach a formal voluntary transfer agreement.136 At this stage, the parties may modify the price indicated in the offer. If the parties reach an agreement, it must be recorded in a contract.

---

132 Law 388 of 1997. Article 61. *"The purchase price shall be equal to the market value determined by the Agustín Codazzi Geographic Institute, the entity performing its functions, or by private appraisers registered with the corresponding exchanges or associations, as determined by Decree-Law 2150 of 1995, in accordance with the rules and procedures established in the special regulatory decree on appraisals issued by the government. The market value shall be determined taking into account the municipal or district urban planning regulations in force at the time of the purchase offer in relation to the property to be acquired, and in particular its economic purpose. […]".*

133 Law 388 of 1997. Article 61. *"Communication of the act by which the purchase offer is made shall be made subject to the rules of the Administrative Litigation Code and shall not give rise to administrative appeals."*

134 Constitutional Court, Judgment C-1074 of 2002.

135 *Cfr.,* Constitutional Court, Judgment C-1074 of 2002.

136 Law 388 of 1997. Article 68.

*Cfr.,* Constitutional Court, Judgment C-020 of 2023.

of sale or promise of sale. At this stage, the agreed price must be paid. However, if there is a balance due, the entity must provide an unconditional bank guarantee.137

**44.** However, if the aforementioned term occurs without reaching an agreement or the parties enter into a contract of promise of sale that is not perfected within two months of its execution, the corresponding entity must issue an *"expropriation resolution"* to initiate the expropriation stage itself.

**45.** Against this decision, an appeal for reconsideration may be filed within 10 days of its notification and the actions.138 If a month passes without the authority resolving the appeal, it will be deemed denied and the decision will become final.139 In these cases, an action for annulment and restoration of the right may also be filed, which must be filed within 4 months of notification of the decision, before the competent Administrative Court, which must decide the matter in a single instance within 8 months of the filing of the claim.140 If the Administrative Litigation Jurisdiction defines the matter in favor of the plaintiff before the civil judge, the latter must refrain from issuing a judgment before the term provided for in the norm and the restitution of the property with the corresponding compensation for damages will proceed. On the contrary, if the civil judge orders the expropriation before the definition of the case by the administrative judge, and the latter grants the owner's claims,

---

137  *Cfr.,* Constitutional Court, Judgment C-1074 of 2002.

138  Law 9 of 1989. Article 21. *"[…] Against the resolution ordering the expropriation, only the appeal for reconsideration will proceed, which must be filed within ten (10) business days following its notification."*

139  Law 9 of 1989. Article 22. *"After one month has elapsed without the expropriating entity issuing the resolution resolving the appeal for reconsideration, the appeal shall be deemed denied, and the appealed act shall become final. Any official who fails to resolve the appeal in a timely manner shall incur misconduct. After this period, the appeal filed may not be resolved. […]"*

140  Law 9 of 1989. Article 22. *"[…] Against the resolution ordering an expropriation pursuant to this Law, contentious-administrative actions for annulment and restoration of the right shall be admissible before the competent Administrative Court, in a single instance. Provisional suspension of the contested act shall not be admissible in these actions. The Administrative Court must issue a final judgment within a maximum period of eight (8) months, counted from the date of filing the claim. The contentious-administrative process shall terminate if no judgment has been issued within the previous period. […]"* Underlined declared UNCONSTITUTIONAL. Judgment C 127 of 1998.

The decision of the civil judges will then be finalized and the corresponding compensation will be paid. [141]

**46.** *Expropriation itself.* This phase corresponds to the advancement of the judicial process regulated in Article 399 of the General Code of Procedure, which is provided for in Chapter I of Title III of the law governing special declaratory proceedings. It consists of the stages described below.

**47.** *Filing the claim.* The corresponding authority must file an expropriation claim within three months of the date on which the aforementioned resolution becomes final. The claim will be directed against: *(a)* the holders of the main property rights in the property; *(b)* the parties involved in pending litigation regarding the ownership of those rights, if any; *(c)* the holders whose contracts are recorded in a registered public deed; and *(d)* the mortgage and lien creditors registered in the registration certificate.[142] With the claim, the entity must attach a copy of the current resolution decreeing the expropriation, an appraisal of the property, and a certificate of ownership and the property rights established for a period of 10 years, if possible.[143]

**48.** If it is not submitted within the established term, the resolution and the registrations made in the corresponding registration folio will lose their validity.

---

[141]   Law 9 of 1989. Article 23. *"The civil expropriation process shall terminate if there is a judgment from the Administrative Court in favor of the plaintiff on a date prior to that on which the judgment of the Civil Judge becomes final, who shall refrain from issuing a judgment before the expiration of the term established in the previous paragraph. In this event, the restitution of the claimed property and compensation for damages shall proceed in accordance with Article 459 of the Code of Civil Procedure. // The transfer of the property right in favor of the expropriating entity shall be final even if the judgment of the Administrative Court is subsequent to that on which the judgment of the civil judge becomes final. In this event, the court shall take into account the compensation decreed by the civil judge for the purpose of repairing the damage suffered by the owner."*

[142]   General Code of Procedure. Article 399. Paragraph 1. *"1. The claim shall be directed against the holders of the principal real rights over the assets and, if these are in litigation, also against all parties to the respective process. // It shall also be directed against the holders whose contracts are recorded in a registered public deed and against the mortgage and lien creditors listed in the registration certificate."*

[143]   General Code of Procedure. Article 399. *"3. The claim shall be accompanied by a copy of the current resolution decreeing the expropriation, an appraisal of the property subject to it, and if the property is subject to registration, a certificate of ownership and the real rights established thereon, for a period of ten (10) years, if possible."*

automatically enforceable. As a result, upon request, the registrar must cancel the corresponding registrations if the fact is verified.144

**49.** *Early delivery of the property.* Once the process has begun, the early delivery of the property may be ordered, if the entity so requests. To this end, the court must deposit the value established in the appraisal provided. During this process, the judge will order the owner to be given the deposited money if the owner proves that the property was used exclusively for his or her residence. This is the case, provided that the plaintiff does not object and the property has no mortgage liens, embargoes, or registered lawsuits.145

**50.** *Service of the complaint.* The owner of the property shall be served with the complaint within a period of three days. If two days pass without notification to the defendants, the judge shall summon them and post a copy of the action on the entrance door of the property to be expropriated or on the premises where the property is located.146

**51.** In case of disagreement with the appraisal of the property, the owner must submit an expert opinion prepared by the Geographic Institute

---

144 General Code of Procedure. Article 399. Section 2. *"The expropriation claim must be filed within three (3) months following the date on which the resolution ordering the expropriation becomes final, otherwise said resolution and any registrations made in the public instruments registry offices will lose their enforceability, without the need for any judicial or administrative pronouncement. The registrar must cancel the corresponding registrations, at the request of any person, after verifying the fact."*

145 General Code of Procedure. Article 399. Section 4. *"From the filing of the claim, at the request of the plaintiff, the early delivery of the property shall be decreed, provided that the plaintiff deposits the value established in the appraisal provided to the court. If, during the proceedings, the defendant proves that the property subject to expropriation is intended exclusively for his or her residence, and no objection is filed, the judge shall order the advance delivery of the deposited money, provided that there are no mortgage liens, seizures, or registered lawsuits."*

146 General Code of Procedure. Article 399. Section 5. *"The defendant shall be notified of the claim within a period of three (3) days. He may not propose exceptions of any kind. In any case, the judge shall adopt the necessary corrective measures to remedy the formal defects of the claim. // After two (2) days have elapsed without the defendants being able to be notified of the order admitting the claim, the judge shall summon them in the terms established in this code; a copy of the summons shall be posted on the access door to the property subject to expropriation or to the property in which the furniture is located."*

Agustín Codazzi (IGAC) or by a real estate appraisal. This will be forwarded to the plaintiff within a period of three days. Failure to do so will result in the objection being rejected outright. [148] However, the defendant may not raise any exceptions. The judge shall, ex officio, adopt the necessary measures to correct the formal defects of the claim.[149]

**52.** *Hearing.* Once the aforementioned transfer terms have expired, the judge will convene a hearing. At the hearing, he will question the experts involved in the reports and issue a judgment. He will decide on the expropriation, order the cancellation of liens, embargoes, and registrations, and determine the amount of the corresponding compensation.

**53.** *Enforcement of the decision.* Within 20 days of the decision becoming enforceable, the plaintiff must deposit the balance of the corresponding compensation. Failure to do so will result in the judge issuing a writ of execution.

---

[147]  General Code of Procedure. Article 399, Section 6. *"[…] At the request of the interested party and without the need for a court order, the Agustín Codazzi Geographic Institute (IGAC) will provide the requested expert reports, for which the applicant must provide proof of the formal purchase offer made by the entity. The National Government will regulate the applicable fees."*

[148]  General Code of Procedure. Article 399. Section 6. *"When the defendant disagrees with the appraisal or considers that compensation is due for items not included therein or for a higher value, he must submit an expert opinion prepared by the Agustín Codazzi Geographic Institute (IGAC) or by a real estate exchange, which will be notified to the plaintiff within three (3) days. If the appraisal is not submitted, the objection raised will be rejected outright […]."*

[149]  General Code of Procedure. Article 399. Section 5. *"The defendant shall be notified of the claim within a period of three (3) days. He may not propose exceptions of any kind. In any case, the judge shall adopt the necessary corrective measures to remedy the formal defects of the claim. // After two (2) days have elapsed without the defendants being able to be notified of the order admitting the claim, the judge shall summon them in the terms established in this code; a copy of the summons shall be posted on the access door to the property subject to expropriation or to the property in which the furniture is located."*

[150]   General Code of Procedure. Article 399. *"PARAGRAPH. <Section crossed out UNENFORCEABLE> For the purposes of calculating the value of compensation for lost profits, when it comes to real estate that is used for productive activities and there is an affectation that causes a temporary or permanent limitation to the generation of income from the development of the same, the compensation for the income that is not received for a maximum period of six (6) months must be considered independently of the appraisal of the property. Crossed out section declared unenforceable in Sentence C-750 of 2015".*

[151]  General Code of Procedure. Article 399. Section 7. *"After the service of the complaint on the defendant or the appraisal on the plaintiff, as the case may be, has expired, the judge shall convene a hearing in which he shall question the experts who prepared the appraisals and issue the judgment. The judgment shall resolve the expropriation and, if decreed, order the cancellation of liens, embargoes, and registrations on the property, and shall determine the value of the corresponding compensation."*

Executive. Once the money has been delivered, the court will arrange for the final delivery of the property and order the registration of the judgment and the minutes of the proceedings to serve as a title for the plaintiff.152

**54.** If the property was delivered in advance and the judge denies the expropriation, he or she will order that measures be taken to return possession of the property to the defendant. However, if a third party alleges material possession of the property during the delivery process, they must file an appeal to have their right recognized within 10 days of the completion of the process. 153 Once the compensation has been assessed, payment will be made with the sum deposited on the office's behalf. 154

**55.** After the decision and the minutes have been registered, the judge will deliver the compensation amount, except in cases where the properties are liens. In such cases, the funds will remain at the firm's disposal so that creditors can exercise their rights in a separate proceeding.

---

152 General Code of Procedure. Article 399. Paragraphs 8, 9 and 10. *"8. The plaintiff must deposit the balance of the compensation within twenty (20) days following the execution of the judgment. If the deposit is not made in a timely manner, the judge will issue an executive order against the plaintiff. // 9.*
*Once the judgment has become final and the deposit has been made to the court, the judge will order the final delivery of the property. // 10. Once the delivery has been made, the record of the proceedings and the judgment will be ordered to be registered, so that they may serve as title to the plaintiff.*

153 General Code of Procedure. Article 399. Section 13. *"When an early delivery of the property has been made and the superior court revokes the judgment decreeing the expropriation, it shall order the inferior court, if possible, to return the defendant to possession or ownership of the property and shall condemn the plaintiff to pay the damages caused, including the value of the works necessary to restore the property to the condition it was in at the time of delivery. // The damages shall be liquidated in the manner indicated in Article 283 and shall be paid with the sum indicated. Once the liquidation process has concluded, the plaintiff shall be given any remaining balance in his favor."*

154 General Code of Procedure. Article 399. Section 11. *"When a third party objects to the delivery process alleging material possession or a right of retention over the expropriated property, the delivery shall be effected, but the opponent shall be warned that within ten (10) days following the completion of the process, they may file an incident to have their right recognized. If the incident is resolved in favor of the opponent, the ruling so deciding shall order an appraisal to establish the corresponding compensation, which shall be paid from the sum deposited by the plaintiff. The ruling resolving the incident may be appealed with deferred effect."*

155 General Code of Procedure. Article 399. Section 12. *"Once the judgment and the minutes have been registered, the interested parties will be given their respective compensation, but if the assets were encumbered with a pledge\* or mortgage, the price will be at the order of the court so that the creditors can exercise their respective rights in a separate process. In this case, the secured obligations will be considered payable, even if they have not expired. // If the assets are subject to embargo, sequestration or registration, the price will be remitted to the authority that decreed such measures; and if they are subject to a resolutory condition, the price will be*

Machine Translated by Google

**56.** *Resources.* Section 13 of Article 399 of the General Code of Procedure establishes that *"a judgment denying expropriation may be appealed with suspensive effect; a judgment decreeing expropriation may be appealed with devolutionary effect."*

**57.** The foregoing account allows us to conclude that it was the legislature itself that granted this judicial process a different scope, taking into account the implicit imbalance of burdens that exists in expropriation proceedings. To that extent, it is not possible to modify its nature to that of a special executive process, given the need to obtain prompt decisions on expropriation matters. On the contrary, when determining the scope of the special declaratory expropriation process, it is essential to assess the other conditions surrounding the process, including the need to avoid the arbitrary exercise of power by the State. It is, therefore, a judicial process whose purpose is to declare whether or not a property is expropriated, but not to execute an administrative decision, which, among other things, does not have the power to order expropriation, as the majority decision asserts.

**58.** Indeed, when the pre-negotiation stage fails, public entities with expropriation powers issue a resolution identifying the property they require and its appraisal, in order to assess the corresponding compensation for the expropriation. However, this administrative act does not actually order the expropriation. This action corresponds to a mere intention that materializes in the expropriation process. Indeed, it is in this action that the judge must decide whether or not the declaration of expropriation is appropriate, taking into account all the necessary elements of judgment. Thus, the argument of the majority's decision in this case ignored the differences between administrative expropriation, which is appropriate under extremely exceptional circumstances, and the special declaratory expropriation judicial process, which is the general rule in these cases.

**59.** Now, if for the sake of discussion it were admitted that the special declaratory judicial process of expropriation is comparable to executive processes, it is appropriate to point out that ultimately the law provides for the possibility that the

---

*will be delivered to the interested party as a seizure, which will remain in effect until the day on which the condition fails, provided that its return is guaranteed if the condition is met."*

Machine Translated by Google

Defendants may oppose the claims of the complaint. Specifically, Articles 422 and 423 of the General Code of Procedure establish precisely the exceptions that may be raised in executive proceedings and the manner in which they must be processed. The same applies to other judicial proceedings that must be resolved expeditiously. Indeed, Article 421 of the same code provides that defendants in these proceedings may oppose all the claims of the complaint in the answer. The rule only limits the right to defense with respect to certain exceptions expressly provided for in the same rule.

**60.** Thus, even under the inappropriate comparison of the special declaratory process of expropriation with other processes such as the executive process, it is evident that the prohibition contained in the challenged rule is disproportionate, because it prevents the exercise of the guarantees of hearing, defense, contradiction and, in general, due process of the defendants.

**The tools provided in the legal system to discuss some issues related to expropriation do not adequately protect the guarantees of hearing, defense, contradiction and, in general, due process of the defendants.**

**61.** The majority decision noted that the law does not disregard the guarantees of defense and contradiction, because the defendants *(i)* may oppose the expropriation claim in the administrative phase; *(ii)* have the opportunity to dispute the amount of compensation; and *(iii)* have the means of reviewing the nullity and restoring the right to challenge the administrative act ordering the expropriation. Furthermore, it considered that the judge's ex officio powers in the proceedings also guarantee the right to due process for those involved.

**62.** However, I do not share the majority's approach. Regarding administrative proceedings, it is important to clarify that they are not sufficiently significant to guarantee the right to defense of those who are sued in a special declaratory expropriation proceeding. They constitute a mechanism for the administration to reconsider its decisions and have the opportunity to correct them if they prove to be unlawful.

contrary to law, but they do not replace the right of persons to access the administration of justice to present their claims or oppose those raised against them before an impartial and independent third party who is empowered to make a definitive ruling on the right in question156.

**63.** Regarding the possibility of challenging the amount of compensation, I believe that, despite its relevance in this type of proceedings, it is not the only debatable issue. As I explained previously, the expropriation claim itself is debatable. Therefore, discussions about fair compensation do not satisfactorily replace the defendants' right to defense, contradiction, and a hearing.

**64.** Furthermore, regarding the possibility of resorting to the process of annulment and restoration of rights, I note that the viability of an additional judicial proceeding is not sufficient to demonstrate that the defendants in this type of proceedings have a suitable defense mechanism within the judicial process that generates the dispute. Furthermore, the possibility of resorting to this judicial means of control is not clearly provided for in the legislation. So much so that only since the Unification Judgment of December 11, 2015, issued by the Council of State, were the defendants allowed to resort to this judicial process to challenge the claims of public entities. Therefore, the admissibility of this additional mechanism is not clearly provided for in the law, which is why it cannot be considered a supplementary mechanism to the guarantees of hearing, defense, and contradiction that must be guaranteed in the special declaratory expropriation process.

**65.** Finally, the judge's ex officio powers are not part of the parties' right to defense and contradiction. Their exercise depends on the will of the judicial authority hearing the case, and to that extent, they cannot be considered part of the defendants' right of action. In short, the mechanisms that the majority decision identifies as guaranteeing the rights of those affected by judicial expropriation proceedings are not suitable for guaranteeing the fundamental rights to due process and access to the administration of justice of those affected by these types of proceedings.

---

156 *Cfr.,* Constitutional Court, Judgment C-319 of 2002.

**The constitutionality control of the norm, through the intermediate constitutionality trial, necessarily led to the declaration of unconstitutionality of the norm.**

**66.** Finally, I consider that the majority decision should have applied a proportionality judgment of intermediate intensity to evaluate the constitutionality of the challenged rule. To justify this position, I will explain *(i)* the legislature's broad scope for regulatory configuration in matters of expropriation; *(ii)* the limits of the aforementioned function; with emphasis on *(iii)* the effectiveness of the guarantees that comprise due process and access to the administration of justice as a restriction on the regulatory configuration of the matter; and *(iv)* I will specify the role of prior and merit exceptions in safeguarding the rights to defense and contradiction. Based on this, *(v)* I will conclude that the challenged rule should have been declared unconstitutional, applying the aforementioned intermediate proportionality judgment.

### *(i) The legislator has a wide margin of normative configuration regarding expropriation*

**67.** Pursuant to Article 58 of the Constitution, the legislature participates directly in the public law operation entailed by expropriation by defining: *(a)* the reasons of public utility or social interest that would enable public entities to acquire a private asset through expropriation; *(b)* the events in which expropriation will be carried out administratively; and *(c)* the manner in which the right to compensation must be guaranteed. [157]

**68.** In this regard, Judgment C-216 of 1996 clarified that *"when [the rule] refers to the legislator and not specifically to Congress, it allows the reasons of public utility or social interest to be exceptionally defined by the Executive, invested, of course, with the precise extraordinary powers contemplated in its article 150, paragraph 10 (76, paragraph 12, of the previous Political Charter, under whose protection the*

---

[157] *Cfr.,* Constitutional Court, Judgment C-153 of 1994.

*attacked rules), that is, in his capacity as extraordinary legislator."* [158]
For its part, Judgment C-750 of 2015 clarified that "[t]he *legislator has broad discretion in the matter of expropriation. However, this power cannot invalidate the scope of action available to the judge and the administration to establish compensation that takes into account the circumstances of each case, as well as the conflicting interests. The law cannot standardize limits or calculations of compensation for all events, because sometimes static rules may be a barrier and impediment to the authorities providing fair compensation."*
[159]

**69.** These are not the only powers that the Legislator has in this matter. It is also responsible for defining the judicial and administrative procedures that public authorities must exhaust to declare the expropriation of private property. Although the aforementioned constitutional mandate does not explicitly refer to the aforementioned duty, it does recognize that this power may only be exercised after exhausting an administrative or judicial procedure that respects the guarantees of due process. Thus, a systematic interpretation of the aforementioned process rule, along with the provisions of the general jurisdiction clause enshrined in sections 1 and of the [160] 2 of article 150 of the Constitution, allows us to conclude that it is up to the Congress Republic to determine the administrative and judicial procedures that must be exhausted in expropriation matters.

**70.** On this matter, Judgment C-035 of 2016 established that the legislature can establish limits on the right to property by authorizing the administration to carry out expropriation proceedings. However, the Constitution enshrines several guarantees in favor of those liable for the action. Among them, the legislature: *(a)* must define in advance the reasons of public utility and social interest that would enable the Government to initiate this type of proceedings; *(b)* establish the competence of public entities to carry out these procedures; and *(c)* regulate everything related to the expropriation process. Regarding this guarantee, the aforementioned ruling emphasized that *"the participation of the legislative branch in expropriation is of*

---

[158]  Constitutional Court, Judgment C-216 of 1996.

[159]  Constitutional Court, Judgment C-750 of 2015.

[160]  *Cfr.,* Constitutional Court, Judgments C-1074 of 2002, C-474 of 2005, C-476 of 2007, C-227 of 2011, C-306 of 2013, C-410 of 2015, C-669 of 2015, C-750 of 2015, C-035 of 2016, C-080 of 2022 and C-020 of 2023, among others.

*"This principle of legality is of particular importance in our constitutional system, as it guarantees the principle of procedural legality. It thus prevents the arbitrary exercise of the power of expropriation by the government at its various levels. This guarantee of the principle of legality limits the government's scope of action and thus protects, from a subjective perspective, the fundamental right to due process of those governed."* [161]

**71.** Indeed, case law has repeatedly indicated that the definition of judicial and administrative procedures falls under the purview of the Congress of the Republic and is particularly relevant within the legal system, as they guarantee the right of access to the administration of justice. This is because their regulation *"contributes to the protection and effectiveness of rights, strengthens legal certainty, implements due process, impacts rationality and social pacification, enables a just order, and gives effect to the mandate directed at the authorities to protect the life, honor, property, beliefs, and other rights and freedoms of members."*

[162]

**72.** Regarding the exercise of the aforementioned jurisdiction, the Court has noted that it involves *"the configuration of all the elements of each of the actions carried out in the jurisdiction."* [163] Specifically, it has specified that it is up to the Congress of the Republic to determine: *(a)* the procedure to be followed, *(b)* the nature of the judicial proceedings, *(c)* the procedural stages and their terms, *(d)* the instances that proceed, *(e)* the formalities that must be fulfilled, *(f)* the regime of competences, *(g)* the system of publicity of the proceedings, *(h)* the form of connection to the process, *(i)* the means of proof, *(j)* the resources to challenge the decisions and, in general, *(k)* the duties, obligations and procedural burdens of the parties. The latter even empowers it to dispense with stages or resources.164

**73.** Likewise, this Corporation has pointed out that *"the margin of legislative configuration in terms of the design of the procedures*

---

[161] Constitutional Court, Judgment C-035 of 2016.

[162] Constitutional Court, Judgment C-284 of 2021.

[163] Constitutional Court, Judgment C-543 of 2011.

[164] *Cf.,* Constitutional Court, Sentences C-1104 of 2001, C-543 of 2011, C-315 of 2012, C-319 of 2013, C-282 of 2017, C-025 of 2018, C-031 of 2019, C-290 of 2019 and C-284 of 2021.

*The scope of the judicial system is broad "insofar as the Political Constitution does not provide a specific model on the matter, so it is up to Congress, legitimized by the principle of representative democracy, to regulate this matter based on the criteria it deems most appropriate." In other words, "everything concerning judicial proceedings, unless directly established by the Constitution, is the responsibility of the legislator (...)"* [165]

**74.** In short, case law has indicated that the legislator has a wide margin of regulatory configuration regarding expropriation.

In exercising this function, it is responsible for establishing the reasons of public utility or social interest that would enable public entities to acquire a private asset through expropriation; the events in which expropriation will proceed through administrative means;[166] the manner in which the right to compensation must be guaranteed; and the judicial and administrative procedures that must be carried out to expropriate a private asset. When designing these judicial or administrative procedures, in principle, it must define *(a)* the procedure to be followed, *(b)* the nature of the judicial actions, *(c)* the procedural stages and their terms, *(d)* the instances that proceed, *(e)* the formalities that must be complied with, *(f)* the jurisdictional regime, *(g)* the system of publicity of the proceedings, *(h)* the form of connection to the process, *(i)* the means of proof, *(j)* the resources to challenge the decisions and, in general, *(k)* the duties, obligations and procedural burdens of the parties. The latter even authorizes it to dispense with stages or resources.[167]

### *(ii)The limits to the broad freedom of regulatory configuration that the Legislator has to design the procedures for expropriation*

**75.** Despite the broad freedom that the legislator has to design judicial and administrative procedures in general and, specifically, in

---

[165]  Judgment C-543 of 2011. This same position was reiterated in Judgments C-290 of 2019 and C-284 of 2021, among others.

[166]  *Cfr.,* Constitutional Court, Judgment C-153 of 1994.

[167]  *Cf.,* Constitutional Court, Sentences C-1104 of 2001, C-543 of 2011, C-315 of 2012, C-319 of 2013, C-282 of 2017, C-025 of 2018, C-031 of 2019, C-290 of 2019 and C-284 of 2021.

Regarding expropriation, case law has emphatically stated that this function is not unlimited. The Court has determined that in *"every attribution of jurisdiction in a democratic state, there are substantive limits that contain and shape the congressional power to establish those* limits, which *procedures",* [168] *"correspond to the compatibility of procedural rules with the Constitution."* [169] In this regard, it has grouped these limits into four categories that are applicable to all judicial proceedings in general and are described below.

**76.** _Constitutional provisions:_ This group of restrictions corresponds to the constitutional clauses that directly and explicitly define procedures or procedural rules. Such is the case of the constitutional provision for judicial proceedings for protection (Article 86 Superior), extinction of the right of ownership (Article 34 Superior), and the provisions that allow for the challenge of first instance rulings in the context of protection (Article 86 Superior), or of criminal convictions (Article 29 Superior).170

**77.** Regarding expropriation, Article 58 of the Constitution explicitly provides that the legislature must design a judicial procedure for expropriation and another, exceptional, administrative procedure. Furthermore, it stipulates that the former must be linked to the configuration of reasons of public utility or social interest, as well as establish appropriate mechanisms so that individuals can access prior compensation. Thus, these mandates constitute a certain and precise limit on the exercise of the regulatory function assigned to Congress in this matter.

**78.** _The fulfillment of the essential purposes of the State and, in particular, of the administration of justic_e. Based on the idea that judicial proceedings are a suitable instrument for materializing substantive law, but not an end in themselves, jurisprudence has noted that one of the limits to the regulatory function of procedures has to do with ensuring that procedural forms give effectiveness to the principles that

---

[168] Judgment C-124 of 2011. See in this regard, Judgments C-652 of 1997, C-1335 of 2000, C-047 of 2001, C-570 of 2003, C-1264 of 2005, C-370 of 2006, C-471 of 2006, C-543 of 2011, C-315 of 2012, C-319 of 2013, C-282 of 2017, C-025 of 2018, C-031 of 2019, C-290 of 2019 and C-284 of 2021, among others.

[169] Constitutional Court, Judgment C-284 of 2021.

[170] *Cf.,* Constitutional Court, Sentences C-124 of 2011, C-543 of 2011, C-284 of 2021.

govern the administration of justice, as provided for in Article 228 of the Constitution.

171    Consequently, the Court has stated that *"forms of judicial procedure that deny the public function of the judiciary, especially the impartiality and autonomy of the judge, prevent the principle of publicity from prevailing, privilege normative parameters other than substantive law, impose procedures that prevent the achievement of timely justice, or render the decentralized and autonomous functioning of the judicial function void" (Art.*

*228 CP)".*    172

**79.** *Compliance with the principles of reasonableness and proportionality.*

Regarding these restrictions, case law has indicated that they are related to the application of the aforementioned precepts to all public or private actions. In this regard, it has specified that they *"derive from the provision of the Social Rule of Law, the protection of the rights and freedoms of individuals as the primary mandates of public authorities, respect for human dignity as the foundation of the State, the inalienable nature of individual rights, the liability of public servants for omission or overstepping their authority in the performance of their duties, and the requirement of proportionality of the measures adopted during states of emergency."*

173    To this extent, they imply that procedures must be directed toward fulfilling constitutionally admissible purposes and be suitable for achieving that end. Furthermore, they *"must not interfere with the essential core of higher rights, principles, or values."*
174

**80.** *The effectiveness of the guarantees that constitute due process and access to the administration of justice.* According to jurisprudence, this limitation is related to the validity of fundamental rights related to judicial proceedings. In this regard, Judgment C-124 of 2011 stated that, to the extent that:

---

171  *Ibid.*

172  Constitutional Court, Judgment C-124 of 2011. That decision, in turn, took into account the Judgments C-652 of 1997, C-1264 of 2005, C-471 of 2005 and was reiterated in Judgment C-543 of 2011.

173  Constitutional Court, Judgment C-284 of 2021. See in this regard, Judgment C-555 of 2001.

174  *Ibid.*

*"The judicial procedure finds its constitutional justification in obtaining fair decisions that resolve society's conflicts; it must guarantee that the guarantees that the Charter confers on the parties are not undermined. Specifically, the judicial process must allow for the effective achievement of the different components of the right to due process, such as the principles of legality, contradiction and defense, favorability in applicable cases, presumption of innocence for procedures related to sanctioning law, etc. These guarantees are added to others, linked to different fundamental rights, such as equal treatment before judicial authorities, the validity of privacy and honor, personal autonomy and human dignity, among many others."175*

**81.** In conclusion, when designing judicial and administrative procedures for expropriation, the legislator *(a)* must observe the mandates set forth in Article 58 of the Constitution. Likewise, *(b)* it is responsible for ensuring the effectiveness of the principles of the administration of justice. To this extent, it must avoid judicial proceedings that affect publicity, privilege formality over substantive law, unjustifiably delay the resolution of disputes, disregard the principles of impartiality and judicial autonomy, or impede the decentralized functioning of the judicial function. Similarly, the Congress of the Republic *(c)* must apply the principles of reasonableness and proportionality in the design of the procedures; and *(d)* establish mechanisms to materialize the guarantees that constitute due process and access to the administration of justice.

### (iii) The effectiveness of the guarantees that constitute due process and access to the administration of justice, as a limit to the power of the Legislator to design judicial and administrative procedures in matters of expropriation

**82.** Jurisprudence has indicated that the fundamental right of access to the administration of justice, enshrined in Article 229 of the Constitution, corresponds to the guarantee that individuals have to use the judicial system to resolve their disputes. In this regard, Judgment C-543 of 2011 indicated that the 1991 Constitution adopted a concept

---

175 *Cfr.,* Constitutional Court, Judgments C-543 of 2011, C-319 of 2013, C-424 of 2015, and C-282 of 2017, among others.

material access to the administration of justice, by virtue of which, not only must the possibility of going to the judicial authorities to receive and process their claims, writings and allegations be guaranteed, but also the right to obtain a prompt and timely response from the administration of justice.176

**83.** For its part, Judgment C-410 of 2015 explained that this fundamental guarantee *"results in the possibility of resorting to the judicial authorities to seek the preservation of the legal order and the protection or restoration of their rights, based on established procedures, and taking into account the fundamental guarantees of the legal system.*

*Its protection implies the real and effective safeguarding of access to authorities, to avoid situations where individuals are left defenseless or unable to resolve disputes that arise between them."*

It also specified that its scope must be understood in a material sense. That is, as a right that involves the real possibility of obtaining justice, through decisions adopted by the competent authorities, to resolve the controversy submitted for consideration in a timely manner and with due respect for due process.177

**84.** Along the same lines, Judgment C-284 of 2021 stated that access to the administration of justice has an instrumental nature, to the extent that its exercise allows other fundamental rights to be realized and protected.

Likewise, it stated that this fundamental right imposes on the legislator the duty to define procedures that enable *"the proper functioning of institutional channels for the resolution of conflicts that arise from life in society, with the purpose that citizens may enjoy the effectiveness of their fundamental rights and peaceful coexistence among members is guaranteed."178*

Therefore, it considered that, in addition to requiring the provision and access to a judicial mechanism, this constitutional precept *"involves the effectiveness of the procedures for the protection of*

*rights and interests of the members."*          179

---

176  *Cfr.,* Constitutional Court, Judgment C-543 of 2011.

177  *Cfr.,* Constitutional Court, Judgment C-410 of 2015.

178  Constitutional Court, Judgment C-031 of 2019, reiterated in Judgment C-284 of 2021.

179  Constitutional Court, Judgment C-284 of 2021.

**85.** In light of the above, case law has specified that this fundamental right includes, among other things, the duty to guarantee: *(a)* access to an effective judicial remedy, that is, to appropriate and effective procedures for the legal determination of rights and obligations, as well as for the resolution of disputes; *(b)* procedural speed, in the sense of obtaining prompt decisions without undue delay;181 *(c)* the right to have the dispute resolved by an impartial judge or tribunal competent to resolve the conflict; *(d)* the possibility of using procedural instruments to bring claims before the court; *(e)* full respect for due process; *(vi)* the provision of measures to facilitate access to the judicial system for persons with limited economic resources;185

*(f)* the provision of justice throughout the national territory;186 and, *(g)* the right to obtain a judicial order that resolves claims in accordance with current regulations and can be effectively complied with.187

**86.** In my opinion, the foregoing does not prevent the legislator from establishing limits on the exercise of the right of access to the administration of justice. As noted in Judgment C-652 of 1997, this *fundamental* right cannot be understood as an open and unlimited possibility for citizens to access the justice system without any conditions. 188 On the contrary, under the terms of Judgment C-1195 of 2001, its exercise may be restricted through the provision of procedural requirements, time limits, procedural opportunities, among other means, as long as they are aimed at guaranteeing the substantive right and are reasonable. 189

---

180 *Cfr.,* Constitutional Court, Judgments C-159 of 2016, C-003 of 2017, C-193 of 2020 and C-284 of 2021, among others.

181 *Cfr.,* Constitutional Court, Judgment C-543 of 2011, C-159 of 2016, among others.

182 *Cfr.,* Constitutional Court, Judgments C-410 of 2015 and C-284 of 2021.

183 *Cfr.,* Constitutional Court, Judgment C-1195 of 2001, C-410 of 2015 and C-284 of 2021.

184 *Ibid.*

185 *Ibid.*

186 *Ibid.*

187 *Ibid.*

188 *Cfr.,* Constitutional Court, Judgment C-652 of 1997.

189 *Cfr.,* Constitutional Court, Judgment C-1195 of 2001.

**87.** Regarding due process, jurisprudence has identified that this guarantee corresponds to a complex clause provided for in articles 29 of the Constitution190 and 8.1 of the American Convention on Human Rights.191
This law provides for a series of guarantees that must be observed in all judicial and administrative proceedings, including the rights of individuals to be heard, to obtain justice within a reasonable time, to have an impartial and competent judge resolve the dispute, to defend themselves against accusations brought against them, and to contradict the claims of their counterpart.


**88.** Regarding the latter, Judgments C-029 and C-284 of 2021 highlighted that they guarantee that *"access to justice is not formal or nominal, but that people have real possibilities of demanding and obtaining protection of their rights and interests in administrative and judicial mechanisms."*
    192   According to jurisprudence, these mechanisms enable the participation of the citizens involved as active or passive participants in the various judicial processes. To this extent, they are a manifestation of the principle of human dignity and a prerequisite for the realization of the highest value of justice. For this reason, in *"the definition of judicial mechanisms, it is imperative to ensure the rights of opposition and defense as core elements of due process."*
                        193

---

190   Political Constitution of Colombia. Article 29. *"Due process shall apply to all types of judicial and administrative proceedings. // No one may be tried except in accordance with laws that preexisted the act with which he or she is charged, before a competent judge or tribunal, and with observance of all the forms appropriate to each trial. // In criminal matters, permissive or favorable law, even if it comes later, shall be applied in preference to restrictive or unfavorable law. // Everyone is presumed innocent until judicially declared guilty. Anyone accused has the right to defense and the assistance of counsel of his or her own choosing, or of a court-appointed attorney, during the investigation and trial; to a public due process without undue delay; to present evidence and to challenge any evidence presented against him or her; to challenge the conviction; and not to be tried twice for the same offense. // Evidence obtained in violation of due process is null and void.*

191   American Convention on Human Rights. Article 8.1. *"Every person has the right to a hearing, with due guarantees and within a reasonable time, by a competent, independent, and impartial tribunal previously established by law, in the substantiation of any criminal charge brought against him or for the determination of his civil, labor, fiscal, or any other rights and obligations."*

192   Constitutional Court, Judgment C-284 of 2021.

193   *Ibid.*

**89.** They also asserted that there is an intrinsic relationship between both guarantees. However, the aforementioned rulings emphasized that these precepts have distinguishable components. Indeed, the aforementioned rulings noted that, on the one hand, the right to defense involves the possibility of using the legitimate and appropriate means established by law to be heard in a proceeding and obtain a decision favorable to one's interests. This includes *"(i) effective binding on the proceedings; (ii) the assistance of counsel when necessary; (iii) the right to be heard in the proceedings; (iv) the possibility of providing evidence; (v) the right to challenge a conviction; (vi) the design of procedures and the setting of reasonable deadlines; and (vii) the provision of adequate time and resources for the preparation of a defense."*

[194]     On the other hand, the right to contradict has to do with the confrontation of substantive and procedural elements that affect the rights and interests of the respective process, although in broad terms it is aimed at protecting the interests of one of the parties in the procedure. From this perspective, the Court's jurisprudence specified that this precept contemplates *"(i) the right to contradict or debate the claims, which includes the formulation of formal and* substantive exceptions https://www.corteconstitucional.gov.co/relatoria/2021/C-284-21.

_____

htm - _ftn98; [195] *(ii) the ability to challenge evidence presented against them; (iii) effectively participate in the production of evidence requested by the other party; (iv) present arguments regarding the evidence; and (v) file appeals against adverse decisions.*
[196]

**90.** Now, in the terms set forth, the rights of access to the administration of justice and due process have an intrinsic relationship, to the point that they include guarantees that are intertwined with each other.[197] In this regard, Judgment C-410 of 2015 stated that due process protects the subjective rights of citizens in the procedures they carry out before the authorities; while access to the administration of justice constitutes a fundamental pillar of a democratic society, to the extent that

_____

[194] Constitutional Court, Judgment C-284 of 2021. See in this regard, Judgments C-341 of 2014 and C-029 of 2021.

[195] *Cfr.,* Constitutional Court, Judgments C-939 of 2003 and C-641 of 2002.

[196] Constitutional Court, Judgment C-284 of 2021. See in this regard, Judgment C-029 of 2021.

[197] *Cfr.,* Constitutional Court, Judgment C-410 of 2015.

which is the instrument that allows people to defend themselves against undue interference from third parties or the State.
Consequently, *"the judicial system is structured as a series of tools for defending citizens' rights and interests through procedural means."*
199

**91.** In that same ruling, the Court emphasized that "[i] *n light of this order of values that radiate to the procedures in the Rule of Law, standards arise for procedural forms, in particular judicial remedies.*
*In line with this, regional human rights protection systems have established two specific criteria that resources must meet to ensure true access to justice.*

200  The first is that the judicial process must be a useful instrument for ensuring access to justice and the effectiveness of due process. In this regard, he emphasized that, in cases where the Inter-American Court of Human Rights has determined the international responsibility of the Colombian State for human rights violations, it has analyzed whether the judicial procedures established by the legal system collectively comply with the guarantees provided for in Articles 8 and 25 of the American Convention on Human Rights. The second relates to the importance of verifying the effectiveness of these remedies on a case-by-case basis. This is because, while judicial processes may comply with the required guarantees overall, in a given case they may not be adequate to realize the rights of the affected person. To justify its point, the ruling referred to the rulings issued by that Corporation in the cases of the Pueblo Bello Massacre, the Rochela Massacre, the Mapiripán Massacre, Escué Zapata, Valle Jaramillo, Manuel Cepeda Vargas, and Vélez Restrepo against Colombia.

**92.** Based on the aforementioned correlation, Judgments C-410 of 2015, C-029 and C-284 of 2021 noted that, in order to assess whether a procedural measure affects the effectiveness of the rights of access to the administration of justice and due process, specifically, in their guarantees of contradiction and defense, it is necessary to consider the following jurisprudential rules:

---

198  *Ibid.*

199  Constitutional Court, Judgment C-410 of 2015.

200  *Ibid.*

• The legislature has broad regulatory discretion to design the various judicial and administrative processes. This means that the rules issued in the exercise of this function enjoy a presumption of constitutionality. Therefore, their scrutiny must be carried out through a proportionality assessment that evaluates the impact of the challenged provision on the constitutional guarantees noted. In principle, the intensity of the "test" should be weak, given the aforementioned presumption. However, as noted in Judgment C-213 of 2017, *"the rigor of scrutiny may be increased in light of the multiple dimensions of fundamental rights involved in the exercise of this power."* [201]

• Judicial processes must ensure that disputes are resolved on the merits, definitively, and within a reasonable period of time, without undue delay, by the judge legally competent[202] for that purpose, who must be functionally independent, impartial, and subject to the rule of law.

• When designing judicial proceedings, the Congress of the Republic must establish procedural mechanisms that realize the right to defense. Among other matters, it must provide that the parties to the proceedings have *"the power to request and present evidence and challenge evidence presented against them, formulate petitions and allegations, and challenge decisions adopted. The exercise of this right is based on the publicity of the proceedings, through summonses to appear, transfers of procedural acts by the parties or judicial auxiliaries, and notifications, communications, and publications of decisions adopted."* [203]

• The rights of access to the administration of justice, contradiction, and defense must be guaranteed in all judicial mechanisms. However, in the terms indicated by Judgment C-820 of 2011,

---

[201] Constitutional Court, Judgment C-284 of 2021.

[202] *Cfr.,* Constitutional Court, Judgment C-543 of 2011, C-410 of 2015, among others.

[203] Constitutional Court, Judgment C-410 of 2015.

This does not imply that there is only one way to implement these prerogatives. On the contrary, these mandates can be implemented in different ways, depending on the established procedural design.

• The design of judicial procedures must respond to the nature of the cases and the objectives they seek to satisfy. As a result, Judgment C-282 of 2017 indicated that, as a general rule, the potential impact of a provision on the guarantees provided for in Articles 29 and 229 of the Charter cannot be established based on a comparison with other procedures of equal rank established by the legal system.

• The legislator may establish procedural burdens for the exercise of the right to contradict. This does not, *prima facie,* imply an infringement of due process guarantees. In any case, **"its definition must maintain a reasonable connection with the purpose of the proceedings and cannot completely eliminate the possibility of the defendant effectively defending himself during the proceedings through exceptions that have a direct impact on the prerequisites of the proceedings."** [204]

Based on this jurisprudential rule, Judgment C-886 of 2004 declared unconstitutional a provision requiring defendants in leased property restitution proceedings to demonstrate that they had paid certain items, including utilities, within 30 days of payment becoming due, in order to be heard in the proceedings. For the Court, this requirement had the potential to eliminate the tenants' ability to exercise their right to defense.

• Rules that establish procedural mechanisms that eliminate the possibility of exercising a defense or that seriously impair its exercise are contrary to Article 29 of the Constitution. Furthermore, as noted in Judgment C-383 of 2000, they disregard the principles of equality, justice, and the protection of the assets and rights of all members.

---

[204] Constitutional Court, Judgment C-284 of 2021.

• On some occasions, the right to defense may come into conflict with the guarantee of speed in the administration of justice. This occurs when the legislature limits the opportunities or reduces the procedural timeframes for presenting evidence or contesting arguments, in order to ensure prompt judicial decisions. According to Judgments C-543 of 2011 and C-648 of 2001, to resolve this conflict, the Court had to determine whether the restriction on the right to defense is proportionate.

To this end, a proportionality assessment must be carried out, in which it not only verifies whether the rule achieves a legitimate purpose. It must also assess *whether the restriction was necessary and useful to achieve that purpose. Furthermore, for such a restriction to be constitutional, it must be balanced or strictly proportional. This step in the proportionality assessment aims to assess whether, from a constitutional perspective, the restriction of the affected rights is equivalent to the benefits the provision generates. If the harm caused to citizens' legal rights is greater than the constitutional benefit the rule is capable of achieving, then it is disproportionate and, consequently, must be declared unconstitutional.*

205

**93.** Based on the foregoing, I consider that the rights of access to the administration of justice and due process constitute an important limit to the legislature's broad discretion in designing procedures in general and, in particular, those that must be established in expropriation matters. These constitutional precepts have an intrinsic relationship that requires a joint assessment of both mandates, since the guarantees that comprise them are intertwined. Their observance requires that the processes established by the Congress of the Republic allow citizens real and effective access to the administration of justice, so that their case is resolved with the appropriate procedures for each trial, which must offer the parties the minimum guarantees to present their claims and exercise their defense. However, the norms issued by the legislature in these matters enjoy a presumption of constitutionality. To that extent, the scrutiny of constitutionality must be carried out through a judgment of proportionality, the intensity of which will depend on the nature of the multiple rights involved.

---

205    Constitutional Court, Judgment C-543 of 2011. See in this regard, Judgments C-699 of 2000, C-803 of 2000 and C-648 of 2001.

Regulated procedure. Based on the above, I will specify the relationship between the procedural figure of preliminary and merit exceptions and the guarantees of defense and contradiction.

### (iv) Preliminary and merit exceptions and their relationship with the right of defense and contradiction

**94.** Exceptions are procedural instruments granted by the legal system to defendants in various judicial proceedings so that they can exercise their right to contradiction and defense. Through them, the passive party in the process can *(a)* attack the claims of the complaint; *(b)* rectify the litigation to avoid potential nullities; or *(c)* request the termination of proceedings that do not have the required formalities to be advanced.206

**95.** Case law has identified three types of exceptions, namely. [207]

The previous ones are those that are related to the procedure, they have the purpose of cleaning up the process and are resolved in the first stages of the process.208 In civil matters, this type of exceptions are enshrined in a strict manner in article 100 of the General Code of Procedure.209 For their part, the mixed ones aim to question substantial matters of the procedure, but the

---

206  *See* Council of State. Third Section. Subsection B. Judgment of August 30, 2018. Filed: 41001-23-33-000-2015-00926-01 (58225).

207  *Cfr.,* Constitutional Court, Judgment C-1335 of 2000.

208  *Ibid.*

209  General Code of Procedure. Article 100. *"Preliminary objections. Unless otherwise provided, the defendant may raise the following preliminary objections within the time limit for serving the complaint: // 1. Lack of jurisdiction or competence. // 2. Commitment or arbitration clause. // 3.*
*Non-existence of the plaintiff or defendant. // 4. Incapacity or improper representation of the plaintiff or defendant. // 5. Inadequacy of the claim due to lack of formal requirements or due to improper accumulation of claims. // 6. Failure to present proof of the status of heir, spouse or permanent partner, guardian of property, administrator of a community, executor, and in general of the capacity in which the plaintiff acts, or failure to summon the defendant, when applicable. // 7. The claim having been processed in a different process than the one to which it corresponds. // 8. Pending litigation between the same parties and on the same matter. // 9. Failure to include all necessary joint litigant parties in the claim. // 10.*
*The summons of other persons required by law to be summoned has not been ordered. // 11. The order admitting the claim has been notified to a person other than the person being sued."*

The judicial authority rules on them at the initial hearing to ensure procedural economy. However, this procedural mechanism is not contemplated for all procedures. [210]   In the civil sphere, they were initially contemplated in Article 97 of the Code of Civil Procedure. [211]   However, the legislator did not reproduce them in the General Code of Procedure. Finally, merits or merits are intended to undermine the plaintiff's claims; that is, they constitute a genuine attack on the merits of the lawsuit. According to case law, these:

> *"They constitute a true counter-right of the defendant, pre-existing to the process and which excludes the legal effects pursued by the claim; whoever raises an exception when sued, in reality what he does is allege new facts, different from those set forth in the introductory statement and which prevent or extinguish the right claimed by the plaintiff. [...] Furthermore, they are constituted by facts that i) undermine the claims, by being demonstrative of the non-existence of the right alleged by the plaintiff, either because it never arose in his favor or because having existed, it was extinguished; or ii) without demonstrating that the claim of the right is inopportune, because it is subject to a term or condition that has not been met."* [212]

**96.** The foregoing leads us to conclude that exceptions are closely related to the right of contradiction and defense of defendants in various judicial proceedings. However, this does not mean that all judicial proceedings must contemplate this procedural instrument in an open and unlimited manner. As I previously noted, the guarantees of contradiction and defense are not absolute, but may be restricted. As a result, the legislator may limit the

---

[210]   *Cfr.*, Council of State. Third Section. Subsection B. Judgment of August 30, 2018. Filed: 41001-23-33-000-2015-00926-01 (58225). See in this regard: Supreme Court of Justice, Civil Cassation Chamber.

Judgment of June 19, 2015. Filed. 2010-00006; Council of State, Third Section, Subsection A.

Order of November 20, 2017. Filed. 58834.

[211]   Code of Civil Procedure. Article 97. *"[…] The exceptions of res judicata, settlement, expiration of the action, extinctive prescription, and lack of standing in the case may also be raised as preliminary exceptions. When the judge finds any of these exceptions proven, he shall so declare by means of an advance judgment."*

[212]   Council of State. Third Section. Subsection B. Judgment of February 20, 2014. Filed: 25000-23-26-000-2001-01678-01 (27507).

presentation of exceptions in the different judicial processes, provided that it does not affect the essential core of the aforementioned guarantees and complies with the principles of reasonableness and proportionality. [213] This tension has been analyzed in the context of abstract constitutional control on several occasions, as explained below.

**97.** Prior to the 1991 Constitution, in its Judgment of June 27, 1978, the Supreme Court of Justice analyzed the constitutionality of Articles 453, 454, and 457 of the Code of Civil Procedure, which regulated the judicial expropriation process for reasons of public utility, in light of the 1936 constitutional reform regarding the right to property. One of the objections raised by the plaintiff was that the aforementioned Article 453[214] was contrary to the rights of equality and due process because, by preventing the filing of exceptions in judicial expropriation proceedings, it subjected the defendants to a procedure that eliminated the right of defense. In his opinion, this situation, in turn, placed the person at a disadvantage compared to other persons.

**98.** On that occasion, the Plenary Chamber of that Corporation noted that the challenged provision required the judge to issue an ex officio ruling on the circumstances that would give rise to the presentation of preliminary exceptions.

Furthermore, he specified that, if any of the aforementioned events were found to have occurred, the judicial authority should refrain from ordering the expropriation.

Thus, in his opinion, the law provided sufficient mechanisms to guarantee the exercise of the right to due process, equality, and the right to property of the subject of the expropriation. In his own words, *"the ex officio and mandatory action that the law imposes on the judge fully compensates for the defense of private interests while allowing the social interest or reason of public utility that justifies the expropriation to be enforced and that must prevail, in the terms of Article 30 of the Constitution."[215]*

---

[213]  *Cfr.,* Constitutional Court, Judgment C-764 of 2014.

[214]  Code of Civil Procedure. Article 453. *"Exceptions. Exceptions of any kind are not admissible in this process, but in the judgment the judge shall rule ex officio on the circumstances contemplated in sections 1, 3, 4, 5, and 7 of article 97, and if any are established, he shall so state and refrain from ordering the expropriation."*

**99.** Along the same lines, he asserted that the ultimate goal of the process was to prevent the defendant's property rights from being ignored, which was also materialized by the effective protection of the judge, as provided for by the law. Furthermore, as a basis for considering that the challenged rule was not contrary to the Constitution, he stated that:

> *"Exceptions are not the only means of defense available to individuals to protect their rights, and in the present case, that guarantee is constituted precisely by the expropriation trial, within which there is a broad and equitable dispute between the administration and the person affected by the expropriation. In this process, the amount of compensation to be paid is determined—and this is one of its objectives—and in this regard, there is no restriction on the right of defense, nor does the State have a privileged position, since the law places it on an equal footing with the expropriated party. And the payment of such compensation is nothing other than the guarantee of the affected right, because it is legal compensation for the harm suffered."*
> 216

**100.** Subsequently, in Judgment C-1335 of 2000, the Constitutional Court examined the constitutionality of a provision establishing a time limit for defendants in foreclosure proceedings involving mortgage or lien titles to raise preliminary and merit-based objections. On that occasion, the Plenary Chamber noted that, given the nature of the proceedings, setting a time limit for filing preliminary and merit-based objections does not violate due process, but rather enhances it. This is because it establishes a reasonable time limit for the defendants to exercise their guarantees of defense and contradiction.

**101.** Similarly, Judgments C-641 of 2002 and C-393 of 2003 noted that, pursuant to Article 29 of the Supreme Court, judicial proceedings must protect several minimum guarantees. These include *"the right to challenge or debate the claims or exceptions raised."* 217 In this regard, they pointed out that the constitutional mandate referred to requires, on the one hand,

---

215  Supreme Court of Justice. Full Court. Judgment of June 27, 1978.

216  *Ibid.*

217  Constitutional Court, Judgment C-641 of 2002.

guarantee the full and effective intervention of the procedural subjects. And, on the other hand, protect it from possible abusive conduct by the authorities involved in the matter and those responsible for defining the legal situation submitted for its consideration.218

**102.** For its part, Judgment C-886 of 2004 ruled on a rule that required defendants in judicial proceedings for restitution of leased real estate to have paid some of the expenses provided for in the contract, including public services, within 30 days following the payment becoming due, in order to be able to exercise their right of defense.

In analyzing the impact of the rule, the Court noted that the provision could effectively nullify the defendants' right to defense.

Consequently, the legislature had envisaged a disproportionate procedural burden that contradicted the Constitution. Therefore, it declared the challenged legislative content unconstitutional.

**103.** In Judgment C-1193 of 2005, the Plenary Chamber analyzed the constitutionality of a provision that, in executive proceedings, only allowed for the submission of preliminary objections through an appeal for reconsideration filed against the court order issuing a payment order. For the plaintiff, the provision disregarded the right to defense because it prevented the elimination of judicial errors that the first-instance judicial authority could commit through the appeal process. However, the Court noted that the legislature is empowered to define the remedies available against a decision, the manner in which they may be exercised, and the procedural opportunity in which they must be filed. Thus, the provision constitutes a legislative policy decision intended to ease the congestion in the justice system. Furthermore, he pointed out that the provision did not affect the right to defense, because the effect of the rule was not to stop processing the plaintiff's objection, but rather *"that they will not be processed as an incident of prior and special pronouncement, in which, in addition, the order that resolved it was susceptible to challenge with the appeal. Thus, if the facts constituting preliminary exceptions can nevertheless be alleged, it is evident that the plaintiff is not right about the alleged violation of the right to defense as* This perspective

*would happen if he were completely prevented from pleading."*219

---

218  *Cfr.,* Constitutional Court, Judgments C-641 of 2002 and C-393 of 2003.

219  Constitutional Court, Judgment C-1193 of 2005.

It was reiterated in Judgment C-032 of 2006, which also specified that such decisions by the legislature are protected by the mandate of speed in the administration of justice.

**104.** Finally, in Judgment C-726 of 2011, the Court had the opportunity to analyze whether the regulation of the summary proceeding, established in Articles 419 et seq. of the General Code of Procedure, affected the rights to equality and due process, insofar as it allowed the judge to make a substantive decision without hearing the defendant's opinion. In response to the proposed objections, the Plenary Chamber examined the provision through a judgment of proportionality and mild reasonableness, given the legislator's broad regulatory framework on the matter. Based on this, it considered that the provision did not disregard the defendant's guarantees because it provided other mechanisms to guarantee the right of defense known as opposition. Indeed, it noted:

> "On the one hand, the challenged regulation pursues a constitutionally legitimate purpose, namely, facilitating access to justice, particularly in relation to small-scale disputes; and on the other, despite the fact that in this case the usual sequence of judicial proceedings has been reversed, the challenged regulations provide sufficient guarantees for the defendant's right to defense, including the impossibility of notifying the defendant through an ad litem guardian, or the rule that, in the event of a well-founded opposition by the defendant, the process becomes a declaratory proceeding (summary oral proceeding), within which the defendant could fully exercise his right to defense. Therefore, it concluded that the application of these rules does not violate equality between the parties to the proceedings, nor does it violate due process, as alleged in this case, which is why these rules are enforceable." [220]

**105.** Based on the foregoing, it is possible to conclude that exceptions are procedural mechanisms that facilitate the exercise of the rights of defense and contradiction, which are not absolute guarantees. To that extent, the legislator has a wide margin of normative configuration to establish whether these instruments are admissible or not and the manner in which they can be interposed, taking into account the nature of the process and the

---

[220]  Constitutional Court, Judgment C-726 of 2011.

principle of speed, provided that it does not affect the essential core of the
aforementioned guarantees and complies with the principles of reasonableness and
proportionality.

### (v) The challenged provision should have been declared unconstitutional in application of the proportionality judgment in the strict sense

**106.** The plaintiffs considered that the expression *"[n]o propose exceptions of any
kind,"* provided for in paragraph 5 of article 399 of the General Code of Procedure,
disregards the fundamental rights of access to justice (article 229 Superior) and due
process (article 29 Superior). This is because it prevents those affected by the special
declaratory judicial process of expropriation from exercising their guarantees of
contradiction and defense, to the point that it makes it impossible for them to access
justice, from a material point of view. Furthermore, they indicated that the judge's duty
to correct formal errors in the complaint is insufficient to materialize the aforementioned
guarantees, insofar as the judicial authority cannot replace the actions of the parties
and transfers the parties' right to an impartial authority without allowing the defendants
to defend themselves based on their own understanding of the matter.

**107.** For their part, some participants indicated that the rule could not be
read in isolation. In their view, the affected parties have adequate defense mechanisms,
insofar as they can resort to the Administrative Litigation Jurisdiction to dispute the
content of the administrative acts issued in the stage prior to the expropriation process
itself. They also noted that the initially challenged regulatory content was contemplated
in Article 453 of the Code of Civil Procedure and was declared constitutional by the
Full Chamber of the Supreme Court of Justice. This, among other things, was due to
the fact that the judge's ex officio duty was sufficient to guarantee the rights of the
parties, insofar as, ultimately, it avoided the arbitrary limitations on the right to property,
which was the important factor. Finally, they pointed out that the rule was issued in
exercise of the legislator's broad powers for this purpose and is constitutional to the
extent that it seeks to guarantee the expeditiousness of the process in order to realize
the general interest.

**108.** In order to address the examination of the matter, the Court had to *(i)* specify the scope of the decision adopted by the Supreme Court of Justice in the Judgment of June 27, 1978; *(iii)* establish the methodology applicable to the specific case; and *(iii)* study the proposed charge, in the following terms:

### *(a)Scope of the decision adopted by the Full Court of the Court Supreme Court of Justice in Judgment of June 27, 1978*

**109.** The judicial expropriation process was regulated by the Code of Civil Procedure. Regarding the possibility of filing exceptions, Article 453 of that law established that *"[i]n this process, exceptions of any kind are not admissible, but in the judgment the judge will rule ex officio on the circumstances contemplated in sections 1, 3, 4, 5, and 7 of Article 97, and if he finds any established, he will so state and refrain from ruling on the expropriation."* In turn, Article 97 of that Code established the preliminary and mixed exceptions that defendants could file in civil proceedings.221

**110.** This rule was challenged before the 1991 Constitution came into force, on a charge similar to the one this Corporation currently holds. For the plaintiff, the prohibition on filing exceptions in the judicial process of expropriation disregarded the owners' right to defense. The above, because it *"was equivalent to eliminating means of defense that guarantee the subjective legal situation of the owner* [, to

---

221  Code of Civil Procedure. Article 97. *"The defendant, in ordinary proceedings\* and in any other proceedings expressly authorized, may raise the following preliminary exceptions within the term for serving the claim: // 1. Lack of jurisdiction. // 2. Lack of competence. // 3. Commitment or arbitration clause. // 4. Non-existence of the plaintiff or the defendant. // 5. Incapacity or improper representation of the plaintiff or the defendant. // 6. Failure to present proof of the status of heir, spouse, curator of property, administrator of a community, executor, and in general, of the capacity in which the plaintiff acts, or failure to summon the defendant. // 7. Ineptitude of the claim due to lack of formal requirements or due to improper accumulation of claims. // 8. The claim having been processed in a process other than the one to which it corresponds. // 9. Failure to include the claim in the presence of all necessary joint litigants.*
*// 10. Pending litigation between the same parties and concerning the same matter. // 11. No summons has been ordered against other persons required by law. // 12. Notification of the admission of the claim has been given to a person other than the person being sued. // <Section amended by Article 6 of Law 1395 of 2010. The new text is as follows:> The exceptions of res judicata, settlement, expiration of the action, extinctive prescription, and lack of standing in the case may also be raised as preliminary exceptions. When the judge finds any of these exceptions proven, he shall declare it by means of an advance judgment."*

[point of] *turning expropriation into a real dispossession."*              [222]    In his view, this situation also violated the right to equality, as it placed those affected by this type of procedure at a disadvantage compared to others.

**111.** The Full Court of the Supreme Court of Justice resolved the controversy in a judgment of June 27, 1978. On that occasion, it held that the rule did not violate the Constitution because the judge was obligated ex officio to rule on certain preliminary exceptions. Furthermore, the complaint had to be accompanied by the resolution decreeing the expropriation and the certificate issued by the Registry Office regarding the ownership and the real rights established, so that *"it is unclear what exceptions the defendant could propose, without which his defense would be nullified or undermined."*

[223]

**112.** Furthermore, the Court specified that the challenged provision should be interpreted in light of Articles 4, 5, and 6 of the same Code, pursuant to which judges must apply procedural rules in such a way as to guarantee the rights recognized by substantive law and constitutional principles, including the right to defense, due process, and equality of the parties. Consequently, judges were obliged to observe these provisions when ruling ex officio on the exceptions enshrined in Article 97 of the same law. Therefore, *"the ex officio and mandatory action that the law imposes on the judge fully supplements the defense of private interests while also making it possible to enforce the social interest or public utility that justifies the expropriation and which must prevail, pursuant to Article 30 of the Constitution."*

[224]

**113.** For the Court, at the time, the relevant issue was to avoid an infringement of the right to property. Thus, the fact that the protection was vested in the judge and not the party was irrelevant. Furthermore, in its view, exceptions are not the only procedural defense mechanism; rather, this guarantee is protected by the trial itself, *"within which there is a broad and equitable controversy between the administration and the person affected by the expropriation. In this process, one determines, and this is one of its objectives, the*

---

[222]    Supreme Court of Justice. Full Court. Judgment of June 27, 1978.

[223]    *Ibid.*

[224]    *Ibid.*

*The amount of compensation to be paid, and in this respect there is no restriction on the right of defense, nor does the State have a privileged position, since the law places it on an equal footing with the expropriated party. And the payment of such compensation is nothing other than the guarantee of the affected right, because it is legal compensation for the harm suffered.*[225]

**114.** Additionally, the Court reiterated the considerations set forth in the Judgment of March 10, 1938, issued by that authority, to point out that in that process, the judges perform a genuine administrative function, insofar as its purpose is to materialize the expropriation, which has its maximum level of concreteness. Thus, in its opinion, the process does not seek to debate the act of expropriation itself, but rather to enforce the administrative decision and quantify the amount of the corresponding compensation. Consequently, it declared the constitutionality of the aforementioned article and of the other provisions related to the ordinary judicial process of expropriation.226

**115.** In light of the foregoing, it is appropriate to clarify that the legal issue under study was analyzed by the Supreme Court of Justice in light of the 1886 Constitution. However, as this Court has noted on previous occasions, this ruling does not generate res judicata effects with respect to the current debate. This is true to the extent that the previous confrontation took place in relation to the 1886 Constitution; while currently it must be done with respect to the 1991 Charter, which offers a significant difference in the subject matter under debate.

**116.** Indeed, Articles 26 of the 1886 Constitution and 29 of the 1991 Charter adopt a similar formula to define the right to due process, insofar as they ensure that *"[n]o one may be judged except in accordance with laws pre-existing to the act imputed, before a competent Court, and observing the fullness of the forms proper to each trial."*
However, the 1991 Constitution, in its article 93, incorporated the notion of the block of constitutionality, by virtue of which, international treaties

---

[225] *Ibid.*

[226] *Ibid.*

[227] *Cfr.,* Constitutional Court, Judgment C-595 of 1999,

Human rights instruments prevail in domestic law, and the provisions of the Charter must be interpreted in light of these instruments. Thus, unlike the constitutional review carried out by the Supreme Court of Justice at the time, this Court must adopt a conception of the right to due process that incorporates the provisions of the human rights treaties on the matter, as it has done throughout its jurisprudence. In particular, the American Convention on Human Rights, which explicitly provides that *"[e]very person has the right to a hearing, with due guarantees and within a reasonable time, […] for the determination of his rights and obligations ."*

*of civil order".*

**117.** Furthermore, the identity between the challenged normative contents is merely formal. While it is true that Article 453 of the Code of Civil Procedure and Section 5 of Article 399 of the General Code of Procedure prohibit defendants in judicial expropriation proceedings from filing exceptions, the truth is that each provision responds to a distinct normative context. Indeed, the provision analyzed by the Supreme Court of Justice was embedded in an ordinary process, in which the judge had the explicit duty to rule on certain exceptions and, if found to exist, refrain from ordering the expropriation. For its part, Section 5 of Article 399 of the General Code of Procedure establishes that the judge shall adopt corrective measures to remedy the formal defects of the claim. The foregoing leads us to conclude that the currently controlled provision has different implications, insofar as the judicial authority does not have an explicit duty to verify whether the prior exceptions are met, to warn of them, and, if found to be met, to refrain from ordering the expropriation. It is only responsible for adopting certain mechanisms to correct the formal defects in the claim in order to continue the process. Consequently, the provision subject to control does not have explicit provisions to compensate for the prohibition on filing exceptions in the special declaratory judicial process for expropriation. Therefore, the decision issued by the Supreme Court of Justice at the time does not generate res judicata effects, nor does it constitute a precedent for this debate.

---

[228]  American Convention on Human Rights, Article 8.

### (b) Methodology of analysis and study that should have been used to determine the censorship: intermediate proportionality test

**118.** In the terms set forth throughout this ruling, the legislature has broad discretion in designing judicial procedures in general and with respect to those established to advance expropriation. It is even empowered to eliminate stages, resources, and actions from the procedures it determines. As a result, case law has indicated that provisions issued in the exercise of this function enjoy a presumption of constitutionality; to that extent, constitutional review must be carried out through a proportionality judgment. In principle, the intensity of the judgment should be weak, to grant deference to the Congress of the Republic. However, rigor can be increased in response to principles that are in conflict.

**119.** In this case, I consider that the challenged provision significantly affects the rights of access to the administration of justice and due process. These *fundamental rights guarantees,* in turn, have an instrumental nature insofar as they are the mechanism for protecting the other rights of the persons involved and achieving a just order that achieves social pacification. For this reason, jurisprudence has considered that, in these cases, constitutional review must comply with a more intense criterion.229

**120.** The proposed censure raised a tension between the fundamental rights of access to the administration of justice and due process, specifically, in their guarantees of defense and contradiction; and the speed and effectiveness of the procedure to realize the public interest. Specifically, it required the Court to determine whether the prohibition on filing exceptions in the special declaratory judicial process of expropriation imposes an excessive restriction on the right of those affected to contradict the claims of the expropriating entity or whether it is a reasonable and proportional mechanism to guarantee the speed of the process. By virtue of the intrinsic relationship between the constitutional mandates provided for in Articles 29 and 229 of the Constitution, the censure should have been analyzed jointly, through the application of an intermediate proportionality test, based on which the

---

229 *See* Constitutional Court, Judgments C-284 of 2021, C-031 of 2019; C-345 of 2019; C-337 of 2016; and C-807 of 2009.

The Court had to conclude that the challenged provision violated the guarantees invoked in the following manner.230

- ***The purpose of the measure is legitimate and constitutionally relevant***

**121.** The regulation under review eliminates the possibility of raising preliminary and merit-based exceptions in the special expropriation declaratory judicial process. This restriction aims to expedite the expropriation process, guarantee the effectiveness of the administration of justice, and facilitate the execution of projects that represent public utility or social interest. These objectives are evident from the legislative process followed by the regulation and from the context of the provision itself.

**122.** Indeed, in the explanatory memorandum of the bill that ultimately gave rise to the General Code of Procedure, the legislator noted that the processes designed in that body of legislation were intended to ensure that judicial proceedings would be of a reasonable duration, without affecting the rights of the persons involved. In this regard, he cautioned that:

*"It is not about speed for the sake of speed, but about achieving a real closeness between the coercion of the claim and the judgment that allows us to avoid the logical reluctance or the reasonable loss of citizens' confidence in their judicial body and to prevent the erosion of democracy as a result. Since delayed justice is not true justice, the new Code sets a maximum duration for the process and prohibits inhibitory rulings and avoids unnecessary nullities, allowing for a remedy for the non-alleged defects at each stage of the process, which makes it impossible to allege these facts as grounds for nullity at a later stage of the process. Measures for remedy are enshrined so that the litigant can be assured that the process in which he or she is involved will end with a judgment that resolves the matter and not with great frustration: the inhibitory ruling or the declaration of nullity of the proceedings. This contradicts the comprehensive aptitude and availability that the Code must have.*

---

230 *Ibid.*

*jurisdiction to resolve, once and for all, the matter submitted to it."231*

**123.** Along the same lines, the report for the first debate reiterated the considerations of this Court's jurisprudence, specifically Judgment C-426 of 2022, to point out that the legislator must design processes that develop within a reasonable timeframe, without affecting the rights of those involved. However, the existing provisions had not achieved these objectives, especially that of speed, which is why a structural reform was necessary. On that occasion, the Congress of the Republic affirmed that:

> *"The Colombian judicial system is experiencing a complex situation, as the procedures instituted do not appear adequate to ensure that judicial proceedings are conducted within a reasonable timeframe and without undue delays. Experience reveals that the duration of proceedings in Colombia far exceeds what could be considered reasonable, and published comparative studies point to the Colombian judicial system as one of the most time-consuming on the planet. The Doing Business study, as of 2010, on the response times of justice systems, places Colombia in 152nd place. The data released for 2011 are no more encouraging, as the country is ranked 150th out of 183 countries analyzed, indicating that the Colombian judicial system is one of the 24 worst-ranked countries according to this international indicator. The time factor indicates that the typical contractual dispute evaluated in all countries takes 1,346 days to resolve, which is almost double the time. the Latin American average of 707 days. Colombia ranks 39th in the overall indicator, demonstrating that the justice variable negatively impacts the nation's overall position."*

*232*

**124.** From the above, it is possible to conclude that the objectives of the Code are indicators of the purposes of the normative content challenged.

Certainly, the rule is part of the mechanisms established to guarantee a more agile judicial process that reduces judicial congestion and

---

231  Congress of the Republic, Gazette 119 of March 29, 2011, p. 95.

232  Congress of the Republic, Gazette 250 of May 11, 2011, p. 2.

Machine Translated by Google

ensure an effective response from the administration of justice within a reasonable period.

**125.** This perspective is confirmed by analyzing the purpose of the process. Indeed, a systematic reading of Article 58 of the Constitution reveals that the expropriation process seeks to ensure that the State acquires the assets it requires to implement public utility or social interest projects that benefit society as a whole. Having these resources quickly available is essential to implement the public policies designed by the executive branch for the benefit of the community. So much so that the Constituent Assembly itself established an interpretive mandate under which private property must yield to public utility and social interest. Thus, the provision pursues the important constitutional purpose of guaranteeing the expeditiousness of judicial proceedings that allow the State to acquire the assets it requires to implement the public policies it has designed to guarantee the general interest.

**126.** In my view, the provision pursues constitutionally relevant ends insofar as it seeks to guarantee, on the one hand, the speedy administration of justice and, on the other, the possibility of implementing public utility or social interest projects that embody the solidarity-based perspective of property ownership and the prevalence of the general interest over the private, understood as one of the purposes of the Social and Democratic State of Law. Regarding speed, it is worth highlighting that it must be understood from two perspectives. The first is as a constitutionally relevant mandate in itself.

Certainly, this constitutional purpose seeks to ensure that authorities protect people, their property, and rights in a timely manner, realize the purposes of the administration of justice, and contribute to decongesting the courts to reduce the backlog of judicial proceedings in Colombia. The second requires understanding speed, in turn, as an instrumental factor in facilitating access to the administration of justice from a material perspective and respecting due process, as has been noted throughout this decision.

### *(a) The provision is not effectively conducive to ensuring the speed of the process and materializing the general interest*

Machine Translated by Google

**127.** However, the challenged provision prevents defendants in expropriation declaratory proceedings from raising prior objections and merits. The Court should have noted that this measure is not effectively conducive to ensuring that citizens access substantive justice within a reasonable time, nor to reducing judicial congestion, nor to efficiently realize the solidarity-based purpose of private property in Colombia. This is because it forces the defendant to initiate parallel proceedings before the Administrative Litigation Jurisdiction to discuss the decisions regarding the expropriation of the property.

**128.** Considering the description of the special declaratory judicial process for expropriation carried out in this decision and the interventions received in the process, it is noted that, before filing the claim, the expropriating entity must issue at least two administrative acts that are subject to review by the administrative litigation judges, namely: the declaration of public utility or social interest; and the resolution ordering the expropriation. Within three months of the finality of the last act, the authority must file the expropriation claim before the civil judges. This implies that the legal system provides for three judicial processes that can be pursued simultaneously to materialize the State's expropriation claim. This situation, coupled with the prohibition established in the contested rule, encourages the parties to initiate multiple annulment and restoration of rights proceedings to challenge the administration's actions in the expropriation process.

**129.** The multiplicity of proceedings not only clogs the administration of justice, but also affects the guarantees of the active and passive subjects of the expropriation and prevents the proper implementation of the mandate provided for in Article 58 Superior. The fact that property owners can resort to other parallel proceedings to discuss their claims affects the speed of the process, because it can generate a situation of prejudiciality that prevents the conclusion of the special expropriation declaratory process until another judicial authority determines that the administrative action was legitimate.

**130.** Similarly, it reduces the legal security of the parties in judicial proceedings, to the extent that they are subject to the judicial authorities issuing contradictory orders, given the impossibility for the defendants to participate in the process through exceptions. While it is true that these judicial means are not the only instruments to

participate in the process, the truth is that in the procedural design established by Article 399 of the General Code of Procedure, only two possibilities of opposition are evident. The first is directed exclusively at compensation, and the second at guaranteeing the rights of the property owners, a point that will be developed later. This situation prevents the discussion of the substance of the matter or even the debate of such transcendental issues as the proper identification of the defendants. Therefore, this situation can lead to judges ruling with different elements of knowledge and issuing opposing decisions that affect the parties' safety in the face of decisions adopted by the competent authorities for this purpose.

**131.** Finally, the measure is also not suitable for ensuring the effective implementation of the mandate provided for in Superior Article 58. Certainly, expropriation is only permitted for reasons of public utility or social interest. By preventing defendants from questioning the actions of the expropriating entity in the aforementioned judicial process, the law would allow expropriations to proceed without these purposes, to the extent that judges would limit their actions to formally verifying the requirements set forth in the complaint. This could lead to an expropriation contrary to the constitutional mandate, which would become final and would subsequently have to be reversed by virtue of a contentious-administrative judicial process. In conclusion, the measure is not effectively conducive to achieving procedural speed, access to the administration of justice, or the solidarity-based purpose of property ownership.

• ***The ban is clearly disproportionate***

**132.** As previously explained, the challenged provision limits the possibilities of defendants in expropriation proceedings to exercise their right to defense. This restriction, although intended to expedite the process, which corresponds to legitimate purposes, is not effectively conducive to that end. In addition to its lack of conduciveness, the measure disproportionately affects the guarantees of defense and contradiction, which are part of the right to due process and access to the administration of justice. This is because, on the one hand, the provision prevents the defendant from raising exceptions to protect their interests and rights, and, on the other, it does not establish measures for plaintiffs to oppose or challenge the administration's actions.

during the pre-propriation phase of the special declaratory judicial process.

Thus, the rule prevents defendants from being heard in the judicial proceedings regarding the expropriation decision and from contradicting or discussing the claims by raising formal and substantive exceptions.

**133.** While it is true that exceptions are not the only judicial mechanism that allows the exercise of the right of defense or contradiction and that the legislator may limit its exercise, it is also true that, in such cases, it must provide other mechanisms for those involved to oppose the claims of their counterpart. In this case, the special declaratory expropriation process only allows the defendants to question the value of the compensation proposed by the expropriating entity. However, the amount to be awarded as a result of the expropriation is not the only relevant issue in the process. On the contrary, pursuant to Article 58 of the Political Constitution, the judicial process must ensure that those affected by these decisions can adequately and effectively discuss the administration's decisions regarding the declaration of public utility or social interest of the asset. In this regard, Judgment C-035 of 2016 emphasized that:

*"One of the fundamental elements of the right to due process is the legislature's duty to define the reasons of public utility and social interest that justify limiting property rights. The definition of such reasons determines the scope of the government's powers to pursue expropriation proceedings and ensures that the exercise of that power effectively contributes to the fulfillment of the social function of property. **Thus, judges can assess whether declaring a project to be of public utility or social interest effectively corresponds to the fulfillment of that social function in a specific case, and to that extent, they can determine whether an expropriation is constitutionally and legally justified."***

*From the perspective of subjective rights, the definition of the reasons of social interest and public utility on the basis of which the government carries out expropriation processes allows the citizens to protect their right to property and guarantee the effective exercise of at least two fundamental rights: access to the administration of justice, the right to due process, and in particular, the right to defense. The prior definition of the reasons*

*The principles of social interest and public utility guarantee that individuals have a legal basis on which to demand the annulment of administrative actions when they consider that the administration's actions do not correspond to the reasons defined by the legislator. In other words, they allow them to defend themselves against possible abuses of power or false motivations in the actions of the* 233 (Emphasis added).

*administration, among others."*

**134.** For this assessment by the judges to have the aforementioned impact, it is essential that the parties involved have appropriate mechanisms to present to the judicial authorities their reasons for opposing the public administration's expropriation claim. This objective is not achieved by merely contradicting the compensatory value of the expropriation claim, nor by allowing the possessors to oppose the delivery process. This is because these mechanisms do not guarantee that the defendants can question the administration's motivation in the administrative acts that give rise to the expropriation claim. To this extent, the challenged provision creates a barrier to the exercise of the right of defense, rendering the rule evidently disproportionate.

**135.** Furthermore, the possibility of challenging the administration's claim in annulment and restoration of rights proceedings is ineffective, as it does not guarantee the owners' right to challenge in a timely manner. Certainly, defendants may resort to annulment and restoration of rights proceedings to debate administrative acts that declare the public utility or social interest of a private property. However, the decision adopted by administrative judges on the matter may prove ineffective in guaranteeing the property rights of those affected, as the ruling in favor of the interested party may be issued after the judgment ordering expropriation in the Ordinary Jurisdiction in its civil specialty. Furthermore, the eventual declaration of prejudiciality in the special declaratory expropriation process not only depends on the will of the judge conducting the proceedings, but would also entail an unjustified delay in the process, which would affect timely access to the administration of justice and due process. Consequently, the normative content challenged, despite pursuing a legitimate and constitutionally relevant end, is not effectively suitable to achieve its purpose and is

---

233   Constitutional Court, Judgment C-035 of 2016.

Machine Translated by Google

Clearly disproportionate, the Court should therefore declare the challenged provision unconstitutional.

**136.** With this clarification, I hereby establish my position on the importance of ensuring that the parties in all proceedings have the opportunity to exercise their rights of hearing, defense, and contradiction in such a way that they can enjoy effective and timely access to the administration of justice.

**Jorge Enrique Ibanez Najar**

**Magistrate**