IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PERIMETRAL ORIENTAL DE BOGOTÁ, S.A.S.,

*Petitioner*,

v.

AGENCIA NACIONAL DE INFRAESTRUCTURA
and
THE REPUBLIC OF COLOMBIA

*Respondents*.

**Civil Action No. ___________________**

**Declaration of Jason W. Myatt in Support of Petition to Confirm Arbitral Award**

# EXHIBIT 15

**CORTE SUPREMA DE JUSTICIA**
SALA DE CASACIÓN CIVIL

Magistrado ponente
**WILLIAM NAMÉN VARGAS**

Bogotá, D.C., treinta (30) de agosto de dos mil once (2011).
Discutida y aprobada en Sala de primero (1°) de agosto de dos mil once (2011)

Referencia: 11001-3103-012-1999-01957-01

Se decide el recurso de casación interpuesto por Luís Fernando González Luque, respecto de la sentencia de 3 de junio de 2009, proferida por el Tribunal Superior del Distrito Judicial de Bogotá, Sala Civil, en el proceso ordinario del recurrente contra la Compañía Nacional de Microbuses Comnalmicros S.A.

**ANTECEDENTES**

1. En la demanda, el demandante pidió declarar la responsabilidad civil extracontractual de la sociedad demandada por incumplimiento a los contratos de afiliación o vinculación de los vehículos identificados con placas SA7939, SD 3052, SD3909, SD4629, SD4216 y SD4492 o, en subsidio, su resolución, y en uno u otro caso, condenarla a pagar la indemnización de los daños causados en la cuantía respectiva debidamente indexada más intereses.

2. Fúndase el *petitum,* en la transgresión de los precitados contratos por Comnalmicros S.A. con su terminación unilateral según comunicación de 13 de diciembre de 1989,



contrariando la buena fe y la prórroga automática pactada al finalizar su duración mínima anual, cuando las partes no los concluían de consuno en los treinta días precedentes.

3. Trabada la *litis*, la sociedad demandada al resistir las pretensiones, invocó la facultad de ambas partes para no renovar los contratos mediante comunicación dirigida por una a otra con treinta días de antelación al vencimiento, y propuso las excepciones perentorias llamadas inexistencia de la obligación, exceso en la cuantía de las pretensiones, compensación, ineptitud sustancial de la demanda, cosa juzgada y la genérica. En escrito separado interpuso las previas de falta de competencia, cosa juzgada y pleito pendiente, todas denegadas por el juzgador.

4. La decisión de primera instancia pronunciada el 20 de diciembre de 2006 por el Juzgado Tercero Civil del Circuito de Descongestión de Bogotá, D.C., desestimó las excepciones perentorias, la objeción por error grave al dictamen pericial y declaró la responsabilidad civil contractual de la demandada por la desafiliación de los automotores, condenándola a pagar daños y costas.

5. Apelada la anterior sentencia por la demandada, el Tribunal, en la suya de 3 de junio de 2009, la revocó para negar las súplicas y condenar en costas de instancias al demandante.

## LA SENTENCIA IMPUGNADA

1. Tras reseñar los antecedentes, el *petitum*, *causa petendi,* sentencia recurrida e impugnación, delanteramente tuvo



constituida en legal forma la relación jurídica procesal sin hallar escollo alguno para desatar el fondo, memoró las fuentes, tipos de responsabilidad y señaló los requisitos para la indemnización por incumplimiento de la relación obligatoria, además del quebranto, su imputación al deudor, el perjuicio al acreedor y la mora en las prestaciones positivas.

2. *Prima facie* a analizar el incumplimiento *debitoris*, registra la existencia y validez de los contratos, ubica en la responsabilidad contractual la reclamada como extracontractual en la pretensión principal según sus fundamentos fácticos por el incumplimiento contractual de la demandada con la terminación unilateral infringiendo la obligación de mantener vinculados los automotores, pues a falta del acuerdo extintivo de las partes treinta días antes del vencimiento anual, conforme a la cláusula quinta debía mantenerlos afiliados, y antes de estudiarla, discurre en torno a la interpretación contractual, cita doctrina y las sentencias de 3 de junio de 1946 (LX, 656), 5 de julio de 1983 y 1º de agosto de 2002 de la Corte, considerándola pertinente para dilucidar la mutua intención de los contratantes, frente a textos oscuros, ambiguos e imprecisos, y aún claros, máxime si el tenor literal aplica en absoluta armonía con la "*voluntad interna*" o querer genuino de los sujetos, nunca en sentido contrario, así fueren simples y diáfanos, regla cardinal *ex* artículo 1618 del Código Civil prevalente sobre "*la literalidad de las palabras*", a la cual estará el juez en su laborío hermenéutico, libertad apreciativa de las pruebas y puede acudir a la naturaleza del contrato, a las circunstancias influyentes en su celebración, a las costumbres, a su aplicación práctica por una u otra parte con aprobación de la otra, o a otras convenciones o escritos.

República de Colombia

Corte Suprema de Justicia
Sala de Casación Civil

3. En ese orden, el tema cardinal litigioso atañe a determinar la real o verdadera intención de las partes con la estipulación de la cláusula quinta de los contratos de vinculación o afiliación, respecto de cuya interpretación discrepan, pues para el demandante basado en la declaración textual, literal o exegética, el plazo de los treinta días precedentes a la duración mínima atañe a su terminación por mutuo acuerdo, y según la demandada a un preaviso durante el cual cualquiera de los sujetos puede concluirlos evitando su renovación automática, de donde, debe verificarse la conformidad del texto con la voluntad convergente de los sujetos.

4. Enseguida, ante la imposibilidad de reconstruir "*lo realmente querido*" con datos probatorios confiables, acudió a las normas hermenéuticas subsidiarias, transcribió la cláusula quinta de los contratos, iteró las discrepancias interpretativas, precisó la problemática "*sobre la manera de terminar los contratos para que éstos no se prorroguen automáticamente por un término igual al mínimo pactado*" y consideró convenido el de los treinta días previos al de duración "*para anunciar el deseo de no continuar con la vigencia de los mismos y, por lo tanto, para hacer saber al otro contratante el deseo de desvincular los automotores de la empresa*".

5. A tal fin, luego de admitir por la "*autonomía de la voluntad privada*", la posibilidad de estipular el plazo para "*acordar la terminación*", funda su inteligencia hermenéutica en la renuncia actual y disposición anticipada de la "*libertad contractual futura*" mediante "*acto único*", implícita en la interpretación contraria, cuya inutilidad, a diferencia de la "*utilidad práctica*" de la suya (artículo 1620, Código Civil), es palmaria por someter la conclusión del



vínculo "*al capricho de cualquiera de los contratantes*", incluso al extremo de negar su consenso, prolongándolo "*a perpetuidad*" en menoscabo del otro y del interés general, cuando el desarrollo pende del empleo más provechoso de los bienes materiales y el cambio de su destino se obstaculiza con las relaciones perpetuas, además la generalidad de las legislaciones fijan tiempos para anunciar una parte a la otra la terminación de los contratos de ejecución continua o periódica, no para concertarla, conforme indican las reglas de experiencia (artículo 1621, Código Civil), y los contratos de afiliación celebrados son de tal especie o de larga duración, "*obligan a las partes o a una de ellas a una prestación continua o que debe ser periódicamente repetida en el tiempo*", tienen por elemento natural, el derecho a disolverlos por acto unilateral de parte, autónomo, espontáneo o de exclusiva voluntad del titular con los límites de la buena fe "*que, precisamente por ser unilateral, no requiere de la aceptación de la otra*".

6. Con los lineamientos antepuestos, al existir "*una contienda*" respecto del sentido "*de la estipulación aludida*", dando alcance a la recíproca intención de las partes conformemente al tipo contractual, naturaleza, función, utilidad práctica, reglas de experiencia y regulación normativa comparada, la interpretó en tanto consagratoria del desistimiento unilateral para terminar los contratos de afiliación por indeterminación de su "*término final*", quedando así "*derogado el principio en virtud del cual el contrato no puede disolverse más que por el mutuo acuerdo*", y concluyó la ausencia del pretendido incumplimiento, al terminarlos la sociedad demandada ejerciendo "*la facultad de no renovarlos mediante aviso no inferior a treinta (30) días anteriores al vencimiento*", según comunicación del 15 de diciembre de 1989 remitida al demandante.



7. No obstante la suficiencia de las consideraciones anotadas, el juzgador las extendió a los restantes elementos de la responsabilidad, para descartar ante la falta de incumplimiento su imputabilidad al deudor, advertir la carencia probativa del daño causado al acreedor, y la omitida petición de la penal pecuniaria base de su liquidación, a cuyo propósito, memoró el concepto, tipología, certidumbre, carga probatoria de existencia y magnitud del daño, intangible decisión denegatoria del daño emergente al no impugnarse, condiciones del lucro cesante indemnizable, sea por la privación de una utilidad económica, bien por la frustración de un beneficio patrimonial, la certeza del interés afectado y del hecho dañoso, ya por destruirse la preexistente fuente de ganancia, ora truncarse a futuro, en la *litis* por frustrarse la prestación del servicio público urbano de pasajeros con la desafiliación de las busetas, actividad aceptada por las partes, sin estar empero, "*probado el perjuicio ni su cuantía*", ni actuar en el proceso, documentos, registros o papeles contables, fichas o apuntes, declaraciones fiscales, las "*cartulinas*" de los vehículos, ausentes también en las copias del penal, tampoco "*hechos reveladores de las ganancias obtenidas con anterioridad al hecho*" para proyectarlas a futuro o calcular el lucro cesante sobre bases ciertas, a más de resultar "*inatendible*" el dictamen pericial por carecer de fundamentos, contener cálculos matemáticos inciertos e irreales, y por las siguientes razones:

a) Exagerada prolongación de la inactividad de los automotores "*por un lapso aproximado de diez años*" desde el 15 de enero de 1990 hasta el 29 de marzo de 2000, "*porque rompe el principio de la normalidad*" más allá del "*tiempo prudencial*" para buscar una alternativa útil de funcionamiento el demandante, a quien la postergación resulta imputable, en cuanto según algunos



testigos "*en vez de buscarles y destinarlos a una actividad productora*" ordenó su permanencia "*en un parqueo en la terminal de la ruta*", y a pesar de su versación en el transporte, a punto de promover la fundación de una empresa de busetas de servicio público, no probó la imposibilidad de "*hallar una actividad sustituta*", ni como afirmó en los alegatos "*que COMNALMICROS, S.A., impidió que las busetas fueran recibidas o afiliadas a otras empresas*", hecho ajeno a la controversia.

b) El promedio "*de cuatro viajes redondos, es decir, ocho (8) recorridos diarios*", dice soportarlo el perito en "*fotocopias de las cartulinas de operación aportadas al proceso del Juzgado 40 Penal del Circuito*", las cuales "*curiosamente*" no están en las copias remitidas, además expresa "*que los ocho recorridos diarios no son uniformes ni constantes, según las planillas de la empresa*" y, otro tanto, acontece respecto del cálculo en 25 días al mes trabajados, sin exponer los motivos ni el análisis de su conclusión general y no concreta.

c) El promedio de mil pasajeros movilizados al día, no es serio y se apoya "*ciegamente*" en los dichos de Ciro Alfonso Castellanos, Ignacio Cortázar, Eduardo Nieto García, Joaquín Reyes Pardo y Reynaldo González Suárez, sin considerar "*otros testimonios que indican que el número de pasajeros transportados era menor*", ni el cálculo realizado por un experto en transportes del Das, testigos aquéllos "*poco confiables*" dada la "*concordancia en las informaciones (...) afectadas por la influencia*" del actor, "*su comunicación directa y constante, permanencia mucho tiempo, años, bajo dependencia del demandante, (...) recibiendo instrucciones y retribución*"; el perito para sustentar su conclusión, no analiza las fotocopias de cartulinas, planillas y liquidaciones



República de Colombia

Corte Suprema de Justicia
Sala de Casación Civil

varias correspondientes a viajes diarios de algunas busetas en 1989, las cuales no obran en el expediente, admite la falta de certeza de las que dice aparecen en manuscrito, ni explicó los criterios adoptados en la determinación del número de pasajeros diarios y nocturnos, el "*porcentaje de utilidad*" fijado en un 35% del producido, "*quedó huérfano de toda explicación*"; y en todo caso, las pruebas testimoniales de Castellanos, Cortázar, Nieto, Reyes y González se rindieron en el proceso penal, los días 29 y 30 de enero de 1992, 17, 19 y 24 de febrero de 1992, respectivamente, antes de la vinculación de Comnalmicros S.A., el 5 de abril de 1994, cuando no disponía de "*los mismos derechos y facultades de los demás sujetos procesales*", fueron ordenadas y practicadas sin su citación e intervención, ni tuvo posibilidad de controvertirlas, por lo cual, no pueden apreciarse en su contra al igual que la experticia apoyada en esas pruebas.

8. Por lo anterior, el *ad quem* revocó la sentencia, negó las pretensiones y condenó en costas de ambas instancias al demandante.

## LA DEMANDA DE CASACIÓN

Un cargo formula, replicado por la otra parte, a cuya decisión se procede.

## CARGO ÚNICO

1. Por la causal primera de casación consagrada en el artículo 368, inciso 2° del Código de Procedimiento Civil,

acusa la sentencia de infringir indirectamente los artículos 1501, 1535, 1602, 1604, 1613, 1614, 1618, 1619, 1620, 1621, 1622, 1623 y 1624 del Código Civil, 822, 830, 870 y 871 del Código de Comercio, y como violación medio, los artículos 175, 177, 179, 180, 187, 217, 218 y 307 del Código de Procedimiento Civil, y el artículo 16 de la Ley 446 de 1998, a causa de trascendentes errores de hecho y de derecho en la interpretación de los contratos y de algunas pruebas.

2. A título de proemio, el casacionista resalta la relevancia de la controversia por concernir a la "*autonomía de la voluntad*", fuerza obligatoria del contrato, posibilidad de terminarlo sin aquiescencia, ejercicio de facultades contractuales "*absolutas, ad nutum*" o controladas, poderes interpretativos del juzgador, "*interpretar un contrato y reglamentarlo*", y el "*activismo judicial para frenar el ejercicio respetuoso de los derechos*".

3. En su desarrollo, el censor ataca por separado las consideraciones del juzgador para denegar el *petitum,* esto es, la procedencia de la terminación de los contratos, ausencia de la relación causal y falta de prueba del monto de los perjuicios.

4. En compendio, gravita el primer segmento de la acusación, en "*la aplicación de la cláusula quinta del contrato*", la "*durabilidad*", el "*tiempo*", manera de terminar el pacto, y precisa:

a) Tales extremos temporales de principio a fin fueron consignados en dicha estipulación, la cual en imperio de "*la expresividad*" o "*minucia*", refleja "*el auténtico designio de las partes*" con la celebración de un acto "*para rato*" según denota la locución "*no obstante*" el plazo "*mínimo*" la "*renovación será la*



*nota descollante*", o sea, la "*regla general*", tanto cuanto más por el carácter "*tracto sucesivo*" del vínculo, la destinación de los vehículos a la prestación del servicio público sin peligro de cobertura, el interés social y contractual ínsito "*en la cláusula de permanencia, sin la cual quizá no se habría contratado*", intención "*rutilante*", clara y fácil de ver, "*que señorea en el contrato*", cuyo desapego por el sentenciador de segundo grado, interprete "*infatigable*", "*laudable*", a riesgo "*de ir a parar a lugares ignotos*", "*necesariamente será forzado y hará crujir el basamento de la contratación*", por cuanto la posibilidad de interpretar una cláusula clara "*supone de modo ineluctable que la intención sea de momento inasible*", o según Giorgio, únicamente cuando las palabras se utilizan de manera errónea en sentido más amplio o limitado, mientras "*la intención palpitaba en el propio tenor del contrato*", con una relación duradera por su naturaleza y logros económicos propuestos o, en términos de Danz, la "*voluntad interna*" procuraba "*un resultado económico*", y si bien el "*pacto, en ese sentido, no es un dechado de juridicidad (...) de tal decir indocto, jamás puede desgajarse, sin suplantar la voluntad de las partes, que cuando las mismas exigieron y explicitaron el consentimiento mutuo para dar la puntilla al contrato, lo que quisieron en verdad fue pactar la terminación unilateral. Ni por lumbre*".

b) En "*irremisible pifia*", la sentencia "*volvió la espalda a lo que late con fuerza en la cláusula*" incurriendo en error de hecho sobre la interpretación del contrato, que plasma la nítida intención de hacerlo "*perdurable*", y exige en seguridad, "*el consenso de las partes*" para acabarlo, sin "*lapsus calami*" ni descuido, nunca el "*desistimiento unilateral*" en la interpretación remota del juez contrariando su textual "*contenido objetivo*", el



artículo 1618 del Código Civil, "*disposición que sólo privilegia sobre la letra a la intención que sea 'claramente conocida'*", y los artículos 1619 a 1623 *in fine,* pues la cláusula quinta de los contratos celebrados contiene la "*permanencia*", la "*terminación consensuada*" y menciona la hipótesis opuesta de la "*terminación unilateral*" por causales pactadas en la cláusula sexta, "*poderosa*" razón para excluir el "*desistimiento unilateral*", "*como con evidente descarrío estuvo sosteniéndolo el ad-quem*".

c) El fallo objetado "*retorció el contenido material del contrato y el espíritu que de él fluye notoriamente*", vulneró "*la ley contractual y el artículo 1602 del código civil*", a consecuencia de la "*pésima aplicación de la regla interpretativa contenida en el artículo 1620 del código civil*".

d) La conclusión de "*inutilidad*" de la cláusula sobre "*terminación consensuada*" por "*la mala observación del contenido material del contrato*", hizo "*trizas los fines económicos y hasta jurídicos del convenio*", porque la cláusula quinta atañe a la permanencia, evita la frustración temprana, tenía su explicación y un contenido preciso, el Tribunal confundiendo "*lo inútil con lo inconveniente*", pasmado ante la idea de los "*contratos eternos*", debió decir "*que no debe contratarse así, que no dejen indefinidos los contratos, si se quiere, que les pongan un plazo conocido*", por lo "*enojoso que es obligarse sin fin*", asunto ajeno a la interpretación y propio de la "*reglamentación*", sin observarse la utilidad de su hermenéutica que "*estrangulando la letra y el espíritu de la negociación, la buena fe y la confianza*", se "*valió*" de aquélla para caer en la última, intervino "*no para desentrañar el sentido de una cláusula, sino para salirle al paso a algo que le preocupaba (...) que el contrato lo entiende, pero no le agradó*"



sin motivo alguno, "*ya que el mismo legislador llama a la calma cuando consiente, por ejemplo, en el contrato de arrendamiento de local comercial que su renovación sea la regla*" disciplinando escasos motivos legales contrarios, y en el arrendamiento común permite el plazo extintivo forzoso para una de las partes, de donde "*el temor de lo indefinido no es, en este caso, incontestable y luce más bien como exacerbado prejuicio*", por la precaria vida útil de los automotores de servicio público, la previsión contractual de la terminación "*con una manifiesta ventaja para la Compañía, arista muy propia de los contratos de adhesión*", y en fin, es imposible afirmar "*que el cuestionado contrato lo era por siempre jamás*" e implicara "*la enajenación total de la libertad*".

e) Previa interrogación acerca de la oportunidad y manera de terminar un contrato "*indefinido*" o de larga duración, repudia la terminación unilateral "*mientras nada extraordinario ocurra*", en tanto "*que no suceda nada imprevisto, que el contrato cumpla con sus designios, y que la frustración no sea lo común y ordinario*", "*que, en condiciones normales, la facultad no podrá ser omnímoda*", sin "*razón valedera*" o "*atendible*" por sujetarse a la buena fe cualificada, y se pregunta cuales consecuencias habría generado la conclusión "*abrupta*" del vínculo por el demandante, al tratarse de una cláusula concebida en el mayor interés de la demandada como declaró José Alejandro Nieto García, testimonio preterido en típico yerro fáctico, para volver al "*desistimiento unilateral*" y admitir "*uno que otro caso en que dicha prerrogativa se ejerza sin rendir cuentas a nadie*" mediando "*una circunstancia especialísima, fuera de lo común, que así lo justifique*", en "*casos de verdadera excepción que carecen de virtualidad para dañar*", por ejemplo, los del comodatario, el depositario, los contratos de afiliación suscritos en confianza e interés de ambas partes, en los



cuales impera buena fe, errando el fallador "*al creer que la demandada obró acorde con ella*" cuando no hay en el expediente nada "*que justifique su proceder*", quebrantando así los artículos 1603 del Código Civil y 871 del Código de Comercio.

f) Citando doctrina y la sentencia de casación del 14 de diciembre de 2001, destaca el origen legal o convencional, naturaleza excepcional e interpretación estricta del desistimiento unilateral, el yerro del sentenciador al considerarlo "*una cuestión demasiada natural, como si de veras fuera la regla general*", verlo en la hipótesis litigiosa, no por expreso sino por parecerle "*que donde decía mutuo disenso estaba consagrándose*" con carácter "*supuesto o inferido aun contra la evidencia de lo que en contrario se haya expresado*", cuando jamás un contratante puede "*actuar con dejadez e inoportunidad*", y aún tenido como elemento natural de los contratos de duración, cabe rechazar su ejercicio "*a troche y noche*", errando también el fallador por tener a Comnalmicros "*naturalmente*" dotado "*de una facultad omnipotente para terminar el contrato*", dejando de lado la buena fe, la decisión abrupta y los "*enormes perjuicios a González Luque*", en menoscabo de los artículos 1535 y 1625 del Código Civil.

g) En el caso, "*más que descuido hubo*", el Tribunal "*se equivocó de medio a fin*", no sólo omitió ver la ausencia de "*motivo legítimo*" para terminar Comnalmicros "*violentamente el contrato, sino que lo hizo reprobablemente*", la causa verdadera es vindicativa, concierne a cuestionamientos del demandante a los manejos administrativos como declararon Gilberto Álvarez Torres, José Ignacio Cortázar Zamora, Darío Amaya Ramos, José Antonio Romero Rodríguez, José Alejandro Nieto García y consta en confesión de José Carlos Virgilio Orjuela, también lo admitió el



fallador pretiriendo en manifiesto error de hecho todas estas pruebas demostrativas del disgusto palmario, diferencias y roces entre las partes, por las cuales la parte fuerte del contrato, resolvió tomar revancha, rompió su palabra, actuó con un móvil doloso e insidioso abusando de su derecho y el sentenciador terminó "*llevándose de la calle el artículo 830 del código de comercio*", y si llegare a existir duda de la intención verdadera de los contratantes, infringió el artículo 1624 del Código Civil al redactar Comnalmicros el contrato de afiliación, y por ende, la cláusula quinta, como dijo Ciro Alfonso Castellanos, respecto de quien "*obra el error de derecho por no haber decretado el tribunal pruebas de oficio*".

h) Los yerros probatorios del fallador son relevantes por determinantes, sin ellos habría concluido plena concordancia del texto e intención, el respeto de la voluntad de los contratantes, que a la cláusula quinta, tal cual está, nada debe acomodarse, superponer, menos sustituirla por un inaceptable desistimiento unilateral, y que la demandada invocándola, al terminar el contrato no mostró "*buenas razones*", sino "*un motivo reprochable de rencor*", esto es, "*faltó a su palabra*" y es responsable de los daños causados al demandante.

5. La segunda parte del cargo por la carencia probativa del *quantum* de los daños, inicia con fuerte reprimenda al juez "*rabiosamente inhumano*" que, impávido ante la lesión a la víctima sacrifica la justicia escondido en "*erudición tan académica como glacial*", a despecho "*de su verdadero rol, y que en cualquier caso no haga pompa*", para:



a) Censurar al Tribunal por omitir el deber legal de decretar y practicar pruebas incurriendo en error de derecho, con violación medio de los artículos 179 y 180 del Código de Procedimiento Civil, y de contragolpe las normas enunciadas en el cargo, porque teniendo a la vista las probanzas materialmente existentes en el expediente, dejó de cumplir sus deberes oficiosos según tiene definido de antaño la jurisprudencia civil (sentencias de 12 de septiembre de 1994, 26 de julio de 2004 y 13 de abril de 2005) en cuanto hace a todas las traídas del proceso penal, y en particular, los testimonios de Ciro Alfonso Castellanos, José Ignacio Cortázar Zamora, Carlos Eduardo Nieto García, José Joaquín Reyes Pardo y Reinaldo González, los dictámenes rendidos allí por Jorge Enrique Ávila -soportado en informes oficiales del Dane- y Miguel Ángel Díaz, además de error fáctico al olvidar la declaración rendida ante el Juzgado Décimo Civil del Circuito por Cortázar Zamora.

b) Reprochar al juzgador por error de derecho con violación de los artículos 217 y 218 del Código de Procedimiento Civil, al descalificar, desacreditar, excluir in limine o descartar a los testigos por sospechosos sin contemplar materialmente el contenido de la declaración, cuando pueden ser verídicos y debió valorarlos con sumo cuidado, así como al exigir a ultranza una tarifa legal postulando "*que los documentos vencen testigos*", sin mencionar norma jurídica alguna consagratoria de tal exigencia, o la de probar con documentos el número de pasajeros movilizados excluyendo la testimonial e interesado en "*cartulinas*" o "*planillas*" echadas de menos en la sentencia, debió hacerlas allegar.

c) Errores de hecho, los hay asimismo al no ver el *ad quem* pruebas de la mesura del quebranto, recorridos de las

busetas, número de pasajeros movilizados, productividad, días laborados mes, como las declaraciones de Jorge Alejandro Nieto García, José Antonio Romero Rodríguez, José Ignacio Cortázar Zamora, Darío Amaya Ramos, Alfonso Ortegón Jiménez, Alberto Soriano, Pedro Isaac Rivera Borda, Oscar Franco y la confesión de la sociedad demandada en proceso de responsabilidad civil extracontractual que instauró frente a Luis Fernando González por daños con la práctica de cautelas ante el Juzgado Dieciocho Civil del Circuito de Bogotá, donde remitió el cálculo de los daños perseguidos "*sobre la base de 1.200 pasajeros día y durante 25 días al mes*", yerro fáctico "*más funesto de todos*".

d) Reprocha la conclusión respecto de la inactividad exagerada hasta el 29 de marzo de 2000, frase de la cual, "*es dable inferir que para el sentenciador perjuicios si pudo haber pero en menor escala*", grave error de hecho por no ver la testimonial y la confesión probativa de los perjuicios, ignorando el artículo 305 del Código de Procedimiento Civil en armonía con el artículo 16 de la Ley 446 de 1998, recordatorio de la equidad, pues si perjuicios hubo debió condenar y no absolver.

e) Estima fácticamente errónea, "*monda y lironda*" la causación de perjuicios por la víctima, quien sin relevar al autor del deber de repararlo "*no debe agrandar el daño*", tal como hizo el demandante con su "*conducta rectilínea*", al cumplir lo suyo y su palabra, acudir a vías legales para el examen del proceder de la empresa, impugnar las actas, recibir provisional razón con la cautela prevista en el artículo 421 del Código de Procedimiento Civil, denunciar el fraude a resolución judicial donde se profirió inicial medida de aseguramiento revocada en apelación y dejar las busetas a disposición de la empresa por pensar "*que en rigor los*



*contratos estaban vigentes, o que deberían estarlo*", o sea, antes de frustrarla propugnó por la ejecución de la relación, sin saberse cuál es el tiempo "*prudencial*", y antes de éste, deben resarcirse los daños ocasionados en el interregno, el parecer de la exageración no traduce absolución, error de hecho monumental, porque la inmovilización no es imputable al demandado, además la empresa creada por éste en 1991 obtuvo licencia el 19 de febrero de 2002, años después.

f) Recapitula los errores fácticos y de derecho con su trascendencia en punto a la reparación de los daños.

6. Concluye la extensa denuncia con la iteración de los yerros, pide a la Corte casar la sentencia recurrida y en sede de instancia, confirmar la del *a quo*, si antes no juzga necesario decretar *ex officio* pruebas, porque una parte del embate se funda en no haberlo hecho el Tribunal.

## CONSIDERACIONES

1. La autonomía privada (*auto*, '*aujtov*', uno mismo, y "*nomos*", ley), expresión de la libertad, derechos fundamentales, libre desarrollo de la personalidad e iniciativa económica y de empresa garantizadas por el "*Estado Social de Derecho*" en tanto soportes del sistema democrático (Preámbulo, artículos 2º, 13, 14, 16, 28, 58, 59 a 66, 78, 82, 94, 150 [19] y [23], 332, 333, 334, 335, 373, Constitución Política), confiere al *sujeto iuris* un poder para engendrar el negocio jurídico (*negotium iuridicus, Rechtgeschäft*), *rectius,* acto dispositivo de intereses jurídicamente relevante.



Más concretamente, la persona es la médula cinética, razón y justificación de toda conocida ordenación normativa, a la cual le concede personificación, atributos, derechos, iniciativa, libertad y habilidad jurídica para disponer de sus intereses en procura de satisfacer sus fines, necesidades vitales, designios o propósitos individuales en la vida de relación, disciplinar, regular, gobernar u ordenar su esfera dispositiva en el tráfico jurídico mediante el negocio jurídico y el contrato o "'*acuerdo dispositivo de dos o más partes o sujetos contractuales para constituir, modificar o extinguir relaciones jurídicas' (arts. 864 Código de Comercio y 1495 Código Civil)*" (cas. civ. sentencias de 31 de mayo de 2010, exp. 25269-3103-001-2005-05178-01; 1° de julio de 2008, exp. 11001-3103-033-2001-06291-01; y 1° de julio de 2008, exp. 11001-31-03-040-2001-00803-01).

Justamente, la autonomía privada en cuanto libertad contractual, comporta el razonable reconocimiento legal a toda persona de un cúmulo de poderes o facultades proyectadas en la posibilidad de disponer o abstenerse de la disposición (libertad de contratar o no contratar), seleccionar el sujeto con quien dispone (libertad de elegir parte o contratante), escoger o crear el tipo contractual (libertad de optar en el catálogo *legis* o en los usos y prácticas sociales por la especie singular de contrato o crearlo), celebrarlo de inmediato o previo agotamiento de una fase formativa (libertad de celebrar el contrato en forma inmediata o progresiva), hacerlo directamente o por mandatario, representante o apoderado, expresar el acto dispositivo (libertad de expresión o de forma), determinar el contenido (libertad de estipular el contenido), asegurar el cumplimiento, prevenir la terminación o disponerla, y garantizar, atenuar o ampliar la responsabilidad.



En coherencia, el postulado axiomático inherente a la relatividad de los derechos, libertades y garantías (XLVI, 60; XV, 8), el orden, regularidad, solidaridad social, seguridad, buena fe, dignidad, respeto y simetría de trato, descarta la autonomía privada como poder libérrimo, *ad libitum,* absoluto, en blanco o ilimitado, y su ejercicio *ab initio* sometido a elementales cauces u orientaciones propias a su reconocimiento, utilidad o función, es limitado, en veces atenuado o ausente, ya por *ius cogens,* orden público, normas imperativas, ora por moralidad, ética colectiva o buenas costumbres (artículos 15 y 16, Código Civil), bien en atención a la naturaleza y tutela de ciertos sujetos o intereses, ora por la ineludible solidaridad, sea porque en ocasiones el Estado o los particulares imponen el acto (p.ej., contrato forzado, impuesto *ex lege* o *ex auctoritate,* p. ej., servicios públicos, seguro ecológico, SOAT, afiliación al sistema general de salud, riesgos y pensiones, "*ventas forzadas hechas por autoridad de la justicia*" como el remate -artículos 741, 1908 C.C; 523 y ss. C. de P.C- arrendamiento de inmuebles destinados a establecimiento de comercio, en los casos legales -artículo 521 Código de Comercio), el sujeto (*ad exemplum,* parte cualificada en el comercio de divisas, armas, municiones, químicos, preferencia del arrendatario en igualdad de circunstancias a cualquier otra persona en el arrendamiento de locales reparados, reconstruidos o de nueva edificación -artículo 521 C. de Co-, en la enajenación o suscripción de acciones -arts. 388 y 403 C. de Co-, y cuotas sociales- artículos 363 a 365 C. de Co-.), el tipo contractual (cuya función *legis* práctica o económica social es inalterable), la forma (solemne *ad substantiam actus),* el procedimiento formativo (licitación pública o privada, concurso de méritos, remate), el contenido (*verbi gratia,* impuesto *esentialia negotia*, mínimo inmodificable o predispuesto por ley, decreto, acto administrativo, orden público nacional o internacional, social, económico o político, buenas costumbres, intervención, "*dirigismo*", "*orientación*", "*economía controlada*", "*vinculista*", "*programática*",



"*planificada*", "*regulada*", "*coordinada*", "*racionalizada*", con sentido tutelar o director de la relación jurídica, por factores sociales ["*Estado Providencia*"], económicos [política deflacionista, derecho de empresa y la competencia] o de interés general [leyes de intervención económica, "*administrativas*", "*de policía y seguridad*", o de prevención, evitación y control de monopolios u oligopolios, concentraciones, poder dominante abusivo], donde el contenido se especifica *per relationem* o, en tratándose de condiciones generales de contratación, recetarios, formularios o moldes contractuales, contratación en serie, en masa, estándar, contrato de o por adhesión, tipo, global, patrón, normativo, términos de referencia o reenvío, etc.), la pervivencia o terminación, responsabilidad de las partes o los efectos (cas. civ. sentencias de 20 de abril de 1940, XLIX, 247; 23 de marzo de 1941, I, 824; SNG, 23 de agosto de 1945, LIX, 1097; 4 de abril de 1968, CXXIV, 167; 13 de octubre de 1987, XIII, 110; 24 de febrero de 1974, CXLVIII y 8 mayo de 1974, CXLVIII 51,101; 29 de agosto de 1980, CLXVI, 123; 27 de marzo de 1996, CCXI, p. 491; 26 de noviembre de 1997, CCXLIX, num. 2488, vol. II, p. 1531; 6 de agosto de 2010, exp. 05001-3103-017-2002-00189-01).

En sentido análogo, los esquemas contemporáneos de la "*globalización*", describen ostensible predominio e injerencia del poder financiero transnacional, dependencia local al mercado internacional, apertura económica, inversión acelerada, liberación de mercados y capitales, producción, competitividad y consumo a gran escala, desregulación, supresión de obstáculos o controles a la movilidad del capital, incremento del tráfico jurídico, superación de barreras espaciales o temporales en expansión de la actividad mercantil, utilización de la tecnología, informática, instrumentos digitales, telecomunicación satelital, redes o plataformas virtuales, oferta mecanizada permanente de bienes, servicios y negocios jurídicos, negociación electrónica libre, vertiginosa y expedita, una *lex mercatoria* universal, uniforme, armónica, dinámica, adaptada



a conveniencia, a las necesidades, y configurada con costumbres, prácticas o usos supranacionales para disciplinar convergente u homogéneamente las relaciones con disminución creciente de la libertad contractual, constante abuso en la posición dominante del mercado o la contractual, cláusulas abusivas, o aprovechamiento de manifiestas condiciones de debilidad, y genera una conciencia solidaria común tutelar del consumo y los consumidores.

2. La posibilidad de disponer o no disponer de los intereses, contratar o no contratar, es la máxima expresión de la autonomía privada y no resulta contradicha por sus crecientes restricciones.

Tal es la inteligencia genuina de la autonomía privada, o sea, la libertad y poder atribuido por el ordenamiento al sujeto *iuris* para celebrar el contrato, cuyo efecto cardinal, primario o existencial es su vinculatoriedad, atadura u obligación legal de cumplirlo, sin que, en línea de principio, quienes lo celebran puedan sustraerse unilateralmente.

La fuerza normativa de todo contrato consagrada en los artículos 1602 del Código Civil (artículo 1134, *Code civil Français)* y 871 del Código de Comercio (artículo 1372, *Codice Civile it*), genera para las partes el deber legal de cumplimiento, ya espontáneo, ora forzado (artículos 1535, 1551, 1603, Código Civil), y la imposibilidad de aniquilarlo por acto unilateral.

En efecto, todo contrato existente y válido, "*obliga a su cumplimiento de buena fe, en todo cuanto le pertenece por definición (esentialia negotia), ley, uso, costumbre* o *equidad (naturalia negotia)* o *expresamente pactado (accidentalia negotia),*



*en la totalidad de la prestación, forma y oportunidad debida, constituye un precepto contractual o norma obligatoria (pacta sunt servanda, lex privatta, lex contractus, artículos 1501, 1602, 1603 y 1623, Código Civil; 871 Código de Comercio), y su observancia vincula a los contratantes"* (cas. civ. sentencia de 31 de mayo de 2010, exp. 25269-3103-001-2005-05178-01).

Elementales directrices lógicas, éticas o legales, la regularidad, normalidad, estabilidad, seguridad, certidumbre del tráfico jurídico, la confianza legítima, autoresponsabilidad, buena fe y libertad contractual, explican la fuerza vinculante del contrato, y el repudio a su ruptura unilateral, en cuanto como acuerdo dispositivo de intereses jurídicamente relevante obra de dos o más partes, las obliga a cumplirlo de buena fe, y en línea general, excluye la terminación por una, so pena de ser compelida a su contrariedad al cumplimiento y a reparar los daños ocasionados.

Empero, las relaciones obligatorias y, en particular, las contractuales, son conforme a su naturaleza, función y finalidad efímeras o transitorias. De suyo, son instrumento para una función práctica o económica social, no tienen vocación perpetua y están llamadas a extinguirse mediante el cumplimiento o demás causas legales.

La perpetuidad, extraña e incompatible al concepto de obligación, contraría el orden público de la Nación por suprimir *ad eternum* la libertad contractual (artículos 15, 16 y 1602, Código Civil; 871 y 899, Código de Comercio).

El artículo 37 de la Constitución de 1886 "*en orden a asegurar la libertad de los aspectos económicos del tráfico*



*jurídico"*, disponía que *"[n]o habrá en Colombia bienes raíces que no sean de libre enajenación, ni obligaciones irredimibles"*, o sea, "*las que no hay manera jurídica de abolir en ningún momento y duran siempre, sin que el deudor esté en capacidad de evitar su cumplimiento por los medios normales de extinción que prevé el derecho"* (Corte Suprema de Justicia, Sala Plena, Sentencia de 23 de noviembre de 1973).

La Constitución Política de 1991, incorporó al derecho interno los tratados o convenios internacionales sobre derechos humanos, consagró disposiciones de principio, enunció un catálogo mínimo de derechos fundamentales, libertades y garantías, enfatizó en la persona como centro motriz del ordenamiento, en su dignidad, libertad e igualdad, libre desarrollo de la personalidad, trabajo, profesión u oficio, garantía de la propiedad privada, función social de los derechos, iniciativa económica y libertad de empresa, cuya sola mención excluye toda relación perpetua al aniquilar *per se* la libertad, cuestión ésta de indudable orden público por concernir a principios ontológicos de la estructura política, el ordenamiento jurídico y a intereses vitales para el Estado y sociedad. Por demás, la transitoriedad de la relación jurídica y la prohibición de relaciones contractuales u obligatorias perpetuas, deriva de los principios generales de las obligaciones.

En esta virtud, los negocios jurídicos, contratos, y las obligaciones de esta estirpe, son temporales y terminan por las causas legales o contractuales. A este propósito, el cumplimiento oportuno e íntegro, es por excelencia el modo extintivo deseable, normal u ordinario.

República de Colombia

Corte Suprema de Justicia
Sala de Casación Civil

Sin embargo, la autoridad de las partes de un negocio jurídico, comprende su celebración y terminación en todo momento por consenso recíproco (*mutuus consensus, contrarius consensus*, *mutuus dissensus*, artículos 1602 y 1625 Código Civil) acatando las normas legales (cas. civ. sentencias de 5 de noviembre de 1979, CLIX, 306; 16 de julio de 1985, CLXXX, 125; 7 de junio de 1989, CXCVI, 162; 1° de diciembre de 1993, CCXXV, 707; 15 de septiembre de 1998, CCLV, 588; 12 de febrero de 2007, exp. 00492-01 y 14 de diciembre de 2010, exp. 41001-31-03-001-2002-08463-01).

Análogamente, el legislador o, las partes, ceñidas a la ley, ética, corrección, probidad, lealtad, buena fe, función, utilidad y relatividad del derecho, en ejercicio de su libertad contractual, pueden disponer la terminación unilateral del contrato.

La figura, describe hipótesis de cesación, extinción o terminación del contrato por acto dispositivo unilateral de una parte y engloba un conjunto heterogéneo de supuestos señalados con expresiones polisémicas, disimiles y anfibológicas, tales las de desistimiento unilateral, receso, retracto, destrato, disolución, renuncia, revocación, rescisión, *resiliation* o resolución unilateral convencional, cláusulas resolutorias o de terminación unilateral expresas, denuncia de contrato a término indefinido, terminación *in continenti* por incumplimiento esencial, grave e insuperable, entre otras.

En la legislación patria carece de disciplina general y se establece en múltiples supuestos. *Ad exemplum*, entre otras hipótesis:



República de Colombia

Corte Suprema de Justicia
Sala de Casación Civil

- El pacto de arras habilita a cada contratante para retractarse del contrato (artículos 1859 Código Civil y 866 del Código de Comercio; cas. civ. sentencias de 30 de julio de 1941, LII, No. 1977, 18; 10 de julio de 1953, LXXV, No. 2129, 548; 6 de octubre de 1953, t. LXXVI, No. 2133, 506; 6 de junio de 1955, LXXX, No. 1254, 407; 6 de marzo de 1961, XCV, No. 2238, 76; 21 de febrero de 1967, CXIX, Nos. 2285 y 2286, 47; 10 de mayo de 1977, CLV, No. 2396, 106; 11 de diciembre de 1978, CLVIII, No. 2399, 1978, 311; 7 de septiembre de 1999, exp. 5217; 1° diciembre de 2004, exp. 54122; 14 de diciembre de 2010, exp. 41001-31-03-001-2002-08463-01 y 16 de diciembre de 2010, C-08001-3103-004-2003-00123-01).

- En la compraventa, el vendedor o comprador asistente en la fecha para el peso, cuenta o medida de la cosa, podrá desistir del contrato si el otro no comparece (artículo 1878, Código Civil); el comprador a su arbitrio es titular del "*derecho potestativo… que no requiere pronunciamiento alguno del juez*" de desistir del contrato cuando el vendedor por su hecho o culpa retarda la entrega de la cosa (cas. civ. sentencia de 9 de junio de 1971, CXXXVIII, p. 382; artículo 1882, Código Civil); y el comprador puede disolver la compraventa celebrada a su gusto o satisfacción (artículo 912, C. de Co), o desistir si falta una parte considerable de la cosa al tiempo de perfeccionarse el contrato (artículo 918 C. de Co).

- El arrendatario tiene igual derecho por la imposibilidad o mora en la entrega de la cosa arrendada (artículos 1983, 1984 y 2011, Código Civil).



- El ordenante de una obra puede cesar su confección reembolsando gastos, el valor del trabajo y la ganancia del artífice (artículo 2056, Código Civil).

- Cualquiera de las partes podrá terminar el arriendo de servicios inmateriales sin término en todo momento o con el desahucio pactado (cas. civ. sentencia de 22 de junio de 1940, XLIX, 548).

- El mandato termina por revocación del mandante o renuncia del mandatario, aquél puede revocarlo a su arbitrio o con justa causa y éste desistir o renunciar al encargo (artículos 2185, 2189 [3], 2191, 2193 Código Civil; 1279, 1283 y 1286, Código de Comercio, aplicables a la comisión y preposición por remisión del artículo 1308, *ibídem*).

- El comodatario debe restituir la cosa en el tiempo acordado, o en caso de silencio, después del uso para el cual se prestó, excepto "si sobreviene al comodante una necesidad imprevista y urgente de la cosa", en cuyo caso, procede la restitución antes del plazo, y en el contrato de comodato precario, el comodante tiene la facultad de pedir la cosa en cualquier tiempo (artículos 2205 y 2219, Código Civil).

- El mutuario, en el mutuo civil puede pagar antes del plazo toda la suma prestada cuando no se pactan intereses (artículo 2229, Código Civil), y aún pactados, tratándose del crédito para vivienda a largo plazo (Sentencia C-252 de 1998; cas. civ. sentencia de 6 de julio de 1955, LXXX, 646 y ss).



República de Colombia

Corte Suprema de Justicia
Sala de Casación Civil

- En el depósito civil, la restitución es a voluntad del depositante, pero acordado un plazo el depositario debe respetarlo (artículo 2251, Código Civil).

- El acreedor anticrético, salvo pacto contrario, puede restituir la cosa dada en anticresis en cualquier tiempo (artículo 2467, Código Civil).

- El suministro mercantil sin duración estipulada puede terminarse por cualquiera de las partes con preaviso, y el incumplimiento de una confiere a la otra el derecho a terminarlo cuando fuere de cierta importancia u ocasiona graves perjuicios suficientes para mermar la confianza, pero "[e]n ningún caso el que efectúa el suministro podrá poner fin al mismo, sin dar aviso al consumidor como se prevé en el artículo precedente" (artículo 973, C. de Co).

- El pasajero dando preaviso al transportador conforme a los reglamentos, el contrato o costumbre, puede desistir del transporte mercantil, con derecho reembolso del valor del pasaje (artículo 1002, C. de Co).

- Salvo las restricciones legales al asegurador en ciertos seguros (p. ej., vida [art. 1159], Soat, cumplimiento [Ley 80 de 1993, cas. civ. sentencia de 2 de mayo de 2002, exp. 675; 15 de agosto de 2008), el seguro es revocable unilateralmente por cualquiera de las partes, facultad ésta, dijo la Sala, *"unilateral incausada", o "altamente subjetiva, que ella 'debe dejarse al arbitrio unilateral de cada uno de los contratantes' (ad nutum), como –a propósito- se consignó en la Exposición de motivos del meritado Proyecto de Código*

República de Colombia

Corte Suprema de Justicia
Sala de Casación Civil

*de Comercio del año 1958, sin que ello signifique, de ninguna manera, que el revocante escape al inexorable y plausible deber constitucional y legal de no abusar de sus derechos (art. 95-1 C. Pol. y 830 C. de Co.), habida cuenta que el reconocimiento de una facultad o poder, de por sí, no constituye salvoconducto o patente de corso para propiciar la arbitrariedad, so pena de la condigna indemnización de los perjuicios irrogados. Es por ello por lo que el abuso, en sí, trasciende al mero arbitrio o a la simple volición", de "inobjetable origen volitivo (ad libitum)" sin "necesidad de consignar en el escrito de enteramiento respectivo a su cocontratante, indefectiblemente, cuáles son las razones que, in casu, lo llevaron a tomar dicha decisión. Le basta con comunicarla, en debida forma, al otro extremo de la relación negocial, sin que su eficacia, per se, quede supeditada a la validez de una motivación específica y, menos aún, a la aceptación por parte de éste, quien ocupa un 'rol' enteramente divergente: [...] a fuer que en su más genuino origen y significado, es una declaración de voluntad formal; unilateral; recepticia; directa o indirecta y que sólo produce efectos para el porvenir, a su turno detonante de un negocio jurídico de carácter extintivo" con "efectos hacia el futuro (in futurum), esto es, ex nunc y no ex tunc, pues ella responde, como ha quedado ya expresado, al confesado deseo de desligarse –o desvincularse- del acuerdo negocial. Y no podía ser de otra manera, tratándose además de un contrato de tracto o ejecución sucesiva como el seguro, en el que las respectivas prestaciones nacientes para las partes, no se pueden diluir una vez ejecutadas"* (cas. civ. sentencia de 14 de diciembre de 2001, exp. 6230).

- El promitente mutuante podrá abstenerse de cumplir cuando las condiciones patrimoniales del promitente mutuario se han alterado de tal forma que hagan la restitución notoriamente difícil (artículo 1169, Código de Comercio), facultad que, "*no le confiere un poder ab libitum, tampoco es libérrima ni puede utilizarse en forma caprichosa e injustificada, por cuanto está subordinada a la plena e*

*indiscutible comprobación objetiva de la alteración patrimonial del promitente mutuario de tal magnitud a punto de dificultar notablemente la restitución, a la falta de ofrecimiento de garantía suficiente para tal efecto, y debe ejercerse con estricta sujeción a los dictados éticos imperantes en el tráfico jurídico, a la buena fe, y sin abusos ni arbitrariedad"* (cas. civ. sentencia de 18 de agosto de 2010, exp. 15001-3103-001-2002-00016-01).

- En el depósito mercantil, la cosa depositada será restituida al depositante cuando la reclame, salvo plazo convenido en interés del depositario, quien podrá por justa causa devolverla antes, y si el contrato no fija término, "*el depositario que quiera restituir la cosa deberá avisar al depositante con una prudencial antelación, según la naturaleza de la cosa*" (artículo 1174, C. de Co).

- El hospedaje termina "*por las causales expresamente pactadas*", y el celebrado sin plazo, *"por aviso dado por una de las partes a la otra, con doce horas de anticipación*" (artículo 1197 [4], C. de Co).

- El contrato de fiducia, entre otras causas termina *"[p]or expiración del plazo*" o *"[p]or revocación del fiduciante, cuando expresamente se haya reservado ese derecho*" (artículos 1240 [3 y 9], 1230 [3] C. de Co. y 101 Ley 1382 de 2009).

- En el contrato de cuenta corriente mercantil sin plazo *"cualquiera de los cuentacorrentistas podrá en cada época de clausura, denunciar el contrato dando aviso con no menos de diez días de anticipación a la fecha de aquélla"* (artículo 1261, C. de Co).





- El agente o empresario puede "*dar por terminado unilateralmente*" el contrato de agencia mercantil por justa causa (artículo 1325, C. de Co).

- Cada una de las partes de la cuenta corriente bancaria podrá terminar el contrato en cualquier tiempo (artículo 1389, C. de Co).

- El establecimiento de crédito, "salvo pacto en contrario", no puede terminar el contrato de apertura de crédito o descuento, antes de vencer el plazo, y cuando "*es por tiempo indeterminado cada una de las partes podrá terminar el contrato mediante el preaviso pactado o, en su defecto, con uno de quince días*" (artículo 1406, C. de Co).

- El crédito documentario, salvo estipulación contraria es "*revocable*" y el banco emisor podrá revocarlo en cualquier tiempo mientras no lo haya utilizado el beneficiario (artículos 1410 y 1411, C. de Co).

- El término del contrato de cajillas de seguridad es indefinido salvo pacto contrario, "*pero las partes podrán unilateralmente darlo por terminado en cualquier tiempo, noticiando a la otra parte por escrito, con treinta días por lo menos de antelación*", y la mora en el pago del precio, "*dará lugar la terminación del contrato, quince días después de ser exigido por escrito su cumplimiento por el banco*" (artículos 1420 y 1421, C. de Co).



- El cargador podrá desistir del transporte de las cosas por mar antes del zarpe (artículo 1620, C. de Co).

- El pasajero en el transporte aéreo puede desistir del contrato (artículo 1878, C. de Co).

- El consumidor tiene derecho a desistir del contrato de compraventa del bien u obtención del servicio (artículo 29, Decreto 3466 de 1982).

- La entidad estatal tiene la facultad excepcional de terminación unilateral en los contratos estatales (artículos 14 y 17, Ley 80 de 1993).

- La empresa prestadora del servicio en caso de incumplimiento grave del usuario puede tener por resuelto el contrato y a proceder el corte del servicio (artículo 141, Ley 142 de 1994).

- Tanto el empleador como el trabajador tienen derecho a terminar unilateralmente el contrato individual de trabajo (artículos 65 y ss. C.S.T.).

En cuanto respecta al pacto de terminación unilateral del contrato cuando la ley, costumbre o los usos y prácticas negociales no la establecen, de antaño suele cuestionarse, ya por oponerse a la noción o fuerza normativa del contrato (artículos 1494, 1535, 1602 y 1603, Código Civil; 864 y 871, Código de Comercio), ora por invalidez e ilicitud al someterlo a la condición potestativa consistente en el simple arbitrio o mera voluntad de un



contratante (artículo 1535, Código Civil), bien al no enunciarse dentro de las causas legales extintivas, formarse y terminar por acuerdo mutuo de las partes, nunca por decisión de una (artículo 1602, *in fine*, Código Civil), preverse en forma excepcional, exclusiva y circunscrita a los contratos estatales sin admitir analogía *legis* o *iuris* ni aplicación extensiva (artículos 14, 15, 16 y 17, Ley 80 de 1993), resultar abusiva en los restantes (artículo 133.2, Ley 142 de 1994) o, convertirse en mecanismo de "*justicia privada*", derogatorio de la jurisdicción del Estado autorizada para terminar el contrato.

En estrictez, la terminación unilateral presupone la existencia, validez y eficacia del contrato, en nada contradice su noción, fuerza normativa, ni encarna condición potestativa.

El contrato a partir de su existencia genera efectos vinculantes para las partes, atadas u obligadas al cumplimiento, sea espontáneo, sea forzado, y fenece por decisión exclusiva de una porque la ley concede el derecho o se pacta *accidentalia negotii,* como las cláusulas resolutorias expresas, con o sin preaviso e, incluso, casos hay, donde la común negativa se ha tomado como *dissensus* o *distrato* o concluye en éste (cas. civ. sentencia de 12 de marzo de 2004). El contrato existe *ex ante,* engendra efectos, termina *ex post* sin eficacia retroactiva y sólo hacía el futuro. Además, cumplimiento y terminación son distintos. Aquél, no queda al simple arbitrio o mera voluntad de una parte, la última se produce por decisión unilateral de una u otra sin afectar las obligaciones cumplidas.

La falta de enunciación expresa en el Código Civil dentro de los modos extintivos, no es escollo ni argumentación



plausible para descartar la terminación unilateral, por cuanto como quedó sentado, la ley la consagra en numerosas hipótesis y contratos de derecho privado, sin concernir sólo a los estatales. Inclusive, la figura existe en el derecho privado, antes de su plasmación en la contratación estatal, y no es extraña la locución, pues utiliza el vocablo "*terminación*" (artículo 870, C. d Co), "*dar por terminado el contrato*" (art. 973, C. de Co), justas causas "*para dar por terminado unilateralmente el contrato de agencia comercial*" (art. 1325, C. de Co).

Tampoco es admisible sostener *prima facie*, ante sí y por sí, su naturaleza abusiva, extender la presunción al respecto circunscrita a los contratos de servicios públicos bajo condiciones generales (artículo 133.2, Ley 142 de 1994), ésta sí destierra la analogía *legis,* ajena a los paritarios y susceptible de desvanecerse, sin resultar lógica la supuesta configuración antelada de un abuso de derecho ulterior, el cual podrá presentarse al ejercerse en ciertas condiciones, o tenerla *a priori* como expresión abusiva de la libertad contractual, por contradecir las reglas de experiencia (cas. civ. sentencia de 14 de diciembre de 2001, exp. 6230).

En general, ante la ausencia de prohibición normativa expresa, es ineluctable concluir la validez de estas cláusulas, por obedecer a la libertad contractual de las partes, facultadas para celebrar el acto dispositivo y disponer su terminación, aún sin declaración judicial, previendo el derecho a aniquilarlo, lo cual no significa ni puede conducir en forma alguna a tomar justicia por mano propia, por cuanto toda controversia respecto de su eficacia o ejercicio, corresponde definirla a los jueces, como se explica más adelante.



Partiendo de la precedente premisa, la jurisprudencia reconoce validez a las cláusulas de terminación de los contratos bilaterales, onerosos, conmutativos y de ejecución sucesiva (cas. civ. sentencia de 3 de septiembre de 1941, LII, 1966, 36 y ss; 23 de febrero de 1961, XCIV, 549), y las relativas a "*[l]a condición resolutoria estipulada expresamente por los contratantes [que] resuelve de pleno derecho el contrato sin que se requiera declaración judicial. El artículo 1546 del C.C. se refiere a la condición resolutoria tácita, es decir a la que envuelve todo contrato bilateral, y no a la expresa, o sea a la que libremente hayan estipulado las partes*" (cas. civ. sentencia de 31 de mayo de 1892, VII, 243).

La Corte admite la eficacia de las atañederas a la exclusión de prórrogas en contratos de duración como el de agencia comercial cuando "*como cláusula accidental del contrato, se pacta que puede darse por terminado en forma anticipada, o no prorrogarse por un término igual al inicialmente convenido, siempre y cuando se dé aviso a la otra contraparte con la debida anticipación, es claro entonces que el ejercicio por una de las partes de esta facultad no puede, ni de lejos, constituir abuso del derecho*" (cas. civ. sentencia de 31 de octubre de 1995, CCXXXVII, 1269), donde "*la estabilidad nunca puede asimilarse a perpetuidad o permanencia, porque esta característica no se opone a una vigencia temporal del contrato*" ni a estipular plazo "*que además de constituir una ley del contrato tiene origen en la voluntad de sendas partes, pues son ellas, quienes dentro del ámbito de su autonomía y de la libertad contractual, deciden la estipulación del mismo*" (cas. civ. sentencia de 20 de octubre de 2000, exp. 5497), y aún "*habrá casos en que, pese al plazo de duración que inicialmente haya sido acordado para el*



*agenciamiento, podrán los contratantes ponerle fin a la relación negocial, si se presenta una de las especiales y excepcionalísimas circunstancias que –ex lege- habilitan la terminación"* (cas. civ. sentencia de 28 de febrero de 2005, exp. 7504).

Desde otra perspectiva, la terminación unilateral, es realidad tendencial inocultable en la contratación, particularmente, en la internacional, electrónica y las relaciones comerciales, así como las de consumo, tanto cuanto más por la sensible evolución, secular transformación, dimensión y entendimiento actual de la autonomía privada en la dinámica del tráfico jurídico y los negocios.

A tal propósito, los artículos 49 a 64 de la Convención sobre Contratos de Compraventa Internacional de Mercaderías, hecha en Viena el 11 de abril de 1980, aprobada por la Ley 518 del 4 de agosto de 1999, declarada exequible según sentencia C-529 de 2000 y promulgada por el Decreto 2826 de 2001, autorizan a cada parte para declarar resuelto el contrato por incumplimiento esencial, y diferir el cumplimiento en los contratos con entregas sucesivas cuando es manifiesto "*que la otra parte no cumplirá una parte sustancial de sus obligaciones*" por las causas señaladas (resolución por anticipación, *anticipatory breach of contract*).

En idéntico sentido, los Principios UNIDROIT sobre los Contratos Comerciales Internacionales, tercera versión adoptada por su Consejo de Administración, establecen el derecho de una parte a resolver el contrato si el incumplimiento de la contraparte constituye un incumplimiento esencial (art. 7.3.1.1) o, si antes de la fecha de ejecución del contrato existe certeza que el deudor



incurrirá en incumplimiento esencial, el acreedor puede resolverlo (art. 7.3.3), en cuyo caso "[e]l derecho a resolver el contrato se ejercita mediante una notificación a la otra parte" (art. 7.3.2.1),

*Et similia*, la generalidad de las legislaciones foráneas disciplinan el derecho a la terminación unilateral por motivos variados. Verbi gratia, con arreglo al artículo 1456 del *Codice Civile It.*, "Cláusula resolutiva expresa", "[l]os contratantes pueden convenir expresamente que el contrato se resuelva en el caso de que una determinada obligación no sea cumplida según las modalidades establecidas. En este caso, la resolución se verifica de derecho cuando la parte interesada declara a la otra que pretende valerse de la cláusula resolutoria"; al tenor del artículo 1429 del Código Civil de Perú, *"[e]n el caso del artículo 1428 la parte que se perjudica con el incumplimiento de la otra puede requerirla mediante carta por vía notarial para que satisfaga su prestación, dentro de un plazo no menor de quince días, bajo apercibimiento de que, en caso contrario, el contrato queda resuelto. Si la prestación no se cumple dentro del plazo señalado, el contrato se resuelve de pleno derecho, quedando a cargo del deudor la indemnización de daños y perjuicios*"; análogas previsiones contiene el artículo 1605 del Código Civil de Quebec, el 543 del Código Civil Holandés y es inclinación del derecho comparado, según evidencian los Principios de Derecho Europeo de los contratos (Comisión Landó), artículo 6.109, *"Cualquiera de las partes puede terminar el contrato de duración indeterminada dando a la otra un preaviso de duración razonable*"; ID., 9:301 '*Una parte puede resolver el contrato si existe incumplimiento esencial de la otra parte'*; el Código Europeo de los contratos (Proyecto de Pavía o Gandolfi): artículo 114.1; *"Si se produce un incumplimiento grave, en el sentido del artículo 107, el acreedor*



*tendrá derecho a exigir la resolución del contrato, requiriendo al deudor el cumplimiento en un plazo razonable que no sea inferior a quince días, y notificándole que, transcurrido inútilmente el plazo, el contrato se considerará resuelto*", y el *Avant-projet* de Reforma al Título III, Libro III, Code Civil Francés, artículo 1158.

Las razones por las cuales las partes recurren a esta vía son múltiples en el esquema legítimo de la libertad contractual sin reducirse al incumplimiento.

En especial, con referencia explícita a los contratos de indefinida duración, trátase de justificar en la prohibición de los pactos perpetuos (*eternal engagemenst*) por atentar contra la libertad y la dignidad humana contraviniendo el orden público, e incluso, según otras, equivaldría a mutuo disenso al originarse en el acuerdo recíproco antelado de los contratantes, o acordada para ambos aseguraría la simetría de los sujetos, o la eficiencia de la relación jurídica (*efficient breach*), la confianza o buena fe tolerando la extinción de la ineficiente o la basada en la confianza perdida, o tutelaría al consumidor, la libre competencia y mercado o facilitaría terminar la continuidad de relaciones indeseables o inconvenientes.

Dicha facultad, dijo la Corte al explicar la revocación unilateral del contrato de seguro *ex* artículo 1071 del Código de Comercio, "*también puede hundir sus raíces en múltiples motivos no necesaria o indefectiblemente ligados a la confianza, stricto sensu, o a la protección de la ubérrima bona fides –cuando alguna de las partes considere que el comportamiento contractual de la otra no se acompasa con tan caro postulado-, pudiendo considerarse, bien como una garantía instituida en pro del*



*consumidor y en beneficio de una sana, ortodoxa y transparente competencia, [...]; ora como una expresión del derecho al arrepentimiento –en sentido lato- de cara al término de duración aún no transcurrido en los negocios jurídicos 'fluyentes', de duración, de ejecución diferida o de tracto sucesivo"* (Cas. civ. sentencia de 14 de diciembre de 2001, exp. 6230).

*Estricto sensu*, una o ambas partes son titulares de un derecho potestativo para terminar unilateralmente el contrato, sin aquiescencia, aceptación, beneplácito o consentimiento de la otra, cuyo ejercicio desemboca en acto dispositivo recepticio en cuanto debe ponerse en conocimiento de la otra parte, usualmente con un preaviso mínimo, legal o convencional o, en su defecto, congruo, razonable o suficiente, de forma libre salvo disposición contraria (p. ej., el artículo 1071 del Código de Comercio, exige el escrito para la revocación del seguro), y constitutivo por extinguir el vínculo con efectos liberatorios hacía el futuro (*ex nunc*) sin alcanzar las prestaciones ejecutadas, cumplidas, consumadas e imposibles de retrotraer, esto es, carece de eficacia retroactiva (*ex tunc*), cumple la función de terminar el pacto, y por tanto, desligar *in futurum* a las partes del compromiso sin declaración judicial, menester a propósito de las controversias al respecto.

Se comprende, entonces, la utilidad o función práctica de la figura, esto es, la posibilidad legal o convencional de concluir el contrato por decisión exclusiva, única, espontánea y autónoma de una parte, y sin declaración judicial. También su distinción con el acuerdo extintivo. Una cosa es el mutuo acuerdo para terminar el contrato, y otra pactar causas para terminarlo unilateralmente. El contrato termina no por acuerdo, sino por decisión unilateral.

Exactamente, la terminación unilateral y el acuerdo extintivo, son simultáneamente excluyentes e incompatibles.

3. La terminación unilateral puede presentarse en contratos de duración definida o indefinida.

Una difundida opinión los distingue en de ejecución instantánea o sucesiva, continúa, periódica o diferida, y a término definido o indefinido.

Cuando se cumplen, ejecutan, agotan y terminan en un solo acto, generalmente coincidente con la celebración o asunción de la prestación, son de ejecución instantánea, a diferencia de la sucesiva, prolongada o proyectada en el tiempo, ya continua, ininterrumpida, fraccionada, escalonada, a intervalos o repetida en fechas preestablecidas intermitentes.

Los de duración definida se pactan desde (*dies a quo*) y hasta fecha precisa (*dies ad quem*), a plazo cierto, determinado o concreto, y su sola verificación los termina salvo pacto contrario, término mínimo legal de duración mayor al convenido, fraude a la ley, abuso del derecho o presencia de condiciones normativas para su eficacia extintiva.

En principio, la terminación unilateral anticipada del contrato de duración definida es improcedente y el plazo debe acatarse según corresponde a la estabilidad del vínculo, utilidad de la relación para las partes y función del término definido.

Con todo, el legislador contempla varios supuestos de terminación unilateral, por ejemplo, en la revocación del seguro



(artículos 1047 [6] y 1071, C. de Co), el mandato por el mandante o por renuncia del mandatario (artículos 2189 [3y 4], C.C. y 1279 C. de Co), la fiducia por el fiduciante si reservó expresamente el derecho (artículo 1240 [11], C. de Co), la reclamación de la cosa por el comodante en cualquier tiempo (2219, C.C.), la restitución en el depósito civil a "*voluntad del depositante*" y aún fijado un término "*esta cláusula sólo será obligatoria para el depositario*" (artículo 2251, C.C.).

Por cuanto la consumación del plazo, legal o negocial finaliza automáticamente el contrato, el término extintivo no se confunde con el acuerdo extintivo y la terminación unilateral.

El cumplimiento del término consuntivo, excluye otra forma diferente de terminación. Al expirar el plazo, termina el contrato en cumplimiento del pacto, y extinguido, no puede haber terminación unilateral o por consenso, ni abuso del derecho (cas. civ. sentencia de 31 de octubre de 1995, CCXXXVII, 1269). Por supuesto, salvo precepto legal o contractual, la expiración del plazo termina *ipso facto* el contrato, hace incompatible el acuerdo extintivo (*mutuo disenso*) y la terminación unilateral, por cuanto el acto concluye en la fecha pactada a consecuencia del término, y extinguido, nada hay por terminar, pues ya no existe.

Previamente al fin del plazo (*ante tempus)*, nada obsta a las partes terminar el contrato, ya por recíproco consenso (mutuo disenso, acuerdo extintivo), ora unilateralmente en los casos legales, contractuales o, por advenimiento de la condición resolutoria expresa en virtud de incumplimiento grave e insalvable cuando estipulan cláusula resolutoria. En efecto, nada impide a las partes, pactar la terminación unilateral anticipada de un



contrato a término definido, pero en ausencia de estipulación o previsión legal, están obligadas por el plazo y deben cumplirlo.

Las partes, podrán acordar la renovación o prórroga, preverla, excluirla o condicionarla, en cuyo defecto, la llegada del término definido *per se* termina el contrato. Particular importancia reviste la ejecución práctica del contrato por conducta concluyente después del plazo (*tácita reconducción*) y la cláusula contractual de renovación o prórroga, expresa o tácita, con duración precisa, determinada o sin ésta.

Renovación (de *renovatio,-onis*), es acción y efecto de renovar (de *renovare*), hacer de nuevo algo, modificar o sustituir, y prorrogar (de *prorrogare*), continuar algo por tiempo determinado.

La renovación no se confunde con la prórroga del contrato, "*el renovado es uno nuevo*" (Corte Suprema de Justicia, Sala Plena, sentencia de 20 de noviembre de 1971, CXXXVIII, 482 y ss; cas. civ. sentencias de 24 de septiembre de 1985 CLXXX, 431; 31 de octubre de 1994, exp. 3868; 7 de julio de 1998, rad. 10825; 8 de octubre de 1997, exp. 4818; 27 de julio de 2001, exp. 5860; 24 de septiembre de 2001, exp. 5876, 14 de abril de 2008, 2001 00082 01), y el prorrogado el mismo. La prórroga mantiene idéntico el contrato, no se presenta más sino por acuerdo anterior al vencimiento del plazo y lo continúa en las condiciones primarias por un período igual (artículos 218 [1], 520, 829, 1425 ["*prorrogado por un período igual*"], 1510, 1685, 1686, 1712, 1891C. de Co).

Salvo expresa, clara e inequívoca previsión normativa o negocial, las cláusulas de renovación o prórroga automática de los contratos de duración definida no los convierte en de duración



indefinida. El efecto fundamental de estas cláusulas, excluye la conversión o transformación del contrato, que en la prórroga subsiste sin perder su naturaleza por un período idéntico al inicial, y en la renovación implica alguna modificación. La prórroga sin previsión de tiempo igual al inicial, las prórrogas más allá de las permitidas por ley, cuando ésta señala un límite máximo, y la celebración de contratos sucesivos entre las mismas partes respecto del mismo objeto, suscitan cierta dificultad. La prórroga automática pactada por un período igual al primario, de entrada impide la conversión del contrato celebrado a plazo definido en indefinido, y la carente de indicación, podrá depurarse mediante la interpretación del mismo contrato, porque éste continúa, pervive igual.

Más compleja es la renovación, por cuanto implica una modificación del contrato, que podrá versar sobre el plazo, y la celebración continua o repetida de contratos encadenados donde a uno de duración definida sucede otro formalmente diferente, pero idéntico en su contenido, en veces, celebrado en fraude a la ley para eludir normas imperativas o evitar la conversión, situación que debe analizarse por el juzgador dentro del marco concreto de circunstancias.

Más, la renovación o prórroga automática acordada expresamente por las partes por un período idéntico al inicial, lo mantiene e impide la transformación del contrato de término definido a indefinido, y en todo caso, a cada parte asiste el derecho e interés legítimo para enervar, denunciar o terminar unilateralmente el contrato por las causas legales o contractuales. Así sucede, por ejemplo, en el arrendamiento de inmuebles para vivienda urbana que, a falta de estipulación expresa del plazo, se



República de Colombia

Corte Suprema de Justicia
Sala de Casación Civil

entiende celebrado por un año, prorrogable por igual término habiendo las partes cumplido sus obligaciones y avenido el arrendatario a los reajustes legales del canon (artículos 5º y 6º, Ley 820 de 2003), quien podrá terminarlo *ad nutum* al vencimiento del término inicial o de sus prórrogas con preaviso no menor tres meses a dicha fecha sin estar "*obligado a invocar causal alguna diferente a la de su plena voluntad, ni deberá indemnizar al arrendador*" (artículo 24.5*, ibídem*), el cual también puede hacerlo durante sus prórrogas con preaviso y pago de indemnización o sin ésta, según el caso (artículos 22.7, 22.8).

Caracteriza a los de duración indefinida, la durabilidad, extensión temporal o prolongación en el tiempo, factor esencial en la función del contrato, su cumplimiento, *utilitas* e interés de la relación (*commodum obligationis*).

La duración indefinida, no es perpetuidad ni eternidad. Ninguna relación jurídica es eterna. La dicotomía entre una relación durable y una relación perpetua permite a las partes terminarla, salvo expresa disposición legal en contrario. El de duración indefinida, es contrato durable, carece de término concreto, determinado o definido, se prolonga en el tiempo y termina acorde a la ley o a la convención. No es *ad perpetuam,* ni deviene, convierte o equivale a éste. La distinción es simple.

Los contratos perpetuos, según denota el vocablo, jamás terminan, comprometen la libertad contractual *ad infinitum*, contradicen el concepto de contrato concebido como un acuerdo dispositivo de intereses jurídicamente relevante de dos o más partes para constituir, modificar o extinguir relaciones jurídicas en procura de una función útil, de la cual son instrumento, a más de



transitorio y destinado a terminar, desde luego que la Constitución Política garantiza la libertad, siendo ilícito por vulnerar el orden público, suprimirla de manera absoluta, eterna e intemporal.

*Contrario sensu,* los contratos de duración indefinida, son durables pero sin vocación de perpetuidad, terminan por las causas normativas o convencionales, excluyen por su definición y sentido común, la renovación o prórroga del plazo por indefinido, y su terminación unilateral se justifica no para impedir su conversión en un vínculo perpetuo, ni por equivaler a éste, sino en función del interés de las partes, la utilidad de la relación y la libertad de contratación. Esta facultad rectamente entendida, protege la libertad contractual y sirve al propósito de la función práctica o económica social del negocio jurídico, de suyo transitorio, así sea durante un largo tiempo.

En los contratos de duración indefinida, la terminación unilateral, según resaltó el Tribunal, es elemento natural (*naturalia negotii*), se entiende pertenecerle e incorpora su contenido por ley, uso o costumbre, sin estipulación a propósito, (artículos 1501, C.C. y 871, C. de Co). No se trata de simple cláusula de estilo, sino de cláusulas de uso común. En oportunidades, deriva de la naturaleza de las cosas, *verbi gratia*, la terminación *in continente* por advenimiento de un incumplimiento grave e insuperable (artículos 2189 [3 y 4], 2225, 2251, C.C.), denuncia de contrato de ejecución sucesiva o escalonada a plazo indefinido, y en veces, se pacta (*accidentalia negotii*) como cláusula resolutoria o de terminación unilateral expresa, práctica de uso común (artículo 1621, inciso segundo, Código Civil).



En estos contratos, algunas corrientes, distinguen la terminación ordinaria con función integrativa del contenido, cuanto derecho potestativo a terminar el contrato mediante preaviso legal o negocial, congruo o razonable, y la extraordinaria merced al influjo de sucesos o acontecimientos iniciales o ulteriores, o como un derecho de retracto o receso de las partes. El preaviso advierte la decisión unilateral de terminar el contrato al expirar su término, la posibilidad de adoptar medidas de mitigación o evitación del daño a la otra parte, y cuando no lo erige la ley o el pacto, deriva de la buena fe, lealtad o corrección y la exclusión de abusos, aplicando el tiempo proporcionado, justo, razonable, ponderado, o congruo, según la relación, antigüedad, confianza, continuidad, función, utilidad e interés de las partes.

Al efecto, explica importante opinión: *"En los contratos de ejecución sucesiva o periódica el desistimiento se configura como el ejercicio del poder de la parte de interrumpir la relación contractual"*, se confiere a uno o ambos contratantes, *"por un acuerdo precedente (cláusula o pacto de desistimiento), o puede ser también atribuido por la ley (derecho legal de desistimiento"*, para remediar *"el incumplimiento"*, *"la onerosidad o la no tolerabilidad de la permanencia en la relación"*, *"En estos casos, sin embargo, el desistimiento constituye un poder de autotutela, y su ejercicio está sometido al control sobre lo adecuado del método respecto de su función. El derecho de desistimiento tutela, por el contrario, el interés objetivo de la parte en la interrupción de la relación contractual, y el ejercicio del derecho se deja exclusivamente a la decisión autónoma del titular, salvo el límite general del principio de la buena fe.... La buena fe exige que se ejerza en forma de salvaguardar el interés de la contraparte, si no comporta para quien lo ejerce un sacrificio apreciable. La importancia o interés de la relación puede exigir un preaviso adecuado. En ciertos contratos la ley lo fija. Esta previsión normativa del término mínimo se entiende por el efecto extintivo al*



República de Colombia
Corte Suprema de Justicia
Sala de Casación Civil

*vencimiento del término. ... Se pregunta si, a falta de una previsión legal específica, la parte puede igualmente contar con la posibilidad de desistir del contrato de ejecución sucesiva o periódica. La respuesta debe ser negativa si el contrato tiene un término de duración establecido por las partes o establecido de cualquiera otra forma, si, por el contrario, el contrato no tiene duración mínima, o si el término de duración ya se superó, se considera que cada una de las partes está en libertad de desistir, dejando a salvo, el respeto del principio de la buena fe. La inercia de las partes después del vencimiento del término puede comportar, según la previsión de la ley, la renovación del término"; "El desistimiento ordinario, convencional o legal, es un poder arbitrario que la parte puede ejercer libremente sin que sea necesario dar una justificación, en el respeto, claro está, del principio de buena fe. Del desistimiento ordinario se debe diferenciar el desistimiento por justa causa, que constituye, propiamente, un remedio extrajudicial de resolución del contrato por incumplimiento. En veces, el desistimiento o revocación puede prever una prestación a cargo de quien desiste, multa penitencial, arras penitenciales"* (C. Massimo Bianca, *Derecho Civil* 3, *El contrato*, trad. esp. Fernando Hinestrosa y Édgar Cortés, 3ª. Universidad Externado de Colombia, Bogotá, 2007, pp. 761 y ss).

Por otra parte, en el tráfico jurídico contemporáneo contractual, son frecuentes las cláusulas resolutorias expresas o de terminación *ipso jure* sin requerir declaración judicial y por decisión unilateral de una parte.

A este respecto, todo contrato, cualquiera fuere su tipología o naturaleza concreta, y en particular, los de ejecución sucesiva, sea a plazo determinado, sea a término indefinido, obliga a las partes a cumplirlo de buena fe durante el plazo fijo o indefinidamente si no lo tiene, y en el de prestaciones correlativas, el incumplimiento o renuencia injustificada, legitima a la parte



cumplida o presta a cumplir para exigir judicialmente el cumplimiento o la resolución con indemnización de perjuicios, o sea, la prestación *in natura* o el subrogado pecuniario con la reparación íntegra de daños (artículos 1546 y 1930, C.C. y 870 C. de Co), en cuyo caso, la resolución debe decretarse judicialmente, genera su terminación, y por lo tanto, la cesación de sus efectos vinculantes a partir de su decreto con la restitución de cosas al estado anterior, las partes se liberan del compromiso y han de restituir lo dado, entregado o ejecutado, salvo aquellas situaciones consumadas no susceptibles de deshacer, en particular, en los contratos de ejecución sucesiva, evento en el cual se produce hacía el futuro (*ex nunc*) sin afectar el pasado (*ex tunc*).

Al lado de la condición resolutoria tácita, las partes pueden estipular *expressis verbis* la condición resolutoria expresa.

Las cláusulas resolutorias expresas, según denota la expresión, resuelven, y por tanto, terminan el contrato. Las más usuales conciernen al incumplimiento de obligaciones precisas y confieren a la parte cumplida o presta al cumplimiento el derecho a terminarlo por decisión autónoma y potestativa en cuanto su ejercicio depende de la exclusiva decisión de la parte interesada cuando se verifica. Sin embargo, la cláusula resolutoria también podrá referir a hipótesis diferentes al incumplimiento.

El pacto comisorio (*Lex Commissoria*), es modalidad concreta de condición resolutoria expresa. Específicamente, el artículo 1937 del Código Civil regula el pacto comisorio calificado, por el cual, "*se estipula que por no pagarse el precio convenido se resuelve ipso facto el contrato de venta*", pero el "*comprador podrá, sin embargo, hacerlo subsistir, pagando el precio lo más*



*tarde en las veinticuatro horas subsiguientes a la notificación judicial de la demanda"* (art. 406, C. de P.C.), hipótesis singular de condición resolutoria expresa circunscrita al incumplimiento del comprador en el pago del precio, a diferencia de la tácita por el de cualquier parte, obligación y contrato de prestaciones correlativas, así como de la expresa por la inobservancia de una o ambas partes a alguna de las obligaciones distintas especificadas.

Tratándose de pacto comisorio calificado la resolución no opera *ipso iure* o de pleno derecho y exige declaración judicial. Otro tanto, acontece en presencia de condición resolutoria tácita. Sin embargo, el pacto comisorio calificado confiere a la parte respectiva la posibilidad de cumplir en el término legal evitando la resolución del contrato, y de no purgar la mora, la ventaja de generarla sin necesidad de analizar la gravedad e injusticia del incumplimiento. Aun cuando el pacto comisorio calificado está previsto en la ley para el contrato de compraventa, ninguna norma excluye o prohíbe pactarlo en otros contratos de prestaciones correlativas, ni ello quebranta el orden público o las buenas costumbres.

La condición resolutoria resuelve el contrato y, en línea de principio requiere declaración judicial.

Empero, en las "*cláusulas resolutorias expresas*" y de terminación unilateral del contrato por motivos distintos al pacto comisorio calificado, cuyas causas también pueden ser diversas al incumplimiento, la ley o las partes, pueden prever la terminación *ipso jure* sin necesidad de declaración judicial *ex ante*. En esta eventualidad, la condición resolutoria expresa se pacta como un derecho para resolver o terminar el contrato por acto de parte



República de Colombia

Corte Suprema de Justicia
Sala de Casación Civil

interesada, autónomo, independiente y potestativo, porque podrá ejercerlo o abstenerse de hacerlo.

De por sí, función primordial de estas estipulaciones, es terminar el contrato por declaración unilateral de una parte, ya por incumplimiento, ora conveniencia, oportunidad u otras razones legítimas, bien por las causas disciplinadas en la ley o el contrato (terminación unilateral por causa justa del contrato de agencia), bien excepcionalmente *ad nutum* (revocación del seguro, arras penitenciales, retro-venta, retro-compra, contrato individual de trabajo con período de prueba, receso en contratos de consumo, etc.), sea después de preaviso (arrendamiento, suministro - artículo 973, párrafo segundo, C. de Co), sea en forma automática o *in continenti* (mandato, depósito, mutuo).

La cláusula resolutoria expresa por la cual se estipula la terminación unilateral *ipso jure* del contrato, es elemento accidental (*accidentalia negotii*), presupone pacto expreso, claro e inequívoco de las partes, y en principio, se estima ajustado a derecho, válido y lícito (cas. civ. sentencias de 31 de mayo de 1892, VII, 243; 3 de septiembre de 1941, LII, 1966, 36 y ss; 23 de febrero de 1961, XCIV, 549) pero susceptible de control judicial posterior, en su origen, contenido y ejercicio.

La eficacia de las cláusulas resolutorias expresas por incumplimiento, exige acatar íntegros los presupuestos genéricos de validez, la indicación particular, clara y precisa de la obligación u obligaciones cuya inobservancia relevante, total o parcial (SNG, sentencia de 29 de abril de 1935), faculta a una o ambas partes la terminación unilateral del contrato. No basta mención o referencia abstracta, global, genérica o en bloque.



Menester, singularizar, precisar, especificar, concretar e individualizar en forma clara y expresa, la obligación, sea legal o contractual, ya principal o accesoria, como corresponde a lo expreso y a la trascendencia del incumplimiento. Igualmente, para preservar la simetría, paridad o equilibrio objetivo de las partes, la buena fe, lealtad y evitar abusos, la eficacia de estas cláusulas se subordina a la reciprocidad de la facultad para ambas partes o, estipulada para una, a un preaviso razonable de quien la ejerce dando a conocer a la otra el incumplimiento preciso, su derecho a subsanarlo antes de vencer el término y la terminación al expirar cuando no rectifica su conducta según corresponde a la probidad o corrección exigible, el principio de la conservación del acto, su utilidad y la gravedad de aquél.

Desde esta perspectiva, la terminación por cláusula resolutoria expresa por incumplimiento obligacional, no implica derecho alguno a tomar justicia por mano propia, ni deroga la jurisdicción.

*Prima facie* la terminación unilateral por cláusula resolutoria expresa, está reservada estrictamente a la parte cumplida o presta a cumplir, pues repugna a claros dictados éticos que, la incumplida o renuente al cumplimiento, pretenda favorecerse con su propio incumplimiento. De igual manera, su ejercicio presupone un incumplimiento cierto, ostensible, evidente e incontestable de las obligaciones individualizadas, no de otras, y de tal gravedad, magnitud, relevancia, significación o importancia, por cuanto no cualquier inobservancia de los deberes de conducta justifica la resolución. Tampoco esta facultad, y ninguna otra en general, podrá ejercerse en forma contraria a la buena fe o con



abuso del derecho. Asimismo, la eficacia y el ejercicio de esta prerrogativa, es controlable por los jueces, sin excluir el derecho fundamental de acceso a la administración de justicia para definir toda disputa, diferencia o controversia a propósito.

La terminación unilateral del contrato por cláusula resolutoria expresa, estructura declaración dispositiva recepticia, análoga al preaviso para terminar los contratos de duración indefinida o enervar las prórrogas automáticas pactadas en los de duración definida, por cuanto debe comunicarse a la otra parte, quien podrá protestar la causa invocada, el ejercicio abusivo o contrario a los dictados de la buena fe, por infundada intempestiva o ilegitima, e incluso su improcedencia por la tolerancia, purga o condonación, o también reconocer la falta.

4. Al ejercerse la facultad de terminación unilateral termina el contrato *ipso jure* sin intervención judicial. No obstante, existiendo disputa, las partes pueden acudir a la jurisdicción, lo que descarta tomar justicia por mano propia.

Pertinente dejar sentado que la posibilidad reconocida por el orden jurídico a las partes para disponer la terminación unilateral del contrato por las causas y modalidades legales o contractuales (retracto, revocación, renuncia, denuncia de contrato a término indefinido, desistimiento unilateral, cláusulas resolutorias expresas o de terminación unilateral, o *in continenti,* etc.), no conceden derecho alguno ni equivalen a tomar justicia por mano propia, menos excluyen el derecho fundamental de acceso a la jurisdicción para decidir toda diferencia en torno a su eficacia, y ejercicio sin descarrío ni abusos.



República de Colombia

Corte Suprema de Justicia
Sala de Casación Civil

Por lo tanto, todas las controversias a propósito de la eficacia de estas estipulaciones o el ejercicio de la prerrogativa legal o contractual, legitiman a las partes para acudir a los jueces competentes, a quienes corresponde su conocimiento y decisión definitiva.

Al respecto, la estipulación podrá contrariar una norma imperativa, resultar abusiva, comportar el ejercicio de posición dominante contractual, abuso del derecho, vulneración de la confianza legítima, el acto propio (*venire contra factum propium*) o la buena fe, o incluso una conducta formalmente ajustada al ordenamiento jurídico o al contenido de la estipulación de terminación unilateral valorada en el marco fáctico concreto de circunstancias, puede devenir abusiva e ilegítima, o en las *ad nutum*, configurar ejercicio disfuncional, por ejemplo, para inferir intencionalmente un daño, aspectos que en función de la justicia, imponen cuidadoso examen del marco de circunstancias fáctico por los jueces dentro de su autonomía hermenéutica y la discreta valoración de los elementos de convicción.

El abuso del derecho, y en particular, la buena fe, son parámetros limitativos y correctores de la libertad contractual, y por ende, ostentan particular relevancia en estos aspectos.

La jurisprudencia, reconoce en precisas circunstancias que el ejercicio de la facultad de terminación unilateral, no configura de suyo un abuso de derecho (artículo 830, C. de Co), sin sentar una directriz general inflexible ni descartarlo *a priori,* por cuanto, podrá ser abusiva, y por regla general, en los casos legales o contractuales, la parte puede terminar el contrato con sujeción a la corrección, lealtad, buena fe y recto ejercicio de los



derechos, pero en lo "*...contractual tiene cabida el abuso del derecho..*", y puede "*...presentarse en la formación del contrato, en su ejecución, en su disolución y aún en el periodo post-contractual*" (LXXX, 656; cas. civ. sentencias de 6 de diciembre de 1899, XV, 8; sentencia de 6 julio de 1955, LXXX, 656; 11 de octubre de 1973, CXLVII, 82; 19 de octubre de 1994, exp. 3972), de donde, en armonía con el artículo 95 de la Constitución Política, según el cual, todas las personas están obligadas a "*[r]espetar los derechos ajenos y no abusar de los propios*", deben "*entenderse las cláusulas convencionales o las regulaciones legales o constitucionales permisivas de la terminación unilateral del pacto respectivo, debido a que ellas no pueden interpretarse a distancia del postulado de que se viene hablando, como quiera que exigen ser observadas a través de su propio prisma, ante la posibilidad de que en ejercicio de esa facultad se incurra en violación del derecho ajeno; ello supone entonces que deben apreciarse bajo el entendido de que su actividad no puede ser causa de daño a quienes han contratado con el agente, salvo, claro está, que exista razón que lo justifique, como sucedería, verbi gratia, cuando el comportamiento del contratista, dada su falta de honradez o inteligencia, lo imponga*" (cas. civ. sentencia de 16 de septiembre de 2010, exp. 11001-3103-027-2005-00590-01).

A esta directriz, se sujetan las prerrogativas *ad nutum, ad libitum* o a arbitrio, en cuyo ejercicio el titular no es ajeno "*al inexorable y plausible deber constitucional y legal de no abusar de sus derechos (arts. 95,1 C.P. y 830 C.Co), habida cuenta que el reconocimiento de una facultad o poder, de por sí, no constituye salvoconducto o patente de corso para propiciar la arbitrariedad, so pena de la condigna indemnización de los perjuicios irrogados.*

*Es por ello por lo que el abuso, en sí, trasciende al mero o a la simple volición"* (cas. civ. sentencia de 14 de diciembre de 2001, exp. 6230).

En consecuencia, todas las expresiones específicas de terminación unilateral del contrato, el ejercicio del derecho potestativo, incluso discrecional, se rigen por los principios de la buena fe, evitación de abuso del derecho y está sujeto a control judicial, lo cual suprime la justicia privada por mano propia. La buena fe y el abuso del derecho, constituyen límites al pacto y ejercicio de estas facultades.

5. A título de colofón, en rigor, el contrato desde su existencia tiene fuerza obligatoria, es irrevocable y las partes deben cumplirlo de buena fe, sin que, por regla general, una vez celebrado, puedan por acto unilateral dejarlo sin efecto ni sustraerse al vínculo, so pena de incumplimiento e indemnizar los daños causados.

La fuerza normativa del contrato y el deber legal de su cumplimiento por las partes, es el principio y la regla. Ninguna, puede sustraerse unilateralmente so pena de incumplimiento y comprometer su responsabilidad. La terminación unilateral del contrato, en cualquiera de sus expresiones, es la excepción.

En específicas hipótesis y bajo determinado respecto, la ley o el contrato, autorizan a una o ambas partes terminarlo por decisión unilateral, ya justificada, motivada o con causa justa, ora *ad nutum*, discrecional, sin justificación o motivación, con preaviso o sin éste, conforme a las previsiones normativas, en cuyo caso,

es causa de terminación del contrato, prevista en éste (*accidentalia negotii*) o en la ley (*esentialia* o *naturalia negotii*).

La Sala concluye a este propósito, la singular previsión normativa o, por uso, costumbre o práctica negocial, de la terminación unilateral del contrato, la ausencia de expresa prohibición legal abstracta y la autoridad o legitimación de las partes en ejercicio de la libertad contractual para acordarla, conformemente a sus necesidades, conveniencia, designios, naturaleza de los intereses disponibles, el orden público, las buenas costumbres, función práctica económica o social útil, relatividad de los derechos, paridad, buena fe, lealtad y corrección exigibles.

Empero, se itera, la terminación unilateral del contrato, es excepcional, requiere texto legal o contractual expreso, excluye analogía *legis* o *iuris,* debe aplicarse e interpretarse estrictamente, y cuando su origen es negocial, las partes en desarrollo de la autonomía privada pueden acordarla sujetas al ordenamiento, normas imperativas, *ius cogens,* buenas costumbres, simetría, equilibrio o reciprocidad de la relación, sin abuso de índole alguna, en los casos y contratos en los cuales la ley no la prohíba o excluya.

En los de duración definida, el plazo obliga a las partes, ninguna, por regla general, puede terminar el contrato; una y otra, antes del término pueden extinguirlo por mutuo consenso o, la ley o el pacto, autorizar a una o una ambas para hacerlo *ex ante tempus* por decisión unilateral; la verificación del plazo consuntivo, aniquila el contrato, el cual ya no existe más, hace incompatible e impide otro medio extintivo, en particular, el



acuerdo extintivo y la terminación unilateral; la cláusula de renovación o prórroga automática del plazo por otro igual al inicial, no convierte ni transforma el contrato de duración definida en indefinida, el cual subsiste idéntico si se trata de la última o, con modificación de su contenido en la primera, excepto en el plazo, y aún las partes tienen el derecho potestativo a denunciar o no continuar el contrato a la finalización del término inicial o el de la prórroga en ejecución, con el preaviso pertinente, evitando su prolongación intemporal.

En los contratos de indefinida duración, la terminación unilateral, es elemento del contrato por ley, uso, costumbre o estipulación contractual, deriva de la naturaleza de las cosas o el advenimiento de hechos graves ulteriores, y tales contratos como dijo el *ad quem,* salvo expresa norma legal contraria, pueden terminar por denuncia de una de las partes con preaviso por el tiempo normativo, contractual o razonable, pues terminan por causas legales o contractuales, no son perpetuos, eternos o que nunca concluyen, por ello prohibidos al contrariar el orden público de la Nación por suprimir en forma absoluta intemporal la libertad contractual.

La lealtad, corrección, probidad, buena fe y el abuso del derecho, son parámetros restrictivos y correctores de la autonomía privada.

La buena fe y la proscripción de abuso, constituyen constantes en la formación, celebración, desarrollo, ejecución e interpretación del acto, a punto de ser instrumentos valiosos para controlar el negocio jurídico y el ejercicio de las facultades de



terminación unilateral, legales o negociales, en función del justo equilibrio y proporción según el contrato y la solidaridad social.

El abuso, conducta disfuncional en beneficio exclusivo del titular y sacrificio desproporcionado de la contraparte, altera la función objetiva y esquema estructural del derecho.

El juzgador, debe actuar para impedir la consecución o conservación de la asimétrica ventaja, a la luz de los principios constitucionales, legales, función social, la ausencia de derechos absolutos, correlación del poder conferido, ejercicio y su función.

La terminación unilateral en cualquiera de las formas o modalidades, no puede ejercerse con abuso, ni de mala fe, so pena de comprometer la responsabilidad, y en toda controversia respecto de la eficacia o el ejercicio de la facultad, los jueces deben tener especial rigor en la valoración específica del marco concreto de circunstancias para garantizar la justicia al *sujeto iuris,* razón de ser, fundamento genuino, fin primario y último del Estado social de derecho democrático.

6. Sentadas las premisas anteriores, el juzgador de segunda instancia, en lo medular, estimó menester interpretar los contratos, en especial la cláusula quinta, a cuyo tenor "*el contrato tendrá una duración mínima efectiva de un (1) año calendario que se computará desde la firma de este documento por las partes. No obstante, quedará renovado en forma automática por períodos iguales al inicialmente pactado si las partes no han acordado con antelación mínima a su vencimiento de treinta (30) su terminación y siempre y cuando no se haya presentado causal de terminación unilateral del contrato y por ende desvinculación del automotor*",



por divergir las partes en su recta inteligencia, el demandante argumentado sobre el texto literal, el plazo de los treinta días previos a la duración inicial para la terminación consensuada, en cuyo defecto, quedan renovados automáticamente por igual período, y la demandada, como un preaviso en el cual una puede expresar a la otra su decisión de no terminarlos evitando la renovación.

Por lo anterior, precisó la diferencia litigiosa "*sobre la manera de terminar los contratos para que éstos no se prorroguen automáticamente por un término igual al mínimo pactado*", juzgándolo acordado "*para anunciar el deseo de no continuar con la vigencia de los mismos y, por lo tanto, para hacer saber al otro contratante el deseo de desvincular los automotores de la empresa*", y sin descartar la libertad de estipular el plazo para la terminación por acuerdo, soportó su raciocinio interpretativo, en lo inútil de ese sentido porque las partes en cualquier época pueden terminar de consuno los contratos, la renuncia o disposición por acto único anticipado de la libertad contractual futura a que conduciría admitirla, la extinción del pacto al capricho o voluntad de un contratante, quien puede negar su consenso prolongándolo a perpetuidad en menoscabo del otro, el interés general, la competencia, circulación y el aprovechamiento de los bienes o servicios en el mercado, mientras la utilidad práctica, las reglas de experiencia y generalidad de las legislaciones establecen tiempos para anunciar la terminación por una parte a la otra, no para acordarla, y en los de ejecución sucesiva, continúa o periódica, es elemento natural el derecho a disolverlos por acto unilateral, con los límites de la buena fe.



La censura, en compendio, reprocha al Tribunal, por interpretar la cláusula quinta sin ninguna discrepancia sobre su entendimiento claro, exacto, nítido, expresivo, minucioso del designio de las partes al celebrar un contrato durable con cláusula de permanencia, cuya nota sobresaliente es la renovación, la terminación por consenso, nunca por "*desistimiento unilateral*", confundir lo "*inútil con lo inconveniente*" cuando los contratos de larga duración repudian la terminación unilateral mientras nada extraordinario o imprevisto acontezca, la facultad no puede ser omnímoda, sin razón valedera, ni motivo, aunque puede darse uno u otro caso, a más de su origen legal o negocial, naturaleza excepcional, no tan demasiado natural, y aún considerada por elemento natural en los contratos de duración, cabe rechazar su ejercicio "*a troche y moche*", máxime si en el caso, se ejerció sin motivo, vindicativamente, con móvil doloso y abuso del derecho, el contrato lo redactó la demandada, la ambigüedad de existir actúa en su contra, por todo lo cual, desconoció la autonomía de la voluntad, la fuerza obligatoria del contrato, las reglas de interpretación, a cambio de interpretar sustituyó y reglamentó, e incurrió en los errores fácticos y de derecho denunciados en la interpretación de los contratos y de otras pruebas.

Al margen del cuestionamiento bajo la perspectiva de la vía indirecta a los poderes legales del juez en la interpretación del contrato, o a la dicotomía entre interpretar y reglamentar, o la atinente a la consideración del juzgador respecto del desistimiento unilateral como elemento natural del pacto, asuntos estrictamente jurídicos, a no dudarlo, la controversia radical planteada entre las partes, comprende el entendimiento prístino de la cláusula quinta de los contratos, según observó certeramente el Tribunal, por cuanto para el demandante la sociedad demandada los incumplió



República de Colombia

Corte Suprema de Justicia
Sala de Casación Civil

al terminarlos unilateral e inconsultamente, mientras ésta invocó el ejercicio de una facultad para enervar la renovación o prórroga mediante preaviso en los treinta días anteriores a la expiración del plazo inicial ("*desistimiento unilateral*"), a lo cual se opone aquélla, por preverse el plazo para acordar la terminación.

El Tribunal, cumple advertir, fundó su razonamiento hermenéutico delanteramente en la libertad de contratación.

Al respecto, juzgó contrario a derecho, el pacto anticipado de renuncia o compromiso de la libertad contractual a futuro, a lo que conduce admitir como único modo de extinción la terminación consensuada, porque por esta vía, al exigirse el consentimiento de las partes, una puede rehusarlo prolongando al infinito la relación contractual en notorio detrimento de la otra, la economía, el mercado y la libertad, argumento toral que lo llevó a desestimar el acuerdo mutuo por único mecanismo para terminar la relación, también por la utilidad y función de la cláusula, según las reglas de experiencia, sentido común y la regulación normativa comparada.

Tal interpretación, no luce descabellada, está dentro del discreto laborío hermenéutico del juzgador y la sugerida por el censor no es la única e implicaría como dijo el fallo opugnado que los contratos del litigio con cláusulas de renovación o prórroga automática terminarían sólo por mutuo acuerdo de las partes en el término antelado de los treinta días anteriores al vencimiento de la duración inicial, y de no darse el consenso, quedarían sucesiva e indefinidamente prorrogados por igual término hacía al infinito.



República de Colombia

Corte Suprema de Justicia
Sala de Casación Civil

La estipulación con esta orientación, en verdad carece de sentido, pues la terminación por "*mutuo disenso*" puede darse en cualquier momento anterior al vencimiento del plazo inicial o después de la prórroga automática, no necesariamente dentro de los treinta días antelados.

Por demás, el plazo extintivo y el acuerdo extintivo, son simultáneamente incompatibles, por cuanto en línea de principio la simple llegada del término consuntivo extingue el contrato, y terminado, nada hay por terminar, ni por acuerdo mutuo, ni por decisión unilateral, de donde la estipulación envolvería de suyo una contradicción, porque el contrato nunca acabaría al vencer el plazo sino por consenso recíproco extintivo.

En idéntico sentido, no es errónea la estimación del fallador al ver en los contratos a plazo definido con prórrogas automáticas, precisamente para diferenciarlos de los pactos perpetuos, conforme a la doctrina y legislación comparadas, el derecho para ambas partes a no continuarlos, a la expiración del término inicial, o de la prórroga en curso, ejerciéndolo dentro del plazo de preaviso legal, negocial, usual o razonable, que algunas opiniones nominan "*desistimiento unilateral*".

Por lo tanto, entendida la cláusula como sugiere la censura, esto es, en cuanto exige el mutuo acuerdo dentro del plazo perentorio de los treinta días anteriores al vencimiento de la duración inicial o de su prórroga, la vigencia del contrato y su terminación se supedita al consenso, bastando la negativa de una de las partes para la renovación o prórroga automática, sucesiva e intemporal, y socavando el artículo 1620 del Código Civil, en punto a que "*[e]l sentido en el que una cláusula puede producir*

*algún efecto, deberá preferirse a aquel en que no sea capaz de producir efecto alguno*", pues, tiene dicho la Sala, "*si la interpretación de una cláusula puede aparejar dos sentidos diversos, uno de los cuales le restaría -o cercenaría- efectos, o desnaturalizaría el negocio jurídico, dicha interpretación debe desestimarse, por no consultar los cánones que, de antiguo, estereotipan esta disciplina*" (cas. civ. sentencia de 28 de febrero de 2005).

*Ex* abundante jurisprudencia, ha señalado la Sala:

*"1. Interpretar, estricto sensu, es auscultar, desentrañar, precisar y determinar el sentido jurídicamente relevante del negocio (cas. agosto 27/1971 y julio 5/1983) el alcance de su contenido (cas. diciembre 10/1999, exp. 5277) y la identificación de los fines perseguidos con su celebración para imprimirle eficacia final (cas. febrero 18/2003. exp. 6806).*

*"Por lo mismo, la interpretación se predica de los negocios jurídicos existentes, es ulterior a la existencia del acto dispositivo y, en rigor, consiste en establecer y precisar la relevancia normativa de su sentido conformemente a la 'recíproca intención de las partes' (art. 1618 C.C.), de ordinario plasmada en las cláusulas, párrafos, condiciones o estipulaciones, a las cuales, sin embargo, no se reduce ni supedita, por cuanto, aun siendo 'claro' el sentido idiomático, literal o textual de las palabras, en toda divergencia a propósito, impónese reconstruirla, precisarla e indagarla según el marco de circunstancias, materia del negocio jurídico, posición, situación, conocimiento, experiencia, profesión u oficio de los sujetos, entorno cultural, social, económico, político, geográfico y temporal en una perspectiva retrospectiva y prospectiva, esto es, considerando además de la celebración, ejecución y conducta práctica negocial, la fase prodrómica, de gestación o formación teniendo en cuenta que '...los actos, tratos o conversaciones preliminares enderezados a preparar la producción de un consentimiento contractual no son intrascendentes; por el contrario, una vez formado el consentimiento son parte integrante de él, y su importancia se traduce en servir de medios auxiliares para interpretar la verdadera intención de las partes, cristalizada en las cláusulas del contrato' (cas. civ. junio 28/1989).*

*"De otro lado, la interpretación del negocio jurídico, es necesaria no sólo respecto de cláusulas oscuras, ambiguas,*



*imprecisas, insuficientes e ininteligibles, antinómicas y contradictorias o incoherentes entre sí o con la disciplina normativa abstracta o singular del acto, sino también en presencia de estipulaciones claras o diáfanas (in claris non fit interpretatio) y aún frente a la claridad del lenguaje utilizado, cuando las partes, una o ambas, le atribuyen un significado divergente, no siendo admisible al hermeneuta restringirse al sentido natural u obvio de las palabras, a la interpretación gramatical o exegética, al escrito del acto dispositivo documental o documentado 'por claro que sea el tenor literal del contrato' (cas. civ. agosto 1/2002, exp. 6907), ni 'encerrarse en el examen exclusivo del texto del contrato...' (cas.civ. junio 3/1946, LX, 656).*

*"Naturalmente, la claridad del articulado o su significación lingüística, no exceptúa el deber de precisar la finalidad común convergente de las partes, pues la particular relevancia dinámica de la hermenéutica del negocio jurídico, se explica ante la imposibilidad pragmática de prever toda contingencia, el significado disímil de la terminología, lenguaje o redacción y no se reduce a hipótesis de ambigüedad, insuficiencia, disfunción u oscuridad, siendo pertinente en todo caso de disparidad, divergencia o diferencia respecto de su entendimiento recíproco (cas. civ. de 1 de agosto de 2002 exp. 6907).*

*"Por supuesto, la labor del juez no se orienta a enervar, reemplazar o suplantar la autoridad del dominus negotti, ni a modificar, eclipsar, adulterar o desvirtuar sus estipulaciones (cas. marzo 27/1927), está ceñida a 'la fidelidad' del pacto (cas. agosto 27/1971, CCLV, 568) y 'a la consecución prudente y reflexiva' del sentido recíproco de la disposición (cas. agosto 14/2000, exp. 5577). Empero, el rol interpretativo del juzgador no es de mero reproductor del contenido negocial, la exégesis de su sentido, ni se encamina exclusivamente a explicitar el querer de las partes como si fuera un autómata.*

*"Más concretamente, la actividad hermenéutica del juzgador no es estática, el ordenamiento jurídico le impone ex autoritate el deber de decidir las controversias buscando el resultado concreto perseguido por las partes con la celebración del negocio jurídico en coherencia con su 'contenido sustancial', utilidad práctica, esencial, 'real' y funcional (Massimo BIANCA, Diritto Civile, Tomo 3, Il contrato, Dott. A. Giuffré Editore, S.p.A. Milán, 1987, Ristampa, 1992, pp. 379), para lo cual, sin alterar, sustituir ni tergiversar lo acordado, debe intervenirlo efectuando un control eficaz e idóneo, incluso corrector, para determinar su relevancia final o efectos definitivos conforme a los intereses sustanciales, el tipo específico, su función y la preceptiva rectora, en general y, en particular.*

*"Con referencia a la común intención, el legislador impone la regla de no limitarse al sentido literal, esto es, al significado*



*gramatical o semántico natural del vocablo utilizado, sea en el contexto general del contrato, sea en el contexto específico de cada palabra, sea en su expresión textual y literal o en su conexión sintáctica por elementales márgenes de disimilitud, ambigüedad u oscuridad semántica, trascendiendo la esfera del simple motivo (interpretación subjetiva), del escrito y la actuación (interpretación objetiva), para lo cual, el juez, sin restringirse a un subjetivismo puro o estricto, de suyo, intrascendente in menta retenta, indagará desde su fase genética in toto el acto dispositivo, la conducta previa, coetánea y ulterior de las partes inserta en la época, lugar y medio predeterminado, verificará su conformidad o desavenencia con el ordenamiento y precisará sus efectos, o sea, la relevancia jurídica del sentido de la communis intentio, locución referida ab initio a la concepción eminentemente voluntarista del negocio jurídico a speculum como acto de 'voluntad interna', ora 'declarada' (cas. mayo 15/1972 '...entre los contratantes debe prevalecer la voluntad real sobre la declarada' y agosto 1/2002, exp. 6907, 'es la voluntad interna y no la declarada la que rige la hermenéutica contractual'), ya 'manifestada', bien de 'voluntad objetiva' (cas. civ. enero 29/1998) y, más próxima, aunque del todo no exacta, al 'acto de autonomía privada' (cas. mayo 21/1968), cuyo alcance es menester subiecta materia en una perspectiva más concorde con sus diversas expresiones y, en particular, con la función práctica o económica social, o sea, en consonancia a la función coordinada, coherente, racional y convergentemente perseguida por las partes con su celebración. (cas. civ. junio 12/1970, cas. civ. sentencia de 14 de enero de 2005, exp. 7550), Sentencia de 3 de junio de 1946. Gaceta Judicial LX, 656).*

*"Es menester, por tanto, denotar la inteligencia de la expresión communis intentio acorde a los principios informadores del sistema jurídico para atribuirle un significado real, coherente y compatible con el contexto histórico actual, particularmente, en consideración a la función práctica o económica social procurada por las partes con la celebración del negocio jurídico, correspondiendo al juzgador determinarla in casu partiendo y yendo más allá de lo estipulado, esto es, sin limitarse al sentido literal de las palabras escritas, ni aún si no ofrecen motivo de duda, tanto más por el carácter prevalente de la recíproca intención respecto del clausulado y su significado natural, el cual, podrá infirmarla in radice.*

*"En sentido análogo, los cánones hermenéuticos de la lex contractus, comportan el análisis in complexu, sistemático e integral de sus cláusulas 'dándosele a cada una el sentido que mejor convenga al contrato en su totalidad' (art.1622 C.C.), plenitud e integridad y no el de uno de sus apartes o segmentos (Tota in toto, et tota in qualibet parte), según de vieja data postula la Corte al destacar la naturaleza orgánica unitaria, compacta y articulada del acto dispositivo 'que por lo regular constituye una unidad y en consecuencia sus estipulaciones deben apreciarse en forma*



*coordinada y armónica y no aislando unas de otras como partes autónomas' (cas. civ. 15 de marzo de 1965, CXI y CXII, 71; 15 de junio 1972, CXLII, 218; sentencia de 2 de agosto de 1935, Gaceta Judicial XLII, pág. 3437, 7 de octubre de 1976).*

*"En la búsqueda del designio concurrente procurado con el pactum, se confiere singular connotación a la conducta, comportamiento o ejecución empírica significante del entendimiento de los sujetos al constituir de lege utenda una 'interpretación auténtica que le imprime vigor al real sentido del contrato por la aplicación práctica que las partes han hecho del mismo' (art. 1622, C.C. cas. civ. S-139-2002 [6907], agosto 1/2002 reiterando cas. octubre 29/1936, XLIV, 456).*

*"Con referencia a la directriz de especificidad, coherencia, racionalidad y razonabilidad hermenéutica, '[p]or generales que sean los términos de un contrato, sólo se aplicarán a la materia sobre que se ha contratado' (art. 1619 C.C.), sin limitarla al caso enunciado 'excluyendo los otros a que naturalmente se extienda' (art. 1623 C.C.) ni ampliarla a otros (Iniquum est perimi pacto, id de quo cogitatum non est) y la identidad de los términos o expresiones imponen un sentido idéntico o idéntica conclusión, debiéndose estar en cuanto no exista decisión contraria 'a la interpretación que mejor cuadre con la naturaleza del contrato' (art. 1621 C.C.) en las cuales se entienden incluidas las 'cláusulas de uso común' (naturalia negotia por uso) y frente a estipulaciones polisémicas, dicotómicas o patológicas '[e]l sentido en que una cláusula puede producir algún efecto, deberá preferirse a aquel en que no sea capaz de producir efecto alguno' (art. 1620 C.C.), privilegiándose la conservación del negocio jurídico, la utilidad respecto de la irrelevancia y la eficacia sobre la ineficacia del acto (effet utile, res magis valeat quam pereat).*

*"De esta forma, cuando la estipulación admite diversos significados prevalece el sentido racional coherente con la función práctica o económica de los intereses dispositivos, por lo común, dignos de tutela y reconocimiento normativo (art. 1620 C.C.) y la inherente a la regularidad del acto dispositivo respecto de su ineficacia o invalidez, in favorem validitatis pacti, y en 'casos ambiguos, lo más conveniente es aceptar que la cosa de que se trata más bien sea válida que no que perezca' (Juliano, Quoties in actionibus aut in excepcionubus ambigua oratio este, commodissimum est, id accipi, quo res, de qua agitur, magis valeat quam pereat), siempre del modo 'que el acto sea válido' (Dicio, Interpretatio fieri debet semper ut actus valeat) y a favor de la validez (Actus intelligendi sunt potius ut valeant quam ut pereant, o Interpretatio fieri debet semper ut actus valeant). Por ende, frente a diversas interpretaciones prevalece la que preserve la inteligencia más concorde con el acto, su relevancia y función (Quoties idem*

*sermo duas sententias exprimit, ea potissimum accipienda quoe gerendae aptiorest).*

*"En efecto, consistiendo el negocio jurídico y, más concretamente el contrato, en un acuerdo dispositivo de intereses, es elemental la 'regulae', 'principiee' o 'principia' de su utilidad y eficacia, en tanto sus autores lo celebran para el desarrollo de concreta función práctica o económica social y bajo el entendimiento recíproco de su utilidad y eficacia. Con esta inteligencia, el hermeneuta preferirá la interpretación más conveniente al efecto útil del acto respecto de aquél en que no lo produzca (Utile per inutile non viatiatur), tanto cuanto más por la relevancia abstracta del negocio, las cargas de la autonomla privada, en particular, las de legalidad, previsión, sagacidad, corrección, buena fe, probidad y el principio de cooperación negocial que imponen a las partes desde el iter negotti la carga de conocer, respetar y aplicar la disciplina normativa (ignoranti legis non excusat), evitar causas de irrelevancia e ineficacia y colaborar armónicamente en la integración y regularidad del acto.*

*"En singular, el deber de probidad y la cláusula general de corrección se concretiza en un comportamiento razonablemente idóneo, para prevenir y corregir toda conducta incorrecta con una actuación prístina orientada a la realización de los fines inherentes a la contratación, regularidad y certidumbre del tráfico jurídico. Por ello, se impone un deber de diligencia a los contratantes y, en su caso, de advertencia, comunicación e información de condiciones cognoscibles, asumiendo cada parte en interés recíproco una carga respecto de la otra en lo concemiente a la plenitud del acto, la realización de su función y la evitación de causas de ineficacia o irrelevancia.*

*"Y, así ha de procederse, no sólo por la naturaleza impegnativa del contrato, sino porque, además la recíproca intención de las partes está presidida razonablemente por el propósito común de obtener sus resultados prácticos concretos y, por consiguiente, su realización, cumplimiento y eficacia, en tanto una suposición contraria, esto es, la celebración del acto para que no produzca efecto alguno por ineficacia, invalidez u otras causas, conduciría al absurdo de la negación misma del negocio jurídico y al inadmisible patrocinio de conductas contrarias al ordenamiento.*

*"Adviértase que las partes al celebrar un contrato razonablemente desean, quieren o procuran su eficacia y, por ende, el juez deberá preferir en toda circunstancia la consecuencia relativa a la preservación del mismo, porque, se itera, sería absurdo siquiera suponer la celebración de un contrato para que no produzca efecto alguno cuando las partes, por principio, lo hacen bajo la premisa cardinal de su cumplimiento y eficacia. Por lo mismo, a efectos de asegurar esta finalidad convergente, naturalmente perseguida con el*



*pactum, las partes, contraen la carga correlativa de evitar causas de ineficacia del negocio jurídico y, el juzgador al interpretarlo y decidir las controversias, procurar dentro de los límites racionales compatibles con el ordenamiento jurídico, su utilidad y eficacia, según corresponde a la ratio legis de toda conocida ordenación normativa.*

*"La fisonomía de esta regla impone que la frustración del acto sólo es pertinente cuando no exista una alternativa diferente, según postula de tiempo atrás la doctrina de la Corte, al relievar la significativa importancia del contrato, su celebración, efecto vinculante, cumplimiento y ejecución de buena fe, destacando la directriz hermenéutica consagrada en el artículo 1620 del Código Civil (cas. civ. sentencia de 28 de febrero de 2005, Exp. 7504).*

*"Los principios generales del derecho, estándares inspiradores e informadores de todo el ordenamiento jurídico, son reglas hermenéuticas del contrato (G. ALPA., principi generali, en Tratatto di diritto privato a cura di G. Iudica e Paolo Zatti, Milano, 1993, pp. 15 y ss; L. BIGLIAZZI, GERI, L'interpretazione del contratto, Giuffrè, Milano, 1991, ps. 1 y ss.; M. COSTANZA, Profili dell'interpretazione del contratto secondo buona fede, Giuffrè, Milano, 1989, pp 1 y ss.). Así la Constitución Política de 1991, previa indicación 'De los principios fundamentales' (Título I), al tratar 'De la rama judicial', remite a los 'principios generales del derecho' dentro de 'los criterios auxiliares de la actividad judicial'. En especial, la buena fe impone una cláusula general de corrección proyectada en un deber de conducta ética y jurídica de singular connotación en todas las fases de la relación obligatoria, la responsabilidad y el negocio jurídico (artículos 863 y 871 del C. de Co. y 1.603 del C. C.), apreciable en la interpretación en su perspectiva objetiva, esto es, en cuanto regla directiva del comportamiento recto, probo, transparente, honorable 'en procura de la satisfacción y salvaguarda de intereses ajenos (deberes de información; de claridad o precisión; de guarda material de la cosa; de reserva o secreto, etc.),* (cas. civ. abril 19/1999, exp. 4929, febrero 2/2001, exp. 5670 y agosto 2/2001).

"Con los lineamientos precedentes, para la Sala, a los criterios hermenéuticos consagrados en la disciplina del contrato, *naturaliter* se incorpora *ex interpretatione* la disciplina específica de la autonomía privada y libertad de contratación, para obtener conformemente a los principios explicativos, directrices y fundantes del acto y, más concretamente a los generales del ordenamiento la relevancia de la *'recíproca intención de las partes', permeable* a *evidentes cambios culturales, sociales, económicos, tecnológicos y científicos en atención a sus intereses convergentes, sin reducirla* a *una simple quaestio voluntatis, cognoscitiva, reconstructiva* o *asentiva, tanto más cuanto que el juzgador en su función de interpretar el negocio jurídico,* o *sea, de determinar el sentido*

*República de Colombia*

*Corte Suprema de Justicia*
*Sala de Casación Civil*

*jurídicamente relevante de la specie juris, precisa su alcance y su eficacia in concreto.*

*[...]*

*"Adviértase, según de antiguo postula la Sala, la 'discreta autonomía' (CXLVII, 52), de los jueces para interpretar el negocio jurídico, labor confiada a su '...cordura, perspicacia y pericia' (CVIII, 289), su prudente, razonado y fundado juicio, dotado de la presunción de acierto y susceptible de infirmar sólo cuando haya incurrido en un yerro fáctico 'tan claro a la luz de las reglas legales y de los datos del expediente que no deje lugar a duda alguna' (XX, 295), evidente, incidente en la decisión, invocado y demostrado por el censor (CXLII, 218; CCXL, 491, CCXV, 567), 'que ponga de manifiesto, palmaria u ostensiblemente, que ella es de tal alcance que contradice la evidencia', como cuando 'supone estipulaciones que no contiene, ora porque ignore las que ciertamente expresa, o ya porque sacrifique el verdadero sentido de sus cláusulas con deducciones que contradicen la evidencia que ellas demuestran' (cas. junio 15/1972, CXLII, 218 y 219), '...desnaturaliza abiertamente las convenciones de las partes contratantes, o pretermite al aplicar el contrato alguna estipulación terminante o la sustituye por otra de su invención' (XXV, 429), en forma que 'la exégesis de la cláusula contractual propuesta por el casacionista sea la única admisible a la luz de las circunstancias particulares, y se muestre, consecuentemente, como un planteamiento tan sólido y persuasivo que, por su propio peso, sea capaz de revelar la contraevidencia en la comprensión del Tribunal' (S-226-2004 [7356], 13 de diciembre de 2004), 'de modo que mientras la adoptada por el Tribunal no desnaturalice los términos claros y no ambiguos de la convención rompiendo su armonía, desconociendo sus fines o la naturaleza específica del contrato, debe ser respetada por la Corte' (LV, 298), pues las interpretaciones 'conformes al haz probatorio y que no sean absurdas o carentes de sindéresis y lógica, impiden la constitución de un error de hecho evidente, alegable en casación, por lo que dicha interpretación, en esas condiciones, queda cerrada en las instancias y resulta inimpugnable mediante el recurso extraordinario de casación, así la hermenéutica que efectuó el censor devenga respetable y, por ende, luzca coherente, lo cual no es suficiente para quebrar un fallo judicial, por lo demás cobijado por una presunción de acierto que es menester derruir' (Sentencia de la Sala Civil, Exp. 7560) y, 'si el juez, tras examinar y aplicar las diversas reglas de hermenéutica establecidas en la ley, opta por uno de los varios sentidos plausibles de una determinada estipulación contractual, esa elección, en sí misma considerada, no puede ser enjuiciada ante la Corte, so pretexto de una construcción más elaborada que pueda presentar el demandante en casación, en la medida en que, en esa hipótesis, la decisión judicial no proviene de un error evidente de hecho en la apreciación de las pruebas, sino que es el resultado del ejercicio de la discreta autonomía con que cuenta el juzgador de*



> *instancia para la interpretación del contrato' (SC-040-2006 [7504]), pues, '[s]i tal elemento admite diversos entendimientos, todos ellos razonables, entonces no se presenta el defecto en mención, máxime cuando en materia de interpretación de contratos, se está frente a una 'cuestión que corresponde a la discreta autonomía de los juzgadores' (CXLII, 218 y 219)"* (cas. civ. sentencia de 7 de febrero de 2008, [SC-007-2008], exp. 2001-06915-01).

Tampoco se observa un proceder abusivo e ilegitimo en el ejercicio de la facultad de enervar la prórroga automática de los contratos, toda vez que, se dio el preaviso en los treinta días anteriores al vencimiento del término inicial, expresándose que a su llegada terminaría el contrato, y aún más, si se quiere, los testimonios mostrados por el censor, ponen de presente manifiestas diferencias administrativas entre las partes, que en una relación de confianza como la generada por los contratos, serían bastantes para justificarla.

Como corolario, frustrada la acusación en torno a la interpretación del contrato, ausente los imputados yerros fácticos hermenéuticos, los restantes errores probatorios de hecho o de derecho, y los relativos a la segunda parte del reproche sobre el *quantum* de los perjuicios, ciertamente carecen de trascendencia, porque sin incumplimiento no brota la responsabilidad contractual, y sin ésta, nada hay por resarcir o reparar.

7. El cargo no prospera.

## DECISIÓN

En mérito de lo expuesto, la Corte Suprema de Justicia, Sala de Casación Civil, administrando justicia en nombre de la República y por autoridad de la Ley, **NO CASA** la sentencia

República de Colombia

Corte Suprema de Justicia
Sala de Casación Civil

de 3 de junio de 2009, proferida por el Tribunal Superior del Distrito Judicial de Bogotá, Sala Civil, en el proceso ordinario de Fernando González Luque, contra la Compañía Nacional de Microbuses Comnalmicros S.A.

Costas en casación a cargo de la recurrente. Tásense. Inclúyase la suma de seis millones de pesos ($6.000.000.oo) por concepto de agencias en derecho.

Cópiese, notifíquese y devuélvase el expediente al Tribunal de origen para lo pertinente.

**EDGARDO VILLAMIL PORTILLA**

Ausencia justificada

**JAIME ALBERTO ARRUBLA PAUCAR**



República de Colombia

Corte Suprema de Justicia
Sala de Casación Civil

**RUTH MARINA DÍAZ RUEDA**

**FERNANDO GIRALDO GUTIÉRREZ**

**PEDRO OCTAVIO MUNAR CADENA**

Impedido

**WILLIAM NAMÉN VARGAS**

**ARTURO SOLARTE RODRÍGUEZ**

# English Translation of Exhibit 15

**SUPREME COURT OF JUSTICE**
CIVIL CASSATION

Reporting Magistrate
**WILLIAM NAMÉN VARGAS**

Bogotá, D.C., August thirty (30), two thousand eleven (2011).
Discussed and approved in Room of August one (1-), two thousand and eleven (2011).

Referencia: 11001-3103-012-1999-01957-01

The appeal filed by Luis Fernando Gonzalez Luque against the judgment of June 3, 2009, issued by the Superior Court of the Judicial District of Bogota, Civil Chamber, in the ordinary proceeding of the appellant against Compañía Nacional de Microbuses Comnalmicros S.A. is decided.

**BACKGROUND**

1. In the complaint, the plaintiff requested a declaration of the non-contractual civil liability of the defendant company for breach of the affiliation or linking contracts of the vehicles identified with license plates SA7939, SD 3052, SD3909, SD4629, SD4216 and SD4492 or, in the alternative, their termination, and in either case, to order it to pay compensation for the damages caused in the respective amount duly indexed plus interest.

2. *The petition* is based on the transgression of the aforementioned contracts by Comnalmicros S.A. with its unilateral termination according to a communication dated December 13, 1989,

"



República de Colombia

ContMugrerut of Jwticia
5afá from maridn tiff

contrary to good faith and the automatic extension agreed upon at the end of their minimum annual term, when the parties did not conclude them by mutual consent within the preceding thirty days.

3. After the *litigation,* the defendant company, in resisting the claims, invoked the right of both parties to not renew the contracts by means of a communication addressed by one to the other thirty days prior to the expiration of the contract, and proposed the following peremptory exceptions called inexistence of the obligation,

The plaintiff filed a separate plea of lack of competence, lack of jurisdiction, res judicata and the generic plea. In a separate document he filed the preliminary objections of lack of competence, res judicata and the generic objection. and pending lawsuit, all of which were denied by the judge.

4. The first instance decision rendered on December 20, 2006 by the Third Civil Court of the Circuit of Decongestion of Bogotá, D.C., dismissed the peremptory exceptions, the objection for serious error to the expert opinion and declared the contractual civil liability of the defendant for the disaffiliation of the automobiles, ordering it to pay damages and costs.

5. Upon appeal of the above judgment by the defendant, the Court, in its judgment of June 3, 2009, reversed it to deny the claims and ordered the plaintiff to pay the costs of the proceedings.

THE CONTESTED JUDGMENT

1. After outlining the background, the *petition, causa petendi,* judgment appealed and challenge, the Court



República de Colombia

Corte Suprema de Justicia
Sala de Casación Civil

established the procedural legal relationship in legal form without
encountering any obstacles to unraveling the merits. It also recalled the
sources and types of liability and established the requirements for
compensation for breach of the obligatory relationship, in addition to the
loss, its attribution to the debtor, the harm to the creditor, and the delay in
positive performance.

       2.   *Prima facie* to analyze the breach debtors, records the
existence and validity of the contracts, locates in the contractual liability
the one claimed as extracontractual in the main claim according to its
factual grounds for the breach of contract of defendant with the unilateral
termination infringing the obligation to keep the automobiles affiliated,
because in the absence of the extinctive agreement of the parties thirty
days before the annual expiration, according to the fifth clause it had to
keep them affiliated, and before studying it, it discusses the
contractual interpretation, citing doctrine and the judgments of June 3, 1946
(LX, 656), July 5, 1983 and August 1, 2002 of the Court of
Appeals of the Argentinean Supreme Court, considering it pertinent
to elucidate the mutual intention of the contracting parties, in the
face of obscure, ambiguous and imprecise texts, and even clear
ones, especially if the literal tenor applies in absolute harmony with the
*"internal will" or* genuine intention of the parties, never in the opposite
sense, even if they are simple and diaphanous, cardinal rule ex article
1618 of the Civil Code prevailing over *"the literalness of the words",* to
which the judge in his hermeneutic work, freedom of appreciation of the
evidence and may resort to the nature of the contract, to circumstances
influencing its conclusion, to the customs, to its practical application by
one or the other party with the approval of the other, or to other
conventions or writings.



3. In that order, the cardinal issue in dispute concerns to determine the real or true intention of the parties with the stipulation of the fifth clause of the affiliation contracts, regarding the interpretation of which they disagree, since for the plaintiff based on the textual, literal or exegetical statement, the term of thirty days preceding the minimum duration refers to its termination by mutual agreement, and according to the defendant to a notice period during which any of the parties may conclude them avoiding their automatic renewal, the term of thirty days preceding the minimum duration refers to its termination by mutual agreement, and according to the defendant to a notice period during which any of the parties may terminate them avoiding their automatic renewal, from which the conformity of the text with the convergent will of the parties must be verified.

4. Then, faced with the impossibility of reconstructing *"what was really wanted"* with reliable evidentiary data, he resorted to the subsidiary hermeneutical rules, transcribed the fifth clause of the contracts, iterated the interpretative discrepancies, it specified the problem *"on the way to terminate the contracts so that they are not automatically extended for a term equal to the minimum agreed"* and considered that the thirty days prior to the duration of the contract *"to announce the desire not to continue with the validity of the same and, therefore, to* make *known to the other contracting party the desire to disconnect the automobiles from the company"* was agreed upon.

5. To this end, after admitting the *"autonomy of the public will",* the possibility of stipulating the term for *"agreeing the termination", he* bases his hermeneutic intelligence on the current waiver and anticipated disposition of the *"future contractual freedom"* by means of a *"single act",* implicit in the contrary interpretation, whose uselessness, unlike the *"practical utility"* of his interpretation (article 1620, Civil Code), is obvious due to the fact that it subjects the conclusion of the



contract *"at the whim of either* of *the contracting parties",* even to the extreme of denying their consent, prolonging it "in *perpetuity"* to the detriment of the other and of the general interest, when the development depends on the most profitable use of the material goods and the change of their destination is hindered by perpetual relationships, moreover, most legislations fix times for announcing one party to the other the termination of the contracts of continuous or periodic performance, not for concluding it, according to the rules of experience (article 1621, Civil Code), and the concluded contracts of affiliation are of such kind or of long duration, *"oblige parties or one of them to a continuous performance or be periodically repeated in time", they* have by natural element, the right to dissolve them by unilateral act of part, autonomous, spontaneous or of exclusive will of the holder with the limits of the good faith *"that, precisely for being unilateral, does not require the acceptance of the other".*

6. With the aforementioned guidelines, since there was *"a dispute"* regarding the meaning *"of the aforementioned stipulation",* giving scope to the reciprocal intention of the parties in accordance with the type of contract, nature, function, practical utility, rules of experience and comparative normative regulation, it interpreted it as consecrating the unilateral withdrawal to terminate the affiliation contracts due to indetermination of its "*final* term*",* thus *"repealing the principle that* the *contract cannot be dissolved* except *by mutual agreement", and* concluded the absence of the alleged breach, when the defendant company terminated them by exercising *"the power not to renew them by notice not less than thirty (30) days* prior *to expiration",* according to the communication of December 15, 1989 sent to the plaintiff.



*República de Colombia*

*Cutting Sup-* Szut/cJo
*Sa£a ':£e* ú'/zsoció/z *CiwiL*

7. Notwithstanding the sufficiency of the aforementioned considerations, the judge extended them to the remaining elements liability, to rule out, in view of the lack of non-performance, its imputability to the debtor, to note the lack of evidence of the damage caused to the creditor, and the omitted request of the pecuniary penalty based on its liquidation, for which purpose, he memorized the concept, typology, certainty, evidentiary burden of existence and magnitude of the damage, intangible decision denying the consequential damage when not challenged, conditions of the compensable loss of profit, either by the deprivation of an economic utility, or by the frustration of a patrimonial benefit, the certainty of the interest affected and of the damaging fact, or by the destruction of the pre-existing source of profit, or truncated in the future, in the *litigation* due to the frustration of the rendering of the urban public passenger service with the disaffiliation of the buses, an activity accepted by the parties, without however, *"proving the damage or its amount",* or acting in the process, documents, records or accounting papers, files or notes, tax declarations, the *"cards"* of vehicles, absent also in the copies of the criminal, nor *"facts revealing* the *profits obtained prior to the fact"* to project them into the future or to calculate the loss of profits on a certain basis, in addition to the fact that the expert opinion is *"unattendable"* for lacking grounds, containing uncertain and unreal mathematical calculations, and for the following reasons:

a) Exaggerated prolongation of the inactivity of motor vehicles *"for a period of approximately ten years"* from January 15, 1990 to March 29, 2000, *"because it breaks* the *principle of normality'* beyond the '*reasonable* time*'* to seek a useful alternative operation for the plaintiff, to whom the postponement is attributable, since, according to some, it is not possible for the plaintiff to have a reasonable time to find a useful alternative operation.



República de Colombia

Corte Suprema de Justicia
Sala de Casación Civil

In spite of his expertise in transportation, on the point promoting the foundation of a public service bus company, he did not prove the impossibility of *"finding a substitute activity",* nor as he stated in the pleadings *"that COMNALMICROS, S.A., prevented the buses from* being *received or affiliated to other companies", a* fact that is not part of the controversy.

b) The average "of *four round* trips*, that is to say, eight (8)* reco/zip:the *daily trips",* says expert supports it in *"photocopies of the operation cards provided to the process of the 40th Criminal Court* of the *Circuit",* which *"curiously"* are not in the copies sent, and also expresses *"that the eight daily trips are not uniform or constant, according to the company's spreadsheets"* and, the same happens with respect to the calculation in 25 days per month worked, without explaining the reasons or the analysis of its general and not concrete conclusion.

c) The average of one thousand passengers transported per day is not serious and is *"blindly"* based on the statements of Ciro Alfonso Castellanos, Ignacio Cortázar, Eduardo Nieto García, Joaquín Reyes Pardo and Reynaldo González Suárez, without considering *"other testimonies that indicate that the number of passengers transported was lower",* nor the calculation made by a transportation expert of the Das, witnesses that *are "not very reliable"* given the *"concordance in the information (...) affected by the influence" of the plaintiff, "his direct and constant communication, his permanence for a long time, years, under the dependence of the plaintiff, (...) receiving instructions and retribution", and the expert to support the* accusation of the plaintiff*....) affected by the influence"* of the plaintiff, *"his direct and constant communication, permanence for a long time, years, under the dependence of the plaintiff, (...) receiving instructions and remuneration", the* expert does not analyze the photocopies of cards, spreadsheets and liquidations to support his conclusion.



República de Colombia

Corte Suprema de Justicia
Sala de Casación Civil

The court also admits the lack of certainty of those that it says appear in handwriting, nor did it explain the criteria adopted in the determination of the number of daily and nightly passengers, the *"percentage of profit'* fixed at 35% of the production, *"was left without any explanation";* and in any case, the testimonial evidence of Castellanos, Cortázar, Nieto, Reyes and González was given in criminal proceeding, on January 29 and 30, 1992, and February 17, 19 and 24, 1992, respectively, before the involvement of Comnalmicros S. A., before the involvement of Comnalmicros S. A., and before the involvement of Comnalmicros S. A. in the criminal proceeding, on January 29 and 30, 1992, and on February 17, 19 and 24, 1992, respectively.A., on April 5, 1994, when he did not have *"the same rights and faculties of the other procedural subjects", they* were ordered and practiced without his summons and intervention, nor did he have the possibility to controvert them, therefore, they cannot be appreciated against him as well as the expert evidence supported by those proofs.

8. For the foregoing reasons, the *ad quem* reversed the judgment, denied the claims and ordered the plaintiff to pay the costs of both instances.

**THE CASSATION CLAIM**

A charge is formulated, replied to by the other party, which is decided upon.

SINGLE POSITION

1. On first ground of cassation established in Article 368, paragraph 2 of the Code of Civil Procedure,



accuses the sentence of indirectly violating articles 1501, 1535, 1602, 1604, 1613, 1614, 1618, 1619, 1620, 1621, 1622,
1623 and 1624 of the Civil Code, 822, 830, 870 and 871 of the Code of Commerce, and as an average violation, articles 175, 177, 179, 180, 187, 217, 218 and 307 of the Code of Civil Procedure, and article 16 of Law 446 of 1998, due to transcendent errors of fact and law in the interpretation of the contracts and of some evidence.

2. By way of proem, the appellant highlights the relevance of the controversy because it concerns *the 'autonomy of the will', the* binding force of the contract, the possibility of terminating it without acquiescence, the exercise of *"absolute, ad nutum"* or controlled contractual powers, the interpretative powers of the judge, *"interpreting a contract and regulations",* and the *"judicial activism to stop the respectful exercise of rights".*

3. In its development, the censor attacks separately the considerations of the judge to deny the *petition,* i.e., the appropriateness of the termination of the contracts, absence of the causal relationship and lack of proof of the amount of damages.

4. In summary, the first segment of accusation focuses on "the *application of the fifth clause of the contract",* the *"durability",* the *"time", the* way to terminate the agreement, and it is precise:

a) Such temporal extremes from beginning to end were consigned in said stipulation, which, in the rule of *"expressiveness" or "thoroughness",* reflects *"the authentic design of* the *parties"* with the celebration of an act *"for a while"* as denoted by the locution *"notwithstanding"* the term *"m/minimum"* the *"renewal shall be the*



República de Colombia

Corte Suprema de Justicia
Sala de Casación Civil

*The "outstanding note",* that is, the *"reg/a genera/",* all the more so because of the *"successive tract"* character of the link, the destination of the vehicles to the rendering of the public service without risk of coverage, the social and contractual interest embedded "in the *permanence clause, without which perhaps it would not have been contracted",* intention *"shining",* clear and easy to see, *"that sefiorea in the contract",* whose detachment by the sentenced of second degree, interpret *"indefatigable", "praiseworthy",* at the risk *"to end up in unknown places", "will necessarily be forced and will make* the *basis of the contract creak",* since the possibility of interpreting a clear clause *"ineluctably supposes that the intention is for the moment ungraspable",* or according to Giorgio, only when the words are used erroneously in a broader or more limited sense, while *"the intention palpitated* in *the very tenor of the contract",* with an enduring relationship by its nature and proposed economic achievements or, in Danz's terms, the *"inner will"* procured *"an economic result",* and while the *"covenant, in* that *sense, is not a paragon of juridical (....) from such an undefined statement, it can never be deduced, without supplanting the will of the parties, that when the parties demanded and made explicit the mutual consent to terminate the contract, what they really wanted was to agree on the unilateral termination. Not even by* fire".

b) In an *"irremissible blunder",* the sentence *"turned its back on what beats strongly in the clause"*, making a mistake of fact on the interpretation of the contract, which embodies the definite intention to make it *"durable",* and requires in security, *"the consensus of the parties"* to finish it, without *"lapsus calaml"* or oversight, never the *"unilateral withdrawal'* in the remote interpretation of the judge contrary to its textual *"objective content",* the

Article 1618 of the Civil Code, *"a provision that only privileges over the letter the intention* if it *is 'clearly known'",* and Articles 1619 to 1623 *in fine,* since the fifth clause of the contracts entered into contains the *"permanence",* the *"consensual termination"* and mentions the opposite hypothesis of the *"unilateral termination"* for causes agreed in the sixth clause*, "powerful"* reason to exclude the *"unilateral withdrawal", "as the ad-quem was sustaining it* with *evident deviation".*

c) The challenged ruling *"twisted the material content of the contract and the spirit that notoriously flows from it,"* violated *"the /contract* law *and article 1602 of the civil code',* as a result of of the *"bad application of the interpretative rule contained in article 1620 of the civil code'.*

d) The conclusion of *"uselessness"* of the clause on *"consensual termination"* due to *"the bad observation of the material content of the contract",* made *"shatter the economic and even legal purposes of the agreement",* because the fifth clause concerns permanence, avoids early frustration, had its explanation and a precise content, the Court confusing "the *useless with the inconvenient",* stunned by the idea of *"eternal contracts",* should have said *"that it should not be contracted in this way, that contracts should not be left indefinite, if you will, that they should be given a known term",* because of the "unpleasantness of *being bound without end", a* matter alien to interpretation and proper to *"regulation",* without observing the usefulness of his hermeneutics that *"strangling the letter and spirit of the negotiation, good faith and trust",* he *"made use"* of the former to fall into the latter, he intervened *"not to unravel the meaning of a clause, but to get out of the way of something that worried him (....) that the contract would not be interpreted in a way that was not in keeping with the letter and spirit of the contract, but in keeping with the spirit of the* contract*"....) that he understood the contract, but it did not please him"*



Corte Suprema de Justicia
Sala de Casación Civil

without any reason, *"since the same legislator calls for calm when he allows, for example, in the lease of commercial premises that its renewal is the rule"* disciplining few contrary legal reasons, and in the common lease allows the forced extinctive term for one of the parties, from where *"the fear of the indefinite is not, in this case, incontestable and looks rather like an exacerbated prejudice, unquestionable and appears rather as an exacerbated prejudice",* due to the precarious useful life of the public service vehicles, the contractual provision termination *"with a manifest advantage for the Company, an edge very typical of the adhesion contracts",* and finally, it is impossible to affirm *"that the questioned contract was for ever and ever' and* implied *"the total alienation of freedom'.*

e) After questioning about the opportunity and manner of terminating an *"indefinite" or* long-term contract, it repudiates unilateral termination *"as long as nothing extraordinary occurs",* as long *as "nothing unforeseen occurs, that* the *contract fulfills its designs, and that frustration is not common and ordinary", "that, under normal conditions, the power could not be omnlmoda",* without "*valid* reason*"* or *"attestable"* for being subject to the qualified good faith, and wonders what consequences would have generated the *"abrupt"* conclusion of the bond by the plaintiff, as it is a clause conceived in the best interest of the defendant as stated by José Alejandro Nieto García, testimony pretermitted in typical factual error, to return to the *"unilateral withdrawal" and* admit *"one or another* case *in which such prerogative is exercised without rendering an account to anyone"* by means of *"a very special circumstance, out of the ordinary, that justifies it",* in *"cases of true exception that* lack *the virtuality to damage',* for example, those of the bailee, the bailee, the contracts of affiliation subscribed in confidence and interest of both parties, in



which prevails good faith, the judge erring "in *believing that the defendant acted in accordance with it"* when there is nothing in the file *"that justly justifies its* actions", thus violating articles 1603 of the Civil Code and 871 of the Code of Commerce.

f) Citing doctrine and the cassation judgment of December 14, 2001, he emphasizes the legal or conventional origin, exceptional nature and strict interpretation of unilateral withdrawal, the error of the sentencer in considering it *"too natural a matter, as if it really were the general rule",* seeing it in the disputed hypothesis, not because it was express but because it seemed to him *"that where it said mutual dissent was being consecrated"* with an *"assumed or inferred* character *even against the evidence of what has been expressed to the contrary",* when a contracting party can never *"act with abandonment and inopoitunity",* and even if it is a natural element of contracts of duration, its exercise "by *hook or by crook"* should be rejected*, and* the judge also erred for having Comnalmicros *"naturally"* endowed *"with an omnipotent power to terminate the contract",* leaving aside the good faith, the abrupt decision and the *"enormous damages to Gonz4lez Luque",* to the detriment of articles 1535 and 1625 of the Civil Code.

g) In the case, *"more than carelessness there was",* the Court "*erred from the middle to the end",* not only did it omit to see the absence of "*legitimate* reason*"* to terminate Comnalmicros "violently *the contract, but it did it reproachfully", the* true cause is vindictive, concerns the plaintiff's questioning of the administrative management, as declared by Gilberto Álvarez Torres, José Ignacio Cortázar Zamora, Darío Amaya Ramos, José Antonio Romero Rodríguez, José Alejandro Nieto García, and as stated in the confession of José Carlos Virgilio Orjuela.



República de Colombia

Corte Suprema de Justicia

The judge, in a manifest error of fact, pretied all this evidence demonstrating the obvious displeasure, differences and friction between the parties, for which the strong party to the contract, resolved to take revenge, broke its word, acted with a malicious and insidious motive abusing its right and the sentencer ended up *"taking Article 830 of the Code of Commerce out of the street",* and if there is any doubt as to the true intention of the contracting parties, he violated article 1624 of the Civil Code when Comnalmicros drafted the affiliation contract, and therefore, the fifth clause, as Ciro Alfonso Castellanos said, with respect to whom *"there is an error of law because the court did not decree evidence ex officio".*

h) The evidentiary errors of the ruling judge are relevant because they are decisive, without them he would have concluded full concordance of the text and intention, the respect of the will of the contracting parties, that nothing should be accommodated to the fifth clause, as it is, nothing should be accommodated, superimposed, much less replaced by an unacceptable unilateral withdrawal, and that the defendant invoking it, when terminating the contract did not show *"good reasons",* but *"a reproachable motive of rancor",* that is, *"it failed in its word"* and is liable for the damages caused to the plaintiff.

5. The second part of the charge for the lack of proof of the *quantum* of damages, begins with a strong rebuke to the *"rabidly inhuman"* judge who, undaunted by the injury to the victim sacrifices justice hidden in *"erudition as academic as glaciaf',* in spite of *"his true role, and in any case does not make pomp",* to:

'Rypüblica de Colombia

Corte Suprema de Justicia
Sala de Casación Civil

a) To censure the Court for omitting the legal duty of decreeing and practicing evidence, incurring in an error of law, with violation of articles 179 and 180 of the Code of Civil Procedure, and of the norms enunciated in the charge, because having in view the materially existing evidence in the file, it failed to comply with its informal duties as defined by the civil jurisprudence (sentences of September 12, 1994, July 26, 2004 and April 13, 2005) with respect to all the evidence in the criminal proceeding, and in particular, the testimonies of Ciro Alfonso Castellanos, José Ignacio Cortázar Zamora, Carlos Eduardo Nieto García, José Joaquín Reyes Pardo and Reinaldo González, the opinions rendered there by Jorge Enrique Ávila -supported by official reports of the Dane- and Miguel Angel Díaz, in addition to the factual error of forgetting the statement rendered before the Tenth Civil Court of the Circuit by Cortázar Zamora.

b) To reproach the judge for error of law with violation of articles 217 and 218 of the Code of Civil Procedure, when disqualifying, discrediting, excluding in limine or discarding the witnesses as suspicious without materially contemplating the content of the declaration, when they can be truthful and should have been evaluated with great care, as well as when demanding a legal fee postulating *"that the documents expire witnesses",* without mentioning any legal norm consecrating such requirement, or to prove with documents the number of passengers mobilized excluding the testimonial and interested in *"cards" or "spreadsheets"* missed in the sentence, it should have made them to be provided.

c) In fact, there are also errors when not seeing the *ad quem* evidence of the measure of the loss, trajectories of the



The following are the declarations of Jorge Alejandro Nieto García, José Antonio Romero Rodríguez, José Ignacio Cortázar Zamora, Darlo Amaya Ramos, Alfonso Ortegón Jiménez, Alberto Soriano, Pedro Isaac Rivera Borda, Oscar Franco, and the confession of the defendant company in a tort liability proceeding filed against Luis Fernando González for damages with precautionary measures before the Eighteenth Civil Court of the Circuit Court of Appeals, Oscar Franco and confession of the defendant company in a tort liability proceeding brought against Luis Fernando González for damages with the practice of precautionary measures before the Eighteenth Civil Court of the Circuit of Bogotá, where it submitted the calculation of the damages pursued *"based on 1.200 passengers per day and for 25 days per month", a* factual error *"most disastrous of all".*

d) He reproaches the conclusion regarding the exaggerated inactivity until March 29, 2000, sentence from which it is *possible to infer that for* the *sentencer there could have been damages, but on a smaller scale",* serious error of fact for not seeing the testimonial and the confession as evidence of the damages, ignoring article 305 of the Code of Civil Procedure in harmony with article 16 of Law 446 of 1998, reminder of equity, because if there were damages, he should have condemned and not acquitted.

e) It considers that it is factually erroneous, *"monda y lironda"*, the causation of damages by the victim, who without relieving the author of the duty to repair it *"should not aggravate the damage",* as the plaintiff did with his *"rectilinear conduct",* by complying with his own and his word, resorting to legal channels for the examination of the company's behavior, to challenge the acts, to receive provisional reason with the caution foreseen in article 421 of the Code of Civil Procedure, to denounce the fraud to the judicial resolution where the initial security measure was issued, revoked on appeal, and to leave the buses at the disposal of the company for thinking *"that in rigorous terms the*



The exaggeration does not translate into acquittal, a monumental error of fact, because the immobilization is not imputable to the defendant, moreover, the company created by the defendant in 1991 obtained a license on February 19, 2002, years later.

f) It recapitulates the factual and legal errors with their transcendence in terms of the reparation of damages.

6. It concludes the extensive complaint with the iteration of the errors, asks the Court to annul the appealed judgment and, in the lower court, to confirm that of the court, if it does not first deem it necessary to decree ex *officio* evidence, because part of the complaint is based on the fact that the Court did not do so.

**CONSIDERATIONS**

1. Private autonomy *(auto, 'aujtov',* , and "nomos", ley), expression of freedom, fundamental rights, free development of personality and economic and entrepreneurial initiative guaranteed by the *"Social State of Law"* as supports of the democratic system (Preamble, articles 2, 13, 14, 16, 28, 58, 59 to 66, 78, 82, 94, 150 [19] and [23], 332, 333, 334, 335,
373, Political Constitution), confers to the *subject iuris* a power to engender the legal business *(negotium iuridicus, Rechtgescháft), rectius,* dispositive act of legally relevant interests.



More specifically, the person is the kinetic core, reason and justification of all known normative ordering, to which it grants personification, attributes, rights, initiative, freedom and legal ability to dispose of their interests in order to satisfy their ends, vital needs, designs or individual purposes in the life of relationship, to discipline, regulate, govern or order their dispositive sphere in the legal traffic through the legal business and the contract or *"'agreement between two or more parties or contractual subjects to constitute, modify or extinguish legal relations' (arts. 864 Code of Commerce and 1495 Civil Code)"* (cas. civ. sentences of May 31, 2010, exp. 25269-3103-001-2005-05178-01; July 1, 2008, exp. 11001-3103-033-2001-06291-01; and July 1°, 2008, exp. 11001-31-03-040-2001-00803-01).

Private autonomy, as contractual freedom, entails the reasonable legal recognition to every person of an accumulation of powers or faculties projected in possibility to dispose or abstain from the disposition (freedom to contract or not to contract), to select the subject with whom to dispose (freedom to choose the party or contracting party), to choose or create the type of contract (freedom to opt in the catalog *legis* or in the social uses and practices for the singular type of contract or to create it), to conclude it immediately or after the exhaustion of a formative phase (freedom to conclude the contract immediately or progressively), to do so directly or by agent, representative or proxy, to express the dispositive act (freedom of expression or form), to determine the content (freedom to stipulate the content), to ensure performance, to prevent termination or to provide for it, and to guarantee, mitigate or extend liability.



Consistently, the axiomatic postulate inherent in the relativity of rights, freedoms and guarantees (XLVI, 60; XV, 8), order, regularity, social solidarity, security, good faith, dignity, respect and symmetry of treatment, rules out private autonomy as a free, *ad libitum,* absolute, blank or unlimited power, and its exercise *ab initio* subject to elementary channels or guidelines proper to its recognition, utility or function, is limited, sometimes attenuated or absent, either because of *ius cogens,* public order, imperative norms, or because of morality, collective ethics or good customs (articles 15 and 16, Civil Code), or because of the nature and protection of certain subjects or interests, or because of the unavoidable solidarity, or because sometimes the State or private individuals impose the act (e.g., because the State or private individuals impose the act), or because of the nature and protection of certain subjects or interests.e.g., forced contract, iimposed *ex lege* or *ex auctoritate*, e.g., public services, ecological insurance, SOAT, affiliation to the general health system, risks and pensions, *"forced sales made by authority of justice*" such as auction - articles 741, 1908 C.C; 523 et seq. C. de P.C., leasing of real estate intended for commercial establishment, in legal cases - article 521 Commercial Code), the subject (for example, qualified party in the trade of foreign currency, arms, ammunition, chemicals, preference of the lessee in equal circumstances to any other person in the lease of repaired, reconstructed or newly built premises - art. 521 C. de Co-, in the alienation or subscription of shares - art. 388 and 403 C. de Co-, and shares in the company - art. 363 to 365 C. de Co-), in the sale or subscription of shares - art. 388 and 403 C. de Co-, and shares in the company - art. 363 to 365 C. de Co-. of Co-, in the alienation or subscription of shares

-arts. 388 and 403 C. of Co-, and social quotas -articles 363 to 365 C. of Co-.), the contractual type (whose *legis practica* or social economic function is unchangeable), the form (*solemn ad substantiam actus*), the formative proceure (public or private bidding, merit-based competition, auction), the content (*verbi gretia*, *esentialia negotia* tax, unmodifiable minimum or predisposed by law, decree, administrative act, national or international, social, economic or political public order, good customs, intervention, "dirigisme", "orientation", "controlled economy", "link-based", "programmatic",



Corte Suprema de Justicia
Sala de Casación Civil

*"planned" "regulated", "coordinated", rationalized",* with a tutelary or directive sense of the legal relationship, by social factors *("*welfare state"), economic [deflationary policy, company law and competition] or of general interest [laws of economic intervention, *"administrative", "police and security",* or of prevention, avoidance and control of monopolies or oligopolies, concentrations, abusive dominant power], where the content is specified per relationem or, in the case of general contracting conditions, prescriptions, forms or contractual molds, serial, mass, standard, standard contract, contract of or by adhesion, type, global, standard, normative, terms of reference or resubmission, etc.), the survival or termination of the contract, *or the termination of the* contract (e.g.*, the* contract of sale, the contract of sale, the contract of sale, etc.), the survival or termination of the contract.), survival or termination, liability of the parties or effects (Cas. civ. judgments of April 20, 1940, XLIX, 247; March 23, 1941, I, 824;
SNG, August 23, 1945, LIX, 1097; April 4, 1968, CXXIV, 167; April 13, 1968, CXXIV, 167; 13. October 1987, XIII, 110; February 24, 1974, CXLVIII; and May 8, 1974, CXLVIII.

1974, CXLVIII 51,101; August 29, 1980, CLXVI, 123; March 27, 1980, CLXVI, 123; March 27, 1980, CLXVI, 123; March 27, 1980, CLXVI, 123.
1996, CCXI, p. 491; November 26, 1997, CCXLIX, num. 2488, vol.
1531; August 6, 2010, exp. 05001-3103-017-2002-00189-01).

In a similar sense, the contemporary schemes of *"globalization"* describe the ostensible predominance and interference of transnational financial power, local dependence on the international market, economic opening, accelerated investment, liberation of markets and capital, production, competitiveness and consumption, deregulation, elimination of obstacles or controls to the mobility of capital, increase in legal traffic, overcoming of spatial or temporal barriers in the expansion of commercial activity, use of technology, information technology, digital instruments, satellite telecommunication, virtual networks or platforms, permanent mechanized supply of goods, services and legal business, free, rapid and expeditious electronic negotiation, a universal, uniform, harmonious, dynamic and adapted *lex mercatoria*.



República de Colombia

Corte Suprema de Justicia
Sala de Casación Civil

The new legislation is based on convenience, needs, and configured with supranational customs, practices or usages in order to discipline convergent or homogeneously the relationships with increasing decrease of contractual freedom, constant abuse in the dominant market or contractual position, abusive clauses, or taking advantage of manifestly weak conditions, and generates a common solidarity conscience to protect consumption and consumers.

2. The possibility to dispose or not to dispose of the interests, to contract or not to contract, is the highest expression private autonomy and is not contradicted by its increasing restrictions.

This is the genuine understanding of private autonomy, that is, the freedom and power attributed by the legal system to the *legal* subject to enter into the contract, whose cardinal, primary or existential effect is its binding, binding or legal obligation to comply with it, without, as a matter of principle, those who enter into it being able to unilaterally withdraw from it.

The normative force of every contract enshrined in articles 1602 of the Civil Code (article 1134, *Code civil Français)* and 871 of the Commercial Code (article 1372, *Codice Civile //*), generates for the parties the legal duty of performance, whether spontaneous or forced (articles 1535, 1551, 1603, Civil Code), and the impossibility of annihilating it by unilateral act.

Indeed, every existing and valid contract *"binds to its performance in good faith, in all that pertains to it by definition (esentialia negotia),* law, *usage, custom or equity (naturalia negotia) or expressly agreed (accidentalia negotia),*



*in the totality of the due performance, form and opportunity, constitutes a contractual precept or mandatory rule (pacta sunt servanda, lex privatta, lex contractus, articles 1501, 1602, 1603 and 1623, Civil Code; 871 Code of Commerce), and its observance binds the contracting parties"* (cas. civ. sentence of May 31, 2010, exp. 25269-3103-001-2005-05178-01).

Elementary logical, ethical or legal guidelines, regularity, normality, stability, security, certainty of legal transactions, legitimate trust, self-responsibility, good faith, and contractual freedom, explain the binding force of the contract, and the repudiation of its unilateral breach, insofar as as as a dispositive agreement of legally relevant interests made by two or more parties, it obliges them to fulfill it in good faith, and in general, excludes the termination by one, under penalty of being compelled to its contrariety to the fulfillment and to repair the damages caused.

However, the obligatory relationships and, in particular, the contractual ones, are in accordance with their nature, function and purpose ephemeral or transitory. As such, they are instruments for a practical or economic social function, do not have a perpetual vocation and are called to be extinguished by performance or other legal causes.

Perpetuity, foreign and incompatible with the concept of obligation, is contrary to the public order of the Nation by suppressing *ad etemum* contractual freedom (articles 15, 16 and 1602, Civil Code; 871 and 899, Code of Commerce).

Article 37 of the 1886 Constitution *"in order to ensure the freedom of the economic aspects of traffic*



*juridical",* provided that *"[t]here shall be no real estate in Colombia* that *(is) not freely alienable,* nor *irredeemable obligations",* that is, *"those that there is no legal way to abolish at any time and that are* not *subject to the law. last forever, without the debtor* being *able* to avoid its *fulfillment by the normal means of* extinction *provided for by law"* (Supreme Court of Justice, Full Chamber, Judgment of 23 December November 1973).

The Political Constitution of 1991 incorporated into domestic law the international treaties and conventions on human rights, enshrined provisions of principle, enunciated a minimum catalog of fundamental rights, freedoms and guarantees, the individual as the driving force of the system, his dignity, freedom and equality, free development of personality, work, profession or trade, guarantee of private property, social function of rights, economic initiative and freedom of enterprise, The mere mention of these rights excludes any perpetual relationship by annihilating freedom *per se*, a matter of unquestionable public order because it concerns ontological principles of the political structure, the legal system and vital interests for the State and society. Moreover, the transitory nature of the legal relationship and the prohibition of perpetual contractual or obligatory relationships derives from the general principles of obligations.

By virtue of this, legal transactions, contracts and obligations of this kind are temporary and terminate for legal or contractual causes. In this , timely and complete performance is par excellence the desirable, normal or ordinary termination mode.



República de Colombia

Supreme Court 't 5eticía
sois se cassation Film

However, the authority of the parties to a legal transaction includes its conclusion and termination at all times by mutual *consensus (mutuus consensus, contrarius consensus, mutuus dissensus,* articles 1602 and 1625 of the Civil Code) in accordance with the legal norms (Cas. civ. sentences of November 5, 2001).

1979, CLIX, 306; July 16, 1985, CLXXX, 125; June 7, 1989,

CXCVI, 162; December 1, 1993, CCXXV, 707; September 15, 1993, CCXXV, 707; September 15, 1993, CCXXV, 707.

1998, CCLV, 588; February 12, 2007, exp. 00492-01 and December 14, 2008, CCLV, 588; February 12, 2007, exp. 00492-01 and December 14, 2007, exp. 00492-01.

of 2010, exp. 41001-31-03-001-2002-08463-01).

Similarly, the legislator or the parties, in accordance with the law, ethics, correctness, probity, loyalty, good faith, function, utility and relativity of the law, in the exercise of their contractual freedom, may provide for the unilateral termination of the contract.

The figure describes hypotheses of cessation, extinction or termination of the contract by unilateral act of a party and includes a heterogeneous set of assumptions indicated with polysemic, dissimilar and amphibological expressions, such as unilateral withdrawal, recess, retraction, destrato, dissolution, resignation, revocation, rescission, *resiliation* or conventional unilateral termination, express unilateral termination clauses, denunciation of an indefinite term contract, termination *in continenti* for fundamental, serious and insurmountable breach, among others.

In the domestic legislation, it lacks general discipline and is established in multiple cases. *Ad exemplum,* among other hypotheses:



- The earnest money agreement entitles each contracting party to withdraw from the contract (articles 1859 of the Civil Code and 866 of the Commercial Code; Cas. civ. sentences of July 30, 1941, LII, No.

1977, 18; July 10, 1953, LXXV, No. 2129, 548; October 6, 1953,

t. LXXVI, No. 2133, 506; June 6, 1955, LXXX, No. 1254, 407; June 6, 1955, LXXX, No. 1254, 407; June 6, 1955, LXXX, No. 1254, 407.

March 1961, XCV, No. 2238, 76; February 21, 1967, CXIX, Nos.

2285 and 2286, 47; May 10, 1977, CLV, No. 2396, 106; Dec. 11, 1977, CLV, No. 2396, 106; Dec. 11, 1977, CLV, No. 2396, 106.

1978, CLVIII, No. 2399, 1978, 311; September 7, 1999, exp. 5217;

December 1, 2004, exp. 54122; December 14, 2010, exp. 41001-31-.

03-001-2002-08463-01 and December 16, 2010, C-08001-3103-004-

2003-00123-01).

- In the purchase-sale, the seller or buyer attending on the date for the weight, count or measure of the thing, may withdraw from the contract if the other does not appear (article 1878, Civil Code); the buyer at his discretion has the *"facultative right... which does not require any pronouncement by the judge"* to withdraw from the contract when the by his own act or fault delays the delivery of the thing (cas. Civil Judgment June 9, 1971, CXXXVIII, p. 382; article 1882, Civil Code); and the buyer may dissolve the sale concluded at his pleasure or satisfaction (article 912, Civil Code), or withdraw if a considerable part of the thing is missing at the time the contract is perfected (article 918, Civil Code).

- The lessee has the same right for the impossibility or delay in the delivery of the leased thing (articles 1983, 1984 and 2011, Civil Code).



- The orderer of a work may cease its manufacture by reimbursing expenses, the value of the work and the profit of the artlfice (article 2056, Civil Code).

- Either party may terminate the lease of immaterial services without term at any time or with the agreed eviction (Cas. civ. sentence of June 221940, XLIX, 548)'

- The mandate is terminated by revocation of the principal or resignation of the mandatary, the former may revoke it at his discretion or with just cause and the latter may desist or resign from the assignment (Articles 2185, 2189 [3], 2191, 2193 Civil Code; 1279, 1283 and 1286, Code of Commerce, applicable to the commission and preposition by reference of article 1308, *ibidem).*

- The bailee must return the thing within the agreed time, or in case of silence, after the use for which it was lent, except "if an unforeseen and urgent need for the thing occurs to the bailee", in which case, the restitution proceeds before the term, and in the contract of precarious bailment, the bailee has the right to ask for the thing at any time (articles 2205 and 2219, Civil Code).

- The mutuary, in the civil loan, may pay before the term the entire amount loaned when no interest is agreed (article 2229, Civil Code), and even if agreed, in the case of long-term housing credit (Decision C-252 of 1998; civil court decision of July 6, 1955, LXXX, 646 et seq.).



- In the civil deposit, restitution is at the depositor's will, but if a time limit has been agreed upon, the depositary must respect it (article 2251, Civil Code).

- The antichresis creditor, unless otherwise agreed, may return the thing given in antichresis at any time (article 2467, Civil Code).

- The mercantile supply without stipulated duration may be terminated by either party with prior notice, and the breach of one party confers on the other the to terminate it when it is of certain importance or causes serious damages sufficient to impair confidence, but "[i]n no case may the party making the supply terminate , without giving notice to the consumer as provided in the preceding article" (article 973, C. de Co).

- The passenger, giving notice to the carrier in accordance with the regulations, the contract or custom, may withdraw from the commercial transport, with the right to reimbursement of the value of the ticket (article 1002, C. de Co).

- Except for the legal restrictions to the insurer in certain insurances (e.g., life [art. 1159], Soat, performance [Law 80 of 1993, cas. civ. sentence of May 2, 2002, exp. 675; August 15, 2008), the insurance is revocable unilaterally by any of the parties, this power, said the Court, *'u '#aterai*

*uncaused", or "highly subjective, that* it *'must be left* **to the** *unilateral decision of each of the* confrafan/es' *(ad nutum), as - by the way -* was *stated in the Explanation of* Mills of *the aforementioned Draft Code.*

República de Colombia



Cutting 3upr- 5 "st/c/a
Sala de Casación Civil

*This in no means that the revoking party escapes the inexorable and plausible constitutional and legal duty of not abusing his rights (art. 95-1 C. Pol. and 830 C. de Co.), taking* into *account that the recognition of a faculty or power, in itself, does not constitute a* sa/vocond¢/cto or license *to propitiate arbitrariness, under penalty of the corresponding indemnification of the damages caused. It is for this reason that the abuse,* in *sl, transcends* mere *arbitrariness or mere volition", of "unobjectionable volitional origin (ad lib "itum)" without "the need to state in the respective letter of* notice *to his co-contractor, without fail, the reasons which, in casu, led him to take such a decision. It is sufficient for him to communicate, in due form, to the other end of the negotiating relationship without its effectiveness, per* se, *being subject to the validity of a specific motivation and, even less, to the acceptance by the latter, who occupies an entirely divergent 'role': (.......] in its most genuine origin and meaning, it* is *a formal declaration of will; unilateral; receptive, direct or indirect, and which produces effects for the future, in turn triggering a legal transaction of an extinctive nature" with "effects towards the future (in futurum), that is, ex nunc and not ex tunc, since it responds, as has already been expressed, to the confessed desire to disengage - or disassociate itself - from the negotiation agreement. And it could* not *be otherwise, being also a contract of successive tract or execution such as insurance, in which the respective benefits arising for the parties cannot be diluted once executed"* (Cas. Civ. sentence of December 14, 2001, exp. 6230).

- The promisor may refrain from performing when the financial conditions of the promisee have been altered in such a way as to make restitution notoriously difficult (Article 1169, Commercial Code), a power that "*does* not *confer a power ab libitum,* nor is it *free and may not be used in any other way.*

*capricious* and *unjustified manner, since* it is *subordinate to the full and*



Corte Suprema de Justicia
Sala de Casación Civil

*The unquestionable objective verification of the pathomonic alteration of the mutual promisor of* such a/ *magnitude as to make the restitution notably difficult, to* the *lack of offering* of *sufficient guarantee for* the/ e/ject, *and must* be exercised *with strict subjection to the* prevailing *ethical dictates in the legal traffic, to the good faith, and without abuses or arbitrariness"* (cas. Clv. judgment of August 18, 2010, exp. 15001-3103-001-2002-00016-01).

- In the commercial deposit, the thing deposited shall be returned to the depositor when he claims it, except for an agreed term in the interest of the depositary, who may for just cause return it earlier, and if the contract does not fix a term, *"the depositary who wishes to return the thing shall give the depositor reasonable , according to the nature of the thing"* (article 1174, C. de Co).

- The lodging is terminated *"for the reasons expressly agreed upon", and* that entered into without a term, *"by notice given by one of the parties to the other, twelve hours in advance"* (article 1197 [4], C. de Co.).

- The trust contract, among other causes, terminates *"[p]or expiration of the term"* or *"[p]or* /evocation *of the trustee, when such right has been expressly* reserved*"* (Articles 1240 [3 and 9], 1230 [3] C. de Co. and 101 Law 1382 of 2009).

- In the contract of mercantile current account without term *"any of the account holders may, at any time of closure, denounce the contract by giving notice not less than ten days prior to the date of such closure"* (article 1261, C. de Co.).



- The agent or entrepreneur may *"unilaterally terminate"* the commercial agency contract for just cause (article 1325, C. de Co).

- Each of the parties to the bank current account may terminate the contract at any time (article 1389, C. de Co).

- The credit establishment, "unless otherwise agreed", may not terminate the credit or discount agreement before the expiration of the term, and when *"it is for an indefinite term, each of the parties may terminate the agreement by giving the agreed notice or, failing that, with a notice of fifteen days"* (article 1406, C. de Co).

- The documentary credit, unless otherwise stipulated, is *"revocable"* and the issuing bank may revoke it at any time as long as it has not been used by the beneficiary (articles 1410 and 1411, C. de Co.).

- The term of the safety deposit box contract is indefinite unless otherwise agreed, *"but the parties may unilaterally terminate it at any time, notifying the other party in writing, at least thirty days in advance"*, and the delay in the payment of the price, *"will result in the termination of the contract, fifteen days after being demanded in writing by the bank"* (articles 1420 and 1421, C. de Co).

República de Colombia

Corte Suprema de Justicia
Sala de Casación Civil

- The shipper may withdraw from the carriage of goods by sea before sailing (article 1620, C. de Co.).

- The passenger in air transport may withdraw from the contract (article 1878, C. de Co.).

- The consumer has the right to withdraw from the contract of sale of the good or service (article 29, Decree 3466 of 1982).

- The state entity has the exceptional power of unilateral termination in state contracts (Articles 14 and 17, Law 80 of 1993).

- In the event of serious non-compliance by the user, the service provider may terminate the contract and proceed to cut off the service (Article 141, Law 142 of 1994).

- Both the employer and the employee have the right to unilaterally terminate the individual employment contract (Articles 65 et seq. C.S.T.).

With respect to the unilateral termination of the contract when the law, custom or business practices do not establish it, it has been questioned in the past, either because it opposes the notion or normative force of the contract (articles 1494, 1535, 1602 and 1603, Civil Code; 864 and 871, Commercial Code), or because it is invalid and unlawful when subjected to the optional condition consisting of the mere will or mere arbitration of a



The contracting party (article 1535, Civil Code), either by not being included among the legal causes for termination, or by being formed and terminated by mutual agreement of the parties, never by decision of one of them (article 1602, *in fine,* Civil Code), or by being provided for in an exceptional, exclusive and circumscribed manner to state contracts without admitting analogy *legis* or *iuris* or extensive application (articles 14, 15, 16 and 17, Law 80 of 1993), or by being abusive in the rest (article 133.2, Law 142 of 1994) or become a mechanism of *"private justice", in* derogation of the State jurisdiction authorized to terminate the contract.

Strictly speaking, unilateral termination presupposes the existence, validity and effectiveness of the contract, in no way contradicts its notion, normative force, nor embodies a facultative condition.

The contract from its existence generates binding effects for the parties, bound or obliged to perform, whether spontaneous or forced, and terminates by the exclusive decision of one party because the law grants the right or *accidentalia negotii* is agreed, such as express termination clauses, with or without notice, and there are even cases, where the common refusal has been taken as *dissensus or distrato or* concludes in this (cas. civ. sentence of March 12, 2004). The contract exists ex *ante,* engenders effects, terminates ex *post* without retroactive effectiveness and only towards the future. Moreover, performance and termination are different. The former is not left to the mere arbitration or will of one party, latter is produced by unilateral decision of one or the other without affecting the obligations performed.

The lack of express enunciation in the Civil Code within the extinguishing modes is not an obstacle or an argument.



The law provides for unilateral termination in numerous hypotheses and contracts under private law, not only concerning state contracts. In fact, the figure exists in private law, before it was embodied in the state contracting, and the locution is not strange, since it uses the *term "ferminacidn"* article 870, C. d Co), *"to terminate the contract"* (art. 973, C. de Co), just causes *"to unilaterally terminate the* commercial *agency contract*" (art. 1325, C. de Co).

Nor is it admissible to sustain *púma facie,* before and per , its abusive nature, to extend the presumption in this respect circumscribed to public utility contracts under general conditions (Article 133.2, Law 142 of 1994), this does banish the analogy *legis,* alien to the parity and susceptible to vanish, without being logical the supposed configuration in advance of a subsequent abuse of right, which may occur when exercised under certain conditions, or to have it a *priori* as an abusive expression of contractual freedom, for contradicting the rules of experience (cas. civ. judgment of December 14, 2001, exp. 6230).

In general, in the absence of express normative prohibition, it is ineluctable to conclude the validity of these clauses, since they obey the contractual freedom of the parties, empowered enter into the dispositive act and to provide for its termination, even without judicial declaration, providing for the right to annul it, which does not mean and cannot lead in any way to take justice into one's own hands, since any controversy regarding its effectiveness or exercise, must be defined by the judges, as explained below.



República de Colombia

Corte Suprema de Justicia
Sala de Casación Civil

On the basis of the foregoing premise, case law recognizes the validity of termination clauses in bilateral, onerous, commutative and successive performance contracts (Cas. civ. Judgment of September 3, 1941, LII, 1966, 36 et seq.; February 23, 1961, XCIV, 549), and those relating to *"(t)he resolutory condition expressly stipulated by the contracting parties [which] terminates* the *contract as of right without the need for a judicial declaration. Article 1546 of the Civil Code refers to the tacit resolutory condition, that is to say, to that which involves every bilateral contract, and not to the express one, that is to say, to that freely stipulated by the parties"* (Cas. civ. Judgment of 31 May 1892, VII, 243).

The Court admits the effectiveness of the provisions concerning the exclusion of extensions in contracts of duration such as the commercial agency contract when *"as an accidental clause of the contract, it is agreed that it can be terminated in advance, or not be extended for a term equal to that initially agreed, provided that notice is given to* the *other party with due anticipation, it is clear then that the exercise by one of the parties of this power , nor* of *lejos, constitute an abuse of law"* (cas. civ. Judgment of October 31, 1995, CCXXXVII, 1269), where *"stability can never be assimilated to perpetuity or permanence, because this characteristic is not opposed to a temporary validity of the contract"* nor to stipulating a term *"which in addition to constituting a* law *of the contract has its origin in the will of the parties, since it is they who, within the scope of their autonomy and contractual freedom, decide the stipulation of the same"* (Cas. civ. sentence of October 20, 2000, exp. 5497), and even *"there will be cases in which, despite the term of duration that initially has been agreed to e/*



República de Colombia

Corte Suprema de Justicia
Sala de Casación Civil

*The contracting parties may put an end to* the *business relationship, if one* of the *special and exceptional circumstances that -ex lege- enable the termination occurs"* (Cas. Civ. Judgment of February 28, 2005, exp. 7504).

From another perspective, unilateral termination is an undeniable trend reality in contracting, particularly in international, electronic and commercial relations, as well as in consumer relations, all the more so due to the sensitive evolution, secular transformation, dimension and current understanding private autonomy in the dynamics of legal and business traffic.

For this purpose, articles 49 to 64 of the Convention on Contracts for the International Sale of Goods, made in Vienna on April 11, 1980, approved by Law 518 of August 4, 1999, declared exequitable according to judgment C-529 of 2000 and promulgated by Decree 2826 of 2001, authorize each party to declare the contract avoided for fundamental breach and to defer performance in contracts with successive deliveries when it is manifest "that the other party will not perform a substantial part of its obligations" for causes of non-performance, authorize each party to declare the contract terminated for material breach, and to defer performance in contracts with successive deliveries when it is manifest *"that the other party will not perform a substantial part of its obligations"* for the causes indicated (termination by anticipation, *anticipatoiy breach of ).*

Similarly, the UNIDROIT Principles of International Commercial Contracts, third version adopted by its Governing Council, establish the right of a party to terminate the contract if the counterparty's breach constitutes a fundamental breach (Art. 7.3.1.1.1) or, if prior the date of performance of the contract, it is certain that the debtor will



If the obligee is in fundamental non-performance, the obligee may terminate the contract (Art. 7.3.3.3), in which case "[t]he right to terminate the contract is exercised by notice to the other party" (Art. 7.3.2.1),

Likewise, most foreign laws regulate the right to unilateral termination for various reasons. Verbi gratia, according to article 1456 of the *Codice Civile* /f., "Express termination clause", "[t]he contracting parties may expressly agree that the contract shall be terminated in the event that a particular obligation is not performed in accordance with the established terms. In this case, the termination is verified by law when the interested party declares to the other party that it intends to avail itself of termination clause"; according to Article 1429 of the Peruvian Civil Code, "[i]n the case *of Article 1428, the party who is prejudiced* by the *non-performance of the other party may be required by notarial letter to satisfy its obligation, within a period of not less than fifteen days, under penalty that, otherwise, the contract is terminated. If the performance is not fulfilled within the term indicated,*

*the contract is terminated by operation* of law, *and* the "*debtor" shall be liable to*

*"debtor* *the indemnity of* *damages*

*y damages",* Similar provisions are contained in article 1605 of the Civil Code of Quebec,

543 of the Dutch Civil Code and is an inclination of comparative law, as evidenced by the Principles of European Contract Law (Land Commission), article 6.109, *'party may terminate the open-ended contract by giving the other a reasonable period of notice','* ID..., 9:301 *'A party may terminate the* paragraph *if there is a fundamental breach by the* other *party';* the European Contract Code (Pavia or Gandolfi Draft): article 114.1; *'If* there is *a serious breach within the meaning of article 107, the obligee may terminate the* contract *by giving the other party reasonable notice', ID.*

*shall have the right to demand the termination of the* contract, *requiring the debtor to perform within a reasonable period of time of not less than fifteen days, and notifying the debtor that, if the period of time has elapsed in vain, the contract shall be deemed terminated", and* the *Avant-projet* de Réforme au Titre III, Livre III, Code Civil Français, article 1158.

The reasons for which the parties have recourse to this route are multiple in the legitimate scheme of contractual freedom without being reduced to non-performance.

In particular, with explicit reference to contracts of indefinite duration, it is to be justified in the prohibition of perpetual agreements *(eternal engagemenst)* for infringing freedom and human dignity by contravening public order, and even, according to others, it would be equivalent to mutual dissent by originating in the reciprocal agreement of the contracting parties in advance, or agreed for both would ensure the symmetry of the subjects, or the efficiency of the legal relationship *(efficient breach),* the trust or good faith tolerating the extinction of the inefficient one or the one based on the lost trust, or would protect the consumer, the free competition and market or would facilitate the termination of the continuity of undesirable or inconvenient relationships.

This power, said the Court when explaining the unilateral revocation of the insurance contract ex Article 1071 of the Code of Commerce, *"may also be rooted in multiple motives not necessarily or unfailingly linked to trust, stricto sensu, or to the protection of the uberrima bona fides -when one of the parties considers that* the *contractual behavior of the* other *is not in accordance with such a dear postulate-, and may be considered either as a guarantee instituted for the benefit of the insured, or as a guarantee for the benefit of the insured.*



*consumer and for the benefit of a healthy, orthodox and transparent competition, [...]; or* as *an expression of the right to repentance - in the broad sense - in the face of the term of duration not yet elapsed in the 'flowing' legal business, of duration, of deferred execution or of successive tract"* (Cas. civ. judgment of December 14, 2001, exp. 6230).

*Strictly speaking,* one or both parties have a facultative right to unilaterally terminate the contract, without acquiescence, acceptance, consent or acquiescence of the other party, the exercise of which results in a receptive dispositive act in that it must be made known to the other party, usually with a minimum notice, legal or conventional or, failing this, congruent, reasonable or sufficient, in a free form unless otherwise provided (e.g., Article 1071 of the Commercial Code, requires a written notice for the revocation of the insurance), Article 1071 of the Commercial Code, requires the writing for the revocation of the insurance), and constitutive for extinguishing the bond with liberating effects towards the future (ex *nunc)* without reaching the executed, fulfilled, consummated and impossible to be retroactive performances, that is to say, it lacks retroactive effectiveness (ex *tunc), it* fulfills the function to terminate the agreement, and therefore, to disengage *in futurum* the parties of the commitment without judicial declaration, necessary with regard to the controversies in this respect.

The usefulness or practical function of the figure, that is, the legal or conventional possibility of concluding the contract by the exclusive, sole, spontaneous and autonomous decision of one party, and without judicial declaration, is then understood. Also its distinction with the extinctive agreement. One thing is the mutual agreement to terminate the contract, and another to agree causes to terminate it unilaterally. The contract terminates not by agreement, but by unilateral decision.



República de Colombia

Corte Suprema de Justicia
Sala de Casación Civil

Exactly, the unilateral termination and the extinctive agreement are simultaneously exclusive and incompatible.

3. Unilateral termination may occur in contracts of definite or indefinite duration.

A widespread opinion distinguishes between instantaneous or successive, continuous, periodic or deferred, and definite or indefinite term.

When they are fulfilled, executed, exhausted and terminated in a single act, generally coinciding with the celebration or assumption of the performance, they are of instantaneous execution, as opposed to successive, prolonged or projected in time, whether continuous, uninterrupted, fractioned, staggered, at intervals or repeated on intermittent pre-established dates.

Those of definite duration are agreed from *(dies a quo'* and until a precise date *(dies ad quemó),* for a certain, determined or concrete term, and their mere verification terminates them unless otherwise agreed, unless the minimum legal term of duration is greater than that agreed, fraud against the law, abuse of rights or the presence of normative conditions for their extinctive effectiveness.

In principle, unilateral early termination of a fixed-term contract is improper and the term must be terminated in accordance with the stability of the relationship, the usefulness of the relationship for the parties and the function of the fixed term.

However, the legislator contemplates several cases of unilateral termination, for example, in the revocation of insurance.



(articles 1047 [6] and 1071, C. de Co), the mandate by the principal or by resignation of the mandatary (articles 2189 [3 and 4], C.C. and 1279 C. de Co), the fiducia by the trustee if he expressly reserved the right (article 1240 [11], C. of Co), the claim of the thing by the bailor at any time (2219, C.C.), the restitution in the civil deposit at *"will of the depositor"* and even fixed a term *"this clause* sd/o *shall be obligatory for the depositary"* (article 2251, C.C.).

Since the expiration of the term, legal or negotiated, automatically terminates the contract, the extinctive term is not confused with the extinctive agreement and the unilateral termination.

The fulfillment of the consumptive term excludes a different form of termination. Upon expiration of the term, the contract terminates in compliance with the agreement, and once extinguished, there can be no unilateral or consensual termination, nor abuse of rights (Cas. civ. Judgment of October 31, 1995, CCXXXVII, 1269). Of course, except for legal or contractual precept, the expiration of the term *ipso facto* terminates the contract, makes incompatible the extinctive agreement *(mutual dissent)* and the unilateral termination, since the act concludes on the date agreed as a consequence of the term, and extinguished, there is nothing to terminate, since it no longer exists.

Prior to the end of the term *(ante tempus),* nothing prevents the parties from terminating the contract, either by mutual consent (mutual dissent, extinctive agreement), or unilaterally in legal or contractual cases, or by the advent of the express termination condition by virtue of serious and insurmountable non-performance when they stipulate a termination clause. Indeed, nothing prevents the parties from agreeing on the unilateral early termination of a contract.



The term of the contract is a definite term contract, but in the absence of any legal stipulation or provision, they are bound by the term and must comply with it.

The parties may agree on the renewal or extension, provide for it, exclude it or make it conditional, failing which, the arrival of the defined term *per se* terminates the contract. Of particular importance is the practical execution of the contract by conclusive conduct after the term *(tacit renewal)* and the contractual clause of renewal or extension, express or tacit, with or without specific duration.

Renewal (from *renovatio,-onis),* is the action and effect of renewing (from *renovare), to* make something new, modify or substitute, and to extend (from *prorrogare), to* continue something for a determined period of time.

The renewal is not to be confused with the extension of the contract, "e/ renewed is *a* new one" (Supreme Court of Justice, Full Chamber, judgment of November 20, 1971, CXXXVIII, 482 et seq.; civil cass. judgments of September 24, 1985 CLXXX, 431; October 31, 1985 CLXXX, 431; October 31, 1985 CLXXX, 431; and October 31, 1985 CLXXX, 431).

1994, exp. 3868; 7 July 1998, rad. 10825; 8 October 1997, exp.

4818; July 27, 2001, exp. 5860; September 24, 2001, exp. 5876,

April 14, 2008, 2001 00082 01), and the extended one the same. The extension keeps the contract identical, is not presented any more but by agreement prior to the expiration of the term and continues it in the primary conditions for an equal period (articles 218 [1], 520, 829, 1425 *["extended for an period,* 1510, 1685, 1686,

1712, 1891 C. of Co).

Unless expressly, clearly and unequivocally provided for by law or negotiation, automatic renewal or extension clauses in fixed-term contracts do not them into fixed-term contracts.



República de Colombia

Corte Suprema de Justicia
Sala de Casación Civil

indefinitely. The fundamental effect of these clauses excludes the conversion or transformation of the contract, which in the extension subsists without losing its nature for a period identical to the initial one, and in the renewal implies some modification. The extension without provision for a period of time equal to the initial one, extensions beyond those permitted by the Law, when the latter sets a maximum limit, and the conclusion of successive contracts between the same parties for the same object, give rise to some difficulty. The automatic extension agreed for a period equal to the primary one, from the outset prevents the conversion of the contract concluded for a definite term into an indefinite term, and the lack of indication, may be purified by means of the interpretation of the contract itself, because it continues, it survives the same.

Renewal is more complex in that it involves a modification of the contract, which may concern the term, and the continuous or repeated conclusion of chain contracts, where one contract of a defined duration is followed by another that is formally different, but identical in content, sometimes concluded in fraud of the law.
Iey to circumvent mandatory rules or to avoid conversion, a situation *
The judge must analyze this situation within the concrete framework of circumstances.

Moreover, the automatic renewal or extension expressly agreed by the parties for a period identical to the initial one, maintains it and prevents the transformation of the contract from a definite term to an indefinite term, and in any case, each party has the right and legitimate interest to unilaterally terminate, denounce or terminate the contract for legal or contractual reasons. This is the case, for example, in the lease of real estate for urban housing that, in the absence of express stipulation of the term, is



The lease is understood to be entered into for one year, renewable for the same term, the parties having fulfilled their obligations and the lessee having agreed to the legal readjustments of the rent (Articles 5 and 6, Law 820 of 2003), who may terminate it *ad nutum* at the expiration of the initial term or its extensions with a notice not less than three months prior to such date without being *"obliged to invoke any reason other than that of its full will, nor must it compensate the lessor"* (Article 24.5, *ibldemj*, which may also do so during its extensions with prior notice and payment of compensation or without it, as the case may be (articles 22.7, 22.8).

It characterizes those of indefinite duration, the durability, temporary extension or prolongation in time, essential factor in the function of the contract, its performance, *utilitas* and interest of the relationship *(commodum obligationis).*

Indefinite duration is neither perpetuity nor eternity. No legal relationship is eternal. The dichotomy between a durable relationship and a perpetual relationship allows the parties to terminate it, unless otherwise expressly provided by law. The one of indefinite duration is a durable contract, it lacks a concrete, determined or defined term, it is prolonged in time and ends according to the law or the convention. It is not *ad perpetuas,* nor becomes, converts or is equivalent to it. The distinction is simple.

Perpetual contracts, as the word denotes, never end, compromise contractual freedom *ad infinitum,* contradict the concept of contract conceived as a legally relevant dispositive agreement of interests of two or more parties to constitute, modify or extinguish legal relationships in pursuit of a useful function, of which they are an instrument, in addition to



*República de Colombia*

*Corte Suprema de Justicia*
*Sala de Casación Civil*

It is unlawful to suppress it in an absolute, eternal and timeless manner because it violates public order.

*Contract sensu,* the contracts of indefinite duration, are durable but without vocation of perpetuity, they terminate by the normative or conventional causes, they exclude by their definition and common sense, the renewal or extension of the term for indefinite, and their unilateral termination is justified not to prevent its conversion into a perpetual bond, nor because they are equivalent to it, but according to the interest of the parties, the utility of the relationship and the freedom of contracting. This power, correctly understood, protects contractual freedom and serves the purpose of the practical or social economic function of the legal business, which is transitory, even if it is for a long period of time.

In contracts of indefinite duration, unilateral termination, as highlighted by the Court, is a natural element *(naturalia negotii), it* is understood to belong to it and incorporates its content by ley, use or custom, without stipulation, (articles 1501, C.C. and 871, C. de Co). It is not a simple style clause but clauses of common use. Sometimes, it derives from the nature of things, *verbi gratia,* the termination *in continent* by the advent of a serious and insurmountable breach (articles 2189 [3 and 4], 2225, 2251, C.C.), denunciation of contract of successive or staggered execution for an indefinite term, and , it is agreed (accidenfalia *negotifj* as resolutory clause or of express unilateral termination, practice of common use (article 1621, second paragraph, Civil Code).



In these contracts, some currents, distinguish the ordinary termination with integrative function of the content, as an elective right to terminate the contract by means of legal or negotiable notice, congruent or reasonable, and the extraordinary termination due to the influence of events or initial or subsequent events, or as a right of withdrawal or recess of the parties. The notice warns the unilateral decision to terminate the contract at the expiration of its term, the possibility of adopting measures of mitigation or avoidance of damage to the other party, and when it is not erected by law or agreement, derives from good faith, loyalty or correctness and the exclusion of abuses, applying the time proportionate, fair, reasonable, weighted, or congruent, according to the relationship, seniority, trust, continuity, function, usefulness and interest of parties.

To this effect, an important opinion explains: *"In contracts of* successive or *periodic execution, withdrawal* is *configured as the exercise of the power* of the *party to interrupt the contractual relationship".* It is conferred to one or both contracting parties, *"by a precedent agreement (clause or covenant of withdrawal), or may also be also attributed by* law *(legal right of withdrawal) to remedy "noncompliance," the "onerousness or the intolerability of continuing in the relationship". In these cases, however, the withdrawal constitutes a power of self-protection, and its* exercise is subject to *control over the adequacy of the method with respect to its function. The right of withdrawal protects, on the contrary, the party's objective interest in the interruption* of the *contractual relationship, and* the *exercise of the right is left exclusively to the autonomous decision of the holder, except for the general limit* of the principle of good faith. Good faith requires that it be exercised in such a way as to safeguard the interests of the other party, if it does not entail an appreciable sacrifice for the person exercising it. The importance or interest of the relationship may require adequate notice. In certain contracts the law sets it. This normative foreseeability of the term is understood as the extinctive effect of the contract.



*It is asked whether, in* the *absence of a specific legal provision, the* party *may also have the possibility of withdrawing from the successive or periodic performance contract. The answer must be in the negative if the contract has a term of duration established by the parties or established in any other* way; if, on the other *hand*, the contract has no *minimum duration, or* if the *term of duration has already been exceeded, each of* the parties *is deemed to be free to withdraw, subject to respect for the principle* of *good faith. The inertia of the parties after the expiration of the term may lead, according to the provisions of the law, to the* renewal of *the term", "The withdrawal* or/dfnary, *conventional or legal,* is *an arbitrary power which the party may exercise freely without it being necessary to give a justification, in the respect, course, of the principle of good faith. From the ordinary termination it is necessary to distinguish* the *termination for just cause, which constitutes, properly speaking, an extrajudicial remedy for termination of the* contract *for non-performance. In* some cases, *the* withdrawal or *revocation may provide for a performance to be made by the party who withdraws, a penalty fine,* deposit" (C. Massimo Bianca, *Derecho Civil* 3, *El contrato,* trans. esp. Fernando Hinestrosa and Édgar Cortés, 3rd Universidad Externado de Colombia, Bogotá, 2007, pp. 761 et seq.)

On the other hand, in contemporary contractual legal transactions, express termination or *ipso jure* termination clauses are frequent, without requiring a judicial declaration and by unilateral decision of one party.

In this, any contract, whatever its typology or specific nature, and in particular, those of successive performance, whether for a fixed term, or for an indefinite term, obliges the parties to perform it in good faith during the fixed term or indefinitely if there is no fixed term, or indefinite term, obliges the parties to perform it in good faith during the fixed term or indefinitely if there no fixed term, and in the case of correlative performance, the non-performance or unjustified reluctance, legitimizes the party to perform the contract in good faith.



In this case, the resolution must be judicially decreed, generating its termination and therefore, the cessation of its binding effects from its decree with the restitution of things to the previous state, with the restitution of things to the previous state, the parties are released from the commitment and must restitute what was given, delivered or executed, except for those consummated situations not susceptible of undoing, in particular, in the contracts of successive execution, event in which it is produced towards the future (ex *nunc)* without affecting the past (ex *tunc).*

Apart from the tacit resolutory condition, the parties may stipulate *expressis verbis* the express resolutory condition.

Express termination clauses, as denoted by the expression, terminate and therefore terminate the contract. The most usual ones concern the non-performance of specific obligations and confer on the party performed or rendering performance the right to terminate it by autonomous and optional decision insofar as its exercise depends on the exclusive decision of the interested party when it occurs. However, the termination clause may also refer to hypotheses other than non-performance.

The commissory agreement (Lex *Commissoúa)* is a specific form of express resolutory condition. Specifically, Article 1937 of the Civil Code regulates the qualified commissory agreement, whereby *"it is stipulated that failure to pay the agreed price will ipso facto terminate the* contract of *sale",* but the *"buyer may, however, make it subsist by paying the price as much as he deems necessary"*, but the *"buyer may, however, make it subsist by paying the price as much as he deems necessary".*



This is a singular hypothesis of express resolutory condition limited to the non-performance of the buyer in the payment of the price, as opposed to the tacit one by any party, obligation and contract of correlative performances, as well as the express one by the non-observance of one or both parties to any of the different obligations specified.

In the case of a qualified commissory agreement, the termination does not operate *ipso* iUre or by operation of law and requires a judicial declaration. The same happens in the presence of a tacit resolutory condition. However, the qualified commissory agreement confers to the respective party the possibility of performing within the legal term avoiding the termination of the contract, and if the default is not purged, the advantage of generating it without the need to analyze the seriousness and unfairness of the non-performance. Even though the qualified commissory agreement is provided by law for the contract of sale, no rule excludes or forbids it in other contracts of correlative performance, nor does it violate public order or good customs.

The resolutory condition terminates the contract and, as a matter of principle, requires a judicial declaration.

However, in the *"express termination clauses" and* unilateral termination of the contract for reasons other than the qualified commissory agreement, whose causes may also be different from the non-performance, the law or the parties may provide for the termination *ipso* jure without the need for a judicial declaration ex anfe. In this eventuality, the express resolutory condition is agreed as a right to terminate or terminate the contract by act of the party.



autonomous, autonomous, independent and elective, because it can exercise it or refrain from doing so.

In itself, the primary function of these stipulations is to terminate the contract by unilateral declaration of one party, either for non-performance, or for convenience, opportunity or other legitimate reasons, either for the causes set forth in the law or the contract (unilateral termination for just cause of the agency contract), or exceptionally *ad nutum* (revocation of insurance, penitential deposit, retro-sale, retro-purchase, individual employment contract with trial period, recession in consumer contracts, etc.), either after notice (lease, supply - article 973, second paragraph, C.C.), or automatically or in continenti (mandate, deposit, mutual agreement, etc.), or after notice (lease, supply - article 973, second paragraph, C.C.), or automatically or in continenti (mandate, deposit, mutual agreement).), either after notice (lease, supply - article 973, second paragraph, C. de Co.), or automatically or *in continenti* (mandate, deposit, mutual).

The express termination clause stipulating the unilateral termination *ipso jure* of the contract is an accidental element *(accidentalia negotii), it* presupposes an express, clear and unequivocal agreement of the parties, and in principle, it is considered to be in accordance with the law, valid and lawful (cas. Judgments of May 31, 1892, VII, 243; September 3, 1941, LII, 1966, 36 et seq.; February 23, 1961, XCIV, 549) but susceptible to subsequent judicial control, in its origin, content and exercise.

The effectiveness express termination clauses for breach requires full compliance with the generic assumptions of validity, the particular, clear and precise indication of the obligation or obligations whose relevant non-observance, total or partial (SNG, judgment of April 29, 1935), entitles one or both parties to unilaterally terminate the contract. An abstract, global, generic or en bloc mention or reference is not sufficient.



Menester, singularize, specify, , specify, specify and individualize clearly and expressly, the obligation, whether legal or contractual, whether principal or accessory, as appropriate to the express and the significance of the breach. Likewise, in order to preserve the symmetry, parity or objective balance of the parties, good faith, loyalty and to avoid abuses, the effectiveness of these clauses is subordinated to the reciprocity of the power for both parties or, stipulated for one, to a reasonable advance notice of the party exercising it, informing the other of the precise non-compliance, its right to remedy it before the expiration of the term and the termination at its expiration when it does not rectify its conduct according to the required probity or correctness, the principle of the conservation of the act, its usefulness and the seriousness of the act.

From this perspective, termination by express resolutory clause for breach of obligation does not imply any right to take justice into one's own hands, nor does it abrogate jurisdiction.

*Prima facie* the unilateral termination by express resolutory clause is strictly reserved to the party that has performed or is willing to perform, since it is repugnant to clear ethical dictates that the party that has not performed or is reluctant to perform should seek to benefit from its own non-performance. Likewise, its exercise presupposes a certain,, evident and incontestable breach of the individualized obligations, not of others, and of such gravity, magnitude, relevance, significance or importance, inasmuch as not any failure to comply with the duties of conduct justifies the termination. Nor may this power, or any other in general, be exercised in a manner contrary to good faith or in breach of any other duty of conduct.



abuse of the right. Likewise, the effectiveness and exercise of this prerogative can be controlled by judges, without excluding the fundamental right of access to the administration of justice to define any dispute, difference or controversy on purpose.

The unilateral termination of the contract by express termination clause, structure receptive dispositive declaration, analogous to the notice to terminate contracts of indefinite duration or enervate the automatic extensions agreed in those definite duration, in that it must be communicated to the other party, who may protest the cause invoked, the abusive exercise or contrary to the dictates of good faith, by unfounded untimely or illegitimate, and even its inappropriateness by tolerance, purge or condonation, or also recognize the fault.

4. When the unilateral termination power is exercised, the contract terminates *ipso jure* without judicial intervention. However, if there is a dispute, the parties may resort to the courts, which rules out taking justice into one's own hands.

It is important state that the possibility recognized by the legal system to the parties to provide for the unilateral termination of the contract for the legal or contractual causes and modalities (withdrawal, revocation, resignation, denunciation of indefinite term contract, unilateral withdrawal, express termination clauses or unilateral termination clauses, or *in continenti,* etc.), do not grant any right nor are they equivalent to taking justice into one's own hands, much less exclude the fundamental right of access to jurisdiction to decide any dispute about its effectiveness, and exercise it without deviation or abuse.), do not grant any right nor are they equivalent to taking justice into one's own hands, much less do they exclude the fundamental right of access to the jurisdiction to decide any dispute regarding its effectiveness, and its exercise without deviation or abuse.

Therefore, all disputes regarding the effectiveness of these stipulations or the exercise of the legal or contractual prerogative, legitimize the parties to resort to the competent judges, to whom their knowledge and final decision corresponds.

In this respect, the stipulation may contravene a mandatory rule, be abusive, involve the exercise of a dominant contractual position, abuse of rights, violation of legitimate expectations, the act itself *(venire contra factum propium)* or good faith, or even conduct formally in accordance with the legal system or the content of the stipulation of unilateral termination assessed in the specific factual framework of circumstances, may become abusive and illegitimate, or in the *ad nutum,* configure a dysfunctional exercise, for example, to intentionally infer a damage, aspects that in terms of justice, impose careful examination of the factual framework of circumstances by the judges within their hermeneutic autonomy and the discreet assessment of the elements of conviction.

Abuse of rights, and in particular, good faith, are parameters limiting and correcting contractual freedom, and are therefore of particular relevance in these aspects.

Jurisprudence recognizes in specific circumstances that the exercise of the power of unilateral termination does not constitute an abuse of rights (article 830, C. de Co), without setting an inflexible general guideline or ruling it out a *priori,* since it may be abusive, and as a general rule, in legal or contractual cases, the party may terminate the contract subject to the correctness, loyalty, good faith and correct exercise of its rights (article 830, C. de Co).



rights, but in the *"...contractual* sphere *there is room for abuse of rights...",* and it can "...occur *in the formation of the contract, in its* execution, *in its dissolution and even in* the *post-contractual period'* (LXXX, 656; cas. civ. judgments of 6 December 1899, XV, 8; judgment of 6 July 1955, LXXX, 656; 11 July 1955, LXXX, 656; 11 July 1955, LXXX, 656; Cas. civ. judgments of 6 December 1899, XV, 8; Cas. civ. judgments of 6 July 1955, LXXX, 656; 11 July 1955, LXXX, 656).

October 1973, CXLVII, 82; October 19, 1994, exp. 3972), from which, in harmony with Article 95 of the Political Constitution, according to which, all persons are obliged to *"[r]espect the rights of others and not abuse their own",* must be *"understood the conventional clauses or the legal or constitutional regulations permitting* the *unilateral termination of the respective agreement, because they cannot be interpreted at a distance from the postulate being discussed, inasmuch as they require to be observed by means of their own púsma, in view of the possibility that in the exercise of this power a violation of the rights of others may be* incurred*; This means that they must be assessed on the understanding that their activity cannot cause damage to those who have contracted with the agent, unless, of course, there is reason to justify it, as would happen, verbi gratia, when the contractor's behavior, given his lack of honesty or intelligence, imposes it"* (Cas. civ. judgment of September 16, 2010, exp. 11001-3103-027-2005-00590-
01).

Prerogatives *ad nutum, ad libitum* or at will are subject to this guideline, in the exercise of which the holder is not alien *"to the inexorable and plausible constitutional and legal duty of not abusing* his *rights (arts. 95.1 C.P. and* 830 *C.Co), taking into account that the recognition of a faculty or power, in , does not constitute a safe-conduct or license to propitiate arbitrariness, under penalty of the condign compensation* of *the damages caused.*



República de Colombia

Corte Suprema de Justicia
Sala de Casación Civil

*It is for this reason that the abuse, in itself, transcends* mere or *simple volition"* (Cas. civ. sentence of December 14, 2001, exp. 6230).

Consequently, all specific expressions of unilateral termination of the contract, the exercise of the discretionary right, even discretionary, are governed by the principles of good faith, avoidance of abuse of rights and subject to judicial control, which suppresses private justice by its own hand. Good faith and abuse of rights constitute limits to the agreement and exercise of these powers.

5. By way of colophon, strictly speaking, the contract from its existence has binding force, it is irrevocable and the parties must comply with it in good faith, without, as a general rule, once entered into, being able to unilaterally terminate it or withdraw from by unilateral act, under penalty of breach and compensation for damages caused.

The normative force of the contract and the legal duty of its fulfillment by the parties is the principle and the rule. No party may unilaterally withdraw from the contract under penalty of non-compliance and compromise its liability. The unilateral termination of the contract, in any of its expressions, is the exception.

In specific hypotheses and under certain , the law or the contract authorizes one or both parties to terminate it by unilateral decision, either justified, motivated or with just cause, or *ad* notom, discretionary, without justification or motivation, with or without notice, in accordance with the provisions of the law, in which case,



República de Colombia

Sala de Casación Civil

is cause of termination of the contract, provided for at in this *(accidentalia negotii)* or in the law (esenfia/ía or *naturalia negotii).*

The Chamber concludes in this regard, the singular normative provision or, by use, custom or business practice, the unilateral termination of the contract, the absence of express abstract legal prohibition and the authority or legitimacy of the parties in exercise of contractual freedom to agree, according to their needs, convenience, designs, nature of the available interests, public order, good customs, useful economic or social practical function, relativity of rights, parity, good faith, loyalty and enforceable correctness.

However, unilateral termination of the contract is exceptional, requires express legal or contractual text, excludes analogy *legis* or *iuris,* must be applied and interpreted strictly, and when its origin is negotiable, the parties in the development of private autonomy may agree it subject to the law, mandatory rules, *ius cogens,* good customs, symmetry, balance or reciprocity of the relationship, without abuse of any kind, in cases and contracts in which the law does not prohibit or exclude it.

In those of definite duration, the term binds the parties, neither, as a general rule, can terminate the contract; one or the other, before the term can extinguish it by mutual consent or, the law or the agreement, authorize one or both to do so *ex ante tempus* by unilateral decision; the verification of the consumptive term, annihilates the contract, which no longer exists, makes incompatible and prevents other means of extinction, in , the



Corte Suprema de Justicia
Sala de Casación Civil

The clause of automatic renewal or extension of the term for another equal to the initial term does not convert or transform the definite term contract into an indefinite term contract, which subsists identical if it the latter or, with modification of its content in the former, except for the term, and even the parties have the optional right to denounce or not to continue the contract at the end of the initial term or of extension in execution, with the pertinent prior notice, avoiding its untimely prolongation.

In contracts of indefinite duration, unilateral termination is an element of the contract by law, usage, custom or contractual stipulation, deriving from the nature of things or the advent of subsequent serious events, and such contracts, as the *ad quem* said*,* unless otherwise expressly provided by law*, may be terminated* by denunciation of one of the parties with notice for a normative, contractual or reasonable time, can be terminated by denunciation of one of the parties with prior notice for the normative, contractual or reasonable time, since they terminate by legal or contractual causes, they are not perpetual, eternal or that never conclude, therefore prohibited because they are contrary to the public order of the Nation for suppressing in an absolute and timeless manner the contractual freedom.

Loyalty, correctness, probity, good faith and abuse of rights are restrictive and corrective parameters of private autonomy.

Good faith and the prohibition of abuse are constants in the formation, conclusion, development, execution and interpretation of the act, to the point of being valuable instruments to control the legal business and the exercise of the powers of the parties.



República de Colombia

Corte Suprema de Justicia
Sala de Casación Civil

unilateral, legal or negotiated termination, based on fair balance and proportion according to the contract and social solidarity.

Abuse, dysfunctional conduct for the exclusive benefit of the holder and disproportionate sacrifice of the counterparty, alters the objective function and structural scheme of the right.

The judge must act to prevent the attainment or preservation of the asymmetric advantage, in accordance with constitutional and legal principles, social function, the absence of absolute rights, correlation of the conferred power, exercise and its function.

Unilateral termination in any form or modality cannot be exercised with abuse, nor in bad faith, under penalty of compromising liability, and in any controversy regarding the effectiveness or exercise of the power, judges must be especially rigorous in the specific assessment of the concrete framework of circumstances to ensure justice to the *subject iuris,* raison d'être, genuine foundation, primary and ultimate purpose of the democratic social rule of law.

6. Based on the above premises, the second instance judge, in the core of the case, deemed it necessary to interpret the contracts, especially the fifth clause, according to which *"the contract shall have* a *minimum effective duration of one (1) calendar year, which shall be computed from the date of signature of* this *document by the parties. Notwithstanding, it shall be automatically renewed for periods equal to the initially agreed upon if the parties have not agreed at least thirty (30) days* prior to *its expiration date to terminate it, and provided that no cause for unilateral termination of the contract has been presented and therefore, the termination of the automobile",*



Corte Suprema de Justicia
Sala de Casación Civil

The plaintiff argued on the literal text, the term of thirty days prior to the initial term for consensual termination, failing which, they are automatically renewed for the same period, and the defendant, as a notice in which one can express to the other its decision not to terminate them avoiding the renewal.

For the foregoing, it specified the disputed difference "on the *manner of terminating the contracts so that they are not automatically extended for a term equal to the agreed minimum",* judging it agreed *"to announce the* desire *not to continue with the validity of the same and, therefore, to let the other* contracting party *know the* desire *to disengage the vehicles from the company", to make known to the other contracting party the desire to disengage the vehicles from the company",* and without discarding the freedom to stipulate the term for the termination by agreement, supported its interpretative reasoning, in the uselessness of that sense because the parties at any time can terminate the contracts jointly, the waiver or disposition by a single anticipated act of the future contractual freedom to which it would lead to admit it, the extinction of the pact at the whim or will of a contracting party, who can deny its consensus by prolonging it in perpetuity to the detriment of the other, the general interest, the competition, circulation and use of the goods or services in the market, while the practical utility, the rules of experience and generality of the legislations establish times to announce the termination by one party to the other, not to agree it, and in those of successive, continuous or periodic execution, the right to dissolve them by unilateral act, with the limits of good faith, is a natural element.



The censure, in summary, reproaches the Court, for interpreting the fifth clause without any discrepancy on its clear, exact, clear, expressive, meticulous understanding of the design of the parties in concluding a durable contract with a permanence clause, whose outstanding note is the renewal, the termination by consensus, never by *"*unilateral *termination*", confusing the "useless/ with *the inconvenient"* when long-term repudiate unilateral termination as long as nothing extraordinary or unforeseen occurs, the power cannot be omnipotent, without valid reason, nor motive, although one or the other case may occur, in addition to its legal or negotiable origin, exceptional nature, not so natural, and even considered as a natural element in contracts of duration, its exercise "a */roc/ie* and /roche" should be rejected, especially if in this , it was exercised without reason, vindictively, with fraudulent motive and abuse of the right, the contract was drawn up by the defendant, the ambiguity of existing acts it, for all of which, it ignored the autonomy of the will, the binding force of the contract, the rules of interpretation, in exchange for interpreting it substituted and regulated, and incurred in the factual and legal errors denounced in the interpretation of the contracts and other evidence.

Apart from the questioning under the perspective of the indirect way to the legal powers of the judge in the interpretation of the contract, or the dichotomy between interpreting and regulating, or the consideration of the judge regarding the unilateral withdrawal as a natural element of the agreement, strictly legal matters, no doubt, the radical controversy raised between the parties, includes the pristine understanding of the fifth clause of the contracts, as the Court rightly observed, because for the plaintiff the defendant company breached them.



by unilaterally and unconsultedly terminating them, while the latter invoked the exercise of a right to terminate the renewal or extension by giving notice within the thirty days prior to the expiration of the initial term *("unilateral withdrawal"),* which the former opposed, since the term for agreeing the termination was foreseen.

The Tribunal, it should be noted, based its reasoning on hermeneutic in the freedom of contracting.

In this respect, he considered contrary to law, the anticipated agreement of waiver or commitment of contractual freedom in the future, which leads to admitting consensual termination as the only means of extinction, because in this way, by requiring the consent of the parties, one can refuse it, prolonging the contractual relationship to infinity to the notorious detriment of the other, The main argument that led him to reject the mutual agreement as the only mechanism to terminate the relationship, also because of the usefulness and function of the clause, according to the rules of experience, common sense and comparative normative regulation.

Such interpretation does not seem far-fetched, it is within the discreet hermeneutic work of the judge and the one suggested by the censor is not the only one and would imply, as stated in the contested decision, that the contracts in dispute with automatic renewal or extension clauses would terminate only by mutual agreement of the parties within the term of thirty days prior to the expiration of the initial term, and if there is no consensus, they would be successively and indefinitely extended for the same term to infinity.

The stipulation with this orientation, in fact, is meaningless, since the termination by *"mutual dissent"* may occur at any time prior to the expiration of the initial term or after the automatic extension, not necessarily within the thirty days prior to the expiration of the initial term.

Moreover, the extinctive term and the extinctive agreement are simultaneously incompatible, since in principle, the simple arrival of the consumptive term extinguishes the contract, and once it is terminated, there is nothing to terminate, neither by mutual agreement, nor by unilateral decision, from which the stipulation would involve a contradiction in itself, because the contract would never end when the term expires but by reciprocal extinctive consensus.

In the same sense, it is not erroneous the estimation of the judge to see in the definite term contracts with automatic extensions, precisely to differentiate them from the perpetual agreements, according to the doctrine and compared legislation, the right for both parties not to continue them, at the expiration of the initial term, or of the extension in progress, exercising it within the legal, negotiated, usual or reasonable notice period, which some opinions nominate *"unilateral withdrawal".*

Therefore, understanding the clause as the censure suggests, that is, insofar as it requires mutual agreement within the peremptory term of thirty days prior to the expiration of the initial term or its extension, the validity of the contract and its termination is subject to consensus, the refusal of one of the parties being sufficient for the automatic, successive and timeless renewal or extension, and undermining Article 1620 of the Civil Code, to the effect that *"[t]he sense in which a clause may produce*

*If the interpretation of a clause can have two different meanings, one of which would subtract -or reduce- its effects, or would distort the legal business, such interpretation must be rejected, for not consulting the canons that, from ancient times, stereotype this discipline"* (Civil Court Judgment of February 28, 2005).

In abundant jurisprudence, the Chamber has pointed out:

> *"Strictly speaking, to interpret is to auscultate, unravel, specify and determine the legally relevant meaning of the business (cas. August 27/1971 and July 5/1983), the scope of its content (cas. December 10/1999, exp. 5277) and the identification of the purposes pursued with its conclusion in order to give it final effectiveness (cas. February 18/2003. exp. 6806).*
>
> *"For the same reason, the interpretation is predicated of the existing legal business, it is subsequent to the existence of the dispositive act and, strictly speaking, it consists of establishing and specifying the normative relevance of its meaning in accordance with the 'reciprocal intention of the parties' (art. 1618 C.C.).), usually embodied in the clauses, paragraphs, conditions or stipulations, to which, however, it is not reduced or subordinated, because, even being 'clear' the idiomatic,* /f/era/ or *textual sense of the words, in any divergence on purpose, it is necessary to reconstmir it, to specify it and to investigate it according to the* framework *of* circumstances, subject *of the legal business, position, situation, knowledge, experience, profession or trade of the subjects, cultural, social, economic, political, geographical and temporal environment in a retrospective and prospective perspective, that is, considering in addition to* the *conclusion, execution and practical conduct of the negotiation, the prodromal, gestation or formation phase,* taking into account that *.......the preliminary* acts, dealings or conversations *aimed at preparing the production of a contractual consent are not unimportant; on the contrary, once the consent is formed they are an integral part of it, and their importance is translated in serving as auxiliary means to interpret the true intention of the parties, crystallized in the clauses of the contract' (cas. civ. June 28/1989).*
>
> *"On the other hand,* the *interpretation of the legal transaction is necessary not only with respect to obscure, ambiguous clauses,*



The same is true not only *in the presence of stipulations that are unclear, insufficient and unintelligible, antinomical and contradictory or incoherent among themselves or with the abstract* or *singular normative discipline* of the act, but *also in the presence of clear or d&fanas* (fn *daris* non *ra inteipretatio) and* ann *fmnte to the clarity of the language used,* when the parfes, *one or both, attribute a* different/genfe *meaning*, not being *admissible to the hermeneuta* res/ringi/se *to the natural or* obvious *sense* of *the words,* to *the grammatical or exegetical interpretation, to the writing of the documentary* or *documented dispositive act 'however clear* the *literal tenor of the contract may be' (cas. civ.* august *1/2002,* exp. *6907), nor 'to confine myself to the exclusive examination of the* wording *of the contesto...' (cas.civ. june 3/1946, LX, 656).*

*"Naturally,* the *clarity of the* arficolate or *its linguistic significance, does not exempt the duty* to *specify* the *common convergent rnality of the* countries, that is to say the *particular dynamic* essence *of the hermeneutics of legal hermeneutics*, is explained *by the pragmatic impossibility of foreseeing every contingency, the dislmile sypni/iccado of terminology, language or wording and does not exclude the duty to specify the common convergent rnality of the* countries.*The pragmatic impossibility* of *foreseeing every contingency, the dislmile* sypni/ic of *the terminology, language or* wording is *explained by the pragmatic impossibility* of *foreseeing every contingency, and* is not reduced to *hypotheses of ambiguity, insufficiency,* dis/'uncidn *or obscurity,* being pe/Yinen/e *in every* case *of dis/Yin/e, divergence or difference with respect* to *their reciprocal understanding* (cas. *civ. of* August *1, 2002 exp. 6907).*

*"Of course, the work of the judge* does not aim at ene/ving, *replacing* or *supplanting the authority* of/ *dominus negotii, nor at modifying, eclipsing, adulterating or distorting its* es/ipo/ations *(cas. March 27/1927),* is *subject* to *'the fidelity' of the pact (cas. August 27/1971, CCLV, 568) and* 'to the *prudent and reflexive* consecL/cidn*' of the reciprocal sense of the disposition (cas. August 14/2000, exp. 5577). However,* the *in/e/pref8///vo role* of/jvzpador *is not* ':/e me/o *reproducer of the content* nepocie/ *the* ex0páSfS of *its sense, nor is* it *exclusively aimed at making explicit the will of* the pa/Yes *as if it were* an aofdmata.

*"Put concretely,* the *hermeneutic activity of the judge is not spherical,* the *legal* system imposes *on him* ex *autoritate the duty to* decide *the controversies looking for* the *concrete result pursued by the* parties *with* the conclusion of *the legal transaction in coherence with its 'substantial content', practical, essential, 'real' and functional utility (Massimo BIANCA, Diritto Cia'//e, Vol. 3, II contract, Dott. A. Gio7rš Ed "itore, S.p.A. Mil4n, 1987, Ristampa, 1992, pp. 379), without altering, substituting or misrepresenting what has been agreed, by carrying out an effective and suitable control, even corrective, to determine its final* effect *or definitive* aspects *in conformity with the interests of* the State, its *specific type, its function and the governing precepts, in general and* in *particular.*

*"With reference to* the *common intention, the lefiftSlator imposes the rule of not limiting oneself to the literal sense, that is, to the signlrcado.*



Corte Suprema de Justicia
Sala de Casación Civil

*grammatical or semantic natural of the word used, either in the general context of the* paragraph, or *in* the *specific context of each word,* either *in its literal and literal expression or in its syntactic connection by elementary margins* of *dissimilarity, ambiguity or semantic obscurity,* transcending *the sphere of the simple* motive *(*subjective *interpretation*), of/ writing *and performance (objective interpretation), for which, the judge,* without *restricting himself to a pure or strict subjectivism, of* his own; *in* menta *retenta, to investigate4 from its genetic phase in toto the dispositive act, the previous,* coefdnea and *subsequent conduct* of the *parties inserted in the time, place and predetermined means, will verify its conformity or disagreement with the ordinance and* will specify *its effects,* that is to say, *the legal relevance of the meaning of* the communis *intentio,* /ocucidn *mferida ab initio to the eminently voluntarist conception of the legal business a speculum as an act of 'internal will' or 'declared' (cas. May 15/1972 '...between the contracting parties the real will must prevail over the declared one' and August 1/2002, exp. 6907, 'it is the internal will and not the declared one that governs the contractual* hermeneutics*), either 'manifested', or 'objective will' (cas. civ. Jan. 29/1998) and, closer, although not entirely exact,* to *'act of private autonomy' (cas.* May *21/1968), the scope of which must be subjected to* a *perspective more in accordance with its various expressions and, in particular, with the practical or social economic function,* that is, *in accordance with the coordinated, coherent, rational and convergent function pursued by the parties with its conclusion.* (Cas. *civ. June 12/1970, cas. civ. sentence of* January *14, 2005, exp. 7550), Sentence of June 3, 1946. Gazette Judicial LX, 656).*

*"It is* necessary, *therefore, to denote the understanding of the expression communis intentio in accordance* with the *principles informing the legal system in order to attribute a real meaning, coherent and compatible with the current* historical *context, particularly in consideration of the practical or social economic function sought by the parties with the* creation *of the legal transaction, The judge must determine the meaning of the* clause *by going beyond what is stipulated,* i.e. *without limiting himself to the literal meaning of* the *written words,* even *if* there is no *reason* to *doubt* them*, all the more so because of the prevailing nature* of *the* reciprocal *intention with respect to* the *clause and its natural meaning, which may* in/í/merfa *in radice.*

*"In the* ang/ogo *sense*, the *hermeneutic rules of the lex contractus, involve the* analysis *in complexu, systematic and integral of its clauses 'giving to* each *one the meaning that best suits the* contract *in its totality (art.1622 C.C.), completeness and integrity and not* e/ of *one of its* parts or *segments (Tota in todo, et tota in qualibet parte), according to the* Court's long-standing *postulation when emphasizing* the *unitary, compact and articulated organic nature of the dispositive act 'which usually constitutes a unit and consequently its stipulations must be appreciated in the following way*



*coordinated and harmonious and not isolated from each other as autonomous parts' (cas. civ.* March *15, 1965, CXI and CXII, 71, June 15, 1972, CXLII, 218;* judgment *of August 2, 1935, Gaceta Judicial XLII, p. 3437, October 7*, *1976).*

*"In the search for the* coricu/zente design *sought with* e/ *pactum, singular connotation is conferred to the conduct, behavior or execution emplnca* sfgn/úcanfe *of the understanding of the subjects to the conStltUif* of /ege *utenda an 'authentic interpretation that imposes vigor to the real sense of the contract by* the *practical application that the parties have made* of/ *it' (art. 1622, C.C. cas. civ. 5-139-2002 (6907),* aposfo *1/2002 reiterating cas. oct.* 29/f936, *XLIV, 456).*

*"With reference to the guideline of specificity, coherence, rationality and hermeneutic reasonableness, '[w]hatever general the terms of a contract may be, they shall only apply to* the subject matter *on which it has been contracted' (art. 1619 C.C.),* Sfr/ *IiiTiTiTiTiit to the case enunciated 'excluding the others to which it naturally extends' (art. 1623 C.C.) nor extend it to others (Iniquum est perimi pacto, id de quo cogitatum non est) and the identity of the terms or expressions impose an identical meaning or identical conclusion, and in the absence of a contrary* decision *'to the interpretation which best fits the nature of the* contract' *(art. 1621 C.C.) in which* the 'c/dt/st/st//es *of common* usage*' (naturalia negotia by usage) are understood to be* inc/ufc/ed *and in the face of polysomic, dichotomous or patologic stipulations* '(e}/ sense *in which a clause can produce some effect, must be preferred to that* in which *it is not capable of producing any effect'* {art. *1620 C.C.), giving preference to* the preservation *of the legal transaction, the utility* /specific of the *irrelevance and the efficacy over* the ineffectiveness *of the* ecto belle/ *utile, ms magis* ve/ea/ *quam pereat).*

*"In this way, when* the sphipu/acid edmife *various meanings* p/eva/ece *the rational sense* co/Gerent *with the practical or* economic *function of the dispositive interests, usually worthy of protection and nomiative recognition* (arf. *1620 C.C.) and that inherent in the* regu/arity *of the dispositive* act *with respect to its ineffectiveness or invalidity, in favores validitatis pacti, and* in *'ambiguous cases, the most* convenient *thing* is to accept *that* the thing *in question is rather valid* qt/e not *that it seems' (Julienus,* Qooties *in actionibus aut in excepcionubus ambigua oratio* es/e, *commodissimum est, id accipi, quo* res, *de qua agitur, magis valeat quam* penal}, siemp/e *del* modo *'que el* acfo sea *válido' (Dicio, Interpretatio nes debet* semper *ut* ecfus ve/eat} *and in favor of* va/idez *(ActUS intellig8ndi sunt potius ut* v'a/eanf *quam ut pereant, o Interpretatio nos d bet* semper *ut* actt/s v'a/eanty. Therefore, *in the face different interpretations, the one that* p/ese/ve *le intelligence more concorde with the* act, *its relevance and /uncidn prevails (Quoties idem*



*serrno duas* senfentias *exprímit,* ea *potíssimum accipienda* guoe *gerendae apliorest).*

*"Indeed, since the legal transaction, and more specifically the contract, consists* of *a dispositive agreement of interests, the 'regulae', 'principles'* or *'principia' of its usefulness and efficacy* is *elementary, insofar as* its *authors conclude it for* the *development of* a *practical or economic social function and under* the *reciprocal understanding of its usefulness and efficacy. With this understanding, the hermeneut will prefer the* interpretation *more suitable to the useful effect of the act with respect to in which it does not produce it (Utile per inutile non viatiatur), all the more so because of the abstract relevance of the act (Utile per inutile non viatiatur).In addition to the abstract relevance* of the *business, the burdens of private autonomy, in particular, those of legality, foresight, sagacity*, rectitude, co/recognition, *good* , *probity* and *the principle of business* cooperation *that impose on the parties from iter negotii the burden of* knowing, respecting *and applying* the *normative discipline (ignoranti legis non* excusat}, *avoiding* causes *of irrelevance and ineffectiveness and collaborating harmoniously in* the *integration and regularity of the* act.

*"In singular, the duty of probity and the general clause of correction is concretized* in *a reasonable/adequate* behavior, to *prevent and* **COf7P@f/"** *any improper conduct with a prlstina performance oriented to the realization of the purposes inherent to the contracting, regularity and certainty of the legal tournament. For this reason, a duty of diligence is imposed on the contracting parties and, where appropriate, of* warning, *communication and information of cognizable conditions, with* each party *assuming*, in the mutual interest, *a* burden with respect to the *other* with respect to *the completeness of the act, the performance of its function and the avoidance of causes of ineffectiveness or irrelevance.*

*"And* so it is *necessary to proceed, not* only *because of the non-negotiable nature* of the paragraph, but also because the reciprocal infection of *the parties* is *reasonably governed* by the *common purpose* of *obtaining its practical results and, consequently, its realization, fulfilment and* effectiveness, *A contrary assumption,* i.e., *the conclusion of the act so that it will not produce any effect due to ineffectiveness, invalidity or other causes, would lead to the absurdity of the* negation of the *legal* transaction itself *and to the inadmissible sponsorship of conduct contrary* to the *law.*

*"It should be noted that the parties when entering into a contract reasonably desire, wish or seek its effectiveness and, therefore, the judge must prefer in all circumstances the consequence relating to the preservation of the same, because,* it is iterated, *it would be* absurd *to even* assume *the conclusion of a contract to produce no effect when the parties, on principle, do so under the cardinal premise of its performance and effectiveness. For the same reason, in order to ensure this convergent purpose, naturally pursued with the*



República de Colombia

Supreme Court of Justice Saíá de Casación Civit

*pactum, the* parties, *contract the* burden *to* avoid *causes of ineffectiveness of the legal transaction and,* the *judge, when deciding the controversies, to try, within* the *rational limits compatible with* the *legal system, its usefulness and effectiveness, as corresponds to the ratio* /epis *of* the *known normative order.*

*"The r'sonomla* de esfa rep/a *imposes that the frustration of the act* sd/o is *pertinent when it does not* ex/sfa a/femafiva *different, according to postulates* of fiempo af/ds *the doctrine* of the Court, a/ *relieving the* Sf{/f}fúcafiva importancie *of the contract, its celebration, binding effect, compliance and execution of* bt/ena *fe, highlighting* the cfirectriz fiermen8ufica *consecrated* in *the article 1620 of the* CddfÇo *Civil* (cas. *civ.* judgment of February *28*, *2005, Exp.* 7504j.

*"The* general *principles of* law, *inspiring* and *informing standards of the entire legal system, are the hemien&utical rules of contract (G. ALPA, Principi* genera/i, *in Tratatto dl diritto privato a cura di G. ludica* e Paolo *Zatti,* /Ui/ano, 1993, *pp. 15* ff; *L. BIGLIAZZI, GERI, Linterpretazione del contrafto, Giuffré, Milano, 1991, pp. 1 ff; M. COSTANZA, Profili deII'interpretazione del contratto secondo buona fede, Giuffré, Milano, 1989, pp. 1 ff). Thus the Political Constitution* of *1991, after indicating 'Of the fundamental principles' (Title I), when dealing with 'Of the judicial branch', refers to the* 'penal *principles of* law' *within 'the auxiliary criteria* of the *judicial activity'. In* **6Sp6Cfá/,** *II good faith imposes a* genera/ *clause of* correction *projected in a duty of* o/ical *and juridical conduct* of *singular connotation in all the phases of the* ob/ipe/orie *relationship*, the *responsibility and the juridical ri9gOCiO (articles 863 and 871* of/ *C.* de *Co. and 1.603 of the C. C. C.)*, appreciable *in the fnction of the law.), appreciable in the* fnferpre/aCfdn *in its objective perspective, that is to say, as a direct rule of upright, probative, transparent, honorable behavior 'in pursuit of the satisfaction and safeguarding of* the interests *of others (duties* of *information;* of *clarity or* precision; of *material custody of the thing; of reserve or* secrecy, *etc.),* (cas. civ. April 19/1999, exp. 4929, February 2/2001, exp. 5670 and August 2/2001).

"With the preceding guidelines, for the Chamber, to the hermeneutic criteria enshrined in the discipline of contract, the specific discipline of private autonomy and freedom of contract is *naturally* incorporated ex *interpretatione*, in order to obtain in conformity with the explanatory principles, guidelines and founding principles of the act and, more specifically, with the general principles of the law, more specifically to the general principles of the legal system, the relevance of the 'sec/proca intention *of* the parties'*, permeable to changing* social*,* economic, *technological and scientific* conditions in *accordance with their convergent* interests*, without being reduced to a simple* quaes//O *voluntatis,* copnoscitive, *reconstructive or assenting, all the more so as the judge* in *his function of interpreting the legal* transaction*, that is to say, of determining* the *meaning of the* contract*,* is *not reduced to a simple* quaes//O *voluntatis,* copnoscitive, *reconstructive or assenting, all the more so as the judge* in *his function of interpreting the legal* transaction*, that is to say, of determining the meaning of the contract,* is *not reduced to a simple* quaes//O *voluntatis,* copnoscitive*, reconstructive or assenting.*



*Corte Suprema de Justicia*
*Sala de Casación Civil*

of *the specie juns, specifies its scope and its* e/fcacia *in* conc/efo.

*"It is to be noted, as* the *Chamber has long postulated, the 'discreet autonomy' (CXLVII, 52) of judges to infer the legal transaction, a task entrusted to their '....sanity, perspicacity and expertise' (CVIII, 289), its pmdent, reasoned and founded* jUiCfO, *endowed* with *the presumption of* ac/e/to *and susceptible of infirming only when it has incurred* in *a* factual *error* 'fan c/aro a *la luz de las reglas legales y de los datos del expediente que no deje lugar a duda alguna' (XX, 295),* evident, *incident to the* decision, *invoked* and demonstrated *by the censor (CXLII, 218; CCXL, 491, CCXV, 567), 'which shows, primarily or, that it* is *of such scope that it contradicts the evidence', as when 'it supposes stipulations that it does not contain, either* because it *ignores those that it certainly expresses, or because it sacrifices the true* meaning *of its clauses with deductions that contradict the evidence that they demonstrate' (cas. June 15/1972, CXLII, 218 y* 219j, *'....openly denaturalizes the conventions of* the *contracting parties, or pretermits in applying the contract some terminating stipulation or substitutes* it for *another of his own invention' (XXV, 429), so that 'the exegesis of the contractual clause proposed by the plaintiff* is *the only one admissible in the light* of *the particular circumstances, and is consequently shown to be such a solid and persuasive approach that, by its own weight, it is capable of revealing the counter-evidence in the Tribunal's understanding (S-226-2004 [7356], December 13, 2004), 'so that as long as* the one *adopted by the Tribunal does not distort the plain and unambiguous terms of* the *convention by breaking its* harmonization/a, *disregarding its purposes* or *the* specific *nature of the contract, it must be respected by the Court' (LV, 298), since the* inte/p/etaciones 'confo/mes *to the evidentiary bundle and which are not absurd or lacking in synderesis and logic, prevent the constitution of an evident error of fact, allegable in* cassation, *so that such interpretation, under these conditions, is closed in the Instances and cannot be challenged by means of the extraordinary appeal in cassation, even if the* hermeneutic *made by* the censor *is respectable and,* therefore, *seems coherent, which is not enough to break a judicial decision, otherwise covered by a presumption* of correctness *that must be overturned' (Decision of the* Sa/a *Civil Court, Exp. 7560) and,* 'if *the judge, after* examining *and applying the various rules of* hermeneutics *established in the Law,* opts *for one of* the *various plausible meanings of a given contractual stipulation, that* e/eccidn, *in itself considered,* cannot *be tried before the Court, The Court may not*, under the pretext *of a more elaborate construction that* the plaintiff *may present* in *cassation, insofar as, in this hypothesis, the judicial decision does not stem* from *an obvious error of fact in the assessment* of the *evidence, but* is *the result of the* exercise of *the discrete autonomy of the judge of the case.*



> *instance for the* interpretation *of the contract' (SC-040-2006 [7504]), since, '[i]f such element admits various understandings,* all of *them reasonable, then the defect* in *is not present, especially when in matters of interpretation of contracts,* one is *faced with a 'matter that corresponds to the autonomous* discretion of *the judges' (CXLII, 218 and 219)"* (cas. civ. judgment of February 7, 2008, [SC-007-2008], exp. 2001-06915-01).

Neither is an abusive and illegitimate procedure observed in the exercise of the power to enervate the automatic extension of the contracts, since the notice was given thirty days prior to the expiration of the initial term, expressing that upon its arrival the contract would terminate, and even more, if you will, the testimonies shown by the censor, show manifest administrative differences between the parties, which in a relationship of trust such as the one generated by the contracts, would be sufficient to justify it.

As a corollary, having frustrated the accusation on the interpretation of the contract, absent the alleged factual and hermeneutical errors, the remaining evidentiary errors of fact or law, and those relating to the second part of the accusation on the *quantum* of damages, certainly lack transcendence, because without breach there is no contractual liability, and without it, there is nothing to compensate or repair.

7. The charge is unsuccessful.

## DECISION

In merit of the foregoing, the Supreme Court of Justice, Civil Cassation Chamber, administering justice in the name of the Republic and by authority of the Law, DOES NOT REJUDGE the sentence



República de Colombia

Corte Suprema de Justicia
Sala de Casación Civil

of June 3, 2009, issued by the Superior Court of the Judicial District of Bogotá, Civil Chamber, in the ordinary proceeding of Fernando González Luque, against Compañía Nacional de Microbuses Comnalmicros S.A.

Costs in cassation to be borne by the appellant. Be assessed. Include the sum of six million pesos $6.000.000.000.oo) for fees.

Copy, notify and return the file to the Court of origin for the pertinent.

EDGARDO VILLAMIL PORTILLA
Excused absence

JAIME ALBERTO ARRUBLA PAUCAR



*Sala de Casación Civil*

RUTH MARINA DÍAZ RUEDA

FERNANDO GIRALDO GUTIÉRREZ

PEDRO OCTAVIO MUNAR CADENA

Impedido

WILLIAM NAMÉN

ARTURO SOLARTE RODRÍGUEZ