IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PERIMETRAL ORIENTAL DE BOGOTÁ, S.A.S., | |
| *Petitioner*, | |
| v. | **Civil Action No.** _____ |
| AGENCIA NACIONAL DE INFRAESTRUCTURA and THE REPUBLIC OF COLOMBIA | |
| *Respondents*. | |

**Declaration of Jason W. Myatt in Support of Petition to Confirm Arbitral Award**

# EXHIBIT 21

  

RÉGIMEN LEGAL DE BOGOTÁ D.C.

© Propiedad de la Secretaría Jurídica Distrital de la Alcaldía Mayor de Bogotá D.C.

*Secretaría*
*Jurídica Distrital*

# Concepto 250 de 2023 Consejo de Estado - Sala de Consulta y Servicio Civil

**Fecha de Expedición:**
22/02/2023
**Fecha de Entrada en Vigencia:**
**Medio de Publicación:**

Temas

Anexos

✉

**La Secretaría Jurídica Distrital aclara que la información aquí contenida tiene exclusivamente carácter informativo, su vigencia está sujeta al análisis y competencias que determine la Ley o los reglamentos. Los contenidos están en permanente actualización.**

## CONCEPTO 250 DE 2023

### (Febrero 22)

### CONSEJO DE ESTADO

### SALA DE CONSULTA Y SERVICIO CIVIL

### Consejera ponente: Ana María Charry Gaitán

**Bogotá, D.C., veintidós (22) de febrero de dos mil veintitrés (2023)**

**Radicación interna: 2496**

**Número único: 110010306000-2022-00250-00**

**Referencia: Creación o autorización de entidades administrativas descentralizadas por servicios. Artículo 69 de la Ley 489 de 1998. Estudio demostrativo**

### I. ANTECEDENTES

El Gobierno nacional, por conducto del director del Departamento Administrativo de la Función Pública, y a solicitud de la alcaldesa mayor de Bogotá, D.C., formula a la Sala una consulta acerca de la interpretación del artículo 69 [1] de la Ley 489 de 1998[2], que se refiere a la creación de entidades administrativas descentralizadas, y, en particular, sobre el alcance de la exigencia de acompañar un «estudio demostrativo que justifique la iniciativa», a que se refiere esta disposición.

Luego de transcribir el precepto citado, el funcionario consultante recuerda que el Legislador previó dos escenarios distintos para dar origen a esta clase de entidades: i) la creación directa y ji) la autorización (mecanismo indirecto).

Asimismo, señala que, como «el sentido común se encuentra previsto en el ordenamiento como un criterio de interpretación legal», es dable afirmar que la autorización es un acto anterior a la creación misma de la entidad.

Con base en lo expuesto, plantea a la Sala las siguientes **PREGUNTAS:**

1. Existe una definición legal de 'estudio demostrativo" [sic] como nuevo documento que deberá acompañarse para justificar la iniciativa de creación.

2. Podría entenderse que solo para la creación propiamente dicha resulta exigible tal estudio demostrativo.

3. Podría entenderse que a partir del momento en que se autoriza la creación de la entidad, se inicia la elaboración del estudio demostrativo con los análisis técnicos, administrativos, jurídicos y presupuestales requeridos que la justifican.

4. Si se entendiera que se deben cumplir los mismos requisitos en el estudio demostrativo bien sea para autorizar la creación de una entidad o para aprobar su creación, carecería de sentido la primera pues conforme a sus competencias constitucionales y legales el legislador, la asamblea o el concejo municipal procederán a crearla directamente. Entonces para que [sic] contemplaría el legislador la figura de la autorización.

## II. CONSIDERACIONES

Para dar respuesta a los interrogantes formulados, la Sala analizará los siguientes temas: i) Creación de entidades administrativas descentralizadas por servicios: competencia, requisitos y procedimiento, y ii) concepto y alcance del «estudio demostrativo» exigido por el artículo 69 de la Ley 489 de 1998.

### A. Creación de entidades administrativas descentralizadas por servicios: competencia, requisitos y procedimiento

En primer lugar, es necesario recordar el marco jurídico -constitucional y legal- que regula, en Colombia, la creación de las entidades administrativas descentralizadas por servicios, así como las precisiones y aclaraciones que, sobre algunos temas, han efectuado la jurisprudencia y la doctrina.

Inicialmente, es pertinente rememorar que, dentro de la Rama Ejecutiva del poder público, tanto en el orden nacional como en el territorial (departamental, distrital y municipal), se distingue entre el sector central y el sector descentralizad0[3].

El sector central está conformado por aquellas dependencias y organismos principales, encargados de fijar e implementar las políticas del gobierno respectivo, establecer las metas y prioridades, y dirigir la gestión administrativa en sus diferentes campos de acción (sectores administrativos).

Por su lado, el sector descentralizado está constituido por las entidades descentralizadas por servicios, que son personas jurídicas públicas, dotadas de autonomía administrativa, patrimonial y técnica, pero sujetas a un control político y a la suprema dirección del órgano del sector central al cual se encuentran adscritas o vinculadas («control de tutela»). Dichas entidades se constituyen para la ejecución de funciones administrativas, la prestación de servicios públicos o la realización de actividades industriales y comerciales determinadas (Ley 489 de 1998, artículo 68).

Al margen de estas, se encuentran las entidades descentralizadas territorialmente, previstas en el artículo 286 de la Constitución Política (departamentos, municipios, distritos y territorios indígenas, principalmente), a las que la misma Carta reconoce autonomía (artículos 1 y 287, entre otros). Tales entidades pueden constituir, a su vez, entidades descentralizadas por servicios, para que formen parte de la Rama Ejecutiva, en el nivel territorial correspondiente.

Sobre estas dos modalidades de descentralización administrativa, la Corte Constitucional, en la Sentencia C-691 de 2007[4] dijo:

En el mismo sentido ha dicho la Corte que la Constitución consagra, de una parte, la descentralización territorial, establecida con una base geográfica y un evidente valor democrático, en cuanto constituye el ámbito dentro del cual los propios interesados, bajo un régimen de autonomía, buscan la satisfacción de las necesidades regionales y locales (Art. 1, 287 C.P.), y de otra, la descentralización por servicios, que constituye una de las modalidades organizativas previstas en la Constitución para el ejercicio de la función administrativa (Art. 209 C.P.), la cual comporta la existencia de personas dotadas de autonomía jurídica patrimonial y financiera, articuladas administrativa y funcionalmente con el Estado, a las cuales se les asignan por la ley potestades jurídicas específicas.[5]

En efecto, la descentralización por servicios puede definirse como la atribución de competencias o funciones de la administración a determinadas entidades creadas para la gestión estatal de actividades especializadas[6] Como modalidad organizativa prevista en la Constitución la descentralización por servicios "compona la existencia de personas dotadas de autonomía jurídica patrimonial y financiera, articuladas administrativa y funcionalmente con el Estado, a las cuales se les asignan por la ley potestades jurídicas específicas"[7]

1) Marco constitucional

Ahora bien, en punto a la determinación de la estructura de la Administración Pública y, particularmente, a la creación o autorización de las entidades descentralizadas, la Carta Política otorga competencias en principio concurrentes al Congreso y al presidente de la República, y replica casi en su totalidad este esquema en el nivel subnacional, como pasa a verse.

En efecto, el artículo 150 dispone que al Congreso de la República le corresponde hacer las leyes, para cumplir las funciones que allí se establecen, entre las cuales, se destacan las siguientes:

(…)

7. Determinar la estructura de la administración nacional y <u>crear</u>, suprimir o fusionar <u>ministerios, departamentos administrativos, superintendencias, establecimientos públicos y otras entidades del orden nacional, señalando sus objetivos y estructura orgánica</u>; reglamentar la creación y funcionamiento de las Corporaciones Autónomas Regionales dentro de un régimen de autonomía; así mismo, <u>crear o autorizar la constitución de empresas industriales y comerciales del estado y sociedades de economía mixta</u> [énfasis añadido].

(…)

Es importante aclarar que las leyes mediante las cuales se ejerzan estas funciones solo pueden ser expedidas por iniciativa del Gobierno nacional, como lo dispone expresamente el artículo <u>154</u> de la Carta Política, en su segundo incis0<sup>[8]</sup>.

En concordancia con el artículo 150, numeral <u>7</u>, el artículo <u>210</u> de la Constitución Política preceptúa que «[l]as entidades del orden nacional descentralizadas por servicios <u>sólo pueden ser creadas por ley o por autorización de ésta, con fundamento en los principios que orientan la actividad administrativa</u>» [se enfatiza], previstos en el artículo <u>209</u> de la misma Carta.

Por su parte, según lo ordenado por el artículo <u>189</u> superior, al presidente de la República, como jefe de Estado, jefe de Gobierno y suprema autoridad administrativa, le corresponde, en este campo: i) suprimir o fusionar entidades u organismos administrativos nacionales, de conformidad con la ley (numeral <u>15</u>); ñ) modificar la estructura de los ministerios, departamentos administrativos y demás entidades u organismos administrativos nacionales, con sujeción a los principios y reglas generales que defina la ley (numeral <u>16</u>), y iii) distribuir los negocios, según su naturaleza, entre ministerios, departamentos administrativos y establecimientos públicos (numeral <u>17</u>).

Ahora bien, en el nivel territorial, las normas constitucionales establecen una distribución de competencias similar. Así, conforme al artículo <u>300</u>, modificado por el artículo <u>2</u> del Acto Legislativo n. 01 de 1996, a las asambleas departamentales, por medio de ordenanzas, les corresponde, entre otras funciones:

7. Determinar la estructura de la Administración Departamental, las funciones de sus dependencias, las escalas de remuneración correspondientes a sus distintas categorías de empleo; <u>crear los establecimientos públicos y las empresas industriales o comerciales del</u>

departamento y autorizar la formación de sociedades de economía mixta [se enfatiza].

Disposición similar, para los municipios, está contenida en el artículo 313, numeral 6 de la Carta[9]

Vale la pena señalar que, de acuerdo con esta norma y con el artículo 300 (inciso final) de la Constitución, la iniciativa para la expedición de los acuerdos o las ordenanzas mediante las cuales se ejerzan estas atribuciones corresponde exclusivamente a los alcaldes y gobernadores, en forma análoga a lo previsto para el nivel nacional.

De conformidad con la Constitución, las entidades descentralizadas por servicios a nivel nacional deben ser creadas por el Legislador, a solicitud del Gobierno. No obstante, en el caso particular de las empresas industriales y comerciales del Estado y las sociedades de economía mixta, también pueden ser autorizadas por el Legislador, para su posterior creación por parte del Ejecutivo.

En el nivel territorial, las entidades descentralizadas por servicios deben ser creadas directamente por la respectiva asamblea departamental, concejo municipal o concejo distrital, a iniciativa del gobernador o alcalde respectivo, con excepción de las sociedades de economía mixta, cuya constitución puede ser autorizada por la respectiva corporación de elección popular.

Nótese que, a diferencia de lo que ocurre en el ámbito nacional, las asambleas y los concejos solamente pueden autorizar a los gobiernos locales para crear sociedades de economía mixta, y no empresas industriales y comerciales del Estado, las cuales deben ser creadas directamente por el respectivo órgano de elección popular[10]. Sobre este punto, la Corte Constitucional manifestó lo siguiente, en la Sentencia C-691 de 2007, antes citada:

Según la Constitución Política, las empresas industriales y comerciales del Estado forman parte de la rama ejecutiva (art. 115), y como tales son parte de la estructura de la administración. Norma Superior que le atribuye al Congreso la facultad para crearlas o autorizar su constitución, y a las Asambleas y Concejos la de su creación directamente (arts. 150-7, 300-7 y 313-6) [se destaca].

En el mismo sentido, la Sala de Consulta y Servicio Civil observó lo siguiente, en el Concepto 1844 de 2007[11]:

17. Solamente para el nivel nacional, la Constitución prevé la autorización para constituir empresas industriales y comerciales del Estado. (…)

2) <u>Desarrollo legal</u>

En ejercicio de la función prevista en el artículo 150, numeral <u>7</u>, superior, el Congreso de la República expidió la Ley 489 de 1998, cuyo artículo <u>39</u> dispone, en lo pertinente, sobre la conformación de la Administración Pública, lo siguiente:

**Artículo 39. Integración de la Administración Pública.** La Administración Pública se integra por los organismos que conforman la Rama Ejecutiva del Poder Público y por todos los demás organismos y entidades de naturaleza pública que de manera permanente tienen a su cargo el ejercicio de las actividades y funciones administrativas o la prestación de servicios públicos del Estado colombiano.

La Presidencia de la República, los ministerios y los departamentos administrativos, en lo nacional, son los organismos principales de la Administración.

Así mismo, los ministerios, los departamentos administrativos y las superintendencias constituyen el Sector Central de la Administración Pública Nacional. Los organismos y entidades adscritos o vinculados a un Ministerio o un Departamento Administrativo que gocen de personería jurídica, autonomía administrativa y patrimonio propio o capital independiente conforman el Sector Descentralizado de la Administración Pública Nacional y cumplen sus funciones en los términos que señale la ley.

Las gobernaciones, las alcaldías, las secretarías de despacho y los departamentos administrativos son los organismos principales de la Administración en el correspondiente nivel territorial. Los demás les están adscritos o vinculados, cumplen sus funciones bajo su orientación, coordinación y control en los términos que señalen la ley, las ordenanzas o los acuerdos, según el caso.

(…)

En armonía con dicho precepto, y en desarrollo de lo dispuesto allí, el artículo <u>38</u> ibidem establece la estructura de la Rama Ejecutiva, en el orden nacional. De acuerdo con esta norma, las entidades que conforman el sector descentralizado son:

a) Los establecimientos públicos;

b) Las empresas industriales y comerciales del Estado;

c) Las superintendencias y las unidades administrativas especiales con personería jurídica;

d) Las empresas sociales del Estado y las empresas oficiales de servicios públicos domiciliarios;

e) Los institutos científicos y tecnológicos;

f) Las sociedades públicas y las sociedades de economía mixta,

g) Las demás entidades administrativas nacionales con personería jurídica que cree, organice o autorice la ley para que formen parte de la Rama Ejecutiva del Poder Público.

Merece la pena aclarar que las superintendencias y las unidades administrativas especiales pueden tener o no personería jurídica, según lo determine la ley que las crea. En el primer caso, son entidades descentralizadas, como lo señala el numeral 2, literal c, de la norma citada; y en la segunda hipótesis, son organismos integrantes del sector central, como lo dispone el numeral 1. literal e, del mismo precepto.

Esta tipificación de las entidades descentralizadas, incluyendo las superintendencias y las unidades administrativas especiales con personería jurídica, aparece reiterada en el artículo 68 eiusdem.

Además de estas personas jurídicas, la Ley 489 de 1998 regula las denominadas «entidades descentralizadas indirectas», es decir, aquellas entidades descentralizadas por servicios creadas con la participación de otras ya establecidas. Dentro de aquellas, se encuentran las filiales de las empresas industriales y comerciales del Estado y de las sociedades de economía mixta (artículo 49, parágrafo), así como las entidades sin ánimo de lucro surgidas de la asociación de varias entidades públicas (artículo 95), o de estas con particulares (artículo 96).

En cuanto a la creación o constitución de las entidades descentralizadas, es importante citar, en particular, lo dispuesto por el artículo 49 de la ley en mención:

**Artículo 49. Creación de organismos y entidades administrativas.** Corresponde a la ley, por iniciativa del Gobierno, la creación de los ministerios, departamentos administrativos, superintendencias, establecimientos públicos y los demás organismos y entidades administrativas nacionales.

Las empresas industriales y comerciales del Estado podrán ser creadas por ley o con autorización de la misma.

Las sociedades de economía mixta serán constituidas en virtud de autorización legal

**Parágrafo.** Las entidades descentralizadas indirectas y las filiales de las empresas industriales y comerciales del Estado y de las sociedades de economía mixta se constituirán <u>con arreglo a las disposiciones de la presente ley, y en todo caso previa autorización del Gobierno Nacional</u> si se tratare de entidades de ese orden <u>o del Gobernador o el Alcalde</u> en tratándose de entidades del orden departamental o municipal. [Subrayas añadidas].

Como se aprecia, esta norma, que desarrolla lo dispuesto en el numeral <u>7</u> del artículo 150 de la Carta Política, establece claramente que, por regla general, tanto los organismos del sector central como las entidades que conforman el sector descentralizado por servicios de la Rama Ejecutiva, en el orden nacional, deben ser creados directamente por el Legislador, a iniciativa del Gobierno nacional, con excepción de:

- Las empresas industriales y comerciales del Estado, que pueden ser <u>creadas</u> directamente por el Congreso, o cuya creación <u>puede ser autorizada</u> por este, y

- Las sociedades de economía mixta, las filiales de las empresas industriales y comerciales del Estado y otras entidades descentralizadas indirectas, cuya creación debe ser <u>autorizada</u> por el Legislador (y, adicionalmente, en el caso de estas dos últimas, por el Gobierno nacional, departamental, municipal o distrital, según corresponda).

Esta disposición se encuentra en concordancia con otras normas de la misma ley, como los artículos 38, numeral 2, literal g (otras entidades descentralizadas); 50 (contenido de los actos de creación); 68 (entidades descentralizadas); 69 (creación de entidades descentralizadas); 71 (para los establecimientos públicos); 82 (para las superintendencias y las unidades administrativas especiales con personería jurídica); 85 (para las empresas industriales y comerciales del Estado); 97 (para las sociedades de economía mixta), y 94 (para las filiales de las empresas industriales y comerciales del Estado).

Ahora bien, es importante precisar que, aun cuando el numeral $7.^{0}$ del artículo 150 superior establece que el Congreso puede «crear o autorizar la constitución» [énfasis añadido] de sociedades de economía mixta, la jurisprudencia[12] y la doctrina[13] han aclarado que no es posible que el Legislador <u>cree directamente</u> este tipo sociedades, ni, en general, entidades descentralizadas de carácter asociativo (incluyendo las entidades sin ánimo de lucro de este tipo, como las asociaciones y las corporaciones), porque su constitución exige la concurrencia de voluntades entre el Estado y los particulares, o entre diferentes entidades públicas, así como el cumplimiento de los requisitos establecidos en el Código de Comercio o en el Código Civil, según el caso.

En esa medida, el Congreso solo puede autorizar la creación de este tipo de sociedades y entidades, para que el Gobierno nacional y las entidades públicas que vayan a participar en su constitución procedan a crearlas, tal como se encuentra regulado en la Ley 489 de 1998. Sobre este punto, la Sala de Consulta y Servicio Civil, en el Concepto 2242 de 2015, manifestó.

De la naturaleza de las sociedades de economía mixta y de su regulación jurídica se desprende que <u>la ley o la ordenanza no puede crear directamente una sociedad de economía mixta</u>, porque para que esta llegue a existir se requiere del concurso de particulares, de cuya voluntad para asociarse con el Estado no puede disponer el legislador, como tampoco de sus eventuales aportes patrimoniales a la sociedad. Es por ello que, para constituir una sociedad de economía mixta, de ordinario se necesitará de <u>una autorización al ejecutivo que se origina en la corporación pública correspondiente</u>. <u>A partir de dicha autorización el ejecutivo nacional o departamental, según el caso, y los representantes del sector privado concertados para constituir la sociedad, suscribirán la correspondiente escritura pública, que es la forma prescrita por la ley para crear una sociedad de economía mixta</u>. El acto de autorización, ley u ordenanza, deberá determinar los bienes o recursos públicos que aportará el Estado a la sociedad proyectada. [Se resalta].

De todas formas, la jurisprudencia y la doctrina han precisado que la autorización que el Legislador (o, según el caso, las asambleas departamentales y los concejos municipales o distritales) puede dar al Ejecutivo, para la creación de este tipo de entidades, no puede ser general y abstracta, sino particular y concreta, pues debe referirse a una entidad determinada. Así lo explicó la Corte Constitucional, en la Sentencia C-357 de 1994.[14]

Ahora bien: ¿qué clase de ley es la que autoriza la creación de una sociedad de economía mixta?

Una ley en sentido formal, pues sólo es ley por su origen, y su formación y no por su contenido. <u>Este contenido no es general y abstracto, sino particular y concreto</u>.

<u>Y por ser particular y concreto tiene que referirse a una sociedad determinada, individualizada</u>. Como lo señala el artículo 80. del decreto 1050 de 1968[15] en tratándose de sociedades de economía [sic] mixta, "el grado de tutela y, en general, las condiciones de la participación del Estado en esta clase de sociedades se determina en la ley que las crea o autoriza y en el respectivo contrato social"

<u>Tal ley, en consecuencia, debe determinar asuntos como estos: la cuantía de los recursos públicos que se aportarán a la sociedad, su objeto, su</u>

<u>domicilio, su duración, la proporción del capital público y privado, lo mismo que el grado de tutela por parte de la administración, y a qué dependencia corresponde ejercerla.</u>

<u>La necesidad de una autorización especial ha sido la tesis sostenida por el Consejo de Estado. Así consta en concepto de la Sala de Consulta y Servicio Civil, de abril 19 de 1993.</u> [Subrayas añadidas].

Por otra parte, es importante recordar que lo prescrito en la Ley 489 de 1998, para la constitución de entidades descentralizadas por servicios en el ámbito nacional, se repite, en lo pertinente, para el nivel territorial, no solo por lo dispuesto en los artículos 300, numeral 7. (para los departamentos), y 313, numeral 6. (para los municipios), de la Carta Política, sino también por lo normado en los artículos 2, parágraf0 [16] • 68 parágrafo primer0 [17] , y 69 [18] de aquella ley.

Claro está que, como la aplicación de dicha normativa a las entidades territoriales debe respetar su autonomía, garantizada constitucionalmente, así como las disposiciones especiales de la Carta que regulan su organización y funcionamiento, las normas de la Ley 489 deben aplicarse a las entidades descentralizadas de ese nivel sin contradecir los preceptos constitucionales que regulan, de manera particular, a las entidades territoriales, como sucede con la potestad -ya explicada- de crear las empresas industriales y comerciales del Estado del orden departamental, municipal o distrital.

Ahora bien, dado que la consulta se refiere específicamente a la interpretación del artículo 69 de la Ley 489, es necesario transcribir dicha norma:

**Artículo 69. Creación de las entidades descentralizadas.** Las entidades descentralizadas, en el orden nacional, <u>se crean por la ley</u>, en el orden departamental, distrital y municipal, <u>por la ordenanza o el acuerdo, o con su autorización, de conformidad con las disposiciones de la presente ley</u>. El proyecto respectivo deberá acompañarse del estudio demostrativo que justifique la iniciativa, con la observancia de los principios señalados en el artículo 209 de la Constitución Política. [Se destaca].

En la consulta, se advierte que esta disposición preceptúa que las entidades descentralizadas, tanto en el orden nacional como en el territorial, pueden ser <u>creadas o autorizadas</u> por la ley, las ordenanzas departamentales o los acuerdos municipales o distritales, según el caso.

Sin embargo, la Sala resalta que la misma norma citada establece que la creación o la autorización para la creación de tales entidades debe hacerse «de conformidad con las disposiciones de la presente ley», expresión que

alude, como es obvio, a los demás preceptos de la Ley 489 de 1998 (sin dejar de lado, claro está, las normas constitucionales que resulten aplicables).

En este punto, cabe reiterar que ninguna norma jurídica -y el artículo 69 de la Ley 489 no es la excepción- puede, ni debe, interpretarse de manera aislada, esto es, sin tener en cuenta, en primer lugar, las demás disposiciones que forman parte del mismo código, estatuto, ley o normativa, y, en segundo lugar, los demás preceptos que sean pertinentes, empezando, como es sabido, por las normas constitucionales, pues tales disposiciones son las que conforman el fundamento de todo el ordenamiento jurídico interno, y le dan su sentido y coherencia.

Por lo tanto, de conformidad con la Constitución, las entidades descentralizadas por servicios a nivel nacional deben ser creadas por el Legislador, a solicitud del Gobierno. En el caso particular de las empresas industriales y comerciales, también pueden ser autorizadas por el Legislador, para su posterior creación por parte del Ejecutivo.

Por su parte, de conformidad con el artículo 69 de la Ley 489 de 1998 y demás normas concordantes, las entidades descentralizadas por servicios a nivel territorial deben ser creadas por las asambleas departamentales o los concejos municipales o distritales, según corresponda.

Lo anterior, con excepción de las sociedades de economía mixta y las entidades descentralizadas indirectas de carácter asociativo, las cuales pueden ser autorizadas por el Legislador, las asambleas o los concejos municipales o distritales, respectivamente.

Vale la pena aclarar que nada de lo anterior impide que el Congreso o, en su caso, las asambleas departamentales o los concejos municipales o distritales concedan, al respectivo gobierno, facultades extraordinarias para la creación de cualquier clase de entidad descentralizada, pues ello no se encuentra prohibido por la Constitución, como lo ha señalado la jurisprudencia.[19]

Así, cuando el artículo 69 de la Ley 489 dispone que las entidades descentralizadas pueden ser creadas por la ley, las ordenanzas o los acuerdos, o con su autorización, no significa que el Congreso de la República, las asambleas departamentales y los concejos municipales y distritales puedan decidir si crean, en forma directa, o autorizan la creación de una determinada entidad descentralizada por servicios, pues ello depende del tipo y el nivel de la respectiva entidad.

**B. El «estudio demostrativo» que exige el artículo 69 de la Ley 489 de 1998**

Ahora bien, en la consulta se indaga acerca del significado y el alcance de la expresión «estudio demostrativo», que utiliza el artículo 69 de la Ley 489, así como sobre los casos en los que dicha exigencia se requiere.

En primer lugar, es necesario señalar que la Sala no conoce norma legal o reglamentaria alguna que defina tal expresión. Por otra parte, al revisar los antecedentes legislativos de la Ley 489 de 1998, tampoco se encuentra ninguna explicación sobre dicho concepto.

Dado lo anterior, es necesario acudir a otras fuentes y a otros métodos de interpretación, como el exegético, el sistemático y el finalista, para lo cual vale la pena transcribir, de nuevo, lo dispuesto en la segunda parte de la norma:

El proyecto respectivo deberá acompañarse del estudio demostrativo que justifique la iniciativa, con la observancia de los principios señalados en el artículo 209 de la Constitución Política [énfasis añadido].

En primer lugar, y desde un punto de vista exegético, dado que la expresión resaltada -o las voces que la componen- no tienen una definición especial en la ley, resulta forzoso acudir a su «sentido natural y obvio, según el uso general de las (…) palabras»[20], como lo ordena el artículo 28 del Código Civil.

Desde esta perspectiva, los términos «estudio», «demostrativo» y «justificar» tienen los siguientes significados, entre otros, según el Diccionario de la Lengua Española.

- Estudio (tercera acepción): «Obra de cierta extensión en que se expone y analiza una cuestión determinada».

- Demostrativo (primera acepción): «Que demuestra».

- Justificar (primera acepción): «Probar algo con razones convincentes, testigos y documentos».

Así, desde el punto de vista semántico, es indudable que, cuando el artículo 69 de la Ley 489 de 1998 exige que se presente un «estudio demostrativo que justifique la iniciativa», se refiere a un documento en el que se demuestre la necesidad o la conveniencia de crear o autorizar la creación (según el caso) de una entidad descentralizada, así como la viabilidad de la iniciativa.

Ahora bien, desde una perspectiva sistemática, debe reiterarse, en primer lugar, que la iniciativa normativa para este este tipo de asuntos está radicada constitucionalmente en el Gobierno nacional y en los gobiernos departamentales, distritales y municipales, de forma exclusiva, y que la

decisión correspondiente es competencia del Congreso de la República, las asambleas departamentales y los concejos municipales o distritales, mediante ley, ordenanza o acuerdo, respectivamente.

Esto implica que, cuando la norma que se comenta utiliza las palabras «proyecto» e «iniciativa», se refiere, en concreto, al <u>proyecto de ley, de ordenanza o de acuerdo</u>, según el caso, que el Gobierno nacional o el territorial debe presentar, ante la corporación de elección popular correspondiente, para solicitar la creación o la autorización para constituir una determinada entidad descentralizada, según la naturaleza jurídica y el nivel que vaya a tener.

Lo anterior permite arribar a una primera conclusión: el «estudio demostrativo» debe ser elaborado y presentado <u>por el Gobierno nacional, el departamental, el distrital o el municipal</u>, ante el Congreso, la asamblea departamental o el concejo municipal o distrital, según el caso, <u>junto con el proyecto de ley, de ordenanza o de acuerdo</u> en el que se proponga la creación de la entidad descentralizada por servicios, o se solicite la autorización para crearla, cuando ello resulta posible.

Para efectos de la consulta, es importante resaltar que el artículo <u>69</u> de la Ley 489 no hace distinción alguna, con relación a dicha exigencia, entre los casos en que la corporación pública de elección popular debe crear directamente la entidad descentralizada (regla general), y aquellos en los que puede o debe autorizar al Gobierno nacional o local para hacerlo. En esa medida, es claro que el «estudio demostrativo» se requiere en ambas hipótesis.

En apoyo de dicho aserto, debe tenerse en cuenta que la decisión política de dar origen a una nueva entidad descentralizada la toma siempre el Estado, por conducto del respectivo órgano de representación popular (Congreso, asamblea departamental o concejo distrital o municipal), ya sea en forma directa e inmediata, o bien de manera indirecta y mediata (autorizando al Ejecutivo), y que la iniciativa, en ambos casos, le corresponde a este último.

Por lo tanto, en los dos eventos, se requiere que el Gobierno nacional o territorial aporten a la respectiva corporación pública de elección popular la información completa, clara y pertinente; los análisis, y los argumentos objetivos, razonables, demostrables y convincentes que le permitan a dicho órgano tomar la decisión correspondiente.

Lo anterior se ratifica, igualmente, al revisar otras disposiciones de la Ley <u>489</u> de 1998, que establecen los requisitos que deben tener los actos de creación o constitución de las entidades descentralizadas, especialmente, los artículos <u>50</u>, <u>98</u> y <u>100</u>.

La primera de las normas citadas señala el contenido mínimo que deben tener los actos de creación de las entidades descentralizadas:

**Artículo 50. Contenido de los actos de creación.** La ley que disponga la creación de un organismo o entidad administrativa deberá <u>determinar sus objetivos y estructura orgánica</u>, así mismo <u>determinará el soporte presupuestal de conformidad con los lineamientos fiscales del Ministerio de Hacienda y Crédito Público</u>.

<u>La estructura orgánica de un organismo o entidad administrativa comprende</u> la determinación de <u>los siguientes aspectos</u>:

1. La denominación.

2. La naturaleza jurídica y el consiguiente régimen jurídico.

3. La sede.

4. La integración de su patrimonio.

5. El señalamiento de los órganos superiores de dirección y administración y la forma de integración y de designación de sus titulares, y

6. El Ministerio o el Departamento Administrativo al cual estarán adscritos o vinculados.

**Parágrafo.** Las superintendencias, los establecimientos públicos y las unidades administrativas especiales estarán adscritos a los ministerios o departamentos administrativos; las empresas industriales y comerciales del Estado y las sociedades de economía mixta estarán vinculadas a aquellos; <u>los demás organismos y entidades estarán adscritos o vinculados, según lo determine su acto de creación</u>. [Se resalta].

Como se aprecia, esta disposición desarrolla lo previsto en el artículo 150, numeral <u>7</u>, de la Constitución, en el sentido de que las leyes que creen ministerios, departamentos administrativos, superintendencias, establecimientos públicos y otros organismos o entidades descentralizadas del orden nacional deben señalar «sus objetivos y estructura orgánica».

En cuanto a las sociedades de economía mixta, cuya creación debe ser autorizada por el Legislador, el artículo <u>98</u> de la misma ley establece.

Artículo 98. Condiciones de participación de las entidades públicas. En el acto de constitución de toda sociedad de economía mixta se señalarán <u>las condiciones para la participación del Estado que contenga la disposición que autorice su creación, el carácter nacional, departamental, distrital o municipal de la sociedad: así como su vinculación a los distintos</u>

organismos para efectos del control que ha de ejercerse sobre ella [énfasis añadido].

Vale la pena recordar que, sobre la clase de aportes que las entidades públicas pueden hacer en este tipo de sociedades, el artículo 100 ibidem precisa que estos pueden consistir, «entre otros, en ventajas financieras o fiscales, garantía de las obligaciones de la sociedad o suscripción de los bonos que la misma emita», así como, también, en «títulos mineros y aportes para la explotación de recursos naturales de propiedad del Estado». Esta disposición se halla en consonancia con lo previsto en los artículos 463 y 467 del Código de Comercio[21]

De las normas citadas, se infiere que las condiciones básicas para la participación del Estado en una sociedad de economía mixta deben quedar establecidas desde la misma ley, ordenanza o acuerdo (en el caso de las sociedades del nivel territorial) que autorice su creación, y deben reflejarse, igualmente, en el respectivo acto de constitución (escritura pública o documento privado, según el tipo de sociedad).

Estas condiciones, a juicio de la Sala, deben incluir, según las normas citadas: i) el tipo de entidad de que se trate (en este caso, una sociedad de economía mixta); ii) el orden al cual pertenecerá (nacional, departamental, distrital o municipal); iii) su objeto y fines generales; iv) la entidad o entidades públicas autorizadas para participar en su constitución; v) el grado de participación que dichas entidades tendrán, inicialmente, en el capital social; vi) el valor y el tipo de aportes que pueden realizar, así como la fuente de los recursos y el soporte presupuestal correspondiente, y vii) el organismo administrativo del sector central al cual estará vinculada.

Todos estos aspectos de las entidades descentralizadas que vayan a crearse o autorizarse, tanto en el caso de las que son creadas directamente por el Congreso de la República, las asambleas y los concejos, como en el de aquellas cuya constitución puede ser autorizada por tales corporaciones, deben quedar previstos claramente en el proyecto de ley, de ordenanza o de acuerdo correspondiente.

Lo anterior permite deducir, a su vez, que el «documento justificativo» de la iniciativa, que el Ejecutivo debe presentar ante las mismas corporaciones de elección popular, ha de incluir una explicación detallada de estas características y condiciones, junto con los hechos, los datos, las normas y los argumentos que las justifiquen o fundamenten, desde el punto de vista jurídico, técnico, financiero y administrativo.

En el mismo sentido, puede citarse lo que establece el artículo 19, numeral 20, de la Ley 2200 de 2022[22] sobre el contenido de los estudios que se requieren para crear una entidad descentralizada del orden departamental:

**Artículo 19. Funciones.** Son funciones de las Asambleas Departamentales:

(…)

20. Aprobar la creación de los establecimientos públicos y las empresas industriales o comerciales del orden departamental previstos en el artículo 300 numeral <u>7</u> de la Constitución Política, <u>previo</u> a <u>la presentación y evaluación del estudio técnico que sustente la conveniencia económica y social de la iniciativa, así como la viabilidad financiera de la nueva entidad teniendo en cuenta sus funciones el sector donde operará y sus fuentes de financiación</u>.

(…) (Se destaca).

Como se aprecia, no existe contradicción u oposición alguna entre esta norma y el artículo <u>69</u> de la Ley 489 de 1998, sino que se trata, en realidad, de disposiciones complementarias, pues el artículo 19, numeral <u>20</u>, de la Ley 2200 señala, con mayor detalle y precisión, el contenido que debe tener el «estudio demostrativo» que se requiere para la creación de una entidad descentralizada del orden departamental, de acuerdo con el artículo <u>69</u> de la Ley 489.

Ahora bien, bajo una <u>interpretación finalista o teleológica</u>, es importante detenerse en lo dispuesto por la parte final del artículo <u>69</u> de la Ley 489, cuando establece que la justificación de la iniciativa de creación o autorización de la entidad descentralizada, contenida en el «estudio demostrativo», debe observar los principios señalados en el artículo <u>209</u> de la Constitución Política.

Merece la pena recordar que, conforme a dicho canon constitucional, «la función administrativa está al servicio de los intereses generales y se desarrolla con fundamento en los principios de igualdad, moralidad, eficacia, economía, celeridad, imparcialidad y publicidad, mediante la descentralización, la delegación y la desconcentración de funciones».

Tales principios están definidos y desarrollados, justamente, en la Ley 489 de 1998 (artículos <u>3</u> a <u>14</u>) y en el artículo <u>3</u> de la Ley 1437 de 2011 (Código de Procedimiento Administrativo y de lo Contencioso Administrativo).

Lo que más importa resaltar, de este conjunto de normas, para los efectos de este concepto, es que la creación o autorización de una nueva entidad descentralizada es una decisión trascendente, desde el punto de vista jurídico, administrativo, económico, ambiental y social, que modifica, de manera permanente, la estructura de la Administración, a nivel nacional o territorial.

Por lo tanto, lo que busca la ley con el «estudio demostrativo» es evitar que la decisión de crear una entidad de esta clase sea fruto del afán, la improvisación, la ligereza, la coyuntura política o el capricho del gobernante de turno, y lograr que constituya, por el contrario, una decisión debidamente razonada, evaluada en todos sus aspectos (jurídico, financiero, técnico, administrativo y ambiental, entre otros), sustentada, ponderada en todas sus implicaciones y planificada.

En este punto, la Sala considera importante recordar el deber de planeación, estrechamente ligado a los principios de la función administrativa, y sobre el cual manifestó, en el Concepto 2260 de 2015[23].

En el Estado Social de Derecho, la necesidad de una política anticipadora y preventiva que evite la producción del daño o el perjuicio tiene pleno sustento en los artículos 1, 2, 334, 339, 341 y 365 CP[24] Al decir de BENDA[25] la no decisión o inactividad de la Administración no es la solución, razón por la cual cobra creciente peso la cláusula del Estado social como categoría jurídica orientada al futuro dándole sentido al mandato constitucional para la planificación[26], que en este contexto significa la exploración de alternativas y la contraposición de ventajas e inconvenientes a favor o en contra de uno u otro proyect0[27] [énfasis añadido].

Para la Sala, la creación o constitución de cualquier entidad descentralizada es una decisión que debe estar precedida de un adecuado proceso de planeación, que permita establecer, en particular, la necesidad o la conveniencia de crear dicha entidad, para lograr determinados fines del Estado; el costo de esta decisión y los beneficios que esperan obtenerse, en comparación con otras alternativas; su forma de financiación; la manera como la nueva entidad quedará inserta en la estructura de la Administración Pública y las interacciones que tendrá con otras autoridades y particulares, incluyendo los controles a las cuales estará sujeta; su viabilidad jurídica, técnica, económica y administrativa; los mecanismos o las decisiones que permitan evitar una eventual duplicidad, contradicción o interferencia entre las funciones o los servicios que se asignarán a la nueva entidad y los que ya realizan otras autoridades o particulares, etc.

Sobre la importancia de la planeación, en esta materia, vale la pena citar, a título ilustrativo, lo señalado por la Corte Constitucional, en la Sentencia C-121 de 2004[28] acerca de los criterios que debe tener en cuenta el presidente de la República, al hacer uso de las facultades extraordinarias que le conceda el Congreso para crear organismos o entidades administrativas:

(…) puede suceder que <u>luego de los estudios técnicos y jurídicos pertinentes</u>, se concluya que <u>no se hace necesario en aras de la eficiencia y eficacia de la función administrativa</u>, la creación de nuevas entidades u organismos. Ello por cuanto la <u>racionalización del funcionamiento de la Administración pública</u>, no es asunto que pueda ser estimado libremente, sino que <u>encuentra soporte en las valoraciones y estudios que deba realizar el Gobierno Nacional, con acatamiento a lo dispuesto en los artículos 209 y 210 de la Constitución Política</u>. [Énfasis añadido].

Toda esta información y los análisis respectivos son los que deben quedar contenidos, a juicio de la Sala, en el «estudio demostrativo» que justifique o fundamente razonablemente la decisión de crear una nueva entidad descentralizada, ya sea mediante su creación directa o mediante la autorización que se otorgue al Ejecutivo, para los mismos efectos.

En todo caso, es pertinente aclarar que ni el artículo 69 de la Ley 489 de 1998, ni otra norma, exigen que el «estudio demostrativo» se elabore y aporte como un documento separado, por lo que nada impide que dicho análisis se incorpore dentro de la exposición de motivos del respectivo proyecto de ley, de ordenanza o de acuerdo, para su consideración y discusión, por parte de la respectiva corporación pública.

Sobre este punto, vale la pena citar, como antecedente, lo decidido por el Consejo de Estado, en sentencia del 29 de septiembre de 2022[29] al resolver la apelación contra una sentencia que denegó la solicitud de nulidad (parcial) de un acuerdo municipal, mediante el cual se había autorizado al respectivo alcalde para crear una empresa industrial y comercial del Estado.

Uno de los principales argumentos del actor consistió en la presunta violación del artículo 69 de la Ley 489 de 1998, debido a que no existía prueba de que el alcalde hubiese acompañado, al proyecto de acuerdo, el estudio justificativo de la iniciativa, al que se refiere la norma legal.

En relación con dicho argumento, que fue desestimado, esta corporación manifestó:

143. Así, para la Sala, revisadas las pruebas que obran en el proceso, si [sic] se presenta el estudio y la justificación para la creación de la empresa de renovación urbana, <u>la que se encuentra en los antecedentes del acuerdo demandado, específicamente en la exposición de motivos</u>, las discusiones del Proyecto de Acuerdo núm. 177 de 2000[30] y en el Plan de Ordenamiento Territorial vigente para la época dado su carácter técnico, político y jurídico [se enfatiza].

Como se aprecia, el Consejo de Estado encontró que el estudio requerido para justificar la creación de esa nueva entidad descentralizada, conforme al artículo 69 de la Ley 489 de 1998, estaba contenido en la exposición de motivos y en los demás antecedentes del proyecto de acuerdo.

Finalmente, vale la pena aclarar que, en el caso de las entidades descentralizadas cuya creación puede ser autorizada por el órgano de representación popular competente, ninguna de las normas citadas exige que, una vez allegado el estudio demostrativo, en la forma y en el momento que se han explicado, dicho documento deba entregarse de nuevo, o deba presentarse un estudio adicional, durante el proceso de creación de la entidad (incluyendo el decreto que la crea, cuando sea el caso, o la firma de los contratos de sociedad, los estatutos, las actas de creación o los demás documentos requeridos por la ley).

En atención a las consideraciones efectuadas,

## III. LA SALA RESPONDE

*1. Existe una definición legal de "estudio demostrativo" [sic] como nuevo documento que deberá acompañarse para justificar la iniciativa de creación*

En primer lugar, el «estudio demostrativo» no es un «nuevo documento» que se exija para la creación o autorización de una entidad descentralizada, pues dicho requisito está previsto en el artículo 69 de la Ley 489 de 1998, desde su promulgación (30 de diciembre de ese año).

En segundo lugar, no existe una definición legal o reglamentaria de la expresión «estudio demostrativo», que la norma citada utiliza.

Sin embargo, al efectuar una interpretación exegética, sistemática y finalista de dicha disposición, a la luz de otras normas de esa ley y de la Constitución Política, se infiere claramente que el «estudio demostrativo» es un documento en el que, como resultado de un adecuado proceso de planeación, se consignan los hechos, datos, argumentos y análisis que permitan demostrar la necesidad o conveniencia de crear o autorizar la creación de una nueva entidad descentralizada, para cumplir determinado fin del Estado; su viabilidad jurídica, financiera y social; las características que tendrá la nueva entidad, conforme a lo previsto en los artículos 50, 98 y 100 de la Ley 489 (según el caso), entre otras normas, así como el cumplimiento de los principios de la función administrativa (artículo 209 superior).

Dicho «estudio» puede estar contenido en un documento separado, que se aporte como anexo a la exposición de motivos del respectivo proyecto de ley, ordenanza o acuerdo, o puede estar incluido en la exposición de motivos, siempre que tenga el contenido informativo y analítico que se explica en este concepto.

*2. Podría entenderse que solo para la creación propiamente dicha resulta exigible tal estudio demostrativo*

*3. Podría entenderse que a partir del momento en que se autoriza la creación de la entidad, se inicia la elaboración del estudio demostrativo con los análisis técnicos, administrativos, jurídicos y presupuestales requeridos que la justifican*

*4. Si se entendiera que se deben cumplir los mismos requisitos en el estudio demostrativo bien sea para autorizar la creación de una entidad o para aprobar su creación, carecería de sentido la primera pues conforme a sus competencias constitucionales y legales el legislador, la asamblea o el concejo municipal procederán a crearla directamente. Entonces para que [sic] contemplaría el legislador la figura de la autorización.*

Estas tres preguntas, por estar relacionadas entre sí, y girar sobre el mismo tema, se responden de manera unificada, así:

Tal como se explica en este concepto, el «estudio demostrativo» que justifique la iniciativa, con el alcance que se ha descrito, debe presentarse tanto en el caso de los proyectos de ley, ordenanza o acuerdo que pretendan crear directamente una entidad descentralizada, como en el de aquellos que tengan por objeto autorizar la creación de una entidad de este tipo, según lo dispuesto en la Constitución Política y la ley.

En el caso de las entidades cuya creación puede ser autorizada por el Congreso, las asambleas departamentales o los concejos municipales o distritales, según el caso, no es necesario presentar posteriormente el mismo «estudio demostrativo», u otro adicional, durante el proceso de creación de la entidad descentralizada.

Remítase al director del Departamento Administrativo de la Función Pública y a la Secretaría Jurídica de la Presidencia de la República.

**ÉDGAR GONZÁLEZ LÓPEZ**

**Presidente de la Sala**

**ÓSCAR DARÍO AMAYA NAVAS**

**Consejero de Estado**

**MARÍA DEL PILAR BAHAMON FALLA**

**Consejera de Estado**

**ANA MARIA CHARRY GAITAN**

**Consejera de Estado**

**REINA CAROLINA SOLORZANO HERNÁNDEZ**

**Secretaria de la Sala**

**A LOS 28 DÍAS DEL MES DE MARZO DEL AÑO 2023**

**LEVANTAMIENTO DE RESERVA LEGAL MEDIANTE OFICIO DEL DEPARTAMENTO ADMINSTRATIVO DE LA FUNCIÓN PÚBLICA DE FECHA 27 DE MARZO DE 2023.**

**Nota: Ver norma original en Anexos.**

**NOTAS AL PIE DE PAGINA:**

[1] Artículo 69. Creacion de las entidades descentralizadas. Las entidades descentralizadas, en el orden nacional, se crean por la ley, en el orden departamental, distrital y municipal, por la ordenanza o el acuerdo, o con su autorización, de conformidad con las disposiciones de la presente ley. El proyecto respectivo deberá acompañarse del estudio demostrativo que justifique la iniciativa, con la observancia de los principios señalados en el artículo 209 de la Constitución Política.

[2] Por la cual se dictan normas sobre la organización y funcionamiento de las entidades del orden nacional, se expiden las disposiciones, principios y reglas generales para el ejercicio de las atribuciones previstas en los numerales 15 y 16 del artículo 189 de la Constitución Política y se dictan otras disposiciones.

[3] Según el inciso final del artículo 115 de la Constitución, «[l]as gobernaciones y las alcaldías, así como las superintendecias [sic], los establecimientos públicos y las empresas industriales o comerciales del Estado, forman parte de la Rama Ejecutiva».

[4] Corte Constitucional, Sentencia C-691 del 5 de septiembre de 2007, expediente D-6687.

[5] [9] En relación con la noción de descentralización y sus diferentes manifestaciones ver, entre otras, las sentencias C-308/94 M.P. Antonio Barrera Carbonell, C-543/01, c-1 112/01, C-482/02 y C-037/03 M.P. Álvaro Tafur Galvis, C-1258/01 M.P. Jaime Córdoba Triviño, C- 894/03 M.P. Rodrigo Escobar Gil».

[6] «[10] Sentencias C-295 de 1995, C-1051 de 2001 y C-127 de 2003». 7 «[11] Sentencia C-784 de 2004».

[7] «[11] Sentencia C-784 de 2004».

[8] Artículo 154. Las leyes pueden tener origen en cualquiera de las Cámaras a propuesta de sus respectivos miembros, del Gobierno Nacional, de las entidades señaladas en el artículo 156, o por iniciativa popular en los casos previstos en la Constitución.

No obstante, sólo podrán ser dictadas o reformadas por iniciativa del Gobierno las leyes a que se refieren los numerales 3, 7, 9, 1 1 y 22 y los literales a, b y e, del numeral 19 del artículo 150; [...] [Se resalta].

[9] Artículo 313. Corresponde a los concejos:
6. Determinar la estructura de la administración municipal y las funciones de sus dependencias; las escalas de remuneración correspondientes a las distintas categorías de empleos; crear a iniciativa del alcalde, establecimientos públicos y empresas industriales o comerciales y autorizar la constitución de sociedades de economía mixta.

[10] En el mismo sentido, puede consultarse lo dispuesto por el artículo 92, numeral 4.0 , del Decreto Ley 1333 de 1986, para las empresas industriales y comerciales del Estado del orden municipal, y el artículo 19, numeral 20, de la Ley 2200 de 2022, para las empresas del nivel departamental.

[11] Consejo de Estado, Sala de Consulta y Servicio Civil, Concepto 1844 del 22 de octubre de 2007.

[12] Corte Constitucional, Sentencia C-357 del 1 1 de agosto de 1994, expediente D- 564.

[13] Consejo de Estado, Sala de Consulta y Servicio Civil, Concepto 2242 del 9 de julio de 2015.

[14] Corte Constitucional, Sentencia C-357 del 1 1 de agosto de 1994, expediente D-564.

[15] Vigente en esa época, aclara la Sala.

[16] Parágrafo. Las reglas relativas a los principios propios de la función administrativa, sobre delegación y desconcentración, características y régimen de las entidades descentralizadas, racionalización administrativa, desarrollo administrativo, participación y control interno de la Administración Pública se aplicarán, en lo pertinente, a las entidades territoriales, sin perjuicio de la autonomía que les es propia de acuerdo con la Constitución Política [énfasis añadido].

[17] Parágrafo 1o. De conformidad con el inciso segundo del artículo 210 de la Constitución Política, el régimen jurídico aquí previsto para las entidades descentralizadas es aplicable a las de las entidades territoriales sin perjuicio de las competencias asignadas por la Constitución y la ley a las autoridades del orden territorial [se resalta].

[18] Se transcribe más adelante.

[19] En el artículo 150, numeral 10 0 , para el Congreso; en el artículo 300, numeral 9. 0 , para las asambleas departamentales, y en el 313, numeral 3. 0 , para los concejos municipales. Sobre este asunto, pueden consultarse, entre otras, las Sentencias C-727 del 21 de junio de 2000 (expediente D-2696), C-121 del 17 de febrero de 2004 (expediente D-4791) y C-150 del 24 de febrero de 2004 (expediente D-4779), de la Corte Constitucional.

[20] Aclara la Sala que el «sentido natural y obvio» de las palabras, al que se refiere el artículo 28 del Código Civil, no es lo mismo que el «sentido común», tal como parece entenderlo la Alcaldía Mayor de Bogotá, en la

comunicación n. [0] 2-2022-28141 del 28 de septiembre de 2022, con la cual solicitó a la Secretaría Jurídica de la Presidencia de la República formular esta consulta. La expresión utilizada por la ley se refiere al significado común y general de las palabras en el idioma castellano, que puede verificarse, hoy en día, en el Diccionario de la Lengua Española, entre otras obras. Por el contrario, el sentido común es un concepto filosófico, de mucho más calado y más difícil de establecer.

[21]  Artículo 463. En las sociedades de economía mixta los aportes estatales podrán consistir, entre otros, en ventajas financieras o fiscales, garantía de las obligaciones de la sociedad o suscripción de los bonos que la misma emita, auxilios especiales, etc. El Estado también podrá aportar concesiones.

Artículo 467. Para los efectos del presente Título, se entienden por aportes estatales los que hacen la Nación o las entidades territoriales o los organismos descentralizados de las mismas personas.

Cuando el aporte lo haga una sociedad de economía mixta, se entiende que hay aporte de capital público en el mismo porcentaje o proporción en que la sociedad aportante tiene, a su vez, capital público o estatal dentro de su capital social.

[22]  Por la cual se dictan normas tendientes a modernizar la organización y el funcionamiento de los departamentos.

[23]  Consejo de Estado, Sala de Consulta y Servicio Civil, Concepto 2260 del 10 de agosto de 2015.

[24]  «[34] Consejo de Estado, Sala de Consulta y Servicio Civil, Concepto 2150 de 2013».

[25]  ___ «[36] BENDA, Manual d Derecho Constitucional, segunda edición. Editorial Marcial Pons, Barcelona. 2001. Páginas 553 y ss.»

[26]  «[36] BENDA, Op. Cit. Página 554: "El derecho no es impotente frente a las relaciones sociales, sino que puede influir en ellas y cambiarlas. Si la cláusula del Estado social no comprende únicamente la preocupación por los actuales ciudadanos, sino que también contempla a sus hijos y nietos en sus futuras condiciones de existencia, entonces es posible hablar de un mandato constitucional en pro de una política anticipadora...Se ha inferido así de la cláusula de Estado social una habilitación constitucional para la planificación"». [Subrayas añadidas].

[27]  «[37] BENDA Op. Cit., página 557. Señala el autor alemán que la planificación se basa en prognosis, es decir, en la averiauación y valoración de las circunstancias que pueden tener importancia en la decisión. El cumplimiento de la tarea de integración que compete al Estado social, referido a la planificación, comporta el esfuerzo de buscar entre las alternativas posibles aquella que mejor puede conducir a una compensación de los intereses y por ende al bien común; vale también para la relación de la población actual con las futuras generaciones [...]». [Se resalta].

[28]  Corte Constitucional, Sentencia C-121 del 17 de febrero de 2004, expediente D-4791

[29]  Consejo de Estado, Sala de lo Contencioso Administrativo, Sección Primera, Sentencia del 29 de septiembre de 2022, radicación n. [0] 7600123310020100185502.

[30]  ___ «[65] Actas núm. 248.249,250 [sic] y 251 de 2000».

# English Translation
# of Exhibit 21

  

LEGAL REGIME OF BOGOTÁ D.C.

Property of the District Legal Secretariat of the Office of the Mayor of Bogota D.C.

*District Legal
Secretariat*

# Concept 250 of 2023 Council of State - Consultation and Civil Service Chamber

**Date of Issue:**
22/02/2023
**Effective Date:**
**Medium of publication:**

Annexe

s

✉

**The District Legal Secretariat clarifies that the information contained herein is exclusively informative, its validity is subject to the analysis and competencies determined by law or regulations. The contents are constantly updated.**

**CONCEPT 250 OF 2023**

**(February 22)**

**COUNCIL OF STATE**

**CONSULTATION ROOM AND CIVIL SERVICE**

**Presiding Judge: Ana María Charry Gaitán Bogotá,**

**D.C., February twenty-second (22), two thousand twenty-three**

**(2023) Internal Filing: 2496.**

**Unique number: 110010306000-2022-00250-00**

**Reference: Creation or authorization of decentralized administrative entities by services. Article 69 of Law 489 of 1998. Demonstration study**

## I. BACKGROUND

The National Government, through the Director of the Administrative Department of the Civil Service, and at the request of the Mayor of Bogota, D.C., asks the Chamber for a consultation on the interpretation of Article 69 [1] of Law 489 of 1998 [2] , which refers to the creation of decentralized administrative entities, and, in particular, on the scope of the requirement to accompany a "demonstrative study that justifies the initiative", referred to in this provision.

After transcribing the aforementioned precept, the consulting officer recalls that the Legislator foresaw two different scenarios to give rise to this type of entities: i) direct creation and ji) authorization (indirect mechanism).

It also points out that, since "common sense is provided for in the legal system as a criterion of legal interpretation", it is possible to affirm that the authorization is an act prior to the creation of the entity itself.

Based on the foregoing, the Chamber raises the following **QUESTIONS:**

1.  There is a legal definition of "demonstrative study" [sic] as a new document that must be submitted to justify the creation initiative.

2.  It could be understood that only for the creation itself is such a demonstrative study required.

3. It could be understood that from the moment the creation of the entity is authorized, the elaboration of the demonstrative study with the required technical, administrative, legal and budgetary analyses that justify it begins.

4. If it were understood that the same requirements must be met in the demonstrative study either to authorize the creation of an entity or to approve its creation, the former would be meaningless since, in accordance with their constitutional and legal powers, the legislator, the assembly or the municipal council will proceed to create it directly. Then why [sic] would the legislator contemplate the figure of authorization.

## II. CONSIDERATIONS

In order to answer the questions raised, the Court will analyze the following issues: i) Creation of decentralized administrative entities by services: competence, requirements and procedure, and ii) concept and scope of the "demonstrative study" required by Article 69 of Law 489 of 1998.

## A. Creation of decentralized administrative entities by services: competence, requirements and procedure

First of all, it is necessary to recall the legal framework -constitutional and legal- that regulates, in Colombia, the creation of decentralized administrative entities by services, as well as the clarifications and clarifications that, on some issues, have been made by jurisprudence and doctrine.

Initially, it is pertinent to recall that, within the Executive Branch of public power, both at the national and territorial (departmental, district and municipal) levels, a distinction is made between the central sector and the decentralized sector [3].

The central sector is made up of the main agencies and organizations responsible for setting and implementing government policies, establishing goals and priorities, and directing administrative management in its different fields of action (administrative sectors).

The decentralized sector is made up of decentralized entities by services, which are public legal entities, endowed with administrative, patrimonial and technical autonomy, but subject to political control and to the supreme direction of the central sector body to which they are attached or linked ("tutelary control"). These entities are constituted for the execution of administrative functions, the rendering of public services or the performance of specific industrial and commercial activities (Law 489 of 1998, Article 68).

Apart from these, there are the territorially decentralized entities, provided for in Article 286 of the Political Constitution (departments, municipalities, districts and indigenous territories, mainly), to which the same Charter recognizes autonomy (Articles 1 and 287, among others). Such entities may, in turn, constitute decentralized entities by services, to form part of the Executive Branch, at the corresponding territorial level.

With regard to these two types of administrative decentralization, the Court [4] Constitutional, in Ruling C-691 of         2007      said:

In the same sense, the Court has said that the Constitution enshrines, on the one hand, territorial decentralization, established on a geographical basis and with an evident democratic value, inasmuch as it constitutes the sphere within which the interested parties themselves, under a regime of autonomy, seek the satisfaction of regional and local needs (Art. 1, 287 C.P.), and on the other hand, decentralization by services, which constitutes one of the organizational modalities foreseen in the Constitution for the exercise of the administrative function (Art. 209 C.P.), which entails the existence of persons endowed with legal, patrimonial and financial autonomy, administratively and functionally articulated with the State, to which the following are assigned
                                                   [5]
by law specific legal powers.                      __

In fact, decentralization by services can be defined as the attribution of competencies or functions of the administration to certain entities created for the management of state activities.
                        [6]
Specialized          As an organizational modality provided for in the Constitution
decentralization by services "consists of the existence of persons endowed with legal, patrimonial and financial autonomy, administratively and functionally articulated with the State, to which the following are assigned
                                                   [7]
by law specific legal powers".                     __

1) Constitutional framework

Now, with regard to the determination of the structure of the Public Administration and, particularly, the creation or authorization decentralized entities, the Political Charter grants concurrent powers in principle to Congress and the President of the Republic, and replicates almost in its entirety this scheme at the subnational level, as will be seen below.

In effect, Article 150 provides that the Congress of the Republic is responsible for making laws to fulfill the functions established therein, among which the following stand out:

(...)

7. To determine the structure of the national administration and to <u>create</u>, suppress or merge <u>ministries</u>, <u>administrative departments</u>, <u>superintendencies</u>, <u>public establishments and other entities of the national order</u>, <u>indicating their objectives and organizational structure</u>; to regulate the creation and operation of the Regional Autonomous Corporations within a regime of autonomy; likewise, to <u>create or authorize the constitution of industrial and commercial enterprises of the state and mixed economy companies</u> [emphasis added].

(...)

It is important to clarify that the laws through which these functions are exercised can only be issued at the initiative of the national government, as expressly provided in Article <u>154</u> of the Constitution, in its second paragraph [8]. __

In accordance with Article 150, paragraph <u>7</u>, Article <u>210</u> of the Constitution provides that "[t]he entities of the national order decentralized by services <u>may only be created by law</u> <u>or by its authorization</u>, <u>based on the principles that guide administrative activity</u>" [emphasis added], provided for in Article <u>209</u> of the same Charter.

For his part, according to the provisions of Article <u>189</u> of the Constitution, the President of the Republic, as Head of State, Head of Government and supreme administrative authority, is responsible, in this field: (i) abolish or merge national administrative entities or agencies, in accordance with the law (numeral <u>15</u>); ñ) modify the structure of the ministries, administrative departments and other national administrative entities or agencies, subject to the general principles and rules defined by law (numeral <u>16</u>), and (iii) distribute business, according to its nature, among ministries, administrative departments and public establishments (numeral <u>17</u>).

Now, at the territorial level, the constitutional norms establish a similar distribution of competencies. Thus, according to Article <u>300</u>, as amended by Article <u>2</u> of Legislative Act No. 01 of 1996, the departmental assemblies, by means of ordinances, are responsible for, among other functions:

7. To determine the structure of the Departmental Administration, the functions of its dependencies, the scales of remuneration corresponding to its different categories of employment; to <u>create the public establishments and the industrial or commercial enterprises of the</u> Departmental Administration; <u>to create the public establishments and the industrial or commercial enterprises of the Departmental Administration</u>.

department and authorize the formation of mixed economy companies
[emphasis added].

A similar provision, for municipalities, is contained in Article 313, [9].
paragraph 6 of the Charter

It is worth noting that, in accordance with this norm and with Article 300
(final paragraph) of the Constitution, the initiative for the issuance of
agreements or ordinances through which these powers are exercised
corresponds exclusively to the mayors and governors, in a manner
analogous to that provided for the national level.

Pursuant to the Constitution, the decentralized entities by services at the
national level must be created by the Legislature, at the request of the
Government. However, in the particular case of industrial and commercial
enterprises of the State and mixed economy companies, they may also be
authorized by the Legislature, for their subsequent creation by the
Executive.

At the territorial level, decentralized entities by services must be created
directly by the respective departmental assembly, municipal council or
district council, at the initiative of the respective governor or mayor, with the
exception of mixed economy companies, whose incorporation may be
authorized by the respective popularly elected corporation.

Note that, unlike at the national level, assemblies and councils can only
authorize local governments to create mixed-economy companies, and not
industrial and commercial companies of the State, which must be created by
local governments.
[10]
directly by the respective popularly elected body_____. On this
On this point, the Constitutional Court stated the following in the
aforementioned Ruling C-691 of 2007:

According to the Political Constitution, the industrial and commercial
companies of the State are part of the executive branch (art. 115), and as
such are part of the structure of the administration. This higher norm
attributes to Congress the power to create them or authorize their
incorporation, and to the Assemblies and Councils the power to create them
directly (arts. 150-7, 300-7 and 313-6) [emphasis added].

In the same sense, the Civil Service and Consultation Chamber noted the following
[11]
in Concept 1844 of 2007, as follows                    :

17. Only at the national level, the Constitution provides for the authorization
to establish industrial and commercial companies of the State (...).

2) <u>Legal development</u>

In exercise of the function provided for in Article 150, paragraph <u>7 </u>of the Constitution, the Congress of the Republic issued Law 489 of 1998, Article <u>39 </u>of which provides, with respect to the composition of the Public Administration, as follows:

**Article 39. Integration of the Public Administration.** The Public Administration is made up of the agencies that make up the Executive Branch of the Public Power and all other agencies and entities of a public nature that are permanently responsible for the exercise of administrative activities and functions or the rendering of public services of the Colombian State.

The Presidency of the Republic, the ministries and the administrative departments, at the national level, are the main agencies of the Administration.

Likewise, the ministries, administrative departments and superintendencies constitute the Central Sector of the National Public Administration. The agencies and entities attached or linked to a Ministry or an Administrative Department that have legal personality, administrative autonomy and their own assets or independent capital make up the Decentralized Sector of the National Public Administration and perform their functions under the terms established by law.

The governors' offices, mayors' offices, office secretariats and administrative departments are the main agencies of the Administration at the corresponding territorial level. The others are attached or linked to them and perform their functions under their guidance, coordination and control under the terms established by law, ordinances or agreements, as the case may be.

(...)

In harmony with said precept, and in development of the provisions therein, Article <u>38 </u>ibidem establishes the structure of the Executive Branch, at the national level. In accordance with this provision, the entities that make up the decentralized sector are:

a) Public establishments;

b) Industrial and commercial enterprises of the State;

c)  The superintendencies and special administrative units with legal personality;

d) State social enterprises and public utilities companies;

e) Scientific and technological institutes;

f) Public companies and mixed economy companies,

g) Other national administrative entities with legal personality created, organized or authorized by law to form part of the Executive Branch of the Public Power.

It is worth clarifying that the superintendencies and special administrative units may or may not have legal personality, as determined by the law creating them. In the first case, they are decentralized entities, as stated in paragraph 2, literal c, of the aforementioned law; and in the second case, they are agencies of the central sector, as provided in paragraph 1, literal e, of the same provision.

This classification of decentralized entities, including superintendencies and special administrative units with legal personality, is reiterated in Article 68 eiusdem.

In addition to these legal entities, Law 489 of 1998 regulates the so-called "indirect decentralized entities", i.e., those decentralized entities by services created with the participation of other already established entities. Among these are the subsidiaries of the industrial and commercial enterprises of the State and of the mixed economy companies (Article 49, paragraph), as well as the non-profit entities arising from the association of several public entities (Article 95), or of these with individuals (Article 96).

Regarding the creation or constitution of decentralized entities, it is important to cite, in particular, the provisions of Article 49 of the aforementioned law:

**Article 49. Creation of agencies and administrative entities.** The creation of ministries, administrative departments, superintendencies, public establishments and other national agencies and administrative entities shall be the responsibility of the Lev,  at the initiative of the Government.

State industrial and commercial enterprises may be created by law or with the authorization of the law.

Mixed economy companies shall be incorporated by virtue of legal authorization.

**Paragraph.** The indirect decentralized entities and the subsidiaries of the industrial and commercial companies of the State and of the mixed economy companies shall be constituted <u>in accordance with the provisions of the present </u>law, and <u>in any case prior authorization of the National Government </u>in the case of entities of that order <u>or of the Governor or the Mayor </u>in the case of entities of the departmental or municipal order. [Underlining added].

As can be seen, this rule, which develops the provisions of numeral <u>7 </u>of Article 150 of the Political Charter, clearly establishes that, as a general rule, both the agencies of the central sector and the entities that make up the decentralized sector by services of the Executive Branch, at the national level, must be created directly by the Legislator, at the initiative of the national Government, with the exception of:

- Industrial and commercial enterprises of the State, which may be <u>created</u> directly by Congress, or whose creation <u>may be authorized </u>by Congress, and

- Mixed economy companies, subsidiaries of industrial and commercial companies of the State and other indirect decentralized entities, whose creation must be <u>authorized </u>by the Legislator (and additionally, in the case of the latter two, by the national, departmental, municipal or district government, as appropriate).

This provision is in accordance with other provisions of the same law, such as articles 38, numeral 2, literal g (other decentralized entities); 50 (content of the acts of creation); 68 (decentralized entities); 69 (creation of decentralized entities); 71 (public establishments); 82 (for superintendencies and special administrative units with legal personality); 85 (for industrial and commercial companies of the State); 97 (for mixed economy ), and 94 (for subsidiaries of industrial and commercial companies of the State).

However, it is important to point out that, even though numeral 7.[0] of Article 150 of the Constitution provides that Congress may "create or authorize the creation" [emphasis added] of mixed-economy companies, case law[12] and doctrine[13] have clarified that it is not possible for the Legislature to <u>directly create </u>this type of company, nor, in general, decentralized entities of an associative nature (including nonprofit entities of this type, such as associations and corporations), because their creation requires the concurrence of wills between the State and individuals, or between different public entities, as well as between different public entities, such as associations and corporations), because their incorporation requires the concurrence of wills between the State and individuals, or between different public entities, as well as compliance with the requirements established in the Code of Commerce or the Civil Code, as the case may be.

To that extent, Congress can only authorize the creation of this type of companies and entities, so that the national Government and the public entities that are going to participate in their constitution proceed to create them, as it is regulated in Law 489 of 1998. On this point, the Chamber of Consultation and Civil Service, in Concept 2242 of 2015, stated.

From the nature of mixed economy companies and their legal regulation it is clear that the law or ordinance cannot directly create a mixed economy company, because for it to come into existence it requires the participation of individuals, whose willingness to associate with the State is not available to the legislator, nor their possible equity contributions to the company. That is why, in order to constitute a mixed economy company, an authorization to the executive is usually required, which originates in the corresponding public corporation. Based on such authorization, the national or departmental executive, as the case may be, and the representatives of the private sector agreed to incorporate the company, will sign the corresponding public deed, which is the form prescribed by law to create a mixed economy company. The act of authorization, law or ordinance, must determine the assets or public resources that the State will contribute to the projected company. [Emphasis added].

In any event, case law and doctrine have specified that the authorization that the Legislature (or, as the case may be, the departmental assemblies and the municipal or district councils) may give to the Executive for the creation of this type of entities cannot be general and abstract, but rather particular and concrete, since it must refer to a specific entity. This was explained by the Constitutional Court in Ruling C-357

fro 1994.[14]
m

Now, what kind of law authorizes the creation of a mixed economy company?

A law in a formal sense, since it is a law only by its origin, and its formation, and not by its content. This content is not general and abstract, but particular and concrete.

And because it is particular and concrete, it must refer to a specific, individualized society. As stated in article 80. of the decree

1050 of 1968[15] in the case of mixed economy [sic] corporations, "the The degree of guardianship and, in general, the conditions of the State's participation in this type of company are determined in the law that creates or authorizes them and in the respective corporate contract".

Such law, therefore, must determine matters such as: the amount of the public resources to be contributed to the company, its purpose, its

The company's domicile, its duration, the proportion of public and private capital, as well as the degree of guardianship by the administration, and which agency is responsible for exercising this guardianship.

The need for a special authorization has been the thesis sustained by the Council of State. This is stated in the opinion of the Civil Service and Consultation Chamber of April 19, 1993. [Underlining added].

On the other hand, it is important to remember that the provisions of Law 489 of 1998, for the constitution of decentralized entities by services at the national level, are repeated, as appropriate, for the territorial level, not only at the local level, but also at the regional level.

(for the departments) and 313, numeral 6. (for the municipalities), of the Political Charter, but also by the provisions of Articles 2, paragraph 0 [16] - 68, paragraph 1 [17] , and

69 [18] of that law.

It is clear that, since the application of such regulations to the territorial entities must respect their autonomy, constitutionally guaranteed, as well as the special provisions of the Charter that regulate their organization and operation, the rules of Law 489 must be applied to the decentralized entities of that level without contradicting the constitutional precepts that regulate, in a particular manner, the territorial entities, as is the case with the power - already explained- to create the industrial and commercial companies of the State of the departmental, municipal or district order.

Now, since the consultation refers specifically to the interpretation of Article 69 of Law 489, it is necessary to transcribe this provision:

**Article 69. Creation of decentralized entities.** The decentralized entities, in the national order, are created by law, in the departmental, district and municipal order, by ordinance or agreement, or with its authorization, in accordance with the provisions of this law. The respective project must be accompanied by the demonstrative study that justifies the initiative, with the observance of the principles indicated in Article 209 of the Political Constitution. [Emphasis added].

In the consultation, it is noted that this provision stipulates that decentralized entities, both at the national and territorial levels, may be created or authorized by law, departmental ordinances or municipal or district agreements, as the case may be.

However, the Chamber emphasizes that the same rule establishes that the creation or authorization for the creation of such entities must be made by "in accordance with the provisions of the present law", an expression which

obviously alludes to the other precepts of Law 489 of 1998 (without leaving aside, of course, the applicable constitutional norms).

On this point, it should be reiterated that no legal norm -and Article 69 of Law 489 is no exception- can, nor should, be interpreted in isolation, that is, without taking into account, firstly, the other provisions that are part of the same code, statute, law or regulation, and, secondly, the other precepts that are relevant, starting, as is well known, with the constitutional norms, since such provisions are those that form the basis of the entire domestic legal system, and give it its meaning and coherence.

Therefore, in accordance with the Constitution, the decentralized entities by services at the national level must be created by the Legislature, at the request of the Government. In the particular case of industrial and commercial companies, they may also be authorized by the Legislature, for their subsequent creation by the Executive.

Pursuant to Article 69 of Law 489 of 1998 and other concordant norms, the decentralized entities by services at the territorial level must be created by the departmental assemblies or the municipal or district councils, as appropriate.

The foregoing, with the exception of mixed economy companies and indirect decentralized entities of an associative nature, which may be authorized by the Legislator, the assemblies or the municipal or district councils, respectively.

It is worth clarifying that none of the above prevents Congress or, where appropriate, the departmental assemblies or municipal or district councils from granting the respective government extraordinary powers for the creation of any kind of decentralized entity, as this is not prohibited by the Constitution, as lo lo has indicated la jurisprudence. [19]

Thus, when Article 69 of Law 489 provides that decentralized entities may be created by law, ordinances or agreements, or with their authorization, it does not mean that the Congress of the Republic, the departmental assemblies and the municipal and district councils may decide whether to create, directly, or authorize the creation of a given decentralized entity by services, since this depends on the type and level of the respective entity.

**B. The "demonstrative study" required by Article 69 of Law 489 of 1998**

Now, the consultation inquires about the meaning and scope of the expression "demonstrative study", used in Article 69 of Law 489, as well as about the cases in which such requirement is required.

In the first place, it is necessary to point out that the Court is not aware of any legal or regulatory norm that defines such expression. On the other hand, when reviewing the legislative background of Law 489 of 1998, no explanation of such concept is found either.

Given the foregoing, it is necessary to resort to other sources and other methods of interpretation, such as the exegetical, the systematic and the finalist, for which it is worthwhile to transcribe, once again, the provisions of the second part of the norm:

The respective project must be accompanied by a demonstrative study justifying the initiative, in compliance with the principles set forth in Article 209 of the Constitution [emphasis added].

In the first place, and from an exegetical point of view, since the highlighted expression -or the words that compose it- do not have a special definition in the law, it is necessary to resort to its "natural and obvious meaning, according to the general use of (...) words"[20], as required by Article 28 of the Civil Code.

From this perspective, the terms "study", "demonstrative" y "justify" have the following meanings, among others, according to the Diccionario de la Lengua Española.

- Study (third meaning): "A work of a certain length in which a specific issue is presented and analyzed".

- Demostrative (first meaning): "That demonstrates".

- Justify (first meaning): "To prove something with convincing reasons, witnesses and documents".

Thus, from a semantic point of view, it is unquestionable that when Article 69 of Law 489 of 1998 requires that a "demonstrative study justifying the initiative" be submitted, it refers to a document demonstrating the need or convenience of creating or authorizing the creation (as the case may be) of a decentralized entity, as well as the feasibility of the initiative.

However, from a systematic perspective, it should be reiterated, first of all, that the regulatory initiative for this type of matter is constitutionally vested exclusively in the national government and in the departmental, district and municipal governments, and that the

The corresponding decision is the responsibility of the Congress of the Republic, the departmental assemblies and the municipal or district councils, by means of a law, ordinance or agreement, respectively.

This implies that, when the standard being commented on uses the words The terms "project" and "initiative" refer, specifically, to the draft law, ordinance or agreement, as the case may be, that the national or territorial government must submit to the corresponding popularly elected corporation to request the creation or authorization to create a certain decentralized entity, depending on the legal nature and level it will have.

The foregoing leads to a first conclusion: the "demonstrative study" must be prepared and submitted by the national, departmental, district or municipal government to Congress, the departmental assembly or the municipal or district council, as the case may be, together with the draft law, ordinance or agreement proposing the creation of the decentralized entity by services, or requesting authorization to create it, when possible.

For the purposes of the consultation, it is important to highlight that Article 69 of Law 489 does not make any distinction, in relation to such requirement, between the cases in which the popularly elected public corporation must directly create the decentralized entity (general rule), and those in which it may or must authorize the national or local government to do so. To that extent, it is clear that the "demonstrative study" is required in both hypotheses.

In support of this assertion, it should be taken into account that the political decision to create a new decentralized entity is always taken by the State, through the respective body of popular representation (Congress, departmental assembly or district or municipal council), either directly and immediately, or indirectly and mediately (by authorizing the Executive), and that the initiative, in both cases, corresponds to the latter.

Therefore, in both events, the national or territorial government is required to provide the respective popularly elected public corporation with complete, clear and pertinent information, analysis, and objective, reasonable, demonstrable and convincing arguments that will allow said body to make the corresponding decision.

The foregoing is also ratified when reviewing other provisions of Law 489 of 1998, which establish the requirements that the acts of creation or constitution of decentralized entities must have, especially Articles 50, 98 and 100.

The first of the aforementioned norms indicates the minimum content that the acts of creation of decentralized entities must have:

**Article 50. Content of the acts of creation.** The law that provides for the creation of an agency or administrative entity shall <u>determine its objectives and organic structure</u>, and <u>shall</u> also <u>determine the budgetary support in accordance with the fiscal guidelines of the Ministry of Finance</u> and <u>Public Credit</u>.

<u>The organizational structure of an agency or administrative entity includes</u> the determination of <u>the following aspects</u>:

1. The denomination.

2. The legal nature and the consequent legal regime.

3. Headquarters.

4. The integration of its equity.

5. The designation of the highest management and administrative bodies and the manner of integration and appointment of their officers, and

6. The Ministry or Administrative Department to which they are attached or linked.

**Paragraph.** The superintendencies, public establishments and special administrative units shall be attached to the ministries or administrative departments; the industrial and commercial enterprises of the State and the mixed economy companies shall be linked to them; <u>the other agencies and entities shall be attached or linked</u>, <u>as determined by their act of creation</u>. [Emphasis added].

As can be seen, this provision develops the provisions of Article 150, paragraph <u>7</u>, of the Constitution, in the sense that the laws that create ministries, administrative departments, superintendencies, public establishments and other agencies or decentralized entities of the national order must indicate "their objectives and organizational structure".

Regarding mixed economy companies, the creation of which must be authorized by the Legislator, Article <u>98</u> of the same law establishes.

Article 98. Conditions for the participation of public entities. In the act of incorporation of any mixed economy company, <u>the conditions for the participation of the State contained in the provision authorizing its creation</u>, <u>the national</u>, <u>departmental</u>, <u>district or municipal character</u> <u>of the company</u> will be indicated: <u>so as its linking to the different</u>

agencies for purposes of the control to be exercised over it [emphasis added].

It is worth remembering that, regarding the type of contributions that public entities may make in this type of companies, Article 100 ibidem specifies that these may consist, "among others, in financial or tax advantages, guarantee of the obligations of the company or subscription of the bonds issued by the same", as well as, also, in "mining titles and contributions for the exploitation of natural resources owned by the State". This provision is in accordance with the provisions of the [21]
Articles 463 and 467 of the Code of Trade.

From the aforementioned rules, it can be inferred that the basic conditions for the participation of the State in a mixed economy company must be established in the same law, ordinance or agreement (in the case of companies at the territorial level) that authorizes its creation, and must also be reflected in the respective act of incorporation (public deed or private document, depending on the type of company).

These conditions, in the opinion of the Chamber, must include, according to the aforementioned norms: (i) the type of entity in question (in this case, a mixed economy company); (ii) the order to which it will belong (national, departmental, district or municipal); (iii) its object and general purposes; (iv) the public entity or entities authorized to participate in its incorporation; (v) the degree of participation that such entities will have, initially, in the capital stock; (vi) the value and type of contributions that may be made, as well as the source of the resources and the corresponding budgetary support; and (vii) the administrative agency of the central sector to which it will be linked.

All these aspects of the decentralized entities to be created or authorized, both in the case of those that are created directly by the Congress of the Republic, the assemblies and the councils, as well as those whose constitution may be authorized by such corporations, must be clearly provided for in the corresponding draft law, ordinance or agreement.

This, in turn, leads to the deduction that the "document justifying" the initiative, which the Executive must present to the same popularly elected corporations, must include a detailed explanation of these characteristics and conditions, together with the facts, data, rules and arguments that justify or support them, from a legal, technical, financial and administrative point of view.

In the same sense, Article 19, numeral 20 of Law 2200 of 2022[22] establishes the content of the studies required to create a decentralized entity of the departmental order:

**Article 19. Functions.** The following are functions of the Departmental Assemblies:

(...)

20. Approve the creation of the public establishments and industrial or commercial enterprises of the departmental order provided for in Article 300 numeral 7 of the Political Constitution, prior to the presentation and evaluation of the technical study that supports the economic and social convenience of the initiative, as well as the financial viability of the new entity, taking into account its functions, the sector where it will operate and its sources of financing.

(...) (Emphasis added).

As can be seen, there is no contradiction or opposition between this norm and Article 69 of Law 489 of 1998, but rather they are, in fact, complementary provisions, since Article 19, numeral 20, of Law 2200 indicates, with greater detail and precision, the content that the "demonstrative study" required for the creation of a decentralized entity of the departmental order, in accordance with Article 69 of Law 489, must have.

Now, under a finalist or teleological interpretation, it is important to dwell on the provisions of the final part of Article 69 of Law 489, when it establishes that the justification of the initiative for the creation or authorization of the decentralized entity, contained in the "demonstrative study", must observe the principles set forth in Article 209 of the Political Constitution.

It is worth remembering that, in accordance with said constitutional canon, "the administrative function is at the service of the general interest and is developed based on the principles of equality, morality, efficiency, economy, celerity, impartiality and publicity, through decentralization, delegation and deconcentration of functions".

Such principles are precisely defined and developed in Law 489 of 1998 (Articles 3 to 14) and in Article 3 of Law 1437 of 2011 (Code of Administrative Procedure and Administrative Disputes).

What is most important to highlight, from this set of rules, for the purposes of this concept, is that the creation or authorization of a new decentralized entity is a transcendental decision, from a legal, administrative, economic, environmental and social point of view, which permanently modifies the structure of the Administration, at a national or territorial level.

Therefore, what the law seeks with the "demonstrative study" is to prevent the decision to create an entity of this kind from being the result of eagerness, improvisation, levity, the political situation or the whim of the ruler in power, and to ensure that it , on the contrary, a duly reasoned decision, evaluated in all its aspects (legal, financial, technical, administrative and environmental, among others), sustained, weighed in all its implications and planned.

On this point, the Chamber considers it important to recall the duty of planning, which is closely linked to the principles of the administrative function, and on which it stated, in Concept 2260 of 2015[23] ____.

In the Social State of Law, the need for an anticipatory and preventive policy that avoids the production of damage or harm is fully supported by articles 1, 2, 334, 339, 341 and 365 CP[24] As stated by ____ BENDA____[25] the non-decision or inactivity of the Administration is not the This is the reason why the social state clause as a future-oriented legal category is gaining more and more weight, giving meaning to the constitutional mandate for planning[26].  ____that in this context means the exploration of alternatives and the weighing of advantages and disadvantages for or against one project or another[27] [emphasis added].

For the Court, the creation or constitution of any decentralized entity is a decision that must be preceded by an adequate planning process, which allows establishing, in particular, the need or convenience of creating such entity, in order to achieve certain purposes of the State; the cost of this decision and the benefits expected to be obtained, comparison with other alternatives; its form of financing; the manner in which the new entity will be inserted into the structure of the Public Administration and the interactions it will have with other authorities and individuals, including the controls to which it will be subject; its legal, technical, economic and administrative feasibility; the mechanisms or decisions that will make it possible to avoid any possible duplication, contradiction or interference between the functions or services to be assigned to the new entity and those already performed by other authorities or individuals, etc.

Regarding the importance of planning in this matter, it is worth citing, by way of illustration, what the Constitutional Court stated in Ruling C-. 121 of 2004[28]____ regarding the criteria to be taken into account by the President of the Republic when making use of the extraordinary powers granted by Congress to create administrative agencies or entities:

(...) it may happen that <u>after the pertinent technical</u> and <u>legal studies</u>, it is concluded that <u>it is not necessary for the sake of efficiency</u> and <u>effectiveness of the administrative function</u>, the creation of new entities or agencies. This is because the <u>rationalization of the functioning of the public administration</u> is not a matter that can be freely estimated, but <u>is based on the assessments</u> and <u>studies to be carried out by the National Government</u>, <u>in accordance with the provisions of Articles 209</u> and <u>210 of the Political Constitution</u>. [Emphasis added].

All this information and the respective analyses are what must be contained, in the opinion of the Chamber, in the "demonstrative study" that justifies or reasonably supports the decision to create a new decentralized entity, either through its direct creation or through the authorization granted to the Executive, for the same purposes.

In any case, it is pertinent to clarify that neither Article 69 of Law 489 of 1998, nor any other regulation, requires that the "demonstrative study" be prepared and submitted as a separate document, so that nothing prevents such analysis to be included in the explanatory memorandum of the respective draft law, ordinance or agreement, for its consideration and discussion by the respective public corporation.

On this point, it is worth citing, as background, the decision of the Council of State, in a judgment of September 29, 2022[29] when resolving an appeal against a judgment that denied the request for (partial) nullity of a municipal agreement, by which the respective mayor had been authorized to create an industrial and commercial company of the State.

One of the main arguments of the plaintiff consisted in the alleged violation of Article 69 of Law 489 of 1998, due to the fact that there was no evidence that the mayor had attached to the draft agreement the study justifying the initiative, to which the legal norm refers.

In relation to this argument, which was dismissed, this corporation stated:

143. Thus, for the Chamber, having reviewed the evidence in the proceedings, if [sic] the study and justification for the creation of the urban renewal company is presented, <u>which is found in the background of the defendant agreement</u>, <u>specifically in the statement of reasons</u>, the discussions[30] of the Project of Agreement no. 177 of 2000_ and in the Land Use Planning in force at the time, given its technical, political and legal nature [emphasis added].

As can be seen, the Council of State found that the study required to justify the creation of this new decentralized entity, in accordance with Article 69 of Law 489 of 1998, was contained in the explanatory memorandum and in the other background of the draft resolution.

Finally, it is worth clarifying that, in the case of decentralized entities whose creation may be authorized by the competent body of popular representation, none of the aforementioned rules require that, once the demonstrative study has been submitted, in the manner and at the time explained above, said document must be submitted again, or an additional study must be submitted, during the process of creation of the entity (including the decree creating it, when applicable, or the signing of the partnership agreements, the bylaws, the creation minutes or other documents required by law).

In view of the considerations made,

### III. THE CHAMBER RESPONDS

*1. There is a legal definition of "demonstrative study" [sic] as a new document to be submitted to justify the creation initiative*

In the first place, the "demonstrative study" is not a "new document" required for the creation or authorization of a decentralized entity, since such requirement is provided for in Article 69 of Law 489 of 1998, since its enactment (December 30 of that year).

Secondly, there is no legal or regulatory definition of the term "demonstrative study", which is used in the aforementioned regulation.

However, upon an exegetical, systematic and finalistic interpretation of said provision, in light of other provisions of said law and of the Political Constitution, it is clearly inferred that the "demonstrative study" is a document in which, as a result of an adequate planning process, the facts, data, arguments and analysis that allow demonstrating the need or convenience of creating or authorizing the creation of a new decentralized entity, in order to fulfill a certain purpose of the State, are consigned; its legal, financial and social feasibility; the characteristics that the new entity will have, as provided in Articles 5050, 98 98 98 98 and of the Constitution; and the characteristics that the new entity will have, as provided in Articles , and of the Constitution.
100 of Law 489 (as the case may be), among other norms, as well as compliance with the principles of the administrative function (Article 209 superior).

Such "study" may be contained in a separate document, which is provided as an annex to the explanatory memorandum of the respective bill, ordinance or agreement, or it may be included in the explanatory memorandum, provided that it has the informative and analytical content explained in this concept.

*2. It could be understood that only for the creation itself is such a demonstrative study required.*

*3. It could be understood that from the moment the creation of the entity is authorized, the elaboration of the demonstrative study with the required technical, administrative, legal and budgetary analyses that justify it begins.*

*4. If it were understood that the same requirements must be met in the demonstrative study either to authorize the creation of an entity or to approve its creation, the former would be meaningless since, in accordance with their constitutional and legal powers, the legislator, the assembly or the municipal council will proceed to create it directly. Then why [sic] would the legislator contemplate the figure of authorization.*

These three questions, since they are related to each other and deal with the same subject, are answered in a unified manner, as follows:

As explained in this concept, the "demonstrative study" that justifies the initiative, with the scope described above, must be presented both in the case of bills, ordinances or agreements that intend to directly create a decentralized entity, and in the case of those whose purpose is to authorize the creation of such an entity, according to the provisions of the Constitution and the law.

In the case of entities whose creation may be <u>authorized</u> by Congress, departmental assemblies or municipal or district councils, as the case may be, it is not necessary to subsequently submit the same or an additional "demonstrative study" during the process of creating the decentralized entity.

Forward to the Director of the Administrative Department of the Civil Service and to the Legal Secretariat of the Presidency of the Republic.

**ÉDGAR GONZÁLEZ LÓPEZ**

**Chairman of the Board**

**ÓSCAR DARÍO AMAYA NAVAS**

**State Counselor**

**MARIA DEL PILAR BAHAMON FALLA**

**State Counselor**

**ANA MARIA CHARRY GAITAN**

**State Counselor**

**QUEEN CAROLINA SOLORZANO HERNÁNDEZ**

**Secretary of the Chamber**

**ON THE 28TH DAY OF MARCH OF THE YEAR 2023**

**LIFTING OF LEGAL RESERVE BY MEANS OF AN OFFICIAL LETTER FROM THE ADMINISTRATIVE DEPARTMENT OF THE CIVIL SERVICE DATED MARCH 27, 2023.**

 **Note: See original standard in Annexes.**

 :

[1] Article 69. Creation of decentralized entities. The decentralized entities, in the national order, are created by law, in the departmental, district and municipal order, by ordinance or agreement, or with its authorization, in accordance with the provisions of the present law. The respective project must be accompanied by the demonstrative study that justifies the initiative, with the observance of the principles set forth in Article 209 of the Political Constitution.

[2] Whereby rules are issued on the organization and operation of national entities, provisions, principles and general rules are issued for the exercise of the powers provided for in paragraphs 15 and 16 of Article 189 of the Constitution and other provisions are issued.

[3] According to the final paragraph of Article 115 of the Constitution, "[t]he governors' and mayors' offices, as well as the superintendencies [sic], the public establishments and the industrial or commercial companies of the State, are part of the Executive Branch".

[4] Constitutional Court, Decision C-691 of September 5, 2007, file D-6687.
___ [9] Regarding the notion of decentralization and its different manifestations, see, among others, the Sentences C-308/94 M.P. Antonio Barrera Carbonell, C-543/01, C-1 112/01, C-482/02 and C-037/03 M.P. Álvaro Tafur Galvis, C-1258/01 M.P. Jaime Córdoba Triviño, C- 894/03 M.P. Rodrigo Escobar Gil".

[6] "[10] Rulings C-295 of 1995, C-1051 of 2001 and C-127 of 2003". [7] "[11] Sentence C-784 of 2004".

[7]
___ "[11] Sentence C-784 of 2004".

[Article 154. Laws may originate in any of the Houses at the proposal of their respective members, of the National Government, of the entities indicated in Article 156, or by popular initiative in the cases provided for in the Constitution.

However, only the laws referred to in paragraphs 3, 7, 9, 1 1 and 22 and paragraphs a, b and e of numeral 19 of Article 150 may be enacted or amended at the initiative of the Government; [...] [Emphasis added].

[9]
___ Article 313. It is incumbent upon the councils:
6. To determine the structure of the municipal administration and the functions of its dependencies; the scales of remuneration corresponding to the different job categories; to create, at the initiative of the mayor, public establishments and industrial or commercial companies and to authorize the constitution of mixed economy companies.

[10]
___ In the same sense, the provisions of Article 92, paragraph 4.[0] of Decree Law 1333 of 1986, for industrial and commercial companies of the State at the municipal level, and Article 19, paragraph 20 of Law 2200 of 2022, for companies at the departmental level, may be consulted.

[11]
___ Council of State, Chamber of Consultation and Civil Service, Decision 1844 of October 22, 2007.

[12] Constitutional Court, Decision C-357 of August 1 1 , 1994, file D-564.

[13] Council of State, Chamber of Consultation and Civil Service, Opinion 2242 of July 9, 2015.

[14] Constitutional Court, Decision C-357 of August 1 1 , 1994, file D-564.
___ In force at that time, the Chamber clarifies.

[16] Paragraph. The rules relating to the principles of the administrative function, on delegation and deconcentration, characteristics and regime of the decentralized entities, administrative rationalization, administrative development, participation and internal control of the Public Administration shall be applied, as appropriate, to the territorial entities, without prejudice to their autonomy in accordance with the Political Constitution [emphasis added].

[17] Paragraph 1. In accordance with the second paragraph of Article 210 of the Political Constitution, the legal regime provided herein for decentralized entities is applicable to those of the territorial entities without prejudice to the competencies assigned by the Constitution and the law to the authorities of the territorial order [emphasis added].

[18]
___ Transcribed below.

[19]
___ In Article 150, numeral 10 [0] , for the Congress; in Article 300, numeral 9 [0] , for the departmental assemblies, and in Article 313, numeral 3 [0] , for the municipal councils. On this matter, see, among others, Rulings C-727 of June 21, 2000 (file D-2696), C-121 of February 17, 2004 (file D-4791) and C-150 of February 24, 2004 (file D-4779), of the Constitutional Court.

[20] The Court clarifies that the "natural and obvious meaning" of words, as referred to in Article 28 of the Civil Code, is not the same as "common sense", as the Mayor's Office of Bogotá seems to understand it in the

communication n. 0 2-2022-28141 of September 28, 2022, with which it requested the Legal Secretariat of the Presidency of the Republic to formulate this consultation. The expression used by the law refers to the common and general meaning of words in the Spanish language, which can be verified, today, in the Dictionary of the Spanish Language, among other works. On the contrary, common sense is a philosophical concept, much more profound and more difficult to establish.

[21]  In mixed economy companies, State contributions may consist, among others, of financial or fiscal advantages, guarantee of the company's obligations or subscription of bonds issued by the , special assistance, etc. The State may also contribute concessions.

For the purposes of this Title, State contributions are understood to be those made by the Nation or the territorial entities or the decentralized agencies of the same persons.

When the contribution is made by a mixed economy company, it is understood that there is a contribution of public capital in the same percentage or proportion in which the contributing company has, in turn, public or state capital within its capital stock.

[22]  Whereby regulations are issued to modernize the organization and operation of the departments.

[23]  Council of State, Chamber of Consultation and Civil Service, Concept 2260 of August 10, 2015.

[24]  "[34] Council of State, Chamber of Consultation and Civil Service, Concept 2150 of 2013."
[25]
     "36] BENDA, Manual d Derecho Constitucional, second edition. Editorial Marcial Pons, Barcelona. 2001. Pages 553 et seq."

[26]  BENDA, Op. Cit. Page 554: "Law is not impotent in the face of social relations, but can influence and change them. If the social state clause does not comprise only concern for present citizens, but also contemplates their children and grandchildren in their future conditions of existence, then it is possible to speak of a constitutional mandate for an anticipatory policy...A constitutional empowerment for planning has thus been inferred from the social state clause"." [Emphasis added].

[27]  "The German author points out that planning is based on prognosis, that is, on the evaluation and assessment of the circumstances that may be of importance in the decision. The fulfillment of the task of integration that is incumbent upon the social State, in terms of planning, involves the effort to seek among the possible alternatives the one that can best lead to a compensation of interests and thus to the common good; it is also valid for the relationship of the present population with future generations [...]" [Emphasis added].

[28]  Constitutional Court, Decision C-121 of February 17, 2004, file D-4791.

[29]  Council of State, Contentious-Administrative Chamber, First Section, Ruling of September 29, 2022, radicación n. 0 76001233100020100185502.
[30]
     "[65] Act Nos. 248,249,250 [sic] and 251 of 2000".