IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PERIMETRAL ORIENTAL DE BOGOTÁ, S.A.S., | |
| *Petitioner*, | |
| v. | Civil Action No. _____ |
| AGENCIA NACIONAL DE INFRAESTRUCTURA and THE REPUBLIC OF COLOMBIA | |
| *Respondents*. | |

**Declaration of Jason W. Myatt in Support of Petition to Confirm Arbitral Award**

# EXHIBIT 26

**Sentencia C-140/20**

> **DEMANDA DE INCONSTITUCIONALIDAD CONTRA ACTO LEGISLATIVO POR MEDIO DEL CUAL SE REFORMA EL REGIMEN DE CONTROL FISCAL-**Exequible

> **DEMANDA DE INCONSTITUCIONALIDAD CONTRA ACTO REFORMATORIO DE LA CONSTITUCION POR VICIOS DE COMPETENCIA-**Condiciones y requisitos exigidos para que la Corte Constitucional pueda emitir un pronunciamiento de fondo

> **DEMANDA DE INCONSTITUCIONALIDAD DE ACTO REFORMATORIO DE LA CONSTITUCION-**Cargos deben ser claros, ciertos, específicos, pertinentes y suficientes/**DEMANDA DE INCONSTITUCIONALIDAD DE REFORMA CONSTITUCIONAL POR SUSTITUCION DE LA CONSTITUCION-**Carga argumentativa se incrementa

*Toda demanda de inconstitucionalidad exige del ciudadano la sustentación de su pretensión con base en razones claras, ciertas, específicas, pertinentes y suficientes. Ahora bien, cuando la demanda se dirija en contra de una enmienda constitucional aprobada por el Congreso "la carga argumentativa se incrementa considerablemente" en atención a "la magnitud de la pretensión, la trascendencia de la decisión de la Corte, el compromiso del principio democrático y la naturaleza misma de las disposiciones que se cotejan".*

> **DEMANDA DE INCONSTITUCIONALIDAD CONTRA ACTOS REFORMATORIOS POR SUSTITUCION DE LA CONSTITUCION-**Cumplimiento de carga argumentativa mínima

*(…) la demanda por el juicio de sustitución debe: i) enunciar el eje definitorio de la Constitución presuntamente sustituido y señalar las disposiciones constitucionales a partir de los cuales se desprende o el precedente jurisprudencial en que haya sido reconocido, respecto de lo cual es necesario que sea claro que no se trata de la contradicción con una norma de la Constitución (juicio de constitucionalidad) sino de la afectación de un principio transversal y definitorio de la Carta Política; ii) exponer de qué manera el acto legislativo impacta el eje definitorio, identificando las diferencias entre ellos y, iii) explicar por qué las modificaciones introducidas por la reforma pueden considerarse una transformación en la identidad de la Constitución de manera que ella, después de la reforma, es otra completamente distinta.*

**DEMANDA DE INCONSTITUCIONALIDAD CONTRA ACTOS REFORMATORIOS DE LA CONSTITUCION-**Competencia de la Corte Constitucional

**PODER DE REFORMA DE LA CONSTITUCION-**Límites

**JUICIO DE SUSTITUCION DE LA CONSTITUCION-**Características

**JUICIO DE SUSTITUCION DE LA CONSTITUCION-**No es un juicio de intangibilidad/**JUICIO DE SUSTITUCION DE LA CONSTITUCION-**No es un juicio de control material/**JUICIO DE SUSTITUCION DE LA CONSTITUCION-**Objeto/**JUICIO DE SUSTITUCION DE LA CONSTITUCION-**Elementos y etapas

**JUICIO O TEST DE SUSTITUCION-**Premisa mayor/**PREMISA MAYOR DEL JUICIO O TEST DE SUSTITUCION-**Identificación del elemento definitorio, axial o esencial que da identidad a la Constitución

**JUICIO O TEST DE SUSTITUCION-**Premisa menor/**PREMISA MENOR DEL JUICIO O TEST DE SUSTITUCION-**Definición del alcance de norma acusada frente a eje definitorio de la Constitución

**JUICIO O TEST DE SUSTITUCION-**Conclusión cuando precepto demandado ha sustituido la Carta Política

**PRINCIPIO DE SEPARACION DE PODERES-**Elemento definitorio de la Constitución de 1991/**PRINCIPIO DE SEPARACION DE PODERES-**Contenido y alcance

**PRINCIPIO DE SEPARACION DE PODERES-**Jurisprudencia constitucional/**PRINCIPIO DE SEPARACION DE PODERES-**Constituye un principio transversal del texto constitucional, no susceptible de ser suprimido o sustituido por el Congreso mediante un acto legislativo/**PRINCIPIO DE SEPARACION DE PODERES-**Características

*La jurisprudencia Constitucional de manera reiterada ha reconocido que el principio de separación de poderes es un eje definitorio de la Carta Política. En consecuencia, no puede ser suprimido o sustituido por el constituyente derivado, toda vez que el poder político debe ser limitado, a fin de evitar su abuso.*

**AUTONOMIA E INDEPENDENCIA DE LOS ORGANOS DEL ESTADO-**Supuesto esencial de la separación de poderes

*La Corte ha explicado que la autonomía e independencia se convierten en un supuesto esencial de la división de poderes, no sólo porque garantizan la especialización de la administración pública, sino especialmente porque impiden la configuración de poderes omnímodos que pongan en riesgo los derechos y libertades de los ciudadanos, sin que esta autonomía e independencia sea incompatible con la implementación de mecanismos que permitan controles recíprocos ni con la cooperación armónica interinstitucional.*

**PRINCIPIO DE SEPARACION DE PODERES Y COLABORACION ARMONICA-**Alcance

**CONTRALORIA GENERAL DE LA REPUBLICA-**Competencia

**CONTRALORIA GENERAL DE LA REPUBLICA-**Naturaleza jurídica

*(...) la Corte ha destacado que la Contraloría General de la República es un organismo de control estatal con competencias específicas, que acompaña horizontal, colaborativa y armónicamente a las ramas tradicionales del poder público, a través de una función especializada y autónoma mediante la cual inspecciona la actividad fiscal externa de todas las instituciones del Estado desde el punto de vista financiero, de gestión y de resultados.*

**CONTROL FISCAL-**Finalidad

*(...) ha sido reconocido por la Corte como una herramienta eficaz e idónea para la protección del patrimonio público, a través de (i) la verificación del correcto manejo de los recursos públicos y (ii) el establecer si en el ejercicio de la gestión de los recursos colectivos se cumplen las normas que sujetan a la administración en términos de legalidad y se asegura el cumplimiento de los fines constitucionales y misionales de cada una de las entidades.*

**CONTROL FISCAL EN LA CONSTITUCION DE 1991-**Jurisprudencia constitucional/**SISTEMA DE CONTROL FISCAL PREVIO QUE OPERABA BAJO EL MARCO CONSTITUCIONAL ANTERIOR Y RAZONES DEL CONSTITUYENTE PARA DECANTARSE POR UN CONTROL DE CARACTER POSTERIOR, SELECTIVO, AMPLIO E INTEGRAL-**Diferencias/**CONTROL FISCAL-**Transformaciones en el modelo constitucional/**CONTROL FISCAL DE LA CONTRALORIA GENERAL DE LA REPUBLICA-**Posterior, selectivo e integral

**CONTROL FISCAL-**Carácter amplio/**CONTROL FISCAL-**Carácter integral/**CONTROL FISCAL-**Complementario/**CONTROL FISCAL-**Carácter posterior/**CONTROL FISCAL-**Carácter selectivo

**CONTROL FISCAL PREVENTIVO Y CONCOMITANTE-**
Finalidad

*(...) La Sala encuentra que la intención del constituyente derivado fue complementar el sistema actual de control por considerarlo insuficiente y añadirle el modelo de control preventivo y concomitante ejercido a través del seguimiento constante y paralelo de la gestión fiscal, a partir de la función de advertencia, sin que ello implique coadministración, eliminando riesgos potenciales y daños previsibles. En tal medida se dejó claro que no se buscaba juzgar la actividad del gestor público, sino el prevenir el daño, a través de un mecanismo eficaz y legítimo para evitar que el gestor fiscal tome decisiones que vayan en contravía del erario.*

**CONTROL FISCAL-**Carácter preventivo y concomitante

*El modelo preventivo y concomitante tiene un carácter excepcional y no puede implicar coadministración. Además, se debe realizar en tiempo real a través del seguimiento permanente de los ciclos, uso, ejecución, contratación e impacto de los recursos públicos, mediante el uso de tecnologías de la información, con la participación del control social y con la articulación del control interno.*

**CONTROL FISCAL PREVENTIVO Y CONCOMITANTE-**
Alcance

*El control preventivo y concomitante no puede incidir en las decisiones de la administración, al punto de instituir un sistema de coadministración o cogestión, toda vez que la enmienda constitucional expresamente lo prohíbe, con lo cual se debe eliminar cualquier tipo de veto o pre-aprobación respecto de las decisiones adoptadas por los gestores de recursos públicos. Así, a través de la figura de la advertencia, se les permite identificar los riesgos que se ciernen sobre algunos proyectos para que evalúen esa situación y puedan tomar los correctivos respectivos antes de que se genere un daño al patrimonio. Finalmente, este modelo no reemplaza el control posterior y selectivo, sino que busca complementar el ejercicio del control fiscal.*

**CONTROL FISCAL-**Posterior y selectivo

**CONTROL FISCAL POSTERIOR Y SELECTIVO-**No es eje definitorio de la Constitución

*(...) la manera como se ejerce el control fiscal posterior y selectivo no es un eje de la Constitución. El que el Constituyente derivado decidiera abandonar un esquema de control previo (Constitución de 1886), no implica que el control posterior y selectivo (Constitución de 1991) constituya, en consecuencia, un eje definitorio del ordenamiento superior. Entenderlo así,*

4

*conllevaría a que este esquema fuera inmodificable, impidiendo cualquier tipo de reforma que lo hiciera más efectivo a partir de los distintos avances tecnológicos existentes, el avance de los sistemas de control de la gestión estatal de recursos públicos, las nuevas formas de corrupción, etc.*

**CONTROL FISCAL PREVENTIVO Y CONCOMITANTE-**Características

**CONTROL FISCAL PREVIO y CONTROL PREVENTIVO Y CONCOMITANTE-**Diferencias

**REFORMA AL REGIMEN DE CONTROL FISCAL-**Finalidad

*La enmienda constitucional busca fortalecer el control fiscal en Colombia, de acuerdo con los nuevos retos, las nuevas formas de corrupción y el desarrollo de nuevas tecnologías de la información*

Referencia: Expediente D-13517

Demanda de inconstitucionalidad contra los artículos 1 (parcial) y 2 (parcial) del Acto Legislativo 4 de 2019 "*Por medio del cual se reforma el Régimen de Control Fiscal*".

Magistrado ponente:
JOSÉ FERNANDO REYES CUARTAS

Bogotá, D.C., seis (6) de mayo de dos mil veinte (2020).

La Sala Plena de la Corte Constitucional, en ejercicio de sus atribuciones constitucionales y en cumplimiento de los requisitos y trámites establecidos en el Decreto 2067 de 1991, ha proferido la presente,

**SENTENCIA**
**I.    Antecedentes**

En ejercicio de la acción pública de inconstitucionalidad, el ciudadano Yefferson Mauricio Dueñas Gómez demandó los artículos 1 (parcial) y 2 (parcial) del Acto Legislativo 4 de 2019 "Por medio del cual se reforma el Régimen de Control Fiscal", por considerar que estos constituyen una sustitución de dos pilares esenciales de la Constitución Política: la separación de poderes y el control fiscal posterior y selectivo.

5

## II.    Norma demandada

El texto de la norma demandada, según fue publicado en el Diario Oficial número 51.080 del 18 de septiembre de 2019 es el siguiente:

### "ACTO LEGISLATIVO 4 DE 2019
Por medio del cual se reforma el Régimen de Control Fiscal.

### EL CONGRESO DE COLOMBIA
### DECRETA:

**ARTÍCULO 1o**. El artículo 267 de la Constitución Política de Colombia quedará así:

"Artículo 267. La vigilancia y el control fiscal son una función pública que ejercerá la Contraloría General de la República, la cual vigila la gestión fiscal de la administración y de los particulares o entidades que manejen fondos o bienes públicos, en todos los niveles administrativos y respecto de todo tipo de recursos públicos. La ley reglamentará el ejercicio de las competencias entre contralorías, en observancia de los principios de coordinación, concurrencia y subsidiariedad. El control ejercido por la Contraloría General de la República será preferente en los términos que defina la ley.

El control fiscal se ejercerá en forma posterior y selectiva, **y además podrá ser preventivo y concomitante,** según sea necesario para garantizar la defensa y protección del patrimonio público. **El control preventivo y concomitante no implicará coadministración y se realizará en tiempo real a través del seguimiento permanente de los ciclos, uso, ejecución, contratación e impacto de los recursos públicos, mediante el uso de tecnologías de la información, con la participación activa del control social y con la articulación del control interno. La ley regulará su ejercicio y los sistemas y principios aplicables para cada tipo de control.**

**El control concomitante y preventivo tiene carácter excepcional, no vinculante, no implica coadministración, no versa sobre la conveniencia de las decisiones de los administradores de recursos públicos, se realizará en forma de advertencia al gestor fiscal y deberá estar incluido en un sistema general de advertencia público. El ejercicio y la coordinación del control concomitante y preventivo corresponde exclusivamente al Contralor General de la República en materias específicas.**

La vigilancia de la gestión fiscal del Estado incluye el seguimiento permanente al recurso público, sin oponibilidad de reserva legal para el acceso a la información por parte de los órganos de control fiscal, y el

6

control financiero, de gestión y de resultados, fundado en la eficiencia, la economía, la equidad, el desarrollo sostenible y el cumplimiento del principio de valoración de costos ambientales. La Contraloría General de la República tendrá competencia prevalente para ejercer control sobre la gestión de cualquier entidad territorial, de conformidad con lo que reglamente la ley.

El control jurisdiccional de los fallos de responsabilidad fiscal gozará de etapas y términos procesales especiales con el objeto de garantizar la recuperación oportuna del recurso público. Su trámite no podrá ser superior a un año en la forma en que lo regule la ley.

La Contraloría es una entidad de carácter técnico con autonomía administrativa y presupuestal. No tendrá funciones administrativas distintas de las inherentes a su propia organización y al cumplimiento de su misión constitucional.

El Contralor será elegido por el Congreso en Pleno, por mayoría absoluta, en el primer mes de sus sesiones para un periodo igual al del Presidente de la República, de lista de elegibles conformada por convocatoria pública con base en lo dispuesto en el artículo 126 de la Constitución y no podrá ser reelegido ni continuar en ejercicio de sus funciones al vencimiento del mismo.

Solo el Congreso puede admitir la renuncia que presente el Contralor y proveer las faltas absolutas y temporales del cargo mayores de 45 días.

Para ser elegido Contralor General de la República se requiere ser colombiano de nacimiento y en ejercicio de la ciudadanía; tener más de treinta y cinco años de edad; tener título universitario en ciencias jurídicas, humanas, económicas, financieras, administrativas o contables y experiencia profesional no menor a 5 años o como docente universitario por el mismo tiempo y acreditar las demás condiciones que exija la ley.

No podrá ser elegido Contralor General quien sea o haya sido miembro del Congreso o se haya desempeñado como gestor fiscal del orden nacional, en el año inmediatamente anterior a la elección. Tampoco podrá ser elegido quien haya sido condenado a pena de prisión por delitos comunes.

En ningún caso podrán intervenir en la postulación o elección del Contralor personas que se hallen dentro del cuarto grado de consanguinidad, segundo de afinidad y primero civil o legal respecto de los candidatos."

**ARTÍCULO 2o.** El artículo 268 de la Constitución Política quedará así:

"Artículo 268. El Contralor General de la República tendrá las siguientes atribuciones:

1. Prescribir los métodos y la forma de rendir cuentas los responsables del manejo de fondos o bienes de la nación e indicar los criterios de evaluación financiera, operativa y de resultados que deberán seguirse.

2. Revisar y fenecer las cuentas que deben llevar los responsables del erario y determinar el grado de eficiencia, eficacia y economía con que hayan obrado.

3. Llevar un registro de la deuda pública de la nación y de las entidades descentralizadas territorialmente o por servicios.

4. Exigir informes sobre su gestión fiscal a los empleados oficiales de cualquier orden y a toda persona o entidad pública o privada que administre fondos o bienes públicos.

5. Establecer la responsabilidad que se derive de la gestión fiscal, imponer las sanciones pecuniarias que sean del caso, recaudar su monto y ejercer la jurisdicción coactiva, para lo cual tendrá prelación.

6. Conceptuar sobre la calidad y eficiencia del control fiscal interno de las entidades y organismos del Estado.

7. Presentar al Congreso de la República un informe anual sobre el estado de los recursos naturales y del ambiente.

8. Promover ante las autoridades competentes, aportando las pruebas respectivas, investigaciones fiscales, penales o disciplinarias contra quienes presuntamente hayan causado perjuicio a los intereses patrimoniales del Estado. La Contraloría, bajo su responsabilidad, podrá exigir, verdad sabida y buena fe guardada, la suspensión inmediata de funcionarios mientras culminan las investigaciones o los respectivos procesos fiscales, penales o disciplinarios.

9. Presentar proyectos de ley relativos al régimen del control fiscal y a la organización y funcionamiento de la Contraloría General.

10. Proveer mediante concurso público los empleos de carrera de la entidad creados por ley. Esta determinará un régimen especial de carrera administrativa para la selección, promoción y retiro de los funcionarios de la Contraloría. Se prohíbe a quienes formen parte de las corporaciones que intervienen en la postulación y elección del Contralor, dar recomendaciones personales y políticas para empleos en ese ente de control.

11. Presentar informes al Congreso de la República y al Presidente de la República sobre el cumplimiento de sus funciones y certificación sobre la situación de las finanzas del Estado, de acuerdo con la ley.

12. Dictar normas generales para armonizar los sistemas de control fiscal de todas las entidades públicas del orden nacional y territorial; y dirigir e implementar, con apoyo de la Auditoría General de la República, el Sistema Nacional de Control Fiscal, para la unificación y estandarización de la vigilancia y control de la gestión fiscal.

**13. Advertir a los servidores públicos y particulares que administren recursos públicos de la existencia de un riesgo inminente en operaciones o procesos en ejecución, con el fin de prevenir la ocurrencia de un daño, a fin de que el gestor fiscal adopte las medidas que considere procedentes para evitar que se materialice o se extienda, y ejercer control sobre los hechos así identificados.**

14. Intervenir en los casos excepcionales previstos por la ley en las funciones de vigilancia y control de competencia de las Contralorías Territoriales. Dicha intervención podrá ser solicitada por el gobernante local, la corporación de elección popular del respectivo ente territorial, una comisión permanente del Congreso de la República, la ciudadanía mediante cualquiera de los mecanismos de participación ciudadana, la propia contraloría territorial o las demás que defina la ley.

15. Presentar a la Cámara de Representantes la Cuenta General del Presupuesto y del Tesoro y certificar el balance de la Hacienda presentado al Congreso por el Contador General de la Nación.

16. Ejercer, directamente o a través de los servidores públicos de la entidad, las funciones de policía judicial que se requieran en ejercicio de la vigilancia y control fiscal **en todas sus modalidades**. La ley reglamentará la materia.

17. Imponer sanciones desde multa hasta suspensión a quienes omitan la obligación de suministrar información o impidan u obstaculicen el ejercicio de la vigilancia y control fiscal, o incumplan las obligaciones fiscales previstas en la ley. Así mismo a los representantes de las entidades que, con dolo o culpa grave, no obtengan el fenecimiento de las cuentas o concepto o calificación favorable en los procedimientos equivalentes para aquellas entidades no obligadas a rendir cuenta, durante dos (2) períodos fiscales consecutivos.

18. Las demás que señale la ley.

PARÁGRAFO TRANSITORIO. La asignación básica mensual de los servidores de la Contraloría General de la República y su planta transitoria

9

será equiparada a los de los empleos equivalentes de otros organismos de control de nivel nacional. Para la correcta implementación del presente acto legislativo, y el fortalecimiento del control fiscal, la ley determinará la creación del régimen de carrera especial de los servidores de las contralorías territoriales, la ampliación de la planta de personal, la incorporación de los servidores de la planta transitoria sin solución de continuidad y la modificación de la estructura orgánica y funcional de la Contraloría General de la República, garantizando la estabilidad laboral de los servidores inscritos en carrera pertenecientes a esa entidad y a contralorías territoriales intervenidas. Exclusivamente para los efectos del presente parágrafo y el desarrollo de este acto legislativo, otórguense precisas facultades extraordinarias por el término de seis meses al Presidente de la República para expedir decretos con fuerza de ley.

Así mismo, el Congreso de la República expedirá, con criterios unificados, las leyes que garanticen la autonomía presupuestal y la sostenibilidad financiera y administrativa de los organismos de control fiscal territoriales y unas apropiaciones progresivas que incrementarán el presupuesto de la Contraloría General de la República durante las siguientes tres vigencias en 250.000, 250.000 y 136.000 millones de pesos respectivamente, las cuales serán incorporadas en los proyectos de ley de presupuesto anual presentados por el Gobierno Nacional, incluso aquellos que ya cursen su trámite en el Congreso de la República. Dichas apropiaciones no serán tenidas en cuenta al momento de decretar aplazamientos del Presupuesto General de la Nación.

En los siguientes cuatrienios dichas apropiaciones estarán de acuerdo con el marco fiscal de mediano plazo".

### III.    La demanda

1. El demandante acusó las expresiones subrayadas por un cargo único de inexequibilidad dado que: *"el Congreso de la República excedió su competencia para reformar la Constitución porque el control fiscal preventivo y concomitante adoptado en el Acto Legislativo 4 de 2019 sustituye los pilares esenciales de separación de poderes y control fiscal posterior y selectivo".*

2. El actor sostuvo como premisa mayor que el principio de separación de poderes constituye uno de los pilares esenciales de la Constitución de 1991 y que de este se deriva la naturaleza posterior y selectiva del control fiscal a cargo de la Contraloría General de la República[1].

---

[1] El demandante sustenta la naturaleza de eje fundamental de la Constitución del principio de separación de poderes a partir de las sentencias C-970 de 2004, C-1040 de 2005, C-141 de 2010 y C-285 de 2016.

3. El accionante a partir de un recuento histórico, afirmó que, en el marco de la Constitución de 1886, el control fiscal previo generó una serie de problemas de corrupción y bloqueos a la actividad administrativa que llevaron a plantear la necesidad de reestructurar el modelo en las discusiones de la Asamblea Nacional Constituyente, siendo expresa la necesidad de que el control fiscal fuera exclusivamente posterior.

4. El ciudadano explicó que, al debatir sobre la estructura del Estado, los constituyentes desarrollaron un amplio análisis sobre cuáles debían ser las funciones de la Contraloría e hicieron hincapié en que la entidad no podía tomar partido en las decisiones fiscales de la administración. A partir de este contexto, el actor explicó que el texto finalmente aprobado por la Asamblea Nacional Constituyente dejó claro que el control sería únicamente posterior y selectivo para evaluar los resultados de la gestión fiscal de la Administración.

5. El demandante indicó que, dentro del modelo de control fiscal concebido en la Constitución Política de 1991, el carácter posterior y selectivo permite su articulación con el resto del modelo de Estado en la medida en que materializa la independencia técnica de cada uno de sus órganos. En consecuencia, afirmó que: "cualquier modificación a la concepción del control fiscal como exclusivamente posterior y selectivo significa sustituir la médula del diseño institucional que hizo el Constituyente de 1991 al control fiscal colombiano, máxime si tal cambio implica restablecer elementos del modelo de control anacrónico que la Asamblea Nacional expresamente decidió excluir de la Administración Pública".

6. El actor destacó que, en la sentencia C-470 del 2016, se resumen las reglas bajo las que funciona la Contraloría General. En ellas cobra especial relevancia la naturaleza posterior y selectiva del control fiscal para preservar la independencia y autonomía del órgano de control, al igual que impedir que este desempeñe funciones administrativas ajenas a las propias.

7. Respecto de la premisa menor, el demandante argumentó que el núcleo del acto legislativo demandado es el establecimiento de un control preventivo y concomitante como forma de cambio o ajuste del control posterior y selectivo instaurado por la Asamblea Nacional Constituyente en 1991. El actor afirmó que el Acto Legislativo 04 de 2019 previó la función de advertencia como mecanismo principal para ejecutarlo y que, pese a no pretender ser formalmente una especie de coadministración ni un prejuzgamiento al gestor fiscal advertido, tiene la virtualidad de incidir en las decisiones de la administración y sirve de insumo para ejercer el control posterior y selectivo en caso de que el daño se materialice.

8. A juicio del ciudadano, la función de advertencia supone una nueva facultad del Contralor General que implica un excesivo poder y reconfigura las relaciones de control dentro del Estado, afectando el equilibrio y la separación de poderes. Asimismo, el control preventivo y concomitante es en

11

definitiva un control previo porque implica su ejercicio antes de que la administración, por medio del gestor fiscal, haya decidido cómo y en qué ejecutar sus recursos, con lo cual se replica la fórmula de control previo que existía en la Constitución de 1886.

9. Como conclusión, el actor indicó que la norma demandada debía ser declarada inexequible en tanto (i) le atribuye a la Contraloría General de la República, de forma indirecta, funciones administrativas distintas a las de su propia organización y (ii) esta intervención en la administración carece de cualquier control material, incluso por parte del aparato judicial.

## IV.    Trámite adelantado

10.   A través del Auto del 28 de octubre de 2019 se admitió para su estudio la demanda de la referencia, se ordenó comunicar la decisión a la Presidencia de la República, al Ministerio de Justicia y del Derecho, a los presidentes del Senado de la República y de la Cámara de Representantes y al contralor general de la República, para que expresen su concepto. Se invitó a participar en el debate a la Academia Colombiana de Jurisprudencia, a las Universidades Nacional, Externado de Colombia, del Rosario, Sergio Arboleda, Javeriana, de Caldas, del Cauca, del Norte, de Nariño y Pedagógica y Tecnológica de Colombia sede Tunja.

11.   En el mismo auto, se ordenó oficiar a la Secretaría General del Senado de la República y a la Secretaría General de la Cámara de Representantes para que remitan a esta Corporación: i) las gacetas del Congreso en donde fue publicada la exposición de motivos del proyecto que dio lugar al Acto Legislativo 04 de 2019; ii) las gacetas en las que fueron publicados los respectivos informes de ponencia destinados al debate y votación en las comisiones y plenarias y iii) las gacetas del Congreso en donde fueron publicadas las actas de comisión y de plenaria, correspondientes a las sesiones cuando fue discutida y aprobada la iniciativa que fue luego sancionada como el Acto Legislativo 04 de 2019.

12.    De igual forma, se le solicitó al contralor general responder las siguientes preguntas: i) ¿cómo está previsto el ejercicio y puesta en marcha del control previo y concomitante dispuesto en los artículos 1 y 2 del Acto Legislativo 4 de 2019? al respecto sírvase explicar si para tal función se tiene previsto el uso de las competencias dispuestas por la reforma constitucional en los artículos 267 y 268 de la Carta Política; ii) ¿cuál es el alcance y grado de obligatoriedad previsto para las advertencias sobre riesgos a que hace referencia el numeral 13 del artículo 2 del Acto Legislativo 4 de 2019? en particular respecto de los efectos de las advertencias en caso de procesos posteriores por responsabilidad fiscal de los funcionarios que fueron previamente objeto de dichas advertencias y iii) ¿cuál es la diferencia entre el control preventivo dispuesto en el Acto Legislativo 4 de 2019 y el control previo, previsto en la Ley 20 de 1975 y el Decreto Ley 925 de 1976?

**Intervenciones**

13.     Durante el término de fijación en lista se recibieron veinticuatro escritos de intervención dentro del proceso de la referencia, los cuales se pueden agrupar en cuatro diferentes posturas[2]:

*Por la ineptitud de la demanda*

14.     La Presidencia de la República y el Ministerio de Justicia y del Derecho, en intervención conjunta[3], solicitaron como petición principal que la Corte se declare inhibida para conocer la demanda por no cumplir con los requisitos exigidos por la ley y la jurisprudencia para este tipo de juicios.

15.     En igual sentido se pronunció la División Jurídica de la Cámara de Representantes[4], la Contraloría General de la República[5], la Junta Nacional de Contralores[6], la Asociación Colombiana de Empresas Sociales del Estado y Hospitales Públicos (ACESI)[7], la Asociación de Funcionarios de las Gerencias Departamentales y Nivel Central de la Contraloría General de la República (AFUNCGER)[8], la Universidad Libre[9], la Universidad Externado de Colombia[10], la Universidad Sergio Arboleda[11], la Universidad del Rosario[12], la Universidad de Nariño[13], el Movimiento de Acción y Oportunidad para la Equidad de Género y Nuevas Masculinidades

[2] Queda fuera de esta clasificación el escrito presentado por la Pontificia Universidad Bolivariana a través de su decano de Derecho, Luis Fernando Álvarez y el director de Derecho, Luis Eduardo Vieco, por cuanto en el escrito no se hace referencia concreta a la constitucionalidad del Acto Legislativo sino sobre la conveniencia de una reforma al sistema de Control Fiscal en Colombia.

[3] Clara María González Zabala, secretaria jurídica del Departamento Administrativo de la Presidencia de la República y Ángela María Bautista Pérez, delegada del Ministerio de Justicia y de Derecho, suscriben conjuntamente la intervención en el proceso a nombre de las dos entidades.

[4] María Isabel Carrillo Hinojosa, jefe de la División Jurídica de la Cámara de Representantes.

[5] Carlos Felipe Córdoba Larrarte, Contralor General de la República.

[6] German Barco López, firma el escrito de intervención en calidad de Contralor Departamental del Quindío y vicepresidente de la Junta Nacional de Contralores y en representación de esta.

[7] Olga Lucia Zuluaga, obrando en calidad de Directora Ejecutiva y representante legal de la Asociación Colombiana de Empresas Sociales del Estado y Hospital Públicos -ACESI.

[8] Pedro Alexander Rubio Sánchez, representante legal de la Asociación de Funcionarios de las Gerencias Departamentales y Nivel Central de la Contraloría General de la República -AFUNCGER.

[9] Jorge Kenneth Burbano Villamarín y Javier Enrique Santander Díaz, director y coordinador, respectivamente, del Observatorio de Intervención Ciudadana Constitucional de la Facultad de Derecho de la Universidad Libre de Bogotá.

[10] Floralba Padrón Pardo y Héctor Santaella Quintero, docentes investigadores de los Departamentos de Derecho Constitucional y Derecho administrativo de la Universidad Externado de Colombia.

[11] Jorge Enrique Ibáñez Najar, director del Departamento de Derecho Público y del Grupo CREAR de la Universidad Sergio Arboleda.

[12] Jorge Alberto Gaitán Martínez, decano de la Facultad de Jurisprudencia de la Universidad del Rosario y Manuel Alberto Restrepo Medina, director de la Escuela Doctoral de Derecho de la misma universidad.

[13] Leonardo Alfredo Enríquez Martínez, decano de la facultad de Derecho de la Universidad de Nariño.

(MAYO)[14], el Sindicato Nacional de Trabajadores al Servicio del Estado en los Órganos de Control y vigilancia y en sus entidades Vigiladas (SINALTRASE)[15] y el ciudadano Pablo Cesar Díaz Barrera. Según estos intervinientes la demanda debía ser declarada inepta por las razones que se exponen a continuación.

16.    Los intervinientes sostuvieron que el planteamiento del demandante adolecía de falta de certeza, pertinencia y suficiencia respecto a la obligación de demostrar por qué el Acto Legislativo estaba sustituyendo la Constitución. Expusieron que se trata de una afirmación que no contó con suficiente argumentación, y surge de apreciaciones subjetivas que no tienen relación directa con el texto de la reforma, al atacar simplemente su conveniencia.

17.    En cuanto a la premisa mayor, los intervinientes indicaron que en la demanda no se estableció de forma adecuada, por cuanto el demandante: i) supone erradamente que el control fiscal posterior y selectivo es un elemento esencial del orden constitucional definido en la Carta Política, sin que exista certeza sobre ello[16]; ii) no logró establecer con claridad la premisa mayor, al basarse en una norma aislada y no en "múltiples referentes normativos" como lo exige la Corte Constitucional y iii) no determinó con claridad y pertinencia el alcance del principio de separación de poderes y el de autonomía administrativa, pues deja al margen conceptos como la colaboración armónica y el sistema de pesos y contrapesos que dan cabida al nuevo modelo de control.

18.    Respecto de la premisa menor, los intervinientes argumentaron que el actor: i) confunde el control fiscal preventivo y concomitante no vinculante, con el control previo; ii) no expone con claridad si las modificaciones realizadas al sistema de control fiscal desaparecían la autonomía administrativa para planear y ejecutar el presupuesto; iii) parte de una interpretación subjetiva y contraevidente, puesto que el mismo Acto Legislativo establece como condicionamiento al control *"previo y concomitante no vinculante",* la no coadministración; y iv) no construye un argumento que genere una duda de inconstitucionalidad, dado que es posible considerar que se dio una sustitución de la Constitución, puesto que no se altera la función ni el órgano llamado a ejercer el control fiscal.

19.    En cuanto a la conclusión del juicio, los intervinientes señalan que no es cierta, puesto que el control concomitante y preventivo no sustituye ni

---

[14] Olga Lucia Rodríguez Mosos, representante legal de Movimiento de Acción y Oportunidad para la Equidad de Género y Nuevas Masculinidades -MAYO.

[15] Jorge Edgar Araque Aldana presidente y representante legal Sinaltrase.

[16] Contrario sensu, aclararon que el control fiscal posterior no fue establecido como un eje axial ni como una de las dimensiones especiales del principio constitucional de la separación de poderes. Algunos intervinientes sostuvieron que el modelo de control fiscal es una herramienta flexible para llevar a cabo el principio de equilibrio de poderes, pero como tal, puede ser adecuada por el legislador en su papel de constituyente secundario.

reemplaza el modelo de control posterior y selectivo, sino que lo complementa de forma excepcional, conservando el modelo establecido por el constituyente primario como la regla general.

*Por la exequibilidad de la norma*

20. Todos los intervinientes que hicieron referencia a la ineptitud de la demanda, con excepción de la División Jurídica de la Cámara de Representantes, quienes solicitaron subsidiariamente la exequibilidad de las disposiciones acusadas. A esas intervenciones se suman los escritos presentados por la Asociación Sindical de Trabajadores de los Órganos de Control Público Judicial (ASCONTROL)[17], la Asociación de Servidores Públicos de los Órganos de Control de Colombia (ASDECCOL)[18], la Unión Nacional Independiente de Trabajadores en Organismos de Control (UNIOS)[19] y el ciudadano José Francisco Zúñiga Cortes de acuerdo con los argumentos que se resumen a continuación.

21. En cuanto a la premisa mayor, los intervinientes señalaron que el control posterior y selectivo no es un eje fundamental de la Carta Política, ya que de ser así no podría ser modificado ni reformado. Indicaron que el verdadero pilar de la Constitución es la función pública del control fiscal y no la forma cómo este se ejerce. En ese sentido, resaltaron la importancia y la necesidad de la reforma, de acuerdo con los nuevos retos, las nuevas formas de corrupción y el desarrollo de nuevas tecnologías de la información, que permiten una mayor eficacia en la defensa de los recursos públicos.

22. En cuanto a la premisa menor, explicaron que el demandante confundió el control previo y perceptivo, derogado con la Carta Política de 1991, con el control preventivo y concomitante no vinculante, propuesto en la norma. Resaltaron que el control preventivo no es vinculante y por ello, resulta un mecanismo eficaz y legítimo para evitar que el gestor fiscal tome decisiones que vayan en contravía del erario y sus fines esenciales y que, por el contrario, se debe ver como la posibilidad de implementar medidas anticipadas para mitigar el daño, máxime cuando no tiene la virtualidad de incidir en las decisiones de la administración pública y la misma norma prohíbe de manera expresa la coadministración.

23. En cuanto a la conclusión, los intervinientes afirmaron que el control preventivo no sustituye ni reforma la Constitución, sino que la complementa y es parte del esquema del control fiscal ya establecido, legitimándose así el acto

---

[17] Carlos Abel Saavedra Zafra, presidente de la Asociación sindical de trabajadores de los Órganos de Control Público Judicial -ASCONTROL.

[18] Blanca Ramírez de Salazar, presidenta de la Asociación de Servidores Públicos de los Órganos de Control de Colombia -ASDECCOL.

[19] Fulton Pua Rosado, representante legal de la Unión Nacional Independiente de Trabajadores en Organismo de Control –UNIOS.

legislativo estudiado. Además, resaltaron la importancia y necesidad de esta reforma, pues constituyen un hecho notorio los numerosos casos de corrupción en el país por falta de control y las medidas tomadas en el acto legislativo son herramientas que permiten evitar el daño fiscal.

24. Los intervinientes señalaron que el control concomitante y preventivo hace parte de una visión moderna del gobierno y de la adecuada revisión del gasto público, que complementa los controles posteriores sin causar afectaciones a los mismos. Todo ello incentiva el buen funcionamiento de la administración y el ejercicio de la autonomía en el marco de la separación de poderes, respetando la libertad de decisión que tienen los gestores públicos.

*Por la exequibilidad condicionada de la norma*

25. La Universidad Externado de Colombia solicitó que se declarara la exequibilidad condicionada, en el entendido que: i) "de ninguna manera, en un eventual proceso de responsabilidad fiscal que se pueda abrir en el futuro con ocasión de una operación que fue objeto de advertencia, el legítimo apartamiento razonado por parte de la entidad vigilada podrá tenerse por prueba del dolo del gestor fiscal investigado"; y ii) "de ninguna manera, el control preventivo y concomitante puede ser ejercido por las autoridades que con posterioridad tendrán a su cargo el control posterior y selectivo sobre la actuación previamente fiscalizada". Esto con el fin de evitar que el órgano de control pierda la independencia e imparcialidad en aquellos casos en que se hayan dado advertencias en ejercicio de la función establecida en la reforma.

*Inexequibilidad de la norma*

26. Finalmente, un grupo de intervinientes pidieron declarar la inexequibilidad de las normas acusadas, a saber: la Comisión Nacional del Control Fiscal Público de Colombia (CONFISPCOL)[20] y los ciudadanos Juanita María Goebertus Estrada, Gustavo Enrique Morales Cobo y Benjamín Luna Burgos.

27. Los intervinientes resaltaron que en el control preventivo y concomitante tanto la recaudación de información como la función de advertencia ocurren necesariamente con anterioridad a que la administración tome la decisión, es decir, en operaciones o procesos de ejecución, incluso se actúa desde las fases de planeación. Señalaron que la reforma constituye una sustitución del modelo constitucional de separación y equilibrio de poderes por cuanto afecta la separación funcional y genera un fenómeno de coadministración que, aparentemente, ya se había superado con su prohibición a través de la Constitución de 1991.

---

[20] Hernando Medina, presidente de la Comisión Nacional del Control Fiscal Público de Colombia.

28. Este grupo de ciudadanos destacó que en la sentencia C-103 de 2015, la Corte declaró inexequible el numeral 7 del artículo 5[21] del Decreto Ley 267 de 2000, mediante el cual se atribuían a la Contraloría la función de advertir sobre operaciones o procesos en ejecución para prever graves riesgos que comprometan el patrimonio público. En aquella oportunidad la Corte encontró que la norma en comento revivía el control previo que existía antes de la Constitución de 1991, el cual fue eliminado por la misma Asamblea Nacional Constituyente por sus fuertes connotaciones de coadministración y por las repercusiones en contra de la imparcialidad que debe acompañar el proceso auditor que se adelanta a los sujetos de control asignados a la Contraloría.

29. Adicionalmente, la interviniente Juanita Goebertus Estrada, Representante a la Cámara, manifestó que durante el trámite del acto legislativo del que fue partícipe se puso en evidencia la preocupación de varios representantes, incluida ella, respecto del riesgo de coadministración a cargo de la Contraloría General que implicaba la reforma. La interviniente afirmó que el nuevo sistema de control no presenta diferencias sustanciales con el anterior tipo de control previo y vinculante de la Constitución de 1886.

30. Asimismo, la ciudadana señaló que en el Acto Legislativo 04 de 2019 se hicieron unas asignaciones que desconocen la división competencial entre el ejecutivo y el legislativo en materia presupuestal. Además, destacó que el incremento presupuestal allí establecido implica un crecimiento desmesurado del órgano de control, en detrimento de una serie de políticas públicas y entidades que requieren con urgencia de esos recursos. Con fundamento en lo anterior, la interviniente solicitó la integración normativa del acto legislativo, pues consideró que no solo son inexequibles los apartes demandados sino el presupuesto designado y la manera en cómo se busca la materialización de este a nivel administrativo.

**Pruebas recaudadas**

31. Dentro del término dispuesto en el Auto del 28 de octubre de 2019 se recibieron los siguientes documentos:

32. *Congreso de la República.* Mediante Oficio No. OPC-353/2019 del 18 de noviembre de 2019, la Secretaría General de la Cámara de Representantes envía las actas del trámite del Proyecto de Acto Legislativo No. 355 de 2019 Cámara – 039 de 2019 Senado, *"por medio del cual se reforma el Régimen de Control Fiscal",* hoy Acto Legislativo No. 04 de 2019. Junto al oficio se

---

[21] *"Funciones. Para el cumplimiento de su misión y de sus objetivos, en desarrollo de las disposiciones consagradas en la Constitución Política, le corresponde a la Contraloría General de la República: 7. Advertir sobre operaciones o procesos en ejecución para prever graves riesgos que comprometan el patrimonio público y ejercer el control posterior sobre los hechos así identificados".*

adjuntó copia electrónica de las gacetas en que constan las respectivas publicaciones[22], información que además fue allegada en medio magnético.

33. *Contraloría General de la República.* El contralor general explicó que el Acto Legislativo 4 de 2019 estableció un control preventivo, el cual: "se diferencia del control previo predominante antes de 1991, en que aquel era general, vinculante y significaba intromisiones directas en la gestión de la Administración. Mientras que, como el mismo texto constitucional lo expresa, el control preventivo no implica coadministración, es decir, no encarna un poder de veto o aprobación a las decisiones de los gestores de recursos públicos; es excepcional, pues solo se ejercerá bajo determinados criterios de actuación y cuando se evidencie riesgo de pérdida de los recursos públicos; no es vinculante, porque está enmarcado bajo la figura de la advertencia que no es obligatoria para los tomadores de decisiones en las distintas ramas y órganos del poder público".

34. El contralor puntualizó que la reforma constitucional requiere de un desarrollo legal para su implementación y, frente a dicho desarrollo legal, le correspondería nuevamente a la Corte Constitucional ejercer el control. No obstante, expuso la metodología que para el ejercicio del control se podría adelantar, así:

> "a) Selección del objeto de control, mediante la declaración de importancia manifiesta por parte del Contralor General de la Republica.
>
> b) Fase de planeación, en donde se determinan las actividades de control a realizar, se fijan los hitos de ejecución del control, el presupuesto, los objetivos, los resultados esperados, los criterios de éxito y los riesgos del proceso en cuestión.
>
> c) Fase de ejecución, en la que se aplican los procedimientos de seguimiento para obtener la información pertinente, se realizan las pruebas y obtienen las evidencias sobre los resultados previsibles, previstos o anticipados y de la efectividad de los controles a los riesgos identificados o de situaciones adversas no previstas.
>
> d) Fase de informe, en donde se presentan los hitos de gestión seleccionados, los riesgos identificados, las evidencias, las conclusiones y recomendaciones.
>
> e) Fase de despliegue y seguimiento. Corresponde a la etapa posterior en la cual se hace seguimiento y evaluación a las decisiones tomadas por el gestor con respecto a las observaciones, advertencias o recomendaciones formuladas".

---

[22] Gaceta 153 de 2019 (publicación del proyecto con la exposición de motivos; primera vuelta: gacetas 195, 207, 519, 245, 260, 647, 330 y 507 de 2019; segunda vuelta: gacetas 676, 749, 742, 743, 769 y 892 de 2019.

35. El contralor refirió que la figura de la advertencia, como concreción del control concomitante y preventivo, no tiene carácter vinculante por expreso mandato constitucional. Eso significa que no obliga al gestor fiscal, quien puede acogerla o no, y desarrollar las recomendaciones propuestas u otras que considere adecuadas o pertinentes. Por tanto, su finalidad es permitir a los gestores que aprecien los riesgos que se ciernen sobre algunos proyectos para que evalúen esa situación y puedan tomar los correctivos sobre la marcha, pero no son herramientas de cogestión ni coadministración y por tanto no son obligatorias en ningún caso y en ninguna circunstancia.

36. El contralor explicó que el control previo regulado por el artículo 2 del Decreto 925 de 1976 constituía un requisito *sine qua non* en el trámite administrativo, sin el cual no se podía ejecutar el presupuesto público. Además, fue por ello por lo que se prestó para ralentizar la actividad administrativa, se convertía en fuente de corrupción y minaba la independencia y objetividad del órgano de control para evaluar la gestión fiscal de la cual había sido partícipe previamente.

37. A diferencia de ello, el control preventivo se enfoca en la gestión de riesgos durante la marcha o ejecución de la actividad administrativa, para pronunciarse oportunamente sobre "*riesgos latentes o eventuales*" que pueden poner en peligro el logro de los objetivos del respectivo proceso, programa o proyecto, y respecto de los cuales la administración no realizó una adecuada valoración o los controles propuestos para mitigarlos no son efectivos.

## V.    Concepto del procurador general de la Nación

38.    El jefe del Ministerio Público consideró que en aquellos casos en que la Corte haga uso de la teoría de la sustitución debe hacerlo de manera moderada y bajo el criterio de autocontención, para evitar bloquear los cambios institucionales que requiera la sociedad.

39.    El procurador general señaló que, si bien la demanda se interpuso de manera oportuna, el análisis se debe restringir al cargo formulado, por lo que no procede la integración normativa. El procurador afirmó que el juicio de sustitución se debe restringir a la supuesta sustitución del eje definitorio de *separación de poderes*, lo que implica que la Corte que se declare inhibida de adoptar un pronunciamiento de fondo respecto del cargo de sustitución de la Carta que se funda en el elemento de control fiscal posterior y selectivo.

40.    La vista fiscal destacó que la premisa mayor debe limitarse al eje de separación de poderes. En este sentido hizo alusión a la sentencia C-977 de 2002, a través de la cual la Corte declaró exequibles las funciones preventivas de la Procuraduría General y consideró que son una materialización del principio de colaboración armónica. Finalmente, el procurador general resaltó

que dichas funciones en cabeza de la Procuraduría son distintas a las de los demás órganos de control y son armónicas entre ellas, luego de lo cual concluye que *"no se evidencian argumentos para sustentar que el acto modificatorio que se examina afecta el eje de separación de poderes".*

41.    En cuanto a la premisa menor, el representante del Ministerio Público concentró sus argumentos en establecer las diferencias entre el control previo y perceptivo vigente antes de la Constitución de 1991 y aquel establecido por el Acto Legislativo 4 de 2019, resaltando que en este último está explícitamente prohibida la coadministración, se enmarca en la lógica del control inter orgánico y no vacía de competencia a la administración. El procurador general señaló que la función de advertencia se erige para prevenir un daño, pero es el gestor fiscal quien tiene la potestad de tomar las medidas que considere pertinentes y tanto la función de advertencia como las de policía judicial se enmarcan en las garantías procesales constitucionales, en la colaboración armónica y no son una forma de intromisión.

42.    El Ministerio Público finalizó advirtiendo que no existe una sustitución del pilar axial de separación de poderes. Al respecto afirmó: *"que la premisa menor no tiene como connotación el cambio ni el reemplazo del eje definitorio de la Constitución descrito en la premisa mayor. El control preventivo y concomitante introducido por el Acto Legislativo 4 de 2019 no sustituye el pilar esencial de separación de poderes de la Constitución Política de 1991, puesto que no conlleva a una interferencia indebida de la Contraloría General de la República en las decisiones fiscales de la Administración Pública".*

## VI.    Consideraciones de la Corte Constitucional

### Competencia

1. De conformidad con lo prescrito por el numeral 1 del artículo 241 de la Constitución Política, corresponde a la Corte Constitucional: "decidir sobre las demandas de inconstitucionalidad que promuevan los ciudadanos contra los actos reformatorios de la Constitución, cualquiera que sea su origen, sólo por vicios de procedimiento en su formación".

### Aptitud de la demanda

2. Algunos de los intervinientes solicitaron a la Corte dictar un fallo inhibitorio por ineptitud sustantiva de la demanda. En su criterio, la demanda no satisfizo los requisitos mínimos que ha fijado la jurisprudencia cuando se acusa un vicio por sustitución de la Constitución. Los intervinientes consideraron, en síntesis, que se incumplían los requisitos de claridad, certeza, especificidad, pertinencia y suficiencia.

### Requisitos formales de la demanda

3. La Sala Plena recuerda que el artículo 379 superior establece que el límite para el ejercicio de la acción pública contra los actos legislativos es de un año, contado a partir de su promulgación. En el presente asunto, el Acto Legislativo 4 de 2019 fue promulgado el 18 de septiembre de ese año y la demanda fue radicada en la Corte Constitucional el 1 de octubre del mismo año 2019, a partir de lo cual se concluye que fue presentada durante el término previsto para ello. Además, no existe ninguna sentencia que constituya cosa juzgada constitucional formal.

**Requisitos sustantivos de la demanda**

4. Toda demanda de inconstitucionalidad exige del ciudadano la sustentación de su pretensión con base en razones claras, ciertas, específicas, pertinentes y suficientes. Ahora bien, cuando la demanda se dirija en contra de una enmienda constitucional aprobada por el Congreso "la carga argumentativa se incrementa considerablemente" en atención a "la magnitud de la pretensión, la trascendencia de la decisión de la Corte, el compromiso del principio democrático y la naturaleza misma de las disposiciones que se cotejan"[23]. En la sentencia C-053 de 2016 esta Corporación señaló que dicha carga argumentativa se traduce en lo siguiente:

> "a) El planteamiento debe ser claro de manera que la ilación de ideas permita entender cuál es el sentido de la acusación en contra del acto reformatorio. Se trata simplemente de que la Corte pueda 'conocer', comprendiéndolas, las razones en las que se funda el desacuerdo respecto de la decisión del Congreso.
>
> b) El cuestionamiento requiere ser cierto y, en esa medida, el acto reformatorio de la Constitución debe existir jurídicamente y encontrarse vigente. Adicionalmente, los contenidos que se le atribuyen deben derivarse de su texto. No puede fundarse su argumentación en la suposición de normas, en interpretaciones conjeturales del acto reformatorio o en premisas relativas evidentemente falsas o inconsecuentes.
>
> c) El razonamiento debe ser pertinente y, en consecuencia, debe tratarse de un verdadero cargo que ponga de presente la infracción de las normas constitucionales relacionadas con la competencia del Congreso de la República para reformar la Carta. Son impertinentes aquellos argumentos fundados en la inconveniencia política de la reforma o en los problemas prácticos que puede suponer su aplicación, a menos que de estos últimos puedan desprenderse consecuencias de naturaleza constitucional. También

---

[23] En todo caso, la jurisprudencia de este Tribunal ha señalado que no son requisitos adicionales a los que se desprenden del Decreto 2067 de 1991 sino del reconocimiento de que una acusación por el desbordamiento de la competencia del Congreso para reformar la Carta plantea problemas particulares y suscita desafíos argumentativos especiales (sentencia C-373 de 2016).

carecen de pertinencia aquellas impugnaciones fundadas en la intangibilidad de normas constitucionales o en la violación de sus contenidos materiales.

d) Como condición de suficiencia del cargo, los demandantes deben esforzarse por presentar de manera específica las razones por las cuales la aprobación del acto reformatorio de la Constitución por parte del Congreso desconoce las normas que le atribuyen su competencia. El esfuerzo de los ciudadanos debe, en consecuencia, contener explicaciones que den respuesta a la siguiente pregunta: ¿Por qué el acto legislativo impugnado constituye no solo una reforma de la Carta sino, en realidad, una sustitución de la misma?".

5. Según lo expuesto, la demanda por el juicio de sustitución debe: i) enunciar el eje definitorio de la Constitución presuntamente sustituido y señalar las disposiciones constitucionales a partir de los cuales se desprende o el precedente jurisprudencial en que haya sido reconocido, respecto de lo cual es necesario que sea claro que no se trata de la contradicción con una norma de la Constitución (juicio de constitucionalidad) sino de la afectación de un principio transversal y definitorio de la Carta Política; ii) exponer de qué manera el acto legislativo impacta el eje definitorio, identificando las diferencias entre ellos y, iii) explicar por qué las modificaciones introducidas por la reforma pueden considerarse una transformación en la identidad de la Constitución de manera que ella, después de la reforma, es otra completamente distinta.

6. Ahora bien, esta mayor exigencia de la carga argumentativa frente a las demandas dirigidas contra actos reformatorios de la Constitución tiene asidero en la intención de resguardar el producto de un consenso democrático surtido de un proceso legislativo formalmente riguroso, pero no puede llegar al extremo de desnaturalizar el carácter de derecho ciudadano de la acción pública de inconstitucionalidad. Se trata entonces de que el ciudadano logre generar una duda suficiente respecto de la posible sustitución de un eje definitorio de la Carta, sin que su argumentación deba llegar al nivel de escrutinio que le corresponde a la Corte Constitucional. A partir de estos lineamientos, se procede a examinar la aptitud de la demanda.

7. *Claridad.* De la lectura integral de la demanda se evidencia que el examen de constitucionalidad solicitado a esta Corporación versa exclusivamente sobre el control fiscal preventivo y concomitante de la Contraloría General de la República. La claridad de la demanda en este sentido se predica del hilo lógico que conduce la argumentación, de forma que resulta inequívoco el sentido de los argumentos y el objeto perseguido por el ejercicio de esta acción pública. En este caso, la redacción del texto y la estructura del escrito permiten identificar con absoluta claridad tanto el objeto como los argumentos con los cuales lo sustenta. Así, la demanda es clara y no existe confusión sobre lo que constituye el objeto de esta y aquello que hace parte

del contexto normativo utilizado para la interpretación sistemática de las expresiones acusadas.

8. *Certeza.* El accionante advierte que pese al enunciado formal de que "no implicará coadministración", para el ejercicio de la función de advertencia le fueron confiadas nuevas facultades al Contralor General, como las de acceder a cualquier información, tener capacidad de suspender y sancionar a quienes se opongan a entregarla y extender este tipo de control a los entes territoriales, implican el ejercicio de una intromisión en las decisiones de contratación, y por ende una forma de coadministración que no se resuelve con la prohibición formal.

9. Al respecto, encuentra la Sala que no se trata de la suposición de normas, porque las normas analizadas y aquellas que sirven de fundamento al análisis son ciertas y verificables, en la medida que (i) las expresiones aludidas por el demandante respecto de la exposición de motivos del proyecto de ley son reales y vigentes; (ii) las competencias a que hace referencia el demandante se encuentran contenidas en los artículos 1 y 2 del Acto Legislativo 04 de 2019; (iii) la interpretación literal de la palabra "previo" corresponde a aquella dispuesta en el Diccionario de la RAE y (iv) los párrafos transcritos de las sentencias C-648 de 2002, C-288 de 2012, C-103 de 2015 y C-470 de 2016 se encuentran contenidos en dichas decisiones. En estos términos, la Corte entiende que no se trata de una interpretación conjetural, aislada o subjetiva del acto reformatorio, con lo cual se cumple con el requisito de certeza exigido para proceder al examen de la norma.

10. Finalmente, establecer si el modelo de control preventivo y concomitante diseñado por el Acto Legislativo 4 de 2019 implica una forma de control previo y si dicho modelo podría constituir una forma de intromisión y coadministración con las entidades controladas, corresponde al examen de fondo de la demanda y no a esta etapa procesal.

11. *Pertinencia.* El demandante plantea, con base en la supuesta sustitución del principio de separación de poderes y control fiscal posterior, que "de acuerdo con su configuración normativa en el Acto Legislativo 4 de 2019, el control preventivo y concomitante tiene una naturaleza tal que conlleva a una interferencia de la Contraloría General de la República en las decisiones fiscales de la Administración Pública".

12. El accionante estructuró su escrito como lo exige la Corte para este tipo de juicios. Inició el planteamiento señalando: "1.- Premisa mayor: La separación de poderes y el control fiscal posterior y selectivo como pilares esenciales de la Constitución Política de 1991." En dicho capítulo señala "a.- La separación de poderes como pilar esencial de la Constitución Política de 1991", donde realiza un reconstrucción histórica y jurisprudencial del principio de separación de poderes en Colombia para luego explicar: "b.- El control posterior y selectivo como manifestación de la separación de poderes y pilar

esencial del control fiscal en la Constitución Política de 1991", en donde el accionante desarrolla el carácter de eje definitorio de la Constitución del modelo de control posterior y selectivo para lo cual se sustenta, en un análisis histórico y sistemático de la Carta.

13. En efecto, la construcción de la premisa menor del cargo se realizó con fundamento en el objeto y el alcance del modelo de control preventivo y concomitante dispuesto en las expresiones acusadas a la luz de la exposición de motivos del proyecto, y de las competencias que el mismo Acto Legislativo le confiere al contralor general de la República para el desarrollo de sus funciones[24], en particular de la función de advertencia. Refiere a los principios rectores que el Constituyente primario identificó en la materia y a los artículos constitucionales[25] en que quedaron plasmados dichos principios, aludiendo a varios artículos constitucionales para concluir que: "[d]e ahí que cualquier modificación a la concepción del control fiscal como exclusivamente posterior y selectivo significa sustituir la médula del diseño institucional que hizo el Constituyente de 1991 al control fiscal colombiano, máxime si tal cambio implica restablecer elementos del modelo de control anacrónico que la Asamblea Nacional expresamente decidió excluir de la Administración Pública".

14. En la parte conclusiva del escrito de demanda, el accionante afirmó: "la verdadera justificación del control posterior y selectivo como pilar esencial de la Constitución está en que solo a través de este diseño, como único momento y forma de ejercer la fiscalización, se concreta la separación de poderes entre la Contraloría y la Administración Pública. Este precepto, y la prohibición de ejercer funciones administrativas diferentes a las inherentes a las propias, es lo único que preserva la autonomía e independencia de ambos establecimientos estatales. Insertar otro tipo de modelo de control, aunque coexista con el posterior y selectivo, implica una rotura de la autonomía e independencia del órgano fiscalizador y del ente sujeto a control fiscal, toda vez que da lugar a intromisiones en las competencias y funcionamiento de uno u otro. Hacerlo implica sustituir la Constitución, al menos de manera parcial".

15. De lo anterior se infiere que la demanda satisfizo este presupuesto en la medida que atacó el diseño normativo de la reforma, con independencia del desarrollo legal que de él se derive. Además, plantea un cargo por sustitución del principio de separación de poderes y del control posterior y selectivo entendido como un eje definitorio y transversal del modelo de control fiscal diseñado por la Carta Política.

---

[24] El accionante construye sus argumentos sobre el alcance de este modelo teniendo en consideración el inciso 4° del artículo 267 y los numeral 16 y 17 del artículo 268 de la Constitución Política, tal como fueron reformados por el Acto Legislativo 04 de 2019.

[25] Para fundamentar su argumento hizo alusión a los artículos 119, 267, 269 y 270.

16. *Suficiencia.* Si bien la jurisprudencia constitucional ha señalado que, en materia de demandas contra actos legislativos por supuesta sustitución de la Constitución, el demandante debe cumplir con una carga argumentativa mayor que permita estructurar el silogismo en que se fundamenta la metodología del juicio por sustitución, esta Corporación también ha señalado que la especialidad de los cargos no puede traducirse en un incremento extraordinario de las condiciones para ejercer la acción pública[26].

17. Así, en cuanto a la suficiencia predicable sobre la premisa mayor de la demanda por vicio de sustitución, el requisito no puede llegar al punto de exigir que el accionante establezca de forma inequívoca, la existencia de un eje definitorio de la Constitución, cuando la identificación de dichos ejes es un proceso en elaboración, que, en todo caso, está a cargo de esta Corporación. Lo que se exige al demandante es que presente una sustentación clara, cierta y pertinente en la materia, a partir de la cual esta Corte pueda extraer elementos de juicio para decidir si el principio constitucional afectado es o no un eje definitorio de la Carta.

18. El accionante enunció con claridad el elemento que constituye el eje fundamental afectado al sostener que "para el caso objeto de estudio por la Corte son particularmente relevantes dos pilares esenciales de la Constitución: (i) la separación de poderes y (ii) el control fiscal como control posterior y selectivo, exclusivamente". En cuanto a sus especificidades a través de "múltiples referentes normativos" el accionante desarrolla toda una sustentación sobre "la separación de poderes como pilar esencial de la Constitución Política de 1991", respecto de lo cual cita algunos apartes de las sentencias C-970 de 2004, C-141 de 2010 y C-285 de 2016 en los que esta Corporación ha reconocido su carácter de eje definitorio de la constitución.

19. En cuanto al "control posterior y selectivo como manifestación de la separación de poderes y pilar esencial del control fiscal en la Constitución Política de 1991" entre los folios 19 y 26 del escrito de demanda el accionante realizó una argumentación basada en las actas de la Asamblea Nacional Constituyente y el análisis de los artículos superiores 267, 269 y 270 a partir de lo cual sustentó la conclusión según la cual "cualquier modificación a la concepción del control fiscal como exclusivamente posterior y selectivo significa sustituir la médula del diseño institucional que hizo el Constituyente de 1991 al control fiscal colombiano, máxime si tal cambio implica restablecer elementos del modelo de control anacrónico que la Asamblea Nacional expresamente decidió excluir de la Administración Pública".

---

[26] En la sentencia C-1040 de 2005 se indicó: "En atención a esas dificultades teóricas, imponer al ciudadano una obligación de argumentación exhaustiva sobre la existencia del eje o una demostración concluyente del carácter irreconocible de la Constitución después de la reforma, desconoce el carácter público de la acción. En esa dirección, la Corte ha reconocido que es a ella a la que corresponde asumir la carga argumentativa necesaria para adelantar el juicio, lo que es consistente con su función de intérprete autorizado de la Constitución".

20. Respecto del deber de argumentar porqué dicho pilar es esencial y definitorio, el demandante sostuvo, como "conclusión de la premisa mayor"[27] una argumentación según la cual "[e]l Constituyente de 1991 instauró un modelo de control fiscal basado exclusivamente en controles posteriores y selectivos. Este mandato es la médula o columna vertebral de toda la fiscalización ejercida sobre la gestión de la Administración, diseñado como una manifestación de la independencia garantizada por la separación de poderes en el ámbito particular del control fiscal".

21. A efectos de sustentar esta conclusión, el demandante aludió a las sentencias que esta Corte ha proferido en asuntos relacionados con las competencias de la Contraloría General de la República, de las cuales resalta la importancia que esta Corte ha reconocido al modelo de control posterior y selectivo. En su extenso análisis el demandante refiere las sentencias C-529 de 1993, C-534 de 1993, C-648 de 2002, C-967 de 2012, C-103 de 2015, C-470 de 2016, al final de cuyo análisis indicó: "la noción de control fiscal como posterior y selectivo se erige en componente del principio de separación de poderes en una materia específica, el cual garantiza la independencia y autonomía entre el Ejecutivo y el órgano de control mismo".

22. Para la Corte es claro que el escrito de demanda cumplió a satisfacción con la carga de suficiencia requerida en la estructuración de la premisa mayor del juicio de sustitución alegado en la demanda. Se reitera en esta ocasión que dicha exigencia debe ser entendida, no como la demostración de existencia de un eje definitorio, sino como el cumplimiento de unos estándares cuyo objeto es dar elementos que permitan colegir razonablemente la existencia de un eje identitario de la Carta Política, a fin de que sea esta Corporación la que al examinar dichos elementos y los demás que considere pertinentes, concluya si le asiste o no razón al demandante.

23. Respecto de la premisa menor, la demanda explicó de manera extensa, las razones por las cuales el accionante considera que el nuevo modelo de control no solo difiere del posterior y selectivo, sino que resulta incompatible con el mismo. Al analizar las competencias con que ejercería el control preventivo y concomitante sostuvo que, pese a que formalmente se diga lo contrario, el nuevo modelo de control fiscal compromete gravemente la adecuada ejecución del control posterior y selectivo, así como las garantías aplicables dentro de su desarrollo, tal como fueron diseñadas por el Constituyente.

24. En este contexto se verificó que la demanda presentó sus premisas con elementos de juicio razonables, que plantean una discusión constitucionalmente pertinente, sobre la forma como la norma demandada podría afectar el eje definitorio identificado por el accionante, correspondiendo en el examen de fondo determinar si realmente se presentó una sustitución de la constitución.

---

[27] Folio 26 del escrito de demanda.

25. En cuanto a la conclusión, el demandante dedicó una sección a sustentar que el eje definitorio de separación de poderes y control fiscal posterior y selectivo habría sido sustituido de forma parcial con la actual reforma[28]. La Corte reitera que en esta etapa procesal lo que se verifica es la suficiencia de los argumentos desde la perspectiva de una sustentación dirigida a activar la competencia de esta Corporación para estudiar la constitucionalidad de una reforma a la Carta. El examen de aptitud de la demanda no es un juicio anticipado en el que se evalúe la exequibilidad de las normas, sino una evaluación de requisitos, que en el presente caso se cumplen a cabalidad.

26. Lo anterior, además, se vincula con la relevancia que el principio *pro actione* cumple en procesos de naturaleza pública y en particular en el ejercicio de la acción de inconstitucionalidad, según el cual "el examen de los requisitos adjetivos de la demanda no debe ser sometido a un riguroso escrutinio y se debe preferir una decisión de fondo antes que una inhibitoria, de manera que se privilegie la efectividad de los derechos de participación ciudadana y de acceso al recurso judicial efectivo ante esta Corte"[29].

27. A partir de lo expuesto, la Corte considera que la demanda satisfizo los requisitos de claridad, certeza, pertinencia, especificidad y las exigencias de suficiencia que son propias de una acción pública contra un acto reformatorio de la constitución por exceso de competencia del legislador. Por todo lo cual la Corte procederá a adelantar el examen de los cargos presentados contra la norma acusada.

**Problema jurídico**

28. En atención a lo expuesto previamente, corresponde a la Sala Plena determinar si las variaciones al modelo de control fiscal, constituyen una sustitución de un eje fundamental de la Constitución.

29. A partir del problema jurídico planteado, la Corte adelantará un análisis a partir de: i) las reglas jurisprudenciales sobre el juicio de sustitución constitucional; ii) el contenido de los elementos del principio constitucional de separación de poderes (*premisa mayor*); iii) las variaciones generadas con la reforma (*premisa menor*); y por último, iv) establecer si las variaciones al modelo de control fiscal constituyen o no una sustitución de un eje fundamental de la Carta Política de 1991 (*conclusión*).

**El juicio de sustitución constitucional**

30. La Constitución en su artículo 241.1 señala que la Corte Constitucional es competente para decidir sobre las demandas de inconstitucionalidad que

---

[28] Folios 34 a 46 del escrito de demanda.

[29] Sentencia C-861 de 2008.

promuevan los ciudadanos contra los actos reformatorios de la Constitución solo por vicios de procedimiento en su formación. A partir de dicha competencia, este Tribunal ha entendido que lo dispuesto en el artículo 374 superior, respecto de que la Constitución Política "podrá ser reformada" por (i) el Congreso, (ii) por una Asamblea Nacional Constituyente o (iii) por el Pueblo mediante referendo, supone que los órganos destinatarios de la potestad de reforma tienen ciertas limitaciones, y que la Constitución ha delimitado las hipótesis de modificación, excluyendo otras modalidades como su derogatoria, la sustitución en su integridad, o su suspensión y desconocimiento.

31. Desde sus primeros pronunciamientos, esta Corte explicó la relevancia de la determinación de la competencia como elemento fundamental para analizar la exequibilidad del procedimiento cuando se reforma la Constitución[30]. En la sentencia C-551 de 2003, la Corte sostuvo que el poder de reforma no puede sustituir, derogar, suprimir o reemplazar la Constitución vigente por otra integralmente diferente, por lo que corresponde al Tribunal Constitucional revisar si el poder de revisión, so pretexto de la reforma, rebasó o excedió sus competencias arrogándose potestades propias del poder constituyente primario.

32. Para definir cuándo se materializa una sustitución de la Constitución, que exceda el poder de reforma de los poderes constituidos, se han considerado varias reglas que restringen la competencia de la Corte para analizar estas materias. Así, es posible identificar en la jurisprudencia analizada los siguientes planos del juicio de sustitución:

i) El juicio de sustitución se centra en la evaluación acerca de si el poder constituido que modifica la Carta, se circunscribió a los límites de su poder de reforma, o los desconoció a través de un cambio de tal entidad que desnaturaliza la Carta. En consecuencia, la actividad de la Corte se circunscribe a estudiar si el reformador sustituyó la Constitución, sin que por ello efectúe un control material ordinario del acto acusado. En tal medida, no existe una comparación entre la reforma y la Constitución con miras a establecer si la primera contradice la segunda, pues necesariamente una reforma constitucional contradice la Constitución[31].

ii) La Constitución no establece reglas intangibles ni cláusulas pétreas, sino principios axiales e identitarios que, si llegasen a ser reformulados, afectarían la identidad de la Constitución, convirtiéndola en un texto distinto. Estos

---

[30] En términos de esta Corte: "tanto la doctrina como la jurisprudencia han señalado, de manera reiterada, que la competencia es un presupuesto ineludible del procedimiento, a tal punto que el procedimiento está siempre viciado si el órgano que dicta un acto jurídico carece de competencia, por más de que su actuación, en lo que al trámite se refiere, haya sido impecable. En tales circunstancias, no tendría sentido que la Constitución atribuyera a la Corte el control de los vicios de procedimiento de las reformas constitucionales, pero la excluyera de verificar si los órganos que adelantaron esa reforma tenían o no competencia para hacerlo, pues esa regulación lleva a una situación inaceptable: así, ¿qué ocurriría si un órgano incompetente (…)".

[31] Ver sentencia C-551 de 2003.

aspectos estructurales no están contenidos en la disposición normativa concreta, puesto que no se trata de instaurar cláusulas intangibles, sino que son identificables a partir del análisis de distintas disposiciones constitucionales que concurren en la conformación de dichos ejes.

La Corte Constitucional ha sido reiterativa en señalar que la identificación de esos ejes estructurales de la Constitución, es un proceso en construcción a partir de una interpretación sistemática de la Carta.

iii) La transgresión de competencia en la reforma puede tener distintas modalidades y se configura no solo cuando la Constitución es reemplazada como un todo (sustitución total), sino también cuando se desnaturaliza uno de sus ejes definitorios y con ello se pierde la identidad de la Carta (sustitución parcial)[32]. Para efectuar el denominado "juicio o test de sustitución" es necesario establecer: (i) una premisa mayor, (ii) una premisa menor y (iii) una conclusión.

33. En primer lugar, una vez establecido el cumplimiento de los requisitos de forma, temporalidad y fondo de la demanda, el juicio inicia por la construcción de la premisa mayor, esto es, la identificación del elemento definitorio, axial o esencial de la Constitución que se alega sustituido por el acto reformatorio.

34. En segundo lugar, la Corte debe establecer la premisa menor, a partir del análisis sobre el alcance de las modificaciones generadas con la reforma, en particular, el efecto de las medidas establecidas en la reforma frente a las disposiciones y los principios constitucionales identificados en la premisa mayor como aquellos cuyo contenido normativo es el reflejo del eje identitario supuestamente afectado. Todo ello se debe realizar a partir del examen del contenido normativo introducido con la reforma.

35. Finalmente, la Corte debe establecer su conclusión, que como resultado del contraste de las dos premisas, recaiga sobre si el nuevo elemento normativo elimina absoluta o parcialmente, de forma permanente o temporal, un elemento esencial de la estructura constitucional y lo reemplaza por otro radicalmente distinto, en cuyo caso se estaría ante un exceso de la competencia de reforma constitucional que se adscribe a los poderes constituidos, como sucede con el Congreso al proferir actos legislativos[33].

36. A partir de lo expuesto, procede la Sala Plena a adelantar el examen de la norma demandada.

**Premisa mayor: el principio de separación de poderes como eje definitorio de la Constitución**

[32] Cfr., sentencia C-332 de 2017.

[33] Sentencia C-577 de 2014.

37. La jurisprudencia Constitucional de manera reiterada ha reconocido que el principio de separación de poderes es un eje definitorio de la Carta Política. En consecuencia, no puede ser suprimido o sustituido por el constituyente derivado[34], toda vez que el poder político debe ser limitado, a fin de evitar su abuso[35].

38. Así, la Corte ha sostenido que el principio de separación de poderes fue el punto de partida del diseño constitucional de la Asamblea Nacional Constituyente, al punto que: "[e]n la Constitución de 1991 este principio irradió toda la configuración del Estado y se convirtió, de este modo, en un principio axial del texto constitucional"[36].

39. En efecto, el sistema estructural del Estado colombiano, diseñado en la Carta Política de 1991, se concibió bajo el modelo flexible e integrador de separación de poderes. Este combina la división tripartita del poder público con el principio de colaboración armónica, en un sistema de pesos y contrapesos lo que permite articular la división funcional y el control interinstitucional con la interacción y la colaboración armónica para el logro de los fines del Estado.

40. Específicamente, el artículo 113 de la Constitución señala que: "son ramas del poder público, la legislativa, la ejecutiva y la judicial y que, además de los órganos que las integran, existen otros, autónomos e independientes para el cumplimiento de las demás funciones del Estado". Igualmente, establece que: "los diferentes órganos del Estado tienen funciones separadas, pero colaboran armónicamente para la realización de sus fines". Lo que se acompasa con todo el entramado que, a partir del diseño republicano del Estado establecido en el artículo 1 de la Carta Política, desarrolla claramente un sistema de división y separación funcional y la prohibición de concentración y abuso de poder[37].

---

[34] Al respecto, esta Corte ha reiterado la importancia de este principio en la definición de la Carta Política y ha señalado que: "En este orden de ideas, la Constitución de 1991 resulta irreconocible si se sustituye, total o parcialmente este principio, por un principio de concentración de poder" (sentencia C-053 de 2016). En la sentencia C-285 de 2016, la Corte Constitucional hizo un recuento jurisprudencia sobre la caracterización del equilibrio de poderes como eje definitorio de la Constitución (ver sentencias C-970 y 971 de 2004, C-1040 de 2005, C-141 de 2010 y C-171 de 2012).

[35] Cfr., sentencias C-285 de 2016 y C-630 de 2017.

[36] Al respecto esta Corte en la sentencia C-286 de 2015 señaló: "Es así como en la Asamblea Nacional Constituyente se entendió que, sin perjuicio de que la versión clásica del principio de separación de poderes debía ser reformulada y flexibilizada, pues la división rígida y absoluta entre las funciones legislativa, ejecutiva y judicial debía articularse con el surgimiento de nuevos roles estatales como los asociados a la fiscalización y a la organización electoral, con el principio de colaboración armónica de poderes y con la existencia de un sistema de controles Inter orgánicos recíprocos, la separación de poderes debía obrar como un principio irradiador de todo el ordenamiento, y en especial, en la definición de toda la estructura y las bases del funcionamiento del Estado".

[37] Ver sentencia C-285 de 2016.

41. Teniendo en cuenta la importancia que para el constituyente primario tuvo dicho principio, la transversalidad que el mismo tiene en la Carta Política y, particularmente, la importancia que la Corte Constitucional le ha reconocido en su jurisprudencia, esta Corte ha señalado que se trata de un verdadero eje definitorio de la Carta.

42. Ahora bien, la separación de poderes ha sido entendida por la jurisprudencia constitucional desde dos dimensiones: (i) el otorgamiento de funciones exclusivas a cada una de las ramas del poder público y (ii) la ausencia de injerencias externas de un órgano hacia otro, en donde se quebranten las funciones y roles asignados a cada uno de ellos, por cuanto ello limita su capacidad de autogobierno.

43. En este contexto, la articulación constitucional del principio de separación de poderes busca garantizar la autonomía e independencia de cada órgano en el desarrollo de sus funciones, pero todo ello en medio de la colaboración armónica. Este diseño se refleja en diversas disposiciones de la Carta Política. Así, el artículo 121 de la Constitución, como primera medida, establece una prohibición expresa a las autoridades del Estado para ejercer funciones diferentes a las previstas en el propio ordenamiento, el cual, analizado armónicamente con lo dispuesto por los artículos 6º, que prescribe la responsabilidad de los servidores públicos por la extralimitación de tales funciones, y el artículo 1º que define a Colombia como un Estado organizado en la forma republicana, pretende establecer que, si bien la misma Carta acepta la colaboración armónica entre los poderes públicos, estos no pueden interferir funcionalmente en las decisiones que cada uno adopte en el ejercicio de las que a ellos hayan sido encomendadas.

44. En ese contexto, el punto clave del principio de separación de poderes es que excluye tajantemente aquellos modelos que respaldan la concentración del poder y de las misiones del Estado, por cuanto su propósito es la asignación y distribución de las funciones que le permitan cumplir con sus fines esenciales, tales como: "legislar, administrar, juzgar, controlar, organizar las elecciones o la de controlar el funcionamiento estatal; si bien en ciertos casos excepcionales, a un mismo órgano se le otorgan competencias para ejercer distintos roles, en cualquier caso el diseño institucional se encuentra atravesado por la división y separación funcional y por la prohibición de concentración y abuso del poder. En este orden de ideas, la Constitución de 1991 resulta irreconocible si se sustituye, total o parcialmente este principio, por un principio de concentración de poder"[38].

45. Ahora bien, a diferencia del modelo rígido de separación de poderes, la Constitución adopta un sistema flexible de distribución de las distintas funciones del poder público. Este se conjuga con un principio de colaboración armónica de los diferentes órganos del Estado y distintos mecanismos de

---

[38] Sentencia C-970 de 2004.

pesos y contrapesos entre las ramas del poder público, como ocurre con distintas instituciones como el Ministerio Público, la Contraloría General de la República, el Banco de la República, el Consejo Nacional Electoral o la Registraduría Nacional del Estado Civil.

46. En consecuencia, es indispensable garantizar la independencia y la autonomía de los órganos a los que la Constitución atribuye las funciones esenciales del Estado, entendiendo por independencia la ausencia de injerencias externas en el desarrollo de los cometidos constitucionales del respectivo órgano, y por autonomía, el otorgamiento, a cada uno de tales órganos, de la capacidad para desenvolverse y desplegar sus actividades por sí mismos, y para autogobernarse[39].

47. Al respecto, la Corte ha explicado que la autonomía e independencia se convierten en un supuesto esencial de la división de poderes, no sólo porque garantizan la especialización de la administración pública, sino especialmente porque impiden la configuración de poderes omnímodos que pongan en riesgo los derechos y libertades de los ciudadanos, sin que esta autonomía e independencia sea incompatible con la implementación de mecanismos que permitan controles recíprocos ni con la cooperación armónica interinstitucional.

48. No obstante lo expuesto, la división funcional como dimensión del principio de separación de poderes no se limita a evitar las intromisiones entre las tres ramas del poder público, sino que evidentemente tiene una implicación transversal a todos los órganos del Estado para evitar la concentración de poder y mantener la independencia de las distintas ramas entre ellas y frente a los órganos de control.

49. Entonces, la tradicional separación de poderes se ha visto sometida a los cambios provenientes del reconocimiento o la aparición de funciones -como el control fiscal- que complementan las encargadas a cada una de las ramas del poder público, en procura de una colaboración recíproca orientada a un mejor desempeño de la actividad estatal y al control que surge como consecuencia de la implementación de un delicado mecanismo de pesos y contrapesos.

50. Al respecto, la Corte ha destacado que la Contraloría General de la República es un organismo de control estatal con competencias específicas, que acompaña horizontal, colaborativa y armónicamente a las ramas tradicionales del poder público, a través de una función especializada y autónoma mediante la cual inspecciona la actividad fiscal externa de todas las instituciones del Estado desde el punto de vista financiero, de gestión y de resultados[40].

---

[39] Ver sentencia C-285 de 2016.

[40] Cfr., sentencia C-101 de 2018.

51. Su marco de acción es el control fiscal, que ha sido reconocido por la Corte como una herramienta eficaz e idónea para la protección del patrimonio público, a través de (i) la verificación del correcto manejo de los recursos públicos y (ii) el establecer si en el ejercicio de la gestión de los recursos colectivos se cumplen las normas que sujetan a la administración en términos de legalidad y se asegura el cumplimiento de los fines constitucionales y misionales de cada una de las entidades[41].

52. Además, esta Corte ha determinado que el control fiscal obedece a la necesidad de preservar el erario y de consolidar una instancia: "que garantice y verifique la correcta ejecución de los presupuestos públicos, evitando y/o sancionando el despilfarro, la desviación de recursos, los abusos, las pérdidas innecesarias y la utilización indebida de fondos"[42].

53. En consideración a lo expuesto, la Sala Plena reitera que la separación de poderes es un eje fundamental de la Constitución. Este incluye el ejercicio de control fiscal realizado por la Contraloría General de la República, con la finalidad de proteger el patrimonio colectivo y asegurar la moralidad en todas las operaciones relacionadas con el manejo y utilización de los bienes y recursos públicos, y la eficiencia y eficacia de la administración en el cumplimiento de los fines del Estado.

54. En este punto conviene hacer una precisión respecto de algunos precedentes de la Corte en relación con el control posterior y selectivo que ejerce la Contraloría General. Para ello, se hará alusión a dos pronunciamientos centrales a través de los cuales esta Corporación explicó las reglas bajo las cuales se diseñó el control fiscal establecido en el artículo 267 superior.

55. En la sentencia C-103 de 2015, la Corte examinó la facultad de advertencia sobre riesgos de pérdida de recursos públicos que implementaba el numeral 7 del artículo 5 del Decreto Ley 267 de 2000. En esta ocasión, este Tribunal Constitucional determinó que la misma contrariaría la Carta Política, dado que dicha función sobrepasaba el marco de acción otorgado a la Contraloría respecto de: "(i) el carácter posterior y no previo que debe tener la labor fiscalizadora de la Contraloría y, de otro lado, (ii) en la prohibición de que sus actuaciones supongan una suerte de coadministración o injerencia indebida en el ejercicio de las funciones de las entidades sometidas a control."

56. En igual sentido, en la sentencia C-470 del 2017 la Corte hizo alusión a las reglas bajo las cuales funcionaba la Contraloría General. En esta ocasión se destacó la relevancia de la naturaleza posterior y selectiva del control fiscal, así:

---

[41] *Ídem.*

[42] Sentencia C-716 de 2002.

"3.1.2. La naturaleza del control y vigilancia que ejerce la Contraloría General de la República es posterior y selectiva, lo cual constituye una de las características del actual modelo de control fiscal. Ello se acompasa con la prohibición de atribuir a la Contraloría funciones administrativas distintas de las inherentes a su propia organización, a fin de evitar toda forma de coadministración y garantizar la independencia y autonomía del órgano de control".

**57.** Lo anterior es una muestra del respeto propio que esta Corporación debe hacer respecto de los lineamientos constitucionales, a partir de las funciones asignadas en el mismo ordenamiento superior, dado que atendió al simple control que se ejerce respecto de la verificación de una oposición objetiva entre la disposición demandada y el texto constitucional. Sin embargo, **ello no implica que la Corte hubiere dado el rango de eje identitario de la Carta Política al control posterior y selectivo y más aún que este fuera el único medio a través del cual se pudiera ejercer el control fiscal.**

58. De las anteriores precisiones se debe reiterar que la Constitución no establece reglas intangibles ni cláusulas pétreas, sino principios axiales e identitarios que, si llegasen a ser reformulados, afectarían su identidad. En tales condiciones, asumir un modelo de control fiscal es una decisión que repara en las necesidades de cada momento y sus circunstancias específicas, como, por ejemplo, los avances tecnológicos y de gestión, en el manejo de recursos públicos.

**Premisa menor: la reforma introducida a través del Acto Legislativo 04 de 2019**

59. El segundo paso del *juicio de sustitución* es la determinación de la *premisa menor*. Dicha premisa está conformada por los elementos novedosos y diferentes que el acto legislativo acusado introdujo en la arquitectura constitucional. Para tal fin se hará alusión a: i) la evolución del control fiscal; ii) el diseño del modelo de control fiscal establecido en la Constitución original y iii) la reforma introducida a través del Acto Legislativo 4 de 2019.

60. *El modelo de control previo bajo la Constitución de 1886[43].* La institución del control fiscal existe en el país desde la Ley 42 de 1923, donde se dispuso la creación de una institución autónoma, denominada "Departamento de Contraloría", encargada de fiscalizar el manejo de los recursos públicos.

61. Luego, mediante el Decreto 911 de 1932, el gobierno decidió reorganizar la Institución otorgándole el carácter de oficina de contabilidad y control

---

[43] En la sentencia C-716 de 2002 esta Corporación efectuó un detallado recuento histórico sobre el control fiscal en Colombia.

fiscal, incluyendo dentro de sus funciones el control previo de la gestión administrativa, correspondiendo al contralor general expedir una certificación de disponibilidad, junto con el registro de los contratos en el Departamento de la Contraloría (art. 9).

62. El artículo 93 del Acto Legislativo 1 de 1945 atribuyó a la Contraloría General de la República la vigilancia de la gestión fiscal de la Administración y por medio de la Ley 20 de 1975 se regularon las etapas de "control previo", "control perceptivo" y "control posterior".

63. Específicamente, en relación con el control previo, la referida ley confirió al contralor una serie de facultades, como lo era la de someter el pago por contratos administrativos a la autorización del contralor, quien debía recibir copia auténtica del Diario Oficial o de un diario de amplia circulación, con el extracto del contrato visado por el auditor o revisor fiscal correspondiente (art. 9).

64. A su vez, el artículo 20 de la misma ley autorizaba a la Contraloría General de la República para efectuar controles previos a las empresas industriales y comerciales del Estado cuya junta directiva lo solicitara; o de oficio, con carácter temporal o permanente, cuando advirtiera frecuentes o repetidas irregularidades en el examen posterior de cuentas o en visitas practicadas por dicha entidad.

65. Por su parte, el Decreto 925 de 1976[44] definió las modalidades de fiscalización,https://www.corteconstitucional.gov.co/relatoria/2015/C-103-15.htm       -       _ftn19 destacando el control previo como aquel consistente en: "examinar con antelación a la ejecución de las transacciones u operaciones, los actos y documentos que las originan o respaldan, para comprobar el cumplimiento de las normas, leyes, reglamentaciones y procedimientos establecidos" (art. 2).

66. En el mismo sentido, el referido decreto ordenaba que en toda junta o comité de licitaciones, adquisiciones o compras debía asistir un representante de la Contraloría General en el trámite previo a la celebración del contrato, de manera que, si tenía observaciones sobre el mismo, no era posible contratar hasta tanto la Contraloría no se hubiere pronunciado y se reestudiara el asunto por el respectivo comité (art. 5).

67. Este tipo de modelo de control fiscal generó múltiples inconvenientes, al punto que el Consejo de Estado se ocupó de precisar el alcance del control previo, advirtiendo que, si bien la Contraloría estaba facultada para verificar el cumplimiento de las normas fiscales antes de la realización del gasto, no podía llegar hasta la intromisión en las actividades propias de la Administración. En concreto se indicó:

---

[44] Expedido con fundamento en las facultades extraordinarias otorgadas al presidente de la República por la Ley 20 de 1975.

"A la Contraloría le compete ejercer la vigilancia de la gestión fiscal de la Administración, exclusivamente, y le está vedado el ejercicio de funciones propias de la Administración activa (art. 59 de la C. N.). Una de las modalidades que ofrece esa vigilancia es el llamado 'control previo', que le permite a la Contraloría verificar el cumplimiento de las normas fiscales antes de la realización del gasto. (…) El control numérico legal, previo al gasto, surge frente a una orden de pago, para verificar su legalidad por el aspecto puramente fiscal y no habilita al órgano que lo ejerce para discutir o controvertir el Acto administrativo que pretende ejecutarse a través de la orden de pago, pues esto equivaldría a una intromisión en la actividad propia de la administración."[45]

68. A partir de las facultades atribuidas al contralor general, se fueron evidenciando múltiples problemáticas como la coadministración, la ralentización de la administración y la corrupción por la concentración del poder, situación que en últimas llevó a cambiar el modelo de control fiscal[46].

69. *El control fiscal en la Constitución de 1991.* El constituyente hizo evidente su interés por evitar cualquier forma de intromisión de los organismos de control fiscal en la actividad administrativa, específicamente en atención a la capacidad decisoria y dispositiva de los administradores, lo que llevó a establecer un modelo de control fiscal posterior y selectivo, a partir de una evaluación de resultados de la gestión fiscal de la administración.

70. En tal sentido, el texto aprobado por la Asamblea Nacional Constituyente dejó explícito que el modelo de control elegido eliminaba definitivamente el sistema de control previo, según quedó consignado en el artículo 267 superior, donde se consignó:

"El control fiscal es una función pública que ejercerá la Contraloría General de la República, la cual vigila la gestión fiscal de la administración y de los particulares o entidades que manejen fondos o bienes de la Nación.

Dicho control se ejercerá en forma posterior y selectiva conforme a los procedimientos, sistemas y principios que establezca la ley. Esta podrá, sin embargo, autorizar que, en casos especiales, la vigilancia se realice por

---

[45] Consejo de Estado, Sala de lo Contencioso Administrativo, Sección Primera, sentencia del 5 de noviembre de 1979.

[46] Al respecto en la sentencia C-103 de 2015, se destacaron las siguientes problemáticas del sistema vigente con la Constitución de 1886, así: "(i) propiciaba la intrusión directa del organismo de vigilancia en la toma de decisiones ejecutivas, intromisión que frecuentemente obstaculizaba, cuando no vetaba, el normal desenvolvimiento de la Administración; (ii) el ejercicio del control previo, pese a sus connotaciones administrativas, no implicaba responsabilidad administrativa alguna para la Contraloría y además comprometía la necesaria independencia y autonomía del ente fiscalizador; (iii) paradójicamente, se consideraba que dicho sistema constituía un foco de corrupción".

empresas privadas colombianas escogidas por concurso público de méritos, y contratadas previo concepto del Consejo de Estado."

71. Por su parte, el artículo 5º de la Ley 42 de 1993[47]https://www.corteconstitucional.gov.co/relatoria/2015/C-103-15.htm - _ftn46 definió el modelo de control fiscal escogido, así:

"Para efecto del artículo 267 de la Constitución Nacional se entiende por control posterior la vigilancia de las actividades, operaciones y procesos ejecutados por los sujetos de control y de los resultados obtenidos por los mismos. Por control selectivo se entiende la elección mediante un procedimiento técnico de una muestra representativa de recursos, cuentas, operaciones o actividades para obtener conclusiones sobre el universo respectivo en el desarrollo del control fiscal.

Para el ejercicio del control posterior y selectivo las contralorías podrán realizar las diligencias que consideren pertinentes."

72. Este modelo se caracteriza por ser un esquema de "carácter posterior, selectivo, amplio e integral"[48], que opera mediante la complementariedad de los mecanismos externos e internos de seguimiento a la actividad fiscal. El primero lo ejerce la Contraloría General de la República junto con las contralorías territoriales y, el segundo, cada entidad pública[49] en consonancia con los parámetros y lineamientos de la entidad nacional[50]. Este esquema se caracteriza por ser amplio, integral, complementario, posterior y selectivo[51].

i) Amplio en dos sentidos: por un lado, recae sobre personas que profieran decisiones que determinen la gestión fiscal, así como a quienes desempeñen funciones de ordenación, control, dirección y coordinación, y a los contratistas y particulares a los cuales se les deduzca responsabilidad dentro del respectivo proceso[52]. Por el otro, la vigilancia fiscal implica un control financiero, de legalidad, de gestión, de resultados, de cuentas y de valoración de los mecanismos de control interno de las entidades o personas controladas, con el propósito de determinar si la asignación de los recursos públicos maximiza los resultados de la gestión administrativa[53].

---

[47] Sobre la organización del sistema de control fiscal financiero y los organismos que lo ejercen.

[48] Sentencia C-103 de 2015.

[49] El artículo 269 establece: "En las entidades públicas, las autoridades correspondientes están obligadas a diseñar y aplicar, según la naturaleza de sus funciones, métodos y procedimientos de control interno, de conformidad con lo que disponga la ley, la cual podrá establecer excepciones y autorizar la contratación de dichos servicios con empresas privadas colombianas".

[50] Artículo 268.12 superior.

[51] En este punto se seguirán los lineamientos sentados en la sentencia C-101 de 2018.

[52] Sentencia SU-620 de 1996.

[53] Sentencia C-103 de 2015.

ii) Integral porque abarca la totalidad del proceso de la gestión de los recursos públicos. Comprende la verificación del "manejo de los bienes y recursos públicos en las etapas de recaudo, gasto, inversión, disposición, conservación, enajenación"[54], y finalmente supone la valoración del logro de los resultados para el que fueron destinados.

iii) Complementario entre las dos modalidades de control, la externa que asume la Contraloría General de la República, la Auditoría General de la República y las contralorías municipales y, la interna y previa desplegada por cada entidad en el marco de su actividad administrativa.

iv) Posterior, dado que los organismos de control fiscal solo están facultados para desplegar sus competencias una vez la administración ha actuado, de modo que su actividad empieza justamente cuando esta ha adoptado sus decisiones.

v) Selectivo, ya que se basa en la elección de una muestra representativa de recursos, cuentas, operaciones o actividades, mediante un procedimiento técnico, a fin de obtener conclusiones sobre el universo respectivo en el desarrollo del control fiscal[55]. Lo anterior, dado que en la práctica no todas las actividades administrativas pueden ser objeto de control, y lo son aquellas que permitan consolidar una visión global de las operaciones de las autoridades[56].

73. En este contexto y de cara al asunto objeto de examen, el esquema original constitucional se refirió principalmente a un control fiscal posterior y selectivo, a fin de evitar cualquier forma de intromisión en la capacidad decisoria y dispositiva de la administración (coadministración) bajo el modelo de control previo imperante en la Constitución de 1886.

**Los cambios generados por las expresiones demandadas del Acto Legislativo 04 de 2019**

74. El accionante demandó puntualmente unas expresiones de los artículos 1 y 2 del Acto Legislativo 4 de 2019, con los cuales se modificaron los artículos 267 y 268 de la Carta, las que se refieren a que:

i) El control fiscal podrá ser preventivo y concomitante, el cual no implicará coadministración y se realizará en tiempo real a través del seguimiento permanente de los ciclos, uso, ejecución, contratación e impacto de los recursos públicos, mediante el uso de tecnologías de la información, con la participación del control social y con la articulación del control interno.

---

[54] Sentencia C-623 de 1999.

[55] Artículo 5 de la Ley 42 de 1993

[56] Sentencia C-716 de 2002.

ii) La ley regulará su ejercicio y los sistemas y principios aplicables para cada tipo de control.

iii) Tiene carácter excepcional, no vinculante, no implica coadministración, no versa sobre la conveniencia de las decisiones de los administradores de recursos públicos, se realizará en forma de advertencia al gestor fiscal y deberá estar incluido en un sistema general de advertencia pública.

iv) El ejercicio y la coordinación del control concomitante y preventivo corresponde exclusivamente al contralor general de la República en materias específicas[57].

v) El contralor cuenta con la atribución de advertir a los servidores públicos y particulares que administren recursos públicos de la existencia de un riesgo inminente en operaciones o procesos en ejecución, con el fin de prevenir la ocurrencia de un daño, a fin de que el gestor fiscal adopte las medidas que considere procedentes para evitar que se materialice o se extienda, y ejercer control sobre los hechos así identificados.

75. El nuevo diseño constitucional implica que el control fiscal se desarrolle en momentos previos al perfeccionamiento de los contratos y al posible daño fiscal, de forma que el objeto de este control no se hace sobre los daños sino sobre los riesgos. Su finalidad no es la reparación del daño sino su prevención a través de advertencias al gestor fiscal para que se valoren las apreciaciones de la Contraloría General de la República en punto de una actividad que esta considere como riesgosa. Es menester regular las especificidades de ese control, para que el mismo se ejerza con valoraciones objetivas, mesurables, evidenciables y no apenas sobre pálpitos, pareceres subjetivos y unilaterales o simples arbitrariedades.

76. Por su parte, en la exposición de motivos del Acto Legislativo 4 de 2019[58] se explicó la ineficiencia del control posterior y selectivo. En consecuencia, se planteó la necesidad de introducir un complemento mediante el control denominado *preventivo y concomitante.* Este funcionaría de forma adicional al control posterior y selectivo originalmente dispuesto en la Carta Política[59].

---

[57] El artículo 69 del Decreto 403 de 2020 establece: "La advertencia procederá sobre los asuntos en curso que determine el Contralor General de la República donde se identifique un riesgo inminente de pérdida de recursos públicos y/o afectación negativa de bienes o intereses patrimoniales de naturaleza pública, con base en alguno de los siguientes criterios excepcionales: a) Trascendencia social. b) Alto impacto ambiental. c) Alta connotación económica".

[58] Publicados en la Gaceta del Congreso 153 del 2019.

[59] En relación con este punto se indicó: "las exigencias sociales requieren la adaptación de las instituciones de control fiscal a las nuevas realidades de la administración de los recursos, que permitan mitigar las dificultades que actualmente se presentan para cumplir su objeto principal, esto es, la protección del recurso público en el marco de la lucha contra la corrupción. Con lo cual queda de presente que actualmente los mecanismos de control que tiene la Contraloría resultan insuficientes ya que no es posible vigilar de debida forma los recursos públicos, así como evitar que los mismos sean destinados de indebida forma, lo cual ha llevado a concluir que el poder posterior y selectivo no es una garantía plena para salvaguardar los recursos

77. En cuanto a la explicación del modelo preventivo y concomitante, la exposición de motivos comenzó por señalar que mientras el modelo anterior a la Constitución de 1991 entorpecía el ejercicio de la administración, el actual: "se queda corto en la real y efectiva protección del patrimonio público, porque por sus límites competenciales puede actuar única y exclusivamente cuando los procesos administrativos se han ejecutado, lo que muchas veces equivale a decir: cuando el daño se ha consumado". A partir de este argumento, en la exposición de motivos se explica que el nuevo modelo propuesto responde a las nuevas dinámicas de la gerencia pública y, en ese sentido, permite que las contralorías actúen en tiempo real *"esto es, que su control y vigilancia se dé en términos de efectividad y protección oportuna del patrimonio desde el momento en que el riesgo surge"[60]*.

78. Se destacó que el diseño propuesto permite a la Contraloría actuar antes de que suceda el daño porque su finalidad no es lograr la determinación de un daño ocurrido para perseguir el resarcimiento de este sino su prevención. En ese sentido, en la exposición de motivos se destacó la necesidad de empezar su actuación a partir de *"el momento en que el riesgo surge"* o *"sobre aquellos daños que son evidentes o cuya materialización es perfectamente predecible"*. Todo ello para enfatizar un tipo de control preventivo en el que se invita a la participación ciudadana[61].

79. El Decreto Ley 403 de 2020, "por el cual se dictan normas para la correcta implementación del Acto Legislativo 04 de 2019 y el fortalecimiento del control fiscal, a partir de las facultades extraordinarias le confiere el parágrafo transitorio del artículo 268 de la Constitución Política, modificado por el artículo 2º del Acto Legislativo 04 de 2019" ofrece las pautas que desarrollarían esta perspectiva del nuevo control fiscal.

80. La intención del constituyente derivado fue la de establecer un sistema basado en la anticipación y prevención del daño, a través del seguimiento de

---

del Estado. Por lo cual en la exposición de motivos se menciona que "se propone fortalecer a las Contralorías en su rol de auditoría, retroalimentado y revitalizado por el nuevo modelo preventivo y concomitante, conservando la posterioridad del control en aras de la evaluación de gestión y resultados. El actual modelo de control fiscal se sustenta en la posteridad y selectividad, esto quiere decir que los actos de la gestión fiscal ya han sido ejecutados y que no opera sobre cualquier acto de la administración sino sobre algunos que se consideren. Esto genera un problema en el control fiscal porque al ya ser ejecutado por la administración los recursos públicos, en caso de indebida destinación de los recursos, esto ya habría generado una grave afectación y la posibilidad de recuperación de los mismos no sería muy efectiva, tal y como se puede reseñar en graves casos de corrupción. En ese sentido, debemos llamar la atención que con la introducción del nuevo parámetro de control "preventivo y concomitante", la ciudadanía jugará un papel protagónico en la prevención del daño, a través de las distintas modalidades de intervención de control fiscal participativo, lo que activará de manera significativa el control micro, con miras no necesariamente a que se inicien las acciones tendientes al resarcimiento al patrimonio, sino a que se evite la configuración y materialización del daño, resultados que se verán reflejados cuantitativamente en los denominados beneficios de auditoría y en factores de medición de las entidades públicas". Gaceta del Congreso N° 195 de 2019, Pág. 19.

[60] Gaceta del Congreso N° 195 de 2019, pág. 20.

[61] *Ibídem*.

las fuentes y uso del recurso público durante todas las fases de las operaciones financieras y presupuestales. Ello implica el fortalecimiento del aparato auditor y de fiscalización, así como el incentivo a la mayor participación ciudadana en la vigilancia fiscal, en procura de evaluar e identificar los riesgos y generar las advertencias dirigidas a que el administrador tome las medidas necesarias a fin de evitar la consolidación del daño al patrimonio público.

81. De todo lo expuesto, se extrae que el Acto Legislativo 04 de 2019, modificó los siguientes aspectos:

i) El control fiscal además de ser posterior y selectivo, se podrá ejercer de manera preventiva y concomitante, según sea necesario para garantizar la defensa y protección del patrimonio público.

ii) El modelo preventivo y concomitante tiene un carácter excepcional y no puede implicar coadministración. Además, se debe realizar en tiempo real a través del seguimiento permanente de los ciclos, uso, ejecución, contratación e impacto de los recursos públicos, mediante el uso de tecnologías de la información, con la participación del control social y con la articulación del control interno.

iii) El control preventivo y concomitante se realizará en forma de advertencia y su ejercicio corresponde exclusivamente al contralor general en materias específicas.

82. En este contexto, la Sala encuentra que la intención del constituyente derivado fue complementar el sistema actual de control por considerarlo insuficiente y añadirle el modelo de control preventivo y concomitante ejercido a través del seguimiento constante y paralelo de la gestión fiscal, a partir de la función de advertencia, sin que ello implique coadministración, eliminando riesgos potenciales y daños previsibles. En tal medida se dejó claro que no se buscaba juzgar la actividad del gestor público, sino el prevenir el daño, a través de un mecanismo eficaz y legítimo para evitar que el gestor fiscal tome decisiones que vayan en contravía del erario.

83. Entonces, el control preventivo y concomitante no puede incidir en las decisiones de la administración, al punto de instituir un sistema de coadministración o cogestión, toda vez que la enmienda constitucional expresamente lo prohíbe, con lo cual se debe eliminar cualquier tipo de veto o pre-aprobación respecto de las decisiones adoptadas por los gestores de recursos públicos. Así, a través de la figura de la advertencia, se les permite identificar los riesgos que se ciernen sobre algunos proyectos para que evalúen esa situación y puedan tomar los correctivos respectivos antes de que se genere un daño al patrimonio. Finalmente, este modelo no reemplaza el control posterior y selectivo, sino que busca complementar el ejercicio del control fiscal.

84. De acuerdo con lo expuesto en la reforma constitucional, esta varió el sistema de control fiscal con el objetivo de hacerlo más eficiente, concentrando parte de su actividad en la prevención de daños sobre los cuales se establece la existencia de un riesgo, de forma que el órgano de control pueda hacer el seguimiento de los procesos de contratación en curso y señalar al gestor fiscal cuando lo vea indispensable, los eventuales riesgos para que estos no se materialicen en daños contra el patrimonio público.

85. La reforma constitucional así vista, plasma una gran preocupación mundial de estos tiempos, cual es la prevención de los riesgos de corrupción a los cuales se exponen los recursos públicos. La corrupción empobrece las naciones, y atrasa las posibilidades de desarrollo en todos los campos. De allí que puede advertirse que constituyente derivado advirtió necesaria una reforma al control fiscal, con miras al control del anotado riesgo.

**Conclusión: las variaciones al modelo de control fiscal no constituyen una sustitución a la separación de poderes como eje definitorio de la Constitución**

86. Por último, el tercer paso del silogismo dentro del juicio de sustitución exige el establecer una conclusión en donde se determine si efectivamente la reforma constitucional introducida realmente termina por sustituir la Carta Política o uno de los ejes identitarios de la misma.

87. A través del presente examen, la Corte Constitucional pudo concluir, como premisa mayor del juicio de sustitución que el diseño constitucional de la estructura del Estado y separación de poderes donde los distintos órganos interactúan entre sí en un sistema de pesos y contrapesos. Específicamente el control fiscal se erige como un instrumento propio del delicado balance constitucional, sin que la forma en que se adelante dicho control forme parte de un elemento definitorio de la Constitución.

88. Efectivamente, la separación de poderes es un eje fundamental de la Constitución. Este incluye el ejercicio de control fiscal adelantado por la Contraloría General de la República con la finalidad de proteger el patrimonio colectivo y asegurar la moralidad en todas las operaciones relacionadas con el manejo y utilización de los bienes y recursos públicos, y la eficiencia y eficacia de la administración en el cumplimiento de los fines del Estado.

89. Ahora bien, lo que se discute es si el modelo de control fiscal en sí mismo constituye tal eje identitario de la Constitución. Así, en el presente asunto, el demandante acusó una serie de expresiones de los artículos 1 y 2 del Acto Legislativo 4 de 2019 por considerar que se habían tramitado con un exceso de competencia por parte del Congreso de la República por tener la naturaleza de una sustitución parcial del eje definitorio de la Constitución de división de poderes y el control fiscal posterior.

90. Al respecto, la Sala Plena entiende que el control fiscal posterior y selectivo no es un eje de la Constitución, pues del hecho cierto de que el Constituyente decidiera abandonar un esquema de control previo, no se deriva como necesario que el control posterior y selectivo constituya un eje de la Constitución del 1991.

91. Para la Corte, el elemento definitorio de la Constitución es el modelo de separación de poderes que incluye un sistema de pesos y contra pesos, a través de instancias de control del ejercicio del poder, con particular énfasis en la lucha contra la corrupción y en la protección de los recursos y los bienes públicos.

92. Por lo tanto, el complejo entramado entre la separación de poderes y los controles recíprocos que implican la concurrencia de distintos órganos en el cumplimiento de las funciones del Estado, conlleva la existencia de diversas modalidades de control, por lo que la reforma corresponde al ejercicio propio de evolución de los controles, convirtiéndose en un modelo complementario al posterior y selectivo, con lo cual la reforma no abandona este tipo de control, simplemente se incorporan otros elementos para lograr los fines del sistema de pesos y contrapesos.

93. Como se dijo párrafos atrás, la manera como se ejerce el control fiscal posterior y selectivo no es un eje de la Constitución. El que el Constituyente derivado decidiera abandonar un esquema de control previo (Constitución de 1886), no implica que el control posterior y selectivo (Constitución de 1991) constituya, en consecuencia, un eje definitorio del ordenamiento superior. Entenderlo así, conllevaría a que este esquema fuera inmodificable, impidiendo cualquier tipo de reforma que lo hiciera más efectivo a partir de los distintos avances tecnológicos existentes, el avance de los sistemas de control de la gestión estatal de recursos públicos, las nuevas formas de corrupción, etc.

94. En este contexto, la Sala destaca la necesaria interacción entre los distintos órganos estatales, dentro del complejo de funciones que constituyen la administración como un concepto total y no apenas reducido al ejecutivo.

95. Sentado lo anterior, la Corte considera indispensable destacar que el Acto Legislativo 4 de 2019 se cuidó de advertir que el control preventivo y concomitante: (i) no implicará coadministración; (ii) se realizará en tiempo real a través del seguimiento permanente de los ciclos, uso, ejecución, contratación e impacto de los recursos públicos; (iii) mediante el uso de tecnologías de la información; (iv) con la participación activa del control social y con la articulación del control interno; (v) con carácter excepcional no vinculante; (vi) sin que pueda versar sobre la conveniencia de las decisiones de los administradores de recursos públicos y finalmente (vii) realizándose en forma de advertencia al gestor fiscal, cuyo ejercicio y

coordinación corresponde exclusivamente al contralor general de la República en materias específicas.

96.  En tal medida, para la Sala es evidente que cuando la Constitución prescribe que el control también será concomitante y preventivo, este debe ser entendido como un control anterior. En tal medida, no se discute que el control previo de la Carta de 1886 resultó fallido, sin embargo, eso no implica que el control preventivo y concomitante cuente con los mismos vicios de aquel.

97.  Entonces, el control concomitante y preventivo establecido por medio del Acto Legislativo 4 de 2019, de acuerdo con lo expresamente señalado en la norma constitucional, no implica ni puede implicar en manera alguna, coadministración. Esto quiere decir que abandona cualquier tipo de poder de veto o pre-aprobación por parte del organismo de control. Además, el control es excepcional y se ejerce ante la existencia de un riesgo inminente para prevenir un daño. A su vez, la advertencia no obliga a los gestores de los recursos públicos, como ocurría con el control previo vigente en la Carta Política de 1886, el cual era general, vinculante y significaba intromisiones directas en la gestión de la Administración.

98. Para la Corte es importante dejar sentadas las profundas diferencias que existen entre el entre control previo (Constitución de 1886) y control concomitante y preventivo (Acto Legislativo 4 de 2019), como se explica en el siguiente cuadro.

| Control previo | Control concomitante y preventivo |
|---|---|
| En el trámite previo a la celebración del contrato debía asistir un representante de la Contraloría General, de manera que, si tenía observaciones sobre el mismo, no era posible contratar hasta tanto la Contraloría no se hubiere pronunciado y se reestudiara el asunto (Decreto 925 de 1976 art. 5). | El control "preventivo y concomitante" tiene carácter excepcional, no vinculante, no implica coadministración, no versa sobre la conveniencia de las decisiones de los administradores de recursos públicos. |
| La contratación estatal estaba sometida al visto bueno del Contralor (Decreto 911 de 1932 art. 9, Ley 20 de 1975 art. 9). | El control preventivo y concomitante se ejerce de forma paralela, a través de advertencias al gestor fiscal, sin que las mismas resulten vinculantes. |

99.  El anterior esquema muestra que el control concomitante o preventivo en manera alguna paraliza la actividad administrativa. Además, este no resulta vinculante para la contratación y mucho menos entorpece la actividad de la

administración, pues su ejercicio se materializa a través de la figura de la advertencia, la cual permite que la actuación del gestor continúe. Ahora bien, para que el fin propuesto evidentemente se materialice, esto es, que el control concomitante y preventivo no se desdibuje al punto que llegue a convertirse en una suerte de control previo camuflado, debe respetar como mínimo las siguientes condiciones:

i) La advertencia permite que el gestor continúe su actividad sin que constituya un prejuzgamiento. No se trata de definir cómo y en qué ejecutar los recursos, sino de indicar a la administración cuándo se puede llegar a materializar un daño. En efecto, en la demanda subyace la idea de cuan nefasta sería para un gran cúmulo de actividades, una *coadministración* disfrazada de control preventivo. Y ello por cuanto un considerable número de actividades propias del ámbito privado puede ser también desempeñada por entidades estatales (establecimientos públicos, sociedades de economía mixta, empresas de servicios públicos domiciliarios oficiales o mixtas), con lo cual posibilitar la injerencia en el libre desarrollo del objeto empresarial de estas últimas, terminaría exponiendo su propia existencia, pues, mientras en el ámbito privado la libre iniciativa gobierna su actuar, en los entes públicos un tercero – la contraloría—tendría capacidad de direccionar el libre discurrir empresarial, lo cual de suyo sería una gran desventaja en frente de sus pares privados.

Debe por ello llamarse la atención en la necesidad de que se diseñen especiales y especificas formas de ejercicio del control preventivo en tales entidades, esto es, en aquellas que desarrollan su objeto en espacios de competitividad.

ii) En relación con las empresas de economía mixta, la reforma debe ser entendida de modo tal que no paralice la actividad administrativa, no implique un prejuzgamiento, ni termine por afectar el adecuado desarrollo de las actividades de las empresas del Estado. En efecto el control fiscal debe atender en estos casos la actividad específica que cumple la entidad, los eventos concretos y determinados que justificarían en su día la injerencia, la forma de evaluar la actividad, por ejemplo, integrando el contexto del mercado a nivel local e internacional, el análisis de procesos completos cuando se trata de actividades complejas o, al contrario, por pasos o niveles de desarrollo.

iii) Se debe garantizar la autonomía territorial. El eventual ejercicio de la intervención funcional se debe realizar en el marco del respeto por la autonomía territorial.

iv) Se debe separar adecuadamente las funciones de prevención, investigación y sanción, como una garantía al debido proceso. Asimismo, el grado de relevancia que tiene en esa función el control interno de las organizaciones, e incluso la inter actuación posible con otras formas de control (*vgrt.* procuraduría, fiscalía y superintendencias). El debido proceso aludido renglones atrás puede llegar incluso a la necesidad de estandarizar las formas

de ejercer el control preventivo, incluso discriminando las actividades objeto del dicho control y sus especificidades, de tal manera que no puede tratarse de control sobre el cual no existan unas claras reglas de juego.

100. Estos lineamientos permiten a la Corte entender que, el manejo adecuado de este nuevo modelo constituye una garantía de protección de los recursos públicos que finalmente se materializa en una forma de satisfacer los derechos de todo el conglomerado social. Para ello se hace necesario contar con todas las herramientas disponibles en procura de alcanzar el fin propuesto, como lo son las metodologías e instrumentos de gestión inteligente de la información, se base en la analítica de datos, la inteligencia artificial u otros instrumentos técnicos o tecnológicos aplicables durante los ciclos de uso, ejecución, contratación e impacto de los recursos públicos. Lo anterior, a fin de identificar eventos, riesgos o malas prácticas de gestión y advertir sobre la eventual ocurrencia de daños al patrimonio público, a partir de modelos de anticipación o pronóstico.

101. En este sentido, la enmienda constitucional busca fortalecer el control fiscal en Colombia, de acuerdo con los nuevos retos, las nuevas formas de corrupción y el desarrollo de nuevas tecnologías de la información.

102. En tales condiciones, la Corte concluye que el Acto Legislativo 4 de 2019 no sustituye la Constitución, por cuanto el establecimiento de un novísimo sistema de control fiscal -como el examinado- no constituye *per se* una afectación al principio de separación de poderes tanto más si la propia norma constitucional examinada justamente establece los límites de no coadministración.

103. En atención a lo expuesto, las expresiones demandadas del Acto Legislativo 4 de 2019, que incluyeron el control concomitante y preventivo, y la función de advertencia para su implementación, serán declaradas exequibles.

## VII.  Decisión

En mérito de lo expuesto, la Sala Plena de la Corte Constitucional administrando justicia en nombre del pueblo y por mandato de la Constitución,

### RESUELVE:

**Primero.-** En cumplimiento de lo dispuesto en el artículo 1 del Decreto Legislativo 469 de 2020, levantar la suspensión de términos en el presente proceso.

**Segundo.-** Declarar EXEQUIBLES las expresiones demandadas del artículo 1º y el numeral 13 del artículo 2º del Acto Legislativo 4 de 2019, por los cargos analizados en esta sentencia.

Notifíquese y cúmplase.

ALBERTO ROJAS RÍOS
Presidente

CARLOS BERNAL PULIDO
Magistrado

DIANA FAJARDO RIVERA
Magistrada
*Con aclaración de voto*

LUIS GUILLERMO GUERRERO PÉREZ
Magistrado

ALEJANDRO LINARES CANTILLO
Magistrado
*Con aclaración de voto*

ANTONIO JOSÉ LIZARAZO OCAMPO
Magistrado
*Con aclaración de voto*

GLORIA STELLA ORTIZ DELGADO
Magistrada

CRISTINA PARDO SCHLESINGER

Magistrada
*Con salvamento de voto*


JOSÉ FERNANDO REYES CUARTAS
Magistrado


MARTHA VICTORIA SÁCHICA MÉNDEZ
Secretaria General

**SALVAMENTO DE VOTO DE LA MAGISTRADA
CRISTINA PARDO SCHLESINGER
A LA SENTENCIA C-140/20**

Referencia: expediente D-13.517

Demanda de inconstitucionalidad contra los artículos 1 (parcial) y 2 (parcial) del Acto Legislativo 4 de 2019 "Por medio del cual se reforma el Régimen de Control Fiscal".

Magistrado ponente:
José Fernando Reyes Cuartas

Con el acostumbrado respeto por las decisiones de la Sala, salvo mi voto en el asunto de la referencia, por las razones que se exponen a continuación:

Las normas demandadas del Acto Legislativo 4 de 2020, configuraban una sustitución de la Constitución Política que ha debido conducir a declarar su inexequibilidad. Considero que el modelo previo y concomitante de control fiscal a cargo de la Contraloría General de la República establecido por el Acto Legislativo 04 de 2019 genera una sustitución parcial y permanente del eje axial de la Carta Política de separación de poderes, por cuanto permite que, a través de las competencias de policía judicial y recaudo de información sobre procesos en desarrollo, el órgano de control se inmiscuya en las funciones administrativas que son propias de las entidades vigiladas y a través de la función de advertencia, intervenga en la decisión del administrador, usurpando su autonomía y afectando la independencia que la misma Contraloría debe tener para el inicio de los juicios fiscales que puedan darse eventualmente.

Estimo que las competencias atribuidas al órgano de control, tanto para exigir información de las entidades, como para ejercer atribuciones de policía judicial, resultan desbordadas cuando se desarrollan en el modelo de control concomitante y preventivo, no solo porque se ejercen sobre el desarrollo de procesos de gestión fiscal en cualquier etapa en que se encuentren - incluso desde las fases de planeación o preparatorias- sin una razón cierta y verificable, sino porque tienen como objetivo servir de insumos a la función de advertencia, dirigida a que el funcionario "adopte las medidas" esto es, que cambie las decisiones y acciones que estaba adelantando sobre gestión de los recursos de su entidad. De esta manera, el modelo de control fiscal concomitante y preventivo establecido por las expresiones demandadas en el Acto Legislativo 04 de 2017 se convierte en una amenaza a la autonomía funcional de las entidades en el manejo de sus recursos, puesto que permite a

49

la Contraloría General realizar injerencias en los procesos y las decisiones propias del gestor fiscal, basándose en un criterio subjetivo e indeterminado como lo es el "riesgo inminente".

Considero que la división funcional, que garantiza la autonomía e independencia de las entidades para el ejercicio de las competencias y decisiones que les son atribuidas, se desdibuja con el control preventivo y concomitante diseñado por la reforma, y en cambio, se establece una concentración de poder en el órgano de control que ya no ejerce su función sobre los resultados, sino que puede intervenir y participar, a través de advertencias, en la gestión de los recursos públicos que le corresponde a las demás entidades del Estado. La Carta Política, que fue diseñada buscando guardar celosamente el equilibrio entre los órganos que implementan el poder del Estado, y que por ello estructuró un modelo de control que solo se ejerciera sobre los resultados de la gestión resguardando las competencias de cada una de las entidades, se sustituyó por otra, al menos parcialmente,[62] cuando se permite que un órgano de control pueda intervenir en las decisiones que son propias de cada autoridad.

Por lo tanto, las expresiones demandadas del Acto Legislativo 04 de 2019, que consagran el control previo y concomitante, y la función de advertencia para su implementación, debieron ser declaradas inexequibles.

En los términos anteriores dejo expresadas las razones de mi discrepancia.

Fecha *ut supra*,


CRISTINA PARDO SCHLESINGER
Magistrada


---

[62] El principio de separación de poderes en su dimensión de separación funcional no queda totalmente sustituido porque no afecta la división de funciones de las tres ramas principales del poder público, sin que las funciones judicial o legislativa puedan verse afectadas. Pero la concentración de poder administrativo en un órgano de control genera un desequilibrio del poder, que sustituye una parte importante del principio, haciendo irreconocible el modelo constitucional fijado por el constituyente primario.

**ACLARACIÓN DE VOTO DE LA MAGISTRADA**
**DIANA FAJARDO RIVERA**
**A LA SENTENCIA C-140/20**

Referencia: Expediente D-13517

Demanda de inconstitucionalidad contra los artículos 1 (parcial) y 2 (parcial) del Acto Legislativo 4 de 2019 *"Por medio del cual se reforma el Régimen de Control Fiscal"*.

Magistrado ponente:
José Fernando Reyes Cuartas

1. Con el acostumbrado respeto por las decisiones de la Corte, procedo a aclarar mi voto respecto de la Sentencia C-140 de 2019.[63] La providencia resolvió declarar exequible las expresiones demandadas del artículo 1º y el numeral 13 del artículo 2º del Acto Legislativo 4 de 2019, *"Por medio del cual se reforma el Régimen de Control Fiscal"*. Si bien comparto la decisión, aclaro mi voto en relación con el análisis que hace la sentencia de la aptitud sustantiva de la demanda, en particular, en lo referente a la premisa mayor y a la premisa menor del juicio de sustitución.

2. La Sentencia C-140 de 2019 señala que el demandante construye la premisa mayor sobre dos ejes definitorios de la Constitución que considera sustituidos con las normas demandas: la separación de poderes y el control fiscal posterior y selectivo. Sobre este último señala la sentencia que, en el acápite b de la demanda, *"el accionante desarrolla el carácter de eje definitorio de la Constitución del modelo de control posterior y selectivo para lo cual se sustenta, en un análisis histórico y sistemático de la Carta"*, por lo que concluye que en este punto los argumentos cumplen con los criterios de *pertinencia* y *suficiencia*. Sin embargo, aunque coincido con la sentencia en que la demanda desarrolla de manera clara y articulada el principio de separación de poderes como un pilar constitucional fundamental, no sucede lo mismo con el control fiscal posterior y selectivo. A pesar de que el actor afirma que la separación de poderes y el control fiscal posterior y selectivo son pilares esenciales de la Constitución Política de 1991, al exponer los argumentos sobre este último señala que es una *"manifestación de la separación de poderes y pilar esencial del control fiscal"*. Al respecto, la demanda concluye: *"la noción de control fiscal como posterior y selectivo se erige en componente del principio de separación de poderes en una materia especifica, el cual garantiza la independencia y autonomía entre el Ejecutivo*

---

[63] M.P. José Fernando Reyes Cuartas.

*y el órgano de control mismo. De ahí deviene que sea un pilar especial esencial de la Constitución Política de 1991, bajo el amparo de la ya extensamente reconocida separación de poderes como eje definitorio del sistema constitucional colombiano".* En consecuencia, en la sentencia se debió advertir que la demanda no logra estructurar el control fiscal posterior y selectivo como un eje definitorio de la Constitución con independencia del principio de separación de poderes, sino, por el contrario, atado a este último, o como lo sostiene el propio demandante, como una manifestación de dicho principio.

3. De otra parte, en relación con el desarrollo de la premisa menor efectuado en la demanda, la Sentencia C-140 de 2019 indica: *"la construcción de la premisa menor del cargo se realizó con fundamento en el objeto y el alcance del modelo de control preventivo y concomitante dispuesto en las expresiones acusadas a la luz de la exposición de motivos del proyecto, y de las competencias que el mismo Acto Legislativo le confiere al contralor general de la República para el desarrollo de sus funciones,*[64] *en particular de la función de advertencia"*, por lo que la argumentación del accionante resulta *pertinente* y *suficiente.* Considero que, si se tiene en cuenta que dicha premisa está conformada por los elementos novedosos y diferentes que el acto legislativo acusado introdujo en la arquitectura constitucional, el demandante debió examinar en este punto el Sistema de Control Interno como parte integrante del modelo de vigilancia fiscal y el impacto que tendrían sobre éste las normas acusadas, y no centrar el análisis únicamente en las competencias que éstas le otorgan al Contralor General de la República.

4. En efecto, el Sistema de Control Interno de las diferentes entidades públicas se articula con el control fiscal externo que realiza la Contraloría General de la República, pues las oficinas de control interno efectúan una tarea de prevención al realizar procesos de auditoria y actividades de seguimiento que facilitan la generación de alertas a la administración. El artículo 2° de la Ley 87 de 1993, *"Por la cual se establecen normas para el ejercicio del control interno en las entidades y organismos del Estado y se dictan otras disposiciones",* señala que uno de los objetivos del Sistema de Control Interno es el de *"[p]roteger los recursos de la organización, buscando su adecuada administración ante posibles riesgos que los afecten."*

5. Por lo tanto, al impactar el Acto Legislativo 4 de 2019 todo el modelo de control fiscal, la Sentencia C-140 de 2019 debió haber considerado este aspecto en el análisis de la aptitud sustantiva de la demanda, pues el modelo vigente hasta la reforma constitucional, tal como lo advierte la propia sentencia, es *"complementario entre las dos modalidades de control, la externa que asume la Contraloría General de la República, la Auditoría General de la República y las contralorías municipales y, la interna y previa*

---

[64] El accionante construye sus argumentos sobre el alcance de este modelo teniendo en consideración el inciso 4° del artículo 267 y los numeral 16 y 17 del artículo 268 de la Constitución Política, tal como fueron reformados por el Acto Legislativo 04 de 2019.

*desplegada por cada entidad en el marco de su actividad administrativa."* Así entonces, al introducirse el denominado control preventivo y concomitante a través del acto legislativo demandado, la premisa menor de la demanda debió dar cuenta, no solamente del impacto que este nuevo tipo de control fiscal tiene sobre el control externo realizado por la Contraloría General de la República, sino también sobre el control interno que realizan las propias entidades públicas. Este tipo de control se caracteriza por enfocarse en la prevención a través de alertas a la administración, cumpliendo entonces una función semejante a la que se propone con el control fiscal preventivo y concomitante, pues este nuevo esquema de control, al igual que el control interno, no se enfoca en los daños sino en los riesgos y su finalidad no es la reparación del daño sino su prevención. Solo de esta manera podría considerarse que el estudio del objeto y alcance del modelo de control preventivo y concomitante, desarrollado en la premisa menor, se realizó de manera integral y coherente a partir del impacto que éste tuvo sobre el modelo de control fiscal en su conjunto.

En estos términos dejo plasmadas las razones por las cuales aclaro el voto en la presente decisión.


Fecha *ut supra.*



DIANA FAJARDO RIVERA
Magistrada

**ACLARACIÓN DE VOTO DEL MAGISTRADO
ALEJANDRO LINARES CANTILLO
A LA SENTENCIA C-140/20**

Referencia: Expediente D-13517

Demanda de inconstitucionalidad contra los artículos 1 (parcial) y 2 (parcial) del Acto Legislativo 4 de 2019 "*Por medio del cual se reforma el Régimen de Control Fiscal*".

Magistrado Ponente:
José Fernando Reyes Cuartas

Con el acostumbrado respeto por las decisiones de esta Corte, si bien comparto su parte resolutiva, considero pertinente aclarar mi voto en relación con la fundamentación y uso de la doctrina de la sustitución de la Constitución. Si bien la ponencia original de la magistrada Cristina Pardo venía declarando la inexequibilidad parcial del Acto Legislativo 4 de 2019, "*Por medio del cual se reforma el Régimen de Control Fiscal*", no estuve de acuerdo con dicha ponencia por razones de respeto con el poder de reforma del Congreso de la República. Es una reforma inconveniente, que *puede revivir el control previo y la coadministración de la Contraloría* ejercidos antes de la Carta de 1991, pero considero que la Corte Constitucional debe ser especialmente estricta en la admisión de las demandas contra reformas constitucionales que se basan en el uso de esta importante doctrina, la cual permite a la Corte Constitucional revisar el poder de reforma de la Carta. En efecto, considero que en el caso concreto la demanda adolecía de ineptitud, como expondré en detalle a continuación.

**A. Sobre la admisión de demandas de constitucionalidad contra reformas constitucionales, y la ineptitud de la demanda en este caso**

1. *La demanda carecía de certeza*: La demanda se construyó sobre supuestos que no se derivan del texto del acto legislativo, sino de suposiciones construidas por parte del accionante, a partir de una lectura subjetiva y parcial de las normas. En efecto, el accionante sostenía que (i) el control preventivo y concomitante equivale a un control previo, sin realizar un análisis claro que lo llevara a tal demostración, de cara a la argumentación de premisa mayor y el entendimiento del eje axial de la Constitución; y (ii) las funciones de advertencia significarán un mecanismo de coadministración por parte de la

Contraloría, con afirmaciones que no soporta en el texto del acto legislativo, sino en meras suposiciones.

2.    *La demanda carecía de pertinencia*: Al revisar la demanda, muchos - sino la mayoría- de los argumentos planteados por el demandante, se referían a la conveniencia de la reforma, sin presentar argumentos que permitan evidenciar si con la misma se sustituyó o modificó algún eje axial de la Constitución. Los argumentos sobre el eje supuestamente sustituido no evidenciaban un análisis de múltiples referentes normativos como lo exige la jurisprudencia de esta Corte, sino que de nuevo se limitaban a la conveniencia frente a los artículos 267 y 268 de la Constitución.

3.    *La demanda carecía de especificidad*: en tratándose de demandas de sustitución de la Constitución, el accionante debe identificar las razones y cuáles serían los ejes constitucionales impactados, y cómo el acto legislativo los estaría reemplazando. Así, aunque el accionante alegaba que existen dos ejes constitucionales que estarían siendo reemplazados: separación de poderes y el control posterior y selectivo, su argumentación se centraba en la separación de poderes y no logró establecer cómo dichas características del control fiscal (posterior y selectivo) serían definitorias de la Constitución de 1991. En el examen de aptitud de la demanda, el proyecto sostiene que dicho trabajo le corresponde a la Corte Constitucional cuando, en realidad, es posible relajar la exigencia cuando se trata de un eje ya reconocido previamente por la jurisprudencia, pero este no pareciera ser el caso del control fiscal posterior y selectivo, que nunca había sido examinado en un juicio de sustitución de la Constitución. La carencia de especificidad de la demanda se evidenciaba porque el demandante no logró construir adecuadamente la premisa mayor, ya que, en nombre de la separación de poderes, pretendía afirmar que el artículo 267 de la Carta es un eje de la Constitución.

### B.    Sobre la fundamentación y uso de la doctrina de sustitución de la Constitución

4.    Finalmente, con el debido respeto por la jurisprudencia de esta Corte, reitero mi postura crítica frente a la fundamentación y uso de la doctrina de la sustitución de la Constitución[65]. La Corte Constitucional mediante la sentencia C-551 de 2003, introdujo la teoría del control de constitucionalidad por vicios de competencia como una modalidad de los vicios de procedimiento de los actos legislativos que, como tal, se encuentran sujetos al control establecido en

---

[65] Al respecto, reitero el salvamento a la sentencia C-285 de 2016, que se refiere específicamente al uso de la doctrina de la sustitución en asuntos de diseño institucional. También ver mis salvamentos y aclaraciones a las sentencias C-084 de 2016; C-261 de 2016; C-699 de 2016, y a la sentencia C-332 de 2017.

el numeral 1º del artículo 241 de la Constitución. No obstante, a pesar de haber pasado varios años y aplicar esta teoría en varias ocasiones, la metodología para el análisis de este vicio, denominado "*juicio de sustitución*", sigue siendo un concepto complejo, inacabado e incompleto, que por tal razón debe ser usado con especial prudencia y auto restricción (*self-restraint*) en aras de no convertir un control estrictamente jurídico en un control político o de conveniencia.

5.    Como lo he señalado anteriormente, el concepto de sustitución de la Constitución resulta problemático en la medida en que (i) afecta gravemente el principio democrático; (ii) vulnera la atribución expresa asignada al Congreso para reformar la Constitución a través de actos legislativos; (iii) desconoce que la aprobación de los actos legislativos está revestida de un trámite calificado que tiene por finalidad asegurar procesos de deliberación y consenso adecuados; y (iv) atribuye a la Corte Constitucional un poder excesivo, discrecional y exento de control, que no se desprende del artículo 241 de la Constitución y que la convierte en una instancia adicional del procedimiento de reforma. Adicionalmente, considero que (i) el juicio de sustitución de la Constitución puede resultar en un control material de los actos legislativos, para el cual la Corte Constitucional carece de competencia; (ii) la construcción del concepto de "eje definitorio" de la Constitución resulta problemático y nuevamente podría conllevar a que se desnaturalice el carácter jurídico del control de constitucionalidad; (iii) la metodología de aplicación del mencionado "juicio de sustitución" puede incurrir en la falacia de petición de principio; y (iv) la aplicación de dicho juicio puede conllevar a la petrificación del sistema constitucional. Todo lo anterior, reafirma mi posición respecto del mencionado juicio de sustitución, el cual demanda un uso restringido, excepcionalísimo y prudente.

6.    Así, no le corresponde a la Corte Constitucional ejercer un 'juicio de sustitución' donde se confundan diseños institucionales específicos con los ejes definitorios de la Constitución, como tampoco hacer un análisis de la conveniencia que puede traer el cambio en un diseño institucional adoptado por la Constitución. En una democracia constitucional, que carece de limites sustanciales explícitos al poder de reforma constitucional, corresponde a esta Corte revisar el cumplimiento del procedimiento previsto y la necesaria deliberación, pero el juicio sobre la conveniencia o necesidad de la reforma es algo que corresponde en últimas, a los ciudadanos o a sus representantes.

En los términos anteriores dejo consignada mi aclaración de voto, respecto de la decisión adoptada por la mayoría de la Sala Plena.

Fecha *ut supra*,

ALEJANDRO LINARES CANTILLO
Magistrado

# English Translation
# of Exhibit 26

**Judgment C-140/20**

**CLAIM OF UNCONSTITUTIONALITY AGAINST ACT LEGISLATIVE BY MEANS OF WHICH THE** FISCAL **CONTROL REGIME** - Enforceable

**CLAIM OF UNCONSTITUTIONALITY AGAINST ACT REFORMATORY OF THE CONSTITUTION FOR DEFECTS OF JURISDICTION - Conditions** and requirements required for the Court Constitutional Court may issue a substantive ruling

**CLAIM FOR UNCONSTITUTIONALITY OF ACT REFORMATORY OF THE CONSTITUTION-Charges** must be clear, certain, specific, pertinent and sufficient/DEMAND **OF UNCONSTITUTIONALITY                    OF                    REFORM CONSTITUTIONAL BY SUBSTITUTION OF THE CONSTITUTION-** Argumentative burden increases

*Any claim of unconstitutionality requires citizens to substantiate their claim based on clear, certain, specific, pertinent, and sufficient reasons. However, when the claim is directed against a constitutional amendment approved by Congress, "the argumentative burden increases considerably" given "the magnitude of the claim, the significance of the Court's decision, the commitment to democratic principles, and the very nature of the provisions being compared."*

**CLAIM OF UNCONSTITUTIONALITY AGAINST ACTS REFORMATORIES BY REPLACEMENT OF THE CONSTITUTION-Compliance** with minimum argumentative burden

*(…) the claim for the substitution trial must: i) state the defining axis of the Constitution that has allegedly been replaced and indicate the constitutional provisions from which it is derived or the jurisprudential precedent in which it has been recognized, with respect to which it must be clear that it is not a question of a contradiction with a norm of the Constitution (judgment of constitutionality) but of the affectation of a transversal and defining principle of the Political Charter; ii) explain how the legislative act impacts the defining axis, identifying the differences between them and, iii) explain why the modifications introduced by the reform can be considered a transformation in the identity of the Constitution so that it, after the reform, is completely different.*

**CLAIM OF UNCONSTITUTIONALITY AGAINST ACTS**

**REFORMATORY OF THE CONSTITUTION-Jurisdiction** of the
Constitutional Court

**POWER TO REFORM THE CONSTITUTION - Limits**

**TRIAL OF REPLACEMENT OF THE CONSTITUTION-**
Features

**TRIAL OF SUBSTITUTION OF THE CONSTITUTION-** It is not a trial of intangibility/TRIAL

**OF SUBSTITUTION OF THE**

**CONSTITUTION-** It is not a judgment of material control/JUDGMENT **OF**

**REPLACEMENT OF THE** CONSTITUTION-Object/JUDGMENT **OF**

**REPLACEMENT OF THE CONSTITUTION - Elements** and stages

**SUBSTITUTION TRIAL OR TEST - Major premise/PREMIS**
**MAJOR JUDGMENT OR** SUBSTITUTION TEST - Identification of the defining, axial or

essential element that gives identity to the
Constitution

**SUBSTITUTION TRIAL OR TEST - Minor premise/PREMIS**
**MINOR OF THE TRIAL OR SUBSTITUTION TEST - Definition** of the scope of the

accused norm versus the defining axis of the Constitution

**SUBSTITUTION TRIAL OR TEST - Conclusion** when the challenged provision has
replaced the Political Charter

**PRINCIPLE OF SEPARATION OF** POWERS-Defining element of the 1991 Constitution /
**PRINCIPLE OF**

**SEPARATION OF** POWERS - Content and scope

**PRINCIPLE OF SEPARATION OF** POWERS-Constitutional Jurisprudence/PRINCIPLE
**OF SEPARATION OF POWERS-**

It constitutes a transversal principle of the constitutional text, not susceptible to being
suppressed or replaced by Congress through a legislative act/PRINCIPLE **OF SEPARATION**
**OF POWERS-**
Features

*Constitutional jurisprudence has repeatedly recognized that the principle of separation of powers*
*is a defining principle of the Political Constitution.*
*Consequently, it cannot be suppressed or replaced by the derived constituent, since political power*
*must be limited in order to avoid its abuse.*

**AUTONOMY AND INDEPENDENCE OF THE BODIES OF THE**
STATE-Essential assumption of the separation of powers

*The Court has explained that autonomy and independence are essential prerequisites for the separation of powers, not only because they guarantee the specialization of public administration, but especially because they prevent the formation of all-encompassing powers that jeopardize citizens' rights and freedoms. This autonomy and independence are not incompatible with the implementation of mechanisms that allow for reciprocal oversight or with harmonious inter-institutional cooperation.*

**PRINCIPLE OF SEPARATION OF POWERS AND HARMONIC COLLABORATION**-Scope

**COMPTROLLER GENERAL OF THE** REPUBLIC - Competition

**COMPTROLLER GENERAL OF THE** REPUBLIC - Legal nature

*(…) the Court has emphasized that the Comptroller General of the Republic is a state oversight body with specific powers, which horizontally, collaboratively, and harmoniously accompanies the traditional branches of public power, through a specialized and autonomous function by which it inspects the external fiscal activity of all state institutions from a financial, management, and results perspective.*

FISCAL **CONTROL** -Purpose

*(…) has been recognized by the Court as an effective and suitable tool for the protection of public assets, through (i) the verification of the correct management of public resources and (ii) establishing whether, in the exercise of the management of collective resources, the rules that subject the administration in terms of legality are complied with and compliance with the constitutional and missionary purposes of each of the entities is ensured.*

**FISCAL CONTROL IN THE CONSTITUTION OF 1991-**
Constitutional Jurisprudence/ **FISCAL CONTROL** SYSTEM **PREVIOUSLY OPERATING UNDER THE FRAMEWORK PREVIOUS CONSTITUTIONAL AND REASONS FOR THE CONSTITUENT ASSEMBLY TO CHOOSE CONTROL OF A POSTERIOR, SELECTIVE, BROAD AND CHARACTER**
INTEGRAL-Differences/ FISCAL CONTROL-Transformations in the constitutional model/ **FISCAL CONTROL OF THE COMPTROLLER GENERAL OF THE** REPUBLIC - Subsequent, selective and comprehensive

FISCAL **CONTROL** - **Broad nature/FISCAL CONTROL** -Comprehensive nature/ FISCAL CONTROL-Complementary/ **FISCAL** CONTROL-Subsequent character/ FISCAL CONTROL-Selective character

**PREVENTIVE AND CONCOMITANT FISCAL CONTROL-**
Purpose

*(…) The Court finds that the intention of the derived constituent was to complement the current control system, considering it insufficient, and to add to it the preventive and concomitant control model exercised through constant and parallel monitoring of fiscal management, based on the warning function, without implying co-administration, eliminating potential risks and foreseeable damages. To this extent, it was made clear that the aim was not to judge the activity of the public manager, but rather to prevent damage, through an effective and legitimate mechanism to prevent the fiscal manager from making decisions that go against the public treasury.*

FISCAL **CONTROL** - Preventive and concomitant nature

*The preventive and concomitant model is exceptional and cannot involve co-administration. Furthermore, it must be implemented in real time through ongoing monitoring of the cycles, use, execution, procurement, and impact of public resources, using information technologies, with the participation of social oversight, and with the coordination of internal control.*

**PREVENTIVE AND CONCOMITANT FISCAL CONTROL-**
Scope

*Preventive and concomitant control cannot influence administrative decisions to the point of establishing a system of co-administration or co-management, since the constitutional amendment expressly prohibits it. Therefore, any type of veto or pre-approval regarding decisions made by public resource managers must be eliminated. Thus, through the concept of a warning, they are allowed to identify the risks looming over some projects so they can assess the situation and take appropriate corrective measures before any damage is caused to assets. Finally, this model does not replace ex post and selective control, but rather seeks to complement the exercise of fiscal control.*

FISCAL **CONTROL** -Post and selective

**SUBSEQUENT AND SELECTIVE FISCAL CONTROL -** It is not a defining axis of the Constitution

*(…) the manner in which subsequent and selective fiscal control is exercised is not a cornerstone of the Constitution. The fact that the resulting Constituent Assembly decided to abandon a prior control scheme (Constitution of 1886) does not imply that subsequent and selective control (Constitution of 1991) constitutes, consequently, a defining cornerstone of the higher order. Understanding it this way,*

*This would lead to this scheme being unchangeable, preventing any type of reform that would make it more effective based on the various existing technological advances, the advancement of control systems for the management of public resources, new forms of corruption, etc.*

**PREVENTIVE AND CONCOMITANT FISCAL CONTROL-** Features

**PRIOR FISCAL CONTROL and PREVENTIVE CONTROL AND CONCOMITANT-Differences**

**REFORM TO THE FISCAL CONTROL REGIME** -Purpose

*The constitutional amendment seeks to strengthen fiscal control in Colombia, in accordance with new challenges, new forms of corruption, and the development of new information technologies.*

Reference: File D-13517

Claim of unconstitutionality against articles 1 (partial) and 2 (partial) of Legislative Act 4 of 2019 *"By means of which the Fiscal Control Regime is reformed."*

Reporting Judge:
JOSE FERNANDO REYES CUARTAS

Bogotá, DC, May six (6), two thousand twenty (2020).

The Plenary Chamber of the Constitutional Court, in exercise of its constitutional powers and in compliance with the requirements and procedures established in Decree 2067 of 1991, has issued this,

## JUDGMENT
### I.    Background

In the exercise of the public action of unconstitutionality, the citizen Yefferson Mauricio Dueñas Gómez challenged Articles 1 (partial) and 2 (partial) of Legislative Act 4 of 2019, "By means of which the Fiscal Control Regime is reformed," considering that these constitute a replacement of two essential pillars of the Political Constitution: the separation of powers and subsequent and selective fiscal control.

## II. Standard requested

The text of the challenged rule, as published in Official Gazette No. 51,080 of September 18, 2019, is as follows:

### "LEGISLATIVE ACT 4 OF 2019

By means of which the Fiscal Control Regime is reformed.

### THE CONGRESS OF COLOMBIA
### DECREE:

**ARTICLE 1.** Article 267 of the Colombian Political Constitution shall be as follows:

"Article 267. Fiscal oversight and control are a public function exercised by the Office of the Comptroller General of the Republic, which oversees the fiscal management of the administration and of individuals or entities that manage public funds or assets, at all administrative levels and with respect to all types of public resources. The law shall regulate the exercise of powers between comptroller general offices, in observance of the principles of coordination, concurrence, and subsidiarity. The control exercised by the Office of the Comptroller General of the Republic shall be preferential under the terms defined by law.

Fiscal oversight will be exercised ex post and selectively, **and may also be** preventive and concomitant, as necessary to guarantee the defense and protection of public assets. **Preventive and concomitant oversight will not involve co-management** and will be carried out in real time through ongoing monitoring of the cycles, use, execution, procurement, and impact of public resources, using information technologies, with the active participation of social oversight, and with the coordination of internal oversight. The law will regulate its exercise and the systems and principles applicable to each type of oversight.

Concomitant and preventive control is exceptional, non-binding, does not imply co-administration, does not address the appropriateness of decisions made by public resource administrators, and is carried out in the form of a warning to the fiscal manager and must be included in a general public warning system. The exercise and coordination of concomitant and preventive control is the exclusive responsibility of the Comptroller General of the Republic in specific matters.

The surveillance of the State's fiscal management includes the permanent monitoring of public resources, without the possibility of legal reserve for access to information by the fiscal control bodies, and the

Financial, management, and results-based control, based on efficiency, economy, equity, sustainable development, and compliance with the principle of environmental cost assessment. The Comptroller General of the Republic shall have overriding authority to exercise control over the management of any territorial entity, in accordance with the provisions of the law.

Jurisdictional review of fiscal liability rulings will enjoy special procedural stages and terms to ensure the timely recovery of public resources. The process may not exceed
to one year in the manner regulated by law.

The Comptroller's Office is a technical entity with administrative and budgetary autonomy. It shall have no administrative functions other than those inherent to its own organization and the fulfillment of its constitutional mission.

The Comptroller shall be elected by the full Congress, by an absolute majority, during the first month of its sessions for a term equal to that of the President of the Republic, from a list of eligible candidates drawn up by public notice based on the provisions of Article 126 of the Constitution. He may not be reelected nor continue in office after the expiration of that term.

Only Congress can admit the Comptroller's resignation and provide for absolute or temporary absences from office lasting more than 45 days.

To be elected Comptroller General of the Republic, the candidate must be Colombian by birth and a practicing Colombian citizen; be over 35 years of age; hold a university degree in law, humanities, economics, finance, administration, or accounting; and have at least five years of professional experience, or experience as a university professor for the same period; and meet all other requirements required by law.

No one who is or has been a member of Congress or has served as a national fiscal manager in the year immediately preceding the election may be elected Comptroller General. No one who has been sentenced to prison for common crimes may be elected.

In no case may persons within the fourth degree of consanguinity, second degree of affinity, and first degree of civil or legal relationship with the candidates participate in the nomination or election of the Comptroller.

**ARTICLE 2.** Article 268 of the Political Constitution shall be as follows:

"Article 268. The Comptroller General of the Republic shall have the following powers:

1. Prescribe the methods and manner of accountability for those responsible for managing the nation's funds or assets and indicate the financial, operational, and results evaluation criteria that must be followed.

2. Review and finalize the accounts that must be kept by those responsible for the treasury and determine the degree of efficiency, effectiveness and economy with which they have acted.

3. Keep a record of the public debt of the nation and of the territorially or service-based decentralized entities.

4. Demand reports on their fiscal management from official employees of any order and from any person or public or private entity that administers public funds or assets.

5. Establish the liability arising from fiscal management, impose any applicable financial penalties, collect the amounts, and exercise coercive jurisdiction, for which it will have priority.

6. Conceptualize the quality and efficiency of internal fiscal control of state entities and agencies.

7. Submit to the Congress of the Republic an annual report on the state of natural resources and the environment.

8. Promote before the competent authorities, providing the relevant evidence, fiscal, criminal, or disciplinary investigations against those who have allegedly caused harm to the State's patrimonial interests. The Comptroller's Office, under its responsibility, may demand, based on the truth and good faith, the immediate suspension of officials while the respective fiscal, criminal, or disciplinary investigations or proceedings are completed.

9. Present bills relating to the fiscal control regime and the organization and operation of the Comptroller General's Office.

10. To fill, through public competition, the entity's career positions created by law. This law will establish a special administrative career system for the selection, promotion, and retirement of Comptroller's officials. Those who are part of the corporations involved in the nomination and election of the Comptroller are prohibited from making personal and political recommendations for positions within this oversight body.

11. Submit reports to the Congress of the Republic and the President of the Republic on the performance of their duties and certify the state of the State's finances, in accordance with the law.

12. Issue general regulations to harmonize the fiscal control systems of all national and territorial public entities; and direct and implement, with the support of the General Audit Office of the Republic, the National Fiscal Control System, for the unification and standardization of fiscal management oversight and control.

**13. Warn public servants and individuals who manage public resources of the existence of an imminent risk in ongoing operations or processes, in order to prevent the occurrence of damage, so that the fiscal manager can adopt the measures he or she deems appropriate to prevent it from materializing or spreading, and exercise control over the events thus identified.**

14. Intervene, in the exceptional cases provided for by law, in the oversight and control functions of the Territorial Comptroller's Offices. Such intervention may be requested by the local governor, the popularly elected corporation of the respective territorial entity, a permanent commission of the Congress of the Republic, the citizenry through any of the citizen participation mechanisms, the territorial comptroller's office itself, or any other functions defined by law.

15. Submit to the House of Representatives the General Budget and Treasury Account and certify the Treasury balance submitted to Congress by the Accountant General of the Nation.

16. Exercise, directly or through the entity's public servants, the judicial police functions required for fiscal surveillance and control **in all its forms.** The law shall regulate this matter.

17. Impose sanctions ranging from fines to suspension on those who fail to provide information or prevent or obstruct the exercise of fiscal oversight and control, or fail to comply with the fiscal obligations provided for by law. Likewise, impose sanctions on representatives of entities who, through fraud or gross negligence, fail to obtain the closing of accounts or a favorable opinion or qualification in equivalent procedures for those entities not required to render accounts, for two (2) consecutive fiscal periods.

18. Others as indicated by law.

TRANSITIONAL PARAGRAPH. The basic monthly allowance of the employees of the Comptroller General of the Republic and its temporary staff

It will be equated to those of equivalent positions in other national-level oversight bodies. For the proper implementation of this legislative act and the strengthening of fiscal oversight, the law will determine the creation of a special career system for employees of territorial comptroller's offices, the expansion of the staff, the incorporation of employees of the temporary staff without interruption, and the modification of the organic and functional structure of the Comptroller General of the Republic, guaranteeing the job security of employees enrolled in the career system belonging to that entity and to intervened territorial comptroller's offices. Exclusively for the purposes of this paragraph and the development of this legislative act, specific extraordinary powers are hereby granted to the President of the Republic for a period of six months to issue decrees with the force of law.

Likewise, the Congress of the Republic will issue, using unified criteria, laws that guarantee the budgetary autonomy and financial and administrative sustainability of the territorial fiscal oversight bodies, as well as progressive appropriations that will increase the budget of the Comptroller General of the Republic over the next three fiscal years by 250, 250, and 136 billion pesos, respectively. These appropriations will be incorporated into the annual budget bills presented by the National Government, including those already before the Congress of the Republic. These appropriations will not be taken into account when deferring the General Budget of the Nation.

In the following four-year periods, these appropriations will be in accordance with the medium-term fiscal framework."

### III. The demand

1. The plaintiff challenged the underlined expressions with a single charge of unconstitutionality given that: *"the Congress of the Republic exceeded its jurisdiction to reform the Constitution because the preventive and concomitant fiscal control adopted in Legislative Act 4 of 2019 replaces the essential pillars of separation of powers and subsequent and selective fiscal control."*

2. The actor maintained as a major premise that the principle of separation of powers constitutes one of the essential pillars of the 1991 Constitution and that from this derives the subsequent and selective nature of fiscal control.

office of the Comptroller General of the Republic1 .

---

1 The plaintiff bases the nature of the principle of separation of powers as a fundamental axis of the Constitution on the basis of judgments C-970 of 2004, C-1040 of 2005, C-141 of 2010 and C-285 of 2016.

3. The plaintiff, based on a historical account, stated that, within the framework of the 1886 Constitution, prior fiscal control generated a series of corruption problems and blockages to administrative activity that led to the need to restructure the model being raised in the discussions of the National Constituent Assembly, with the need for fiscal control to be exclusively ex post.

4. The citizen explained that, when debating the structure of the State, the constituents developed a broad analysis of what the Comptroller's Office's functions should be and emphasized that the entity could not take sides in the administration's fiscal decisions. Based on this context, the actor explained that the text finally approved by the National Constituent Assembly made it clear that control would only be posterior and
selective to evaluate the results of the Administration's fiscal management.

5. The plaintiff indicated that, within the fiscal control model conceived in the Political Constitution of 1991, the subsequent and selective nature allows its articulation with the rest of the State model to the extent that
It embodies the technical independence of each of its bodies. Consequently, it stated that: "Any modification to the concept of fiscal oversight as exclusively ex post and selective means replacing the core of the institutional design for Colombian fiscal oversight that the 1991 Constituent Assembly envisioned, especially if such a change entails restoring elements of the anachronistic oversight model that the National Assembly expressly decided to exclude from public administration."

6. The actor emphasized that Ruling C-470 of 2016 summarizes the rules under which the Comptroller General's Office operates. They emphasize the ex post and selective nature of fiscal oversight, which is especially relevant in order to preserve the independence and autonomy of the oversight body and prevent it from performing administrative functions unrelated to its own.

7. Regarding the minor premise, the plaintiff argued that the core of the challenged legislative act is the establishment of a preventive control and
concomitant as a form of change or adjustment of the subsequent and selective control established by the National Constituent Assembly in 1991. The actor stated that Legislative Act 04 of 2019 provided for the warning function as the main mechanism for executing it and that, despite not formally intending to be a type of co-administration or a prejudgment of the warned fiscal manager, it has the potential to influence the administration's decisions and serves as input for exercising subsequent and selective control in the event that the damage materializes.

8. In the opinion of the citizen, the warning function represents a new power of the Comptroller General that implies excessive power and reconfigures the control relationships within the State, affecting the balance and separation of powers. Likewise, preventive and concomitant control is, in

definitive prior control because it implies its exercise before the administration, through the fiscal manager, has decided how and in what to execute its resources, thereby replicating the prior control formula that existed in the Constitution of 1886.

9. In conclusion, the actor indicated that the challenged rule should be declared unconstitutional because (i) it indirectly attributes to the Comptroller General of the Republic administrative functions different from those of its own organization and (ii) this intervention in the administration lacks any material control, even by the judicial apparatus.

## IV. Advanced procedure

10. By Order of October 28, 2019, the aforementioned claim was admitted for review, and the decision was ordered to be communicated to the Presidency of the Republic, the Ministry of Justice and Law, the Presidents of the Senate of the Republic and the House of Representatives, and the Comptroller General of the Republic, so that they may express their opinion. The Colombian Academy of Jurisprudence, the National University, the Externado de Colombia University, the University of Rosario, the Sergio Arboleda University, the Javeriana University, the University of Caldas, the University of Cauca, the University of Norte, the University of Nariño, and the Pedagogical and Technological University of Colombia (Tunja campus) were invited to participate in the debate.

11. In the same order, the General Secretariat of the Senate of the Republic and the General Secretariat of the House of Representatives were ordered to send to this Corporation: i) the gazettes of Congress in which the explanatory statement of the project that gave rise to Legislative Act 04 of 2019 was published; ii) the gazettes in which the respective reports of the presentation intended for debate and voting in the committees and plenary sessions were published and iii) the gazettes of Congress in which the committee and plenary minutes were published, corresponding to the sessions when the initiative was discussed and approved, which was later sanctioned as Legislative Act 04 of 2019.

12. Similarly, the Comptroller General was asked to answer the following questions: i) How is the exercise and implementation of the prior and concomitant control provided for in Articles 1 and 2 of Legislative Act 4 of 2019 planned? In this regard, please explain whether the powers established by the constitutional reform in Articles 267 and 268 of the Political Constitution are planned for this function; ii) What is the scope and degree of mandatory nature of the risk warnings referred to in paragraph 13 of Article 2 of Legislative Act 4 of 2019? in particular regarding the effects of the warnings in the event of subsequent proceedings for fiscal liability of the officials who were previously subject to said warnings and iii) what is the difference between the preventive control provided for in Legislative Act 4 of 2019 and the prior control provided for in Law 20 of 1975 and Legislative Decree 925 of 1976?

**Interventions**

13. During the term of listing, twenty-four intervention documents were received within the reference process, which can be grouped into four different positions2:

*Due to the ineptitude of the claim*

14. The Presidency of the Republic and the Ministry of Justice and Law, in joint intervention3, requested as their main petition that the Court declare itself inhibited from hearing the claim for not complying with the requirements demanded by law and jurisprudence for this type of trial.

15. The Legal Division of the House of Representatives,4 the Comptroller General of the Republic,5 the National Board of Comptrollers,6 the Colombian Association of State Social Enterprises and Public Hospitals (ACESI),7 the Association of Officials of Departmental Management and Central Level of the Comptroller General of the Republic (AFUNCGER),8 the Free University,9 the Externado de Colombia University,10 the Sergio Arboleda University,11 the Rosario University,12 the University of Nariño,13 the Movement for Action and Opportunity for Gender Equity and New Masculinities, also expressed their views on the matter.

---

2   The brief submitted by the Pontificia Universidad Bolivariana through its Dean of Law, Luis Fernando Álvarez, and the Director of Law, Luis Eduardo Vieco, is excluded from this classification, as the brief does not specifically refer to the constitutionality of the Legislative Act but rather to the advisability of reforming the Fiscal Control system in Colombia.

3 Clara María González Zabala, legal secretary of the Administrative Department of the Presidency of the Republic, and Ángela María Bautista Pérez, delegate of the Ministry of Justice and Law, jointly sign the intervention in the process on behalf of the two entities.

4 María Isabel Carrillo Hinojosa, head of the Legal Division of the House of Representatives.

5 Carlos Felipe Córdoba Larrarte, Comptroller General of the Republic.

6 German Barco López, signs the intervention document as Departmental Comptroller of Quindío and Vice President of the National Board of Comptrollers and on behalf of the latter.

7 Olga Lucia Zuluaga, acting as Executive Director and legal representative of the Colombian Association of State Social Enterprises and Public Hospitals -ACESI.

8 Pedro Alexander Rubio Sánchez, legal representative of the Association of Officials of the Departmental Management and Central Level of the Comptroller General of the Republic -AFUNCGER.

9   Jorge Kenneth Burbano Villamarín and Javier Enrique Santander Díaz, director and coordinator, respectively, of the Observatory of Constitutional Citizen Intervention of the Faculty of Law of the Free University of Bogotá.

10 Floralba Padrón Pardo and Héctor Santaella Quintero, professors and researchers at the Departments of Constitutional Law and Administrative Law at the Externado University of Colombia.

11   Jorge Enrique Ibáñez Najar, director of the Department of Public Law and the CREAR Group at Sergio Arboleda University.

12   Jorge Alberto Gaitán Martínez, dean of the Faculty of Law at the University of Rosario and Manuel Alberto Restrepo Medina, director of the Doctoral School of Law at the same university.

13 Leonardo Alfredo Enríquez Martínez, Dean of the Faculty of Law at the University of Nariño.

13

(MAY)14, the National Union of Workers in the Service of the State in the Control and Surveillance Bodies and in their Supervised Entities (SINALTRASE)15 and citizen Pablo Cesar Díaz Barrera. According to these interveners, the claim should be declared inadmissible for the reasons set forth below.

16. The interveners maintained that the plaintiff's argument lacked certainty, relevance and sufficiency with respect to the obligation to demonstrate why the Legislative Act was replacing the Constitution.
They argued that this claim was insufficiently substantiated and arose from subjective assessments that bear no direct relation to the text of the reform, simply attacking its appropriateness.

17. Regarding the major premise, the interveners indicated that it was not adequately established in the claim, since the plaintiff: i) wrongly assumes that subsequent and selective fiscal control is an essential element of the constitutional order defined in the Political Charter, without there being certainty about this16; ii) failed to clearly establish the major premise, by basing it on an isolated rule and not on "multiple normative references" as required by the Constitutional Court; and iii) did not clearly and pertinently determine the scope of the principle of separation of powers and that of administrative autonomy, since it leaves out concepts such as harmonious collaboration and the system of checks and balances that accommodate the new control model.

18. Regarding the minor premise, the interveners argued that the actor: i) confuses preventive and concomitant non-binding fiscal control, with prior control; ii) it does not clearly explain whether the modifications made to the fiscal control system eliminated administrative autonomy to plan and execute the budget; iii) it is based on a subjective and counter-evident interpretation, since the same Legislative Act establishes non-co-administration as a condition for *"non-binding prior and concomitant control"* ; and iv) it does not construct an argument that raises a doubt of unconstitutionality, given that it is possible to consider that the Constitution was replaced, since neither the function nor the body called upon to exercise fiscal control is altered.

19. As regards the conclusion of the trial, the interveners point out that it is not true, since the concomitant and preventive control does not replace or

---

[14] Olga Lucia Rodríguez Mosos, legal representative of the Movement for Action and Opportunity for the Gender Equity and New Masculinities - MAY.

[15] Jorge Edgar Araque Aldana, president and legal representative of Sinaltrase.

16 Contrario sensu, they clarified that ex post fiscal control was not established as a central axis or as one of the special dimensions of the constitutional principle of the separation of powers. Some participants argued that the fiscal control model is a flexible tool for implementing the principle of balance of powers, but as such, it can be adapted by the legislator in its role as a secondary constituent.

It not only replaces the model of subsequent and selective control, but also complements it in an exceptional way, preserving the model established by the primary constituent as the general rule.

*For the constitutionality of the rule*

20. All the interveners who referred to the unsuitability of the claim, with the exception of the Legal Division of the House of Representatives, who requested, in the alternative, the constitutionality of the challenged provisions. These interventions are supported by the briefs submitted by the Trade Union Association of Workers of Public Judicial Oversight Bodies (ASCONTROL)[17], the Association of Public Servants of Oversight Bodies of Colombia (ASDECCOL)[18], the National Independent Union of Workers in Oversight Bodies (UNIOS)[19] and citizen José Francisco Zúñiga Cortes, in accordance with the arguments summarized below.

21. Regarding the major premise, the speakers pointed out that ex post and selective oversight is not a fundamental pillar of the Political Constitution, since if it were, it could not be modified or reformed. They indicated that the true pillar of the Constitution is the public function of fiscal oversight, not the manner in which it is exercised. In this regard, they emphasized the importance and necessity of reform, in line with new challenges, new forms of corruption, and the development of new information technologies, which allow for greater effectiveness in the protection of public resources.

22. Regarding the minor premise, they explained that the plaintiff confused the prior and perceptive control, repealed by the Political Charter of 1991, with the non-binding preventive and concomitant control proposed in the rule.
They emphasized that preventive control is not binding and therefore represents an effective and legitimate mechanism to prevent fiscal managers from making decisions that run counter to the public treasury and its essential purposes. Instead, it should be viewed as an opportunity to implement preemptive measures to mitigate damage, especially when it does not have the potential to influence public administration decisions and the same regulation expressly prohibits co-administration.

23. As for the conclusion, the participants stated that preventive control does not replace or amend the Constitution, but rather complements it and is part of the fiscal control scheme already established, thus legitimizing the act.

---

[17] Carlos Abel Saavedra Zafra, president of the Trade Union Association of Workers of the Control Bodies Judicial Public -ASCONTROL.

[18] Blanca Ramírez de Salazar, president of the Association of Public Servants of the Control Bodies from Colombia -ASDECCOL.

[19] Fulton Pua Rosado, legal representative of the National Independent Union of Workers in Organization Control –UNIOS.

legislative body studied. They also highlighted the importance and necessity of this reform, as the numerous cases of corruption in the country due to lack of oversight are a well-known fact, and the measures taken in the legislative act are tools that allow for avoiding fiscal damage.

24. The speakers pointed out that concomitant and preventive control is part of a modern vision of government and the appropriate review of public spending, which complements ex post controls without affecting them. All of this encourages the proper functioning of the administration and the exercise of autonomy within the framework of the separation of powers, respecting the freedom of decision-making of public managers.

*For the conditional constitutionality of the rule*

25. The Externado de Colombia University requested a conditional declaration of constitutionality, with the understanding that: i) "under no circumstances, in any potential fiscal liability proceedings that may be opened in the future in connection with a transaction that was the subject of a warning, may the legitimate reasoned departure of the supervised entity be considered evidence of the fraudulent conduct of the investigated fiscal manager"; and ii) "under no circumstances may preventive and concomitant control be exercised by the authorities who will subsequently be in charge of subsequent and selective control over the previously audited conduct." This is to prevent the oversight body from losing its independence and impartiality in cases where warnings have been issued in the exercise of the function established in the reform.

*Unconstitutionality of the rule*

26. Finally, a group of interveners requested that the unconstitutionality be declared of the accused norms, namely: the National Commission of Public Fiscal Control of Colombia (CONFISPCOL)20 and the citizens Juanita María Goebertus Estrada, Gustavo Enrique Morales Cobo and Benjamín Luna Burgos.

27. The participants emphasized that in preventive and concomitant control, both the collection of information and the warning function necessarily occur before the administration makes a decision, that is, in operations or execution processes, even during the planning phases. They pointed out that the reform constitutes a replacement of the constitutional model of separation and balance of powers, as it affects functional separation and generates a phenomenon of co-administration, which, apparently, had already been overcome with its prohibition by the 1991 Constitution.

---

20 Hernando Medina, president of the National Commission for Public Fiscal Control of Colombia.

28. This group of citizens highlighted that in Judgment C-103 of 2015, the Court declared unconstitutional paragraph 7 of Article 521 of Decree Law 267 of 2000, which assigned to the Comptroller's Office the function of warning about operations or processes in progress in order to prevent serious risks that jeopardize public assets. On that occasion, the Court found that the aforementioned rule revived the previous control that existed before the 1991 Constitution, which was eliminated by the same National Constituent Assembly due to its strong connotations of co-administration and the repercussions against the impartiality that must accompany the audit process carried out by the control subjects assigned to the Comptroller's Office.

29. Additionally, the intervenor, Juanita Goebertus Estrada, Representative to the House, stated that during the processing of the legislative act in which she participated, several representatives, including herself, were concerned about the risk of co-administration by the Comptroller General that the reform entailed. The intervenor affirmed that the new control system does not present substantial differences with the previous type of prior and binding control of the 1886 Constitution.

30. The citizen also pointed out that Legislative Act 04 of 2019 contained allocations that disregarded the division of powers between the executive and legislative branches in budgetary matters. She also emphasized that the budget increase established therein implies a disproportionate growth of the oversight body, to the detriment of several public policies and entities that urgently require these resources. Based on the foregoing, the intervener requested the normative integration of the legislative act, considering that not only the challenged sections are unconstitutional, but also the designated budget and the manner in which it is sought to materialize at the administrative level.

**Evidence collected**

31. Within the term provided in the Order of October 28, 2019,
received the following documents:

32. *Congress of the Republic.* By Official Letter No. OPC-353/2019 of November 18, 2019, the General Secretariat of the House of Representatives
sends the minutes of the procedure of Legislative Act Project No. 355 of 2019 Chamber - 039 of 2019 Senate, *"by means of which the Fiscal Control Regime is reformed",* today Legislative Act No. 04 of 2019. Along with the letter,

---

21 *"Functions. In order to fulfill its mission and objectives, pursuant to the provisions enshrined in the Political Constitution, the Office of the Comptroller General of the Republic shall: 7. Warn about ongoing operations or processes to prevent serious risks that jeopardize public assets and exercise subsequent control over the events thus identified."*

Machine Translated by Google

attached an electronic copy of the gazettes in which the respective documents are recorded publications22, information that was also provided on magnetic media.

33. *Office of the Comptroller General of the Republic.* The Comptroller General explained that Legislative Act 4 of 2019 established preventive control, which: "differs from the prior control prevalent before 1991, in that the former was general, binding, and entailed direct interference in the management of the Administration. However, as the constitutional text itself expresses, preventive control does not imply co-administration, that is, it does not embody the power to veto or approve the decisions of public resource managers; it is exceptional, as it will only be exercised under certain criteria of action and when there is evidence of a risk of loss of public resources; it is not binding, because it is framed under the concept of a warning, which is not mandatory for decision-makers in the different branches and bodies of public power."

34. The Comptroller pointed out that the constitutional reform requires legal development for its implementation and, in light of said legal development, it would again be up to the Constitutional Court to exercise control. However, he explained the methodology that could be used to exercise control.
overtake, like this:

"a) Selection of the object of control, through the declaration of manifest importance on the part of the Comptroller General of the Republic.

b) Planning phase, where the control activities to be carried out are determined, the control execution milestones, the budget, the objectives, the expected results, the success criteria and the risks of the process in question are set.

c) Execution phase, in which the procedures of follow-up to obtain relevant information, the following are carried out tests and obtain evidence on the expected results, planned or anticipated and the effectiveness of controls on identified risks or unforeseen adverse situations.

d) Report phase, where the selected management milestones, identified risks, evidence, conclusions and recommendations are presented.

e) Deployment and monitoring phase. This is the subsequent stage in which the decisions made by the manager regarding the observations, warnings, or recommendations made are monitored and evaluated.

---

22 Gazette 153 of 2019 (publication of the project with the statement of reasons; first round: gazettes 195, 207, 519, 245, 260, 647, 330 and 507 of 2019; second round: gazettes 676, 749, 742, 743, 769 and 892 of 2019.

35. The Comptroller stated that the concept of a warning, as a concretization of concomitant and preventive control, is not binding by express constitutional mandate. This means that it does not oblige the fiscal manager, who may or may not accept it and develop the proposed recommendations or any others he or she deems appropriate or pertinent. Therefore, its purpose is to allow managers to assess the risks posed to some projects so they can evaluate the situation and take immediate corrective action. However, they are not tools for co-management or co-administration and are therefore not mandatory in any case or under any circumstances.

36. The comptroller explained that the prior control regulated by article 2 of Decree 925 of 1976 constituted a *sine qua non* requirement in the procedure administrative, without which the public budget could not be executed. Furthermore, it was for this reason that it lent itself to slowing down administrative activity, becoming a source of corruption and undermining the independence and objectivity of the oversight body in assessing fiscal management in which it had previously participated.

37. In contrast, preventive control focuses on risk management during the progress or execution of administrative activities, in order to make a timely statement on *"latent or eventual risks"* that may jeopardize the achievement of the objectives of the respective process, program, or project, and for which the administration did not carry out an adequate assessment or the controls proposed to mitigate them are not effective.

### V. Concept of the Attorney General of the Nation

38. The head of the Public Prosecutor's Office considered that in those cases in which the Court makes use of the theory of substitution, it should do so in a moderate manner and under the criterion of self-restraint, to avoid blocking the institutional changes that society requires.

39. The Attorney General noted that, although the complaint was filed in a timely manner, the analysis should be restricted to the charge made, and therefore regulatory integration is not appropriate. The Attorney General affirmed that the substitution trial should be restricted to the alleged substitution of the defining principle of *the separation of powers,* which implies that the Court should decline to issue a substantive ruling regarding the charge of substitution of the Charter, which is based on the element of subsequent and selective fiscal co

40. The Prosecutor's Office emphasized that the major premise should be limited to the separation of powers. In this regard, it referred to Judgment C-977 of 2002, in which the Court declared the preventive functions of the Attorney General's Office constitutional and considered them to be a materialization of the principle of harmonious collaboration. Finally, the Attorney General emphasized

that these functions under the Office of the Attorney General are distinct from those of the other oversight bodies and are harmonious with each other, after which it concludes that *"there are no arguments to support that the modifying act under review affects the axis of separation of powers."*

41. Regarding the minor premise, the representative of the Public Prosecutor's Office He focused his arguments on establishing the differences between the prior and perceptive control in force before the 1991 Constitution and that established by Legislative Act 4 of 2019, highlighting that the latter explicitly prohibits co-administration, is framed within the logic of inter-organizational control, and does not deprive the administration of its jurisdiction. The Attorney General pointed out that the warning function is established to prevent harm, but it is the fiscal manager who has the power to take the measures he deems pertinent, and both the warning function and the judicial police functions are framed within constitutional procedural guarantees and harmonious collaboration, and are not a form of interference.

42. The Public Prosecutor's Office concluded by warning that there is no substitution of the central pillar of the separation of powers. In this regard, it stated: *"The minor premise does not imply a change or replacement of the defining principle of the Constitution described in the major premise. The preventive and concomitant control introduced by Legislative Act 4 of 2019 does not replace the essential pillar of the separation of powers of the 1991 Political Constitution, since it does not entail undue interference by the Comptroller General of the Republic in the fiscal decisions of the Public Administration."*

## VI. Considerations of the Constitutional Court

**Competence**

1. In accordance with the provisions of paragraph 1 of article 241 of the Political Constitution, the Constitutional Court is responsible for: "deciding on claims of unconstitutionality brought by citizens against acts amending the Constitution, regardless of their origin, solely due to procedural defects in their formation."

**Suitability of demand**

2. Some of the intervenors requested that the Court issue a restraining order based on the substantive inadequacy of the complaint. In their opinion, the complaint did not satisfy the minimum requirements established by case law for alleging a defect due to substitution of the Constitution. The intervenors considered, in summary, that the requirements of clarity, certainty, specificity, relevance, and sufficiency were not met.

**Formal requirements of the claim**

20

3. The Plenary Court recalls that Article 379 of the Constitution establishes that the limit for exercising public action against legislative acts is one year, counted from their promulgation. In the present case, Legislative Act 4 of 2019 was promulgated on September 18 of that year, and the lawsuit was filed with the Constitutional Court on October 1 of that same year, 2019. It is therefore concluded that it was filed within the established period. Furthermore, there is no ruling that constitutes formal constitutional res judicata.

**Substantive requirements of the claim**

4. Any claim of unconstitutionality requires citizens to substantiate their claim based on clear, certain, specific, pertinent, and sufficient reasons. However, when the claim is directed against a constitutional amendment approved by Congress, "the argumentative burden increases considerably" given "the magnitude of the claim, the significance of the Court's decision, the commitment to democratic principles, and the very nature of the provisions being compared." 23 In Ruling C-053 of 2016, this Court indicated that this argumentative burden translates into the following:

"a) The statement must be clear so that the connection of ideas allows us to understand the meaning of the accusation against the reformatory act. It is simply a matter of the Court being able to 'know',
understanding them, the reasons on which the disagreement with the decision of Congress is based.

b) The challenge must be true, and to that extent, the constitutional amendment must legally exist and be in force. Additionally, the content attributed to it must be derived from its text. Its argument cannot be based on the assumption of norms, on conjectural interpretations of the constitutional amendment, or on obviously false or inconsistent premises.

c) The reasoning must be pertinent and, consequently, must be a genuine charge that highlights the violation of the constitutional norms related to the competence of the Congress of the Republic to reform the Charter. Arguments based on the political inconvenience of the reform or on the practical problems that its implementation may entail are impertinent, unless the latter can lead to constitutional consequences.

---

[23] In any case, the jurisprudence of this Court has indicated that these are not additional requirements to those arising from Decree 2067 of 1991, but rather from the recognition that an accusation of exceeding the jurisdiction of Congress to reform the Charter poses particular problems and raises special argumentative challenges (judgment C-373 of 2016).

21

Those challenges based on the intangibility of constitutional norms or the violation of their material contents are irrelevant.

(d) As a condition of the sufficiency of the charge, the plaintiffs must endeavor to specifically present the reasons why Congress's approval of the act amending the Constitution disregards the norms that grant it jurisdiction. The citizens' effort must, therefore, contain explanations that answer the following question: "Why does the challenged legislative act constitute not only an amendment to the Charter but, in reality, a replacement of it?"

5. According to the above, the claim for a substitution trial must: i) state the defining principle of the Constitution that has allegedly been substituted and indicate the constitutional provisions on the basis of which it is derived or the jurisprudential precedent in which it has been recognized, with respect to which it must be clear that it is not a question of a contradiction with a norm of the Constitution (judgment of constitutionality) but of the affectation of a transversal and defining principle of the Political Constitution; ii) explain how the legislative act impacts the defining principle, identifying the differences between them; and iii) explain why the modifications introduced by the reform can be considered a transformation in the identity of the Constitution such that, after the reform, it is completely different.

6. Now, this greater requirement for argumentative burden in claims against acts amending the Constitution is based on the intention of safeguarding the product of a democratic consensus endowed with a formally rigorous legislative process, but it cannot go so far as to distort the character of a citizen's right in the public action of unconstitutionality. The goal, then, is for citizens to generate sufficient doubt regarding the possible substitution of a defining principle of the Constitution, without their arguments having to reach the level of scrutiny that corresponds to the Constitutional Court. Based on these guidelines, we proceed to examine the suitability of the claim.

7. *Clarity.* A comprehensive reading of the complaint shows that the constitutionality review requested of this Court concerns exclusively the preventive and concomitant fiscal control of the Comptroller General of the Republic. The clarity of the complaint in this regard is predicated on the logical thread that guides the argument, such that the meaning of the arguments and the objective pursued by the exercise of this power are unequivocal.

Public action. In this case, the wording and structure of the document allow for the clear identification of both the object and the arguments supporting it. Thus, the claim is clear, and there is no confusion about what constitutes the object of the claim and what is part of it.

from the normative context used for the systematic interpretation of the accused expressions.

8. *Certainty.* The plaintiff warns that despite the formal statement that "it will not imply co-administration," the Comptroller General was granted new powers to exercise the warning function. These powers include access to any information, the ability to suspend and sanction those who refuse to provide it, and the extension of this type of control to territorial entities. This implies interference in contracting decisions and, therefore, a form of co-administration that is not resolved by the formal prohibition.

9. In this regard, the Court finds that this is not a matter of the assumption of norms, because the norms analyzed and those that serve as the basis for the analysis are true and verifiable, to the extent that (i) the expressions alluded to by the plaintiff regarding the explanatory statement of the bill are real and in force; (ii) the powers referred to by the plaintiff are contained in articles 1 and 2 of Legislative Act 04 of 2019; (iii) the literal interpretation of the word "prior" corresponds to that provided in the Dictionary of the RAE (Royal Spanish Academy of Fine Arts); and (iv) the transcribed paragraphs of judgments C-648 of 2002, C-288 of 2012, C-103 of 2015, and C-470 of 2016 are contained in said decisions. In these terms, the Court understands that this is not a conjectural, isolated, or subjective interpretation of the amending act, thereby fulfilling the requirement of certainty required to proceed with the examination of the norm.

10. Finally, determining whether the preventive and concomitant control model designed by Legislative Act 4 of 2019 implies a form of prior control and whether said model could constitute a form of interference and co-administration with the controlled entities corresponds to the substantive examination of the claim and not to this procedural stage.

11. *Relevance.* The plaintiff argues, based on the alleged substitution of the principle of separation of powers and subsequent fiscal control, that "according to its regulatory configuration in Legislative Act 4 of 2019, preventive and concomitant control is of such a nature that it leads to interference by the Comptroller General of the Republic in the fiscal decisions of the Public Administration."

12. The plaintiff structured his brief as required by the Court for this type of lawsuit. He began his argument by stating: "1.- Major premise: The separation of powers and subsequent and selective fiscal control as essential pillars of the 1991 Political Constitution." In this chapter, he states "a.- The separation of powers as an essential pillar of the 1991 Political Constitution," where
It carries out a historical and jurisprudential reconstruction of the principle of separation of powers in Colombia and then explains: "b.- The subsequent and selective control as a manifestation of the separation of powers and pillar

23

essential of fiscal control in the Political Constitution of 1991", where the plaintiff develops the defining character of the Constitution's axis of the model of subsequent and selective control, for which he relies on a historical and systematic analysis of the Charter.

13. Indeed, the construction of the minor premise of the charge was based on the purpose and scope of the preventive and concomitant control model set forth in the accused expressions in light of the explanatory statement of the project, and the powers that the same Legislative Act confers on the Comptroller General of the Republic for the development of his functions24, in particular the warning function. It refers to the guiding principles that the primary Constituent identified in the matter and to the constitutional articles25 in which said principles were embodied, alluding to several constitutional articles to conclude that: "[f]orward, any modification to the conception of fiscal control as exclusively posterior and selective means replacing the core of the institutional design that the 1991 Constituent made for Colombian fiscal control, especially if such change implies reestablishing elements of the anachronistic control model that the National Assembly expressly decided to exclude from the Public Administration."

14. In the concluding part of the complaint, the plaintiff stated: "The true justification for ex post and selective oversight as an essential pillar of the Constitution is that only through this design, as the sole moment and form of exercising oversight, is the separation of powers between the Comptroller's Office and the Public Administration realized. This precept, and the prohibition of exercising administrative functions other than those inherent to their own, is the only thing that preserves the autonomy and independence of both state institutions. Inserting another type of oversight model, even if it coexists with ex post and selective oversight, implies a breach of the autonomy and independence of the oversight body and the entity subject to fiscal oversight, since it leads to interference in the powers and functioning of one or the other. Doing so implies replacing the Constitution, at least partially."

15. From the foregoing, it follows that the lawsuit satisfied this requirement to the extent that it attacked the regulatory design of the reform, regardless of the legal development derived from it. Furthermore, it raises a charge of substitution of the principle of separation of powers and of subsequent and selective control, understood as a defining and cross-cutting axis of the fiscal control model designed by the Political Constitution.

---

24 The plaintiff builds his arguments on the scope of this model taking into consideration section 4 of article 267 and numerals 16 and 17 of article 268 of the Political Constitution, as amended by Legislative Act 04 of 2019.

25 To support his argument, he referred to articles 119, 267, 269 and 270.

16. *Sufficiency.* While constitutional jurisprudence has indicated that, in claims against legislative acts for alleged substitution of the Constitution, the plaintiff must meet a greater argumentative burden to structure the syllogism on which the methodology of the substitution trial is based, this Court has also indicated that the specialized nature of the charges cannot translate into an extraordinary increase in the conditions for exercising public action.

17. Thus, regarding the sufficiency predicated on the major premise of the claim for defect of substitution, the requirement cannot go so far as to require the plaintiff to unequivocally establish the existence of a defining principle of the Constitution, when the identification of such principles is an ongoing process, which, in any case, is the responsibility of this Court. What is required of the plaintiff is to present clear, certain, and pertinent support on the matter, from which this Court can draw evidence to decide whether or not the affected constitutional principle is a defining principle of the Constitution.

18. The plaintiff clearly stated the element that constitutes the fundamental axis affected by arguing that "for the case under study by the Court, two essential pillars of the Constitution are particularly relevant: (i) the separation of powers and (ii) fiscal control as subsequent and selective control, exclusively." Regarding its specificities through "multiple normative references," the plaintiff develops a complete justification on "the separation of powers as an essential pillar of the Political Constitution of 1991," regarding which he cites some excerpts from judgments C-970 of 2004, C-141 of 2010 and C-285 of 2016 in which this Court has recognized its character as a defining axis of the Constitution.

19. Regarding "subsequent and selective control as a manifestation of the separation of powers and an essential pillar of fiscal control in the 1991 Political Constitution," between folios 19 and 26 of the complaint, the plaintiff presented an argument based on the minutes of the National Constituent Assembly and the analysis of the superior articles 267, 269 and 270, based on which he supported the conclusion that "any modification to the conception of fiscal control as exclusively subsequent and selective means replacing the core of the institutional design that the 1991 Constituent Assembly made to Colombian fiscal control, especially if such change implies reestablishing elements of the anachronistic control model that the National Assembly expressly decided to exclude from the Public Administration."

---

26 In Judgment C-1040 of 2005, it was stated: "Given these theoretical difficulties, imposing on the citizen an obligation to provide exhaustive arguments regarding the existence of the axis or a conclusive demonstration of the unrecognizable nature of the Constitution after the reform, ignores the public nature of the action. In this regard, the Court has recognized that it is the one responsible for assuming the argumentative burden necessary to advance the trial, which is consistent with its function as authorized interpreter of the Constitution."

20. Regarding the duty to argue why said pillar is essential and defining, the plaintiff argued, as a "conclusion of the major premise"[27]
an argument according to which "[t]he 1991 Constituent Assembly established a model of fiscal control based exclusively on ex post and selective controls. This mandate is the core or backbone of all the oversight exercised over the management of the Administration, designed as a manifestation of the independence guaranteed by the separation of powers in the specific area of fiscal control."

21. In support of this conclusion, the plaintiff referred to the judgments this Court has issued in matters related to the powers of the Comptroller General of the Republic, highlighting the importance this Court has recognized in the ex post and selective control model. In his extensive analysis, the plaintiff refers to judgments C-529 of 1993, C-534 of 1993, C-648 of 2002, C-967 of 2012, C-103 of 2015, and C-470 of 2016, at the end of which he stated: "The notion of fiscal control as ex post and selective is established as a component of the principle of separation of powers in a specific matter, which guarantees the independence and autonomy between the Executive and the control body itself."

22. For the Court, it is clear that the complaint satisfactorily met the burden of sufficiency required in structuring the major premise of the substitution lawsuit alleged in the complaint. It is reiterated on this occasion that this requirement must be understood not as demonstrating the existence of a defining axis, but rather as compliance with certain standards intended to provide elements that allow a reasonable inference to the existence of an identifying axis of the Political Charter, so that this Court, upon examining said elements and any others it deems pertinent, may conclude whether or not the plaintiff is right.

23. Regarding the minor premise, the complaint explained in detail the reasons why the plaintiff believes that the new control model not only differs from the subsequent and selective control model, but is also incompatible with it. In analyzing the powers with which it would exercise preventive and concomitant control, it held that, despite formal statements to the contrary, the new fiscal control model seriously compromises the proper execution of subsequent and selective control, as well as the guarantees applicable within its development, as designed by the Constituent Assembly.

24. In this context, it was verified that the claim presented its premises with reasonable elements of judgment, which raise a constitutionally pertinent discussion, on the way in which the challenged rule could affect the defining axis identified by the plaintiff, corresponding to the substantive examination to determine whether a substitution of the constitution actually occurred.

---

27 Folio 26 of the complaint.

25. As for the conclusion, the plaintiff dedicated a section to supporting that the defining axis of separation of powers and subsequent and selective fiscal control would have been partially replaced with the current reform28 .

The Court reiterates that at this stage of the proceedings, what is being verified is the sufficiency of the arguments from the perspective of a justification aimed at activating this Court's jurisdiction to review the constitutionality of an amendment to the Constitution. The examination of the suitability of the claim is not a preliminary judgment assessing the constitutionality of the norms, but rather an evaluation of requirements, which in the present case are fully met.

26. The above is also linked to the relevance of the *pro actione* principle in public processes and in particular in the exercise of the action of unconstitutionality, according to which "the examination of the procedural requirements of the claim should not be subjected to rigorous scrutiny and a substantive decision should be preferred over an inhibitory one, so that the effectiveness of the rights of citizen participation and access to effective judicial recourse before this Court are privileged"29.

27. Based on the foregoing, the Court considers that the application satisfied the requirements of clarity, certainty, relevance, specificity and the demands of sufficiency that is inherent to a public action against an act amending the Constitution due to the legislature's excessive jurisdiction. Therefore, the Court will proceed to examine the charges brought against the challenged provision.

## Legal problem

28. In view of the above, it is up to the Plenary Chamber to determine whether the changes to the fiscal control model constitute a replacement of a fundamental axis of the Constitution.

29. Based on the legal problem posed, the Court will conduct an analysis based on: i) the jurisprudential rules regarding the constitutional substitution trial; ii) the content of the elements of the constitutional principle of separation of powers *(major premise);* iii) the variations generated by the reform *(minor premise);* and finally, iv) determining whether or not the variations to the fiscal control model constitute a substitution of a fundamental axis of the 1991 Political Constitution *(conclusion).*

## The constitutional substitution trial

30. The Constitution in its article 241.1 states that the Constitutional Court is competent to decide on claims of unconstitutionality that

---

28 Folios 34 to 46 of the complaint.

29 Judgment C-861 of 2008.

citizens bring against acts amending the Constitution solely on the grounds of procedural flaws in its formation. Based on this jurisdiction, this Court has understood that the provisions of Article 374 above, regarding the fact that the Political Constitution "may be amended" by (i) Congress, (ii) a National Constituent Assembly, or (iii) the People by referendum, implies that the bodies that are the recipients of the power to amend have certain limitations, and that the Constitution has delimited the possibilities for modification, excluding other modalities such as its repeal, its replacement in its entirety, or its suspension and disavowal.

31. From its first pronouncements, this Court explained the relevance of determining jurisdiction as a fundamental element for analyzing the constitutionality of the procedure when reforming the Constitution. 30 In judgment C-551 of 2003, the Court held that the power of reform cannot substitute, repeal, suppress or replace the current Constitution with a completely different one, so it is up to the Constitutional Court to review whether the power of review, under the pretext of reform, exceeded or overstepped its powers by assuming powers proper to the constituent power.

primary.

32. To define when a substitution of the Constitution materializes, which exceeds the power of the constituted powers to amend, several rules have been considered that restrict the Court's jurisdiction to analyze these matters. Thus, the following aspects of the substitution judgment can be identified in the analyzed jurisprudence:

(i) The judgment of substitution focuses on the assessment of whether the constituted power that modified the Charter limited itself to the limits of its power to amend, or ignored them through a change of such magnitude that it distorts the Charter. Consequently, the Court's activity is limited to studying whether the reformer substituted the Constitution, without thereby carrying out an ordinary material review of the accused act. To this extent, there is no comparison between the reform and the Constitution with a view to establishing whether the former contradicts the latter, since a constitutional reform necessarily contradicts the Constitution.

ii) The Constitution does not establish intangible rules or fixed clauses, but rather axial and identity principles that, if reformulated, would affect the identity of the Constitution, turning it into a distinct text.

---

[30] In the words of this Court: "both doctrine and jurisprudence have repeatedly indicated that jurisdiction is an unavoidable prerequisite of the procedure, to such an extent that the procedure is always flawed if the body issuing a legal act lacks jurisdiction, even if its performance, with respect to the procedure, has been impeccable. In such circumstances, it would not make sense for the Constitution to attribute to the Court the control of procedural defects in constitutional reforms, but exclude it from verifying whether or not the bodies that carried out said reform had jurisdiction to do so, since such a regulation leads to an unacceptable situation: thus, what would happen if an incompetent body (...)"

[31] See judgment C-551 of 2003.

Structural aspects are not contained in the specific regulatory provision, since it is not a question of establishing intangible clauses, but rather they are identifiable from the analysis of different constitutional provisions that concur in the formation of said axes.

The Constitutional Court has repeatedly pointed out that the identification of these structural axes of the Constitution is a process under construction based on a systematic interpretation of the Charter.

iii) The violation of jurisdiction in the reform may take different forms and is configured not only when the Constitution is replaced as a whole (total substitution), but also when one of its defining axes is distorted and thus the identity of the Charter is lost (partial substitution)32. To carry out the so-called "substitution judgment or test" it is necessary to establish: (i) a major premise, (ii) a minor premise and (iii) a conclusion.

33. First, once compliance with the requirements of form, temporality and substance of the claim has been established, the trial begins with the construction of the major premise, that is, the identification of the defining, axial or essential element of the Constitution that is alleged to have been replaced by the amending act.

34. Second, the Court must establish the minor premise, based on an analysis of the scope of the changes brought about by the reform, in particular, the effect of the measures established in the reform on the constitutional provisions and principles identified in the major premise as those whose normative content reflects the identity axis supposedly affected. All of this must be done based on an examination of the normative content introduced by the reform.

35. Finally, the Court must establish its conclusion, which as a result of the contrast of the two premises, falls on whether the new normative element eliminates absolutely or partially, permanently or temporarily, an essential element of the constitutional structure and replaces it with a radically different one, in which case there would be an excess of the competence of constitutional reform that is attributed to the constituted powers, as occurs with Congress when issuing legislative acts33.

36. Based on the above, the Plenary Chamber proceeds to advance the examination of the challenged rule.

**Major premise: the principle of separation of powers as the defining axis of the Constitution**

---

32Cf., judgment C-332 of 2017.

33 Judgment C-577 of 2014.

37. Constitutional jurisprudence has repeatedly recognized that the
The principle of separation of powers is a defining axis of the Political Charter.
Consequently, it cannot be suppressed or replaced by the derived constituent34, since political power must be limited in order to avoid its abuse35.

38. Thus, the Court has held that the principle of separation of powers was the starting point of the constitutional design of the National Constituent Assembly, to the point that: "[i]n the 1991 Constitution, this principle radiated throughout the entire configuration of the State and thus became an axial principle of the constitutional text"36.

39. Indeed, the structural system of the Colombian State, designed in the 1991 Political Charter, was conceived under the flexible and integrative model of separation of powers. This combines the tripartite division of public power with the principle of harmonious collaboration, in a system of checks and balances that allows for the articulation of functional division and inter-institutional control with harmonious interaction and collaboration to achieve the State's objectives.

40. Specifically, Article 113 of the Constitution states that: "The branches of public power are the legislative, executive, and judicial branches, and that, in addition to the bodies comprising them, there are other autonomous and independent bodies that fulfill the other functions of the State." It also establishes that: "The different bodies of the State have separate functions, but they work together harmoniously to achieve their ends." This is consistent with the entire framework that, based on the republican design of the State established in Article 1 of the Political Charter, clearly develops a system of functional division and separation and the prohibition of concentration and abuse of power.

---

34 In this regard, this Court has reiterated the importance of this principle in defining the Political Constitution and has stated that: "In this context, the 1991 Constitution becomes unrecognizable if this principle is replaced, in whole or in part, by a principle of concentration of power" (judgment C-053 of 2016). In judgment C-285 of 2016, the Constitutional Court reviewed case law on the characterization of the balance of powers as the defining axis of the Constitution (see judgments C-970 and 971 of 2004, C-1040 of 2005, C-141 of 2010, and C-171 of 2012).

35 Cfr., sentences C-285 of 2016 and C-630 of 2017.

36 In this regard, this Court in judgment C-286 of 2015 stated: "Thus, the National Constituent Assembly understood that, without prejudice to the fact that the classic version of the principle of separation of powers should be reformulated and made more flexible, since the rigid and absolute division between the legislative, executive and judicial functions should be articulated with the emergence of new state roles such as those associated with oversight and electoral organization, with the principle of harmonious collaboration of powers and with the existence of a system of reciprocal inter-organic controls, the separation of powers should act as a radiating principle of the entire legal system, and in particular, in the definition of the entire structure and the bases of the functioning of the State."

37 See judgment C-285 of 2016.

41. Taking into account the importance that this principle had for the primary constituent, its transversality in the Political Charter and, particularly, the importance that the Constitutional Court has recognized in its jurisprudence, this Court has indicated that it is a true axis

defining the Charter.

42. Now, the separation of powers has been understood by constitutional jurisprudence from two dimensions: (i) the granting of exclusive functions to each of the branches of public power and (ii) the absence of external interference from one body to another, where the functions and roles assigned to each of them are violated, since this limits their capacity for self-government.

43. In this context, the constitutional articulation of the principle of separation of powers seeks to guarantee the autonomy and independence of each body in the performance of its functions, but all within the framework of harmonious collaboration. This design is reflected in various provisions of the Political Constitution.
Thus, Article 121 of the Constitution, as a first measure, establishes an express prohibition on State authorities from exercising functions other than those provided for in the legal system itself, which, analyzed harmoniously with the provisions of Article 6, which prescribes the liability of public servants for exceeding their functions, and Article 1, which defines Colombia as a State organized in a republican form, seeks to establish that, although the same Charter accepts harmonious collaboration between public powers, these cannot functionally interfere in the decisions that each one adopts in the exercise of those that have been entrusted to them.

44. In this context, the key point of the principle of separation of powers is that it categorically excludes those models that support the concentration of power and the missions of the State, since its purpose is the assignment and distribution of functions that allow it to fulfill its essential purposes, such as: "legislating, administering, judging, controlling, organizing elections or overseeing the functioning of the State; although in certain exceptional cases, the same body is granted powers to exercise different roles, in any case the institutional design is permeated by the division and functional separation and by the prohibition of concentration and abuse of power. In this order of ideas, the 1991 Constitution becomes unrecognizable if this principle is replaced, totally or partially, by a principle of concentration of power"38.

45. However, unlike the rigid model of separation of powers, the Constitution adopts a flexible system for distributing the various functions of public power. This is combined with a principle of harmonious collaboration between the different organs of the State and various mechanisms of

---

38
Judgment C-970 of 2004.

checks and balances between branches of government, as is the case with various institutions such as the Public Prosecutor's Office, the Comptroller General's Office, the Bank of the Republic, the National Electoral Council, and the National Civil Registry.

46. Consequently, it is essential to guarantee the independence and autonomy of the bodies to which the Constitution attributes the essential functions of the State, understanding independence as the absence of external interference in the development of the constitutional duties of the respective body, and autonomy as the granting to each of such bodies of the capacity to operate and carry out their activities by themselves, and to govern themselves39.

47. In this regard, the Court has explained that autonomy and independence become an essential assumption of the division of powers, not only because they guarantee the specialization of public administration, but especially because they prevent the configuration of absolute powers that put at risk the rights and freedoms of citizens, without this autonomy and independence being incompatible with the implementation of mechanisms that allow reciprocal controls or with harmonious cooperation.

interinstitutional.

48. Notwithstanding the foregoing, the functional division as a dimension of the principle of separation of powers is not limited to avoiding interference between the three branches of public power, but evidently has a transversal implication for all organs of the State to avoid the concentration of power and maintain the independence of the different branches among themselves and from the control bodies.

49. Thus, the traditional separation of powers has been subject to changes arising from the recognition or emergence of functions - such as fiscal control - that complement those assigned to each of the branches of public power, in pursuit of reciprocal collaboration aimed at better performance of state activity and the control that arises as a consequence of the implementation of a delicate mechanism of checks and balances.

50. In this regard, the Court has emphasized that the Office of the Comptroller General of the Republic is a state oversight body with specific powers, which horizontally, collaboratively, and harmoniously accompanies the traditional branches of public power, through a specialized and autonomous function by which it inspects the external fiscal activity of all State institutions from a financial, management, and results perspective.

---

39    See judgment C-285 of 2016.

40    Cf., judgment C-101 of

51. Its framework for action is fiscal control, which has been recognized by the Court as an effective and suitable tool for the protection of public assets, through (i) verification of the correct management of public resources and (ii) establishing whether, in the exercise of the management of collective resources, the rules that subject the administration in terms of legality are complied with and compliance with the constitutional and missionary purposes of each of the entities is ensured41.

52. Furthermore, this Court has determined that fiscal control responds to the need to preserve the treasury and to consolidate an authority: "that guarantees and verifies the correct execution of public budgets, avoiding and/or sanctioning waste, diversion of resources, abuses, unnecessary losses and improper use of funds"42.

53. In light of the above, the Plenary Chamber reiterates that the separation of powers is a fundamental pillar of the Constitution. This includes the exercise of fiscal control carried out by the Office of the Comptroller General of the Republic, with the purpose of protecting collective assets and ensuring morality in all operations related to the management and use of public assets and resources, and the efficiency and effectiveness of the administration in fulfilling the purposes of the State.

54. At this point it is appropriate to make a clarification regarding some Court precedents regarding the subsequent and selective control that exercises the Comptroller General. For this purpose, reference will be made to two central pronouncements through which this Corporation explained the rules under which the fiscal control established in article 267 was designed superior.

55. In judgment C-103 of 2015, the Court examined the power of warning about the risk of loss of public resources that implemented numeral 7 of article 5 of Decree Law 267 of 2000. On this occasion, this Constitutional Court determined that it contravened the Political Charter, given that said function exceeded the framework of action granted to the Comptroller's Office regarding: "(i) the subsequent and not prior nature that the supervisory work of the Comptroller's Office and, on the other hand, (ii) in the prohibition of that their actions constitute a kind of co-administration or interference improper in the exercise of the functions of the entities subject to control."

56. Similarly, in judgment C-470 of 2017, the Court referred to the rules under which the Comptroller General's Office operated. On this occasion, The relevance of the subsequent and selective nature of control was highlighted prosecutor, as follows:

---

41 *Ibid.*

42 Judgment C-716 of 2002.

"3.1.2. The nature of the control and surveillance exercised by the Comptroller's Office General of the Republic is later and selective, which constitutes one of the characteristics of the current fiscal control model. This is in line with with the prohibition of attributing administrative functions to the Comptroller's Office other than those inherent to its own organization, in order to avoid any form of co-administration and guarantee the independence and autonomy of the "control body."

**57.** The foregoing demonstrates the due respect this Court must have for constitutional guidelines, based on the functions assigned in the same higher legal order, given that it focused on the simple oversight exercised with respect to the verification of an objective opposition between the challenged provision and the constitutional text. However, **this does not imply that the Court had granted subsequent and selective oversight the status of the identifying axis of the Political Constitution, or even that this was the only means through which fiscal oversight could be exercised.**

58. From the foregoing clarifications, it should be reiterated that the Constitution does not establish intangible rules or rigid clauses, but rather core and identifying principles that, if reformulated, would affect its identity. Under these conditions, adopting a fiscal control model is a decision that takes into account the needs of each moment and its specific circumstances, such as, for example, technological and management advances in the handling of public resources.

**Minor premise: the reform introduced through Legislative Act 04 of 2019**

59. The second step in the *substitution trial* is the determination of the *minor premise.* This premise consists of the novel and different elements that the challenged legislative act introduced into the constitutional architecture. For this purpose, reference will be made to: i) the evolution of fiscal control; ii) the design of the fiscal control model established in the original Constitution; and iii) the reform introduced through Legislative Act 4 of 2019.

60. *The prior control model under the 1886 Constitution43.* The institution of fiscal control has existed in the country since Law 42 of 1923, which established the creation of an autonomous institution called the "Comptroller's Department," responsible for overseeing the management of public resources.

61. Then, by Decree 911 of 1932, the government decided to reorganize the Institution, granting it the status of an accounting and control office.

---

43 In judgment C-716 of 2002, this Corporation made a detailed historical account of the control prosecutor in Colombia.

fiscal, including within its functions the prior control of administrative management, corresponding to the general comptroller to issue a certification of availability, together with the registration of contracts in the Comptroller's Department (art. 9).

62. Article 93 of Legislative Act 1 of 1945 assigned to the Comptroller General of the Republic the supervision of the fiscal management of the Administration and by means of Law 20 of 1975 the stages of "prior control", "perceptual control" and "subsequent control" were regulated.

63. Specifically, in relation to prior control, the aforementioned law conferred on the comptroller a series of powers, such as subjecting payment for administrative contracts to the authorization of the comptroller, who had to receive an authentic copy of the Official Gazette or a widely circulated newspaper, with the extract of the contract endorsed by the corresponding auditor or fiscal auditor (art. 9).

64. In turn, Article 20 of the same law authorized the Comptroller General of the Republic to conduct prior audits of state-owned industrial and commercial enterprises whose board of directors requested it, or ex officio, on a temporary or permanent basis, when it noted frequent or repeated irregularities in the subsequent examination of accounts or in inspections carried out by said entity.

65. For its part, Decree 925 of 1976[44] defined the inspection modalities, https://www.corteconstitucional.gov.co/relatoria/2015/C-103-15.htm _ftn19 highlighting prior control as that which consists of: "examining, prior to the execution of transactions or operations, the acts and documents that originate or support them, to verify compliance with the established rules, laws, regulations and procedures" (art. 2).

66. In the same sense, the aforementioned decree ordered that a representative of the Comptroller General's Office must attend every meeting or committee for bidding, acquisitions or purchases in the process prior to the execution of the contract, so that, if he had observations on the same, it was not possible to contract until the Comptroller General's Office had issued a ruling and the matter had been re-examined by the respective committee (art. 5).

67. This type of fiscal control model generated numerous problems, to the point that the Council of State took it upon itself to clarify the scope of prior control, noting that, while the Comptroller's Office was empowered to verify compliance with fiscal regulations before expenditures were incurred, it could not interfere in the Administration's own activities. Specifically, it stated:

---

[44] Issued based on the extraordinary powers granted to the President of the Republic by Law 20 of 1975.

"The Comptroller's Office is exclusively responsible for overseeing the Administration's fiscal management and is prohibited from exercising functions inherent to the active Administration (Article 59 of the CN). One of the modalities offered by this oversight is the so-called 'prior control,' which allows the Comptroller's Office to verify compliance with fiscal regulations before the expenditure is made. (...) Legal numerical control, prior to expenditure, arises in the face of a payment order, to verify its legality for purely fiscal reasons. It does not authorize the body exercising it to discuss or challenge the administrative act intended to be executed through the payment order, since this would be equivalent to interference in the administration's own activities."45

68. Based on the powers attributed to the Comptroller General, multiple problems became evident, such as co-administration, the slowdown of the administration and corruption due to the concentration of power, a situation that ultimately led to a change in the fiscal control model46.

69. *Fiscal control in the 1991 Constitution.* The constituent made clear its interest in avoiding any form of interference by fiscal control bodies in administrative activity, specifically in attention to the decision-making and dispositive capacity of administrators, which led to the establishment of a model of subsequent and selective fiscal control, based on an evaluation of the results of the fiscal management of the administration.

70. In this regard, the text approved by the National Constituent Assembly made it clear that the chosen control model definitively eliminated the prior control system, as stated in the superior article 267, which stated:

"Fiscal oversight is a public function exercised by the Office of the Comptroller General of the Republic, which oversees the fiscal management of the administration and of individuals or entities that manage national funds or assets.

Such control shall be exercised subsequently and selectively in accordance with the procedures, systems and principles established by law. However, this may authorize, in special cases, surveillance to be carried out by

---

45 Council of State, Administrative Litigation Chamber, First Section, judgment of November 5, 1979.

46 In this regard, Judgment C-103 of 2015 highlighted the following problems with the system in force under the 1886 Constitution: "(i) it facilitated direct interference by the oversight body in executive decision-making, an interference that frequently hindered, if not vetoed, the normal development of the Administration; (ii) the exercise of prior control, despite its administrative connotations, did not imply any administrative responsibility for the Comptroller's Office and also compromised the necessary independence and autonomy of the oversight body; (iii) paradoxically, said system was considered to be a hotbed of corruption."

Colombian private companies selected through a public competition based on merit and contracted after receiving the opinion of the Council of State."

71. For its part, 5th of Law 42 of 1993[47] article https://www.cortecconstitucional.gov.co/relatoria/2015/C-103-15.htm - _ftn46 defined the chosen fiscal control model as follows:

"For the purposes of Article 267 of the National Constitution, ex post control is understood to mean the monitoring of the activities, operations, and processes carried out by the subjects of control and the results obtained. Selective control is understood to mean the selection, through a technical procedure, of a representative sample of resources, accounts, operations, or activities to obtain conclusions about the respective universe in the development of fiscal control.

For the exercise of subsequent and selective control, the comptroller's offices may carry out the procedures they deem appropriate."

72. This model is characterized by being a "subsequent, selective, broad, and comprehensive" scheme,48 which operates through the complementarity of external and internal mechanisms for monitoring fiscal activity. The former is exercised by the Office of the Comptroller General of the Republic together with the territorial comptroller's offices, and the latter by each public entity49 in accordance with the parameters and guidelines of the national entity.50 This scheme is characterized by being broad, comprehensive, complementary, posterior, and selective.51

i) Broad in two senses: on the one hand, it falls on people who make decisions that determine fiscal management, as well as those who perform management, control, direction and coordination functions, and on contractors and individuals who are held responsible within the respective process52. On the other hand, fiscal oversight implies financial control, control of legality, management, results, accounts and assessment of the internal control mechanisms of the controlled entities or persons, with the purpose of determining whether the allocation of public resources maximizes the results of administrative management53.

---

47 On the organization of the financial fiscal control system and the bodies that exercise it.

48 Judgment C-103 of 2015.

Article 269 establishes: "In public entities, the corresponding authorities are obliged to design and apply, according to the nature of their functions, internal control methods and procedures, in accordance with the provisions of the law, which may establish exceptions and authorize the contracting of such services with Colombian private companies."

50 Article 268.12 superior.

51 At this point, the guidelines established in judgment C-101 of 2018 will be followed.

52 Judgment SU-620 of 1996.

53 Judgment C-103 of 2015.

ii) Comprehensive because it encompasses the entire process of managing public resources. It includes the verification of the "management of public assets and resources in the stages of collection, expenditure, investment, disposal, conservation, and disposal"54 and, finally, involves the assessment of the achievement of the results for which they were intended.

iii) Complementary between the two control modalities, the external one assumed by the Comptroller General of the Republic, the General Audit Office of the Republic and the municipal comptroller's offices and the internal and prior one deployed by each entity within the framework of its administrative activity.

iv) Subsequently, given that fiscal control bodies are only empowered to deploy their powers once the administration has acted, so their activity begins precisely when it has adopted its decisions.

v) Selective, since it is based on the selection of a representative sample of resources, accounts, operations or activities, through a technical procedure, in order to obtain conclusions about the respective universe in the development of fiscal control55. This is because, in practice, not all administrative activities can be subject to control, but only those that allow for the consolidation of a global vision of the authorities' operations56.

73. In this context and in view of the matter under examination, the original constitutional scheme referred mainly to a subsequent and selective fiscal control, in order to avoid any form of interference in the decision-making and dispositive capacity of the administration (co-administration) under the prior control model prevailing in the Constitution of 1886.

**The changes generated by the demanded expressions of the Act
Legislative 04 of 2019**

74. The plaintiff specifically requested certain expressions from articles 1 and 2 of Legislative Act 4 of 2019, which amended articles 267 and 268 of the Charter, which refer to the following:

(i) Fiscal control may be preventive and concomitant, which will not involve co-administration and will be carried out in real time through permanent monitoring of the cycles, use, execution, contracting and impact of public resources, through the use of information technologies, with the participation of social control and with the coordination of internal control.

---

54 Judgment C-623 of 1999.

Article 5 of Law 42 of 1993

56 Judgment C-716 of 2002.

ii) The law will regulate its exercise and the systems and principles applicable to each type of control.

iii) It is exceptional, non-binding, does not imply co-administration, does not address the appropriateness of the decisions of public resource administrators, will be made in the form of a warning to the fiscal manager and must be included in a general public warning system.

iv) The exercise and coordination of concomitant and preventive control corresponds exclusively to the Comptroller General of the Republic in specific matters57.

v) The comptroller has the power to warn public servants and individuals who manage public resources of the existence of an imminent risk in operations or processes in progress, in order to prevent the occurrence of damage, so that the fiscal manager can adopt the measures he deems appropriate to prevent it from materializing or spreading, and to exercise control over the facts thus identified.

75. The new constitutional design implies that fiscal control is developed in the moments prior to the execution of contracts and the potential for fiscal damage, so the purpose of this control is not based on damage but on risks. Its purpose is not to repair damage but to prevent it through warnings to the fiscal manager so that the assessments of the Comptroller General of the Republic regarding an activity it considers risky are assessed. It is necessary to regulate the specifics of this control so that it is exercised with objective, measurable, and evidential assessments, and not merely on hunches, subjective and unilateral opinions, or simple arbitrariness.

76. For its part, the explanatory statement of Legislative Act 4 of 201958 explained the inefficiency of ex post and selective control. Consequently, the need arose to introduce a complement through the so-called *preventive and concomitant control.* This would operate in addition to the ex post and selective control originally provided for in the Political Charter59.

---

57 Article 69 of Decree 403 of 2020 establishes: "The warning will apply to ongoing matters determined by the Comptroller General of the Republic where an imminent risk of loss of public resources and/or negative impact on assets or patrimonial interests of a public nature is identified, based on any of the following exceptional criteria: a) Social significance. b) High environmental impact. c)
"High economic connotation."

58 Published in the Congressional Gazette 153 of 2019.

59 In relation to this point, it was indicated: "Social demands require the adaptation of fiscal control institutions to the new realities of resource management, which allow mitigating the difficulties that currently arise in fulfilling their main objective, that is, the protection of public resources within the framework of the fight against corruption. Therefore, it is clear that the control mechanisms currently in place at the Comptroller's Office are insufficient since it is not possible to properly monitor public resources, as well as prevent them from being misused, which has led to the conclusion that subsequent and selective power is not a full guarantee for safeguarding resources."

77. Regarding the explanation of the preventive and concomitant model, the explanatory statement began by pointing out that while the model prior to the 1991 Constitution hindered the exercise of administration, the current one: "it falls short in the real and effective protection of public assets, because due to its limits of competence it can act only and exclusively when the administrative processes have been executed, which is often equivalent to saying: when the damage has been consummated." Based on this argument, the explanatory statement explains that the new proposed model responds to the new dynamics of public management and, in this sense, allows the comptroller's offices to act in real time *"that is, that their control and surveillance is given in terms of effectiveness and timely protection of assets from the moment the risk arises"60.*

78. It was emphasized that the proposed design allows the Comptroller's Office to act before the damage occurs because its purpose is not to determine whether damage has occurred in order to seek compensation for it, but rather to prevent it. In this regard, the explanatory statement emphasized the need to begin its action from *"the moment the risk arises" or "on those damages that are evident or whose materialization is perfectly predictable."* All of this emphasizes a type of preventive control that invites citizen participation.

79. Decree Law 403 of 2020, "which establishes regulations for the correct implementation of Legislative Act 04 of 2019 and the strengthening of fiscal control, based on the extraordinary powers conferred by the transitional paragraph of article 268 of the Political Constitution, modified by article 2 of Legislative Act 04 of 2019" offers the guidelines that would develop this perspective of the new fiscal control.

80. The intention of the derived constituent was to establish a system based on the anticipation and prevention of damage, through the monitoring of

---

of the State. Therefore, the explanatory statement mentions that "it is proposed to strengthen the Comptroller's Offices in their auditing role, fed back and revitalized by the new preventive and concomitant model, preserving the posteriority of control for the sake of evaluating management and results. The current fiscal control model is based on posterity and selectivity, meaning that fiscal management acts have already been executed and that it does not operate on any act of the administration but on some that are considered. This creates a problem in fiscal control because, since public resources have already been executed by the administration, in the event of improper allocation of resources, this would have already generated a serious impact, and the possibility of recovering them would not be very effective, as can be seen in serious cases of corruption. In this sense, we must highlight that with the introduction of the new "preventive and concomitant" control parameter, citizens will play a leading role in preventing damage, through the different intervention modalities of participatory fiscal control, which will significantly activate microcontrol. not necessarily with a view to initiating actions aimed at compensating assets, but rather to preventing the configuration and materialization of damage, results that will be quantitatively reflected in the so-called audit benefits and in measurement factors of public entities." Official Gazette of Congress No. 195 of 2019, page 19.

60 Congressional Gazette No. 195 of 2019, p. 20.

61 *Ibid.*

the sources and use of public resources during all phases of financial and budgetary operations. This implies strengthening the auditing and oversight apparatus, as well as encouraging greater citizen participation in fiscal oversight, seeking to assess and identify risks and generate warnings so that the administrator can take the necessary measures to prevent the consolidation of damage to public assets.

81. From all the above, it can be seen that Legislative Act 04 of 2019 modified the following aspects:

i) Fiscal control, in addition to being ex post and selective, may be exercised preventively and concomitantly, as necessary to guarantee the defense and protection of public assets.

ii) The preventive and concomitant model is exceptional in nature and cannot involve co-administration. Furthermore, it must be implemented in real time through ongoing monitoring of the cycles, use, execution, procurement, and impact of public resources, using information technologies, with the participation of social oversight, and with the coordination of internal control.

iii) Preventive and concomitant control will be carried out in the form of a warning and its exercise corresponds exclusively to the general comptroller in specific matters.

82. In this context, the Court finds that the intention of the derivative constituent was to complement the current control system, considering it insufficient, and to add to it the preventive and concomitant control model exercised through constant and parallel monitoring of fiscal management, based on the warning function, without implying co-administration, eliminating potential risks and foreseeable damages. To this extent, it was made clear that the objective was not to judge the activity of the public manager, but rather to prevent damage, through an effective and legitimate mechanism to prevent the fiscal manager from making decisions that go against the public treasury.

83. Therefore, preventive and concomitant control cannot influence the administration's decisions to the point of establishing a system of co-administration or co-management, since the constitutional amendment expressly prohibits it. Therefore, any type of veto or pre-approval regarding decisions made by public resource managers must be eliminated. Thus, through the concept of a warning, they are allowed to identify the risks looming over some projects so they can assess the situation and take appropriate corrective measures before any damage is caused to assets. Finally, this model does not replace ex post and selective control, but rather seeks to complement the exercise of fiscal control.

84. In accordance with the provisions of the constitutional reform, this modified the fiscal control system with the objective of making it more efficient, concentrating part of its activity on the prevention of damages for which the existence of a risk is established, so that the control body can monitor the contracting processes in progress and inform the fiscal manager, when it deems it essential, of any possible risks so that these do not materialize into damages against public assets.

85. The constitutional reform, seen in this light, reflects a major global concern of these times, which is the prevention of corruption risks to which public resources are exposed. Corruption impoverishes nations and hinders development opportunities in all areas. It can therefore be noted that the resulting constituent assembly recognized the need for fiscal oversight reform to address this aforementioned risk.

**Conclusion: the variations to the fiscal control model do not constitute a replacement for the separation of powers as the defining axis of the Constitution**

86. Finally, the third step of the syllogism within the judgment of substitution requires establishing a conclusion in which it is determined whether the constitutional reform introduced actually ends up replacing the Political Charter or one of its identifying axes.

87. Through this examination, the Constitutional Court was able to conclude, as a major premise of the substitution judgment, that the constitutional design of the structure of the State and the separation of powers, where the different bodies interact with each other in a system of checks and balances, is essential. Specifically, fiscal oversight stands as an instrument of the delicate constitutional balance, without the manner in which such oversight is carried out being a defining element of the Constitution.

88. Indeed, the separation of powers is a fundamental pillar of the Constitution. This includes the exercise of fiscal control carried out by the Office of the Comptroller General of the Republic for the purpose of protecting collective assets and ensuring morality in all operations related to the management and use of public assets and resources, as well as the efficiency and effectiveness of the administration in fulfilling the purposes of the State.

89. Now, what is at issue is whether the fiscal control model itself constitutes such an identifying axis of the Constitution. Thus, in the present case, the plaintiff challenged a series of expressions in Articles 1 and 2 of Legislative Act 4 of 2019, considering that they had been processed with an excess of jurisdiction by the Congress of the Republic, as they were in the nature of a partial replacement of the Constitution's defining axis of the separation of powers and subsequent fiscal control.

90. In this regard, the Plenary Chamber understands that subsequent and selective fiscal control is not an axis of the Constitution, since from the certain fact that the Constituent Assembly decided to abandon a prior control scheme, it does not follow as necessary that subsequent and selective control constitutes an axis of the 1991 Constitution.

91. For the Court, the defining element of the Constitution is the model of separation of powers, which includes a system of checks and balances, through bodies that control the exercise of power, with particular emphasis on the fight against corruption and the protection of public resources and assets.

92. Therefore, the complex framework between the separation of powers and the reciprocal controls that involve the concurrence of different bodies in the fulfillment of the functions of the State, entails the existence of various
control modalities, so the reform corresponds to the exercise of the evolution of controls, becoming a complementary model to the later and selective one, with which the reform does not abandon this type of control, simply incorporating other elements to achieve the purposes of the system of checks and balances.

93. As stated in the preceding paragraphs, the manner in which ex post and selective fiscal control is exercised is not a cornerstone of the Constitution. The fact that the constituent assembly decided to abandon a system of ex post control (1886 Constitution) does not imply that ex post and selective control (1991 Constitution) consequently constitutes a defining cornerstone of the higher order.
Understanding it this way would lead to this scheme being unmodifiable,
preventing any type of reform that would make it more effective based on the various existing technological advances, the advancement of state management control systems for public resources, new forms of corruption, etc.

94. In this context, the Court highlights the necessary interaction between the different State bodies, within the complex of functions that constitute the administration as a total concept and not just limited to the executive.

95. Having stated the above, the Court considers it essential to highlight that Legislative Act 4 of 2019 was careful to warn that preventive and concomitant control: (i) will not imply co-administration; (ii) will be carried out in real time through permanent monitoring of the cycles, use, execution, contracting and impact of public resources; (iii) through the use of information technologies; (iv) with the active participation of social control and with the articulation of internal control; (v) with an exceptional non-binding nature; (vi) without being able to address the convenience of the decisions of the administrators of public resources and finally (vii) being carried out in the form of a warning to the fiscal manager, whose exercise and

Coordination corresponds exclusively to the Comptroller General of the Republic in specific matters.

96. To this extent, it is clear to the Court that when the Constitution stipulates that control shall also be concomitant and preventive, this must be understood as prior control. To this extent, it is undisputed that the prior control of the 1886 Charter failed; however, this does not imply that preventive and concomitant control suffer from the same flaws as the former.

97. Therefore, the concomitant and preventive control established by Legislative Act 4 of 2019, in accordance with what is expressly stated in the constitutional norm, does not imply nor can it imply in any way,
co-administration. This means that it abandons any type of veto power or pre-approval by the supervisory body. In addition, the control
It is exceptional and is exercised when there is an imminent risk to prevent harm. At the same time, the warning does not bind the managers of public resources, as was the case with the prior control in force in the Political Charter of 1886, which was general, binding, and entailed direct interference in the management of the Administration.

98. For the Court, it is important to establish the profound differences that exist between prior control (Constitution of 1886) and concomitant and preventive control (Legislative Act 4 of 2019), as explained in the following table.

| Prior control | Concomitant and preventive control |
|---|---|
| A representative of the Comptroller General's Office had to be present in the process prior to the execution of the contract, so that if there were observations on the contract, it was not possible to enter into a contract until the Comptroller General's Office had issued a ruling and the matter had been re-examined (Decree 925 of 1976, art. 5). | "Preventive and concomitant" control is exceptional, non-binding, does not imply co-administration, and does not address the appropriateness of decisions made by public resource administrators. |
| State contracting was subject to the approval of the Comptroller (Decree 911 of 1932, art. 9, Law 20 of 1975 art. 9). | Preventive and concomitant control is exercised in parallel, through warnings to the tax manager, without these being binding. |

99. The above diagram shows that concomitant or preventive control in no way paralyzes administrative activity. Furthermore, it is not binding on contracting and much less hinders the activity of the

Administration, since its exercise is materialized through the figure of warning, which allows the manager's actions to continue. However, for the evidently proposed goal to materialize—that is, for concomitant and preventive control not to become blurred to the point of becoming a sort of camouflaged prior control—it must meet at least the following conditions:

(i) The warning allows the manager to continue its activity without it constituting a prejudgment. It is not a matter of defining how and on what to execute the resources, but of indicating to the administration when damage may materialize. Indeed, the claim is based on the idea of how harmful a *co-administration* disguised as preventive control would be for a large number of activities. This is because a considerable number of activities belonging to the private sector can also be carried out by state entities (public establishments, mixed-economy companies, official or mixed public utility companies). This would, therefore, allow interference in the free development of the business purpose of the latter, end up exposing their very existence, since, while in the private sector free initiative governs their actions, in public entities a third party—

The comptroller's office—would have the capacity to direct the free flow of business, which in itself would be a great disadvantage compared to its private counterparts.

Attention must therefore be drawn to the need to design special and specific forms of exercising preventive control in such entities, that is, in those that develop their purpose in competitive spaces.

ii) With regard to mixed-economy enterprises, the reform must be understood in such a way that it does not paralyze administrative activity, imply prejudgment, or ultimately affect the proper development of the activities of state-owned enterprises. Indeed, in these cases, fiscal control must address the specific activity carried out by the entity, the concrete and determined events that would justify the intervention, and the method of evaluating the activity, for example, by integrating the local and international market context, analyzing complete processes in the case of complex activities, or, conversely, by steps or levels of development.

iii) Territorial autonomy must be guaranteed. Any exercise of functional intervention must be carried out within the framework of respect for territorial autonomy.

iv) The functions of prevention, investigation, and punishment must be adequately separated, as a guarantee of due process. Likewise, the degree of relevance that the internal control of organizations has in this function, and even the possible interaction with other forms of control *(e.g.,* the attorney general's office, the prosecutor's office, and superintendencies) must be considered. The due process mentioned above may even lead to the need to standardize the forms

to exercise preventive control, even by identifying the activities that are the object of said control and their specificities, in such a way that it cannot be a control for which there are no clear rules of the game.

100. These guidelines allow the Court to understand that the proper management of this new model constitutes a guarantee of protection of public resources, which ultimately materializes in a way of satisfying the rights of the entire social conglomerate. To achieve this, it is necessary to have all the tools available to achieve the proposed goal, such as methodologies and instruments for intelligent information management, based on data analytics, artificial intelligence, or other technical or technological instruments applicable during the cycles of use, execution, contracting, and impact of public resources. This is done in order to identify events, risks, or poor management practices and warn about the possible occurrence of damage to public assets, based on anticipatory or forecasting models.

101. In this sense, the constitutional amendment seeks to strengthen fiscal control in Colombia, in accordance with new challenges, new forms of corruption, and the development of new information technologies.

102. Under these conditions, the Court concludes that Legislative Act 4 of 2019 does not replace the Constitution, since the establishment of a brand new fiscal control system - such as the one examined - does not constitute *per se*
an impact on the principle of separation of powers, even more so if the constitutional rule examined itself establishes the limits of non-co-administration.

103. In light of the above, the challenged expressions of Legislative Act 4 of 2019, which included concomitant and preventive control, and the warning function for its implementation, will be declared constitutional.

### VII. Decision

In view of the foregoing, the Plenary Chamber of the Constitutional Court, administering justice in the name of the people and by mandate of the
Constitution,

### RESOLVES:

**First.-** In compliance with the provisions of Article 1 of Legislative Decree 469 of 2020, the suspension of terms in this process is lifted.

**Second.-** Declare CONSTITUTIONAL the challenged expressions of article 1 and numeral 13 of article 2 of Legislative Act 4 of 2019, for the charges analyzed in this judgment.

Notify and comply.

Alberto Rojas Ríos
President

Carlos Bernal Pulido
Magistrate

Diana Fajardo Rivera
Magistrate
*With clarification of vote*

Luis Guillermo Guerrero Perez
Magistrate

Alejandro Linares Cantillo
Magistrate
*With clarification of vote*

Antonio Jose Lizarazo Ocampo
Magistrate
*With clarification of vote*

Gloria Stella Ortiz Delgado
Magistrate

CRISTINA PARDO SCHLESINGER

Magistrate
*With dissenting vote*


JOSE FERNANDO REYES CUARTAS
Magistrate


MARTHA VICTORIA SÁCHICA MENDEZ
General Secretariat

**DISSENTING VOTE OF THE JUDGE
CRISTINA PARDO SCHLESINGER
TO JUDGMENT C-140/20**

Reference: file D-13.517

Claim of unconstitutionality against articles 1 (partial)
and 2 (partial) of Legislative Act 4 of 2019 "By means
of which the Fiscal Control Regime is reformed."

Reporting Judge:
José Fernando Reyes Cuartas

With due respect for the decisions of the Chamber, I reserve the right to vote on the matter in
question for the reasons set out below:

The challenged rules of Legislative Act 4 of 2020 constituted a substitution of the Political
Constitution that should have led to its declaration of unconstitutionality. I consider that the
previous and concomitant model of fiscal control carried out by the Comptroller General of the
Republic established by Legislative Act 04 of 2019 generates a partial and permanent substitution
of the central axis of the Political Charter of separation of powers, since it allows, through the
powers of judicial police and the collection of information on ongoing processes, the control body
to interfere in the administrative functions that are specific to the supervised entities and, through
the warning function, to intervene in the administrator's decision, usurping its autonomy and
affecting the independence that the Comptroller General's Office must have for the initiation of
any fiscal trials that may eventually arise.

I believe that the powers attributed to the oversight body, both to demand information from
entities and to exercise judicial police powers, are exceeded when they are developed within the
concomitant and preventive control model, not only because they are exercised over the
development of fiscal management processes at any stage in which they are found - even from
the planning or preparatory phases - without a certain and verifiable reason, but also because
they are intended to serve as inputs to the warning function, aimed at the official "adopting
measures" that is, changing the decisions and actions that were being carried out regarding the
management of the resources of their entity. In this way, the concomitant and preventive fiscal
control model established by the challenged expressions in Legislative Act 04 of 2017 becomes
a threat to the functional autonomy of the entities in the management of their resources, since it
allows

The Comptroller General's Office may interfere in the processes and decisions of the fiscal manager, based on a subjective and indeterminate criterion such as "imminent risk."

I consider that the functional division, which guarantees the autonomy and independence of the entities for the exercise of the powers and decisions attributed to them, is blurred with the preventive and concomitant control designed by the reform, and instead, a concentration of power is established in the control body that no longer exercises its function on the results, but can intervene and participate, through warnings, in the management of public resources that corresponds to the other entities of the State. The Political Charter, which was designed seeking to jealously maintain the balance between the bodies that implement the power of the State, and which therefore structured a control model that was only exercised on the results of the management, safeguarding the powers of each of the entities, was replaced by another, at least partially,62
when a supervisory body is allowed to intervene in decisions that are specific to each authority.

Therefore, the challenged provisions of Legislative Act 04 of 2019, which establish prior and concomitant control and the warning function for its implementation, should have been declared unconstitutional.

In the above terms I express the reasons for my disagreement.

Date *as above,*


CRISTINA PARDO SCHLESINGER
Magistrate

---

62 The principle of separation of powers, in its functional separation dimension, is not completely replaced because it does not affect the division of functions of the three main branches of public power, and the judicial or legislative functions cannot be affected. However, the concentration of administrative power in a single oversight body generates an imbalance of power, which replaces a significant part of the principle, rendering the constitutional model established by the primary constituent unrecognizable.

**EXPLANATION OF THE JUDGE'S VOTE**
Diana Fajardo Rivera
**TO JUDGMENT C-140/20**

Reference: File D-13517

Claim of unconstitutionality against articles 1
(partial) and 2 (partial) of Legislative Act 4 of 2019
*"By means of which the Fiscal Control Regime is
reformed."*

Reporting Judge:
José Fernando Reyes Cuartas

1. With the customary respect for the decisions of the Court, I proceed to clarify my vote regarding Judgment C-140 of 2019.[63] The ruling resolved to declare constitutional the challenged expressions of Article 1 and numeral 13 of Article 2 of Legislative Act 4 of 2019, *"By means of which the Fiscal Control Regime is reformed."* Although I share the decision, I clarify my vote in relation to the judgment's analysis of the substantive suitability of the claim, in particular, with regard to the major premise and the minor premise of the substitution judgment.

2. Judgment C-140 of 2019 indicates that the plaintiff builds the major premise on two defining axes of the Constitution that it considers superseded by the challenged norms: the separation of powers and ex post and selective fiscal control. Regarding the latter, the judgment states that, in section b of the complaint, *"the plaintiff develops the character of the ex post and selective control model as a defining axis of the Constitution, which is based on a historical and systematic analysis of the Constitution."* Therefore, it concludes that on this point, the arguments meet the criteria of *relevance* and *sufficiency.* However, although I agree with the judgment that the complaint clearly and articulately develops the principle of separation of powers as a fundamental constitutional pillar, the same is not true of ex post and selective fiscal control. Although the plaintiff claims that the separation of powers and subsequent and selective fiscal control are essential pillars of the 1991 Political Constitution, when presenting the arguments on the latter, he points out that it is a *"manifestation of the separation of powers and an essential pillar of fiscal control."* In this regard, the complaint concludes: *"The notion of fiscal control as subsequent and selective is established as a component of the principle of separation of powers in a specific matter, which guarantees the independence and autonomy between the Executive*

---

[63] MP José Fernando Reyes Cuartas.

*and the oversight body itself. Hence, it becomes an essential special pillar of the 1991 Political Constitution, under the protection of the already widely recognized separation of powers as the defining axis of the Colombian constitutional system."* Consequently, the ruling should have noted that the claim fails to structure subsequent and selective fiscal control as a defining axis of the Constitution independently of the principle of separation of powers, but rather, on the contrary, tied to the latter, or as the plaintiff himself maintains, as a manifestation of said principle.

3. Furthermore, in relation to the development of the minor premise made in the claim, Judgment C-140 of 2019 states: *"the construction of the minor premise of the charge was carried out based on the purpose and scope of the preventive and concomitant control model set forth in the accused expressions in light of the statement of reasons of the bill, and the powers that the same Legislative Act confers on the Comptroller General of the Republic for the development of his functions,64 in particular the warning function,"* so the plaintiff's argument is *pertinent* and *sufficient.* I consider that, taking into account that said premise is made up of the novel and different elements that the accused legislative act introduced into the constitutional architecture, the plaintiff should have examined at this point the Internal Control System as an integral part of the fiscal oversight model and the impact that the accused norms would have on it, and not focus the analysis solely on the powers that these grant to the Comptroller General of the Republic.

4. Indeed, the Internal Control System of the various public entities is coordinated with the external fiscal control carried out by the Comptroller General's Office, since internal control offices perform preventive tasks by conducting audits and monitoring activities that facilitate the generation of alerts to the administration. Article 2 of Law 87 of 1993, *"Whereby standards are established for the exercise of internal control in state entities and agencies and other provisions are issued,"* states that one of the objectives of the Internal Control System is to *"[p]rotect the organization's resources, seeking their proper management against potential risks that affect them."*

5. Therefore, since Legislative Act 4 of 2019 impacted the entire fiscal control model, Judgment C-140 of 2019 should have considered this aspect in the analysis of the substantive suitability of the claim, since the model in force until the constitutional reform, as the judgment itself warns, is *"complementary between the two control modalities, the external one assumed by the Comptroller General of the Republic, the General Audit Office of the Republic and the municipal comptroller's offices and the internal and prior one*

---

[64] The plaintiff builds his arguments on the scope of this model taking into consideration section 4 of article 267 and numerals 16 and 17 of article 268 of the Political Constitution, as amended by Legislative Act 04 of 2019.

*deployed by each entity within the framework of its administrative activity."*
Thus, when introducing the so-called preventive and concomitant control through the challenged legislative act, the minor premise of the claim should have taken into account not only the impact that this new type of fiscal control has on the external control carried out by the Comptroller General of the Republic, but also on the internal control carried out by the public entities themselves. This type of control is characterized by focusing on prevention through alerts to the administration, thus fulfilling a function similar to that proposed by preventive and concomitant fiscal control, since this new control scheme, like internal control, does not focus on damage but on risks, and its purpose is not the repair of damage but its prevention. Only in this way could it be considered that the study of the object and scope of the preventive and concomitant control model, developed in the minor premise, was carried out in a comprehensive and coherent manner based on the impact it had on the fiscal control model as a whole.

In these terms I set out the reasons why I clarify my vote in this decision.

Date *as above.*

Diana Fajardo Rivera

Magistrate

**EXPLANATION OF THE JUDGE'S VOTE**
Alejandro Linares Cantillo
**TO JUDGMENT C-140/20**


Reference: File D-13517

Claim of unconstitutionality against articles 1 (partial)

and 2 (partial) of Legislative Act 4 of 2019 *"By means
of which the Fiscal Control Regime is reformed."*


Reporting Judge:
José Fernando Reyes Cuartas


With due respect for the decisions of this Court, while I share its operative part, I consider it pertinent to clarify my vote regarding the basis and use of the doctrine of constitutional substitution. While Judge Cristina Pardo's original ruling declared the partial unconstitutionality of Legislative Act 4 of 2019, *"By means of which the Fiscal Control Regime is reformed,"* I disagreed with said ruling for reasons of respect for the reform power of the Congress of the Republic. It is an inconvenient reform, which **could revive the prior control and co-administration of the Comptroller's Office** exercised before the 1991 Constitution, but I believe that the Constitutional Court should be especially strict in admitting lawsuits against constitutional reforms based on the use of this important doctrine, which allows the Constitutional Court to review the power of the Constitution to reform. Indeed, I consider that in this specific case the claim was flawed, as I will explain in detail below.


**A. On the admission of constitutional claims against constitutional reforms, and the ineptitude of the claim in this case**

1. *The claim lacked certainty:* The claim was built on assumptions that do not derive from the text of the legislative act, but rather from assumptions constructed by the plaintiff, based on a subjective and partial reading of the rules. In effect, the plaintiff argued that (i) preventive and concomitant control is equivalent to prior control, without performing a clear analysis that would lead to such a demonstration, in the face of the major premise argument and the understanding of the axial axis of the Constitution; and (ii) the warning functions will mean a co-administration mechanism by the

Comptroller's Office, with statements that are not supported by the text of the legislative act, but rather by mere assumptions.

2. *The claim was irrelevant:* Upon reviewing the claim, many -
Not only did the plaintiff's arguments concern the appropriateness of the reform, but they did not present any arguments that would demonstrate whether it replaced or modified any central axis of the Constitution. The arguments regarding the supposedly replaced axis did not demonstrate an analysis of multiple normative references, as required by the jurisprudence of this Court, but were once again limited to appropriateness in light of Articles 267 and 268 of the Constitution.

3. *The claim lacked specificity:* in the case of claims for the substitution of the Constitution, the plaintiff must identify the reasons and the constitutional axes impacted, and how the legislative act would be replacing them. Thus, although the plaintiff alleged that there are two constitutional axes that would be replaced: separation of powers and ex post and selective control, his argument focused on the separation of powers and failed to establish how these characteristics of fiscal control (ex post and selective) would be defining of the 1991 Constitution. In the examination of the suitability of the claim, the bill maintains that such work corresponds to the Constitutional Court when, in fact, it is possible to relax the requirement when it comes to an axis already recognized by jurisprudence, but this does not seem to be the case with ex post and selective fiscal control, which had never been examined in a lawsuit for the substitution of the Constitution. The lack of specificity in the claim was evident because the plaintiff failed to adequately construct the major premise, since, in the name of the separation of powers, he sought to assert that Article 267 of the Charter is a cornerstone of the Constitution.

**B. On the foundation and use of the doctrine of substitution of the Constitution**

4. Finally, with due respect for the jurisprudence of this Court, I reiterate my critical position regarding the foundation and use of the doctrine of the substitution of the Constitution.65 The Constitutional Court, through judgment C-551 of 2003, introduced the theory of constitutional control due to jurisdictional defects as a modality of procedural defects of legislative acts that, as such, are subject to the control established in

---

65 In this regard, I reiterate my opinion on Judgment C-285 of 2016, which specifically refers to the use of the substitution doctrine in matters of institutional design. See also my opinions and clarifications on Judgments C-084 of 2016; C-261 of 2016; C-699 of 2016, and Judgment C-332 of 2017.

Article 241, paragraph 1, of the Constitution. However, despite the passage of several years and the application of this theory on several occasions, the methodology for analyzing this defect, known as *"substitution judgment,"* remains a complex, unfinished, and incomplete concept. Therefore, it must be used with special caution and self -*restraint* to avoid converting a strictly legal control into a political or expedient one.

5. As I have previously indicated, the concept of constitutional replacement is problematic insofar as (i) it seriously affects the democratic principle; (ii) it violates the express power assigned to Congress to reform the Constitution through legislative acts; (iii) it ignores the fact that the approval of legislative acts is vested in a qualified procedure intended to ensure adequate deliberation and consensus processes; and (iv) it attributes to the Constitutional Court excessive, discretionary, and uncontrolled powers, which do not arise from Article 241 of the Constitution and which transforms it into an additional instance in the reform process. Additionally, I consider that (i) the judgment of constitutional replacement may result in substantive review of legislative acts, for which the Constitutional Court lacks jurisdiction; (ii) the construction of the concept of the "defining axis" of the Constitution is problematic and could, once again, lead to the distortion of the legal nature of constitutional review; (iii) the methodology for applying the aforementioned "substitution judgment" may incur the fallacy of begging the question; and (iv) the application of said judgment may lead to the petrification of the constitutional system. All of the above reaffirms my position regarding the aforementioned substitution judgment, which requires restricted, exceptional, and prudent use.

6. Thus, it is not the responsibility of the Constitutional Court to exercise a "substitution judgment" where specific institutional designs are confused with the defining axes of the Constitution, nor to analyze the advisability of changing an institutional design adopted by the Constitution. In a constitutional democracy, which lacks explicit substantive limits on the power of constitutional reform, it is the responsibility of this Court to review compliance with the established procedure and the necessary deliberation, but the judgment on the advisability or necessity of reform is something that ultimately corresponds to the citizens or their representatives.

In the above terms I leave my clarification of vote recorded, regarding the decision adopted by the majority of the Plenary Chamber.

Date *as above,*

Alejandro Linares Cantillo

Magistrate