**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**PERIMETRAL ORIENTAL DE BOGOTÁ, S.A.S.,**

**Petitioner,**

**v.**

**AGENCIA NACIONAL DE INFRAESTRUCTURA, et al.,**

**Respondents.**

**Civil Action No. 25-1099 (JDB)**

**MEMORANDUM OPINION**

This dispute concerns a failed effort to build a road between the Colombian towns of Sopó and Cáqueza. Colombia's Agencia Nacional de Infraestructura (ANI) contracted with petitioner Perimetral Oriental de Bogotá (POB), a private Colombian company, to construct, operate, and maintain a 95-mile highway between the towns. After environmental concerns quickly scuttled the project, POB commenced arbitration proceedings, alleging that ANI had breached its obligations under their contract. An arbitral tribunal of the International Centre for Dispute Resolution, sitting in Bogotá and applying Colombian law, sided with POB and awarded it approximately 425 million dollars in damages.

A keen reader may now wonder: what brings a dispute over a Colombian road, between two Colombian entities, governed by Colombian law, and arbitrated in Colombia to our shores?

The United States, Colombia, and 170 other nations are parties to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, also known as the New York Convention. See Contracting States, New York Arbitration Convention, available at https://www.newyorkconvention.org/contracting-states [https://perma.cc/8BGH-J78T] (last visited Aug. 12,

2026). The New York Convention "obligates each contracting state to 'recognize [foreign] arbitral awards as binding and enforce them in accordance with' local procedural law." GSS Grp. Ltd. v. Nat'l Port Auth. (GSS Grp. I), 680 F.3d 805, 811 (D.C. Cir. 2012) (quoting The New York Convention art. 3, opened for signature June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3). The Federal Arbitration Act implements the Convention, vesting foreign arbitral awardees with a cause of action for confirmation and enforcement of their awards, and United States federal courts with jurisdiction over these actions. 9 U.S.C. §§ 203, 207.

POB—and its dispute with ANI—thus arrive in this District by way of the United States' treaty obligations under the New York Convention. Invoking the Convention and the Federal Arbitration Act which implements it,[1] POB petitions this Court to confirm and enforce its arbitral award against ANI within the United States. POB also names the Republic of Colombia as a respondent, seeking to impute ANI's liability onto the Colombian state.

ANI and Colombia move to dismiss POB's petition, each disputing this Court's jurisdiction to confirm and enforce the award, albeit for different reasons. Colombia objects that as a sovereign nation, it is presumptively immune from suit, and because ANI is legally distinct from Colombia, imputing ANI's waiver of sovereign immunity onto it is improper. ANI argues that because it has no property in the United States, and both it and the underlying dispute have no nexus with the United States, this Court lacks personal jurisdiction over it.

Only Colombia's objection persuades. ANI is a separate juridical entity from Colombia, so ANI's agreement to arbitrate does not waive Colombia's sovereign immunity, and the Court

[1] The United States and Colombia are also parties to the Inter-American Convention on International Commercial Arbitration, opened for signature Jan. 30, 1975, O.A.S.T.S. No. 42, 1438 U.N.T.S. 245 (the "Panama Convention"). The United States' execution of the Panama Convention references its prior execution of the New York Convention, see 9 U.S.C. § 302, and the two treaties "are substantively identical for purposes of this case," so the Court proceeds as the parties did, analyzing their dispute under the New York Convention. TermoRio S.A. E.S.P. v. Electranta S.P., 487 F.3d 928, 933 (D.C. Cir. 2007).

grants Colombia's motion to dismiss. The Court denies ANI's parallel motion, however, because the Foreign Sovereign Immunities Act authorizes the Court to exercise personal jurisdiction over ANI, and doing so does not violate ANI's rights under the Due Process Clause of the Fifth Amendment.

## BACKGROUND

### I. ANI

To improve infrastructure conditions within its borders, Colombia created a new public entity responsible for initiating, managing, and maintaining public-private infrastructure projects—the Agencia Nacional de Infraestructura (ANI). Decree 4165 of 2011 ("ANI Enabling Act") [ECF No. 1-5] art. 3. The legislative decree establishing ANI vested it with independent juridical status and the accompanying powers to sue and be sued, enter contracts, and purchase, hold, and sell property in its own name. See id. art. 1 (declaring ANI shall have "legal personality, its own assets and administrative, financial and technical autonomy"). The decree also granted ANI the power to manage its finances, obtain funding from several sources, both public and private, and to expropriate property when necessary to execute its projects. Id. art. 4 ¶¶ 5–6, 8, 10; id. art. 5 ¶¶ 3–4, 7.

By law, a board of directors, composed of both officials in Colombia's national government and independent members, governs ANI. Id. art. 8. Colombian officials held a majority of voting board seats upon ANI's creation, but in 2022 Colombia amended ANI's enabling act, allotting a majority of voting seats to independent members. See id. (decreeing that nine members of ANI's board shall have voting rights, five of whom are independent). Yet it is unclear whether this amendment has had a practical effect on ANI's governance. POB alleges that ANI's five

independent board seats are all vacant, citing the lack of biographies for independent board members on ANI's website. See Opp'n to Colombia Mot. [ECF No. 34] at 9.

As a public entity, ANI has a unique mix of obligations and powers. It must, for example, comply with state contracting rules and submit to audits by Colombia's comptroller, and its leadership is subject to discipline by Colombia's Inspector General. See Law 80 of 1993 [ECF No. 1-14] art. 2.1(a); Decree 267 of 2000 [ECF No. 1-26] art. 4; Bulletin 1275 of 2024 [ECF No. 1-31] at 7. Along with these obligations come substantial contractual powers. ANI is empowered to interpret, modify, or terminate certain of its contracts to avoid "serious affectation of the public services." Law 80 of 1993 art. 14(1). If it does so, "the recognition and payment order of the compensation and indemnities to which the persons subject to such measures are entitled must be carried out." Id. ANI must also deduct taxes owed to the Colombian state by an arbitral awardee from its payment to that awardee. ANI 2025 Pet. Resp. [ECF No. 34-5] at 16–17.

ANI's finances, like the Colombian legal regime governing it, reflect ANI's mixed public-private status. ANI avers that it maintains all its assets exclusively within Colombia. Decl. of G.H. Rodríguez Chacón [ECF No. 16-3] ¶¶ 2–3. Those assets, and ANI's liabilities, are formally separate from those of the Colombian state. See ANI Enabling Act arts. 1, 5. Colombia may—but is not obligated to—"recognize as public debt" judgments against ANI of up to 500 billion pesos. Decree 2295 of 2023 [ECF No. 1-33] art. 65. As a practical matter, however, ANI often depends on appropriations from Colombia's Ministry of Finance and Public Credit to meet its obligations to pay arbitral awards. See ANI 2025 Pet. Resp. at 15. Colombia also supplies 97% of the capital for ANI's infrastructure development projects, while ANI covers 92% of its operating expenses from its own revenue sources. See Decree 1523 of 2024 [ECF No. 34-4] at 101.

## II. The Construction Contract and Ensuing Litigation

In line with its mission to improve infrastructure within Colombia, ANI sought bids from private partners to design, build, and operate a toll road connecting two Colombian towns east of Bogotá. Pet. [ECF No. 1] ¶¶ 17–18; Arbitral Award ("Award") [ECF No. 2] ¶ 74. In 2014, Perimetral Oriental de Bogotá (POB), a Colombian company, won the tender and contracted with ANI to build the road. Pet. ¶¶ 4, 18–19. The partnership was short-lived. After natural springs were discovered along the planned route, ANI suspended a portion of the project. See id. ¶¶ 22–23. POB responded by invoking an international arbitration clause within their contract, alleging that the suspension breached their agreement. Id. ¶¶ 15, 25.

POB and ANI arbitrated their contract dispute before a tribunal of the International Centre for Dispute Resolution, sitting in Bogotá, Colombia. Id. ¶¶ 15, 25, 29. Colombia itself was neither a party to the arbitration nor a signatory of the underlying contract. See id. ¶¶ 19, 25. After four years of proceedings, the tribunal found ANI liable for breach of contract and awarded POB 1.33 trillion Colombian Pesos—approximately 425 million dollars. Id. ¶ 36. ANI has since requested that the Colombian Council of State set the award aside. ANI Mot. [ECF No. 16-1] at 6. Although that set-aside request remains pending, POB has begun efforts to collect its award, petitioning this Court to confirm and enforce the award against both ANI and Colombia. Pet. ¶ 1.

ANI and Colombia have each moved to dismiss POB's petition, contending that United States district courts lack jurisdiction to confirm the award, albeit for different reasons. Colombia objects that as a sovereign nation, it is presumptively immune from suit. And because ANI is legally distinct from Colombia, imputing ANI's waiver of sovereign immunity onto it is improper. Colombia Mot. [ECF No. 33-1] at 1. ANI argues that because it has no property in the United

States, and both it and the underlying dispute have no nexus with the United States, the Court lacks personal jurisdiction over it. ANI Mot. at 1.

## DISCUSSION

### I. Colombia's Motion to Dismiss

Colombia moves to dismiss POB's petition for want of jurisdiction, asserting that as a sovereign nation, it is immune from suit. To assess Colombia's immunity defense, the Court charts a winding course through the foundations of sovereign immunity law, the Foreign Sovereign Immunities Act, and the common law governing imputation of an instrumentality's obligations onto its sovereign creator, before returning to the merits of POB's and Colombia's dispute.

#### A. Foreign Sovereign Immunity and its Exceptions

Begin with the basics—foreign sovereigns are presumptively immune from suit in American courts. Fed. Republic of Germany v. Philipp, 592 U.S. 169, 173 (2021). This immunity derives from "grace and comity," not constitutional prerogative, and is therefore subject to congressional definition. Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 486 (1983).

In 1976, Congress enacted a comprehensive scheme for determining when foreign states and their political subdivisions, agencies, and instrumentalities may be sued in our courts, the Foreign Sovereign Immunities Act (FSIA). Id. at 488; 28 U.S.C. §§ 1602–11. The FSIA imposes a baseline rule: "foreign states and their instrumentalities are immune from suit unless one of the Act's enumerated exceptions applies." CC/Devas (Mauritius) Ltd. v. Antrix Corp., 605 U.S. 223, 229 (2025) (citing 28 U.S.C. § 1604); see also Exxon Mobil Corp. v. Corporacion Cimex, S. A. (Cuba), 146 S. Ct. 1909, 1917 (2026). Where no exception applies, federal courts lack subject matter jurisdiction over the dispute. Fed. Republic of Germany, 592 U.S. at 176.

At the motion to dismiss stage, the petitioner bears the initial burden to allege the facts necessary to demonstrate that an exception to foreign sovereign immunity applies. See Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela (Helmerich & Payne I), 743 F. App'x 442, 449 (D.C. Cir. 2018). Once the petitioner has done so, the burden shifts to the foreign sovereign to refute the petitioner's claim by a preponderance of the evidence. Agudas Chasidei Chabad of U.S. v. Russian Fed'n, 528 F.3d 934, 940 (D.C. Cir. 2008). Furthermore, because sovereign immunity is jurisdictional, "the court must go beyond the pleadings and resolve any disputed issues of fact" necessary to judge its own power to adjudicate the petition. De Csepel v. Republic of Hungary, 27 F.4th 736, 743 (D.C. Cir. 2022) (quoting Phoenix Consulting, Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C. Cir. 2000)).

Two of the FSIA's exceptions to sovereign immunity are relevant here: the arbitration exception and the implied waiver exception. The Court considers POB's contentions under each in turn.

**B. The Arbitration Exception**

Section 1605(a)(6) of the FSIA establishes an exception to foreign sovereign immunity for suits to confirm and enforce arbitral awards. CC/Devas, 605 U.S. at 230. This exception applies in actions to confirm and enforce an arbitral award against a foreign state, where the award was issued pursuant to an agreement to arbitrate "made by the foreign state with or for the benefit of a private party" and is "governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards." 28 U.S.C. § 1605(a)(6)(B); see also CC/Devas, 605 U.S. at 230.

In other words, courts must find three jurisdictional facts before applying the FSIA's arbitration exception: the existence of (1) an arbitration agreement binding on the parties, (2) an

arbitration award pursuant to that agreement, and (3) a treaty governing enforcement of the award in the United States. NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain, 112 F.4th 1088, 1100 (D.C. Cir. 2024), cert. denied sub nom. Spain v. Blasket Invs. LLC, No. 24-1130, 2026 WL 1855038 (U.S. June 29, 2026); see also TIG Ins. Co. v. Republic of Argentina, 110 F.4th 221, 231 (D.C. Cir. 2024) (concluding that an agreement is "made by" a foreign state, within the meaning of 28 U.S.C. § 1605(a)(6), "if it legally binds that sovereign to arbitrate with the party opposing the sovereign's sovereign immunity").

POB asserts that all three jurisdictional prerequisites to the application of the FSIA's arbitration exception are satisfied in this action—citing its contract with ANI, which includes an international arbitration clause, the arbitral award rendered by the Bogotá tribunal, and the New York Convention, to which both Colombia and the United States are signatories. Opp'n to Colombia Mot. at 11–13. Colombia disagrees. It disputes the existence of a binding agreement to arbitrate, pointing out that the Republic of Colombia neither signed the contract between ANI and POB nor participated in the Bogotá arbitration. Colombia Mot. at 1.

1. *Bancec* and the Imputation of an Entity's Liability onto its Sovereign

At the heart of ANI and Colombia's dispute is a legal question—under what circumstances can a separately constituted public entity bind its sovereign creator to the agreements it makes? Colombia contends that the Supreme Court's decision in First National City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611 (1983) [hereinafter Bancec], supplies the rule of decision. POB insists that the relevant standard is whether, under the terms of the FSIA, the contracting entity is an instrumentality or a subdivision of a foreign state. Colombia is correct.

In Bancec, the Supreme Court considered whether an American bank could hold Cuba's national bank liable for Cuba's expropriation of its property. Id. at 613. The Court began by explaining that the FSIA did not resolve the dispute, because "[t]he language and history of the

FSIA clearly establish that the Act was not intended to affect the substantive law determining the liability of a foreign state or instrumentality, or the attribution of liability among instrumentalities of a foreign state." Id. at 620. Questions of substantive liability turn instead on federal common law and principles of international law. Id. at 623.

Drawing from those bodies of law, the Bancec Court determined that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." Id. at 626–27. To hold otherwise and permit American courts to "[f]reely ignore[e] the separate status of government instrumentalities," would create "substantial uncertainty over whether an instrumentality's assets would be diverted to satisfy a claim against the sovereign, and might thereby cause third parties to hesitate before extending credit to a government instrumentality without the government's guarantee." Id. at 626. The Supreme Court thus held that substantive liability may not be imputed between a sovereign state and its instrumentality, subject to two defined exceptions. Id. at 626–28, 630. Just as with private corporations, an instrumentality could be liable for the actions of its sovereign, and vice versa, only if the instrumentality was "so extensively controlled" by the sovereign state that a principal/agent relationship was created, or if affording the instrumentality a separate legal identity "would work fraud or injustice." Id. at 628–30 (citation modified).[2]

In the years since the Supreme Court decided Bancec, the D.C. Circuit has clarified that its standard governs not only attribution of monetary liability, but legal obligations more generally, including imputation of an instrumentality's agreement to arbitrate onto its sovereign. See Foremost-McKesson, Inc. v. Islamic Republic of Iran, 905 F.2d 438, 446 (D.C. Cir. 1990)

[2] In 2008, Congress amended the Foreign Sovereign Immunities Act, abrogating Bancec to allow victims of state sponsored terrorism to hold a terrorist state's instrumentalities liable for its terroristic acts. Otherwise, Bancec remains good law. See Rubin v. Islamic Republic of Iran, 583 U.S. 202, 209–11 (2018).

(reasoning that the Bancec standard governs imputation of jurisdictional waivers); Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d 843, 848 (D.C. Cir. 2000) (explaining that Bancec's principal/agent and fraud exceptions to an instrumentality's presumption of separateness "serve also as exceptions to the rule that a foreign sovereign is not amenable to suit based upon the acts of [its] instrumentality" (emphasis added)); GSS Grp. Ltd. v. Nat'l Port Auth. of Liberia (GSS Grp. II), 822 F.3d 598, 602–05 (D.C. Cir. 2016) (applying Bancec and Transamerica Leasing to assess whether an arbitration clause in a construction contract between the petitioner and Liberia's national port authority waived Liberia's sovereign immunity).

POB sued Colombia, requesting that this Court attribute ANI's agreement to arbitrate to the Colombian state. Controlling precedent from this Circuit and the Supreme Court mandates that the Court apply Bancec's two-part test before doing so. See, e.g., Foremost-McKesson, 905 F.2d at 446; see also Rubin, 583 U.S. at 209 (reinforcing that in actions not involving state sponsored terrorism, Bancec, not the FSIA, supplies the standard for determining "under what circumstances, if any, the agencies or instrumentalities of a foreign state could be held liable for judgments against the state").

POB resists the Court's conclusion, insisting that whether ANI's agreement to arbitrate binds Colombia turns only on whether ANI falls within the FSIA's definition of "instrumentality," as used in § 1608 of the Act and construed by the D.C. Circuit in Transaero, Inc. v. La Fuerza Aerea Boliviana, 30 F.3d 148 (D.C. Cir. 1994). Opp'n to Colombia Mot. at 14–15, 23–28.

POB's argument is a non sequitur. Section 1608 of the FSIA distinguishes between foreign states and their instrumentalities to prescribe rules for service of process, not imputation of immunity waivers. See 28 U.S.C. § 1608(a)–(b) (establishing how "a foreign state or political subdivision" and "an agency or instrumentality of a foreign state" may be served). In nearly every

other section of the Act[3]—including its arbitration exception—the term "foreign state" means both a foreign sovereign and its instrumentalities. See id. § 1603(a) (defining "foreign state" to include instrumentalities, except as used in § 1608). And Colombia does not dispute that if it entered an arbitration agreement, it could fall within the FSIA's provision that "[a] foreign state shall not be immune" from this Court's jurisdiction to confirm and enforce an arbitral award. Id. § 1605(a)(6)(B) (emphasis added); see also Colombia Mot. at 3. The live question is whether Colombia did so.

Put differently, this case does not present a question of statutory construction. Its animating controversy occurs upstream of the FSIA's terms, asking whether ANI's contractual obligations may be imputed to Colombia. A case on which POB heavily relies, Amaplat Mauritius Ltd. v. Zimbabwe Mining Development Corp., 663 F. Supp. 3d 11 (D.D.C. 2023),[4] illustrates the distinction. In Amaplat, the plaintiff petitioned the district court to recognize a foreign judgment enforcing an arbitral award against Zimbabwe's Chief Mining Commissioner. Id. at 16. Substantive liability was not disputed; the mining commissioner "actually participated in the arbitration against Plaintiffs," so the Bancec framework was inapposite. Id. at 26. Rather, "the heart of the parties' dispute" was statutory: whether Zambia's Chief Mining Commissioner, as a

[3] The Flatow Amendment and the expropriation provision of the FSIA are two notable and inapposite exceptions. The Flatow Amendment, subsequently replaced by the FSIA's terrorism exception, § 1605A, permitted "punitive damages against an official, employee, or agent of a foreign state designated as a state sponsor of terrorism, [but] not against the foreign state itself." Salazar v. Islamic Republic of Iran, 370 F. Supp. 2d 105, 116 (D.D.C. 2005) (citation modified).

Under the expropriation provision, a foreign state is not immune from suit involving property taken in violation of international law if the property is owned by a state instrumentality engaged in commercial activity in the United States. 28 U.S.C. § 1605(a)(3). By contrast, where the taken property is owned by the foreign state itself, the FSIA abrogates the foreign state's sovereign immunity only if the property is actually "present in the United States in connection with a commercial activity carried on in the United States by the foreign state." Id.

This case, of course, concerns neither expropriation nor terrorism.

[4] The D.C. Circuit reversed in part and vacated in part the district court's decision in Amaplat because the district court had conflated actions to confirm and enforce arbitral awards with actions to domesticate foreign judgments. See 143 F.4th 496, 499, 505 (D.C. Cir. 2025).

human person, could be a "'foreign state' under § 1603(a), which does not include individuals sued in their personal capacity." Id. at 26–28. To resolve the statutory question, the district court applied Transaero. Id. at 27–28.

This case presents the inverse of Amaplat. There is no question that the Republic of Colombia is a foreign state under § 1603(a) of the FSIA or that Colombia did not participate in the arbitration that rendered the award POB now seeks to enforce. What is disputed is whether POB may impute ANI's agreement to arbitrate onto Colombia—a substantive liability issue that the FSIA does not resolve. Bancec, 462 U.S. at 620; see also TIG, 110 F.4th at 234 ("There is no indication that Congress intended the FSIA to displace common-law contract principles that inform our understanding of what constitutes the 'making' of an 'agreement.'").

The Court therefore follows the lead of the D.C. Circuit and other judges in this District and rejects POB's attempt to apply Transaero outside of its statutory context. See, e.g., TMR Energy Ltd. v. State Prop. Fund of Ukraine, 411 F.3d 296, 301 (D.C. Cir. 2005) (confining Transaero's test to assessments of service of process and "the meaning of statutory terms" in the FSIA); DRC, Inc. v. Republic of Honduras, 71 F. Supp. 3d 201, 208–09, 213–14 (D.D.C. 2014) (holding that Bancec, not Transaero, governs whether the plaintiff could impute liability from a Honduran instrumentality onto the Honduran state); Entes Indus. Plants, Constr. & Erection Contracting Co. v. Kyrgyz Republic (Entes I), Civ. A. No. 18-2228, 2019 WL 5268900, at *8–9 (D.D.C. Oct. 17, 2019) (identifying "[t]he starting point" for determining whether the plaintiff could impute liability from the Ministry of Transport and Communications of the Kyrgyz Republic onto the Republic itself as Bancec, not Transaero).[5]

[5] Nearly every case POB cites for the proposition that the Court should look to Transaero to determine ANI's legal status involved disputes over the construction of the FSIA's terms, not substantive liability. See Baker v. Socialist People's Libyan Arab Jamahirya, 775 F. Supp. 2d 48, 74 (D.D.C. 2011) (applying Transaero's core functions test to assess sufficiency of service under the FSIA); Magness v. Russian Fed'n, 247 F.3d 609, 612–13 (5th Cir. 2001)

Instead, the Court looks to Bancec to assess whether POB may hold Colombia liable, as Bancec both describes the nature and characteristics of government entities entitled to a presumption of separate legal identity and defines the circumstances in which that presumption may be overcome. See, e.g., DRC, 71 F. Supp. 3d at 208–09 (describing Bancec's two-part analysis); Archirodon Constr. (Overseas) Co. v. Gen. Co. for Ports of Iraq, Civ. A. No. 22-1571, 2024 WL 341066, at *3 (D.D.C. Jan. 30, 2024) (doing the same).

2. ANI's Relationship to Colombia

Having traversed the contested legal territory of this case, the Court now presses forward into disputed factual land and examines the nature of ANI's relationship with Colombia under the Bancec framework.[6]

(doing the same); Mississippi v. The People's Republic of China, 2025 WL 3252405, *8 (S.D. Miss. Nov. 14, 2025) (doing the same); Murphy v. Islamic Republic of Iran, 740 F. Supp. 2d 51, 62–63 (D.D.C. 2010) (applying Transaero to "interpret[] and apply[] [the FSIA's] statutory definitions" and find that Iran and its Ministry of Information and Security were both "foreign states" subject to the court's original jurisdiction); Roeder v. Islamic Republic of Iran, 333 F.3d 228, 234–35 (D.C. Cir. 2003) (applying Transaero to determine that Iran's Ministry of Foreign Affairs was not an instrumentality of Iran under the Flatow Amendment); Salazar, 370 F. Supp. 2d at 116 (doing the same for Iran's Ministry of Information and Security and its Islamic Revolutionary Guard Corps); Crist v. Republic of Turkey, 107 F.3d 922, at *2–3 (D.C. Cir. 1997) (unpublished table decision) (applying Transaero to determine that the Turkish Army was Turkey itself, not Turkey's instrumentality, for purposes of applying the FSIA's expropriation exception); Taylor v. Kingdom of Sweden, Civ. A. No. 18-1133, 2019 WL 3536599, at *3 (D.D.C. Aug. 2, 2019) (doing the same but for Sweden and its National Museums of World Culture).

The only citation POB can marshal in support of applying Transaero in this context is a nonprecedential opinion from the Second Circuit, in which the defendant conceded that Transaero was the governing framework. See Servaas Inc. v. Republic of Iraq, 653 F. App'x 22, 24 (2d Cir. 2011). Suffice to say that the Court is unpersuaded by Servaas for all of the foregoing reasons.

[6] Colombia contends that the Court need go no further. In its telling, POB "failed to plead alter ego or otherwise engage with the Bancec framework," so POB cannot withstand Colombia's motion to dismiss. See Colombia Mot. at 9. This contention misconstrues the heart of civil litigation's notice pleading requirement. "[S]o long as the basis for a claim is clear, a complaint need not 'plead law' in specific detail." Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc., 525 F.3d 8, 18 n.5 (D.C. Cir. 2008); see also Johnson v. City of Shelby, 574 U.S. 10, 11 (2014) (per curiam) (summarily reversing the dismissal of the plaintiffs' complaint for its "imperfect statement of the legal theory supporting the claim asserted").

As POB has acknowledged, the allegations in its complaint speak directly to its claim that Colombia should be held to ANI's agreement to arbitrate—and those allegations remain largely relevant under Bancec. See Opp'n to Colombia Mot. at 34 & n.9. Given that the basis for POB's claim is clear, the Court will consider whether the facts it has alleged are sufficient under the Bancec framework.

*a. ANI is a separate instrumentality.*

Bancec's presumption of separate legal identity applies only to "government instrumentalities established as juridical entities distinct and independent from their sovereign." 462 U.S. at 626–27. So to determine whether ANI is entitled to the presumption, the Court must assess whether ANI is a juridical entity distinct and independent from Colombia. Bancec's core reasoning, together with the Supreme Court's identification of common attributes of government instrumentalities, guide the Court's analysis.

In Bancec, the Supreme Court rested its determination that government instrumentalities are presumptively separate from their sovereigns on two central premises—one of public administration, and one of international law. The first premise observes that partnerships between the public and private sectors can be a potent driver of economic development. See id. at 625. Yet private actors are often wary of doing business with the state, for fear that if a deal goes sour, or the capital they contribute is redirected, they will have no recourse. See id. at 625–26.

Enter government instrumentalities: "separately constituted legal entities" with their own assets and liabilities, and the power to sue and be sued. Id. at 624. By creating instrumentalities to administer public-private partnerships, a sovereign state can mitigate risks to private partners that would otherwise stifle the state's efforts to obtain the loans and capital necessary to make large-scale national investments. Id. at 624–26. With "[l]imited liability [as] the rule, not the exception; . . . vast enterprises are launched, and huge sums of capital attracted." Id. at 626 (quoting Anderson v. Abbott, 321 U.S. 349, 362 (1944)).

The Bancec Court's second premise, drawn from principles of comity in international law, provides that "[d]ue respect" for foreign sovereigns requires American courts to refrain from frustrating their efforts "to structure their governmental activities in a manner deemed necessary to promote economic development and efficient administration." Id.; see also Bank of N.Y. v.

Yugoimport, 745 F.3d 599, 614 (2d Cir. 2014) (observing that the desire "to give respect, but not conclusive effect, to foreign sovereigns' policy decisions" was the primary driver of the Supreme Court's decision in Bancec).

Combined, these twin premises produce Bancec's core holding: "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." 462 U.S. at 626–27. They also shed light on the nature of the instrumentalities the Court deemed entitled to a presumption of separateness—public entities purposefully configured by their sovereign creators to avoid economic uncertainty and reassure business partners that the entity's assets would not "be diverted to satisfy a claim against the sovereign." Id. at 626.

The provision of economic certainty also manifests as the throughline of the features the Supreme Court identified as typical of government instrumentalities. Despite "vary[ing] considerably" in their missions and organizational structures, Bancec's government instrumentalities are juridically separate, enabling them to sue and be sued. Id. at 624. They are also financially separate, "run as . . . distinct economic enterprise[s]" with the power to hold property in their own names, and primary responsibility for their own finances, "[e]xcept for appropriations to provide capital or to cover losses." Id. So while profits may flow from the instrumentality to the state, capital contributions, once transferred to an instrumentality, remain in the instrumentality's exclusive possession. See DRC, 71 F. Supp. 3d at 211 (emphasizing the importance of an entity's "ownership of its assets" to Bancec's "central rationale"). Finally, Bancec's prototypical government instrumentality possesses some operational independence from the state. It derives its powers and duties from its enabling statute, not executive whim, and that

statute generally establishes that the instrumentality shall be "managed by a board selected by the government." 462 U.S. at 624.

ANI possesses most, albeit not all, of the attributes of government instrumentalities that Bancec identifies. ANI has its own, separate "legal personality" within Colombia's "decentralized sector." ANI Enabling Act art. 1; contrast Entes Indus. Plants, Constr. & Erection Contracting Co. v. Kyrgyz Republic (Entes II), Civ. A. No. 18-2228, 2020 WL 1935554, at *4 (D.D.C. Apr. 22, 2020) (holding that the Kyrgyz Republic Ministry was not an instrumentality in part because it was not defined "as a separate entity" or one decentralized from the sovereign). And as POB demonstrated before the Bogotá tribunal, ANI may contract in its own name and be sued for its contract violations. See ANI Enabling Act art. 4; ANI-POB Contract [ECF No. 1-4] at 2, 270 (declaring that the agreement was "[b]etween" "Agencia Nacional De Infraestructura" as grantor, and "Perimetral Oriental de Bogotá S.A.S." as dealer).

What's more, ANI's enabling act expressly provides that it may exercise its core juridical powers autonomously—in other words, independently from the state. ANI Enabling Act art. 1 (vesting ANI with "administrative, financial and technical autonomy"), see also Entes II, 2020 WL 1935554, at *4 (reasoning that while juridical rights alone are not dispositive under Bancec, when combined with indicia of "autonomy or [a] degree of separation from the state," they become stronger evidence that an entity is an instrumentality).

POB resists the reality of ANI's distinct legal identity primarily by arguing that ANI has too much power to be independent of its sovereign creator. POB objects that ANI can both expropriate property and unilaterally terminate or modify its contracts, powers POB characterizes as indivisible from the sovereign state. See Opp'n to Colombia Mot. at 24–26. Colombia, for its part, disputes POB's characterization of ANI's powers. It asserts that all expropriations require

judicial permission and compensation, and that private parties may wield contract rights indistinguishable from ANI's. See Colombia Mot. at 16–17.

The specifics of ANI's contractual and eminent domain powers aside, POB's contention fails to persuade because Bancec imposes no express limits on the functions or powers a sovereign may vest in its instrumentality. Instead, Bancec's primary concern is whether those powers are both legally defined and independently wielded, such that private partners may contract with certainty. Granted, certain types of sovereign powers—such as the authority to wage war—may, in and of themselves, indicate that a juridical entity lacks true independence from the state. Cf. Entes II, 2020 WL 1935554, at *3 (explaining that an enabling law prescribing an entity's powers counts for little if those powers "are strictly controlled by the Government"). But the powers POB identifies do not give rise to such an inference.

Expropriation and unilateral contract termination powers are, in fact, commonly wielded by private entities. The American historical record contains many examples of delegations of the eminent domain power to private entities. See, e.g., Jessica L. Asbridge, Private Delegations and Eminent Domain, 101 Or. L. Rev. 359, 373–74 (2023). And Colombia correctly notes that private parties may agree to vest one another with contractual rights that resemble ANI's. As a result, POB must do more than cite ANI's possession of these powers in order to undercut ANI's independent juridical identity; it must come forward with evidence indicating that Colombia has guided ANI's hand as ANI wielded those powers. POB has not done so.

ANI's independence from Colombia is also evident in its distinct fiscal identity. ANI possesses the power to manage its own finances, including by holding property in its own name, setting its own budget, and making decisions about whether to enter public-private partnerships. See ANI Enabling Act arts. 1, 9 ¶ 7. While Colombia may choose to assume some of ANI's legal

liabilities, by default ANI's legal debts are its own. On the record before the Court, it appears that Colombian law even prohibits the state from assuming judgments against ANI exceeding 500 billion pesos—like the award in this case. See Decree 2295 of 2023 art. 65.

To be sure, ANI relies on financial support from Colombia to pay for 97% of its capital investment budget and many of its legal liabilities. See Decree 1523 of 2024 at 101; ANI 2025 Pet. Resp. at 15. Yet where ANI derives its capital investment funds from is of little import to this Court's analysis. Bancec excludes "appropriations to provide capital or to cover losses" from its measure of economic independence. 462 U.S. at 624; see also Transamerica Leasing, 200 F.3d at 852 (explaining that "the infusion of state capital to cover [an entity's] losses" is "a normal aspect" of an instrumentality's relations with its sovereign).[7] Indeed, Bancec itself, which the Supreme Court determined was a separate government instrumentality, received all its capital from the Cuban government. Bancec, 462 U.S. at 614.

The exclusion of state appropriations from Bancec's financial calculus is also consistent with the Supreme Court's broader reasoning. Bancec anticipates that foreign states may create instrumentalities "to make large-scale national investments," including in "utilities." Id. at 625. But capital investment in utilities, like roads and power grids, and the liabilities those utilities can produce, often dwarf the direct revenue they generate. Utility franchises may nevertheless operate as distinct economic enterprises as they work to balance their revenue and operating expenses. For the state, return on investment arrives indirectly, through the positive externality of accelerated economic growth.

[7] The Supreme Court recently echoed this principle in the domestic sovereign immunity context, reasoning that "formal legal liability" is more relevant to whether a public entity is an instrumentality than the "entity's practical financial relationship with the State, such as its expectation that the State would cover its judgments if needed." Galette v. N.J. Transit Corp., 607 U.S. 509, 525 (2026).

Colombia acted just as Bancec anticipated when it created ANI. It sought to partner with the private sector to make a large-scale investment in its national road infrastructure—a utility. See ANI Enabling Act at 53 (creating ANI "to achieve greater efficiency and effectiveness in the administration of the country's infrastructure, as well as to strengthen the linkage of private capital to projects associated with the infrastructure of the transport sector"). To accomplish this goal, Colombia simultaneously infused ANI with capital contributions and vested it with economic responsibility for its own operations. On the limited record before the Court, ANI appears to have made substantial strides towards Colombia's objective. ANI currently covers 92% of its operating expenses with its own revenue. See Decree 1523 of 2024 at 101; contrast Entes II, 2020 WL 1935554, at *5–6 (finding a Kyrgyz Ministry lacked financial independence when there was "no suggestion that the Ministry raises funds on its own").

That ANI must comply with Colombian public contracting law and audits by Colombia's comptroller does not undercut the Court's confidence in its financial independence, either. While status as a government instrumentality may absolve a public entity of some of the "budgetary and personnel requirements with which government agencies must comply," Bancec, 462 U.S. at 624, it cannot shield the entity from all regulation. So as another judge in this District observed, "the government's maintenance of some degree of financial oversight" does not "transform[] a juridically separate instrumentality into an organ of the state." DRC, 71 F. Supp. 3d at 211.

ANI's role in aiding Colombia's tax collection efforts gives the Court more pause. POB has offered evidence that ANI must deduct an arbitration awardee's outstanding taxes before paying out an award against it. ANI 2025 Pet. Resp. at 16–17. While there is no indication that ANI directly transmits its assets to Colombia to cover these tax debts, money is fungible.

Colombia could, for example, reduce its appropriations to ANI proportionately to the taxes ANI indirectly collects, opening a financial portal for ANI's assets to become Colombia's.

Nevertheless, upon close examination of Bancec's beating heart—respect for other nations' policy choices when they elect to infuse their public-private partnerships with economic certainty—the Court cannot say that Colombia's tax law deprives ANI of the presumption of separate legal identity. Formally, Colombia is not treating ANI's assets as its own, freely transferring capital between ANI and itself. And functionally, offsetting an entity's legitimate tax liability is not the kind of redirection of capital that moots Colombia's other efforts to assure ANI's private partners. Private partners owe the money, they are not experiencing asset confiscation, and they may unilaterally avoid triggering this process by paying their tax bills. Moreover, because both Colombia's tax laws and ANI's duty to offset arbitral awards with awardee's unpaid taxes are codified, ANI's sophisticated private partners may contract with certainty. Simply put, the tax offset law does not blur the lines between ANI's liabilities and Colombia's such that Colombia's decision to imbue ANI with separate juridical status is meaningless and need not be respected by American courts.

Turning to ANI's governance structure, the limited evidence submitted thus far presents a mixed picture. Bancec states that the enabling statute of a typical government instrumentality "specifies that it is to be managed by a board selected by the government in a manner consistent with the enabling law." 462 U.S. at 624. That is true of ANI. ANI Enabling Act arts. 6, 8. At the same time, when POB contracted with ANI to construct the ill-fated road in this case, majority control of ANI's board lay with government ministers and officials. See id. art. 8 (initial text) (establishing that five members of ANI's nine-member board would be national ministers or directors). Even today, after the 2022 Amendments vested majority control of ANI with

independent board members, the Court is unsure whether those independent seats are currently occupied. See Opp'n to Colombia Mot. at 8–9.

As other judges in this District have observed, the presence of government ministers on an entity's board may raise the specter that the entity is part and parcel of the state. It is not, however, dispositive by itself. See, e.g., DRC, 71 F. Supp. 3d at 211–12; Entes II, 2020 WL 1935554, at *4. After all, a board "consisting of delegates from Cuban governmental ministries governed and managed Bancec." Bancec, 462 U.S. at 614. And the D.C. Circuit has held that even "[m]ajority shareholding and majority control of a board of directors, without more, are not sufficient" to overcome Bancec's presumption. See Foremost-McKesson, 905 F.2d at 448.

What matters is that the foreign state configures the entity such that it has "a greater degree of flexibility and independence from close political control than is generally enjoyed by government agencies." Bancec, 462 U.S. at 624–25. ANI meets that standard. The presence of a governing board, combined with a statute vesting ANI with administrative autonomy, see ANI Enabling Act art. 1, establishes political distance between ANI and Colombia.

To show that distance is a legal illusion, POB must come forward with at least some evidence that Colombia directs day-to-day decisions at ANI. See, e.g., Entes II, 2020 WL 1935554, at *4 (finding a state ministry was not an instrumentality where it was required to conduct its activities "in accordance with" presidential decrees and the Kyrgyz government had the right to veto the ministry's acts); McKesson Corp. v. Islamic Republic of Iran, 672 F.3d 1066, 1082 (D.C. Cir. 2012) (finding Iran liable for its state-owned enterprise's actions, where Iran was extensively involved in the enterprise's day-to-day operations and directed the enterprise to deny its foreign shareholders dividends). The record in this case contains no such evidence.

Examining ANI's powers, obligations, and governance holistically, the Court finds that Colombia has structured ANI as a juridical entity separate and independent from the state. That policy choice works to ANI's prospective partners' benefit, as they may avoid diversion of their capital investments and can sue ANI for breaches of their agreements. It also works to their detriment, as Colombia is not guaranteed to satisfy any judgment they obtain against ANI. Both of those legal certainties should have been apparent to POB when it entered its agreement with ANI. Guided by Bancec and principles of comity, the Court declines to unsettle these economic certainties by failing to give due respect to Colombia's decision to imbue ANI with independent juridical status. ANI is an instrumentality of Colombia, and the Court will afford it Bancec's presumption of separate legal identity.

*b. Neither of Bancec's exceptions apply.*

Bancec's presumption of separateness is, of course, only a presumption. It may be overcome when the entity "is so extensively controlled by its owner that a relationship of principal and agent is created," or when applying the presumption "would work fraud or injustice." Bancec, 462 U.S. at 629.

Courts consider five factors when determining whether a principal/agent relationship has arisen between a sovereign and its instrumentality:

> (1) the level of economic control by the government;
>
> (2) whether the entity's profits go to the government;
>
> (3) the degree to which government officials manage the entity or otherwise have a hand in its daily affairs;
>
> (4) whether the government is the real beneficiary of the entity's conduct; and
>
> (5) whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations.

Rubin, 583 U.S. at 210 (quoting Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines, 965 F.2d 1375, 1380 n.7 (5th Cir. 1992)).

The D.C. Circuit has further held that while the proponent of the principal/agent relationship need not show the sovereign exercises "complete dominion" over the instrumentality, "[a]t a minimum" it must show that (1) "the parent has manifested its desire for the subsidiary to act upon the parent's behalf," (2) "the subsidiary has consented so to act," (3) "the parent has the right to exercise control over the subsidiary with respect to matters entrusted to the subsidiary," and (4) "the parent exercises its control in a manner more direct than by voting a majority of the stock in the subsidiary or making appointments to the subsidiary's Board of Directors." Transamerica Leasing, 200 F.3d at 849.

Whether considering the Rubin factors or this Circuit's Transamerica floor, POB has not carried its burden to show a principal/agent relationship between ANI and Colombia. POB has alleged only that Colombia exercises control over ANI via general regulations and its board structure. Neither supply the level of economic control required to find a principal/agent relationship. Compare GSS Grp. II, 822 F.3d at 606–07 (reasoning that sovereigns may influence their instrumentality as shareholder and as regulator without creating a principal/agent relationship), with Helmerich & Payne Int'l Drilling Co. v. Venezuela (Helmerich & Payne II), 153 F.4th 1316, 1329 (D.C. Cir. 2025) (finding an instrumentality was the alter ego of the state when the instrumentality admitted that the state controlled it and determined its capital investment and other spending programs).

Nor has POB offered evidence that ANI's profits remit to Colombia or that Colombia is the sole or "real" beneficiary of ANI's conduct.[8] To the contrary, the record established so far

[8] This Court does not construe the second Rubin factor to mean that a sovereign state cannot derive any benefit, direct or indirect, from its instrumentality's work. Such a reading would contradict Bancec's definition of an

indicates that ANI collects tolls and other revenue from its projects, which it relies on to fund its operations. See ANI Enabling Act art. 5 ¶ 8; Decree 1523 of 2024 at 101.

POB has also failed to allege a single instance where Colombia directed a specific decision made by ANI as to a matter entrusted to ANI, a crucial factor in principal/agent analyses. For example, in McKesson Corp., the D.C. Circuit hinged its determination that a state-owned enterprise was an alter ego of Iran on the fact that Iran forced the enterprise to disregard its corporate mission and deny the foreign plaintiff-shareholders dividends. 52 F.3d at 351–52; see also Transamerica Leasing, 200 F.3d at 853 (construing McKesson Corp. as turning on Iran's actual efforts to control its state-owned enterprise). In cases lacking such evidence, like this one, this Circuit has roundly rejected assertions of a principal/agent relationship. See, e.g., GSS Grp. II, 822 F.3d at 606–08; TIG, 110 F.4th at 239; Transamerica Leasing, 200 F.3d at 853.

POB fares no better under Bancec's fraud-or-injustice exception. While POB briefly suggests that ANI may have been undercapitalized, see Opp'n to Colombia Mot. at 4, 38, this Circuit has held that bare allegations of undercapitalization are not sufficient to defeat a motion to dismiss, TIG, 110 F.4th at 239. The Court therefore finds that POB has not rebutted Bancec's presumption of separateness by showing that ANI is an agent of the Colombian state or that respecting ANI's separate juridical status would work a fraud or injustice.

* * *

The FSIA's arbitration exception abrogates a foreign sovereign's immunity from suit only where the sovereign "made" an agreement to arbitrate "with or for the benefit of a private party." 28 U.S.C. § 1605(a)(6). Colombia did not agree to arbitrate disputes with POB, and ANI's

---

instrumentality's core purpose: to carry out tasks that benefit the state but are more efficiently accomplished by an independent legal entity. See Bancec, 462 U.S. at 624–25.

agreement to arbitrate is not attributable to Colombia under the Bancec framework. Consequently, the FSIA's arbitration exception does not render Colombia amenable to POB's suit.

**C. The Implied Waiver Exception**

In the alternative, POB asserts that the implied waiver exception to the FSIA abrogates Colombia's sovereign immunity. This contention, too, is unavailing.

The implied waiver exception establishes that a foreign state shall not be immune from suit in any case in which it "has waived its immunity either explicitly or by implication." 28 U.S.C. § 1605(a)(1). The FSIA itself does not define how a sovereign may waive its immunity from suit by implication, and this Circuit has repeatedly instructed courts to construe the provision narrowly. See Glob. Voice Grp. SA v. Republic of Guinea, 177 F.4th 299, 302 (D.C. Cir. 2026); Khochinsky v. Republic of Poland, 1 F.4th 1, 8 (D.C. Cir. 2021); Creighton Ltd. v. Gov't of State of Qatar, 181 F.3d 118, 122 (D.C. Cir. 1999).

The D.C. Circuit has identified only three ways in which a foreign sovereign may impliedly waive its immunity: by "(1) executing a contract containing a choice-of-law clause designating the laws of the United States as applicable; (2) filing a responsive pleading without asserting sovereign immunity; or (3) agreeing to submit a dispute to arbitration in the United States." TIG, 110 F.4th at 236 (citation modified). POB has not alleged that Colombia took any of these three actions.

Instead, POB urges this Court to adopt the reasoning of a Second Circuit case, Seetransport, and find that Colombia impliedly waived its sovereign immunity when it ratified the New York Convention and then made an agreement to arbitrate disputes in a nation bound by the Convention—that is, at home. See Opp'n to Colombia Mot. at 31–32 (citing Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala, 989 F.2d 572, 578–79 (2d Cir. 1993)). The D.C. Circuit has yet to adopt or reject

Seetransport. See Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria, 27 F.4th 771, 774 (D.C. Cir. 2022). This Court need not weigh in on the debate, however, because as it has just explained, POB has not offered sufficient facts to show that ANI's agreement with POB is attributable to Colombia, and thus that Colombia made an agreement to arbitrate. So even under Seetransport, Colombia has not waived its sovereign immunity by implication.

* * *

Foreign nations are presumptively immune from suit in American courts. Where no exception to this sovereign immunity applies, courts lack subject matter jurisdiction to hear claims against them. Fed. Republic of Germany, 592 U.S. at 176. POB has failed to make out a prima facie case that its dispute with Colombia falls within an exception to Colombia's sovereign immunity. The Court therefore lacks subject matter jurisdiction over POB's claims against Colombia and will grant Colombia's motion and dismiss the petition against it without prejudice. See Fed. R. Civ. P. 12(h)(3).

## II. POB's Request for Leave to Amend and Conduct Jurisdictional Discovery

Anticipating this Court's decision that the Bancec framework governs whether ANI's agreement bound Colombia, and that its petition fails to carry its burden under Bancec, POB seeks leave to amend its petition and conduct jurisdictional discovery. Opp'n to Colombia Mot. at 34–39. Colombia opposes both requests. Colombia Reply [ECF No. 35] at 23. The Court will grant POB leave to amend but deny its motion for jurisdictional discovery, without prejudice to a renewed motion once it files its amended petition.

District courts must freely give plaintiffs leave to amend their complaints "when justice so requires." Fed. R. Civ. P. 15(a)(2). Leave to amend should not be refused without "sufficient reason, such as undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by

previous amendments, or futility of amendment." Firestone v. Firestone, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (per curiam) (citation modified). No such reason to deny POB's request exists. POB made its request for leave to amend timely and in good faith, it has not previously amended its petition, and given the fact-bound nature of the Bancec framework, amendment is not futile. The Court will therefore grant POB's request for leave to amend.

By contrast, a much more stringent standard governs POB's request for jurisdictional discovery. In FSIA cases, jurisdictional discovery must be "carefully controlled and limited," to "avoid burdening a sovereign that proves to be immune from suit." Phoenix Consulting, 216 F.3d at 40; see also TIG, 110 F.4th at 240. Discovery may be ordered "only to verify allegations of specific facts crucial to an immunity determination." Nyambal v. Int'l Monetary Fund, 772 F.3d 277, 281 (D.C. Cir. 2014) (quoting First City, Texas-Houston, N.A. v. Rafidain Bank, 150 F.3d 172, 176 (2d Cir. 1998)).

POB has not yet filed an amended petition with the Court, so at this juncture, the Court cannot say whether such a petition will contain new "allegations of specific facts crucial to an immunity determination" that would benefit from discovery. See id. And without new allegations, any approval of jurisdictional discovery would be premature.

POB resists this conclusion by pointing to several issues raised in its petition and central to the Court's immunity determination, including whether ANI was undercapitalized and whether Colombia leveraged its control of ANI's board to direct ANI's day-to-day operations. See Opp'n to Colombia Mot. at 36–37. Yet POB's broad gestures at dispositive issues do not entitle it to jurisdictional discovery. To obtain discovery, POB must specify the "relevant facts it believe[s] jurisdictional discovery would uncover"—not simply the legal conclusions it seeks to establish.

TIG, 110 F.4th at 240 (emphasis added). Because POB has not yet done so, the Court denies its motion for jurisdictional discovery.

### III. ANI's Motion to Dismiss

ANI also moves to dismiss POB's petition, asserting that this Court lacks personal jurisdiction over it because it operates exclusively within Colombia and there is no nexus between the United States and the underlying dispute. ANI Mot. at 1. ANI further contends that even if the Court has jurisdiction, it should nevertheless dismiss POB's petition under the doctrine of forum non conveniens. Id. at 2. The Court considers ANI's contentions in turn.

#### A. Personal Jurisdiction

The limitations on a federal court's exercise of personal jurisdiction over a nonconsenting defendant are two-fold. First, a federal statute, the Federal Rules of Civil Procedure, or the law of the forum state must authorize personal jurisdiction over the defendant. See Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 711 (1982) (Powell, J., concurring in the judgment); see also Fed. R. Civ. P. 4(k). Second, the court's exercise of personal jurisdiction must comport with the Due Process Clause of the Fifth Amendment. See Fuld v. Palestine Liberation Org., 606 U.S. 1, 18 (2025); Gligorov v. Nation of Brunei, -- F.4th --, No. 24-7150, 2026 WL 2276372, at *1, 4 (D.C. Cir. Aug. 7, 2026).

The Supreme Court's recent decision in CC/Devas forecloses ANI's objection that this Court lacks statutory authorization to exercise personal jurisdiction over it. CC/Devas held that the FSIA imposes only two prerequisites to the exercise of personal jurisdiction over a foreign state or instrumentality: (1) an applicable exception to foreign sovereign immunity, and (2) proper service under the Act. 605 U.S. at 232–33 (discussing 28 U.S.C. § 1330(b)). Minimum contacts with the United States are not required. Id. As ANI concedes, both of the FSIA's prerequisites

are satisfied in this action: the FSIA's arbitration exception encompasses POB's claims against ANI, and POB has properly served ANI with process. ANI Mot. at 7 n.2.

ANI's constitutional claim—that this Court's exercise of personal jurisdiction over it would violate the Due Process Clause of the Fifth Amendment—rests on more uneven legal ground. In Fuld v. Palestine Liberation Organization, the Supreme Court considered whether federal courts' exercise of personal jurisdiction over the Palestine Liberation Organization (PLO) under the Promoting Security and Justice for Victims of Terrorism Act (PSJVTA), 18 U.S.C. §§ 2333–34, violated the Fifth Amendment. 606 U.S. at 5–6. The Court found that the minimum contacts standard, which governs assessments of state court exercises of personal jurisdiction under the Fourteenth Amendment, did not apply in the Fifth Amendment context. Id. at 16. But the Court declined to specify what standard does govern Fifth Amendment analyses of exercises of personal jurisdiction. See id. at 18 ("[W]e do not purport to delineate the outer bounds of the Federal Government's power, consistent with due process, to hale foreign defendants into U.S. courts.").[9]

The Fuld Court held only that "the Fifth Amendment necessarily permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority." Id. at 16. The PSJVTA satisfied that flexible inquiry because it was reasonable, even considering the factors the Court has relied upon to assess the constitutionality of an exercise of personal jurisdiction under the Fourteenth Amendment. Id. at 23–25; but see id. at 23 (refusing to fully endorse a reasonableness standard and remarking only that "the Fifth Amendment might entail a[n] . . . inquiry into the reasonableness of the assertion of jurisdiction" (emphasis added)).

[9] Because neither ANI nor POB addressed the impact of the Supreme Court's decision in Fuld in their principal briefs, the Court sought supplemental memoranda from each party on the issue. See POB Supp. Mem. [ECF No. 36]; ANI Supp. Mem. [ECF No. 37].

Reasonableness, the Supreme Court explained, depends on "the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief," id. at 24 (quoting Asahi Metal Indus. Co. v. Sup. Ct. of Cal., 480 U.S. 102, 113 (1987)), and "[t]he PSJVTA ticks all three boxes," id. The United States has a "substantial interest" in adjudicating claims against terrorists that target Americans, plaintiffs have a strong interest in pursuing justice under the PSJVTA, and "sophisticated international organizations" with large budgets, like the PLO, are not burdened by having to litigate in the United States. Id.

As a threshold matter, the Court finds that ANI—as an instrumentality, not a foreign sovereign—is a "person" entitled to the protections of the Fifth Amendment's Due Process Clause. See GSS Grp. I, 680 F.3d at 815 (reasoning, based on Bancec, that "if an instrumentality does not act as an agent of the state, and separate treatment would not result in manifest injustice, the instrumentality will enjoy all the due process protections available to private corporations" (citation omitted)); see also supra I.B.2. The Court will not expound on the precise contours of those Fifth Amendment protections, however, because assuming without deciding that federal exercises of personal jurisdiction must be reasonable, the Court's exercise of jurisdiction over ANI satisfies that requirement.[10]

Exercising personal jurisdiction over ANI is reasonable for many of the same reasons that the exercise of personal jurisdiction over the PLO under the PSJVTA was reasonable. To begin, the political branches have articulated a strong public policy in favor of arbitration. TermoRio, 487 F.3d at 933 (citing Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc., 473 U.S. 614, 631 (1985)); see also Gligorov, 2026 WL 2276372, at *8 (underscoring the importance of "communicate[d]" and "substantive" federal policy to the Fuld Court's determination that

[10] See, e.g., Gligorov, 2026 WL 2276372, at *8 (taking a similar approach to a Fifth Amendment due process challenge to personal jurisdiction after Fuld).

exercising personal jurisdiction over the PLO was constitutional). This "emphatic federal policy in favor of arbitral dispute resolution . . . applies with special force in the field of international commerce" and is implemented through the United States' participation in and adherence to the New York Convention. Mitsubishi Motors Corp., 473 U.S. at 631.

By enthusiastically complying with the New York Convention at home, the United States ensures that its citizens' arbitral awards will be recognized and enforced abroad. Cf. Scherk v. Alberto-Culver Co., 417 U.S. 506, 516–17 (1974) ("[P]arochial refusal by the courts of one country to enforce an international arbitration agreement . . . would invite unseemly and mutually destructive jockeying by the parties to secure tactical litigation advantages"). So just as in Fuld, the United States has a substantial interest in supplying a forum to arbitral awardees seeking to enforce their awards.

True, the underlying conduct in this case has a much less direct connection to the United States than that of foreign terrorists targeting American victims. See Fuld, 606 U.S. at 24 (emphasizing the PSJVTA's protection of Americans); see also Gligorov, 2026 WL 2276372, at *9 (finding that a dispute's lack of impact on "the United States, its residents, or its property" counseled against finding an exercise of personal jurisdiction constitutional). But Fuld describes courts' Fifth Amendment inquiries as "flexible," 606 U.S. at 16, so this Court does not read Fuld to require that any lawful exercise of personal jurisdiction must protect Americans' interests directly, as opposed to via the enforcement of international treaties and norms. The Court is also reassured by the limitations of the FSIA's arbitration exception, which encompasses only a specific cause of action: confirmation of arbitral awards governed by an applicable treaty against foreign states and their instrumentalities. The exception does not put a wide array of respondents "at broad risk of being haled into U.S. courts for myriad civil liability actions." Id. at 20.

POB's interest in this action is comparatively modest. Because ANI avers that it has never had assets in the United States, Decl. of G.H. Rodríguez ¶¶ 2–3, and POB may not impute ANI's liability onto Colombia, what POB stands to gain from a federal judgment confirming and enforcing its award is uncertain. Still, neither ANI nor POB can predict the future, and given the United States' central role in world financial markets, it remains possible that ANI could accumulate assets within the United States in the future. Cf. TMR Energy, 411 F.3d at 303 ("Even if [a foreign arbitral award debtor] currently has no attachable property in the United States, however, it may own property here in the future, and [the creditor] having a judgment in hand will expedite the process of attachment."). POB thus has a cognizable interest in seeking confirmation and enforcement of its award now, so that it is prepared to satisfy that award in the future.

POB's modest interest in this action is mirrored in the action's minimal burden on ANI. As a sophisticated organization that operates a nearly three-billion-dollar budget, see Decree 1523 of 2024 at 101, and which had clear notice that its activities could subject it to suit in the United States, ANI is not so burdened by a federal court's exercise of personal jurisdiction to render that exercise "unreasonable and unfair." Fuld, 606 U.S. at 25. As a result, ANI may not rely on the burden this suit imposes to assert that haling it into this Court would violate its rights under the Fifth Amendment's Due Process Clause.

Considering the Asahi reasonableness factors holistically, then, the Court concludes that exercising personal jurisdiction over ANI in this action is reasonable. The Court thus holds that subjecting ANI to suit in this Court will not violate its rights under the Due Process Clause of the Fifth Amendment and denies ANI's motion to dismiss the petition against it for lack of personal jurisdiction. See Fuld, 606 U.S. at 23–24.

**B. Forum Non Conveniens**

Finally, ANI contends that POB's petition should be dismissed under the doctrine of forum non conveniens. ANI Mot. at 2. "A forum non conveniens dismissal . . . is a determination that the merits [of a case] should be adjudicated elsewhere." Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp., 549 U.S. 422, 432 (2007). Yet only American courts may attach foreign property found within the United States. Tatneft v. Ukraine, 21 F.4th 829, 840 (D.C. Cir. 2021). There is no other equivalent forum that could hear POB's petition to do so. The D.C. Circuit has thus held that "forum non conveniens is not available in proceedings to confirm a foreign arbitral award," a blanket prohibition that applies "even if the defendant 'currently has no attachable property in the United States, [as] it may own property here in the future.'" Id. (quoting TMR Energy, 411 F.3d at 303); see also NextEra Energy, 112 F.4th at 1105. Accordingly, the Court denies ANI's motion to dismiss on forum non conveniens grounds.

**CONCLUSION**

For these reasons, the Court will grant Colombia's motion to dismiss and POB's motion for leave to amend its petition. It will deny, however, ANI's motion to dismiss and POB's request for leave to conduct jurisdictional discovery. A separate order will follow this memorandum opinion.

/s/
JOHN D. BATES
United States District Judge

Dated: August 14, 2026